SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
TRACEY A. KENNEDY, Cal Bar No. 150782
ROBERT E. MUSSIG, Cal. Bar No. 240369
H. SARAH FAN, Cal. Bar No. 328282
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
Telephone:    213.620.1780
Facsimile:    213.620.1398
E-mail:    tkennedy@sheppardmullin.com
    rmussig@sheppardmullin.com
    sfan@sheppardmullin.com

Attorneys for Defendant.
CHEVRON U.S.A. INC.,
a Pennsylvania corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARK SNOOKAL, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-6302-HDV-AJR<br><br>**JOINT BRIEF RE DEFENDANT CHEVRON U.S.A. INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently with Notice of Motion; Defendant's Statement of Uncontroverted Facts and Genuine Disputes; Joint Appendix of Declarations and Written Evidence; and [Proposed] Judgment granting Defendant's Motion for Summary Judgment]*<br><br>Hearing:  December 5, 2024<br>Time:    10:00 a.m.<br>Place:    Courtroom 5B – 5th Floor<br>Judge:    Hon. Hernán D. Vera<br><br>Action Filed: August 3, 2023<br>Trial Date: February 4, 2025 |

**<u>DEFENDANT'S TABLE OF CONTENTS</u>**

<u>Page</u>

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT ................................................... 1

I.     INTRODUCTION ............................................................. 1

II.    FACTUAL BACKGROUND .............................................. 2

    A.   Plaintiff Applied for and Received a Conditional Offer for an Expatriate Assignment in Remote Escravos, Nigeria. ............................... 2

    B.   The Expatriate Assignment Is Located in an Extremely Remote Facility in Escravos, Nigeria, Located At Least One Hour or More From a Medical Facility by Emergency Medical Evacuation. ........................ 3

    C.   Plaintiff's Heart Condition Had an Approximate 2% Risk of Incident Which, if Occurring, Would Lead to Plaintiff's Death Due to the Remoteness of the Escravos Facility and Lack of Onsite Medical Care........................... 4

    D.   Due to the Lack of Access to Appropriate Medical Care in Escravos, Plaintiff Could Not Obtain Medical Clearance and the Offer for the Expatriate Assignment Was Rescinded. ........................................... 5

    E.   Chevron U.S.A. Promised Plaintiff Continued Employment Despite the Rescinded Offer and Worked Diligently with Plaintiff to Find Alternative Positions He was Qualified For. ........................................... 7

    F.   When Plaintiff Was Unable to Obtain an Offer for the Positions He Applied For, Chevron U.S.A. Created a Position for Plaintiff So He Could Continue His Employment. .............................................................. 7

        1.   Chevron U.S.A.'s Hiring Process Involves a Robust Metrics-Based Screening Model With Peer and HR Oversight........................... 7

        2.   Chevron U.S.A. Created the Reliability Change Operating Assistant Position for Plaintiff So He Could Continue Employment....................... 8

    G.   Plaintiff Resigned From His Employment With Chevron For an Opportunity with Significantly Increased Responsibility. ............................... 8

III.   LEGAL STANDARD ........................................................ 8

IV.    LEGAL ARGUMENT ...................................................... 9

    A.   Plaintiff's Disability Discrimination Claim Is Meritless. ................ 9

        1.   Chevron U.S.A. Was Not the Employer of the REM Position Plaintiff Applied For, Did Not Make the Decision to Deny Plaintiff's Medical Clearance, and Did Not Rescind the Job Offer....................... 10

2.      Plaintiff Was Not Qualified for the Expatriate Assignment Because He Could Not Perform the Essential Duties of the Job, Which Had to Be Performed in Escravos, Nigeria. ..................................................................11

3.      The Offer for the REM Position was Rescinded for Legitimate and Non-Discriminatory Reasons Because Plaintiff's Presence in Escravos Would Endanger His Own and the Health and Safety of Others......................................12

4.      Plaintiff Cannot Demonstrate that Dr. Asekomeh's Reasons to Deny His Medical Clearance Were Pretextual...........................................................15

B.      Plaintiff's Claim for Failure to Accommodate is Frivolous, Because Plaintiff Admits He Never Needed Accommodations During His Employment. ..........................16

C.      Plaintiff's Constructive Wrongful Termination Claim Is Meritless. ................................17

D.      Plaintiff Cannot Recover Punitive Damages. ..................................................18

V.      CONCLUSION.........................................................................................19

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# PLAINTIFF'S TABLE OF CONTENTS

**Page**

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ........... 20

I.    INTRODUCTION ................................................................. 20

II.   FACTUAL BACKGROUND ........................................................ 22

    A.    Mr. Snookal Rises in Chevron's Ranks During His First Ten Years of Service .............................................................. 22

    B.    Chevron Selects Mr. Snookal for A Coveted Rotational Expatriate Assignment ........................................................... 22

    C.    Mr. Snookal Is Deemed "Fit for Duty" Pursuant to Chevron's Medical Suitability for Expatriate Assignment Screening (MSEA) Procedure, Receiving Clearance by Two Physicians ............................ 23

    D.    Mr. Snookal's Risk of Any Adverse Health Event While in Escravos Was Miniscule ...................................................... 23

    E.    Mr. Snookal Could Complete All of the Job Duties of the REM Position, an "Office Job," And Nothing about the Completion of the REM Job Duties or Its Location in Escravos Would Exacerbate the Risk of A Cardiac Event ............................................ 24

    F.    Chevron Nonetheless Rescinds Mr. Snookal's Job Offer Because of His Disability, Claiming Incorrectly that Mr. Snookal Poses a Direct Threat to Himself .................................................... 25

    G.    Mr. Snookal Reports That This Decision Constitutes Disability Discrimination, but Chevron Ratifies It ............................. 25

    H.    To the Contrary, Mr. Snookal's Asymptomatic Condition Posed No "Direct Threat" to Himself or Others ............................... 27

    I.    After Rescinding Mr. Snookal's Job Offer for Discriminatory Reasons, Chevron Doubles Down and Fails to Provide Mr. Snookal with A Reasonable Accommodation .................................... 27

    J.    Chevron Wrongfully Constructively Discharges Mr. Snookal in Violation of Public Policy ........................................... 29

III.  LEGAL STANDARD ............................................................ 29

IV.   LEGAL ARGUMENT ............................................................ 30

    A.    Disputes of Material Fact Exist as to Mr. Snookal's Disability Discrimination Claim ............................................... 30

1.   Defendant Chevron U.S.A. Was The Employer for the REM Position ........................................................................ 30

2.   Regardless, Chevron U.S.A., At Minimum, Ratified the Discriminatory Decisions in Question ............................... 31

3.   Mr. Snookal Had a Disability, Was Fully Qualified for the Expatriate Assignment, and Could Perform all Essential Duties of the Job ..................................................................... 32

4.   Chevron Rescinded the REM Job Because of Mr. Snookal's Disability, A Decision That Was Discriminatory On its Face .......... 33

5.   Chevron's "Direct Threat" Defense Fails Because Mr. Snookal Posed No "Imminent and Substantial" Risk to Himself Nor to Others ........................................................... 34

6.   Chevron's Decision Did Not "Rely on the Most Current Medical Knowledge and/or on the Best Available Objective Evidence" As Required by Law ....................................... 36

7.   Mr. Snookal's Asymptomatic Heart Condition Did Not Pose Any Imminent Risk to Others, Particularly Because The REM Job is an Office Job ................................................. 38

B.   Disputes of Material Fact Exist as to Mr. Snookal's Cause of Action for Failure to Accommodate His Disability ............................ 39

1.   *Chevron Was on Notice of Mr. Snookal's Need for A Disability Accommodation* ..................................................... 39

2.   *Chevron Denied Mr. Snookal A Reasonable Accommodation* .......... 40

D.   Disputes of Material Fact Exist as to Mr. Snookal's Claim for Wrongful Termination ......................................................... 42

E.   Disputes of Material Fact Exists as to Mr. Snookal's Entitlement to Punitive Damages ............................................................ 43

V.   CONCLUSION ..................................................................... 44

# DEFENDANT'S TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ackerman v. Western Electric Co.*
643 F. Supp. 836 (N.D. Cal. 1986), aff'd, 860 F.2d 1514 (9th Cir. 1988) ...........................18

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)..................................................................................................8, 9

*Aquino v. Sup. Ct.*
21 Cal. App. 4th 847 (Cal. Ct. App. 1993) ...........................................................18

*Avila v. Cont'l Airlines, Inc.*
165 Cal. App. 4th 1237 (Cal. Ct. App. 2008) .........................................................9

*Basich v. Allstate Ins. Co.*
87 Cal. App. 4th 1112 (Cal. Ct. App. 2001) .........................................................18

*Bates v. United Parcel Service, Inc.*
511 F.3d 974 (9th Cir. 2007) ...............................................................................12

*Brown v. Lucky Stores*
246 F.3d 1182 (9th Cir. 2001) .............................................................................16

*Chevron U.S.A. v. Echazabal*
536 U.S. 73 (2002)................................................................................................12

*Chuang v. Univ. of Cal. Davis, Bd. of Trustees*
225 F.3d 1115 (9th Cir. 2000) .............................................................................15

*CRST, Inc. v. Superior Court*
218 Cal. Rptr. 3d 664 (2017) ...............................................................................18

*Cuiellette v. City of Los Angeles*
194 Cal. App. 4th 757 (Cal. Ct. App. 2011) ...................................................11, 16

*Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*
642 F.3d 728 (9th Cir. 2011) .................................................................................9

*DFEH v. Orange County Sheriff-Coroner Dep't*
1983 CAFEHC LEXIS 21, Dec. No. 82-26, 1982 WL 36770 (Cal. F.E.H.C. 1983) .............13

*Donahue v. Consol. Rail Corp.*
224 F.3d 226 (3d Cir. 2000)..................................................................................14

*Earl v. Nielsen Media Research, Inc.*
658 F.3d 1108 (9th Cir. 2011) .............................................................................15

*EEOC v. United Parcel Service, Inc.*
    424 F.3d 1060 (9th Cir. 2005) ............................................................12, 13, 14, 15

*Green v. State*
    42 Cal. 4th 254 (Cal. 2007)..................................................................................11

*Guz v. Bechtel Nat. Inc.*
    24 Cal. 4th 317 (Cal. 2000)......................................................................9, 10, 17

*Hutton v. Elf Atochem N. Am., Inc.*
    273 F.3d 884 (9th Cir. 2001) ...............................................................................14

*Jensen v. Wells Fargo Bank*
    85 Cal. App. 4th 245 (Cal. Ct. App. 2000) .........................................................16

*Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC*
    704 F.3d 1235 (9th Cir. Cal. 2013).....................................................................11

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ...............................................................................................9

*McCullah v. Southern Cal. Gas Co.*
    82 Cal. App. 4th 495 (Cal. Ct. App. 2000) .........................................................16

*McIntosh v. Wal-Mart Assocs.*
    2024 U.S. Dist. LEXIS 41423 (C.D. Cal. Mar. 7, 2024)...........................8, 9, 10, 15

*McMillen v. Civil Service Commission*
    6 Cal. App. 4th 125 (Cal. Ct. App. 1992)......................................................12, 13

*Mullins v. Rockwell Int'l Corp.*
    15 Cal. 4th 731 (Cal. 1997)..................................................................................17

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
    682 F.3d 1144 (9th Cir. 2012) ...............................................................................8

*Nelson v. Pima Community College*
    83 F.3d 1075 (9th Cir. 1996) .................................................................................9

*Nidds v. Schindler Elevator Corp.*
    113 F.3d 912 (9th Cir. 1996) ...............................................................................10

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*
    210 F.3d 1099 (9th Cir. 2000) ...............................................................................9

*Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n*
    212 Cal. App. 3d 1242 (Cal. Ct. App. 1989) ......................................................12

*Scott v. Harris*
    550 U.S. 372 (2007)................................................................................................9

-vi-

*Soremekun v. Thrifty Payless, Inc.*
  509 F.3d 978 (9th Cir. 2007) ..........................................................................9

*Spitzer v. Good Guys, Inc.*
  80 Cal. App. 4th 1376 (Cal. Ct. App. 2000) ..............................................16

*Sterling Transit Co. v. Fair Employment Practice Comm'n*
  121 Cal. App. 3d 791 (Ct. App. 1981) ........................................................13

*In re the Accusation of the Dep't of Fair Employment & Housing v. City of San Jose*
  1984 CAFEHC LEXIS 30, Dec. No. 84-18, 1984 WL 54298 (Cal. F.E.H.C. 1984) ..............13

*In re the Accusation of the Dep't of Fair Employment & Housing v. Di Salvo Trucking Co.*
  1987 CAFEHC LEXIS 16, Dec. No. 87-14, 1987 WL 114862 (Cal. F.E.H.C. 1987) .....12, 14

*In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.*
  1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906 (Cal. F.E.H.C. 1980) ........13, 15

*Thornhill Pub. Co., Inc. v. GTE Corp.*
  594 F.2d 730 (9th Cir. 1979) ........................................................................9

*Turner v. Anheuser-Busch, Inc.*
  7 Cal. 4th 1238 (Cal. 1994)...........................................................................17

*Vernon v. Cal.*
  116 Cal. App. 4th 114 (Cal. Ct. App. 2004) ..............................................10

*Warren v. City of Carlsbad*
  58 F.3d 439 (9th Cir. 1995) ........................................................................10

*Wash. Mut. Inc. v. United States*
  636 F.3d 1207 (9th Cir. 2012) ......................................................................8

*White v. Ultramar, Inc.*
  21 Cal. 4th 566-577 (1999) ........................................................................18

*Wilson v. Cty. of Orange*
  169 Cal. App. 4th 1185 (Cal. Ct. App. 2009) ...........................................16

<u>Statutes</u>

29 U.S.C. § 654(a)(1)...................................................................................12

Americans with Disabilities Act ................................................................12

Cal. Civ. Code § 3294(a) ............................................................................18

Cal. Civ. Proc. Code § 437c(f).....................................................................18

Cal. Code Regs., tit. 2, § 7293.8(d)............................................................12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Cal. Gov't Code § 12940(a) ........................................................................................ 10

Cal. Gov't Code § 12940(a)(1) .................................................................................... 12

California Fair Employment and Housing Act ............................................................... 9

FEHA ....................................................................................................... 9, 10, 12, 16

Other Authorities

Fed. R. Civ. P. 56(a) .................................................................................................... 8

Fed. R. Civ. P. 56(c) .................................................................................................... 9

Fed. R. Civ. P. 56(e) .................................................................................................... 9

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## PLAINTIFF'S TABLE OF AUTHORITIES

**Page(s)**

State Cases

*1980 CAFEHC LEXIS 23, Dec. No. 80-33,*
   1980 WL 20906 (Cal. F.E.H.C. 1980) .................................................................... 35
424 F.3d 1060 (9th Cir. 2005) .................................................................... 35, 37, 38
6 Cal. App. 4th 125 (Cal. Ct. App. 1992) .................................................................... 35
653 F.2d 1273 (9th Cir. 1981) .................................................................... 32
Ackerman v. W. Elec. Co.,
   643 F. Supp. 836 (N.D. Cal. 1986) .................................................................... 34
*Ackerman v. W. Elec. Co.,*
   860 F.2d 1514 (9th Cir. 1988) .................................................................... 43
*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,*
   96 Cal. App. 4th 1017 (Cal. Ct. App. 2002) .................................................................... 43
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .................................................................... 29
*Claudio v. Regents of the University of California,*
   134 Cal.App.4th 224 (Cal. Ct. App. 2005) .................................................................... 40
Colmenares v. Braemar Country Club, Inc.,
   29 Cal.4th 1019 (9th Cir. 2003) .................................................................... 33
*Contreras-Velazquez v. Fam. Health Centers of San Diego, Inc.,*
   62 Cal. App. 5th 88 (Cal. Ct. App. 2021) .................................................................... 44
*Dominguez-Curry v. Nevada Transp. Dep't,*
   424 F.3d 1027 (9th Cir. 2005) .................................................................... 30
*Furtado v. State Personnel Bd.,*
   212 Cal.App.4th 729 (Cal. Ct. App. 2013) .................................................................... 40
*Hanson v. Lucky Stores,*
   74 Cal.App.4th 215 (Cal. Ct. App. 1999) .................................................................... 40
*Hernandez v. Rancho Santiago Cmty. College Dist.,*
   22 Cal.App.5th 1187 (Cal. Ct. App. 2018) .................................................................... 39
*Martin v. Lockheed Missiles & Space Co., Inc.,*
   29 Cal.App.4th 1718 (Cal. Ct. App. 1994) .................................................................... 30
*McIntosh v. Wal-Mart Assocs.,*
   2024 U.S. Dist. LEXIS 41423 (C.D. Cal. Mar. 7, 2024) .................................................................... 29
*Muzquiz v. City of Emeryville,*
   79 Cal.App.4th 1106, fn. 5 (Cal. Ct. App. 2000) .................................................................... 30
*Nadaf-Rahrov v. The Neiman Marcus Group, Inc.,*
   166 Cal.App.4th 952 (Cal. Ct. App. 2008) .................................................................... 42, 43
*Nazir v. United Airlines, Inc.,*
   178 Cal.App.4th 243 (Cal. Ct. App. 2009) .................................................................... 30
*Prilliman v. United Air Lines, Inc.,*
   53 Cal.App.4th 935 (Cal. Ct. App. 1997) .................................................................... 39, 40
Rakestraw v. Rodrigues,
   8 Cal.3d 67 (Cal. S.Ct. 1972) .................................................................... 32

SMRH:4880-9577-6242.3                    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Raytheon Co. v. Fair Employment & Housing Com.,*
   212 Cal.App.3d 1242 (Cal. Ct. App. 1989) ...................................................................... 34
*Roby v. McKesson Corp.,*
   47 Cal. 4th 686 (Cal. S.Ct. 2009)...................................................................................... 44
*Rowe v. Superior Court,*
   15 Cal.App.4th 1711 (Cal. Ct. App. 1993) ...................................................................... 43
*Sada v. Robert F. Kennedy Med. Ctr.,*
   56 Cal.App.4th 138 (Cal. Ct. App. 1997) ........................................................................ 30
Sandell v. Taylor-Listug, Inc.,
   188 Cal.App.4th 297 (Cal. Ct. App. 2010) ................................................................ 33, 35
Sterling Transit Co. v. Fair Employment Practice Com.,
   121 Cal.App.3d 791 (Cal. Ct. App. 1981) ........................................................................ 34
*Swanson v. Morongo Unified School Dist.,*
   supra, at 232 Cal.App.4th 954 (Cal. Ct. App. 2014)................................................... 40, 41
*Wallis v. J.R. Simplot Co.,*
   26 F.3d 885 (9th Cir. 1994) .............................................................................................. 30
*Wash. Mut. Inc. v. United States,*
   636 F.3d 1207 (9th Cir. 2012) .......................................................................................... 29
Wittkopf v. County of Los Angeles,
   90 Cal.App.4th 1205 (Cal. Ct. App. 2001) ...................................................................... 34

## Federal Statutes

§12940(m).................................................................................................................................. 39
Cal. Gov. Code § 12926 (m)(4) ................................................................................................ 33
Cal. Gov. Code § 12940 ............................................................................................................ 21
Cal. Gov. Code §12940(m)(1) ................................................................................................... 39
Cal. Gov. Code, § 12926(d) ...................................................................................................... 31
California Gov. Code § 12926(m) ............................................................................................. 32
California Labor Code § 226(a)(8) ...................................................................................... 30, 31
Government Code §12940(n) ..................................................................................................... 39
section 12940(a) ................................................................................................................... 41, 42

## Rules

Fed. R. Civ. P. 56(a) ..................................................................................................... 29, 30, 43

## Miscellaneous

Cal. Code Regs. 2 §11068(d)(5) ......................................................................................... 40, 41
Cal.Admin.Code tit. 2, § 7293.8(b) .......................................................................................... 34

*

CACI No. 2544 ..................................................................................................................... 34, 36

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Mark Snookal ("Plaintiff") was employed by Defendant Chevron U.S.A. Inc., a Pennsylvania corporation ("Chevron U.S.A.") beginning on January 12, 2009.  In or around May 2019, Plaintiff applied for and conditionally received an offer for an expatriate position from Chevron Nigeria, Limited ("Chevron Nigeria"), contingent upon Plaintiff's receipt of medical clearance to work on location.  The position was located in an extremely remote facility in Escravos, Nigeria, with access only to basic medical care.  Plaintiff has a distorted aortic root, a heart condition which puts him at risk of rupture or dissection.  An aortic event in Escravos would likely have led to his death, or the serious injury or death of his coworkers, should he have been operating equipment at the time of a cardiac event.  Accordingly, Plaintiff was denied medical clearance to work in Escravos and his conditional offer for the expatriate assignment was revoked.

Even though Plaintiff's previous position had been backfilled following his offer for the expatriate assignment, Chevron U.S.A. worked with Plaintiff to find alternative positions he was qualified for to ensure Plaintiff would have continued employment with Chevron U.S.A.  When Plaintiff interviewed for and was not selected for the positions he applied for, Chevron U.S.A. created a job position for Plaintiff with the same pay salary grade as his prior position.  Plaintiff now alleges that he was discriminated against because of his alleged disability and that Chevron U.S.A. failed to accommodate his alleged disability.

Plaintiff's disability discrimination claim is based solely on the fact the conditional offer for the position in Escravos was revoked because of his heart condition.  The claim fails for multiple reasons.  Chief among them, the undisputed evidence shows the decision to revoke the conditional offer was made by medical professionals relying on first-hand knowledge of the conditions in Escravos, who reasonably determined that Plaintiff was unable to perform the essential duties of the position without

-1-

endangering the health and safety of himself and the people around him.[1]   Plaintiff cannot maintain a disability discrimination claim under such circumstances.  Plaintiff also cannot maintain a failure to accommodate claim because he admits he did not need any accommodations for his alleged disability.

Plaintiff's constructive discharge claim fails because Plaintiff cannot establish that his working conditions were so intolerable that he had no choice but to resign.  The undisputed evidence shows that Plaintiff left because he felt his career at Chevron U.S.A. was not progressing as he would like, although his supervisors were supportive of him and expressed to Plaintiff that they preferred he stay.  Lastly, there is no evidence, and certainly not clear and convincing evidence, of any act of fraud, oppression or malice by a managing agent of Chevron U.S.A.  Accordingly, all of Plaintiff's claims, including his claim for punitive damages, fail and Chevron U.S.A.'s motion should be granted in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff Applied for and Received a Conditional Offer for an Expatriate Assignment in Remote Escravos, Nigeria.

Plaintiff was hired by Chevron U.S.A. on January 12, 2009, as an Analyzer Engineer.  (DUF[2] 1.)  Beginning in or about November 2016, Plaintiff was promoted to the position of Instrumentation, Electrical, and Analyzer Reliability ("IEAR") Team Lead in the Reliability subgroup of the Maintenance department, with pay salary grade 22.  (DUF 2.)

In or around May 2019, Plaintiff applied for the Reliability Engineering Manager ("REM") position, which was an expatriate position with an estimated potential duration of 3-4 years located in Escravos, Nigeria, with the same pay salary grade as his IEAR Team Lead position. (DUF 3.)  The REM position was employed by Chevron Nigeria, Limited ("Chevron Nigeria").  (DUF 4.)  On or about July 9, 2019, Chevron Nigeria conditionally awarded Plaintiff the REM position, contingent upon Plaintiff obtaining the appropriate work authorization and successfully passing a Medical Suitability for Expat Assignment ("MSEA").  (DUF 5.)

---

[1] Additionally, the undisputed evidence also shows Chevron U.S.A. was not even the entity that made the decision to rescind the offer.

[2] Chevron U.S.A.'s Statement of Uncontroverted Facts and Genuine Disputes is referred to herein as "DUF."

-2-

**B.    The Expatriate Assignment Is Located in an Extremely Remote Facility in Escravos, Nigeria, Located At Least One Hour or More From a Medical Facility by Emergency Medical Evacuation.**

As part of the MSEA procedure, all expatriate candidates must pass medical clearance with the local medical team at the location of the job site, and the local team makes the final determination as to medical fitness for duty.  (DUF 6.)  The MSEA standard for medical clearance is based on the MSEA Location Clusters Table, which evaluates the relative level of safety in terms of medical care in categories from the highest "A" to the least "D," taking into account the promptness and availability of medical care in those countries.  (DUF 7.)

Under the MSEA categories, Nigeria is split into categories "C" and "D".   (DUF 8.)  Lagos, the former capital of Nigeria, falls under "C," whereas all other locations within Nigeria, including Escravos, falls under "D," reflecting the lowest level of available medical care.  (*Id*.)  The health care infrastructure in Escravos is not set up to handle complex cases, with limited internal health support, and external health care resources for tertiary level care are very limited.  (DUF 9.)  There are only two clinics in Escravos – the Escravos Joint Venture ("JV") Clinic and the Escravos Gas to Liquids ("EGTL") clinic, with at most three doctors (one in Escravos, two at EGTL).  (*Id*.)  At these clinics, there are no surgeons, and only minor procedures can be performed, such as minor sutures for lacerations, and handling minor illnesses.  (*Id*.)  The clinics cannot perform blood transfusions and cannot provide other acute surgical care. (*Id*.)  Individuals with any serious medical condition must be evacuated to Lagos or Warri.  (*Id*.)  For serious cardiac events requiring surgery, the closest cardiothoracic surgeon works for the government hospital in Benin, approximately 100 kilometers away from Escravos, who must travel from Benin or to whom the patient must be transferred for treatment. (*Id*.)

The facility in Escravos, Nigeria is in an isolated swamp located on a river coast only accessible by helicopter or by boat, making regular and emergency access in and out of the facility difficult. (DUF 10.)  Helicopters are not always available for transport, and there are no roads in or out of Escravos.  (*Id*.)  In the event of bad weather in Escravos or Lagos, evacuation could take more than four hours.  (*Id*.)  Escravos has bad weather up to 50% of the time, as does Warri or Lagos during rainy season of April through October.  (*Id*.)

-3-

C.    **Plaintiff's Heart Condition Had an Approximate 2% Risk of Incident Which, if Occurring, Would Lead to Plaintiff's Death Due to the Remoteness of the Escravos Facility and Lack of Onsite Medical Care.**

As part of the MSEA procedure, Plaintiff disclosed on the "Standard Medical Suitability for Expatriate Assignment History & Physical Examination" form (the "MSEA form") that he had a dilated aortic root, otherwise known as a thoracic aortic dilatation or aneurysm, which was diagnosed in or about 2014 to 2015 and which was at risk of rupture or dissection.  (DUF 11.)  Plaintiff disclosed that his dilated aortic root was under the care of his cardiologist, Dr. Steven Khan, whom he saw annually for his condition.  (DUF 12.)  A dilated aortic root cannot be treated without open heart surgery, which Plaintiff has not had to date.  (*Id*.)  Plaintiff's heart condition did not impact his day-to-day ability to work, nor did Plaintiff need any sort of accommodation for his heart condition during his employment with Chevron U.S.A.  (DUF 13.)

Plaintiff's cardiologist stated that based on a published medical study, Plaintiff's aortic root had a 2% risk per year of rupture or dissection.  (DUF 25.)  Plaintiff's cardiologist could not predict whether Plaintiff's aortic root would remain stable or continue to expand to an operable size, and Plaintiff's aortic root was at times stable and at times expanding since his diagnosis.  (DUF 14.)  Rupture or dissection of Plaintiff's aortic root was not predictable, and it was not possible to isolate triggers to reduce the risk of an occurrence.  (DUF 15.)

In Escravos, care is only available for basic needs and there is no readily available access to the type of care Plaintiff would need should an acute event occur.  (DUF 9.)  In the event of a rupture or dissection, any medical evacuation would depend on the availability of a helicopter for a medivac and whether the weather permitted an evacuation.  (DUF 16.)  Due to these conditions, a rupture or dissection occurring in Escravos would likely result in Plaintiff's death.  (*Id*.)  If Plaintiff had experienced a rupture or dissection while he was inspecting and operating equipment, or supervising the operation and inspection of heavy machinery, he could have injured other employees who likewise have limited access to evacuation for medical treatment, leading to serious impairment or even death. (DUF 17.)

D. **Due to the Lack of Access to Appropriate Medical Care in Escravos, Plaintiff Could Not Obtain Medical Clearance and the Offer for the Expatriate Assignment Was Rescinded.**

As part of the MSEA procedure, independent internal medicine provider Dr. Irving Sobel examined Plaintiff in July 2019 and completed the "Standard Medical Suitability for Expatriate Assignment History & Physical Examination" form on Plaintiff's behalf, recommending that Plaintiff's cardiologist provide a letter to clear Plaintiff for duty in Escravos, Nigeria. (DUF 18.) On July 29, 2019, Plaintiff's cardiologist, Dr. Khan, prepared a letter regarding Plaintiff's heart condition stating only that it was generally "safe for [Plaintiff] to work in Nigeria with his heart condition," without any reference to Escravos in particular. (DUF 19.)

Based on an assessment of Plaintiff's medical records from his visit with Dr. Sobel, as well as his first-hand experience working in Escravos, Dr. Eshiofe Asekomeh, who was then the Occupational Health Physician at the Chevron Hospital in Warri, Nigeria,[3] concluded on August 15, 2019 that Plaintiff was not fit for duty in Escravos due to the remote location, but stated that Plaintiff could be cleared for assignment in Lagos. (DUF 24.) In making his assessment of Plaintiff's medical clearance, Dr. Asekomeh consulted with two cardiologists in Nigeria who were familiar with Plaintiff's type of aortic condition – Dr. Victor Adeyeye in Warri and Dr. Ujomoti Akintunde in Lagos – who independently reviewed Plaintiff's medical records and assessed him as fit for duty in Lagos, but not Escravos. (DUF 26.) Dr. Asekomeh also took into account the remote location of the assignment, Escravos, which was a particularly dangerous work location for a person with Plaintiff's condition because Escravos does not have a healthcare system infrastructure to handle complex cases. (DUF 23.) Due to Plaintiff's heart condition, an aortic event in Escravos would likely lead to Plaintiff's death or the death or injury of others because of the lack of access to adequate medical care and timely medical evacuations in Escravos. (DUF 17, 23.)

When Plaintiff appealed Dr. Asekomeh's determination, Dr. Scott Levy, Chevron U.S.A.'s Regional Medical Manager then serving the Europe, Eurasia, Middle East & Africa region, became involved at Plaintiff's request. (DUF 24.) While the local medical team would make the ultimate

---

[3] Dr. Asekomeh has never been an employee of Chevron U.S.A. (DUF 21.)

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1    determination as to Plaintiff's medical clearance, Dr. Levy agreed to speak with Plaintiff's cardiologist,

2    Dr. Khan, and to facilitate discussion with the local team regarding Plaintiff's medical clearance to

3    further consider whether Plaintiff could safely assume the expatriate assignment in Escravos.  (DUF 6,

4    24.)  Dr. Levy communicated several times with Dr. Khan regarding Plaintiff's heart condition.  (DUF

5    24.)  Dr. Levy discussed with Dr. Asekomeh the information provided by Dr. Khan, which only

6    addressed Dr. Khan's assessment of the risk of an occurrence, but not the lack of resources in Escravos

7    to provide treatment in the event of such an occurrence.  (DUF 25-26.)  Dr. Asekomeh ultimately

8    maintained his decision that Plaintiff could not be cleared for duty in Escravos, even with the low but

9    unpredictable risk of an incident, due to Escravos's lack of necessary medical resources and immediate

10   emergency responses.  (DUF 26.)

11         As Plaintiff was medically cleared for assignment in Lagos, relocation of the REM position to

12   Lagos was considered, but it was ultimately determined that the REM position could not have been

13   performed in Lagos because the essential duties of the position require on-site supervision and

14   interaction with the personnel and equipment in Escravos.  (DUF 20, 27.)  As Plaintiff was unable to

15   obtain medical clearance from the local team, and the REM position could not have been performed in

16   Lagos, Plaintiff's offer for the REM position was rescinded on or about September 4, 2019.  (DUF 27-

17   28.)  No Chevron U.S.A. employee, including Dr. Levy, had any final determination in whether Plaintiff

18   was ultimately awarded the REM position in Escravos.  (DUF 29.)

19         The rescission of the REM position offer is the only decision that Plaintiff believes was based on

20   discrimination due to his heart condition.  (DUF 30.)  Plaintiff believes that the rescission of the

21   expatriate assignment in Escravos was discriminatory because the local medical team in Nigeria only

22   considered the 2002 study regarding his medical condition provided by his cardiologist, Dr. Khan, and

23   did not consider any other studies.  (DUF 31.)  However, Dr. Khan did not reference any study other

24   than the 2002 study in his communications with Chevron U.S.A.  (DUF 32.)  Plaintiff does not have any

25   other basis supporting his belief that the rescission of the REM position offer was discriminatory.

26   (DUF 31.)

27

28

**E.     Chevron U.S.A. Promised Plaintiff Continued Employment Despite the Rescinded
Offer and Worked Diligently with Plaintiff to Find Alternative Positions He was
Qualified For.**

Although Plaintiff's offer to work in Escravos was rescinded and his former position as the
IEAR Team Lead in El Segundo had been backfilled due to the offer, Chevron U.S.A. stated it would
"ensure" that Plaintiff would continue to have a position in El Segundo.  (DUF 33.)  On or about
September 5, 2019, Plaintiff met with his supervisor at the El Segundo facility, Austin Ruppert, HR
Manager Andrew Powers, and HR Business Partner Thalia Tse, when they informed him they would
look to identify open positions he may be qualified for and encouraged Plaintiff to do the same.
(DUF 34.)  That same day, Plaintiff emailed Mr. Ruppert regarding "three possible positions" for
himself that he found after examining Chevron U.S.A.'s posted job openings.  (*Id*.)

Dr. Levy also outlined approximately 40 other geographic regions at which Plaintiff could obtain
medical clearance for an expatriate assignment and approximately 26 other geographic regions at which,
following a specific assessment, Plaintiff may be able to obtain medical clearance.  (DUF 34.)

Plaintiff ultimately applied to the El Segundo Routine Maintenance General Team Lead, El
Segundo Operating Assistant, and Maintenance Change Operating Assistant positions based in El
Segundo, but did not receive an offer for any of these positions.  (DUF 35.)

**F.     When Plaintiff Was Unable to Obtain an Offer for the Positions He Applied For,
Chevron U.S.A. Created a Position for Plaintiff So He Could Continue His
Employment.**

**1.     *Chevron U.S.A.'s Hiring Process Involves a Robust Metrics-Based Screening
Model With Peer and HR Oversight.***

Chevron U.S.A.'s open job postings have a job owner who makes the hiring decision and is at
times also the reporting supervisor for the position.  (DUF 36.)  As part of the selection process,
candidates are rated numerically in a metrics-based screening process based on selection criteria such as
Functional Experience, People Development, Leadership Behaviors, Stakeholder Management
(Internal/External), Development Fit, and Operational Excellence.  (*Id*.)  Although the job owner is the
ultimate decisionmaker in filling the open role, the candidate selection occurs during group meetings
with approximately thirty people, including HR personnel and counselors who ensure Chevron U.S.A.'s
policies are being followed in the selection process.  (*Id*.)  At all times relevant to Plaintiff's claims,

-7-

Chevron U.S.A. maintained compliant policies regarding Equal Employment Opportunity and

prohibiting discrimination or retaliation in the workplace.  (DUF 37.)  All job owners and personnel

involved in the selection process are required to undergo regular training on Chevron U.S.A.'s Equal

Employment Opportunity and anti-discrimination and retaliation policies.  (DUF 38.)

> **2.    *Chevron U.S.A. Created the Reliability Change Operating Assistant Position for Plaintiff So He Could Continue Employment.***

When Plaintiff did not receive any offers for the positions to which he applied, Chevron U.S.A.

created the Reliability Change Operating Assistant role for Plaintiff.  (DUF 39.)  Like the El Segundo

Operating Assistant role which Plaintiff sought, the Reliability Change Operating Assistant role did not

have direct reports.  (*Id.*)  The Reliability Change Operating Assistant position paid the same as

Plaintiff's prior IEAR Team Lead position.  (*Id.*)

**G.    Plaintiff Resigned From His Employment With Chevron For an Opportunity with Significantly Increased Responsibility.**

On or about August 4, 2021, Plaintiff resigned from his employment with Chevron U.S.A.

effective August 20, 2021, for the stated reason that he was leaving for an opportunity with significantly

increased responsibility.  (DUF 40.)  The reason for Plaintiff's resignation was that he felt that his career

was not progressing as he would like at Chevron U.S.A.  (DUF 41.)  However, Plaintiff's supervisors,

Austin Ruppert and Greg Curtin, were very supportive of him during his employment at Chevron U.S.A.

(DUF 42.)  No one at Chevron U.S.A. asked Plaintiff to leave, and Mr. Curtin told Plaintiff that he

preferred Plaintiff to stay.  (DUF 43.)

## III.    LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  *McIntosh v. Wal-Mart Assocs.*, 2024 U.S.

Dist. LEXIS 41423, *9 (C.D. Cal. Mar. 7, 2024) (J. Vera) ("*McIntosh*") (*citing* Fed. R. Civ. P. 56(a);

*Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2012).  "Material facts are those which

might affect the outcome of the case."  *McIntosh* (J. Vera), *8 (*citing* Nat'l Ass'n of Optometrists &

*Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986)).  "A dispute is genuine if the evidence is such that a reasonable jury could return a

1  verdict for the nonmoving party."  *McIntosh* (J. Vera), *8 (*citing Liberty Lobby*, 477 U.S. at 248)

2  (internal quotations omitted).  To establish that no genuine dispute of material fact exists, "the moving

3  party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or

4  defense; or (2) show that there is an absence of evidence to support the nonmoving party's case."

5  *McIntosh* (J. Vera), *8 (*citing Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th

6  Cir. 2000)).

7        Evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  "[T]he mere

8  existence of some alleged factual dispute between the parties" will not defeat summary judgment.

9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48.  The nonmoving party "must do more than

10  simply show that there is some metaphysical doubt as to the material facts . . .."  *Scott v. Harris*, 550

11  U.S. 372, 280 (2007) (*quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-

12  87 (1986)).  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

13  genuine issues of fact and defeat summary judgment."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

14  984 (*citing Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)); *Thornhill Pub.*

15  *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).)  Only if the nonmoving party demonstrates a

16  genuine dispute of material fact will the Court view the facts in the light most favorable to the

17  nonmoving party.  *Scott*, 550 U.S. at 380 (*citing* Fed. R. Civ. P. 56(c)).

18  **IV.    LEGAL ARGUMENT**

19        **A.    Plaintiff's Disability Discrimination Claim Is Meritless.**

20        The only act which Plaintiff claims is discriminatory on the basis of his alleged disability is the

21  rescission of the REM job offer in Escravos Nigeria.  (DUF 30.)  "[T]o prevail on summary judgment,

22  the employer is required to show either that: "(1) plaintiff could not establish one of the elements of the

23  FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate

24  plaintiff's employment."  *McIntosh* (J. Vera), *10 (*quoting Dep't of Fair Empl. & Hous. v. Lucent

25  Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011); *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237,

26  (Cal. Ct. App. 2008)).

27        To establish a valid claim of disability discrimination in violation of the California Fair

28  Employment and Housing Act ("FEHA"), Plaintiff must establish a prima facie case of discrimination

by showing: "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *McIntosh* (J. Vera), *9-10 (*quoting Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 355 (Cal. 2000)).

Should Plaintiff be capable of establishing a prima facie case of discrimination, the employer can rebut the presumption of discrimination by showing that the adverse employment action was taken for a "legitimate, nondiscriminatory reason." *Id.* at *10-11 (*citing Guz*, 24 Cal. 4th at 355-56).  In order to defeat summary judgment, Plaintiff must produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [his] discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one." *Id.* at *11 (*quoting Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996)) (emphasis in original) (*citing Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Here, Plaintiff's disability discrimination claim necessarily fails because, as explained below, Plaintiff cannot establish a prima facie case.  Chevron U.S.A. was not the employer of the REM position, did not make the REM position offer to Plaintiff, and did not make the decision to rescind Plaintiff's job offer.  (*See* DUF 4, 29.)  Plaintiff was not qualified for the position he sought, because he could not pass the medical clearance required for assignment in the remote facility in Escravos, Nigeria. (*See* DUF 20, 26.)  Even if Plaintiff could establish a prima facie case, which he cannot, the offer for the REM position was rescinded for legitimate, nondiscriminatory reasons which Plaintiff cannot establish was pretextual.  (*See* DUF 23, 26-28.)  Aside from the rescinded REM position, Plaintiff does not contend that any other allegedly adverse employment action was based on discrimination because of his heart condition.  (DUF 30.)

        **1.**    ***Chevron U.S.A. Was Not the Employer of the REM Position Plaintiff Applied For, Did Not Make the Decision to Deny Plaintiff's Medical Clearance, and Did Not Rescind the Job Offer.***

Plaintiff's disability discrimination claim against Chevron U.S.A. fails because the REM position he sought was employed by Chevron Nigeria.  (DUF 4.)  The FEHA only prohibits an "employer" from engaging in improper discrimination.  Cal. Gov't Code § 12940(a). "The fundamental foundation for

-10-

liability is the existence of an employment relationship between the one who discriminates against another and that other who finds himself the victim of discrimination." *Vernon v. Cal.*, 116 Cal. App. 4th 114, 123 (Cal. Ct. App. 2004).  Chevron Nigeria was the entity which extended the conditional offer of employment to Plaintiff for the REM position, not Chevron U.S.A.  *Id.*  Dr. Asekomeh, who made the decision that Plaintiff was not fit for duty in Escravos, Nigeria, has never been an employee of Chevron U.S.A.  (DUF 21.)  No Chevron U.S.A. employee had any final determination in whether Plaintiff was ultimately awarded the REM position in Escravos, including Dr. Levy.  (DUF 29.)  Accordingly, Chevron U.S.A. was not the employer for the purposes of the REM position Plaintiff claims he was wrongfully denied.

## 2. *Plaintiff Was Not Qualified for the Expatriate Assignment Because He Could Not Perform the Essential Duties of the Job, Which Had to Be Performed in Escravos, Nigeria.*

Plaintiff's disability discrimination claim also fails because Plaintiff cannot establish that he could perform the essential duties of the expatriate assignment in Escravos, Nigeria without endangering his own health and safety or the health and safety of others.  "[D]rawing distinctions on the basis of physical or mental disability . . . is prohibited *only* if the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job . . . with or without reasonable accommodation."  *Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir. Cal. 2013) (*quoting Green v. State*, 42 Cal. 4th 254, 262 (Cal. 2007)).  Employees who are not qualified to perform the essential job duties are excluded from the FEHA's prohibition against discrimination.  *See Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757, 766 (Cal. Ct. App. 2011).

Here, the essential duties of the expatriate assignment required on-site supervision and interaction with personnel and equipment in Escravos.  (DUF 27.)  The expatriate assignment therefore could not be performed in Lagos, where Plaintiff had been cleared for duty.  (*Id.; see also* DUF 20.)  Although Plaintiff maintained that his heart condition does not impact his day-to-day ability to work (DUF 13), a rupture or dissection due to Plaintiff's heart condition was not predictable and it was impossible to isolate triggers to reduce the risk of an occurrence (DUF 15).  Should Plaintiff have had an occurrence in Escravos, the remoteness of the Escravos facility and its lack of access to appropriate

-11-

1    medical care for serious medical conditions would likely lead to Plaintiff's death.  (DUF 16, 22-23.)

2    Additionally, if Plaintiff was operating equipment at the time of an occurrence, it could lead to serious

3    injury or death for others working at the facility.  (DUF 17, 23.)  As Plaintiff couldn't fulfill the essential

4    duties of the position, which required the job to be performed in Escravos, Plaintiff cannot demonstrate

5    that he was qualified for the REM position, and his disability discrimination claim fails as a matter of

6    law.

7          **3.**      ***The Offer for the REM Position was Rescinded for Legitimate and Non-***

8          ***Discriminatory Reasons Because Plaintiff's Presence in Escravos Would Endanger His Own and the Health and Safety of Others.***

9          Even if Plaintiff could establish a prima facie case of disability discrimination, which he cannot,

10   there was a legitimate and nondiscriminatory reason to rescind Plaintiff's REM job offer because

11   Plaintiff would have posed a direct threat to his own and the health and safety of others.  An employer

12   has a duty to "furnish to each of his employees employment and a place of employment which are free

13   from recognized hazards that are causing or are likely to cause death or serious physical harm to his

14   employees."  *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 84-85 (2002) (*quoting* 29 U.S.C. § 654(a)(1)).

15   An employer is not prohibited from refusing to hire an employee who cannot perform his duties without

16   endangering the health or safety of himself or others.  *Raytheon Co. v. Cal. Fair Employment & Hous.*

17   *Comm'n*, 212 Cal. App. 3d 1242, 1252 (Cal. Ct. App. 1989) (*citing* Cal. Gov't Code § 12940(a)(1)).  An

18   employer must establish, by a preponderance of the evidence, that "the applicant or employee cannot

19   perform the essential functions of the position in question in a manner which would not *endanger the*

20   *health or safety of others to a greater extent than if an individual without a disability performed the*

21   *job*."  *EEOC v. United Parcel Service, Inc.*, 424 F.3d 1060, 1074 ("*UPS*") (*quoting* Cal. Code Regs., tit.

22   2, § 7293.8(d)) (emphasis in original).

23         The "safety-of-others" defense in the FEHA is broader than the "direct threat" defense under the

24   Americans with Disabilities Act ("ADA").  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 999-1000

25   (9th Cir. 2007)(*citing UPS*, 424 F.3d at 1074, fn. 12)(finding "the primary concern of FEHA's safety-of-

26   others defense is to avoid dangers caused by an individual's performance of the job")).  An employer

27   "need not wait for disaster to strike before taking action: [an employer] owes a duty to the public and its

28   employees affirmatively to avert disaster, rather than simply wait and hope it does not occur."  *UPS*, 424

          DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

F.3d at 1075 (*quoting McMillen v. Civil Service Commission*, 6 Cal. App. 4th 125, 131 (Cal. Ct. App. 1992).

"[E]ven a modest increase in the risk that a problem will occur is significant when the potential consequences of that problem are very serious." *UPS*, 424 F.3d at 1074-75 (*citing In re the Accusation of the Dep't of Fair Employment & Housing v. Di Salvo Trucking Co.*, 1987 CAFEHC LEXIS 16, Dec. No. 87-14, 1987 WL 114862, at *8 (Cal. F.E.H.C. 1987)(finding 25% chance that a truck driver's herniated discs could cause symptoms in the future established a "significant potential for harm to others" in the event symptoms appeared while he was driving); *In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.*, 1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906, at *6 (Cal. F.E.H.C. 1980)(finding that despite an "extensive and completely safe record as an engineer," a train engineer susceptible to dizziness and blackouts posed a "significantly greater danger to others"); *McMillen*, 6 Cal. App. 4th at 130-31 (Cal. Ct. App. 1992) (finding weight limitations rational because "excess fat" negatively affected performance and contributed to risk of back injury, and "sudden incapacitation of an ambulance driver could be life-threatening")).

The danger-to-self and safety-of-others defenses require an individualized assessment specific to the employee, but categorical evidence is relevant to establish the defenses. *UPS*, 424 F.3d at 1075-76 (*citing Sterling Transit Co. v. Fair Employment Practice Comm'n*, 121 Cal. App. 3d 791, 798 (Ct. App. 1981) (applying the danger-to-self defense); *In re the Accusation of the Dep't of Fair Employment & Housing v. City of San Jose*, 1984 CAFEHC LEXIS 30, Dec. No. 84-18, 1984 WL 54298, at *10 (Cal. F.E.H.C. 1984) (finding danger-to-self defense and danger-to-others defense must be specific to the employee); *DFEH v. Orange County Sheriff-Coroner Dep't*, 1983 CAFEHC LEXIS 21, Dec. No. 82-26, 1982 WL 36770, at *4-6 (Cal. F.E.H.C. 1983) (finding categorical evidence such as studies outlining the risk of impaired physical ability could establish that an applicant would pose such a risk). When there is substantial evidence of the reasonableness of the assessment, the affirmative defense applies. *See McMillen*, 6 Cal. App. 4th at 130 (finding just cause for adverse employment action where "substantial evidence in the record establish[ed] the reasonableness of the [employer's] standards as a means of ensuring the safety of its employees and members of the public").

1    Here, Plaintiff's distorted aortic root is a life-long condition that has to be monitored and cannot

2  be treated without open-heart surgery, which Plaintiff has not had to date.  (DUF 11-12.)  The stability

3  or expansion of Plaintiff's aortic root was not predictable.  (DUF 14).  Rupture or dissection of

4  Plaintiff's aortic root was likewise unpredictable and isolation of triggers to reduce the risk of an

5  occurrence was impossible.  (DUF 15.)  The risk of rupture or dissection would have been prevalent

6  throughout the assignment in Escravos.  (*See* DUF 11-12.)

7    The local medical team has personal knowledge of the conditions and capacities of the Escravos

8  facility and are best situated to determine an applicant's medical clearance.  (DUF 6.)  The local medical

9  team in Nigeria determined that Plaintiff's heart condition posed a danger to himself and to the

10  employees around him.  (DUF 16-17, 23.)  Based on his knowledge of the Escravos facility, as well as

11  an individualized review of Plaintiff's medical records, Dr. Asekomeh determined that Plaintiff was not

12  fit for duty in Escravos, but could be cleared for assignment in Lagos, which did have better access to

13  medical care.  (DUF 20, 22-23.)  If Plaintiff experienced a rupture or a dissection while in Escravos, it

14  would likely have led to his death because the personnel on-site could not have transported him to

15  adequate medical care on time.  (DUF 16, 22.)  If Plaintiff had experienced such an occurrence while he

16  was supervising or operating equipment, he could have injured other employees who likewise may not

17  have transport or access to appropriate medical care, perhaps leading to serious impairment or even

18  death.  (DUF 17.)  Given the remoteness of the Escravos facility, the lack of medical care for serious

19  incidents, and the unreliability of medical evacuations out of Escravos in the event of an incident,

20  Plaintiff's condition would put the facility at risk of a catastrophic event involving death or impairment

21  to Plaintiff or to other employees.  (DUF 16-17.)

22    Plaintiff will no doubt assert that the risk of danger to himself or to his coworkers was small, and

23  therefore did not constitute a serious risk of endangerment.  Indeed, Plaintiff's cardiologist referenced a

24  medical study and opined that he believed there was a 2% or less chance per year that Plaintiff would

25  experience a rupture or dissection.  (DUF 25.)  However, even if the likelihood of risk could be

26  considered small, courts have concluded that small risks can be significant when the threatened harm is

27  grievous. *See Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (*citing Donahue v.*

28  *Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000)) (finding that despite a small likelihood of an

-14-

accident, "the severity and scale of the potential harm to others . . . nevertheless pose a significant risk"
under the direct-threat analysis).  Even a small increase in the risk of an occurrence is significant where
the potential consequences could be catastrophic—i.e., death, not only of Plaintiff but potentially the
employees around him as well.  *See* UPS, 424 F.3d at 1074-75 (*citing Di Salvo Trucking Co.*, 1987
CAFEHC LEXIS 16, *8) (finding "even a modest increase in the risk that a problem will occur is
significant when the potential consequences of that problem are very serious").  Even the fact that
Plaintiff has not previously experienced any prior occurrence due to his heart condition is insufficient to
eliminate the risk of danger to self and/or others.  *See* UPS, 424 F.3d at 1074-75 (*citing S. Pac. Transp.
Co.*, 1980 CAFEHC LEXIS 23 at *6 (finding a susceptibility to dizziness and blackouts posed a
"significantly greater danger to others" despite a previously spotless record).

Dr. Asekomeh reviewed the information provided by Dr. Khan, including the data provided in
the 2002 medical study.  (DUF 26.)  Dr. Khan did not address the lack of resources in Escravos to
provide treatment in the event Plaintiff suffered an aortic event.  (DUF 25.)  Due to Escravos's lack of
medical care and unreliable evacuation in the event of an incident, Dr. Asekomeh reasonably concluded
that even with the low but unpredictable risk of an incident, Plaintiff was not fit for duty in Escravos.
(DUF 26.)  Since Plaintiff was unable to perform the essential duties of the REM position in Escravos
without endangering himself or others, Plaintiff's disability discrimination claim fails.

### 4.    *Plaintiff Cannot Demonstrate that Dr. Asekomeh's Reasons to Deny His Medical Clearance Were Pretextual.*

In order to defeat summary judgment, Plaintiff must show that the reason for rescinding his job
offer was pretextual: "(1) directly, by showing that unlawful discrimination more likely than not
motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is
unworthy of credence because it is internally inconsistent or otherwise not believable."  *McIntosh* (J.
Vera), *17 (*quoting Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011)
(*citing Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)).

Plaintiff believes that the ultimate denial of the REM position was discriminatory, because the
local medical team did not do their due diligence by not considering medical studies aside from the 2002
study provided and referenced by Dr. Khan.  (DUF 31.)  Plaintiff does not set forth any other basis for

-15-

1  his claim that the decision to rescind his offer was discriminatory.  (*Id.*)  Notably, Plaintiff's

2  cardiologist, Dr. Khan, did not reference any study other than the 2002 study which was provided to and

3  reviewed by the local medical team in Nigeria.  (DUF 32.)  Plaintiff does not have a medical degree and

4  cannot opine as to the sufficiency of the medical review conducted by the local medical team in their

5  determination on his medical clearance.  Indeed, the local team in Nigeria had superior knowledge

6  regarding the conditions and resources available in Escravos and are doctors capable of assessing the

7  risk posed by Plaintiff taking the expatriate assignment.  (DUF 6.)  Plaintiff cannot produce any direct or

8  circumstantial evidence showing that the reason to rescind the REM offer was pretextual, and Plaintiff's

9  disability discrimination claim must fail.

10         **B.**    **Plaintiff's Claim for Failure to Accommodate is Frivolous, Because Plaintiff Admits He Never Needed Accommodations During His Employment.**

11

12       "The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability

13  covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential

14  functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's

15  disability.  *Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757, 766 (Cal. Ct. App. 2011) (*quoting*

16  *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 256 (Cal. Ct. App. 2000); *Wilson v. Cty. of Orange*,

17  169 Cal. App. 4th 1185, 1192 (Cal. Ct. App. 2009)).  An employer has no affirmative duty to provide an

18  accommodation where the employee never needed nor requested one.  *See Brown v. Lucky Stores*, 246

19  F.3d 1182, 1188 (9th Cir. 2001).

20       As a threshold matter, Plaintiff's failure to accommodate claim is meritless because, by

21  Plaintiff's own admission, he did not need any accommodation during his employment.  (DUF 13.)

22  Additionally, as discussed above, Plaintiff was unable to perform the essential duties of the REM

23  position and therefore cannot establish the essential elements of his failure to accommodate claim.  *See*

24  *Cuiellette*, 194 Cal. App. 4th at 766 (*citing cases*).

25       Even if Plaintiff could establish that Chevron U.S.A. had an affirmative duty to provide him with

26  accommodations, which Plaintiff cannot, Chevron U.S.A. nevertheless accommodated Plaintiff by

27  ensuring that he could continue employment with Chevron U.S.A.  *See Cuiellette*, 194 Cal. App. 4th at

28  767 (*quoting Spitzer v. Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1389 (Cal. Ct. App. 2000)) (finding the

1    duty to accommodate does "not require creating a new job, moving another employee, promoting the

2    disabled employee or violating another employee's rights"); *McCullah v. Southern Cal. Gas Co.*, 82 Cal.

3    App. 4th 495, 501 (Cal. Ct. App. 2000) (finding same).  Even though Plaintiff's former position had

4    been backfilled due to the REM offer, Chevron U.S.A. ensured that Plaintiff would have a position in El

5    Segundo.  (DUF 33.)  Although Plaintiff was not selected for any of the jobs he subsequently applied

6    for, Chevron U.S.A. created the Reliability Change Operating Assistant role for Plaintiff, which paid the

7    same as Plaintiff's prior position.  (DUF 39.)

8        Although Chevron U.S.A. did not have an affirmative duty to provide accommodations, Chevron

9    U.S.A. went above and beyond its duties as an employer to ensure that Plaintiff could continue his

10   employment, despite the offer for the expatriate assignment being rescinded.  Plaintiff's failure to

11   accommodate claim fails as a matter of law.

12       **C.    <u>Plaintiff's Constructive Wrongful Termination Claim Is Meritless.</u>**

13       To establish constructive discharge, Plaintiff must demonstrate that a reasonable person in his

14   situation would have had ***no reasonable alternative*** except to quit.  *Turner v. Anheuser-Busch, Inc.*, 7

15   Cal. 4th 1238, 1249-50 (Cal. 1994) (emphasis added).  "Intolerable working conditions" are those that

16   are either "unusually aggravating" or amount to a "continuous pattern of objectionable conduct."

17   *Turner*, 7 Cal.4th at 1246-1247.  Courts have recognized that a plaintiff alleging constructive

18   termination faces a heavy burden:

19       [A]n employee cannot simply "quit and sue," claiming [constructive discharge].  The
         conditions giving rise to the resignation must be ***sufficiently extraordinary and***
20       ***egregious*** to overcome the normal motivation of a competent, diligent, and reasonable
         employee to remain on the job to earn a livelihood and to serve his or her employer.  The
21       proper focus is on whether the resignation was coerced, not whether it was simply one
         rational option for the employee.
22

23   *Turner*, 7 Cal.4th at 1246 (emphasis added); *Mullins v. Rockwell Int'l Corp.*, 15 Cal. 4th 731, 737 (Cal.

24   1997) (finding "[c]onstructive discharge occurs only when the employer coerces the employee's

25   resignation").  Thus, courts recognize claims for constructive termination ***only*** when the conduct of the

26   employer was ***so intolerable or aggravated*** that a reasonable employee would have resigned.  *Turner*, 7

27   Cal. 4th at 1247, n. 3.

28

-17-

By Plaintiff's own admission, this is not the case.  Plaintiff asserts that he left his employment simply because he felt his career with Chevron U.S.A. wasn't progressing as he would like.  (DUF 40-41.)  Plaintiff waited until he received a job offer for another position with "significantly increased responsibility" before turning in his resignation notice to Chevron U.S.A.  (DUF 40.)  Plaintiff admitted that his supervisors were very supportive of him during his employment, that no one at Chevron U.S.A. told him to leave, and that his supervisor expressed to Plaintiff that he would prefer Plaintiff to stay.  (DUF 42-43.)  As a matter of law, Plaintiff cannot meet the high standard required to show wrongful constructive termination, and Plaintiff's claim fails as a matter of law.

### D.    Plaintiff Cannot Recover Punitive Damages.

Plaintiff cannot recover punitive damages even if any of his claims could survive summary judgment.  It is well settled that a party may move for summary adjudication in the defendant's favor of a claim for punitive damages.  *See* Cal. Civ. Proc. Code § 437c(f).  To successfully oppose such a motion, a plaintiff must establish his right to punitive damages by "clear and convincing evidence." *Aquino v. Sup. Ct.*, 21 Cal. App. 4th 847, 854-55 (Cal. Ct. App. 1993).  An award of punitive damages requires proof by clear and convincing evidence of an act of oppression, fraud, or malice by an officer, director, or managing agent, which requires "despicable conduct" carried out in "conscious disregard" of Plaintiff's rights.  *See* Cal. Civ. Code § 3294(a); *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1119-20 (Cal. Ct. App. 2001) (finding a plaintiff must meet the "clear and convincing evidence" standard on a motion for summary judgment).  A finding of even unlawful discrimination or retaliation in personnel decisions would not itself justify punitive damages as such conduct is not the equivalent of malice or oppression.  See *Ackerman v. Western Electric Co.*, 643 F. Supp. 836, 857 (N.D. Cal. 1986), aff'd, 860 F.2d 1514 (9th Cir. 1988) (discriminatory conduct that was "unfounded, misguided and extremely ill-advised" remained insufficient for punitive damages).

Here, there is no evidence, let alone clear and convincing evidence, of fraud, oppression or malice by any officer, director or managing agent of Chevron U.S.A.  First, there is no evidence that any officer, director or managing agent engaged in or ratified an act of fraud, oppression or malice.  Plaintiff claims Dr. Levy should have overridden Dr. Asekomeh's determination denying medical clearance, but no Chevron U.S.A. employee, including Dr. Levy, had any final determination in whether Plaintiff was

-18-

ultimately awarded the REM position.  (DUF 29.)  Even if Dr. Levy was an officer, director, or managing agent of Chevron U.S.A., which he is not, an assertion that Dr. Levy "should" have reversed the medical clearance determination is insufficient to hold Chevron U.S.A. liable for punitive damages. *See CRST, Inc. v. Superior Court*, 218 Cal. Rptr. 3d 664, 679 (2017); *White v. Ultramar, Inc.*, 21 Cal. 4th 566-577 (1999).  Accordingly, Plaintiff's claim for punitive damages should be dismissed.

## V.  **CONCLUSION**

For the foregoing reasons, Chevron U.S.A. respectfully requests that the Court grant its motion for summary judgment.


Dated:  October 10, 2024

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By  _____
                    */s/ Robert E. Mussig*
TRACEY A. KENNEDY
ROBERT E. MUSSIG
H. SARAH FAN

Attorneys for Defendant
CHEVRON U.S.A. INC.,
a Pennsylvania Corporation

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Plaintiff Mark Snookal (hereinafter "Plaintiff" or "Mr. Snookal") was a conscientious and diligent employee of Defendant Chevron U.S.A. Inc. (hereinafter "Defendant" or "Chevron") for over twelve years. In August of 2019, Chevron offered Mr. Snookal a rotational expatriate assignment in Escravos, Nigeria as a Reliability Engineering Manager ("the REM position"). The REM position was an office-based/desk job that would come with significant advantages to Mr. Snookal, including an increased scope of responsibilities, better promotional opportunities, and a significant pay increase.

However, prior to Mr. Snookal's planned start date, Chevron required Mr. Snookal to undergo a medical fitness for duty screening. Pursuant to Chevron's protocol, a doctor of Chevron's choosing evaluated Mr. Snookal and deemed him "fit for duty with restrictions." The restrictions were: (1) no heavy lifting over 50 pounds (something that was not required for this desk job) and (2) to have Mr. Snookal's treating cardiologist review and provide a clearance letter.

Mr. Snookal has had an asymptomatic dilated aortic root (also called a "thoracic aneurysm"), which was managed with medication and screened annually to monitor any increase in size which would indicate risk to Mr. Snookal. The size of Mr. Snookal's thoracic aneurysm had been stable for years, and the risk of a rupture or dissection was under 1% per year. Mr. Snookal's cardiologist promptly provided the requested clearance letter indicating that Mr. Snookal was under his care and that Mr. Snookal was fit for duty for the REM position "in rural or remote area of Nigeria."

Nonetheless, Dr. Eshiofe Asekomeh, then the Occupational Health Physician at the Chevron Hospital in Warri, Nigeria, who is not a cardiologist by training and has never practiced cardiology, deemed Mr. Snookal "not fit for duty." Chevron rescinded the job offer from Mr. Snookal, reasoning that they could not tolerate the potential perceived risk of having Mr. Snookal work for them in Escravos, lest Mr. Snookal's thoracic aneurysm

rupture or dissect while in Escravos. Dr. Asekomeh made this decision without speaking to Mr. Snookal, without speaking with the doctor who deemed Mr. Snookal "fit for duty with restrictions," without speaking with Mr. Snookal's treating cardiologist, Dr. Khan, and without reviewing the REM job description. Dr. Asekomeh has never treated an individual with an aortic dissection or rupture. He also came to this decision despite the fact that Mr. Snookal was fully able to perform all of the desk-based job duties without any increased risk of a sever cardiac event.

When Mr. Snookal challenged this decision as disability discrimination, Defendant repeatedly ratified Dr. Asekomeh's decision.

Meanwhile, Chevron backfilled Mr. Snookal's old job, leaving Mr. Snookal in limbo. Chevron then failed to accommodate Mr. Snookal's disability, denying his applications for four vacant positions and ultimately placing Mr. Snookal in non-managerial position with abysmal growth opportunities. This new position was a significant demotion, not only relative to the rescinded REM position, but even relative to Mr. Snookal's previous job they filled.

Shortly thereafter, Mr. Snookal began suffering from debilitating depression because of Chevron's arbitrary discrimination, and on August 20, 2021, Chevron wrongfully constructively discharged Mr. Snookal.

Accordingly, Mr. Snookal is asserting claims for (1) disability discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940, *et seq.*; (2) failure to accommodate a disability in violation of the FEHA, *Id.*; and (3) wrongful constructive discharge in violation of public policy.[4]

/ / /

/ / /

/ / /

---

[4] On September 27, 2024, the Court entered the Parties' joint stipulation to dismiss Mr. Snookal's third cause of action for age discrimination. (Dkt 27).

## II.    FACTUAL BACKGROUND

### A.    Mr. Snookal Rises in Chevron's Ranks During His First Ten Years of Service

In January of 2009, Chevron hired Mr. Snookal to serve as an Analyzer Designs Engineer in the Technical Services Department in El Segundo, California. (Defendant's Statement of Undisputed Facts and Genuine Disputes (hereinafter "DUF") 1.) Mr. Snookal worked his way up in the ranks and received several promotions over the years for his standout contributions. (DUF 2; Plaintiff's Statement of Undisputed Facts and Genuine Disputes, (hereinafter "PUF") 44.)

### B.    Chevron Selects Mr. Snookal for A Coveted Rotational Expatriate Assignment

In or about May of 2019, Mr. Snookal applied for a Reliability Engineering Manager position, a three-to-four-year rotational assignment at a Chevron liquid to gas oil refinery in Escravos, Nigeria ("the REM position"). (DUF 3.)

On July 9, 2019, Chevron (not "Chevron Nigeria, Limited" as claimed by Defendant) sent Mr. Snookal an "Assignment Offer" letter for the REM position and thereafter began the administrative process for this expatriate assignment. (DUF 4-5; PUF 105.)

Although Mr. Snookal was to start the REM position at the same salary (grade 22) as his previous position, the IEAR Team Lead in El Segundo, California, the compensation associated with the REM position would be significantly higher. (DUF 2-3; PUF 45.) The position came with a 55% increase in Mr. Snookal's base pay pursuant to Chevron's Rotational Assignment policy which awards a 55% location premium for expatriates in Escravos, Nigeria. (PUF 45.) As an additional benefit, he would only have to work for half of the year, working in Nigeria for a four-week period then returning home to the United States for a four-week period off duty. (PUF 46.)

/ / /

/ / /

**C.**     **Mr. Snookal Is Deemed "Fit for Duty" Pursuant to Chevron's Medical Suitability for Expatriate Assignment Screening (MSEA) Procedure, Receiving Clearance by Two Physicians**

On or about July 24, 2019, Dr. Irving Sobel, a doctor whom Chevron appointed to evaluate Mr. Snookal, completed a Medical Suitability for Expatriate Assignment History and Physical Exam (MSEA) of Mr. Snookal. (DUF 18; PUF 47-48.) Dr. Sobel documented that Mr. Snookal was "fit for duty with restrictions." (PUF 48.) The two restrictions Dr. Sobel noted were: (1) no heavy lifting over 50 pounds and (2) to get a clearance letter from Dr. S. Khan, Mr. Snookal's treating cardiologist. (PUF 49.)

With respect to the heavy lifting restriction, the REM position required no heavy lifting or physical exertion. (PUF 51, 60, 113.) With respect to receiving a clearance letter from his cardiologist, Mr. Snookal promptly complied. (PUF 52.) Mr. Snookal was under the care of his cardiologist, Dr. S. Khan, for an asymptomatic dilated aortic root/thoracic aneurysm. (DUF 12; PUF 115; 52.) Dr. Khan completed once annual screenings to detect any changes to Mr. Snookal's condition, and Mr. Snookal was taking medication to manage same. (DUF 12; PUF 96.) On July 29, 2019, Dr. Khan wrote a letter which Mr. Snookal provided to Chevron. The letter read in relevant part that "Mr. Snookal is under my care for his heart condition. It is safe for him to work in Nigeria with his heart condition. His condition is under good control and no special treatments are needed." (PUF 52.)

Moreover, given the rotational nature of the REM position, Mr. Snookal would not have had any interruption to receiving this regular preventative care in the United States. (PUF 50.)

**D.**     **Mr. Snookal's Risk of Any Adverse Health Event While in Escravos Was Miniscule**

Chevron incorrectly asserts that "Plaintiff's cardiologist stated that based on a published medical study, Plaintiff's aortic root had a 2% risk per year of rupture or dissection." (Defendant's Motion for Summary Judgment at 4:21-22). To the contrary,

-23-

Dr. Khan indicated that Mr. Snookal's risk was "low" and *likely less than* 2% per year." (italicization added). (DUF 25; PUF 53.) On August 23, 2019, he wrote to Chevron in relevant part that:

> Mr. [Snookal]'s aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan. From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm . . . Since Mr. Snookal's aneurysm has not shown any growth for 3 years, **his risk may be lower than the published 2% number above which would be based on "average" growth rates.** Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms. For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or reversing aortic aneurysm growth and Mr MS (sic) is on an ARB. In summary, **Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.** The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan. (emphasis added) (Id.)

Mr. Snookal's risk of a cardiac event was in fact less than 1% per year, and since Mr. Snookal would have only been in Escravos for half of that time, the likelihood of any adverse event occurring while he was in Escravos was even less than 0.5% per year. (PUF 46, 56-57.)

Further, Defendant insists that "a dilated aortic root cannot be treated without open heart surgery." (DUF 12). This is irrelevant, because given the actual size and stability of Mr. Snookal's thoracic aneurysm, it is not considered clinically significant and does not warrant surgical intervention because the risk is de minimis. (DUF 12; PUF 56, 58.)

### E. Mr. Snookal Could Complete All of the Job Duties of the REM Position, an "Office Job," And Nothing about the Completion of the REM Job Duties or Its Location in Escravos Would Exacerbate the Risk of A Cardiac Event

Chevron has conceded that Mr. Snookal's condition did not impact his day-to-day ability to work or to complete his job duties. (DUF 13; PUF 59-61, 66.) Chevron categorized the REM position as an "office based job" and agreed that he was capable of doing the job without accommodation. (PUF 59-61, 66.) Further still, Chevron admits that nothing about the REM position would exacerbate Mr. Snookal's condition, nor would anything about the job or its location increase of a cardiac event occurring. (PUF 67.) Dr. Scott Levy, Chevron's then Regional Medical Manager for the Europe, Eurasia,

Middle East & Africa Region, stated that Mr. Snookal's "proposed job in Nigeria was an office-based job . . . And again, I didn't have an issue with the job at all. I don't think any of us had an issue with the specific type of work he was doing." (PUF 59-61.)

### F.    Chevron Nonetheless Rescinds Mr. Snookal's Job Offer Because of His Disability, Claiming Incorrectly that Mr. Snookal Poses a Direct Threat to Himself

Nonetheless, after Mr. Snookal jumped through all of Chevron's administrative hoops, Chevron rescinded the job offer.[5] (DUF 4.) On or about August 15, 2019, Dr. Eshiofe Asekomeh deemed Mr. Snookal "not fit for duty," citing Mr. Snookal's thoracic aneurysm, and on or about September 4, 2019, Chevron informed Mr. Snookal of same. (DUF 28.) Dr. Asekomeh made this decision without ever communicating with Dr. Sobel, Dr. Khan, or Mr. Snookal; without reviewing the job duties of the REM position; and without reviewing Mr. Snookal's work history. (PUF 63, 70-74.)

### G.    Mr. Snookal Reports That This Decision Constitutes Disability Discrimination, but Chevron Ratifies It

Mr. Snookal reported Chevron's discriminatory decision to the Chevron Ombuds, and his complaint was eventually passed to Dr. Scott Levy, Chevron's then Regional Medical Manager for Europe, Eurasia, Middle East & Africa. (DUF 24; PUF 75.) Mr. Snookal and Dr. Levy spoke several times, and Dr. Levy explained that although Mr. Snookal had been cleared by both Dr. Sobel and Dr. Khan, the decision regarding his medical fitness for duty was up to the local medical team namely, Dr. Asekomeh. (DUF 20, 28; PUF 76.) Dr. Levy explained that the jobsite was in a remote area in Nigeria with limited medical facilities, and emergency medical care could only be provided by charter aircraft using the facility airstrip to Lagos, Nigeria. (PUF 76.)

Dr. Levy requested permission to discuss Mr. Snookal's medical fitness with his

---

[5] Whether Chevron rescinded an offer of employment or whether, as Chevron proposes, it made only a "conditional offer" is immaterial. Either way, it barred Mr. Snookal from commencing the job because of his disability, an adverse employment action.

treating cardiologist, Dr. Khan, and Mr. Snookal granted same. (PUF 77.) Thereafter, Dr. Levy left one voicemail for Dr. Khan, but never spoke with Dr. Khan directly. (PUF 28, 72.) On August 23, 2019, Dr. Khan sent Dr. Levy an email reiterating his opinion that Mr. Snookal was medically fit for duty despite the remote location of the job. (PUF 53, 73.)

On September 4, 2019, Mr. Snookal emailed Chevron USA Human Resources Manager, Andrew Powers, to report the disability discrimination: "I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is therefore, discriminatory in nature." (PUF 80.) He further noted that "my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic." (Id.) Just minutes after receiving Mr. Snookal's disability complaint, before any investigation, Mr. Powers wrote to his colleagues: "I am sure there is a very good reason why this [job] was rescinded." (PUF 81.)

Mr. Powers also forwarded Mr. Snookal's disability discrimination complaint to the medical team in Nigeria, asking Dr. Ayanna for "context" "and suggested response." (PUF 82.) Dr. Ayana referred Mr. Powers back to the "EEMEA Regional Medical Manager" (i.e. Dr. Levy) for the response. (PUF 83.)

On September 6, 2019, Mr. Powers replied to Mr. Snookal, "I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination." (PUF 84.)

Mr. Snookal then requested an explanation for why this offer had been rescinded.

(PUF 85.) On September 16, 2019, Dr. Levy emailed Mr. Snookal, *inter alia*:[6]

> I understand you are willing to take the risk of potentially dying on the job and do not
> feel it is the company's place to make that decision for you. I agree to a certain extent and
> recognize your concerns about paternalism. However, the company does have a right to
> not engage individuals where their assignment could pose a 'direct threat' to their own
> health and safety. . . I became involved on your case when you had requested a second
> opinion on the initial denial and with your consent involved your treating physician to
> better understand your specific risk. While reasonable professionals can debate the exact
> percentage, we are dealing with an established risk that is several magnitudes higher than
> the baseline and is a realistic possibility . . . **The concern is that if the condition were to
> occur**, the outcome would be catastrophic and would require an immediate emergency
> response which is not available and would most certainly result in death in Escravos . . . it
> is also clear that the duration of your condition is not limited and is continually present,
> and the occurrence is not predictable and it's not possible to isolate triggers to reduce the
> risk. (emphasis added.) (PUF 86.)

## H.    To the Contrary, Mr. Snookal's Asymptomatic Condition Posed No "Direct Threat" to Himself or Others

Contrary to Chevron's assertion, Mr. Snookal posed no direct threat to himself or others. (PUF 56-62.) Though Chevron cites the hypothetical risk of Mr. Snookal suffering a cardiac event in Escravos, the risk of this happening was less than half of a percentage per year, and nothing about Mr. Snookal's desk job would have put others at risk of injury. (Id.)

## I.    After Rescinding Mr. Snookal's Job Offer for Discriminatory Reasons, Chevron Doubles Down and Fails to Provide Mr. Snookal with A Reasonable Accommodation

Meanwhile, after Chevron offered Mr. Snookal the REM position, it offered his previous role at the El Segundo refinery to someone else. (DUF 33.) Chevron thereby left Mr. Snookal in limbo without a role. Id.

On or about September 5, 2019, Mr. Snookal searched for and identified four vacant positions for which he was qualified and submitted applications for same: (1) El Segundo Routine Maintenance General Team Lead, (2) El Segundo Operating Assistant (which had two separate openings) and (3) Maintenance Change Operating Assistant.

---

[6] Nowhere in his email purporting to justify Chevron's decision did Dr. Levy note any concern about Mr. Snookal posing a threat to others. (Id.)

(PUF 87, 89-90.)

For these positions, Chevron made Mr. Snookal apply with the rest of the general applicant pool, and Chevron did not give him preference for any of these vacant positions. (PUF 88.) Chevron did not select Mr. Snookal for any of the positions. (PUF 91.)

In or about November of 2019, Austin Ruppert, Mr. Snookal's former supervisor, requested that Chevron create a position called Reliability Change Operating Assistant (OA) for Mr. Snookal.  (PUF 92.) Although Chevron categorized this as "lateral move" for Mr. Snookal, the position was not comparable to the rescinded REM position in pay, in its scope of responsibilities, nor its opportunities for advancement within Chevron. (PUF 45, 93.) Just some examples of why the Reliability Change OA position was not comparable to the REM position include:

- In the REM position, Mr. Snookal would have been responsible for managing a team of approximately twenty people. (PUF 61.) As Reliability Change OA, Mr. Snookal had no direct reports and no management opportunities. (PUF 93.)

- In the REM position, Mr. Snookal would have received a 55% location premium (equal to 55% of his base salary) on top of his base salary and compensation. (PUF 45.) The Reliability Change OA position came with no location premium since it was located in El Segundo, California. (PUF 93.)

- In the REM position, Mr. Snookal would have worked on a four-weeks on, four-weeks off basis. (PUF 46.) The Reliability Change OA position required a regular, full time, around-the-year schedule. (PUF 93.)

Moreover, even with respect to Mr. Snookal's previous role as IEAR Team Lead, the Reliability Change OA role represented a demotion and a shrinking of his scope and responsibilities since the new role had no direct reports and no management opportunities for Mr. Snookal. (Id.) Overall, given that the Reliability Change OA role was a role that Chevron created after placing Mr. Snookal in limbo, the role lacked meaningful direction

-28-

and promotional opportunities. (Id.)

**J.    Chevron Wrongfully Constructively Discharges Mr. Snookal in Violation of Public Policy**

For nearly two years after Chevron rescinded the REM position, Mr. Snookal continued to diligently search for a better job opportunity at Chevron, including other rotational expatriate assignments in one of the locations Dr. Levy deemed acceptable. (PUF 94.) He subscribed to receive regular email notifications regarding any new job postings, searched Chevron's internal job posting sites, and asked colleagues about available opportunities. (Id.) Mr. Snookal was never able to find any other rotational expatriate assignments for which he was told he was eligible and could apply. (PUF 95.)

In or about November of 2019, Mr. Snookal first started treating with a therapist to help him cope with the emotional distress of Chevron's discriminatory actions, and in or about October of 2020, with his symptoms of depression persisting, he commenced taking antidepressant medications. (PUF 99.)

Mr. Snookal also was struggling to meet his family's needs, particularly for his son's specialized education. (PUF 97-98.) Given that he was continuing to experience debilitating symptoms of depression, and on the advice of his treating therapist, Mr. Snookal had no choice but to submit his resignation of employment from Chevron on August 4, 2021, effective August 21, 2021, and thereafter moved himself and his family out of state. (PUF 97-102.)

## III.    LEGAL STANDARD

It is true that summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *McIntosh v. Wal-Mart Assocs.*, 2024 U.S. Dist. LEXIS 41423, *9 (C.D. Cal. Mar. 7, 2024) (J. Vera) ("McIntosh") (citing Fed. R. Civ. P. 56(a); *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2012). And, that "[a] dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McIntosh* (J. Vera), *8 (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986)

-29-

(internal quotations omitted).

However, Chevron fails to mention that they carry the burden of proof as the moving party to show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a). In the context of opposing a motion for summary judgment, unlike at trial, a plaintiff has no initial burden. *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal.App.4th 138, 150 (Cal. Ct. App. 1997); *Martin v. Lockheed Missiles & Space Co., Inc.*, 29 Cal.App.4th 1718, 1730 (Cal. Ct. App. 1994).

Moreover, summary judgment is rarely appropriate for an employment case because, as here, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper. Such cases, we caution, are rarely appropriate for disposition on summary judgment, however liberalized it be." *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 286 (Cal. Ct. App. 2009). "The jury is left to decide which evidence it finds more convincing, that of the employer's discriminatory intent or that of the employer's []neutral reasons for the employment decision." See *Muzquiz v. City of Emeryville*, 79 Cal.App.4th 1106, 1118, fn. 5 (Cal. Ct. App. 2000).  In addition, "[a]t summary judgment, the degree of proof necessary to establish a prima facie case [of discrimination] is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'"  *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

## IV.    LEGAL ARGUMENT

### A.    Disputes of Material Fact Exist as to Mr. Snookal's Disability Discrimination Claim

#### 1.    *Defendant Chevron U.S.A. Was The Employer for the REM Position*

First, pursuant to California Labor Code § 226(a)(8), employers are required to provide wage statements that list "the name and address of the legal entity that is the employer." Though Mr. Snookal was never given the chance to assume the REM

position, it is evident that Chevron U.S.A. would have been his employer. (PUF 103-105.) Other Chevron U.S.A. employees, such as Dr. Levy and Andrew Powers, on expatriate assignment in different states and other countries (including Singapore, England, Kazakhstan and the Philippines) were still paid and employed by Defendant Chevron U.S.A. (Id.) Moreover, the "Assignment Offer" letter received by Mr. Snookal did not identify "Chevron Nigeria" as his employer, as Defendant wrongly asserts, but rather "Chevron." (PUF 105.)

Second, the plain text of the California Fair Employment and Housing Act (FEHA) instructs that when an employer allows a person or entity to act as its direct or indirect agent, it is liable for the acts of those authorized agents. An "employer" for purposes of disability discrimination in violation of the FEHA "includes anyone regularly employing five or more persons, *or any person acting as an agent of an employer, directly or indirectly. . .*" Cal. Gov. Code, § 12926(d) (italicization added). Though Defendant insists that Dr. Asekomeh has "never been employed at any time by Chevron U.S.A. Inc." and was the decisionmaker responsible for rescinding the REM position from Mr. Snookal, Dr. Asekomeh was, at minimum, acting as a direct agent of Defendant Chevron U.S.A., Inc. At the time of the decision, Dr. Asekomeh worked as the Occupational Health Physician at the Chevron Hospital in Warri, Nigeria" and "[a]s part of [his] job duties, [he] conduct[s] Medical Suitability for Expat Assignment ("MSEA") evaluations" for Chevron's expatriate assignments in Nigeria. (DUF 20; PUF 106.) Dr. Asekomeh further testified that Chevron contracted with his employer to provide medical services to Chevron, and in practice, Dr. Asekomeh exclusively provided services to Chevron, not to any other entities. (PUF 107-108.) Chevron also provides specific guidelines and protocols which Dr. Asekomeh was to follow in conducting the MSEA evaluations. (PUF 109.)

### 2. *Regardless, Chevron U.S.A., At Minimum, Ratified the Discriminatory Decisions in Question*

Assuming *arguendo* that Dr. Asekomeh was not acting as Chevron U.S.A.'s agent,

-31-

Defendant Chevron U.S.A., at minimum, ratified the decision. "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.'" *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73 (Cal. S.Ct. 1972).

Dr. Levy, who Defendant agrees was, and is, its employee, also offered a "second opinion" on Mr. Snookal's condition; "agreed to facilitate discussion with the local team regarding Mr. Snookal's medical condition;" and issued findings about why the local team's decision would stand. (DUF 24; PUF 86). Mr. Snookal also reported the disability discrimination to Mr. Powers, also an employee of Defendant, who "investigated" and similarly issued findings about why the local team's decision would stand. (PUF 84.)

Defendant cannot shield itself from liability simply by claiming it is deferring to the discriminatory preferences of others. In *Fernandez v. Wynn Oil Co.*, the Ninth Circuit held that "[t]hough the United States cannot impose standards of non-discriminatory conduct on other nations through its legal system, the district court's rule would allow other nations to dictate discrimination in this country. No foreign nation can compel the non-enforcement of Title VII here." 653 F.2d 1273, 1277 (9th Cir. 1981).

### 3. *Mr. Snookal Had a Disability, Was Fully Qualified for the Expatriate Assignment, and Could Perform all Essential Duties of the Job*

California Gov. Code § 12926(m) defines a qualifying physical disability expansively, which "includes, but is not limited to, all of the following:

(1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:
    (A) Affects one or more of the following body systems: . . . cardiovascular . . .
    (B) Limits a major life activity. For purposes of this section:
        (i) "Limits shall be determined without regard to mitigating measures such

-32-

as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.
(ii) A physiological disease, disorder, [or] condition . . . limits a major life activity if it makes the achievement of a major life activity difficult.
(iii) "Major life activities" shall be broadly construed and includes physical, mental, and social activities and working.

Mr. Snookal's thoracic aneurysm undoubtedly "affects" his cardiovascular system and limited his ability to lift over 50 pounds, a physical "major life activity." (DUF 11, PUF 49.)[7] Nothing in this standard requires that the employee need or request workplace accommodations to qualify as disabled for the purposes of the FEHA. Notably, the standard under the FEHA only requires that a disability "limit," as opposed to "substantially limit," a single major life activity. *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1031–32 (9th Cir. 2003) (reversing summary judgment for employer).

Further, Chevron's allegation that Mr. Snookal could "not perform the essential functions" of the REM position is baseless. Dr. Sobel, Dr. Levy and Dr. Asekomeh all noted that they had no concerns about Plaintiff's ability to do actual job duties, nor does Plaintiff's expert witness, Dr. Alexander Marmureanu. (PUF 59-61.)

### 4. Chevron Rescinded the REM Job Because of Mr. Snookal's Disability, A Decision That Was Discriminatory On its Face

To meet his burden to show a prima facie burden of discrimination, a Plaintiff may show "'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a [prohibited] discriminatory criterion . . . .' The prima facie burden is light; the evidence necessary to sustain the burden is minimal. As noted above, while the elements of a plaintiff's prima facie case can vary considerably, generally an employee need only offer sufficient circumstantial evidence to give rise to a reasonable *inference* of discrimination." *Sandell*

---

[7] In the alternative, Chevron at least "regarded or treated" Mr. Snookal as "having, or having had, any physical condition that makes achievement of a major life activity difficult," which is sufficient to invoke the FEHA's prohibition against perceived disability. Cal. Gov. Code § 12926 (m)(4).

*v. Taylor-Listug, Inc.*, 188 Cal.App.4th 297, 310 (Cal. Ct. App. 2010) (original italics, internal citations omitted.) Here, Defendants stated explicitly that they were rescinding their offer of the REM position from Mr. Snookal because of his thoracic aneurysm, insisting, incorrectly, that Mr. Snookal posed a "direct threat" to his own health and safety. (DUF 20; PUF 86).

### 5.    *Chevron's "Direct Threat" Defense Fails Because Mr. Snookal Posed No "Imminent and Substantial" Risk to Himself Nor to Others*

As a preliminary matter, Chevron has the burden of proving its "direct threat" defense by a preponderance of the evidence. *Raytheon Co. v. Fair Employment & Housing Com.*, 212 Cal.App.3d 1242, 1252 (Cal. Ct. App. 1989). "FEHA's 'danger to self' defense has a narrow scope; an employer must offer more than mere conclusions or speculation in order to prevail on the defense. . . . As one court said, '[t]he defense requires that the employee face an "imminent and substantial degree of risk" in performing the essential functions of the job.' An employer may not terminate an employee for harm that is merely potential . . . ' " *Wittkopf v. County of Los Angeles*, 90 Cal.App.4th 1205, 1218-1219 (Cal. Ct. App. 2001) (internal citations omitted); see also Judicial Council of California Civil Jury Instructions CACI No. 2544 (2024). Moreover, "[u]nlike the BFOQ defense, this exception must be tailored to the individual characteristics of each applicant . . . in relation to specific, legitimate job requirements . . . . [Defendant's] evidence, at best, shows a possibility [plaintiff] might endanger his health sometime in the future. In the light of the strong policy for providing equal employment opportunity, such conjecture will not justify a refusal to employ a handicapped person." *Sterling Transit Co. v. Fair Employment Practice Com.*, 121 Cal.App.3d 791, 798-799 (Cal. Ct. App. 1981), internal citations and footnote omitted. "The risk of injury to the employee must be imminent and substantial, Cal.Admin.Code tit. 2, § 7293.8(b), and the mere possibility of future injury is not sufficient." *Ackerman v. W. Elec. Co.*, 643 F. Supp. 836, 848 (N.D. Cal. 1986), *aff'd*, 860 F.2d 1514 (9th Cir.

-34-

1988). Chevron admits that their decision to rescind the REM position was based upon the perceived hypothetical, future risk. (DUF 17, 20).

Defendant's central premise that "even a modest increase in the risk that a problem will occur is significant when the potential consequences of that problem are very serious" is based upon an interpretation of a since **repealed** regulatory standard which is **lower** than the current standard articulated above. The Ninth Circuit in *E.E.O.C. v. United Parcel Service*[8] was applying a repealed regulation which required only a showing that "the applicant or employee cannot perform the essential functions of the position in question in a manner which would not endanger the health or safety of others *to a greater extent than if an individual without a disability performed the job.*" 424 F.3d 1060, 1074 (9th Cir. 2005) (italicization added).

Not only is Mr. Snookal's future risk *de minimis*, it is "negligible compared to the general population." (PUF 5.) This is especially true with respect to the occupational hazards associated with Chevron's gas to liquids oil refinery in Escravos. Though Defendant relies upon a future, hypothetical situation where Mr. Snookal suffers a cardiac event while in Escravos, Escravos has "bad weather," and a swift medical evacuation cannot occur, medical evacuations "from Escravos to Warri [occur] almost on a regular basis." (DUF 10, PUF 68.) Dr. Asekomeh testified that at the time of his deposition on October 10, 2024, there had been two *emergency* medical evacuations from Escravos in the past week alone (this number excludes non-emergency medical referrals). (PUF 69.)

---

[8] With the exception of *McMillen*, this is also true for the whole string of case citations to which Defendant cites. *McMillen v. Civ. Serv. Com.*, is not a disability discrimination case, nor is it applying the threat to self or others defense. 6 Cal. App. 4th 125, 127 (Cal. Ct. App. 1992). Even so, unlike the instant cases, the old "direct threat" cases to which Chevron cites all involve an imminent, substantial risk of catastrophic injuries to others (e.g. truck drivers with limited peripheral vision or complete sight loss in one eye (Id. at 424); train conductors prone to fainting and blackouts (*In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.*, 1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906, at *6 (Cal. F.E.H.C. 1980)). Mr. Snookal on the other hand, is asymptomatic, does not pose a risk to others, and had a less than 0.5% future chance of Chevron's purportedly feared outcome. (PUF 57, 115.)

### 6. *Chevron's Decision Did Not "Rely on the Most Current Medical Knowledge and/or on the Best Available Objective Evidence" As Required by Law*

CACI No. 2544 Disability Discrimination – Affirmative Defense – Health or Safety Risk (2024) also provides specific factors "to be considered when determining the merits of the defenses enumerated in [Cal. Code Regs., tit. 2,] section 11067(b)-(d) include, but are not limited to:

(1) the duration of the risk;
(2) the nature and severity of the potential harm;
(3) the likelihood that potential harm will occur;
(4) the imminence of the potential harm; and
(5) consideration of relevant information about an employee's past work history.

The analysis of these factors should be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." Here, the "duration of the risk" is limited to the time Mr. Snookal would have actually been in Escravos, which halves the already miniscule odds he would suffer a cardiac event while in Escravos. (PUF 57.) Moreover, Mr. Snookal's past employment history, which Chevron did not consider in making its decision, would indicate that he had been working for Chevron without incident for the ten years prior to their decision to rescind the REM position. (PUF 70-71.)

Ultimately, Chevron's analysis of the likelihood of the potential future harm to Mr. Snookal was inflated by bias and not based upon the "most current medical knowledge and/or on the best available objective evidence" as the law requires. Although Dr. Asekomeh testified to consulting with two cardiologists regarding Mr. Snookal's risk,[9] the opinions expressed by these cardiologists indicated support for Mr. Snookal being low risk. (DUF 22, PUF 110.) The cardiologists cited to one study regarding thoracic

---

[9] There are two different kinds of adverse cardiac events at issue here— aortic dissection and aortic rupture. Dissection and rupture have different severity, mortality rates, and treatment. In addition, Chevron also conflates the risk of either cardiac event (dissection or rupture) with the risk of sudden death, but that too is a major logical leap. (DUF 16.)

aneurysms to conclude that Mr. Snookal was "low risk," noting that an even larger sized aortic aneurysm that Mr. Snookal's (up to 4.5 cm) is the "partition value for low-risk situations." (Id.) Still, they admitted that they were unable to find "clear cut field guidelines for patient with aortic aneurysm." (PUF 111.) They offered some clinical instructions for Mr. Snookal, including to "avoid lifting heavy objects"; "quit smoking (if he is a smoker); (manage hypertension strictly)"; "watch out for alarm symptoms" and "avoid moderate to high intensity exercises as much as possible;" all of which were things Mr. Snookal was already implementing. (PUF 112-113.) With respect to the REM position, the only recommendation of the cardiologists was: "What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location." (PUF 114.) They and Chevron knew that Mr. Snookal had only an *asymptomatic* aneurysm. (PUF 115.) Nowhere do these cardiologists recommend that Mr. Snookal be barred from working in Escravos. (PUF 111-115).

Chevron also overrode the initial recommendation of Dr. Sobel, who indicated Mr. Snookal was "fit for duty with restrictions." (PUF 48.) They have also continued to summarily discount the opinion of Mr. Snookal's treating cardiologist, Dr. Khan, in a number of ways. For one thing, Chevron repeatedly insists that Dr. Khan was not informed of the remote conditions of Escravos, Nigeria specifically (as opposed to Nigeria generally).[10] To the contrary, before reiterating that Mr. Snookal is "low-risk." Dr. Khan addressed the location directly, writing: "*I understand [Mr. Snookal] is applying for a job in rural or remote area of Nigeria* and I understand the concern about his aortic aneurysm." (italicization added). (PUF 79.) Regardless, no one at Chevron bothered to speak with Dr. Khan in real time to collect the best available information, despite Dr. Khan's offer to do so. (PUF 54-55, 72, 78.) Moreover, Dr. Khan wrote Chevron that Mr. Snookal's risk was "*lower than the published 2% number above*" given

---

[10] Chevron asserts above that "the information provided by Dr. Khan . . . only addressed Dr. Khan's assessment of the risk of an occurrence, but not the lack of resources in Escravos to provide treatment in the event of such an occurrence."  (DUF 25-26.)

1    a variety of factors, including the stability of the size of the dilation and the medications

2    Mr. Snookal takes. (PUF 53). Still, Chevron has ignored this and insisted that Mr.

3    Snookal's risk is higher than medical and clinical evidence actually indicate, and higher

4    than several of the doctors who reviewed Mr. Snookal's case indicated to them.[11] (PUF

5    48, 56, 110.)

6           **7.    *Mr. Snookal's Asymptomatic Heart Condition Did Not Pose Any***

7                   ***Imminent Risk to Others, Particularly Because The REM Job is an***

8                   ***Office Job***

9           Chevron now claims *post hoc* that Mr. Snookal also would have somehow posed a

10   threat to others in his office job and that he could injure others while "operating

11   equipment." To the contrary, the REM position did not require the operation of any

12   equipment, heavy or otherwise. (DUF 17; PUF 61.) It was an "office based" desk job, it

13   was not "physically strenuous," and it was not considered a safety-sensitive position.

14   (PUF 60.) Tellingly, Dr. Asekomeh struggled to articulate any plausible reason why Mr.

15   Snookal's asymptomatic condition would pose a risk to others admitting "[he] wouldn't

16   be able to cite a specific example now." (PUF 62.)

17          Regardless, Chevron has admitted that Mr. Snookal's purported threat to others did

18   not at all inform its decision to rescind the REM job from Mr. Snookal. (PUF 62-65.) The

19   factual record is devoid of anything indicating that Chevron was concerned about some

20   hypothetical threat to others at the time. (PUF 63-64.) To the contrary, Dr. Levy admitted

21   that he did not document any concern about Mr. Snookal posing a risk to others, and that

22   he "[did not] think it ended up being relevant in this situation." (Id.) Dr. Asekomeh

23   similarly testified that they did not complete any functional capacity evaluation for Mr.

24   Snookal because he would be completing an "almost-always office job" which was not a

25   "physically-demanding job[]." (PUF 66.) He also had not seen a job description for the

26

27   _____

     [11] Chevron continues to insist, incorrectly, that "Plaintiff's cardiologist stated that based on a published

28   medical study, Plaintiff's aortic root had a 2% risk per year of rupture or dissection." (DUF 25.)

-38-

REM position before his deposition. (PUF 63.) Moreover, Dr. Asekomeh admitted that "the bulk of that decision" to rescind the job from Mr. Snookal "was taken on the fact that if he had a medical event, we would not be able to support him in Escravos, irrespective of his job role." (PUF 65.)

### B. Disputes of Material Fact Exist as to Mr. Snookal's Cause of Action for Failure to Accommodate His Disability

Although the REM position was rescinded on an illegal basis in the first instance, after making this decision, Chevron was required to accommodate Mr. Snookal's disability. Still, they failed to do so. To make a prima facie case for failure to accommodate, the Plaintiff must show "'(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]'" *Hernandez v. Rancho Santiago Cmty. College Dist.* 22 Cal.App.5th 1187, 1193-1194 (Cal. Ct. App. 2018). As explained herein above, Mr. Snookal has a cardiovascular disability covered by the FEHA, and he was a qualified individual fully capable of performing the essential functions of the REM position.

### 1. *Chevron Was on Notice of Mr. Snookal's Need for A Disability Accommodation*

It is an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov. Code §12940(m)(1). **"**No element has been included that requires the plaintiff to specifically request reasonable accommodation. Unlike Government Code §12940(n) on the interactive process . . . §12940(m) does not specifically require that the employee request reasonable accommodation; it requires only that the employer know of the disability." See *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 950-951 (Cal. Ct. App. 1997).

Defendant was on actual notice of Mr. Snookal's disability and corresponding need for a reasonable accommodation after the REM position was rescinded. (DUF 11, PUF

80). As Chevron points out, Mr. Snookal disclosed his thoracic aneurysm during the MSEA process, and Defendant rescinded the REM position on this basis. (DUF 11). Though Chevron may now try to claim that its local Human Resources in El Segundo was unaware of thoracic aneurysm specifically, on September 4, 2019, Mr. Snookal reported to them in writing that the job had been rescinded because of his medical condition/disability, specifically referring to having a disability and a medical condition. (PUF 80.) He also specifically asked them "where does this decision leave me" now that the REM role had been rescinded, and his previous job had been given to someone else. (Id.)

### 2.  *Chevron Denied Mr. Snookal A Reasonable Accommodation*

It is canonical that reassignment to a vacant position is one form of a reasonable accommodation. See e.g., *Swanson v. Morongo Unified School Dist.*, 232 Cal.App.4th 954, 968 (Cal. Ct. App. 2014). "'If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an *employer must make affirmative efforts to determine whether a position is available* . . . 'What is required is the 'duty to reassign a disabled employee if an already funded, vacant position at the same level exists.'" *Furtado v. State Personnel Bd.*, 212 Cal.App.4th 729, 745 (Cal. Ct. App. 2013). (internal citations omitted, italicization added). "The rule has been that the employer has an affirmative duty to make known to the employee other suitable job opportunities and to determine whether the employee is interested in, and qualified for, those positions, if the employer can do so without undue hardship or if the employer offers similar assistance or benefit to any other employees or has a policy of offering such assistance or benefit to any other employees." *Prilliman,* supra, at 950-951 (Cal. Ct. App. 1997); see also *Furtado*, supra, at 729, 745 (Cal. Ct. App. 2013); *Claudio v. Regents of the University of California*, 134 Cal.App.4th 224, 243 (Cal. Ct. App. 2005); *Hanson v. Lucky Stores*, 74 Cal.App.4th 215, 226 (Cal. Ct. App. 1999). Notably, "[t]he employee with a disability is entitled to preferential consideration of reassignment to a vacant position over other applicants and existing employees." Cal. Code Regs. 2 §11068(d)(5);

see also *Swanson*, supra at 970 (Cal. Ct. App. 2014).

In the instant case, Defendant required Mr. Snookal to search for and identify vacant positions in which he was interested and for which qualified, rather than fulfilling their affirmative duty[12] to search for and make available those opportunities. (PUF 87.) Worse still, Defendant concedes they required Mr. Snookal to apply and compete in the general applicant pool for these four positions, despite his "entitle[ment] to preferential consideration of reassignment to a vacant position." Cal. Code Regs. 2 §11068(d)(5). Ultimately, Chevron selected other candidates over Mr. Snookal for all four of those positions. (PUF 88.)

Further still, the position which Chevron eventually created for Mr. Snookal afterwards was a demotion in terms of responsibilities (both with respect to the REM position and Mr. Snookal's prior IEAR position) and in pay (with respect to the REM position). (PUF 92-93.) Offering an individual a "lower graded or lower paid position" is only allowable when "there are no funded, vacant comparable positions for which the individual is qualified with or without reasonable accommodation. . . " Cal. Code Regs. 2 §11068(d)(2).

Last, Chevron argues that because "Plaintiff was unable to perform the essential duties of the REM position and therefore cannot establish the essential elements of his failure to accommodate claim."[13] Though that is vigorously factually disputed, as explained above, that is also not the legal standard. "Summary adjudication of the section 12940(a) claim . . . turns on . . . whether [plaintiff] could perform the essential functions of the relevant job with or without accommodation. [Plaintiff] does not dispute that she was unable to perform the essential functions of her former position as a clothes fitter with or without accommodation. Under federal law, however, when an employee seeks

---

[12] Chevron now claims that the positions Mr. Snookal identified were not ones he was qualified for or would constitute promotions. While Mr. Snookal disputes this, it is also a nonstarter because he should not have been forced to do this in the first place.

[13] See Defendant's Motion for Summary Judgment at 16:23-25.

accommodation by being reassigned to a vacant position in the company, the employee satisfies the 'qualified individual with a disability' requirement by showing he or she can perform the essential functions of the vacant position with or without accommodation. . . To prevail on summary adjudication of the section 12940(a) claim, [defendant] must show there is no triable issue of fact about [plaintiff]'s ability, with or without accommodation, *to perform the essential functions of an available vacant position that would not be a promotion*." *Nadaf-Rahrov v. The Neiman Marcus Group, Inc.*,166 Cal.App.4th 952, 965 (Cal. Ct. App. 2008) (original italics, internal citations omitted.) Chevron cannot meet that burden.

### D.    Disputes of Material Fact Exist as to Mr. Snookal's Claim for Wrongful Termination

Defendants rely solely upon two August 4, 2021, pieces of paperwork Mr. Snookal submitted to Chevron to support its insistence that Mr. Snookal "left his employment simply because he felt his career with Chevron wasn't progressing as he would like" and to pursue "another position with 'significantly increased responsibility.'" (DUF 40-41.) Mr. Snookal's resignation email is three sentences long. Moreover, the resignation form which says Mr. Snookal was leaving for a job with "significantly increased responsibility" is a one-page document containing a single sentence. (Id.) This limited evidence is devoid of context concerning Chevron's treatment of Mr. Snookal and the underlying discrimination that led to his wrongful constructive discharge. (PUF 118.) During his deposition, Mr. Snookal testified to expressing to multiple people, including Greg Curtin and Austin Ruppert, his former supervisors, that he felt he had been treated unfairly by Chevron and that he felt he had no choice but to quit. (PUF 116.) He further testified to discussing discrimination specifically with Mr. Ruppert. (PUF 117.) Further still, Mr. Snookal testified to a logical explanation for why he did not state in his exit paperwork that he was faced with no choice but to leave: "The typical resignation letter doesn't say anything bad about a company that you're leaving, and I saw no benefit to writing it down . . ." and 'There's no point in putting it on this form which is just going to

get stuck in my file. They probably didn't even read it." (PUF 118.)

Mr. Snookal did not resign merely because his career "was not progressing as he wanted." (PUF 99-102, 118-120.) To the contrary, Chevron's arbitrary discrimination against him resulted in a demotion and systemic career stagnation. (Id.) In turn, Mr. Snookal began suffering debilitating symptoms of depression, and it created financial challenges that made it difficult for Mr. Snookal to support his family's needs, including his son's special education services. (PUF 97-102.) Mr. Snookal was thus forced to relocate out of state to help him start anew and attempt to better meet his family's needs. (Id.)

### E.    Disputes of Material Fact Exists as to Mr. Snookal's Entitlement to Punitive Damages

As a preliminary matter, Chevron significantly overstates Mr. Snookal's burden for opposing its motion for summary judgment as to punitive damages. As with every other type of claim on which Chevron seeks summary judgment, the moving party bears the burden to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. FRCP Rule 56(a). Although punitive damages indeed have a "clear and convincing" evidentiary standard, this "does not impose on a plaintiff the obligation to 'prove' a case for punitive damages at summary judgment." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1049 (Cal. Ct. App. 2002) citing *Cf. Rowe v. Superior Court*, 15 Cal.App.4th 1711, 1734–1735 (Cal. Ct. App. 1993).

Moreover, Defendant cites to *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1521 (9th Cir. 1988) in support of its proposition that "[a] finding of even unlawful discrimination or retaliation in personnel decisions would not itself justify punitive damages as such conduct is not the equivalent of malice or oppression." However, when accompanied by a finding of malice (i.e. an "intentional injury") or oppression ("despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights," punitive damages are indeed an appropriate remedy for employment

discrimination. See e.g. *Roby v. McKesson Corp.,* 47 Cal. 4th 686, 712 (Cal. S.Ct. 2009), as modified (Feb. 10, 2010); *Contreras-Velazquez v. Fam. Health Centers of San Diego,* Inc., 62 Cal. App. 5th 88, 106 (Cal. Ct. App. 2021), as modified on denial of reh'g (Apr. 7, 2021).

Here, Chevron intentionally ignored every indication of Mr. Snookal's miniscule risk, disregarded the recommendations of multiple doctors, including Mr. Snookal's own treating cardiologist and inflated the relative risk to Mr. Snookal in conscious disregard for Mr. Snookal's rights to be free of disability discrimination. (PUF 48-49, 52-53, 110-115.) This decision is even more intentional and malicious when compared to the fact that Chevron's oil refinery operations in Escravos, Nigeria are inherently dangerous for all of its employees, who "regularly" must be medevacked from the location. (PUF 68.) Thereafter, Mr. Snookal reported this discriminatory decision in writing, and the discriminatory decision was ratified by Chevron's managing agents, including Dr. Levy, Chevron's then Regional Medical Manager for the Europe, Eurasia, Middle East, and Africa, and who had authority to "create policies and protocols for [Chevron's] medical evacuations from the region area. (PUF 130.)

## V.   **CONCLUSION**

For the foregoing reasons, Mr. Snookal respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety.

Dated:  October 17, 2024

ALLRED, MAROKO & GOLDBERG


By _____
                    DOLORES Y. LEAL
                    OLIVIA FLECHSIG
                    Attorneys for Plaintiff,
                    MARK SNOOKAL

-44-

# DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff fails to raise any triable issues of fact in response to any of the Undisputed Facts identified by Chevron U.S.A. in support of its Motion for Summary Judgment, and Plaintiff's claims must be dismissed as a matter of law.  Plaintiff purports to add almost 90 additional facts which he claims are material to the claims in this action.  However, none are sufficient to dispute that Plaintiff's medical condition posed a direct threat to the health or safety of himself and others in Escravos, on which basis Plaintiff's REM offer was lawfully withdrawn.  Even if Plaintiff contends that the risk of an adverse incident occurring is low, there is still a cognizable, nonzero risk of severe consequences which support Chevron U.S.A.'s direct threat defense.

Plaintiff also fails to raise disputed issues of fact regarding Chevron U.S.A.'s duty to accommodate.  Nor can he, since he admitted at deposition that he never needed accommodations nor requested them.  Despite the fact that Chevron U.S.A. had no duty to accommodate, it nevertheless "accommodated" Plaintiff by ensuring Plaintiff was guaranteed a position in El Segundo after the REM offer was lawfully withdrawn while he explored other roles he was interested in and qualified for.  When Plaintiff was unable to obtain the positions he was interested in, Chevron U.S.A. created a position for Plaintiff – which paid the exact same as the position he was previously in – so could remain employed.

Despite Plaintiff's allegation that the allegedly discriminatory act of rescinding his REM offer created an intolerable working environment, Plaintiff continued to work for Chevron U.S.A. for almost two years after the offer was rescinded.  Plaintiff's claim of constructive discharge fails as a matter of law because he cannot establish that his working conditions were so intolerable that he had no choice but to quit.  Finally, because no Chevron U.S.A. employee made any final determination regarding Plaintiff's fitness for duty in Escravos, and Plaintiff furthermore failed to raise a triable issue of fact that any of the actors involved were officers, directors, or managing agents of Chevron U.S.A., Plaintiff's claim for punitive damages must also fail.  For these reasons, Chevron U.S.A. respectfully requests that the Court grant its Motion for Summary Judgment in full.

## II. **CHEVRON U.S.A. IS NOT LIABLE FOR DISABILITY DISCRIMINATION AS A MATTER OF LAW**

### A. **Rescission of the REM Position Was Not Disability Discrimination, Because a Group of Doctors Reasonably Determined That Plaintiff's Aortic Aneurysm Posed a Direct Threat to His Own Health and Safety and That of Others.**

By statute, an employer may lawfully withdraw an employment offer based on the results of a medical examination if hiring the employee would endanger their own health or safety or that of others, with or without a reasonable accommodation. Cal. Code Regs., tit. 2, § 11071(c). "Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ . . . an employee who, because of the employee's medical condition, . . . cannot perform [essential duties] in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations." Cal. Gov't Code § 12940(a)(2).

It is indisputable that Escravos is one of the most remote work environments imaginable. Plaintiff has never been to Escravos and therefore lacks any knowledge regarding the lack of access to medical care in Escravos for a serious cardiac event, such as an aortic rupture. Dr. Asekomeh, who works in Escravos and has personal knowledge, attested that Escravos is an exceedingly remote location, with limited access to medical resources or timely medical evacuations. (DUF 23.) The only way in or out of Escravos is by helicopter or boat. (DUF 10.) There are only two small medical clinics in Escravos, and they are only equipped to handle minor procedures, such as minor sutures for lacerations and handling minor illnesses. (DUF 9.) Any serious medical conditions must be evacuated for treatment in Lagos or Warri. (DUF 9.) Due to limited access to helicopters and the significant risk of inclement weather in Escravos depending on the time of year, reliable and timely medical evacuations are often unavailable and may take more than four hours. (DUF 10.) Moreover, a serious cardiac event requiring surgery would require the closest cardiothoracic surgeon to travel from the country of Benin to Lagos or Warri to perform the surgery, or the patient to be transported, 100 kilometers for treatment. (DUF 9.)

Based on these facts, and based on his consultation with at least two cardiologists in Nigeria about the risk of Plaintiff experiencing an aortic event, which all the doctors in this case agree was not zero, Dr. Asekomeh understood that if Plaintiff experienced such an event in Escravos, it would more

-46-

than likely result in his death.  (DUF 16.)  Although the REM position was a "desk job," as Plaintiff characterizes it, the REM would still be required to go into the field with their team.  (DUF 23.)  Due to this, Dr. Asekomeh also considered that the occurrence of an aortic event could potentially result in injury to others, which would be similarly exacerbated due to the lack of access to medical care in Escravos.  (DUF 23.)  With his medical condition, Plaintiff could not perform the essential duties of the REM position without endangering his own or others' health or safety, and the REM position was lawfully rescinded on that basis.  See *Hegwer v. Board of Civil Service Comm'rs*, 5 Cal. App. 4th 1011 (Cal. App. Ct. 1992) (finding no discrimination where an employee, who worked in a position "prone to job-related injury," was found to be at higher risk of heart problems due to being overweight and deemed unable to safely perform the job without endangering herself or others).

### B.    Chevron U.S.A. Plaintiff Posed a Direct Threat to the Health and Safety of Himself and Others.

Because Plaintiff could not perform the essential duties of his position without endangering the health or safety of himself or of others, Chevron U.S.A. has a valid defense to Plaintiff's disability discrimination claim.  *See* Cal. Code Regs., tit. 2, § 11067, subds. (b) and (c).  Courts consider the following factors in determining whether an employer has established the defense:

      (1)    the duration of the risk;

      (2)    the nature and severity of the potential harm;

      (3)    the likelihood that potential harm will occur;

      (4)    the imminence of the potential harm; and

      (5)    consideration of relevant information about an employee's past work history.

Cal. Code Regs., tit. 2, § 11067(e).

Where the duration of the risk exists for as long as the employee holds the position, the first factor weighs in favor of finding a direct threat.  *Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (citing 29 C.F.R. § 1630.2(r)).  As for the second and third factors, the Ninth Circuit has made clear that even where "the likelihood of an [incident] is small . . . if the threatened harm is grievous . . . even a small risk may be 'significant.'"  *Id.* (*quoting Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) (emphasis added).  Here, the potential harm is ***death***, so even if

-47-

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1   there is a small chance that a rupture would occur, the second and third factors weigh in favor of finding

2   a direct threat exists.  Additionally, courts have held that when it is impossible to predict whether or

3   when the occurrence will happen, as is the case here, it is an additional reason for the third factor to

4   weigh in favor of finding a direct threat.  *Milan v. Union Pac. R.R. Co.*, 2019 U.S. Dist. LEXIS 78489,

5   *19-20, 23-24 (Or. Dist. 2019) (*citing Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884, 894

6   (9th Cir. 2001)) (finding even a "very unlikely" chance of occurrence to be a "greater safety risk" due to

7   the unpredictability of the employee's condition).  Finally, where the "imminence," or immediacy, of the

8   potential harm is unknown, the fourth factor weighs in favor of finding a direct threat exists.  *Hutton*,

9   273 F.3d at 894-95 (finding a direct threat where the "imminence of the potential harm" is unknown

10  when the employee's medical condition is unpredictable).

11      Here, there can be no dispute that Plaintiff's assumption of the REM position would have posed

12  potentially grievous harm to himself and could have posed potential harm to others.  Contrary to

13  Plaintiff's assertions, the principle that "frequency, or the likelihood of risk, is not as important of a

14  factor in determining whether the patient is a direct threat when the potential harm is grave" remains a

15  guiding principle even after revisions to the FEHA implementing regulations.  *Grosso v. UPMC*, 857 F.

16  Supp. 2d 517, *538-39 (*citing Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884 (9th Cir.

17  2001); *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284 (10th Cir. 2000)) (collecting cases).

18      Plaintiff argues, in essence, that because the likelihood of an aortic event is small, his heart

19  condition should not disqualify him from taking the REM position.  Plaintiff offers multiple assumptions

20  about the likelihood that an aortic event might occur (suggesting, contrary to his own cardiologist's

21  statements, that the risk is less than 1% or less than 0.5%), but the risk of an occurrence would be

22  present throughout the time Plaintiff would be on assignment in Escravos.  (DUF 25.)  It is impossible to

23  predict if or when an aortic event might occur, or to reduce the risk of an occurrence by isolating

24  triggers.  (DUF 15.)  Plaintiff fails to acknowledge that, due to the lack of medical resources in

25  Escravos, an aortic event would likely have led to a catastrophic outcome -- Plaintiff's death -- and may

26  also have caused injury or death to other employees.  (DUF 23, 26.)  Additionally, Plaintiff attempts to

27  downplay the consequences of an aortic event occurring, i.e., his own death, but the death of any person

28  is a grievous harm that should not be taken lightly.  *See EEOC v. United Parcel Service, Inc.*, 424 F.3d

-48-

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1060, 1075 (*quoting McMillen v. Civil Service Commission*, 6 Cal. App. 4th 125, 131 (Cal. Ct. App. 1992) (finding an employer "owes a duty to the public and its employees affirmatively to avert disaster, rather than simply wait and hope it does not occur").

Plaintiff makes much of the fact that he did not have any prior aortic events during his employment history with Chevron U.S.A., but due to the very nature of Plaintiff's heart condition, occurrences cannot be predicted or prevented. (DUF 15.) The fact Plaintiff did not have any prior aortic events during his employment history is irrelevant. Accordingly, each of the five factors weigh in favor of finding a direct threat defense, and Plaintiff's disability discrimination claim fails.

### C. Plaintiff's MSEA Determination Was Made Based on the Best Available, Objective Evidence Provided by Plaintiff's Own Doctor and on Current Medical Literature on the Subject.

As Plaintiff states in his Opposition, whether Plaintiff's medical condition constituted a direct threat to his own health or safety or that of others must be determined based on "reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." Cal. Code Regs., tit. 2, § 11067(e). As is apparent in the record, Dr. Asekomeh made his determination of Plaintiff's fitness for duty in Escravos according to such standards. Dr. Asekomeh is himself a medical doctor with a Bachelor of Surgery and residency training in internal medicine capable of reviewing and assessing Plaintiff's medical records. (*See* DUF 22 [Asekomeh Dep. Tr. 18:21-19:6].) Although Dr. Asekomeh does not have specific expertise in cardiology, he consulted with cardiologists in Nigeria regarding Plaintiff's heart condition before making his determination. (DUF 22.) The cardiologists independently reviewed Plaintiff's medical records, as well as medical literature regarding Plaintiff's condition, and based on their education and experience concluded that an aortic event with limited resources in Escravos would be fatal. (DUF 22.)

Plaintiff cannot dispute that Dr. Asekomeh, as part of the local medical team in Nigeria, was the decisionmaker regarding Plaintiff's MSEA determination, not Dr. Sobel (who is located in Los Angeles). (DUF 6.) Likewise, Plaintiff does not dispute that his cardiologist, Dr. Khan, did not have the same knowledge as Dr. Asekomeh regarding the conditions and medical resource capacities in Escravos; nor would Dr. Khan have been responsible for evacuating Plaintiff in the event of an emergency, unlike Dr. Asekomeh. Dr. Khan's suggestion that he understood Plaintiff was seeking a job in a "rural or

-49-

remote area of Nigeria" is meaningless, as there is no indication Dr. Khan actually considered the ramifications of Plaintiff having limited access to medical care or timely medical evacuations if an aortic event should occur.

Additionally, Dr. Khan's assessment that Plaintiff's risk of an aortic event was perhaps "lower than the published 2% number above" acknowledged it was made contrary to published medical literature and was based only on Dr. Khan's speculation.  (PUF 53.)  Conversely, the cardiologists Dr. Asekomeh consulted reviewed published medical literature which supported their assessment of Plaintiff's medical condition.  (DUF 22.)  Dr. Asekomeh made a reasonable determination based on the objective facts available to him about the working conditions and medical resources available at Escravos, and the assessment of cardiologists based on Plaintiff's medical records and published medical literature.  (DUF 22.)  Although Plaintiff's expert opines that the risk of an aortic event occurring is less than 1%, Plaintiff's expert did not review the journal referenced by Dr. Khan indicating a 2% risk of occurrence nor address the discrepancy.  (*See* PUF 58, 60.)  Based on the available facts and medical knowledge, Dr. Asekomeh made a reasonable judgment on Plaintiff's MSEA determination.  Dr. Asekomeh's determination was not discrimination as a matter of law.

### D. Chevron U.S.A. Was Not the Employer of the REM Position, Nor Did It Ratify the Decision Made by Chevron Nigeria.

Plaintiff's assertion that Chevron U.S.A. was the employer of the REM position is based on nothing more than self-serving conjecture.  Plaintiff lacks the personal knowledge to dispute the employer of the REM position, and his arguments are contrary to the evidence submitted in support of this Motion: the Assignment Offer Plaintiff received for the REM position states that the SBU, or Strategic Business Unit, for the position is Nigeria Mid-Africa.  (DUF 4 [*see* Ex. E-1].)  Even assuming facts in the light most favorable to Plaintiff, as is required on a summary judgment motion, the fact that Plaintiff may have remained on Chevron U.S.A.'s payroll is irrelevant to whether Chevron U.S.A. made the determination that Plaintiff was not fit for the REM position in Escravos, which is the only basis for Plaintiff's belief that he was allegedly subjected to disability discrimination.  (DUF 30.)

Additionally, Plaintiff cannot dispute that Dr. Asekomeh made the determination that he was unfit for duty in Escravos.  (DUF 20.)  Plaintiff contends, without basis, that Dr. Asekomeh acted as

-50-

1   Chevron U.S.A.'s "direct agent," based solely on the fact Dr. Asekomeh conducted MSEA

2   determinations for individuals seeking to take on expatriate assignments in Escravos, Nigeria.  Plaintiff

3   does not, and cannot, dispute that Dr. Asekomeh was never employed by Chevron U.S.A. at any time.

4   (DUF 21.)  Plaintiff's assertion that Dr. Asekomeh's chain of command reported through Chevron

5   U.S.A.'s human resources department is a deliberate misrepresentation of deposition testimony in this

6   case.  (*See* DUF 6.)  Dr. Levy testified that Dr. Asekomeh reported to the medical director in Nigeria,

7   who in turn reported to the North Nigeria Mid Africa Business Unit.  (DUF 6.)  Similarly, any

8   insinuation by Plaintiff that Dr. Asekomeh performed work for Chevron U.S.A., or utilized guidelines

9   provided by Chevron U.S.A., misrepresents Dr. Asekomeh's testimony.  (*See* PUF 107-109.)  At no time

10  during his deposition did Dr. Asekomeh state that he performed work for Chevron U.S.A. (*Cf.* DUF 21.)

11  Dr. Asekomeh testified that the Medical Examination Protocol that he followed in conducting MSEA

12  was a global guide used by Chevron entities.  (PUF 109.)

13          Chevron U.S.A. did not ratify any decisions made by Chevron Nigeria.  Plaintiff's assertion that

14  Dr. Levy rendered a "second opinion" on Plaintiff's medical condition after Dr. Asekomeh's

15  determination is simply Plaintiff's arbitrary characterization and deliberate misstatement of the facts—

16  Dr. Levy was clear at deposition that his role was merely to act as an intermediary between Dr. Khan

17  and the Nigerian team and to help the Nigerian team evaluate the risks.  (PUF 86.)  Plaintiff cannot

18  dispute that no Chevron U.S.A. employee, including Dr. Levy, was involved in making Plaintiff's

19  MSEA determination.  (DUF 29.)

20          Plaintiff's reliance on *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir. 1981) is inapposite.

21  There, the employer contended that being male was a bona fide occupational qualification, claiming that

22  its South American clients would "refuse to deal" with a female employee.  *Id.* at 1276.  The *Fernandez*

23  court soundly rejected the employer's argument, finding that the discriminatory policies of other nations

24  cannot form the basis of a bona fide occupational qualification exception.  *Id.* at 1277 (*citing* EEOC

25  Decision No. 72-0697, CCH EEOC Decisions 1971, P 6317, at 4569.)  Here, it is undisputable that

26  Chevron U.S.A. did not make any decision with respect to Plaintiff's MSEA determination at all.  (DUF

27  6, 21, 29.)  Accordingly, Plaintiff's disability discrimination claim against Chevron U.S.A. fails.

28  **III.    PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM FAILS AS A MATTER OF**

**LAW.**

A.      **Plaintiff Never Needed Nor Requested Accommodations, So Chevron U.S.A. Had No Duty to Accommodate as a Matter of Law.**

Chevron U.S.A. had no duty to accommodate Plaintiff, since Plaintiff admits he did not need any accommodation and his failure to accommodate claim therefore fails as a matter of law.   Nevertheless, the company created a position for Plaintiff to ensure that he could remain employed after the REM job offer was rescinded.  "Two principles underlie a cause of action for failure provide a reasonable accommodation. First, the employee must request an accommodation." *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 54 (*citing Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 954 (1997)).  "Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith." *Gelfo*, 140 Cal. App. 4th at 54 (citing Jensen *v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 266 (2000)).  If an employee never requested an accommodation, the failure to accommodate claim fails, even if the employer was on notice of the disability.  *See Price v. Victor Valley Union High School Dist.*, 85 Cal. App. 5th 231, 249 (2022) (distinguishing *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 954) (finding that *Prilliman* does not excuse the employee's initial burden to request an accommodation in order succeed on a failure to accommodate claim).

Here, Plaintiff acknowledged that he never needed an accommodation from Chevron U.S.A. during his employment.  (DUF 13.)  As a matter of law, Plaintiff's failure to accommodate claim fails. *See Price v. Victor Valley Union High School Dist.*, 85 Cal. App. 5th 231, 249 (2022) (*citing Moore v. Regents of Univ. of California*, 248 Cal. App. 4th 216, 242 (2016)).  Plaintiff's argument that he was excused from requesting an accommodation because Chevron U.S.A. had notice of his heart condition was directly rejected by the *Price* court.  As a matter of law, Plaintiff's failure to accommodate claim fails.

B.      **Even If Chevron U.S.A. Had a Duty to Accommodate, Plaintiff Is Not Entitled to His Preferred Accommodation When the Accommodation Provided is Reasonable.**

Although Chevron U.S.A. had no duty to accommodate Plaintiff, it nevertheless ensured that Plaintiff remained employed and worked with Plaintiff to find a position he was qualified for and interested in.  An employer is not obligated to choose the best accommodation or the specific

-52-

1    accommodation preferred by Plaintiff, so long as the accommodation chosen is reasonable. *Miller v.*

2    *California Dept. of Corrections & Rehabilitation*, 105 Cal. App. 5th 261, 763 (2024) (*citing* cases).  A

3    reasonable accommodation may include reassignment to a comparable or lower graded vacant position

4    for which the employee is qualified. *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 377 (2015)

5    (*citing* Cal. Gov't Code § 12926(p)(2); Cal. Code Regs., tit. 2, § 11068, subds. (d)(1), (2)).

6    Reassignment is *not* required if there is no vacant position for which the employee is qualified, nor is an

7    employer required to promote or create a new position. *Nealy*, 234 Cal. App. 4th 377 (*citing*

8    *Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757, 767; Cal. Code Regs., tit. 2, § 11068, subd.

9    (d)(4); *Spitzer v. The Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1389 (2000).)  Provision of reasonable

10   accommodations does *not* require "creating a new job, moving another employee, [or] promoting the

11   disabled employee." *Spitzer*, 80 Cal. App. 4th at 1389 (2000) (*citing* authority).

12       Plaintiff's Opposition fails to acknowledge that even while his IEAR Team Lead position had

13   been filled following his offer for the REM position, Plaintiff remained employed with Chevron U.S.A.

14   following the rescission of the REM offer.  (DUF 33.)  Contrary to Plaintiff's assertions, Plaintiff was

15   not required to apply for new positions as an accommodation—he was invited to explore other positions

16   he was interested in, *while he continued to be paid in his prior IEAR Team Lead position*.   Plaintiff was

17   not qualified for the Maintenance Change Operating Assistant and the El Segundo Operating Assistant

18   positions, which required a college degree that Plaintiff does not have.  (PUF 89.)  When Plaintiff was

19   unable to get an offer for the new positions he sought, Chevron U.S.A. created the Reliability Change

20   Operating Assistant position for him, which paid the same as the IEAR Team Lead position he held

21   prior to receiving the REM offer.  (DUF 39)

22       Plaintiff's erroneous assertion that the Reliability Change Operating Assistant position was

23   inferior to the IEAR Team Lead position or the REM position in responsibility or compensation is

24   irrelevant, even if taken as true for purposes of this summary judgment motion.  Chevron U.S.A. could

25   place Plaintiff in a lower graded position as a reasonable accommodation.  Cal. Code Regs., tit. 2, §

26   11068, subd. (d)(1), (2).  Additionally, Chevron U.S.A. is not obligated to create a position for Plaintiff

27   as a reasonable accommodation as a matter of law.  *Spitzer*, 80 Cal. App. 4th at 1389 (2000) (*citing*

28   authority).  Since there were no comparable, vacant positions that Plaintiff was qualified for,

-53-

1  reassignment to another position was not required. *Cuiellette*, 194 Cal. App. 4th at 767. Notably, it is

2  undisputed that, following a short period working in the Reliability Change Operating Assistant

3  position, the role was eliminated due to an organizational restructure and Plaintiff was ultimately

4  reassigned to his original IEAR Team Lead position. (PUF 92-93.)

5
6  **IV.   PLAINTIFF CANNOT SHOW UNDER AN OBJECTIVE STANDARD THAT HIS WORKING CONDITIONS WERE SO INTOLERABLE AND AGGRAVATED THAT HE WAS COMPELLED TO RESIGN**

7      Plaintiff's allegations in support of his constructive termination claim fall far short of the

8  objective standard of "intolerable" or "aggravated," and cannot support his claim as a matter of law.

9  *Cloud v. Casey*, 76 Cal. App. 4th 895 (Cal. Ct. App. 2d Dist. 1999) is instructive here. In *Cloud*, the

10  employee stated in her exit interview that her reason for resigning was the "[l]ack of upward mobility

11  and recognition"—namely, the denial of a promotion to company controller. *Id.* at 900. The employee

12  alleged a "continuous pattern" of adverse and discriminatory conditions over a six-year period which she

13  contended made her working conditions intolerable. Id. at 903. The employee further alleged that she

14  had been denied promotions and excluded from meetings on the basis of her gender, which denied her

15  the experience necessary to qualify for the controller role, and that despite her inquiries, she was not

16  offered other job opportunities to advance her career. Id. at 903-04. Finally, the employee alleged that

17  company management told her they did not "see a woman" taking the controller's position. Id.

18      The *Cloud* court found that even if the employee's allegations supported a determination that she

19  was a victim of gender discrimination, the issue is "whether the discriminatory working conditions were

20  so extreme as to coerce a reasonable employee to resign, thereby constituting a constructive discharge."

21  Id. at 905. Where the employee continued to work for her employer for nearly a year after the alleged

22  discriminatory denial of her promotion, the *Cloud* court found there was a strong inference that the

23  working conditions were not "so intolerable that a reasonable person would have to resign" and affirmed

24  the trial court's ruling that the employee's resignation was not a constructive discharge as a matter of

25  law. Id.

26      The *Cloud* case is on point. Plaintiff alleges he was denied the REM position for discriminatory

27  reasons and that, despite his efforts, he was not able to find any other rotational expatriate assignments

28  for which he was eligible and could apply. (PUF 94-95.) Yet it is undisputed that Plaintiff continued to

-54-

work for Chevron U.S.A. for ***almost two years*** following these alleged events, from September 4, 2019, the date the REM position was rescinded, to August 20, 2021, the effective date of his resignation. (DUF 28, 40.)  Plaintiff fails to cite any authority suggesting his allegation that he sought therapy for his alleged emotional distress following the denial of the REM position is in any way relevant to his constructive discharge claim.  Even if Plaintiff's allegations supported a determination that he had been discriminated against on the basis of his disability, which they cannot, the undisputed fact is that Plaintiff continued to work for Chevron U.S.A. for almost two years after the alleged discriminatory act. Plaintiff's constructive termination claim fails as a matter of law.

## V.    <u>PLAINTIFF DID NOT DISPUTE THAT NO OFFICER, DIRECTOR, OR MANAGING AGENT OF CHEVRON U.S.A. ENGAGED IN FRAUD, OPPRESSION, OR MALICE.</u>

Plaintiff claims, without citation to any legal authority, that the denial of the REM position was "intentional" and "malicious" such that Chevron U.S.A. is liable for punitive damages.  Plaintiff's assertion misstates the law.  Punitive damages against Chevron U.S.A. if there is "clear and convincing evidence" that an officer, director, or managing agent of Chevron U.S.A. engaged in an act of oppression, fraud, or malice.  *See* Cal. Civ. Code § 3294(a); *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1119-20 (Cal. Ct. App. 2001) (finding a plaintiff must meet the "clear and convincing evidence" standard on a motion for summary judgment).  Plaintiff overstates Dr. Levy's involvement in the setting of Chevron U.S.A.'s policies, as he only provided recommendations based on his knowledge of the countries in the Europe, Eurasia, Middle East, and Africa regions.  (*See* PUF 130.)  As Dr. Levy testified, the Center of Excellence managed the creation of policies, not him.  (*Id.*)   In any event, it is undisputed that no Chevron U.S.A. employee, including Dr. Levy, made any final determination in whether Plaintiff was ultimately awarded the REM position in Escravos.  (DUF 29.)  Plaintiff's claim for punitive damages must fail as a matter of law.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Chevron U.S.A. respectfully requests that the Court grant its motion for summary judgment.

1  Dated:  October 24, 2024

2                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                          By _____
                                              /s/ Sarah Fan
5                                        TRACEY A. KENNEDY
                                         ROBERT E. MUSSIG
6                                        H. SARAH FAN

7                                        Attorneys for Defendant
                                         CHEVRON U.S.A. INC.,
8                                        a Pennsylvania Corporation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4880-9577-6242.3          DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
                               IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT