## DECLARATION OF DR. ESHIOFE ASEKOMEH

I, Dr. Eshiofe Asekomeh, declare as follows:

1. I currently work as Staff Physician-in-Charge at the Escravos Joint Venture ("JV") clinic in Escravos, Nigeria. I have held this position since November 3, 2021. Prior to this, I worked as an Occupational Health Physician at the Chevron Hospital in Warri, Nigeria between July 2016 and October 2021. I have personal knowledge of the facts set forth in this declaration, which are known by me to be true and correct. If called as a witness, I could and would competently testify concerning these facts under oath.

2. As part of my job duties, I conduct Medical Suitability for Expat Assignment ("MSEA") evaluations for applicants who have been conditionally offered an expatriate assignment located in Nigeria.

3. I have never been employed at any time by Chevron U.S.A. Inc., a Pennsylvania corporation.

4. The healthcare system infrastructure in Escravos, Nigeria is not set up to handle complex cases. It has limited internal health support, and external health care resources for tertiary level care are very limited. There are only two clinics in Escravos – the Escravos JV Clinic and the Escravos Gas to Liquids ("EGTL") clinic, with at most three doctors (one in Escravos, two at EGTL). At these clinics, there are no surgeons, and only minor procedures can be performed, such as minor sutures for lacerations, and handling minor illnesses. The clinics cannot perform blood transfusions and cannot provide other acute surgical care.

5. Individuals with any serious medical condition must be evacuated to Lagos or Warri. For serious cardiac events requiring surgery, the closest cardiothoracic surgeon works for the government hospital in Benin, approximately 100 kilometers away from Escravos. The surgeon must travel from Benin or the patient must be transferred to Benin for treatment.

6. The Chevron facility in Escravos is in an isolated swamp located on a river coast only accessible by helicopter or by boat, making regular and emergency access in and out of the facility difficult. Helicopters are not always available for transport. There are no roads in or out of Escravos.

-1-

7. In the event of bad weather in Escravos or Lagos, medical evacuation could take more than four hours. Escravos has bad weather up to 50% of the time, as does Warri or Lagos during rainy season of April through October.

8. As part of Plaintiff Mark Snookal's MSEA for the Reliability Engineering Manager ("REM") position in Escravos, I reviewed Mr. Snookal's medical records from his visit with Dr. Irving Sobel. During the MSEA process, Mr. Snookal disclosed that he had a distorted aortic root, otherwise known as a thoracic aortic dilatation or aneurysm, at risk of rupture or dissection.

9. In making my assessment of Mr. Snookal's medical clearance, I reviewed Mr. Snookal's medical records and consulted with two cardiologists in Nigeria who were familiar with Mr. Snookal's type of aortic condition—Dr. Victor Adeyeye in Warri and Dr. Ujomoti Akintunde in Lagos. Drs. Adeyeye and Akintunde independently reviewed Mr. Snookal's medical records and opined that if Mr. Snookal were to experience an aortic event in Escravos, it would likely lead to his death, given the limited medical resources in Escravos.

10. Based on my consultation with Drs. Adeyeye and Akintunde, I understood that there was no way to minimize the risk of an occurrence, because a rupture or dissection was not predictable, and it was not possible to isolate triggers to reduce the risk of an occurrence. However, I understood that the risk of death from an occurrence could be mitigated provided Mr. Snookal could promptly receive appropriate medical care and be stabilized pending treatment.

11. Following my consultation with Drs. Adeyeye and Akintunde, I concluded that Mr. Snookal could not be cleared for assignment in Escravos, which lacked the necessary medical resources and was too remote for reliable medical evacuation. However, I cleared Mr. Snookal for assignment in Lagos, which did have a hospital with resources capable of stabilizing Mr. Snookal following a rupture or dissection. A true and correct copy of the Expatriate Exam Recommendations that I completed regarding Mr. Snookal on August 15, 2019, is attached here as **Exhibit C**.

12. Following completion of my recommendations, I understand Dr. Scott Levy, Regional Medical Manager for Europe, Eurasia, Middle East & Africa, communicated several times with Mr. Snookal's cardiologist, Dr. Steven Khan, to determine whether Mr. Snookal could safely

assume the expatriate assignment in Escravos. Dr. Khan indicated that he believed Mr. Snookal's risk of rupture or dissection was approximately 2% per year, based on a 2002 medical study on the subject. However, even though the risk of an occurrence is relatively low, whether a rupture or dissection will occur is unpredictable, and the consequences are extreme. Given the lack of adequate medical care in Escravos for an aortic event, and that Mr. Snookal could not count on a timely medical evacuation in such circumstances, any occurrence in Escravos would likely be fatal. As I understand Mr. Snookal's duties as an REM would require him to inspect and operate or to supervise the operation and inspection of heavy machinery, an aortic event could cause injury to other employees, who likewise have limited access to evacuation for medical treatment, leading to serious impairment or even death.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 21, 2024 at Escravos, Nigeria.

*Asekomeh Eshiofe*
_____
DR. ESHIOFE ASEKOMEH