**DECLARATION OF MARK SNOOKAL**

I, Mark Snookal, declare as follows:

1. I am the Plaintiff in the matter titled Mark Snookal v. Chevron USA, Inc., a California corporation and DOES 1 through 10. I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify competently to such facts under oath.

2. I applied to work at Chevron in 2008 as I had learned that Chevron had a social forwardness philosophy described as "the Chevron way" which was focused on treating people with respect, believing in Diversity, Equity, and Inclusion (DEI), and emphasizing collaboration and mutual support among employees.

3. As such, I was very happy when I was hired by Chevron in January of 2009 as an Analyzer Engineer at Chevron's El Segundo, California refinery. I performed design and engineering functions for the installation of Analyzer systems in all divisions of the refinery.

4. Upon my hire and for the next twelve years, I demonstrated my strong work ethic, my abilities and commitment to Chevron. During my twelve years of employment with Chevron, I was promoted multiple times. In 2011, I was promoted to Maintenance Supervisor Analyzer and Digital Group. In 2013, I was promoted to Analyzer Reliability Improvement Champion in the Technical Services Department. In 2016, I was promoted yet again to Instrumentation Electrical and Analyzer Reliability Team Lead in the Reliability Department.

5. In May of 2019, I applied for the Reliability Engineering Manager ("REM") position in Escravos, Nigeria with an assignment duration of 3-4 years. This would mean that I would be an expatriate employee on a rotational assignment. Some of the tremendous benefits for this position are that it would come with a 55% annual premium pay (on top of my base salary grade 22), and it

was a rotational assignment where I would only have to work 28 days in Escravos and 28 days off, during which I could return home. This meant that I would only work 6 months out of the year for an annual salary for grade 22 plus the 55% annual premium pay. This was a significant financial gain which was necessary for me to properly care for my family's needs and have a better work-life balance.

6. When I interviewed for the position, the hiring manager and another Chevron employee, Michelle Johansen, told me that I would be eligible for a promotion to a salary grade 23 after six months in the role.

7. Chevron sent me an "Assignment Offer" letter confirming that I was offered the REM position with a start date of July 1, 2019. Chevron advised: "Contingent upon obtaining work/residence permit clearance where applicable and Company medical suitability for assignment where required by law (and/or related to your job and consistent with business necessity), you are offered the following assignment…" A true and correct copy of said "Assignment Offer" letter (SNOOKAL-00647-650) is attached hereto as Exhibit 1.

8. Chevron then advised me that I was to have a medical examination by Dr. Irving Sobel to complete the medical evaluation form, titled, "Medical Suitability for Expatriate Assignment History & Physical Examination" (hereinafter "MSEA"). I had never before met Dr. Sobel, as he was someone selected by Chevron to complete my MSEA exam. On July 24, 2019, Dr. Sobel completed the MSEA form and in the remarks section noted that I had a "dilated aortic root followed by cardiology ongoing studies yearly echo vs CT chests stable on meds." Dr. Sobel also wrote "Fit for Duty with Restrictions" "no heavy lifting >50 lbs" (which was irrelevant since I would not be required to do heavy lifting) and "needs review of recommend letter from cardiologist to clear him." A true and correct copy of said MSEA exam completed by Dr. Sobel (SNOOKAL-00605-610) is attached as Exhibit 2.

9. As a result of Dr. Sobel's request that I needed a recommendation letter from my cardiologist, I contacted my treating cardiologist, Dr. S. Khan. Dr. Khan was an attending Cardiologist, Division of Cardiology, SCKPMG and a Clinical Associate Professor, UCLA School of Medicine. I advised Dr. Khan that I had applied to work in Escravos, Nigeria and needed a letter from him about my ability to safely work there. We discussed that the position in question was a supervisory position, and a "desk" job. On July 29, 2019, Dr. Khan wrote a letter, "Dear Sirs: Mr. Snookal is under my care for his heart condition. It is safe for him to work in Nigeria with his heart condition. His condition is under good control and no special treatments are needed." A true and correct copy of this letter (SNOOKAL-00665) is attached as Exhibit 3. I promptly submitted this letter from Dr. Khan to Chevron.

10. I learned that on August 15, 2019, Dr. Eshiofe Asekomeh had opined that I was "NOT fit for duty." I received a copy of the "Expatriate Exam Recommendations" form where Dr. Asekomeh wrote "NOT FIT for Duty." "Remote location can be cleared for assignment in Lagos." A true and correct copy of same (SNOOKAL-01099) is attached as Exhibit 4.

11. Because of Dr. Asekomeh's determination, Chevron rescinded the job offer. I was shocked since I had been medically cleared by two physicians, and I had successfully managed the dilated aortic root since 2014-2015 when I was first diagnosed, and it remained stable. In addition, I consistently followed my cardiologists' advice

12. Moreover, insofar as I needed the recommended preventative treatment for my dilated aortic root (an annual CT and echocardiogram to monitor changes in size, and blood pressure medication); I would have been readily able to access this care during the half of the year I was home in California and off duty.

13. I felt this decision was a form of disability discrimination and that I

3
DECLARATION OF MARK SNOOKAL

1  needed to appeal this decision. I contacted the Chevron Ombuds, and I was
2  ultimately put in contact with Dr. Scott Levy, Chevron's Regional Medical
3  Manager for Europe, Eurasia, Middle East & Africa.
4         14.    I spoke with Dr. Levy several times. Dr. Levy advised me that
5  although Dr. Sobel and Dr. Khan had cleared me, the final decision was up to the
6  local staff in Nigeria, Dr. Asekomeh. Dr. Levy explained that the jobsite was in a
7  remote area in Nigeria with limited medical facilities and emergency medical care
8  could only be provided by charter aircraft using the facility airstrip to Lagos.
9         15.    I pled with Dr. Levy to look into the matter as I was qualified for the
10 position and my cardiologist opined that my having an aortic root was not a
11 concern. Dr. Levy requested permission to discuss my medical history with Dr.
12 Khan, and I gave the permission.
13        16.    I was copied on email correspondence between Dr. Khan and Dr.
14 Levy of August 23, 2019 and August 26, 2019. Dr. Khan wrote: "Mr. MS's
15 aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm
16 size is 4.1-4.2 cm on his most CT scan. From published studies, the risk of rupture
17 or dissection is 2% per year for aneurysms between 4.0 and 4.5cm (Ann Thor Surg
18 2002 Vol 73, pg. 17-28, figure 3). Further the average rate of growth of the
19 thoracic aortic aneurysm is 0.1%/year and Mr. MS's aneurysm has not changed
20 between his CTs in May 2016, May 2017 and April 2019. Since Mr. Snookal's
21 aneurysm has not shown any growth for 3 years, his risk may be lower than the
22 published 2% number above which would be based on "average" growth rates.
23 Finally, the studies of risk of rupture are fairly old (2002) and treatment has
24 improved as has our understanding of aortic aneurysms. For example, animal
25 studies have shown a significant benefit from use of Angiotensin Receptor
26 Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr.
27 MS is on an ARB. In summary, Mr. MS's risk of serious complications related to

4
DECLARATION OF MARK SNOOKAL

his thoracic aortic aneurysm is low and likely less than 2% per year. The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan." A true and correct copy of this email thread (Snookal-00089-90) is attached as Exhibit 5.

17. Dr. Levy responded, "Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss." *Id.*

18. On September 4, 2019, I contacted Senior Human Resources Manager, Andrew Powers by sending him an email stating in part, "I am very disappointed in that decision by Chevron medical to classify me as "unfit" for the reliability engineering manager physician at EGTL. I believe this decision was made on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore discriminatory in nature. As my condition does not affect my ability to perform the job duties that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic…Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning and they are rescinding the offer, but my position in El Segundo has already been filled." A true and correct copy (CUSA000542-543) is attached as Exhibit 6.

19. I am aware that the REM position does not require the operation of equipment, heavy or otherwise. The position is not considered a safety-sensitive position, nor is it physically strenuous. It is an "office based job." I have reviewed Chevron's "Physical Requirements and Working Conditions GO-308" completed in connection the REM position in question, and it confirms that the position is not a safety-sensitive position. A true and correct copy of this form (CUSA000208-

220) is attached as Exhibit 7.

20. I advised Mr. Powers that I wanted an explanation from Chevron Medical regarding their reason for rescinding the position. As such, Dr. Levy sent me an email dated September 16, 2019, stating, *inter alia*, "I understand that you are willing to take the risk of potentially dying on the job, and that you do not feel it is the company's place to make that decision for you. I agree to a certain extent and recognize your concerns about paternalism. However, the company does have a right to not engage individuals where their assignments could pose 'a direct threat' to their own health and safety." Dr. Levy continued, "The concern is that ***if the condition were to occur***, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos. There is no medical capability to manage this type of emergency in Escravos or anywhere near Escravos." (emphasis added). A true and correct copy (SNOOKAL-00645-646) is attached as Exhibit 8.

21. I am informed that Dr. Asekomeh opined that any medical evacuation in Escravos would depend on the availability of a helicopter and whether the weather permitted an evacuation, so a rupture or dissection in Escravos would likely result. I am aware that access is also available to Escravos by fixed wing plane, which is used to transport employees who are rotating in or out of the assignment on a regular basis.

22. No one asked me if I was willing to sign an acknowledgement and waiver of liability stating that if I suffered a medical condition, including an aortic rupture or dissection in Escravos, that it was possible that medical care could be delayed and that I was nonetheless willing to work in Escravos.

23. After I was selected for the REM position, Chevron filled my old position with someone else. As such, after the REM position was rescinded, I was forced to find a new position.

6
DECLARATION OF MARK SNOOKAL

24. I searched for availabilities and applied for four vacant positions, Operating Assistant (which had two openings), General Team Lead and Maintenance Change Operating Assistant. Chevron made me compete with the general applicant pool, and I was not selected for any of the four positions.

25. Since I was out of a job, I learned that my then supervisor, Austin Ruppert, created a position, "Reliability Change Operating Assistant" for me. However, it was a demotion since it was not a supervisory role (as I previously held and as I would have held had the REM position not been rescinded), and it was a temporary position with no path to promotion.

26. Even after this, I continued to search for any other rotational expatriate assignments I was eligible to apply for, and for other job opportunities generally. I also subscribed to get regular updates regarding any new availabilities from Chevron's internal job posting site. Still, I never found anything that became available to which I was eligible to apply.

27. The fact that Chevron rescinded the REM position because of my disability, and I was now in a position with no path to promotion, I fell into a depressive state. In or about November of 2019, I began treating with a therapist, and in or about October of 2020, I began taking antidepressants.

28. I am the breadwinner for my family, including my son who is on the autism spectrum. During the time when I believed I would be starting the REM position and thereby receiving significantly increased pay, I enrolled my son in a private school that offered special services for his educational needs. After the REM position was rescinded from me, I could not afford to reenroll him in that private school. This has been devastating for me.

29. I felt forced to resign my employment and ultimately, my therapist and I decided that the best course of action for my health was to resign my employment with Chevron. On August 4, 2021, I sent a letter notifying Chevron

that I was resigning my position effective August 20, 2021. A true and correct copy (Snookal Depo. Exhibit 17) is attached as Exhibit 9.

30. At the time of my resignation, I filled out a form that said "I am leaving for an opportunity with significantly increased responsibility." This sentence did not capture all of the reasons I felt I had no choice but to leave my employment with Chevron, as explained further above. A true and correct copy (SNOOKAL-01143) is attached as Exhibit 10.

31. Afterwards, I relocated out of state to try to better support my family.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on October ___Oct 16, 2024___, 2024, at Vancouver, Washington.

Mark Snookal (Oct 16, 2024 16:39 PDT)
_____
Mark Snookal