# EXHIBIT 12

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| MARK SNOOKAL, an individual, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No. |
| | ) 2:23-cv-6302-HDV-AJR |
| | ) |
| CHEVRON USA, INC., a California | ) |
| Corporation, and DOES 1 through | ) |
| 10, inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657


**EXHIBIT 12-1**

Scott Levy, M.D.                                            August 30, 2024

```
 1                    A P P E A R A N C E S

 2

 3

 4   FOR THE PLAINTIFF:

 5           ALLRED, MAROKO & GOLDBERG
             By:  OLIVIA FLECHSIG
 6                DOLORES Y. LEAL
             Attorneys at Law
 7           6300 Wilshire Boulevard, Suite 1500
             Los Angeles, California 90048
 8           (323) 653-6530
             oflechsig@amglaw.com
 9           dleal@amglaw.com

10   FOR THE DEFENDANT:

11           SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
             By:  ROBERT E. MUSSIG
12           Attorney at Law
             333 South Hope Street, 43rd Floor
13           Los Angeles, California 90071
             (213) 620-1780
14           rmussig@sheppardmullin.com

15   THE VIDEOGRAPHER:

16           Jacob Rivera

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 12-2**

Scott Levy, M.D.                                                    August 30, 2024

1      Q.   Anyone other than your attorney?

2      A.   I have not.

3      Q.   Okay.  Have you ever been convicted of a crime?

4      A.   I have not.

5           MR. MUSSIG:  Okay.

6           THE WITNESS:  Oh, sorry.

7           MR. MUSSIG:  I would object on privacy grounds,

8   but you've already answered, so...

9   BY MS. FLECHSIG:

10     Q.   Okay.  And what's your date of birth, Dr. Levy?

11     A.   April 8, 1973.

12     Q.   Okay.  So you're currently an employee of

13  Chevron; correct?

14     A.   I am.

15     Q.   Do you know what the name of the entity you

16  work for is, like, specifically, like, the corporate

17  entity, to clarify?

18     A.   I work for -- it changes all the time, which

19  makes things a little complicated, but I work for

20  Chevron USA.

21     Q.   Okay.  Do you know when that last changed?

22     A.   No, it's not clear.  And I can explain.  I've

23  had several assignments with the company throughout my

24  12 years here, and so I've worked under different

25  businesses, so it's -- but I think I've -- I think

**EXHIBIT 12-3**

Scott Levy, M.D.                                                    August 30, 2024

1   technically I may have always been on the Chevron USA.

2   I'm just not completely aware.  I've never changed

3   payrolls or anything like that, though.

4        Q.  Okay.  Is your understanding that your

5   paychecks are paid by Chevron USA or Chevron USA Inc.?

6        A.  It is my understanding that that's what

7   happens, yes.

8        Q.  Okay.  I think you just said you worked for

9   Chevron for 12 years, so you would have started in or

10  about 2012?

11       A.  Correct.

12       Q.  Okay.  I want to go through just your whole,

13  sort of, work history with Chevron.

14          What -- what was your role when you started in

15  2012?

16       A.  I started as -- my title was the occupational

17  health manager for North America.

18       Q.  What -- just, sort of, briefly, what kind of

19  job were you doing in that capacity?

20       A.  Sure.  So my -- my agreement was our businesses

21  across -- like, across North America -- my job was to --

22  I was an internal consultant to our businesses.

23          So if our businesses needed to set up medical

24  operations, I would be the one to help with that and

25  advise.  I would also help run their occupational health

**EXHIBIT 12-4**

Scott Levy, M.D.                                                    August 30, 2024

1    program across North America and then involved with

2    different health and wellness events as they arose.

3              (Reporter clarification.)

4    BY MS. FLECHSIG:

5        Q.  How long were you in that occupational health

6    role?

7        A.  It was about two years or so.

8        Q.  What was your next role?

9        A.  I was moved to Singapore, and I was assigned

10   the role of regional medical manager for the Asia

11   Pacific region.

12       Q.  What did you do in that capacity?

13       A.  Similar responsibilities just -- I guess, more

14   of a -- of a senior position.  So I managed, again, more

15   complicated businesses and had more reports.

16       Q.  How long were you in that role?

17       A.  Three years approximately.

18       Q.  Okay.  And after that -- excuse me, the role in

19   Singapore, what was your next role at Chevron?

20       A.  I took a lateral position to regional medical

21   manager of our EEMEA, E-E-M-E-A, region, which is

22   Europe, Eurasia, Mid East, and Africa, based out of

23   London.

24       Q.  Okay.  So what was the date range on that -- on

25   that role?  I want to -- like, in time.

**EXHIBIT 12-5**

Scott Levy, M.D.                                          August 30, 2024

1      A.  It ended on May 31st of this year.  So I moved

2   to my current role May 31 -- on June 1st.  So it was

3   May 31st and then I would subtract seven years.  2017

4   roughly, '18.

5      Q.  Started 2018, and then you were in that role

6   until May 31st, 2024?

7      A.  Correct.

8      Q.  Okay.  Were you located in London that whole

9   time?

10      A.  I was.

11      Q.  Okay.  And what's your current role?

12      A.  I now have the role of regional medical manager

13   for the Americas based out of Houston.

14      Q.  Do you know what entity -- what Chevron

15   corporate entity was your employer during the time you

16   were the regional medical director for the EEMEA role?

17      A.  Yeah, so I was working out of the -- it was

18   Chevron Products UK.  And, again, that was the title

19   that we used in my signature.  I can't tell you the

20   technical bits, though, about payroll and whether I was

21   paid through Chevron USA or not, but my paychecks remain

22   the same -- through the same -- for my 12 years that I

23   was a Chevron employee.

24      Q.  You mean the entity that's paying your paycheck

25   is the same?

**EXHIBIT 12-6**

Scott Levy, M.D.                                    August 30, 2024

1      A.  I kept the same benefits.  I kept the same --
2   nothing's really changed.  I stayed on the same payroll.
3   Obviously the amounts changed, but -- over time, but no,
4   it's the same payroll.  That's more of an HR question.
5   I don't have the -- the info, I guess.  I don't know the
6   answer.
7      Q.  And prior to starting work with Chevron, where
8   were you employed?
9      A.  I worked for the Permanente Medical Group.
10  It's a large physician group in Northern California.
11     Q.  Is that -- I'm sorry, you said Permanente?
12     A.  The Permanente -- "permanent" with an E.
13  Permanente Medical Group.
14     Q.  Okay.
15     A.  TPMG.
16     Q.  Okay.  So did you practice medicine, then,
17  between the time -- like, up until the time you joined
18  Chevron?
19     A.  I did.
20     Q.  Okay.  And when did you graduate from medical
21  school?
22     A.  '99.
23     Q.  And then you completed residency?
24     A.  I completed two residencies, yes.
25     Q.  Okay.  What were your residencies?

EXHIBIT 12-7

Scott Levy, M.D.                                    August 30, 2024

1          Q.   Okay.   Do you -- did you get any specialized

2     training in cardiology?

3          A.   I have not.

4          Q.   Do you have any Board certifications?

5          A.   I'm Board-certified in internal medicine and

6     occupational environmental medicine as well.

7          Q.   Okay.   So I want to ask about your job duties

8     while you were the regional medical director of the EMEA

9     region -- am I getting the acronym correct?

10         A.   You are, yes.

11         Q.   EMEA.   Okay.

12              While you were the regional director of the

13    EMEA region, what were your job duties?

14         A.   Yeah, it's EEMEA.   But that's okay.

15         Q.   EEMEA.

16         A.   Yeah.   That's okay.

17         Q.   Thank you.

18         A.   My job duties -- so again, internal consultant

19    to our businesses, we've had -- again, a lot of our --

20    we have new business, we have old business, we have

21    small projects, big projects.   So I would say that for

22    the large projects, they had embedded medical teams.   So

23    my job was usually to interact with the teams, make sure

24    that they got what they needed.   I would help them -- I

25    would help train or mentor.   I would review processes

**EXHIBIT 12-8**

Scott Levy, M.D.                                         August 30, 2024

1    and try to align some of the work coming from our

2    corporate function down to the embedded businesses.

3             I would also serve as -- I would manage

4    emergencies.  So when I say "emergencies," the -- if

5    there wasn't anyone present, we didn't have a medical

6    operation on the ground in a certain country, I would

7    help facilitate care for our people to get them where

8    they needed to be.

9             So lots of medical evacuations and things like

10   this.  A lot of cross-border transfers.  So let's just

11   say -- we're talking about a case from Nigeria today.

12   So if I was -- so if we were evacuating someone from

13   Nigeria, I would help facilitate care from Nigeria out

14   to another country, manage the issue -- or help case

15   manage the issue while in that second country, and then

16   see the process to the end when we get the person back

17   home safe and sound.

18             And so those would be some of the things we do.

19   I -- we would help put together

20   health-and-wellness-related programs and things like

21   that to keep employees safe, to keep -- to keep the

22   workforce healthy, and then we would also review and

23   evaluate our fitness-for-duty programs to make sure that

24   they were functioning as intended.

25        Q.  Okay.  So in terms of managing the

**EXHIBIT 12-9**

Scott Levy, M.D.                                      August 30, 2024

1   fitness-for-duty programs, do you get to create the

2   policies and protocols for how the evaluations are

3   carried out?

4          A.   Influence.   I influence it, yes.

5          Q.   Okay.   What do you mean you "influence it"?

6          A.   So we have policies related to fitness for

7   duty, and I'm jumping -- maybe jumping ahead because

8   this is an expat-related case, and so -- so in this

9   situation, we -- there's a policy for expat medical

10  clearances.

11              And as time goes and things need to be updated,

12  I may pass on my thoughts and ideas to the -- to the

13  team that manages the policies.

14         Q.   Okay.   What team manages the policies?

15         A.   So at the time, the team was called the Center

16  of Excellence.

17         Q.   Okay.   And that's a -- Chevron corporate or --

18         A.   Sorry.   Yes.   I'm sorry for speaking over you.

19              Yes, that is -- it's a function under our

20  health and medical department.

21         Q.   So what kind of -- I guess what kind of

22  consulting role do you have on creating the policies and

23  practices for that, then?

24         A.   So --

25              MR. MUSSIG:   Vague as to time.

**EXHIBIT 12-10**

Scott Levy, M.D.                                                                    August 30, 2024

```
 1   BY MS. FLECHSIG:
 2        Q.  Yeah.  I can clarify.
 3           I do mean, you know, while you were the
 4   regional EEMEA director.
 5        A.  Sure.  So the countries change over time.
 6   Sometimes the countries get safer, sometimes they get
 7   less safe, sometimes they have issues.  And so mostly it
 8   was taking a look at frequency of the evaluations,
 9   taking a look at the new risks that may be in a location
10   that weren't there before.
11           Again, things could be -- infectious diseases
12   that are in a place, cholera, malaria, ebola at times --
13   so making sure that when we send people from one
14   location to another that the -- that, A, they're safe to
15   be there; and, B, they're -- we can keep them safe from
16   whatever outside hazards they would -- they may -- they
17   may face, and they're well-informed of their risks.
18        Q.  Okay.  So -- so in other words, you have a role
19   in evaluating the real-time risks based on location.
20        A.  Correct.
21        Q.  Okay.  And you then give recommendations for
22   policy setting for the fitness-for-duty program
23   to the --
24        A.  Correct.
25           (Reporter clarification.)
```

**EXHIBIT 12-11**

Scott Levy, M.D.                                      August 30, 2024

1              MS. FLECHSIG:   Center for Excellence.

2              THE WITNESS:   Center of Excellence.

3              MS. FLECHSIG:   Center of Excellence.   Excuse

4   me.   Okay.

5   BY MS. FLECHSIG:

6        Q.   In terms of -- you also mentioned one of your

7   duties is to manage emergency medical evacuations --

8        A.   Correct.

9        Q.   -- and oversee care, you know, when someone has

10  been evacuated.

11       A.   Correct.

12       Q.   What -- I guess, what do you -- strike that.

13            Do you also get to create policies and

14  protocols for medical evacuations?

15       A.   Correct.

16       Q.   Okay.   And -- okay.

17            And you also would, you know, carry them out in

18  real time when something happens.

19       A.   Yes.

20       Q.   Okay.   And at the time you were the regional

21  director for the EEMEA region, you would have been

22  personally responsible for overseeing any medical

23  evacuations from within your region?

24       A.   I would be responsible for -- it's a difficult

25  question to answer, and I'll explain why.   We had

**EXHIBIT 12-12**

Scott Levy, M.D.                                                    August 30, 2024

1    approximately 300 medical evacuations a year in our

2    region.  Generally, the evacuations that would reach my

3    level would be extremely complicated, not simple, and so

4    I would not be involved in -- in every single

5    evacuation.

6              I would be involved with anything that was very

7    complex, that required international borders, critical

8    patients, and -- or -- or maybe Q and A on an evacuation

9    that had some issues done by our embedded medical teams.

10             (Reporter clarification.)

11             THE REPORTER:  Just keep your voice up at the

12   end.  It kind of trails off on me.

13             THE WITNESS:  Oh, sorry.  Sorry.

14             THE REPORTER:  Thank you.

15   BY MS. FLECHSIG:

16        Q.  The embedded medical teams, just to clarify,

17   those are the local medical teams on the ground.

18        A.  Correct.  And -- and in -- my medical teams for

19   EEMEA, all of those medical teams reported to the

20   businesses.  They didn't report to me directly.

21        Q.  Did you -- did you oversee the people who were

22   handling less complicated medical evacuation?

23        A.  When they were --

24             MR. MUSSIG:  Vague as to "oversee."  Go ahead.

25   You can answer.

**EXHIBIT 12-13**

Scott Levy, M.D.                                                                August 30, 2024

1   what I think the -- the risk may be or not be.

2       Q.  So how did you -- how did you first become

3   involved with Mr. Snookal's challenge to the host team

4   deeming him unfit for duty?

5       A.  I was asked as a second opinion to review the

6   case.

7       Q.  To provide a medical opinion on whether it was

8   safe for him?

9       A.  I was -- so I don't recall exactly, but I know

10  Mr. Snookal asked for a second opinion and -- that, I

11  know for a fact.  And then this was sent to me for a

12  review.

13      Q.  Who sent it to you for review?

14      A.  I don't remember.  Again, it was years ago.  I

15  know Mark and I did speak, so I'm not sure if he

16  approached me first or if someone sent it to me, but I

17  do know that Mark and I chatted about his situation.

18      Q.  Okay.  So when you were asked to give a second

19  opinion, were you allowed to override the decision that

20  the host team had made?

21      A.  I was not allowed to override, but I would say

22  that the -- even the -- as I'm thinking of the word

23  "second opinion," that might be incorrect as well.  I

24  would say that -- I was here to help with an appeal.  So

25  I would look at a case and see if there was anything

**EXHIBIT 12-14**

Scott Levy, M.D.                                    August 30, 2024

1    that was missed or some other information that might be

2    pertinent to the case and then have that discussion,

3    doctor to doctor, with our host medical team so they're

4    aware of potentially mitigating factors.

5              So it wasn't necessarily a second -- a second

6    opinion.  It just -- maybe another opinion or -- maybe

7    that's not necessarily different.  But just assist with

8    an appeal.  But -- but the absolute -- the final

9    decision was with the host location.

10        Q.   Okay.  At the time that you were the regional

11   medical director for the EEMEA region, do you recall

12   anyone else who complained about the host decision not

13   to allow the transfer to take place?

14        A.   No.

15        Q.   Okay.  So Mark Snookal was the only time --

16   Mark Snookal's complaint about the decision was the only

17   time you became involved in that way --

18        A.   Correct.

19        Q.   -- to give a second opinion?

20        A.   Correct.

21        Q.   Okay.  In terms of the organizational chart,

22   are you considered the supervisor of the host medical

23   teams?

24        A.   I am not.

25        Q.   Okay.  Who would be supervising those folks?

**EXHIBIT 12-15**

Scott Levy, M.D.                                                    August 30, 2024

1          MR. MUSSIG:  Calls for speculation.  Lacks

2    foundation.

3          THE WITNESS:  In this specific business, H --

4    the medical team reported to HR.

5    BY MS. FLECHSIG:

6       Q.  Okay.  So you said "this specific business."

7          Are you referring to the Escravos, Nigeria,

8    location -- host location?  Okay.

9       A.  I'm -- I'm referring to the medical team that

10   made the decision in Nigeria.

11      Q.  Okay.  Who made the decision in Mr. Snookal's

12   instance; right?

13      A.  Yeah, it was Dr. Asekomeh -- don't ask me to

14   spell that at this moment, but -- you may have it

15   already.

16      Q.  Is it Dr. -- and I may well be butchering this

17   as well -- Dr. Asekomeh?

18      A.  That sounds correct.

19      Q.  Okay.  So --

20          MR. MUSSIG:  That is, by the way, the correct

21   pronunciation.  It took me a while.

22          MS. FLECHSIG:  Thank you.  I came up with that

23   myself.  I -- okay.  Great.

24          MR. MUSSIG:  Oh, wait, no, it's Asekomeh.

25          MS. FLECHSIG:  Asekomeh.

**EXHIBIT 12-16**

Scott Levy, M.D.                                        August 30, 2024

```
 1              MR. MUSSIG:  Asekomeh.

 2              MS. FLECHSIG:  Okay.

 3   BY MS. FLECHSIG:

 4       Q.  So your understanding is Dr. Asekomeh reported

 5   to Chevron human resources.

 6       A.  No.  He reported to the medical director for

 7   Nigeria.  Sorry.

 8              MR. MUSSIG:  Calls for speculation.  Lacks

 9   foundation.

10   BY MS. FLECHSIG:

11       Q.  Sorry.  Go ahead.  You -- you said he reports

12   to the medical director in Nigeria.

13       A.  Correct.

14       Q.  Okay.  And then I think you said somebody

15   reports to HR.

16              Who then reports up into Chevron's human

17   resources?

18       A.  The medical director.

19              MR. MUSSIG:  Calls for speculation.  Lacks

20   foundation.

21              THE WITNESS:  The medical director then reports

22   to HR.

23   BY MS. FLECHSIG:

24       Q.  Who was the medical director in Nigeria?

25       A.  It was at this -- at the time of this case, it
```

**EXHIBIT 12-17**

1    was Dr. Arenyeka, A-R-E-N-Y-E-K-A.

2         Q.   Okay.  And is that -- if you know, is the human

3    resources department that Dr. Arenyeka reports to -- is

4    that Chevron USA, or what -- do you know what the

5    corporate entity is?

6         A.   So --

7              MR. MUSSIG:  Calls for speculation.

8              THE WITNESS:  We call the business NMA, so it's

9    the North African -- North -- it's -- NMA is the

10   abbreviation.  I'm -- North -- Nigeria Mid Africa

11   business unit.

12   BY MS. FLECHSIG:

13        Q.   Okay.  Do you know what medical specialty

14   Dr. Arenyeka has?

15        A.   I don't recall.

16        Q.   Okay.  Okay.  So when you became involved in

17   giving a second opinion on Mr. Snookal's challenge to

18   the host location's determination, what did you do to

19   inform your second opinion?

20             MR. MUSSIG:  Misstates the witness's testimony.

21             THE WITNESS:  So I'm not sure I understand the

22   question.  Could you please repeat it?

23   BY MS. FLECHSIG:

24        Q.   Yeah.  So you said you were asked by somebody

25   to give a second opinion on Mr. Snookal's fitness for

**EXHIBIT 12-18**

Scott Levy, M.D.                                                August 30, 2024

1   duty in -- for the expatriate assignment; right?

2            MR. MUSSIG:  Misstates the witness's

3   testimony.

4            THE WITNESS:  Correct.  Correct.  Yeah.  I --

5   again, I don't remember how -- how I was contacted

6   initially, but I was obviously dragged into discussion

7   or at least into the case one way or another, but -- so

8   I had a conversation with Mr. Snookal as a first line to

9   understand what was going on.

10           I received his impression of the situation,

11  discussed the issues with him, discussed some of the

12  details of his medical condition, and then asked

13  permission to speak with his medical -- his treating

14  medical provider.

15  BY MS. FLECHSIG:

16       Q.  Okay.  In terms of his treating medical

17  provider, was that his treating cardiologist?

18       A.  Correct.

19       Q.  And did you -- did you speak with Dr. Khan, the

20  cardiologist?

21       A.  I spoke with Dr. Cardio- -- Dr. Khan via

22  messaging.  So I left a voicemail for him explaining who

23  I was and what I was trying to do, and then he responded

24  in an e-mail.

25       Q.  Did you ever speak in real time over the phone

**EXHIBIT 12-19**

Scott Levy, M.D.                                      August 30, 2024

1    or in person?

2        A.   I don't recall.  I -- I don't recall.

3        Q.   Okay.  You don't recall whether you did, or you

4    don't recall speaking with him?

5        A.   I don't recall speaking with him on the phone.

6        Q.   Okay.  And in your recollection, what did

7    Dr. Khan say to you about his evaluation of

8    Mr. Snookal's health?

9        A.   The -- I'll get to the summary.  So what he

10   explained to me and -- was that he has this condition;

11   he's been followed; and for the last three years, they

12   haven't seen a significant or any increase in the size

13   of his problem.  And he gave me some risk -- what the --

14   what his risk of -- of a subsequent event was.

15          So I believe the message that I left for him

16   was that I'm trying to understand the risk.  The data

17   that I pull up shows he's got about a 4 or 5 percent

18   risk of a cardiac event per year -- you know, currently,

19   and I just need to better understand to -- to be able to

20   fine tune or decide if that number is -- has any

21   validity at all.

22          And so he responded with he believes that the

23   individual's risk of having a cardiac event -- or an

24   event related to his condition was about 2 percent a

25   year.  He quoted some studies in mice, and he said that

**EXHIBIT 12-20**

Scott Levy, M.D.                                              August 30, 2024

1    those were positive, and potentially his -- his risk

2    could be less than 2 percent a year.

3        Q.   Okay.  In terms of the -- you said that

4    according to your data, there was a 4 to 5 percent risk

5    of a cardiac event per year.

6        A.   Yes.

7        Q.   How did you get that figure?

8             MS. FLECHSIG:  Sorry, Dr. Levy --

9             MR. MUSSIG:  Is he frozen?

10            MS. FLECHSIG:  I think it's just him.  He

11   froze.

12            MR. MUSSIG:  Okay.

13            MS. FLECHSIG:  Dr. Levy, are you there?

14            MR. MUSSIG:  He's still frozen for me.

15            MS. FLECHSIG:  Yeah.  Me too.

16            THE VIDEOGRAPHER:  Would you like to go off the

17   record?

18            MR. MUSSIG:  Yeah, maybe -- yeah, we've been

19   going about an hour.  Does it make sense to take a break

20   now?

21            MS. FLECHSIG:  I mean, I'd rather not, you

22   know, break while we're -- have a question pending,

23   but -- Dr. Levy, are you there?  I see you turned your

24   video off.

25            MR. LEAL:  Does it make sense to ask him to log

**EXHIBIT 12-21**

Scott Levy, M.D.                                          August 30, 2024

```
 1              THE WITNESS:  Oh, no, we're good.  We're good
 2    now.  I can see this.  And this is easier for me at the
 3    moment.
 4    BY MS. FLECHSIG:
 5         Q.  Okay.  So I'm going through -- it looks like
 6    it's an e-mail from Mr. Snookal to you on August 23rd,
 7    2019; correct?
 8         A.  Correct.
 9         Q.  Okay.  So I see the screenshot Mr. Snookal
10    included in his e-mail to you, which has a chart of
11    maximal aortic diameter and probability of aortic events
12    in one year.
13         A.  Uh-huh.
14         Q.  When you were evaluating the risk of an adverse
15    event for Mr. Snookal, did you consider the actual
16    diameter of his aortic aneurysm?
17         A.  Absolutely.  That's -- the larger the diameter
18    is, the higher the risk is.  Very similar to this chart.
19    The numbers we can debate, but, yeah, it's absolutely
20    relevant.
21         Q.  Okay.  Did you also consider the changes or
22    lack of changes in the diameter over time and whether
23    that impacted Mr. Snookal's risk?
24         A.  I have.  Yes, I did.
25         Q.  Okay.  Did you evaluate whether Mr. Snookal's
```

**EXHIBIT 12-22**

1   management with medication impacted the risk of an

2   adverse outcome due to the aortic aneurysm?

3       A.   So the fact that he was on his medications and

4   the aneurysm had not grown in those three years -- I

5   took that as he was relatively stable.

6       Q.   So, yes, you did consider it.

7       A.   Correct.  Correct.  Yes.  Considered it, yes.

8       Q.   Okay.  And this e-mail, it does say that

9   Mr. Snookal attached a past research and he found a

10  paper.

11          Did you look at --

12      A.   I think --

13      Q.   -- the attachment that he included?

14      A.   No.  So I believe that the attachment that he

15  included is that photo right below.

16      Q.   Okay.  So your sense is that there was not any

17  separate attachment to this e-mail.

18      A.   Correct.

19      Q.   Okay.

20      A.   I actually believe there was a -- there was an

21  attachment to the e-mail, but it was the article that I

22  sent to him.  So he just replied with attachments and

23  then added this to the -- to the e-mail message.

24      Q.   Okay.  Let's see if we can track down the

25  article.  I'm going to screen share this with you as

**EXHIBIT 12-23**

Scott Levy, M.D.                                        August 30, 2024

1        A.   Yes.

2        Q.   -- about Mr. Snookal's risk?

3        A.   I would have, yes, correct.  I would have.

4        Q.   Okay.  Okay.  Did you review any of

5   Mr. Snookal's actual medical records in formulating your

6   opinion?

7        A.   I did not.  I -- I reviewed the medical

8   evaluations that he had for Chevron, and I reviewed his

9   message -- or letter from his cardiologist.  So the --

10   the key bit here is -- it's a risk tolerance issue.

11           So he has a medical issue with a risk, and we

12   can debate the risk even on this call, but there's a

13   certain risk and the -- the determination was based on

14   the host location's willingness to accept that risk.

15           MR. MUSSIG:  Do you -- he -- oh, it's me.

16   BY MS. FLECHSIG:

17        Q.   Okay.

18           MR. MUSSIG:  Can you guys hear me?

19           MS. FLECHSIG:  Yes.

20           MR. MUSSIG:  My computer froze for a second.

21           MS. FLECHSIG:  Yeah.

22   BY MS. FLECHSIG:

23        Q.   Okay.  So ultimately, the host location gets to

24   decide how much risk they're willing to tolerate at

25   their site; correct?

**EXHIBIT 12-24**

Scott Levy, M.D.                                        August 30, 2024

1    A.  Correct.  It's -- yeah, it is -- that's exactly
2  right.  And then the risk is a combination of things;
3  right?  It's the -- it's -- we need to know what the
4  condition is so we know what the risk is that we're
5  taking.  If it's -- if the risk is high risk that
6  someone's going to sprain their ankle, not so relevant;
7  but if it's -- you know, if it's a -- if it's a risk
8  that someone's going to potentially die or have a very
9  bad outcome, then it becomes very significant as far as
10  the discussion goes.
11    Q.  So when the host location makes a
12  determination, I guess, what -- what role do you have in
13  whether it's too much risk for Chevron to tolerate?
14    A.  My job in this situation would be to better
15  clarify the risk for them.  And I believe in our
16  situation -- I don't -- I don't believe that anyone had
17  a conversation with the cardiologist.
18        I did get the specifics from the cardiologist
19  about what his individualized risk is, again, not based
20  on studies, not based on -- not based on studies that
21  may or not -- may not pertain to him, but what his --
22  what his treating cardiologist thought the risk was for
23  him.  And I used this information to try to make a case
24  for Mr. Snookal with the medical team.
25    Q.  Did you have -- did you ever suggest that

**EXHIBIT 12-25**

```
 1   Dr. Asekomeh speak with Dr. Khan?
 2        A.   No, I did not.  I felt that I had enough
 3   information.  Usually it's pretty complicated to make
 4   those connections work, given the time zones.
 5        Q.   Okay.  So did you suggest that anyone from the
 6   host team speak with Dr. Khan?
 7        A.   I did not -- I did not have that conversation.
 8   Correct.
 9        Q.   Okay.
10        A.   I did pass on the information word for word
11   from Dr. Khan to the medical team, though.
12        Q.   Did you speak with Dr. Asekomeh about
13   Mr. Snookal's case?
14        A.   I believe I forwarded him -- the information to
15   Asekomeh and Arenyeka, his boss.  And Arenyeka responded
16   with the risk is -- the risk in this location is still
17   too high and, if possible, we'd be very happy to take
18   him in Lagos where we have medical resources.  And I'm
19   paraphrasing.
20        Q.   Other than the e-mail exchange that you just
21   described, did you speak with Dr. Asekomeh about
22   Mr. Snookal in real time, like, over the phone or
23   video --
24        A.   I don't recall.  I don't recall that.
25             (Reporter admonishment.)
```

**EXHIBIT 12-26**

1    BY MS. FLECHSIG:

2          Q.   You don't recall speaking with him directly.

3          A.   Correct.   I don't recall speaking with him.

4          Q.   Okay.   Did you speak with Dr. Arenyeka about

5    Mr. Snookal directly, other than the e-mail that you

6    described?

7          A.   Not about -- not about this case.   I -- sorry,

8    I don't recall speaking to him about this case.

9          Q.   Okay.   Did you speak with any other doctors in

10   Nigeria about Mr. Snookal's case?

11         A.   I have not.

12         Q.   Okay.   And that includes over e-mail.   You

13   didn't have any e-mail communications with anyone other

14   than what you described with Dr. Asekomeh and

15   Dr. Arenyeka.

16         A.   Not to my knowledge, no.

17         Q.   Okay.   Okay.   Other than the e-mail you

18   described -- I know you paraphrased with Dr. Asekomeh

19   and Arenyeka, did you have any other written exchanges

20   with them about Mr. Snookal?

21         A.   No, I don't believe so.   It was a simple, this

22   is the information from his provider, the risk doesn't

23   appear high, it appears of low to moderate -- I believe

24   I said risk doesn't appear high, and their response was

25   simply the risk is still too high for us.

**EXHIBIT 12-27**

Scott Levy, M.D.                                        August 30, 2024

1    approach his cardiologist to talk about why he does --
2    why -- whether that pertains to him or not.  So I would
3    say that 4 or 5 is only my initial start at an appeal to
4    try to acquire more information.
5        Q.  Okay.  I'm going to show you another document.
6    I'll mark it as Exhibit C.
7                (Exhibit C marked for
8                identification.)
9    BY MS. FLECHSIG:
10       Q.  It's been produced as SNOOKAL-01091.  And I
11   think for this one, it's just a one-pager, so I'll
12   screen share.  And if you're having issues reading it,
13   please let me know.
14       A.  Yeah, if you could zoom in, please.  Okay.
15       Q.  So it looks like it's an August 23rd, 2019,
16   e-mail from Dr. Steven Khan to you,
17   scottlevy@chevron.com with a CC to Mark Snookal?
18       A.  Correct.  Yes.  I know this e-mail.
19       Q.  Okay.  I'll give you a second to look at it.
20            Okay.  So in this e-mail, Dr. Khan cites a 2002
21   study.  Is that the study that you are referring to in
22   terms of how you came up with the 4 to 5 percent figure?
23       A.  Yes.  Actually, can you zoom in a little bit
24   more, please?
25       Q.  Yes.  Of course.  So I'm referring to this --

**EXHIBIT 12-28**

Scott Levy, M.D.                                      August 30, 2024

1      A.  Yes, yes.

2      Q.  That's the study that you were referring to?

3      A.  Correct.  Yes.

4      Q.  Okay.  Okay.  So in this e-mail, Dr. Khan also

5  notes that the studies of risk of rupture are fairly

6  old, 2002, and treatment has improved, as has our

7  understanding of aortic aneurysms.

8      A.  Yes.

9      Q.  So did you compare this 2002 study to more

10  recent research?

11      A.  I did not.  I took the word of the expert and

12  his treating provider who knows him better than I can.

13  And I accepted his number as a little bit lower.  He

14  says the risk of complications related to thoracic

15  aneurysm is low and likely less than 2 percent, but

16  he -- he says that it's 2 percent, and then the mouse

17  studies are likely -- likely show that he's better than

18  2 percent.

19          So that's what I took:  2 percent or lower was

20  his risk.  I didn't take zero was the risk.  I took 2

21  percent or lower.

22      Q.  Okay.  So basically that was your final thought

23  on the percentage of the risk that you then conveyed to

24  the host team?

25      A.  I conveyed this exact message.  I forwarded

**EXHIBIT 12-29**

Scott Levy, M.D.                                          August 30, 2024

1   way or another with certainty.  And so I apologize.

2        Q.   Okay.  Slightly different question.

3             Are you aware of anyone who died in Escravos

4   before being medically evacuated?

5        A.   I'm aware of people in Nigeria who have died --

6   working for us in Nigeria that have died without --

7   without warning.  So sudden onset, found slumped over,

8   found dead, found not waking up in the morning.  So

9   we've had cases like that.  The -- yeah.

10       Q.   Do you know where in Nigeria those deaths

11  occurred?

12       A.   So I believe they happened all over Nigeria and

13  all of our operations.  But Escravos is a very small

14  location, and I want to be very careful about telling

15  you anything that's not correct here.

16       Q.   Are you aware of anyone who's ever been injured

17  because of a medical evacuation, whether that's the

18  person being evacuated or a personnel who's carrying out

19  the evacuation?

20       A.   No, I'm not aware of anyone that was injured as

21  a result of a medical evacuation in Nigeria at all.  So

22  the -- in general, the -- we consider Escravos to be one

23  of the most remote locations in our company, and the

24  medical evaluation to -- for someone to get to Escravos

25  is -- is -- let's just say it has a higher criteria of

**EXHIBIT 12-30**

1      Q.   Okay.

2      A.   And then the -- obviously, the condition itself

3   will warrant different types of planes based on -- based

4   on the capabilities, whether it needs to be ICU capable,

5   whether it can handle heart attacks, whether it's just a

6   simple transport.  All of these things come into play.

7   And then also visas of the -- visas or passports of the

8   individual.  Obviously, if we're going to move an

9   individual somewhere, can they get into the host country

10  that we're about to send them to.  And the same for the

11  medical team.  Can the medical team get into the host

12  country.  So there are a lot of factors to play -- that

13  come into play.

14      Q.   Okay.  I do want to ask -- I want to ask a

15  question specific to Mr. Snookal.

16           So was there anything about the actual job that

17  Mr. Snookal would have been performing in Escravos that

18  would increase the risk of an adverse outcome to him?

19           MR. MUSSIG:  Calls for speculation.

20           THE WITNESS:  So I believe that Mr. Snookal

21  was -- his proposed job in Nigeria was an office-based

22  job with just mild to light lifting activities.  I don't

23  think it's significant -- I don't think it's of --

24  sorry, let me start over.

25           I don't think that his condition would have

EXHIBIT 12-31

Scott Levy, M.D.                                              August 30, 2024

1   been an issue for his proposed role, had it not been for

2   the location.

3   BY MS. FLECHSIG:

4        Q.   Okay.  And in terms of the specific scenarios

5   you were concerned about, it -- again, it was the aortic

6   dissection or an aortic aneurysm; correct?

7             MR. MUSSIG:  Asked and answered.

8             THE WITNESS:  Yes.

9   BY MS. FLECHSIG:

10       Q.   Were you concerned at all that Mr. Snookal

11  would pose a threat to other people's safety?

12            MR. MUSSIG:  Calls for speculation.  Lacks

13  foundation.

14            THE WITNESS:  Potentially.  And I would say it

15  all -- again, it's so -- these are so complicated.  So

16  if -- I'll give you an example.  If he were to have an

17  event while he was on location, he would have tied up

18  the medical team for potentially days trying to sort out

19  his issue, if he survived that long during the

20  evacuation.  If he were doing something that were deemed

21  safety sensitive -- and I'm not sure he had

22  responsibilities that were -- if he were climbing up a

23  ladder or climbing upstairs and fell over -- potentially

24  a lot of things could have happened, and so it's -- it's

25  not so easy to say.

**EXHIBIT 12-32**

Scott Levy, M.D.                                                    August 30, 2024

1          It all depends on specifically what he was

2     doing on location.  And again, I didn't have an issue

3     with the job at all.  I don't think any of us had an

4     issue with the specific type of work he was doing.  We

5     didn't have an issue -- even when he was declined or

6     turned down for this assignment, still working at the

7     refinery in Richmond, California, was still -- wasn't

8     something that we even considered stopping him from

9     doing because of the risk.

10         It was simply because of that -- that -- if

11    there -- if that -- if that sort of 2 percent occurred

12    while -- while he was on location, it was something that

13    the team could not manage.

14    BY MS. FLECHSIG:

15        Q.  Okay.  Did you document any concerns that you

16    had about any risk to other people that you thought

17    Mr. Snookal could have?

18        A.  I did not.

19        Q.  Okay.  Was it something that you were concerned

20    with at the time in assessing the risk that the host

21    location would tolerate?

22        A.  So I don't think it -- so I don't think it

23    ended up to be relevant in this situation.  So -- and

24    the reason being was there was no -- even the risk of 2

25    percent to himself was enough for them to say -- was

**EXHIBIT 12-33**

Scott Levy, M.D.                                              August 30, 2024

1   enough for them to say no.  So I would say it wasn't

2   even -- the risk to others wasn't even -- let's just say

3   they didn't even have time to come up and -- or, no, it

4   wasn't discussed.  Not -- it wasn't discussed for me.

5            I don't know the discussions that they had

6   inside of the Nigeria Mid Africa business unit, but it

7   wasn't a discussion that I had with the medical teams.

8        Q.  Okay.

9        A.  Or Dr. Khan.

10       Q.  I want to ask -- I'm going to show you another

11  document.  I'm up to Exhibit D now.

12            (Exhibit D marked for

13            identification.)

14  BY MS. FLECHSIG:

15       Q.  This is -- this has been produced as

16  SNOOKAL-01088 through 01089.

17            Again, please go ahead and take a look at this.

18  It looks like it's an e-mail from you to Mr. Snookal on

19  September 16th, 2019.

20            I'm going to see if I can --

21       A.  Can you zoom in, please?

22       Q.  Yeah.  Is that -- is that better?

23       A.  Better, yes.

24       Q.  Do you recall writing this e-mail to

25  Mr. Snookal?

**EXHIBIT 12-34**

Scott Levy, M.D.                                    August 30, 2024

1        A.  Can you scroll up to the top of it?  Let me

2   just --

3        Q.  Yes.

4        A.  I do.  I do.

5        Q.  Absolutely.

6        A.  I know this message, yes.

7        Q.  Okay.  So in this e-mail, you send a list of

8   locations where it sounds like you would be okay with

9   Mr. Snookal working as an expatriate on assignment by

10  Chevron; right?

11       A.  So, yes, that's -- so that's what I did say.  I

12  said those are the locations that will -- would probably

13  be perfectly fine.  And then for the other locations,

14  it's one where we'd specifically need to talk with the

15  local -- I -- it would take additional work to -- to

16  clarify.

17       Q.  Okay.  And when you created the list of ones

18  that you did not foresee issues with, how did you come

19  up with those locations?

20       A.  Oh, so we have -- well, those are

21  higher-quality medical infrastructures.  And so -- so

22  between the -- where the work locations are and the

23  medical resources around them are a better fit for --

24  for dealing with an emergency and things like that.

25           So the -- and I believe we ranked the locations

**EXHIBIT 12-35**

Scott Levy, M.D.                                    August 30, 2024

1        A.   Correct.

2             MR. MUSSIG:   Calls for speculation.

3    BY MS. FLECHSIG:

4        Q.   In terms of the -- in terms of procedurally,

5    that's how this works; right?

6        A.   Yeah.   From what I see here, it looks like he

7    did a physical exam and took the history and then wrote

8    notes, even restrictions, correct.   So I would assume --

9    from reading this, I would assume that this was a -- he

10   did an actual exam on him.

11       Q.   Okay.   So ultimately, on the fifth page of this

12   document, SNOOKAL-00609, Dr. Sobel checks, "Fit for duty

13   with restrictions."

14            You see what I'm referring to; right?

15       A.   Yes.

16       Q.   And the restrictions are, "No heavy lifting

17   greater than 50 pounds, needs review of recommend letter

18   from cardiologist to clear him."   Right?

19       A.   Uh-huh, correct.

20       Q.   Okay.   So did you review the letter that

21   Mr. Snookal's cardiologist provided?

22       A.   I need to see it again to remember.   Sorry.

23       Q.   So -- no problem.   I -- I was going to segue us

24   there anyway.   So I'll mark as Exhibit E --

25            MS. FLECHSIG:   Is that right?

**EXHIBIT 12-36**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              THE REPORTER:  F.

 2              MS. FLECHSIG:  Okay.  Thank you.  Exhibit F,

 3    SNOOKAL-01090.

 4              (Exhibit F marked for

 5              identification.)

 6    BY MS. FLECHSIG:

 7         Q.  This is a letter dated July 29th, 2019, and

 8    it's signed by S. Khan, M.D.; correct?

 9         A.  Yes, I've seen this before.

10         Q.  Okay.  Is that the cardiology clearance letter?

11         A.  It is.  It would be, yes.

12         Q.  Okay.  So with Mr. Snookal's cardiologist

13    saying that "Mr. Snookal's under my care for his heart

14    condition.  It is safe for him to work in Nigeria with

15    his heart condition.  His condition is under good

16    control and no special treatments are needed";

17    ultimately, someone still made the determination that

18    Mr. Snookal was not fit for duty; correct?

19         A.  Correct.

20         Q.  And is it because despite Mr. Snookal's ability

21    to complete the job, Chevron felt it was too great of a

22    risk in the event he had to be evacuated?

23              MR. MUSSIG:  Calls for speculation.  Lacks

24    foundation.

25              THE WITNESS:  So the issue is -- I'll tell you
```

**EXHIBIT 12-37**

```
 1   definite risk, not a theoretical risk.  And then the
 2   ability to manage that risk is -- was -- was the basis
 3   of their decision.  There was -- I would say there's
 4   nothing theoretical about that 2 percent.
 5   BY MS. FLECHSIG:
 6       Q.  For example, would a pregnant woman be allowed
 7   to go to Escravos, Nigeria?
 8           MR. MUSSIG:  Calls for speculation.  Lacks
 9   foundation.  Incomplete hypothetical.  Vague as to "go
10   to."
11           THE WITNESS:  Yeah, so I would say -- yeah,
12   it's complicated.  And what we need to know is how --
13   what term she was in, whether the expectation would be
14   that we'd allow a delivery on the ground in Escravos for
15   this individual.  There are a lot of factors in there.
16           I would say certain women who are pregnant with
17   high risk, so high-risk babies, IVF, previous
18   complications, known complication of the current
19   pregnancy, those things would be disqualifiers for sure.
20   BY MS. FLECHSIG:
21       Q.  In terms of health conditions that are not
22   actively impacting someone's ability to do the job, what
23   makes it too high risk for Chevron?
24           MR. MUSSIG:  Calls for speculation.  Lacks
25   foundation.  Asked and answered.
```

**EXHIBIT 12-38**

Scott Levy, M.D.                                        August 30, 2024

1          THE WITNESS:  It's not the job.  It's the
2    location.  So Chevron has a duty of care for their
3    employees.  And we need to ensure that the quality of
4    care delivered to our employees who we move around the
5    world are consistent or compatible with what they would
6    have received in their home country.
7          So I would say it's the duty-of-care question
8    and -- and the assignment.  It's the location, not
9    the -- not the job here.
10   BY MS. FLECHSIG:
11        Q.  To confirm, the location of Escravos, Nigeria,
12   would not impact Mark's aortic aneurysm; correct?
13        In other words, being in Escravos, Nigeria,
14   would not affect the risk of an adverse event for
15   Mr. Snookal; correct?
16        A.  Not based on --
17        MR. MUSSIG:  Calls for speculation.
18        THE WITNESS:  Not based on his written job
19   desc- -- requirements.  However, I would look at the
20   aneurysm as -- with -- with the risk, it's 2 percent and
21   likely to grow -- I'll just say it's 2 percent, and I
22   would consider it more like a ticking -- ticking clock.
23   And it's just -- or a ticking time bomb, and it's just a
24   matter of time until it stops ticking.
25          And so -- so that's what the -- so the -- his

**EXHIBIT 12-39**

1   risk is when -- when he does have an issue with that

2   heart -- and, again, we hope it never happens.  It's --

3   it would be a disaster if it happened in Escravos.

4   BY MS. FLECHSIG:

5       Q.  Right.

6       A.  Because we can't provide that duty of care to

7   him.  We wouldn't have been able to get him to a

8   high-quality tertiary care medical center that could

9   sort this issue.

10      Q.  Right.  But what I'm asking is in terms of the

11  likelihood of having an adverse event, it doesn't matter

12  whether Mr. Snookal is in Los Angeles; Texas; Escravos,

13  Nigeria; the risk of the adverse event happening remains

14  the same; correct?

15      A.  Correct.  But the outcome would be different

16  based on those locations.  The outcome would be

17  different based on his -- the time to get to a

18  high-quality medical center.  The -- the -- even across

19  medical centers -- all across the U.S., those that

20  have -- that see more cases per year have better

21  outcomes than those that see less cases per year.

22          So -- so we're talking about, yes, the problem

23  would happen, and then if he lived in certain locations,

24  he would do better if that problem happened than if he

25  lived in others.

**EXHIBIT 12-40**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5    Reporter of the State of California, hereby certify that

 6    the witness in the foregoing deposition,

 7                    SCOTT LEVY, M.D.,

 8    was by me duly sworn to tell the truth, the whole truth,

 9    and nothing but the truth in the within-entitled cause;

10    that said deposition was taken at the time and place

11    therein named; that the testimony of said witness was

12    stenographically reported by me, a disinterested person,

13    and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties to said

18    deposition, nor in any way interested in the outcome of

19    the cause named in said caption.

20

21          DATED:  September 12, 2024.

22

23    _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

**EXHIBIT 12-41**