# EXHIBIT 14

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MARK SNOOKAL, an          )
individual,               )
                          )
          Plaintiff,      )
                          )
     vs.                  )   NO. 2:23-cv-6302-HDV-AJR
                          )
CHEVRON USA, INC., a      )
California Corporation,   )
and DOES 1 through 10,    )
inclusive,                )
                          )
          Defendants.     )
_____)

REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS

Tuesday, September 17, 2024

Houston, Texas

Reported by:
JANE BRAMBLETT, CLR, CCRR, CSR No. 7574
Job No. 114803

**EXHIBIT 14-1**

Andrew Powers                                September 17, 2024

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4  MARK SNOOKAL, an          )
    individual,               )
 5                            )
                   Plaintiff, )
 6                            )
            vs.               )   NO. 2:23-cv-6302-HDV-AJR
 7                            )
    CHEVRON USA, INC., a      )
 8  California Corporation,   )
    and DOES 1 through 10,    )
 9  inclusive,                )
                              )
10                 Defendants.)
    _____)
11

12

13

14

15      REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS,

16  taken on behalf of Plaintiff, commencing at

17  10:00 a.m. and ending at 1:50 p.m., at Houston, Texas,

18  Tuesday, September 17, 2024, before Jane Bramblett, CLR,

19  CCRR, Certified Shorthand Reporter No. 7574.

20

21

22

23

24

25
```

**EXHIBIT 14-2**

Andrew Powers                                    September 17, 2024

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3   ALLRED, MAROKO & GOLDBERG
     BY:  DELORES Y. LEAL, ESQ.
 4   6300 Wilshire Boulevard, Suite 1500
     Los Angeles, California 90048
 5   323.653.6530
     dleal@amglaw.com
 6

 7   FOR THE DEFENDANTS:

 8   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     BY:  SARAH FAN, ESQ.
 9   333 South Hope Street, Suite 4300
     Los Angeles, California 90071-1422
10   213.620.1780
     sfan@sheppardmullin.com
11

12   Also Present:  Jenny Sherman, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 14-3**

Andrew Powers                                    September 17, 2024

```
1       Q     Is that it?

2       A     That's it.

3       Q     Who is your employer?

4       A     Chevron.

5       Q     On your paycheck stubs, what's the entity

6    that's identified as your employer?

7       A     Chevron USA.

8       Q     Has any entity other than Chevron USA paid

9    your salary?

10      A     No.

11      Q     And how long have you been employed by

12   Chevron?

13      A     15 years.

14      Q     When did you begin?  When were you hired?

15      A     June of 2009.

16      Q     And my understanding is that your current

17   position is senior adviser to the chief human

18   resources officer.

19      A     That's correct.

20      Q     And you've been in that position since on

21   or about June of '22?

22      A     I've been in this role since November of

23   2023.

24      Q     Okay.  And who is your current superior?

25      A     By "superior," do you mean who I report
```

**EXHIBIT 14-4**

1        A     Yes, it is.

2        Q     Which is it?  A division or a subsidiary?

3        A     I don't know off the top of my head.

4        Q     During the time that you reported to

5   Ms. Delaney, Chevron USA paid your salary?

6        A     Yes.

7        Q     During the time that you have been senior

8   adviser to Ms. Morris, from November of '23 through

9   the present, where are you physically located?

10       A     Houston, Texas.

11       Q     And when you were reporting to Ms. Delaney

12   as a senior HR, where were you physically located?

13       A     Houston, Texas.

14       Q     And during the time that you were senior HR

15   manager in Houston, Texas, reporting to Ms. Delaney,

16   was Chevron USA still your employer?

17       A     Yes.

18       Q     And they paid your salary.

19       A     Yes.

20       Q     What was the position you held just prior

21   to senior HR manager reporting to Ms. Delaney?

22       A     I was the senior HR manager of our

23   El Segundo refinery.

24       Q     And how long were you in that position?

25       A     For just about three years.

EXHIBIT 14-5

Andrew Powers                                          September 17, 2024

1       Q    From when to when?

2       A    June 2019 through May 2022.

3       Q    And who was your superior during that

4    period?

5       A    I had two during that period.

6       Q    Who were they?

7       A    It was Glenda Valero and Scott Wilcox.

8    They had changed out during that time, and the title

9    of them was GM of HR for manufacturing.

10      Q    And when was Mr. Wilcox your manager?

11      A    In the November 2020 time frame.

12      Q    Through May of '22?

13      A    Say it again, please.

14      Q    Through May of '22?

15      A    That's correct.

16      Q    And did you hold any other position prior

17   to Senior HR Manager in El Segundo?

18      A    Yes.

19      Q    What position was that?

20      A    I was the HR manager of our Appalachian

21   Mountain business unit in Coraopolis, Pennsylvania.

22      Q    And how long were you, in Pennsylvania, the

23   HR manager?

24      A    Two years.

25      Q    From when to when?

**EXHIBIT 14-6**

Andrew Powers                                          September 17, 2024

1        A    May of 2017 to May of 2019.
2        Q    And during the time that you were in
3   Pennsylvania, did Chevron USA pay your salary?
4        A    Yes.
5        Q    And did you have any other positions with
6   Chevron prior to that?
7        A    I did.
8        Q    What was your next position and what date?
9        A    I was the executive compensation adviser
10  from 2015 -- May -- June 2015 to June 2017.
11       Q    And where were you geographically
12  stationed?
13       A    San Ramon, California.
14       Q    And Chevron USA was your employer at that
15  time as well?
16       A    Yes.
17       Q    And did -- do you hold any other position
18  prior to that one?
19       A    Yes.  I was an HR adviser in our joint
20  venture operation called Tengiz Chevroil.  That was
21  located in Kazakhstan, so this was an expatriot
22  assignment.  And that was from June of 2013 to June
23  of 2015.
24       Q    In the expatriot assignment in Kazakhstan,
25  was Chevron USA still your employer?

**EXHIBIT 14-7**

Andrew Powers                                      September 17, 2024

1           MS. FAN:  Objection.  Calls for a legal

2    conclusion.

3    BY MS. LEAL:

4           Q     You can answer.

5           A     I can't confirm that.  I don't know that

6    part right now.

7           Q     Did Chevron USA pay your salary during that

8    time that you were in Kazakhstan?

9           A     Yes.

10          Q     And did you hold any other position prior

11   to your assignment in Kazakhstan?

12          A     I did.  I was the senior labor relations

13   adviser and payroll supervisor in our San Joaquin

14   Valley business unit in Bakersfield, California,

15   from July of 2011 to June of 2013.

16          Q     And when you were stationed in Bakersfield,

17   was Chevron USA your employer?

18          A     Yes.

19          Q     And did Chevron USA pay your salary?

20          A     Yes.

21          Q     And did you hold any other position with

22   Chevron prior to this assignment in Bakersfield?

23          A     Yes, I did.  I was on our HR development

24   program from 2009 to 2011.  And on -- the

25   development program was located in San Ramon,

**EXHIBIT 14-8**

Andrew Powers                                      September 17, 2024

1    California, from 2009 to 2010; Houston, Texas, for

2    six months in 2010; and then I was -- another

3    expatriot assignment where I was in Manila, the

4    Philippines.  And that was from January of 2011 to

5    June of 2011 for that expatriot assignment

6    specifically.

7        Q    Certainly have traveled around for Chevron.

8        A    I have.

9        Q    During this last position that you just

10   mentioned, HR development program, where you were in

11   San Ramon; Houston, Texas; and then Manila, was

12   Chevron USA your employer?

13       A    Yes.

14            MS. FAN:  Objection.  Calls for a legal

15   conclusion.  Calls for speculation.

16            Mr. Powers, you're doing great.  Just a

17   quick reminder to pause a little bit so I can get my

18   objections in.

19            THE WITNESS:  Sure.

20            MS. FAN:  Thank you.

21   BY MS. LEAL:

22       Q    And during the time that you were HR

23   development program in San Ramon; Houston, Texas;

24   and Manila, did Chevron USA also pay your salary?

25            MS. FAN:  Objection.  Compound.

**EXHIBIT 14-9**

1          THE WITNESS:   Yes.

2     BY MS. LEAL:

3          Q    Any other position with Chevron prior to HR

4     development program?

5          A    No.

6          Q    So you were hired into HR development

7     program position in San Ramon in 2009?

8          A    Yes.   That's correct.

9          Q    So most of my questions today, Mr. Powers,

10    will pertain to the period of time when you were the

11    Senior HR Manager at the El Segundo refinery.   Okay?

12         A    Okay.

13         Q    So during the time that you were a senior

14    HR manager in El Segundo, were there any individuals

15    who reported to you?

16         A    Yes.

17         Q    Who?

18         A    Thalia Tse, Eric Stephenson, Kelly Andrews,

19    Violet Torres, Willy Martinez.

20         Q    Anyone else?

21         A    Those were my direct reports.

22         Q    Okay.   And what positions did these

23    individuals hold?   Were they all -- did they all

24    hold the same position?

25         A    No, they did not.   So --

**EXHIBIT 14-10**

1   all employees.  She went through onboarding for

2   Chevron as well, which would be our business code

3   and ethics.  Other policies on anti-harassment and

4   discrimination.

5        Q    Was it your expectation, Mr. Powers, as the

6   senior HR manager, that your HR business partners be

7   familiar with Chevron's human resources policy?

8             MS. FAN:  Objection.  Vague and ambiguous.

9             THE WITNESS:  Yes.  I would -- I would

10  expect my HR VPs to be familiar with the processes

11  in order to perform them and be partners to their

12  client groups.

13  BY MS. LEAL:

14       Q    Do you know if your HR business partners,

15  such as Ms. Tse, were responsible for providing

16  training to management within her area of

17  responsibility?

18            MS. FAN:  Objection.  Vague and ambiguous.

19            THE WITNESS:  Can you be more specific on

20  the type of training you're referring to?

21  BY MS. LEAL:

22       Q    Thank you for that clarification.  I think

23  I do need to clarify my question.

24            So do you know if Ms. Tse, for example, as

25  the HR business partner, as part of her

**EXHIBIT 14-11**

Andrew Powers                                      September 17, 2024

1    responsibilities, was she supposed to train
2    supervisors, managers in her specific clients' area
3    with respect to HR policy?
4        A    I don't know that I would call it "train"
5    them specifically, but Thalia, as an HR VP, would be
6    present for a variety of people processes.  And HR
7    VP's primary responsibility would often be to
8    facilitate and make sure that managers, supervisors,
9    employees were following appropriate steps and
10   processes.  You know, making sure, as an example,
11   that we're keeping bias out of a selection, making
12   sure that we are staying in compliance with, you
13   know, federal, state, and local laws for anything
14   that we did.
15       Q    So Ms. Tse, then, as the HR business
16   partner in El Segundo, in your opinion, was she
17   required to be familiar with federal, state and
18   local laws, as you mentioned?
19            MS. FAN:  Objection.  Vague and ambiguous.
20   Calls for speculation.
21   BY MS. LEAL:
22       Q    Employment law.
23       A    Can you clarify your question?  You're
24   referring to employment law?
25       Q    Yeah.  Let me make sure my question is

**EXHIBIT 14-12**

September 17, 2024

1    clear.

2            So would you expect Ms. Tse, who reports to

3    you as the HR business partner in El Segundo for her

4    specific client area of maintenance and reliability,

5    do you believe that she should be familiar with

6    federal, state, and local employment laws?

7        A    Yes.  And I would also expect that the HR

8    business partner partner with our legal counsel if

9    there was any questions on those.

10       Q    Thank you.

11           Referring to the legal counsel you just

12   mentioned, was legal counsel also in El Segundo?

13       A    Yes.

14       Q    So you could partner with someone in

15   El Segundo who was an attorney?

16       A    Yes.

17       Q    In 2019 was there an employment counsel in

18   El Segundo with whom Ms. Tse or you could have

19   consulted?

20       A    There was senior counsel present.  Your

21   question was phrased as employment counsel.  That

22   individual was not located in El Segundo, but was

23   very accessible to us by phone or email as we needed

24   it.

25       Q    Who was the senior counsel present in

**EXHIBIT 14-13**

1      A     Yes.  This document looks familiar.  It's

2  our location premiums by area of assignment, a

3  document that exists to capture the different

4  premiums associated with our locations of work.

5      Q    Okay.  And for the record, this is a

6  document produced by Chevron.  The Bates number on

7  the bottom right-hand corner is CUSA000501 and 502.

8          So it's your understanding then,

9  Mr. Powers, that employees with rotational

10  assignments receive annual premium pay?

11      A    That's correct.

12      Q    So this document explains to Chevron

13  employees that irrespective of where in the world

14  they might work, they'll receive premium pay, and

15  this document shows how much the annual premium pay

16  percentage will be?

17          MS. FAN:  Objection.  Argumentative.

18          THE WITNESS:  I'm not sure I understand the

19  question.  I would describe it as not all locations

20  getting a premium percentage.  If you're in your own

21  home country, you would not be getting a premium

22  percentage.  This is if you're going on expat

23  assignment, rotational or residential, temporary.

24  BY MS. LEAL:

25      Q    Okay.  So, for example, when you went to

EXHIBIT 14-14

Andrew Powers                                        September 17, 2024

1    Kazakhstan, you received a rotational assignment

2    premium percentage pay?

3         A    Yes.  When I was located in Kazakhstan, I

4    received a premium percentage pay.

5         Q    And the same was true when you were in the

6    Philippines?

7         A    That's correct.

8         Q    And were you aware that Mr. Snookal, the

9    plaintiff in this case, the rotational assignment

10   that he sought was in Escravos, Nigeria?

11        A    Sorry.  Are you asking if I was aware of

12   him going to that assignment?

13        Q    Yeah.  Let me -- let me start again.

14             Were you aware that the rotational

15   assignment which Mr. Snookal sought was in Escravos,

16   Nigeria?

17        A    Yes, ma'am.  I was not aware of

18   Mr. Snookal's assignment or offer to Escravos until

19   I first received a note from him.

20        Q    Right.  So at that point you became aware

21   that it would have been in Escravos, Nigeria?

22        A    Correct.

23        Q    So looking at Exhibit 1, that would mean

24   that if Chevron were to have allowed Mr. Snookal to

25   work in Escravos, he would have been at the annual

**EXHIBIT 14-15**

Andrew Powers                                          September 17, 2024

1    premium of 55 percent; is that correct?

2            MS. FAN:  Objection.  Incomplete

3    hypothetical.

4            THE WITNESS:  That's correct, based on the

5    document you've shared.  I see 55 percent associated

6    with Nigeria, Escravos.

7    BY MS. LEAL:

8        Q    And what does it mean to be at 55 percent

9    annual percentage?

10       A    It could be interpreted as a hardship

11   allowance that we give our employees for going to

12   these different locations, and it's in recognition

13   of maybe a loss of amenities that they would be used

14   to in their home country as well as due to the

15   extreme conditions, lack of medical facilities or

16   access, other goods and services that they might not

17   be able to get.

18           So 55 percent, as an example, would mean

19   it's 55 percent additional income on top of their

20   base salary.

21       Q    Okay.  So you testified earlier that when

22   you were in Kazakhstan, that Chevron USA paid your

23   salary.  Do you know if the same would have been

24   true with respect to Mr. Snookal had he gone to

25   Escravos?

**EXHIBIT 14-16**

1    delivery model.  This was handled by another group

2    within HR, not me specifically as senior HR manager

3    in a refinery for my team as HR business partners.

4    This -- this policy, tax equalization administered

5    by HR Shared Service is a completely different

6    group.

7         Q    What is HR Shared Services?

8         A    That is an organization within HR that

9    administers various processes for HR.  Could be

10   reporting.  It could be global mobility topics.

11   It -- in short, it's an organization within HR at

12   Chevron.

13        Q    And so there's this organization called

14   "Human Resources Shared Services" that reports to

15   whom?

16        A    Can you clarify what -- what date you're

17   talking about?

18        Q    2019.

19        A    So that shared services organization would

20   report in to our HR leaders.  It's one of the

21   organizations that exists.  So I -- 2019 time frame,

22   I couldn't tell you who they exactly reported in to.

23        Q    Do you know what "Human Resources Shared

24   Services" mean; in other words, shared services?

25             MS. FAN:  Vague and ambiguous.

**EXHIBIT 14-17**

1      THE WITNESS:  As I've mentioned, it's an

2   organization within Chevron HR that handles a

3   variety of processes for us.  I don't know what

4   topics you would like me to refer to, but they're --

5   they're just an organization that is under our

6   umbrella.

7   BY MS. LEAL:

8      Q    Okay.  And this organization under your

9   umbrella, are they located in the Philippines and in

10  Argentina?

11     A    Yes.

12          MS. FAN:  Vague and ambiguous.

13  BY MS. LEAL:

14     Q    Do the different Chevron subsidiary --

15  strike that.

16          Are you aware if the different Chevron

17  subsidiaries are required to abide by the same

18  Chevron personnel policies?

19          MS. FAN:  Objection.  Calls for

20  speculation.  Calls for a legal conclusion.

21          THE WITNESS:  We have Chevron-wide policies

22  that exist, and then we have policies that may exist

23  due to local laws and regulations.

24  BY MS. LEAL:

25     Q    Do you know if there are policies that

**EXHIBIT 14-18**

1   Mr. Snookal was unfit for duty for the Escravos

2   assignment.  And once that determination is made,

3   then they begin to inform the employee so that they

4   know that the expat assignment is not going to

5   happen, as well as make necessary parties aware so

6   that we can figure out what role the employees is

7   going to go into instead.

8   BY MS. LEAL:

9       Q   So who was the individual or individuals

10  who actually made the decision to retract the expat

11  assignment to Mr. Snookal?

12          MS. FAN:  Objection.  Calls for

13  speculation.

14          THE WITNESS:  I am only aware of the

15  medical personnel that were part of making that

16  determination of unfit for duty.

17  BY MS. LEAL:

18      Q   And who were those medical personnel that

19  you're referring to?

20      A   It would be Chevron Nigeria Health and

21  Medical, so people that were actually in that

22  location, as well as Dr. Levy, who is a doctor who

23  looked over multiple locations.

24      Q   And do you remember the names of the

25  medical personnel in Chevron Nigeria in Health and

**EXHIBIT 14-19**

Andrew Powers                                    September 17, 2024

1    Medical that you referenced?

2       A    No, I don't.

3            MS. FAN:  Counsel, we've been going for

4    about an hour.  And when you get to a good stopping

5    point, could we take a five-minute break?

6            MS. LEAL:  We can take a five-minute break

7    now.

8            MS. FAN:  Okay.  Thank you.

9            MS. LEAL:  Thank you.

10           THE VIDEO OPERATOR:  We are off the record.

11   The time is 11:00 a.m.

12           (Recess)

13           THE VIDEO OPERATOR:  We are back on the

14   record.  The time is 11:10 a.m.

15           MS. LEAL:  I'm going to put in the chat

16   another document marked Exhibit 3.

17           (Exhibit 3 was marked for identification.)

18   BY MS. LEAL:

19      Q    Let me know when you have it, Mr. Powers.

20      A    Okay.  I'm pulling it up now.  Okay.  I

21   have it.

22      Q    Why don't you scroll through it.  For the

23   record, it is a three-page document Bates number

24   CUSA000538 through 540.

25           So look at the first email beginning on

**EXHIBIT 14-20**

Andrew Powers                                        September 17, 2024

1    page 539, which is the second page.  The first email

2    is dated September 4, 2019, at 7:21 a.m. from

3    Mr. Snookal to you.

4            Do you see that?

5        A    Yes, I do.

6        Q    And the email begins, "Andrew, I am very

7    disappointed in the decision by Chevron Medical to

8    classify me as," quote/unquote, "'unfit' for the

9    Reliability Engineering Manager position at EGTL.  I

10   believe this decision was made based on a lack of

11   understanding and stereotypical assumptions about my

12   medical condition and is, therefore, discriminatory

13   in nature.  As my condition does not affect my

14   ability to perform the job duties of that position,

15   I require no ongoing care outside of annual

16   monitoring, working in a remote location does not

17   affect my condition, a complication from my

18   condition would cause no harm to others, and I have

19   no work restrictions from my physician this decision

20   seems excessively paternalistic."  And it goes on

21   for another long paragraph, two paragraphs.

22           Do you remember receiving this email from

23   Mr. Snookal, Mr. Powers?

24       A    I'm still reading through it.  If I could

25   just read through the rest, I'll confirm.

**EXHIBIT 14-21**

Andrew Powers                                      September 17, 2024

1       Q    Okay.

2       A    Okay.  Yes.  I'm familiar with this email.

3       Q    Would you look at the last page of

4    Exhibit 3, Mr. Snookal's signature line.

5            Are you there?

6       A    Yes.

7       Q    He was at the time an IEA reliability team

8    lead, but at the bottom, it says, in bold "Chevron

9    Products Company."

10           Do you know if Chevron Products Company

11   paid Mr. Snookal's salary at the time?

12           MS. FAN:  Objection.  Calls for

13   speculation.  Calls for a legal conclusion.

14           THE WITNESS:  I do not know if it was

15   listed as Chevron Products Company or Chevron USA.

16   I would need to confirm that.

17   BY MS. LEAL:

18      Q    Okay.  So is it possible for him to be

19   working for Chevron Products Company, but, at the

20   same time, being paid by Chevron USA?

21           MS. FAN:  Calls for speculation.  Calls for

22   a legal conclusion.

23           THE WITNESS:  I guess it's possible.

24   BY MS. LEAL:

25      Q    But going back to the second page of this

**EXHIBIT 14-22**

Andrew Powers                                      September 17, 2024

1   document, Exhibit 3, you sent an email that same day

2   at 7:35 a.m. to Mr. Snookal replying to him, and

3   then you copied Ms. Tse as well as Austin Ruppert.

4            Do you see that?

5       A    Yes, I do.

6       Q    And in this email from you to Mr. Snookal,

7   you're thanking him for bringing this issue to your

8   attention, and you said:  Let me look into this and

9   I'll get a better understanding and we'll get back

10  to you ASAP.  Correct?

11      A    Yes.  I also said, "This is the first I'm

12  hearing of this."

13      Q    Right.  So no one else, including the

14  Nigeria business unit, had not reached out to you in

15  connection with the job offer that was rescinded in

16  Nigeria.  Correct?

17      A    No.  Correct.

18      Q    So after responding to Mr. Snookal at

19  7:35 a.m., you then sent an email, same day, at

20  7:41 a.m. to Troy Tortorich -- I don't know if I'm

21  pronouncing the name correctly or not, but it's

22  T-o-r-t-o-r-i-c-h, and to Austin Ruppert, and you

23  again copied Ms. Tse.

24            Do you see that email?

25      A    Yes, I do.

**EXHIBIT 14-23**

Andrew Powers                                      September 17, 2024

1      Q    And you said, "Austin/Troy, please be

2  thinking about what role Mark could do if this falls

3  through."

4         What you were referring to is the actual --

5  the fact that the job was rescinded in Nigeria?

6      A    That's correct.

7      Q    And then you go on to say, "Thalia and I

8  will investigate and see what medical can share/set

9  up with an appropriate response."

10         Do you see that?

11      A    I see that.

12      Q    The next paragraph in your email, you say,

13  "Note he finds this discriminatory, however, that is

14  hard to know without further context from medical,"

15  period.

16         Who is the medical that you're referring to

17  there?

18      A    In this sentence, I was referring to

19  medical at a broad level, not a specific individual.

20      Q    Would it have been Nigeria business unit?

21      A    At this point in time, I wasn't even

22  specifically referring to Nigeria, just medical,

23  which is another organization within Chevron.

24      Q    And where is that organization?

25         MS. FAN:  Vague and ambiguous.  Calls for

**EXHIBIT 14-24**

Andrew Powers                                          September 17, 2024

1    speculation.

2    BY MS. LEAL:

3        Q    Where is that organization geographically

4    located?

5            MS. FAN:  Same objections.

6            THE WITNESS:  We have medical personnel

7    throughout all of our assets in the company, so I

8    would need more specific, if you could.

9    BY MS. LEAL:

10       Q    Okay.  And when you say "all of our

11   assets," it's worldwide, I imagine?

12           MS. FAN:  Objection.  Calls for -- calls

13   for a legal conclusion.  Vague and ambiguous.  Calls

14   for speculation.

15           THE WITNESS:  We have medical

16   representatives in Chevron that are Chevron

17   employees that are looking over different assets.

18   BY MS. LEAL:

19       Q    What do you mean by "assets"?

20       A    Business units.

21       Q    Okay.  And these business units can be

22   located around the world?

23       A    Yes.

24           MS. FAN:  Objection.  Calls for

25   speculation.  Calls for a legal conclusion.  Vague

**EXHIBIT 14-25**

Andrew Powers                                      September 17, 2024

1   and ambiguous.

2           THE WITNESS:   Yes.   We're a global company.

3   BY MS. LEAL:

4       Q    So the next sentence in that second

5   paragraph, you say, "I am sure there is a very good

6   reason why this was rescinded."

7           Do you see that?

8       A    Yes.

9       Q    And when you wrote this email, you had not

10  started your investigation, correct?

11      A    That's correct.

12      Q    So were you giving -- I'm sorry.  Did I cut

13  you off?  I apologize if I did.

14      A    It was within, you know, a very short time

15  frame of first hearing about it, so I had not ticked

16  that off yet.

17      Q    So you were giving Chevron the benefit of

18  the doubt, then, that there was a very good reason

19  for it?

20          MS. FAN:   Objection.   Argumentative.   Vague

21  and ambiguous.

22          THE WITNESS:   I don't know that I would

23  phrase it as "benefit of the doubt."  However, I do

24  know we have various policy, and as we spoke about

25  earlier, we comply with all federal, state, local

**EXHIBIT 14-26**

Andrew Powers                                          September 17, 2024

```
1   he was interested in applying for those roles.  And
2   so that's what I see from this email.
3   BY MS. LEAL:
4       Q    So after you advised Mr. Snookal that the
5   position in Escravos would not go forward, did you
6   personally look for any positions which might be
7   comparable for Mr. Snookal?
8            MS. FAN:  Objection.  Calls for a legal
9   conclusion.
10           THE WITNESS:  I don't recall at this point.
11  I do remember making sure his supervisor and his PDR
12  were involved in those discussions with Mark to
13  determine what roles would be available.
14  BY MS. LEAL:
15      Q    So you didn't ask Ms. Tse also to look for
16  any positions which might be comparable to the
17  Escravos position for Mr. Snookal?
18           MS. FAN:  Objection.  Calls for a legal
19  conclusion.
20           THE WITNESS:  I don't recall.
21           MS. LEAL:  Let's move on to the next
22  exhibit, Exhibit 5, which I just posted on the chat.
23  It's a two-page document Bates No. CUSA000542 and
24  543.  It is a document with two emails, one on the
25  bottom, and an email from Mr. Snookal to Mr. Powers
```

**EXHIBIT 14-27**

Andrew Powers                                          September 17, 2024

1    with a copy to others, dated September 4th at

2    7:21 a.m.

3              (Exhibit 5 was marked for identification.)

4    BY MS. LEAL:

5         Q    And do you recognize that email,

6    Mr. Powers, as the same email that we discussed

7    earlier in Exhibit 3?

8         A    Yes.  I recognize it.

9         Q    So the only new email on this Exhibit 5 is

10   the email at the top, correct?

11        A    That's correct.

12        Q    And the email at the top is an email from

13   you to Mr. Snookal, correct?

14        A    That's correct.

15        Q    So you've seen this document before today?

16        A    Yes.  It's an email that I sent.

17        Q    In the second paragraph, you say, "I've

18   reached out to the medical department."  And I just

19   want to clarify, the medical department to whom

20   you're referring here is Dr. Levy?

21        A    That's correct.

22        Q    And then you say, "I understand a thorough

23   review was conducted and alternatives were

24   explored."

25              Is that understanding based upon your

**EXHIBIT 14-28**

Andrew Powers                                    September 17, 2024

1    conversation with Dr. Levy as well?

2         A    Yes.   That's correct.

3         Q    And where were the alternatives that were

4    explored that you mention here?

5         A    So through my summary and overview provided

6    by Dr. Levy, I know that they did explore whether

7    another location in Nigeria would be suitable.   That

8    location, Lagos, has more medical facilities that

9    would be available.   However, ultimately it was

10   determined that that would not be an appropriate

11   location for the role to be performed.   It would not

12   be possible for Mark to perform his duties from that

13   location.   And that was the main alternative that

14   was explored.

15        Q    Transferring Mr. Snookal to work from Lagos

16   instead of Escravos but performing the same job, the

17   reliability engineering manager's job?

18        A    That's correct.   Could he perform that job

19   effectively from another location is what we

20   explored.

21        Q    And the answer was no.

22        A    That's correct.

23        Q    And then you go on to say, "We would

24   respectfully disagree that the determination was

25   based on stereotyping or impermissible

**EXHIBIT 14-29**

1    discrimination."

2            Do you see that?

3    A     I see that.

4    Q     As of 2019, September of 2019, how many

5    investigations of complaints of discrimination

6    involving disability had you performed?

7            MS. FAN:  Objection.  Vague and ambiguous.

8    Calls for a legal conclusion.

9            THE WITNESS:  How many investigations had I

10   been part of?

11   BY MS. LEAL:

12   Q     Yeah.

13   A     Was that your question?

14           To my recollection, no other investigations

15   that I personally was part of.

16   Q     So as of September 2019 -- I'm going to

17   expand my question.  Let me start again.

18           So as of September 2019, had you conducted

19   any type of investigation into employee complaints

20   of discrimination?  Any form of discrimination?

21           MS. FAN:  Objection.  Vague and ambiguous.

22   Calls for a legal conclusion.

23           THE WITNESS:  Are you talking about

24   infinite amount of time, or just in September of

25   2019?  What time period are you referring to?  Can

**EXHIBIT 14-30**

Andrew Powers                                      September 17, 2024

```
 1   interact with the local manager in Nigeria.
 2   BY MS. LEAL:
 3       Q    Did you ask Ms. Tse to do so?
 4       A    No, I did not.
 5       Q    Okay.  I'm going to put in the chat one
 6   last exhibit, and it will be Exhibit 12.
 7            (Exhibit 12 was marked for identification.)
 8   BY MS. LEAL:
 9       Q    Let me know when you see this.
10       A    Okay.  It just came through.  I'm opening.
11       Q    And for the record, is it a two-page
12   document.  CUSA000650 and 651.
13       A    Okay.  I have it open.
14       Q    Great.  And if you'll see in the middle of
15   this email string, the top email is an email from
16   you to Jones, M.D. Jones, on September 4th.
17            Was this the same doctor you referred to
18   earlier today, Dr. Ayanna?
19       A    That's correct.
20       Q    So Ayanna Jones, correct?
21       A    That's correct.
22       Q    And Dr. Ayanna Jones was located at least
23   in 2019, in Houston, Texas.  Correct?
24       A    Correct.  Based on the email signature
25   line, that's what it looks like.
```

**EXHIBIT 14-31**

Andrew Powers                                      September 17, 2024

1        Q    And so this is the exhibit that you were

2   referring to when Dr. Ayanna Jones referred you to

3   another person to speak with in connection with

4   Mr. Snookal's complaint?

5        A    That's correct.  Just looking to make

6   contact with health and medical, and then was

7   pointed to someone else.

8        Q    Her email says, "Hello, Andrew.  The

9   EEMEA."  Do you know what that acronym stands for?

10       A    It's our -- at the time was our Europe and

11  Middle Eastern Africa business segment, which

12  encompassed multiple countries under it.  And so

13  this regional medical director -- or medical manager

14  looked over multiple countries.

15       Q    Do you know who that person was in 2019?

16       A    Yes.  Dr. Levy.

17            MS. LEAL:  Okay.  I have no further

18  questions.  You have time to spare to get to your

19  bus.

20            Ms. Court Reporter, we'll just handle the

21  transcript under Code.

22            MS. FAN:  Oh, Counsel, I apologize.  I do

23  have a couple of questions on my own.  I'm aware of

24  the 2:00 o'clock end time, and we'll try to get us

25  all out of here by then.

**EXHIBIT 14-32**

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were duly sworn; that a record

8   of the proceedings was made by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given.

12       Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [  ] was [  ] was not requested.

16       I further certify I am neither financially

17  interested in the action, nor a relative or employee

18  of any attorney or party to this action.

19       IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated: October 1, 2024

23

24  _____

25  JANE BRAMBLETT, CLR, CCRR
    CSR No. 7574

**EXHIBIT 14-33**