# EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,        )
                                    )
                                    )
                Plaintiff,          )
vs.                                 ) Case No.
                                    ) 2:23-cv-6302-HDV-AJR
                                    )
CHEVRON USA, INC., a California     )
Corporation, and DOES 1 through     )
10, inclusive,                      )
                                    )
                Defendants.         )
_____)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

**EXHIBIT 15-1**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1                    A P P E A R A N C E S

2

3

4    FOR THE PLAINTIFF:

5              ALLRED, MAROKO & GOLDBERG
               By:  DOLORES Y. LEAL
6              Attorney at Law
               6300 Wilshire Boulevard, Suite 1500
7              Los Angeles, California 90048
               (323) 653-6530
8              dleal@amglaw.com

9    FOR THE DEFENDANT:

10             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
               By:  ROBERT E. MUSSIG
11             Attorney at Law
               333 South Hope Street, 43rd Floor
12             Los Angeles, California 90071
               (213) 620-1780
13             rmussig@sheppardmullin.com

14   THE VIDEOGRAPHER:

15             Jacob Rivera

16   ALSO PRESENT:

17             Eguono Erhun, In-House Counsel for Chevron

18

19

20

21

22

23

24

25
```

**EXHIBIT 15-2**

Dr. Eshiofe Asekomeh                                           October 10, 2024

1   foundation.  Let me just -- Doctor, when I object,

2   unless I instruct you not to answer, you should still

3   answer the question.  I'm just making objections for the

4   record.  So unless I'm instructing you not to answer, go

5   ahead and answer her questions.

6           THE WITNESS:  Okay.  So by the nature of this

7   contract, Deep Drill is providing medical services to

8   Chevron by supplying manpower, doctors and nurses.

9   BY MS. LEAL:

10      Q.  Do you know if Deep Drill Oil Services provides

11  medical services to any other companies other than

12  Chevron, or is Chevron the only client?

13      A.  I don't know.

14          MR. MUSSIG:  Calls for speculation.

15  BY MS. LEAL:

16      Q.  So prior to 2020, who was your employer?

17      A.  So prior to 2020, my employer was Delog Nigeria

18  Limited, D-E-L-O-G, Delog Nigeria Limited.

19      Q.  So prior to 2020, your employer was Delog

20  Nigeria Limited?

21      A.  Yes.  That's D-E-L-O-G.

22      Q.  So what business was Delog Nigeria Limited in

23  at the time?

24          MR. MUSSIG:  Calls for speculation.  Lacks

25  foundation.

**EXHIBIT 15-3**

Dr. Eshiofe Asekomeh                                October 10, 2024

1         THE WITNESS:  Okay.  So -- so for my group, it

2     was, again, provision of manpower, doctors and nurses,

3     to Chevron in this instance.

4     BY MS. LEAL:

5         Q.  Okay.  Do you know if Delog Nigeria Limited

6     provided doctors and nurses to other companies other

7     than Chevron at the time?

8         MR. MUSSIG:  Calls for speculation.

9         THE WITNESS:  I don't know.

10    BY MS. LEAL:

11        Q.  Okay.  Has Chevron directly ever paid your

12    salary?

13        A.  No.

14        Q.  So the work that you did for Chevron was paid

15    either by Delog Nigeria Limited or by Deep Drill Oil

16    Services in conjunction with the contract that those

17    companies had with Chevron; is that correct then?

18        A.  Can you rephrase that question?

19        Q.  Yes.  I want to make sure I understand.

20        Prior to 2020, and since then, all of the work

21    that you have performed for Delog Nigeria Limited and

22    Deep Drill Oil Services was work that you did in

23    connection with services for Chevron.

24        A.  Yes.

25        Q.  Other than Chevron, did you have any other

**EXHIBIT 15-4**

Dr. Eshiofe Asekomeh                                        October 10, 2024

1     companies for which you provided any services at any

2     time during your employment with either Delog Nigeria

3     services or Deep Drill Oil Services?

4          A.   No.

5          Q.   When did you first start doing any work for

6     Chevron?

7          A.   My contract started in 2011.

8          Q.   And at that time, then, your salary -- your

9     compensation was paid by Delog?

10         A.   No.  So from 2011, my contract company was IMS

11    Medical Services.

12         Q.   I-V, as in Victor?

13         A.   No.  IMS, International Medical Services

14    Limited.

15         Q.   I apologize.  What were the letters again?

16         A.   IMS.  S --

17         Q.   "X" like X-ray.

18         A.   -- for services.  No, "S" like services.

19         Q.   IMS.

20         A.   Yes.

21         Q.   Okay.  And how long did you have a contract

22    with IMS Medical Services?  From 2011 until when?

23         A.   2011 until about -- I'm not sure now.  I have

24    to look that up.  About 2005, 2006.

25              Oh, sorry, '15, '16.  '11 to '15, '16.

**EXHIBIT 15-5**

Dr. Eshiofe Asekomeh                                October 10, 2024

1   did residency training in internal medicine in the

2   University of Port Harcourt Teaching House, which was

3   specializing in the West African College of Physician.

4   Between 2003 and 2009, junior residency for three years

5   in general internal medicine, and then the last three

6   years subspecializing in neurology.

7           I have a Master's in pharmacology from the

8   University of Port Harcourt in Nigeria.  I have another

9   Master's in public health from the University of

10  Manchester.  And then in between, I've done a course in

11  occupational health from the University College

12  Hospital, Ibadan, Nigeria.

13          Q.  How do you spell Ibadan?

14          A.  I-B-A-D-A-N.

15          Q.  And how long have you been a physician -- a

16  licensed physician?

17          A.  1997 until date.  Last 27 years.

18          Q.  And do you have a medical specialty?

19          A.  Yes.

20          Q.  What is that?

21          A.  I'm a physician, that's equivalent to the U.S.

22  internist, and I'm also a neurologist.

23          Q.  An internist and neurologist.  Okay.

24          A.  Yes.

25          Q.  Have you ever practiced cardiology?

**EXHIBIT 15-6**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1          A.  Not as a cardiologist.
 2          Q.  Have you ever seen an aortic dissection or
 3   rupture?
 4          A.  No --
 5              MR. MUSSIG:  Vague and ambiguous as to "seen."
 6              THE WITNESS:  Can you clarify that?
 7   BY MS. LEAL:
 8          Q.  Sure.  Have you ever treated an individual who
 9   had an aortic dissection or a rupture?
10          A.  No.
11          Q.  The contract which you have with Deep Drill Oil
12   Services, which you've had since, you said, 2020, does
13   that contract specify that you only do work for Chevron?
14          A.  Not written in the contract.
15          Q.  Do you only do work for Chevron, though?
16          A.  Yes.
17          Q.  And prior to 2020, have you only done work for
18   Chevron?
19              MR. MUSSIG:  Vague and ambiguous.
20              THE WITNESS:  Yes.  When you say "do work," you
21   mean have contract with?  Or what do you mean "do work"?
22   BY MS. LEAL:
23          Q.  Well, in your work as a doctor, you said that
24   the company Delog provides doctors and nurses to
25   Chevron.
```

**EXHIBIT 15-7**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1              So in your work as a doctor, do you provide
2     services to any other company other than Chevron?
3              A.  No.
4         Q.  So you're exclusive to Chevron then?
5              (Simultaneous crosstalk.  Reporter
6              clarification.)
7              MR. MUSSIG:  Vague and ambiguous as
8     "exclusive."
9     BY MS. LEAL:
10        Q.  I'll withdraw that.  You've already answered my
11    other question.
12             So let's focus on your job duties during the
13    time that you were an occupational health physician.
14             Can you tell me what your job duties were?
15        A.  Okay.  So specific for the occupational health
16    duties, I did annual --
17             (Reporter clarification.)
18             THE WITNESS:  Annual or periodic medical --
19    BY MS. LEAL:
20        Q.  Annual or periodic --
21        A.  -- medical --
22        Q.  -- medical --
23        A.  -- exams for the local employees, their
24    dependents; retirees, and their dependents.  I also did
25    work-related medicals for employees, pre-employments,
```

**EXHIBIT 15-8**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   recall also being deemed not fit for duty?

2          A.   I will have to look at the record to answer.

3          Q.   Okay.  Other than Mr. Snookal, in 2019, 2020,

4   are there any individuals whom you deemed to be unfit

5   for duty because of an aortic dissection or an aortic

6   aneurysm?

7          A.   No.

8          Q.   So Mr. Snookal was the only one?

9          A.   The only one with aortic aneurysm.

10         Q.   Okay.  So let's focus on the MSEA evaluations

11  that you were responsible for performing in 2019.

12              Can you tell me how you went about conducting

13  these evaluations?

14              MR. MUSSIG:  Vague and ambiguous.  Calls for a

15  narrative.

16              THE WITNESS:  Okay.  So do you want, like, a

17  generic description of what the process is like?

18  BY MS. LEAL:

19         Q.   Yes.

20         A.   Okay.  So from both end, both from the Nigeria

21  end and the U.S. end, or any other country where MSEAs

22  are done, there is a specific list of what you are

23  supposed to do, and that is captured in the Medical

24  Examination Protocol book that is a global guide to

25  Chevron occupational health screenings, work-related

**EXHIBIT 15-9**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1   screenings that tells you what forms the client should

2   fill.  So we have a form for collecting background

3   medical --

4              (Reporter clarification.)

5              THE WITNESS:  Medical history of the patient.

6   There are forms for specific things.  Authorization,

7   medical history, medical examination by his physician or

8   the physician who is doing the MSEA, and then there's a

9   list of investigations to be done for MSEA, what blood

10  works, X-rays, and all of that.

11             And after that is done, as of that time, the

12  country of origin would send those documents to the

13  destination country, and it is the job of the

14  destination country to review those documents and make a

15  determination of fitness or no fitness.  So it is --

16             (Reporter clarification.)

17             THE WITNESS:  It is sent -- it is sent through

18  the electronic medical record system.  So you get an

19  e-mail when it has been sent to you to say documents for

20  Mr. XYZ has been sent to you.  So you go to the EMR and

21  look at those documents, go through all the forms, make

22  sure they're properly filled, make sure the person has

23  been examined, look at the examination finding, look at

24  the medical history of that person, look at the results,

25  and make sure the results are complete and they are all

**EXHIBIT 15-10**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   normal.  Okay?
 2           If there is any abnormality, make sure there is
 3   an explanation or the fact that the person has been
 4   reviewed.  And if you are not comfortable with any of
 5   those results, you send back a message to the team that
 6   sends you those MSEA documents and ask for further
 7   investigation or ask for further review, which you then
 8   get back and then you make a determination.
 9   BY MS. LEAL:
10       Q.  Thank you.  Can you tell me again what is the
11   name of that guide?
12           What is the title of that guide that you
13   utilized in ensuring that everything is completed, the
14   global guide?
15       A.  That is the Medical Examination Protocol, MEP,
16   Medical Examination Protocol.
17       Q.  And is that a Chevron document, to your
18   knowledge?
19       A.  Yes.
20       Q.  And this Medical Examination Protocol document
21   is a document that you utilize in order to ensure that
22   you properly conduct these MSEAs; correct?
23       A.  So it's a guide to tell you what -- what
24   investigations and what forms needs to be filled and
25   what needs to be done for every protocol.  So for MSEA,
```

**EXHIBIT 15-11**

Dr. Eshiofe Asekomeh                                    October 10, 2024

 1 | please?

 2 |         MS. LEAL:  Sure.

 3 |         THE VIDEOGRAPHER:  All right.  Going off the

 4 | record at 8:04 a.m.

 5 |         (Off the record.)

 6 |         THE VIDEOGRAPHER:  All right.  We're back on

 7 | the record at 8:17 a.m.

 8 | BY MS. LEAL:

 9 |     Q.  Dr. Asekomeh, from 2016 through 2020, when you

10 | were in Warri as the occupational physician, did you

11 | learn of any instances where an employee required

12 | medical attention which the local Escravos clinic was

13 | not equipped to handle?

14 |     A.  Yes.

15 |     Q.  And can you tell me about those instances that

16 | you do recall?

17 |     A.  Because of the date range given, it would be

18 | difficult to recall specifics.  But we do have medevacs

19 | from Escravos to Warri almost on a regular basis.

20 |     Q.  On what basis?

21 |     A.  On a regular basis.

22 |     Q.  What do you mean by "regular"?  How many times

23 | a week?

24 |     A.  The answer I'm going to give you now is going

25 | to be not -- maybe not for 2016, 2019.  I've been here

**EXHIBIT 15-12**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   since 2020.  So in the past week, I've had two medevacs.
2   That's not counting referrals.  So we differentiate
3   between referrals and medevac.  Medevacs are medevacs,
4   urgent, emergency.  Referrals are things we can
5   prioritize, and then put them on normal flights out.
6        Q.  If someone suffered an aortic rupture, that, in
7   your mind, would require a medevac?
8        A.  Okay.  Again --
9        MR. MUSSIG:  Incomplete hypothetical.
10       THE WITNESS:  That's --
11       (Reporter clarification.)
12       THE WITNESS:  I said that's if the person
13  survives from where they are driven, gets to the -- to
14  even get them to the Escravos clinic.  An aortic rupture
15  is a sudden, fatal event.
16  BY MS. LEAL:
17       Q.  I'm sorry.  Would you repeat what you said?
18       A.  I said an aortic rupture oftentime is fatal.
19       Q.  An aortic rupture is oftentimes fatal.
20       A.  Yes.
21       Q.  Correct.  So there's a possibility that the
22  person may just die as soon as there's a rupture, in
23  which case they would not even have to be medevacked
24  to --
25       A.  Yes.

**EXHIBIT 15-13**

Dr. Eshiofe Asekomeh                                     October 10, 2024

1  | "know"?

2  |      Q.  Are you aware that Dr. Sobel was the doctor

3  | selected by Chevron to conduct an examination of

4  | Mr. Snookal?

5  |          MR. MUSSIG:  Lacks foundation.

6  |          THE WITNESS:  So this form was signed by

7  | Dr. Sobel, and as I said, we use -- these forms are sent

8  | through the electronic medical records.  So for the form

9  | to have been signed by him, it means that the U.S. team

10 | were aware of him and that he had conducted the test

11 | before he passed them into the EMR web chat and then

12 | send them to me to review.

13 | BY MS. LEAL:

14 |      Q.  My question was a bit different.

15 |          Are you aware that Dr. Sobel who signed this

16 | form was not Mr. Snookal's own physician but rather a

17 | physician --

18 |      A.  Yes.

19 |      Q.  -- from Chevron selected to do the

20 | examination?

21 |      A.  Yes.

22 |          MR. MUSSIG:  Lacks foundation.

23 | BY MS. LEAL:

24 |      Q.  And according to this form, he dated it

25 | July 24th, 2019, and he determined that Mr. Snookal was

**EXHIBIT 15-14**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   fit for duty with restrictions of no heavy lifting more

2   than 50 pounds, and then he needed a review of a

3   recommendation letter from a cardiologist to clear him.

4           Is that your understanding?

5           MR. MUSSIG:  Document speaks for itself.

6           THE WITNESS:  Yes.

7   BY MS. LEAL:

8       Q.  Did you speak with Dr. Sobel at all?

9       A.  No.

10      Q.  And did you at some point learn that Dr. Steven

11  Khan was Mr. Snookal's cardiologist?

12      A.  Yes.

13      Q.  Did you speak with Dr. Khan?

14      A.  There's a report from Dr. Khan in these

15  records.

16      Q.  My question was:  Did you speak with Dr. Khan?

17      A.  No.

18      Q.  Did you speak with Mr. Snookal at all in

19  conjunction with your MSEA evaluation?

20      A.  No.

21      Q.  So you didn't speak with Mr. Snookal to find

22  out how long he had worked at Chevron prior to 2019

23  without any medical incidents?

24          MR. MUSSIG:  Asked and answered.

25          THE WITNESS:  No.

**EXHIBIT 15-15**

Dr. Eshiofe Asekomeh                                      October 10, 2024

1   BY MS. LEAL:

2        Q.  No, you did not speak with him to find out that

3   information; correct?

4        A.  It wasn't part of the process that I would

5   speak to him.

6        Q.  Well, you could have spoken to him, could you

7   not?

8              MR. MUSSIG:  Incomplete hypothetical.  Calls

9   for speculation.

10             THE WITNESS:  As I said, it's a process.

11  Wasn't part of the process.

12  BY MS. LEAL:

13       Q.  Was there anything to preclude you from picking

14  up the phone or sending an e-mail to Mr. Snookal to get

15  more information from him in order for you to evaluate

16  him for assignment to Escravos?

17       A.  So the way the process work was if I need any

18  further information, on that EMR web chat, I will

19  request for those information and the U.S. team will

20  handle it.

21       Q.  Did you ask anyone in the U.S. team to find out

22  how Mr. -- how long Mr. Snookal had worked at Chevron

23  prior to 2019 without any medical incidents?

24       A.  What will you need that information for?

25       Q.  I'm just asking if you -- if you did.

**EXHIBIT 15-16**

Dr. Eshiofe Asekomeh                                        October 10, 2024

1          Did you contact any person to find out whether
2   Mr. Snookal had any prior medical incidents while
3   working at Chevron?
4       A.  That information was not necessary.
5       Q.  In your opinion, it was not necessary?  Is that
6   correct?
7       A.  As of that time, it wasn't necessary.
8       Q.  So because you didn't find out any information
9   about Mr. Snookal's prior employment at Chevron, you
10  didn't know that he had worked there for ten years
11  before 2019 without any medical incidents; correct?
12      A.  That information is not necessary.
13      Q.  So the answer is "correct"?
14      A.  Ask the question again.
15          MS. LEAL:  Can I have the court reporter read
16  it back.
17          (Requested portion of record read.)
18          THE WITNESS:  So -- so the form you showed
19  before has his medical history.
20  BY MS. LEAL:
21      Q.  Did you know that Mr. Snookal had worked at
22  Chevron since 2009 without any medical incidents at
23  Chevron?
24      A.  That's what I said.  He sent in the medical
25  record form that shows his past medical history.  So if

**EXHIBIT 15-17**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1    he had an incident, it would be stated in his medical

2    record.

3        Q.  So had he had one, it would be reflected in the

4    medical record, you're saying?

5        A.  He would have stated it.  The form 146, the

6    first part of it, he filled and state what medical

7    history he has.  So the fact that he was on medication,

8    he stated that.

9        Q.  Did you speak with anyone in Escravos who would

10   be Mr. Snookal's supervisor to understand the job duties

11   of the reliability engineering manager position?

12       A.  No.

13       Q.  Did you speak with anyone in Escravos who would

14   be Mr. Snookal's supervisor to determine whether the

15   supervisor believed Mr. Snookal should be cleared for

16   duty?

17       A.  Again, the pathway --

18           (Reporter clarification.)

19           THE WITNESS:  I said the pathway -- the medical

20   team doesn't speak to the supervisor.  It was a process.

21   The medical team doesn't speak to his supervisor.

22   BY MS. LEAL:

23       Q.  So if it's not listed in the guidelines or in

24   the process, you don't do it, then, is what you're

25   saying?

**EXHIBIT 15-18**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   role for managers, you don't do functional capacity

2   evaluation.

3           But having said that, Dr. Sobel talked about

4   lifting, not lifting up to so-so weight.  So those will

5   tell you what and what that role is going to involve.

6   If I needed more information, I would talk to the U.S.

7   team to get that information, not his supervisor.

8   BY MS. LEAL:

9       Q.  Did you think it was important for you to know

10  what a reliability engineering manager position entailed

11  in order to be able to properly assess Mr. Snookal,

12  whether he was fit for duty or not?

13      A.  That question has two answers.  Okay?  So if I

14  was writing my decision on whether he had to lift weight

15  above 30 kg, because Dr. Sobel had said fit with

16  limitation would not lift 30 kg, then I would have to

17  find out whether his job role involved lifting 30 kg.

18          The bulk of that decision was taken on the fact

19  that if he had a medical event, we would not be able to

20  support him in Escravos, irrespective of his job role.

21  So that is my answer.

22      Q.  Did you review the job description for the

23  reliability engineering manager?

24      A.  I can't remember now.  But there was no issue

25  around his duty.

**EXHIBIT 15-19**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1   BY MS. LEAL:
2       Q.  So he was qualified, then -- by the time you
3   were involved, he was deemed qualified to perform the
4   job of an REM; correct?
5           MR. MUSSIG:  Calls for speculation.  Lacks
6   foundation.
7           THE WITNESS:  I wasn't part of that
8   determination.  Mine was to decide is this man, coming
9   to Escravos, fit to come.  Would we be able to manage
10  him if he had any issues, medically --
11  BY MS. LEAL:
12      Q.  Were you aware -- sorry.
13      A.  I'm done.
14      Q.  Were you aware that the REM job would be a desk
15  job?  Majority of the time spent working at a desk?
16      A.  Okay.  So that is the key, "majority of the
17  time," but never all of the time.
18      Q.  Were you aware that the REM was a management
19  position where he supervised persons who were actually
20  working at the location?
21      A.  So almost always the manager once --
22          (Reporter clarification.)
23          THE WITNESS:  Has to step into the field.
24  BY MS. LEAL:
25      Q.  Were you aware that the REM job was not
```

**EXHIBIT 15-20**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1    physically demanding?
2           MR. MUSSIG:  Vague and ambiguous as to
3    "physically demanding."  Calls for speculation.  Lacks
4    foundation.
5           THE WITNESS:  Okay.  I can answer that.
6    Because I mentioned about the functional capacity
7    evaluation -- so physically-demanding jobs, we do a
8    functional capacity evaluation.  He had no functional
9    capacity evaluation.  But that position entail visiting
10   the fields, so he would still have gone to the field
11   once in a while to see what the team was doing.
12   BY MS. LEAL:
13        Q.  Do you know why he was not given a functional
14   capacity evaluation?
15        A.  Because as --
16            (Simultaneous crosstalk.  Reporter
17            clarification.)
18            MR. MUSSIG:  Calls for speculation.
19   BY MS. LEAL:
20        Q.  You can answer, Doctor.
21        A.  Ask the question again.  I've forgotten how you
22   phrased it.
23        Q.  You said that he did not have a functional
24   capacity evaluation conducted.
25            And my question was:  Do you know why?

**EXHIBIT 15-21**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              MR. MUSSIG:  Same objection.
 2              THE WITNESS:  Okay.  I just said now that
 3   office jobs mean we don't have functional capacity
 4   evaluation.  Where almost-always office job and
 5   management will visit fields.
 6   BY MS. LEAL:
 7       Q.  So you don't know why?
 8       A.  Why what?
 9              MR. MUSSIG:  Misstates testimony.
10   BY MS. LEAL:
11       Q.  The functional capacity evaluation was not
12   conducted on Mr. Snookal.
13       A.  I just said this.  Office-based jobs don't have
14   functional capacity, but office-based managers would
15   visit the field once in a while to see what is going
16   on.
17       Q.  I see.  You're saying that office jobs don't
18   require the functional capacity evaluation.
19       A.  Yes.
20       Q.  Okay.  Was there anything about the actual
21   reliability engineering manager job that Mr. Snookal
22   would have been performing that would increase the risk
23   of an exacerbation of his condition?
24              MR. MUSSIG:  Calls for speculation.  Lacks
25   foundation.  Incomplete hypothetical.
```

**EXHIBIT 15-22**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1          THE VIDEOGRAPHER:  All right.  We're back on

2    the record at 9:37 a.m.

3          MS. LEAL:  Jacob, can you put up Exhibit 2,

4    please, on the screen?  I'm sorry, that was Exhibit --

5    yes -- 2.

6    BY MS. LEAL:

7          Q.  For the record, it's a document Bates number

8    Snookal 01157 and 01158.  The title of the document is

9    Job Title: NMA EGTL Reliability Engineering Manager.

10         Have you seen this document before today,

11   Dr. Asekomeh?

12         A.  No.

13         Q.  So this was not a document that anyone sent you

14   in conjunction with your evaluation of Mr. Snookal's

15   suitability for the assignment?

16         A.  Can you scroll it down?

17         MR. MUSSIG:  Objection.  Asked and answered.

18         THE WITNESS:  No.

19         MS. LEAL:  Can we show the next document,

20   Exhibit 3?

21              (Exhibit Number 3 marked for

22              identification.)

23   BY MS. LEAL:

24         Q.  And for the record, Exhibit 3 is Bates number

25   CUSA000208 through 220.  And the title of this document

**EXHIBIT 15-23**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   records were inside the MSEA, and then I had reports

 2   from the cardiologist, which have not shown so far, and

 3   then review by Nigerian cardiologists.

 4   BY MS. LEAL:

 5        Q.  Did you review any published studies regarding

 6   aortic aneurysms?

 7        A.  So there was one review by one of the

 8   cardiologists.  Dr. Aiwuyo did the review.

 9        Q.  Which doctor?

10        A.  Dr. Henry Aiwuyo.

11        Q.  A-I-W-U-Y-O?

12        A.  Yes.

13        Q.  And how do you know that Dr. Aiwuyo reviewed

14   such published studies regarding aortic aneurysms?

15        A.  So it's in his reports as e-mailed to me.

16        Q.  Okay.  Well, I will -- I will ask you about

17   that because there were, as your attorney said this

18   morning, several documents sent to me before -- or

19   during your deposition, which I have not had a chance to

20   review.  So we'll take a break and I will review all of

21   those documents and we'll come back to that.

22             So I understand your testimony that

23   Dr. Aiwuyo --

24        A.  Aiwuyo.  Henry Aiwuyo.

25        Q.  Okay.  Aiwuyo.
```

**EXHIBIT 15-24**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1        MR. MUSSIG:  Calls for speculation.  Incomplete

2    hypothetical.

3        THE WITNESS:  Do you mean, like, the weather

4    or, like, the water?  What variables are you looking at?

5    BY MS. LEAL:

6        Q.  Anything.  I mean, is there anything about

7    being in Escravos, Nigeria, that would aggravate or

8    increase the likelihood that Mr. Snookal would suffer a

9    rupture?

10       A.  Those -- those risks would have to be recorded

11   risk, the risk we already know, which the cardiologist

12   had mentioned in their review, if he was smoking, if he

13   was doing vigorous exercise, was lifting heavy weights.

14       Q.  Yeah, I'm not talking about him.  I'm talking

15   about the location.

16           Being in Escravos, just him working in

17   Escravos, is there anything there that would increase or

18   aggravate the likelihood that he would have a rupture?

19           MR. MUSSIG:  Calls for speculation.  Lacks

20   foundation.  Incomplete hypothetical.

21           THE WITNESS:  So if we were talking of the

22   weather or food, these are not known risk anywhere in

23   the world that aggravates an aneurysm or the chances

24   that it ruptures, to the best of my knowledge.

25           MS. LEAL:  Okay.  Would -- Jacob, would you

**EXHIBIT 15-25**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    BY MS. LEAL:

2        Q.   Now, you said earlier that in reviewing the

3    documents, you saw that Mr. Snookal had had annual CT

4    scans and echocardiograms; correct?

5        A.   Yes.

6        Q.   Do you agree that annual imaging with the CT

7    scans and the echocardiograms was and could continue to

8    be used to monitor Mr. Snookal's aorta for changes?

9        A.   Are you asking me if I know after 2019 whether

10   he's been having more CTs and echocardiograms?

11       Q.   Well, do you agree that having annual imaging

12   of the CT scans and echoes could -- could continue to be

13   done in order to monitor Mr. Snookal?

14       A.   The first cardiologist -- Dr. Aiwuyo stated

15   that in his report, that the right thing to do is that,

16   to have his annual CTs and echocardiograms.

17       Q.   So that's something that could and should be

18   done; correct?

19       A.   That was what was recommended as of that

20   time.

21            MR. MUSSIG:   Calls for speculation.

22   BY MS. LEAL:

23       Q.   I'm sorry, you said that was what was

24   recommended at the time?

25       A.   Yes.

**EXHIBIT 15-26**

Dr. Eshiofe Asekomeh                                        October 10, 2024

```
 1   BY MS. LEAL:
 2        Q.   Nothing else comes to mind?
 3        A.   Not presently.
 4        Q.   Okay.  In Escravos, during a routine operation
 5   there at the facility, are there opportunities for
 6   employees to suffer whole or partial body crush
 7   injuries?
 8             MR. MUSSIG:  Vague and ambiguous as to "routine
 9   operation."  Calls for speculation.  Lacks foundation.
10   Incomplete hypothetical.
11             THE WITNESS:  Did you say "routine operation"?
12   BY MS. LEAL:
13        Q.   Well, let's just say operation.
14             So during the operations there in Escravos, are
15   there opportunities where employees could suffer whole
16   or partial body crush injury?
17             MR. MUSSIG:  Vague and ambiguous as to "whole
18   body crush injuries."  Calls for speculation.  Lacks
19   foundation.  Incomplete hypothetical.
20             THE WITNESS:  So -- so if an employee was
21   working where those risk exist, hypothetically, yes.
22   BY MS. LEAL:
23        Q.   So have there been any, for example,
24   amputations, employees working on a machine and
25   someone's arm or leg or other body part is amputated?
```

**EXHIBIT 15-27**

Dr. Eshiofe Asekomeh                                      October 10, 2024

1          A.  That's possible.

2          Q.  Have you heard of any such incidents there in

3   Escravos?

4          A.  Now, that's work related.  I don't know if I'm

5   allowed to share that with you.

6          Q.  Well, I don't need the identity of the person.

7   I don't need you to violate anyone's privacy.  I'm just

8   saying in general.

9              MR. MUSSIG:  I'll say you can answer that

10  question.  I don't want to get into any details about,

11  you know, specific injuries that happened to specific

12  people.

13  BY MS. LEAL:

14         Q.  I'm just asking about the injuries themselves.

15  I don't want you to identify people.

16         A.  Yes.

17         Q.  Can you describe -- or can you list for me the

18  different injuries that you've seen occur there in

19  Escravos?

20             MR. MUSSIG:  Calls for a narrative.

21             THE WITNESS:  Okay.  So we've had injuries like

22  sea pirate attacks, finger injuries, crushed fingers.

23  Lacerations from -- lacerations, slip and falls.

24  BY MS. LEAL:

25         Q.  Have there been any amputations?

**EXHIBIT 15-28**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1        A.   Yes.

2        Q.   And what type?

3        A.   Finger.   I'm aware of a finger amputation.

4        Q.   Any others?

5        A.   Mainly fingers.

6        Q.   Any other body parts?

7             MR. MUSSIG:   Asked and answered.

8             THE WITNESS:   I'm aware of fingers.

9   BY MS. LEAL:

10       Q.   Was a head decapitated at one point?

11       A.   I'm aware of fingers.

12       Q.   I understand fingers.

13            But do you have a recollection that a head

14   actually was decapitated?

15       A.   I'm not aware of that.

16       Q.   Have you heard of legs being cut off?

17            MR. MUSSIG:   Asked and answered.

18            THE WITNESS:   None that I can recollect.

19   BY MS. LEAL:

20       Q.   Have you heard or recall arms being cut off?

21       A.   I am aware of fingers.   I am not aware of arm

22   amputations.   I can't recollect any arm amputation.

23       Q.   Do you recall any incidents where an employee

24   suffered a severe crushing injury to the chest?

25       A.   No.

**EXHIBIT 15-29**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1      Q.  And some are predictable and some are not

2  predictable; correct?

3      A.  Well, in the workplace, you want to try and

4  predict what can happen and mitigate it before it

5  happens.  You don't leave anything to chance, especially

6  in the oil industry.

7      Q.  Right.  But there are some injuries that occur

8  from accidents that occur that are not predictable there

9  in Escravos; correct?

10     A.  That's why they are called accident, I guess.

11     Q.  Okay.  I'm going to have Jacob show you the

12  next exhibit, 7.

13          (Exhibit Number 7 marked for

14          identification.)

15  BY MS. LEAL:

16     Q.  And these are seven pages of documents produced

17  this morning by Chevron's counsel, a series of e-mails.

18  The first Bates is CUSA000768 and it goes through 774.

19          Dr. Asekomeh, are these e-mails among the three

20  other doctors and you regarding Mark Snookal?

21     A.  Yes.

22     Q.  Other than these communications by e-mail with

23  these three other doctors in Nigeria, were there any

24  other communications that you had with them that are not

25  reflected here in this exhibit?

**EXHIBIT 15-30**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1          THE WITNESS:  It's -- you're asking me if I

2    think physicians should determine fitness for work?

3    BY MS. LEAL:

4          Q.  No.

5          A.  That's the equivalence of the question you're

6    asking me, what was the essence of doing the medical.

7          Q.  No.  My question is whether it's okay for you

8    to substitute your judgment for an employee's decision,

9    like Mr. Snookal, to assume a risk to work in Escravos.

10         Do you think that's okay for you to do that?

11         MR. MUSSIG:  Calls for speculation.  Lacks

12   foundation.  Incomplete hypothetical.  Asked and

13   answered.

14         THE WITNESS:  The essence of doing medical is

15   to decide whether the person is fit to work based on the

16   job type, based on the job location.  That was my task

17   to do.  And that was what I did.

18   BY MS. LEAL:

19         Q.  Right.  And he could perform the duties of an

20   REM.  That, we've established.  The reason he was deemed

21   unfit for duty is because in the event he had a rupture

22   or a dissection, he would not be able to be treated

23   there in Escravos because the medical facilities are

24   small; correct?

25         A.  Additionally, in the event he had the rupture

**EXHIBIT 15-31**

Dr. Eshiofe Asekomeh                                      October 10, 2024

1    in some location, it would put the life of others at

2    risk.

3          Q.  He'd put the life of what?

4          A.  Others at risk.

5          Q.  How is it that Mr. Snookal would -- would put

6    the lives of others at risk if he had a rupture at work?

7          A.  So I just cited an example of him as a manager

8    going to visit an offshore location.

9             MS. LEAL:  We can take this -- the exhibit off

10   the screen, Jacob.  Thank you.

11   BY MS. LEAL:

12         Q.  What did you just say?  I'm sorry.

13         A.  I said I cited an example as a manager, he has

14   to visit some work location from time to time.

15         Q.  Can you give me an example of how he would put

16   others at risk in the event he had a rupture?

17         A.  I wouldn't be able to cite specific example

18   now, but we fly around in choppers, so he's boarding a

19   chopper, he has a rupture at the point of boarding or

20   coming down that chopper.

21         Q.  Coming down a what?

22         A.  A helicopter.

23         Q.  Oh, helicopter.

24             So can you think of any specific way, though,

25   that he would put someone else's life in danger if he

**EXHIBIT 15-32**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    had a rupture to his aorta?

2         A.   Okay.   So he's in a work location, some

3    offshore location on inspection visit, he's climbing the

4    stairs, there's somebody walking behind him, and he

5    ruptures his aorta on that staircase.

6         Q.   He falls down; he falls on top of someone,

7    you're saying?

8         A.   That's a possibility.   We are speculating now.

9         Q.   Yeah, well, that can happen even if someone

10   doesn't have a rupture; correct?   I mean, they misstep,

11   you know, a step on a ladder, for example; they can fall

12   and fall on someone else.   That can happen too; right?

13             MR. MUSSIG:   Calls for speculation.   Incomplete

14   hypothetical.

15             THE WITNESS:   So we are looking at hypothetical

16   situations.   The risk is higher if he ruptures.

17   BY MS. LEAL:

18        Q.   Before you said that -- strike that.

19             Before you determined that Mr. Snookal was not

20   fit for duty for the REM position in Escravos, did you

21   contact anyone in the United States in legal to

22   determine whether or not your decision would be legal or

23   not?

24        A.   No.

25             MR. MUSSIG:   Asked and answered.

**EXHIBIT 15-33**

Dr. Eshiofe Asekomeh                                            October 10, 2024

```
1              CERTIFICATE OF STENOGRAPHIC REPORTER

2

3

4         I, RACHEL N. BARKUME, a Certified Shorthand

5    Reporter of the State of California, hereby certify that

6    the witness in the foregoing deposition,

7                   DR. ESHIOFE ASEKOMEH,

8    was by me duly sworn to tell the truth, the whole truth,

9    and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14        Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21             DATED:  October 13, 2024.

22

23        _____

24        Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

**EXHIBIT 15-34**