# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

```
MARK SNOOKAL, an individual,   )
                               )
                               )
             Plaintiff,        )
vs.                            ) Case No.
                               ) 2:23-cv-6302-HDV-AJR
                               )
CHEVRON USA, INC., a California)
Corporation, and DOES 1 through)
10, inclusive,                 )
                               )
             Defendants.       )
_____)
```

REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Scott Levy, M.D.                                                    August 30, 2024

1                      A P P E A R A N C E S

4   FOR THE PLAINTIFF:

5           ALLRED, MAROKO & GOLDBERG
            By:  OLIVIA FLECHSIG
6                DOLORES Y. LEAL
            Attorneys at Law
7           6300 Wilshire Boulevard, Suite 1500
            Los Angeles, California 90048
8           (323) 653-6530
            oflechsig@amglaw.com
9           dleal@amglaw.com

10  FOR THE DEFENDANT:

11          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
            By:  ROBERT E. MUSSIG
12          Attorney at Law
            333 South Hope Street, 43rd Floor
13          Los Angeles, California 90071
            (213) 620-1780
14          rmussig@sheppardmullin.com

15  THE VIDEOGRAPHER:

16          Jacob Rivera

```
 1   program across North America and then involved with
 2   different health and wellness events as they arose.
 3           (Reporter clarification.)
 4   BY MS. FLECHSIG:
 5       Q.   How long were you in that occupational health
 6   role?
 7       A.   It was about two years or so.
 8       Q.   What was your next role?
 9       A.   I was moved to Singapore, and I was assigned
10   the role of regional medical manager for the Asia
11   Pacific region.
12       Q.   What did you do in that capacity?
13       A.   Similar responsibilities just -- I guess, more
14   of a -- of a senior position.  So I managed, again, more
15   complicated businesses and had more reports.
16       Q.   How long were you in that role?
17       A.   Three years approximately.
18       Q.   Okay.  And after that -- excuse me, the role in
19   Singapore, what was your next role at Chevron?
20       A.   I took a lateral position to regional medical
21   manager of our EEMEA, E-E-M-E-A, region, which is
22   Europe, Eurasia, Mid East, and Africa, based out of
23   London.
24       Q.   Okay.  So what was the date range on that -- on
25   that role?  I want to -- like, in time.
```

| | |
|---|---|
| 1 | A. It ended on May 31st of this year. So I moved |
| 2 | to my current role May 31 -- on June 1st. So it was |
| 3 | May 31st and then I would subtract seven years. 2017 |
| 4 | roughly, '18. |
| 5 | Q. Started 2018, and then you were in that role |
| 6 | until May 31st, 2024? |
| 7 | A. Correct. |
| 8 | Q. Okay. Were you located in London that whole |
| 9 | time? |
| 10 | A. I was. |
| 11 | Q. Okay. And what's your current role? |
| 12 | A. I now have the role of regional medical manager |
| 13 | for the Americas based out of Houston. |
| 14 | Q. Do you know what entity -- what Chevron |
| 15 | corporate entity was your employer during the time you |
| 16 | were the regional medical director for the EEMEA role? |
| 17 | A. Yeah, so I was working out of the -- it was |
| 18 | Chevron Products UK. And, again, that was the title |
| 19 | that we used in my signature. I can't tell you the |
| 20 | technical bits, though, about payroll and whether I was |
| 21 | paid through Chevron USA or not, but my paychecks remain |
| 22 | the same -- through the same -- for my 12 years that I |
| 23 | was a Chevron employee. |
| 24 | Q. You mean the entity that's paying your paycheck |
| 25 | is the same? |

Scott Levy, M.D.                                                         August 30, 2024

1  sick, though -- that was probably the most common --
2  where they developed a medical condition in a location
3  where they didn't have the capabilities of managing that
4  problem, so they would be -- frequent destination for
5  people in that region to come into London to get sorted.
6           (Reporter admonishment.)
7  BY MS. FLECHSIG:
8       Q.   Were you also responsible for reviewing the
9  fitness-for-duty determinations that the evaluating
10 doctors made?
11      A.   Not always.  And I can explain.  So the
12 policy -- what we did -- the way things were handled
13 were the host location would do the evaluations -- so
14 the host would be -- in the situation we're dealing with
15 today -- would be the U.S. location would be in charge
16 of collecting the data, get the exam done where the
17 person lives or relatively close to where they live, and
18 then the host -- H-O-S-T -- location -- that's the --
19 embedded medical team would then review the medical
20 records for fitness for duty.
21           As they were receiving that person to their
22 communities, into their systems, they would perform an
23 evaluation -- well, perform a review to make sure that
24 the person was fit.  And so these -- we called our
25 fitness for duties for expats Medical Suitability for

Scott Levy, M.D. August 30, 2024

1  Expat Assignment, MSCA, and so the host location would
2  review for suitability to their -- for their new
3  location.
4      Q.  Okay.  So I just want to make sure I'm
5  understanding correctly.
6          So basically -- it sounds like you're familiar
7  with the facts of Mr. Snookal's case; right?
8      A.  Correct.
9      Q.  Generally.  So you -- you know that he was
10 evaluated in Los Angeles, and then he was trying to go
11 to a host location in Nigeria; right?
12     A.  Yes.
13     Q.  Okay.  So in the policy that you just outlined,
14 in other words, Mr. Snookal, you know -- the policy is
15 the person gets evaluated by a doctor on the ground
16 where they live and then a medical team in the place
17 they're going to go reviews the evaluation.
18     A.  Correct.
19     Q.  Okay.  So you said you sometimes are involved
20 in reviewing the determinations that are made for a
21 person's fitness for duty.
22         So when would you become involved after the
23 local exam and the host location review?
24     A.  When there's a challenge or uncertainty about
25 the situation.  So the -- so there are, I would say,

1  many intricate pieces to this.  And so one could be
2  something that we're not really sure of.  Second could
3  be where maybe the person can't be -- a condition can't
4  be managed locally but can be managed close by, and so
5  there might be an opportunity to set up a second
6  treatment center close by to -- to their host location.
7  Or try to identify other -- other factors that could
8  potentially mitigate.  And -- happy to expand as needed.
9       Q.   Yeah.  So I guess in terms of -- you said you
10 get involved when there's a challenge or uncertainty.
11          Does that include when an employee challenges
12 the decision that they were not fit for duty?
13      A.   Yeah, I was thinking that exactly, that if --
14 the fact that I'm here shows that I do get involved in
15 certain situations.  And so, yes, that's correct.
16      Q.   Okay.  Do you get the final say on the fitness
17 for duty when an employee makes such a challenge to the
18 determination?
19      A.   I do not.
20      Q.   Who -- who would get the final say?
21      A.   The host location.
22      Q.   Okay.  So you have to defer to what the host --
23 the doctors at the host location determine.
24      A.   Correct.  Correct.  So the host location,
25 they -- host location reviews -- the doctors review.

1  They would then discuss any, let's say, conflict or
2  challenges or issues with, you know -- with their
3  business, so -- HR and their teams to determine and work
4  with the supervisors to determine whether a position can
5  be accommodated, whether something else can be worked
6  out, whether they need to bring me into the situation to
7  try to troubleshoot.  So -- but that's -- yeah, that
8  decision would have been at the host location.
9       Q.   Okay.  And what kind -- so I think you started
10 describing, but what sort of troubleshooting can you do
11 if the host location says that there's an issue with the
12 employee's fitness for duty?
13      A.   Correct.  So potentially -- it depends on the
14 specific issue.  If it's -- there are times where -- and
15 I'll give you an example.
16           There are times where the medication that the
17 person wasn't taking -- that the person was taking at
18 home is just simply not available in country and can't
19 be -- it can't -- it can't come into country, it can't
20 be prescribed in country, so sometimes the issue may be
21 simply is there a way of -- of setting up a close stop
22 for the person to come in -- when they fly in and out,
23 they can pick up their medications.
24           Potentially, if there's a specialist that they
25 need to follow instead of -- and if -- I'm just making

Scott Levy, M.D.                                                                August 30, 2024

1   what I think the -- the risk may be or not be.
2       Q.   So how did you -- how did you first become
3   involved with Mr. Snookal's challenge to the host team
4   deeming him unfit for duty?
5       A.   I was asked as a second opinion to review the
6   case.
7       Q.   To provide a medical opinion on whether it was
8   safe for him?
9       A.   I was -- so I don't recall exactly, but I know
10  Mr. Snookal asked for a second opinion and -- that, I
11  know for a fact.  And then this was sent to me for a
12  review.
13      Q.   Who sent it to you for review?
14      A.   I don't remember.  Again, it was years ago.  I
15  know Mark and I did speak, so I'm not sure if he
16  approached me first or if someone sent it to me, but I
17  do know that Mark and I chatted about his situation.
18      Q.   Okay.  So when you were asked to give a second
19  opinion, were you allowed to override the decision that
20  the host team had made?
21      A.   I was not allowed to override, but I would say
22  that the -- even the -- as I'm thinking of the word
23  "second opinion," that might be incorrect as well.  I
24  would say that -- I was here to help with an appeal.  So
25  I would look at a case and see if there was anything

| | |
|---|---|
| Scott Levy, M.D. | August 30, 2024 |

```
 1    CERTIFICATE OF STENOGRAPHIC REPORTER
 2
 3
 4         I, RACHEL N. BARKUME, a Certified Shorthand
 5    Reporter of the State of California, hereby certify that
 6    the witness in the foregoing deposition,
 7                  SCOTT LEVY, M.D.,
 8    was by me duly sworn to tell the truth, the whole truth,
 9    and nothing but the truth in the within-entitled cause;
10    that said deposition was taken at the time and place
11    therein named; that the testimony of said witness was
12    stenographically reported by me, a disinterested person,
13    and was thereafter transcribed into typewriting.
14           Pursuant to Federal Rule 30(e), transcript
15    review was requested.
16           I further certify that I am not of counsel or
17    attorney for either or any of the parties to said
18    deposition, nor in any way interested in the outcome of
19    the cause named in said caption.
20
21           DATED:  September 12, 2024.
22
23           _____
                     Rachel N. Barkume
24           Rachel N. Barkume, CSR No. 13657, RMR, CRR
25
```