1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   TRACEY A. KENNEDY, Cal. Bar No. 150782
3  ROBERT E. MUSSIG, Cal. Bar No. 240369
   H. SARAH FAN, Cal. Bar No. 328282
4  350 South Grand Avenue, 40th Floor
   Los Angeles, CA 90071-3460
5  Telephone:    213.620.1780
   Facsimile:    213.620.1398
6  E-mail:        tkennedy@sheppardmullin.com
                  rmussig@sheppardmullin.com
7                 sfan@sheppardmullin.com

8  Attorneys for Defendant.
   CHEVRON U.S.A. INC.,
9  a Pennsylvania corporation

10

11                  UNITED STATES DISTRICT COURT

12         CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

13 MARK SNOOKAL, an individual,              Case No. 2:23-cv-6302-HDV-AJR

14              Plaintiff,                    **JOINT BRIEF RE DEFENDANT CHEVRON
                                             U.S.A. INC.'S MOTION FOR SUMMARY
15       vs.                                 JUDGMENT OR, IN THE ALTERNATIVE,
                                             PARTIAL SUMMARY JUDGMENT**
16 CHEVRON USA, INC., a California Corporation,
   and DOES 1 through 10, inclusive,          *[Filed concurrently with Notice of Motion;
17                                           Statement of Uncontroverted Facts and Genuine
               Defendants.                   Disputes; Joint Appendix of Declarations and
18                                           Written Evidence; and [Proposed] Judgment
                                             granting Defendant's Motion for Summary
19                                           Judgment]*

20

21                                           Hearing: May 8, 2025
                                             Time:    10:00 a.m.
22                                           Place:   Courtroom 5B – 5th Floor
                                             Judge:   Hon. Hernán D. Vera
23
                                             Action Filed: August 3, 2023
24                                           Trial Date: August 19, 2025

25

26

27

28

JOINT BRIEF RE DEFENDANT CHEVRON U.S.A. INC.'S
                                                           MOTION FOR SUMMARY JUDGMENT

1

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF SUMMARY JUDGMENT**

2

**TABLE OF CONTENTS**

3                                                                                    **Page**

4

5  I.    OVERVIEW ..................................................................................................1

6  II.   INTRODUCTION ..........................................................................................1

7  III.  FACTUAL BACKGROUND .........................................................................2

8        A.  Plaintiff Applied for and Received a Conditional Offer for an Expatriate
             Assignment Located in an Extremely Remote Facility in Escravos, Nigeria,
9            Located Over an Hours Away From a Medical Facility by Emergency Medical
             Evacuation. ..........................................................................................2

10

11       B.  The Expatriate Assignment Is Located in an Extremely Remote Facility in
             Escravos, Nigeria, Located Over an Hours Away From a Medical Facility by
             Emergency Medical Evacuation. ..........................................................3

12

13       C.  Due to the Remoteness of the Escravos Facility and Lack of Onsite Medical Care,
             an Incident Occurring Due to Plaintiff's Heart Condition Would Lead to His
14           Death. ....................................................................................................4

15       D.  Due to the Lack of Access to Appropriate Medical Care in Escravos, Plaintiff
             Could Not Obtain Medical Clearance and the Offer for the Expatriate Assignment
             Was Rescinded. .....................................................................................5

16

17       E.  Chevron U.S.A. Promised Plaintiff Continued Employment Despite the
             Rescinded Offer and Worked Diligently with Plaintiff to Find Alternative
             Positions He was Qualified For. ...........................................................7

18

19       F.  When Plaintiff Was Unable to Obtain an Offer for the Positions He Applied For,
             Chevron U.S.A. Created a Position for Plaintiff So He Could Continue His
             Employment. ..........................................................................................8

20

21            1.   Chevron U.S.A.'s Hiring Process Involves a Robust Metrics-Based
                   Screening Model With Peer and HR Oversight. (DUF 36.) .................8

22            2.   Chevron U.S.A. Created the Reliability Change Operating Assistant
                   Position for Plaintiff So He Could Continue Employment...................8

23

24       G.  Plaintiff Resigned From His Employment With Chevron For an Opportunity with
             Significantly Increased Responsibility. ...............................................9

25  IV.  LEGAL STANDARD....................................................................................9

26  V.   LEGAL ARGUMENT..................................................................................10

27       A.  Plaintiff's Disability Discrimination Claim Is Meritless. ...................10

28

-i-

1.    Plaintiff Was Not Qualified for the Expatriate Assignment Because He Could Not Perform the Essential Duties of the Job, Which Had to Be Performed in the Escravos Region of Nigeria. .......................................................11

2.    Chevron U.S.A. Was Not the Employer of the REM Position, Did Not Make the Decision to Deny Medical Clearance, and Did Not Rescind the Job Offer. ...................................................................................................................12

3.    The Offer for the REM Position was Rescinded for Legitimate and Non-Discriminatory Reasons Because Plaintiff's Presence in Escravos Would Endanger His Own and the Health and Safety of Others.............................13

4.    Plaintiff's MSEA Determination Was Made Based on the Best Available, Objective Evidence Provided by Plaintiff's Own Doctor and on Current Medical Literature on the Subject..............................................................16

5.    Plaintiff Cannot Demonstrate that Dr. Asekomeh's Reasons to Deny His Medical Clearance Were Pretextual...............................................................17

B.    Plaintiff's Claim for Failure to Accommodate is Frivolous, Because Plaintiff Never Needed Accommodations During His Employment.................................18

1.    Chevron U.S.A. Had No Duty to Accommodate....................................18

2.    Even Assuming Chevron U.S.A. Had a Duty to Accommodate, Chevron U.S.A. Provided Reasonable Accommodation by Not Only Ensuring Plaintiff's Continued Employment, But Also By Creating a Position for Plaintiff. .......................................................................................................19

3.    Even Assuming Chevron U.S.A. Had a Duty to Accommodate, Plaintiff Is Not Entitled to His Preferred Accommodation When the Accommodation Provided is Reasonable. .....................................................................20

C.    Plaintiff's Constructive Wrongful Termination Claim Is Meritless. ...............................21

D.    Plaintiff Cannot Recover Punitive Damages. ...................................................................23

VI.    CONCLUSION.............................................................................................................25

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.      OVERVIEW ...................................................................................................26

II.     INTRODUCTION ...........................................................................................26

III.    FACTUAL BACKGROUND ..........................................................................28

    A.    Mr. Snookal Rises in Chevron's Ranks During His First Ten Years of Service ..............28

    B.    Chevron Selects Mr. Snookal for A Coveted Rotational Expatriate Assignment ............28

    C.    Mr. Snookal Is Deemed "Fit for Duty" Pursuant to Chevron's Medical Suitability for Expatriate Assignment Screening (MSEA) Procedure, Receiving Clearance by Two Physicians .........................................................29

    D.    Mr. Snookal Could Complete All of the Job Duties of the REM Position, an "Office Job," And Nothing about the Completion of the REM Job Duties or Its Location in Escravos Would Exacerbate the Risk of a Cardiac Event ...........................30

    E.    Chevron Nonetheless Rescinded Mr. Snookal's Job Offer Because of His Disability, Claiming Incorrectly that Mr. Snookal Poses a Direct Threat to Himself ...............................30

    F.    Mr. Snookal's Risk of Any Adverse Health Event While in Escravos Was Miniscule .............................................30

    G.    Mr. Snookal Reports That This Decision Constitutes Disability Discrimination, but Chevron Ratifies It .....................................32

    H.    To the Contrary, Mr. Snookal's Asymptomatic Condition Posed No "Direct Threat" to Himself or Others ..........................33

    I.    After Rescinding Mr. Snookal's Job Offer for Discriminatory Reasons, Chevron Doubles Down and Fails to Provide Mr. Snookal with A Reasonable Accommodation .............................33

    J.    Chevron Wrongfully Constructively Discharges Mr. Snookal in Violation of Public Policy .....................................34

IV.     LEGAL STANDARD ......................................................................................35

V.      LEGAL ARGUMENT .....................................................................................36

    A.    Disputes of Material Fact Exist as to Mr. Snookal's Disability Discrimination Claim ........................................36

        1.    Defendant Chevron U.S.A. Was The Employer for the REM Position .................36

2.    Chevron U.S.A. Made the Discriminatory Decision to Rescind the REM Position from Mr. Snookal .......................................................................37

3.    Regardless, Chevron U.S.A., At Minimum, Ratified the Discriminatory Decisions in Question ..............................................................................38

4.    Mr. Snookal Had a Disability, Was Fully Qualified for the Expatriate Assignment, and Could Perform all Essential Duties of the Job ..........................39

5.    Chevron Rescinded the REM Job Because of Mr. Snookal's Disability, A Decision That Was Discriminatory On its Face .....................................39

6.    Chevron's "Direct Threat" Defense Fails Because Mr. Snookal Posed No "Imminent and Substantial" Risk to Himself Nor to Others..............................40

7.    Chevron's Decision Did Not "Rely on the Most Current Medical Knowledge and/or on the Best Available Objective Evidence" As Required by Law ................................................................................42

8.    Mr. Snookal's Asymptomatic Heart Condition Did Not Pose Any Imminent Risk to Others, Particularly Because The REM Job is an Office Job ....................................................................................................44

B.    Disputes of Material Fact Exist as to Mr. Snookal's Cause of Action for Failure to Accommodate His Disability ...........................................45

1.    *Chevron Was on Notice of Mr. Snookal's Need for A Disability Accommodation* ......................................................................................45

2.    *Chevron Denied Mr. Snookal A Reasonable Accommodation* ..............47

D.    Disputes of Material Fact Exist as to Mr. Snookal's Claim for Wrongful Termination..................................................................................48

E.    Disputes of Material Fact Exists as to Mr. Snookal's Entitlement to Punitive Damages........................................................................................49

V.    CONCLUSION .........................................................................................50

SMRH:4904-3023-3647.1

**<u>DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

**<u>TABLE OF CONTENTS</u>**

I.      OVERVIEW ...................................................................................................52

II.     INTRODUCTION ..........................................................................................52

III.    CHEVRON U.S.A. IS NOT LIABLE FOR DISABILITY DISCRIMINATION......................53

        A.      Rescission of the REM Position Was Not Disability Discrimination, Because a Group of Doctors Reasonably Determined That Plaintiff's Aortic Aneurysm Posed a Direct Threat to His Own Health and Safety and That of Others........................53

        B.      This Court Cannot Second Guess a Reasoned Medical Decision By Qualified Health Care Professionals in Nigeria about the Health and Safety Risks in Escravos. ..............55

        C.      Based on Medical Opinions by Doctors With the Best Information of the Risks in Ecravos Determined That Plaintiff Was Not Qualified for the Expatriate Assignment, Because the Location of the REM Position Was an Essential Function of the Position ...........55

        D.      Chevron U.S.A. Was Not the Employer of the REM Position, Nor Did It Make the Decision to Rescind the Offer for the REM Position........................56

        E.      Chevron U.S.A. Did Not Ratify the Recission Decision By Chevron Nigeria.................58

IV.     PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM FAILS. ...........................................58

        A.      Plaintiff Did Not Need any Accommodation For His Heart Condition............................58

        B.      Even Assuming Plaintiff Did Require an Accommodation, the Accommodation Need Was Only Arise in Escravos, Not in Los Angeles.................59

        C.      Even If Chevron U.S.A. Was Aware of Plaintiff's Heart Condition After the REM Offer was Rescinded, Plaintiff Admitted Did Not Need An Accommodation.................60

        D.      Despite Having No Duty to Accommodate, Chevron U.S.A. Ensured that Plaintiff's Employment Continued ........................60

V.      PLAINTIFF CANNOT SHOW UNDER AN OBJECTIVE STANDARD THAT HIS WORKING CONDITIONS WERE SO INTOLERABLE AND AGGRAVATED THAT HE WAS COMPELLED TO RESIGN........................61

VI.     PLAINTIFF CANNOT DISPUTE THAT NO OFFICER, DIRECTOR, OR MANAGING AGENT OF CHEVRON U.S.A. ENGAGED IN FRAUD, OPPRESSION, OR MALICE .........62

VII.    CONCLUSION ...........................................................................63

<u>**DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

<u>**Cases**</u>

*Baptist v. Robinson*
    143 Cal. App. 4th 151 (Cal. Ct. App. 2006) ........................................................61

*C.R. v. Tenet Healthcare Corp.*
    169 Cal. App. 4th 1094 (Cal. Ct. App. 2009) .....................................................61

*Cuiellette v. City of Los Angeles*
    194 Cal. App. 4th 757 ..........................................................................................64

*Dark v. Curry County*
    451 F.3d 1078 (9th Cir. 2006) .............................................................................59

*Fernandez v. Wynn Oil Co.*
    653 F.2d 1273 (9th Cir. 1981) .............................................................................62

*Green v. State*
    42 Cal. 4th 254 (2007) .........................................................................................59

*Hegwer v. Board of Civil Service Comm'rs*
    5 Cal. App. 4th 1011 (Cal. App. Ct. 1992) .........................................................58

*Hill v. New York City Bd. Of Educ.*
    808 F. Supp. 141 (E.D.N.Y. 1992) ......................................................................59

*Moore v. Regents of Univ. of California*
    248 Cal. App. 4th 216 (2016) ..............................................................................65

*Nealy v. City of Santa Monica*
    234 Cal. App. 4th 359 (2015) ..............................................................................64

*Ortiz v. Dameron Hospital Assn.*
    37 Cal. App. 5th 568 (2019) ................................................................................60

*Patterson v. Domino's Pizza, LLC*
    60 Cal. 4th 474 (Cal. 2014) .................................................................................60

*Pollock v. Tri-Modal Distribution Services, Inc.*
    11 Cal. 5th 918 (Cal. 2021) .................................................................................60

*Price v. Victor Valley Union High School Dist.*
    85 Cal. App. 5th 231 (Cal. Ct. App. 2022) ...................................................63, 65

-vi-

*Rakestraw v. Rodrigues*
    8 Cal. 3d 67 (Cal. 1972)........................................................................61

*Reno v. Baird*
    18 Cal. 4th 640 (Cal. 1998).................................................................59

*Roby v. McKesson Corp.*
    47 Cal. 4th 686 (Cal. 2009).................................................................60

*Spitzer v. The Good Guys, Inc.*
    80 Cal. App. 4th 1376 (2000) .............................................................64

*Taylor v. Financial Casualty & Surety, Inc.*
    67 Cal. App. 5th 966 (Cal. Ct. App. 2021) ........................................60

*Thomas v. Regents of University of California*
    97 Cal. App. 5th 587 (Cal. Ct. App. 2023) ........................................61

*Van Asdale v. Int'l Game Tech.*
    577 F.3d 989 (9th Cir. 2009) .............................................................62

*Vernon v. State of Cal.*
    116 Cal. App. 4th 114 (Cal. Ct. App. 2004) ......................................59

**<u>Statutes</u>**

Cal. Civ. Code § 2307 ..............................................................................61

Cal. Code Regs., Title 2, § 11068, subd. (d)(4) ......................................64

Cal. Code Regs., Title 2, § 11071(c).......................................................56

Cal. Gov. Code § 12926(f)........................................................................59

Cal. Gov. Code, § 12940...........................................................................59

Cal. Gov. Code § 12940(a) .......................................................................59

Cal. Gov't Code § 12940(a)(2) .................................................................57

Civil Code § 3294 .....................................................................................66

**<u>Other Authorities</u>**

29 C.F.R. § 1630.2(n)(1)...........................................................................59

CACI 2510 .................................................................................................56

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# DEFENDANT'S TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ackerman v. Western Electric Co.*
  643 F. Supp. 836 (N.D. Cal. 1986), aff'd, 860 F.2d 1514 (9th Cir. 1988) ..............................23

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986)...................................................................................................................10

*Aquino v. Sup. Ct.*
  21 Cal. App. 4th 847 (Cal. Ct. App. 1993) ...............................................................................23

*Basich v. Allstate Ins. Co.*
  87 Cal. App. 4th 1112 (Cal. Ct. App. 2001) .............................................................................24

*Beyenhof v. Schwan's Consumer Brands, Inc.*
  2023 U.S. Dist. LEXIS 68713 (C.D. Cal. Apr. 17, 2023) (J. Vera) .................................23, 24

*Brown v. Lucky Stores*
  246 F.3d 1182 (9th Cir. 2001) ..................................................................................................18

*Chevron U.S.A. v. Echazabal*
  536 U.S. 73 (2002) ....................................................................................................................13

*Cloud v. Casey*
  76 Cal. App. 4th 895 (Cal. Ct. App. 1999) ...............................................................................22

*Cuiellette v. City of Los Angeles*
  194 Cal. App. 4th 757 (Cal. Ct. App. 2011) .......................................................12, 18, 19, 21

*Gelfo v. Lockheed Martin Corp.*
  140 Cal. App. 4th 34 (Cal. Ct. App. 2006) ........................................................................18, 19

*Grosso v. UPMC*
  857 F. Supp. 2d 517 (W.D. Penn. 2012) ...................................................................................14

*Guz v. Bechtel Nat. Inc.*
  24 Cal. 4th 317 (Cal. 2000)........................................................................................................11

*Hutton v. Elf Atochem North American, Inc.*
  273 F.3d 884 (9th Cir. 2001) ................................................................................14, 15, 16

*Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC*
  704 F.3d 1235 (9th Cir. Cal. 2013)............................................................................................12

*McCullah v. Southern Cal. Gas Co.*
  82 Cal. App. 4th 495 (Cal. Ct. App. 2000) ...............................................................................19

*McDonnell Douglas Corp. v. Green*
   411 U.S. 792 (1973) ......................................................................................................10

*McIntosh v. Wal-Mart Assocs.*
   2024 U.S. Dist. LEXIS 41423 (C.D. Cal. Mar. 7, 2024) (J. Vera) ..........................9, 10, 11, 17

*McMillen v. Civil Service Commission*
   6 Cal. App. 4th 125 (Cal. Ct. App. 1992) ......................................................................13, 16

*Milan v. Union Pac. R.R. Co.*
   2019 U.S. Dist. LEXIS 78489 (Or. Dist. 2019) ...................................................................14

*Miller v. California Dept. of Corrections & Rehabilitation*
   105 Cal. App. 5th 261 (Cal. Ct. App. 2024) .......................................................................20

*Mullins v. Rockwell Int'l Corp.*
   15 Cal. 4th 731 (Cal. 1997) ................................................................................................22

*Myers v. Trendwest Resorts, Inc.*
   148 Cal. App. 4th 1403 (Cal. Ct. App. 2007) ...............................................................24, 25

*Nealy v. City of Santa Monica*
   234 Cal. App. 4th 359 (Cal. Ct. App. 2015) .......................................................................20

*Price v. Victor Valley Union High School Dist.*
   85 Cal. App. 5th 231 (Cal. Ct. App. 2022) .........................................................................19

*Prilliman v. United Air Lines, Inc.*
   53 Cal.App.4th 935 (Cal. Ct. App. 1997) ...........................................................................19

*Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n*
   212 Cal. App. 3d 1242 (Cal. Ct. App. 1989) ......................................................................13

*Scott v. Harris*
   550 U.S. 372 (2007) ............................................................................................................10

*Soremekun v. Thrifty Payless, Inc.*
   509 F.3d 978 (9th Cir. 2007) ..............................................................................................10

*Spitzer v. Good Guys, Inc.*
   80 Cal. App. 4th 1376 (Cal. Ct. App. 2000) ..................................................................20, 21

*In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.*
   1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906 (Cal. F.E.H.C. 1980) .............16

*Thornhill Pub. Co., Inc. v. GTE Corp.*
   594 F.2d 730 (9th Cir. 1979) ..............................................................................................10

*Turner v. Anheuser-Busch, Inc.*
   7 Cal. 4th 1238 (Cal. 1994) ...........................................................................................21, 22

-ix-

*Vernon v. Cal.*
    116 Cal. App. 4th 114 (Cal. Ct. App. 2004) ...................................................13

*Wash. Mut. Inc. v. United States*
    636 F.3d 1207 (9th Cir. 2012) ...........................................................................9

*White v. Ultramar, Inc.*
    21 Cal. 4th 563 (Cal. 1999)..............................................................................24

<u>Statutes</u>

Cal. Civ. Code § 3294(a) ........................................................................................24

Cal. Civ. Proc. Code § 437c(f)................................................................................23

Cal. Code Regs., tit. 2, § 11067(d)..........................................................................14

Cal. Code Regs., tit. 2, § 11067(e)..........................................................14, 16, 17, 18

Cal. Code Regs., tit. 2, § 11067, subds. (b) and (c) .................................................13

Cal. Code Regs., tit. 2, § 11068, subds. (d)(1), (2) ..................................................21

Cal. Code Regs., tit. 2, § 11068, subd. (d)(4) ..........................................................20

Cal. Gov't Code § 12940(a) .....................................................................................12

Cal. Gov't Code § 12940(a)(1) .................................................................................13

<u>Other Authorities</u>

Fed. R. Civ. P. 56(e) ................................................................................................10

# PLAINTIFF'S TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ackerman v. W. Elec. Co.*,
643 F. Supp. 836 (N.D. Cal. 1986) ...................................................................41

*Ackerman v. W. Elec. Co.*,
860 F.2d 1514 (9th Cir. 1988) .........................................................................50

*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* ,
15 Cal. App. 4th 1017 (2002) ...........................................................................49

*Claudio v. Regents of the Univ. of Cal.*,
134 Cal. App. 4th 224 (2005) ...........................................................................47

*Colmenares v. Braemar Country Club, Inc.*,
29 Cal. 4th 1019 (2003) ...................................................................................39

*Contreras-Velazquez v. Family Health Centers of San Diego, Inc.*,
62 Cal. App. 5th 88 (2021) ...............................................................................50

*Dominguez-Curry v. Nev. Transp. Dep't*,
424 F.3d 1027 (9th Cir. 2005) .........................................................................36

*Donahue v. CONRAIL*,
224 F.3d 226 (3d Cir. 2000) .............................................................................41

*Fernandez v. Wynn Oil Co.*,
653 F.2d 1273 (9th Cir. 1981) .........................................................................38

*Furtado v. State Pers. Bd.*,
212 Cal. App. 4th 729 (2013) ...........................................................................47

*Hanson v. Lucky Stores, Inc.*,
74 Cal. App. 4th 215 (1999) .............................................................................47

*Hernandez v. Rancho Santiago Cmty. Coll. Dist.*,
22 Cal. App. 5th 1187 (2018) ...........................................................................45

*Hutton v. Elf Atochem N. Am.*,
273 F.3d 884 (9th Cir. 2001) ...........................................................................41

*Inland Empire Waterkeeper v. Corona Clay Co.*,
17 F.4th 826 (9th Cir. 2021) ...........................................................................35

*Martin v. Lockheed Missiles & Space Co., Inc.*,
29 Cal.App.4th 1718, 1730 (Cal. Ct. App. 1994)……………………………………35

*McIntosh v. Wal-Mart Assocs.*,
2024 U.S. Dist. LEXIS 41423, (C.D. Cal. 2024)…………………………………....35

*McMillen v. Civil Serv. Com.*,
  6 Cal. App. 4th 125 (1992) ...................................................................41

*Muzquiz v. City of Emeryville*,
  79 Cal. App. 4th 1106 (2000) ..............................................................36

*Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*,
  166 Cal. App. 4th 952 (2008) .........................................................48, 49

*Nazir v. United Airlines, Inc.*,
  178 Cal. App. 4th 243 (2009) ..............................................................35

*Price v. Victor Valley Union High Sch. Dist.*,
  85 Cal. App. 5th 231 (2022) ................................................................45

*Prilliman v. United Air Lines, Inc.*,
  53 Cal. App. 4th 935 (1997) ...........................................................46, 47

*Rakestraw v. Rodrigues*,
  8 Cal. 3d 67 (1972) .............................................................................38

*Raytheon Co. v. Cal. Fair Emp. & Hous. Com* ,
  212 Cal. App. 3d 1242 (1989) ............................................................40

*Roby v. McKesson Corp.*,
  47 Cal. 4th 686 (2009) ........................................................................50

*Sada v. Robert F. Kennedy Med. Ctr.*,
  56 Cal.App.4th 138, 150 (Cal. Ct. App. 1997)........................................35

*Sandell v. Taylor-Listug, Inc.*,
  188 Cal. App. 4th 297 (2010) ..............................................................40

*Soria v. Univision Radio L.A., Inc.*,
  5 Cal. App. 5th 570 (2016) ..................................................................46

*Sterling Transit Co. v. Fair Emp. Practice Com.*,
  121 Cal. App. 3d 791 (1981) ...............................................................41

*Swanson v. Morongo Unified Sch. Dist.*,
  232 Cal. App. 4th 954 (2014) ..............................................................47

*Wash. Mut. Inc. v. United States*,
  636 F.3d 1207, 1216 (9th Cir. 2012)......................................................35

*Wallace v. Cnty. of Stanislaus*,
  245 Cal. App. 4th 109 (2016) ..............................................................40

*Wittkopf v. Cnty. of L.A.*,
  90 Cal. App. 4th 1205 (2001) ..............................................................40

**Statutes**

Cal. Gov't Code § 12926 ....................................................................................36, 37, 38, 39

Cal. Gov't Code § 12940 ...................................................... 28, 30, 31, 32, 33, 34, 45- 47

Cal. Lab. Code § 226 ...........................................................................................................36

Cal. Lab. Code § 7293.8 .....................................................................................................41

**Rules**

Fed. R. Civ. P. 56 ..........................................................................................................35, 49

**Other**

Cal. Code Regs., tit. 2, § 11067(b) .................................................................................42, 44

Cal. Code Regs., tit. 2, § 11068(d)(2) ................................................................................48

Cal. Code Regs., tit. 2, § 11068(d)(3) ................................................................................48

Cal. Code Regs., tit. 2, § 11068(d)(5) ................................................................................47

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF SUMMARY JUDGMENT**

## I.    OVERVIEW

In this case, the legal question for the court is whether under the California Fair Employment and Housing Act ("FEHA"), an employer has the legal right to rely on the opinion of medical professionals in determining that an employee with a known heart condition cannot be medically cleared to work in one of the most remote locations on Earth, given the specific location and lack of medical care and facilities, because according to those professionals, that employee had an unpredictable risk of a cardiac event and, if an event occurred, the result would likely be death. Under these circumstances, the FEHA does not require the employer to assume the risk of harm or death to the employee, or others.

## II.    INTRODUCTION

Plaintiff Mark Snookal ("Plaintiff") was employed by Defendant Chevron U.S.A. Inc., a Pennsylvania corporation ("Chevron U.S.A."), beginning on January 12, 2009. In or around May 2019, Plaintiff applied for and was conditionally offered an expatriate position from Chevron Nigeria, Limited ("Chevron Nigeria"), contingent upon Plaintiff receiving medical clearance to work on location. The position was located in an extremely remote facility accessible only by helicopter or boat in the Escravos region of Nigeria, with access to only very basic medical care. Plaintiff has a dilated aortic root, a heart condition which puts him at risk of rupture or dissection. Due in part to Escravos's remote location, the doctors living and working in Nigeria, who know first hand of the working conditions in Escravos, determined that an aortic event in Escravos would likely lead to Plaintiff's death or the serious injury or death of his coworkers. Accordingly, they denied Plaintiff medical clearance to work in Escravos and his conditional offer for the expatriate assignment was rescinded.

Even though Plaintiff's previous position had been backfilled after he was offered the expatriate assignment (because Chevron U.S.A. had no knowledge of his aortic root and therefore assumed he would obtain medical clearance to work for Chevron Nigeria), Chevron U.S.A. worked with Plaintiff to find alternative positions he was qualified for to ensure Plaintiff would have continued employment with Chevron U.S.A. When Plaintiff was not selected for the positions he applied for, Chevron U.S.A. created a job position for Plaintiff with the same pay grade as his prior position and ultimately returned

-1-

1  Plaintiff to his previous position. Plaintiff continued to work for Chevron U.S.A. for nearly two years

2  before abruptly resigning for another job, even though his supervisors encouraged him to stay. Plaintiff

3  now alleges that he was discriminated against because of his alleged disability, that Chevron U.S.A.

4  failed to accommodate his alleged disability, and that he was constructively discharged.

5   Plaintiff's disability discrimination claim is based solely on the fact the conditional offer for the

6  position in Escravos was rescinded because of his heart condition, after medical professionals in Nigeria

7  did not medically clear him.[1] The claim fails for multiple reasons. Chief among them, the undisputed

8  evidence shows the decision to revoke the conditional offer was made by disinterested medical

9  professionals relying on Plaintiff's cardiologist's assessment of the risks associated with his heart

10  condition and their own first-hand knowledge of the conditions in Escravos. Those doctors made an

11  informed, reasoned determination that Plaintiff was unable to perform the essential duties of the position

12  without endangering the health and safety of himself and the people around him.  This is not

13  "discrimination" and Plaintiff cannot maintain a disability discrimination claim under such

14  circumstances. Plaintiff also cannot maintain a failure to accommodate claim because he admits he did

15  not need any accommodations for his alleged disability.

16   Plaintiff's constructive discharge claim fails because Plaintiff cannot establish that his working

17  conditions **in El Segundo, California** were so intolerable that he had no choice but to resign. The

18  undisputed evidence shows that Plaintiff resigned for a better paying job because he felt his career at

19  Chevron U.S.A. was not progressing as he would like, although his supervisors were supportive of him

20  and expressed to Plaintiff that they preferred he stay. Finally, there is no evidence, and certainly not

21  clear and convincing evidence, of any act of fraud, oppression or malice by a managing agent of

22  Chevron U.S.A. Accordingly, all of Plaintiff's claims, including his claim for punitive damages, fail and

23  Chevron U.S.A.'s motion should be granted in its entirety.

24  ### III. FACTUAL BACKGROUND

25    **A.** **Plaintiff Applied for and Received a Conditional Offer for an Expatriate
26  Assignment Located in an Extremely Remote Facility in Escravos, Nigeria, Located
    Over an Hours Away From a Medical Facility by Emergency Medical Evacuation.**

27

28  [1] Defendant Chevron U.S.A. was not the entity that made the decision to rescind the offer.

-2-

Plaintiff was hired by Chevron U.S.A. on January 12, 2009, as an Analyzer Engineer. (DUF[2] 1.) Beginning in or about November 2016, Plaintiff was promoted to the position of Instrumentation, Electrical, and Analyzer Reliability ("IEAR") Team Lead in the Reliability subgroup of the Maintenance department, with pay grade 22. (DUF 2.)

In or around May 2019, Plaintiff applied for the Reliability Engineering Manager ("REM") position, which was an expatriate position with an estimated potential duration of 3-4 years located in the Escravos region of Nigeria, with the same pay grade as his IEAR Team Lead position. (DUF 3.) The REM position was employed by Chevron Nigeria, Limited ("Chevron Nigeria"). (DUF 4.) On or about July 9, 2019, Chevron Nigeria conditionally awarded Plaintiff the REM position, contingent upon Plaintiff obtaining the appropriate work authorization and successfully passing a Medical Suitability for Expat Assignment ("MSEA"). (DUF 5.) As part of the MSEA procedure, all expatriate candidates must pass medical clearance with the embedded medical team at the host location (i.e., location of the expatriate assignment), and the embedded medical team makes the final determination as to medical fitness for duty. (DUF 6.) The MSEA standard for medical clearance is based on the MSEA Location Clusters Table, which evaluates the relative level of safety in terms of medical care in categories from the highest "A" to the least "D," taking into account the promptness and availability of medical care in those countries. (DUF 7.) Under the MSEA categories, Nigeria is split into categories "C" and "D". (DUF 8.) Lagos, the former capital of Nigeria, falls under "C," whereas all other locations within Nigeria, including Escravos, falls under "D," reflecting the lowest level of available medical care. (*Id*.)

**B.** **The Expatriate Assignment Is Located in an Extremely Remote Facility in Escravos, Nigeria, Located Over an Hours Away From a Medical Facility by Emergency Medical Evacuation.**

The REM position is assigned to an industrial complex located in the region of Escravos, Nigeria, which is a facility primarily focused on the Escravos Gas to Liquids ("EGTL") project, converting natural gas into liquid petroleum products. (DUF 9.) This facility is located in an isolated swamp located on a river coast only accessible by helicopter or by boat, making regular and emergency

---

[2] Chevron U.S.A.'s Statement of Uncontroverted Facts and Genuine Disputes is referred to herein as "DUF" (Defendant's Undisputed Fact).

access in and out of the facility difficult. (*Id*.) Helicopters are not on standby in Escravos and are not always available for transport, and there are no roads in or out of Escravos. (*Id*.) If there are no helicopters available, or in the event of bad weather in Escravos or Lagos, medical evacuation could take more than 4 hours and up to 10-12 hours. (*Id*.) Because Escravos is located in the Niger Delta, in which Boko Haram and other militants operate, the Nigerian military needs to be contacted for escort through the region. (*Id*.) Escravos has bad weather up to 50% of the time, as does Warri or Lagos during rainy season of April through October. (*Id*.) Arrivals and exits from Escravos must be coordinated and depending upon season can be difficult due to rain. (*Id*.)

The health care infrastructure in Escravos is not set up to handle complex cases. (DUF 10.) It has limited internal health support, and external health care resources for tertiary level care are very limited. (*Id*.) There are only two medical clinics in Escravos – the Escravos Joint Venture ("JV") Clinic and the EGTL clinic, with at most three doctors (one in Escravos, two at EGTL). (*Id*.) At these clinics, there are no surgeons, and only minor procedures can be performed, such as minor sutures for lacerations, and handling minor illnesses. (*Id*.) The clinics cannot perform blood transfusions and cannot provide other acute surgical care. (*Id*.) Individuals with any serious medical condition must be evacuated to Lagos or Warri, which can take up to 10-12 hours depending on the weather. (DUF 9-10.) For serious cardiac events requiring surgery, the closest cardiothoracic surgeon works for the government hospital in Benin, approximately 100 kilometers (62 miles) away from Escravos, who must travel from Benin to an adequate medical facility or to whom the patient must be transferred for treatment. (DUF 10.)

### C.   Due to the Remoteness of the Escravos Facility and Lack of Onsite Medical Care, an Incident Occurring Due to Plaintiff's Heart Condition Would Lead to His Death.

As part of the MSEA procedure, Plaintiff disclosed on the "Standard Medical Suitability for Expatriate Assignment History & Physical Examination" form (the "MSEA form") that he had a dilated aortic root, otherwise known as a thoracic aortic dilatation or aneurysm, which was diagnosed in or about 2014 to 2015. (DUF 11.) Plaintiff disclosed that his dilated aortic root was under the care of his cardiologist, Dr. Steven Khan, whom he saw annually for his condition. (DUF 12.) Dr. Khan worked in Los Angeles, California, and not in the Escravos region of Nigeria. (DUF 21.) A dilated aortic root cannot be treated except by open heart surgery, which Plaintiff has never had. (*Id*.) Plaintiff's heart

1   condition did not impact his day-to-day ability to work, nor did Plaintiff need any sort of

2   accommodation for his heart condition during his employment with Chevron U.S.A. (DUF 13.)

3          In response to an inquiry from Chevron U.S.A. following Plaintiff's self-disclosure of his aortic

4   root, Plaintiff's cardiologist stated that based on a published medical study, Plaintiff's aortic root had a

5   2% risk per year of rupture or dissection, but did not address the lack of resources in Escravos to provide

6   treatment in the event of such an occurrence. (DUF 25.) Rupture or dissection of Plaintiff's aortic root

7   was not predictable, and it was not possible to isolate triggers to reduce the risk of an occurrence. (DUF

8   14.)

9          In Escravos, care is only available for basic needs and there is no readily available access to the

10  type of care Plaintiff would need should an acute event occur. (DUF 10.) In the event of a rupture or

11  dissection, any medical evacuation would depend on the availability of a helicopter for a medivac and

12  whether the weather permitted an evacuation. (DUF 15.) Due to these conditions, a rupture or dissection

13  occurring in Escravos would likely result in Plaintiff's death. (*Id.*) If Plaintiff had experienced a rupture

14  or dissection while he was inspecting and operating equipment, or supervising the operation and

15  inspection of heavy machinery, he could have injured other employees who likewise have limited access

16  to evacuation for medical treatment, leading to serious impairment or even death. (DUF 16.)

17          **D.    Due to the Lack of Access to Appropriate Medical Care in Escravos, Plaintiff Could Not Obtain Medical Clearance and the Offer for the Expatriate Assignment Was Rescinded.**

18

19          As part of the MSEA procedure, independent internal medicine provider Dr. Irving Sobel

20  examined Plaintiff in July 2019 and completed the "Standard Medical Suitability for Expatriate

21  Assignment History & Physical Examination" form, recommending that Plaintiff's cardiologist provide

22  a letter to clear Plaintiff for duty in Escravos, Nigeria. (DUF 17.) On July 29, 2019, Plaintiff's

23  cardiologist, Dr. Khan, prepared a letter regarding Plaintiff's heart condition stating only that it was

24  generally "safe for [Plaintiff] to work in Nigeria with his heart condition," without any reference to

25  Escravos in particular. (DUF 18.) Dr. Khan did not have personal knowledge of the conditions in the

26  Escravos region in Nigeria—Dr. Khan worked in Los Angeles, California and was not told how remote

27  Escravos is nor the availability of or access to medical services there. (DUF 19.)

28          Based on an assessment of Plaintiff's medical records from his visit with Dr. Sobel, as well as

-5-

1   his first-hand experience working in Escravos, Dr. Eshiofe Asekomeh, who was then the Occupational

2   Health Physician at the Chevron Hospital in Warri, Nigeria,[3] concluded on August 15, 2019 that

3   Plaintiff was not fit for duty in Escravos due to the remote location, but stated that Plaintiff could be

4   cleared for assignment in Lagos, Nigeria.[4] (DUF 20.) In making his assessment of Plaintiff's medical

5   clearance, Dr. Asekomeh consulted with two cardiologists in Nigeria who were familiar with Plaintiff's

6   type of aortic condition – Dr. Victor Adeyeye in Warri and Dr. Ujomoti Akintunde in Lagos – who

7   independently reviewed Plaintiff's medical records based on their education, experience, and knowledge

8   of existing medical literature. (DUF 22.) Dr. Asekomeh also took into account the remote location of the

9   assignment, Escravos, which was a particularly dangerous work location for a person with Plaintiff's

10  condition because Escravos does not have a healthcare system infrastructure to handle complex cases.

11  (DUF 23.) Dr. Asekomeh, in consultation with Drs. Adeyeye and Akintunde, determined that, due to

12  Plaintiff's heart condition, an aortic event in Escravos would likely lead to Plaintiff's death or the death

13  or injury of others because of the lack of access to adequate medical care and timely medical

14  evacuations in Escravos. (DUF 22-23.)

15       When Plaintiff appealed Dr. Asekomeh's determination, Dr. Scott Levy, who was then Chevron

16  U.S.A.'s Regional Medical Manager serving the Europe, Eurasia, Middle East & Africa region, became

17  involved at Plaintiff's request. (DUF 24.) While the embedded medical team was responsible for making

18  the ultimate determination as to Plaintiff's medical clearance, Dr. Levy communicated with Plaintiff's

19  cardiologist, Dr. Khan, and to facilitate discussions with the embedded medical team regarding

20  Plaintiff's medical clearance to further consider whether Plaintiff could safely assume the expatriate

21  assignment in Escravos. (DUF 6, 24.) Dr. Levy discussed with Dr. Asekomeh the information provided

22  by Dr. Khan, which only addressed Dr. Khan's assessment of the risk of an occurrence, but not the lack

23  of resources in Escravos to provide treatment in the event of such an occurrence. (DUF 25-26.) Dr.

24  Asekomeh ultimately maintained his decision that Plaintiff could not be cleared for duty in Escravos,

25

26       [3] Dr. Asekomeh has never been an employee of Chevron U.S.A. (DUF 21.)

27       [4] Dr. Asekomeh's determination was not in conflict with the assessment of Plaintiff's

28  cardiologist, who stated it was generally "safe for [Plaintiff] to work in Nigeria with his heart condition," without any reference to Escravos in particular. (*See* DUF 19.)

-6-

1  even with the relatively low risk of an incident, due to the unpredictability of an incident and Escravos's

2  lack of necessary medical resources and immediate emergency responses. (DUF 26.)

3       As Plaintiff was medically cleared for assignment in Lagos, relocation of the REM position to

4  Lagos was considered, but it was ultimately determined that the REM position could not have been

5  performed in Lagos because the essential duties of the position require on-site supervision and

6  interaction with the personnel and equipment in Escravos. (DUF 20, 27.) As Plaintiff was unable to

7  obtain medical clearance from the embedded medical team, and the REM position could not have been

8  performed in Lagos, Plaintiff's offer for the REM position was rescinded on or about September 4,

9  2019. (DUF 27-28.) No Chevron U.S.A. employee, including Dr. Levy and Dr. Stephen Frangos (then

10  Chevron U.S.A.'s Regional Health and Medical Manager serving the Americas region), had any final

11  say in whether Plaintiff was ultimately awarded the REM position in Escravos, nor could they override

12  the decision of the medical team in Nigeria. (DUF 29.)

13       The rescission of the REM position offer is the only decision that Plaintiff contends was based

14  on discrimination due to disability. (DUF 30.) Plaintiff believes that the rescission of the expatriate

15  assignment in Escravos was discriminatory because the local medical team in Nigeria only considered

16  the 2002 study regarding his medical condition provided by his cardiologist, Dr. Khan, and did not

17  consider any other studies. (DUF 31.) However, Dr. Khan did not reference any study other than the

18  2002 study in his communications with Chevron U.S.A. (DUF 32.) Plaintiff does not have any other

19  basis supporting his belief that the rescission of the REM position offer was discriminatory. (DUF 31.)

20  Aside from Dr. Levy and Dr. Asekomeh, Plaintiff does not believe that anyone else discriminated

21  against him on the basis of his disability. (DUF 33.)

22      **E.**    **Chevron U.S.A. Promised Plaintiff Continued Employment Despite the Rescinded**
           **Offer and Worked Diligently with Plaintiff to Find Alternative Positions He was**

23             **Qualified For.**

24       Although Plaintiff's offer to work in Escravos was rescinded and his former position as the

25  IEAR Team Lead in El Segundo had been backfilled after the offer was made, Chevron U.S.A. stated it

26  would "ensure" that Plaintiff would continue to have a position in El Segundo. (DUF 34.) On or about

27  September 5, 2019, Plaintiff met with his supervisor at the El Segundo facility, Austin Ruppert, HR

28  Manager Andrew Powers, and HR Business Partner Thalia Tse, when they informed him they would

-7-

look to identify open positions he may be qualified for and encouraged him to do the same. (DUF 35.) That same day, Plaintiff emailed Mr. Ruppert regarding "three possible positions" for himself that he found after examining Chevron U.S.A.'s posted job openings. [5] (*Id*.)

Plaintiff ultimately applied for the El Segundo Routine Maintenance General Team Lead, El Segundo Operating Assistant, and Maintenance Change Operating Assistant positions based in El Segundo, but did not receive an offer for any of these positions. (DUF 36.)

F.    **When Plaintiff Was Unable to Obtain an Offer for the Positions He Applied For, Chevron U.S.A. Created a Position for Plaintiff So He Could Continue His Employment.**

1.    *Chevron U.S.A.'s Hiring Process Involves a Robust Metrics-Based Screening Model With Peer and HR Oversight. (DUF 36.)*

Chevron U.S.A.'s open job postings have a job owner who makes the hiring decision and is at times also the reporting supervisor for the position. (DUF 37.) As part of the selection process, candidates were rated numerically in a metrics-based screening process based on selection criteria such as Functional Experience, People Development, Leadership Behaviors, Stakeholder Management (Internal/External), Development Fit, and Operational Excellence. (*Id*.) Although the job owner is the ultimate decisionmaker in filling the open role, the candidate selection usually occurred during group meetings which included HR personnel who ensured Chevron U.S.A.'s policies were being followed in the selection process. (*Id*.) At all times relevant to Plaintiff's claims, Chevron U.S.A. maintained compliant policies regarding Equal Employment Opportunity and prohibiting discrimination or retaliation in the workplace. (DUF 38.) All job owners and personnel involved in the selection process are required to undergo regular training on Chevron U.S.A.'s Equal Employment Opportunity and anti-discrimination and retaliation policies. (DUF 39.)

2.    *Chevron U.S.A. Created the Reliability Change Operating Assistant Position for Plaintiff So He Could Continue Employment.*

When Plaintiff did not receive any offers for the positions to which he applied, Chevron U.S.A.

---

[5] Around this same time period, Dr. Levy also outlined approximately 40 other geographic regions where Plaintiff could obtain medical clearance for an expatriate assignment and approximately 26 other geographic regions where, following a specific assessment, Plaintiff may be able to obtain medical clearance. (DUF 35.)

created the Reliability Change Operating Assistant role for Plaintiff. (DUF 40.) Like the El Segundo Operating Assistant role which Plaintiff applied for, the Reliability Change Operating Assistant role did not have direct reports. (*Id.*) The Reliability Change Operating Assistant position paid the same as Plaintiff's prior IEAR Team Lead position. (*Id.*) In or around 2020, after Chevron U.S.A. went through layoffs and restructured, and the Reliability Change Operating Assistant position was eliminated, Plaintiff was offered and accepted the IEAR Team Lead position he previously held, even though he had not applied. (DUF 41.)

### G.     Plaintiff Resigned From His Employment With Chevron For an Opportunity with Significantly Increased Responsibility.

On or about August 4, 2021, Plaintiff resigned from his employment with Chevron U.S.A. effective August 20, 2021, for the stated reason that he was leaving for an opportunity with significantly increased responsibility. (DUF 42.) The reason for Plaintiff's resignation was that he felt that his career was not progressing as he would like at Chevron U.S.A. (DUF 43.) However, Plaintiff's supervisors, Austin Ruppert and Greg Curtin, were very supportive of him during his employment at Chevron U.S.A. (DUF 44.) No one at Chevron U.S.A. asked Plaintiff to leave, and Mr. Curtin told Plaintiff that he preferred Plaintiff to stay. (DUF 45.)

## IV.    LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *McIntosh v. Wal-Mart Assocs.*, 2024 U.S. Dist. LEXIS 41423, *9 (C.D. Cal. Mar. 7, 2024) (J. Vera) ("*McIntosh*") (*citing* Fed. R. Civ. P. 56(a); *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2012). "Material facts are those which might affect the outcome of the case." *McIntosh* (J. Vera), *8 (*citing Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McIntosh* (J. Vera), *8 (*citing Liberty Lobby*, 477 U.S. at 248) (internal quotations omitted). To establish that no genuine dispute of material fact exists, "the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case."

1  *McIntosh* (J. Vera), \*8 (*citing Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th

2  Cir. 2000)).

3        Evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). "[T]he mere

4  existence of some alleged factual dispute between the parties" will not defeat summary judgment.

5  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48. The nonmoving party "must do more than

6  simply show that there is some metaphysical doubt as to the material facts . . .." *Scott v. Harris*, 550 U.S.

7  372, 280 (2007) (*quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

8  (1986)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise

9  genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

10  984 (9th Cir. 2007) (*citing Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996));

11  *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).) Only if the nonmoving party

12  demonstrates a genuine dispute of material fact will the Court view the facts in the light most favorable

13  to the nonmoving party. *Scott*, 550 U.S. at 380 (*citing* Fed. R. Civ. P. 56(c)).

14  **V.**    **LEGAL ARGUMENT**

15      **A.**    **Plaintiff's Disability Discrimination Claim Is Meritless.**

16        The only act that Plaintiff claims is discriminatory based on his alleged disability is the

17  rescission of the REM job offer in Escravos. (DUF 30.) Disability discrimination claims are analyzed

18  under the *McDonnell Douglas* burden shifting test. Plaintiff has the initial burden to establish a prima

19  facie case of disability discrimination in violation of the California Fair Employment and Housing Act

20  ("FEHA").  The plaintiff must establish a prima facie case of discrimination by showing: "(1) he was a

21  member of a protected class, (2) he was qualified for the position he sought or was performing

22  competently in the position he held, (3) he suffered an adverse employment action, such as termination,

23  demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory

24  motive." *McIntosh* (J. Vera), \*9-10 (*quoting Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 355 (Cal. 2000);

25  *citing Godwin v. Hunt Wesson, Inc.*, 50 F.3d 1217, 1220 (9th Cir. 1998); *McDonnell Douglas Corp. v.*

26  *Green*, 411 U.S. 792, 803 (1973)). Should the plaintiff successfully establish a prima facie case, there is

27  a rebuttable presumption of discrimination that the employer can counter by showing that the adverse

28  employment action was taken for a "legitimate, nondiscriminatory reason." *Id.* at \*10-11 (*citing Guz*, 24

Cal. 4th at 355-56). If the employer meets this burden, the presumption of discrimination disappears and the burden then shifts again to the plaintiff, who must show either that the employer's proffered reasons are pretexts for discrimination or any other evidence of discriminatory motive. *Guz*, 24 Cal. 4th at 355-56 (*citing* cases).

On a motion for summary judgment, an employer will prevail if it shows either that: "(1) plaintiff could not establish one of the elements of the FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *McIntosh* (J. Vera), *10 (*quoting Dep't of Fair Empl. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011); *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1247 (Cal. Ct. App. 2008)). A plaintiff may only defeat summary judgment if he produces enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [his] discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one." *Id.* at *11 (*quoting Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996)) (emphasis in original) (*citing Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Here, Plaintiff's disability discrimination claim fails because, as explained below, Plaintiff cannot establish a prima facie case. Plaintiff was not qualified for the position he sought because he could not pass the medical clearance required for assignment in the remote facility in Escravos, Nigeria. (*See* DUF 5, 20.) Further, Chevron U.S.A. was not the employer of the REM position, did not make the REM position offer to Plaintiff, and did not make the decision to rescind Plaintiff's job offer. (*See* DUF 4, 21, 29.) Even if Plaintiff could establish a prima facie case, which he cannot, the offer for the REM position was rescinded for legitimate, nondiscriminatory reasons which Plaintiff cannot establish were pretextual. (*See* DUF 23, 26-28.) Aside from the rescinded REM position, Plaintiff does not contend that any other allegedly adverse employment action was based on discrimination. (DUF 30.) Aside from Dr. Levy and Dr. Asekomeh, Plaintiff does not contend that anyone else discriminated against him on the basis of his disability. (DUF 33.)

### 1. *Plaintiff Was Not Qualified for the Expatriate Assignment Because He Could Not Perform the Essential Duties of the Job, Which Had to Be Performed in the Escravos Region of Nigeria.*

Plaintiff's disability discrimination claim fails because Plaintiff cannot establish that he could perform the essential duties of the expatriate assignment in Escravos without endangering his own health

-11-

1   and safety or the health and safety of others. "[D]rawing distinctions on the basis of physical or mental

2   disability . . . is prohibited *only* if the adverse employment action occurs because of a disability *and* the

3   disability would not prevent the employee from performing the essential duties of the job . . . with or

4   without reasonable accommodation." *Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC*,

5   704 F.3d 1235, 1242 (9th Cir. Cal. 2013) (*quoting Green v. State*, 42 Cal. 4th 254, 262 (Cal. 2007)).

6   Employees who are not qualified to perform the essential duties of the job are excluded from the

7   FEHA's prohibition against discrimination. *See Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757,

8   766 (Cal. Ct. App. 2011).

9       Here, the essential duties of the expatriate assignment required on-site supervision and

10  interaction with personnel and equipment in Escravos. (DUF 27.) The expatriate assignment therefore

11  could not be performed in Lagos, where Plaintiff had been cleared for duty. (*Id.; see also* DUF 20.)

12  Although Plaintiff maintains that his heart condition did not impact his day-to-day ability to work (DUF

13  13), a rupture or dissection due to Plaintiff's heart condition was completely unpredictable and it was

14  impossible to isolate triggers to reduce the risk of an occurrence (DUF 14). If Plaintiff had an occurrence

15  in Escravos, the remoteness of the Escravos facility and its lack of access to appropriate medical care for

16  serious medical conditions would likely lead to Plaintiff's death. (DUF 15, 22-23.) Additionally, if

17  Plaintiff was operating equipment at the time of an occurrence, it could lead to serious injury or death

18  for others working at the facility. (DUF 16, 23.) An employer is not required to expose itself to wrongful

19  death lawsuits, or to unnecessarily expose its employees to the trauma associated with the death of a

20  colleague (or colleagues), to satisfy FEHA. As Plaintiff couldn't fulfill the essential duties of the REM

21  position, which required the job to be performed in Escravos, Plaintiff cannot demonstrate that he was

22  qualified for the position, and his disability discrimination claim fails as a matter of law.

23          **2.      *Chevron U.S.A. Was Not the Employer of the REM Position, Did Not Make the
               Decision to Deny Medical Clearance, and Did Not Rescind the Job Offer.***

24

25      Plaintiff's disability discrimination claim against Chevron U.S.A. also fails because the REM

26  position he sought was employed by Chevron Nigeria. (DUF 4.) The FEHA only prohibits an

27  "employer" from engaging in improper discrimination. Cal. Gov't Code § 12940(a). "The fundamental

28  foundation for liability is the existence of an employment relationship between the one who

-12-

1   discriminates against another and that other who finds himself the victim of discrimination." *Vernon v.*
2   *Cal.*, 116 Cal. App. 4th 114, 123 (Cal. Ct. App. 2004). Chevron Nigeria was the entity which extended
3   the conditional offer of employment to Plaintiff for the REM position, not Chevron U.S.A. (DUF 4.) Dr.
4   Asekomeh, who made the decision that Plaintiff was not fit for duty in Escravos, Nigeria, has never been
5   an employee of Chevron U.S.A. (DUF 21.) No Chevron U.S.A. employee had any final say in whether
6   Plaintiff was ultimately awarded the REM position in Escravos, including Dr. Levy and Dr. Frangos.
7   (DUF 29.) Accordingly, Chevron U.S.A. was not the employer for the purposes of the REM position
8   Plaintiff claims he was wrongfully denied, and Plaintiff's disability discrimination claim brought only
9   against Chevron U.S.A. therefore fails.

10   **3.** ***The Offer for the REM Position was Rescinded for Legitimate and Non-Discriminatory Reasons Because Plaintiff's Presence in Escravos Would***
11   ***Endanger His Own and the Health and Safety of Others.***

12   Even if Plaintiff could establish a prima facie case of disability discrimination, which he cannot,
13   there was a legitimate and nondiscriminatory reason to rescind Plaintiff's REM job offer because
14   Plaintiff would have posed a direct threat to his own and the health and safety of others. An employer
15   has a duty to "furnish to each of his employees employment and a place of employment which are free
16   from recognized hazards that are causing or are likely to cause death or serious physical harm to his
17   employees." *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 84-85 (2002) (*quoting* 29 U.S.C. § 654(a)(1)).
18   An employer has an affirmative duty to "avert disaster, rather than simply wait and hope it does not
19   occur." *McMillen v. Civil Service Commission*, 6 Cal. App. 4th 125, 131 (Cal. Ct. App. 1992).
20   Therefore, an employer is not prohibited from refusing to hire an employee who cannot perform his
21   duties without endangering the health or safety of himself or others. *Raytheon Co. v. Cal. Fair*
22   *Employment & Hous. Comm'n*, 212 Cal. App. 3d 1242, 1252 (Cal. Ct. App. 1989) (*citing* Cal. Gov't
23   Code § 12940(a)(1)).

24   Because Plaintiff could not perform the essential duties of his position without endangering the
25   health or safety of himself or of others, Chevron U.S.A. has a valid defense to Plaintiff's disability
26   discrimination claim (known as the "direct threat" defense). *See* Cal. Code Regs., tit. 2, § 11067, subds.
27   (b) and (c). Courts consider the following factors in determining whether an employer has established
28   the direct threat defense:

-13-

1          (1)    the duration of the risk;
          (2)    the nature and severity of the potential harm;
2          (3)    the likelihood that potential harm will occur;
          (4)    the imminence of the potential harm; and
3          (5)    consideration of relevant information about an employee's past work history.

Cal. Code Regs., tit. 2, § 11067(e). Where an individual's disability presently interferes with his ability to perform his job without endangering himself or others, even a future risk can form the basis for denial of a job position. *Id.* at subd. (d). There can be no dispute that Plaintiff's disability would have posed potentially grievous harm to himself and others if he was placed in the REM position.

The first factor weighs in favor of finding a direct threat when the duration of the risk exists for as long as the employee holds the position. *Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (citing 29 C.F.R. § 1630.2(r)). This is true here because Plaintiff's dilated aortic root is a life-long condition that has to be monitored and cannot be treated without open-heart surgery, which Plaintiff has not had. (DUF 11-12.) Had Plaintiff assumed the expatriate assignment in Escravos, his heart condition and the risk of a cardiac event would remain throughout his employment. (*Id.*)

As for the second and third factors, the Ninth Circuit has made clear that even where "the likelihood of an [incident] is small . . . if the threatened harm is grievous . . . even a small risk may be 'significant.'" *Id.* (quoting *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) (emphasis added). Courts have found that "frequency, or the likelihood of risk, is not as important of a factor in determining whether the patient is a direct threat when the potential harm is grave." *Grosso v. UPMC*, 857 F. Supp. 2d 517, 538-39 (W.D. Penn. 2012) (*citing Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884 (9th Cir. 2001); *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284 (10th Cir. 2000)) (collecting cases). Here, the potential harm is **death** (*see* DUF 15-16, 22-23), so even though there was only a relatively small chance a cardiac event would occur, the second and third factors weigh in favor of finding a direct threat existed.

Courts also held the third factor weighs in favor of finding a direct threat when it is impossible to predict whether or when the occurrence will happen, as is the case here. *Milan v. Union Pac. R.R. Co.*, 2019 U.S. Dist. LEXIS 78489, *19-20, 23-24 (Or. Dist. 2019) (*citing Hutton v. Elf Atochem North American, Inc.*, 273 F.3d 884, 894 (9th Cir. 2001)) (finding even a "very unlikely" chance of occurrence to be a "greater safety risk" due to the unpredictability of the employee's condition).

Similarly, the fourth factor weighs in favor of finding a direct threat exists where the "imminence" or immediacy of the potential harm is unknown. *Hutton*, 273 F.3d at 894-95 (finding a direct threat where the "imminence of the potential harm" is unknown when the employee's medical condition is unpredictable). Here, the stability or expansion of Plaintiff's aortic root was not predictable, which Plaintiff's own cardiologist acknowledged. (DUF 14.) Rupture or dissection of Plaintiff's aortic root was likewise unpredictable and isolation of triggers to reduce the risk of an occurrence was impossible. (*Id*.) The risk of rupture or dissection would have been prevalent throughout the assignment in Escravos. (*See* DUF 11-12.)

Finally, because it is impossible to predict whether or when a cardiac event would occur due to Plaintiff's heart condition, the fifth factor regarding consideration of relevant information about an employee's past work history should not be accorded any weight at all. Even assuming Plaintiff previously had an uneventful past work history, such a fact does not lessen the risk of a future occurrence of a cardiac event, which is impossible to predict.

The local medical team had personal knowledge of the conditions and capacities of the Escravos facility and are clearly best situated to determine an applicant's medical clearance. (DUF 6, 22-23.) The local medical team in Nigeria determined that Plaintiff's heart condition posed a danger to himself and to the employees around him. (DUF 15-16, 22-23.) Based on his knowledge of the Escravos facility, as well as an individualized review of Plaintiff's medical records, Dr. Asekomeh determined that Plaintiff was not fit for duty in Escravos, but could be cleared for assignment in Lagos, which had better access to medical care. (DUF 20, 22-23.) If Plaintiff experienced a rupture or a dissection while in Escravos, it would likely have led to his death because the personnel on-site could not have transported him to adequate medical care on time. (DUF 15, 22.) If Plaintiff had experienced such an occurrence while he was supervising or operating equipment, he could have injured other employees who likewise may not have transport or access to appropriate medical care, potentially leading to serious impairment or even death. (DUF 16, 23.) Given the remoteness of the Escravos facility, the lack of medical care for serious incidents, and the unreliability of medical evacuations out of Escravos in the event of an incident, Plaintiff's condition would put the facility at risk of a catastrophic event involving death or impairment to Plaintiff or to other employees. (DUF 15-16, 22-23.)

-15-

1    Plaintiff may assert that the risk of danger to himself or to his coworkers was small, and

2    therefore did not constitute a serious risk of endangerment. Indeed, Plaintiff's cardiologist referenced a

3    medical study and opined that he believed there was a 2% or less chance per year that Plaintiff would

4    experience a rupture or dissection. (DUF 25.) However, even if the likelihood of risk could be

5    considered small, as noted above, courts have concluded that small risks can be significant when the

6    threatened harm is grievous. *See Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001)

7    (*citing Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000)) (finding that despite a small

8    likelihood of an accident, "the severity and scale of the potential harm to others . . . nevertheless pose a

9    significant risk" under the direct-threat analysis). Even the fact that Plaintiff has not previously

10    experienced any prior occurrence due to his heart condition is insufficient to eliminate the risk of danger

11    to self and/or others. *See In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac.*

12    *Transp. Co.*, 1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906, at *6 (Cal. F.E.H.C. 1980)

13    (finding that despite an "extensive and completely safe record as an engineer," a train engineer

14    susceptible to dizziness and blackouts posed a "significantly greater danger to others"); *McMillen*, 6 Cal.

15    App. 4th at 130-31 (Cal. Ct. App. 1992) (finding weight limitations rational because "excess fat"

16    negatively affected performance and contributed to risk of back injury, and "sudden incapacitation of an

17    ambulance driver could be life-threatening")).

18    Because Plaintiff was unable to perform the essential duties of the REM position in Escravos

19    without endangering himself or others, Plaintiff's disability discrimination claim fails.

20    **4.    *Plaintiff's MSEA Determination Was Made Based on the Best Available,**
         ***Objective Evidence Provided by Plaintiff's Own Doctor and on Current Medical***
21       ***Literature on the Subject.***

22    Whether Plaintiff's medical condition constituted a direct threat to his own health or safety or

23    that of others must be determined based on "reasonable medical judgment that relies on the most current

24    medical knowledge and/or on the best available objective evidence." Cal. Code Regs., tit. 2, § 11067(e).

25    As is apparent in the record, Dr. Asekomeh made his determination regarding Plaintiff's fitness for duty

26    in Escravos according to such standards. Dr. Asekomeh is himself a medical doctor with a Bachelor of

27    Surgery and residency training in internal medicine capable of reviewing and assessing Plaintiff's

28    medical records. (*See* DUF 21.) Although Dr. Asekomeh does not have specific expertise in cardiology,

-16-

1   he consulted with cardiologists in Nigeria regarding Plaintiff's heart condition before making his

2   determination. (DUF 22.) The cardiologists independently reviewed Plaintiff's medical records and,

3   based on their education, experience, and knowledge of existing medical literature regarding Plaintiff's

4   medical condition, concluded that an aortic event with limited resources in Escravos would be fatal. (*Id.*)

5   Dr. Asekomeh also reviewed and relied on the information provided by Dr. Khan, including the data

6   provided in the 2002 medical study, which contained the 2% risk assessment but obviously did not

7   address the lack of resources in Escravos to provide treatment in the event Plaintiff suffered an aortic

8   event. (DUF 25-26; *see also* DUF 19.)

9          Plaintiff cannot dispute that Dr. Asekomeh, as part of the local medical team in Nigeria, was the

10  decisionmaker regarding Plaintiff's MSEA determination, not Dr. Sobel or Dr. Khan (who are located in

11  Los Angeles). (DUF 6.) Likewise, Plaintiff cannot dispute that his cardiologist, Dr. Khan, did not have

12  the same knowledge as Dr. Asekomeh regarding the conditions and medical resource capacities in

13  Escravos; nor would Dr. Khan have been responsible for evacuating Plaintiff in the event of an

14  emergency, unlike Dr. Asekomeh. (DUF 19-20.)

15         Due to Escravos's lack of medical care and unreliable ability to evacuate in the event of an

16  incident due to weather, and based on the information available to him, Dr. Asekomeh reasonably

17  concluded that even with the relatively low but unpredictable risk of an incident, Plaintiff was not fit for

18  duty in Escravos. (DUF 20, 26.) Dr. Asekomeh made a reasonable determination based on the objective

19  facts available to him about the working conditions and medical resources available at Escravos, and the

20  assessment of cardiologists based on Plaintiff's medical records and published medical literature. (DUF

21  20, 22-23, 26.) Based on the available facts and medical knowledge, Dr. Asekomeh made a reasonable

22  judgment on Plaintiff's MSEA determination. Dr. Asekomeh's determination was not discrimination as

23  a matter of law.

24         **5.      *Plaintiff Cannot Demonstrate that Dr. Asekomeh's Reasons to Deny His
                     Medical Clearance Were Pretextual.***

25         In order to defeat summary judgment, Plaintiff must show that the reason for rescinding his job

26  offer was pretextual: "(1) directly, by showing that unlawful discrimination more likely than not

27  motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is

28

-17-

1    unworthy of credence because it is internally inconsistent or otherwise not believable." *McIntosh* (J.

2    Vera), *17 (*quoting Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011)

3    (*citing Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)).

4        Plaintiff contends the ultimate denial of the REM position was discriminatory, because the local

5    medical team did not do their due diligence by not considering medical studies aside from the 2002

6    study provided and referenced by Dr. Khan. (DUF 31.) Plaintiff does not set forth any other basis for his

7    claim that the decision to rescind his offer was discriminatory. (*Id.*) Notably, Plaintiff's cardiologist, Dr.

8    Khan, did not reference any study other than the 2002 study which was provided to and relied upon by

9    the local medical team in Nigeria. (DUF 32.) Plaintiff does not have a medical degree and cannot opine

10    as to the sufficiency of the medical review conducted by the local medical team in their determination

11    on his medical clearance. Indeed, the local team in Nigeria had superior knowledge regarding the

12    conditions and resources available in Escravos and are doctors capable of assessing the risk posed by

13    Plaintiff taking the expatriate assignment. (DUF 6, 20, 22-23, 26.) Plaintiff cannot produce any direct or

14    circumstantial evidence showing that the reason to rescind the REM offer was pretextual, and Plaintiff's

15    disability discrimination claim therefore must fail.

16        **B.**    <u>**Plaintiff's Claim for Failure to Accommodate is Frivolous, Because Plaintiff Never**</u>

17          <u>**Needed Accommodations During His Employment.**</u>

18        **1.**    *Chevron U.S.A. Had No Duty to Accommodate.*

19       "The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability

20    covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential

21    functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's

22    disability. *Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757, 766 (Cal. Ct. App. 2011) (*quoting*

23    *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 256 (Cal. Ct. App. 2000); *Wilson v. Cty. of Orange*,

24    169 Cal. App. 4th 1185, 1192 (Cal. Ct. App. 2009)). An employer has no affirmative duty to provide an

25    accommodation where the employee never needed nor requested one. *See Brown v. Lucky Stores*, 246

26    F.3d 1182, 1188 (9th Cir. 2001).

27       "Two principles underlie a cause of action for failure provide a reasonable accommodation. First,

28    the employee must request an accommodation." *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34,

54 (Cal. Ct. App. 2006) (*citing Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 954 (Cal. Ct. App. 1997)). "Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith." *Gelfo*, 140 Cal. App. 4th at 54 (*citing* Jensen *v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 266 (Cal. Ct. App. 2000)). If an employee never requested an accommodation, the failure to accommodate claim fails, even if the employer was on notice of the disability. *See Price v. Victor Valley Union High School Dist.*, 85 Cal. App. 5th 231, 249 (Cal. Ct. App. 2022) (distinguishing *Prilliman*, 53 Cal. App. 4th at 954) (finding *Prilliman* does not excuse the employee's initial burden to request an accommodation in order succeed on a failure to accommodate claim).

As a threshold matter, Plaintiff's failure to accommodate claim is meritless because, by Plaintiff's own admission at deposition, he did not need any accommodation during his employment. (DUF 13.) Even if Plaintiff now claims that he did need an accommodation, despite his deposition testimony to the contrary, his failure to request an accommodation defeats his claim as a matter of law. *See Price v. Victor Valley Union High School Dist.*, 85 Cal. App. 5th 231, 249 (Cal. Ct. App. 2022). Additionally, as discussed above, Plaintiff was unable to perform the essential duties of the REM position and therefore cannot establish the essential elements of his failure to accommodate claim. *See Cuiellette*, 194 Cal. App. 4th at 766 (*citing cases*).

### 2. Even Assuming Chevron U.S.A. Had a Duty to Accommodate, Chevron U.S.A. Provided Reasonable Accommodation by Not Only Ensuring Plaintiff's Continued Employment, But Also By Creating a Position for Plaintiff.

Even if Plaintiff could establish that Chevron U.S.A. had an affirmative duty to provide him with accommodations, which he cannot, Chevron U.S.A. nevertheless accommodated Plaintiff by ensuring that he could continue employment with Chevron U.S.A. *See Cuiellette*, 194 Cal. App. 4th at 767 (*quoting Spitzer v. Good Guys, Inc*., 80 Cal. App. 4th 1376, 1389 (Cal. Ct. App. 2000)) (finding the duty to accommodate does "not require creating a new job, moving another employee, promoting the disabled employee or violating another employee's rights"); *McCullah v. Southern Cal. Gas Co.*, 82 Cal. App. 4th 495, 501 (Cal. Ct. App. 2000) (finding same). Even though Plaintiff's former position had been backfilled due to the REM offer, Chevron U.S.A. ensured that Plaintiff would have a position in El Segundo. (DUF 34.) Although Plaintiff was not selected for any of the jobs he subsequently applied for,

1  Chevron U.S.A. created the Reliability Change Operating Assistant role for Plaintiff, which paid the

2  same as Plaintiff's prior position. (DUF 36, 40.) Furthermore, when a restructure at Chevron U.S.A. in

3  2020 eliminated Plaintiff's Reliability Change Operating Assistant position, Plaintiff was offered his

4  former position as an IEAR Team Lead—the position he was in before he applied for the REM position

5  in Nigeria—even though he had not applied. (DUF 41.)

6       Although Chevron U.S.A. did not have an affirmative duty to provide accommodations, Chevron

7  U.S.A. went above and beyond its duties as an employer to ensure that Plaintiff could continue his

8  employment, despite the offer for the expatriate assignment being rescinded. Plaintiff's failure to

9  accommodate claim fails as a matter of law.

10          **3.      *Even Assuming Chevron U.S.A. Had a Duty to Accommodate, Plaintiff Is Not***
            ***Entitled to His Preferred Accommodation When the Accommodation Provided***
11          ***is Reasonable.***

12      Although Chevron U.S.A. had no duty to accommodate Plaintiff, it nevertheless provided

13  reasonable accommodations by ensuring that Plaintiff remained employed and working with Plaintiff to

14  find a position he was qualified for and interested in. Although Plaintiff may claim that he did not want

15  the position created for him or that he believed, erroneously, that the position was inferior to his prior

16  position, Chevron U.S.A. is not obligated to choose the best accommodation or the specific

17  accommodation preferred by Plaintiff, so long as the accommodation chosen is reasonable. *Miller v.*

18  *California Dept. of Corrections & Rehabilitation*, 105 Cal. App. 5th 261, 763 (Cal. Ct. App. 2024)

19  (*citing* cases). A reasonable accommodation may include reassignment to a comparable or even a lower

20  graded vacant position for which the employee is qualified. *Nealy v. City of Santa Monica*, 234 Cal.

21  App. 4th 359, 377 (Cal. Ct. App. 2015) (*citing* Cal. Gov't Code § 12926(p)(2); Cal. Code Regs., tit. 2, §

22  11068, subds. (d)(1), (2)). Reassignment is *not* required if there is no vacant position for which the

23  employee is qualified, nor is an employer required to promote or create a new position. *Nealy*, 234 Cal.

24  App. 4th at 377 (*citing Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757, 767; Cal. Code Regs.,

25  tit. 2, § 11068, subd. (d)(4); *Spitzer v. The Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1389 (2000).)

26  Provision of reasonable accommodations does *not* require "creating a new job, moving another

27  employee, [or] promoting the disabled employee." *Spitzer*, 80 Cal. App. 4th at 1389 (2000) (*citing*

28  authority).

1    Chevron U.S.A. clearly expected that Plaintiff would assume the REM position in Escravos

2    pursuant to his assignment offer, as it backfilled Plaintiff's prior position. Nevertheless, despite the fact

3    it had no obligation to do so, Chevron U.S.A. took reasonable steps to ensure Plaintiff remained

4    employed with Chevron U.S.A. following the rescission of the REM offer. (DUF 34.) Plaintiff was

5    invited to explore other positions he was interested in, *while he continued to be paid in his prior IEAR*

6    *Team Lead position.*  (*Id.*) When Plaintiff was unable to get an offer for the new positions he sought,

7    Chevron U.S.A. created the Reliability Change Operating Assistant position for him, which paid the

8    same as the IEAR Team Lead position he held prior to receiving the REM offer. (DUF 36, 40)

9    Even if Plaintiff erroneously asserts that the Reliability Change Operating Assistant position was

10   inferior to the IEAR Team Lead position or the REM position in responsibility or compensation, such an

11   assertion is irrelevant, even if taken as true for purposes of this summary judgment motion. Chevron

12   U.S.A. could place Plaintiff in a lower graded position as a reasonable accommodation. Cal. Code Regs.,

13   tit. 2, § 11068, subd. (d)(1), (2). Additionally, Chevron U.S.A. is not obligated to create a position for

14   Plaintiff as a reasonable accommodation as a matter of law. *Spitzer*, 80 Cal. App. 4th at 1389 (2000)

15   (citations omitted). Since there were no comparable, vacant positions that Plaintiff was qualified for,

16   reassignment to another position was not required. *Cuiellette*, 194 Cal. App. 4th at 767. Notably, it is

17   undisputed that, following a short period working in the Reliability Change Operating Assistant

18   position, the role was eliminated due to an organizational restructure and Plaintiff was ultimately

19   offered, and he accepted, his original IEAR Team Lead position. (DUF 41.)

20   **C.    Plaintiff's Constructive Wrongful Termination Claim Is Meritless.**

21   To establish a constructive discharge, Plaintiff must demonstrate that his working conditions

22   were so intolerable that a reasonable person in his situation would have had no reasonable alternative

23   except to quit. *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1249-50 (Cal. 1994) (emphasis added).

24   "Intolerable working conditions" are those that are either "unusually aggravating" or amount to a

25   "continuous pattern of objectionable conduct." *Turner*, 7 Cal.4th at 1246-1247. Courts have recognized

26   that a plaintiff alleging constructive termination faces a heavy burden:

27   > [A]n employee cannot simply "quit and sue," claiming [constructive discharge]. The
   > conditions giving rise to the resignation must be ***sufficiently extraordinary and***
28   > ***egregious*** to overcome the normal motivation of a competent, diligent, and reasonable

-21-

1    employee to remain on the job to earn a livelihood and to serve his or her employer. The
2    proper focus is on whether the resignation was coerced, not whether it was simply one
     rational option for the employee.

3    *Turner*, 7 Cal.4th at 1246 (emphasis added); *Mullins v. Rockwell Int'l Corp.*, 15 Cal. 4th 731, 737 (Cal.

4    1997) (finding "[c]onstructive discharge occurs only when the employer coerces the employee's

5    resignation"). Thus, courts recognize claims for constructive termination ***only*** when the conduct of the

6    employer was ***so intolerable or aggravated*** that a reasonable employee would have resigned. *Turner*, 7

7    Cal. 4th at 1247, n. 3.

8         By Plaintiff's own admissions, that is not the case here. Plaintiff's allegations in support of his

9    constructive termination claim fall far short of the objective standard of "intolerable" or "aggravated,"

10   and cannot support his claim as a matter of law. *Cloud v. Casey*, 76 Cal. App. 4th 895 (Cal. Ct. App.

11   1999) is instructive here. In *Cloud*, the employee stated in her exit interview that her reason for

12   resigning was the "[l]ack of upward mobility and recognition"—namely, the denial of a promotion to

13   company controller. *Id.* at 900. The employee alleged a "continuous pattern" of adverse and

14   discriminatory conditions over a six-year period which she contended made her working conditions

15   intolerable. *Id.* at 903. The employee further alleged that she had been denied promotions and excluded

16   from meetings on the basis of her gender, which denied her the experience necessary to qualify for the

17   controller role, and that despite her inquiries, she was not offered other job opportunities to advance her

18   career. *Id.* at 903-04. Finally, the employee alleged that company management told her they did not "see

19   a woman" taking the controller's position. *Id.*

20        The *Cloud* court found that even if the employee's allegations supported a determination that she

21   may have been a victim of gender discrimination, the relevant inquiry was "whether the discriminatory

22   working conditions were so extreme as to coerce a reasonable employee to resign, thereby constituting a

23   constructive discharge." *Id.* at 905. Where the employee continued to work for her employer for nearly a

24   year after the alleged discriminatory denial of her promotion, the *Cloud* court found there was a strong

25   inference that the working conditions were not "so intolerable that a reasonable person would have to

26   resign" and affirmed the trial court's ruling that the employee's resignation was not a constructive

27   discharge as a matter of law. *Id*.

28        The *Cloud* case is on point. Plaintiff asserts that he left his employment simply because he felt

-22-

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1   his career with Chevron U.S.A. wasn't progressing as he would like. (DUF 42-43.) It is undisputed that

2   Plaintiff continued to work for Chevron U.S.A. for **almost two years** following these alleged events,

3   from September 4, 2019, the date the REM position was rescinded, to August 20, 2021, the effective

4   date of his resignation. (DUF 34, 42.) Plaintiff waited until he received a job offer for another position

5   with "significantly increased responsibility" before turning in his resignation notice to Chevron U.S.A.

6   (DUF 42.) Plaintiff admits that his supervisors were very supportive of him during his employment, that

7   no one at Chevron U.S.A. told him to leave, and that his supervisor expressed to Plaintiff that he would

8   prefer Plaintiff to stay. (DUF 44-45.) As a matter of law, Plaintiff cannot meet the high standard

9   required to show wrongful constructive termination, and Plaintiff's claim fails as a matter of law.

10          **D.    Plaintiff Cannot Recover Punitive Damages.**

11          Plaintiff cannot recover punitive damages even if any of his claims could survive summary

12   judgment. "Punitive damages are never awarded as a matter of right, are disfavored by the law, and

13   should be granted with the greatest of caution and only in the clearest of cases." *Beyenhof v. Schwan's*

14   *Consumer Brands, Inc.*, 2023 U.S. Dist. LEXIS 68713, *43 (C.D. Cal. Apr. 17, 2023) (J. Vera) (*citing*

15   *Henderson v. Security National Bank*, 72 Cal. App. 3d 764, 771 (1977)). It is well settled that a party

16   may move for summary adjudication on a punitive damages claim. *See* Cal. Civ. Proc. Code § 437c(f).

17   To successfully oppose such a motion, a plaintiff must establish a right to punitive damages by "clear

18   and convincing evidence." *Aquino v. Sup. Ct.*, 21 Cal. App. 4th 847, 854-55 (Cal. Ct. App. 1993). "The

19   clear and convincing standard requires a finding of high probability . . . so clear as to leave no

20   substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind."

21   *Beyenhof*, 2023 U.S. Dist. LEXIS 68713 at *43 (*quoting Scott v. Phoenix Sch., Inc.*, 175 Cal. App. 4th

22   702, 715 (Cal. Ct. App. 2009), *review denied* (Sept. 23, 2009) (internal citations omitted) (*citing*

23   *Lackner v. North*, 135 Cal. App. 4th 1188, 1211-12 (Cal. Ct. App. 2006)) (internal quotations omitted).

24          Even a finding of unlawful discrimination or retaliation in personnel decisions would not by

25   itself justify punitive damages, as such conduct is not necessarily the equivalent of malice or oppression.

26   See *Ackerman v. Western Electric Co.*, 643 F. Supp. 836, 857 (N.D. Cal. 1986), aff'd, 860 F.2d 1514

27   (9th Cir. 1988) (discriminatory conduct that was "unfounded, misguided and extremely ill-advised"

28   remained insufficient for punitive damages). "Something more" is required for punitive damages—

-23-

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
                                IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  "[t]here must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil

2  motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of

3  others that his conduct may be called willful or wanton." *Beyenhof*, 2023 U.S. Dist. LEXIS 68713 at *44

4  (*citing Scott*, 175 Cal. App. 4th at 715; *Taylor v. Super. Ct.*, 24 Cal. 3d 890, 894, 895 (Cal. 1979)).

5        An award of punitive damages against a corporate employer requires proof by clear and

6  convincing evidence of an act of oppression, fraud, or malice by an officer, director, or managing agent,

7  which requires "despicable conduct" carried out in "conscious disregard" of the plaintiff's rights. *See*

8  Cal. Civ. Code § 3294(a); *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1119-20 (Cal. Ct. App.

9  2001) (finding a plaintiff must meet the "clear and convincing evidence" standard on a motion for

10  summary judgment). An officer, director, or managing agent is someone who "exercise[s] substantial

11  discretionary authority over decisions that ultimately determine corporate policy." *Beyenhof*, 2023 U.S.

12  Dist. LEXIS 68713 at *44 (*quoting White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577 (Cal. 1999)).

13  "Supervisors who have no discretionary authority over decisions that *ultimately determine corporate*

14  *policy* would not be considered managing agents." *See White v. Ultramar*, 21 Cal. 4th 563, 577 (Cal.

15  1999) (emphasis added); *Myers v. Trendwest Resorts, Inc.*, 148 Cal. App. 4th 1403, 1437 (Cal. Ct. App.

16  2007) ("a supervisor must be in a *corporate policymaking position* in order to be considered a managing

17  agent for purposes of imposing punitive damages liability on the employer") (emphasis added).

18        Here, there is no evidence, let alone clear and convincing evidence, of fraud, oppression or

19  malice by any person involved in this case, let alone an officer, director or managing agent of Chevron

20  U.S.A. First, there is no evidence of fraud, oppression, or malice here. There is no allegation, much less

21  evidence, that any of the doctors involved in Plaintiff's MSEA determination held any sort of animus

22  toward Plaintiff. Plaintiff cannot proffer evidence that any of the doctors even knew him prior to their

23  involvement with his MSEA determination. The doctors made their evaluations and decisions based on

24  the medical evidence and information available to them at that time. Whether Plaintiff agrees with their

25  conclusions or not, it is undisputable that there was no ill intent

26        Second, none of the individuals identified by Plaintiff were officers, directors, or managing

27  agents of Chevron U.S.A. Dr. Asekomeh was not even an employee of Chevron U.S.A. (DUF 21.) Dr.

28  Levy was not an officer or director of Chevron U.S.A. (DUF 46.) Nor was he a managing agent. (*Id.*)

Dr. Levy was at that time the Regional Medical Director serving the Europe, Eurasia, Middle East & Africa region, and supervised a small team of four as the embedded medical team in London, who assisted with logistics, such as in scheduling fitness-for-duty exams for people on an expatriate assignment passing through London. (*Id.*) Dr. Levy did not have authority or discretion to create or set corporate policies for Chevron U.S.A., which were set by the Center of Excellence. (*Id.*)

Finally, there is no evidence that any of Chevron U.S.A.'s officers, directors, or managing agents engaged in or ratified an act of fraud, oppression, or malice. Aside from the rescinded offer for the REM position, Plaintiff does not contend any other decision was based on discrimination because of his medical condition. (DUF 30.) Aside from Dr. Levy and Dr. Asekomeh, Plaintiff does not contend that anyone else discriminated against him on the basis of his disability. (DUF 33.) As discussed above, no Chevron U.S.A. employee, including Dr. Levy, had any final determination in whether Plaintiff was ultimately awarded the REM position. (DUF 29.) The embedded medical team at the host location makes the final determination as of an expatriate's medical fitness duty, and this decision could not be overridden by any Chevron U.S.A. employee. (*Id.*; DUF 6.) Accordingly, Plaintiff's claim for punitive damages should be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, Chevron U.S.A. respectfully requests that the Court grant its motion for summary judgment.

Dated: March 6, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    */s/ Robert E. Mussig*
                    TRACEY A. KENNEDY
                    ROBERT E. MUSSIG
                    H. SARAH FAN

                    Attorneys for Defendant
                    CHEVRON U.S.A. INC.,
                    a Pennsylvania Corporation

<u>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

## I.    OVERVIEW

Contrary to every indication of objective medical evidence that Plaintiff Mark Snookal's disability presented a "negligible risk relative to the general population"; against the recommendation of Mr. Snookal's own cardiologist who told Defendant that it was safe for Mr. Snookal to perform the required job duties even in a "remote or rural area of Nigeria;" against the recommendation of the doctor Chevron appointed to evaluate Mr. Snookal and deemed him "fit for duty"; against the suggestion of Chevron's own Regional Medical Manager serving the Europe, Eurasia, Middle East & Africa region that Mr. Snookal be cleared for duty; and despite the opinions of three additional cardiologists who unanimously agreed that Mr. Snookal's disability was "low risk" of any adverse outcome; Defendant Chevron USA, Inc. rescinded Plaintiff Mark Snookal's job offer because of its bias against him as a disabled employee.

## II.    INTRODUCTION

Plaintiff Mark Snookal (hereinafter "Plaintiff" or "Mr. Snookal") was a conscientious and diligent employee of Defendant Chevron U.S.A. Inc. (hereinafter "Defendant" or "Chevron") for over twelve years. (Plaintiff's Separate Statement of Uncontroverted Facts ("PUF") 49; Defendant's Statement of Uncontroverted Facts ("DUF") 1.) In or about July of 2019, Chevron offered Mr. Snookal a rotational expatriate assignment in Escravos, Nigeria as a Reliability Engineering Manager ("the REM position"). (DUF 5.) The REM position was an office-based/desk job that would come with significant advantages to Mr. Snookal, including an increased scope of responsibilities and a significant pay increase. (PUF 50-41, 72-74, 118.)

However, prior to Mr. Snookal's planned start date, Chevron required Mr. Snookal to undergo a medical fitness for duty screening. (DUF 5-6.) Pursuant to Chevron's protocol, a doctor of Chevron's own choosing evaluated Mr. Snookal and deemed him "fit for duty with restrictions." (PUF 52-53.) The restrictions were: (1) no heavy lifting over 50 pounds (something that was not required for the desk job in any case) and (2) to have Mr. Snookal's treating cardiologist review and provide a clearance letter. (PUF 52-56.)

-26-

Mr. Snookal has had an asymptomatic dilated aortic root (also called a "thoracic aneurysm"), which was managed with medication and screened annually to monitor any increase in size which would indicate risk to Mr. Snookal. (DUF 12, PUF 64.) The size of Mr. Snookal's thoracic aneurysm had been stable for years, and the risk of a rupture or dissection was under 1% per year. (PUF 65-67, 79.) Mr. Snookal's treating cardiologist, Dr. Shahid Khan, promptly provided the requested clearance letter indicating that Mr. Snookal was under his care and that Mr. Snookal was fit for duty and that it was safe for him to complete the duties of the REM position. (DUF 11; PUF 57.) Dr. Khan later submitted further documentation in support of medical clearance for Mr. Snookal, noting that Mr. Snookal's risk of any serious cardiac event was extremely low, controlled with medication, and readily monitored during an annual screening. (PUF 58, 64.)

In contrast, at least two of the three local cardiologists with whom Chevron chose to consult had limited to no experience treating patients with Mr. Snookal's condition; never spoke to Mr. Snookal or any of his physicians; were not familiar with the job duties of the role in question; and had only limited information about his medical history. (DUF 22; PUF 77-78, 80, 140-141.) They also admitted to Chevron that they were unable to find directly applicable research to help them evaluate Mr. Snookal's specific risk of a serious cardiac event. (PUF 136). Regardless, these cardiologists opined to Chevron that Mr. Snookal's risk of a serious cardiac event were "low risk." (PUF 69-71.) Dr. Stephen Frangos, then Chevron U.S.A.'s Regional Health and Medical Manager serving the Americas region weighed in on the decision, noting that "the patient is low risk for a major cardiac event." (DUF 20.)

Dr. Scott Levy, Chevron's own Regional Medical Manager, Europe, Eurasia, Middle East & Africa, also reviewed and agreed, noting that "[a]lthough not without some risk, I don't think we're dealing with high risk. We can mandate yearly clearance and report from nephrologist (sic) on a yearly basis. Risk is even lower when we consider that [Mr. Snookal]'ll be a rotator." (PUF 150.) Indeed, per the terms of this rotational expatriate assignment, Mr. Snookal would be home in the United States half the time, and readily able to conduct his once annual recommended screening with Dr. Khan. (DUF 51; PUF 55.)

Nonetheless, Dr. Paul Arenyeka, the Medical Director for Chevron's Nigeria Mid Africa SBU insisted that "the risk of an incident no matter how low is a major factor in Escravos medical care" and

-27-

1  doubled down on the decision to deem Mr. Snookal "not fit for duty." (PUF 149.)

2  When Mr. Snookal reported this decision as disability discrimination, Defendant repeatedly

3  ratified it, and Defendant's Human Resources did not investigate or remediate Mr. Snookal's complaint

4  other than to ask Dr. Levy – the subject of Mr. Snookal's complaint – to provide his "justification."

5  (DUF 33-34; PUF 93.)

6  Meanwhile, Chevron backfilled Mr. Snookal's previous job, leaving Mr. Snookal in limbo.

7  (DUF 34.) Chevron then failed to accommodate Mr. Snookal's disability, denying his applications for

8  four fully-funded, vacant positions and ultimately placing Mr. Snookal in non-managerial, temporary

9  position with abysmal growth opportunities. (PUF 34, 112-117.)This new position was a significant

10 demotion, not only relative to the rescinded REM position, but even relative to Mr. Snookal's previous

11 position. (PUF 112-117.)

12 Shortly thereafter, Mr. Snookal began suffering from debilitating depression because of

13 Chevron's arbitrary discrimination, and on August 20, 2021, Chevron wrongfully constructively

14 discharged Mr. Snookal. (PUF 124-127.)

15 Accordingly, Mr. Snookal is asserting claims for (1) disability discrimination in violation of the

16 California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940, *et seq.*; (2) failure to

17 accommodate a disability in violation of the FEHA, *Id.*; and (3) wrongful constructive discharge in

18 violation of public policy.[6]

19 **III.    FACTUAL BACKGROUND**

20 **A.    Mr. Snookal Rises in Chevron's Ranks During His First Ten Years of Service**

21 In January of 2009, Chevron hired Mr. Snookal to serve as an Analyzer Designs Engineer in the

22 Technical Services Department in El Segundo, California. (DUF 1.) Mr. Snookal worked his way up in

23 the ranks and received several promotions for his standout contributions. (DUF 2; PUF 44, 49.)

24 **B.    Chevron Selects Mr. Snookal for A Coveted Rotational Expatriate Assignment**

25 In or about May of 2019, Mr. Snookal applied for a Reliability Engineering Manager position, a

26

27

28 [6] On September 27, 2024, the Court entered the Parties' joint stipulation to dismiss Mr. Snookal's third cause of action for age discrimination. (Dkt 27.)

1  three-to-four-year rotational assignment at a Chevron liquid-to-gas oil refinery in Escravos, Nigeria

2  ("the REM position"). (DUF 3.)

3       On July 9, 2019, Chevron (not "Chevron Nigeria, Limited" as claimed by Defendant) sent Mr.

4  Snookal an "Assignment Offer" letter for the REM position and thereafter began the administrative

5  process for this expatriate assignment. (DUF 4-5.)

6       Although Mr. Snookal was to start the REM position at the same salary (grade 22) as his

7  previous position (the IEAR Team Lead in El Segundo, California) the compensation associated with

8  the REM position would be significantly higher. (DUF 2-3; PUF 45.) The position came with a 55%

9  increase in Mr. Snookal's base pay pursuant to Chevron's Rotational Assignment policy which awards a

10  55% location premium for expatriates in Escravos, Nigeria. (PUF 50.) As an additional benefit, he

11  would only have to work for half of the year, working in Nigeria for a four-week period then returning

12  home to the United States for a four-week period off duty. (PUF 51.)

13  **C.  Mr. Snookal Is Deemed "Fit for Duty" Pursuant to Chevron's Medical Suitability**

14  **for Expatriate Assignment Screening (MSEA) Procedure, Receiving Clearance by Two Physicians**

15       On or about July 24, 2019, Dr. Irving Sobel, a doctor who Chevron appointed to evaluate Mr.

16  Snookal, completed a Medical Suitability for Expatriate Assignment History and Physical Exam

17  (MSEA) of Mr. Snookal. (DUF 17; PUF 52-53.) Dr. Sobel documented that Mr. Snookal was "fit for

18  duty with restrictions." (PUF 53.) The two restrictions Dr. Sobel noted were: (1) no heavy lifting over 50

19  pounds and (2) to get a clearance letter from Dr. S. Khan, Mr. Snookal's treating cardiologist. (PUF 54.)

20       With respect to the heavy lifting restriction, the REM position required no heavy lifting or

21  physical exertion. (PUF 56, 73-74.) With respect to receiving a clearance letter from his cardiologist,

22  Mr. Snookal promptly complied. (DUF 18, PUF 57-58.) Mr. Snookal was under the care of his

23  cardiologist, Dr. S. Khan, for an asymptomatic, ascending dilated aortic root. (DUF 11; PUF 57-58.) Dr.

24  Khan completed annual screenings to detect any changes to Mr. Snookal's condition, and Mr. Snookal

25  was taking medication to manage same. (DUF 12; PUF 57, 64.) On July 29, 2019, Dr. Khan wrote a

26  letter, which Mr. Snookal provided to Chevron. The letter read in relevant part that "Mr. Snookal is

27  under my care for his heart condition. It is safe for him to work in Nigeria with his heart condition. His

28  condition is under good control and no special treatments are needed." (DUF 18, PUF 57-58.) Moreover,

-29-

1  given the rotational nature of the REM position, Mr. Snookal would have had no interruption to

2  receiving this regular preventative care in the United States. (DUF 12, PUF 55.)

**D.    Mr. Snookal Could Complete All of the Job Duties of the REM Position, an "Office Job," And Nothing about the Completion of the REM Job Duties or Its Location in Escravos Would Exacerbate the Risk of a Cardiac Event**

5  Chevron has also conceded that Mr. Snookal's condition did not impact his day-to-day ability to

6  work or to complete his job duties. (DUF 12; PUF 64-76.) Chevron categorized the REM position as an

7  "office based job" and agreed that Mr. Snookal was capable of doing the job without accommodation.

8  (PUF 59-61, 66.) Further still, Chevron admits that nothing about the REM position would exacerbate

9  Mr. Snookal's condition, nor would anything about its remote location increase the risk of a cardiac

10  event occurring. (PUF 64-76, 84.) Drs. Marmureanu and Khan both agree. Id. Dr. Scott Levy, Chevron's

11  then Regional Medical Manager for the Europe, Eurasia, Middle East & Africa Region, admitted that

12  Mr. Snookal's "proposed job in Nigeria was an office-based job . . . And again, I didn't have an issue

13  with the job at all. I don't think any of us had an issue with the specific type of work he was doing." (Id.)

**E.    Chevron Nonetheless Rescinded Mr. Snookal's Job Offer Because of His Disability, Claiming Incorrectly that Mr. Snookal Poses a Direct Threat to Himself**

15  Nonetheless, after Mr. Snookal jumped through all of Chevron's administrative hoops, Chevron

16  rescinded the job offer.[7] (DUF 28.) On or about August 15, 2019, Dr. Eshiofe Asekomeh documented

17  Chevron's finding that Mr. Snookal was "not fit for duty," citing Mr. Snookal's thoracic aneurysm, and

18  on or about September 4, 2019, Chevron informed Mr. Snookal of same. (DUF 28; PUF 104.) Dr.

19  Asekomeh entered this decision without ever communicating with Dr. Sobel, Dr. Khan, or Mr. Snookal;

20  without reviewing Mr. Snookal's work history; and without knowing what the REM position's job

21  duties even were. (PUF 88-92).

**F.    Mr. Snookal's Risk of Any Adverse Health Event While in Escravos Was Miniscule**

23  Chevron incorrectly asserts that "Plaintiff's cardiologist stated that based on a published medical

24  study, Plaintiff's aortic root had a 2% risk per year of rupture or dissection." (Defendant's Motion for

25  Summary Judgment ("Defendant's MSJ") at 5:3-5). To the contrary, Dr. Khan specifically indicated that

---

[7] Whether Chevron rescinded an offer of employment or whether, as Chevron proposes, it made only a "conditional offer" is immaterial. Either way, it barred Mr. Snookal from commencing the job because of his disability, an adverse employment action.

-30-

1    Mr. Snookal's risk was "low" and "*likely less than* 2% per year." (italicization added). (DUF 25; PUF

2    103.) On August 23, 2019, he wrote to Chevron in relevant part that:

> Mr. [Snookal]'s aneurysm is relatively small and considered low risk. His thoracic aortic
> aneurysm size is 4.1-4.2 cm on his most recent CT scan. From the published studies, the
> risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm . . .
> Since Mr. Snookal's aneurysm has not shown any growth for 3 years, **his risk may be**
> **lower than the published 2% number above which would be based on "average"**
> **growth rates.** Finally, the studies of risk of rupture are fairly old (2002) and treatment
> has improved as has our understanding of aortic aneurysms. For example, animal studies
> have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in
> preventing or reversing aortic aneurysm growth and Mr MS (sic) is on an ARB. In
> summary, **Mr. MS's risk of serious complications related to his thoracic aortic**
> **aneurysm is low and likely less than 2% per year.** The risk is primarily related to
> further enlargement of the aneurysm which can be tracked with an annual CT scan.
> (emphasis added) (Id.)

10    Mr. Snookal's risk of a cardiac event was in fact less than 1% per year, and since Mr. Snookal

11    would have only been in Escravos for half of the time, the likelihood of any adverse event occurring

12    while he was in Escravos was less than 0.5% per year. (PUF 65-67.)

13    Defendant is also incorrect in its insistence that Mr. Snookal's condition was "completely

14    unpredictable and it was impossible to isolate triggers to reduce the risk of an occurrence (Defendant's

15    MSJ at 12:13-14). As Dr. Khan instructed Chevron, the risk of a serious cardiac event was "primarily

16    related to further enlargement of the aneurysm which can be tracked with an annual CT scan." (DUF 11-

17    13.) Mr. Snookal's was also on blood pressure medications to further reduce the risk of rupture or

18    dissection. (PUF 64-67, 121.)

19    Moreover, Defendant avers that "a dilated aortic root cannot be treated without open heart

20    surgery." (DUF 12). This is irrelevant, because given the actual size and stability of Mr. Snookal's

21    thoracic aneurysm, it is not considered clinically significant and does not warrant surgical intervention

22    because the risk of a rupture or dissection is "negligible relative to the general population." (DUF 11-12;

23    PUF 67.)

24    Dr. Frangos also opined at the time that "the patient is low risk for a major adverse CV

25    [cardiovascular] event," as did Chevron's three consulting cardiologists Drs. Adeyeye, Akintunde, and

26    Aiwuyo (DUF 20, 22; PUF 69, 94).

27    / / /

28    / / /

-31-

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### G.    Mr. Snookal Reports That This Decision Constitutes Disability Discrimination, but Chevron Ratifies It

Mr. Snookal reported Chevron's discriminatory decision to the Chevron Ombuds, and his complaint was eventually passed to Dr. Scott Levy, Chevron's then Regional Medical Manager for Europe, Eurasia, Middle East & Africa. (DUF 24; PUF 98.) Dr. Levy explained that the jobsite was in a remote area in Nigeria with limited medical facilities, and emergency medical care could only be provided by charter aircraft using the facility airstrip to Lagos, Nigeria. (PUF 99.)

Dr. Levy requested permission to discuss Mr. Snookal's medical fitness with his treating cardiologist, Dr. Khan, and Mr. Snookal granted same. (PUF 100.) Thereafter, Dr. Levy left one voicemail for Dr. Khan, but never spoke with Dr. Khan directly. (PUF 101.) On August 23, 2019, Dr. Khan sent Dr. Levy an email reiterating his opinion that Mr. Snookal was medically fit for duty despite the remote location of the job. (PUF 58.)

On September 4, 2019, Mr. Snookal emailed Chevron USA Human Resources Manager, Andrew Powers, to report the disability discrimination: "I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is therefore, discriminatory in nature." (PUF 104.) He further noted that "my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic." (Id.) Just minutes after receiving Mr. Snookal's disability complaint, before any investigation, Mr. Powers wrote to his colleagues: "I am sure there is a very good reason why this [job] was rescinded." (PUF 105.)

Mr. Powers also forwarded Mr. Snookal's disability discrimination complaint to the medical team in Nigeria, asking Dr. Ayanna Jones for "context" "and suggested response." (PUF 106.) Dr. Jones referred Mr. Powers back to the "EEMEA Regional Medical Manager" (i.e. Dr. Levy) for the response even though Dr. Levy was one of the subjects of Mr. Snookal's discrimination complaint. (PUF 107.)

On September 6, 2019, Mr. Powers replied to Mr. Snookal, "I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was

based on stereotyping or impermissible discrimination." (PUF 109.)

Mr. Snookal then requested an explanation for why this offer had been rescinded. (PUF 110.) On September 16, 2019, Dr. Levy emailed Mr. Snookal, *inter alia*:[8]

> I understand you are willing to take the risk of potentially dying on the job and do not feel it is the company's place to make that decision for you. I agree to a certain extent and recognize your concerns about paternalism. However, the company does have a right to not engage individuals where their assignment could pose a 'direct threat' to their own health and safety. . . I became involved on your case when you had requested a second opinion on the initial denial and with your consent involved your treating physician to better understand your specific risk. . . **The concern is that if the condition were to occur**, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos . . . it is also clear that the duration of your condition is not limited and is continually present, and the occurrence is not predictable and it's not possible to isolate triggers to reduce the risk. (emphasis added.) (PUF 111.)

### H. To the Contrary, Mr. Snookal's Asymptomatic Condition Posed No "Direct Threat" to Himself or Others

Contrary to Chevron's assertion, Mr. Snookal posed no direct threat to himself or others. (PUF 62-76; 81-89.) Though Chevron cites the hypothetical risk of Mr. Snookal suffering a cardiac event in Escravos, the risk of this happening was less than half of a percentage per year, and nothing about Mr. Snookal's desk job would have put others at risk of injury. (Id.)

### I. After Rescinding Mr. Snookal's Job Offer for Discriminatory Reasons, Chevron Doubles Down and Fails to Provide Mr. Snookal with A Reasonable Accommodation

Meanwhile, after Chevron offered Mr. Snookal the REM position, it offered his previous role at the El Segundo refinery to someone else. (DUF 34.) Chevron thereby left Mr. Snookal in limbo and without a role. Id. On or about September 5, 2019, Mr. Snookal searched for and identified four vacant positions for which he was qualified and submitted applications for same: (1) El Segundo Routine Maintenance General Team Lead, (2) El Segundo Operating Assistant (which had two separate openings) and (3) Maintenance Change Operating Assistant. (PUF 112-115.)

For these positions, Chevron made Mr. Snookal apply with the rest of the general applicant pool, and Chevron did not give him preference for any of these vacant positions. (PUF 112-116.) Chevron did not select Mr. Snookal for any of the positions. (PUF 116.)

---

[8] Nowhere in his email purporting to justify Chevron's decision did Dr. Levy note concern about Mr. Snookal posing a threat to others. (Id.)

-33-

In or about November of 2019, Austin Ruppert, Mr. Snookal's former supervisor, requested that Chevron create a position called Reliability Change Operating Assistant (OA) for Mr. Snookal. (PUF 117.) Although Chevron categorized this as "lateral move" for Mr. Snookal, the position was not comparable to the rescinded REM position in pay, in its scope of responsibilities, nor its opportunities for advancement within Chevron. (PUF 50, 115, 117-118.) It was also a temporary position (PUF 117). Just some examples of why the Reliability Change OA position was not comparable to the REM position include:

- In the REM position, Mr. Snookal would have been responsible for managing a team of approximately twenty people. (PUF 118.) As Reliability Change OA, Mr. Snookal had no direct reports and no management opportunities. (Id.; DUF 40)

- In the REM position, Mr. Snookal would have received a 55% location premium (equal to 55% of his base salary) on top of his base salary and compensation. (PUF 50.) The Reliability Change OA position came with no location premium since it was located in El Segundo, California. (PUF 93, DUF 40.)

- In the REM position, Mr. Snookal would have worked on a four-weeks on, four-weeks off basis. (PUF 51.) The Reliability Change OA position required a regular, full time, around-the-year schedule. (DUF 40.)

Moreover, even with respect to Mr. Snookal's previous role as IEAR Team Lead in El Segundo, California, the new Reliability Change OA role represented a demotion and a shrinking of his scope and responsibilities since the new role had no direct reports and no management opportunities for Mr. Snookal. (DUF 40, PUF 118.)

### J.   Chevron Wrongfully Constructively Discharges Mr. Snookal in Violation of Public Policy

For nearly two years after Chevron rescinded the REM position, Mr. Snookal continued to diligently search for a better job opportunity at Chevron,[9] including other rotational expatriate assignments in one of the locations Dr. Levy deemed acceptable. (PUF 119.) He subscribed to receive regular email notifications regarding any new job postings, searched Chevron's internal job posting sites, and asked colleagues about available opportunities. (Id.) Mr. Snookal was never again able to find any other rotational expatriate assignments for which he was told he was eligible. (PUF 120.)

---

[9] Notably, there is no evidence in the record that Defendant ever conducted any efforts to find other available rotational expatriate assignments for Mr. Snookal that were comparable to the REM position.

In or about November of 2019, Mr. Snookal first started treating with a therapist to help him cope with the emotional distress of Chevron's discriminatory actions, and in or about October of 2020, with his symptoms of depression persisting, he commenced taking antidepressant medications. (PUF 122-126.)

Mr. Snookal also was struggling to meet his family's needs, particularly for his son's specialized education. (PUF 122.) Given that he was continuing to experience debilitating symptoms of depression, and on the advice of his treating therapist, Mr. Snookal had no choice but to submit his resignation of employment from Chevron on August 4, 2021, effective August 21, 2021, and he thereafter moved himself and his family out of state. (PUF 122-127; 143-147.)

## IV.    **LEGAL STANDARD**

It is true that summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *McIntosh v. Wal-Mart Assocs.*, 2024 U.S. Dist. LEXIS 41423, *9 (C.D. Cal. Mar. 7, 2024) (J. Vera) ("McIntosh") (citing Fed. R. Civ. P. 56(a); *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2012). However, Chevron fails to mention that they carry this burden of proof as the moving party. Fed. R. Civ. P. 56(a). In the context of opposing a motion for summary judgment, unlike at trial, a plaintiff has no initial burden. *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal.App.4th 138, 150 (Cal. Ct. App. 1997); *Martin v. Lockheed Missiles & Space Co., Inc.*, 29 Cal.App.4th 1718, 1730 (Cal. Ct. App. 1994). "[T]he court also views the evidence in the light most favorable to the non-moving party." *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826, 42 (9th Cir. 2021) (quoting *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016)).[10] Further "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper. Such cases, we caution, are rarely appropriate for disposition on summary judgment, however liberalized it be." *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 286 (Cal. Ct. App. 2009). "The jury is left to decide which evidence it finds

---

[10] Defendant also misstates the evidentiary standard at the summary judgment phase. Rather than having to show that the evidence submitted is admissible as-is, the proponent can "show that the material is admissible as presented or [] explain the admissible form that is anticipated." Committee Notes to Fed. R. Civ. P. 56(c)(2) – 2007 Amendment.

1   more convincing, that of the employer's discriminatory intent or that of the employer's []neutral reasons

2   for the employment decision." See *Muzquiz v. City of Emeryville*, 79 Cal.App.4th 1106, 1118, fn. 5 (Cal.

3   Ct. App. 2000). In addition, "[a]t summary judgment, the degree of proof necessary to establish a prima

4   facie case [of discrimination] is 'minimal and does not even need to rise to the level of a preponderance

5   of the evidence.'" *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005)

6   (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

7   **V.    LEGAL ARGUMENT**

8       **A.    Disputes of Material Fact Exist as to Mr. Snookal's Disability Discrimination Claim**

9           **1.    *Defendant Chevron U.S.A. Was The Employer for the REM Position***

10       First, pursuant to California Labor Code § 226(a)(8), employers are required to provide wage

11  statements that list "the name and address of the legal entity that is the employer." Defendant Chevron

12  admits that "[i]n July of 2019, Defendant provided payroll services for its employees who assumed the

13  REM expatriate rotational assignment with Chevron Nigeria Limited in Escravos, Nigeria, and the

14  employee's compensation was charged by Defendant to Chevron Nigeria Limited . . ." (DUF 4.)

15  Therefore, they would have continued to pay Mr. Snookal's wages and handled his payroll for the

16  duration of his expatriate assignment. Id. Other Chevron U.S.A. employees, including Dr. Levy and

17  Andrew Powers, also testified that while they served their respective expatriate assignments in different

18  states and other countries (including Singapore, England, Kazakhstan and the Philippines), Chevron

19  U.S.A. directly paid their compensation and remained their employer throughout the duration of their

20  assignments. (PUF 128-129.) Moreover, the "Assignment Offer" letter received by Mr. Snookal did not

21  identify "Chevron Nigeria" as his employer, as Defendant wrongly asserts, but rather "Chevron." (PUF

22  105.) By Defendant's own admission, it and Chevron Nigeria Limited are also "affiliates under Chevron

23  Corporation, a Delaware corporation." (PUF 130.)

24       Second, the California Fair Employment and Housing Act (FEHA) instructs that when an

25  employer allows a person or entity to act as its direct or indirect agent, it is liable for the acts of those

26  authorized agents. An "employer" for purposes of disability discrimination in violation of the FEHA

27  "includes anyone regularly employing five or more persons, *or any person acting as an agent of an*

28  *employer, directly or indirectly. . .*" Cal. Gov. Code, § 12926(d) (italicization added). Defendant insists

-36-

1    that Dr. Asekomeh was the decisionmaker responsible for rescinding the REM position from Mr.

2    Snookal and that he has "never been an employee of Chevron U.S.A." (Defendant's MSJ at p. 13:4-5.

3    This assertion is irrelevant since Dr. Asekomeh was, at a minimum, acting as an agent of Defendant

4    Chevron U.S.A., Inc. (PUF 131-134.) At the time of the decision, Dr. Asekomeh worked as the

5    Occupational Health Physician at the Chevron Hospital in Warri, Nigeria" and "[a]s part of [his] job

6    duties, [he] conduct[s] Medical Suitability for Expat Assignment ("MSEA") evaluations" for Chevron's

7    expatriate assignments in Nigeria. (Id.; DUF 20.) Chevron also provides specific guidelines and

8    protocols which Dr. Asekomeh was to follow in conducting the Medical Suitability for Expatriate

9    Assignment evaluations. (PUF 134.)

10        **2.    *Chevron U.S.A. Made the Discriminatory Decision to Rescind the REM Position from Mr. Snookal***

11        Despite ample evidence to the contrary, Chevron asserts that "[n]o Chevron U.S.A. employee

12    had any final say in whether Plaintiff was ultimately awarded the REM position in Escravos, including

13    Dr. Levy and Dr. Frangos. (DUF 29)." (p. 13:5-7.) Yet, the Nigerian medical team repeatedly indicated

14    in writing that they were deferring to Dr. Levy and Dr. Frangos' opinions. (PUF 93-95.) For example, on

15    August 8, 2019, Dr. Arenyeka emailed Drs. Frangos and Levy with a write-up on Mr. Snookal and

16    concluding that "I would greatly value your kind opinions and thoughts on this." (Id.) Dr. Frangos,

17    whose email signature indicates he is "Regional Manager, Health and Medical - Americas" for

18    "Chevron Services Company A Division of Cheron U.S.A. Inc. Global Health and Medical" responded

19    to Dr. Arenyeka's invitation to weigh in: "Thanks for the opportunity to review this case. In the case of

20    medical transfers to Escravos, my view is that NMA Occupational Health and NMA Cardiologists get

21    9/10 of the opinions. As is pointed out, the patient is low risk for a major adverse CV event." (Id.)

22    Following this email, Dr. Pitan instructed Dr. Asekomeh to "decline a job transfer to Escravos" and

23    "indicate that [Mr. Snookal] will be cleared for an assignment in Lagos if that is the direction the U.S.

24    decides to pursue." (Id.) On August 15, 2019, Dr. Frangos also emailed Dr. Levy admitting that "I

25    shared with [Mr. Snookal] that *Paul [Arenyeka] and I had determined in our review of this case*: that he

26    was not deemed fit for assignment in Escravos because of the location." (PUF 97.) (italicization added).

27        On August 23, 2019, Dr. Levy wrote: "I don't know who the msea advisor is for Mark Snookal

28    but can you inform them that we're reviewing his msea eval for escravos (sic). This was previous sent

-37-

(sic) as not ffd [fit for duty] but *I'm performing a second review*." (PUF 102.) Again, on August 26,

2019, Dr. Arenyeka wrote to Dr. Levy expressing that he suggested upholding the original designation

of Mr. Snookal as "unfit" and concluded: "I will appreciate your guidance." (PUF 93). Dr. Levy wrote

in response: "I support your decision and appreciate your rereview." (Id.) In an August 26, 2019 email to

Dr. Khan, Dr. Levy also referred to the medical team in Nigeria as "my team in Nigeria," and stated that

he was "working with" them to discuss Mr. Snookal's fitness for duty. (PUF 151.)

### 3.     *Regardless, Chevron U.S.A., At Minimum, Ratified the Discriminatory Decisions in Question*

Assuming *arguendo* that Drs. Frangos and Dr. Levy were still not sufficiently involved in the

discriminatory decision in question, Defendant Chevron U.S.A., still at minimum, ratified it.

"Ratification is the voluntary election by a person to adopt in some manner as his own an act which was

purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to

treat the act as if originally authorized by him. A purported agent's act may be adopted expressly or it

may be adopted by implication based on conduct of the purported principal from which an intention to

consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any

reasonable intention on his part, other than that he intended approving and adopting it.'" *Rakestraw v.

Rodrigues*, 8 Cal.3d 67, 73 (Cal. S.Ct. 1972).

It is undisputed that Dr. Levy was at all relevant times, and is, Defendant's employee. (DUF 24).

Dr. Levy admits to offering, at minimum, a "second opinion" on Mr. Snookal's condition; "agreed to

facilitate discussion with the local team regarding Mr. Snookal's medical condition;" and issued findings

about why the local team's decision would stand. (DUF 24; PUF 111). Mr. Snookal also reported the

disability discrimination to Andrew Powers, also an employee of Defendant, who "investigated" and

similarly issued findings about why the local team's decision would stand. (DUF 48; PUF 104-111.)

Defendant also cannot shield itself from liability simply by claiming it is deferring to the

discriminatory preferences of others. In *Fernandez v. Wynn Oil Co.*, the Ninth Circuit held that

"[t]hough the United States cannot impose standards of non-discriminatory conduct on other nations

through its legal system, the district court's rule would allow other nations to dictate discrimination in

this country. No foreign nation can compel the non-enforcement of Title VII here." 653 F.2d 1273, 1277

(9th Cir. 1981).

### 4. *Mr. Snookal Had a Disability, Was Fully Qualified for the Expatriate Assignment, and Could Perform all Essential Duties of the Job*

California Gov. Code § 12926(m) defines a qualifying physical disability expansively, and it "includes, but is not limited to, all of the following:

(1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:
   (A) Affects one or more of the following body systems: . . . cardiovascular . . .
   (B) Limits a major life activity. For purposes of this section:
       (i) "Limits shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.
       (ii) A physiological disease, disorder, [or] condition . . . limits a major life activity if it makes the achievement of a major life activity difficult.
       (iii) "Major life activities" shall be broadly construed and includes physical, mental, and social activities and working."

Mr. Snookal's thoracic aneurysm undoubtedly "affects" his cardiovascular system and limited his ability to lift over 50 pounds, a physical "major life activity." (PUF 54, 137)[11] Notably, the standard under the FEHA only requires that a disability "limit," as opposed to "substantially limit," a single major life activity. *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1031–32 (9th Cir. 2003) (reversing summary judgment for employer).

Further, Chevron's allegation that Mr. Snookal could "not perform the essential functions" of the REM position is baseless. Dr. Sobel, Dr. Levy and Dr. Asekomeh all noted that they had no concerns about Plaintiff's ability to do the actual job duties, nor does Plaintiff's expert witness, Dr. Alexander Marmureanu. (PUF 55-77.) Drs. Marmureanu and Khan, further attest that it was safe for Mr. Snookal to perform the REM position even in the remote area of Escravos, Nigeria. (Id.)

### 5. *Chevron Rescinded the REM Job Because of Mr. Snookal's Disability, A Decision That Was Discriminatory On its Face*

To meet his burden to show a prima facie burden of discrimination, a Plaintiff may show "'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is

---

[11] In the alternative, Chevron at least "regarded or treated" Mr. Snookal as "having, or having had, any physical condition that makes achievement of a major life activity difficult," which is sufficient to invoke the FEHA's prohibition against discrimination based upon a perceived. Cal. Gov. Code § 12926 (m)(4).

1  more likely than not that such actions were based on a [prohibited] discriminatory criterion . . . .' The

2  prima facie burden is light." *Sandell v. Taylor-Listug, Inc.*, 188 Cal.App.4th 297, 310 (Cal. Ct. App.

3  2010) (original italics, internal citations omitted.)

4          Here, Defendants stated explicitly that they were rescinding their offer of the REM position from

5  Mr. Snookal because of his dilated aortic root, claiming incorrectly, and despite the weight of the

6  medical evidence, that Mr. Snookal posed a "direct threat" to his own health and safety. (DUF 20; PUF

7  55-95; 94-103). Defendant nonetheless argues that the decision was made by "disinterested medical

8  professionals" (Defendant's MSJ at 2:8-9). But "where, as here, an employee is found to be able to

9  safely perform the essential duties of the job, a plaintiff alleging disability discrimination can establish

10  the requisite employer intent to discriminate by proving (1) the employer knew that plaintiff had a

11  physical condition that limited a major life activity, or perceived him to have such a condition, and (2)

12  the plaintiff's actual or perceived physical condition was a substantial motivating reason for the

13  defendant's decision to subject the plaintiff to an adverse employment action. . . . " *Wallace v. County of*

14  *Stanislaus*, 245 Cal.App.4th 109, 129 (Cal. Ct. App. 2016) (internal citations omitted).

15              **6.      *Chevron's "Direct Threat" Defense Fails Because Mr. Snookal Posed No***
                          ***"Imminent and Substantial" Risk to Himself Nor to Others***

16          Chevron has the burden of proving its "direct threat" affirmative defense by a preponderance of

17  the evidence. *Raytheon Co. v. Fair Employment & Housing Com.*, 212 Cal.App.3d 1242, 1252 (Cal. Ct.

18  App. 1989). "FEHA's 'danger to self' defense has a narrow scope; an employer must offer more than

19  mere conclusions or speculation in order to prevail on the defense. . . . As one court said, '[t]he defense

20  requires that the employee face an "imminent and substantial degree of risk" in performing the essential

21  functions of the job.' An employer may not terminate an employee for harm that is merely potential . . . '

22  " *Wittkopf v. County of Los Angeles*, 90 Cal.App.4th 1205, 1218-1219 (Cal. Ct. App. 2001) (internal

23  citations omitted); see also Judicial Council of California Civil Jury Instructions CACI No. 2544 (2024).

24  Moreover, "[u]nlike the BFOQ defense, this exception must be tailored to the individual characteristics

25  of each applicant . . . in relation to specific, legitimate job requirements . . . . [Defendant's] evidence, at

26  best, shows a possibility [plaintiff] might endanger his health sometime in the future. In the light of the

27  strong policy for providing equal employment opportunity, such conjecture will not justify a refusal to

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
                                          IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   employ a handicapped person." *Sterling Transit Co. v. Fair Employment Practice Com.*, 121 Cal.App.3d

2   791, 798-799 (Cal. Ct. App. 1981), internal citations and footnote omitted. "The risk of injury to the

3   employee must be imminent and substantial, Cal.Admin.Code tit. 2, § 7293.8(b), and the mere

4   possibility of future injury is not sufficient." *Ackerman v. W. Elec. Co.*, 643 F. Supp. 836, 848 (N.D. Cal.

5   1986), *aff'd*, 860 F.2d 1514 (9th Cir. 1988). Here, Chevron admits that their decision to rescind the REM

6   position was based upon the perceived, hypothetical, miniscule, future risk. (DUF 17, 20).

7       Defendant's central assertion that "courts have concluded that small risks can be significant

8   when the threatened harm is grievous" relies on cases with readily distinguishable facts because all of

9   these cases 1) involved jobs that pose a *substantial* risk of harm to others and 2) the Plaintiffs all had

10  actualized health episodes. The Plaintiff in *Hutton* handled dangerous chemicals, had an "erratic medical

11  history" of diabetic episodes, and would have been working "essentially alone" during swing shifts.

12  *Hutton v. Elf Atochem N. Am.*, 273 F.3d 884, 894 (9th Cir. 2001). In *Donahue*, the Plaintiff "had had one

13  heart attack and had twice passed out at work in less than a year. Even after his defibrillator was

14  installed, he passed out suddenly along a stretch of railroad track. The risk of his passing out

15  unexpectedly was sufficiently high that his own cardiologist refused to clear him to work near trains. . ."

16  *Donahue v. CONRAIL*, 224 F.3d 226, 231 (3d Cir. 2000). *McMillen v. Civ. Serv. Com.*, is not a

17  disability discrimination case, nor was the Court applying the threat to self or others defense at all. 6

18  Cal. App. 4th 125, 127 (Cal. Ct. App. 1992). In *In re the Accusation of the Dep't of Fair Employment &*

19  *Housing v. S. Pac. Transp. Co.*, the Plaintiff was a train conductor and had already "suffered four

20  syncope episodes" due to his health condition/medication to treat same. 1980 CAFEHC LEXIS 23, Dec.

21  No. 80-33, 1980 WL 20906, at *4 (Cal. F.E.H.C. 1980)).

22      Not only is Mr. Snookal's future risk *de minimis*, it is "negligible compared to the general

23  population." (DUF 23, PUF 62-81.) This is especially true relative to the tremendous occupational

24  hazards associated with Chevron's gas to liquids oil refinery in Escravos. (PUF 68). Further still, when

25  calculating Mr. Snookal's future risk, they assume that Escravos will have "bad weather," and that a

26  swift medical evacuation cannot occur. However, emergency medical evacuations from Escravos to

27  occur regularly. (DUF 9-10, PUF 68, 85-87.) Dr. Asekomeh testified that at the time of his deposition on

28  October 10, 2024, there had been two *emergency* medical evacuations from Escravos in the past week

alone. (PUF 86.) Dr. Akintunde, who also worked at the Escravos EGTL, estimated that one to two emergency medical evacuations occurred per week on average and with an average speed of one and a half hours. (PUF 87.)

### 7. *Chevron's Decision Did Not "Rely on the Most Current Medical Knowledge and/or on the Best Available Objective Evidence" As Required by Law*

Defendant is correct that the Cal. Code Regs., tit. 2, section 11067(b)-(d) instruct them to consider:

"(1) the duration of the risk;
(2) the nature and severity of the potential harm;
(3) the likelihood that potential harm will occur;
(4) the imminence of the potential harm; and
(5) consideration of relevant information about an employee's past work history."

The application of these factors should be "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." Judicial Council of Cal. Civ. Instructions (2025) – CACI No. 2544. Here, the "duration of the risk" is limited to the time Mr. Snookal would have actually been in Escravos, which halves the already miniscule odds he would suffer a cardiac event while in Escravos. (PUF 51, 66.) Moreover, Mr. Snookal's past employment history, which Chevron did not consider in making its decision, would indicate that he had been working for Chevron without incident for the ten years prior to their decision to rescind the REM position. (PUF 78, 80, 88-89.) Moreover, there is no imminent potential harm, and no potential harm to others. (PUF 62-81).

Ultimately, Chevron's analysis of the likelihood of the potential future harm to Mr. Snookal was inflated by bias and not based upon the "most current medical knowledge and/or on the best available objective evidence" as the law requires. Although Dr. Asekomeh testified to consulting with three local cardiologists regarding Mr. Snookal's risk[12] (Drs. Adeyeye, Aiwuyo, and Akintunde), the opinions they expressed actually indicated unanimous support for Mr. Snookal being "low risk." (DUF 22, PUF 69-71; 125-142.) Unlike Drs. Khan and Marmuraneau, who have significantly more experience and familiarity

---

[12] There are two different kinds of adverse cardiac events at issue here— aortic dissection and aortic rupture. Dissection and rupture have different severity, mortality rates, and treatment. In addition, Chevron also conflates the risk of either cardiac event (dissection or rupture) with the risk of sudden death, but that too is a major logical leap. (DUF 16.)

1    with Mr. Snookal's specific condition, neither cardiologist with whom Chevron consulted had ever

2    actually treated a patient a dissected or rupture dilated aortic root. (DUF 22; PUF 140-141). Dr. Adeyeye

3    had only ever seen *one* patient with Mr. Snookal's specific heart condition in general, and even this was

4    between 2010 and 2012 (PUF 141). Neither Dr. Adeyeye nor Dr. Akintunde had ever spoken to Mr.

5    Snookal, reviewed his employment history, and neither had access to his whole medical history. (PUF

6    78-89). In fact, Dr. Adeyeye testified that before expressing her opinion regarding Mr. Snookal's risk of

7    a serious adverse cardiac event, she did not have a medical summary of Mr. Snookal's history and had

8    access to only one of his echocardiograms and one CT scan. (PUF 79). Drs. Khan and Marmureanu, in

9    contrast, both access to Mr. Snookal's scans over time, which indicated the size of his dilated aortic root

10   is stable and indicated an even lower risk of serious cardiac event.(PUF 63, 80).

11         The cardiologists cited to one study regarding thoracic aneurysms to conclude that Mr. Snookal

12   was "low risk," noting that an even larger sized aortic aneurysm that Mr. Snookal's (up to 4.5 cm) is the

13   "partition value for low-risk situations." (PUF 69-71.) Chevron's consulting doctors were "unable to get

14   any other literature on risk stratification aside from the one he already referenced (Canadian)." (PUF

15   137.) Indeed, even at the time, they admitted in writing that they were unable to find "clear cut field

16   guidelines for patient with aortic aneurysm." (PUF 69-71; 137.) They offered some clinical instructions

17   for Mr. Snookal, including to "avoid lifting heavy objects"; "quit smoking (if he is a smoker); (manage

18   hypertension strictly)"; "watch out for alarm symptoms" and "avoid moderate to high intensity exercises

19   as much as possible;" all of which were things Mr. Snookal was already implementing. (PUF 137-139.)

20   With respect to the REM position, the only recommendation of the cardiologists was: "What is

21   established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore

22   location." (PUF 140.) Parties agree that Mr. Snookal had only an *asymptomatic* aneurysm. (PUF 143.)

23   Nowhere do any of these cardiologists recommend that Mr. Snookal be barred from working in

24   Escravos. (PUF 136-143).

25         Chevron also overrode the initial recommendation of Dr. Sobel, who indicated that Mr. Snookal was

26   "fit for duty with restrictions." (PUF 53.) Dr. Levy also initially recommended that Mr. Snookal could

27   be cleared for duty subject to an annual recertification affirming he had received appropriate screening.

28   (PUF 151). Chevron has also continued to summarily discount the opinion of Mr. Snookal's treating

-43-

1  cardiologist, Dr. Khan[13] even though he specifically addressed the location of the job, writing: "*I*

2  *understand [Mr. Snookal] is applying for a job in rural or remote area of Nigeria* and I understand the

3  concern about his aortic aneurysm." (italicization added). (DUF 19.) Regardless, no one at Chevron

4  bothered to speak with Dr. Khan in real time to collect the best available information, despite Dr. Khan's

5  offer to do so. (PUF 60-61; 91, 102.) Moreover, Dr. Khan wrote Chevron that Mr. Snookal's risk was

6  "*lower than the published 2% number above*" given a variety of factors, including the stability of the

7  size of the dilation and the medications Mr. Snookal takes. (PUF 58). Still, Chevron has insisted that Mr.

8  Snookal's risk is higher than medical and clinical evidence actually indicates, and higher than several of

9  the doctors who reviewed Mr. Snookal's case indicated to them.[14] (PUF 53-98; 104-110; 112; 136-151.)

### 8. *Mr. Snookal's Asymptomatic Heart Condition Did Not Pose Any Imminent Risk to Others, Particularly Because The REM Job is an Office Job*

Chevron now claims *post hoc* that Mr. Snookal also would have somehow posed a threat to

others in his office job and that he could injure others while "operating equipment." To the contrary, the

REM position did not require the operation of any equipment, heavy or otherwise. (DUF 16, 23; PUF

74-79, 81-85.) It was an "office based" desk job, it was not "physically strenuous," and it was not

considered a safety-sensitive position. (Id.) Tellingly, Dr. Asekomeh struggled to articulate any plausible

reason why Mr. Snookal's asymptomatic condition would pose a risk to others admitting "[he] wouldn't

be able to cite a specific example now." (PUF 76.) Dr. Akintunde further admitted that the heart

condition does not pose a physical danger to anyone other than the person who has the condition. (PUF

77).

Regardless, Chevron has admitted that Mr. Snookal's purported threat to others did not at all

inform its decision to rescind the REM job from Mr. Snookal. (PUF 81-84.) The factual record is devoid

of anything indicating that Chevron was concerned about some hypothetical threat to others at the time.

(Id.) To the contrary, Dr. Levy admitted that he did not document any concern about Mr. Snookal posing

a risk to others, and that he "[did not] think it ended up being relevant in this situation." (Id.) Dr.

[13] Chevron asserts above that "the information provided by Dr. Khan . . . only addressed Dr. Khan's assessment of the risk of an occurrence, but not the lack of resources in Escravos to provide treatment in the event of such an occurrence." (DUF 25.)
[14] Chevron continues to insist, incorrectly, that "Plaintiff's cardiologist stated that based on a published medical study, Plaintiff's aortic root had a 2% risk per year of rupture or dissection." (DUF 25.)

Asekomeh similarly testified that they did not complete any functional capacity evaluation for Mr. Snookal because he would be completing an "almost-always office job" which was not a "physically-demanding job[]." (PUF 84.) He also had not seen a job description for the REM position until his deposition in this case. (PUF 78.) Moreover, Dr. Asekomeh admitted that "the bulk of that decision" to rescind the job from Mr. Snookal "was taken on the fact that if he had a medical event, we would not be able to support him in Escravos, irrespective of his job role." (PUF 83.)

**B.**    **Disputes of Material Fact Exist as to Mr. Snookal's Cause of Action for Failure to Accommodate His Disability**

Although the REM position was rescinded on an illegal basis in the first instance, after making this decision, Chevron was required to accommodate Mr. Snookal's disability. They failed to do so. To make a prima facie case for failure to accommodate, the Plaintiff must show "'(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]'" *Hernandez v. Rancho Santiago Cmty. College Dist.*, 22 Cal.App.5th 1187, 1193-1194 (Cal. Ct. App. 2018). As explained herein above, Mr. Snookal has a cardiovascular disability covered by the FEHA, and he was a qualified individual fully capable of performing the essential functions of the REM position. (PUF 51-122).

**1.**    ***Chevron Was on Notice of Mr. Snookal's Need for A Disability Accommodation***

Defendant cites *Price v. Victor Valley Union High School Dist.*, 85 Cal. App. 5th 231, 249 (Cal. Ct. App. 2022) for its erroneous assertion that "[i]f an employee never requested an accommodation, the failure to accommodate claim fails, even if the employer was on notice of the disability." (Defendant's MSJ at p. 19:3-7).[15] However, this is no such affirmative requirement that the Plaintiff explicitly request a disability accommodation. To the contrary, it is an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov. Code §12940(m)(1). **"No element has been**

---

[15] *Price* is also readily distinguishable because the Plaintiff in Price repeatedly, affirmatively "denied having any disability or limitation that needed to be accommodated." *Price v. Victor Valley Union High School Dist.*, 85 Cal.App.5th 231, 247 (2022).

1  included that requires the plaintiff to specifically request reasonable accommodation. Unlike

2  Government Code §12940(n) on the interactive process . . . §12940(m) does not specifically require that

3  the employee request reasonable accommodation; it requires only that the employer know of the

4  disability." See *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 950-951 (Cal. Ct. App. 1997). "

5  '[A]n employer "knows an employee has a disability when the employee tells the employer about his

6  condition, or when the employer otherwise becomes aware of the condition, such as through a third

7  party or by observation. The employer need only know the underlying facts, not the legal significance of

8  those facts." ' " *Soria v. Univision Radio Los Angeles, Inc.* (*Soria*), 5 Cal.App.5th 570, 592 (Cal. App.

9  Ct. 2016) (quoting *Faust v. California Portland Cement Co.* 150 Cal.App.4th 864, 887 (Cal. App. Ct.

10  2007)). "An employee is not required to specifically invoke the protections of FEHA or speak any

11  "'magic words'" in order to effectively request an accommodation under the statute. (Id. citing

12  *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 954 (Cal. App. Ct. 1997)). "[T]he employer

13  cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it

14  establishes through undisputed facts that … the employer did everything in its power to find a

15  reasonable accommodation, but the informal interactive process broke down because the employee

16  failed to engage in discussions in good faith." *Soria*, supra at 598 (internal citation omitted).

17      In this instance, Defendant was on actual notice of Mr. Snookal's disability and his

18  corresponding need for a reasonable accommodation after the REM position was rescinded. (DUF 28,

19  PUF 100-108; 110-112). As Chevron points out, Mr. Snookal disclosed his thoracic aneurysm during the

20  MSEA process,[16] and Defendant rescinded the REM position on this basis. (DUF 28). Though Chevron

21  may now try to claim that its local Human Resources in El Segundo was unaware of the dilated aortic

22  root specifically, on September 4, 2019, Mr. Snookal reported to them in writing that the job had been

23  rescinded because of his medical condition/disability and specifically referred to having a disability and

24  a medical condition. (PUF 105-107.) He also specifically asked: "where does this decision leave me?"

25  now that the REM role had been rescinded, and his previous job had been given to someone else. (Id.)

26

27

28  [16] See also Defendant's MSJ at p. 5:3-4 "[i]n response to an inquiry from Chevron U.S.A. following Plaintiff's self-disclosure of his aortic root. . ."

## 2.    *Chevron Denied Mr. Snookal A Reasonable Accommodation*

Reassignment to a vacant position is one form of a reasonable accommodation. See e.g., *Swanson v. Morongo Unified School Dist.*, 232 Cal.App.4th 954, 968 (Cal. Ct. App. 2014). "'If the employee cannot be accommodated in his or her existing position and the requested accommodation is reassignment, an *employer must make affirmative efforts to determine whether a position is available* . . . 'What is required is the 'duty to reassign a disabled employee if an already funded, vacant position at the same level[17] exists.'" *Furtado v. State Personnel Bd.*, 212 Cal.App.4th 729, 745 (Cal. Ct. App. 2013). (internal citations omitted, italicization added). "The rule has been that the employer has an affirmative duty to make known to the employee other suitable job opportunities and to determine whether the employee is interested in, and qualified for, those positions, if the employer can do so without undue hardship or if the employer offers similar assistance or benefit to any other employees or has a policy of offering such assistance or benefit to any other employees." *Prilliman,* supra, at 950-951 (Cal. Ct. App. 1997); see also *Furtado*, supra, at 729, 745 (Cal. Ct. App. 2013); *Claudio v. Regents of the University of California*, 134 Cal.App.4th 224, 243 (Cal. Ct. App. 2005); *Hanson v. Lucky Stores*, 74 Cal.App.4th 215, 226 (Cal. Ct. App. 1999). Notably, "[t]he employee with a disability is entitled to preferential consideration of reassignment to a vacant position over other applicants and existing employees." Cal. Code Regs. 2 §11068(d)(5); see also *Swanson*, supra at 970 (Cal. Ct. App. 2014).

In the instant case, Defendant required Mr. Snookal to search for and identify vacant positions in which he was interested and for which qualified, rather than fulfilling their affirmative duty[18] to search for and make available those opportunities. (PUF 113-121.) Defendant also concedes they required Mr. Snookal to apply and compete in the general applicant pool for these four positions, despite his "entitle[ment] to preferential consideration of reassignment to a vacant position." Cal. Code Regs. 2 §11068(d)(5). (DUF 35-37). Ultimately, Chevron selected other candidates over Mr. Snookal for all four

---

[17] Since Mr. Snookal was a successful applicant for the REM position, and the FEHA requires accommodation for successful "applicants" with disabilities, the REM position is the relevant, comparator position. Cal. Gov. Code §12940(m)(1).

[18] Chevron now claims that the positions Mr. Snookal identified were not ones he was qualified for or would constitute promotions. While Mr. Snookal disputes this, it is also a nonstarter because he should not have been forced to do this in the first place.

1    of those positions. (PUF 113-118.) Further, per Cal. Code Regs. Tit. 2, § 11068(d) (3): "reassignment to

2    a temporary position is not considered a reasonable accommodation under these regulations, an

3    employer or other covered entity may offer, and an employee may choose to accept or reject, a

4    temporary assignment during the interactive process." Nonetheless, the position they created for him

5    was temporary. (PUF 118-119).

6         Further still, the temporary position which Chevron eventually created for Mr. Snookal

7    afterwards was a demotion in terms of responsibilities (both with respect to the REM position and Mr.

8    Snookal's prior IEAR position) and in pay (with respect to the REM position). (PUF 118-119, 50-52.)

9    Offering an individual a "lower graded or lower paid position" is only allowable when "there are no

10   funded, vacant comparable positions for which the individual is qualified with or without reasonable

11   accommodation. . . " Cal. Code Regs. 2 §11068(d)(2). Here, Chevron carries the burden to "demonstrate

12   [that], after engaging in the interactive process, that the accommodation would impose an undue

13   hardship." Id.

14        Last, Chevron argues that because "Plaintiff was unable to perform the essential duties of the

15   REM position, his failure to accommodate claim fails." (Defendant's MJS at 19:13-14). Though that is

16   vigorously factually disputed, as explained above, that is also not the legal standard. "To prevail on

17   summary adjudication of the section 12940(a) claim, [defendant] must show there is no triable issue of

18   fact about [plaintiff]'s ability, with or without accommodation, *to perform the essential functions of an*

19   *available vacant position that would not be a promotion*." *Nadaf-Rahrov v. The Neiman Marcus Group,*

20   *Inc.*,166 Cal.App.4th 952, 965 (Cal. Ct. App. 2008) (original italics, internal citations omitted.) Chevron

21   cannot meet that burden.

22        D.   <u>Disputes of Material Fact Exist as to Mr. Snookal's Claim for Wrongful Termination</u>

23        Defendants rely solely upon two August 4, 2021, pieces of paperwork Mr. Snookal submitted to

24   Chevron to support its insistence that Mr. Snookal "left his employment simply because he felt his

25   career with Chevron wasn't progressing as he would like" and to pursue "another position with

26   'significantly increased responsibility.'" (DUF 42-43.) Mr. Snookal's resignation email is three

27   sentences long. (Id.) Moreover, the resignation form which says Mr. Snookal was leaving for a job with

28

-48-

"significantly increased responsibility" is a one-page document containing a single sentence. (Id.) This limited evidence is devoid of context concerning Chevron's treatment of Mr. Snookal and the underlying discrimination that led to his wrongful constructive discharge. (PUF 49-152.) During his deposition, Mr. Snookal testified to expressing to multiple people, including Greg Curtin and Austin Ruppert, his former supervisors, that he felt he had been treated unfairly by Chevron and that he felt he had no choice but to quit. (PUF 144.) He further testified to discussing discrimination specifically with Mr. Ruppert. (PUF 145.) Further still, Mr. Snookal testified to a logical explanation for why he did not state in his exit paperwork that he was faced with no choice but to leave: "The typical resignation letter doesn't say anything bad about a company that you're leaving, and I saw no benefit to writing it down . . ." and 'There's no point in putting it on this form which is just going to get stuck in my file. They probably didn't even read it." (PUF 146.)

Mr. Snookal did not resign merely because his career "was not progressing as he wanted." (PUF 49-152.) To the contrary, Chevron's arbitrary discrimination against him resulted in a demotion and systemic career stagnation even after his efforts to move forward. (Id.) In turn, Mr. Snookal began suffering debilitating symptoms of depression, and it created financial challenges that made it difficult for Mr. Snookal to support his family's needs, including his son's special education services. (PUF 97-123-128; 144-148.) Mr. Snookal was thus forced to relocate out of state to help him start anew and attempt to better meet his family's needs. (Id.)

### E.  Disputes of Material Fact Exists as to Mr. Snookal's Entitlement to Punitive Damages

Chevron significantly overstates Mr. Snookal's burden for opposing its motion for summary judgment as to punitive damages. As with every other type of claim on which Chevron seeks summary judgment, the moving party bears the burden to show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. FRCP Rule 56(a). Although punitive damages indeed have a "clear and convincing" evidentiary standard, this "does not impose on a plaintiff the obligation to 'prove' a case for punitive damages at summary judgment." *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1049 (Cal. Ct. App. 2002) citing *Cf. Rowe v. Superior Court*, 15 Cal.App.4th 1711, 1734–1735 (Cal. Ct. App. 1993).

1   Moreover, Defendant cites to *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1521 (9th Cir. 1988) in

2 support of its proposition that "[a] finding of even unlawful discrimination or retaliation in personnel

3 decisions would not itself justify punitive damages as such conduct is not the equivalent of malice or

4 oppression." However, when accompanied by a finding of malice (i.e. an "intentional injury") or

5 oppression ("despicable conduct that subjects a person to cruel and unjust hardship in conscious

6 disregard of that person's rights"), punitive damages are indeed an appropriate remedy for employment

7 discrimination. See e.g. *Roby v. McKesson Corp.,* 47 Cal. 4th 686, 712 (Cal. S.Ct. 2009), as modified

8 (Feb. 10, 2010); *Contreras-Velazquez v. Fam. Health Centers of San Diego*, Inc., 62 Cal. App. 5th 88,

9 106 (Cal. Ct. App. 2021), as modified on denial of reh'g (Apr. 7, 2021).

10   Here, Chevron intentionally ignored every indication of Mr. Snookal's miniscule risk,

11 disregarded the recommendations of multiple doctors, including Mr. Snookal's own treating

12 cardiologist, the doctor it contracted to evaluate Mr. Snookal, the local cardiologists with whom they

13 consulted who deemed Mr. Snookal "low risk" in conscious disregard for Mr. Snookal's rights to be free

14 of disability discrimination. (PUF 49-152.) Chevron U.S.A.'s managing agent, Dr. Frangos weighed in

15 on this key discriminatory decision. (DUF 6, 20, 24, 26, 29, 33, 47; PUF 94-112); This decision is even

16 more intentional and malicious when compared to the fact that Chevron's oil refinery operations in

17 Escravos, Nigeria are inherently dangerous for all of its employees, who "regularly" must be

18 medevacked from the location. (PUF 68.) Thereafter, Mr. Snookal reported this discriminatory decision

19 in writing, and the discriminatory decision was again ratified by Chevron's managing agents, including

20 Dr. Levy. (DUF 46-48; PUF 105-112, 130.) Andrew Powers, also Chevron U.S.A.'s managing agent

21 made no real effort to investigate Mr. Snookal's discrimination. (DUF 48; PUF 105-112.)

22

23

24

25

26

27

28

SMRH:4904-3023-3647.1

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Mr. Snookal respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety.

Dated: March 27, 2025                 ALLRED, MAROKO & GOLDBERG


By _____
                              DOLORES Y. LEAL
                              OLIVIA FLECHSIG
                              Attorneys for Plaintiff
                              MARK SNOOKAL

**DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I.    **OVERVIEW**

The question before this Court is whether an employer, in determining that an employee with a known heart condition **has to be** medically cleared to work in one of the most remote locations in Africa due to the unpredictable risk to the health and safety of that employee or others, violated the FEHA in relying on the reasonable judgment of medical doctors with specific expertise and knowledge of the conditions at the work site. The facts in this case are undisputed. The parties agree the risk was small – somewhere in the 1-2% range – but nonetheless real, that the consequence if that risk were to occur was death. The FEHA does not require an employer to assume the risk of harm or death to the employee, or others, against the reasonable judgment and recommendation of experienced medical doctors who work in the specific region and environment who weighed the risk and came to a reasoned medical conclusion that even a low risk was too much given the enormous downside: death. That is precisely what the FEHA authorizes and allows. Accordingly, summary judgment should be granted.

II.    **INTRODUCTION**

Plaintiff fails to present facts that create a genuine issue of material fact in response to any of the Undisputed Facts identified by Chevron U.S.A. in support of its Motion for Summary Judgment. Plaintiff purports to add approximately 104 additional facts which he claims are material to the claims. However, the vast majority are immaterial and all are insufficient to dispute that Plaintiff's medical condition posed a direct threat to the health or safety of himself and others in Escravos, on which basis Plaintiff's REM offer was lawfully withdrawn. Chevron U.S.A. does not dispute that the risk of an adverse incident occurring was low, but Plaintiff cannot dispute that it was real and carried the potential for severe consequences which support Chevron U.S.A.'s direct threat defense.

Plaintiff also fails to present facts that create a genuine issue of material fact about Chevron U.S.A.'s duty to accommodate. Nor can he, because Plaintiff admitted at deposition that he never needed accommodations nor requested them (a fact Plaintiff fails to address in his opposition). (See Pl. Dep. Tr. 95:10-13.) Chevron U.S.A. had no duty to accommodate because Plaintiff did not need accommodation. The search for a new position after the REM offer was lawfully withdrawn was not about "accommodating" Plaintiff's alleged disability, it was about ameliorating the fact his old job had

1   already been reassigned – they are two different things. Despite the fact Chevron U.S.A. had no duty to

2   accommodate, it nevertheless ensured Plaintiff was guaranteed a position in El Segundo while he

3   explored other roles he was interested in and qualified for. When Plaintiff was unable to obtain the

4   positions he wanted, Chevron U.S.A. created a position for him – which paid the exact same as the

5   position he was previously in – so he could remain employed.

6        Despite Plaintiff's allegation that the allegedly discriminatory act of rescinding his REM offer

7   created an intolerable working environment, Plaintiff continued to work for Chevron U.S.A. for almost

8   two years after the offer was rescinded and performed satisfactorily. Plaintiff's claim of constructive

9   discharge fails because he presented no evidence that his *working conditions* (not his feelings of being

10  mistreated) were so intolerable that he had no choice but to quit. CACI 2510 ("In order to be sufficiently

11  intolerable, adverse working conditions must be unusually aggravated or amount to a continuous pattern.

12  In general, single, trivial, or isolated acts of misconduct are insufficient to support a constructive

13  discharge claim.") Finally, because there is absolutely no evidence of malice on the part of the Nigerian

14  doctors when they determined Plaintiff was not fit for duty in Escravos, no Chevron U.S.A. employee

15  made any final determination regarding Plaintiff's fitness for duty in Escravos, and Plaintiff failed to

16  present facts supporting a genuine dispute of material fact that any of the actors involved were officers,

17  directors, or managing agents of Chevron U.S.A., Plaintiff's claim for punitive damages fails.

18  **III.    CHEVRON U.S.A. IS NOT LIABLE FOR DISABILITY DISCRIMINATION**

19          **A.    Rescission of the REM Position Was Not Disability Discrimination, Because a
20                  Group of Doctors Reasonably Determined That Plaintiff's Aortic Aneurysm Posed a
                    Direct Threat to His Own Health and Safety and That of Others.**

21          By statute, an employer may lawfully withdraw an employment offer based on the results of a

22  medical examination if hiring the employee would endanger their own health or safety or that of others,

23  with or without a reasonable accommodation. Cal. Code Regs., tit. 2, § 11071(c). "Nothing in this part

24  shall subject an employer to any legal liability resulting from the refusal to employ . . . an employee

25  who, because of the employee's medical condition, . . . cannot perform [essential duties] in a manner

26  that would not endanger the employee's health or safety or the health or safety of others even with

27  reasonable accommodations." Cal. Gov't Code § 12940(a)(2).

28          There is no dispute that Escravos is one of the most remote work environments in the world.

-53-

Plaintiff, as well as all of his health care providers and experts, have never been to Escravos and therefore each of them lack knowledge regarding the lack of access to medical care in Escravos for a serious cardiac event, such as an aortic rupture. Dr. Asekomeh, who works in Escravos and has personal knowledge, attested that Escravos is an exceedingly remote location, with limited access to medical resources or timely medical evacuations. (DUF 23.) The only way in or out of Escravos is by helicopter or boat. (DUF 9.) There are only two small medical clinics in Escravos, and they are only equipped to handle minor procedures, such as minor sutures for lacerations and handling minor illnesses. (DUF 10.) Any serious medical conditions must be evacuated for treatment in Lagos or Warri. (*Id*.) Due to limited access to helicopters and the significant risk of inclement weather in Escravos depending on the time of year, reliable and timely medical evacuations are often unavailable and may take more than four hours and up to 10-12 hours. (DUF 9.) Moreover, a serious cardiac event requiring surgery would require the closest cardiothoracic surgeon to travel from the country of Benin to Lagos or Warri to perform the surgery, or the patient to be transported, 100 kilometers for treatment. (DUF 10.) Although Plaintiff could have been cleared for assignment in Lagos, the essential duties of the REM position required on-site supervision and interaction with personnel and equipment in Escravos. (DUF 27.)

Based on these facts, and based on his consultation with at least two cardiologists in Nigeria about the risk of Plaintiff experiencing an aortic event, which all the doctors in this case agree was more than zero, Dr. Asekomeh understood that if Plaintiff experienced such an event in Escravos, it would more than likely result in his death. (DUF 16.) Although the REM position was a "desk job," as Plaintiff characterizes it, in that role, he would still be required to go into the field with his team on occasion. (DUF 27.) Due to this, Dr. Asekomeh also considered that the occurrence of an aortic event could potentially result in injury to others, which would be similarly exacerbated due to the lack of access to medical care in Escravos. (*Id*.) With his medical condition, Plaintiff could not perform the essential duties of the REM position without endangering his own or others' health or safety, and the REM position was lawfully rescinded on that basis. See *Hegwer v. Board of Civil Service Comm'rs*, 5 Cal. App. 4th 1011 (Cal. App. Ct. 1992) (finding no discrimination where an employee, who worked in a position "prone to job-related injury," was found to be at higher risk of heart problems due to being overweight and deemed unable to safely perform the job without endangering herself or others). None of

-54-

1    Plaintiff's experts have the requisite experience or background for this particular job, in this particular

2    location, which is the primary reason why the health and safety risk is a defense in this particular case.

3    **B.    This Court Cannot Second Guess a Reasoned Medical Decision By Qualified Health Care Professionals in Nigeria about the Health and Safety Risks in Escravos.**

4    In this particular circumstance, with these very specific facts, a court cannot determine, in light

5    of undisputed qualified medical opinions, that an employer must place an employee in a location that

6    endangers that employee's life. There is no evidence presented by Plaintiff that any of the doctors

7    involved in the MSEA determination are not qualified to make their medical determinations. There is no

8    dispute that the decision to rescind Plaintiff's job offer in 2019 was made by Dr. Asekomeh, a medical

9    doctor in Nigeria (who does not know Plaintiff) after making a reasonable medical judgment about

10    Plaintiff's fitness for duty after consultation with several other doctors, many of whom were also in

11    Nigeria. (DUF 20-23.) There is no dispute that Dr. Asekomeh did not make this decision alone, and

12    consulted other medical professionals before making his recommendation. (*Id.*) Plaintiff presents

13    evidence that other doctors – all of whom are located in California –"would have reached a different

14    conclusion."  Further, none of those doctors have any knowledge of the conditions in Escravos and the

15    risks that location presents to Plaintiff. And even if they did, it would not render Dr. Asekomeh's

16    medical conclusion invalid. Medical professionals can disagree and a "medical" disagreement does not

17    equate to disability discrimination in violation of California law.

18    **C.    Based on Medical Opinions by Doctors With the Best Information of the Risks in Escravos Determined That Plaintiff Was Not Qualified for the Expatriate Assignment, Because the Location of the REM Position Was an Essential Function of the Position**

19

20    Under the FEHA, "drawing distinctions on the basis of physical or mental disability is not

21    forbidden discrimination in itself. Rather, drawing these distinctions is prohibited only if the adverse

22    employment action occurs because of a disability and the disability would not prevent the employee

23    from performing the essential duties of the job." *Green v. State*, 42 Cal. 4th 254, 123 (2007) (*citing* Cal.

24    Gov. Code, § 12940). The FEHA defines "essential functions" of a position as the "fundamental job

25    duties of the employment position the individual with a disability holds or desires." Cal. Gov. Code §

26    12926(f); *Dark v. Curry County*, 451 F.3d 1078, 1087 (9th Cir. 2006) (*citing* 29 C.F.R. § 1630.2(n)(1)).

27    A function may be considered essential if the reason the position exists is to perform that function. *Id.* at

28    subd. (f)(1)(A). It is undisputable that the essential duties of the REM function had to be performed on-

1  site in Escravos, because the position required on-site supervision and interaction with personnel and

2  equipment. (DUF 27.) Even if Plaintiff could supervise and/or interact with personnel and equipment

3  with or without his heart condition, Plaintiff was unable to do so safely in Escravos.

4      **D.    Chevron U.S.A. Was Not the Employer of the REM Position, Nor Did It Make the Decision to Rescind the Offer for the REM Position.**

5      It is a fundamental concept that the FEHA only prohibits an "employer" from engaging in

6  unlawful discrimination. *Vernon v. State of Cal.*, 116 Cal. App. 4th 114, 123 (Cal. Ct. App. 2004) (*citing*

7  Cal. Gov. Code § 12940(a); *Reno v. Baird*, 18 Cal. 4th 640, 644 (Cal. 1998)). In other words, liability

8  only exists if a defendant actually <u>committed</u> the act of discrimination against an alleged victim with

9  whom it had an employment relationship. *Vernon*, 116 Cal. App. 4th at 123 (*citing Hill v. New York City*

10  *Bd. Of Educ.*, 808 F. Supp. 141, 146 (E.D.N.Y. 1992). A large number of factors are considered in

11  assessing whether the parties have an employment relationship, not only including the payment of salary

12  and employment benefits, but also "the authority of the defendant to hire, transfer, promote, discipline or

13  discharge the employee." *Vernon*, 116 Cal. App. 4th at 125 (*citing* authorities).

14      The payment of salary and employment benefits by itself is insufficient to establish liability of a

15  defendant for an alleged discriminatory act. "The FEHA standard of an employer requires a

16  comprehensive and immediate level of <u>day-to-day</u> authority over matters such as hiring, firing, direction,

17  supervision, and discipline of the employee." *Taylor v. Financial Casualty & Surety, Inc.*, 67 Cal. App.

18  5th 966, 1006 (Cal. Ct. App. 2021) (*quoting Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474 (Cal.

19  2014)) (internal quotes omitted) (emphasis added). "In the case of an institutional or corporate employer,

20  the institution or corporation itself must have taken some official action with respect to the employee,

21  such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or

22  benefits, or official disciplinary action." *Pollock v. Tri-Modal Distribution Services, Inc.*, 11 Cal. 5th

23  918, 931-32 (Cal. 2021) (*quoting Roby v. McKesson Corp.*, 47 Cal. 4th 686, 706 (Cal. 2009). The

24  definition of an employer under FEHA "was intended to ensure that employers will be held liable if their

25  supervisory employees take actions later found discriminatory." *Taylor*, 67 Cal. App. 5th at 1006

26  (*quoting Ortiz v. Dameron Hospital Assn.*, 37 Cal. App. 5th 568, 580-81 (2019) (internal quotations

27  omitted).)

28      Plaintiff's argument that Chevron U.S.A. was the employer of the REM position is solely based

-56-

1  on the fact that Chevron U.S.A. provided payroll services for employees who assumed that expatriate

2  position assignment. The alleged discriminatory act at issue here is the rescission of the offer to Plaintiff

3  for the REM position—Plaintiff does not allege that any other decision was based on discrimination

4  because of his heart condition. (DUF 30.) It is undisputable that no Chevron U.S.A. employee had any

5  final say in whether Plaintiff was awarded the REM position in Escravos. (DUF 29.) Dr. Asekomeh,

6  who has never been employed by Chevron U.S.A. at any time (DUF 21), made the determination that

7  Plaintiff was not fit for duty in Escravos (DUF 20).

8       It is likewise indisputable that no Chevron U.S.A. employee, including Drs. Levy and Frangos,

9  could override the decision of the embedded medical team. (DUF 29; *see also* DUF 6 [the embedded

10  medical team at the host location makes the final determination as to medical fitness for duty].) Even if

11  Drs. Levy and Frangos participated in reviewing Plaintiff's MSEA determination after Plaintiff made the

12  request and discussed the decision with the embedded medical team in Nigeria (*see*, *e.g.,* DUF 24, 26), it

13  remains undisputed that the final determination remained with the embedded medical team—Dr.

14  Asekomeh maintained his determination that Plaintiff could not be cleared for duty in Escravos (DUF

15  26). Aside from inadmissible hearsay and baseless conjecture, Plaintiff cannot produce any evidence

16  creating a genuine dispute of fact as to whether Chevron U.S.A. actually made the decision to rescind

17  the offer for the REM position.

18       Although Plaintiff appears to argue that Dr. Asekomeh was acting as an agent of Chevron

19  U.S.A., Plaintiff failed to produce any evidence whatsoever in support of his arbitrary conclusion of law.

20  Plaintiff did not—indeed, cannot—dispute that Dr. Asekomeh has never been an employee of Chevron

21  U.S.A. (DUF 21.) Plaintiff attempts to conflate ambiguous references to "Chevron" with Chevron

22  U.S.A., or otherwise attempts to suggest without foundation or context that Chevron U.S.A. and

23  Chevron Nigeria are the same entity. (See, e.g., PUF 132 [lacks foundation that the Chevron Hospital <u>in</u>

24  <u>Warri, Nigeria</u> is affiliated with Chevron U.S.A.], PUF 133 [lacks foundation that Chevron U.S.A. was

25  the Chevron entity which contracted with Dr. Asekomeh's employer <u>in Nigeria</u>], PUF 134 [lacks

26  foundation that Chevron U.S.A. was the Chevron entity which Dr. Asekomeh's employer <u>in Nigeria</u>

27  contracted with to provide medical services].) In other words, Plaintiff has not and cannot produce

28  evidence sufficient to create a triable issue of fact that Dr. Asekomeh performed any work whatsoever

-57-

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  for or on behalf of Chevron U.S.A.

2      **E.**    **Chevron U.S.A. Did Not Ratify the Recission Decision By Chevron Nigeria.**

3      "Ratification is a principle of agency law." *Thomas v. Regents of University of California*, 97

4  Cal. App. 5th 587, 618-19 (Cal. Ct. App. 2023) (*citing* Cal. Civ. Code § 2307; *citing* authorities). By

5  definition, the ratification theory of liability in the employment context only applies when an employer

6  ratifies the acts of its <u>agents</u>, i.e., its employees. *See C.R. v. Tenet Healthcare Corp.*, 169 Cal. App. 4th

7  1094, 1110-11 (Cal. Ct. App. 2009) (*quoting Baptist v. Robinson*, 143 Cal. App. 4th 151, 169-70 (Cal.

8  Ct. App. 2006); *Rakestraw v. Rodrigues*, 8 Cal. 3d 67, 73 (Cal. 1972).

9      As discussed Plaintiff has not produced any evidence showing Dr. Asekomeh was an agent of

10  Chevron U.S.A. Additionally, Plaintiff's assertion that Dr. Levy rendered a "second opinion" on

11  Plaintiff's medical condition after Dr. Asekomeh's determination is simply Plaintiff's deliberate

12  mischaracterization of the facts—Dr. Levy made clear his role was merely to act as an intermediary

13  between Dr. Khan and the Nigerian team and to help the Nigerian team evaluate the risks. (PUF 112.) It

14  is undisputed that no Chevron U.S.A. employee, including Drs. Levy and Frangos, made Plaintiff's

15  MSEA determination. (DUF 29.) Plaintiff's reliance on *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th

16  Cir. 1981) is inapposite. There, the employer contended that being male was a bona fide occupational

17  qualification, claiming its South American clients would "refuse to deal" with a female employee. *Id.* at

18  1276. The *Fernandez* court rejected that argument, finding that the discriminatory policies of other

19  nations cannot form the basis of a bona fide occupational qualification exception. *Id.* at 1277 (*citing*

20  EEOC Decision No. 72-0697, CCH EEOC Decisions 1971, P 6317, at 4569.) Here, Chevron U.S.A. did

21  not make any decision with respect to Plaintiff's MSEA determination at all. (DUF 6, 21, 29).

22  **IV.**    **PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM FAILS.**

23      **A.**    **Plaintiff Did Not Need any Accommodation For His Heart Condition.**

24      Chevron U.S.A. had no duty to accommodate Plaintiff because Plaintiff admits he did not need

25  any accommodation, and his failure to accommodate claim therefore fails. Plaintiff testified

26  unequivocally during deposition that his heart condition did not impact his day-to-day ability to work,

27  nor did he need any sort of accommodation during his employment with Chevron U.S.A. (DUF 13.)

28  Indeed, Plaintiff's Opposition is largely comprised of arguments attempting to convince this Court that

    

1    his heart condition was not of any concern and would not have led to his own death or harm in Escravos,

2    or that of others. However, Plaintiff's Opposition also now attempts to claim, in contravention of

3    Plaintiff's sworn admission at deposition, that his heart condition did require accommodation by

4    Chevron U.S.A. (*See, e.g.*, Plaintiff's citation to Snookal Decl. ¶ 23.) Plaintiff's citation to a self-serving

5    declaration cannot supersede his admission in deposition testimony to create a genuine dispute of fact.

6    *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (*citing* authority) ("a party cannot

7    create an issue of fact by an affidavit contradicting his prior deposition testimony").

8    **B.    Even Assuming Plaintiff Did Require an Accommodation, the Need for Accommodation Only Arises in Escravos, Not in Los Angeles.**

9    Even taking as true Plaintiff's contradictory assertion that he actually did need an

10   accommodation for his heart condition, it is undisputed that Plaintiff was only deemed not fit for duty in

11   a highly remote location like Escravos, which under the MSEA classification system was rated "D,"

12   reflecting the lowest level of available medical care. (DUF 8, 20.) In an isolated location like Escravos,

13   which had limited access to internal health support and which was not even set up to allow blood

14   transfusions, much less acute surgical care, a rupture or dissection of Plaintiff's heart condition would

15   likely result in his death, or in the serious impairment or death of others. (DUF 15, 20.) However,

16   Plaintiff was cleared for assignment in Lagos, which was rated "C" under the MSEA classification

17   system and had more readily available access to medical support in the event of a cardiac event. (DUF 8,

18   20.) In other words, any accommodation Plaintiff purportedly required for his condition was limited to

19   the access to medical care available at the <u>location</u> of his job position. There is no question that Plaintiff

20   would have been able to perform any job position in Los Angeles, California without an

21   accommodation, as he testified he was able to do. (DUF 13.)

22   **C.    Even If Chevron U.S.A. Was Aware of Plaintiff's Heart Condition After the REM Offer was Rescinded, Plaintiff Admitted Did Not Need An Accommodation.**

23   Even assuming for the purposes of this motion that Chevron U.S.A. was aware of Plaintiff's

24   heart condition when Dr. Levy reviewed Plaintiff's appeal of his MSEA determination (*see* DUF 24),

25   such knowledge is insufficient to create a duty to accommodate. *Price v. Victor Valley Union High*

26   *School Dist.*, 85 Cal. App. 5th 231 (Cal. Ct. App. 2022), is nearly on all fours with this case. There, the

27   *Price* employee had lingering symptoms from a stroke, such as difficulty grasping and holding items,

28   which the *Price* court found was not an open and obvious disability. *Id.* at 246. The *Price* employee

1  never told her employer that she had a disability, that she needed an accommodation for one, and did not

2  tell her employer that she had physical limitations. *Id.* Instead, the *Price* employee maintained that she

3  did not have any disability or limitation that needed to be accommodated. *Id.* at 247. The *Price* court

4  found that where the disability is not obvious, <u>even when the employer is purportedly on notice of the</u>

5  <u>alleged disability</u>, an employee's failure to accommodate claim fails if the employee fails to request an

6  accommodation. *Id.* at 249.

7      As a threshold matter, Plaintiff acknowledged that his heart condition did not impact his ability

8  to work and that he never needed an accommodation from Chevron U.S.A. during his employment.

9  (DUF 13.) Plaintiff continued to assert, even after the offer for the REM position was rescinded, that he

10  "does not require ongoing care outside of annual monitoring" and that he has "no work restrictions from

11  [his] physician." (*See, e.g.,* Snookal Decl. ¶ 18, Ex. 6.) Plaintiff cannot dispute that he did not require an

12  accommodation to continue working at the El Segundo Refinery. There has never been any indication by

13  Plaintiff, or from anybody else or any other source, that Plaintiff would be unable to work in Los

14  Angeles County without an accommodation, such that Chevron U.S.A. would be put on notice that an

15  accommodation is required. Accordingly, Chevron U.S.A. had no duty to accommodate Plaintiff's heart

16  condition, and Plaintiff's claim fails.

17      **D.    Despite Having No Duty to Accommodate, Chevron U.S.A. Ensured that Plaintiff's
         Employment Continued.**

18      Chevron U.S.A. did not have any obligation to accommodate Plaintiff, but nevertheless went

19  above and beyond to ensure that Plaintiff's employment with Chevron U.S.A. would continue. It is well-

20  settled that an employer is not required to create a new position or provide a promotion as an

21  accommodation. *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 377 (2015) (*citing Cuiellette v.*

22  *City of Los Angeles*, 194 Cal. App. 4th 757, 767; Cal. Code Regs., tit. 2, § 11068, subd. (d)(4); *Spitzer v.*

23  *The Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1389 (2000).) An employer has no obligation to provide an

24  employee's preferred accommodation, so long as the accommodation chosen is reasonable.

25      No employee of Chevron U.S.A. had any final say in whether Plaintiff was awarded the REM

26  position in Escravos. (DUF 29.) The last position Plaintiff held before applying for the REM position in

27  Escravos is the IEAR Team Lead position. (DUF 2.) Plaintiff does not dispute that, even though his

28  prior position as the IEAR Team Lead had been backfilled, Chevron U.S.A. ensured that Plaintiff would

1    continue to have a position at the El Segundo Refinery (DUF 34) and that Chevron U.S.A. worked with

2    Plaintiff to find alternative job positions that he was qualified for, including by suggesting available

3    positions and inviting Plaintiff to look for positions he was interested in as well (DUF 35). Furthermore,

4    it is undisputed that Chevron U.S.A. created the Reliability Change Operating Assistant role for Plaintiff

5    which, like the El Segundo Operating Assistant role which Plaintiff applied for, did not have direct

6    reports and paid the same as the IEAR Team Lead position. (DUF 40.) Additionally, Plaintiff does not

7    dispute that after the Reliability Change Operating Assistant role was eliminated in layoffs in or around

8    2020, and he was offered his original position as the IEAR Team Lead, even though he had not applied.

9    (DUF 41.) Thus, Plaintiff's failure to accommodate claim fails. *See Price v. Victor Valley Union High*

10   *School Dist.*, 85 Cal. App. 5th 231, 249 (2022) (*citing Moore v. Regents of Univ. of California*, 248 Cal.

11   App. 4th 216, 242 (2016)). Plaintiff's argument that he was excused from requesting an accommodation

12   because Chevron U.S.A. had notice of his heart condition was directly rejected by the *Price* court. As a

13   matter of law, Plaintiff's failure to accommodate claim fails.

14   **V.    PLAINTIFF CANNOT SHOW UNDER AN OBJECTIVE STANDARD THAT HIS**
         **WORKING CONDITIONS WERE SO INTOLERABLE AND AGGRAVATED THAT**
15       **HE WAS COMPELLED TO RESIGN**

16          Plaintiff argues that he was constructively terminated based on the following: "Mr. Snookal did

17   not resign merely because his career "was not progressing as he wanted." (PUF 49-152.) To the

18   contrary, Chevron's arbitrary discrimination against him resulted in a demotion and systemic career

19   stagnation even after his efforts to move forward. (*Id*.) In turn, Mr. Snookal began suffering debilitating

20   symptoms of depression, and it created financial challenges that made it difficult for Mr. Snookal to

21   support his family's needs, including his son's special education services. (PUF 97-123-128; 144-148.)

22   Mr. Snookal was thus forced to relocate out of state to help him start anew and attempt to better meet his

23   family's needs. (Id.)" [Opposition at p. 49] Although Chevron disputes this, assuming this is true for the

24   purpose of this motion, under the objective standard of a constructive termination claim, this is

25   insufficient. C.A.C.I. 2510 requires facts that it was more likely true than not true that Chevron U.S.A.

26   "intentionally created or knowingly permitted working conditions to exist that were so intolerable that a

27   reasonable person in [Plaintiff's] position would have no reasonable alternative except to resign . . . In

28   order to be sufficiently intolerable, **adverse working** conditions must be unusually aggravated or

-61-

1   amount to a continuous pattern." [emphasis added] Feeling like your career is stagnated is not an

2   adverse working condition, nor are personal financial challenges, adverse working conditions.

3   **VI.    PLAINTIFF CANNOT DISPUTE THAT NO OFFICER, DIRECTOR, OR MANAGING AGENT OF CHEVRON U.S.A. ENGAGED IN FRAUD, OPPRESSION, OR MALICE.**

4          This court should grant partial summary judgment as to Plaintiff's claim for punitive damages,

5   because there is no evidence, much less clear and convincing evidence of fraud, oppression or malice as

6   required under California Civil Code section 3294. Plaintiff argues that partial summary judgment

7   should not be granted because Chevron U.S.A. purportedly "ignored . . . Mr. Snookal's miniscule risk"

8   and then argues, without any evidence, that the various doctors and Andrew Powers (human resources)

9   are all "managing agents." (Opp. at p. 50.) C.A.C.I. 3946 requires clear and convincing evidence of

10   malice, fraud or oppression, which means "intent to cause injury" or that Chevron U.S.A.'s conduct

11   "was despicable and was done with a willful and knowing disregard of the rights or safety of another. A

12   person acts with knowing disregard when he or she is aware of the probable dangerous consequences of

13   his or her conduct and deliberately fails to avoid those consequences." *Id*. There is no such evidence

14   here. Further, there is no such evidence of "oppression," which means conduct was despicable and

15   subjected Plaintiff to cruel and unjust hardship in knowing disregard of his rights. For a claim for

16   punitive damages to get to the jury, that is to overcome partial summary judgment, there needs to be

17   evidence of "despicable conduct," which is conduct so vile, base, or contemptible that it would be

18   looked down on and despised by reasonable people. *Id*. Here, even assuming Plaintiff's recitation of the

19   "facts" is true, there is no such evidence of such conduct. And, finally there is no evidence of "fraud,"

20   which is defined as conduct whereby Chevron U.S.A. intentionally misrepresented or concealed a

21   material fact and did so intending to harm Plaintiff. *Id*. As explained above, it is undisputed that at most

22   here, the medical doctors involved in Plaintiff's MSEA determination have a different medical opinion

23   as to Plaintiff's fitness for duty in Escravos, than Plaintiff and his California doctors. When there is such

24   a disagreement by several and various medical professionals, there is an absence of fraud, oppression or

25   malice. Partial summary judgment should be granted as to punitive damages.

26   **VII.    <u>CONCLUSION</u>**

27          For the foregoing reasons, Chevron U.S.A. respectfully requests that the Court grant its motion

28   for summary judgment.

-62-

1  Dated: March 27, 2025

2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3  By _____
                    /s/ Tracey A. Kennedy
4               TRACEY A. KENNEDY
               ROBERT E. MUSSIG
5               H. SARAH FAN

6               Attorneys for Defendant
7               CHEVRON U.S.A. INC.,
               a Pennsylvania Corporation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4904-3023-3647.1
DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT