## <u>DECLARATION OF DOLORES Y. LEAL</u>

I, Dolores Y. Leal, declare as follows:

1.    I am an attorney licensed to practice law in California. I am a partner with the law firm Allred, Maroko & Goldberg, counsel of record for Plaintiff Mark Snookal. I have personal knowledge of the facts set forth below and, if called as a witness, could and would testify competently to such facts under oath.

2.    I defended the deposition of Mark Snookal on May 10, 2024, and I am in possession of a certified copy of his deposition transcript. Attached hereto as **Exhibit 16** is a true and correct copy of relevant excerpts from Mr. Snookal's deposition transcript.

3.    I took the deposition of Andrew Powers on September 17, 2024, and I am in possession of a certified copy of his deposition transcript. Attached hereto as **Exhibit 17** is a true and correct copy of relevant excerpts from Mr. Powers's deposition transcript. During his deposition, Mr. Powers authenticated a number of documents including those that were marked as Exhibits 3, 5, and 12 which are each referenced in the concurrently filed Joint Brief re Motion for Summary Judgment and Statement of Uncontroverted Facts and Genuine Disputes. Those documents are attached hereto as **Exhibits 17-3, 17-5, and 17-12:**

> **Exhibit 17-3:**   September 4, 2019 Email from Mark Snookal to Human Resources Manager Andrew Powers (CUSA000538- CUSA000540)
>
> **Exhibit 17-5:**   Andrew Powers Email to Mark Snookal Re: Medical Team Findings (CUSA000542- CUSA000543)
>
> **Exhibit 17-12:** Email from Andrew Powers to medical team in Nigeria (CUSA000650-CUSA000651)

4.    I took the deposition of Dr. Eshiofe Asekomeh on October 10, 2024, and I am in possession of a certified copy of his deposition transcript. Attached

hereto as **Exhibit 18** is a true and correct copy of relevant excerpts from Dr. Asekomeh's deposition transcript. During his deposition, Dr. Asekomeh authenticated a number of documents including those that were marked as Exhibits 2 and 7 which are each referenced in the concurrently filed Joint Brief re Motion for Summary Judgment and Statement of Uncontroverted Facts and Genuine Disputes. Those documents are attached hereto as Exhibits 15-2 and 15-7:

**Exhibit 18-2:**  Job Description for NMA EGTL Reliability Engineering Manager (SNOOKAL-01157-SNOOKAL-01158)

**Exhibit 18-7:**  Dr. Asekomeh email thread with Nigerian cardiologists regarding Mark Snookal's medical report (CUSA000768-CUSA000774)

5.    I took the deposition of Thalia Tse on September 13, 2024, and I am in possession of a certified copy of her deposition transcript. Attached hereto as **Exhibit 19** is a true and correct copy of relevant excerpts from Ms. Tse's deposition transcript.

6.    Attached as **Exhibit 20** is a true and correct copy of Andrew Powers' September 6, 2019 Email to Mark Snookal Re: Disability Complaint Findings which Defendant produced on September 12, 2024 as CUSA000644.

7.    Attached as **Exhibit 21** is a true and correct copy of the September 4, 2019 Email from Andrew Powers Re: the Rescinded Job Offer in Nigeria which Defendant produced on June 15, 2024 as CUSA000538-CUSA000540.

8.    Attached as **Exhibit 22** is a true and correct copy of the September 6, 2019 Email from Andrew Powers to Mark Snookal Re: the Rescinded Job Offer in Nigeria which Defendant produced on June 15, 2024 as CUSA000542-CUSA000543.

9.    Attached as **Exhibit 23** is a true and correct copy of the September 4, 2019 Emails Re: the Rescinded Job Offer in Nigeria which Defendant produced on

September 12, 2024 as CUSA000650-CUSA000651.

10.  Attached as **Exhibit 24** is a true and correct copy of Defendant, CUSA's Responses to Plaintiff Mark Snookal's Interrogatories Nos. 20-24.

11.  Attached as **Exhibit 25** is a true and correct copy of Defendant CUSA's Response to Plaintiff Mark Snookal's Interrogatory No. 26.

12.  Attached as **Exhibit 26** is a true and correct copy of Defendant CUSA's Response to Plaintiff Mark Snookal's Interrogatory No. 33.

13.  On March 12, 2025, Defendant Chevron U.S.A. Inc. served us with documents marked as CUSA000949-1562. True and correct copies of specific documents are attached hereto as:

| | |
|---|---|
| **Exhibit 27:** | August 15, 2019 Email from Dr. Pitan to Dr. Asekomeh (CUSA000824-000827) |
| **Exhibit 28:** | Escravos Medevac Records for 2017-2022 (CUSA000830-000836) |
| **Exhibit 29:** | September 4, 2019 Emails Re: Mark Snookal's Rescinded Job offer in Nigeria (CUSA000983-985) |
| **Exhibit 30:** | July 9, 2019 email from Chevron to Mark Snookal Re: New Assignment (CUSA000986-000988) |
| **Exhibit 31:** | August 26, 2019 Emails Between Dr. Arenyeka and Dr. Levy Re: Mark Snookal (CUSA000995-000997) |
| **Exhibit 32:** | August 20, 2019 Email from Dr. Frangos to Dr. Levy and Dr. Arenyeka Re: Nigeria Medical Determination (CUSA001003-001006) |
| **Exhibit 33:** | August 23, 2019 Email from Dr. Levy to Eldyleida Seca Torres Re: Msea |

3

(CUSA001041)

**Exhibit 34:** August 23, 2019 Email from Dr. Khan to Dr. Levy Re: Mark Snookal
(CUSA001042-001043)

**Exhibit 35:** September 5, 2019 Emails Re: Nigeria Medical Determination
(CUSA001236)

**Exhibit 36:** June 6, 2019 Email recommending Mark Snookal for the Reliability Engineering Manager position
(CUSA001435-1438)

**Exhibit 37:** Summary of Cardiology Opinions – NMA Cardiologists and Emails Re: Mark Snookal's Medical Report
(CUSA0001520-CUSA0001525)

**Exhibit 38:** August 7, 2019 Email from Dr. Asekomeh to Dr. Pitan Re: Mark Snookal's Medical Summary
(CUSA001526-0001527)

14.  Attached as **Exhibit 39** is a true and correct copy of a screenshot collected on or about November 11, 2024 of Dr. Stephen Frangos' public LinkedIn page.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on March 20 2025, at Los Angeles, California.

_____
Dolores Y. Leal

DECLARATION OF DOLORES Y. LEAL

# EXHIBIT 16

EXHIBIT 16-1

5

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5   MARK SNOOKAL, an individual,      )
                                      )
6           Plaintiff,                )
                                      )
7       v.                            )   NO. 2:23-cv-6302-
                                      )        HDV-AJR
8   CHEVRON USA, INC., a California   )
    Corporation, and DOES 1 through   )
9   10, inclusive,                    )
                                      )
10          Defendants.               )
    _____)

11

12

13

14

15

16

17           Videotaped deposition of MARK JORDAN

18      SNOOKAL, Plaintiff, taken on behalf of Defendants

19      at 333 South Hope Street, 43rd Floor, Los Angeles,

20      California, commencing at 10:00 a.m. on Friday,

21      May 10, 2024, before John M. Taxter, Certified

22      Shorthand Reporter No. 3579 in and for the State

23      of California, a Registered Professional Reporter.

24

25

**EXHIBIT 16-2**

```
1    APPEARANCES OF COUNSEL:

2

3

4    FOR PLAINTIFF MARK JORDAN SNOOKAL:

5         ALLRED, MAROKO & GOLDBERG
          BY:  DOLORES Y. LEAL, Attorney at Law
6         6300 Wilshire Boulevard, Suite 1500
          Los Angeles, California  90048-5217
7         323.653.6530
          dleal@amglaw.com
8

9

10   FOR DEFENDANT CHEVRON USA, INC.:

11        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
          BY:  ROBERT E. MUSSIG, Attorney at Law
12        333 South Hope Street, 43rd Floor
          Los Angeles, California  90071-1422
13        213.620.1780
          rmussig@sheppardmullin.com
14
                    -and-
15
          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
16        BY:  LINDA Z. SHEN, Attorney at Law
          501 West Broadway, 18th Floor
17        San Diego, California  92101-3598
          619.338.6500
18        lshen@sheppardmullin.com

19

20

21   VIDEOGRAPHER:

22        GIGI FADICH

23

24

25
```

**EXHIBIT 16-3**

```
 1   time whose name escapes me at the moment to        10:25:05

 2   basically put me back in analyzer engineering but   10:25:09

 3   with a focus on analyzer reliability improvement.   10:25:13

 4   So they kind of made that one up.                   10:25:19

 5        Q    They created a position for you because   10:25:23

 6   they wanted you in that -- in that department?      10:25:25

 7        A    Correct.                                  10:25:27

 8        Q    And I -- I guess my question had been     10:25:28

 9   you -- you said it wasn't a promotion.              10:25:30

10             Was it a lateral move?  And was it -- it  10:25:32

11   wasn't a demotion; right?                           10:25:34

12        A    In my mind, it was a demotion.  It was a  10:25:37

13   lateral move from a career development standpoint,  10:25:40

14   I was told.                                         10:25:48

15        Q    And why --                                10:25:48

16        A    And I treated it that way, but it didn't  10:25:49

17   really feel like that at the time.                  10:25:53

18        Q    Why was it a demotion, in your mind?      10:25:54

19        A    I went from supervising a group of 18     10:25:57

20   people to supervising no one and essentially doing  10:25:59

21   the same job that I left before I did that          10:26:03

22   supervisory job.                                    10:26:05

23        Q    Were you paid the same?                   10:26:09

24        A    I was.                                    10:26:10

25        Q    And that -- so that position is in the    10:26:13
```

**EXHIBIT 16-4**

| | | |
|---|---|---|
| 1 | subgroup. | 10:28:03 |
| 2 | Is that right? | 10:28:03 |
| 3 | A    That is correct. | 10:28:04 |
| 4 | Q    Then so at this point you had worked in | 10:28:06 |
| 5 | the maintenance department and in the engineering | 10:28:08 |
| 6 | group; is that right? | 10:28:12 |
| 7 | A    Yes. | 10:28:13 |
| 8 | Q    And you held that IEAR team lead | 10:28:16 |
| 9 | position from November of 2016 to November of | 10:28:19 |
| 10 | 2019; is that right? | 10:28:22 |
| 11 | A    Yes. | 10:28:22 |
| 12 | Q    Okay.  And did I already ask you this? | 10:28:26 |
| 13 | You were a PSG 22 in that position? | 10:28:28 |
| 14 | A    I was. | 10:28:32 |
| 15 | Q    And then I think that was around the | 10:28:34 |
| 16 | time of the Escravos which we'll get into in a | 10:28:38 |
| 17 | moment. | 10:28:43 |
| 18 | Is that right? | 10:28:43 |
| 19 | A    Yes, it was. | 10:28:43 |
| 20 | Q    Okay.  Now, you -- you were based out of | 10:28:44 |
| 21 | Chevron's El Segundo refinery throughout your time | 10:28:47 |
| 22 | with Chevron; correct? | 10:28:50 |
| 23 | A    That's correct. | 10:28:51 |
| 24 | Q    And your employer was Chevron USA, Inc.; | 10:28:53 |
| 25 | is that right? | 10:28:53 |

**EXHIBIT 16-5**

| | | |
|---|---|---|
| 1 | A    They have a very complicated corporate | 10:28:59 |
| 2 | structure, so I don't actually know -- | 10:29:01 |
| 3 | Q    Okay. | 10:29:01 |
| 4 | A    -- the answer that question. | 10:29:04 |
| 5 | Q    As you sit here right now, do you have | 10:29:06 |
| 6 | any reason to dispute that your employer | 10:29:07 |
| 7 | throughout that time was Chevron USA, Inc.? | 10:29:10 |
| 8 | A    I do not. | 10:29:12 |
| 9 | Q    And how many employees total at the | 10:29:14 |
| 10 | El Segundo refinery, your best estimate? | 10:29:15 |
| 11 | A    I would say around a thousand. | 10:29:18 |
| 12 | Q    And there were -- so I -- correct me if | 10:29:21 |
| 13 | I'm wrong, but I -- as I understand it, there -- | 10:29:26 |
| 14 | and I think we talked about this a little bit. | 10:29:30 |
| 15 | There are different departments, and in | 10:29:33 |
| 16 | the maintenance department there are four | 10:29:34 |
| 17 | subgroups -- right? -- or at the time there were | 10:29:36 |
| 18 | four subgroups; routine maintenance, reliability, | 10:29:38 |
| 19 | integrity, integrity turnaround, and construction | 10:29:43 |
| 20 | services. | 10:29:46 |
| 21 | Does that sound right? | 10:29:47 |
| 22 | A    You'll have to break them up a little | 10:29:48 |
| 23 | bit more. | 10:29:50 |
| 24 | Q    Okay. | 10:29:50 |
| 25 | A    Not -- not further, just a little more | 10:29:50 |

| | | |
|---|---|---|
| 1 | page 3 of the document, SNOOKAL-607, is that your | 10:46:02 |
| 2 | signature at the bottom? | 10:46:07 |
| 3 | A    It is. | 10:46:08 |
| 4 | Q    And it's dated July 18, 2019; is that | 10:46:08 |
| 5 | right? | 10:46:08 |
| 6 | A    That's correct. | 10:46:13 |
| 7 | Q    And is this referred to as an MSEA form? | 10:46:16 |
| 8 | A    It is. | 10:46:19 |
| 9 | Q    And so on -- and so on the first three | 10:46:24 |
| 10 | pages of the form up to your signature, all the | 10:46:28 |
| 11 | boxes that are checked, you checked those; right? | 10:46:33 |
| 12 | A    That's correct. | 10:46:36 |
| 13 | Q    Okay.  And so box No. 1 is: | 10:46:36 |
| 14 | "Do you have any medical, | 10:46:40 |
| 15 | physical or psychological | 10:46:41 |
| 16 | conditions under the care of a | 10:46:42 |
| 17 | health professional?  If yes, | 10:46:44 |
| 18 | please describe." | 10:46:46 |
| 19 | You marked by the box "yes"; right? | 10:46:48 |
| 20 | A    Correct. | 10:46:48 |
| 21 | Q    And then you said: | 10:46:50 |
| 22 | "I have a dilated aortic root. | 10:46:51 |
| 23 | I am under the care of a | 10:46:54 |
| 24 | cardiologist and see him once per | 10:46:56 |
| 25 | year for a checkup.  I have | 10:46:58 |

**EXHIBIT 16-7**

| | | |
|---|---|---|
| 1 | consulted with him on this | 10:46:59 |
| 2 | assignment, and he sees no issues | 10:47:00 |
| 3 | with it." | 10:47:02 |
| 4 | You wrote that; correct? | 10:47:02 |
| 5 | A   I did. | 10:47:03 |
| 6 | Q   And you -- you had -- you had testified | 10:47:05 |
| 7 | about this earlier.  I'm sorry for -- for -- I | 10:47:09 |
| 8 | think you were diagnosed with the dilated aortic | 10:47:12 |
| 9 | root in 2015. | 10:47:16 |
| 10 | Is that wrong? | 10:47:17 |
| 11 | A   I -- I honestly can't remember if it was | 10:47:19 |
| 12 | late 2014 or 2015. | 10:47:21 |
| 13 | Q   Okay.  But in that time frame? | 10:47:24 |
| 14 | A   In that time frame. | 10:47:26 |
| 15 | Q   And who -- who diagnosed you with that? | 10:47:27 |
| 16 | A   Dr. Khan who was my doctor through this | 10:47:30 |
| 17 | whole event. | 10:47:34 |
| 18 | Q   Is he with Cedars? | 10:47:36 |
| 19 | A   He, I think, has multiple affiliations. | 10:47:40 |
| 20 | I saw him at Kaiser Permanente, Los Angeles. | 10:47:44 |
| 21 | Q   And, I mean, I -- I just want to ask a | 10:47:49 |
| 22 | couple background questions about it.  I don't | 10:47:54 |
| 23 | want to get too far into your -- your medical | 10:47:55 |
| 24 | history. | 10:48:00 |
| 25 | What -- when -- when he diagnosed you | 10:48:00 |

**EXHIBIT 16-8**

| | | |
|---|---|---|
| 1 | with it, what was the prognosis? | 10:48:02 |
| 2 | A    To sum it up, he said that sometimes the | 10:48:09 |
| 3 | aortic root will not expand any more than it | 10:48:15 |
| 4 | already has and it will never expand to a point | 10:48:18 |
| 5 | where they consider it to be something that they | 10:48:23 |
| 6 | should operate on, or it can expand at a rate and | 10:48:26 |
| 7 | to a size that they consider to be operable or | 10:48:36 |
| 8 | something that they should operate on.  He said | 10:48:40 |
| 9 | that there's no way to accurately predict -- | 10:48:44 |
| 10 | predict which one mine would be but that the rate | 10:48:51 |
| 11 | of growth determines how they treat it, basically. | 10:48:54 |
| 12 | Q    Okay.  And -- and I think here you say | 10:49:04 |
| 13 | that you had to see him on a yearly basis.  Was | 10:49:08 |
| 14 | that what he -- what he -- | 10:49:11 |
| 15 | A    They call it -- | 10:49:13 |
| 16 | Q    -- said at the time? | 10:49:14 |
| 17 | A    Yes.  They call it "watchful waiting" | 10:49:16 |
| 18 | which is basically taking a picture of it once a | 10:49:19 |
| 19 | year and seeing if it's grown or not and at what | 10:49:22 |
| 20 | rate from the last time. | 10:49:25 |
| 21 | Q    And so you -- you followed up on a | 10:49:26 |
| 22 | yearly basis with him, I'm assuming? | 10:49:28 |
| 23 | A    Every year. | 10:49:30 |
| 24 | Q    And how did it develop, if at all? | 10:49:31 |
| 25 | A    There were some years where it grew at a | 10:49:36 |

**EXHIBIT 16-9**

| | | |
|---|---|---|
| 1 | low rate and other years where it had remained | 10:49:40 |
| 2 | stable.  I believe at the time that I applied it | 10:49:44 |
| 3 | had been stable for two or three years. | 10:49:47 |
| 4 | Q    And you may have already said this, but | 10:49:53 |
| 5 | the cardiologist that you're referring to here on | 10:49:56 |
| 6 | page 1 of -- of this exhibit, Exhibit 3, is | 10:49:58 |
| 7 | Dr. Khan; right? | 10:50:02 |
| 8 | A    Yes.  That's correct. | 10:50:03 |
| 9 | Q    What's the current state of the | 10:50:08 |
| 10 | condition? | 10:50:10 |
| 11 | A    I'm not sure how to answer that | 10:50:13 |
| 12 | question. | 10:50:15 |
| 13 | Q    Have you continued to see Dr. Khan about | 10:50:17 |
| 14 | the dilated aortic root? | 10:50:19 |
| 15 | A    Dr. Khan retired.  He retired during | 10:50:22 |
| 16 | COVID.  Kaiser had trouble assigning me a new | 10:50:25 |
| 17 | doctor, and during that time I left Chevron. | 10:50:30 |
| 18 | After this I went to Portland, and I continued my | 10:50:37 |
| 19 | care in Portland. | 10:50:43 |
| 20 | Q    Okay.  With a different cardiologist, I | 10:50:44 |
| 21 | assume? | 10:50:47 |
| 22 | A    With a different -- yeah. | 10:50:47 |
| 23 | Q    And what is his or her name? | 10:50:48 |
| 24 | A    I've actually -- the first two years I | 10:50:49 |
| 25 | was in Portland they did not assign me a | 10:50:53 |

| | | |
|---|---|---|
| 1 | cardiologist.  They just managed it through my | 10:50:55 |
| 2 | primary-care physician.  I recently changed | 10:50:58 |
| 3 | employment to a different employer, and I do have | 10:51:02 |
| 4 | a cardiologist now, a Dr. Schneider.  I've only | 10:51:05 |
| 5 | seen him once. | 10:51:10 |
| 6 | Q    Okay.  And we'll get into this more | 10:51:11 |
| 7 | later, but I believe you moved to Washington? | 10:51:13 |
| 8 | A    Correct. | 10:51:14 |
| 9 | Q    And so Dr. Schneider is in Washington? | 10:51:15 |
| 10 | A    He's actually in Portland.  I live right | 10:51:17 |
| 11 | near Portland, Oregon. | 10:51:21 |
| 12 | Q    Oh, I see. | 10:51:21 |
| 13 | A    There's a heart center in Portland, | 10:51:22 |
| 14 | Oregon. | 10:51:26 |
| 15 | Q    And when was your most recent checkup | 10:51:26 |
| 16 | with Dr. Schneider? | 10:51:28 |
| 17 | A    It was actually unrelated to the aortic | 10:51:31 |
| 18 | root dilation and was in -- I don't remember the | 10:51:36 |
| 19 | exact month, but it was late 2023. | 10:51:43 |
| 20 | Q    And what was it related to? | 10:51:46 |
| 21 | A    Tangentially related to PVCs that I also | 10:51:50 |
| 22 | listed on the form.  They ablated those to end -- | 10:51:56 |
| 23 | end me having PVCs. | 10:51:59 |
| 24 | Q    What are PVCs? | 10:52:01 |
| 25 | A    Premature ventricular contractions. | 10:52:03 |

**EXHIBIT 16-11**

| | | |
|---|---|---|
| 1 | BY MR. MUSSIG: | 10:59:00 |
| 2 | Q    Well, I -- you know, let me -- let me | 10:59:03 |
| 3 | rephrase it. | 10:59:04 |
| 4 | The document speaks for itself, but did | 10:59:05 |
| 5 | Dr. -- did Dr. Sobel tell you at any point that | 10:59:08 |
| 6 | getting the recommendation letter would guarantee | 10:59:10 |
| 7 | medical clearance? | 10:59:12 |
| 8 | A    What Dr. Sobel said when he gave this to | 10:59:14 |
| 9 | me was -- he said, "You'll just need a letter from | 10:59:16 |
| 10 | your cardiologist.  This is what it should say, | 10:59:19 |
| 11 | and then it should be fine." | 10:59:22 |
| 12 | Q    Okay.  Did he say anything about needing | 10:59:27 |
| 13 | further assessment? | 10:59:33 |
| 14 | A    He did not. | 10:59:35 |
| 15 | Q    Since this visit, have you ever seen | 10:59:40 |
| 16 | Dr. Sobel again? | 10:59:42 |
| 17 | A    No.  He's not my doctor, so -- | 10:59:42 |
| 18 | Q    I understand.  It was just this one | 10:59:47 |
| 19 | time? | 10:59:49 |
| 20 | A    Yeah. | 10:59:51 |
| 21 | MR. MUSSIG:  I'll mark as Exhibit 4. | 10:59:55 |
| 22 | It's a letter from Dr. Khan on Kaiser Permanente | 11:00:00 |
| 23 | letterhead.  It's Bates-numbered SNOOKAL-665. | 11:00:05 |
| 24 | (Exhibit 4 was marked for identification | 11:00:05 |
| 25 | by the Certified Shorthand Reporter.) | 11:00:18 |

| | | |
|---|---|---|
| 1 | A    This e-mail was sent after I requested | 11:48:12 |
| 2 | this e-mail, so there was no response necessary. | 11:48:14 |
| 3 | Q    How did you request the e-mail? | 11:48:18 |
| 4 | A    Through Andrew Powers which was the HR | 11:48:20 |
| 5 | manager at El Segundo. | 11:48:23 |
| 6 | Q    And why did you request the e-mail? | 11:48:25 |
| 7 | A    Because I wanted them to give me written | 11:48:28 |
| 8 | documentation of why they were saying that I | 11:48:29 |
| 9 | couldn't go to Escravos and to identify other | 11:48:32 |
| 10 | locations where they would consider me to be | 11:48:35 |
| 11 | medically fit. | 11:48:38 |
| 12 | Q    Oh.  And he does that in this e-mail -- | 11:48:40 |
| 13 | right? -- at the -- at the bottom? | 11:48:42 |
| 14 | A    Correct. | 11:48:43 |
| 15 | Q    Did you ever apply to any jobs in those | 11:48:44 |
| 16 | locations? | 11:48:47 |
| 17 | A    There were no job openings in those | 11:48:48 |
| 18 | locations. | 11:48:49 |
| 19 | Q    I see.  And I -- I guess most -- are | 11:48:49 |
| 20 | these locations -- well, I -- I don't know if | 11:49:04 |
| 21 | you -- you probably don't know, but I'll ask the | 11:49:10 |
| 22 | question.  You can say "I don't know." | 11:49:13 |
| 23 | Would they have adequate medical | 11:49:14 |
| 24 | facilities in all these locations where he | 11:49:15 |
| 25 | indicates he would not foresee any issues with you | 11:49:17 |

**EXHIBIT 16-13**

| | | |
|---|---|---|
| 1 | of discrimination to anyone else at Chevron? | 11:55:59 |
| 2 | A    No. | 11:56:02 |
| 3 | Q    And when you say "based on a lack of | 11:56:03 |
| 4 | understanding," what -- what do you mean by that? | 11:56:13 |
| 5 | A    In my opinion, I don't believe that the | 11:56:18 |
| 6 | people that evaluated me did their due diligence | 11:56:21 |
| 7 | in understanding the condition that I had and the | 11:56:24 |
| 8 | effects that a remote location would have.  That's | 11:56:28 |
| 9 | what I meant by that. | 11:56:30 |
| 10 | Q    Okay.  And why do you believe that? | 11:56:31 |
| 11 | A    Just based on the conversations that I | 11:56:35 |
| 12 | had with them, it was clear that they didn't | 11:56:36 |
| 13 | really know what they were looking at and the fact | 11:56:38 |
| 14 | that they took a 17-year-old study as the only | 11:56:41 |
| 15 | piece of evidence that they looked at, as far as I | 11:56:47 |
| 16 | knew. | 11:56:50 |
| 17 | Q    Wasn't the 17-year-old study referenced | 11:56:53 |
| 18 | by Dr. Khan? | 11:56:55 |
| 19 | A    It's not Dr. Khan's job to give them the | 11:56:57 |
| 20 | information that they need.  They didn't -- | 11:57:01 |
| 21 | Q    So you agree that they were -- they | 11:57:05 |
| 22 | based their decision on the information provided | 11:57:07 |
| 23 | by Dr. Khan; right? | 11:57:09 |
| 24 | MS. LEAL:  Objection.  Calls for | 11:57:10 |
| 25 | speculation. | 11:57:11 |

| | | |
|---|---|---|
| 1 | dated September 5th, 2019 -- well, an e-mail from | 12:12:12 |
| 2 | Mr. Snookal but to Austin Ruppert and then from | 12:12:15 |
| 3 | Mr. Ruppert to Troy Tortorich, Thalia Tse, and | 12:12:19 |
| 4 | Andrew Powers. | 12:12:24 |
| 5 | (Exhibit 10 was marked for | 12:12:24 |
| 6 | identification by the Certified | 12:12:24 |
| 7 | Shorthand Reporter.) | 12:12:24 |
| 8 | BY MR. MUSSIG: | 12:12:24 |
| 9 | Q    Do recognize the first e-mail in this | 12:12:45 |
| 10 | chain, the one at the bottom of the page? | 12:12:47 |
| 11 | A    Yes. | 12:12:47 |
| 12 | Q    Okay.  And this is an e-mail from you to | 12:12:53 |
| 13 | Mr. Ruppert; correct? | 12:12:55 |
| 14 | A    Correct. | 12:12:56 |
| 15 | Q    And Mr. Ruppert at this point was your | 12:12:57 |
| 16 | supervisor; right? | 12:12:59 |
| 17 | A    Correct. | 12:13:00 |
| 18 | Q    And it says "position" -- the "subject" | 12:13:01 |
| 19 | line is "positions in 2H PDC." | 12:13:03 |
| 20 | What does -- what does the "2H PDC" | 12:13:06 |
| 21 | mean? | 12:13:09 |
| 22 | A    A second half PDC.  I don't know what | 12:13:10 |
| 23 | the acronym stands for.  It's just what they used | 12:13:14 |
| 24 | for the job selection process at Chevron. | 12:13:17 |
| 25 | Q    Okay.  And so why -- they look -- you're | 12:13:24 |

| | | |
|---|---|---|
| 1 | e-mailing Mr. Ruppert three possible positions. | 12:13:30 |
| 2 | Why were you doing that? | 12:13:33 |
| 3 | A    They asked me to search and see which | 12:13:34 |
| 4 | positions in El Segundo I felt that I would be | 12:13:36 |
| 5 | qualified for. | 12:13:40 |
| 6 | Q    And is that because this was after the | 12:13:41 |
| 7 | Escravos -- the REM position in Escravos had been | 12:13:45 |
| 8 | rescinded and your IEAR team lead position had | 12:13:50 |
| 9 | been back-filled? | 12:13:55 |
| 10 | A    That's correct. | 12:13:56 |
| 11 | Q    And I'm going to ask you a few | 12:13:57 |
| 12 | questions.  You may or may not know the answer, | 12:14:07 |
| 13 | but I just want to see if you do. | 12:14:10 |
| 14 | Any -- any job postings in the PDC | 12:14:12 |
| 15 | require a specific application process; right? | 12:14:16 |
| 16 | A    They do. | 12:14:19 |
| 17 | Q    Okay.  And each of those jobs has a -- a | 12:14:20 |
| 18 | PDR, a personal development representative, | 12:14:23 |
| 19 | assigned to the job? | 12:14:25 |
| 20 | A    That's correct. | 12:14:26 |
| 21 | Q    Okay.  And a PDR can represent 15 to 20 | 12:14:27 |
| 22 | jobs in the process; right? | 12:14:31 |
| 23 | A    I don't know the numbers, but -- | 12:14:34 |
| 24 | Q    More than one? | 12:14:36 |
| 25 | A    -- more than one. | 12:14:36 |

| | | |
|---|---|---|
| 1 | Q    And each of those jobs also has a job | 12:14:38 |
| 2 | owner; is that right? | 12:14:41 |
| 3 | A    That's my understanding.  Yes. | 12:14:43 |
| 4 | Q    Okay.  And the job owner is typically | 12:14:45 |
| 5 | the hiring supervisor for the opening; is that | 12:14:47 |
| 6 | right? | 12:14:47 |
| 7 | A    I don't know if it's typically the -- I | 12:14:50 |
| 8 | don't know if it works that way. | 12:14:52 |
| 9 | Q    Okay.  You just don't have any knowledge | 12:14:53 |
| 10 | one way or the other? | 12:14:56 |
| 11 | A    I don't. | 12:14:58 |
| 12 | Q    Do you know if the job owner is also | 12:14:58 |
| 13 | typically the supervisor who the employee would | 12:15:02 |
| 14 | report to, if they get that job? | 12:15:04 |
| 15 | A    I -- I do not know the answer to that. | 12:15:06 |
| 16 | No. | 12:15:08 |
| 17 | Q    Okay.  Do you have any knowledge about | 12:15:09 |
| 18 | the job owner's role in the decision-making | 12:15:14 |
| 19 | process as to -- as to the particular job? | 12:15:16 |
| 20 | A    Not in a generic sense.  Generally, each | 12:15:20 |
| 21 | job is defined -- they'll tell you who to talk to. | 12:15:22 |
| 22 | It's not, in my experience, always the same | 12:15:27 |
| 23 | person. | 12:15:31 |
| 24 | Q    What do you mean, "it's not"? | 12:15:31 |
| 25 | A    The -- the -- the owner of the position | 12:15:32 |

**EXHIBIT 16-17**

| | | |
|---|---|---|
| 1 | is not always the person that will be your | 12:15:35 |
| 2 | supervisor -- | 12:15:38 |
| 3 | Q    I see. | 12:15:39 |
| 4 | A    -- in my experience.  That doesn't mean | 12:15:39 |
| 5 | I know the process. | 12:15:43 |
| 6 | Q    Sure.  In your experience, is it usually | 12:15:44 |
| 7 | the supervisor? | 12:15:47 |
| 8 | A    No. | 12:15:47 |
| 9 | Q    So more often than not the job owner is | 12:15:54 |
| 10 | not the same as the person that would be | 12:15:56 |
| 11 | supervising the position, in your experience? | 12:15:58 |
| 12 | A    In my recollection and experience, that | 12:16:01 |
| 13 | is correct. | 12:16:03 |
| 14 | Q    In -- in your recollection and | 12:16:05 |
| 15 | experience, do you know then like how a job owner | 12:16:06 |
| 16 | would be selected or assigned? | 12:16:10 |
| 17 | A    I do not. | 12:16:18 |
| 18 | Q    Earlier you had said -- going back to | 12:16:25 |
| 19 | the exhibit, Exhibit 10, you had said they told | 12:16:27 |
| 20 | you to look through the PDC openings. | 12:16:30 |
| 21 | When you said "they" -- is that right? | 12:16:34 |
| 22 | A    Yes. | 12:16:36 |
| 23 | Q    Okay.  When you said "they," who do | 12:16:37 |
| 24 | you -- who were you referring to? | 12:16:39 |
| 25 | A    We had a meeting between Austin | 12:16:41 |

| | | |
|---|---|---|
| 1 | "Powers," Thalia Tse, and -- | 12:16:44 |
| 2 | Q    Austin Ruppert? | 12:16:49 |
| 3 | A    Sorry.  Yes.  Austin Ruppert, Andrew | 12:16:50 |
| 4 | Powers, and Thalia Tse.  I believe that was on the | 12:16:53 |
| 5 | 6th or 7th of September. | 12:17:04 |
| 6 | Q    Well, this e-mail is dated | 12:17:04 |
| 7 | September 5th -- | 12:17:07 |
| 8 | A    Okay. | 12:17:07 |
| 9 | Q    -- so it couldn't have been the 6th or | 12:17:09 |
| 10 | 7th. | 12:17:11 |
| 11 | A    So it might have been the 4th then. | 12:17:11 |
| 12 | Q    Okay.  Sometime shortly before you sent | 12:17:13 |
| 13 | this? | 12:17:15 |
| 14 | A    I don't remember the exact date, but, | 12:17:15 |
| 15 | yeah, it must be September 5th.  It would be the | 12:17:17 |
| 16 | same day that we had the meeting. | 12:17:19 |
| 17 | Q    So you had the meeting, and then you | 12:17:24 |
| 18 | immediately went to look for positions; right? | 12:17:29 |
| 19 | A    Right.  So there is a time limit; right? | 12:17:31 |
| 20 | The PDCs happen on a cycle -- that's why | 12:17:35 |
| 21 | it's called "2H" -- and there's deadlines.  I | 12:17:39 |
| 22 | believe we were -- I believe the deadline was | 12:17:43 |
| 23 | Friday, so -- | 12:17:45 |
| 24 | Q    And this was on Thursday? | 12:17:49 |
| 25 | A    Yeah, if I recall correctly. | 12:17:50 |

**EXHIBIT 16-19**

| | | |
|---|---|---|
| 1 | Q    Now, at -- at one point in this case | 12:18:07 |
| 2 | there is an allegation that during this meeting | 12:18:08 |
| 3 | they identified three positions that you were | 12:18:10 |
| 4 | qualified for; operating assistant, general team | 12:18:13 |
| 5 | lead, and maintenance change operating assistant. | 12:18:16 |
| 6 | Are those the same as these positions | 12:18:18 |
| 7 | that are in this e-mail? | 12:18:25 |
| 8 | A    Two are the same; one is not. | 12:18:25 |
| 9 | Q    Okay.  And so -- so let me -- is that | 12:18:28 |
| 10 | accurate, that allegation that you -- they | 12:18:31 |
| 11 | identified three positions they thought you were | 12:18:34 |
| 12 | qualified for? | 12:18:36 |
| 13 | A    Yes. | 12:18:37 |
| 14 | Q    Okay. | 12:18:37 |
| 15 | A    That would be after this e-mail.  So | 12:18:37 |
| 16 | Austin came and talked to me with three positions. | 12:18:40 |
| 17 | Q    Oh.  Oh, okay.  So this e-mail came | 12:18:44 |
| 18 | after a meeting with Austin, not a meeting -- | 12:18:50 |
| 19 | A    No.  This -- so in the time line we met | 12:18:52 |
| 20 | to discuss the path forward with Austin, Thalia, | 12:19:00 |
| 21 | and Andrew.  During that meeting, they said they | 12:19:07 |
| 22 | would look for positions, and they also asked me | 12:19:12 |
| 23 | to look for positions.  So we both looked for | 12:19:14 |
| 24 | positions. | 12:19:17 |
| 25 | I sent them this e-mail with the | 12:19:18 |

| | | |
|---|---|---|
| 1 | positions that I found.  I don't know how they | 12:19:20 |
| 2 | came up with their positions that they approached | 12:19:26 |
| 3 | me with afterwards, but the positions that Austin | 12:19:29 |
| 4 | came and talked to me about were the second ones | 12:19:34 |
| 5 | on this e-mail, the two that start with "DS&C" -- | 12:19:39 |
| 6 | Q    Okay? | 12:19:45 |
| 7 | A    -- which are positions in El Segundo. | 12:19:45 |
| 8 | And he came to me with a third position also in | 12:19:47 |
| 9 | El Segundo that isn't on this e-mail but is the | 12:19:51 |
| 10 | maintenance change OA. | 12:19:55 |
| 11 | Q    Maintenance change "AOA"? | 12:19:58 |
| 12 | A    Maintenance change OA. | 12:20:00 |
| 13 | Q    Maintenance change? | 12:20:03 |
| 14 | A    Yeah. | 12:20:04 |
| 15 | Q    And why isn't that position on this | 12:20:06 |
| 16 | e-mail? | 12:20:09 |
| 17 | A    I didn't particularly want that | 12:20:11 |
| 18 | position, so I didn't identify it. | 12:20:13 |
| 19 | Q    Why didn't you want that position? | 12:20:18 |
| 20 | A    It was a new position that had been | 12:20:25 |
| 21 | created that year, and I didn't see it having much | 12:20:27 |
| 22 | potential for career development and I saw it as a | 12:20:33 |
| 23 | possible step back in my career based on its job | 12:20:45 |
| 24 | description that I saw. | 12:20:49 |
| 25 | Q    What in the job description made you | 12:20:49 |

| | | |
|---|---|---|
| 1 | think that? | 12:20:53 |
| 2 | A    No direct reports, a purely influential | 12:20:53 |
| 3 | leadership position which can be a career | 12:20:58 |
| 4 | development position, but not if it doesn't have | 12:21:01 |
| 5 | an established pathway already. | 12:21:04 |
| 6 | Q    And you said that position was created | 12:21:06 |
| 7 | earlier in the year? | 12:21:09 |
| 8 | A    I -- I believe it was created for this | 12:21:10 |
| 9 | PDC.  I don't think it existed before this PDC. | 12:21:13 |
| 10 | Q    So -- so nobody had held that position | 12:21:17 |
| 11 | previously; right? | 12:21:21 |
| 12 | A    It had existed once before, but it had a | 12:21:22 |
| 13 | different reporting structure which would have | 12:21:25 |
| 14 | been beneficial to your career.  It reported | 12:21:28 |
| 15 | directly to the maintenance manager.  And the new | 12:21:31 |
| 16 | position the second time they did it reported to a | 12:21:35 |
| 17 | different manager -- | 12:21:38 |
| 18 | Q    And how long -- | 12:21:39 |
| 19 | A    -- lower in the structure. | 12:21:40 |
| 20 | Q    How long prior to this was that first | 12:21:42 |
| 21 | iteration of the position? | 12:21:46 |
| 22 | A    You mean, when did it exist or when -- | 12:21:51 |
| 23 | Q    Yes. | 12:21:53 |
| 24 | A    It, I believe, was two years earlier, | 12:21:54 |
| 25 | and it was only held by one person, I believe, and | 12:21:56 |

| | | |
|---|---|---|
| 1 | then discontinued -- | 12:22:00 |
| 2 | Q   Okay. | 12:22:01 |
| 3 | A   -- which also led into why I didn't want | 12:22:05 |
| 4 | it. | 12:22:07 |
| 5 | Q   Okay.  So looking at Exhibit 10, you | 12:22:08 |
| 6 | identify three positions.  The first one you're -- | 12:22:12 |
| 7 | you're telling Austin that, according to | 12:22:15 |
| 8 | Dr. Levy -- I'm assuming you're saying in the | 12:22:18 |
| 9 | e-mail that we had looked at earlier -- | 12:22:21 |
| 10 | A   Uh-huh. | 12:22:23 |
| 11 | Q   -- you would not be -- you would not | 12:22:24 |
| 12 | qualify for that position? | 12:22:25 |
| 13 | A   Correct. | 12:22:26 |
| 14 | Q   Okay.  And then the third one on your | 12:22:27 |
| 15 | list, it says a degree is "required for OA | 12:22:28 |
| 16 | positions, and I do not have a degree." | 12:22:33 |
| 17 | So did you think you were qualified for | 12:22:35 |
| 18 | that position? | 12:22:36 |
| 19 | A   Yes, I do think I'm qualified for that | 12:22:37 |
| 20 | position. | 12:22:42 |
| 21 | Q   Isn't a qualification -- and by "degree" | 12:22:43 |
| 22 | I assume you mean a college degree? | 12:22:45 |
| 23 | A   College degree, correct. | 12:22:47 |
| 24 | Q   And if it says a college degree is | 12:22:48 |
| 25 | required but you don't have one, how would you be | 12:22:51 |

**EXHIBIT 16-23**

| | | |
|---|---|---|
| 1 | qualified? | 12:22:53 |
| 2 | A    The operating assistant role is posted | 12:22:54 |
| 3 | many times each year, and it's for the same job | 12:22:57 |
| 4 | responsibilities and duties.    And sometimes it has | 12:23:03 |
| 5 | a degree requirement, and sometimes it does not | 12:23:07 |
| 6 | have a degree requirement.    Austin said that I | 12:23:09 |
| 7 | should go talk to Tolly Graves who was the | 12:23:12 |
| 8 | operations manager and the owner of that position | 12:23:16 |
| 9 | and ask him if I could apply, and he did give me | 12:23:19 |
| 10 | permission to apply without a college degree. | 12:23:21 |
| 11 | Q    Do you think your lack of college degree | 12:23:24 |
| 12 | held you back at Chevron? | 12:23:26 |
| 13 | A    Yes. | 12:23:26 |
| 14 | Q    Do you agree that's not discriminatory? | 12:23:32 |
| 15 | A    Yes. | 12:23:34 |
| 16 | Q    So going back, I -- I -- I don't think | 12:23:41 |
| 17 | we finished with the time line. | 12:23:43 |
| 18 | So there was a meeting with you, Thalia, | 12:23:46 |
| 19 | Austin, and Andrew, and you said you left the | 12:23:50 |
| 20 | meeting saying, "Let's go see if there are other | 12:23:54 |
| 21 | jobs"; right? | 12:23:57 |
| 22 | A    Uh-huh. | 12:23:57 |
| 23 | Q    And so you went and you saw these three, | 12:23:58 |
| 24 | you sent them to Austin, and then I -- and I think | 12:24:00 |
| 25 | that's where we left off. | 12:24:06 |

**EXHIBIT 16-24**

```
 1          Q    Okay.  Now, some of these jobs, looking          12:26:30

 2    at the PSG which we talked about earlier, there --          12:26:33

 3    there -- they range from PSG 21 to PSG 24; right?           12:26:36

 4          A    Yes.                                             12:26:40

 5          Q    And you were a PSG 22 at the time?               12:26:40

 6          A    I was.                                           12:26:43

 7          Q    Okay.  And so were you looking for a PSG         12:26:44

 8    22 position or a PSG 23 position?                           12:26:49

 9          A    I was looking at a position comparable           12:26:52

10    to the EGTL position which is a 23, 24 position.            12:26:55

11          Q    When you say "EGTL," that's the REM              12:27:00

12    position in Escravos?                                       12:27:04

13          A    Yes.                                             12:27:05

14          Q    Was a 23, 24 PSG?                                12:27:05

15          A    It was.                                          12:27:08

16          Q    And how much would your pay have                 12:27:08

17    increased going from PSG 22 to PSG 23?                      12:27:12

18          A    Those aren't really published                   12:27:19

19    information, so it would just be an estimate.               12:27:21

20          Q    What's your estimate?                            12:27:24

21          A    Somewhere in the neighborhood of 12,000          12:27:26

22    "dollars" a year -- I'm sorry -- 12 percent a               12:27:28

23    year.                                                      12:27:33

24          Q    And so how much were you making in the           12:27:35

25    22 position, PSG 22?                                       12:27:38
```

**EXHIBIT 16-25**

| | | |
|---|---|---|
| 1 | A    I think it was 147,000. | 12:27:41 |
| 2 | Q    Okay.  So about another -- what? -- | 12:27:44 |
| 3 | sixteen, seventeen thousand a year? | 12:27:47 |
| 4 | A    Roughly, plus there's an increase in | 12:27:49 |
| 5 | your bonus, your annual bonus, as well. | 12:27:52 |
| 6 | Q    And what is that increase? | 12:27:54 |
| 7 | A    Between 22 and 23 I think it goes from | 12:27:56 |
| 8 | 14 to 16 percent, and 24 I believe is 18 percent. | 12:28:00 |
| 9 | Q    And how -- what would that translate to | 12:28:06 |
| 10 | in terms of dollars, again, estimates? | 12:28:08 |
| 11 | A    Two percent of my base pay.  So what is | 12:28:11 |
| 12 | that? | 12:28:14 |
| 13 | Like 5,000, $6,000 each grade. | 12:28:15 |
| 14 | Q    Okay.  So what jobs did you ultimately | 12:28:20 |
| 15 | apply to in this September, October, November time | 12:28:26 |
| 16 | frame, 2019? | 12:28:32 |
| 17 | A    I applied to the maintenance general | 12:28:33 |
| 18 | team lead, the operating assistant, and the | 12:28:35 |
| 19 | maintenance change OA. | 12:28:39 |
| 20 | Q    Okay.  Including -- so one of -- and | 12:28:41 |
| 21 | that's the OA -- the -- one of those OA positions | 12:28:49 |
| 22 | stated that it had a college degree requirement; | 12:28:54 |
| 23 | right? | 12:28:54 |
| 24 | A    Yes. | 12:28:58 |
| 25 | Q    Do you know -- and maybe you don't -- | 12:28:58 |

**EXHIBIT 16-26**

| | | |
|---|---|---|
| 1 | whether anyone -- when -- when a job has been | 12:29:03 |
| 2 | posted saying there's a college degree | 12:29:08 |
| 3 | requirement, somebody without a college degree has | 12:29:10 |
| 4 | ever gotten a job at El Segundo? | 12:29:14 |
| 5 | A    I believe the answer is "yes," but I -- | 12:29:16 |
| 6 | yes. | 12:29:18 |
| 7 | Q    And who do you know that did that? | 12:29:19 |
| 8 | A    I believe Larry Laye applied for a job | 12:29:23 |
| 9 | as an OA when it required a college degree. | 12:29:26 |
| 10 | Q    How do you spell his last name? | 12:29:31 |
| 11 | A    L-a-y-e. | 12:29:33 |
| 12 | Q    So you believe Larry Laye got an OA job | 12:29:37 |
| 13 | that had been posted as a -- as requiring a | 12:29:40 |
| 14 | college degree, even though he didn't have a | 12:29:43 |
| 15 | college degree? | 12:29:45 |
| 16 | A    I believe so. | 12:29:46 |
| 17 | Q    Anyone else? | 12:29:47 |
| 18 | A    No.  But lots of OAs have no college | 12:29:48 |
| 19 | degree and are OAs.  And the OA position, like I | 12:29:52 |
| 20 | said, sometimes it's posted with a college degree, | 12:29:56 |
| 21 | sometimes posted without a college degree, and | 12:30:00 |
| 22 | people hold the same positions in the facility | 12:30:02 |
| 23 | with and without college degrees. | 12:30:06 |
| 24 | Q    Well, you got the maintenance change OA | 12:30:08 |
| 25 | position; right? | 12:30:10 |

| | | |
|---|---|---|
| 1 | A    I did not. | 12:30:11 |
| 2 | Q    Wait.  What was the position?  Oh.  Hold | 12:30:12 |
| 3 | on.  Hold on.  Well, let me back up.  Let's get | 12:30:15 |
| 4 | there. | 12:30:17 |
| 5 | Any other jobs that you applied to | 12:30:19 |
| 6 | between September and November, 2019? | 12:30:21 |
| 7 | A    Not that I recall. | 12:30:23 |
| 8 | MR. MUSSIG:  I don't know if you guys | 12:30:38 |
| 9 | want to do lunch. | 12:30:39 |
| 10 | MS. LEAL:  Well, we will need lunch. | 12:30:40 |
| 11 | MR. MUSSIG:  I -- this is probably as | 12:30:42 |
| 12 | good a time as any.  Why don't we take a break. | 12:30:44 |
| 13 | THE VIDEOGRAPHER:  Video deposition off | 12:30:46 |
| 14 | the record at 12:30 p.m., conclusion of media 2. | 12:30:48 |
| 15 | (Lunch recess:  12:30 p.m.) | 12:30:52 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**EXHIBIT 16-28**

| | | |
|---|---|---|
| 1 | Los Angeles, California | 12:30:52 |
| 2 | Friday, May 10, 2024 | 12:30:52 |
| 3 | 1:34 p.m. | 12:30:52 |
| 4 | | 12:30:52 |
| 5 | THE VIDEOGRAPHER:  Video deposition | 13:34:40 |
| 6 | returning to the record at 1:34 p.m., beginning of | 13:34:41 |
| 7 | media 3. | 13:34:45 |
| 8 | | 13:34:45 |
| 9 | FURTHER EXAMINATION | 13:34:45 |
| 10 | BY MR. MUSSIG: | 13:34:45 |
| 11 | Q    One question I wanted to circle back on, | 13:34:49 |
| 12 | then we'll move on to -- to these documents. | 13:34:51 |
| 13 | Would you agree the decision to rescind | 13:34:54 |
| 14 | the REM job offer in Escravos was not based on | 13:34:56 |
| 15 | your ability or inability to do the job? | 13:35:04 |
| 16 | A    Yeah.  It didn't have anything to do | 13:35:11 |
| 17 | with my ability to do the job. | 13:35:14 |
| 18 | MR. MUSSIG:  So let me mark as | 13:35:16 |
| 19 | Exhibit 11 a document that's titled "Job title: | 13:35:18 |
| 20 | Maintenance change operating assistant (OA)," | 13:35:24 |
| 21 | SNOOKAL-1131 to -1132. | 13:35:27 |
| 22 | (Exhibit 11 was marked for | 13:35:27 |
| 23 | identification by the Certified | 13:35:27 |
| 24 | Shorthand Reporter.) | 13:35:27 |
| 25 | BY MR. MUSSIG: | 13:35:27 |

| | | |
|---|---|---|
| 1 | Q    Now, I -- I assume you're familiar with | 13:35:48 |
| 2 | this document? | 13:35:51 |
| 3 | A    Uh-huh. | 13:35:51 |
| 4 | Q    You have to say "yes" or "no." | 13:35:52 |
| 5 | A    Yes.   I'm sorry. | 13:35:54 |
| 6 | Q    So this is a -- a copy of the El Segundo | 13:35:56 |
| 7 | maintenance change operating assistant, OA, job | 13:36:00 |
| 8 | posting in the PDC database as of the time you | 13:36:03 |
| 9 | were searching for a job in or around September, | 13:36:07 |
| 10 | 2019; right? | 13:36:12 |
| 11 | A    Yes. | 13:36:13 |
| 12 | Q    One question just sort of logistical: | 13:36:13 |
| 13 | So this says -- at the top it's -- it says: | 13:36:18 |
| 14 | "Chevron is accepting online | 13:36:24 |
| 15 | applications for the position of | 13:36:26 |
| 16 | maintenance change operating | 13:36:27 |
| 17 | assistant (OA) located in | 13:36:28 |
| 18 | El Segundo, California through | 13:36:31 |
| 19 | 8/11/19." | 13:36:34 |
| 20 | Do you know -- I mean, you weren't | 13:36:36 |
| 21 | looking for a position as of 8/11/19. | 13:36:38 |
| 22 | Was -- was the job extended?  Was this | 13:36:41 |
| 23 | deadline extended? | 13:36:44 |
| 24 | A    It may have been.  I'm not sure. | 13:36:46 |
| 25 | Q    Okay.  You don't recall? | 13:36:47 |

**EXHIBIT 16-30**

| | | |
|---|---|---|
| 1 | position? | 13:38:53 |
| 2 | A    I do not know that this position had a | 13:38:54 |
| 3 | PDR. | 13:38:57 |
| 4 | Q    Do you know whether Mr. Cswaykus had any | 13:39:07 |
| 5 | knowledge regarding your heart condition? | 13:39:14 |
| 6 | A    I would doubt it, but I don't know. | 13:39:19 |
| 7 | Q    Do you know whether he knew your age? | 13:39:23 |
| 8 | A    He did.  I've worked with Cotey before. | 13:39:25 |
| 9 | Q    Okay.  And how did -- how would he know | 13:39:27 |
| 10 | your age? | 13:39:30 |
| 11 | A    I mean, you can make an estimation.  I | 13:39:31 |
| 12 | mean, I don't think he knew my age exactly, but | 13:39:34 |
| 13 | you can make an estimate of someone's age based on | 13:39:36 |
| 14 | appearance. | 13:39:39 |
| 15 | Q    I see.  So -- so you knew him, so you | 13:39:40 |
| 16 | assumed he had some estimate of how old you were? | 13:39:43 |
| 17 | A    Correct. | 13:39:45 |
| 18 | Q    On page 2 of this -- of this Exhibit 11 | 13:39:45 |
| 19 | it has some "required qualifications" and some | 13:40:03 |
| 20 | "preferred qualifications." | 13:40:07 |
| 21 | Do you see that? | 13:40:08 |
| 22 | A    I do. | 13:40:09 |
| 23 | Q    And did you meet all the required | 13:40:09 |
| 24 | qualifications at the time you applied? | 13:40:12 |
| 25 | A    Yes. | 13:40:12 |

| | | |
|---|---|---|
| 1 | Q    And did you meet all of the preferred | 13:40:29 |
| 2 | qualifications? | 13:40:31 |
| 3 | A    No. | 13:40:31 |
| 4 | Q    And I assume one of them was you didn't | 13:40:37 |
| 5 | have a Bachelor's degree; right? | 13:40:40 |
| 6 | A    Correct. | 13:40:42 |
| 7 | Q    Were there any other preferred | 13:40:42 |
| 8 | qualifications that you didn't meet? | 13:40:44 |
| 9 | And, again, this is at the time you | 13:40:46 |
| 10 | applied for the job. | 13:40:48 |
| 11 | A    Uh-huh.  For this particular job I would | 13:40:48 |
| 12 | say that it did not align with my career | 13:41:00 |
| 13 | development plan which is one of the preferred | 13:41:03 |
| 14 | qualifications. | 13:41:08 |
| 15 | Q    I see.  Any others? | 13:41:08 |
| 16 | A    No. | 13:41:08 |
| 17 | Q    Do you know who ultimately got this job? | 13:41:12 |
| 18 | A    I can't remember their name.  I -- I -- | 13:41:21 |
| 19 | I know loosely who they are, but I don't really | 13:41:23 |
| 20 | know them. | 13:41:26 |
| 21 | Q    Okay.  Do you think that you didn't get | 13:41:26 |
| 22 | this job for any sort of discriminatory reason? | 13:41:28 |
| 23 | A    No. | 13:41:31 |
| 24 | MR. MUSSIG:  Let's mark as Exhibit 12 a | 13:41:44 |
| 25 | document titled "Job title:  DS&C - MFG - | 13:41:48 |

| | | |
|---|---|---|
| 1 | various different positions; right? | 13:44:03 |
| 2 | So he's in operations, and I was in | 13:44:06 |
| 3 | engineering and maintenance.  He was in his | 13:44:08 |
| 4 | various roles someone that I would work with on a | 13:44:11 |
| 5 | regular basis. | 13:44:13 |
| 6 | Q    Do you -- do you know whether Mr. Byrd | 13:44:20 |
| 7 | would have any reason to have knowledge about your | 13:44:22 |
| 8 | heart condition? | 13:44:26 |
| 9 | A    No. | 13:44:26 |
| 10 | Q    You don't know or, "no," he would not? | 13:44:29 |
| 11 | A    No, he would not.  Sorry. | 13:44:31 |
| 12 | Q    And, again, would he know your age, | 13:44:33 |
| 13 | other than just making a general estimate based | 13:44:37 |
| 14 | on, you know, the fact that he knew you? | 13:44:39 |
| 15 | A    No, I wouldn't think so, other than | 13:44:41 |
| 16 | that. | 13:44:44 |
| 17 | Q    Well, I mean, let me ask this:  Did you | 13:44:50 |
| 18 | get this job? | 13:44:52 |
| 19 | A    I did not. | 13:44:53 |
| 20 | Q    And do you believe that decision was | 13:44:53 |
| 21 | discriminatory in any way? | 13:44:55 |
| 22 | A    I believe it might have been, yes. | 13:44:59 |
| 23 | Q    Okay.  So let me ask a few more | 13:45:01 |
| 24 | questions. | 13:45:04 |
| 25 | Do you know who the decision maker was | 13:45:06 |

```
 1    them is a BS degree in engineering; right?           13:46:18

 2         A    Correct.                                    13:46:20

 3         Q    And you have didn't have a BS degree in     13:46:21

 4    engineering; correct?                                 13:46:23

 5         A    That is correct.                            13:46:24

 6         Q    And so now we -- we had talked earlier      13:46:26

 7    about the fact that certain OA positions,             13:46:33

 8    sometimes, when they were posted, they had a          13:46:37

 9    college degree requirement; sometimes they didn't.    13:46:39

10         But if one of the required                       13:46:45

11    qualifications is a BS degree in engineering and      13:46:47

12    you don't have that, why would you think you're       13:46:50

13    qualified for this job?                               13:46:53

14         A    I was told that it was a job that I         13:46:54

15    could apply for, if I got permission to apply for     13:46:57

16    it from Tolly Graves who was the operations           13:47:00

17    manager and would have been Zak Byrd's supervisor     13:47:07

18    or manager at that time.                              13:47:16

19         Q    Do you know who ultimately got this job?    13:47:16

20         A    There's two jobs, and I remember the        13:47:19

21    name of one of them.  I don't remember the name of    13:47:23

22    the other.  One was Danielle Rivera.  I don't         13:47:25

23    remember the name of the other.                       13:47:36

24         Q    Do you know whether Danielle Rivera had     13:47:38

25    a college degree?                                     13:47:42
```

| | | |
|---|---|---|
| 1 | these PMP ratings? | 14:25:12 |
| 2 | A   It is one of the factors. | 14:25:14 |
| 3 | Q   And do you know whether your PMP rating | 14:25:15 |
| 4 | was higher or lower than Brian Getchius' was? | 14:25:18 |
| 5 | A   I believe it was lower for two of the | 14:25:21 |
| 6 | years. | 14:25:23 |
| 7 | Q   And so you believe you were more | 14:25:32 |
| 8 | qualified than Brian Getchius for this position; | 14:25:40 |
| 9 | is that right? | 14:25:40 |
| 10 | A   That is correct. | 14:25:44 |
| 11 | Q   And why is that? | 14:25:45 |
| 12 | A   Brian Getchius at this point had only | 14:25:50 |
| 13 | had supervisory experience of hourly or | 14:25:52 |
| 14 | represented employees.  This GTL position is -- | 14:25:55 |
| 15 | your direct reports are salaried employees, and | 14:26:02 |
| 16 | then they have hourly reports to them.  So it's an | 14:26:05 |
| 17 | indirect report relationship.  I had had both | 14:26:09 |
| 18 | union employee representation -- or represented | 14:26:15 |
| 19 | employee supervision as well as at this point I | 14:26:19 |
| 20 | had had salaried representation -- salaried | 14:26:25 |
| 21 | employees' direct reports. | 14:26:28 |
| 22 | Q   Okay.  Any other reason you think you | 14:26:31 |
| 23 | were more qualified? | 14:26:33 |
| 24 | A   I had a reliability background and a | 14:26:35 |
| 25 | better understanding of operations and maintenance | 14:26:37 |

**EXHIBIT 16-35**

| | | |
|---|---|---|
| 1 | coordination and what jobs were important, what | 14:26:41 |
| 2 | jobs weren't important.  I had a project | 14:26:45 |
| 3 | management background through other jobs before | 14:26:48 |
| 4 | Chevron.  I had done more influential leadership | 14:26:54 |
| 5 | positions which is also necessary in GTL because | 14:26:59 |
| 6 | you're working with other departments and other | 14:27:03 |
| 7 | groups.  I just had more general experience that | 14:27:05 |
| 8 | aligned with the selection criteria. | 14:27:11 |
| 9 | Q    Anything else? | 14:27:15 |
| 10 | A    No. | 14:27:15 |
| 11 | Q    What -- so, ultimately, Chevron created | 14:27:27 |
| 12 | a role for you; right? | 14:27:30 |
| 13 | A    Yes. | 14:27:33 |
| 14 | Q    And it was the reliability change | 14:27:33 |
| 15 | operating assistant; correct? | 14:27:36 |
| 16 | A    Yes. | 14:27:38 |
| 17 | Q    Okay.  And so that's an OA role; right? | 14:27:38 |
| 18 | A    No. | 14:27:41 |
| 19 | Q    Why not? | 14:27:42 |
| 20 | A    All of the OA roles are in operations, | 14:27:46 |
| 21 | except for the two change OA positions which were | 14:27:48 |
| 22 | both in maintenance and were both discontinued | 14:27:52 |
| 23 | during the reorganization.  They also only existed | 14:27:54 |
| 24 | for one year.  OA positions has been around in the | 14:27:57 |
| 25 | organization by one title or another as far back | 14:28:02 |

**EXHIBIT 16-36**

| | | |
|---|---|---|
| 1 | as anyone really that still works there can | 14:28:09 |
| 2 | remember.  It's an integral position in the | 14:28:13 |
| 3 | day-to-day operation of the facility.  So the job | 14:28:18 |
| 4 | duties and responsibilities are -- are very | 14:28:22 |
| 5 | dissimilar between an OA and a reliability change | 14:28:24 |
| 6 | OA or a maintenance change OA. | 14:28:28 |
| 7 | Q    And so you felt -- well, did you feel | 14:28:35 |
| 8 | that this was a downgrade from your IEAR team lead | 14:28:39 |
| 9 | position? | 14:28:52 |
| 10 | A    I did feel that way, yes. | 14:28:52 |
| 11 | Q    But you were ultimately put back into | 14:28:55 |
| 12 | the IEAR team lead position; right? | 14:28:58 |
| 13 | A    I was, against my wishes.  But, yes, I | 14:29:01 |
| 14 | was. | 14:29:07 |
| 15 | Q    Okay.  Well, we'll get to that.  The -- | 14:29:07 |
| 16 | the reliability change operating assistant role | 14:29:09 |
| 17 | was created at the suggestion of your supervisor, | 14:29:12 |
| 18 | Austin Ruppert; right? | 14:29:16 |
| 19 | A    Yes. | 14:29:16 |
| 20 | Q    Okay.  And so would you agree that | 14:29:18 |
| 21 | Mr. Ruppert had a good opinion of your abilities? | 14:29:20 |
| 22 | A    Yes. | 14:29:20 |
| 23 | Q    And he endorsed you for the REM job in | 14:29:22 |
| 24 | Escravos; right? | 14:29:26 |
| 25 | A    No. | 14:29:27 |

| | | |
|---|---|---|
| 1 | change OA, maintenance change OA were different | 14:33:53 |
| 2 | from all the other OA roles -- roles at the | 14:33:57 |
| 3 | facility; right? | 14:33:59 |
| 4 | A    Yes. | 14:34:00 |
| 5 | Q    And how so?  As a -- as a reliability | 14:34:00 |
| 6 | change OA, weren't you also in a leadership role? | 14:34:03 |
| 7 | A    No. | 14:34:03 |
| 8 | Q    Were you guiding teams? | 14:34:12 |
| 9 | A    No. | 14:34:12 |
| 10 | Q    But the other OA positions did? | 14:34:17 |
| 11 | A    The operating assistants have day-to-day | 14:34:20 |
| 12 | say in the way the units at the refinery operate. | 14:34:23 |
| 13 | So even though they don't give direct -- even | 14:34:29 |
| 14 | though the people don't report to them, they give | 14:34:33 |
| 15 | direct instructions to operations and even | 14:34:36 |
| 16 | maintenance personnel about what should be done | 14:34:39 |
| 17 | today, what things are the priority.  They | 14:34:42 |
| 18 | effectively run a small section of the refinery. | 14:34:47 |
| 19 | Q    But you're saying the reliability change | 14:34:52 |
| 20 | OA did not do that? | 14:34:54 |
| 21 | A    That is correct. | 14:34:56 |
| 22 | Q    And why is that? | 14:34:56 |
| 23 | A    It wasn't its job. | 14:34:58 |
| 24 | Q    What was its job? | 14:35:00 |
| 25 | A    I mean, I don't really have a job | 14:35:02 |

```
 1   description for it because it doesn't exist.        14:35:06
 2        Q    What were you doing on a day-to-day       14:35:09
 3   basis?                                              14:35:11
 4        A    Whatever Austin wanted me to do.  I       14:35:12
 5   spent the first three or so months training the     14:35:15
 6   new IEAR team lead and wrapping up some projects    14:35:19
 7   that I was working on.  I think I also got          14:35:26
 8   assigned to an investigation, but it was just --    14:35:31
 9   it's kind of like whatever --                       14:35:34
10        Q    Almost like special projects?            14:35:36
11        A    Yeah.                                     14:35:38
12        Q    Okay.  Now, less than a year later        14:35:44
13   around October, 2020, that's when this big reorg    14:35:47
14   happened -- right? -- restructuring of the          14:35:49
15   business?                                           14:35:51
16        A    That's -- that's when it rolled down to   14:35:51
17   my level, yeah.  It began much earlier than that.   14:35:54
18        Q    Okay.  And are you aware that ten         14:35:57
19   percent of the employees were laid of?             14:35:58
20        A    I am.                                     14:36:00
21        Q    And --                                    14:36:00
22        A    I actually take issue with that number.   14:36:02
23   It's not ten percent were laid off.  Ten percent    14:36:05
24   of the employee -- there was a reduction of ten     14:36:08
25   percent of the workforce.                           14:36:10
```

| | | |
|---|---|---|
| 1 | Q    And was that Austin Ruppert at the time? | 15:48:49 |
| 2 | A    It was not.  It was Greg Curtin.  Austin | 15:48:52 |
| 3 | Ruppert had opted not to stay with the company | 15:48:56 |
| 4 | during the reorganization. | 15:48:59 |
| 5 | Q    So you gave copies of this to Ms. Tse | 15:49:01 |
| 6 | and "Ms." -- Mr. Curtin; correct? | 15:49:03 |
| 7 | A    Yes. | 15:49:05 |
| 8 | Q    Anyone else? | 15:49:05 |
| 9 | A    No. | 15:49:07 |
| 10 | Q    Okay.  And this is your resignation | 15:49:07 |
| 11 | letter; right? | 15:49:09 |
| 12 | A    Yes. | 15:49:10 |
| 13 | Q    And it states, among other things, you | 15:49:11 |
| 14 | appreciate all the opportunities you've been -- | 15:49:13 |
| 15 | you've given -- that Chevron has given you during | 15:49:16 |
| 16 | your time at Chevron Products Company and the | 15:49:19 |
| 17 | support you've received from the rest of the team; | 15:49:20 |
| 18 | right? | 15:49:22 |
| 19 | A    Correct. | 15:49:22 |
| 20 | Q    Okay.  And so the letter doesn't say | 15:49:23 |
| 21 | anything about working with conditions so | 15:49:25 |
| 22 | intolerable that you had no choice but to quit; | 15:49:28 |
| 23 | correct? | 15:49:28 |
| 24 | A    That is correct. | 15:49:31 |
| 25 | Q    And/or that you felt like you were | 15:49:31 |

**EXHIBIT 16-40**

| | |
|---|---|
| 1 | forced to leave Chevron; correct? | 15:49:33 |
| 2 | A    Correct. | 15:49:35 |
| 3 | Q    And did you ever express those | 15:49:35 |
| 4 | sentiments in writing to anyone at Chevron? | 15:49:36 |
| 5 | A    Not in writing. | 15:49:39 |
| 6 | Q    Did you express them verbally? | 15:49:40 |
| 7 | A    Yes. | 15:49:40 |
| 8 | Q    To who? | 15:49:43 |
| 9 | A    Greg Curtin, Austin Ruppert.  I | 15:49:45 |
| 10 | expressed to them on several occasions that I felt | 15:49:51 |
| 11 | that my treatment at the company had been very | 15:49:55 |
| 12 | unfair and that I was considering leaving and -- | 15:49:57 |
| 13 | yeah. | 15:50:10 |
| 14 | Q    Mr. Ruppert left during the | 15:50:10 |
| 15 | reorganization event; right? | 15:50:11 |
| 16 | A    Yes. | 15:50:13 |
| 17 | Q    That was not quite a year but almost a | 15:50:13 |
| 18 | year before you resigned. | 15:50:16 |
| 19 | A    Correct. | 15:50:17 |
| 20 | Q    And so did you express this to him while | 15:50:18 |
| 21 | he was your supervisor or after he left? | 15:50:20 |
| 22 | A    While he was my supervisor. | 15:50:23 |
| 23 | Q    Anyone else? | 15:50:26 |
| 24 | A    Nobody in a position that would have | 15:50:28 |
| 25 | done anything about it, no. | 15:50:31 |

**EXHIBIT 16-41**

| | | |
|---|---|---|
| 1 | regard; Mr. Curtin? | 15:51:28 |
| 2 | A   I laid out the jobs that I had applied | 15:51:30 |
| 3 | to and that, you know, certain things had been on | 15:51:34 |
| 4 | my career development path since I started at | 15:51:36 |
| 5 | Chevron and many people had made me many promises | 15:51:39 |
| 6 | and many people had said that they would do things | 15:51:42 |
| 7 | for me and help me out, if I did X or Y; and that | 15:51:45 |
| 8 | those things never came to fruition; and that I | 15:51:50 |
| 9 | see being placed back in the role that I was | 15:51:54 |
| 10 | placed in as just a continuation of that. | 15:51:56 |
| 11 | Q   Okay.  So you didn't say anything to him | 15:52:00 |
| 12 | about discrimination or retaliation? | 15:52:02 |
| 13 | A   No. | 15:52:10 |
| 14 | Q   Let me ask it a better way.  Is it -- is | 15:52:11 |
| 15 | it true that you did not say anything to him about | 15:52:14 |
| 16 | discrimination or retaliation? | 15:52:16 |
| 17 | A   That is true. | 15:52:17 |
| 18 | Q   Okay.  Did you say anything to | 15:52:18 |
| 19 | Mr. Ruppert about discrimination or retaliation? | 15:52:19 |
| 20 | A   I believe I said something about | 15:52:21 |
| 21 | discrimination to Mr. Ruppert but not about | 15:52:23 |
| 22 | retaliation. | 15:52:27 |
| 23 | Q   When did you say something about | 15:52:28 |
| 24 | discrimination to Mr. Ruppert? | 15:52:30 |
| 25 | A   It would have been at the time when I | 15:52:31 |

**EXHIBIT 16-42**

| | | |
|---|---|---|
| 1 | believed the discrimination occurred. | 15:52:35 |
| 2 | Q    Is that age discrimination? | 15:52:37 |
| 3 | A    No.   That would have been disability | 15:52:39 |
| 4 | discrimination. | 15:52:42 |
| 5 | Q    I see.   Oh.   So he was copied on that | 15:52:43 |
| 6 | e-mail to Mr. Powers? | 15:52:45 |
| 7 | A    We would have to refer back to the | 15:52:48 |
| 8 | document as to whether he was copied or not, but I | 15:52:50 |
| 9 | know I told him in person. | 15:52:52 |
| 10 | Q    So assuming he was copied on the e-mail, | 15:52:55 |
| 11 | you're saying you also told him in person? | 15:53:00 |
| 12 | A    That is correct. | 15:53:01 |
| 13 | Q    Okay.   And what exactly did you say to | 15:53:02 |
| 14 | him in person? | 15:53:04 |
| 15 | A    Just that I thought it was | 15:53:05 |
| 16 | discriminatory that they didn't have a good reason | 15:53:06 |
| 17 | for not letting me go to Escravos. | 15:53:09 |
| 18 | Q    Anything else? | 15:53:13 |
| 19 | A    I don't think so.   No details. | 15:53:14 |
| 20 | Q    Do you know whether he ever told anybody | 15:53:15 |
| 21 | else about that? | 15:53:17 |
| 22 | A    I have no idea. | 15:53:17 |
| 23 | Q    And so why didn't you say anything about | 15:53:19 |
| 24 | any of that in this resignation letter? | 15:53:21 |
| 25 | A    The typical resignation letter doesn't | 15:53:29 |

| | | |
|---|---|---|
| 1 | say anything bad about a company that you're | 15:53:33 |
| 2 | leaving, and I saw no benefit to writing it down | 15:53:36 |
| 3 | to people that really don't have anything to do -- | 15:53:40 |
| 4 | any power to affect what I was complaining about. | 15:53:43 |
| 5 | Q    Did you talk to anyone else at Chevron | 15:53:54 |
| 6 | about your resignation? | 15:53:56 |
| 7 | A    No. | 15:53:56 |
| 8 | Q    And I'm not -- again, I'm not trying to | 15:54:01 |
| 9 | surprise. | 15:54:03 |
| 10 | Did you talk to Troy Tortorich? | 15:54:04 |
| 11 | A    I don't believe I did, no. | 15:54:06 |
| 12 | MR. MUSSIG:  I'll mark as Exhibit 18 a | 15:54:19 |
| 13 | document titled "voluntarily termination - | 15:54:21 |
| 14 | GO-439-1," Bates-numbered SNOOKAL-1143. | 15:54:26 |
| 15 | (Exhibit 18 was marked for | 15:54:26 |
| 16 | identification by the Certified | 15:54:26 |
| 17 | Shorthand Reporter.) | 15:54:37 |
| 18 | MS. LEAL:  Thank you. | 15:54:37 |
| 19 | BY MR. MUSSIG: | 15:54:38 |
| 20 | Q    Are you familiar with this document? | 15:54:39 |
| 21 | A    I am. | 15:54:41 |
| 22 | Q    Is it -- is that your signature in the | 15:54:43 |
| 23 | middle of the page? | 15:54:44 |
| 24 | A    It is. | 15:54:45 |
| 25 | Q    And you signed this on August 4, 2021? | 15:54:47 |

| | | |
|---|---|---|
| 1 | A    I did. | 15:54:49 |
| 2 | Q    And this says: | 15:54:51 |
| 3 | "I wish to resign my | 15:54:52 |
| 4 | employment with the Chevron | 15:54:53 |
| 5 | Products Company effective | 15:54:55 |
| 6 | August 20, 2021, for the following | 15:54:56 |
| 7 | reasons:  I am leaving for an | 15:54:59 |
| 8 | opportunity with significantly | 15:55:01 |
| 9 | increased responsibility." | 15:55:02 |
| 10 | There's no other stated reason for your | 15:55:04 |
| 11 | resignation; correct? | 15:55:07 |
| 12 | A    Correct. | 15:55:08 |
| 13 | Q    Is that true?  You were leaving for an | 15:55:08 |
| 14 | opportunity with a significantly increased | 15:55:10 |
| 15 | responsibility? | 15:55:12 |
| 16 | A    It is a correct statement.  Yeah. | 15:55:13 |
| 17 | Q    Did you discuss with anyone at Chevron | 15:55:17 |
| 18 | in this time period about anything with regard to | 15:55:22 |
| 19 | discrimination or retaliation? | 15:55:27 |
| 20 | MS. LEAL:  Again, that he hasn't already | 15:55:29 |
| 21 | discussed today, I assume. | 15:55:30 |
| 22 | BY MR. MUSSIG: | 15:55:30 |
| 23 | Q    During -- during this -- during the | 15:55:34 |
| 24 | resignation -- | 15:55:36 |
| 25 | MS. LEAL:  Okay. | 15:55:37 |

| | | |
|---|---|---|
| 1 | BY MR. MUSSIG: | 15:55:37 |
| 2 | Q    -- in connection with the resignation? | 15:55:37 |
| 3 | A    No. | 15:55:39 |
| 4 | Q    And, again, why not? | 15:55:45 |
| 5 | A    The same answer.  There's no point in | 15:55:49 |
| 6 | putting it on this form which is just going to get | 15:55:52 |
| 7 | stuck in my file.  They probably didn't even read | 15:55:55 |
| 8 | it. | 15:55:58 |
| 9 | MR. MUSSIG:  19.  I'm going to mark as | 15:56:14 |
| 10 | Exhibit 19 a document entitled "exit interview." | 15:56:16 |
| 11 | (Exhibit 19 was marked for | 15:56:16 |
| 12 | identification by the Certified | 15:56:16 |
| 13 | Shorthand Reporter.) | 15:56:16 |
| 14 | BY MR. MUSSIG: | 15:56:16 |
| 15 | Q    And you participated in an exit | 15:56:36 |
| 16 | interview with Ms. Tse before you left Chevron; | 15:56:38 |
| 17 | correct? | 15:56:38 |
| 18 | A    I did. | 15:56:42 |
| 19 | Q    And the interview was voluntary; | 15:56:43 |
| 20 | correct? | 15:56:43 |
| 21 | A    Yes. | 15:56:45 |
| 22 | Q    Do you know -- you might not know the | 15:56:48 |
| 23 | answer to this. | 15:56:51 |
| 24 | Do you know whether Chevron only | 15:56:51 |
| 25 | requests this type of exit interview when | 15:56:52 |

| | | |
|---|---|---|
| 1 | Q    Did you at some point say that you | 16:12:29 |
| 2 | needed to leave Chevron for your mental health? | 16:12:31 |
| 3 | A    I did not; not to anyone at Chevron, no. | 16:12:33 |
| 4 | Q    Do you feel like you did need to leave | 16:12:38 |
| 5 | Chevron for your mental health? | 16:12:40 |
| 6 | A    Yes. | 16:12:42 |
| 7 | Q    Why so? | 16:12:43 |
| 8 | A    As someone that doesn't have a degree, | 16:12:50 |
| 9 | it's very difficult to make a career above a | 16:12:53 |
| 10 | technician level; right? | 16:12:56 |
| 11 | To get into engineering, to get into | 16:12:57 |
| 12 | management and leadership, to get into a | 16:13:00 |
| 13 | multinational oil corporation, all of these things | 16:13:04 |
| 14 | are not without a lot of head wind, if you don't | 16:13:07 |
| 15 | have a Bachelor's degree and not just a Bachelor's | 16:13:10 |
| 16 | degree but in a specific field; right? | 16:13:15 |
| 17 | They want an engineering degree almost | 16:13:16 |
| 18 | exclusively. | 16:13:25 |
| 19 | I have always worked very hard to add as | 16:13:26 |
| 20 | much value in whatever role I have at whatever | 16:13:30 |
| 21 | company I'm at, and I take a lot of personal | 16:13:33 |
| 22 | responsibility for my work ethic and the | 16:13:36 |
| 23 | contributions that I make, and I have always seen | 16:13:39 |
| 24 | that rewarded in one way or another by the | 16:13:46 |
| 25 | companies I worked for. | 16:13:48 |

**EXHIBIT 16-47**

| | | |
|---|---|---|
| 1 | It was always a small struggle at | 16:13:55 |
| 2 | Chevron to make progress, and I attributed that to | 16:13:57 |
| 3 | the size of the company.  It is the largest | 16:14:00 |
| 4 | company that I had worked for. | 16:14:03 |
| 5 | But as time went on, especially after | 16:14:07 |
| 6 | the Nigeria -- or after the -- the EGTL, you know, | 16:14:09 |
| 7 | revocation, the -- the subsequent inability to be | 16:14:20 |
| 8 | placed into roles that I felt at least | 16:14:26 |
| 9 | competitive, if not overqualified in some cases, | 16:14:32 |
| 10 | certainly to the candidates that were selected -- | 16:14:35 |
| 11 | I felt like I wasn't being rewarded for my | 16:14:39 |
| 12 | contributions and that, you know, it -- it caused | 16:14:41 |
| 13 | me a lot of -- I don't know -- a lot of grief | 16:14:45 |
| 14 | and -- and -- and difficulty in -- in figuring out | 16:14:56 |
| 15 | what I was; right? | 16:15:04 |
| 16 | So it's like -- it's like -- almost like | 16:15:05 |
| 17 | it kind of twisted my identity a little bit; | 16:15:08 |
| 18 | right? | 16:15:12 |
| 19 | Like if I'm this person that works hard | 16:15:12 |
| 20 | and makes it anyway, even though I don't have all | 16:15:15 |
| 21 | the tools that I should have, I can make it work, | 16:15:17 |
| 22 | and then all of a sudden I can't make it work and | 16:15:20 |
| 23 | just it keeps happening and keeps happening and | 16:15:23 |
| 24 | keeps happening, it got to the point where, you | 16:15:26 |
| 25 | know, I started suffering from depression.  And -- | 16:15:31 |

**EXHIBIT 16-48**

| | | |
|---|---|---|
| 1 | and so I did seek a therapist and then counseling, | 16:15:34 |
| 2 | and they, you know, through -- through | 16:15:42 |
| 3 | conversations, basically, that's how we identified | 16:15:45 |
| 4 | that a lot of my personality and my self-worth is | 16:15:48 |
| 5 | tied up in my job and advancement and -- and, you | 16:15:51 |
| 6 | know, rewards that I get from that, and it was | 16:15:59 |
| 7 | really almost my whole world at that point. | 16:16:02 |
| 8 | And so, you know, she encouraged me to | 16:16:10 |
| 9 | try to separate that out some -- right? -- so | 16:16:14 |
| 10 | that's part of what my therapist and I worked on, | 16:16:17 |
| 11 | getting side hobbies and doing other things.  But, | 16:16:21 |
| 12 | you know, it never really fully separated from | 16:16:24 |
| 13 | work. | 16:16:27 |
| 14 | And then once the reorganization | 16:16:28 |
| 15 | happened and I wasn't -- I didn't get any of the | 16:16:31 |
| 16 | jobs that I put in for and they basically said, | 16:16:41 |
| 17 | "Take this old job you already had or quit," which | 16:16:44 |
| 18 | is similar to something that they did to me in | 16:16:48 |
| 19 | 2013 when I left the analyzer role and they're | 16:16:52 |
| 20 | like, "We need you in technical, so take this | 16:16:55 |
| 21 | technical job.  You're not going to be in | 16:16:58 |
| 22 | maintenance anymore."  It's just like -- it was | 16:17:01 |
| 23 | just like repeating.  And that's when my therapist | 16:17:06 |
| 24 | started suggesting that I should probably try to, | 16:17:08 |
| 25 | you know, maybe look for other work. | 16:17:10 |

| | | |
|---|---|---|
| 1 | Q    Well, let me ask:  So when did you begin | 16:17:13 |
| 2 | seeing a therapist? | 16:17:18 |
| 3 | A    I believe it was sometime in 2020. | 16:17:21 |
| 4 | Q    During COVID? | 16:17:25 |
| 5 | A    It was during COVID, yes. | 16:17:26 |
| 6 | Q    And who is the therapist? | 16:17:29 |
| 7 | A    It -- I talked to a few people before | 16:17:30 |
| 8 | finally we settled on one therapist.  It was | 16:17:34 |
| 9 | Eileen Baer, I believe her name was. | 16:17:37 |
| 10 | Q    How do spell Baer?  "B-e-a-r"? | 16:17:40 |
| 11 | A    I'm not sure how you -- no.  It's | 16:17:43 |
| 12 | like -- | 16:17:47 |
| 13 | Q    Bayer aspirin -- | 16:17:47 |
| 14 | A    Maybe, yeah. | 16:17:48 |
| 15 | Q    -- B-a-y-e-r? | 16:17:49 |
| 16 | A    I -- I think it was "B-e-a" -- or | 16:17:50 |
| 17 | B-a-e-r; something like that.  It wasn't -- it -- | 16:17:55 |
| 18 | it's in the -- | 16:17:57 |
| 19 | Q    All right. | 16:17:58 |
| 20 | A    It's in the records. | 16:17:59 |
| 21 | Q    Are you still seeing her? | 16:18:02 |
| 22 | A    No. | 16:18:03 |
| 23 | Q    When did you stop seeing her? | 16:18:05 |
| 24 | A    Shortly after I resigned from Chevron. | 16:18:07 |
| 25 | Q    Why did you stop seeing her? | 16:18:09 |

| | | |
|---|---|---|
| 1 | A    Most of what we were talking about | 16:18:12 |
| 2 | was -- at that point, anyway, it was Chevron | 16:18:14 |
| 3 | and -- and being -- you know, ways to cope with | 16:18:21 |
| 4 | continued disappointment that was happening at | 16:18:23 |
| 5 | Chevron.  I wasn't really discussing other issues | 16:18:26 |
| 6 | that I was having with her. | 16:18:32 |
| 7 | You know, the -- when I didn't go to | 16:18:36 |
| 8 | Escravos, it caused a lot of difficulty in my | 16:18:44 |
| 9 | family with my wife and my son, but it wasn't -- | 16:18:46 |
| 10 | it wasn't the kind of thing that I needed therapy | 16:18:55 |
| 11 | for; right? | 16:19:02 |
| 12 | My wife was upset.  My son was upset. | 16:19:03 |
| 13 | We had him in a special school for some | 16:19:06 |
| 14 | developmental disabilities that he has and for | 16:19:12 |
| 15 | some mental health disabilities that he has, and | 16:19:14 |
| 16 | we weren't going to be able to send him to that | 16:19:21 |
| 17 | school anymore without the money from Nigeria. | 16:19:24 |
| 18 | But I didn't need the therapist to help | 16:19:31 |
| 19 | me talk to my son and my wife about that; right? | 16:19:33 |
| 20 | We had communication, and we were | 16:19:37 |
| 21 | working through that on our own. | 16:19:39 |
| 22 | She was really helping me with the | 16:19:40 |
| 23 | continued negative feelings that I was having just | 16:19:47 |
| 24 | by working for Chevron; right? | 16:19:52 |
| 25 | Q    Because you weren't being promoted? | 16:19:54 |

| | | |
|---|---|---|
| 1 | A    Right, and watching other people be | 16:19:56 |
| 2 | promoted and essentially, in my mind, being | 16:19:58 |
| 3 | demoted and then not being particularly valued for | 16:20:01 |
| 4 | the work that I was doing even in the new position | 16:20:04 |
| 5 | that I was in.  It wasn't new.  In the position | 16:20:07 |
| 6 | that I was put back in.  They held a -- an | 16:20:13 |
| 7 | employee, you know, like survey, engagement | 16:20:22 |
| 8 | survey, and there were a lot of feedback and a lot | 16:20:25 |
| 9 | of stuff, and Chevron wasn't really going to | 16:20:27 |
| 10 | address that. | 16:20:30 |
| 11 | And I -- I felt like, you know, that | 16:20:31 |
| 12 | made it difficult for me in that, you know, my | 16:20:34 |
| 13 | group had had a hard time through COVID and they | 16:20:37 |
| 14 | had had a hard time through the reorganization, | 16:20:42 |
| 15 | and it -- it didn't seem like Chevron was going to | 16:20:45 |
| 16 | help them any more than me.  And so it just, you | 16:20:48 |
| 17 | know, was almost a daily -- daily thoughts about | 16:20:53 |
| 18 | how -- how much it wasn't that great to work there | 16:21:00 |
| 19 | anymore. | 16:21:02 |
| 20 | Q    Did you see any other mental health | 16:21:02 |
| 21 | providers or -- | 16:21:05 |
| 22 | A    I also took Cymbalta at the time, so I | 16:21:07 |
| 23 | had a psychiatrist just for prescribing. | 16:21:12 |
| 24 | Q    And who was that? | 16:21:19 |
| 25 | A    I don't re -- I don't recall her name. | 16:21:19 |

**EXHIBIT 16-52**

```
 1    STATE OF CALIFORNIA   )
                            ) SS.
 2    COUNTY OF VENTURA     )

 3           I, John M. Taxter, a California Certified

 4    Shorthand Reporter, Certificate No. 3579, a

 5    Registered Professional Reporter, do hereby

 6    certify:

 7           That the foregoing proceedings were taken

 8    before me at the time and place therein set forth,

 9    at which time the deponent was put under oath by

10    me; that the testimony of the deponent and all

11    objections made at the time of the examination

12    were recorded stenographically by me and were

13    thereafter transcribed; that the foregoing is a

14    true and correct transcript of my shorthand notes

15    so taken.

16           I further certify that I am neither counsel

17    for nor related to any party to said action.

18           The dismantling, unsealing, or unbinding of

19    the original transcript will render the Reporter's

20    Certificate null and void.

21           Pursuant to Federal Rule 30(e), transcript

22    review was requested.

23    Dated May 22, 2024.

24    _____
                                 JOHN M. TAXTER
25                               California Certified Shorthand
                                 Reporter No. 3579, RPR
```

Abrams, Mah & Kahn                                    320

**EXHIBIT 16-53**

57

1

2

3

4         I, John M. Taxter , Certified Shorthand Reporter,

5    CSR No.   3579, hereby certify:

6         The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12    Dated:   May 23, 2024 _____

13

14

15

16    _____

17         John Taxter, CSR No. 3579

18

19

20

21

22

23

24

25

# EXHIBIT 17

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK SNOOKAL, an individual, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. 2:23-cv-6302-HDV-AJR |
| CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS

Tuesday, September 17, 2024

Houston, Texas

Reported by:
JANE BRAMBLETT, CLR, CCRR, CSR No. 7574
Job No. 114803

**EXHIBIT 17-1**

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4  MARK SNOOKAL, an          )
    individual,               )
 5                            )
                  Plaintiff,  )
 6                            )
            vs.               )  NO. 2:23-cv-6302-HDV-AJR
 7                            )
    CHEVRON USA, INC., a       )
 8  California Corporation,   )
    and DOES 1 through 10,    )
 9  inclusive,                )
                              )
10               Defendants.  )
    ──────────────────────────)
11

12

13

14

15      REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS,

16  taken on behalf of Plaintiff, commencing at

17  10:00 a.m. and ending at 1:50 p.m., at Houston, Texas,

18  Tuesday, September 17, 2024, before Jane Bramblett, CLR,

19  CCRR, Certified Shorthand Reporter No. 7574.

20

21

22

23

24

25
```

EXHIBIT 17-2

61

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3   ALLRED, MAROKO & GOLDBERG
     BY:  DELORES Y. LEAL, ESQ.
 4   6300 Wilshire Boulevard, Suite 1500
     Los Angeles, California 90048
 5   323.653.6530
     dleal@amglaw.com
 6

 7   FOR THE DEFENDANTS:

 8   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     BY:  SARAH FAN, ESQ.
 9   333 South Hope Street, Suite 4300
     Los Angeles, California 90071-1422
10   213.620.1780
     sfan@sheppardmullin.com
11

12   Also Present:  Jenny Sherman, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 17-3

Andrew Powers                                    September 17, 2024

1       Q     Is that it?

2       A     That's it.

3       Q     Who is your employer?

4       A     Chevron.

5       Q     On your paycheck stubs, what's the entity

6    that's identified as your employer?

7       A     Chevron USA.

8       Q     Has any entity other than Chevron USA paid

9    your salary?

10      A     No.

11      Q     And how long have you been employed by

12   Chevron?

13      A     15 years.

14      Q     When did you begin?  When were you hired?

15      A     June of 2009.

16      Q     And my understanding is that your current

17   position is senior adviser to the chief human

18   resources officer.

19      A     That's correct.

20      Q     And you've been in that position since on

21   or about June of '22?

22      A     I've been in this role since November of

23   2023.

24      Q     Okay.  And who is your current superior?

25      A     By "superior," do you mean who I report

**EXHIBIT 17-4**

Andrew Powers                                    September 17, 2024

1       A     Yes, it is.

2       Q     Which is it?  A division or a subsidiary?

3       A     I don't know off the top of my head.

4       Q     During the time that you reported to

5   Ms. Delaney, Chevron USA paid your salary?

6       A     Yes.

7       Q     During the time that you have been senior

8   adviser to Ms. Morris, from November of '23 through

9   the present, where are you physically located?

10      A     Houston, Texas.

11      Q     And when you were reporting to Ms. Delaney

12  as a senior HR, where were you physically located?

13      A     Houston, Texas.

14      Q     And during the time that you were senior HR

15  manager in Houston, Texas, reporting to Ms. Delaney,

16  was Chevron USA still your employer?

17      A     Yes.

18      Q     And they paid your salary.

19      A     Yes.

20      Q     What was the position you held just prior

21  to senior HR manager reporting to Ms. Delaney?

22      A     I was the senior HR manager of our

23  El Segundo refinery.

24      Q     And how long were you in that position?

25      A     For just about three years.

**EXHIBIT 17-5**

Andrew Powers                                          September 17, 2024

1       Q      From when to when?

2       A      June 2019 through May 2022.

3       Q      And who was your superior during that

4    period?

5       A      I had two during that period.

6       Q      Who were they?

7       A      It was Glenda Valero and Scott Wilcox.

8    They had changed out during that time, and the title

9    of them was GM of HR for manufacturing.

10      Q      And when was Mr. Wilcox your manager?

11      A      In the November 2020 time frame.

12      Q      Through May of '22?

13      A      Say it again, please.

14      Q      Through May of '22?

15      A      That's correct.

16      Q      And did you hold any other position prior

17   to Senior HR Manager in El Segundo?

18      A      Yes.

19      Q      What position was that?

20      A      I was the HR manager of our Appalachian

21   Mountain business unit in Coraopolis, Pennsylvania.

22      Q      And how long were you, in Pennsylvania, the

23   HR manager?

24      A      Two years.

25      Q      From when to when?

**EXHIBIT 17-6**

Andrew Powers                                    September 17, 2024

1        A    May of 2017 to May of 2019.

2        Q    And during the time that you were in

3    Pennsylvania, did Chevron USA pay your salary?

4        A    Yes.

5        Q    And did you have any other positions with

6    Chevron prior to that?

7        A    I did.

8        Q    What was your next position and what date?

9        A    I was the executive compensation adviser

10   from 2015 -- May -- June 2015 to June 2017.

11       Q    And where were you geographically

12   stationed?

13       A    San Ramon, California.

14       Q    And Chevron USA was your employer at that

15   time as well?

16       A    Yes.

17       Q    And did -- do you hold any other position

18   prior to that one?

19       A    Yes.  I was an HR adviser in our joint

20   venture operation called Tengiz Chevroil.  That was

21   located in Kazakhstan, so this was an expatriot

22   assignment.  And that was from June of 2013 to June

23   of 2015.

24       Q    In the expatriot assignment in Kazakhstan,

25   was Chevron USA still your employer?

**EXHIBIT 17-7**

1           MS. FAN:  Objection.  Calls for a legal

2    conclusion.

3    BY MS. LEAL:

4           Q     You can answer.

5           A     I can't confirm that.  I don't know that

6    part right now.

7           Q     Did Chevron USA pay your salary during that

8    time that you were in Kazakhstan?

9           A     Yes.

10          Q     And did you hold any other position prior

11   to your assignment in Kazakhstan?

12          A     I did.  I was the senior labor relations

13   adviser and payroll supervisor in our San Joaquin

14   Valley business unit in Bakersfield, California,

15   from July of 2011 to June of 2013.

16          Q     And when you were stationed in Bakersfield,

17   was Chevron USA your employer?

18          A     Yes.

19          Q     And did Chevron USA pay your salary?

20          A     Yes.

21          Q     And did you hold any other position with

22   Chevron prior to this assignment in Bakersfield?

23          A     Yes, I did.  I was on our HR development

24   program from 2009 to 2011.  And on -- the

25   development program was located in San Ramon,

**EXHIBIT 17-8**

Andrew Powers                                    September 17, 2024

1   California, from 2009 to 2010; Houston, Texas, for

2   six months in 2010; and then I was -- another

3   expatriot assignment where I was in Manila, the

4   Philippines.  And that was from January of 2011 to

5   June of 2011 for that expatriot assignment

6   specifically.

7        Q    Certainly have traveled around for Chevron.

8        A    I have.

9        Q    During this last position that you just

10  mentioned, HR development program, where you were in

11  San Ramon; Houston, Texas; and then Manila, was

12  Chevron USA your employer?

13       A    Yes.

14            MS. FAN:  Objection.  Calls for a legal

15  conclusion.  Calls for speculation.

16            Mr. Powers, you're doing great.  Just a

17  quick reminder to pause a little bit so I can get my

18  objections in.

19            THE WITNESS:  Sure.

20            MS. FAN:  Thank you.

21  BY MS. LEAL:

22       Q    And during the time that you were HR

23  development program in San Ramon; Houston, Texas;

24  and Manila, did Chevron USA also pay your salary?

25            MS. FAN:  Objection.  Compound.

**EXHIBIT 17-9**

Andrew Powers                                      September 17, 2024

```
 1              THE WITNESS:  Yes.
 2   BY MS. LEAL:
 3       Q    Any other position with Chevron prior to HR
 4   development program?
 5       A    No.
 6       Q    So you were hired into HR development
 7   program position in San Ramon in 2009?
 8       A    Yes.  That's correct.
 9       Q    So most of my questions today, Mr. Powers,
10   will pertain to the period of time when you were the
11   Senior HR Manager at the El Segundo refinery.  Okay?
12       A    Okay.
13       Q    So during the time that you were a senior
14   HR manager in El Segundo, were there any individuals
15   who reported to you?
16       A    Yes.
17       Q    Who?
18       A    Thalia Tse, Eric Stephenson, Kelly Andrews,
19   Violet Torres, Willy Martinez.
20       Q    Anyone else?
21       A    Those were my direct reports.
22       Q    Okay.  And what positions did these
23   individuals hold?  Were they all -- did they all
24   hold the same position?
25       A    No, they did not.  So --
```

**EXHIBIT 17-10**

Andrew Powers                                    September 17, 2024

```
 1   all employees.  She went through onboarding for
 2   Chevron as well, which would be our business code
 3   and ethics.  Other policies on anti-harassment and
 4   discrimination.
 5        Q    Was it your expectation, Mr. Powers, as the
 6   senior HR manager, that your HR business partners be
 7   familiar with Chevron's human resources policy?
 8             MS. FAN:  Objection.  Vague and ambiguous.
 9             THE WITNESS:  Yes.  I would -- I would
10   expect my HR VPs to be familiar with the processes
11   in order to perform them and be partners to their
12   client groups.
13   BY MS. LEAL:
14        Q    Do you know if your HR business partners,
15   such as Ms. Tse, were responsible for providing
16   training to management within her area of
17   responsibility?
18             MS. FAN:  Objection.  Vague and ambiguous.
19             THE WITNESS:  Can you be more specific on
20   the type of training you're referring to?
21   BY MS. LEAL:
22        Q    Thank you for that clarification.  I think
23   I do need to clarify my question.
24             So do you know if Ms. Tse, for example, as
25   the HR business partner, as part of her
```

**EXHIBIT 17-11**

Andrew Powers                                        September 17, 2024

1    responsibilities, was she supposed to train

2    supervisors, managers in her specific clients' area

3    with respect to HR policy?

4        A    I don't know that I would call it "train"

5    them specifically, but Thalia, as an HR VP, would be

6    present for a variety of people processes.  And HR

7    VP's primary responsibility would often be to

8    facilitate and make sure that managers, supervisors,

9    employees were following appropriate steps and

10   processes.  You know, making sure, as an example,

11   that we're keeping bias out of a selection, making

12   sure that we are staying in compliance with, you

13   know, federal, state, and local laws for anything

14   that we did.

15       Q    So Ms. Tse, then, as the HR business

16   partner in El Segundo, in your opinion, was she

17   required to be familiar with federal, state and

18   local laws, as you mentioned?

19            MS. FAN:  Objection.  Vague and ambiguous.

20   Calls for speculation.

21   BY MS. LEAL:

22       Q    Employment law.

23       A    Can you clarify your question?  You're

24   referring to employment law?

25       Q    Yeah.  Let me make sure my question is

**EXHIBIT 17-12**

Andrew Powers                                      September 17, 2024

1    clear.
2           So would you expect Ms. Tse, who reports to
3    you as the HR business partner in El Segundo for her
4    specific client area of maintenance and reliability,
5    do you believe that she should be familiar with
6    federal, state, and local employment laws?
7    A    Yes.  And I would also expect that the HR
8    business partner partner with our legal counsel if
9    there was any questions on those.
10   Q    Thank you.
11          Referring to the legal counsel you just
12   mentioned, was legal counsel also in El Segundo?
13   A    Yes.
14   Q    So you could partner with someone in
15   El Segundo who was an attorney?
16   A    Yes.
17   Q    In 2019 was there an employment counsel in
18   El Segundo with whom Ms. Tse or you could have
19   consulted?
20   A    There was senior counsel present.  Your
21   question was phrased as employment counsel.  That
22   individual was not located in El Segundo, but was
23   very accessible to us by phone or email as we needed
24   it.
25   Q    Who was the senior counsel present in

**EXHIBIT 17-13**

Andrew Powers                                    September 17, 2024

1        A    J-o-n-m-i, last name Koo, K-o-o.

2        Q    Was Mr. Koo the attorney who primarily

3    supported you and your team in 2019?

4        A    Just for clarification, Jonmi is a female.

5    And Jonmi was, yes, primary contact point for me,

6    for my HR VP specifically.  Just throughout the

7    course of my career at Chevron, I've had a

8    connection with Abiel, so I've also reached out to

9    him.

10       Q    Thank you.

11            The five individuals who reported to you in

12   El Segundo, were they all located in El Segundo as

13   well?

14       A    Yes.

15       Q    Did you supervise any other employees not

16   located in El Segundo during the time that you were

17   the senior HR manager in El Segundo?

18       A    No.

19       Q    Would you please describe your job

20   responsibilities as the senior HR manager in

21   El Segundo.

22       A    Yes.  So as the senior HR manager in

23   El Segundo, I was supervising a team of HR business

24   partners, a labor relation adviser, an HR assistant,

25   and our -- my primary responsibilities were to lead

EXHIBIT 17-14

Andrew Powers                                      September 17, 2024

1   HR operations at a local level for the refinery.

2   That includes day-to-day counsel and policy

3   administration for the HR VPs, and that our labor

4   relations was the primary contact point for our

5   union present in the refinery, and an HR assistant,

6   you know, primarily helping with logistics and other

7   tasks associated with our day-to-day operations.

8        Q    Was part of your responsibility as senior

9   HR manager in El Segundo to conduct investigations

10  if someone complained about discrimination?

11           MS. FAN:  Objection.  Vague and ambiguous.

12  BY MS. LEAL:

13       Q    Did you understand my question, Mr. Powers?

14       A    I did, yes.  Yes, as the senior HR manager,

15  complaints and investigations may come my way, but

16  oftentimes they would come through our HR business

17  partners or maybe even through our hotline that we

18  have available to employee.

19           So it was really case by case, but

20  depending on the nature of the complaint, it would

21  normally be assigned to one of our HR business

22  partners to conduct.  In some occasions we may ask

23  for our employee relations department, which is a

24  different group within Chevron, to take on the lead

25  of the investigation.  And that can be for a variety

**EXHIBIT 17-15**

Andrew Powers                                     September 17, 2024

1    of reasons, you know, where we didn't feel it was

2    suitable for the HR business partner to take the

3    lead on the investigation.

4            For myself specifically, it would be, if it

5    was more senior management-related complaints,

6    that's when I would get involved; otherwise, I would

7    ask my HR VPs to be the primary contact point.

8        Q    My tech skills will now be revealed.  I'm

9    going to put in the chat a document.

10           (Exhibit 1 was marked for identification.)

11   BY MS. LEAL:

12       Q    I have now put in the chat Exhibit 1, if

13   can you open that up, Mr. Powers.

14           MS. LEAL:  Did you get it, Counsel?

15           MS. FAN:  No.  I'm not seeing an attachment

16   in the chat.

17           THE WITNESS:  I'm not, either.

18           MS. FAN:  There we go.  It just came

19   through.

20           MS. LEAL:  Thank you.

21   BY MS. LEAL:

22       Q    If you'll both open that up now.

23       A    Okay.  I have it.

24       Q    Okay.  Good.  Have you seen this document

25   before today, Mr. Powers?

**EXHIBIT 17-16**

Andrew Powers                                    September 17, 2024

1      A    Yes.  This document looks familiar.  It's
2   our location premiums by area of assignment, a
3   document that exists to capture the different
4   premiums associated with our locations of work.
5      Q    Okay.  And for the record, this is a
6   document produced by Chevron.  The Bates number on
7   the bottom right-hand corner is CUSA000501 and 502.
8           So it's your understanding then,
9   Mr. Powers, that employees with rotational
10  assignments receive annual premium pay?
11     A    That's correct.
12     Q    So this document explains to Chevron
13  employees that irrespective of where in the world
14  they might work, they'll receive premium pay, and
15  this document shows how much the annual premium pay
16  percentage will be?
17          MS. FAN:  Objection.  Argumentative.
18          THE WITNESS:  I'm not sure I understand the
19  question.  I would describe it as not all locations
20  getting a premium percentage.  If you're in your own
21  home country, you would not be getting a premium
22  percentage.  This is if you're going on expat
23  assignment, rotational or residential, temporary.
24  BY MS. LEAL:
25     Q    Okay.  So, for example, when you went to

**EXHIBIT 17-17**

Andrew Powers                                      September 17, 2024

1  Kazakhstan, you received a rotational assignment

2  premium percentage pay?

3      A    Yes.  When I was located in Kazakhstan, I

4  received a premium percentage pay.

5      Q    And the same was true when you were in the

6  Philippines?

7      A    That's correct.

8      Q    And were you aware that Mr. Snookal, the

9  plaintiff in this case, the rotational assignment

10 that he sought was in Escravos, Nigeria?

11     A    Sorry.  Are you asking if I was aware of

12 him going to that assignment?

13     Q    Yeah.  Let me -- let me start again.

14          Were you aware that the rotational

15 assignment which Mr. Snookal sought was in Escravos,

16 Nigeria?

17     A    Yes, ma'am.  I was not aware of

18 Mr. Snookal's assignment or offer to Escravos until

19 I first received a note from him.

20     Q    Right.  So at that point you became aware

21 that it would have been in Escravos, Nigeria?

22     A    Correct.

23     Q    So looking at Exhibit 1, that would mean

24 that if Chevron were to have allowed Mr. Snookal to

25 work in Escravos, he would have been at the annual

**EXHIBIT 17-18**

Andrew Powers                                                    September 17, 2024

1   premium of 55 percent; is that correct?

2            MS. FAN:  Objection.  Incomplete

3   hypothetical.

4            THE WITNESS:  That's correct, based on the

5   document you've shared.  I see 55 percent associated

6   with Nigeria, Escravos.

7   BY MS. LEAL:

8        Q    And what does it mean to be at 55 percent

9   annual percentage?

10       A    It could be interpreted as a hardship

11  allowance that we give our employees for going to

12  these different locations, and it's in recognition

13  of maybe a loss of amenities that they would be used

14  to in their home country as well as due to the

15  extreme conditions, lack of medical facilities or

16  access, other goods and services that they might not

17  be able to get.

18           So 55 percent, as an example, would mean

19  it's 55 percent additional income on top of their

20  base salary.

21       Q    Okay.  So you testified earlier that when

22  you were in Kazakhstan, that Chevron USA paid your

23  salary.  Do you know if the same would have been

24  true with respect to Mr. Snookal had he gone to

25  Escravos?

**EXHIBIT 17-19**

Andrew Powers                                    September 17, 2024

1   delivery model.  This was handled by another group

2   within HR, not me specifically as senior HR manager

3   in a refinery for my team as HR business partners.

4   This -- this policy, tax equalization administered

5   by HR Shared Service is a completely different

6   group.

7        Q    What is HR Shared Services?

8        A    That is an organization within HR that

9   administers various processes for HR.  Could be

10  reporting.  It could be global mobility topics.

11  It -- in short, it's an organization within HR at

12  Chevron.

13       Q    And so there's this organization called

14  "Human Resources Shared Services" that reports to

15  whom?

16       A    Can you clarify what -- what date you're

17  talking about?

18       Q    2019.

19       A    So that shared services organization would

20  report in to our HR leaders.  It's one of the

21  organizations that exists.  So I -- 2019 time frame,

22  I couldn't tell you who they exactly reported in to.

23       Q    Do you know what "Human Resources Shared

24  Services" mean; in other words, shared services?

25            MS. FAN:  Vague and ambiguous.

**EXHIBIT 17-20**

1          THE WITNESS:  As I've mentioned, it's an

2     organization within Chevron HR that handles a

3     variety of processes for us.  I don't know what

4     topics you would like me to refer to, but they're --

5     they're just an organization that is under our

6     umbrella.

7     BY MS. LEAL:

8          Q     Okay.  And this organization under your

9     umbrella, are they located in the Philippines and in

10    Argentina?

11         A     Yes.

12         MS. FAN:  Vague and ambiguous.

13    BY MS. LEAL:

14         Q     Do the different Chevron subsidiary --

15    strike that.

16         Are you aware if the different Chevron

17    subsidiaries are required to abide by the same

18    Chevron personnel policies?

19         MS. FAN:  Objection.  Calls for

20    speculation.  Calls for a legal conclusion.

21         THE WITNESS:  We have Chevron-wide policies

22    that exist, and then we have policies that may exist

23    due to local laws and regulations.

24    BY MS. LEAL:

25         Q     Do you know if there are policies that

**EXHIBIT 17-21**

Andrew Powers                                    September 17, 2024

```
 1   Mr. Snookal was unfit for duty for the Escravos
 2   assignment.  And once that determination is made,
 3   then they begin to inform the employee so that they
 4   know that the expat assignment is not going to
 5   happen, as well as make necessary parties aware so
 6   that we can figure out what role the employees is
 7   going to go into instead.
 8   BY MS. LEAL:
 9       Q    So who was the individual or individuals
10   who actually made the decision to retract the expat
11   assignment to Mr. Snookal?
12            MS. FAN:  Objection.  Calls for
13   speculation.
14            THE WITNESS:  I am only aware of the
15   medical personnel that were part of making that
16   determination of unfit for duty.
17   BY MS. LEAL:
18       Q    And who were those medical personnel that
19   you're referring to?
20       A    It would be Chevron Nigeria Health and
21   Medical, so people that were actually in that
22   location, as well as Dr. Levy, who is a doctor who
23   looked over multiple locations.
24       Q    And do you remember the names of the
25   medical personnel in Chevron Nigeria in Health and
```

**EXHIBIT 17-22**

Andrew Powers                                September 17, 2024

```
 1   Medical that you referenced?
 2        A    No, I don't.
 3             MS. FAN:  Counsel, we've been going for
 4   about an hour.  And when you get to a good stopping
 5   point, could we take a five-minute break?
 6             MS. LEAL:  We can take a five-minute break
 7   now.
 8             MS. FAN:  Okay.  Thank you.
 9             MS. LEAL:  Thank you.
10             THE VIDEO OPERATOR:  We are off the record.
11   The time is 11:00 a.m.
12             (Recess)
13             THE VIDEO OPERATOR:  We are back on the
14   record.  The time is 11:10 a.m.
15             MS. LEAL:  I'm going to put in the chat
16   another document marked Exhibit 3.
17             (Exhibit 3 was marked for identification.)
18   BY MS. LEAL:
19        Q    Let me know when you have it, Mr. Powers.
20        A    Okay.  I'm pulling it up now.  Okay.  I
21   have it.
22        Q    Why don't you scroll through it.  For the
23   record, it is a three-page document Bates number
24   CUSA000538 through 540.
25             So look at the first email beginning on
```

**EXHIBIT 17-23**

Andrew Powers                                          September 17, 2024

1    page 539, which is the second page.  The first email

2    is dated September 4, 2019, at 7:21 a.m. from

3    Mr. Snookal to you.

4           Do you see that?

5        A    Yes, I do.

6        Q    And the email begins, "Andrew, I am very

7    disappointed in the decision by Chevron Medical to

8    classify me as," quote/unquote, "'unfit' for the

9    Reliability Engineering Manager position at EGTL.  I

10   believe this decision was made based on a lack of

11   understanding and stereotypical assumptions about my

12   medical condition and is, therefore, discriminatory

13   in nature.  As my condition does not affect my

14   ability to perform the job duties of that position,

15   I require no ongoing care outside of annual

16   monitoring, working in a remote location does not

17   affect my condition, a complication from my

18   condition would cause no harm to others, and I have

19   no work restrictions from my physician this decision

20   seems excessively paternalistic."  And it goes on

21   for another long paragraph, two paragraphs.

22          Do you remember receiving this email from

23   Mr. Snookal, Mr. Powers?

24       A    I'm still reading through it.  If I could

25   just read through the rest, I'll confirm.

**EXHIBIT 17-24**

Andrew Powers                                      September 17, 2024

1      Q     Okay.

2      A     Okay.   Yes.   I'm familiar with this email.

3      Q     Would you look at the last page of

4   Exhibit 3, Mr. Snookal's signature line.

5            Are you there?

6      A     Yes.

7      Q     He was at the time an IEA reliability team

8   lead, but at the bottom, it says, in bold "Chevron

9   Products Company."

10           Do you know if Chevron Products Company

11  paid Mr. Snookal's salary at the time?

12           MS. FAN:   Objection.   Calls for

13  speculation.   Calls for a legal conclusion.

14           THE WITNESS:   I do not know if it was

15  listed as Chevron Products Company or Chevron USA.

16  I would need to confirm that.

17  BY MS. LEAL:

18     Q     Okay.   So is it possible for him to be

19  working for Chevron Products Company, but, at the

20  same time, being paid by Chevron USA?

21           MS. FAN:   Calls for speculation.   Calls for

22  a legal conclusion.

23           THE WITNESS:   I guess it's possible.

24  BY MS. LEAL:

25     Q     But going back to the second page of this

**EXHIBIT 17-25**

Andrew Powers                                    September 17, 2024

1  document, Exhibit 3, you sent an email that same day

2  at 7:35 a.m. to Mr. Snookal replying to him, and

3  then you copied Ms. Tse as well as Austin Ruppert.

4        Do you see that?

5     A    Yes, I do.

6     Q    And in this email from you to Mr. Snookal,

7  you're thanking him for bringing this issue to your

8  attention, and you said:  Let me look into this and

9  I'll get a better understanding and we'll get back

10  to you ASAP.  Correct?

11     A    Yes.  I also said, "This is the first I'm

12  hearing of this."

13     Q    Right.  So no one else, including the

14  Nigeria business unit, had not reached out to you in

15  connection with the job offer that was rescinded in

16  Nigeria.  Correct?

17     A    No.  Correct.

18     Q    So after responding to Mr. Snookal at

19  7:35 a.m., you then sent an email, same day, at

20  7:41 a.m. to Troy Tortorich -- I don't know if I'm

21  pronouncing the name correctly or not, but it's

22  T-o-r-t-o-r-i-c-h, and to Austin Ruppert, and you

23  again copied Ms. Tse.

24        Do you see that email?

25     A    Yes, I do.

**EXHIBIT 17-26**

Andrew Powers                                      September 17, 2024

1        Q    And you said, "Austin/Troy, please be
2   thinking about what role Mark could do if this falls
3   through."
4            What you were referring to is the actual --
5   the fact that the job was rescinded in Nigeria?
6        A    That's correct.
7        Q    And then you go on to say, "Thalia and I
8   will investigate and see what medical can share/set
9   up with an appropriate response."
10           Do you see that?
11       A    I see that.
12       Q    The next paragraph in your email, you say,
13  "Note he finds this discriminatory, however, that is
14  hard to know without further context from medical,"
15  period.
16           Who is the medical that you're referring to
17  there?
18       A    In this sentence, I was referring to
19  medical at a broad level, not a specific individual.
20       Q    Would it have been Nigeria business unit?
21       A    At this point in time, I wasn't even
22  specifically referring to Nigeria, just medical,
23  which is another organization within Chevron.
24       Q    And where is that organization?
25           MS. FAN:  Vague and ambiguous.  Calls for

**EXHIBIT 17-27**

Andrew Powers                                    September 17, 2024

1    speculation.

2    BY MS. LEAL:

3        Q    Where is that organization geographically

4    located?

5            MS. FAN:  Same objections.

6            THE WITNESS:  We have medical personnel

7    throughout all of our assets in the company, so I

8    would need more specific, if you could.

9    BY MS. LEAL:

10       Q    Okay.  And when you say "all of our

11   assets," it's worldwide, I imagine?

12           MS. FAN:  Objection.  Calls for -- calls

13   for a legal conclusion.  Vague and ambiguous.  Calls

14   for speculation.

15           THE WITNESS:  We have medical

16   representatives in Chevron that are Chevron

17   employees that are looking over different assets.

18   BY MS. LEAL:

19       Q    What do you mean by "assets"?

20       A    Business units.

21       Q    Okay.  And these business units can be

22   located around the world?

23       A    Yes.

24           MS. FAN:  Objection.  Calls for

25   speculation.  Calls for a legal conclusion.  Vague

**EXHIBIT 17-28**

Andrew Powers                                        September 17, 2024

 1   and ambiguous.

 2          THE WITNESS:  Yes.  We're a global company.

 3   BY MS. LEAL:

 4      Q    So the next sentence in that second

 5   paragraph, you say, "I am sure there is a very good

 6   reason why this was rescinded."

 7          Do you see that?

 8      A    Yes.

 9      Q    And when you wrote this email, you had not

10   started your investigation, correct?

11      A    That's correct.

12      Q    So were you giving -- I'm sorry.  Did I cut

13   you off?  I apologize if I did.

14      A    It was within, you know, a very short time

15   frame of first hearing about it, so I had not ticked

16   that off yet.

17      Q    So you were giving Chevron the benefit of

18   the doubt, then, that there was a very good reason

19   for it?

20          MS. FAN:  Objection.  Argumentative.  Vague

21   and ambiguous.

22          THE WITNESS:  I don't know that I would

23   phrase it as "benefit of the doubt."  However, I do

24   know we have various policy, and as we spoke about

25   earlier, we comply with all federal, state, local

**EXHIBIT 17-29**

1  he was interested in applying for those roles.  And

2  so that's what I see from this email.

3  BY MS. LEAL:

4      Q    So after you advised Mr. Snookal that the

5  position in Escravos would not go forward, did you

6  personally look for any positions which might be

7  comparable for Mr. Snookal?

8          MS. FAN:  Objection.  Calls for a legal

9  conclusion.

10         THE WITNESS:  I don't recall at this point.

11 I do remember making sure his supervisor and his PDR

12 were involved in those discussions with Mark to

13 determine what roles would be available.

14 BY MS. LEAL:

15     Q    So you didn't ask Ms. Tse also to look for

16 any positions which might be comparable to the

17 Escravos position for Mr. Snookal?

18         MS. FAN:  Objection.  Calls for a legal

19 conclusion.

20         THE WITNESS:  I don't recall.

21         MS. LEAL:  Let's move on to the next

22 exhibit, Exhibit 5, which I just posted on the chat.

23 It's a two-page document Bates No. CUSA000542 and

24 543.  It is a document with two emails, one on the

25 bottom, and an email from Mr. Snookal to Mr. Powers

**EXHIBIT 17-30**

Andrew Powers                                    September 17, 2024

1    with a copy to others, dated September 4th at

2    7:21 a.m.

3              (Exhibit 5 was marked for identification.)

4    BY MS. LEAL:

5        Q     And do you recognize that email,

6    Mr. Powers, as the same email that we discussed

7    earlier in Exhibit 3?

8        A     Yes.  I recognize it.

9        Q     So the only new email on this Exhibit 5 is

10   the email at the top, correct?

11       A     That's correct.

12       Q     And the email at the top is an email from

13   you to Mr. Snookal, correct?

14       A     That's correct.

15       Q     So you've seen this document before today?

16       A     Yes.  It's an email that I sent.

17       Q     In the second paragraph, you say, "I've

18   reached out to the medical department."  And I just

19   want to clarify, the medical department to whom

20   you're referring here is Dr. Levy?

21       A     That's correct.

22       Q     And then you say, "I understand a thorough

23   review was conducted and alternatives were

24   explored."

25              Is that understanding based upon your

**EXHIBIT 17-31**

Andrew Powers                                    September 17, 2024

1    conversation with Dr. Levy as well?

2         A    Yes.   That's correct.

3         Q    And where were the alternatives that were

4    explored that you mention here?

5         A    So through my summary and overview provided

6    by Dr. Levy, I know that they did explore whether

7    another location in Nigeria would be suitable.   That

8    location, Lagos, has more medical facilities that

9    would be available.   However, ultimately it was

10   determined that that would not be an appropriate

11   location for the role to be performed.   It would not

12   be possible for Mark to perform his duties from that

13   location.   And that was the main alternative that

14   was explored.

15        Q    Transferring Mr. Snookal to work from Lagos

16   instead of Escravos but performing the same job, the

17   reliability engineering manager's job?

18        A    That's correct.   Could he perform that job

19   effectively from another location is what we

20   explored.

21        Q    And the answer was no.

22        A    That's correct.

23        Q    And then you go on to say, "We would

24   respectfully disagree that the determination was

25   based on stereotyping or impermissible

**EXHIBIT 17-32**

Andrew Powers                                        September 17, 2024

1    discrimination."

2           Do you see that?

3    A     I see that.

4    Q     As of 2019, September of 2019, how many

5    investigations of complaints of discrimination

6    involving disability had you performed?

7           MS. FAN:  Objection.  Vague and ambiguous.

8    Calls for a legal conclusion.

9           THE WITNESS:  How many investigations had I

10   been part of?

11   BY MS. LEAL:

12   Q     Yeah.

13   A     Was that your question?

14          To my recollection, no other investigations

15   that I personally was part of.

16   Q     So as of September 2019 -- I'm going to

17   expand my question.  Let me start again.

18          So as of September 2019, had you conducted

19   any type of investigation into employee complaints

20   of discrimination?  Any form of discrimination?

21          MS. FAN:  Objection.  Vague and ambiguous.

22   Calls for a legal conclusion.

23          THE WITNESS:  Are you talking about

24   infinite amount of time, or just in September of

25   2019?  What time period are you referring to?  Can

**EXHIBIT 17-33**

Andrew Powers                                    September 17, 2024

```
1    interact with the local manager in Nigeria.

2    BY MS. LEAL:

3        Q    Did you ask Ms. Tse to do so?

4        A    No, I did not.

5        Q    Okay.  I'm going to put in the chat one

6    last exhibit, and it will be Exhibit 12.

7            (Exhibit 12 was marked for identification.)

8    BY MS. LEAL:

9        Q    Let me know when you see this.

10       A    Okay.  It just came through.  I'm opening.

11       Q    And for the record, is it a two-page

12   document.  CUSA000650 and 651.

13       A    Okay.  I have it open.

14       Q    Great.  And if you'll see in the middle of

15   this email string, the top email is an email from

16   you to Jones, M.D. Jones, on September 4th.

17           Was this the same doctor you referred to

18   earlier today, Dr. Ayanna?

19       A    That's correct.

20       Q    So Ayanna Jones, correct?

21       A    That's correct.

22       Q    And Dr. Ayanna Jones was located at least

23   in 2019, in Houston, Texas.  Correct?

24       A    Correct.  Based on the email signature

25   line, that's what it looks like.
```

**EXHIBIT 17-34**

Andrew Powers                                    September 17, 2024

1       Q    And so this is the exhibit that you were

2   referring to when Dr. Ayanna Jones referred you to

3   another person to speak with in connection with

4   Mr. Snookal's complaint?

5       A    That's correct.  Just looking to make

6   contact with health and medical, and then was

7   pointed to someone else.

8       Q    Her email says, "Hello, Andrew.  The

9   EEMEA."  Do you know what that acronym stands for?

10      A    It's our -- at the time was our Europe and

11  Middle Eastern Africa business segment, which

12  encompassed multiple countries under it.  And so

13  this regional medical director -- or medical manager

14  looked over multiple countries.

15      Q    Do you know who that person was in 2019?

16      A    Yes.  Dr. Levy.

17           MS. LEAL:  Okay.  I have no further

18  questions.  You have time to spare to get to your

19  bus.

20           Ms. Court Reporter, we'll just handle the

21  transcript under Code.

22           MS. FAN:  Oh, Counsel, I apologize.  I do

23  have a couple of questions on my own.  I'm aware of

24  the 2:00 o'clock end time, and we'll try to get us

25  all out of here by then.

**EXHIBIT 17-35**

Andrew Powers                                    September 17, 2024

```
 1            I, the undersigned, a Certified Shorthand

 2     Reporter of the State of California, do hereby

 3     certify:

 4            That the foregoing proceedings were taken

 5     before me at the time and place herein set forth;

 6     that any witnesses in the foregoing proceedings,

 7     prior to testifying, were duly sworn; that a record

 8     of the proceedings was made by me using machine

 9     shorthand which was thereafter transcribed under my

10     direction; that the foregoing transcript is a true

11     record of the testimony given.

12            Further, that if the foregoing pertains to

13     the original transcript of a deposition in a Federal

14     Case, before completion of the proceedings, review

15     of the transcript [  ] was [  ] was not requested.

16            I further certify I am neither financially

17     interested in the action, nor a relative or employee

18     of any attorney or party to this action.

19            IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21

22     Dated: October 1, 2024

23
                      _____
24
                      JANE BRAMBLETT, CLR, CCRR
25                    CSR No. 7574
```

EXHIBIT 17-36

# EXHIBIT 17 -3

09.17.24

**Andrew Powers**

**3**

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Wednesday, September 4, 2019 12:49 PM |
| **To:** | Tortorich, Troy; Ruppert, Austin |
| **Cc:** | Tse, Thalia |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

All – Not for forwarding, but I wanted to give you a quick update. Apologies for the lengthy e-mail as I am traveling.

First, I heard back from medical. They were not able to provide any specific medical information but could state that having a medical condition by itself does not disqualify an individual if the risk can be managed effectively at the host location. In this situation, the host medical team reviewed the case and given the inherent risk and inability to mitigate/eliminate this risk in Escravos, led to the decision of unfit for expat assignment in this case. They did look into whether the position could be moved to Lagos, where there are hospitals and better medical resources but that was not feasible. It is common for the treating physician's decision to be overridden, this happens when the treating provider does not understand the local medical resources at the host location, the difficulty medically evacuating a person from the location, and the risk tolerance of the host, in short disagreements do happen. The use of the term "low risk" is a little misleading here as there is a specific risk of his underlying condition becoming problematic and although the treating doctor reported this individuals risk to be lower than what is written in the medical literature, it's still significant and higher than the business was willing to accept.

Second, I have asked medical how we have responded to these in the past. Mark is not the first person to be deemed unfit for expat assignment. I'd like to get proper and effective language before responding to Mark and let him know who his resources are to further discuss medical details (it is not appropriate if he discusses his condition with you, me or anyone besides medical).

Third, I think you will be best prepared by thinking about what role Mark can do within El Segundo. Do you have an existing vacancy? Do we have any roles that he could be good for in the near future? He mentions a backfill was identified, is that already finalized? I know it would not be ideal, but would you want to consider rescinding that person's offer since Mark's offer fell through? Main intent here is that we need to give Mark the assurance (if possible) that he should not worry about NOT having a job (we will figure something out). It is clear he is frustrated about not getting the expat role, but now is concerned what his employment looks like in general.

I will report back once I hear back from medical on how they have responded to these in the past. In the meantime, if you have any questions that need immediate attention, please feel free to call Thalia or myself.

Kind Regards,

**_Andrew Powers_**
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

**From:** Powers, Andrew C
**Sent:** Wednesday, September 4, 2019 7:41 AM

1

CUSA000538

**EXHIBIT 17-3-1**

3.1

**To:** Tortorich, Troy (TRMT) <TRMT@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>
**Subject:** Fwd: Rescinded Job Offer in Nigeria

Austin/Troy,
Please be thinking about what role Mark could do if this falls through. Thalia and I will investigate and see what medical can share/set us up with an appropriate response.

Note he finds this discriminatory, however, that is hard to know without further context from medical. I am sure there is a very good reason why this was rescinded.

Andrew

Sent from my iPhone

Begin forwarded message:

> **From:** "Powers, Andrew C" <Andrew.Powers@chevron.com>
> **Date:** September 4, 2019 at 7:35:44 AM PDT
> **To:** "Snookal, Mark" <Mark.Snookal@chevron.com>
> **Cc:** "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
> **Subject:** Re: Rescinded Job Offer in Nigeria
>
> Mark,
> Thank you for bringing this to our attention. This is the first I am hearing of this. Therefore, please let me look into this and see if I can get a better understanding of why. We will get back to you ASAP.
>
> Andrew
>
> Sent from my iPhone
>
> On Sep 4, 2019, at 7:21 AM, Snookal, Mark <Mark.Snookal@chevron.com> wrote:
>
>> Andrew,
>>
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>>
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

CUSA000539

**EXHIBIT 17-3-2**

3.2

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

3

CUSA000540

**EXHIBIT 17-3-3**

99

3.3

# EXHIBIT 17 -5

09.17.24
**Andrew Powers**
**5**

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Friday, September 6, 2019 7:57 AM |
| **To:** | Snookal, Mark |
| **Cc:** | Tse, Thalia; Ruppert, Austin |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

*Andrew Powers*
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria…His [my] condition is under good control, and no special treatment

1

is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

2

CUSA000543

**EXHIBIT 17-5-2**

5.2

# EXHIBIT 17 -12

From: Powers, Andrew C[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AFB7F7C935FE4FB4938203195698DFEA-BDQS]
Sent: Wed 9/4/2019 2:42:07 PM Coordinated Universal Time
To: Jones MD, Ayanna[Ayanna.Jones@chevron.com]
Cc: Tse, Thalia[thaliatse@chevron.com]; Levy, Scott[ScottLevy@chevron.com]
Subject: Re: Rescinded Job Offer in Nigeria

```
09.17.24
Andrew Powers
12
```

Thank you Dr. Ayana.
Would be great if we can get some further justification and suggested response today.

Sent from my iPhone

On Sep 4, 2019, at 7:39 AM, Jones MD, Ayanna <Ayanna.Jones@chevron.com> wrote:

> Hello Andrew,
> The EEMEA Regional Medical Manager would be able to provide you with context on this case and appropriate response.
> Regards,
> Ayanna Jones, MD, MPH
> Manager US Occupational and
> Expatriate Health Services
> **Chevron Services Company**
> A Division of Chevron U.S.A. Inc.
> TR & HM COE
> Global Health and Medical
> 1400 Smith, #03196
> Houston, TX 77002
> Tel: (713)372-5921
> Fax: (713)372-5941
> Email: Ayanna.Jones@chevron.com
> *This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*
>
> From: Powers, Andrew C <Andrew.Powers@chevron.com>
> Sent: Wednesday, September 04, 2019 9:33 AM
> To: Jones MD, Ayanna <Ayanna.Jones@chevron.com>
> Cc: Tse, Thalia <thaliatse@chevron.com>
> Subject: Fwd: Rescinded Job Offer in Nigeria
> Dr. Ayana,
> Are you able to provide me with any context on the below and suggested response? Is this common to have conflicting views between someone's personal physician and Chevron Expat Medical?
> If there is another resource you would suggest, could I please have their name?
> Note that Mark finds this discriminatory in nature, however, this is hard to know with the limited information.
> Kind Regards,
> Andrew Powers
>
> Sent from my iPhone
> Begin forwarded message:
>
>> From: "Snookal, Mark" <Mark.Snookal@chevron.com>
>> Date: September 4, 2019 at 7:20:38 AM PDT
>> To: "Powers, Andrew C" <Andrew.Powers@chevron.com>
>> Cc: "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
>> Subject: Rescinded Job Offer in Nigeria
>>
>> Andrew,
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.
>> Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.
>> Mark Snookal

**EXHIBIT 17-12-1**

IEA Reliability Team Lead
**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 17-12-2**

# EXHIBIT 18

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,    )
                                )
                                )
            Plaintiff,          )
vs.                             ) Case No.
                                ) 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                  )
                                )
            Defendants.         )
_____)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

**EXHIBIT 18-1**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1                    A P P E A R A N C E S

 2


 3


 4    FOR THE PLAINTIFF:

 5            ALLRED, MAROKO & GOLDBERG
              By:  DOLORES Y. LEAL
 6            Attorney at Law
              6300 Wilshire Boulevard, Suite 1500
 7            Los Angeles, California 90048
              (323) 653-6530
 8            dleal@amglaw.com

 9    FOR THE DEFENDANT:

10            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  ROBERT E. MUSSIG
11            Attorney at Law
              333 South Hope Street, 43rd Floor
12            Los Angeles, California 90071
              (213) 620-1780
13            rmussig@sheppardmullin.com

14    THE VIDEOGRAPHER:

15            Jacob Rivera

16    ALSO PRESENT:

17            Eguono Erhun, In-House Counsel for Chevron

18


19


20


21


22


23


24


25
```

**EXHIBIT 18-2**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   foundation.  Let me just -- Doctor, when I object,
 2   unless I instruct you not to answer, you should still
 3   answer the question.  I'm just making objections for the
 4   record.  So unless I'm instructing you not to answer, go
 5   ahead and answer her questions.
 6           THE WITNESS:  Okay.  So by the nature of this
 7   contract, Deep Drill is providing medical services to
 8   Chevron by supplying manpower, doctors and nurses.
 9   BY MS. LEAL:
10       Q.  Do you know if Deep Drill Oil Services provides
11   medical services to any other companies other than
12   Chevron, or is Chevron the only client?
13       A.  I don't know.
14           MR. MUSSIG:  Calls for speculation.
15   BY MS. LEAL:
16       Q.  So prior to 2020, who was your employer?
17       A.  So prior to 2020, my employer was Delog Nigeria
18   Limited, D-E-L-O-G, Delog Nigeria Limited.
19       Q.  So prior to 2020, your employer was Delog
20   Nigeria Limited?
21       A.  Yes.  That's D-E-L-O-G.
22       Q.  So what business was Delog Nigeria Limited in
23   at the time?
24           MR. MUSSIG:  Calls for speculation.  Lacks
25   foundation.
```

**EXHIBIT 18-3**

Dr. Eshiofe Asekomeh                                      October 10, 2024

1          THE WITNESS:  Okay.  So -- so for my group, it

2    was, again, provision of manpower, doctors and nurses,

3    to Chevron in this instance.

4    BY MS. LEAL:

5          Q.  Okay.  Do you know if Delog Nigeria Limited

6    provided doctors and nurses to other companies other

7    than Chevron at the time?

8          MR. MUSSIG:  Calls for speculation.

9          THE WITNESS:  I don't know.

10   BY MS. LEAL:

11         Q.  Okay.  Has Chevron directly ever paid your

12   salary?

13         A.  No.

14         Q.  So the work that you did for Chevron was paid

15   either by Delog Nigeria Limited or by Deep Drill Oil

16   Services in conjunction with the contract that those

17   companies had with Chevron; is that correct then?

18         A.  Can you rephrase that question?

19         Q.  Yes.  I want to make sure I understand.

20         Prior to 2020, and since then, all of the work

21   that you have performed for Delog Nigeria Limited and

22   Deep Drill Oil Services was work that you did in

23   connection with services for Chevron.

24         A.  Yes.

25         Q.  Other than Chevron, did you have any other

**EXHIBIT 18-4**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    companies for which you provided any services at any

2    time during your employment with either Delog Nigeria

3    services or Deep Drill Oil Services?

4         A.   No.

5         Q.   When did you first start doing any work for

6    Chevron?

7         A.   My contract started in 2011.

8         Q.   And at that time, then, your salary -- your

9    compensation was paid by Delog?

10        A.   No.  So from 2011, my contract company was IMS

11   Medical Services.

12        Q.   I-V, as in Victor?

13        A.   No.  IMS, International Medical Services

14   Limited.

15        Q.   I apologize.  What were the letters again?

16        A.   IMS.  S --

17        Q.   "X" like X-ray.

18        A.   -- for services.  No, "S" like services.

19        Q.   IMS.

20        A.   Yes.

21        Q.   Okay.  And how long did you have a contract

22   with IMS Medical Services?  From 2011 until when?

23        A.   2011 until about -- I'm not sure now.  I have

24   to look that up.  About 2005, 2006.

25             Oh, sorry, '15, '16.  '11 to '15, '16.

**EXHIBIT 18-5**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   did residency training in internal medicine in the
 2   University of Port Harcourt Teaching House, which was
 3   specializing in the West African College of Physician.
 4   Between 2003 and 2009, junior residency for three years
 5   in general internal medicine, and then the last three
 6   years subspecializing in neurology.
 7            I have a Master's in pharmacology from the
 8   University of Port Harcourt in Nigeria.  I have another
 9   Master's in public health from the University of
10   Manchester.  And then in between, I've done a course in
11   occupational health from the University College
12   Hospital, Ibadan, Nigeria.
13        Q.  How do you spell Ibadan?
14        A.  I-B-A-D-A-N.
15        Q.  And how long have you been a physician -- a
16   licensed physician?
17        A.  1997 until date.  Last 27 years.
18        Q.  And do you have a medical specialty?
19        A.  Yes.
20        Q.  What is that?
21        A.  I'm a physician, that's equivalent to the U.S.
22   internist, and I'm also a neurologist.
23        Q.  An internist and neurologist.  Okay.
24        A.  Yes.
25        Q.  Have you ever practiced cardiology?
```

**EXHIBIT 18-6**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1          A.  Not as a cardiologist.

2          Q.  Have you ever seen an aortic dissection or

3     rupture?

4          A.  No --

5              MR. MUSSIG:  Vague and ambiguous as to "seen."

6              THE WITNESS:  Can you clarify that?

7     BY MS. LEAL:

8          Q.  Sure.  Have you ever treated an individual who

9     had an aortic dissection or a rupture?

10         A.  No.

11         Q.  The contract which you have with Deep Drill Oil

12    Services, which you've had since, you said, 2020, does

13    that contract specify that you only do work for Chevron?

14         A.  Not written in the contract.

15         Q.  Do you only do work for Chevron, though?

16         A.  Yes.

17         Q.  And prior to 2020, have you only done work for

18    Chevron?

19              MR. MUSSIG:  Vague and ambiguous.

20              THE WITNESS:  Yes.  When you say "do work," you

21    mean have contract with?  Or what do you mean "do work"?

22    BY MS. LEAL:

23         Q.  Well, in your work as a doctor, you said that

24    the company Delog provides doctors and nurses to

25    Chevron.

**EXHIBIT 18-7**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              So in your work as a doctor, do you provide
 2    services to any other company other than Chevron?
 3         A.   No.
 4         Q.   So you're exclusive to Chevron then?
 5              (Simultaneous crosstalk.  Reporter
 6              clarification.)
 7              MR. MUSSIG:  Vague and ambiguous as
 8    "exclusive."
 9    BY MS. LEAL:
10         Q.   I'll withdraw that.  You've already answered my
11    other question.
12              So let's focus on your job duties during the
13    time that you were an occupational health physician.
14              Can you tell me what your job duties were?
15         A.   Okay.  So specific for the occupational health
16    duties, I did annual --
17              (Reporter clarification.)
18              THE WITNESS:  Annual or periodic medical --
19    BY MS. LEAL:
20         Q.   Annual or periodic --
21         A.   -- medical --
22         Q.   -- medical --
23         A.   -- exams for the local employees, their
24    dependents; retirees, and their dependents.  I also did
25    work-related medicals for employees, pre-employments,
```

**EXHIBIT 18-8**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1   recall also being deemed not fit for duty?
2          A.  I will have to look at the record to answer.
3          Q.  Okay.  Other than Mr. Snookal, in 2019, 2020,
4   are there any individuals whom you deemed to be unfit
5   for duty because of an aortic dissection or an aortic
6   aneurysm?
7          A.  No.
8          Q.  So Mr. Snookal was the only one?
9          A.  The only one with aortic aneurysm.
10         Q.  Okay.  So let's focus on the MSEA evaluations
11  that you were responsible for performing in 2019.
12             Can you tell me how you went about conducting
13  these evaluations?
14             MR. MUSSIG:  Vague and ambiguous.  Calls for a
15  narrative.
16             THE WITNESS:  Okay.  So do you want, like, a
17  generic description of what the process is like?
18  BY MS. LEAL:
19         Q.  Yes.
20         A.  Okay.  So from both end, both from the Nigeria
21  end and the U.S. end, or any other country where MSEAs
22  are done, there is a specific list of what you are
23  supposed to do, and that is captured in the Medical
24  Examination Protocol book that is a global guide to
25  Chevron occupational health screenings, work-related
```

**EXHIBIT 18-9**

Dr. Eshiofe Asekomeh                                October 10, 2024

1    screenings that tells you what forms the client should

2    fill.  So we have a form for collecting background

3    medical --

4              (Reporter clarification.)

5              THE WITNESS:  Medical history of the patient.

6    There are forms for specific things.  Authorization,

7    medical history, medical examination by his physician or

8    the physician who is doing the MSEA, and then there's a

9    list of investigations to be done for MSEA, what blood

10   works, X-rays, and all of that.

11             And after that is done, as of that time, the

12   country of origin would send those documents to the

13   destination country, and it is the job of the

14   destination country to review those documents and make a

15   determination of fitness or no fitness.  So it is --

16             (Reporter clarification.)

17             THE WITNESS:  It is sent -- it is sent through

18   the electronic medical record system.  So you get an

19   e-mail when it has been sent to you to say documents for

20   Mr. XYZ has been sent to you.  So you go to the EMR and

21   look at those documents, go through all the forms, make

22   sure they're properly filled, make sure the person has

23   been examined, look at the examination finding, look at

24   the medical history of that person, look at the results,

25   and make sure the results are complete and they are all

**EXHIBIT 18-10**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   normal.  Okay?
 2            If there is any abnormality, make sure there is
 3   an explanation or the fact that the person has been
 4   reviewed.  And if you are not comfortable with any of
 5   those results, you send back a message to the team that
 6   sends you those MSEA documents and ask for further
 7   investigation or ask for further review, which you then
 8   get back and then you make a determination.
 9   BY MS. LEAL:
10        Q.  Thank you.  Can you tell me again what is the
11   name of that guide?
12            What is the title of that guide that you
13   utilized in ensuring that everything is completed, the
14   global guide?
15        A.  That is the Medical Examination Protocol, MEP,
16   Medical Examination Protocol.
17        Q.  And is that a Chevron document, to your
18   knowledge?
19        A.  Yes.
20        Q.  And this Medical Examination Protocol document
21   is a document that you utilize in order to ensure that
22   you properly conduct these MSEAs; correct?
23        A.  So it's a guide to tell you what -- what
24   investigations and what forms needs to be filled and
25   what needs to be done for every protocol.  So for MSEA,
```

**EXHIBIT 18-11**

Dr. Eshiofe Asekomeh                                     October 10, 2024

1   please?

2           MS. LEAL:  Sure.

3           THE VIDEOGRAPHER:  All right.  Going off the

4   record at 8:04 a.m.

5           (Off the record.)

6           THE VIDEOGRAPHER:  All right.  We're back on

7   the record at 8:17 a.m.

8   BY MS. LEAL:

9       Q.  Dr. Asekomeh, from 2016 through 2020, when you

10  were in Warri as the occupational physician, did you

11  learn of any instances where an employee required

12  medical attention which the local Escravos clinic was

13  not equipped to handle?

14      A.  Yes.

15      Q.  And can you tell me about those instances that

16  you do recall?

17      A.  Because of the date range given, it would be

18  difficult to recall specifics.  But we do have medevacs

19  from Escravos to Warri almost on a regular basis.

20      Q.  On what basis?

21      A.  On a regular basis.

22      Q.  What do you mean by "regular"?  How many times

23  a week?

24      A.  The answer I'm going to give you now is going

25  to be not -- maybe not for 2016, 2019.  I've been here

**EXHIBIT 18-12**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1    since 2020.  So in the past week, I've had two medevacs.
2    That's not counting referrals.  So we differentiate
3    between referrals and medevac.  Medevacs are medevacs,
4    urgent, emergency.  Referrals are things we can
5    prioritize, and then put them on normal flights out.
6        Q.  If someone suffered an aortic rupture, that, in
7    your mind, would require a medevac?
8        A.  Okay.  Again --
9            MR. MUSSIG:  Incomplete hypothetical.
10           THE WITNESS:  That's --
11           (Reporter clarification.)
12           THE WITNESS:  I said that's if the person
13   survives from where they are driven, gets to the -- to
14   even get them to the Escravos clinic.  An aortic rupture
15   is a sudden, fatal event.
16   BY MS. LEAL:
17       Q.  I'm sorry.  Would you repeat what you said?
18       A.  I said an aortic rupture oftentime is fatal.
19       Q.  An aortic rupture is oftentimes fatal.
20       A.  Yes.
21       Q.  Correct.  So there's a possibility that the
22   person may just die as soon as there's a rupture, in
23   which case they would not even have to be medevacked
24   to --
25       A.  Yes.

**EXHIBIT 18-13**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   "know"?
 2        Q.  Are you aware that Dr. Sobel was the doctor
 3   selected by Chevron to conduct an examination of
 4   Mr. Snookal?
 5             MR. MUSSIG:  Lacks foundation.
 6             THE WITNESS:  So this form was signed by
 7   Dr. Sobel, and as I said, we use -- these forms are sent
 8   through the electronic medical records.  So for the form
 9   to have been signed by him, it means that the U.S. team
10   were aware of him and that he had conducted the test
11   before he passed them into the EMR web chat and then
12   send them to me to review.
13   BY MS. LEAL:
14        Q.  My question was a bit different.
15             Are you aware that Dr. Sobel who signed this
16   form was not Mr. Snookal's own physician but rather a
17   physician --
18        A.  Yes.
19        Q.  -- from Chevron selected to do the
20   examination?
21        A.  Yes.
22             MR. MUSSIG:  Lacks foundation.
23   BY MS. LEAL:
24        Q.  And according to this form, he dated it
25   July 24th, 2019, and he determined that Mr. Snookal was
```

**EXHIBIT 18-14**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1   fit for duty with restrictions of no heavy lifting more

2   than 50 pounds, and then he needed a review of a

3   recommendation letter from a cardiologist to clear him.

4           Is that your understanding?

5           MR. MUSSIG:  Document speaks for itself.

6           THE WITNESS:  Yes.

7   BY MS. LEAL:

8       Q.  Did you speak with Dr. Sobel at all?

9       A.  No.

10      Q.  And did you at some point learn that Dr. Steven

11  Khan was Mr. Snookal's cardiologist?

12      A.  Yes.

13      Q.  Did you speak with Dr. Khan?

14      A.  There's a report from Dr. Khan in these

15  records.

16      Q.  My question was:  Did you speak with Dr. Khan?

17      A.  No.

18      Q.  Did you speak with Mr. Snookal at all in

19  conjunction with your MSEA evaluation?

20      A.  No.

21      Q.  So you didn't speak with Mr. Snookal to find

22  out how long he had worked at Chevron prior to 2019

23  without any medical incidents?

24          MR. MUSSIG:  Asked and answered.

25          THE WITNESS:  No.

**EXHIBIT 18-15**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    BY MS. LEAL:

2         Q.  No, you did not speak with him to find out that

3    information; correct?

4         A.  It wasn't part of the process that I would

5    speak to him.

6         Q.  Well, you could have spoken to him, could you

7    not?

8              MR. MUSSIG:  Incomplete hypothetical.  Calls

9    for speculation.

10             THE WITNESS:  As I said, it's a process.

11   Wasn't part of the process.

12   BY MS. LEAL:

13        Q.  Was there anything to preclude you from picking

14   up the phone or sending an e-mail to Mr. Snookal to get

15   more information from him in order for you to evaluate

16   him for assignment to Escravos?

17        A.  So the way the process work was if I need any

18   further information, on that EMR web chat, I will

19   request for those information and the U.S. team will

20   handle it.

21        Q.  Did you ask anyone in the U.S. team to find out

22   how Mr. -- how long Mr. Snookal had worked at Chevron

23   prior to 2019 without any medical incidents?

24        A.  What will you need that information for?

25        Q.  I'm just asking if you -- if you did.

**EXHIBIT 18-16**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1           Did you contact any person to find out whether
2    Mr. Snookal had any prior medical incidents while
3    working at Chevron?
4        A.   That information was not necessary.
5        Q.   In your opinion, it was not necessary?  Is that
6    correct?
7        A.   As of that time, it wasn't necessary.
8        Q.   So because you didn't find out any information
9    about Mr. Snookal's prior employment at Chevron, you
10   didn't know that he had worked there for ten years
11   before 2019 without any medical incidents; correct?
12       A.   That information is not necessary.
13       Q.   So the answer is "correct"?
14       A.   Ask the question again.
15           MS. LEAL:   Can I have the court reporter read
16   it back.
17           (Requested portion of record read.)
18           THE WITNESS:   So -- so the form you showed
19   before has his medical history.
20   BY MS. LEAL:
21       Q.   Did you know that Mr. Snookal had worked at
22   Chevron since 2009 without any medical incidents at
23   Chevron?
24       A.   That's what I said.  He sent in the medical
25   record form that shows his past medical history.  So if

**EXHIBIT 18-17**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    he had an incident, it would be stated in his medical

2    record.

3         Q.  So had he had one, it would be reflected in the

4    medical record, you're saying?

5         A.  He would have stated it.  The form 146, the

6    first part of it, he filled and state what medical

7    history he has.  So the fact that he was on medication,

8    he stated that.

9         Q.  Did you speak with anyone in Escravos who would

10   be Mr. Snookal's supervisor to understand the job duties

11   of the reliability engineering manager position?

12        A.  No.

13        Q.  Did you speak with anyone in Escravos who would

14   be Mr. Snookal's supervisor to determine whether the

15   supervisor believed Mr. Snookal should be cleared for

16   duty?

17        A.  Again, the pathway --

18            (Reporter clarification.)

19            THE WITNESS:  I said the pathway -- the medical

20   team doesn't speak to the supervisor.  It was a process.

21   The medical team doesn't speak to his supervisor.

22   BY MS. LEAL:

23        Q.  So if it's not listed in the guidelines or in

24   the process, you don't do it, then, is what you're

25   saying?

**EXHIBIT 18-18**

Dr. Eshiofe Asekomeh                                          October 10, 2024

1   role for managers, you don't do functional capacity

2   evaluation.

3           But having said that, Dr. Sobel talked about

4   lifting, not lifting up to so-so weight.  So those will

5   tell you what and what that role is going to involve.

6   If I needed more information, I would talk to the U.S.

7   team to get that information, not his supervisor.

8   BY MS. LEAL:

9       Q.  Did you think it was important for you to know

10  what a reliability engineering manager position entailed

11  in order to be able to properly assess Mr. Snookal,

12  whether he was fit for duty or not?

13      A.  That question has two answers.  Okay?  So if I

14  was writing my decision on whether he had to lift weight

15  above 30 kg, because Dr. Sobel had said fit with

16  limitation would not lift 30 kg, then I would have to

17  find out whether his job role involved lifting 30 kg.

18          The bulk of that decision was taken on the fact

19  that if he had a medical event, we would not be able to

20  support him in Escravos, irrespective of his job role.

21  So that is my answer.

22      Q.  Did you review the job description for the

23  reliability engineering manager?

24      A.  I can't remember now.  But there was no issue

25  around his duty.

**EXHIBIT 18-19**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   BY MS. LEAL:
 2        Q.   So he was qualified, then -- by the time you
 3   were involved, he was deemed qualified to perform the
 4   job of an REM; correct?
 5             MR. MUSSIG:  Calls for speculation.  Lacks
 6   foundation.
 7             THE WITNESS:  I wasn't part of that
 8   determination.  Mine was to decide is this man, coming
 9   to Escravos, fit to come.  Would we be able to manage
10   him if he had any issues, medically --
11   BY MS. LEAL:
12        Q.   Were you aware -- sorry.
13        A.   I'm done.
14        Q.   Were you aware that the REM job would be a desk
15   job?  Majority of the time spent working at a desk?
16        A.   Okay.  So that is the key, "majority of the
17   time," but never all of the time.
18        Q.   Were you aware that the REM was a management
19   position where he supervised persons who were actually
20   working at the location?
21        A.   So almost always the manager once --
22             (Reporter clarification.)
23             THE WITNESS:  Has to step into the field.
24   BY MS. LEAL:
25        Q.   Were you aware that the REM job was not
```

**EXHIBIT 18-20**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    physically demanding?

2            MR. MUSSIG:  Vague and ambiguous as to

3    "physically demanding."  Calls for speculation.  Lacks

4    foundation.

5            THE WITNESS:  Okay.  I can answer that.

6    Because I mentioned about the functional capacity

7    evaluation -- so physically-demanding jobs, we do a

8    functional capacity evaluation.  He had no functional

9    capacity evaluation.  But that position entail visiting

10   the fields, so he would still have gone to the field

11   once in a while to see what the team was doing.

12   BY MS. LEAL:

13       Q.  Do you know why he was not given a functional

14   capacity evaluation?

15       A.  Because as --

16           (Simultaneous crosstalk.  Reporter

17           clarification.)

18           MR. MUSSIG:  Calls for speculation.

19   BY MS. LEAL:

20       Q.  You can answer, Doctor.

21       A.  Ask the question again.  I've forgotten how you

22   phrased it.

23       Q.  You said that he did not have a functional

24   capacity evaluation conducted.

25           And my question was:  Do you know why?

**EXHIBIT 18-21**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              MR. MUSSIG:  Same objection.
 2              THE WITNESS:  Okay.  I just said now that
 3  office jobs mean we don't have functional capacity
 4  evaluation.  Where almost-always office job and
 5  management will visit fields.
 6  BY MS. LEAL:
 7       Q.  So you don't know why?
 8       A.  Why what?
 9              MR. MUSSIG:  Misstates testimony.
10  BY MS. LEAL:
11       Q.  The functional capacity evaluation was not
12  conducted on Mr. Snookal.
13       A.  I just said this.  Office-based jobs don't have
14  functional capacity, but office-based managers would
15  visit the field once in a while to see what is going
16  on.
17       Q.  I see.  You're saying that office jobs don't
18  require the functional capacity evaluation.
19       A.  Yes.
20       Q.  Okay.  Was there anything about the actual
21  reliability engineering manager job that Mr. Snookal
22  would have been performing that would increase the risk
23  of an exacerbation of his condition?
24              MR. MUSSIG:  Calls for speculation.  Lacks
25  foundation.  Incomplete hypothetical.
```

**EXHIBIT 18-22**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1              THE VIDEOGRAPHER:  All right.  We're back on
 2    the record at 9:37 a.m.
 3              MS. LEAL:  Jacob, can you put up Exhibit 2,
 4    please, on the screen?  I'm sorry, that was Exhibit --
 5    yes -- 2.
 6    BY MS. LEAL:
 7         Q.  For the record, it's a document Bates number
 8    Snookal 01157 and 01158.  The title of the document is
 9    Job Title: NMA EGTL Reliability Engineering Manager.
10              Have you seen this document before today,
11    Dr. Asekomeh?
12         A.  No.
13         Q.  So this was not a document that anyone sent you
14    in conjunction with your evaluation of Mr. Snookal's
15    suitability for the assignment?
16         A.  Can you scroll it down?
17              MR. MUSSIG:  Objection.  Asked and answered.
18              THE WITNESS:  No.
19              MS. LEAL:  Can we show the next document,
20    Exhibit 3?
21              (Exhibit Number 3 marked for
22              identification.)
23    BY MS. LEAL:
24         Q.  And for the record, Exhibit 3 is Bates number
25    CUSA000208 through 220.  And the title of this document
```

**EXHIBIT 18-23**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   records were inside the MSEA, and then I had reports

2   from the cardiologist, which have not shown so far, and

3   then review by Nigerian cardiologists.

4   BY MS. LEAL:

5        Q.  Did you review any published studies regarding

6   aortic aneurysms?

7        A.  So there was one review by one of the

8   cardiologists.  Dr. Aiwuyo did the review.

9        Q.  Which doctor?

10       A.  Dr. Henry Aiwuyo.

11       Q.  A-I-W-U-Y-O?

12       A.  Yes.

13       Q.  And how do you know that Dr. Aiwuyo reviewed

14   such published studies regarding aortic aneurysms?

15       A.  So it's in his reports as e-mailed to me.

16       Q.  Okay.  Well, I will -- I will ask you about

17   that because there were, as your attorney said this

18   morning, several documents sent to me before -- or

19   during your deposition, which I have not had a chance to

20   review.  So we'll take a break and I will review all of

21   those documents and we'll come back to that.

22            So I understand your testimony that

23   Dr. Aiwuyo --

24       A.  Aiwuyo.  Henry Aiwuyo.

25       Q.  Okay.  Aiwuyo.

**EXHIBIT 18-24**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              MR. MUSSIG:  Calls for speculation.  Incomplete
 2    hypothetical.
 3              THE WITNESS:  Do you mean, like, the weather
 4    or, like, the water?  What variables are you looking at?
 5    BY MS. LEAL:
 6         Q.  Anything.  I mean, is there anything about
 7    being in Escravos, Nigeria, that would aggravate or
 8    increase the likelihood that Mr. Snookal would suffer a
 9    rupture?
10         A.  Those -- those risks would have to be recorded
11    risk, the risk we already know, which the cardiologist
12    had mentioned in their review, if he was smoking, if he
13    was doing vigorous exercise, was lifting heavy weights.
14         Q.  Yeah, I'm not talking about him.  I'm talking
15    about the location.
16              Being in Escravos, just him working in
17    Escravos, is there anything there that would increase or
18    aggravate the likelihood that he would have a rupture?
19              MR. MUSSIG:  Calls for speculation.  Lacks
20    foundation.  Incomplete hypothetical.
21              THE WITNESS:  So if we were talking of the
22    weather or food, these are not known risk anywhere in
23    the world that aggravates an aneurysm or the chances
24    that it ruptures, to the best of my knowledge.
25              MS. LEAL:  Okay.  Would -- Jacob, would you
```

**EXHIBIT 18-25**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   BY MS. LEAL:
 2       Q.  Now, you said earlier that in reviewing the
 3   documents, you saw that Mr. Snookal had had annual CT
 4   scans and echocardiograms; correct?
 5       A.  Yes.
 6       Q.  Do you agree that annual imaging with the CT
 7   scans and the echocardiograms was and could continue to
 8   be used to monitor Mr. Snookal's aorta for changes?
 9       A.  Are you asking me if I know after 2019 whether
10   he's been having more CTs and echocardiograms?
11       Q.  Well, do you agree that having annual imaging
12   of the CT scans and echoes could -- could continue to be
13   done in order to monitor Mr. Snookal?
14       A.  The first cardiologist -- Dr. Aiwuyo stated
15   that in his report, that the right thing to do is that,
16   to have his annual CTs and echocardiograms.
17       Q.  So that's something that could and should be
18   done; correct?
19       A.  That was what was recommended as of that
20   time.
21           MR. MUSSIG:  Calls for speculation.
22   BY MS. LEAL:
23       Q.  I'm sorry, you said that was what was
24   recommended at the time?
25       A.  Yes.
```

**EXHIBIT 18-26**

Dr. Eshiofe Asekomeh                                      October 10, 2024

```
 1   BY MS. LEAL:

 2        Q.   Nothing else comes to mind?

 3        A.   Not presently.

 4        Q.   Okay.  In Escravos, during a routine operation

 5   there at the facility, are there opportunities for

 6   employees to suffer whole or partial body crush

 7   injuries?

 8             MR. MUSSIG:  Vague and ambiguous as to "routine

 9   operation."  Calls for speculation.  Lacks foundation.

10   Incomplete hypothetical.

11             THE WITNESS:  Did you say "routine operation"?

12   BY MS. LEAL:

13        Q.   Well, let's just say operation.

14             So during the operations there in Escravos, are

15   there opportunities where employees could suffer whole

16   or partial body crush injury?

17             MR. MUSSIG:  Vague and ambiguous as to "whole

18   body crush injuries."  Calls for speculation.  Lacks

19   foundation.  Incomplete hypothetical.

20             THE WITNESS:  So -- so if an employee was

21   working where those risk exist, hypothetically, yes.

22   BY MS. LEAL:

23        Q.   So have there been any, for example,

24   amputations, employees working on a machine and

25   someone's arm or leg or other body part is amputated?
```

**EXHIBIT 18-27**

Dr. Eshiofe Asekomeh                                October 10, 2024

1          A.  That's possible.

2          Q.  Have you heard of any such incidents there in

3     Escravos?

4          A.  Now, that's work related.  I don't know if I'm

5     allowed to share that with you.

6          Q.  Well, I don't need the identity of the person.

7     I don't need you to violate anyone's privacy.  I'm just

8     saying in general.

9              MR. MUSSIG:  I'll say you can answer that

10    question.  I don't want to get into any details about,

11    you know, specific injuries that happened to specific

12    people.

13    BY MS. LEAL:

14         Q.  I'm just asking about the injuries themselves.

15    I don't want you to identify people.

16         A.  Yes.

17         Q.  Can you describe -- or can you list for me the

18    different injuries that you've seen occur there in

19    Escravos?

20             MR. MUSSIG:  Calls for a narrative.

21             THE WITNESS:  Okay.  So we've had injuries like

22    sea pirate attacks, finger injuries, crushed fingers.

23    Lacerations from -- lacerations, slip and falls.

24    BY MS. LEAL:

25         Q.  Have there been any amputations?

**EXHIBIT 18-28**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
1        A.  Yes.

2        Q.  And what type?

3        A.  Finger.  I'm aware of a finger amputation.

4        Q.  Any others?

5        A.  Mainly fingers.

6        Q.  Any other body parts?

7            MR. MUSSIG:  Asked and answered.

8            THE WITNESS:  I'm aware of fingers.

9  BY MS. LEAL:

10       Q.  Was a head decapitated at one point?

11       A.  I'm aware of fingers.

12       Q.  I understand fingers.

13           But do you have a recollection that a head

14  actually was decapitated?

15       A.  I'm not aware of that.

16       Q.  Have you heard of legs being cut off?

17           MR. MUSSIG:  Asked and answered.

18           THE WITNESS:  None that I can recollect.

19  BY MS. LEAL:

20       Q.  Have you heard or recall arms being cut off?

21       A.  I am aware of fingers.  I am not aware of arm

22  amputations.  I can't recollect any arm amputation.

23       Q.  Do you recall any incidents where an employee

24  suffered a severe crushing injury to the chest?

25       A.  No.
```

**EXHIBIT 18-29**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1        Q.  And some are predictable and some are not
2    predictable; correct?
3        A.  Well, in the workplace, you want to try and
4    predict what can happen and mitigate it before it
5    happens.  You don't leave anything to chance, especially
6    in the oil industry.
7        Q.  Right.  But there are some injuries that occur
8    from accidents that occur that are not predictable there
9    in Escravos; correct?
10       A.  That's why they are called accident, I guess.
11       Q.  Okay.  I'm going to have Jacob show you the
12   next exhibit, 7.
13           (Exhibit Number 7 marked for
14           identification.)
15   BY MS. LEAL:
16       Q.  And these are seven pages of documents produced
17   this morning by Chevron's counsel, a series of e-mails.
18   The first Bates is CUSA000768 and it goes through 774.
19           Dr. Asekomeh, are these e-mails among the three
20   other doctors and you regarding Mark Snookal?
21       A.  Yes.
22       Q.  Other than these communications by e-mail with
23   these three other doctors in Nigeria, were there any
24   other communications that you had with them that are not
25   reflected here in this exhibit?
```

**EXHIBIT 18-30**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1            THE WITNESS:  It's -- you're asking me if I
 2    think physicians should determine fitness for work?
 3    BY MS. LEAL:
 4        Q.  No.
 5        A.  That's the equivalence of the question you're
 6    asking me, what was the essence of doing the medical.
 7        Q.  No.  My question is whether it's okay for you
 8    to substitute your judgment for an employee's decision,
 9    like Mr. Snookal, to assume a risk to work in Escravos.
10            Do you think that's okay for you to do that?
11            MR. MUSSIG:  Calls for speculation.  Lacks
12    foundation.  Incomplete hypothetical.  Asked and
13    answered.
14            THE WITNESS:  The essence of doing medical is
15    to decide whether the person is fit to work based on the
16    job type, based on the job location.  That was my task
17    to do.  And that was what I did.
18    BY MS. LEAL:
19        Q.  Right.  And he could perform the duties of an
20    REM.  That, we've established.  The reason he was deemed
21    unfit for duty is because in the event he had a rupture
22    or a dissection, he would not be able to be treated
23    there in Escravos because the medical facilities are
24    small; correct?
25        A.  Additionally, in the event he had the rupture
```

**EXHIBIT 18-31**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    in some location, it would put the life of others at

2    risk.

3          Q.   He'd put the life of what?

4          A.   Others at risk.

5          Q.   How is it that Mr. Snookal would -- would put

6    the lives of others at risk if he had a rupture at work?

7          A.   So I just cited an example of him as a manager

8    going to visit an offshore location.

9                MS. LEAL:   We can take this -- the exhibit off

10   the screen, Jacob.   Thank you.

11   BY MS. LEAL:

12         Q.   What did you just say?   I'm sorry.

13         A.   I said I cited an example as a manager, he has

14   to visit some work location from time to time.

15         Q.   Can you give me an example of how he would put

16   others at risk in the event he had a rupture?

17         A.   I wouldn't be able to cite specific example

18   now, but we fly around in choppers, so he's boarding a

19   chopper, he has a rupture at the point of boarding or

20   coming down that chopper.

21         Q.   Coming down a what?

22         A.   A helicopter.

23         Q.   Oh, helicopter.

24                So can you think of any specific way, though,

25   that he would put someone else's life in danger if he

**EXHIBIT 18-32**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    had a rupture to his aorta?

2         A.   Okay.   So he's in a work location, some

3    offshore location on inspection visit, he's climbing the

4    stairs, there's somebody walking behind him, and he

5    ruptures his aorta on that staircase.

6         Q.   He falls down; he falls on top of someone,

7    you're saying?

8         A.   That's a possibility.   We are speculating now.

9         Q.   Yeah, well, that can happen even if someone

10   doesn't have a rupture; correct?   I mean, they misstep,

11   you know, a step on a ladder, for example; they can fall

12   and fall on someone else.   That can happen too; right?

13          MR. MUSSIG:   Calls for speculation.   Incomplete

14   hypothetical.

15          THE WITNESS:   So we are looking at hypothetical

16   situations.   The risk is higher if he ruptures.

17   BY MS. LEAL:

18        Q.   Before you said that -- strike that.

19          Before you determined that Mr. Snookal was not

20   fit for duty for the REM position in Escravos, did you

21   contact anyone in the United States in legal to

22   determine whether or not your decision would be legal or

23   not?

24        A.   No.

25          MR. MUSSIG:   Asked and answered.

**EXHIBIT 18-33**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4         I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                    DR. ESHIOFE ASEKOMEH,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14         Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21              DATED:  October 13, 2024.

22

23   _____

24         Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

EXHIBIT 18-34

# EXHIBIT 18 -2

# Job Title: NMA EGTL Reliability Engineering Manager (PSG 23-24, FL 4-6)

Req ID **401333** - Posted **05/06/2019 - Facilities Engineering - Africa - Nigeria - Niger State - Not in list**
(23; 24) - (Facilities Engineering)

This position is accepting applicants until May 20, 2019, 11:59 PM CST

Welcome to the Enterprise PDC postings, where you will find all open jobs managed within the Enterprise PDC process.  You must obtain approval to apply to PDC jobs from both your supervisor and PDR before submitting your application(s); failure to do so may disqualify you from consideration.

As part of the application, you will be required to enter your Personnel Development Representative's (PDR) CAI; it is important that the correct PDR, representing you, is entered. When applying for each job, upload your updated GO-400-2 as your **Resume** attachment and your updated Career Development Plan (CDP) as your **Cover Letter** attachment. Updating your "Company Work Experience", "Previous Employment", etc. is not required within your 'Candidate Profile'.

For more information about the Enterprise PDC process and to locate your PDR, please visit the Corporate Organizational Capability site.

<table>
<tr><td colspan="2"><strong>Position Information:</strong></td><td colspan="2"><strong>Position Contacts:</strong></td></tr>
<tr><td colspan="2"><u>Work Locations:</u> <strong>Escravos, Nigeria</strong></td><td colspan="2"><u>Job Owner:</u> <strong>OLUWASIJIBOMI OKEOWO</strong></td></tr>
<tr><td colspan="2"><u>Position Type:</u> <strong>Career Ladder</strong></td><td colspan="2"><u>PDR:</u> <strong>ANDREW AJINDE OMOMEHIN</strong></td></tr>
<tr><td colspan="2"><u>Rotational?:</u> <strong>Yes</strong></td><td colspan="2"><u>Sponsor:</u> <strong>BAO VANG</strong></td></tr>
<tr><td colspan="2"><u>Incumbent/Vacant/New:</u> <strong>Vacant</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Number of Vacancies:</u> <strong>1</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Direct Reports:</u> <strong>Yes</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Pay Scale Group:</u> <strong>23; 24</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Will expatriate assignments be considered for this position?</u> <strong>Yes</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Will Relocation be considered within Chevron parameters?:</u> <strong>No</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Appointment: Method:</u> <strong>Off-Cycle</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Functional Level:</u> <strong>4,5,6</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>SBU:</u> <strong>Nigeria Mid-Africa</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Anticipated Start Date (MM/DD/YYYY):</u> <strong>07/01/2019</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Duration:</u> <strong>3-4 Years</strong></td><td colspan="2"></td></tr>
<tr><td colspan="2"><u>Contingent:</u> <strong>No</strong></td><td colspan="2"></td></tr>
</table>

HIGH LEVEL JOB DESCRIPTION/SCOPE:
The EGTL Reliability Engineering Manager reports to the EGTL Technical Manager position located in Escravos, Nigeria. The position is responsible for managing a multidiscipline team of ~20 engineers and technicians in the areas of rotating equipment, instrumentation & analyzers, and electrical.  Working closely with the Maintenance and Operations organizations, the RE Manager sets the high-level strategies and work direction for the asset integrity management program in a highly complex Gas to Liquids (GTL) plant environment.  The RE Manager ensures adequate staff is in place to support the reliability initiatives, long term business plans, and nationalization goals.  Coordinates joint reliability initiatives with the NMA base business organization as well as the Complex Process Facilities (CPF) Organization, and ETC.  Ensures team compliance with all required training and field verification initiatives.

SPECIAL CONSIDERATIONS:
Engineering Degree preferred.  Experience working in complex process facilities.
This is a 28/28 rotational assignment in Nigeria with multi-cultural workforce of many ethnicities. Scheduled work hours are from 06:00 to 18:00 Monday through Saturday, and 06:00 to 16:00 Sunday.
The work location is Escravos, Nigeria. Escravos is a closed camp environment. Escravos is an isolated, swamp location located on a river coast. Living quarters are dorm style
The area has a tropical environment with high humidity and average temperatures ranging between 74 and 86 degrees F and average rainfall of 71 inches. Malaria and other tropical diseases are prevalent - necessitating preventative treatment program. The Medical facilities available are sufficient for basic health and emergency care. All serious illness/injuries will be evacuated to a Chevron approved medical facility until the patient is stabilized and can be returned to their home country.
International Consideration:  Expatriate assignments will be considered
Relocation Options:  Relocation will not be considered

CRITICAL SELECTION CRITERIA
Operational Excellence and Safety:
• Demonstrated highest safety & environmental performance and leadership trait.
• Must be proactive in addressing safety issues and have a proven track record of strong support of processes that support

EXHIBIT
2
Eshiofe Asekomeh
10/10/2024
Rachel N. Barkume, CSR, RMR, CRR

Incident Free Operations.
• Working knowledge of Root Cause Analysis (RCA) and Management of Change (MOC) work processes.

Technical Experience:
• At least 10 years plant experience preferably in a complex process facility managing multidiscipline technical teams.
• A working knowledge of rotating equipment, electrical power, and instrument/analyzer systems.
• Experience with Root Cause Analysis, RAM modeling, RCM, FMEA, and other reliability work processes.
• Working knowledge of the various reliability and integrity management programs in Chevron (ERIP, SERIP, URIP, FIRM, etc.)

Supervision and Leadership:
• Recognized as a leader with supervisory experience leading a technical support organization.
• Demonstrated working knowledge of Reliability Engineering and how to apply it to rotating equipment, instruments & analyzers, and electrical power systems.
• Requires strong oral and written communication skills.
• Demonstrated ability to lead work teams through difficult problems and present effective solutions with clear and concise recommendations.
.
Teamwork:
• Must have good communication skills and be able to build strong working relationships with diverse work groups (O&M, contractors, projects, etc.)
• Experience working in a multi-cultural work environment
• Experience with training, development, and mentoring of less experienced engineers.


**Location Specific Information:**
Some countries have specific location and legal requirements (e.g. age limit, college degree, etc.) for issuing work permits/visas allowing individuals to work in the country and Chevron must abide by these location and legal requirements. For more details, please refer to the Location Specific Information Sheet.
**Living and Working:**
To get a closer look at what life is like in one of our expat communities, take some time to review our Living & Working In website. This website will give you preliminary information to help decide if this assignment is suited for you and your family. You can also access this site outside the Chevron Internet, to view at home with your family.

**SNOOKAL-01158**

**EXHIBIT 18-2-2**

2.2

# EXHIBIT 18-7



**From:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Sent:** Monday, 5 August 2019 17:55
**To:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Asekomeh, Eshiofe [DELOG]
<EAEV@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Sir/Ma,

I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures
highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine). Guideline-
directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood
pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and
documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.

Kind regards,

Victor.

**From:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>
**Sent:** Monday, August 5, 2019 2:26 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>; ADEYEYE, VICTOR [DELOG MEDICAL
SERVICES] <DNOY@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report



Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic
aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm
max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have
used values of <4.5cm as partition value for low risk situations., link below refers.

**EXHIBIT 18-7-1**

CUSA000768

**145**

7.1

https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this

evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include

   a. Rupture/dissection ( sudden and catastrophic) and its attendant sequala
   b. Thromboembolic phenomenon
   c. Pressure symptoms on other vital organs
   d. Sudden death

2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support
   such an individual due to our peculiarities.

3. Instructions for the patient

   -avoid lifting heavy objects
   -quit smoking (if he is a smoker)
   -manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic (DOC beta blockers)
   -watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
         -avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic aneurysm, unfortunately I found none.  What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this sir.

Warm regards.


DR. AIWUYO, HENRY
OH Physician/Cardiologist
EGTL clinic
EXT-77943
B2B dr oyebowale olaniyi
"as to diseases, make a habit of two things- to help, or at least, to do no harm"
hippocrates

EXHIBIT 18-7-2                                                    CUSA000769
146
7.2

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Monday, August 5, 2019 11:43 AM
**To:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Below mail trail refers. Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:
   1. Potential complications and the likelihood of progression
   2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
   3. Possible instructions to communicate to employee as per preventing complications.
Thanks for your usual help.


Warm regards,

Eshiofe Asekomeh


**From:** Asekomeh, Eshiofe [DELOG]
**Sent:** Tuesday, July 30, 2019 7:44 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Cc:** NIGEC Staff Physicians (l9esc300) <L9ESC300@chevron.com>
**Subject:** Snookal, Mark- Medical report

Good day Ma,

I will like to discuss Mark Snookal (Manager, Reliability Engineering) with you tomorrow. He is on transfer from El Segundo, USA to Escravos, Nigeria on international assignment.
He has aortic root dilatation and was reviewed by a Cardiologist April this year. The examining Physician in the US had declared him fit with limitation (not to lift weight above 50 pounds)
Attached are the medical reports and the Cardiologist report from April, 2019.


Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**


**EXHIBIT 18-7-3**



**From:** Akintunde, Ujomoti <UJOM@chevron.com>
**Sent:** Wednesday, 7 August 2019 17:08
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Dear Dr Asekomeh,

I concur with my colleagues. With an aortic root of 4.2cm, he is 'low risk' but not 'no risk'.
I would however be more comfortable if he were on a beta-blocker as one of his meds or in addition to current meds. The fact that he does not smoke cigarettes is beneficial.
There could be a reason his cardiologist did not put him on a beta-blocker. Could he have a contraindication such as asthma, COPD or allergy?
Is there a medical report from his cardiologist? I only see imaging reports.

Kind regards,
Ujomoti Akintunde


**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Tuesday, August 6, 2019 12:35 PM
**To:** Akintunde, Ujomoti <UJOM@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Please see mail trail below.


Warm regards,

Eshiofe Asekomeh

**From:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Sent:** Monday, August 5, 2019 5:55 PM
**To:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

**EXHIBIT 18-7-4**

Sir/Ma,

I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine). Guideline-directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.

Kind regards,

Victor.

---

**From:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>
**Sent:** Monday, August 5, 2019 2:26 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>; ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have used values of <4.5cm as partition value for low risk situations., link below refers.

https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this

evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include

    a. Rupture/dissection ( sudden and catastrophic) and its attendant sequala
    b. Thromboembolic phenomenon

**EXHIBIT 18-7-5**

   c. Pressure symptoms on other vital organs

   d. Sudden death

2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support such an individual due to our peculiarities.

3. Instructions for the patient

   -avoid lifting heavy objects
   -quit smoking (if he is a smoker)
   -manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic (DOC beta blockers)
   -watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
   -avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic aneurysm, unfortunately I found none.  What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this sir.

Warm regards.


**DR. AIWUYO, HENRY**
**OH Physician/Cardiologist**
**EGTL clinic**
**EXT-77943**
**B2B dr oyebowale olaniyi**
**"as to diseases, make a habit of two things- to help, or at least, to do no harm"**
**hippocrates**

---

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Monday, August 5, 2019 11:43 AM
**To:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Below mail trail refers. Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:

**EXHIBIT 18-7-6**

CUSA009773

**150**

7.6

1. Potential complications and the likelihood of progression
2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
3. Possible instructions to communicate to employee as per preventing complications.

Thanks for your usual help.


Warm regards,

Eshiofe Asekomeh


---

**From:** Asekomeh, Eshiofe [DELOG]
**Sent:** Tuesday, July 30, 2019 7:44 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Cc:** NIGEC Staff Physicians (l9esc300) <L9ESC300@chevron.com>
**Subject:** Snookal, Mark- Medical report

Good day Ma,

I will like to discuss Mark Snookal (Manager, Reliability Engineering) with you tomorrow. He is on transfer from El Segundo, USA to Escravos, Nigeria on international assignment.
He has aortic root dilatation and was reviewed by a Cardiologist April this year. The examining Physician in the US had declared him fit with limitation (not to lift weight above 50 pounds)
Attached are the medical reports and the Cardiologist report from April, 2019.


Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**

**EXHIBIT 18-7-7**

CUSA008774
151
7.7

# EXHIBIT 19

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, AN
INDIVIDUAL,

                              Case No.
        Plaintiff,           2:23-cv-6302-HDV-AJR

    vs.

CHEVRON USA, INC., A
CALIFORNIA CORPORATION, AND
DOES 1 THROUGH 10,
INCLUSIVE,

        Defendants.
_____/

ZOOM VIDEOCONFERENCE/VIDEO-RECORDED

DEPOSITION OF THALIA TSE

HELD REMOTELY

SEPTEMBER 13, 2024

REPORTED BY CYNTHIA DENISE STIRES, CSR NO. 4472

**EXHIBIT 19-1**

153

Thalia Tse                                    September 13, 2024

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4     _____

 5    MARK SNOOKAL, AN INDIVIDUAL,

 6
                Plaintiff,              Case No.
 7                                      2:23-cv-6302-HDV-AJR
          vs.
 8
      CHEVRON USA, INC., A
 9    CALIFORNIA CORPORATION, AND
      DOES 1 THROUGH 10, INCLUSIVE,
10

11              Defendants.
      _____/
12

13          ZOOM VIDEOCONFERENCE/VIDEO-RECORDED

14    DEPOSITION OF THALIA TSE, commencing at the hour of

15    9:02 A.M., Pacific Time, Friday, September 13, 2024,

16    held via Zoom Internet Conferencing Platform, before

17    Cynthia Denise Stires, Certified Shorthand Reporter in

18    and for the State of California.

19

20

21

22

23

24

25
```

**EXHIBIT 19-2**

Thalia Tse                                          September 13, 2024

```
 1    APPEARANCES

 2    FOR THE PLAINTIFF:

 3                Allred Maroko & Goldberg
                  BY:  Dolores Y. Leal, Esq.
 4                     Olivia Flechsig, Esq.
                  6300 Wilshire Boulevard, Suite 1500
 5                Los Angeles, California 90048
                  323.653.6530
 6                dleal@amglaw.com.
                  oflechsig@amglaw.com
 7

 8    FOR THE DEFENDANT:

 9                Sheppard Mullin Richter & Hampton, LLP
                  BY:  Sarah Fan, Esq.
10                333 South Hope Street, 43rd Floor
                  Los Angeles, California 90071
11                213.620.1780
                  sfan@sheppardmullin.com
12

13    ALSO PRESENT:

14                Michael Kelley, Video Technician

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 19-3

Thalia Tse                                                September 13, 2024

```
 1    BY MS. LEAL:
 2         Q.   Do you know if there is a specific state law
 3    that prohibits discrimination on the job against
 4    persons with disabilities or perceived disabilities?
 5              MS. FAN:  Objection.  Relevance.  Calls for a
 6    legal conclusion.
 7              THE WITNESS:  No.
 8    BY MS. LEAL:
 9         Q.   No, you don't know?
10         A.   I don't.
11         Q.   Okay.  Getting back to the training that you
12    received when you were hired by Chevron, you said that
13    you didn't receive any formal training but that you
14    were instructed to learn Chevron policies; is that
15    correct?
16              MS. FAN:  Objection.  Misstates prior
17    testimony.
18              THE WITNESS:  Yes.
19    BY MS. LEAL:
20         Q.   Okay.  And do you remember which policies
21    during the time of your employment as an HR business
22    partner in El Segundo that you were responsible for
23    becoming familiar with?
24         A.   We have a website where it housed, you know,
25    policies, so it wasn't like I was told to read
```

**EXHIBIT 19-4**

Thalia Tse                                          September 13, 2024

1    everything, but it was more so get familiar, know where

2    to find policies if questions come up.

3        Q.   So you didn't have any, for example, any

4    classroom training or computerized-type training when

5    you were hired by Chevron with respect to their

6    policies then?

7            MS. FAN:  Objection.  Compound.

8            MS. LEAL:  I'll break it up.

9    BY MS. LEAL:

10       Q.   At the time of your hire as an HR business

11   partner for the El Segundo facility, did Chevron

12   provide you with any classroom-type training with

13   respect to their policies?

14       A.   No.

15       Q.   At the time of your hire, did Chevron provide

16   you with any training on computers with respect to

17   their personnel policies?

18       A.   No.

19       Q.   Did Mr. Powers provide you with any specific

20   training at the time of your hire with respect to your

21   job responsibilities as an HR business partner in

22   El Segundo?

23       A.   No.

24       Q.   I'm going to show you a document now.

25           MS. LEAL:  Olivia, if you can go to Exhibit

**EXHIBIT 19-5**

Thalia Tse                                                September 13, 2024

```
 1   BY MS. LEAL:
 2        Q.   Do you know, or do you not know, if
 3   rotational assignment employees receive premium pay?
 4        A.   I believe they do.
 5        Q.   And is it your knowledge that the premiums
 6   are based on the area of assignment; in other words,
 7   which country they're assigned to?
 8             MS. FAN:  Calls for speculation.
 9             THE WITNESS:  I think so.
10   BY MS. LEAL:
11        Q.   Employees who become expats, in other words,
12   working at Chevron facilities outside the continental
13   US, do you know who pays their salary?
14             MS. FAN:  Objection.  Calls for speculation.
15   Calls for a legal conclusion.
16             THE WITNESS:  I don't know.
17   BY MS. LEAL:
18        Q.   Let's go to Exhibit 2.
19             (Deposition Exhibit 2 was marked.)
20   BY MS. LEAL:
21        Q.   And this document is a one-page document,
22   Bates No. CUSA000503.  It's a document produced by
23   Chevron and it's titled Chevron Tax Equalization
24   Policy, Human Resources Shared Services.
25             MS. FAN:  Counsel, I apologize for jumping in
```

**EXHIBIT 19-6**

Thalia Tse                                           September 13, 2024

 1  e-mail from Mr. Ruppert to you with a copy to Troy

 2  Tortorich.

 3          Have you seen this document before, Ms. Tse?

 4      A.  Yes.

 5      Q.  And this e-mail is dated November 6th, 2019.

 6          So I assume you received this e-mail from

 7  Mr. Ruppert?

 8      A.  Yes.

 9      Q.  And he's telling you that he would like to

10  manage or move Mr. Snookal into a reliability change OA

11  role starting as soon as possible.

12          Do you see that?

13      A.  Yes, I can see it.

14      Q.  Did you do anything prior to November 6th,

15  2019 to move Mr. Snookal into the reliability change OA

16  position?

17      A.  No.

18      Q.  Do you know if Mr. Powers -- do you know if

19  Mr. Powers did?

20      A.  No.  The position didn't exist.

21      Q.  So your understanding is that Mr. Ruppert was

22  the one who created this position for Mr. Snookal, this

23  position of reliability change OA role?

24      A.  Yes.

25      Q.  Did you respond to Mr. Ruppert's e-mail?

**EXHIBIT 19-7**

Thalia Tse                                          September 13, 2024

```
1              (Deposition Exhibit 10 was marked.)
2              MS. FLECHSIG:  Give me one second.
3    BY MS. LEAL:
4        Q.   And this document is Bates No. CUSA000014
5    through 18.
6              MS. LEAL:  Move up to the first page, please.
7    BY MS. LEAL:
8        Q.   So this document before you, Ms. Tse, is HR
9    Policy 410 for US payroll employees, employment of
10   individuals with disabilities.
11             Do you see that?
12       A.   Yes, I see it.
13       Q.   Are you familiar with this policy?
14       A.   I know where I can find it if I need it.
15       Q.   Is it the policy that you as an HR business
16   partner is responsible for being familiar with?
17       A.   Like I previously said, we -- as an HR
18   business partner, we just need to know where we need to
19   find the document or have the policy and so as needed.
20       Q.   So an HR business partner only needs to know
21   where to find policies and not necessarily know
22   anything about the policy?
23             MS. FAN:  Argumentative.  Asked and answered.
24   BY MS. LEAL:
25       Q.   Is that what you're saying?
```

**EXHIBIT 19-8**

Thalia Tse                                         September 13, 2024

```
 1              MS. FAN:  Compound.  Same objections.
 2              THE WITNESS:  We have access to it, so
 3    meaning that if we need to reference it, we know where
 4    to find it.
 5    BY MS. LEAL:
 6         Q.   But as an HR business partner both in
 7    El Segundo and now in Texas, are you supposed to know
 8    what these policies are about?
 9         A.   Well, we don't need to memorize everything
10    from the policy.
11         Q.   And that's not what I'm suggesting, Ms. Tse.
12    I'm suggesting, are you as an HR business partner
13    responsible for being familiar with the contents of
14    these types of personnel policies?
15              MS. FAN:  Asked and answered.
16              THE WITNESS:  Maybe.
17    BY MS. LEAL:
18         Q.   What do you mean by "maybe"?
19         A.   I know where to find the policy.  So if I
20    need to reference it, that's what I'm going to do.
21         Q.   When Mr. Snookal sent the e-mail saying he
22    thought he was being discriminated against because of
23    his disability, did you pull up this policy,
24    Policy 410, employment of individuals with
25    disabilities?
```

**EXHIBIT 19-9**

Thalia Tse                                                    September 13, 2024

1       A.    No.

2       Q.    Why not?

3       A.    I don't know.

4       Q.    Did you think it wasn't important to pull up

5  the policy involving individuals with disabilities when

6  an employee was complaining about disability

7  discrimination?

8              MS. FAN:  Objection.  Argumentative.

9              THE WITNESS:  No.  But I was fairly new at

10  the time.

11  BY MS. LEAL:

12       Q.    Did Mr. Powers ask you to pull up Chevron's

13  policies with respect to employment of individuals with

14  disabilities after Mr. Snookal made the complaint of

15  disability discrimination?

16       A.    I don't remember.

17       Q.    So he may have; he may not have.  You just

18  don't remember one way or the other?

19              MS. FAN:  Asked and answered.

20  BY MS. LEAL:

21       Q.    Is that correct?

22       A.    Yes.

23       Q.    So let's stay on the exhibit, please.  So

24  under general it looks like something is hyper linked,

25  Corporate Policy 200, employment.

EXHIBIT 19-10

Thalia Tse                                    September 13, 2024

```
 1   did you say in that conversation, the exit interview
 2   conversation?
 3        A.   I think there were questions
 4   about -- actually, I think there is a document on the
 5   exit interview.
 6        Q.   What do you remember being discussed during
 7   this exit interview?
 8        A.   Questions that was on the interview template.
 9   I think there are questions about management, benefits
10   that Chevron offers.
11        Q.   So it's a form or template that you use when
12   you conduct an exit interview?
13        A.   At that time, yes.
14        Q.   During that exit interview with Mr. Snookal,
15   did you think to ask him if he was resigning because of
16   the fact that Chevron had retracted the Nigeria
17   position?
18        A.   No, I didn't ask him that question.
19             MS. LEAL:  I'm going to suggest a five-minute
20   break or so, Counsel, so I can look at my notes.  We
21   might be almost finished.
22             MS. FAN:  Okay.
23             MS. LEAL:  We'll take a break.
24             MS. FAN:  Sounds good.
25             VIDEO TECHNICIAN:  This is the end of Media
```

163

**EXHIBIT 19-11**

Thalia Tse                                          September 13, 2024

 1

 2                    REPORTER CERTIFICATE

 3          I, Cynthia Denise Stires, Certified Shorthand

 4   Reporter, Certificate No. 4472, for the State of

 5   California, hereby certify that Thalia Tse was by me

 6   duly sworn/affirmed to testify to the truth, the whole

 7   truth and nothing but the truth in the within-entitled

 8   cause; that said deposition was taken at the time and

 9   place herein named; that the deposition is a true

10   record of the witness's testimony as reported to the

11   best of my ability by me, a duly certified shorthand

12   reporter and a disinterested person, and was thereafter

13   transcribed under my direction into print by computer.

14          That request [XX] was    [    ] was not made to

15   read and correct said deposition.

16          I further certify that I am not interested in

17   the outcome of said action, nor connected with nor

18   related to any of the parties in said action, nor to

19   their respective counsel.

20          IN WITNESS WHEREOF, I have hereunto set my

21   hand this 27th day of September, 2024.

22

23

24   _____
                       Cynthia Denise Stires
25                     CSR No. 4472

**EXHIBIT 19-12**

# EXHIBIT 20

**From:** Powers, Andrew C[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AFB7F7C935FE4FB4938203195698DFEA-BDQS]
**Sent:** Mon 9/9/2019 3:53:49 PM Coordinated Universal Time
**To:** Tortorich, Troy (TRMT)[TRMT@chevron.com]
**Subject:** FW: Rescinded Job Offer in Nigeria

---

FYI.

**From:** Powers, Andrew C
**Sent:** Friday, September 6, 2019 7:57 AM
**To:** Snookal, Mark <Mark.Snookal@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** RE: Rescinded Job Offer in Nigeria

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

*Andrew Powers*
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.

Mark Snookal
IEA Reliability Team Lead
**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 20**

**166**

CUSA000644

# EXHIBIT 21

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Wednesday, September 4, 2019 12:49 PM |
| **To:** | Tortorich, Troy; Ruppert, Austin |
| **Cc:** | Tse, Thalia |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

All – Not for forwarding, but I wanted to give you a quick update. Apologies for the lengthy e-mail as I am traveling.

First, I heard back from medical. They were not able to provide any specific medical information but could state that having a medical condition by itself does not disqualify an individual if the risk can be managed effectively at the host location. In this situation, the host medical team reviewed the case and given the inherent risk and inability to mitigate/eliminate this risk in Escravos, led to the decision of unfit for expat assignment in this case. They did look into whether the position could be moved to Lagos, where there are hospitals and better medical resources but that was not feasible. It is common for the treating physician's decision to be overridden, this happens when the treating provider does not understand the local medical resources at the host location, the difficulty medically evacuating a person from the location, and the risk tolerance of the host, in short disagreements do happen. The use of the term "low risk" is a little misleading here as there is a specific risk of his underlying condition becoming problematic and although the treating doctor reported this individuals risk to be lower than what is written in the medical literature, it's still significant and higher than the business was willing to accept.

Second, I have asked medical how we have responded to these in the past. Mark is not the first person to be deemed unfit for expat assignment. I'd like to get proper and effective language before responding to Mark and let him know who his resources are to further discuss medical details (it is not appropriate if he discusses his condition with you, me or anyone besides medical).

Third, I think you will be best prepared by thinking about what role Mark can do within El Segundo. Do you have an existing vacancy? Do we have any roles that he could be good for in the near future? He mentions a backfill was identified, is that already finalized? I know it would not be ideal, but would you want to consider rescinding that person's offer since Mark's offer fell through? Main intent here is that we need to give Mark the assurance (if possible) that he should not worry about NOT having a job (we will figure something out). It is clear he is frustrated about not getting the expat role, but now is concerned what his employment looks like in general.

I will report back once I hear back from medical on how they have responded to these in the past. In the meantime, if you have any questions that need immediate attention, please feel free to call Thalia or myself.

Kind Regards,

**Andrew Powers**
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

**From:** Powers, Andrew C
**Sent:** Wednesday, September 4, 2019 7:41 AM

**EXHIBIT 21-1**

**To:** Tortorich, Troy (TRMT) <TRMT@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>
**Subject:** Fwd: Rescinded Job Offer in Nigeria

Austin/Troy,
Please be thinking about what role Mark could do if this falls through. Thalia and I will investigate and see what medical can share/set us up with an appropriate response.

Note he finds this discriminatory, however, that is hard to know without further context from medical. I am sure there is a very good reason why this was rescinded.

Andrew

Sent from my iPhone

Begin forwarded message:

> **From:** "Powers, Andrew C" <Andrew.Powers@chevron.com>
> **Date:** September 4, 2019 at 7:35:44 AM PDT
> **To:** "Snookal, Mark" <Mark.Snookal@chevron.com>
> **Cc:** "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
> **Subject: Re: Rescinded Job Offer in Nigeria**
>
> Mark,
> Thank you for bringing this to our attention. This is the first I am hearing of this. Therefore, please let me look into this and see if I can get a better understanding of why. We will get back to you ASAP.
>
> Andrew
>
> Sent from my iPhone
>
> On Sep 4, 2019, at 7:21 AM, Snookal, Mark <Mark.Snookal@chevron.com> wrote:
>
>> Andrew,
>>
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>>
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria…His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

2

**EXHIBIT 21-2**                    CUSA000539    169

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 21-3**

# EXHIBIT 22

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Friday, September 6, 2019 7:57 AM |
| **To:** | Snookal, Mark |
| **Cc:** | Tse, Thalia; Ruppert, Austin |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

**Andrew Powers**
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment

CUSA000542     172

**EXHIBIT 22-1**

is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

2

**EXHIBIT 22-2**

# EXHIBIT 23

**From:** Powers, Andrew C[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AFB7F7C935FE4FB4938203195698DFEA-BDQS]
**Sent:** Wed 9/4/2019 2:42:07 PM Coordinated Universal Time
**To:** Jones MD, Ayanna[Ayanna.Jones@chevron.com]
**Cc:** Tse, Thalia[thaliatse@chevron.com]; Levy, Scott[ScottLevy@chevron.com]
**Subject:** Re: Rescinded Job Offer in Nigeria

---

Thank you Dr. Ayana.
Would be great if we can get some further justification and suggested response today.


Sent from my iPhone

On Sep 4, 2019, at 7:39 AM, Jones MD, Ayanna <Ayanna.Jones@chevron.com> wrote:

> Hello Andrew,
> The EEMEA Regional Medical Manager would be able to provide you with context on this case and appropriate response.
> Regards,
> Ayanna Jones, MD, MPH
> Manager US Occupational and
> Expatriate Health Services
> **Chevron Services Company**
> A Division of Chevron U.S.A. Inc.
> TR & HM COE
> Global Health and Medical
> 1400 Smith, #03196
> Houston, TX 77002
> Tel: (713)372-5921
> Fax: (713)372-5941
> Email: Ayanna.Jones@chevron.com
> *This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*
>
> **From:** Powers, Andrew C <Andrew.Powers@chevron.com>
> **Sent:** Wednesday, September 04, 2019 9:33 AM
> **To:** Jones MD, Ayanna <Ayanna.Jones@chevron.com>
> **Cc:** Tse, Thalia <thaliatse@chevron.com>
> **Subject:** Fwd: Rescinded Job Offer in Nigeria
> Dr. Ayana,
> Are you able to provide me with any context on the below and suggested response? Is this common to have conflicting views between someone's personal physician and Chevron Expat Medical?
> If there is another resource you would suggest, could I please have their name?
> Note that Mark finds this discriminatory in nature, however, this is hard to know with the limited information.
> Kind Regards,
> Andrew Powers
>
> Sent from my iPhone
> Begin forwarded message:
>
>> **From:** "Snookal, Mark" <Mark.Snookal@chevron.com>
>> **Date:** September 4, 2019 at 7:20:38 AM PDT
>> **To:** "Powers, Andrew C" <Andrew.Powers@chevron.com>
>> **Cc:** "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
>> **Subject: Rescinded Job Offer in Nigeria**
>>
>> Andrew,
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.
>> Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.
>> Mark Snookal

**EXHIBIT 23-1**

175

CUSA000650

IEA Reliability Team Lead
**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 23-2**

CUSA000651

# EXHIBIT 24

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   TRACEY A. KENNEDY, Cal Bar No. 150782
3  ROBERT E. MUSSIG, Cal. Bar No. 240369
   333 South Hope Street, 43rd Floor
4  Los Angeles, CA 90071-1422
   Telephone: 213.620.1780
5  Facsimile: 213.620.1398
   E-mail:    tkennedy@sheppardmullin.com
6             rmussig@sheppardmullin.com
   Attorneys for Defendant.
7  CHEVRON U.S.A. INC.

8

9                    UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11

12  MARK SNOOKAL, an individual,          Case No. 2:23-cv-6302-HDV-AJR

13              Plaintiff,                **DEFENDANT CHEVRON USA, INC.'S
                                          RESPONSES TO PLAINTIFF MARK
14        vs.                             SNOOKAL'S SPECIAL
                                          INTERROGATORIES (SET 2)**
15  CHEVRON USA, INC., a California
    Corporation, and DOES 1 through 10,   Action Filed: August 3, 2023
16  inclusive,                            Trial Date: February 4, 2025

17              Defendants.

18

19

20  PROPOUNDING PARTY:  PLAINTIFF, MARK SNOOKAL

21  RESPONDING PARTY:   DEFENDANT, CHEVRON USA, INC.

22  SET NO.:            TWO

23  NUMBERS:            18-25

24

25

26

27

28

                                  -1-

**EXHIBIT 24-1**

1  and the PDR was Troy Tortorich.  With respect to the position of El Segundo

2  Maintenance Change Operating Assistant posted in or around late 2019, the individual

3  overseeing job applications was Emil ("Cotey") Cswaykus.  For each of these

4  individuals, they were involved in reviewing the applications for these positions,

5  interviewing, and assessing the qualifications of each for each position.

6  **SPECIAL INTERROGATORY NO. 20:**

7      IDENTIFY any and all persons who died while on a Chevron Rotational

8  Assignment between January 1, 2017 and January 1, 2022.

9  **RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

10     Defendant hereby incorporates by reference the general objections set forth above.

11 Defendant objects to this Interrogatory to the extent that it seeks information protected

12 from disclosure by the attorney-client privilege and/or the attorney work product

13 doctrine.  Defendant objects to this Interrogatory to the extent that it seeks confidential

14 and/or proprietary business information.  Defendant objects to this Interrogatory to the

15 extent that it seeks confidential and/or private personnel information of third parties.

16 **SPECIAL INTERROGATORY NO. 21:**

17     For each person IDENTIFIED in YOUR response to Plaintiff's Interrogatory No.

18 20 above, state the date, cause, location of their death, whether the death occurred on

19 your premises, and whether any wrongful death action was filed.

20 **RESPONSE TO SPECIAL INTERROGATORY NO. 21:**

21     Defendant hereby incorporates by reference the general objections set forth above.

22 Defendant objects to this Interrogatory to the extent that it seeks information protected

23 from disclosure by the attorney-client privilege and/or the attorney work product

24 doctrine.  Defendant objects to this Interrogatory to the extent that it seeks confidential

25 and/or proprietary business information.  Defendant objects to this Interrogatory to the

26 extent that it seeks confidential and/or private personnel information of third parties.

27

28

**EXHIBIT 24-2**

1  **SPECIAL INTERROGATORY NO. 22:**

2      IDENTIFY any and all persons who had to undergo an emergency medical

3  evacuation from a Chevron Rotational Assignment location from January 1, 2017 through

4  January 1, 2022 inclusive.

5  **RESPONSE TO SPECIAL INTERROGATORY NO. 22:**

6      Defendant hereby incorporates by reference the general objections set forth above.

7  Defendant objects to this Interrogatory to the extent that it seeks information protected

8  from disclosure by the attorney-client privilege and/or the attorney work product

9  doctrine.  Defendant objects to this Interrogatory to the extent that it seeks confidential

10  and/or proprietary business information.  Defendant objects to this Interrogatory to the

11  extent that it seeks confidential and/or private personnel and medical information of third

12  parties.

13  **SPECIAL INTERROGATORY NO. 23:**

14      For each person IDENTIFIED in YOUR response to Plaintiff's Interrogatory No.

15  22 above, state the date, cause, and location of their emergency medical evacuation.

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 23:**

17      Defendant hereby incorporates by reference the general objections set forth above.

18  Defendant objects to this Interrogatory to the extent that it seeks information protected

19  from disclosure by the attorney-client privilege and/or the attorney work product

20  doctrine.  Defendant objects to this Interrogatory to the extent that it seeks confidential

21  and/or proprietary business information.  Defendant objects to this Interrogatory to the

22  extent that it seeks confidential and/or private personnel and medical information of third

23  parties.

24  **SPECIAL INTERROGATORY NO. 24:**

25      Describe in detail any and all times when anyone, including rescue personnel, was

26  injured or killed because of an emergency medical evacuation from a Chevron Rotational

27  Assignment between January 1, 2017 and January 1, 2022.

28

SMRH:4864-2622-5619.1    DEFENDANT CHEVRON USA, INC.'S RESPONSES TO PLAINTIFF MARK SNOOK'S
SPECIAL INTERROGATORIES (SET 2)

**EXHIBIT 24-3**

**RESPONSE TO SPECIAL INTERROGATORY NO. 24:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel and medical information of third parties.

**SPECIAL INTERROGATORY NO. 25:**

IDENTIFY every person who has held a Reliability Engineering Manager position in Escravos, Nigeria from January 1, 2019 to the present, and provide the dates during which they held the position.

**RESPONSE TO SPECIAL INTERROGATORY NO. 25:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel information of third parties.

Subject to and without waiving the foregoing objections, Defendant responds for the time period of Plaintiff's employment, Amir Zaheer and Cesar Malpica. They may be contacted through counsel.

-12-

DEFENDANT CHEVRON USA, INC.'S RESPONSES TO PLAINTIFF MARK SNOOK'S
SPECIAL INTERROGATORIES (SET 2)

**EXHIBIT 24-4**

1  Dated:  August 13, 2024

2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4  By _____

5  /s/Tracey A. Kennedy

   TRACEY A. KENNEDY
6  ROBERT E. MUSSIG

7  Attorneys for Defendant
   CHEVRON U.S.A. INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Docusign Envelope ID: DB306431-95E4-4D81-996A-09C05D3AD5BB

1

**VERIFICATION**

2
I, _Harpreet K. Tiwana_ declare and state:

3
I am _Assistant Secretary_ of Chevron U.S.A. Inc. ("Chevron"), , a defendant in the action

4
*Mark Snookal v. Chevron U.S.A. Inc.* Case No. 2:23-cv-6302-HDV-AJR filed in the United

5
States District Court for the Central District of California.

6
I am authorized to sign this verification on behalf of **Chevron**, and I make this

7
verification for that reason.

8
I have reviewed the foregoing document titled **DEFENDANTS CHEVRON USA.**

9
**INC.'S RESPONSES TO PLAINTIFF MARK SNOOKAL'S SPECIAL**

10
**INTERROGATORIES, SET TWO.**

11
I am informed and believe that the matters stated therein are true and, on that ground

12
verify such matters are true. I do not believe that any one person at **Chevron** knows all of the

13
matters stated therein, and therefore these responses were prepared with the assistance and

14
advice of employees of, and counsel for, **Chevron,** upon whose assistance and advice I have

15
relied. These responses are limited by the records and information still in existence, presently

16
recollected, and thus far discovered in the course of preparation of these responses. **Chevron**

17
reserves the right to change, or supplement said responses, or to apply for relief to permit

18
insertion of unintentionally omitted matter.

19
I declare under penalty of perjury of the State of California and the United States of

20
America  that the foregoing is true and correct.

21
Executed at _San Ramon_, California, on August _15_, 2024.

22
Name: _Harpreet K. Tiwana_    [DocuSigned by: *Harpreet K. Tiwana* 5093F566A32543B...]

23
Title: _Assistant Secretary_

24

25

26

27

28

**EXHIBIT 24-6**

<u>PROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF LOS ANGELES</u>

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422.

On August 13, 2024, I served true copies of the following document(s) described as **DEFENDANT CHEVRON USA, INC.'S RESPONSES TO PLAINTIFF MARK SNOOKAL'S SPECIAL INTERROGATORIES (SET 2)** on the interested parties in this action as follows:

| | |
|---|---|
| Dolores Y. Leal | Attorneys for Plaintiff, |
| Olivia Flechsig | MARK SNOOKAL |
| ALLRED, MAROKO & GOLDBERG | |
| 6300 Wilshire Blvd. Suite 1500 | |
| Los Angeles, CA 90048-5217 | |
| dleal@amglaw.com; | |
| oflechsig@amglaw.com | |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address bdelacruz@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 13, 2024, at Los Angeles, California.

_____
Beannette De La Cruz

SMRH:4864-2622-5619.1    DEFENDANT CHEVRON USA, INC.'S RESPONSES TO PLAINTIFF MARK SNOOKAL'S SPECIAL INTERROGATORIES (SET 2)    184

**EXHIBIT 24-7**

# EXHIBIT 25

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   TRACEY A. KENNEDY, Cal Bar No. 150782
3  ROBERT E. MUSSIG, Cal. Bar No. 240369
   H. SARAN FAN, Cal. Bar No. 328282
4  350 South Grand Avenue, 40th Floor
   Los Angeles, CA 90071-3460
5  Telephone:  213.620.1780
   Facsimile:  213.620.1398
6  E-mail:     tkennedy@sheppardmullin.com
               rmussig@sheppardmullin.com
7              sfan@sheppardmullin.com

8  Attorneys for Defendant.
   CHEVRON U.S.A. INC., a Pennsylvania corporation
9

10

11                UNITED STATES DISTRICT COURT

12     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

13

14  MARK SNOOKAL, an individual,          Case No. 2:23-cv-6302-HDV-AJR

15              Plaintiff,                 **DEFENDANTS CHEVRON U.S.A.
                                           INC.'S OBJECTIONS AND
16         vs.                             RESPONSES TO PLAINTIFF MARK
                                           SNOOKAL'S INTERROGATORIES,
17  CHEVRON USA, INC., a California        SET THREE**
    Corporation, and DOES 1 through 10,
18  inclusive,
                                           Action Filed: August 3, 2023
19              Defendants.                Trial Date: August 19, 2025

20

21  PROPOUNDING PARTY:      PLAINTIFF MARK SNOOKAL

22  RESPONDING PARTY:       DEFENDANT CHEVRON U.S.A. INC.

23  SET NO.:                THREE

24  NUMBERS:                26-33

25

26

27

28

                              -1-

**EXHIBIT 25-1**

2.     Defendant objects to each and every Interrogatory to the extent it seeks information that is confidential, proprietary, or a business or trade secret.

3.     Defendant objects to each and every Interrogatory to the extent it seeks information pertaining to a non-party that is protected from disclosure by, among other things, the California Constitution's right of privacy and other privacy privileges.

4.     In responding to the following Interrogatories, Defendant does not concede the relevance or materiality of any such area of inquiry to the subject matter of this litigation.

5.     Inadvertent disclosure of privileged information by Defendant shall not constitute a waiver of any applicable privilege or doctrine, including but not limited to objections on the basis of competency, confidentiality, relevancy, materiality, privilege and/or admissibility of evidence as such objections may apply at trial or otherwise in this action.

6.     Defendant objects to each and every Interrogatory to the extent it is overbroad and unduly burdensome, and seeks information that is neither relevant, proportional to the needs of the case, nor reasonably calculated to lead to the discovery of admissible evidence, including, without limitation, on the grounds that an Interrogatory lacks reasonable date or time parameters.

7.     Defendant objects to each and every Interrogatory to the extent it is vague, ambiguous, and/or unintelligible.

8.     Defendant objects to each and every Interrogatory to the extent the requested information is available from other sources and/or from other means.

Each of the foregoing general objections is hereby incorporated by reference into each specific objection to each Interrogatory as if separately stated therein.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 26:**

Describe in detail the business relationship between YOU and Chevron Nigeria Ltd. during the 2018 to 2020 time period.

-4-

**RESPONSE TO INTERROGATORY NO. 26:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory on the grounds that it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel information of third parties.

Subject to and without waiving the foregoing objections, and limiting its response to the time period relevant to Plaintiff's Complaint, Defendant responds as follows: Defendant and Chevron Nigeria Limited are independent legal entities and affiliates under Chevron Corporation, a Delaware corporation.

**INTERROGATORY NO. 27:**

Describe in detail the business relationship between Chevron Nigeria Ltd. and Chevron Hospital in Warri, Nigeria during the 2018 to 2020 time period.

**RESPONSE TO INTERROGATORY NO. 27:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory on the grounds that it seeks information that is not relevant to any party's claim or defense nor proportional to the needs of the case. Defendant objects to this Interrogatory on the grounds that it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel information of third parties.

**INTERROGATORY NO. 28:**

Describe in detail the business relationship between Chevron Nigeria Ltd. and the Escravos Joint Venture Clinic in Escravos, Nigeria during the 2018 to 2020 time period.

**RESPONSE TO INTERROGATORY NO. 28:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory on the grounds that it seeks information that is not relevant to any party's claim or defense nor proportional to the needs of the case.

-5-

**INTERROGATORY NO. 33:**

IDENTIFY the business entity or entities which compensate employees while on rotational expatriate assignment in Nigeria.

**RESPONSE TO INTERROGATORY NO. 33:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory on the grounds that it is vague and ambiguous, including as to time and scope and as to the term "compensate." Defendant objects to this Interrogatory on the grounds that it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel information of third parties.

Subject to and without waiving the foregoing objections, based upon its understanding of this Interrogatory, and limiting its response to the time period and allegations relevant to Plaintiff's Complaint, Defendant responds as follows: In July 2019, Defendant provided payroll services for its employees who assumed the REM expatriate rotational assignment with Chevron Nigeria Limited in Escravos, Nigeria, and the employee's compensation was charged by Defendant to Chevron Nigeria Limited, who was the employer of the REM position.

Dated: February 25, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____/s/ Sarah Fan_____
TRACEY A. KENNEDY
ROBERT E. MUSSIG
SARAH FAN

Attorneys for Defendant
CHEVRON U.S.A. INC. a Pennsylvania corporation

-8-

Docusign Envelope ID: 3B953039-2FCD-4654-ACC5-DED4B131B5B5

# VERIFICATION

I, Harpreet K. Tiwana declare and state:

I am an Assistant Secretary of Chevron U.S.A. Inc. ("Chevron"), a defendant in the action *Mark Snookal v. Chevron U.S.A. Inc.* Case No. 2:23-cv-6302-HDV-AJR filed in the United States District Court for the Central District of California.

I am authorized to sign this verification on behalf of **Chevron**, and I make this verification for that reason.

I have reviewed the foregoing document titled **DEFENDANTS CHEVRON U.S.A. INC.'S RESPONSES TO PLAINTIFF MARK SNOOKAL'S INTERROGATORIES (SET THREE).**

I am informed and believe that the matters stated therein are true and, on that ground verify such matters are true. I do not believe that any one person at **Chevron** knows all of the matters stated therein, and therefore these responses were prepared with the assistance and advice of employees of, and counsel for, **Chevron,** upon whose assistance and advice I have relied. These responses are limited by the records and information still in existence, presently recollected, and thus far discovered in the course of preparation of these responses. **Chevron** reserves the right to change, or supplement said responses, or to apply for relief to permit insertion of unintentionally omitted matter.

I declare under penalty of perjury of the State of California and the United States of America that the foregoing is true and correct.

Executed at San Ramon, California, on February 25, 2025.

DocuSigned by:

*Harpreet K. Tiwana*

—————————————————————————
5093F566A32543B...

Name: Harpreet K. Tiwana

Title: Assistant Secretary

-9-

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Diego, State of California. My business address is 350 South Grand Avenue, 40th Floor, Los Angeles, CA 90071-3460.

On February 25, 2025, I served true copies of the following document(s) described as **DEFENDANTS CHEVRON USA. INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF MARK SNOOKAL'S INTERROGATORIES (SET THREE)** on the interested parties in this action as follows:

| | |
|---|---|
| Dolores Y. Leal<br>Olivia Flechsig<br>ALLRED, MAROKO & GOLDBERG<br>6300 Wilshire Blvd. Suite 1500<br>Los Angeles, CA 90048-5217<br>dleal@amglaw.com<br>oflechsig@amglaw.com<br>jpena@amglaw.com<br>apaz@amglaw.com | Attorneys for Plaintiff<br>MARK SNOOKAL |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address sfan@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 25, 2025, at Culver City, California.

/s/ Sarah Fan
_____
Sarah Fan

-10-

DEFENDANT'S OBJECTIONS AND RESPONSES
PLAINTIFF'S INTERROGATORIES, SET THREE

**EXHIBIT 25-6**

196

# EXHIBIT 26

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
TRACEY A. KENNEDY, Cal Bar No. 150782
ROBERT E. MUSSIG, Cal. Bar No. 240369
H. SARAN FAN, Cal. Bar No. 328282
350 South Grand Avenue, 40th Floor
Los Angeles, CA 90071-3460
Telephone: 213.620.1780
Facsimile: 213.620.1398
E-mail:    tkennedy@sheppardmullin.com
           rmussig@sheppardmullin.com
           sfan@sheppardmullin.com

Attorneys for Defendant.
CHEVRON U.S.A. INC., a Pennsylvania corporation

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARK SNOOKAL, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:23-cv-6302-HDV-AJR<br><br>**DEFENDANTS CHEVRON U.S.A. INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF MARK SNOOKAL'S INTERROGATORIES, SET THREE**<br><br>Action Filed: August 3, 2023<br>Trial Date: August 19, 2025 |

PROPOUNDING PARTY:     PLAINTIFF MARK SNOOKAL

RESPONDING PARTY:     DEFENDANT CHEVRON U.S.A. INC.

SET NO.:     THREE

NUMBERS:     26-33

-1-

**EXHIBIT 26-1**

**INTERROGATORY NO. 33:**

IDENTIFY the business entity or entities which compensate employees while on rotational expatriate assignment in Nigeria.

**RESPONSE TO INTERROGATORY NO. 33:**

Defendant hereby incorporates by reference the general objections set forth above. Defendant objects to this Interrogatory on the grounds that it is vague and ambiguous, including as to time and scope and as to the term "compensate." Defendant objects to this Interrogatory on the grounds that it calls for a legal conclusion. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or proprietary business information. Defendant objects to this Interrogatory to the extent that it seeks confidential and/or private personnel information of third parties.

Subject to and without waiving the foregoing objections, based upon its understanding of this Interrogatory, and limiting its response to the time period and allegations relevant to Plaintiff's Complaint, Defendant responds as follows: In July 2019, Defendant provided payroll services for its employees who assumed the REM expatriate rotational assignment with Chevron Nigeria Limited in Escravos, Nigeria, and the employee's compensation was charged by Defendant to Chevron Nigeria Limited, who was the employer of the REM position.

Dated: February 25, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By _____/s/ Sarah Fan_____
TRACEY A. KENNEDY
ROBERT E. MUSSIG
SARAH FAN

Attorneys for Defendant
CHEVRON U.S.A. INC. a Pennsylvania corporation

Docusign Envelope ID: 3B953039-2FCD-4654-ACC5-DFD4B131B595

**VERIFICATION**

I, Harpreet K. Tiwana declare and state:

I am an Assistant Secretary of Chevron U.S.A. Inc. ("Chevron"), a defendant in the action *Mark Snookal v. Chevron U.S.A. Inc*. Case No. 2:23-cv-6302-HDV-AJR filed in the United States District Court for the Central District of California.

I am authorized to sign this verification on behalf of **Chevron**, and I make this verification for that reason.

I have reviewed the foregoing document titled **DEFENDANTS CHEVRON U.S.A. INC.'S RESPONSES TO PLAINTIFF MARK SNOOKAL'S INTERROGATORIES (SET THREE).**

I am informed and believe that the matters stated therein are true and, on that ground verify such matters are true. I do not believe that any one person at **Chevron** knows all of the matters stated therein, and therefore these responses were prepared with the assistance and advice of employees of, and counsel for, **Chevron,** upon whose assistance and advice I have relied. These responses are limited by the records and information still in existence, presently recollected, and thus far discovered in the course of preparation of these responses. **Chevron** reserves the right to change, or supplement said responses, or to apply for relief to permit insertion of unintentionally omitted matter.

I declare under penalty of perjury of the State of California and the United States of America that the foregoing is true and correct.

Executed at San Ramon, California, on February 25, 2025.

_DocuSigned by:_
*Harpreet K. Tiwana*
—————————————————————————
5093F566A32543B...

Name: Harpreet K. Tiwana

Title: Assistant Secretary

SMRH:4905-3302-0432.4

**EXHIBIT 26-3**

DEFENDANT'S RESPONSES
PLAINTIFF'S INTERROGATORIES, SET THREE

195

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of San Diego, State of California.  My business address is 350 South Grand Avenue, 40th Floor, Los Angeles, CA 90071-3460.

On February 25, 2025, I served true copies of the following document(s) described as **DEFENDANTS CHEVRON USA. INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF MARK SNOOKAL'S INTERROGATORIES (SET THREE)** on the interested parties in this action as follows:

| | |
|---|---|
| Dolores Y. Leal<br>Olivia Flechsig<br>ALLRED, MAROKO & GOLDBERG<br>6300 Wilshire Blvd. Suite 1500<br>Los Angeles, CA 90048-5217<br>dleal@amglaw.com<br>oflechsig@amglaw.com<br>jpena@amglaw.com<br>apaz@amglaw.com | Attorneys for Plaintiff<br>MARK SNOOKAL |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address sfan@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 25, 2025, at Culver City, California.


/s/ Sarah Fan
_____
Sarah Fan

-10-

DEFENDANT'S OBJECTIONS AND RESPONSES
PLAINTIFF'S INTERROGATORIES, SET THREE

**EXHIBIT 26-4**

# EXHIBIT 27

**From:** Asekomeh, Eshiofe [DELOG][/O=CHEVRON/OU=AG02/CN=RECIPIENTS/CN=EAEV]
**Sent:** Thur 8/15/2019 10:13:10 AM Coordinated Universal Time
**To:** Pitan, Olorunfemi (femi.pitan)[femi.pitan@chevron.com]
**Subject:** RE: MSEA Case - Snookal, Mark

Good morning Ma,

Thanks for the feedback. I complete the clearance today.

Warm regards,

Eshiofe Asekomeh

---

**From:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Sent:** Thursday, August 15, 2019 9:24 AM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Cc:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>
**Subject:** FW: MSEA Case - Snookal, Mark

Dear Dr Asekomeh,

Thanks for the excellent work you put into this case. Please view e mail.

- Kindly decline a job transfer to Escravos.
- You can indicate that he will be cleared for an assignment in Lagos if that is the direction the U.S. decides to pursue.

Best regards,
Femi Pitan

**Dr O.C. Pitan**
OH Physician/ Head, Occupational Health
Nigeria Mid Africa Strategic Business Unit
✉ femi.pitan@Chevron.com
☎ CTN 2772222 ext 61807
☎ International ▮▮▮▮▮▮▮▮▮
*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>
**Sent:** Thursday, August 8, 2019 10:07 PM
**To:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>; Levy, Scott <ScottLevy@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: MSEA Case - Snookal, Mark

Hi Paul.  Thanks for the opportunity to review this case.

In the case of medical transfers to Escravos, my view is that NMA Occupational Health and NMA Cardiologists get 9/10 of the opinions.

As is pointed out, the patient is low risk for a major adverse CV event.  Yet in Escravos, there are only limited resources for initial stabilization and transfer of a major adverse CV event.  There is health risk in an Escravos assignment.

This individual would likely be fit for expatriate assignment in Lagos.

Happy to discuss further if needed.

**Stephen Frangos, MD, MPH, FACOEM**
Regional Manager, Health and Medical – Americas
TR & HM COE
safr@chevron.com
**Chevron Services Company**
A Division of Chevron U.S.A. Inc.
Global Health and Medical
1400 Smith, Room 03016
Houston, Texas 77002
Tel +1 713 372 5922
Fax +1 713 372 5941
Mobile ▇▇▇▇▇▇▇▇

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118
*This message may contain confidential information and is intended only for the use of parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at (713) 372-5922 or by reply e-mail.*

---

**From:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>
**Sent:** Thursday, August 08, 2019 12:43 PM
**To:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>; Levy, Scott <ScottLevy@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: MSEA Case - Snookal, Mark


Hello Steve and Scott

Top of the day to you

Kindly find attached and below  the details of an expatriate employee Mark Snookal, who is being evaluated for a transfer from El Segundo, USA to Escravos, Nigeria.

My concerns are on the safety of such an employee with a potential cardiac abnormality though of low risk being transferred to remote location in the field where access to expert cardiac management and equipment may not be readily available or subject to logistic challenge.

I would greatly value your kind opinions and thoughts on this.


Best Regards

**Paul Arenyeka MD**

Medical Director
Nigeria Mid Africa SBU
✉ poar@chevron.com
☎ CTN 2772222 ext 67046
☎ International ████████

*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Sent:** Thursday, August 8, 2019 2:08 PM
**To:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>
**Subject:** MSEA Case - Snookal, Mark


Good day sir,

As discussed, please find attached the following documents pertaining to Mark Snookal, who is being evaluated for a transfer from El Segundo, USA to Escravos, Nigeria.
The position is Reliability Engineering Manager.

Documents attached:
- Cardiology clearance (of July 29, 2019). Cleared to work in Nigeria but not Escravos specifically
- Report of Cardiac CTA (computed tomography angiogram) and Echo
- Medical Summary by Dr Asekomeh
- Summary of opinions from NMA Cardiologists – **for your own perusal**.



Kind regards,
Femi Pitan

**Dr O.C. Pitan**
OH Physician/ Head, Occupational Health
Nigeria Mid Africa Strategic Business Unit
✉ femi.pitan@Chevron.com
☎ CTN 2772222 ext 61807
☎ International ████████
*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Wednesday, August 7, 2019 1:31 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** Medical summary - Snookal, Mark

Good day Ma,

Please find attached, medical summary for above named employee as requested.
Also attached, are the recent Cardiologist clearance and the CTA/ Echo reports from April.


Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**

# EXHIBIT 28

**Escravos Medevac Records for 2017 - 2022**

### 2017

| S/N | Date of incident | Diagnosis | Remarks |
|---|---|---|---|
| 1 | 1/2/2017 | Acute coronary syndrome | Sudden onset chest pain with palpitations. Elevated cardiac enzymes but no ECG abnormalities. |
| 2 | 1/7/2017 | Spondylotic radiculopathy | Acute sciatica resulting in severe pain and inability to sit |
| 3 | 1/9/2017 | Bleeding Haemorrhoid | |
| 4 | 1/10/2017 | Hypertensive Encephalopathy | Sudden collapse and confusion with highly elevated blood pressure  hypertension |
| 5 | 1/15/2017 | Seizure disorder | Alteration in level of consciousness and tonic features |
| 6 | 1/29/2017 | Appendicitis | |
| 7 | 1/30/2017 | severe sciatica (?slipped disc) | Severe back pain, unable to walk |
| 8 | 2/19/2017 | Seizure disorder | Was admitted for post seizure confusion and had more seizures  during admission |
| 9 | 4/4/2017 | Uncontrol Hypertension and Diabetes | |
| 10 | 5/1/2017 | severe migraine headache | |
| 11 | 7/5/2017 | Cerebrovascular accident (CVA) | |
| 12 | 7/7/2017 | Traumatic Injury (Rt. Foot)- Fracture | |
| 13 | 7/17/2017 | Cerbrovascular disease | |
| 14 | 7/22/2017 | Hand and foot  injury- burns | Burn injury from diesel fire |
| 15 | 7/22/2017 | Hand and foot  injury- burns | Hand and leg burns from diesel fire |
| 16 | 8/1/2017 | Severe burns | Fire |
| 17 | 8/1/2017 | Severe burns | Fire |
| 18 | 8/14/2017 | Traumatic amputation of left middle finger | |
| 19 | 9/19/2017 | Traumatic contusional injury of left ankle and deep lacerations | Other IOC personnel |
| 20 | 9/19/2017 | Severe injury | Other IOC personnel |
| 21 | 10/2/2017 | Fire Injury/ burns | Boat fire |
| Total | | 21 | |

### 2018

| S/N | Date of incident | Diagnosis | Remarks |
|---|---|---|---|
| 1 | 3/3/2018 | Cerebrovascular accident (CVA) | Right hemiparesis and associated dysphasia |
| 2 | 3/14/2018 | Acute urinary retention | |
| 3 | 3/29/2018 | Acute coronary syndrome | |
| 4 | 4/21/2018 | Cerebrovasclar accident | Right hemispheric ischeamic CVA, medevac from a vessel |
| 5 | 5/9/2018 | Severe Burns | From steam |
| 6 | 5/11/2018 | Congestive cardiac failure | |
| 7 | 6/21/2018 | Cerebrovascular accident (CVA) | Found unconscious in his room |
| 8 | 7/23/2018 | Seizure disorder | |
| 9 | 8/10/2018 | Acute coronary syndrome | |

**EXHIBIT 28-1**

CUSA000830

| | | S/N | Date | Diagnosis | Remarks |
|---|---|---|---|---|---|
| | | 10 | 8/14/2018 | Non-STEMI Acute coronary syndrome | |
| | | 11 | 9/18/2018 | Hand Injury | Amputated index finger of the right hand |
| | | 12 | 8/19/2018 | Acute Appendicitis | |
| | | 13 | 8/19/2018 | Acute urinary retention | |
| | | 14 | 8/19/2018 | Multiple organ failure (Heart/renal) | |
| | | 15 | 8/24/2018 | Cerebrovascular accident (CVA) | Slurred speech and left limb weakness |
| | | 16 | 10/4/2018 | Severe Sepsis | Fever with chills and chest infection |
| | | 17 | 11/16/2018 | Acute pulmonary oedema | |
| | | 18 | 12/3/2018 | Acute Upper GI bleeding | Hypotension and hypoglyceamia and upper GI bleeding |
| | | 19 | 12/4/2018 | Acute Appendicitis | |
| | | 20 | 12/8/2018 | Seizure disorder | History of recent fall with head trauma while at home |
| | | | | | |
| | | **Total** | | 20 | |
| | | | | | |
| | | **2019** | | | |
| | | **S/N** | | **Diagnosis** | **Remarks** |
| | | 1 | 1/5/2019 | Transient ischeamic attack (TIA) | Transient inability to walk and slurred speech. Also had supraventricular tachycardia |
| | | 2 | 1/11/2019 | Cerebrovascular accident | |
| | | 3 | 1/14/2019 | Injury from motor vehicular accident (MVA) | |
| | | 4 | 2/11/2019 | Near drowning | |
| | | 5 | 2/23/2019 | Severe hypertension in RVD patient | |
| | | 6 | 3/11/2019 | Acute Hyperglycaemic crisis in DM | |
| | | 7 | 3/26/2019 | Cerebrovascular accident | Slurred speech with right limb weakness |
| | | 8 | 3/28/2019 | Severe Bleeding Haemorrhoid | |
| | | 9 | 3/31/2019 | Cerebrovascular accident | |
| | | 10 | 4/22/2019 | Severe Burns | |
| | | 11 | 5/9/2019 | Burns | |
| | | 12 | 5/9/2019 | Cerebrovascular accident | |
| | | 13 | 5/21/2019 | Traumatic brain injury with Irrational behaviour | Developed symptoms hours after he fell into the sea. |
| | | 14 | 6/6/2019 | Head trauma | Resulted in headache and dizziness |
| | | 15 | 6/7/2019 | Acute Febrile Illness | |
| | | 16 | 6/28/2019 | Severe Sciatica | |
| | | 17 | 7/30/2019 | Hypertensive encephalopathy | |
| | | 18 | 8/11/2019 | Pulmonary embolism | |
| | | 19 | 8/12/2019 | Pulmonary oedema | |
| | | 20 | 8/19/2019 | Cerebrovascular accident | Heamorrhagic stroke with altered consciousness |
| | | 21 | 8/21/2019 | Panic attack | |
| | | 22 | 9/10/2019 | Appendicitis | |
| | | 23 | 9/10/2019 | Appendicitis | |
| | | 24 | 9/17/2019 | Traumatic Chest Injury | Chest trauma with fracture of the left 8th rib |
| | | 25 | 10/4/2019 | Psychosis | Irrational behavious and hallucination |
| | | 26 | 10/22/2019 | Renal stone | Severe flank pain/ known hypertensive |
| | | 27 | 10/7/2019 | Cerebrovascular accident | |
| | | 28 | 10/8/2019 | Cycling accident – traumatic leg injury | |

**EXHIBIT 28-2**

| | | S/N | Date | Diagnosis | Remarks | | |
|---|---|---|---|---|---|---|---|
| | | 29 | 10/19/2019 | Severe lumbargo | | | |
| | | 30 | 11/20/2019 | Acute Appendicitis | | | |
| | | 31 | 12/3/2019 | Hypertensive encephalopathy | | | |
| | | | | | | | |
| | **Total** | | | | 31 | | |
| | | | | | | | |
| | | | | | | | |
| | **2020** | | | | | | |
| | S/N | | | Diagnosis | Remarks | | |
| | | 1 | 1/26/2020 | Hypertensive Encephalopathy | Sudden collapse and severely elevated blood pressure | | |
| | | 2 | 1/27/2020 | Myocardial infarction | Acute Chest pain in a known hypertensive | | |
| | | 3 | 2/24/2020 | Wax burn | | | |
| | | 4 | 2/28/2020 | Cerebrovascular accident | Collapse with weakness of limbs and inability to move | | |
| | | 5 | 3/14/2020 | Burns from explosion | | | |
| | | 6 | 3/17/2020 | Upper Gastrointestinal bleeding | | | |
| | | 7 | 3/23/2020 | Abnormal behaviour/ Mood disorder | | | |
| | | 8 | 4/17/2020 | Acute urinary retention | | | |
| | | 9 | 4/21/2020 | Cerebrovascular accident | Left limb weakness | | |
| | | 10 | 5/11/2020 | Cerebrovascular accident | Collapse with limb weakness | | |
| | | 11 | 5/13/2020 | Severe hypertension | | | |
| | | 12 | 5/12/2020 | Seizure disorder | | | |
| | | 13 | 5/13/2020 | Hypertensive crisis | | | |
| | | 14 | 11/8/2020 | Traumatic injury from accident | Traumatic left ring finger tip amputation and crush injury of other fingers | | |
| | | 15 | 11/8/2020 | Traumatic brain injury | Boat collision with platform boat landing | | |
| | | 16 | 11/23/2020 | Acute appendicitis | | | |
| | | 17 | 6/10/2020 | Severe Sepsis | | | |
| | | | | | | | |
| | | | | | | | |
| | **Total** | | | | 17 | | |
| | **2021** | | | | | | |
| | S/N | | | Diagnosis | Remarks | | |
| | | | | | | | |
| | | 1 | 2/26/2021 | Hypovolemic Shock from Gastroenteritis | | | |
| | | 2 | 3/19/2021 | Intestinal Obstruction | | | |
| | | 3 | 3/30/2021 | Ischemic Heart Disease | ECG showed atrial flutter and evidence of old ischeamic heart changes. | | |
| | | 4 | 5/14/2021 | Traumatic Knee Dislocation | | | |
| | | 5 | 5/20/2021 | Cholecystitis | | | |
| | | 6 | 5/5/2021 | Appendicitis | | | |
| | | 7 | 6/6/2021 | Acute Coronary Syndrome | Sudden onset chest pain and breathlessness | | |
| | | 8 | 5/26/2021 | Severe Malaria | | | |
| | | 9 | 6/13/2021 | Sepsis | | | |
| | | 10 | 6/26/2021 | Rt Forearm Fracture | | | |
| | | 11 | 7/17/2021 | Seizure disoder | Generalised new onset tonic-clonic seizure | | |
| | | 12 | 8/5/2021 | Seizure disorder | Epileptic. Disorientation after seizures | | |

**EXHIBIT 28-3**

CUSA000832

| | | S/N | Date | Diagnosis | Remarks | |
|---|---|---|---|---|---|---|
| | | 13 | 8/26/2021 | Hypotension In Cyesis | | |
| | | 14 | 9/27/2021 | Acute Appendicitis | | |
| | | 15 | 11/1/2021 | Near Drowning | | |
| | | 16 | 9/28/2021 | Acute Confusional State | | |
| | | 17 | 9/29/2021 | Peri Anal abscess | | |
| | | 18 | 10/14/2021 | Septic Shock | | |
| | | 19 | 12/26/2021 | Traumatic Injury -Accident | | |
| | | | | | | |
| | | **Total** | | 19 | | |
| | | **2022** | | | | |
| | | **S/N** | | **Diagnosis** | **Remarks** | |
| | | 1 | 2/21/2022 | Acute appendicitis | | |
| | | 2 | 2/21/2022 | Acute appendicitis | | |
| | | 3 | 3/28/2022 | Acute coronary syndrome | | |
| | | 4 | 3/30/2022 | Acute appendicitis | | |
| | | 5 | 4/4/2022 | Appendicitis | | |
| | | 6 | 4/5/2022 | Urolithiasis | | |
| | | 7 | 5/14/2022 | Deep Vein Thrombosis (DVT) | | |
| | | 8 | 5/15/2022 | Burns | Fire | |
| | | 9 | 5/19/2022 | Deep Vein Thrombosis and pulmonary embolism | | |
| | | 10 | 5/24/2022 | Traumatic head injury with Mutiple lacerations | | |
| | | 11 | 6/10/2022 | Severe multiple injuries | Legs trapped between boat and platform boat landing | |
| | | 12 | 7/27/2022 | Severe Malaria and sepsis | | |
| | | 13 | 8/25/2022 | Severe  injuries | | |
| | | 14 | 9/30/2022 | Diabetes & Hypotension | | |
| | | 15 | 10/28/2022 | Major head trauma | From sea pirate attack | |
| | | 16 | 10/28/2022 | Facial trauma | From sea pirate attack | |
| | | 17 | 10/28/2022 | Partial intestinal obstruction | | |
| | | 18 | 11/3/2022 | Vaso-oclusive Crisis In A Known HBSS genotype | | |
| | | 19 | 11/18/2022 | Major burns | 27% burns from hot engine oil in tanker vessel pipe rupture | |
| | | 20 | 11/18/2022 | Abnormal behaviour/ Delusions (Schizophrenia) | | |
| | | | | | | |
| | | **Total** | | 20 | | |

**EXHIBIT 28-4**

CUSA000833

Escravos Fatalities 2017-2022

| Year | # of Incidents | Date | Incident Details |
|---|---|---|---|
| 2017 | 1 | January 17, 2017 | Contractor personnel was found unresponsive in his accommodation. The site medical team responded and commenced Cardiopulmonary Resuscitation ("CPR").  The CPR was unsuccessful. |
| 2018 | 4 | January 07, 2018 | Medical team was called to the case of a contractor personnel who slumped along the walkway to the accommodation block in Escravos. He was moved to the clinic. CPR was unsuccessful. |
| | | October 17, 2018 | Employee collapsed while walking back to his office from lunch. CPR was commenced immediately and continued until Escravos medical personnel arrived the scene and transported him to the clinic. Additional efforts made at resuscitation were not successful. |
| | | July 22, 2018 | Contractor personnel was observed conscious but unresponsive while in bed at 1835 hours. He was immediately taken to the clinic where he was stabilized until the following morning when flight conditions were favorable for medevac. He was medevaced to his company arranged clinic in Warri. He later died at about 1630 hours on July 23, 2018. |
| | | August 10, 2018 | At approximately 1300hrs, a contractor personnel was observed to be unwell in her accommodation. She was transferred to the on-site clinic. Her condition deteriorated during the evening and resuscitation efforts were not successful. |
| 2019 | 4 | April 8, 2019 | At approximately 1600 hours, a Captain slumped on the accommodation deck of his stationary Tugboat while it was on standby at a CNL facility. He was immediately transferred to the nearby medical post where CPR was performed without success. |
| | | May 22, 2019 | At approximately 0500 hrs, a contractor personnel was found unconscious and having seizures by one of his roommates in his Escravos accommodation. The Medical Response team was mobilized and treatment commenced. He was later medevaced to Warri at 0755 hours and transferred to his company's retainer hospital where he died at approximately 1215 hrs |
| | | August 11, 2019 | At approximately 1300hrs, a contractor personnel on a Self Elevating Work Over Platform (SEWOP) collapsed in the toilet and momentarily lost consciousness. He was medevaced to the Escravos clinic where he was stabilised and later transferred to his company clinic. He died on August 14, 2019. |
| | | October 16, 2019 | At about 3:20pm, a contractor personnel slumped at a on a Well Platform. All efforts to resuscitate him were unsuccessful. |

**EXHIBIT 28-5**

CUSA000834

Escravos Fatalities 2017-2022

| 2020 | 2 | December 18, 2020 | At about 23:15hrs, a security personnel was discovered unresponsive on an Oil Platform. The medical personnel found no sign of life and he was confirmed dead. |
| | | October 12, 2020 | A Contractor personnel discovered he had a highly elevated blood pressure on self check while feeling weak. He became unresponsive while being assessed by the facility Nurse. Resuscitation efforts were not successful |
| 2021 | 3 | May 13, 2021 | A Contractor personnel reported at the medical post at about 23:30 hours with an acute illness. Treatment was commenced, however the condition deteriorated rapidly and efforts at resuscitation failed. He died on May 14, 2021. |
| | | July 27, 2021 | An employee was medevaced from Escravos to Chevron Hospital Warri with a fever and respiratory difficulties. He subsequently tested positive for Coronavirus Disease (COVID-19) and was diagnosed with COVID-19 pneumonia. However, his condition continued to deteriorate until he passed on at 9:00 a.m. on July 28, 2021. |
| | | November 9, 2021 | A contractor personnell was brought into the Escravos Clinic at 0530hrs from his room following sudden onset of chest tightness and breathlessness. He was unresponsive on arrival at the Escravos clinic. Resuscitation efforts were unsuccessful. |
| 2022 | 7 | January 17, 2022, | At about 0610 hours, contractor personnel was found unconscious by his roommate in his room on a Houseboat attached to a Well Platform. He was immediately moved to the nearest medical Post where the Medic assessed him and commenced CPR which was unsuccessful. |
| | | August 17, 2022 | At about 0850 hours, a contractor personnel l slumped while at the mess hall on a barge. Resuscitation efforts were unsuccessful. |
| | | September 11, 2022 | At about 1030hrs, a contractor personnel had seizures while off-duty and on the deck of the vessel making a phone call. He became unconscious and resuscitation efforts were unsuccessful. |

**EXHIBIT 28-6**

CUSA000835

Escravos Fatalities 2017-2022

| | | September 10, 2022 | At about 1020 hrs, a contractor personnel developed breathing difficulties on a facility. He was moved to the nearby medical post for further medical attention. He subsequently had a cardiopulmonary arrest at about 1045hrs and resuscitation was not successful. |
|---|---|---|---|
| | | September 2, 2022 | At about 1800 hours, a contractor personnel on a Self Elevating Workover Platform (SEWOP), lost consciousness while mustering with other crew members Resuscitation efforts were unsuccessful. |
| | | September 5, 2022, | At about 2250 hours, a contractor personnel was retrived from his room following a call by his roommates that saw him grunting in the bathroom. He subsequently had a cardiac arrest. CPR was not successful. |
| | | December 24, 2022 | At about 08:10hrs, a contractor personnel was found unrousable in his room by his roommate. A quick assessment by the medical team noted that rigor mortis had set in and no need for resuscitation. He was confirmed dead. |

**EXHIBIT 28-7**

CUSA000836

# EXHIBIT 29

| From: | Levy, Scott[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF6C6DC5AA0B407FA6A60ED694E3A3D1-LTMV] |
| Sent: | Wed 9/4/2019 5:42:22 PM (UTC) |
| To: | Jones MD, Ayanna[Ayanna.Jones@chevron.com] |
| Subject: | Re: Rescinded Job Offer in Nigeria |

Thanks. I got this.

Sent from my iPad

On Sep 4, 2019, at 3:39 PM, Jones MD, Ayanna <Ayanna.Jones@chevron.com> wrote:

Hello Andrew,

The EEMEA Regional Medical Manager would be able to provide you with context on this case and appropriate response.

Regards,

Ayanna Jones, MD, MPH
Manager US Occupational and
Expatriate Health Services

**Chevron Services Company**
A Division of Chevron U.S.A. Inc.
TR & HM COE
Global Health and Medical
1400 Smith, #03196
Houston, TX 77002
Tel: (713)372-5921
Fax: (713)372-5941
Email: Ayanna.Jones@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

**From:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Sent:** Wednesday, September 04, 2019 9:33 AM
**To:** Jones MD, Ayanna <Ayanna.Jones@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>
**Subject:** Fwd: Rescinded Job Offer in Nigeria

**EXHIBIT 29-1**

211

CUSA0000983

Dr. Ayana,

Are you able to provide me with any context on the below and suggested response? Is this common to have conflicting views between someone's personal physician and Chevron Expat Medical?

If there is another resource you would suggest, could I please have their name?

Note that Mark finds this discriminatory in nature, however, this is hard to know with the limited information.

Kind Regards,
Andrew Powers

Sent from my iPhone
Begin forwarded message:

> **From:** "Snookal, Mark" <Mark.Snookal@chevron.com>
> **Date:** September 4, 2019 at 7:20:38 AM PDT
> **To:** "Powers, Andrew C" <Andrew.Powers@chevron.com>
> **Cc:** "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
> **Subject: Rescinded Job Offer in Nigeria**
>
> Andrew,
>
> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>
> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.
>
> Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.
>
>
> Mark Snookal
> IEA Reliability Team Lead
>
> **Chevron Products Company**
> El Segundo Refinery

**212**

**EXHIBIT 29-2**

CUSA0000984

324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel  310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 29-3**

CUSA0000985

# EXHIBIT 30

| From: | Plazuela, Ira Danica [Chevron][/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d4d6da04fec44afa8a58f3cbab16c23b-irau] |
|---|---|
| Sent: | Fri 4/24/2020 5:16:58 AM (UTC) |
| To: | EMPortal_DO_NOT_REPLY@chevron.com[EMPortal_DO_NOT_REPLY@chevron.com]; NMA - Expat Admin.[L9LEK168@chevron.com]; Isiocha, Chinyere (ChinyereIsiocha)[ChinyereIsiocha@chevron.com]; Okorodudu, Idongesit A. (IAIA)[IAIA@chevron.com]; Health & Medical Services - North and South America Expatriate Ex[EXAMAMER@chevron.com]; Health & Medical Services - Europe, Afr, Mid East, Eurasia Expat[EXAMEAME@chevron.com]; Immigration Group[immigr@chevron.com]; Mirabueno, Bijo Velante[JosephineMirabueno@chevron.com]; Jueves, Therese Nicole[ThereseNicole.Jueves@chevron.com]; Jueves, Therese Nicole[ThereseNicole.Jueves@chevron.com] |
| Subject: | RE: Snookal,Mark - Escravos, Nigeria - Domestic to International  Notification |

Hi, All.
Please be advised that metadata below is cancelled due to assignment cancellation. Thank you.
**Ira Plazuela** ●●
Processing Representative - Global Mobility
iradanicaplazuela@chevron.com
CTN 793-7642

**From:** EMPortal_DO_NOT_REPLY@chevron.com <EMPortal_DO_NOT_REPLY@chevron.com>
**Sent:** Tuesday, July 9, 2019 3:51 PM
**To:** NMA - Expat Admin. <L9LEK168@chevron.com>; Isiocha, Chinyere (ChinyereIsiocha) <ChinyereIsiocha@chevron.com>; Okorodudu, Idongesit A. (IAIA) <IAIA@chevron.com>; Health & Medical Services - North and South America Expatriate Ex <EXAMAMER@chevron.com>; Health & Medical Services - Europe, Afr, Mid East, Eurasia Expat <EXAMEAME@chevron.com>; Immigration Group <immigr@chevron.com>; Mirabueno, Bijo Velante <JosephineMirabueno@chevron.com>; Jueves, Therese Nicole <ThereseNicole.Jueves@chevron.com>; Jueves, Therese Nicole <ThereseNicole.Jueves@chevron.com>
**Subject:** Snookal,Mark - Escravos, Nigeria - Domestic to International Notification

To Whom It May Concern,

This e-mail message is sent to you by Chevron Global Expatriate Administration Group. We would like to notify you about the new assignment acceptance with information in the table below.

| ASSIGNEE INFORMATION | |
|---|---|
| Assignee Name (Last Name, First Name) | Snookal,Mark |
| Chevron-issued 4-Letter CAI | MVZM |
| Email | Mark.Snookal@chevron.com |
| Payroll | United States |
| Marital Status | Single |
| Host Family Size | 1 |
| Phone Number to Contact | +1 310-615-5208 |
| Home Country | United States |
| Point of Origin | El Segundo, California |
| New Assignment Job Title | EGTL Reliability Engineering |

**215**

**EXHIBIT 30-1**

CUSA0000986

Manager

| | |
|---|---|
| Home Personnel Number | 70017136 |
| New Hire | No |

## NEW ASSIGNMENT INFORMATION

| | |
|---|---|
| New Assignment | Rotational |
| New Assignment Country | Nigeria |
| New Assignment City/Work Location | Escravos |
| New Assignment Company | 0811 - Chevron Upstream & Gas |
| New Assignment Cost Center | XCPR225000 |
| New Assignment Supervisor Name | Okeowo, Siji |
| New Assignment Supervisor Email | siji.okeowo@chevron.com |
| Move Type: | Domestic to International |
| Anticipated Start Date | 1 Jul 2019 |
| Assignment Duration | 3-4 years |
| Career Couple | No |
| Spouse's Name (Last Name, First Name) | |

## CURRENT ASSIGNMENT INFORMATION

| | |
|---|---|
| Current Assignment | Domestic |
| Current Host City/Work Location | El Segundo, United States |
| Current Assignment Company | 0061 - Chevron Products Company |
| Current Assignment Cost Center | DCRES00758 |

## OTHER CONTACTS

| | |
|---|---|
| HR Assignee Counselor Name (Last Name, First Name) | Mirabueno, Bijo |
| HR Assignee Counselor Email | JosephineMirabueno@chevron.com |
| Home-Country HR Contact Name | Andrews, Kelly |
| Home-Country HR Contact | KellyAndrews@chevron.com |

**EXHIBIT 30-2**

**216**

CUSA0000987

| | |
|---|---|
| Email | |
| Home-Country HR Contact Phone | +1 310-615-5468 |
| New Assignment HR Contact Name | Ajayi, Nwamaka |
| New Assignment HR Contact Email | NwamakaAjayi@chevron.com |
| New Assignment HR Contact Phone | +234 3660000X68122 |

DISCLAIMER: This message contains confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is STRICTLY PROHIBITED. If you have received this message in error, please notify Chevron by contacting:

*********

Email: expatjob@chevron.com

**EXHIBIT 30-3**

CUSA0000988

# EXHIBIT 31

| From: | Levy, Scott[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF6C6DC5AA0B407FA6A60ED694E3A3D1-LTMV] |
|---|---|
| Sent: | Mon 8/26/2019 2:54:39 PM (UTC) |
| To: | Arenyeka, Paul O.  (PaulArenyeka)[PaulArenyeka@chevron.com] |
| Cc: | Frangos MD, Steve (SAFR)[SAFR@chevron.com] |
| Subject: | Re: [**EXTERNAL**] Patient MS |

I support your decision and appreciate the rereview.
Scott

Sent from my iPhone

On 26 Aug 2019, at 15:51, Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com> wrote:

Dear Scott

Thank you for making the effort to engage the specialist in this case and I understand his opinion and recommendations.

However I believe we should still be very cautious. Based on recent developments around increasing medical evacuation from the field there is heightened focus on FFD in field locations by management. The risk of an incident no matter how low is a major factor in Escravos medical care. The logistics of getting an emergency out of Escravos especially when there is weather challenge compounds the risk of an adverse outcome.

I would be cautious about this and maintain our current decision. I discussed this case in view of its impending appeal with the HR & Medical leadership team this morning and the general feeling is that we should maintain the restriction based on the issues already outlined.

I will appreciate your guidance

Best Regards

**Paul Arenyeka MD**

Medical Director
Nigeria Mid Africa SBU
✉ poar@chevron.com
☎ CTN 2772222 ext 67046
☎ International + (234) -1-3667046

*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed.  If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited.  If you have received this message in error, please notify me immediately at the telephone number indicated above*

**From:** Levy, Scott <ScottLevy@chevron.com>
**Sent:** Saturday, August 24, 2019 8:00 AM
**To:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>
**Cc:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>
**Subject:** Fwd: [**EXTERNAL**] Patient MS

**EXHIBIT 31-1**

219

CUSA0000995

Paul,

I had a conversation with Mark Snookals nephrologist and the info is below.  Although not without some risk, I don't think we're dealing with high risk. We can mandate yearly clearance and report from nephrologist on yearly basis.  Risk is even lower when we consider that he'll be a rotator.

Scott

Sent from my iPhone
Begin forwarded message:

> **From:** "Steven H. Khan" <Steven.S.Khan@kp.org>
> **Date:** 23 August 2019 at 22:35:33 BST
> **To:** "scottlevy@chevron.com" <scottlevy@chevron.com>
> **Cc:** "mark@maygus.com" <mark@maygus.com>
> **Subject:** [**EXTERNAL**] Patient MS
>
> Hi Dr. Levy,
> I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
> I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.
>
> I just spoke to Mr. MS  and received his permission to email you back. I am also copying him on this email.
>
> Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.
> From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).
>
> Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.
> Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.
>
> Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.
> For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
> Is on an ARB.
>
> In summary,  Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.
> The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.
>
> If you have any further questions, please feel free to email me or call me.

**EXHIBIT 31-2**

**220**

CUSA0000996

Best regards,

S. Khan, MD
Clinical Associate Professor, UCLA School of Medicine
Heart Failure and Transplant Cardiology, Kaiser Permanente

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**EXHIBIT 31-3**

CUSA0000997

# EXHIBIT 32

| From: | Levy, Scott[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF6C6DC5AA0B407FA6A60ED694E3A3D1-LTMV] |
|---|---|
| Sent: | Tue 8/20/2019 4:05:53 PM (UTC) |
| To: | Frangos MD, Steve (SAFR)[SAFR@chevron.com] |
| Cc: | Arenyeka, Paul O. (PaulArenyeka)[PaulArenyeka@chevron.com] |
| Subject: | Re: Nigeria Medical Determination |

Got it. Thanks.

Sent from my iPhone

On 20 Aug 2019, at 17:31, Frangos MD, Steve (SAFR) <SAFR@chevron.com> wrote:

Scott / Paul:  the employee reached me Friday evening, through guidance from another employee.  I shared with him what Paul and I had determined in our review of the case:  that he was deemed not fit for assignment in Escravos because of the location; but would have been fit if assignment was to Lagos.

He said he planned to appeal the medical clearance decision.
**Stephen Frangos, MD, MPH, FACOEM**
Regional Manager, Health and Medical – Americas
TR & HM COE
safr@chevron.com
**Chevron Services Company**
A Division of Chevron U.S.A. Inc.
Global Health and Medical
1400 Smith, Room 03016
Houston, Texas 77002
Tel +1 713 372 5922
Fax +1 713 372 5941
Mobile ████████████

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118
*This message may contain confidential information and is intended only for the use of parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at (713) 372-5922 or by reply e-mail.*

---

**From:** Levy, Scott <ScottLevy@chevron.com>
**Sent:** Tuesday, August 20, 2019 8:44 AM
**To:** Arenyeka, Paul O. (PaulArenyeka) <PaulArenyeka@chevron.com>
**Cc:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>
**Subject:** RE: Nigeria Medical Determination

Understood. Does he know this?

**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
Chevron Products UK Limited
1 Westferry Circus
Canary Wharf

**EXHIBIT 32-1**

223

CUSA0001003

London E14 4HA
Office-  +44 (0) 207 719 3390 (Also serves 24/7 medical emergency support)
Fax-    +44 (0) 207 719 5188
Mobile- ███████████████
CTN- (8) 584 3390
ScottLevy@chevron.com

This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above

**Important Message from the Global Privacy Team**

Remember that when it comes to sharing personal data, **less is more**. Do not share more information than is being requested from you. Share information securely and follow company policy by **encrypting** emails and attachments that contain **sensitive personal data**.  Before clicking "send" on an email, **double-check** that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com

---

**From:** Arenyeka, Paul O. (PaulArenyeka)
**Sent:** 20 August 2019 11:58
**To:** Levy, Scott <ScottLevy@chevron.com>
**Cc:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>
**Subject:** RE: Nigeria Medical Determination

Good morning Scott

He was deemed not fit for assignment in Escravos because of the location. He would have been fit if assignment was to Lagos. it is left for his team to consider re-assignment to Lagos if that is their decision

Best Regards

**Paul Arenyeka MD**

Medical Director
Nigeria Mid Africa SBU
✉ poar@chevron.com
☎ CTN 2772222 ext 67046
☎ International ██████████████

*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed.  If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited.  If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** Levy, Scott <ScottLevy@chevron.com>
**Sent:** Tuesday, August 20, 2019 8:27 AM
**To:** Frangos MD, Steve (SAFR) <SAFR@chevron.com>; Arenyeka, Paul O. (PaulArenyeka)

**EXHIBIT 32-2**

CUSA0001004

<PaulArenyeka@chevron.com>
**Subject:** FW: Nigeria Medical Determination


Just trying to find where we left this.  Has anyone reviewed if assignment could be Lagos?


**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
Chevron Products UK Limited
1 Westferry Circus
Canary Wharf
London E14 4HA
Office-   +44 (0) 207 719 3390 (Also serves 24/7 medical emergency support)
Fax-      +44 (0) 207 719 5188
Mobile- ███████████████
CTN- (8) 584 3390
ScottLevy@chevron.com

This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above

**Important Message from the Global Privacy Team**
Remember that when it comes to sharing personal data, **less is more**. Do not share more information than is being requested from you. Share information securely and follow company policy by **encrypting** emails and attachments that contain **sensitive personal data**.  Before clicking "send" on an email, **double-check** that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com


---

**From:** Cortina, Yvette
**Sent:** 19 August 2019 23:13
**To:** Levy, Scott <ScottLevy@chevron.com>
**Cc:** Snookal, Mark <Mark.Snookal@chevron.com>
**Subject:** FW: Nigeria Medical Determination


Hello Dr. Levy,

Mr. Mark Snookal (MVZM) reached out to me last week in regards to his Expatriate Assignment Recommendation.  He was recently deemed "Not Fit" for assignment and would like to appeal this decision.  Initial Assignment offer is Rotational to Escravos, Nigeria.

He has not received his medical results.

Thank you!
Regards,

**EXHIBIT 32-3**

CUSA0001005

Yvette Cortina | Administrative Assistant, Expatriate Health Services | 713-372-5926 |
yvette.cortina@chevron.com

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Monday, August 19, 2019 9:30 AM
**To:** Cortina, Yvette <Yvette.Cortina@chevron.com>
**Subject:** Nigeria Medical Determination


Good morning Yvette,

I never heard from anyone from your group on Friday and am hoping to get in touch with someone soon. In the meantime, I would like to request the records used to make the "not fit" determination as is my right.

Thanks,

Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel  310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 32-4**

**226**

CUSA0001006

# EXHIBIT 33

| From: | Levy, Scott[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF6C6DC5AA0B407FA6A60ED694E3A3D1-LTMV] |
|---|---|
| Sent: | Tue 8/27/2019 10:13:58 AM (UTC) |
| To: | Seca Torres, Eldyleida[eldyleidasecatorres@chevron.com] |
| Subject: | Re: Msea |

Disregard.

Sent from my iPhone

> On 27 Aug 2019, at 11:02, Seca Torres, Eldyleida <eldyleidasecatorres@chevron.com> wrote:
>
> Should I request that the clearance given be placed on hold?
>
>
> -----Original Message-----
> From: Levy, Scott <ScottLevy@chevron.com>
> Sent: Friday, August 23, 2019 5:14 PM
> To: Seca Torres, Eldyleida <eldyleidasecatorres@chevron.com>
> Subject: Msea
>
>
> I don't know who the msea advisor is for Mark Snookal but can you inform them that we're reviewing his msea eval for escravos. This was previous sent as not ffd but I'm performing a second review.
>
> Thanks,
>
> Scott
> Sent from my iPhone

**EXHIBIT 33**

228

CUSA0001041

# EXHIBIT 34

| From: | Levy, Scott[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EF6C6DC5AA0B407FA6A60ED694E3A3D1-LTMV] |
|---|---|
| Sent: | Mon 8/26/2019 7:51:00 AM (UTC) |
| To: | Steven H. Khan[Steven.S.Khan@kp.org] |
| Cc: | Mark Snookal[Mark@maygus.com] |
| Subject: | Re: [**EXTERNAL**] Patient MS |

Dr. Khan,
Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss.

Scott

Sent from my iPad

On Aug 23, 2019, at 10:35 PM, Steven H. Khan <Steven.S.Khan@kp.org> wrote:

Hi Dr. Levy,
I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.

I just spoke to Mr. MS  and received his permission to email you back. I am also copying him on this email.

Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.
From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).

Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.
Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.

Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.
For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
Is on an ARB.

In summary,  Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.
The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.

If you have any further questions, please feel free to email me or call me.

Best regards,

S. Khan, MD

**EXHIBIT 34-1**

CUSA0001042

Clinical Associate Professor, UCLA School of Medicine

Heart Failure and Transplant Cardiology, Kaiser Permanente

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

**EXHIBIT 34-2**

CUSA0001043

# EXHIBIT 35

| | |
|---|---|
| **From:** | Snookal, Mark[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=055D9094D3E242128BEF80F5C6B3DAD9-MVZM] |
| **Sent:** | Thur 9/5/2019 11:56:01 PM (UTC) |
| **To:** | Cortina, Yvette[Yvette.Cortina@chevron.com] |
| **Subject:** | RE: Nigeria Medical Determination |

Yvette,

I have spoken to Dr. Levy about the determination, but I would still like to have a copy of the paperwork and results used to make the determination.

Thank You

Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
Tel  310.615.5208
Mobile 310.678.5914

---

**From:** Cortina, Yvette <Yvette.Cortina@chevron.com>
**Sent:** Monday, August 19, 2019 3:13 PM
**To:** Levy, Scott <ScottLevy@chevron.com>
**Cc:** Snookal, Mark <Mark.Snookal@chevron.com>
**Subject:** FW: Nigeria Medical Determination

Hello Dr. Levy,

Mr. Mark Snookal (MVZM) reached out to me last week in regards to his Expatriate Assignment Recommendation.  He was recently deemed "Not Fit" for assignment and would like to appeal this decision.  Initial Assignment offer is Rotational to Escravos, Nigeria.

He has not received his medical results.

Thank you!
Regards,
Yvette Cortina | Administrative Assistant, Expatriate Health Services | 713-372-5926 |
yvette.cortina@chevron.com

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Monday, August 19, 2019 9:30 AM
**To:** Cortina, Yvette <Yvette.Cortina@chevron.com>
**Subject:** Nigeria Medical Determination

Good morning Yvette,

I never heard from anyone from your group on Friday and am hoping to get in touch with someone soon. In the meantime, I would like to request the records used to make the "not fit" determination as is my right.

**233**

**EXHIBIT 35**

CUSA0001236

# EXHIBIT 36

| From: | Vang, Bao[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E5F73CF2E13A487F8014CA4E33650E84-BAVU] |
|---|---|
| Sent: | Fri 6/7/2019 12:49:40 PM (UTC) |
| To: | Omomehin, Andrew A. (AAOM)[aaom@chevron.com] |
| Cc: | Ajayi, Nwamaka[NwamakaAjayi@chevron.com]; NIGEC EGTL Technical - Manager (L9ESC1596-smb)[L9esc1596@chevron.com]; FE - Sponsor Group[fespogrp@chevron.com] |
| Subject: | RE: EGTL RE Manager Posting - Global PDC |

Hi Andrew,

The candidate summary table is not fully filled out.  Please complete rankings in the following areas for all shortlisted candidates as they are currently blank and also note the selected candidate in the file in the last column. This is required for record purposes and as it appears at least one of the categories below is a differentiating factor, I'd like to ensure we clearly communicate this to the candidate's PDRs when seeking concurrence.

| CSOC Focus | Demonstrated Chevron Way Behavior | Development Fit | Operational Excellence | Selected Candidate |
|---|---|---|---|---|

Thanks.
Bao

**From:** Omomehin, Andrew A. (AAOM)
**Sent:** Thursday, June 6, 2019 11:28 AM
**To:** FE - Sponsor Group <fespogrp@chevron.com>
**Cc:** Vang, Bao <BaoVang@chevron.com>; Ajayi, Nwamaka <NwamakaAjayi@chevron.com>; NIGEC EGTL Technical - Manager (L9ESC1596-smb) <L9esc1596@chevron.com>
**Subject:** FW: EGTL RE Manager Posting - Global PDC


Please See attached ranking of the candidates for the NMA EGTL Reliability Engineering Manager position for your use. We are recommending Mark Snookal for the position.

Regards,
Andrew

**From:** NIGEC EGTL Technical - Manager (L9ESC1596-smb)
**Sent:** Tuesday, June 4, 2019 10:36 AM
**To:** Omomehin, Andrew A. (AAOM) <aaom@chevron.com>; Ajayi, Nwamaka <NwamakaAjayi@chevron.com>
**Subject:** EGTL RE Manager Posting - Global PDC


Amaka, Andrew:

We finished the ranking of the candidates this morning.  Here is a summary of the results...

| | 20% | 30% | 30% | 20% | Total |
|---|---|---|---|---|---|
| Amir Zaheer | 4 | 4 | 3 | 3 | 3.5 |

**235**

**EXHIBIT 36-1**

CUSA0001435

Mark Snookal                           4        3        3        4      3.4

We saw Amir and Mark essentially tied based on the criteria and weighting.  We think the development fit was much better for Mark Snookal and used that criteria as the tie breaker.  The VGM (Greg Gabel / Mike Charlton) and the existing Reliability Manager (Chander Sanbhi) participated on the scoring and ranking of the candidates.

Thanks,


Kent DeBoer – Technical Manager
(B2B – Siji Okeowo)
Escravos Gas to Liquids (EGTL)
Chevron Nigeria Limited
Office:  +234 (0) 1 367 6877
Office U.S. Tie-Line:  (925) 842 1111 option 4 x6877
Office CTN:  367 6877
Nigeria Mobile: ███████████
kdeboer@chevron.com
l9esc1596@chevron.com (shared email with B2B)




**From:** FE - Sponsor Group
**Sent:** Tuesday, May 21, 2019 10:07 AM
**To:** Omomehin, Andrew A. (AAOM) <aaom@chevron.com>
**Cc:** Vang, Bao <BaoVang@chevron.com>
**Subject:** NMA Job Closed 5/20

Hi Andrew,

The following job for **NMA** closed on 05/20, **401333**. You will find the candidate summary table in SharePoint- 2H2019 Off-Cycle under **Job Slates.**

Regards,

**Marion Gerard**
Sponsor Support Specialist
mariongerard@chevron.com

**Chevron Services Company**
HR Shared Services
1400 Smith Street, 09040
Houston, TX 77002
+1 713 372 8070




**EXHIBIT 36-2**

CUSA0001436

| From: | Omomehin, Andrew A. (AAOM)[aaom@chevron.com] |
|---|---|
| Sent: | Thur 6/6/2019 4:27:35 PM (UTC) |
| To: | FE - Sponsor Group[fespogrp@chevron.com] |
| Cc: | Vang, Bao[BaoVang@chevron.com]; Ajayi, Nwamaka[NwamakaAjayi@chevron.com]; NIGEC EGTL Technical - Manager  (L9ESC1596-smb)[L9esc1596@chevron.com] |
| Subject: | FW: EGTL RE Manager Posting - Global PDC |
| Attachment: | 401333_Candidate Summary NMA EGTL Reliability Engrg Mgr.xlsx |
| Attachment: | EGTL Reliability Engineering Manager_v- OJ1.xlsx |

Please See attached ranking of the candidates for the NMA EGTL Reliability Engineering Manager position for your use. We are recommending Mark Snookal for the position.

Regards,
Andrew

**From:** NIGEC EGTL Technical - Manager (L9ESC1596-smb)
**Sent:** Tuesday, June 4, 2019 10:36 AM
**To:** Omomehin, Andrew A. (AAOM) <aaom@chevron.com>; Ajayi, Nwamaka <NwamakaAjayi@chevron.com>
**Subject:** EGTL RE Manager Posting - Global PDC

Amaka, Andrew:

We finished the ranking of the candidates this morning.  Here is a summary of the results…

|  | 20% | 30% | 30% | 20% | Total |
|---|---|---|---|---|---|
| ███████ |  |  |  |  |  |
| Amir Zaheer | 4 | 4 | 3 | 3 | 3.5 |
| Mark Snookal | 4 | 3 | 3 | 4 | 3.4 |

We saw Amir and Mark essentially tied based on the criteria and weighting.  We think the development fit was much better for Mark Snookal and used that criteria as the tie breaker.  The VGM (Greg Gabel / Mike Charlton) and the existing Reliability Manager (Chander Sanbhi) participated on the scoring and ranking of the candidates.

Thanks,


Kent DeBoer – Technical Manager
(B2B – Siji Okeowo)
Escravos Gas to Liquids (EGTL)
Chevron Nigeria Limited
Office: +234 (0) 1 367 6877
Office U.S. Tie-Line:  (925) 842 1111 option 4 x6877
Office CTN:  367 6877

**EXHIBIT 36-3**

CUSA0001437

Nigeria Mobile: ███████████

kdeboer@chevron.com
l9esc1596@chevron.com (shared email with B2B)

**From:** FE - Sponsor Group
**Sent:** Tuesday, May 21, 2019 10:07 AM
**To:** Omomehin, Andrew A. (AAOM) <aaom@chevron.com>
**Cc:** Vang, Bao <BaoVang@chevron.com>
**Subject:** NMA Job Closed 5/20

Hi Andrew,

The following job for **NMA** closed on 05/20, **401333**. You will find the candidate summary table in SharePoint-2H2019 Off-Cycle under **Job Slates.**

Regards,

**Marion Gerard**
Sponsor Support Specialist
mariongerard@chevron.com

**Chevron Services Company**
HR Shared Services
1400 Smith Street, 09040
Houston, TX 77002
+1 ███████████

**238**

**EXHIBIT 36-4**

# EXHIBIT 37

## Summary of Cardiology Opinions – NMA Cardiologists

**Request**

Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:
1. Potential complications and the likelihood of progression
2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
3. Possible instructions to communicate to employee as per preventing complications.

**Responses**

**Dr Aiwuyo (EGTL)**

Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have used values of <4.5cm as partition value for low risk situations., link below refers.

[ HYPERLINK "https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm" ]

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include

   a. Rupture/dissection (sudden and catastrophic) and its attendant sequala
   b. Thromboembolic phenomenon
   c. Pressure symptoms on other vital organs
   d. Sudden death

2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support such an individual due to our peculiarities.

**EXHIBIT 37-1**

3. Instructions for the patient

-avoid lifting heavy objects
-quit smoking (if he is a smoker)
-manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic
(DOC beta blockers)
-watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp
pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
-avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic
aneurysm, unfortunately I found none.  What is established is that a patient with symptomatic
aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this.


**Dr Adeyeye**
I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures
highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine).  Guideline-
directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood
pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and
documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.


**Dr Akintunde**

I concur with my colleagues. With an aortic root of 4.2cm, he is 'low risk' but not 'no
risk'.
I would however be more comfortable if he were on a beta-blocker as one of his meds
or in addition to current meds. The fact that he does not smoke cigarettes is beneficial.
There could be a reason his cardiologist did not put him on a beta-blocker. Could he
have a contraindication such as asthma, COPD or allergy?
Is there a medical report from his cardiologist? I only see imaging reports.

**Dr Asekomeh's response to Dr Akintunde**
Below is response from Dr. Akintunde. I have given her update on the Cardiologist report. I also
engaged her on the pulse rate and we agreed on the fact that this could signify either the
employee is already on a beta blocker and did not mention it on his form GO-146 or this is the
reason why he is not on the beta blocker.

**241**

**EXHIBIT 37-2**

CUSA0001521

| From: | Pitan, Olorunfemi (femi.pitan)[femi.pitan@chevron.com] |
|---|---|
| Sent: | Thur 8/15/2019 8:15:07 AM (UTC) |
| To: | ADEYEYE, VICTOR [DELOG MEDICAL SERVICES][DNOY@chevron.com]; Aiwuyo, Henry [SERVITICO][henryaiwuyo@chevron.com]; Asekomeh, Eshiofe [DELOG][EAEV@chevron.com] |
| Cc: | NIGEC Staff Physicians (I9esc300)[L9ESC300@chevron.com] |
| Subject: | RE: Snookal, Mark- Medical report |

Good day sirs,

Thanks for your very valuable and comprehensive input into this case. Your opinions were communicated to the Physicians in the U.S.
It has been decided that Mark Snookal is not a suitable candidate to work in Escravos. He will be considered for an assignment in Lagos.

Kind regards,
Femi Pitan

Dr O.C. Pitan
OH Physician/ Head, Occupational Health
Nigeria Mid Africa Strategic Business Unit
✉ femi.pitan@Chevron.com
☎ CTN 2772222 ext 61807
☎ International ███████████
*NMA HR: Focus, Process Excellence, Expertise*
*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Sent:** Monday, August 5, 2019 5:55 PM
**To:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Sir/Ma,

I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine). Guideline-directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.

Kind regards,

Victor.

**242**

**EXHIBIT 37-3**

CUSA0001522

**From:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>
**Sent:** Monday, August 5, 2019 2:26 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>; ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report


Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have used values of <4.5cm as partition value for low risk situations., link below refers.

https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this

evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include


    a. Rupture/dissection ( sudden and catastrophic) and its attendant sequala
    b. Thromboembolic phenomenon
    c. Pressure symptoms on other vital organs
    d. Sudden death


2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support

   such an individual due to our peculiarities.

3. Instructions for the patient


    -avoid lifting heavy objects
    -quit smoking (if he is a smoker)
    -manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic (DOC beta blockers)

**EXHIBIT 37-4**

CUSA0001523

-watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
-avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic aneurysm, unfortunately I found none.  What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this sir.

Warm regards.


*DR. AIWUYO, HENRY*

*OH Physician/Cardiologist*
*EGTL clinic*
*EXT-77943*
*B2B dr oyebowale olaniyi*
*"as to diseases, make a habit of two things- to help, or at least, to do no harm"*
*hippocrates*


---

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Monday, August 5, 2019 11:43 AM
**To:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report


Good day,

Below mail trail refers. Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:
1. Potential complications and the likelihood of progression
2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
3. Possible instructions to communicate to employee as per preventing complications.

Thanks for your usual help.


Warm regards,

Eshiofe Asekomeh


**EXHIBIT 37-5**

CUSA0001524

**From:** Asekomeh, Eshiofe [DELOG]
**Sent:** Tuesday, July 30, 2019 7:44 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Cc:** NIGEC Staff Physicians (l9esc300) <L9ESC300@chevron.com>
**Subject:** Snookal, Mark- Medical report


Good day Ma,

I will like to discuss Mark Snookal (Manager, Reliability Engineering) with you tomorrow. He is on transfer from El Segundo, USA to Escravos, Nigeria on international assignment.
He has aortic root dilatation and was reviewed by a Cardiologist April this year. The examining Physician in the US had declared him fit with limitation (not to lift weight above 50 pounds)
Attached are the medical reports and the Cardiologist report from April, 2019.



Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**

**EXHIBIT 37-6**

CUSA0001525

# EXHIBIT 38

| From: | Pitan, Olorunfemi (femi.pitan)[femi.pitan@chevron.com] |
|---|---|
| Sent: | Wed 8/7/2019 3:20:05 PM (UTC) |
| To: | Asekomeh, Eshiofe [DELOG][EAEV@chevron.com] |
| Subject: | RE: Medical summary - Snookal, Mark |

Thanks for the follow-up and updates.

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Wednesday, August 7, 2019 3:17 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Medical summary - Snookal, Mark

Good day Ma,

Unfortunately Dr. Aiwuyo is unable to get any other  literature on risk stratification aside from  the one he already referenced (Canadian).
Literature on risk of complications post- surgery exist but is not relevant here. I hinted Dr. Akintunde on the urgency of the review and she promised to review the case possibly today.
I have not been able to catch her on phone today. I am still hopeful she will revert back before the end of the day. I will keep trying to reach her.

Warm regards,

Eshiofe Asekomeh

**From:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Sent:** Wednesday, August 7, 2019 1:41 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Subject:** RE: Medical summary - Snookal, Mark

Excellent summary! Thanks a million.

• Is Dr Aiwuyo  (or Dr Oyebowale) able to do a further risk stratification, based on percentage likelihood of occurrence of each complication in this client?
• When should I expect Dr Akintunde's review?

I totally appreciate all your help.

Kind regards,
Femi Pitan

Dr O.C. Pitan
OH Physician/ Head, Occupational Health
Nigeria Mid Africa Strategic Business Unit
✉ femi.pitan@Chevron.com
☎ CTN 2772222 ext 61807

**EXHIBIT 38-1**

247

CUSA0001526

☎ International ▮▮▮▮▮▮▮▮▮▮▮▮

*NMA HR: Focus, Process Excellence, Expertise*

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*

---

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Wednesday, August 7, 2019 1:31 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** Medical summary - Snookal, Mark


Good day Ma,

Please find attached, medical summary for above named employee as requested.
Also attached, are the recent Cardiologist clearance and the CTA/ Echo reports from April.



Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G
Chevron Hospital
Warri, Nigeria**

**EXHIBIT 38-2**

CUSA0001527

# EXHIBIT 39

    

Home  My Network  Jobs  Messaging  Notifications  Me ▾  For Business ▾  Try Premium



## Stephen Frangos, MD, MPH, FACOEM (He/Him)

Physician Expert in Occupational Health, Environmental Health and Public Health

 Baker Hughes

Santa Barbara, California, United States · Contact info

500+ connections

Connect    Message    More

---

### Activity
1,331 followers

Stephen Frangos, MD, MPH, FACOEM commented on a post • 3d

Dear Rhonda, your post and your words struck a definite cord with me. I appreciate how easily you are able to share your feelings and impart your wisdom to friends and colleagues. I wish you a very best of things and good health to enjoy them. Dr. Steve

Stephen Frangos, MD, MPH, FACOEM commented on a post • 4d

Hi Robin. Wishing you the very best in your upcoming retirement and transition to what lies in front for you and your family.

Stephen Frangos, MD, MPH, FACOEM commented on a post • 6d

Congrats Chase! Go get 'em!

Show all comments →

---

Enhance your own profile by adding a work experience. Add experience    

### Experience

 **Global Medical Director**
Baker Hughes · Full-time
Dec 2022 - Present · 2 yrs
Santa Barbara, California, United States · Remote

I am pleased to announce that I have been hired by Baker Hughes to serve their employees and business operations as their Global Medical Director. This is an exciting opportunity and I look forward to continuing my friendship and affiliation with colleagues in the oil and gas industries.

 **Chevron**
30 yrs 11 mos

**Regional Medical Manager for North and South America Operations**
Aug 1999 - Jun 2022 · 22 yrs 11 mos

**250**

**EXHIBIT 39-1**

Physician expert in Occupational Health, Environmental Health and Public Health. Responsible for the development and implementation of Occupational Health services for business operations with more than 25,000 employees, including oversight of ten occupational health clinics and 6,000 employees enrolled in medical surveillance programs.

**Staff Physician**
Aug 1991 - Aug 1999 · 8 yrs 1 mo

---

**Cruise Ship Physician**
Norwegian Cruise Line Holdings Ltd · Part-time
Aug 1989 - Jun 1991 · 1 yr 11 mos

Delivering high quality urgent care and emergency medical care to cruise ship passengers and crew members on multiple vessels in the Caribbean...

---

 **Aerospace Medicine Physician**
United States Air Force · Full-time
Jun 1984 - Jul 1988 · 4 yrs 2 mos
Zaragoza, Aragon, Spain and RAF Lakenheath, England UK

Provided mission-essential Aerospace Medicine and Flight Surgeon medical support front-line fight squadrons and supporting tanker operat  ...see more

## Skills

### Industrial Hygiene

 Endorsed by 15 colleagues at Chevron

 Endorsed by 1 person in the last 6 months

 37 endorsements

---

### Offshore Drilling

Endorsed by 4 colleagues at Chevron

Endorsed by 1 person in the last 6 months

9 endorsements

Show all 47 skills →

## Recommendations

**Received**    Given

 **Wade Goldston**
Purchasing Manager - Orbital Gas Systems
April 4, 2013, Wade worked with Stephen but they were at different companies

Steve is a rock solid dependable asset to whatever he makes an effort at. He genuinely cares about his work and always puts forth his best effort.

## Interests

**Top Voices**    Companies    Groups    Newsletters

 **Lorenzo Simonelli** 🔗
Chairman & CEO at Baker Hughes
194,080 followers

+ Follow

251

**EXHIBIT 39-2**



**Fernando Akio Mariya** in
Medical Director for Latin America - South
8,200 followers

+ Follow

---

Show all Top Voices →

---

Promoted •••

OKX

Olivia, grow your career by following **OKX**

Olivia, stay informed on industry news and trends

Follow

---

**More profiles for you**

**Lorenzo Simonelli** in · 3rd+
Chairman & CEO at Baker Hughes

+ Follow

**Annemieke De Wilde, MD, MPH, FACOEM** · 3rd+
Thought Leader - Strategic Partner - Whole Health - Lifestyle Medicine -
Global Experience...

Message

**Steven Ross MD, MPH** · 3rd+
Senior/Enterprise Occupational Health Physician at Boeing

Message

**Yogesh Reddy MD, MPH, MHA, FACOEM** · 3rd+
VP Health Services

Message

**Arch "Chip" Carson** · 3rd+
Occupational/Environmental Medicine and Medical Toxicology

+ Follow

---

Show all

---

**Explore Premium profiles**

**Jayne (Koo) Cho** in · 3rd+
Experiences Expert - Relationship Builder - Strategic Solutions | Creating
unforgettable corporate events for your clients | Ex-NBCU & Showtime

✈ Message

**Alan Zreczny** in · 3rd+
Entrepreneur/CEO/COO/General Counsel/Small Business Specialist

✈ Message

**EXHIBIT 39-3**

**People you may know**
From Stephen's company


**Lucas Thoennes** 
Systems Engineer @ Baker Hughes | MCSE, IT Pro


**Tomiris K.**
Field Engineer I - LWD / DD at Baker Hughes


**Gabriela Weretka**
LATAM Lead specialist Finance en Baker Hughes


**Pilar Alvarez Delgado**
Global Service Leader at Baker Hughes


**Mahmoud El Hemaly**
Crew leader & technician .SRP.
Downhole pump work shop ,Tubing Anchor Catchers @ lufkin

Show all

**You might like**
Pages for you


**Nabors Industries**
Oil and Gas
187,739 followers
+ Follow


**Halliburton**
Oil and Gas
2,450,234 followers
+ Follow

Show all

Promoted •••

 **Software Development**
Custom applications to serve your specific business needs

 **Proud to Be UAGC**
Online bachelor's degrees. 5-week classes. Credit for work/life experience.

 **Fundraising Guidance**
Call 860-478-9291 or email info@brianlacy.com to lift your fundraising

About | Accessibility
Professional Community Policies | Careers
Privacy & Terms | Ad Choices
Sales Solutions | Mobile
Safety Center

Talent Solutions
Marketing Solutions
Advertising
Small Business

Questions? Visit our Help Center.
Manage your account and privacy Go to your Settings.
Recommendation transparency Learn more about Recommended Content.

Select Language
English (English)

LinkedIn Corporation © 2024

**EXHIBIT 39-4**