## <u>DECLARATION OF OLIVIA J. FLECHSIG</u>

I, Olivia J. Flechsig, declare as follows:

1.      I am an attorney licensed to practice law in California. I am an associate with the law firm Allred, Maroko & Goldberg, counsel of record for Plaintiff Mark Snookal. I have personal knowledge of the facts set forth below and, if called as a witness, could and would testify competently to such facts under oath.

2.      I took the deposition of Scott Levy, M.D. on August 30, 2024, and I am in possession of a certified copy of his deposition transcript. Attached hereto as **Exhibit 12** is a true and correct copy of relevant excerpts from Dr. Levy's deposition transcript. During his deposition, Dr. Levy authenticated a number of documents including those that were marked as Exhibits C and E, which are each referenced in the concurrently filed Joint Brief re Motion for Summary Judgment and Statement of Uncontroverted Facts and Genuine Disputes. Those documents are attached hereto as **Exhibits 12-C and 12-E:**

> **Exhibit 12-C:** August 23, 2019 E-mail from Dr. Khan to Dr. Levy
>
> **Exhibit 12-E:** Expatriate Assignment History & Physical Examination Form for REM Position

3.      I took the deposition of Dr. Ujomoti Akintunde on October 31, 2024, and I am in possession of a certified copy of his deposition transcript. Attached hereto as **Exhibit 13** is a true and correct copy of relevant excerpts from Dr. Akintunde's deposition transcript.

4.      I took the deposition of Dr. Victor Adeyeye on November 15, 2024, and I am in possession of a certified copy of his deposition transcript. Attached hereto as **Exhibit 14** is a true and correct copy of relevant excerpts from Dr. Adeyeye's deposition transcript.

5.      I defended the deposition of Shahid Hameed Khan, M.D. on February 10, 2025, and I am in possession of a certified copy of his deposition transcript.

1    Attached hereto as **Exhibit 15** is a true and correct copy of relevant excerpts from

2    Dr. Khan's deposition transcript.

3

4         I declare under penalty of perjury under the laws of the State of California

5    that the foregoing is true and correct, and that this Declaration was executed on

6    March 20, 2025, at Los Angeles, California.

7

8    _____

9                    Olivia J. Flechsig

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF OLIVIA FLECHSIG

# EXHIBIT 12

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| MARK SNOOKAL, an individual, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No. |
| | ) 2:23-cv-6302-HDV-AJR |
| | ) |
| CHEVRON USA, INC., a California | ) |
| Corporation, and DOES 1 through | ) |
| 10, inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

**EXHIBIT 12-1**                                    4

Scott Levy, M.D.                                          August 30, 2024

```
 1                    A P P E A R A N C E S

 2


 3


 4    FOR THE PLAINTIFF:

 5            ALLRED, MAROKO & GOLDBERG
              By:  OLIVIA FLECHSIG
 6                 DOLORES Y. LEAL
              Attorneys at Law
 7            6300 Wilshire Boulevard, Suite 1500
              Los Angeles, California 90048
 8            (323) 653-6530
              oflechsig@amglaw.com
 9            dleal@amglaw.com

10    FOR THE DEFENDANT:

11            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  ROBERT E. MUSSIG
12            Attorney at Law
              333 South Hope Street, 43rd Floor
13            Los Angeles, California 90071
              (213) 620-1780
14            rmussig@sheppardmullin.com

15    THE VIDEOGRAPHER:

16            Jacob Rivera

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 12-2**

5

Scott Levy, M.D.                                                    August 30, 2024

```
 1        Q.  Anyone other than your attorney?

 2        A.  I have not.

 3        Q.  Okay.  Have you ever been convicted of a crime?

 4        A.  I have not.

 5             MR. MUSSIG:  Okay.

 6             THE WITNESS:  Oh, sorry.

 7             MR. MUSSIG:  I would object on privacy grounds,

 8   but you've already answered, so...

 9   BY MS. FLECHSIG:

10        Q.  Okay.  And what's your date of birth, Dr. Levy?

11        A.  April 8, 1973.

12        Q.  Okay.  So you're currently an employee of

13   Chevron; correct?

14        A.  I am.

15        Q.  Do you know what the name of the entity you

16   work for is, like, specifically, like, the corporate

17   entity, to clarify?

18        A.  I work for -- it changes all the time, which

19   makes things a little complicated, but I work for

20   Chevron USA.

21        Q.  Okay.  Do you know when that last changed?

22        A.  No, it's not clear.  And I can explain.  I've

23   had several assignments with the company throughout my

24   12 years here, and so I've worked under different

25   businesses, so it's -- but I think I've -- I think
```

**EXHIBIT 12-3**

6

Scott Levy, M.D.                                    August 30, 2024

```
 1   technically I may have always been on the Chevron USA.

 2   I'm just not completely aware.  I've never changed

 3   payrolls or anything like that, though.

 4       Q.  Okay.  Is your understanding that your

 5   paychecks are paid by Chevron USA or Chevron USA Inc.?

 6       A.  It is my understanding that that's what

 7   happens, yes.

 8       Q.  Okay.  I think you just said you worked for

 9   Chevron for 12 years, so you would have started in or

10   about 2012?

11       A.  Correct.

12       Q.  Okay.  I want to go through just your whole,

13   sort of, work history with Chevron.

14           What -- what was your role when you started in

15   2012?

16       A.  I started as -- my title was the occupational

17   health manager for North America.

18       Q.  What -- just, sort of, briefly, what kind of

19   job were you doing in that capacity?

20       A.  Sure.  So my -- my agreement was our businesses

21   across -- like, across North America -- my job was to --

22   I was an internal consultant to our businesses.

23           So if our businesses needed to set up medical

24   operations, I would be the one to help with that and

25   advise.  I would also help run their occupational health
```

**EXHIBIT 12-4**

Scott Levy, M.D.                                                August 30, 2024

1   program across North America and then involved with

2   different health and wellness events as they arose.

3          (Reporter clarification.)

4   BY MS. FLECHSIG:

5       Q.  How long were you in that occupational health

6   role?

7       A.  It was about two years or so.

8       Q.  What was your next role?

9       A.  I was moved to Singapore, and I was assigned

10  the role of regional medical manager for the Asia

11  Pacific region.

12      Q.  What did you do in that capacity?

13      A.  Similar responsibilities just -- I guess, more

14  of a -- of a senior position.  So I managed, again, more

15  complicated businesses and had more reports.

16      Q.  How long were you in that role?

17      A.  Three years approximately.

18      Q.  Okay.  And after that -- excuse me, the role in

19  Singapore, what was your next role at Chevron?

20      A.  I took a lateral position to regional medical

21  manager of our EEMEA, E-E-M-E-A, region, which is

22  Europe, Eurasia, Mid East, and Africa, based out of

23  London.

24      Q.  Okay.  So what was the date range on that -- on

25  that role?  I want to -- like, in time.

**EXHIBIT 12-5**

8

Scott Levy, M.D.                                          August 30, 2024

```
 1        A.  It ended on May 31st of this year.  So I moved
 2   to my current role May 31 -- on June 1st.  So it was
 3   May 31st and then I would subtract seven years.  2017
 4   roughly, '18.
 5        Q.  Started 2018, and then you were in that role
 6   until May 31st, 2024?
 7        A.  Correct.
 8        Q.  Okay.  Were you located in London that whole
 9   time?
10        A.  I was.
11        Q.  Okay.  And what's your current role?
12        A.  I now have the role of regional medical manager
13   for the Americas based out of Houston.
14        Q.  Do you know what entity -- what Chevron
15   corporate entity was your employer during the time you
16   were the regional medical director for the EEMEA role?
17        A.  Yeah, so I was working out of the -- it was
18   Chevron Products UK.  And, again, that was the title
19   that we used in my signature.  I can't tell you the
20   technical bits, though, about payroll and whether I was
21   paid through Chevron USA or not, but my paychecks remain
22   the same -- through the same -- for my 12 years that I
23   was a Chevron employee.
24        Q.  You mean the entity that's paying your paycheck
25   is the same?
```

**EXHIBIT 12-6**

9

Scott Levy, M.D.                                          August 30, 2024

 1      A.  I kept the same benefits.  I kept the same --
 2   nothing's really changed.  I stayed on the same payroll.
 3   Obviously the amounts changed, but -- over time, but no,
 4   it's the same payroll.  That's more of an HR question.
 5   I don't have the -- the info, I guess.  I don't know the
 6   answer.
 7      Q.  And prior to starting work with Chevron, where
 8   were you employed?
 9      A.  I worked for the Permanente Medical Group.
10   It's a large physician group in Northern California.
11      Q.  Is that -- I'm sorry, you said Permanente?
12      A.  The Permanente -- "permanent" with an E.
13   Permanente Medical Group.
14      Q.  Okay.
15      A.  TPMG.
16      Q.  Okay.  So did you practice medicine, then,
17   between the time -- like, up until the time you joined
18   Chevron?
19      A.  I did.
20      Q.  Okay.  And when did you graduate from medical
21   school?
22      A.  '99.
23      Q.  And then you completed residency?
24      A.  I completed two residencies, yes.
25      Q.  Okay.  What were your residencies?

**EXHIBIT 12-7**

**10**

Scott Levy, M.D.                                    August 30, 2024

```
1        Q.  Okay.  Do you -- did you get any specialized
2   training in cardiology?
3        A.  I have not.
4        Q.  Do you have any Board certifications?
5        A.  I'm Board-certified in internal medicine and
6   occupational environmental medicine as well.
7        Q.  Okay.  So I want to ask about your job duties
8   while you were the regional medical director of the EMEA
9   region -- am I getting the acronym correct?
10       A.  You are, yes.
11       Q.  EMEA.  Okay.
12            While you were the regional director of the
13  EMEA region, what were your job duties?
14       A.  Yeah, it's EEMEA.  But that's okay.
15       Q.  EEMEA.
16       A.  Yeah.  That's okay.
17       Q.  Thank you.
18       A.  My job duties -- so again, internal consultant
19  to our businesses, we've had -- again, a lot of our --
20  we have new business, we have old business, we have
21  small projects, big projects.  So I would say that for
22  the large projects, they had embedded medical teams.  So
23  my job was usually to interact with the teams, make sure
24  that they got what they needed.  I would help them -- I
25  would help train or mentor.  I would review processes
```

**EXHIBIT 12-8**

**11**

1    and try to align some of the work coming from our

2    corporate function down to the embedded businesses.

3            I would also serve as -- I would manage

4    emergencies.  So when I say "emergencies," the -- if

5    there wasn't anyone present, we didn't have a medical

6    operation on the ground in a certain country, I would

7    help facilitate care for our people to get them where

8    they needed to be.

9            So lots of medical evacuations and things like

10   this.  A lot of cross-border transfers.  So let's just

11   say -- we're talking about a case from Nigeria today.

12   So if I was -- so if we were evacuating someone from

13   Nigeria, I would help facilitate care from Nigeria out

14   to another country, manage the issue -- or help case

15   manage the issue while in that second country, and then

16   see the process to the end when we get the person back

17   home safe and sound.

18           And so those would be some of the things we do.

19   I -- we would help put together

20   health-and-wellness-related programs and things like

21   that to keep employees safe, to keep -- to keep the

22   workforce healthy, and then we would also review and

23   evaluate our fitness-for-duty programs to make sure that

24   they were functioning as intended.

25       Q.  Okay.  So in terms of managing the

**EXHIBIT 12-9**

1    fitness-for-duty programs, do you get to create the

2    policies and protocols for how the evaluations are

3    carried out?

4         A.   Influence.  I influence it, yes.

5         Q.   Okay.  What do you mean you "influence it"?

6         A.   So we have policies related to fitness for

7    duty, and I'm jumping -- maybe jumping ahead because

8    this is an expat-related case, and so -- so in this

9    situation, we -- there's a policy for expat medical

10   clearances.

11           And as time goes and things need to be updated,

12   I may pass on my thoughts and ideas to the -- to the

13   team that manages the policies.

14        Q.   Okay.  What team manages the policies?

15        A.   So at the time, the team was called the Center

16   of Excellence.

17        Q.   Okay.  And that's a -- Chevron corporate or --

18        A.   Sorry.  Yes.  I'm sorry for speaking over you.

19           Yes, that is -- it's a function under our

20   health and medical department.

21        Q.   So what kind of -- I guess what kind of

22   consulting role do you have on creating the policies and

23   practices for that, then?

24        A.   So --

25           MR. MUSSIG:  Vague as to time.

**EXHIBIT 12-10**

Scott Levy, M.D.                                           August 30, 2024

```
 1   BY MS. FLECHSIG:
 2        Q.   Yeah.   I can clarify.
 3             I do mean, you know, while you were the
 4   regional EEMEA director.
 5        A.   Sure.   So the countries change over time.
 6   Sometimes the countries get safer, sometimes they get
 7   less safe, sometimes they have issues.   And so mostly it
 8   was taking a look at frequency of the evaluations,
 9   taking a look at the new risks that may be in a location
10   that weren't there before.
11             Again, things could be -- infectious diseases
12   that are in a place, cholera, malaria, ebola at times --
13   so making sure that when we send people from one
14   location to another that the -- that, A, they're safe to
15   be there; and, B, they're -- we can keep them safe from
16   whatever outside hazards they would -- they may -- they
17   may face, and they're well-informed of their risks.
18        Q.   Okay.   So -- so in other words, you have a role
19   in evaluating the real-time risks based on location.
20        A.   Correct.
21        Q.   Okay.   And you then give recommendations for
22   policy setting for the fitness-for-duty program
23   to the --
24        A.   Correct.
25             (Reporter clarification.)
```

**EXHIBIT 12-11**

14

```
 1              MS. FLECHSIG:  Center for Excellence.
 2              THE WITNESS:  Center of Excellence.
 3              MS. FLECHSIG:  Center of Excellence.  Excuse
 4    me.  Okay.
 5    BY MS. FLECHSIG:
 6         Q.  In terms of -- you also mentioned one of your
 7    duties is to manage emergency medical evacuations --
 8         A.  Correct.
 9         Q.  -- and oversee care, you know, when someone has
10    been evacuated.
11         A.  Correct.
12         Q.  What -- I guess, what do you -- strike that.
13              Do you also get to create policies and
14    protocols for medical evacuations?
15         A.  Correct.
16         Q.  Okay.  And -- okay.
17              And you also would, you know, carry them out in
18    real time when something happens.
19         A.  Yes.
20         Q.  Okay.  And at the time you were the regional
21    director for the EEMEA region, you would have been
22    personally responsible for overseeing any medical
23    evacuations from within your region?
24         A.  I would be responsible for -- it's a difficult
25    question to answer, and I'll explain why.  We had
```

EXHIBIT 12-12

Scott Levy, M.D.                                          August 30, 2024

```
 1   approximately 300 medical evacuations a year in our
 2   region.  Generally, the evacuations that would reach my
 3   level would be extremely complicated, not simple, and so
 4   I would not be involved in -- in every single
 5   evacuation.
 6           I would be involved with anything that was very
 7   complex, that required international borders, critical
 8   patients, and -- or -- or maybe Q and A on an evacuation
 9   that had some issues done by our embedded medical teams.
10           (Reporter clarification.)
11           THE REPORTER:  Just keep your voice up at the
12   end.  It kind of trails off on me.
13           THE WITNESS:  Oh, sorry.  Sorry.
14           THE REPORTER:  Thank you.
15   BY MS. FLECHSIG:
16       Q.  The embedded medical teams, just to clarify,
17   those are the local medical teams on the ground.
18       A.  Correct.  And -- and in -- my medical teams for
19   EEMEA, all of those medical teams reported to the
20   businesses.  They didn't report to me directly.
21       Q.  Did you -- did you oversee the people who were
22   handling less complicated medical evacuation?
23       A.  When they were --
24           MR. MUSSIG:  Vague as to "oversee."  Go ahead.
25   You can answer.
```

**EXHIBIT 12-13**

16

Scott Levy, M.D.                                    August 30, 2024

1    what I think the -- the risk may be or not be.

2         Q.  So how did you -- how did you first become

3    involved with Mr. Snookal's challenge to the host team

4    deeming him unfit for duty?

5         A.  I was asked as a second opinion to review the

6    case.

7         Q.  To provide a medical opinion on whether it was

8    safe for him?

9         A.  I was -- so I don't recall exactly, but I know

10   Mr. Snookal asked for a second opinion and -- that, I

11   know for a fact.  And then this was sent to me for a

12   review.

13        Q.  Who sent it to you for review?

14        A.  I don't remember.  Again, it was years ago.  I

15   know Mark and I did speak, so I'm not sure if he

16   approached me first or if someone sent it to me, but I

17   do know that Mark and I chatted about his situation.

18        Q.  Okay.  So when you were asked to give a second

19   opinion, were you allowed to override the decision that

20   the host team had made?

21        A.  I was not allowed to override, but I would say

22   that the -- even the -- as I'm thinking of the word

23   "second opinion," that might be incorrect as well.  I

24   would say that -- I was here to help with an appeal.  So

25   I would look at a case and see if there was anything

**EXHIBIT 12-14**

 1   that was missed or some other information that might be

 2   pertinent to the case and then have that discussion,

 3   doctor to doctor, with our host medical team so they're

 4   aware of potentially mitigating factors.

 5          So it wasn't necessarily a second -- a second

 6   opinion.  It just -- maybe another opinion or -- maybe

 7   that's not necessarily different.  But just assist with

 8   an appeal.  But -- but the absolute -- the final

 9   decision was with the host location.

10      Q.  Okay.  At the time that you were the regional

11   medical director for the EEMEA region, do you recall

12   anyone else who complained about the host decision not

13   to allow the transfer to take place?

14      A.  No.

15      Q.  Okay.  So Mark Snookal was the only time --

16   Mark Snookal's complaint about the decision was the only

17   time you became involved in that way --

18      A.  Correct.

19      Q.  -- to give a second opinion?

20      A.  Correct.

21      Q.  Okay.  In terms of the organizational chart,

22   are you considered the supervisor of the host medical

23   teams?

24      A.  I am not.

25      Q.  Okay.  Who would be supervising those folks?

**EXHIBIT 12-15**

Scott Levy, M.D.                                              August 30, 2024

```
 1           MR. MUSSIG:  Calls for speculation.  Lacks
 2   foundation.
 3           THE WITNESS:  In this specific business, H --
 4   the medical team reported to HR.
 5   BY MS. FLECHSIG:
 6       Q.  Okay.  So you said "this specific business."
 7           Are you referring to the Escravos, Nigeria,
 8   location -- host location?  Okay.
 9       A.  I'm -- I'm referring to the medical team that
10   made the decision in Nigeria.
11       Q.  Okay.  Who made the decision in Mr. Snookal's
12   instance; right?
13       A.  Yeah, it was Dr. Asekomeh -- don't ask me to
14   spell that at this moment, but -- you may have it
15   already.
16       Q.  Is it Dr. -- and I may well be butchering this
17   as well -- Dr. Asekomeh?
18       A.  That sounds correct.
19       Q.  Okay.  So --
20           MR. MUSSIG:  That is, by the way, the correct
21   pronunciation.  It took me a while.
22           MS. FLECHSIG:  Thank you.  I came up with that
23   myself.  I -- okay.  Great.
24           MR. MUSSIG:  Oh, wait, no, it's Asekomeh.
25           MS. FLECHSIG:  Asekomeh.
```

**EXHIBIT 12-16**

Scott Levy, M.D.                                    August 30, 2024

```
 1              MR. MUSSIG:  Asekomeh.

 2              MS. FLECHSIG:  Okay.

 3    BY MS. FLECHSIG:

 4       Q.  So your understanding is Dr. Asekomeh reported

 5    to Chevron human resources.

 6       A.  No.  He reported to the medical director for

 7    Nigeria.  Sorry.

 8              MR. MUSSIG:  Calls for speculation.  Lacks

 9    foundation.

10    BY MS. FLECHSIG:

11       Q.  Sorry.  Go ahead.  You -- you said he reports

12    to the medical director in Nigeria.

13       A.  Correct.

14       Q.  Okay.  And then I think you said somebody

15    reports to HR.

16              Who then reports up into Chevron's human

17    resources?

18       A.  The medical director.

19              MR. MUSSIG:  Calls for speculation.  Lacks

20    foundation.

21              THE WITNESS:  The medical director then reports

22    to HR.

23    BY MS. FLECHSIG:

24       Q.  Who was the medical director in Nigeria?

25       A.  It was at this -- at the time of this case, it
```

**EXHIBIT 12-17**

1    was Dr. Arenyeka, A-R-E-N-Y-E-K-A.

2         Q.  Okay.  And is that -- if you know, is the human

3    resources department that Dr. Arenyeka reports to -- is

4    that Chevron USA, or what -- do you know what the

5    corporate entity is?

6         A.  So --

7              MR. MUSSIG:  Calls for speculation.

8              THE WITNESS:  We call the business NMA, so it's

9    the North African -- North -- it's -- NMA is the

10   abbreviation.  I'm -- North -- Nigeria Mid Africa

11   business unit.

12   BY MS. FLECHSIG:

13        Q.  Okay.  Do you know what medical specialty

14   Dr. Arenyeka has?

15        A.  I don't recall.

16        Q.  Okay.  Okay.  So when you became involved in

17   giving a second opinion on Mr. Snookal's challenge to

18   the host location's determination, what did you do to

19   inform your second opinion?

20             MR. MUSSIG:  Misstates the witness's testimony.

21             THE WITNESS:  So I'm not sure I understand the

22   question.  Could you please repeat it?

23   BY MS. FLECHSIG:

24        Q.  Yeah.  So you said you were asked by somebody

25   to give a second opinion on Mr. Snookal's fitness for

**EXHIBIT 12-18**

Scott Levy, M.D.                                              August 30, 2024

 1   duty in -- for the expatriate assignment; right?

 2          MR. MUSSIG:  Misstates the witness's

 3   testimony.

 4          THE WITNESS:  Correct.  Correct.  Yeah.  I --

 5   again, I don't remember how -- how I was contacted

 6   initially, but I was obviously dragged into discussion

 7   or at least into the case one way or another, but -- so

 8   I had a conversation with Mr. Snookal as a first line to

 9   understand what was going on.

10          I received his impression of the situation,

11   discussed the issues with him, discussed some of the

12   details of his medical condition, and then asked

13   permission to speak with his medical -- his treating

14   medical provider.

15   BY MS. FLECHSIG:

16      Q.  Okay.  In terms of his treating medical

17   provider, was that his treating cardiologist?

18      A.  Correct.

19      Q.  And did you -- did you speak with Dr. Khan, the

20   cardiologist?

21      A.  I spoke with Dr. Cardio- -- Dr. Khan via

22   messaging.  So I left a voicemail for him explaining who

23   I was and what I was trying to do, and then he responded

24   in an e-mail.

25      Q.  Did you ever speak in real time over the phone

**EXHIBIT 12-19**

1    or in person?

2         A.   I don't recall.  I -- I don't recall.

3         Q.   Okay.  You don't recall whether you did, or you

4    don't recall speaking with him?

5         A.   I don't recall speaking with him on the phone.

6         Q.   Okay.  And in your recollection, what did

7    Dr. Khan say to you about his evaluation of

8    Mr. Snookal's health?

9         A.   The -- I'll get to the summary.  So what he

10   explained to me and -- was that he has this condition;

11   he's been followed; and for the last three years, they

12   haven't seen a significant or any increase in the size

13   of his problem.  And he gave me some risk -- what the --

14   what his risk of -- of a subsequent event was.

15            So I believe the message that I left for him

16   was that I'm trying to understand the risk.  The data

17   that I pull up shows he's got about a 4 or 5 percent

18   risk of a cardiac event per year -- you know, currently,

19   and I just need to better understand to -- to be able to

20   fine tune or decide if that number is -- has any

21   validity at all.

22            And so he responded with he believes that the

23   individual's risk of having a cardiac event -- or an

24   event related to his condition was about 2 percent a

25   year.  He quoted some studies in mice, and he said that

**EXHIBIT 12-20**

Scott Levy, M.D.                                        August 30, 2024

```
 1   those were positive, and potentially his -- his risk
 2   could be less than 2 percent a year.
 3       Q.   Okay.  In terms of the -- you said that
 4   according to your data, there was a 4 to 5 percent risk
 5   of a cardiac event per year.
 6       A.   Yes.
 7       Q.   How did you get that figure?
 8            MS. FLECHSIG:  Sorry, Dr. Levy --
 9            MR. MUSSIG:  Is he frozen?
10            MS. FLECHSIG:  I think it's just him.  He
11   froze.
12            MR. MUSSIG:  Okay.
13            MS. FLECHSIG:  Dr. Levy, are you there?
14            MR. MUSSIG:  He's still frozen for me.
15            MS. FLECHSIG:  Yeah.  Me too.
16            THE VIDEOGRAPHER:  Would you like to go off the
17   record?
18            MR. MUSSIG:  Yeah, maybe -- yeah, we've been
19   going about an hour.  Does it make sense to take a break
20   now?
21            MS. FLECHSIG:  I mean, I'd rather not, you
22   know, break while we're -- have a question pending,
23   but -- Dr. Levy, are you there?  I see you turned your
24   video off.
25            MR. LEAL:  Does it make sense to ask him to log
```

**EXHIBIT 12-21**

```
 1            THE WITNESS:  Oh, no, we're good.  We're good
 2    now.  I can see this.  And this is easier for me at the
 3    moment.
 4    BY MS. FLECHSIG:
 5        Q.  Okay.  So I'm going through -- it looks like
 6    it's an e-mail from Mr. Snookal to you on August 23rd,
 7    2019; correct?
 8        A.  Correct.
 9        Q.  Okay.  So I see the screenshot Mr. Snookal
10    included in his e-mail to you, which has a chart of
11    maximal aortic diameter and probability of aortic events
12    in one year.
13        A.  Uh-huh.
14        Q.  When you were evaluating the risk of an adverse
15    event for Mr. Snookal, did you consider the actual
16    diameter of his aortic aneurysm?
17        A.  Absolutely.  That's -- the larger the diameter
18    is, the higher the risk is.  Very similar to this chart.
19    The numbers we can debate, but, yeah, it's absolutely
20    relevant.
21        Q.  Okay.  Did you also consider the changes or
22    lack of changes in the diameter over time and whether
23    that impacted Mr. Snookal's risk?
24        A.  I have.  Yes, I did.
25        Q.  Okay.  Did you evaluate whether Mr. Snookal's
```

**EXHIBIT 12-22**

Scott Levy, M.D.                                    August 30, 2024

1    management with medication impacted the risk of an

2    adverse outcome due to the aortic aneurysm?

3         A.   So the fact that he was on his medications and

4    the aneurysm had not grown in those three years -- I

5    took that as he was relatively stable.

6         Q.   So, yes, you did consider it.

7         A.   Correct.  Correct.  Yes.  Considered it, yes.

8         Q.   Okay.  And this e-mail, it does say that

9    Mr. Snookal attached a past research and he found a

10   paper.

11        Did you look at --

12        A.   I think --

13        Q.   -- the attachment that he included?

14        A.   No.  So I believe that the attachment that he

15   included is that photo right below.

16        Q.   Okay.  So your sense is that there was not any

17   separate attachment to this e-mail.

18        A.   Correct.

19        Q.   Okay.

20        A.   I actually believe there was a -- there was an

21   attachment to the e-mail, but it was the article that I

22   sent to him.  So he just replied with attachments and

23   then added this to the -- to the e-mail message.

24        Q.   Okay.  Let's see if we can track down the

25   article.  I'm going to screen share this with you as

**EXHIBIT 12-23**

26

Scott Levy, M.D.                                        August 30, 2024

1          A.   Yes.

2          Q.   -- about Mr. Snookal's risk?

3          A.   I would have, yes, correct.  I would have.

4          Q.   Okay.  Okay.  Did you review any of

5     Mr. Snookal's actual medical records in formulating your

6     opinion?

7          A.   I did not.  I -- I reviewed the medical

8     evaluations that he had for Chevron, and I reviewed his

9     message -- or letter from his cardiologist.  So the --

10    the key bit here is -- it's a risk tolerance issue.

11              So he has a medical issue with a risk, and we

12    can debate the risk even on this call, but there's a

13    certain risk and the -- the determination was based on

14    the host location's willingness to accept that risk.

15              MR. MUSSIG:  Do you -- he -- oh, it's me.

16    BY MS. FLECHSIG:

17         Q.   Okay.

18              MR. MUSSIG:  Can you guys hear me?

19              MS. FLECHSIG:  Yes.

20              MR. MUSSIG:  My computer froze for a second.

21              MS. FLECHSIG:  Yeah.

22    BY MS. FLECHSIG:

23         Q.   Okay.  So ultimately, the host location gets to

24    decide how much risk they're willing to tolerate at

25    their site; correct?

**EXHIBIT 12-24**

Scott Levy, M.D.                                      August 30, 2024

```
 1        A.   Correct.  It's -- yeah, it is -- that's exactly
 2   right.  And then the risk is a combination of things;
 3   right?  It's the -- it's -- we need to know what the
 4   condition is so we know what the risk is that we're
 5   taking.  If it's -- if the risk is high risk that
 6   someone's going to sprain their ankle, not so relevant;
 7   but if it's -- you know, if it's a -- if it's a risk
 8   that someone's going to potentially die or have a very
 9   bad outcome, then it becomes very significant as far as
10   the discussion goes.
11        Q.   So when the host location makes a
12   determination, I guess, what -- what role do you have in
13   whether it's too much risk for Chevron to tolerate?
14        A.   My job in this situation would be to better
15   clarify the risk for them.  And I believe in our
16   situation -- I don't -- I don't believe that anyone had
17   a conversation with the cardiologist.
18             I did get the specifics from the cardiologist
19   about what his individualized risk is, again, not based
20   on studies, not based on -- not based on studies that
21   may or not -- may not pertain to him, but what his --
22   what his treating cardiologist thought the risk was for
23   him.  And I used this information to try to make a case
24   for Mr. Snookal with the medical team.
25        Q.   Did you have -- did you ever suggest that
```

**EXHIBIT 12-25**

```
 1    Dr. Asekomeh speak with Dr. Khan?

 2         A.   No, I did not.  I felt that I had enough

 3    information.  Usually it's pretty complicated to make

 4    those connections work, given the time zones.

 5         Q.   Okay.  So did you suggest that anyone from the

 6    host team speak with Dr. Khan?

 7         A.   I did not -- I did not have that conversation.

 8    Correct.

 9         Q.   Okay.

10         A.   I did pass on the information word for word

11    from Dr. Khan to the medical team, though.

12         Q.   Did you speak with Dr. Asekomeh about

13    Mr. Snookal's case?

14         A.   I believe I forwarded him -- the information to

15    Asekomeh and Arenyeka, his boss.  And Arenyeka responded

16    with the risk is -- the risk in this location is still

17    too high and, if possible, we'd be very happy to take

18    him in Lagos where we have medical resources.  And I'm

19    paraphrasing.

20         Q.   Other than the e-mail exchange that you just

21    described, did you speak with Dr. Asekomeh about

22    Mr. Snookal in real time, like, over the phone or

23    video --

24         A.   I don't recall.  I don't recall that.

25              (Reporter admonishment.)
```

**EXHIBIT 12-26**

Scott Levy, M.D.                                            August 30, 2024

```
 1   BY MS. FLECHSIG:
 2        Q.   You don't recall speaking with him directly.
 3        A.   Correct.  I don't recall speaking with him.
 4        Q.   Okay.  Did you speak with Dr. Arenyeka about
 5   Mr. Snookal directly, other than the e-mail that you
 6   described?
 7        A.   Not about -- not about this case.  I -- sorry,
 8   I don't recall speaking to him about this case.
 9        Q.   Okay.  Did you speak with any other doctors in
10   Nigeria about Mr. Snookal's case?
11        A.   I have not.
12        Q.   Okay.  And that includes over e-mail.  You
13   didn't have any e-mail communications with anyone other
14   than what you described with Dr. Asekomeh and
15   Dr. Arenyeka.
16        A.   Not to my knowledge, no.
17        Q.   Okay.  Okay.  Other than the e-mail you
18   described -- I know you paraphrased with Dr. Asekomeh
19   and Arenyeka, did you have any other written exchanges
20   with them about Mr. Snookal?
21        A.   No, I don't believe so.  It was a simple, this
22   is the information from his provider, the risk doesn't
23   appear high, it appears of low to moderate -- I believe
24   I said risk doesn't appear high, and their response was
25   simply the risk is still too high for us.
```

**EXHIBIT 12-27**

Scott Levy, M.D.                                    August 30, 2024

1   approach his cardiologist to talk about why he does --

2   why -- whether that pertains to him or not.  So I would

3   say that 4 or 5 is only my initial start at an appeal to

4   try to acquire more information.

5          Q.  Okay.  I'm going to show you another document.

6   I'll mark it as Exhibit C.

7              (Exhibit C marked for

8              identification.)

9   BY MS. FLECHSIG:

10         Q.  It's been produced as SNOOKAL-01091.  And I

11  think for this one, it's just a one-pager, so I'll

12  screen share.  And if you're having issues reading it,

13  please let me know.

14         A.  Yeah, if you could zoom in, please.  Okay.

15         Q.  So it looks like it's an August 23rd, 2019,

16  e-mail from Dr. Steven Khan to you,

17  scottlevy@chevron.com with a CC to Mark Snookal?

18         A.  Correct.  Yes.  I know this e-mail.

19         Q.  Okay.  I'll give you a second to look at it.

20             Okay.  So in this e-mail, Dr. Khan cites a 2002

21  study.  Is that the study that you are referring to in

22  terms of how you came up with the 4 to 5 percent figure?

23         A.  Yes.  Actually, can you zoom in a little bit

24  more, please?

25         Q.  Yes.  Of course.  So I'm referring to this --

**EXHIBIT 12-28**

Scott Levy, M.D.                                    August 30, 2024

1        A.   Yes, yes.

2        Q.   That's the study that you were referring to?

3        A.   Correct.  Yes.

4        Q.   Okay.  Okay.  So in this e-mail, Dr. Khan also

5   notes that the studies of risk of rupture are fairly

6   old, 2002, and treatment has improved, as has our

7   understanding of aortic aneurysms.

8        A.   Yes.

9        Q.   So did you compare this 2002 study to more

10  recent research?

11       A.   I did not.  I took the word of the expert and

12  his treating provider who knows him better than I can.

13  And I accepted his number as a little bit lower.  He

14  says the risk of complications related to thoracic

15  aneurysm is low and likely less than 2 percent, but

16  he -- he says that it's 2 percent, and then the mouse

17  studies are likely -- likely show that he's better than

18  2 percent.

19            So that's what I took:  2 percent or lower was

20  his risk.  I didn't take zero was the risk.  I took 2

21  percent or lower.

22       Q.   Okay.  So basically that was your final thought

23  on the percentage of the risk that you then conveyed to

24  the host team?

25       A.   I conveyed this exact message.  I forwarded

**EXHIBIT 12-29**

Scott Levy, M.D.                                        August 30, 2024

1   way or another with certainty.  And so I apologize.

2       Q.  Okay.  Slightly different question.

3           Are you aware of anyone who died in Escravos

4   before being medically evacuated?

5       A.  I'm aware of people in Nigeria who have died --

6   working for us in Nigeria that have died without --

7   without warning.  So sudden onset, found slumped over,

8   found dead, found not waking up in the morning.  So

9   we've had cases like that.  The -- yeah.

10      Q.  Do you know where in Nigeria those deaths

11  occurred?

12      A.  So I believe they happened all over Nigeria and

13  all of our operations.  But Escravos is a very small

14  location, and I want to be very careful about telling

15  you anything that's not correct here.

16      Q.  Are you aware of anyone who's ever been injured

17  because of a medical evacuation, whether that's the

18  person being evacuated or a personnel who's carrying out

19  the evacuation?

20      A.  No, I'm not aware of anyone that was injured as

21  a result of a medical evacuation in Nigeria at all.  So

22  the -- in general, the -- we consider Escravos to be one

23  of the most remote locations in our company, and the

24  medical evaluation to -- for someone to get to Escravos

25  is -- is -- let's just say it has a higher criteria of

**EXHIBIT 12-30**

Scott Levy, M.D.                                              August 30, 2024

```
 1          Q.   Okay.

 2          A.   And then the -- obviously, the condition itself

 3    will warrant different types of planes based on -- based

 4    on the capabilities, whether it needs to be ICU capable,

 5    whether it can handle heart attacks, whether it's just a

 6    simple transport.  All of these things come into play.

 7    And then also visas of the -- visas or passports of the

 8    individual.  Obviously, if we're going to move an

 9    individual somewhere, can they get into the host country

10    that we're about to send them to.  And the same for the

11    medical team.  Can the medical team get into the host

12    country.  So there are a lot of factors to play -- that

13    come into play.

14          Q.   Okay.  I do want to ask -- I want to ask a

15    question specific to Mr. Snookal.

16               So was there anything about the actual job that

17    Mr. Snookal would have been performing in Escravos that

18    would increase the risk of an adverse outcome to him?

19               MR. MUSSIG:  Calls for speculation.

20               THE WITNESS:  So I believe that Mr. Snookal

21    was -- his proposed job in Nigeria was an office-based

22    job with just mild to light lifting activities.  I don't

23    think it's significant -- I don't think it's of --

24    sorry, let me start over.

25               I don't think that his condition would have
```

**EXHIBIT 12-31**

Scott Levy, M.D.                                        August 30, 2024

1  been an issue for his proposed role, had it not been for

2  the location.

3  BY MS. FLECHSIG:

4      Q.  Okay.  And in terms of the specific scenarios

5  you were concerned about, it -- again, it was the aortic

6  dissection or an aortic aneurysm; correct?

7          MR. MUSSIG:  Asked and answered.

8          THE WITNESS:  Yes.

9  BY MS. FLECHSIG:

10     Q.  Were you concerned at all that Mr. Snookal

11 would pose a threat to other people's safety?

12         MR. MUSSIG:  Calls for speculation.  Lacks

13 foundation.

14         THE WITNESS:  Potentially.  And I would say it

15 all -- again, it's so -- these are so complicated.  So

16 if -- I'll give you an example.  If he were to have an

17 event while he was on location, he would have tied up

18 the medical team for potentially days trying to sort out

19 his issue, if he survived that long during the

20 evacuation.  If he were doing something that were deemed

21 safety sensitive -- and I'm not sure he had

22 responsibilities that were -- if he were climbing up a

23 ladder or climbing upstairs and fell over -- potentially

24 a lot of things could have happened, and so it's -- it's

25 not so easy to say.

**EXHIBIT 12-32**

Scott Levy, M.D.                                        August 30, 2024

```
 1            It all depends on specifically what he was
 2    doing on location.  And again, I didn't have an issue
 3    with the job at all.  I don't think any of us had an
 4    issue with the specific type of work he was doing.  We
 5    didn't have an issue -- even when he was declined or
 6    turned down for this assignment, still working at the
 7    refinery in Richmond, California, was still -- wasn't
 8    something that we even considered stopping him from
 9    doing because of the risk.
10            It was simply because of that -- that -- if
11    there -- if that -- if that sort of 2 percent occurred
12    while -- while he was on location, it was something that
13    the team could not manage.
14    BY MS. FLECHSIG:
15       Q.  Okay.  Did you document any concerns that you
16    had about any risk to other people that you thought
17    Mr. Snookal could have?
18       A.  I did not.
19       Q.  Okay.  Was it something that you were concerned
20    with at the time in assessing the risk that the host
21    location would tolerate?
22       A.  So I don't think it -- so I don't think it
23    ended up to be relevant in this situation.  So -- and
24    the reason being was there was no -- even the risk of 2
25    percent to himself was enough for them to say -- was
```

**EXHIBIT 12-33**

Scott Levy, M.D.                                                    August 30, 2024

 1  enough for them to say no.  So I would say it wasn't
 2  even -- the risk to others wasn't even -- let's just say
 3  they didn't even have time to come up and -- or, no, it
 4  wasn't discussed.  Not -- it wasn't discussed for me.
 5          I don't know the discussions that they had
 6  inside of the Nigeria Mid Africa business unit, but it
 7  wasn't a discussion that I had with the medical teams.
 8      Q.  Okay.
 9      A.  Or Dr. Khan.
10      Q.  I want to ask -- I'm going to show you another
11  document.  I'm up to Exhibit D now.
12          (Exhibit D marked for
13          identification.)
14  BY MS. FLECHSIG:
15      Q.  This is -- this has been produced as
16  SNOOKAL-01088 through 01089.
17          Again, please go ahead and take a look at this.
18  It looks like it's an e-mail from you to Mr. Snookal on
19  September 16th, 2019.
20          I'm going to see if I can --
21      A.  Can you zoom in, please?
22      Q.  Yeah.  Is that -- is that better?
23      A.  Better, yes.
24      Q.  Do you recall writing this e-mail to
25  Mr. Snookal?

**EXHIBIT 12-34**

1      A.  Can you scroll up to the top of it?  Let me

2  just --

3      Q.  Yes.

4      A.  I do.  I do.

5      Q.  Absolutely.

6      A.  I know this message, yes.

7      Q.  Okay.  So in this e-mail, you send a list of

8  locations where it sounds like you would be okay with

9  Mr. Snookal working as an expatriate on assignment by

10  Chevron; right?

11      A.  So, yes, that's -- so that's what I did say.  I

12  said those are the locations that will -- would probably

13  be perfectly fine.  And then for the other locations,

14  it's one where we'd specifically need to talk with the

15  local -- I -- it would take additional work to -- to

16  clarify.

17      Q.  Okay.  And when you created the list of ones

18  that you did not foresee issues with, how did you come

19  up with those locations?

20      A.  Oh, so we have -- well, those are

21  higher-quality medical infrastructures.  And so -- so

22  between the -- where the work locations are and the

23  medical resources around them are a better fit for --

24  for dealing with an emergency and things like that.

25          So the -- and I believe we ranked the locations

**EXHIBIT 12-35**

1      A.  Correct.

2           MR. MUSSIG:  Calls for speculation.

3   BY MS. FLECHSIG:

4      Q.  In terms of the -- in terms of procedurally,

5   that's how this works; right?

6      A.  Yeah.  From what I see here, it looks like he

7   did a physical exam and took the history and then wrote

8   notes, even restrictions, correct.  So I would assume --

9   from reading this, I would assume that this was a -- he

10  did an actual exam on him.

11     Q.  Okay.  So ultimately, on the fifth page of this

12  document, SNOOKAL-00609, Dr. Sobel checks, "Fit for duty

13  with restrictions."

14          You see what I'm referring to; right?

15     A.  Yes.

16     Q.  And the restrictions are, "No heavy lifting

17  greater than 50 pounds, needs review of recommend letter

18  from cardiologist to clear him."  Right?

19     A.  Uh-huh, correct.

20     Q.  Okay.  So did you review the letter that

21  Mr. Snookal's cardiologist provided?

22     A.  I need to see it again to remember.  Sorry.

23     Q.  So -- no problem.  I -- I was going to segue us

24  there anyway.  So I'll mark as Exhibit E --

25          MS. FLECHSIG:  Is that right?

EXHIBIT 12-36

39

Scott Levy, M.D.                                        August 30, 2024

```
1              THE REPORTER:  F.

2              MS. FLECHSIG:  Okay.  Thank you.  Exhibit F,

3     SNOOKAL-01090.

4              (Exhibit F marked for

5              identification.)

6     BY MS. FLECHSIG:

7         Q.  This is a letter dated July 29th, 2019, and

8     it's signed by S. Khan, M.D.; correct?

9         A.  Yes, I've seen this before.

10        Q.  Okay.  Is that the cardiology clearance letter?

11        A.  It is.  It would be, yes.

12        Q.  Okay.  So with Mr. Snookal's cardiologist

13    saying that "Mr. Snookal's under my care for his heart

14    condition.  It is safe for him to work in Nigeria with

15    his heart condition.  His condition is under good

16    control and no special treatments are needed";

17    ultimately, someone still made the determination that

18    Mr. Snookal was not fit for duty; correct?

19        A.  Correct.

20        Q.  And is it because despite Mr. Snookal's ability

21    to complete the job, Chevron felt it was too great of a

22    risk in the event he had to be evacuated?

23             MR. MUSSIG:  Calls for speculation.  Lacks

24    foundation.

25             THE WITNESS:  So the issue is -- I'll tell you
```

**EXHIBIT 12-37**

Scott Levy, M.D.                                        August 30, 2024

```
 1   definite risk, not a theoretical risk.  And then the
 2   ability to manage that risk is -- was -- was the basis
 3   of their decision.  There was -- I would say there's
 4   nothing theoretical about that 2 percent.
 5   BY MS. FLECHSIG:
 6       Q.  For example, would a pregnant woman be allowed
 7   to go to Escravos, Nigeria?
 8           MR. MUSSIG:  Calls for speculation.  Lacks
 9   foundation.  Incomplete hypothetical.  Vague as to "go
10   to."
11           THE WITNESS:  Yeah, so I would say -- yeah,
12   it's complicated.  And what we need to know is how --
13   what term she was in, whether the expectation would be
14   that we'd allow a delivery on the ground in Escravos for
15   this individual.  There are a lot of factors in there.
16           I would say certain women who are pregnant with
17   high risk, so high-risk babies, IVF, previous
18   complications, known complication of the current
19   pregnancy, those things would be disqualifiers for sure.
20   BY MS. FLECHSIG:
21       Q.  In terms of health conditions that are not
22   actively impacting someone's ability to do the job, what
23   makes it too high risk for Chevron?
24           MR. MUSSIG:  Calls for speculation.  Lacks
25   foundation.  Asked and answered.
```

**EXHIBIT 12-38**

Scott Levy, M.D.                                            August 30, 2024

```
 1            THE WITNESS:  It's not the job.  It's the
 2    location.  So Chevron has a duty of care for their
 3    employees.  And we need to ensure that the quality of
 4    care delivered to our employees who we move around the
 5    world are consistent or compatible with what they would
 6    have received in their home country.
 7            So I would say it's the duty-of-care question
 8    and -- and the assignment.  It's the location, not
 9    the -- not the job here.
10    BY MS. FLECHSIG:
11       Q.  To confirm, the location of Escravos, Nigeria,
12    would not impact Mark's aortic aneurysm; correct?
13            In other words, being in Escravos, Nigeria,
14    would not affect the risk of an adverse event for
15    Mr. Snookal; correct?
16       A.  Not based on --
17            MR. MUSSIG:  Calls for speculation.
18            THE WITNESS:  Not based on his written job
19    desc- -- requirements.  However, I would look at the
20    aneurysm as -- with -- with the risk, it's 2 percent and
21    likely to grow -- I'll just say it's 2 percent, and I
22    would consider it more like a ticking -- ticking clock.
23    And it's just -- or a ticking time bomb, and it's just a
24    matter of time until it stops ticking.
25            And so -- so that's what the -- so the -- his
```

**EXHIBIT 12-39**

Scott Levy, M.D.                                                    August 30, 2024

```
 1  risk is when -- when he does have an issue with that
 2  heart -- and, again, we hope it never happens.  It's --
 3  it would be a disaster if it happened in Escravos.
 4  BY MS. FLECHSIG:
 5      Q.  Right.
 6      A.  Because we can't provide that duty of care to
 7  him.  We wouldn't have been able to get him to a
 8  high-quality tertiary care medical center that could
 9  sort this issue.
10      Q.  Right.  But what I'm asking is in terms of the
11  likelihood of having an adverse event, it doesn't matter
12  whether Mr. Snookal is in Los Angeles; Texas; Escravos,
13  Nigeria; the risk of the adverse event happening remains
14  the same; correct?
15      A.  Correct.  But the outcome would be different
16  based on those locations.  The outcome would be
17  different based on his -- the time to get to a
18  high-quality medical center.  The -- the -- even across
19  medical centers -- all across the U.S., those that
20  have -- that see more cases per year have better
21  outcomes than those that see less cases per year.
22          So -- so we're talking about, yes, the problem
23  would happen, and then if he lived in certain locations,
24  he would do better if that problem happened than if he
25  lived in others.
```

**EXHIBIT 12-40**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4           I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                        SCOTT LEVY, M.D.,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14           Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21           DATED:  September 12, 2024.

22

23   _____

24   Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

**EXHIBIT 12-41**

# EXHIBIT 12 -C

Subject: *Patient MS*

From: "Steven H. Khan" <Steven.S.Khan@kp.org>

To: "scottlevy@chevron.com" <scottlevy@chevron.com>

Cc: "mark@maygus.com" <mark@maygus.com>

Fri, 23 Aug 2019 21:35:33 +0000

Hi Dr. Levy,

I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.

I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.

I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this email.

Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.

From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).

Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.

Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.

Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.

For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS

Is on an ARB.

In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.

The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.

If you have any further questions, please feel free to email me or call me.

Best regards,

S. Khan, MD

Clinical Associate Professor, UCLA School of Medicine

Heart Failure and Transplant Cardiology, Kaiser Permanente

NOTICE TO RECIPIENT: If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

EXHIBIT
C
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

SNOOKAL-01091

**EXHIBIT 12-C**

# EXHIBIT 12 -D

**EXHIBIT D**
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

**Snookal, Mark**

| | |
|---|---|
| **From:** | Levy, Scott |
| **Sent:** | Monday, September 16, 2019 4:20 AM |
| **To:** | Snookal, Mark |
| **Subject:** | medical |

Mark,

I spoke with Andrew Powers who briefed me on your recent discussion with him and let me know that you were waiting on written documentation and perhaps further explanation of your recent MSEA (medical suitability for expat assignment) examination.  I'll do my best to explain in writing but also happy to further discuss live.

As you know, foreign assignments (including, Escravos Nigeria) can be in locations where access to critical prescription medications or medical care is extremely limited.  For these and other reasons, we conduct an MSEA to confirm that an employee is medically able to work in the new job and location.

I understand that you are willing to take the risk of potentially dying on the job, and that you do not feel it is the company's place to make that decision for you.  I agree to a certain extent and recognize your concerns about paternalism.  However, the company does have a right to not engage individuals where their assignment could pose a "direct threat" to their own health and safety.

We certainly don't believe that every employee with a health condition poses a direct threat; we need to analyze the condition and the attributes of the job. When there are ways of ameliorating the risks (including reasonable accommodations) we work with the individual to do so. I became involved on your case when you had requested a second opinion on the initial denial and with your consent involved your treating physician to better understand your specific risk. While reasonable professionals can debate the exact percentage, we are dealing with an established risk that is several magnitudes higher than the baseline and is a realistic possibility.  We respectfully disagree that this finding (regardless of the exact percentage) is based on stereotypes, as distinguished from objective medical evidence.  But the risk itself is not determinative.  The concern is that if the condition were to occur, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos.  There is no medical capability to manage this type of emergency in Escravos or anywhere near Escravos.  It is also clear that the duration of your condition is not limited and is continually present, and the occurrence is not predictable and it's not possible to isolate triggers to reduce the risk.

We have no problems with you working in El Segundo and believe there are many other foreign locations where you could work.  We in fact discussed whether you could perform this particular job at a different location in Lagos, but it wasn't possible.

In response to your question, I would not foresee issues with you working in the following locations:

Americas: US onshore operations, San Ramon, Houston, Calgary, Vancouver, St. John, Argentina (Buenos Aires); Colombia (Bogota); Brazil (Rio de Janeiro), Trinidad (Port of Spain)

Asia Pacific: Singapore, Australia (Perth based), Hong Kong, New Zealand, Thailand (Bangkok, Rayong, Sirai Chi); South Korea (Seoul, Ulsan, Geoje), Philippines (Manila), China (Beijing, Shanghai), Japan Metropolitan; Malaysia (Kuala Lumpur); Pakistan Metropolitan

EEMEA: UK (all locations), Belgium (all locations), Denmark (all locations), France (all locations), Italy (all locations), Netherlands (all locations), United Arab Emirates (all locations), Norway (all locations), Germany (all locations), Sweden (all locations), South Africa (all locations), Bahrain (all locations), Qatar (all locations), Kuwait (all locations), Turkey (all locations), Poland (all locations), Saudi Arabia (all locations), Nigeria (Lagos), Russia (Moscow)

I'd need to do a more specific assessment for:

Americas: US offshore operations (Deepwater), Colombia (Riohacha); Argentina- Nuquen, Colombia –Rio Hacha, Guatemala, Panama, Mexico, Brazil Offshore, Kitimat (Canada)

1

**EXHIBIT 12-D-1**

AP: Australia (Barrow Island, Onslow, Dampier, Karratha, Thevenard Island & Wheatstone offshore); Bangladesh (Dhaka); China (Chengdu, Tianjin, Tanggu); Indonesia (Jakarta, Sumatra, Balikpapan); Malaysia (Lumut); Thailand (Songkla, Nakorn Srithammarat - NST, Offshore); Vietnam; India

EEMEA: Angola (Luanda); Nigeria (Lekki, Abuja); Azerbaijan (all locations), Ukraine (all locations), Romania (all locations), Rep. of Congo (Pointe Noire), Morocco (all locations), Egypt (all locations), Russia (outside Moscow).

I'd be quite concerned about other locations.  As I mentioned above, I'd be more than happy to discuss this with you further.

Scott


**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
TR & HM COE

Chevron Products UK Limited
1 Westferry Circus
Canary Wharf
London E14 4HA
Office-   +44 (0) 207 719 3390 (Also serves 24/7 medical emergency support)
Fax-     +44 (0) 207 719 5188
Mobile- +44 (0) 792 258 4538
CTN- (8) 584 3390
ScottLevy@chevron.com

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118


### Important Message from the Global Privacy Team

Remember that when it comes to sharing personal data, **less is more**. Do not share more information than is being requested from you. Share information securely and follow company policy by **encrypting** emails and attachments that contain **sensitive personal data**.  Before clicking "send" on an email, **double-check** that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com

SNOOKAL-01089

**EXHIBIT 12-D-2**

49
D.2

# EXHIBIT 12 -E

**Chevron**

**Medical Suitability for Expatriate Assignment History & Physical Examination**
**GO-146-MSEA**

Mark Snookal

CAI - MVZM

0724-15

RECEIVED
JUL 2 4 2019

Initial
Nigeria

Note to Examinee and Examiner: In the US, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information for any U.S. based employees (whether within the U.S. or outside the U.S. on assignment) when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. Local or Host Country legal requirements may also apply.

**Part A. Examinee: Please complete Parts A through F prior to exam.**

| F.I. | M.I | Last Name | First Name | | CAI | Gender | | | |
|------|-----|-----------|------------|--|-----|--------|--|--|--|
| | | Mark Snookal | | | MVZM | M | | | |

| Current Job Title | New Job Title* | Current Company/BU/OpCo | Next * Company/BU/OpCo | Current Location | Next * Location |
|-------------------|----------------|-------------------------|------------------------|-----------------|-----------------|
| IEA Reliability Team Lead | Reliability Engineering Manager | ESE | NMASBU | El Segundo CA USA | Escravos, Nigeria |

*If Applicable

**Part B.** Your country of assignment may or may not have full medical resources to support your health needs. Please answer the following questions as accurately as possible and check 'N' (no) or 'Y' (yes) in the column. Answers with Yes, please provide more information in the description boxes. This information is used to promote your safety and ensure your health needs can be met. (If need, please use back page)

| | | N | Y | Description |
|--|--|---|---|-------------|
| 1. | Do you have any medical, physical or psychological conditions under the care of a health professional? If yes, please describe. | ☐ | ☒ | I have a dilated aortic root, I am under the care of a cardiologist and see him once per year for a checkup. I have consulted with him on this assignment and he sees no issues with it. |
| 2. | (a) Are you taking any medicines that require a prescription? If yes, please list. | ☐ | ☒ | Losartan and Amlodipine |
| | (b) Are you taking any non-prescription medicines on a frequent basis? If yes, please list. | ☒ | ☐ | |
| 3. | (a) Do you have any allergies? | ☒ | ☐ | |
| | (b) Have you ever had severe allergic reactions? If yes, do you know what caused it? | ☒ | ☐ | |
| 4. | Do you exercise for at least 30 minutes 3 times a week, on average? | ☐ | ☒ | |
| 5. | (a) Do you feel unusual fatigue or sleepiness? | ☒ | ☐ | |
| | (b) Do you have any problems sleeping? | ☒ | ☐ | |
| | (c) Do you use sleeping aids, including medication? | ☒ | ☐ | |
| 6. | Have you ever experienced health problems working in extreme weather conditions? | ☒ | ☐ | |
| 7. | Have you experienced unexplained weight loss or gain? | ☒ | ☐ | |
| 8. | (a) Do you smoke? If yes, what and how much each day? | ☒ | ☐ | |
| | (b) Did you smoke regularly for more than 1 year ever in your past? | ☒ | ☐ | |
| 9. | Do you drink alcoholic beverages? If yes, what is your average weekly intake? | ☒ | ☐ | |
| 10. | Have you ever required a medical evacuation from a work location? If yes, what was the reason? | ☒ | ☐ | |

**EXHIBIT E**
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

Page 1 of 6

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00605

**EXHIBIT 12-E-1**

51
E.1

| | | | | Examinee Last and First Name<br>**Mark Snookal** | | Examinee CAI<br>**MVZM** |
|---|---|---|---|---|---|---|

| 11. | Have you ever had any mental health or psychological issues requiring at least a medical prescription? If yes, please describe | ☐ | ☒ | I was treated for depression with Effexor for a few years from approximately 1994-1996 |
|---|---|---|---|---|
| 12. | Have you been in the emergency room and or hospitalized within the last six months? | ☒ | ☐ | |
| 13. | Have you undergone any surgical procedure or operations within the last six months? | ☒ | ☐ | |
| 14. | Did you have a physical (periodic, preventive) exam within the past two years? | ☐ | ☒ | |
| 15. | Would you need health/medical resources for any disabling or special condition in the country of assignment? | ☒ | ☐ | |
| 16. | Would you like to schedule a discussion with a Chevron Physician or Regional Medical Manager to discuss further a health condition or learn more about the host country medical resources? | ☒ | ☐ | |
| 17. | Does your new position require you to work or travel Offshore, In Field/Plant or Strictly Office?  Please advise if you need additional certifications for your new position (e.g. HUET/BOSIET, Oil and Gas U.K.) | ☐ | ☐ | My position is strictly office |

**Part C: Please answer the following questions and check 'N' (no) or 'Y' (yes) in the column. If 'Y' please describe:**

| | Have you had any illness or condition related to the following body parts or systems? (minor conditions do not need to be mentioned): | | N | Y | Description: |
|---|---|---|---|---|---|
| 18. | Head and Neck | | ☒ | ☐ | |
| 19. | Eyes or Visual | | ☒ | ☐ | |
| 20. | Ear, Nose and Throat | | ☒ | ☐ | |
| 21. | Teeth<br>(a) When was your last exam?<br>(b) Is there any dental work pending? Please describe | | ☐<br>☒ | ☐<br>☐ | 11/2017 |
| 22. | (a) Chest such as shortness of breath, chronic cough.<br>(b) Breasts | | ☒<br>☒ | ☐<br>☐ | |
| 23. | Heart such as chest pain, palpitations or irregular beating | | ☐ | ☒ | I have PVC's which have been evaluated by a cardiologist and do not require any treatment |
| 24. | Abdomen such as pain, hernias, abnormal bowel movement | | ☐ | ☒ | I had my gallbladder removed in 2014 |
| 25. | Kidney, bladder or genital area | | ☒ | ☐ | |
| 26. | Spine and Musculo-skeletal, movement limitations or pain | | ☒ | ☐ | |
| 27. | Skin changes such as rash, spots, moles or itching | | ☒ | ☐ | |
| 28. | Epileptic seizures, dizzy spells or migraine | | ☒ | ☐ | |
| 29. | Diabetes or increase in blood sugar | | ☒ | ☐ | |
| 30. | Anemia or other blood conditions | | ☒ | ☐ | |
| 31. | Tuberculosis (TB) or positive TB test, skin or blood (e.g. TB spot, IGRA/ Quantiferon®) | | ☒ | ☐ | |
| 32. | Any other health problems<br>(Please use space below.  If need, use back page) | | ☒ | ☐ | |

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00606

**EXHIBIT 12-E-2**

52
E.2

| Examinee Last and First Name | Examinee CAI |
|---|---|
| **Mark Snookal** | **MVZM** |

## Part D.  Exposure History (Employee Only)

Have you ever been exposed at work to dusts, solvents, other chemicals or any other known workplace hazards, e.g. biological agents?

☒ Yes  ☐ No

If YES, please list agents with dates and for how long:

I have worked in industrial and petrochemical locations from 1990  present

Have you ever been exposed in the workplace to:

☒ Noise   ☐ Radiation/X-ray Equipment   ☐ Vibrating Hand Tools   ☐ Repetitive Movement   ☐ Weight Lifting   ☐ Other

If you checked one of the boxes above, please specify for how long, and whether Personal Protective Equipment (PPE) was used:

In my work in industrial and petrochemical locations from 1990  present I have been exposed to noise but have always used PPE

## Part E. Occupational History (Employee Only)

Have you ever been part of a medical (health) surveillance program through your work due to exposure to workplace hazards?  e.g. Part of a hearing conservation program due to exposure to workplace noise.

☒ Yes  ☐ No

If YES, please list with dates:

I am currently in a hearing conservation program in my employment with Chevron El Segundo

## Part F.  Family History.

To comply with the US Genetic Information Nondiscrimination Act of 2008, this part should NOT be completed for any US based employees (whether in the U.S. or outside the U.S. on assignment).   Any information inadvertently provided for a US employee in this section should be redacted if the form is to be sent to the US for filing in the employee's medical record. Local related legislation may be also applicable.

Are there any medical conditions within your family relevant to be mentioned?

Physician Comments:

Have you ever been employed with Chevron or examined for employment by Chevron?

☐ No  ☒ Yes   If yes, when   At hiring at Chevron El Segundo in 2009

### EXAMINEE:

I certify that the information given by me is true and I authorize the examiner to furnish the results of this examination and other related medical investigation results to either the Chevron Regional Medical Managers or the Chevron Global Health and Medical facility. I acknowledge and agree that the results of this medical evaluation are managed by Chevron in a secure and confidential data system that will store and may transmit information to countries other than where the medical examination takes place, including but not limited to the U.S.

FOR APPLICANT ONLY: I understand that any misrepresentation, false statement or omission herein may result in the company rejecting my application, withdrawing any offer of employment, or terminating my employment at any time.

Examinee Signature  _____    Date (mm/dd/yyyy)  7/18/2019

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00607

**EXHIBIT 12-E-3**

53
E.3

| Examinee Last and First Name | Examinee CAI |
|---|---|
| **Mark Snookal** | **MVZM** |

## Part G. PHYSICAL EXAMINATION. To be completed by Health Care Provider.

### Vital Signs

| HEIGHT ft/cm | WEIGHT lb/kg | BMI | Abdominal Circumference in/cm | B.P. (mmHg) | PULSE | Temperature (°C/°F) |
|---|---|---|---|---|---|---|
| 72" | 256 lb | 34.7 | | 135/78 | 53 | 97.5 |

### Vision

| | Uncorrected | | | Corrected | | | Depth | Tonometry | Color Vision | Visual Fields |
|---|---|---|---|---|---|---|---|---|---|---|
| | Both | Right | Left | Both | Right | Left | | | | |
| Far | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ | | | Normal | |
| Near | J# | J# | J# | J# / ← | J# / ← | J# / ← | | | | |

| N | A | | N = Normal. A = Abnormal, please describe | DESCRIPTION |
|---|---|---|---|---|
| ☑ | ☐ | 1. | General Appearance | |
| ☑ | ☐ | 2. | Head | |
| ☑ | ☐ | 3. | Ear, Nose Mouth and Throat | |
| ☑ | ☐ | 4. | Neck | |
| ☑ | ☐ | 5. | Eyes | |
| ☑ | ☐ | 6. | Chest | |
| ☑ | ☐ | 7. | Breasts | |
| ☑ | ☐ | 8. | Respiratory System | |
| ☐ | ☐ | 9. | Cardiovascular System | occas ectopics (PVC's) |
| ☑ | ☐ | 10. | Abdomen, Viscera/Hernias | |
| ☑ | ☐ | 11. | Genito-urinary | |
| ☑ | ☐ | 12. | Lower GI Tract | |
| ☑ | ☐ | 13. | Extremities | |
| ☑ | ☐ | 14. | Spine and Musculo-skeletal. Range of Motion. | |
| ☑ | ☐ | 15. | Skin and Lymphatic System | |
| ☑ | ☐ | 16. | Central Nervous System | |
| ☑ | ☐ | 17. | Peripheral Nervous System Reflexes | |
| ☐ | ☐ | 18. | Others, please specify | |

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00608

**EXHIBIT 12-E-4**

54

E.4

| Examinee Last and First Name | Examinee CAI |
|---|---|
| **Mark Snookal** | **MVZM** |

## LABORATORY AND SPECIAL TESTS

| N | A | Not Done | AS INDICATED | RESULTS. N = Normal. A = Abnormal, please describe |
|---|---|---|---|---|
| ☐ | ☐ | ☑ | Audiogram | |
| ☐ | ☐ | ☑ | Chest X Ray | |
| ☑ | ☐ | ☐ | Complete Blood Count | |
| ☐ | ☐ | ☑ | Drug Screening | |
| ☐ | ☑ | ☐ | ECG | |
| ☐ | ☐ | ☑ | Pulmonary Function | |
| ☑ | ☐ | ☐ | Serum Profile/Chemistries | |
| ☐ | ☐ | ☑ | Stress Test | |
| ☑ | ☐ | ☐ | Urinalysis | |
| ☐ | ☐ | ☐ | Others, please specify | |

REMARKS; Describe significant / abnormal findings/limitations noted above (if need, please use back page)

① PVC's – frequent asymptomatic followed by cardiology
② Dilated aortic root  followed by cardiology
ongoing studies yearly echo us CT chest
stable on meds

If any abnormalities were found during the examination, was examinee informed? ☑ Yes ☐ No

## Part H: MEDICAL RECOMMENDATION

| H.1. Fitness for Duty Classification, ONLY FOR INTERNAL CHEVRON USE | H.2. Restrictions pertinent to Job Requirements (refer to GO-308) |
|---|---|
| ☐ A. Fit for Duty | No heavy lifting >50 lbs |
| ☑ B. Fit for Duty with Restrictions | needs review of |
| ☐ C. Not Fit for Duty | Recommend letter from |
| ☐ D. Failed to comply with requested evaluations, due to: | cardiologist to clear him |

| Examiner's Name (please print) | Signature | Date (mm/dd/yyyy) 07/24/2015 |
|---|---|---|
| IRVING SOBEL MD | M Sobel M | USA Chevron Provider Number |

| Address | 4676 ADMIRALTY WAY | 4th FLOOR | MDR CA | 90292 | 1 1 4 0 8 |
|---|---|---|---|---|---|
| | Street | City | State / Province | Postal / Zip Code  Country | |

| Chevron Global Health & Medical Approval (please print name) | Signature | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

Page 5 of 6

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00609

**EXHIBIT 12-E-5**

55
E.5

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

**PLEASE ATTACH COPIES OF IMPORTANT REPORTS OF CURRENT INTEREST.**
If available, Form GO-308 (Physical Requirements and Working Conditions) must be included.

Page 6 of 6

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00610

**EXHIBIT 12-E-6**

56
E.6

# EXHIBIT 13

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


MARK SNOOKAL, an individual,

        Plaintiff,               Case No.

        vs.                  2:23-cv-6302-HDV-AJR

CHEVRON USA, INC., a California
Corporation, and DOES 1 through 10,
inclusive,

        Defendants.

_____


DEPOSITION OF DR. UJOMOTI AKINTUNDE

OCTOBER 31, 2024

CONDUCTED VIA ZOOM VIDEOCONFERENCE




REPORTED BY LAUREN RAMSEYER, CSR NO. 14004

**EXHIBIT 13-1**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARK SNOOKAL, an individual,

 5            Plaintiff,                Case No.

 6         vs.                         2:23-cv-6302-HDV-AJR

 7   CHEVRON USA, INC., a California
     Corporation, and DOES 1 through 10,
 8   inclusive,

 9            Defendants.
     _____
10

11

12

13

14

15         DEPOSITION OF DR. UJOMOTI AKINTUNDE,

16   commencing on Thursday, October 31, 2024, at 8:00 a.m.,

17   Pacific Time, held via Zoom videoconference, all

18   participants appearing remotely before Lauren Ramseyer,

19   Certified Shorthand Reporter, CSR No. 14004.

20

21

22

23

24

25
```

**EXHIBIT 13-2**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                    I N D E X

 2   WITNESS:

 3   DR. UJOMOTI AKINTUNDE

 4

 5   EXAMINATION:                              PAGE

 6   BY MS. FLECHSIG                          5, 85

 7   BY MS. FAN                                 56

 8

 9

10   DEPOSITION EXHIBITS:                       PAGE

11   Exhibit 1        Email (CUSA000771-775)      21

12   Exhibit 2        Article Entitled "Yearly Rupture   71
                      or Dissection Rates for Thoracic
13                    Aortic Aneurysms, Simple
                      Prediction Based on Size" (CUSA
14                    776-787)

15   Exhibit 3        Article Entitled "Risk of          73
                      Rupture or Dissection in
16                    Descending Thoracic Aortic
                      Aneurysm" (CUSA778-797)
17

18

19

20

21

22

23

24

25
```

**EXHIBIT 13-3**

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1                    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3          ALLRED, MAROKO & GOLDBERG

 4          BY: OLIVIA FLECHSIG, ESQ.

 5          6300 Wilshire Boulevard, Suite 1500

 6          Los Angeles, California 90048

 7          (323)653-6530

 8          oflechsig@amglaw.com

 9

10    FOR THE DEFENDANTS:

11          SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

12          BY: SARAH FAN, ESQ.

13          333 South Hope Street, 43rd Floor

14          Los Angeles, California 90071

15          (213)620-1780

16          sfan@sheppardmullin.com

17

18    ALSO PRESENT:  EGUONO ERHUN

19

20

21

22

23

24

25
```

**EXHIBIT 13-4**

Dr. Ujomoti Akintunde                                    October 31, 2024

1        Q.    Okay.  In your practice as a cardiologist,
2    have you ever treated an aortic aneurysm that ruptured?
3        A.    No.
4        Q.    In your practice as a cardiologist, have you
5    ever treated an aortic aneurysm that dissected?
6        A.    No.
7        Q.    Do you have a current curriculum vitae or
8    resume?
9        A.    I would have to update it.  I have not applied
10   for any job since I started working at Chevron.
11       Q.    Okay.  So the most recent version would be
12   from around 2018?
13       A.    Approximately.  There have been some updates
14   along the line of -- definitely it's not -- it's not
15   recent.  I do not have it current.
16       Q.    In your work as a cardiologist, have you ever
17   treated someone with a dilated aortic root?
18       A.    Yes.
19       Q.    How many people do you think that you've
20   treated with a dilated aortic root?
21       A.    I cannot remember.  I didn't do counts.
22       Q.    I understand.  What's your best estimate?  Is
23   it between five and ten, ten and 20, over a hundred?
24   You know, what sort of would be your best estimate of
25   the range of the number?

**EXHIBIT 13-5**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1              MS. FAN:  Objection.  Vague and ambiguous.
 2              THE WITNESS:  I can't remember.  I'm not so
 3   sure how many, but I have managed them in the past.
 4   They're not as common in this part of the world.
 5   BY MS. FLECHSIG:
 6       Q.   In the last year, how many patients with a
 7   dilated aortic root have you -- have you treated?
 8       A.   A couple.  I'm not sure exactly.
 9       Q.   Since joining Chevron in 2018, how many people
10   with a dilated aortic root have you -- have you seen?
11              MS. FAN:  Vague and ambiguous as to "Chevron."
12              THE WITNESS:  I'm not certain of the exact
13   number, but I've seen a few.
14   BY MS. FLECHSIG:
15       Q.   So I want to turn now to Mark Snookal, the
16   plaintiff in this case.  Have you ever spoken with
17   Mr. Snookal?
18       A.   No.
19       Q.   Have you ever reviewed a job description for
20   the position that Mr. Snookal was seeking in Escravos?
21       A.   No.
22       Q.   Did you have any work history, for
23   Mr. Snookal, to review?
24       A.   No.  That's not within my purview as a
25   cardiologist.  That's managed by the occupational health
```

**EXHIBIT 13-6**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   physician.
 2        Q.   Okay.  I think I want to just go ahead and
 3   turn towards the email that I believe you were referring
 4   to earlier.  I'm going to put the document in the chat
 5   so that you can scroll through it at your leisure, just
 6   give me one moment to give you the file.
 7             (Exhibit 1 was marked for identification.)
 8   BY MS. FLECHSIG:
 9        Q.   So I'm marking as Exhibit 1 what's been
10   provided as CUSA000771 through 000775.
11             Dr. Akintunde, please go ahead and open the
12   document, and you're welcome to take a moment to look
13   through it.  And then you can let me know when you're
14   done.
15        A.   I've looked through it.
16        Q.   Okay.  Is this the email that you were
17   referring to earlier in terms of the document you
18   reviewed to prepare for your deposition today?
19        A.   Yes.
20        Q.   Is this the entire email thread that you had
21   with Dr. Asekomeh relating to Mr. Snookal?
22        A.   Yes.
23        Q.   Okay.  Other than this email, did you discuss
24   Mr. Snookal with Dr. Asekomeh at any other time?
25        A.   I don't recall at all.  That was five years
```

**EXHIBIT 13-7**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1          A.    Two imaging reports.

 2          Q.    Okay.

 3          A.    The CT and the echo.

 4          Q.    Okay.  So this email thread, it looks like

 5     Dr. Asekomeh sent the first email to you on, let's

 6     see -- on August 6th, 2019; is that correct, he

 7     forwarded you the thread?

 8          A.    I think it was August 7th.

 9          Q.    So I'm looking at --

10          A.    Oh, maybe it was the 6th.  I can't remember.

11     It's possible.

12          Q.    That's okay.  I'm not trying to trick you.

13     I'm just trying to get a good sense of the timeline in

14     terms of what the document says.

15               So on the first page of the document,

16     CUSA000771, it looks like there's an email from

17     Dr. Asekomeh.  It says sent Tuesday, August 6, 2019,

18     12:35 to Akintunde, and then it looks like your Chevron

19     email.  Is that -- are you seeing what I'm reading out?

20          A.    Yes.

21          Q.    Okay.  So that was what you received from

22     Dr. Asekomeh relating to Mr. Snookal, correct?

23          A.    Yes, that's correct.

24          Q.    Okay.  And so when you received that email,

25     you did not also receive the medical summary that's on
```

**EXHIBIT 13-8**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   the last page of this thread?
 2        A.   No.
 3        Q.   Okay.  So I understand you received just -- I
 4   think you said two imaging reports, right?
 5        A.   Yes.  Yes.
 6        Q.   Apologies if I already asked this.  What were
 7   the imaging reports of?
 8        A.   Echo, cardiology, and CT scan.
 9        Q.   Okay.  And so I see in your response email, if
10   you scroll up so we're still on 771, the first page of
11   the document, in this -- this is the email response that
12   you wrote to Dr. Asekomeh, correct?
13        A.   Yes.
14        Q.   Okay.  So just going down the -- going down in
15   order of what you wrote, you said, "I concur with my
16   colleagues."  That was in reference to the remainder of
17   the email thread, right?
18        A.   Yes.
19        Q.   And then you say he is, quote, low risk, but
20   not low risk, correct?
21             MS. FAN:  Objection.  Misstates the document.
22             THE WITNESS:  Correct.
23             MS. FAN:  Counsel, I think you might have
24   flipped those terms.
25
```

**EXHIBIT 13-9**

Dr. Ujomoti Akintunde                                October 31, 2024

```
 1   Lagos.  So I would say it was more general cardiology.
 2        Q.   For people that you were treating with
 3   hypertension, what were you doing for them?
 4        A.   Clinical exams, review of their medications,
 5   EKGs, when required.
 6        Q.   Okay.  And that was on location at Escravos,
 7   correct?
 8        A.   Correct.
 9        Q.   I think you said that you didn't have all of
10   your cardiology equipment available at Escravos.  What
11   equipment was not available while you were in Escravos?
12        A.   There's no intensive care unit at Escravos, no
13   echo machines.  It's just a basic clinic.
14        Q.   Okay.  While you were in Escravos, did you
15   have any medical emergencies that required emergency
16   evacuation?
17        A.   Yes.
18        Q.   How many?
19        A.   I don't think I'm allowed to give that kind of
20   data.
21        Q.   Well, the attorneys haven't objected.  I
22   don't -- I personally think it's fine.  It's not
23   something that is specific.  So just to clarify the
24   scope, you don't need to identify the person or anything
25   like that.  I'm just wondering how many emergency
```

**EXHIBIT 13-10**

Dr. Ujomoti Akintunde                                    October 31, 2024

1  medical evacuations took place while you were there.

2      A.   In a week, maybe two.  Maybe one or two.

3  Sometimes less; sometimes more.

4      Q.   So one to two per week would be your best

5  estimate of the average emergency medical evacuations?

6      A.   Yeah.  It would just -- it should be an

7  estimate.

8      Q.   Do you know what would happen during those

9  medical evacuations, like do you know how they were

10 evacuated?

11         MS. FAN:  Objection.

12         THE REPORTER:  I'm sorry, what was the

13 objection?

14         MS. FAN:  It was vague and ambiguous.

15 BY MS. FLECHSIG:

16     Q.   You can go ahead, Dr. Akintunde, or I can -- I

17 can say the question again.

18     A.   Can you please say the question again?

19     Q.   Yeah.  When someone needed to be medically

20 evacuated on an emergency basis, do you know how the

21 evacuation took place, like how were they evacuated?

22     A.   By chopper.

23     Q.   Okay.  Is that true for all of the medical

24 evacuations that took place while you were in Escravos?

25     A.   Most of them.

**EXHIBIT 13-11**

Dr. Ujomoti Akintunde                                    October 31, 2024

1      Q.   Okay.  For the ones that were not evacuated by
2   chopper, how were they evacuated?
3      A.   So if they needed referrals, but not really
4   those kind of emergencies, we would put them on a
5   regular flight.
6      Q.   Okay.  When you say a "regular flight," are
7   those -- those are, like, fixed wing airplanes that are
8   coming and going from Escravos?
9      A.   I'm not sure I know what fixed wing is, but
10  regular airplanes that are coming in and out of
11  Escravos.
12     Q.   How often are regular airplanes coming and
13  going from Escravos?
14     A.   At least three times a week.
15     Q.   Okay.  For the people that needed to be
16  emergency evacuated by chopper, do you know how quickly
17  they were able to get onto the helicopter for
18  evacuation?
19          MS. FAN:  Objection.  Vague and ambiguous.
20          I apologize, Dr. Akintunde.  You can go ahead.
21          THE WITNESS:  That varied a lot.  Back then it
22  was a company in Escravos, so sometimes evacuations were
23  delayed.  Sometimes a chopper wasn't regularly
24  available, you had to wait for one to come back, so that
25  varied a lot.  There's no one size fits all.

**EXHIBIT 13-12**

Dr. Ujomoti Akintunde                                    October 31, 2024

1          MS. FLECHSIG:  Yeah, absolutely.  I think I

2   just have a couple more questions on this point, and

3   then we can do a little break.

4          MS. FAN:  Great.

5   BY MS. FLECHSIG:

6      Q.   I know you mentioned it could vary a lot in

7   terms of the time it took to get, you know, a chopper to

8   the site.  What was the average time you think that it

9   took to get someone on to the helicopter for evacuation?

10         MS. FAN:  Objection.  Vague and ambiguous.

11  Calls for speculation.

12         THE WITNESS:  How much time?  Maybe an hour

13  and a half.  I think about that.  That's just an

14  approximation.

15         MS. FLECHSIG:  Okay.  All right.  Do we want

16  to take a five-minute break, a ten-minute break?

17         MS. FAN:  I think five minutes should work.

18         MS. FLECHSIG:  Is that okay with everyone?

19         THE WITNESS:  That's fine.

20         THE REPORTER:  That's fine with me.

21         MS. FLECHSIG:  Okay.  Thank you so much.

22         MS. FAN:  Great.  We can go off the record.

23         THE REPORTER:  We're off the record.

24         (Recess.)

25

**EXHIBIT 13-13**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   identifying details.
 2        A.   Yes, I did see a hand injury, trauma, you
 3   know, yes, a hand injury.  Yeah, very few, but I did
 4   see, yes, a hand injury.
 5        Q.   What -- were there any other traumas that you
 6   treated while you were in Escravos?
 7             MS. FAN:  Objection.  Vague and ambiguous.
 8             THE WITNESS:  I can't remember, but I guess --
 9   I think -- I think somebody while playing sports on the
10   field, I can't remember what -- we did see some mild
11   trauma, maybe muscle, you know, twisting the muscle or
12   something, yeah.  There were some, definitely.
13   BY MS. FLECHSIG:
14        Q.   Okay.  During the time you were in Escravos,
15   was anyone injured because of a medical evacuation, in
16   other words, was anyone injured due to the process of an
17   emergency medical evacuation?
18        A.   No.
19        Q.   Does a dilated aortic root pose a physical
20   danger to anyone other than the person who has the
21   dilated aortic root?
22             MS. FAN:  Objection.  Vague and ambiguous.
23   Incomplete hypothetical.  Calls for a legal conclusion.
24             THE WITNESS:  No.
25
```

**EXHIBIT 13-14**

Dr. Ujomoti Akintunde                                    October 31, 2024

```
1            MS. FAN:  Objection.  Argumentative.

2            THE WITNESS:  Well, size is important, so the

3    risk is lower that it would dissect or rupture, but it

4    may also -- that may also occur, even at the current

5    size; that is why there is a risk category to it.  So

6    you really want to make sure, like I said, as a

7    physician, my priority one is the health and wellbeing

8    of every patient, so I also want to make sure all the

9    factors that may potentially increase the risk of this

10   person are doing well, are put into perspective and

11   addressed.

12   BY MS. FLECHSIG:

13       Q.   In your email did you intend to express any

14   opinion about whether it was safe for Mr. Snookal to

15   work in Escravos?

16       A.   That's not within my sphere of work.  My

17   communication was strictly cardiology, about the signs,

18   and its possible issues that may arise.  Nothing within

19   my sphere of work allows me to determine suitability for

20   work or otherwise.

21       Q.   For someone with an aortic root of

22   4.2 centimeters, is that a situation where you would

23   recommend surgical intervention?

24       A.   I would not recommend surgical intervention at

25   that size except he didn't have symptoms.
```

**EXHIBIT 13-15**

Dr. Ujomoti Akintunde                                      October 31, 2024

1          Q.   What are --

2          A.   If he has no symptoms, then I would say no to

3    surgery at that time.

4          Q.   What are symptoms of a dilated aortic root?

5          A.   Tearing chest pain, blood pressure will drop,

6    amongst others.

7          Q.   Okay.  What are the others, if you know?

8          A.   There are so many, like, I won't go into all

9    of that right now, but they are listed in the email

10   trail there, so...

11         Q.   Okay.  I think I see in -- I think I see what

12   you're referring to in the email trail from Dr. Aiwuyo,

13   he says, "Watch out for alarm symptoms like pain in the

14   chest, throbbing, tearing, aching or sharp pain, often

15   sudden; pain in the back, nausea, vomiting, fainting and

16   systemic shock."

17              Is that -- are those the symptoms that you're

18   referring to?

19         A.   Yes.

20         Q.   Just to clarify, those symptoms, does that

21   indicate a dissection or rupture, or is that just what a

22   symptomatic aortic root is?

23         A.   It can indicate either one of them, and all of

24   that refers to symptomatic pieces.

25         Q.   And, honestly, I'm just asking because I'm not

**EXHIBIT 13-16**

Dr. Ujomoti Akintunde                                    October 31, 2024

1    review -- strike that.

2            I want to ask about -- I actually want to ask

3    about the CT scan and the echocardiogram that you said

4    were attached to Dr. Asekomeh's email.  Do you know what

5    I'm referring to?

6        A.    Yes.

7        Q.    The CT scan, was it just one CT scan, or were

8    there multiple CT scans?

9        A.    So I remember correctly it was one CT.

10       Q.    Okay.  For the echocardiogram, was that

11   attachment -- or were there attachments that were

12   multiple echocardiogram or just one echocardiogram?

13       A.    I recall one echocardiogram.

14       Q.    Okay.  So based off of the information that

15   you had available to you, did you consider whether

16   Mr. Snookal's aortic root dilation was stable in size?

17       A.    I cannot make a determination about if it was

18   stable in size from only one imaging report.  I would

19   have to see a series, a sequence, a series of them to

20   determine the rate of increase over the years.

21       Q.    Okay.  So in other words, no one provided you

22   with any information about any changes in size?

23       A.    I was given only one set of imaging reports.

24       Q.    Okay.  In this email thread at the bottom of

25   page 774, so CUSA000774, I want to -- I want to give you

**EXHIBIT 13-17**

Dr. Ujomoti Akintunde                                          October 31, 2024

1   The engineers who work there can probably give more

2   information about that.

3        Q.   In Exhibit 1, there is a link from Dr. Aiwuyo

4   on the second page of the document, so it's CUSA000772.

5   Do you see what I'm referring to?

6        A.   I'm going there.  Yes, I see the link.

7        Q.   Did you -- did you review the contents of the

8   link?

9        A.   I cannot remember.

10       Q.   Is there -- your conclusion was that

11   Mr. Snookal, given the size of his aortic root dilation,

12   would be considered low risk, right?

13       A.   Yes.

14       Q.   Do you know at what -- is there a certain size

15   where someone becomes high risk?

16       A.   So those risk measurements are based on a

17   population level.  So higher risk is determined by the

18   level, the size at which you're referred for surgery.

19   And referring for surgery is what determines high risk,

20   so that's where the division comes in, except the person

21   has smaller sizes and has become symptomatic, then that

22   changes their risk categories.  So it's -- it's -- those

23   are the variables.  It's not one definition.  Most of

24   the time higher risk refers to the size.

25       Q.   At what size does someone become high risk, if

**EXHIBIT 13-18**

Dr. Ujomoti Akintunde                                              October 31, 2024

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, Lauren Ramseyer, Certified Shorthand

 4   Reporter licensed in the State of California, License

 5   No. 14004, hereby certify that the deponent was by me

 6   first duly sworn and the foregoing testimony was

 7   reported by me and was thereafter transcribed with

 8   Computer-Aided Transcription; that the foregoing is a

 9   full, complete, and true record of said proceedings.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties in the

12   foregoing proceeding and caption named or in any way

13   interested in the outcome of the cause in said caption.

14          The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificate null and void.

17          In witness whereof, I have hereunto set my

18   hand this day: November 19, 2024.

19

20

21          Lauren Ramseyer, CSR No. 14004

22

23

24

25
```

EXHIBIT 13-19

# EXHIBIT 14

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| MARK SNOOKAL, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | 2:23-cv-6302-HDV-AJR |
| CHEVRON USA, INC., a California ) | |
| Corporation, and DOES 1 through ) | |
| 10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| _____) | |


DEPOSITION OF

DR. VICTOR ADEYEYE

Volume 1, Pages 1 - 34

Taken Remotely Via Videoconference

Friday, November 15, 2024


Stenographically reported by:
Renee M. Bencich, CSR No. 11946, RPR

STENO
concierge@steno.com
888.707.8366
Job Number 117195

**EXHIBIT 14-1**

Dr. Victor Adeyeye                                    November 15, 2024

```
 1                        APPEARANCES

 2

 3     For Plaintiff, Mark Snookal:

 4          ALLRED, MAROKO & GOLDBERG
            By: OLIVIA FLECHSIG, Attorney at Law
 5          6300 Wilshire Boulevard, Suite 1500
            Los Angeles, California 90048
 6          323.653.6530
            oflechsig@amglaw.com
 7

 8

 9     For Defendant Chevron USA, Inc.:

10          SHEPPARD MULLIN
            By: SARAH FAN, Attorney at Law
11          333 South Hope Street, 43rd Floor
            Los Angeles, California 90071
12          213.620.1780
            sfan@sheppardmullin.com
13

14

15     Also Present:

16          Dolores Y. Leal, Attorney at Law
            Allred, Maroko & Goldberg
17
            Paris Stephen, Attorney at Law
18          Allred, Maroko & Goldberg

19          Eguono Erhun, Attorney at Law
            Chevron Nigeria Limited
20

21

22

23

24

25
```

**EXHIBIT 14-2**

Dr. Victor Adeyeye                                        November 15, 2024

```
 1                    INDEX OF EXAMINATION

 2

 3   Examination by:                                   Page

 4   Ms. Flechsig                                        6

 5

 6

 7

 8

 9                       ---o0o---

10

11          QUESTIONS INSTRUCTED NOT TO ANSWER

12                       (None.)

13

14                  QUESTIONS MARKED

15                       (None.)

16

17               CONFIDENTIAL PORTIONS

18                       (None.)

19

20                       ---o0o---

21

22

23

24

25
```

**EXHIBIT 14-3**

Dr. Victor Adeyeye                                          November 15, 2024

```
 1                     INDEX OF EXHIBITS

 2

 3    Plaintiff's Exhibits:

 4   Exhibit No.    Description                        Page

 5                     (No exhibits marked.)

 6

 7

 8

 9

10   Defendant's Exhibits:

11   Exhibit No.    Description                        Page

12                     (No exhibits marked.)

13

14

15                     ---o0o---

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 14-4**

Dr. Victor Adeyeye                                        November 15, 2024

```
1    College of Surgeon, ATLS, Advanced Trauma Life Supports.
2              I also have American College of Physician,
3    Advanced Cardiovascular Life Supports.
4              Also, Basic Life Supports for America.
5              Then, luckily, too, I have Health Management
6    Certification of Nigerian Postgraduate Medical College,
7    and a Physician of Emergency Medicine, Nigeria, where I
8    also have a certification.
9              Thank you.
10      Q.    Have you ever treated any patients with a
11   thoracic aortic aneurysm?
12      A.    In the course of my treating, I've had one case
13   of such.
14      Q.    Okay.  When was that?
15      A.    That was between 2010 to 2012.
16      Q.    Okay.  Do you know whether that patient had a
17   descending aortic aneurysm or an ascending aortic
18   aneurysm?
19      A.    Aortic roots aneurysm.  That was the patient's
20   type.
21      Q.    Okay.  Is -- since I'm a layperson, is that --
22   does that mean it's an ascending or --
23      A.    Yes --
24      Q.    -- descending?
25      A.    -- yes, yes.  Ascending.  Ascending.
```

**EXHIBIT 14-5**

```
 1              a follow-up patient.  Nothing could be done.

 2              Ruptured, and that was the --)

 3              THE COURT REPORTER:  There was more.

 4              THE WITNESS:  Mortality.  Death.  Death.

 5              THE COURT REPORTER:  Thank you.

 6    BY MS. FLECHSIG:

 7       Q.   So was the patient alive when they first came

 8    to you?

 9       A.   Yes.

10       Q.   Understood.

11              Were you able to administer any treatments to

12    the patient before they passed away?

13       A.   The treatment could not be given.  Not

14    available.

15       Q.   Understood.

16              Do you have a current curriculum vitae or a

17    resume?

18       A.   Have but not updated.

19       Q.   Okay.  Do you know when you would have last

20    updated it?

21       A.   Over a year ago.

22       Q.   Have you published any medical research during

23    the last 10 years?

24       A.   Two contributions to textbooks of medicine with

25    over 20 publications in local and international
```

**EXHIBIT 14-6**

Dr. Victor Adeyeye                                                November 15, 2024

```
 1  figure to that.  Not only consultation, even medevac
 2  cases that require expats' management as a supporting
 3  facility to offshore -- location.  Thank you.
 4          THE COURT REPORTER:  To offshore?  Doctor, to
 5  offshore what location?
 6          THE WITNESS:  Offshore location.  Offshore.
 7  Offshore.  Escravos.  Offshore Escravos.  Escravos.
 8  Escravos.  Escravos location.  Offshore Escravos
 9  location.
10          Thank you.
11  BY MS. FLECHSIG:
12      Q.   Okay.  You have never spoken to Mark Snookal,
13  the plaintiff in this case, correct?
14      A.   Never spoken with him.
15      Q.   Okay.  Have you ever reviewed Mr. Snookal's
16  employment history?
17      A.   Employment history?
18      Q.   Yes.
19      A.   Or medical history?
20      Q.   No, have you ever reviewed his employment
21  history?
22      A.   Oh, that's not within my scope.
23      Q.   Okay.  So, no, you have not reviewed his
24  employment history, correct?
25      A.   Yes.
```

**EXHIBIT 14-7**

Dr. Victor Adeyeye                                      November 15, 2024

```
 1              MS. FAN:  Asked and answered.
 2    BY MS. FLECHSIG:
 3         Q.   That's a -- you said yes?
 4         A.   I've never reviewed his employment history.
 5         Q.   Thank you.
 6              You mentioned also giving treatment in response
 7    to medical evacuations.
 8         A.   Yes.
 9         Q.   Do you -- do you treat people who have been
10    medevaced from Escravos, Nigeria?
11         A.   Yes.
12         Q.   How often do you treat people who have been
13    medevaced on an emergency basis from Escravos, Nigeria?
14         A.   Putting specific number is difficult because
15    not all cases are medevaced.  Many cases are, based
16    on --
17              THE COURT REPORTER:  Based --
18              THE WITNESS:  Expats advised.  Based on expat
19    advised.
20    BY MS. FLECHSIG:
21         Q.   Okay.  Can you give me your best estimate of
22    how often on average you treat someone who has been
23    evacuated from Escravos on an emergency basis?  Just
24    approximately.
25         A.   That varies.  In a year -- it's -- it's quite
```

**EXHIBIT 14-8**

Dr. Victor Adeyeye                                          November 15, 2024

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                        ---o0o---

 4   MARK SNOOKAL, an individual,    )
                  Plaintiff,          )
 5   vs.                              )  Case No.
                                      )  2:23-cv-6302-HDV-AJR
 6   CHEVRON USA, INC., a California  )
     Corporation, and DOES 1 through  )
 7   10, inclusive,                   )
                  Defendants.         )
 8   _____)

 9                REPORTER'S CERTIFICATION
                   ORAL DEPOSITION OF
10                  DR. VICTOR ADEYEYE
                  Volume 1, Pages 1 - 34
11               Friday, November 15, 2024

12           I, RENÉE M. BENCICH, Certified Shorthand
     Reporter in and for the State of California, hereby
13   certify to the following:
             That the witness, DR. VICTOR ADEYEYE, was duly
14   sworn by the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
15   the witness;
             I further certify that pursuant to FRCP Rule
16   30(e)(1) that the signature of the deponent:
             (XX) was requested by the deponent or a party
17   before the completion of the deposition and returned
     within 30 days from date of receipt of the transcript.
18   If returned, the attached Changes and Signature Page
     contains any changes and the reasons therefor;
19           (  ) was not requested by the deponent or a
     party before the completion of the deposition.
20           I further certify that I am neither attorney
     nor counsel for, related to, nor employed by any of the
21   parties to the action in which this testimony was taken.
             Further, I am not a relative or employee of any
22   attorney of record in this cause, nor do I have a
     financial interest in the action.
23           Subscribed and sworn to on this the 1st day of
     December, 2024.
24                              _____
                                RENÉE M. BENCICH, CSR, RPR
25                              California License No. 11946
```

**EXHIBIT 14-9**

# EXHIBIT 15

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4   MARK SNOOKAL, an individual,    )
                                     )
 5                                   )
                  Plaintiff,         )
 6                                   )
                                     )
 7        vs.                        )  CASE No.
                                     )  2:23-cv-6302
 8                                   )  HDV-AJR
     CHEVRON USA, INC., a California )
 9   Corporation and DOES 1 through  )
     10, inclusive,                  )
10                                   )
                                     )
11                Defendants.        )
     _____)
12

13

14

15       Videotaped Remote Deposition via Zoom videoconference

16   of SHAHID HAMEED KHAN, M.D., taken on behalf of Defendant

17   Chevron USA, Inc., at Culver City, California, commencing

18   at 2:06 p.m., Monday, February 10, 2025, before Marivon H.

19   Christine, CSR No. 3735.

20

21

22

23

24

25
```

**EXHIBIT 15-1**

```
 1    APPEARANCES OF COUNSEL:

 2


 3       For the Plaintiff:

 4           ALLRED, MAROKO & GOLDBERG
             BY:  OLIVIA FLECHSIG, ESQ.
 5           6300 Wilshire Boulevard
             Suite 1500
 6           Los Angeles, California  90048
             (323) 653-6530
 7           oflechsig@amglaw.com

 8
         For the Defendant:
 9
             SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
10           BY:  TRACEY A. KENNEDY, ESQ.
             350 South Grand Avenue
11           40th Floor
             Los Angeles, California  90071
12           (213) 620-1780
             tkennedy@sheppardmullin.com
13


14    ALSO PRESENT:

15
             Blake Jones, Videographer
16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 15-2**

```
1                          I N D E X

2

3    DEPONENT                  EXAMINED BY              PAGE

4    SHAHID HAMEED KHAN, M.D.   MS. KENNEDY              5

5                                                       42

6                              MS. FLECHSIG            25

7

8

9    EXHIBITS FOR IDENTIFICATION:

10   1    Kaiser Medical Records, Mark Snookal,         12
          April 19, 2019, Bates No. Snookal 641 - 643

11
     2    Note, dated July 29, 2019, Bates             18
12        No. Snookal 665

13   3    E-mail between Steven H. Khan and Scott      20
          Levy, dated August 23, 2019, Bates
14        No. Snookal 644

15   4    Kaiser Medical Records, Bates                34
          No. Snookal 779 - 788
16
     5    Kaiser Medical Records, Bates                37
17        No. Snookal 789 - 806

18   6    E-mail Communication re Rotational Work      40
          in Nigeria, Bates No. Snookal 01284
19

20

21

22

23

24

25
```

**EXHIBIT 15-3**

1   risk than average.  Does that make sense?

2       Q    Yes.  Thank you, Dr. Khan.

3           Quick question.  You write that "has not shown

4   any growth for three years."  Is there a reason you

5   selected three years as opposed to four or five or even    02:32

6   one year?

7       A    That's just based on the years of CT scans, which

8   are between 2016 and 2019, so I just subtracted those and

9   came up with three.

10      Q    In the second or third to last line of the e-mail    02:33

11  you write, "In summary, Mr. MS's risk of serious

12  complications related to his thoracic aortic aneurysm is

13  low and likely less than 2 percent per year."

14          In layman's terms, what does that mean?

15      A    Well, again, he's demonstrated that the aneurysm    02:33

16  is not growing over a three-year period, and so his risk

17  of it starting to expand suddenly seems very low and less

18  than average because he's demonstrated a less-than-average

19  rate of growth over the last three years we've done CTs on

20  him.                                                         02:33

21      Q    In your experience if someone like Mr. Snookal

22  had -- I guess, not had much growth or no growth at all in

23  his thoracic aortic aneurysm, again, from a medical

24  perspective does that ever change over time?

25      A    Yes, it certainly can.  So he would need once a     02:34

1    year to come back and have a CT scan done, a CAT scan of

2    his aorta.  So we would continue to follow with an annual

3    CAT scan.

4        Q    And why is it that individuals like Mr. Snookal,

5    why do they need an annual CAT scan?                      02:34

6        A    Again, just to check to see if it's getting any

7    bigger.

8        Q    What are some of the causes that could cause an

9    aortic -- strike that.

10       What are some of the causes that would increase a    02:34

11   thoracic aortic aneurysm?  What causes it to grow, so to

12   speak?

13       A    Well, one of the factors would be high blood

14   pressure.  If his blood pressure was significantly

15   elevated, then that would be a concern.  You want to make  02:35

16   sure his blood pressure is well-controlled.

17       Q    Any other causes that you can think of?

18       A    I think that would be the main one, yeah.

19       Q    All right.  Thank you.

20       Dr. Khan, do you have any recollection as to when     02:35

21   the last time you had any interaction was with

22   Mr. Snookal?

23       A    I do not, no.

24       MS. KENNEDY:  I think I'm just about done.  Let

25   me see if I can track down the other document.  Let's go   02:35

```
 1      Q    During the 35 years of general cardiology

 2   practice, as well as the transplant cardiology that you

 3   also spent time on, how many people with dilated aortic

 4   root did you treat?

 5      A    I don't know.  But the early part of my career at      02:51

 6   Cedars, I think for seven-ish years, maybe, I worked in

 7   the cardiac surgery intensive care unit, so we had a fair

 8   number of people with aortic aneurysms, you know, before

 9   and after surgery.  We took care of them there.

10      Q    Let me ask it in a more answerable way.               02:52

11           Do you know on average how many people you saw

12   per year with a dilated aortic root, if you just had to

13   give me your best estimate?

14      A    I mean, I would just be making a random wild

15   guess.  I don't know.                                         02:52

16      Q    Do you know if it was less than 10 per year on

17   average, more than 10 per year on average?

18      A    I would guess it was probably 15 -- between 10

19   and 20, but again, kind of a random guess there.

20      Q    Okay.  The patients with dilated aortic root you     02:52

21   saw; correct?

22      A    Yeah.  Yeah.

23      Q    I want to follow up on some of the questions that

24   Ms. Kennedy was asking.  So you said that one of the

25   reasons why a thoracic aortic aneurysm would increase in     02:53
```

```
1   size is high blood pressure; right?

2        A    Yeah.  I mean, if it was uncontrolled.  So that's

3   why I said you'd have to follow it closely to make sure it

4   was controlled recently.

5        Q    How do you control blood pressure?  How does that    02:53

6   work?

7        A    Yeah.  Primarily through medicines, some

8   lifestyle things, low-salt diet, you know.  Primarily

9   through medicines.

10       Q    Okay.  Any other lifestyle things other than      02:54

11  low-salt diet?

12       A    Well, they shouldn't do strenuous isometric

13  exertion, like, lifting weights.  That could be

14  contraindicated to lift heavy weights.  You know, general

15  cardio kind of exercise is okay to keep -- walking on a     02:54

16  treadmill, as I recall.  So cardio exercise in general is

17  okay, but isometric kind of exercise generally is frowned

18  on, especially very heavy lifting.

19       Q    How heavy is heavy usually, just so I have a

20  sense of, you know, sort of what that means?               02:54

21       A    I mean, I don't think there is a number that we

22  think about.  I think it's something that would be a

23  strenuous amount to lift, and that's going to be different

24  for different people.  You know, for some people that

25  might be 30 pounds.  For some it might be 50 pounds.  But   02:55
```

**EXHIBIT 15-7**

1    it depends on the person.

2        Q    Okay.  Understood.  And in terms of medication

3    used to control high blood pressure, would Mr. Snookal be

4    on one or more of those medications?

5        A    Yes.  He was on two:  amlodipine and losartan.    02:55

6        Q    Understood.  So no other medications would have

7    been needed to control Mr. Snookal's blood pressure?

8        A    His blood pressure looked okay there from what I

9    saw, but, yeah, he's apparently doing well.  There were, I

10   think, two medicines that were blacked out so I don't      02:55

11   know, but from what I saw there were two medicines he was

12   on for blood pressure.

13       Q    Okay.  For a patient such as Mr. Snookal where

14   the recommendation is to get a CT, an echocardiogram once

15   per year, why is it that he only needs to have the testing  02:56

16   done once per year and not more frequently?

17       A    It depends on the size of the aneurysm and the

18   rate of growth that you're seeing.  So his had been stable

19   over the three years that we had checked him.

20            So once a year was adequate for him, and that's    02:56

21   something he could have done anywhere.  And it would be

22   ideal for him to come back to the United States and have

23   it done at the same place, but he could have it done

24   anywhere.

25       Q    Okay.  I want to quickly direct you back to        02:57

EXHIBIT 15-8

1    that's the question.

2        Q    Yeah.  I guess, does it make you think that you

3    at least must have known that it was in a rural or remote

4    area of Nigeria?

5            MS. KENNEDY:  I'll object to the form of the        02:59

6    question.

7            THE WITNESS:  I mean, it does look like I

8    understood that this was a rural or remote location.

9    BY MS. FLECHSIG:

10       Q    Okay.  I wanted to ask, I guess to follow up on    02:59

11   that, why was it in your opinion that he could perform a

12   job in a rural or remote area of Nigeria?

13       A    Well, a couple of things.  One is that his

14   aneurysm appeared stable.  Second, his blood pressure

15   appeared under reasonably good control; and third, the     03:00

16   follow-up for this kind of disease is very intermittent,

17   very periodic.

18           Once a year come back and have a CT scan done.

19   It's not an elaborate follow-up, and it's not complex or

20   difficult to follow.  I mean, it's a very quick, simple    03:01

21   visit.  You just have him come in.  Check the results of

22   the CT, check the blood pressure, chat a little bit, and

23   it's not a complicated disease process.

24           If it was to get bigger, then the follow-up would

25   be more intense, but at the level he's at it's not         03:01

**EXHIBIT 15-9**

1    particularly intense.  It's a straightforward type of

2    follow-up.

3        Q    Yeah.  In terms of detecting whether the size has

4    changed, that's the purpose of the CT, the annual CT scan?

5        A    Yeah.                                                03:01

6        Q    I wanted to ask you -- you and Ms. Kennedy

7    discussed a little bit a citation that I've highlighted on

8    the screen here.  I think it's Annals of Thoracic Surgery,

9    2002, and there's a volume and page number.

10       A    Um-hum.                                              03:02

11       Q    You said you recall actually looking that study

12   up in order to, you know, draft this e-mail; is that

13   correct?

14       A    Yeah.

15       Q    Okay.  What did you do to locate that study?       03:02

16       A    Typically what I do is do a search on MedMine or

17   PubMed, which is kind of a federal database for searching

18   for medical questions.  And then you get a list of papers

19   that are relevant, and then I look through them and find a

20   table that listed thoracic aneurysm size and the risks     03:02

21   based on that.

22            It could also come from the guidelines because --

23   I'm not actually sure if there were guidelines at this

24   point for aortic aneurysm management, but I know there

25   currently are guidelines for follow-up, but this is a      03:03

```
 1  while ago, yeah.

 2     Q    Okay.  Just to sort of put a point on this, you

 3  put in this highlighted line here, "In summary, Mr. MS's

 4  risk of serious complications related to his thoracic

 5  aortic aneurysm is low and likely less than 2 percent per    03:03

 6  year."

 7         Why did you conclude less than 2 percent or the

 8  risk of serious complication was likely less than 2

 9  percent per year?

10     A    Yeah.  Basically, what I mentioned before, that    03:04

11  we had been following the aneurysm over the last three

12  years, and the aneurysm had not grown or enlarged at all.

13  The average person, as I mentioned, would grow about 0.1

14  centimeters per year, but the fact that his had not grown

15  meant or implied that the risk of enlarging in any given    03:04

16  year was lower than that 0.1 percent, so the risk of a

17  problem with the aneurysm would likely be less than that

18  reported in literature.

19     Q    Okay.  Okay.  Thank you for going through that.

20         So do you have any recollection speaking in    03:04

21  realtime with anyone from Chevron about Mr. Snookal?

22     A    No, I don't.  I don't remember if I spoke to

23  someone.

24     Q    Okay.  Do you remember whether you would have

25  been willing to speak to someone had you connected in    03:05
```

**EXHIBIT 15-11**

1    realtime over the phone or the internet?

2        A    Yes, sure.

3        Q    Would you have been willing to provide additional

4    follow-up information had they asked for it after this

5    e-mail?                                                          03:05

6        A    Yeah.  Certainly.

7            MS. FLECHSIG:  I'm going to go through an

8    additional exhibit.  I'm going to mark as Exhibit 4 what's

9    been produced as Snookal 00779 through Snookal 00788.

10            (The document referenced was marked                    03:07

11            as Exhibit 4 for identification and is

12            attached hereto.)

13            MS. KENNEDY:  You said 779 through 788?

14            MS. FLECHSIG:  788, yeah, I think that's right.

15            MS. KENNEDY:  I'm sorry.  799 through 788?            03:07

16            MS. FLECHSIG:  Excuse me, 779.

17            MS. KENNEDY:  Okay.

18            MS. FLECHSIG:  779, apologies, through -- yeah,

19    actually, okay.  Hold on.  I think I found the better

20    redacted version.  Let's start with 779 through --           03:07

21            MS. KENNEDY:  That's dated April 9, 2019.

22    BY MS. FLECHSIG:

23        Q    I think that's the same, but with fewer

24    redactions.  I apologize, but I want to show you this, as

25    well, Dr. Khan.                                                03:08

1    Snookal 01284.

2         (The document referenced was marked

3         as Exhibit 6 for identification and is

4         attached hereto.)

5    BY MS. FLECHSIG:

6    Q    And it's just one-page, Dr. Khan.  I'm going to

7    give you a second to read through it.

8    A    Um-hum.  Yes.

9    Q    Have you seen this document before?

10   A    I'm sure I did.  I mean, I responded to it.          03:20

11   Q    It looks like these are messages that you

12   exchanged with Mr. Snookal via the Kaiser Permanente

13   communication platform; is that correct?

14   A    Right.  I mean, Kaiser patients can e-mail their

15   doctor directly and we can respond back directly.        03:20

16   Q    Okay.  So in this e-mail that Mark Snookal sent

17   you 7-24-2019, does this look like a true and correct copy

18   that you received?

19   A    Yeah.

20   Q    Okay.  In it you'll see he says, "I was a          03:21

21   successful candidate for a position working in Nigeria on

22   a 28-day rotational assignment (28 days on in Nigeria and

23   28 days off in the US)."

24        With this rotational assignment where he's

25   working 28 days in Nigeria and 28 days off in the United  03:21

**EXHIBIT 15-13**

1  States, the fact that he's working 28 days on at a time,

2  would that impact your analysis of Mr. Snookal's ability

3  to complete the job duties for 28 days at a time?

4      MS. KENNEDY:  Objection.  Lacks foundation as

5  phrased, but you can respond, Dr. Khan.                    03:22

6      THE WITNESS:  I don't think that would be

7  contraindicated based on his medical condition.

8  BY MS. FLECHSIG:

9      Q    And why not?

10     A    I mean, he basically just needs to get a CT once   03:22

11  a year and then have his blood pressure checked, but I

12  mean, his blood pressure is under control.  And most

13  people with high blood pressure, you know, they're checked

14  a couple times a year, but, you know, this is well within

15  acceptable parameters for checking somebody's aortic       03:22

16  aneurysm and blood pressure when he's back here roughly

17  once a month.

18     Q    Can people also check their blood pressure

19  themselves at home?

20     A    Yeah, absolutely.  Yeah, we encourage that now.    03:22

21  That's -- we encourage people to get home blood pressure

22  cuffs, and Kaiser hands them out or sells them to patients

23  for the patients to do that too.

24     MS. FLECHSIG:  Okay.  I think that's all I have

25  for you, Dr. Khan.  I think that's it.  Thank you so much   03:23

**EXHIBIT 15-14**

```
 1                      CERTIFICATE

 2                          OF

 3              CERTIFIED SHORTHAND REPORTER

 4

 5          The undersigned Certified Shorthand Reporter

 6    of the State of California does hereby certify:

 7          That the foregoing proceeding was taken

 8    remotely before me at the time and place therein set

 9    forth, at which time the witness was duly sworn by me;

10          That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me and were thereafter

13    transcribed, said transcript being a true and correct

14    copy of my shorthand notes thereof;

15          I hereby certify that I am not interested in

16    the event of the action.

17          IN WITNESS WHEREOF, I have subscribed my name

18    this date: February 17, 2025.

19

20

21          MARIVON H. CHRISTINE, CSR
            Certificate No. 3735

22

23

24

25
```

**EXHIBIT 15-15**

1

2

3

4      Marivon H. Christine , Certified Shorthand Reporter,

5    CSR No.   3735, hereby certify:

6      The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12   Dated:   February 24, 2025
             _____

13

14

15

16                    _____

17

18

19

20

21

22

23

24

25

**EXHIBIT 15-16**