# EXHIBIT 1



## Assignment Offer

**To**: Mark Snookal

Contingent upon obtaining work/residence permit clearances where applicable and Company medical suitability for assignment where required by law (and/or related to your job and consistent with business necessity), you are offered the following assignment:

**Job Title**: EGTL Reliability Engineering Manager
**Salary Grade**: 22
**Position Type**: Career Ladder
**Base Salary**: No Change
**Competitive Objective**: No Change
**Location**: Escravos, Nigeria
**Anticipated Assignment Start Date**: July 1, 2019
**Anticipated Length**: 3-4 Years
**Offer Type**: Assignment Offer
**Assignment Subtype**: Resident greater than 24 months (Intl)
**Host Organization**: Africa / Latin America
**SBU**: Nigeria Mid-Africa
**Function**: Facilities Engineering
**Sponsor**: Vang, Bao - BAVU
**Supervisor(s)**: OLUWASIJIBOMI OKEOWO
**PDR(s)**: Omomehin, Andrew-AAOM
**HRBP**: NWAMAKA ANITA AJAYI

All details regarding your new expatriate work location and expatriate benefits will be provided to you directly from the position owner, or in some cases, through authorized HR contacts. In the interim, you can access the Expatriate Resources website to learn more about expatriate assignments. If you have specific questions regarding your expatriate assignment, please contact your Global Mobility Specialist/Expatriate Counselor. You can find your Global Mobility Specialist/Expatriate Counselor by searching the Counselor Finder which is also located on the Expatriate Resources website.

The attached details cover the compensation, relocation and other policies and programs that currently apply to this position and location (where applicable). Where applicable, it is important to complete specific pre-assignment requirements (e.g. medical, orientations, etc., see attached letter) of your assignment. If you fail to fulfill these requirements within the identified time frame, you will be deemed to have declined the job offer. Though the Company expects that your assignment will continue as described, special circumstances or a change in business conditions or policies and programs may result in a modification of the assignment or its duration, including elimination of the assignment (where applicable) at the sole discretion of the Company and/or Receiving Organization. Nothing in this Offer changes the "at-will" status of your

**EXHIBIT 1-1**                                    SNOOKAL-00647

employment.

Please advise your HRBP (for domestic assignments) of your effective transfer date. For international assignments, please advise your Expatriate Assignee Counselor of your departure date (date you board the plane to start your assignment), since that becomes your actual assignment effective date and begins your over-base allowance and premium. I accept this assignment.

Signed: _____     Date: _____
                        Employee

I do not accept this assignment. I understand that the Company might not place me in another assignment and that I may be subject to termination of employment.

Signed: _____     Date: _____
                        Employee

**The completed form should be emailed to the Sponsor Group at SPGRP@chevron.com within one week of receiving this offer. If** we do not receive an acceptance within the deadline specified on this note, you will be deemed to have declined the job offer. Note: Any hand written changes will not be honored.  Please contact your Sponsor to discuss corrections or revisions prior to signing.

**Special Instructions (if you are US-payroll, please disregard the following sections):**

**For Non US-Payroll Employees Only:**
U.S. Export Controls/Trade Sanctions Compliance: U.S. export controls and trade sanctions can restrict the Company's ability to share certain technologies with employees who are non U.S. nationals (i.e. those who are not U.S. citizens, those who are not permanent residents, and those who do not enjoy protected individual status such as refugees or asylees). If our understanding of your immigration status is incorrect, please let us know immediately.

If your employment is subject to U.S. export license and/or trade sanction authorization requirements, your employment may not commence until Chevron receives the required license and/or authorization from the U.S. government; obtains approval of your work visa; and receives Company medical suitability for assignment (where required). While Chevron has been successful in obtaining U.S. export licenses and/or trade sanctions authorizations in the past, Chevron cannot guarantee the issuance of an export license and/or trade sanction authorization request. Similarly, Chevron cannot make any guarantee as to the timing for the U.S. government's processing of the export license and/or trade authorization application. Chevron reserves the right to modify your employment location, duties and assignments, if such modification is required or necessitated by the terms of any U.S. export license and/or trade sanctions

**EXHIBIT 1-2**          SNOOKAL-00648

authorization. Chevron also reserves the right to rescind this offer of employment if a required export license and/or trade sanction authorization is not granted.

**For UK-Payroll Employees Only: Mobility Clause**
The demands of the Company's business and organization make it necessary for its employees to be able to transfer from place to place. It is therefore a condition of your employment that:

> (1) at any time during your employment with the Company you may be required, at the Company's absolute discretion, to transfer to any of the locations in the UK in which Chevron is from time to time located, either on a temporary or a permanent basis; and

> (2) at any time when you are on temporary expatriate assignment outside the UK, and regardless of the originally agreed or intended length of that particular assignment, you may be required, at the Company's absolute discretion, either to repatriate to the UK or to transfer to any of the locations in which Chevron is from time to time located (which you accept and acknowledge may be another location outside the UK).

In either instance, you will be given reasonable notice of any such requirement and where a permanent transfer within, or a repatriation to, UK is required, the Company's relocation and other applicable policies may apply, as appropriate.

**If I agree to the mobility clause, what will this mean for me in the future?**
You will continue to be considered for positions both in your home country and on a global basis in accordance with Chevron's established policies and procedures and in line with your career aspirations, skills and experience.

**Will the Company use this in future to transfer me to a hardship location?**
This is not the driver for introducing such a clause. The business wishes to be able to place the right employees, into the right jobs, at the right time, regardless of where those jobs are located. In operating the mobility clause, the Company will always act reasonably and will take into consideration personal preferences where possible.

**If I agree to the mobility clause, what would happen in the future if my mobility status changed and I was unwilling or unable (for example, for personal or health reasons) to move to a certain country?**
If you advise the Company that you are no longer mobile, at the end of your existing assignment you will be repatriated to the UK and suitable alternative employment will be sought. If no suitable role is identified, you will be at risk of redundancy. If notice of redundancy is served, redundancy terms at that time will apply.

**If I don't accept the mobility clause, what will happen to me?**
If you do not wish to accept the mobility clause, the job offer will be withdrawn and you will be repatriated to the UK. You will enter a period of redeployment and a search for suitable alternative employment will be undertaken. If no suitable role is identified, you will be at risk of redundancy. If notice of redundancy is served, redundancy terms at that time will apply.

**What if I am willing to agree to the clause but I don't agree with the wording of it? Can I make changes to the clause and still accept the offer?**
No, no changes to the clause will be agreed by the Company and you will be deemed to have declined the offer unless you agree to the mobility clause as it is presented with

**EXHIBIT 1-3**                                   SNOOKAL-00649

your offer.

**EXHIBIT 1-4**    SNOOKAL-00650

# EXHIBIT 2

## KAISER PERMANENTE

| | |
|---|---|
| 1526 EDGEMONT MEDICAL OFFICES  U<br>1526 N EDGEMONT ST<br>LOS ANGELES CA 90027-5260<br>SCAL HIM ROI AMB LMR | Snookal, Mark J<br>MRN: 000004554567, DOB: 4/13/1972, Sex: M<br>Visit date: 4/19/2019 |

**Lab - All Orders and Results (continued)**

**Testing Performed By (continued)**

| Lab - Abbreviation | Name | Director | Address | Valid Date Range |
|---|---|---|---|---|
| **240 - 956** | SHERMAN WAY REGIONAL LABORATORY | Steven McLaren, DO | 11668 Sherman Way NORTH HOLLYWOOD CA 91605 | 03/28/19 2317 - Present |
| **1225 - 002** | KFH, LAMC HOSPITAL LABORATORY | Hedyeh Shafi, MD | 4867 Sunset Blvd. Los Angeles CA 90027 | 03/31/16 0248 - Present |

**Final Spectacle Rx**

Click to see and print Final Spectacle Rx

**Final CL Rx**

Click to see and print Final Contact Lens Rx

Audit Trail for Eye Care Forms

**Medications the Patient Reported Taking**

amLODIPine (NORVASC) 10 mg Oral Tab (Taking)

Losartan (COZAAR) 100 mg Oral Tab (Taking/Discontinued)

Betamethasone Dipropionate Aug (DIPROLENE AF) 0.05 % Top Crea (Taking/Expired)

**Medications Discontinued During This Encounter**

| | Reason for Discontinue |
|---|---|
| FLONASE ALLERGY RELIEF 50 mcg/actuation Nasl SpSn | |
| amLODIPine (NORVASC) 10 mg Oral Tab | Continue Therapy |

**Prescriptions Ordered This Encounter**

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **amLODIPine (NORVASC) 10 mg Oral Tab**<br>Sig: Take 1 tablet by mouth daily<br>Class: Fill Later<br>Route: Oral | 100 | 1/5 | 4/19/2019 | 4/18/2021 |

**Social Documentation as of 4/19/2019**

No social documentation on file.

## Patient Instructions

**Return for Care:** Return in about 1 year (around 4/19/2020).

**Follow-up and Disposition**

Return in about 1 year (around 4/19/2020).

**Follow-up and Disposition History**

04/19/2019 1626 - Shahid Hameed (M.D.) Khan, M.D.

| Dispositions: | Return in about 1 year (around 4/19/2020). |
|---|---|

**All Flowsheet Data (all recorded)**

**Encounter Vitals**

| Row Name | 04/19/19 1553 |
|---|---|
| Enc Vitals | |
| BP | 126/59 -TC |
| Pulse | 72 Patient has frequent PVCs which are not |

**EXHIBIT 2-1**                    SNOOKAL-00801

**KAISER PERMANENTE**

1526 EDGEMONT MEDICAL OFFICES  U
1526 N EDGEMONT ST
LOS ANGELES CA 90027-5260
SCAL HIM ROI AMB LMR

Snookal, Mark J
MRN: 000004554567, DOB: 4/13/1972, Sex: M
Visit date: 4/19/2019

**All Flowsheet Data (all recorded) (continued)**

**Encounter Vitals (continued)**

| Row Name | 04/19/19 1553 |
|---|---|
| | counted by BP cuff  [1]  -SK |
| Wt (gms) | 254 lb 3.1 oz (115.3 kg) -TC |
| Height | 6' (1.829 m)  -TC |
| Pain Score | 0 (0-10)  -TC |

**Custom Formula Data**

| Row Name | 04/19/19 1553 |
|---|---|
| Vitals | |
| Pct Wt Change | 0 %  -TC |
| OTHER | |
| Birth Weight | 0  -TC |
| % Change from Birth Weight | 1153029010.25  -TC |
| Weight change from previous (gm) | 0  -TC |
| Ideal Body Weight (calculated) | 73.86  -TC |
| BSA (Last Ht) | 0  -TC |
| BSA (System Calculated) | 2.42  -TC |
| Body Mass Index | 28.24  -TC |
| Body Mass Index | 34  -TC |
| BSA (Dubois) | 2.357  -TC |
| Mean Arterial Pressure (MAP) | 81  -TC |

**Audit Information**

| Ref # | Row Name | Time Taken | Time Recorded | Value | User |
|---|---|---|---|---|---|
| 1 | Pulse | 04/19/19 1553 | 04/19/19 1634 | 72 Patient has frequent PVCs which are not counted by BP cuff | SK |
| 1 | Pulse | 04/19/19 1553 | 04/19/19 1555 | (!) 40 | TC |

**User Key**                                                          (r) = Recorded By, (t) = Taken By, (c) = Cosigned By

| Initials | Name | Effective Dates | Provider Type | Discipline |
|---|---|---|---|---|
| TC | ███████████ (M.A.), M.A. | 12/02/18 - 10/30/19 | MEDICAL ASSISTANT | — |
| SK | ███████████ (M.D.), M.D. | 12/02/18 - 12/07/19 | Physician | — |

**EXHIBIT 2-2**                    SNOOKAL-00802

**KAISER PERMANENTE**

1526 EDGEMONT MEDICAL OFFICES  U
1526 N EDGEMONT ST
LOS ANGELES CA 90027-5260
SCAL HIM ROI AMB LMR

Snookal, Mark J
MRN: 000004554567, DOB: 4/13/1972, Sex: M
Visit date: 4/19/2019

---

**Encounter-Level Documents - 04/19/2019:**



**EXHIBIT 2-3**          **SNOOKAL-00803**

**KAISER PERMANENTE**
1526 EDGEMONT MEDICAL OFFICES  U
1526 N EDGEMONT ST
LOS ANGELES CA 90027-5260
SCAL HIM ROI AMB LMR

Snookal, Mark J
MRN: 000004554567, DOB: 4/13/1972, Sex: M
Visit date: 4/19/2019

---

**Encounter-Level Documents - 04/19/2019: (continued)**

New Orders (continued)

Normal Orders This Visit
**REFERRAL CARDIOLOGY [200267 Custom]**

Common Medication Direction Abbreviations
PO = Orally, QD = Once/day, BID = Twice/day, TID = 3x/day, QID = 4x/day, PRN = as needed
QHS = Every night at bedtime, AC = Before meals, PC = After meals, c = With, s = Without

Allergies as of 4/19/2019                    Reviewed On: 4/19/2019 By ████████ (M A.), M.A.
No Known Allergies

# General Information

**Protect yourself from the flu. Get vaccinated.**

The flu is a serious, contagious illness caused by influenza viruses. Anyone can get the flu. It can cause mild to severe illness. The best way to prevent the flu is by getting a flu shot each year. The CDC and Kaiser Permanente recommend everyone 6 months and older get a flu shot every year.

Flu shot clinics open in September. No appointment is necessary.

Flu shots are available at no charge to members at Kaiser Permanente medical facilities.

For information about hours, times, and locations, please visit kp.org/flu or call
1-866-70-NOFLU (1-866-706-6358).

Adults should participate in at least 30 minutes, and children at least 60 minutes, of moderate exercise (such as brisk walking) for five or more days each week, unless instructed otherwise by your provider. For more information on the health benefits of walking please refer to http://www.everybodywalk.org. THRIVE!

Register at www.kp.org to email your physician, renew prescriptions, request appointments, learn more about your personal health, or obtain tips for healthy living!

Save money and time! Get your refills for home delivery at www.kp.org/refill

Mark J. Snookal (MRN: 000004554567) • Printed at 4/19/19  4:26 PM              Page 2 of 2  Epic
This is confidential information. Do not throw away in a Kaiser Permanente trash can.

---

**Order-Level Documents:**
There are no order-level documents.

{\"\EpicData xml <epicdata format="IDMPainter"><DocumentsDone>1</DocumentsDone></epicdata> }

**Encounter-Level E-Signatures:**
No documentation.

**EXHIBIT 2-4**                    SNOOKAL-00804

**KAISER PERMANENTE**    1526 EDGEMONT MEDICAL    Snookal, Mark J
OFFICES  U    MRN: 000004554567, DOB: 4/13/1972, Sex: M
1526 N EDGEMONT ST    Visit date: 4/19/2019
LOS ANGELES CA 90027-
5260
SCAL HIM ROI AMB LMR

**Encounter-Level E-Signatures: (continued)**

**EXHIBIT 2-5**    SNOOKAL-00805

**KAISER PERMANENTE**    1526 EDGEMONT MEDICAL    Snookal, Mark J
OFFICES  U    MRN: 000004554567, DOB: 4/13/1972, Sex: M
1526 N EDGEMONT ST    Visit date: 4/19/2019
LOS ANGELES CA 90027-
5260
SCAL HIM ROI AMB LMR

**END OF ENCOUNTER**

**EXHIBIT 2-6**    SNOOKAL-00806

# EXHIBIT 3

 **KAISER PERMANENTE.**

7/29/2019                              MR#000004554567


Re: Mark J Snookal
2200 Maricopa Drive
Los Angeles CA 90065


Dear Sirs,

Mr. Snookal is under my care for his heart condition. It is safe for him to work in
Nigeria with his heart condition. His condition is under good control and no
special treatments are needed.

If you have any questions, please feel free to contact me at the number below.


Sincerely,




Electronically signed by,

S. KHAN MD
Attending Cardiologist, Division of Cardiology, SCPMG
Clinical Associate Professor, UCLA School of Medicine
Ph: 323-783-4585
7/29/2019
10:14 AM




**EXHIBIT 3**          SNOOKAL-00665

# EXHIBIT 4



Chevron

# Expatriate Exam Recommendations GO-1769

**Examiner: When completed, please forward to the Chevron regional medical manager office checked below:**

☐ Americas: Chevron Health and Medical, P.O. Box 6024, San Ramon, CA , USA 94583
☐ Asia / Pacific Region: Chevron International Pte LTD, Health and Medical, Chevron House, 30 Raffles Place #21-01, Singapore 048622
☒ Europe / Eurasia / Middle East / Africa: Chevron Health and Medical 1 Westferry Circus, Canary Wharf, London, UK, E14 4HA
☐ Chevron Shipping Medical Manager, 6101 Bollinger Canyon Road, BR1, Room 4646, San Ramon, CA, USA  94583
☐ Other Chevron Medical Facility: _____

## Part A –Examinee Information

For medical confidentiality, please complete one form per examinee. If the examinee is a dependent, please complete Part B below

| Last Name | First  Name | MI | CAI | Birth Date (mm/dd/yyyy) | ☒ Male | Examinee ID |
|---|---|---|---|---|---|---|
| SNOOKAL | MARK | | MVZM | 04 - 13 – 1972 | ☐ Female | |

| Job Title | Operating Company | Current Work Location | Destination Location |
|---|---|---|---|
| IEA RELIABILITY TEAM LEAD | | EL SEGUNDO, USA | ESCRAVOS, NIGERIA |

## Part B:  Chevron Employee Information

If the examinee is a dependent, please complete this section with the Chevron employee information.

| Last Name | First  Name | CAI | Chevron Employee ID |
|---|---|---|---|
| | | | |

| Job Title | Operating Company | Current Work Location | Destination Location |
|---|---|---|---|
| | | | |

Number of dependents in Host Location: _____

## Part C – OpCo / Business Unit Contact – Human Resources, Sponsor (if applicable), other.

| Name | Phone No. | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

| Contact Address | City | State/Province | Postal/Zip Code | Country |
|---|---|---|---|---|
| | | | | |

## Part D – Examination - *The recommendation below is based on a review of the medical history and physical examination.*

Exam Type:    INITIAL EXPAT EXAM (ROTATIONAL)

Date of Exam (mm/dd/yyyy):   07/24/2019      Exam Location:   MEL DEL RAY

State/Province:   CALIFORNIA          Country:   USA

**Disposition**
☒ *Employee*
    ☐ FIT for Duty
    ☒ NOT FIT for Duty
    Describe:     REMOTE LOCATION. CAN BE CLEARED FOR ASSIGNMENT IN LAGOS
    ☐ FIT for Duty with Limitation(s) (list below and provide estimated duration of limitations)
    Describe: _____

    ☐ Failed to comply with requested evaluations
    Describe: _____

    Exam Periodicity: ☐ One Year  ☐ Two Years  ☐ Other _____
☐ *Dependents*
    ☐ Cleared
    ☐ Not Cleared
    Describe: _____

    ☐ Cleared with Limitation(s) (list below and provide estimated duration of limitations)
    Describe: _____

    ☐ Failed to comply with requested evaluations
    Describe: _____

    Exam Periodicity: ☐ One Year  ☐ Two Years  ☐ Other

| Examiner Name (please print) | Signature | Date (mm/dd/yyyy) |
|---|---|---|
| DR. ASEKOMEH ESHIOFE | | 08/15/2019 |

| Address | City | State/Province | Postal/Zip Code | Country |
|---|---|---|---|---|
| CHEVRON HOSPITAL | WARRI | DELTA | | NIGERIA |

GO- 1769 (9-13)

# EXHIBIT 5

**From:** Levy, Scott
**Sent:** 26 August 2019 00:51
**To:** Steven H. Khan <Steven.S.Khan@kp.org>
**Cc:** Mark Snookal <Mark@maygus.com>
**Subject:** Re: [**EXTERNAL**] Patient MS

Dr. Khan,

Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss.

Scott

Sent from my iPad

On Aug 23, 2019, at 10:35 PM, Steven H. Khan <Steven.S.Khan@kp.org > wrote:

Hi Dr. Levy,
I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.

I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this email.

Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.
From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).

Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.
Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.

Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.
For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
Is on an ARB.

In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.
The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.

If you have any further questions, please feel free to email me or call me.

Best regards,

S. Khan, MD
Clinical Associate Professor, UCLA School of Medicine
Heart Failure and Transplant Cardiology, Kaiser Permanente

**EXHIBIT 5-1**          **SNOOKAL-00089**

NOTICE TO RECIPIENT: If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

**EXHIBIT 5-2**          **SNOOKAL-00090**

# EXHIBIT 6

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Friday, September 6, 2019 7:57 AM |
| **To:** | Snookal, Mark |
| **Cc:** | Tse, Thalia; Ruppert, Austin |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

**Andrew Powers**
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria…His [my] condition is under good control, and no special treatment

1

**EXHIBIT 6-1**

CUSA000542

is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.

Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

**EXHIBIT 6-2**

CUSA000543

# EXHIBIT 7

Case 2:23-cv-06302-HDV-AJR    Document 43-11    Filed 03/27/25    Page 24 of 107
Page ID #:1695



**Chevron**



# Physical Requirements and Working Conditions GO-308

This form is a requirement for all jobs. The GO-308 should be completed by a GO-308 Developer that has completed the Chevron training. Review form instructions prior to filling out this form.

☐ This is an 'interim' GO-308 that has not yet been through the complete OE-FFD GO-308 procedure.

## SPECIFIC POSITION INFORMATION

GO-308 Category:   **OFFICE BASED JOBS**

Reporting Unit Summary (e.g. : Chevron Upstream, Downstream & Chemicals):   Upstream

Reporting Unit RollUp (e.g : Africa/Latin America, Manufacturing):   INTERNATNIONAL UPSTREAM

Reporting Unit Employee (e.g. : Southern Africa, Richmond Refinery):   NIGERIA MID -AFRICA UNIT

Location City:   LAGOS / ABUJA / WARRI / ESCRAVOS / ONNE
State/Province:   LAGOS / FCT / DELTA / RIVERS   Country:   NIGERIA

Safety Sensitive ☐      Highly Safety Sensitive ☐      Non–Safety Sensitive ☒

GO-308 Category requires Medical Evaluation:   ☒ Yes   ☐ No
GO-308 Category requires FCE:   ☐ Yes ( attach to GO-308)   ☒ No

## SPECIFIC PHYSICAL REQUIREMENTS (DETAILED)

Frequency:   N = Never   O = Occasionally (1-33% of the day)   F = Frequently (34-66% of the day)   C = Constantly (67-100% of the day)

Dexterity and Coordination: 1 = Extremely High Ability   2= Above Average Ability   3 =Average Ability   4 = Below Average Ability   5 =Negligible Ability

| Physical Demands | | | N | O | F | C |
|---|---|---|---|---|---|---|
| Below Waist Lifting | 13 kg | lb/kg | ☐ | ☒ | ☐ | ☐ |
| Above Waist Lifting | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| One-Hand Carrying | 12kg | lb/kg | ☐ | ☒ | ☐ | ☐ |
| Two-Hand Carrying | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| Pushing-Max Force | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| Pulling-Max Force | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| Forceful Grip | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| Forceful Pinch | 0 | lb/kg | ☒ | ☐ | ☐ | ☐ |
| Sit | | | ☐ | ☐ | ☒ | ☐ |
| Stand | | | ☐ | ☒ | ☐ | ☐ |
| Stoop | | | ☒ | ☐ | ☐ | ☐ |
| Kneel | | | ☒ | ☐ | ☐ | ☐ |
| Squat | | | ☒ | ☐ | ☐ | ☐ |
| Forward Bend - St | | | ☒ | ☐ | ☐ | ☐ |
| Body Twist Static | | | ☒ | ☐ | ☐ | ☐ |
| Back-Lying | | | ☒ | ☐ | ☐ | ☐ |
| Reaching High Level | | | ☒ | ☐ | ☐ | ☐ |
| Reaching Medium Level | | | ☐ | ☒ | ☐ | ☐ |
| Reaching Low Level | | | ☐ | ☒ | ☐ | ☐ |
| Walk | 300m | ft/m | ☐ | ☒ | ☐ | ☐ |
| Climbing-Ladder | | ft/m | ☒ | ☐ | ☐ | ☐ |
| Climbing-Stairs | 12 stairs | ft/m | ☐ | ☒ | ☐ | ☐ |
| Jump | | ft/m | ☒ | ☐ | ☐ | ☐ |
| Body Twist - Repetitive | | | ☒ | ☐ | ☐ | ☐ |
| Throw | | ft/m | ☒ | ☐ | ☐ | ☐ |
| Crawl | | ft/m | ☒ | ☐ | ☐ | ☐ |
| Handling | | | ☐ | ☒ | ☐ | ☐ |
| Fingering | | | ☐ | ☒ | ☐ | ☐ |

### Dexterity and Coordination

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Manual Dexterity | ☐ | ☐ | ☒ | ☐ | ☐ |
| Finger Dexterity | ☐ | ☐ | ☒ | ☐ | ☐ |
| Bi-Lateral Hand Coordination | ☐ | ☐ | ☐ | ☒ | ☐ |
| Eye-Hand-Foot Coordination | ☐ | ☐ | ☐ | ☐ | ☒ |

### Motor and Sensory

| | Required | Not Required |
|---|---|---|
| Balancing | R ☐ | NR ☒ |
| Sense of Touch | R ☐ | NR ☒ |
| Sense of Smell | R ☐ | NR ☒ |
| Speaking Clearly | R ☒ | NR ☐ |
| Hearing-Speech Range | R ☒ | NR ☐ |
| Hearing-All Ranges | R ☐ | NR ☒ |
| Seeing, Reading & Comprehension | R ☒ | NR ☐ |
| Seeing Distant | R ☒ | NR ☐ |
| Seeing Near | R ☒ | NR ☐ |
| Depth Perception | R ☐ | NR ☒ |
| Color Vision | R ☐ | NR ☒ |
| Emergency Evacuation | R ☒ | NR ☐ |
| Swing Rope Test | R ☐ | NR ☒ |

Other   Physically Strenuous Training - N R

Files: Gates, Hogan and Miodus

GO-308 (4.16)
Web Enabled Version

## SECTION - WORKING CONDITIONS

R = Required        NR = Not Required

| | | | | | |
|---|---|---|---|---|---|
| Extreme Cold-Below 32° F/0° C | R ☐ NR ☒ | Problem Solving/Independent Decision Making | R ☒ NR ☐ | | |
| Extreme Heat-Above 100° F/38° C | R ☐ NR ☒ | Multiple Tasks | R ☒ NR ☐ | | |
| Dryness | R ☐ NR ☒ | Travel - Domestic | R ☒ NR ☐ | ☒ Check if > 8 trips/year | |
| Wetness | R ☐ NR ☒ | Travel - International | R ☒ NR ☐ | ☒ Check if > 8 trips/year | |
| Humidity-Above 90% | R ☐ NR ☒ | Overtime | R ☐ NR ☒ | | |
| Confined Spaces | R ☐ NR ☒ | Schedules/Deadlines | R ☒ NR ☐ | | |
| Cramped Qtrs. | R ☐ NR ☒ | Shift Duration (hrs/day)   8/9 hours ☒   10/11 hours ☐   12/13 hours ☒   14 or more ☐ | | | |
| Elevated Heights          ft/m | R ☐ NR ☒ | Shift Schedule      Day ☒      Night ☐   Day and Night ☐   Rotational (define below) ☐ | | | |
| Noise-Over 85 Decibels | R ☐ NR ☒ | Other (Describe)     5/2, 14/14, 28/28 | | | |
| Moving Equipment | R ☐ NR ☒ | Chemicals (List) | | | |
| Vibrating-Rotating Equipment | R ☐ NR ☒ | N/A | | R ☐ NR ☒ |
| Explosives | R ☐ NR ☒ | | | R ☐ NR ☒ |
| Operate Motor Vehicle | R ☐ NR ☒ | | | R ☐ NR ☒ |
| Working Around People/Interacting with Others | R ☒ NR ☐ | | | R ☐ NR ☒ |
| Working Alone | R ☒ NR ☐ | Airborne Contaminants (List) | | | |
| Operate Computer Station | R ☒ NR ☐ | | | R ☐ NR ☒ |
| Operate Office Equipment | R ☐ NR ☒ | | | R ☐ NR ☒ |
| Rapid Working Pace | R ☐ NR ☒ | | | R ☐ NR ☒ |
| Other | | | | | |

## SECTION - PROTECTIVE EQUIPMENT REQUIRED

R = Required        NR = Not Required

Frequency

| | | | | | |
|---|---|---|---|---|---|
| Eye Protection | R ☐ NR ☒ | Torso Protection | R ☐ NR ☒ | Fall Protection | R ☐ NR ☒ |
| Hearing Protection | R ☐ NR ☒ | Arms, Hands, Fingers | R ☐ NR ☒ | Respirator-Breathing Apparatus | R ☐ NR ☒ |
| Head Protection | R ☐ NR ☒ | Legs, Feet, Toes | R ☐ NR ☒ | Personal Flotation Device (PFD) | R ☐ NR ☒ |

Other (Describe)   PHONE HEAD SET

## SECTION - INDIVIDUAL POSITION TITLES

| | |
|---|---|
| ADVISOR | FINANCE SUPERVISOR |
| HR BUSINESS PARTNER/SENIOR HR BUSINESS PARTNER | SENIOR FINANCE ANALYST |
| ASSOCIATE HR ANALYST/HR ANALYST /SENIOR HR ANALYST | FINANCE ANALYST |
| ASSOCIATE HR REPRESENTATIVE/HR REPRESENTATIVE/SENIOR HR REPRESENTATIVE | CASHIER |
| MANAGER | |
| SUPERVISOR | LEGAL ADVISOR |
| TEAM LEAD | ATTORNEY |
| | LEGAL ADMINISTRATOR |
| | GENERAL COUNSEL |

**Instructions -** This portion should be very specific and include complete details of the physical requirements of the job. Use categories only up to the weight that applies to the specific job.

**SECTION 3: PHYSICAL REQUIREMENTS (DETAILED)**

**Below Waist Lifting –** To move an object, weighing more than 5 lb / 2kg, from the floor to waist level by supporting it in the air (also includes waist to waist lifting). If rated as lifting, the demand cannot also be rated as another whole body position

| Weight | Items | Distance (V/H and f/m) | Other Comments |
|---|---|---|---|
| 5-10 lb<br>2-4 kg | | | |
| 11-20 lb<br>5-9 kg | | | |
| 21-50 lb<br>10-23 kg | Luggage | 3V ft | From floor to knee level |
| 51-100 lb<br>25-46 kg | | | |
| >100 lb<br>> 46 kg | | | |

Additional Information: _____

**Above Waist Lifting –** To move an object weighing more than 5 lb / 2 kg, from waist level to a higher position, by supporting it in the air. If rated as lifting, the demand cannot also be rated as another whole body position.

| Weight | Items | Distance (V/H and f/m) | Other Comments |
|---|---|---|---|
| 5-10 lb<br>2-4 kg | | | |
| 11-20 lb<br>5-9 kg | | | |
| 21-50 lb<br>10-23 kg | | | |
| 51-100 lb<br>25-46 kg | | | |
| >100 lb<br>> 46 kg | | | |

Additional Information: _____

**One-handed Carrying –** To move or transport an object, weighing more than 5 lb / 2 kg, from one place to another while holding or supporting the object with one hand. Three consecutive steps (i.e. right, left, right) are required for the physical demand to be considered carrying. Fewer than 3 steps is considered lifting. The hand used should be designated.

| Weight | Items | Distance (V/H and f/m) | Other Comments |
|---|---|---|---|
| 5-10 lb<br>2-4 kg | | | |
| 11-20 lb<br>5-9 kg | | | |
| 21-50 lb<br>10-23 kg | Luggage | 200H / m | From accommodation and office to car park. Also from staff bus to airport check-in counter |
| 51-100 lb<br>25-46 kg | | | |
| >100 lb<br>> 46 kg | | | |

Additional Information: _____

**Two-handed Carrying** – To move or transport an object, weighing more than 5 lb / 2 kg, from one place to another while holding or supporting the object with both hands. Three consecutive steps (i.e. right, left, right) are required for the physical demand to be considered carrying. Fewer than 3 steps is considered lifting.

| Weight | Items | Distance (V/H and ft/m) | Other Comments |
|---|---|---|---|
| 5-10 lb 2-4 kg | | | |
| 11-20 lb 5-9 kg | | | |
| 21-50 lb 10-23 kg | | | |
| 51-100 lb 25-46 kg | | | |
| >100 lb > 46 kg | | | |

Additional Information _____

**Pushing** – Exerting a force upon an object so that the object moves away from the force (includes slapping, striking, and kicking away). The height of the hand position present during pushing should be rated as overhead, shoulder, mid-chest, waist, knee, or below knee.

| Push Force | Items | Distance (V/H and ft/m) | Hand Position | Other Comments |
|---|---|---|---|---|
| 5-10 lb 2-4 kg | | | | |
| 11-20 lb 5-9 kg | | | | |
| 21-50 lb 10-23 kg | | | | |
| 51 - 100 lb 25 - 46 kg | | | | |
| >100 lb > 46 kg | | | | |

**Pulling** – Exerting a force upon an object so that the object moves toward the force (includes jerking). The height of the hand position present during pushing should be rated as overhead, shoulder, mid-chest, waist, knee, or below knee.

| Pull Force | Items | Distance (V/H and ft/m) | Hand Position | Other Comments |
|---|---|---|---|---|
| 5-10 lb 2-4 kg | | | | |
| 11-20 lb 5-9 kg | | | | |
| 21-50 lb 10-23 kg | | | | |
| 51 - 100 lb 25 - 46 kg | | | | |
| >100 lb > 46 kg | | | | |
| | | Hand Positions | | |

OH – Overhead    S – Shoulder    MC – Mid Chest    W – Waist    K – Knee    BK – Below Knee

Additional Information _____

**Forceful Gripping** – Squeezing firmly using the entire hand, requiring greater than 10 lb / 4 kg of force.

| Hand Position | Max Continuous Duration | Force | Description | Other Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |

Additional Information _____

**Forceful Pinching** – Squeezing firmly between the thumb and one or more of the opposing fingers, requiring more than 5 lb / 2 kg of force.

| Hand Position | Max Continuous Duration | Force | Description | Other Comments |
|---|---|---|---|---|
| | | | | |

Additional information _____

**Sitting** – To rest the weight of the body upon the buttocks and with back upright.

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| Ergonomic chair | 30 mins | Sitting to work on computer | Also when attending meetings |

Additional Information _____

**Standing** – Remaining on one's feet in an upright and erect position without moving about, with weight distributed on the feet.

| Surface | Max Continuous Duration | Other Comments |
|---|---|---|
| Concrete and tiled surfaces | 5 mins | During presentations or when discussing with colleagues and clients |

Additional information _____

**Stooping** – To bend forward at the waist while keeping the knees fairly straight. To qualify as stooping, the hips or waist should be bent forward from vertical at least 35 degrees with knees bent no more than 45 degrees from a fully straight position.

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Kneeling** – Supporting the body weight through both knees, with hips relatively straight and knees bent to at least 90 degrees.

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Squatting / Crouching** – To bend both hips and knees so as to sit on the heels with the knees bent and the weight resting on the balls of the feet, or to bend both hips and knees and rest one knee down on the floor. Knees must be bent more than 45 degrees from fully straight position.

| Surface | Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Forward Bending in Sitting** – Bending the upper body forward, at least 75 degrees from vertical, while in a sitting position.

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Static Body Twisting** – Maintaining the body in a position where the lower body remains fairly stationary and the upper body rotates to one side or the other – can occur while the worker is either sitting or standing.

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Back Lying – Lying on one's back to perform work activity. Legs can be bent or straight**

| Surface | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |
| | | | |

Additional information: _____

**Reaching High Level:** Moving the arms in any direction away from the body, with hands above shoulder height. Upper arms must be higher than shoulder.

| Distance (V or H) | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| | | | |

Additional Information: _____

**Reaching Medium Level:** Moving the arms in any direction away from the body, with hands from waist to shoulder height. Upper arm must be at least 45 degrees away from body and no higher than shoulder

| Distance (V or H) | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| 3H ft | 30 seconds | To reach telephone hand set | Pick up files, books from cabinet |

Additional Information: _____

**Reaching Low level:** Moving the arms in any direction away from the body, with hands below waist. Body is usually in a forward bend/stooping position

| Distance (V or H) | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|
| 3V ft | 30 seconds | To pick items from locker | |

Additional information _____

**Walking – Moving about on foot, placing one foot down before the other is lifted. Three consecutive steps (i.e. right, left, right) are required for the physical demand to be considered walking. Fewer than 3 steps is considered standing.**

| Surface | Distance (R/m) | Max Continuous Duration | Other Comments |
|---|---|---|---|
| Concrete and tiled surface | 300m | 10 mins | To discuss with colleagues, attend meetings in other departments and also walk to and from car park. Also to attend court proceedings |

Additional information _____

**Climbing - Stairs – Ascending or descending stairs using feet and legs with or without use of hands and arms.**

| Type of Climb | Number of Stairs | Max Continuous Duration | Other Comments |
|---|---|---|---|
| inclined | 12 | 1 min | To the offices and also to attend meetings in other buildings |

Additional information _____

**Climbing - Ladders – Ascending or descending ladder using feet and legs with or without use of hands and arms. The ladder climbed can be either a vertical or A-frame ladder.**

| Type of Climb | Number of Rungs | Max Continuous Duration | Other Comments |
|---|---|---|---|
| | | | |

Additional information _____

**Jumping** – To move oneself from the ground, propelling the body through the air with both feet simultaneously not in contact with the ground surface.

| Surface | Distance (ft/m) | Description | Other Comments |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

Additional Information: _____

**Repetitive Body Twisting** – Rotation of the trunk during which the lower body remains fairly stationary and the spine and torso rotate to one side or the other, over and over, for at least 3 consecutive repetitions (start right, twist left and back to the right is considered one repetition). Can occur while worker is either sitting or standing.

| Surface | No. of Repetitions | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|---|
|  |  |  |  |  |

Additional Information: _____

**Throwing** – To propel an object through the air by releasing from the hand while the arm is in rapid motion.

| Object | Distance (ft/m) | Weight (lbs/kgs) | Description | Other Comments |
|---|---|---|---|---|
|  |  |  |  |  |

Additional Information: _____

**Crawling** – Moving around while on hands and knees. Minimum of 3 steps is required to be considered crawling.

| Surface | Distance (ft/m) | Max Continuous Duration | Description | Other Comments |
|---|---|---|---|---|
|  |  |  |  |  |

Additional Information: _____

**Handling** – The act of closing the hand with sufficient force as to be able to grasp, hold, turn, or seize an object, requiring less than 10 lb / 4 kg of force. Hand activities that require contact of the palm of the hand with the object.

| Hand Position | Max Continuous Duration | Force | Description | Other Comments |
|---|---|---|---|---|
| MC | 5 mins | 4 kgf | Handling telephone handset to make or answer calls |  |

Additional Information: _____

**Fingering** – The act of picking, sorting, or working primarily with the fingers rather than with the whole hand. Hand activities that do not involve contact with the palm of the hand

| Hand Position | Max Continuous Duration | Force | Description | Other Comments |
|---|---|---|---|---|
| MC | 10 mins | 2 kgf | Typing on the keyboard and writing. |  |

Additional Information: _____

**Manual Dexterity** – Ability to work with hands rapidly and accurately in performing tasks that involve using the whole hand for grasping, holding, turning.

| Scale | Description | Other Comments |
|---|---|---|
| 3 | Holding mouse and telephone handset | Also to handle books |

Additional Information: _____

**Finger Dexterity** – Ability to move fingers and manipulate small objects rapidly and accurately.

| Scale | Description | Other Comments |
|---|---|---|
| 3 | Required to use computer keyboard | |

Additional Information: _____

**Bi Lateral Hand Coordination** – The ability to move both hands rapidly and accurately, making precise movements with speed.

| Scale | Description | Other Comments |
|---|---|---|
| 3 | Required for working on the computer | |

Additional Information: _____

**Eye-Hand-Foot Coordination** – Ability to move hands and feet in coordination with one another in accordance with visual simulation

| Scale | Description | Other Comments |
|---|---|---|
| 5 | When ascending and descending stairs | |

Additional Information: _____

**Balancing** – The ability to maintain bodily equilibrium and stability. The ability to balance on level surfaces (i.e. Indoors), uneven surfaces (i.e. outside), ladder, or balance beam.

| Surface | Distance (ft/m) | Feet position | Description | Other Comments |
|---|---|---|---|---|
| | | | | |

Additional Information: _____

**Sense of Touch** – To put the hand or finger or some other body part on an object or individual so as to perceive size, shape, temperature, or texture.

| Description | Other Comments |
|---|---|
| | |

Additional Information: _____

**Sense of Smell** – Perceiving odors or scents by means of the organs in the nose to the extent needed to distinguish or recognize particular odors.

| Description | Other Comments |
|---|---|
| | |

Additional Information: _____

**Speaking Clearly** – To be able to communicate, using the voice, in a manner that is easily perceptible.

| Description | Other Comments |
|---|---|
| Required to communicate with colleagues and clients | |

Additional Information: _____

**Hearing-Speech Range – To be able to hear all sounds in the vibratory wavelength of the human voice.**

| Description | Other Comments |
|---|---|
| Required for effective communication with colleagues and customers. | Use of hearing aids is acceptable |

Additional Information: _____

**Hearing All Ranges – To be able to hear all sounds in the vibratory wavelength of human hearing.**

| Description | Other Comments |
|---|---|
| To hear sounds at near and distance e.g. alarms, horns etc. | |

Additional Information _____

**Seeing, Reading & Comprehension –To be able to visually perceive the words on a page or object so as to allow the individual to understand what is to be communicated by the printed words**

| Description | Other Comments |
|---|---|
| Required to be able to read emails, policies and other documents | Use of corrective glasses are acceptable |

Additional Information _____

**Seeing, Distant - The ability to see objects that are 20 feet / 6 meters or more from the individual in a manner that allows the individual to make judgments about the object.**

| Description | Other Comments |
|---|---|
| To be able to see other persons, objects or hazards ahead | Use of corrective glasses are acceptable |

Additional Information: _____

**Seeing Near – The ability to see objects that are 20 inches / 51 centimeters or less from the individual in a manner that allows the individual to make judgments about the object.**

| Description | Other Comments |
|---|---|
| Required to read clearly, see near objects and recognise colleagues | Use of corrective glasses are acceptable |

Additional Information: _____

**Depth Perception – The ability to perceive and judge different distances and spatial relationships between objects.**

| Description | Other Comments |
|---|---|
| | |

Additional Information _____

**Color Vision – The ability to distinguish and identify differences in colors**

| Description | Other Comments |
|---|---|
| | |

Additional Information _____

**Emergency Evacuation – The ability to leave a location very quickly in an emergency situation.**

| Description | Max Continuous Duration | Other Comments |
|---|---|---|
| Employee should be able to vacate facility in the event of emergency and move to muster point | 5 mins | |

Additional Information: _____

SECTION: ADDITIONAL INFORMATION

(Add other Physical Demands, Working Conditions, Personal Protective Equipment or general comments. Attach a separate sheet if necessary.)

SECTION: GO-308 DEVELOPMENT AUTHORITY

Check Box

☒ Interim Development Signature
(GO-308 has not yet been through the complete GO-308 procedure)

| | | | |
|---|---|---|---|
| IWUANYANWU J. / ADEBAYO J / ENAHOLO B. | CNL / EUROFLOW | 76215 / 61172 | 08 / 01 / 2016 |
| Name | Company | Phone Number | Date (mm/dd/yyyy) |

☒ Onsite Functional Job Analysis Performed
(Steps 4, 5 and 6 of the OE-FFD GO-308 procedure have been completed)

| | | | |
|---|---|---|---|
| IWUANYANWU J. / ADEBAYO J / ENAHOLO B. | CNCNL / EUROFLOWL | 76215 / 61172 | 08 / 10 / 2016 |
| Name | Company | Phone Number | Date (mm/dd/yyyy) |

☒ Final Developer Signature
(Steps 4, 5 and 6 of the OE-FFD GO-308 procedure have been completed)

| | | | |
|---|---|---|---|
| IWUANYANWU J. / ADEBAYO J / ENAHOLO B. | CNL / EUROFLOW | 76215 / 61172 | / / |
| Name | Company | Phone Number | Date (mm/dd/yyyy) |

SECTION: SIGNATURES (If necessary) AND APPROVERS (This GO-308 Approved)

| | | | | |
|---|---|---|---|---|
| MRS. OLUYOMI ATOLABI | | CNL / MGR. HR ADMIN AND SERVICES | 68111 | 03 / 26 / 2013 |
| Name | Signature | Company / Job Title | Phone Number | Date (mm/dd/yyyy) |
| MRS. M. O. AKEREDOLU | | CNL / SUPV OFFICE SUPPORT SERVICES | 68391 | 03 / 26 / 2013 |
| Name | Signature | Company / Job Title | Phone Number | Date (mm/dd/yyyy) |
| DR. O. C. PITAN | | CNL / OH PHYSICIAN | 61807 | 05 / 26 / 2013 |
| Name | Signature | Company / Job Title | Phone Number | Date (mm/dd/yyyy) |
| Name | Signature | Company / Job Title | Phone Number | Date (mm/dd/yyyy) |

Flex. Global Health and Medical

GO-308 (X-16)
Word Electronic Version

Please make sure to complete Section 8 and 9 during the reevaluation process.

| | | | |
|---|---|---|---|
| Supervisor | AKEJU OSARETIN / OKUGO ANTHONY / NENGHE LUCKY | *signature* | 10 / 20 / 2016 |
| | Print Name | Signature | Date (mm/dd/yyyy) |
| Management | EFFIONG ANTHONY / ABIOLA NNAOBI / MOJUETAN NED | *signature* | 11 / 04 / 2016 |
| | Print Name | Signature | Date (mm/dd/yyyy) |
| GHM / Designee | DR. O. C. PHAN | *signature* | 11 / 07 / 2016 |
| | Print Name | Signature | Date (mm/dd/yyyy) |

Completed GO-308 and Functional Capacity Evaluation (FCE), if appropriate, sent to GO308@Chevron.com    11 / 09 2016
                                                                                                     Date (mm/dd/yyyy)

---

## GO-308 Physical Requirements and Working Conditions
### Form Instructions

The term Developer will be used to identify the company/person that will develop/update the GO-308. The GO-308 forms should be re-evaluated and updated at least every five years, or earlier, if the job scope or physical requirements / working conditions change.

Section 1 – Position Information

GO-308 Category: Combination of position titles with like physical requirements and working conditions.

Supervisor: Complete all areas of this section with the assistance from your HR Business Partner, Operational Excellence SBU Fitness for Duty Process Advisor, HES Specialist and Global Health and Medical (GHM) (if needed).

Reporting Units (RUs): Are distinct organizations that report a set of operational results on an ongoing basis to Chevron's Office of the Chairman. There are three RU levels
- Summary RU: represents a broad area of Chevron, such as Downstream and Chemicals or Chevron Upstream or Gas and Midstream
- Rollup RU: represents major areas of Chevron, such as Manufacturing or North America Exploration & Production or Pipeline
- Employee RU: represents a further breakout of operational areas, such as El Segundo Refinery, LABU or MidContinent

Examples of RU hierarchy (this is only a partial listing) are below. For some Reporting Units, Employee RU is the same as the Rollup RU

| Summary RU | RollUp RU | Employee RU |
|---|---|---|
| Corporate Staffs | Business Development | Business Development |
| | Executive Staff | Executive Staff |
| | Law, Governance & Compliance | Law |
| | | Governance |
| | | Compliance |
| Downstream & Chemicals | Lubricants | Americas Finished Lubricants |
| | Manufacturing | Richmond Refinery |
| Chevron Upstream | North America Exploration & Production | MidContinent |
| | Africa Latin America (CA-AEP) | Southern Africa, Latin America (LABU) |

| | Production | |
| | Africa/Latin America (CA/AEP) | Southern Africa, Latin America (LABU) |
| Gas and Midstream | Pipeline | Pipeline |
| | Shipping | Shipping |
| Technology, Projects and Services | Information Technology | Information Technology |
| | Energy Technology | Energy Technology |

Location City, State/Province, Country: Identify the actual work location information
Safety Sensitivity: Identify if position is safety sensitive, highly safety sensitive, or non-safety sensitive
Medical Evaluation: Check the appropriate box. GHM and/or their designee are available for consultation.
FCE: Check the appropriate box. If a FCE is required, attach the FCE protocol with the completed GO-308.

**Section 2 – Physical Requirements (Summary)**
Developer: Complete this section after completing/updating GO-308

Frequency    N = Never    O = Occasionally (1-33% of the day)    F = Frequently (34-66% of the day)    C = Constantly (67-100% of the day)

Dexterity and Coordination 1 = Extremely High Ability    2= Above Average Ability    3 =Average Ability    4 = Below Average Ability    5 =Negligible Ability

Motor and Sensory: R = Required    NR = Not Required

**Section 3 – Working Conditions**
Developer: Complete this section after completing/updating the GO-308

**Section 4 – Protective Equipment Required**
Developer: Complete this section after on-site analysis of the job

**Section 5 – Individual Position Titles**
Jobs that can be combined, for GO-308 purposes, based upon physical demands. A GO-308 is not a requirement at this level, provided the position is covered at the GO-308 Category level.
Developer: Complete with assistance from SBU HR Business partner, HES Specialist, Operational Excellence SBU Process Advisor and GHM (if needed) after all the GO-308's have been developed for SBU.

**Section 6 – Physical Requirements (Detailed)**
Developer: Complete this section based on job analysis questionnaire, onsite analysis, and position interviews. This portion should be very specific and include complete details of the physical requirements of the job

**Section 7 – Additional Information**
Developer: Use this section to document any items not previously documented

**Section 8: GO-308 Development Actions Taken**
Developer: Complete Quality Assurance review of the GO-308 form prior to obtaining required signatures and submitting to the GO-308 Repository for uploading
Interim Developer Signature: This GO-308 has not been through the complete GO-308 procedure. Please check the box and sign and date the form. Your signature acknowledges that this is an interim GO-308 and this GO-308 has not been through the complete GO-308 procedure for the positions listed.
Onsite Functional Job Analysis Performed: Steps 4, 5 and 6 of the OE-FFD GO-308 procedure have been completed (box checked in above section). Please check the box and sign and date the form.
Final Developer Signature: Steps 4, 5 and 6 of the OE-FFD GO-308 procedure have been completed (box checked in above section). Please review the GO-308 form for accuracy, then check the box and sign and date the form. Your signature will acknowledge that the GO-308 accurately describes the physical requirements and working conditions of the positions listed.

**Section 9 – Steering Team (recommended) or local Management Review and Approval (Original Development of GO-308)**
This section is provided to document agreements of the GO-308 steering team or local Management. The steering team may include the following types of roles: Fitness for Duty Process Advisor, Human Resources, HES, Managers, Union Stewards, and/or Global Health and Medical (GHM) and/or their designee.

Steering Team or CoCo Management: Obtain appropriate signatures and complete team member roles. Individual signatures will acknowledge that you approve the GO-308 and agree with the Medical Evaluation and FCE requirements

**Section 10 – Signature Updated**
This section is provided for when the GO-308 is updated
<u>Developer:</u> Obtain appropriate signatures
<u>Supervisor:</u>  Your signature will acknowledge that the GO-308 has been revalidated and accurately describes the physical demands of the positions listed


**Section 11 – GO-308 Repository**
<u>Developer:</u> Email the completed GO-308 word document (.doc) including the PCE, if appropriate to <u>GO308@Chevron.com</u> for uploading into the GO-308 repository.
<u>GO-308 Developer:</u>  Maintain all GO-308 documentation as outlined in the OE - Fitness for Duty process. Creating and updating the GO-308 Procedure
<u>Global Health & Medical (GHM):</u>  Perform administrative review of the GO-308 prior to uploading into the GO-308 repository.  Return incomplete GO-308 forms to the supervisor for completion

# EXHIBIT 8

**Snookal, Mark**

---

| | |
|---|---|
| **From:** | Levy, Scott |
| **Sent:** | Monday, September 16, 2019 4:20 AM |
| **To:** | Snookal, Mark |
| **Subject:** | medical |

Mark,

I spoke with Andrew Powers who briefed me on your recent discussion with him and let me know that you were waiting on written documentation and perhaps further explanation of your recent MSEA (medical suitability for expat assignment) examination. I'll do my best to explain in writing but also happy to further discuss live.

As you know, foreign assignments (including, Escravos Nigeria) can be in locations where access to critical prescription medications or medical care is extremely limited. For these and other reasons, we conduct an MSEA to confirm that an employee is medically able to work in the new job and location.

I understand that you are willing to take the risk of potentially dying on the job, and that you do not feel it is the company's place to make that decision for you. I agree to a certain extent and recognize your concerns about paternalism. However, the company does have a right to not engage individuals where their assignment could pose a "direct threat" to their own health and safety.

We certainly don't believe that every employee with a health condition poses a direct threat; we need to analyze the condition and the attributes of the job. When there are ways of ameliorating the risks (including reasonable accommodations) we work with the individual to do so. I became involved on your case when you had requested a second opinion on the initial denial and with your consent involved your treating physician to better understand your specific risk. While reasonable professionals can debate the exact percentage, we are dealing with an established risk that is several magnitudes higher than the baseline and is a realistic possibility. We respectfully disagree that this finding (regardless of the exact percentage) is based on stereotypes, as distinguished from objective medical evidence. But the risk itself is not determinative. The concern is that if the condition were to occur, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos. There is no medical capability to manage this type of emergency in Escravos or anywhere near Escravos. It is also clear that the duration of your condition is not limited and is continually present, and the occurrence is not predictable and it's not possible to isolate triggers to reduce the risk.

We have no problems with you working in El Segundo and believe there are many other foreign locations where you could work. We in fact discussed whether you could perform this particular job at a different location in Lagos, but it wasn't possible.

In response to your question, I would not foresee issues with you working in the following locations:

      Americas: US onshore operations, San Ramon, Houston, Calgary, Vancouver, St. John, Argentina (Buenos Aires); Colombia (Bogota); Brazil (Rio de Janeiro), Trinidad (Port of Spain)

      Asia Pacific: Singapore, Australia (Perth based), Hong Kong, New Zealand, Thailand (Bangkok, Rayong, Sirai Chi); South Korea (Seoul, Ulsan, Geoje), Philippines (Manila), China (Beijing, Shanghai), Japan Metropolitan; Malaysia (Kuala Lumpur); Pakistan Metropolitan

      EEMEA: UK (all locations), Belgium (all locations), Denmark (all locations), France (all locations), Italy (all locations), Netherlands (all locations), United Arab Emirates (all locations), Norway (all locations), Germany (all locations), Sweden (all locations), South Africa (all locations), Bahrain (all locations), Qatar (all locations), Kuwait (all locations), Turkey (all locations), Poland (all locations), Saudi Arabia (all locations), Nigeria (Lagos), Russia (Moscow)

I'd need to do a more specific assessment for:

      Americas: US offshore operations (Deepwater), Colombia (Riohacha); Argentina- Nuquen, Colombia –Rio Hacha, Guatemala, Panama, Mexico, Brazil Offshore, Kitimat (Canada)

1

**EXHIBIT 8-1**                    SNOOKAL-00645

AP: Australia (Barrow Island, Onslow, Dampier, Karratha, Thevenard Island & Wheatstone offshore); Bangladesh (Dhaka); China (Chengdu, Tianjin, Tanggu); Indonesia (Jakarta, Sumatra, Balikpapan); Malaysia (Lumut); Thailand (Songkla, Nakorn Srithammarat - NST, Offshore); Vietnam; India

EEMEA: Angola (Luanda); Nigeria (Lekki, Abuja), Azerbaijan (all locations), Ukraine (all locations), Romania (all locations), Rep. of Congo (Pointe Noire), Morocco (all locations), Egypt (all locations), Russia (outside Moscow).

I'd be quite concerned about other locations.  As I mentioned above, I'd be more than happy to discuss this with you further.

Scott


**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
TR & HM COE

Chevron Products UK Limited
1 Westferry Circus
Canary Wharf
London E14 4HA
Office-   +44 (0) 207 719 3390 (Also serves 24/7 medical emergency support)
Fax-      +44 (0) 207 719 5188
Mobile- +44 (0) 792 258 4538
CTN- (8) 584 3390
ScottLevy@chevron.com

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118


**Important Message from the Global Privacy Team**

Remember that when it comes to sharing personal data, less is more. Do not share more information than is being requested from you. Share information securely and follow company policy by encrypting emails and attachments that contain sensitive personal data.  Before clicking "send" on an email, double-check that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com

**EXHIBIT 8-2**                    SNOOKAL-00646

# EXHIBIT 9

Mark Snookal
2200 Maricopa Dr
Los Angeles, CA 90065
213-458-1341
Mark.Snookal@gmail.com

August 4, 2021

Thalia Tse
HR Business Partner, El Segundo Refinery
Chevron Products Company
324 W. El Segundo Blvd.
El Segundo, CA 90245

Dear Ms. Tse,

I am writing to inform you of my resignation from my position as Instrumentation, Electrical, and Analyzer Reliability Team Leader, effective August 20, 2021. I appreciate all the opportunities you've given me during my time at Chevron Products Company, and the support I've received from the rest of the team.

If I can be of any assistance during the transition, please don't hesitate to ask. I'm always available for questions if need be.

Sincerely,

Mark Snookal



**EXHIBIT 9**

# EXHIBIT 10


**Chevron**

# Voluntary Termination – GO-439-1

I wish to resign my employment with the   Chevron Products Company
_____
(Employing Organization)

effective   August 20, 2021_____ , for the following reason(s):

I am leaving for an opportunity with significantly increased responsibility
_____

_____

_____

_____
(Continue on reverse, if needed)

_____          1000444873
              Full Signature                          SAP Personnel Number

Mark Snookal                                    August 4, 2021
_____          _____
              Name (print)                              Date Signed

2200 Maricopa Drive
_____
              Home Address

Los Angeles, CA, 90065
_____
              City, State, Zip

_____


**(If this is a recent change of address, you need to update your records in SAP HR on-line.)**


Distribution:    Original to Personnel File                    GO-439-1 (7-05)
                 Employee -- Retain Copy                       Word Electronic Version


**EXHIBIT 10**          **SNOOKAL-01143**

# EXHIBIT 11

# ALEXANDER R. MARMUREANU, MD

Diplomate, American Boards of Surgery and Thoracic Surgery
Thoracic and Cardiovascular Surgery
Assistant Professor of Surgery

---

## EXPERT REPORT

I, Alexander R. Marmureanu, M.D. declare as follows:

I currently practice Thoracic and Cardiovascular Surgery in Los Angeles, CA. I am Board Certified in Cardiothoracic Surgery and General Surgery and licensed to practice in the states of California and New York. I am also an Assistant Professor of Surgery and Vice Chair of the Bylaws Committee at the School of Medicine at California University of Science and Medicine.

I am the CEO and President of California Heart and Lung Surgery Medical Center in Los Angeles and the Director of Cardiothoracic Surgery at Centinela Hospital Medical Center as well as the Director of Cardiovascular Surgery at Southern California Hospital at Culver City.

I am also the Medical Staff President-Elect and the Chairman of the Multi-Disciplinary Peer Review Committee, as well as member of the Medical Executive Committee Leadership at Hollywood Presbyterian Medical Center.

My offices are located in Westwood, at 10921 Wilshire Blvd., #1205 Los Angeles, CA 90024, and at Centinela Hospital Medical Center on 501 East Hardy St. #315, Inglewood CA 90301.

I completed my General Surgery residency at New York University Medical Center and Mt. Sinai Medical Center from 1994 – 2000. I then completed my Cardiothoracic Surgery fellowship at UCLA Medical Center from 2000 – 2002, where I served on the Faculty, before founding California Heart and Lung Surgery Center.

Currently, in addition to my Thoracic and Cardiovascular surgical practice, I continue to train medical students, residents, as well as other surgeons. I also continue to publish and lecture on various topics in the field of Thoracic and Cardiovascular Surgery.

Through my education, training and professional experience, I am very familiar with this patient's medical conditions, treatment, and associated prognosis.

My opinions are based upon my medical education, thoracic and cardiovascular surgical training, practice, and experience, as well as the medical records, and all other documents that I have reviewed.

I reserve the right to supplement my opinion based upon the receipt of additional information.

My education and background are accurately listed on the curriculum vitae, attached as Exhibit "A", which sets forth my education, training, experience, and qualifications as a physician and expert.

**EXHIBIT 11-1**

# DOCUMENTS REVIEWED

Review of Legal Documents:

- Dr. Levy Deposition & Exhibits
- Medical Suitability for Expatriate Assignment History & Physical Examination
- Physical Requirements and Working Conditions
- Expatriate Exam Recommendations
- Complaint for Damages
- Assignment Offer
- Job Description
- Employee Mental Health Questionnaire
- Request for Medical Service
- Email Communications
- Kim, Joon Bum, et al. "Risk of rupture or dissection in descending thoracic aortic aneurysm." *Circulation* 132.17 (2015): 1620-1629.

Review of Medical Records

- Kaiser Permanente Medical Records & Imaging Studies
  - o  CT Angiogram Report
  - o  ECHO Report
  - o  Chest CT
  - o  Chest X-ray
- Holter Monitor Results
- Work Letter by Dr. Khan
- Immunization Records
- Quest Lab Results
- Access Medical Group (Chevron) Medical Examination

**EXHIBIT 11-2**

# SUMMARY OF RECORDS

Mr. Mark J. Snookal, a 52-year-old male (DOB: April 13, 1972), has a stable 4.2 cm dilated aortic root and ascending aortic aneurysm, both of which have remained asymptomatic. His ejection fraction is normal, indicating that the aneurysm has not impacted his cardiac function.

Mr. Snookal was being considered for a promotion to Reliability Engineering Manager at Chevron, a desk-based role that would have required travel to Escravos, Nigeria every other month. However, the offer was withdrawn following a routine medical evaluation due to concerns about his cardiovascular condition.

His cardiologist, Dr. Khan, had cleared him from a cardiovascular standpoint, confirming that the aneurysm was stable, well-managed, and posed minimal risk to his health. Dr. Khan recommended continued medical management and annual imaging. Despite this expert opinion, Chevron's medical team overruled Dr. Khan's recommendation, deeming Mr. Snookal's condition a "direct threat" to his safety based on perceived risks rather than clinical evidence.


## Timeline of Events

**2019 - Application for Nigeria Position**

- Chevron required a medical evaluation before starting the assignment in Escravos, Nigeria. Dr. Irving Sobel assessed Mr. Snookal and deemed him fit for duty with two restrictions:
    - Avoid lifting weights over 50 lbs.
    - Obtain clearance from his cardiologist.

**April 19, 2019 - Cardiology Note by Dr. Khan**

- **Chronic Conditions**:
    - **Dilated Aortic Root: Stable and unchanged.**
    - **Aortic Valve Regurgitation: Stable and unchanged**.
    - Cholelithiasis
    - Hypertriglyceridemia

- **Key Points**:
    - **Mr. Snookal remained asymptomatic from a cardiac standpoint**, without shortness of breath during his daily activities.
    - He exercises regularly, performing 30 minutes of cardio on a treadmill about 4 times per week.
    - **His blood pressure at home was generally under 120 mmHg.**
    - **No history of syncope.**

3

**EXHIBIT 11-3**

## Review of Imaging Studies

**February 11, 2012 - Chest CT with Contrast**

- Findings included diffuse mixed ground-glass and dense airspace consolidation, likely due to an infectious or inflammatory cause, unrelated to chronic heart conditions.
- Small bilateral pleural effusions and reactive subcarinal lymph nodes were noted, with no chronic or progressive pulmonary condition.

**November 5, 2014 - Chest X-ray**

- Imaging showed resolution of previous lower lobe opacities, suggesting the findings were not persistent or significant.
- **A normal cardiac silhouette** and absence of lung consolidation indicated no active cardiopulmonary pathology.

**February 16, 2015 - Holter Monitor**

- **Sinus rhythm** predominated, with occasional PACs and frequent PVCs (20% of beats), which are common and benign in the general population.
- Ventricular tachycardia was limited to brief, three-beat runs, suggesting no significant impact on physical ability or daily activities.

**March 26, 2015 - Echocardiogram**

- Showed normal biventricular size and function, with an **ejection fraction of 55-60%,** adequate for normal cardiac performance.
- Mild to moderate eccentric aortic regurgitation was present, but **Mr. Snookal was asymptomatic, indicating no functional limitation.**
- **The aortic root measurements were stable**, with no concerning elevation in right ventricular pressure.

**May 26, 2016 - CTA Cardiac**

- **The aortic root remained stable at 4.2 cm, with no significant progression.**

  *Comment: No evidence suggested any pathology that would interfere with physical tasks.*

**February 24, 2017 - Echocardiogram**

- Findings included normal **systolic function/ejection fraction of 50-55%, stable aortic dimensions, and no significant strain on the heart.**

4

**EXHIBIT 11-4**

**March 29, 2018 - 2D Echocardiogram**

- Mild left ventricular enlargement and trace mitral regurgitation were noted, but the **ejection fraction was robust (60-65%)**

  *(\*Comment: the ejection fraction is the best indicator regarding how strong Mr. Snookal's heart is. He has normal ejection fraction)*

- Stable aortic regurgitation and mild right atrial enlargement were present.

**April 10, 2019 - CTA Chest**

- **Stable aortic root (4.2 cm) and ascending aorta measurements, with no significant enlargement or dissection.**

## Review of Clinical Notes

**March 13, 2017 - Cardiology Consultation**

- **Mr. Snookal was asymptomatic from a cardiac perspective, with no limitations on physical exertion**.
- **His cardiac evaluations were precautionary, with no functional deficits identified**.

**April 19, 2019 - Office Visit**

- **Mr. Snookal continued to be asymptomatic, engaging in routine physical activity without limitations.**

**June 5, 2019 - Holter Monitor Follow-Up**

- The Holter results were consistent with previous findings, indicating benign PVCs.
- **Dr. Khan recommended a beta blocker as a precautionary measure to help prevent the growth of the ascending aorta**, even though it isn't strictly necessary since the patient has no symptoms.

**EXHIBIT 11-5**

In summary, the clinical data consistently indicates that Mr. Snookal's ascending aortic aneurysm and aortic root have remained stable at 4.2 cm, with no significant progression over several years of monitoring. At this size, in my opinion, the annual risk of rupture or dissection is less than 1%, especially considering the stability of his condition and aortic measurements. Given that his work is desk-based and not physically demanding, there is no evidence to suggest that his condition would affect his job performance or pose an immediate risk.

The risk of aortic dissection and possible rupture typically increases when the aneurysm reaches measurements around 5.5 cm, meaning Mr. Snookal's aneurysm is not large enough to be considered clinically significant. Moreover, there is no indication that his condition would worsen or present a danger while he carries out his duties in Escravos, Nigeria (his aortic measurements have remained stable). Additionally, his ejection fraction has remained normal, indicating that the aneurysm has had no impact on his cardiac function. This, combined with the absence of any symptoms, further supports his fitness for duty.

In conclusion, the evidence overwhelmingly supports that Mr. Snookal's aneurysm does not pose any clinically significant risk, particularly given his travel to Nigeria every other month. It is important to emphasize that before considering the risk of aortic dissection or rupture, there must be clear documentation of rapid growth or an increase in size to around 5.5 cm. In contrast, Mr. Snookal's aortic root dilation and ascending aortic aneurysm have consistently remained stable, with no signs of growth to date. With proper blood pressure management and regular monitoring, there is no justification for classifying his condition as a "direct threat." His functional capacity remains fully intact, further reinforcing that the perceived risks are unfounded.

**EXHIBIT 11-6**

# METHODOLOGY OF OPINIONS

All of my opinions and conclusions are stated within a reasonable degree of medical certainty. The following opinions are based on my education, training, practice, and experience as well as the applicable medical literature available. I applied the same generally accepted methodology utilized in the medical community for diagnosing and treating cardiovascular diseases. I also utilized the same methodology in rendering my opinions as I do in my daily medical/surgical practice as a board-certified thoracic and cardiovascular surgeon. I reserve the right to amend, supplement or modify those opinions as new evidence is developed, including new or additional medical records become available.

# OPINIONS

After thoroughly reviewing the medical records, imaging studies, and current clinical guidelines, it is my expert opinion that Mr. Snookal is fit for duty in Escravos, Nigeria. His 4.2 cm ascending aortic aneurysm and dilated aortic root have remained stable over several years of monitoring, staying well below the threshold for significant risk, which is generally considered to be around 5.5 cm. The stability of the aneurysm, combined with Mr. Snookal's well-controlled blood pressure, indicates there is no medical reason to restrict him from performing his job duties. I agree with Dr. Khan's recommendation to continue annual CT scans to monitor the aneurysm's stability. No additional treatments are necessary at this time.

## Low Risk of Complications

In my expert opinion and according to the clinical data, ascending aortic aneurysms between 4.0 and 4.9 cm carry a very low annual risk of rupture or dissection, estimated at roughly 1% per year in this size range. This risk is considered negligible compared to the general population, especially given the absence of rapid growth in Mr. Snookal's case. Aneurysms typically become clinically significant and warrant surgical intervention when they become around 5.5 cm, OR if there is a rapid increase in size (more than 0.5 cm within six months). These conditions are not relevant in Mr. Snookal's case, as his aneurysm has demonstrated long-term stability, making the likelihood of rapid expansion exceedingly low.

## Supporting Medical Evaluations

Dr. Khan's assessment, along with the corroborating medical evaluations, clearly indicates that Mr. Snookal's aneurysm poses a minimal to no risk. The lack of significant change in the aneurysm's size over the last several years, coupled with effective blood pressure management, places his risk profile near that of individuals without an aneurysm. As such, there is no medical justification for preventing him from undertaking his duties in Nigeria.

**EXHIBIT 11-7**

## Job Requirements and Fitness for Duty

The physical requirements and working conditions for the assignment in Nigeria do not specify that an ascending aorta of 4.2 cm would preclude employment. Mr. Snookal's desk job is not physically demanding and does not present any additional risk factors that would exacerbate his condition. The concern cited by Chevron's medical team about the remote location and limited medical facilities in Nigeria (where he would be located every other month) does not outweigh the fact that routine monitoring (annually) is sufficient to ensure Mr. Snookal's safety.

## Clinical Management and Recommendations

Annual imaging with CT scans or echocardiograms is sufficient to continue monitoring Mr. Snookal's aorta for any changes. This approach is consistent with standard practice for stable aortic aneurysms and aortic root dilations of this size. In addition, maintaining blood pressure control through medication and lifestyle modifications—keeping levels ideally below 130/80 mm Hg—will further minimize any potential risks associated with the aneurysm.

Additional recommendations include:

- Regular, moderate physical activity to support overall cardiovascular health.
- Adherence to a heart-healthy diet rich in fruits, vegetables, and whole grains.
- Awareness of symptoms indicating aneurysm expansion or rupture, such as sudden chest or back pain, with an understanding of the importance of seeking immediate medical care if such symptoms arise.

## Conclusion

In conclusion, it is my expert opinion that Mr. Snookal's 4.2 cm ascending aortic aneurysm and 4.2 cm dilated aortic root are not clinically significant to warrant exclusion from his assignment in Nigeria, especially given the well-documented stability. Blood pressure control as well as annual monitoring are appropriate and effective measures to ensure his continued health. Based on the evidence, Mr. Snookal could have safely proceeded with his work in Nigeria, provided that standard annual surveillance remains in place. There are no medical grounds to consider him unfit for duty or to classify his condition as a "direct threat" to his safety.

Alexander Marmureanu MD

October 9, 2024

**EXHIBIT 11-8**

# EXHIBIT 12

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| MARK SNOOKAL, an individual, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No. |
| | ) 2:23-cv-6302-HDV-AJR |
| | ) |
| CHEVRON USA, INC., a California | ) |
| Corporation, and DOES 1 through | ) |
| 10, inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

**EXHIBIT 12-1**

Scott Levy, M.D.                                                    August 30, 2024

```
1                    A P P E A R A N C E S

2


3


4    FOR THE PLAINTIFF:

5              ALLRED, MAROKO & GOLDBERG
               By:  OLIVIA FLECHSIG
6                   DOLORES Y. LEAL
               Attorneys at Law
7              6300 Wilshire Boulevard, Suite 1500
               Los Angeles, California 90048
8              (323) 653-6530
               oflechsig@amglaw.com
9              dleal@amglaw.com

10   FOR THE DEFENDANT:

11             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
               By:  ROBERT E. MUSSIG
12             Attorney at Law
               333 South Hope Street, 43rd Floor
13             Los Angeles, California 90071
               (213) 620-1780
14             rmussig@sheppardmullin.com

15   THE VIDEOGRAPHER:

16             Jacob Rivera

17


18


19


20


21


22


23


24


25
```

**EXHIBIT 12-2**

Scott Levy, M.D.                                                    August 30, 2024

```
1        Q.  Anyone other than your attorney?

2        A.  I have not.

3        Q.  Okay.  Have you ever been convicted of a crime?

4        A.  I have not.

5            MR. MUSSIG:  Okay.

6            THE WITNESS:  Oh, sorry.

7            MR. MUSSIG:  I would object on privacy grounds,

8    but you've already answered, so...

9    BY MS. FLECHSIG:

10       Q.  Okay.  And what's your date of birth, Dr. Levy?

11       A.  April 8, 1973.

12       Q.  Okay.  So you're currently an employee of

13   Chevron; correct?

14       A.  I am.

15       Q.  Do you know what the name of the entity you

16   work for is, like, specifically, like, the corporate

17   entity, to clarify?

18       A.  I work for -- it changes all the time, which

19   makes things a little complicated, but I work for

20   Chevron USA.

21       Q.  Okay.  Do you know when that last changed?

22       A.  No, it's not clear.  And I can explain.  I've

23   had several assignments with the company throughout my

24   12 years here, and so I've worked under different

25   businesses, so it's -- but I think I've -- I think
```

**EXHIBIT 12-3**

Scott Levy, M.D.                                                August 30, 2024

1   technically I may have always been on the Chevron USA.

2   I'm just not completely aware.  I've never changed

3   payrolls or anything like that, though.

4        Q.  Okay.  Is your understanding that your

5   paychecks are paid by Chevron USA or Chevron USA Inc.?

6        A.  It is my understanding that that's what

7   happens, yes.

8        Q.  Okay.  I think you just said you worked for

9   Chevron for 12 years, so you would have started in or

10  about 2012?

11       A.  Correct.

12       Q.  Okay.  I want to go through just your whole,

13  sort of, work history with Chevron.

14            What -- what was your role when you started in

15  2012?

16       A.  I started as -- my title was the occupational

17  health manager for North America.

18       Q.  What -- just, sort of, briefly, what kind of

19  job were you doing in that capacity?

20       A.  Sure.  So my -- my agreement was our businesses

21  across -- like, across North America -- my job was to --

22  I was an internal consultant to our businesses.

23            So if our businesses needed to set up medical

24  operations, I would be the one to help with that and

25  advise.  I would also help run their occupational health

**EXHIBIT 12-4**

Scott Levy, M.D.                                          August 30, 2024

1   program across North America and then involved with

2   different health and wellness events as they arose.

3           (Reporter clarification.)

4   BY MS. FLECHSIG:

5       Q.  How long were you in that occupational health

6   role?

7       A.  It was about two years or so.

8       Q.  What was your next role?

9       A.  I was moved to Singapore, and I was assigned

10  the role of regional medical manager for the Asia

11  Pacific region.

12      Q.  What did you do in that capacity?

13      A.  Similar responsibilities just -- I guess, more

14  of a -- of a senior position.  So I managed, again, more

15  complicated businesses and had more reports.

16      Q.  How long were you in that role?

17      A.  Three years approximately.

18      Q.  Okay.  And after that -- excuse me, the role in

19  Singapore, what was your next role at Chevron?

20      A.  I took a lateral position to regional medical

21  manager of our EEMEA, E-E-M-E-A, region, which is

22  Europe, Eurasia, Mid East, and Africa, based out of

23  London.

24      Q.  Okay.  So what was the date range on that -- on

25  that role?  I want to -- like, in time.

**EXHIBIT 12-5**

Scott Levy, M.D.                                           August 30, 2024

1    A.  It ended on May 31st of this year.  So I moved

2  to my current role May 31 -- on June 1st.  So it was

3  May 31st and then I would subtract seven years.  2017

4  roughly, '18.

5    Q.  Started 2018, and then you were in that role

6  until May 31st, 2024?

7    A.  Correct.

8    Q.  Okay.  Were you located in London that whole

9  time?

10    A.  I was.

11    Q.  Okay.  And what's your current role?

12    A.  I now have the role of regional medical manager

13  for the Americas based out of Houston.

14    Q.  Do you know what entity -- what Chevron

15  corporate entity was your employer during the time you

16  were the regional medical director for the EEMEA role?

17    A.  Yeah, so I was working out of the -- it was

18  Chevron Products UK.  And, again, that was the title

19  that we used in my signature.  I can't tell you the

20  technical bits, though, about payroll and whether I was

21  paid through Chevron USA or not, but my paychecks remain

22  the same -- through the same -- for my 12 years that I

23  was a Chevron employee.

24    Q.  You mean the entity that's paying your paycheck

25  is the same?

**EXHIBIT 12-6**

Scott Levy, M.D.                                    August 30, 2024

1       A.   I kept the same benefits.  I kept the same --

2   nothing's really changed.  I stayed on the same payroll.

3   Obviously the amounts changed, but -- over time, but no,

4   it's the same payroll.  That's more of an HR question.

5   I don't have the -- the info, I guess.  I don't know the

6   answer.

7       Q.   And prior to starting work with Chevron, where

8   were you employed?

9       A.   I worked for the Permanente Medical Group.

10  It's a large physician group in Northern California.

11      Q.   Is that -- I'm sorry, you said Permanente?

12      A.   The Permanente -- "permanent" with an E.

13  Permanente Medical Group.

14      Q.   Okay.

15      A.   TPMG.

16      Q.   Okay.  So did you practice medicine, then,

17  between the time -- like, up until the time you joined

18  Chevron?

19      A.   I did.

20      Q.   Okay.  And when did you graduate from medical

21  school?

22      A.   '99.

23      Q.   And then you completed residency?

24      A.   I completed two residencies, yes.

25      Q.   Okay.  What were your residencies?

**EXHIBIT 12-7**

Scott Levy, M.D.                                            August 30, 2024

1        Q.   Okay.  Do you -- did you get any specialized

2   training in cardiology?

3        A.   I have not.

4        Q.   Do you have any Board certifications?

5        A.   I'm Board-certified in internal medicine and

6   occupational environmental medicine as well.

7        Q.   Okay.  So I want to ask about your job duties

8   while you were the regional medical director of the EMEA

9   region -- am I getting the acronym correct?

10       A.   You are, yes.

11       Q.   EMEA.  Okay.

12            While you were the regional director of the

13  EMEA region, what were your job duties?

14       A.   Yeah, it's EEMEA.  But that's okay.

15       Q.   EEMEA.

16       A.   Yeah.  That's okay.

17       Q.   Thank you.

18       A.   My job duties -- so again, internal consultant

19  to our businesses, we've had -- again, a lot of our --

20  we have new business, we have old business, we have

21  small projects, big projects.  So I would say that for

22  the large projects, they had embedded medical teams.  So

23  my job was usually to interact with the teams, make sure

24  that they got what they needed.  I would help them -- I

25  would help train or mentor.  I would review processes

**EXHIBIT 12-8**

1    and try to align some of the work coming from our

2    corporate function down to the embedded businesses.

3           I would also serve as -- I would manage

4    emergencies.  So when I say "emergencies," the -- if

5    there wasn't anyone present, we didn't have a medical

6    operation on the ground in a certain country, I would

7    help facilitate care for our people to get them where

8    they needed to be.

9           So lots of medical evacuations and things like

10   this.  A lot of cross-border transfers.  So let's just

11   say -- we're talking about a case from Nigeria today.

12   So if I was -- so if we were evacuating someone from

13   Nigeria, I would help facilitate care from Nigeria out

14   to another country, manage the issue -- or help case

15   manage the issue while in that second country, and then

16   see the process to the end when we get the person back

17   home safe and sound.

18          And so those would be some of the things we do.

19   I -- we would help put together

20   health-and-wellness-related programs and things like

21   that to keep employees safe, to keep -- to keep the

22   workforce healthy, and then we would also review and

23   evaluate our fitness-for-duty programs to make sure that

24   they were functioning as intended.

25          Q.  Okay.  So in terms of managing the

**EXHIBIT 12-9**

1    fitness-for-duty programs, do you get to create the

2    policies and protocols for how the evaluations are

3    carried out?

4         A.   Influence.  I influence it, yes.

5         Q.   Okay.  What do you mean you "influence it"?

6         A.   So we have policies related to fitness for

7    duty, and I'm jumping -- maybe jumping ahead because

8    this is an expat-related case, and so -- so in this

9    situation, we -- there's a policy for expat medical

10   clearances.

11        And as time goes and things need to be updated,

12   I may pass on my thoughts and ideas to the -- to the

13   team that manages the policies.

14        Q.   Okay.  What team manages the policies?

15        A.   So at the time, the team was called the Center

16   of Excellence.

17        Q.   Okay.  And that's a -- Chevron corporate or --

18        A.   Sorry.  Yes.  I'm sorry for speaking over you.

19        Yes, that is -- it's a function under our

20   health and medical department.

21        Q.   So what kind of -- I guess what kind of

22   consulting role do you have on creating the policies and

23   practices for that, then?

24        A.   So --

25             MR. MUSSIG:  Vague as to time.

EXHIBIT 12-10

Scott Levy, M.D.                                              August 30, 2024

```
 1   BY MS. FLECHSIG:
 2        Q.  Yeah.  I can clarify.
 3             I do mean, you know, while you were the
 4   regional EEMEA director.
 5        A.  Sure.  So the countries change over time.
 6   Sometimes the countries get safer, sometimes they get
 7   less safe, sometimes they have issues.  And so mostly it
 8   was taking a look at frequency of the evaluations,
 9   taking a look at the new risks that may be in a location
10   that weren't there before.
11             Again, things could be -- infectious diseases
12   that are in a place, cholera, malaria, ebola at times --
13   so making sure that when we send people from one
14   location to another that the -- that, A, they're safe to
15   be there; and, B, they're -- we can keep them safe from
16   whatever outside hazards they would -- they may -- they
17   may face, and they're well-informed of their risks.
18        Q.  Okay.  So -- so in other words, you have a role
19   in evaluating the real-time risks based on location.
20        A.  Correct.
21        Q.  Okay.  And you then give recommendations for
22   policy setting for the fitness-for-duty program
23   to the --
24        A.  Correct.
25             (Reporter clarification.)
```

**EXHIBIT 12-11**

Scott Levy, M.D.                                          August 30, 2024

```
 1              MS. FLECHSIG:  Center for Excellence.
 2              THE WITNESS:  Center of Excellence.
 3              MS. FLECHSIG:  Center of Excellence.  Excuse
 4    me.  Okay.
 5    BY MS. FLECHSIG:
 6         Q.  In terms of -- you also mentioned one of your
 7    duties is to manage emergency medical evacuations --
 8         A.  Correct.
 9         Q.  -- and oversee care, you know, when someone has
10    been evacuated.
11         A.  Correct.
12         Q.  What -- I guess, what do you -- strike that.
13              Do you also get to create policies and
14    protocols for medical evacuations?
15         A.  Correct.
16         Q.  Okay.  And -- okay.
17              And you also would, you know, carry them out in
18    real time when something happens.
19         A.  Yes.
20         Q.  Okay.  And at the time you were the regional
21    director for the EEMEA region, you would have been
22    personally responsible for overseeing any medical
23    evacuations from within your region?
24         A.  I would be responsible for -- it's a difficult
25    question to answer, and I'll explain why.  We had
```

**EXHIBIT 12-12**

Scott Levy, M.D.                                              August 30, 2024

1    approximately 300 medical evacuations a year in our

2    region.  Generally, the evacuations that would reach my

3    level would be extremely complicated, not simple, and so

4    I would not be involved in -- in every single

5    evacuation.

6           I would be involved with anything that was very

7    complex, that required international borders, critical

8    patients, and -- or -- or maybe Q and A on an evacuation

9    that had some issues done by our embedded medical teams.

10          (Reporter clarification.)

11          THE REPORTER:  Just keep your voice up at the

12   end.  It kind of trails off on me.

13          THE WITNESS:  Oh, sorry.  Sorry.

14          THE REPORTER:  Thank you.

15   BY MS. FLECHSIG:

16      Q.  The embedded medical teams, just to clarify,

17   those are the local medical teams on the ground.

18      A.  Correct.  And -- and in -- my medical teams for

19   EEMEA, all of those medical teams reported to the

20   businesses.  They didn't report to me directly.

21      Q.  Did you -- did you oversee the people who were

22   handling less complicated medical evacuation?

23      A.  When they were --

24          MR. MUSSIG:  Vague as to "oversee."  Go ahead.

25   You can answer.

**EXHIBIT 12-13**

Scott Levy, M.D.                                              August 30, 2024

1    what I think the -- the risk may be or not be.

2          Q.   So how did you -- how did you first become

3    involved with Mr. Snookal's challenge to the host team

4    deeming him unfit for duty?

5          A.   I was asked as a second opinion to review the

6    case.

7          Q.   To provide a medical opinion on whether it was

8    safe for him?

9          A.   I was -- so I don't recall exactly, but I know

10   Mr. Snookal asked for a second opinion and -- that, I

11   know for a fact.  And then this was sent to me for a

12   review.

13         Q.   Who sent it to you for review?

14         A.   I don't remember.  Again, it was years ago.  I

15   know Mark and I did speak, so I'm not sure if he

16   approached me first or if someone sent it to me, but I

17   do know that Mark and I chatted about his situation.

18         Q.   Okay.  So when you were asked to give a second

19   opinion, were you allowed to override the decision that

20   the host team had made?

21         A.   I was not allowed to override, but I would say

22   that the -- even the -- as I'm thinking of the word

23   "second opinion," that might be incorrect as well.  I

24   would say that -- I was here to help with an appeal.  So

25   I would look at a case and see if there was anything

**EXHIBIT 12-14**

Scott Levy, M.D.                                              August 30, 2024

1    that was missed or some other information that might be

2    pertinent to the case and then have that discussion,

3    doctor to doctor, with our host medical team so they're

4    aware of potentially mitigating factors.

5              So it wasn't necessarily a second -- a second

6    opinion.  It just -- maybe another opinion or -- maybe

7    that's not necessarily different.  But just assist with

8    an appeal.  But -- but the absolute -- the final

9    decision was with the host location.

10        Q.  Okay.  At the time that you were the regional

11   medical director for the EEMEA region, do you recall

12   anyone else who complained about the host decision not

13   to allow the transfer to take place?

14        A.  No.

15        Q.  Okay.  So Mark Snookal was the only time --

16   Mark Snookal's complaint about the decision was the only

17   time you became involved in that way --

18        A.  Correct.

19        Q.  -- to give a second opinion?

20        A.  Correct.

21        Q.  Okay.  In terms of the organizational chart,

22   are you considered the supervisor of the host medical

23   teams?

24        A.  I am not.

25        Q.  Okay.  Who would be supervising those folks?

**EXHIBIT 12-15**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              MR. MUSSIG:  Calls for speculation.  Lacks
 2    foundation.
 3              THE WITNESS:  In this specific business, H --
 4    the medical team reported to HR.
 5    BY MS. FLECHSIG:
 6         Q.  Okay.  So you said "this specific business."
 7              Are you referring to the Escravos, Nigeria,
 8    location -- host location?  Okay.
 9         A.  I'm -- I'm referring to the medical team that
10    made the decision in Nigeria.
11         Q.  Okay.  Who made the decision in Mr. Snookal's
12    instance; right?
13         A.  Yeah, it was Dr. Asekomeh -- don't ask me to
14    spell that at this moment, but -- you may have it
15    already.
16         Q.  Is it Dr. -- and I may well be butchering this
17    as well -- Dr. Asekomeh?
18         A.  That sounds correct.
19         Q.  Okay.  So --
20              MR. MUSSIG:  That is, by the way, the correct
21    pronunciation.  It took me a while.
22              MS. FLECHSIG:  Thank you.  I came up with that
23    myself.  I -- okay.  Great.
24              MR. MUSSIG:  Oh, wait, no, it's Asekomeh.
25              MS. FLECHSIG:  Asekomeh.
```

**EXHIBIT 12-16**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              MR. MUSSIG:  Asekomeh.

 2              MS. FLECHSIG:  Okay.

 3    BY MS. FLECHSIG:

 4        Q.  So your understanding is Dr. Asekomeh reported

 5    to Chevron human resources.

 6        A.  No.  He reported to the medical director for

 7    Nigeria.  Sorry.

 8              MR. MUSSIG:  Calls for speculation.  Lacks

 9    foundation.

10    BY MS. FLECHSIG:

11        Q.  Sorry.  Go ahead.  You -- you said he reports

12    to the medical director in Nigeria.

13        A.  Correct.

14        Q.  Okay.  And then I think you said somebody

15    reports to HR.

16              Who then reports up into Chevron's human

17    resources?

18        A.  The medical director.

19              MR. MUSSIG:  Calls for speculation.  Lacks

20    foundation.

21              THE WITNESS:  The medical director then reports

22    to HR.

23    BY MS. FLECHSIG:

24        Q.  Who was the medical director in Nigeria?

25        A.  It was at this -- at the time of this case, it
```

**EXHIBIT 12-17**

Scott Levy, M.D.                                              August 30, 2024

```
 1   was Dr. Arenyeka, A-R-E-N-Y-E-K-A.
 2        Q.   Okay.  And is that -- if you know, is the human
 3   resources department that Dr. Arenyeka reports to -- is
 4   that Chevron USA, or what -- do you know what the
 5   corporate entity is?
 6        A.   So --
 7             MR. MUSSIG:  Calls for speculation.
 8             THE WITNESS:  We call the business NMA, so it's
 9   the North African -- North -- it's -- NMA is the
10   abbreviation.  I'm -- North -- Nigeria Mid Africa
11   business unit.
12   BY MS. FLECHSIG:
13        Q.   Okay.  Do you know what medical specialty
14   Dr. Arenyeka has?
15        A.   I don't recall.
16        Q.   Okay.  Okay.  So when you became involved in
17   giving a second opinion on Mr. Snookal's challenge to
18   the host location's determination, what did you do to
19   inform your second opinion?
20             MR. MUSSIG:  Misstates the witness's testimony.
21             THE WITNESS:  So I'm not sure I understand the
22   question.  Could you please repeat it?
23   BY MS. FLECHSIG:
24        Q.   Yeah.  So you said you were asked by somebody
25   to give a second opinion on Mr. Snookal's fitness for
```

**EXHIBIT 12-18**

Scott Levy, M.D.                                                    August 30, 2024

1   duty in -- for the expatriate assignment; right?

2            MR. MUSSIG:  Misstates the witness's

3   testimony.

4            THE WITNESS:  Correct.  Correct.  Yeah.  I --

5   again, I don't remember how -- how I was contacted

6   initially, but I was obviously dragged into discussion

7   or at least into the case one way or another, but -- so

8   I had a conversation with Mr. Snookal as a first line to

9   understand what was going on.

10           I received his impression of the situation,

11  discussed the issues with him, discussed some of the

12  details of his medical condition, and then asked

13  permission to speak with his medical -- his treating

14  medical provider.

15  BY MS. FLECHSIG:

16       Q.  Okay.  In terms of his treating medical

17  provider, was that his treating cardiologist?

18       A.  Correct.

19       Q.  And did you -- did you speak with Dr. Khan, the

20  cardiologist?

21       A.  I spoke with Dr. Cardio- -- Dr. Khan via

22  messaging.  So I left a voicemail for him explaining who

23  I was and what I was trying to do, and then he responded

24  in an e-mail.

25       Q.  Did you ever speak in real time over the phone

**EXHIBIT 12-19**

Scott Levy, M.D.                                                      August 30, 2024

1   or in person?

2        A.   I don't recall.  I -- I don't recall.

3        Q.   Okay.  You don't recall whether you did, or you

4   don't recall speaking with him?

5        A.   I don't recall speaking with him on the phone.

6        Q.   Okay.  And in your recollection, what did

7   Dr. Khan say to you about his evaluation of

8   Mr. Snookal's health?

9        A.   The -- I'll get to the summary.  So what he

10  explained to me and -- was that he has this condition;

11  he's been followed; and for the last three years, they

12  haven't seen a significant or any increase in the size

13  of his problem.  And he gave me some risk -- what the --

14  what his risk of -- of a subsequent event was.

15            So I believe the message that I left for him

16  was that I'm trying to understand the risk.  The data

17  that I pull up shows he's got about a 4 or 5 percent

18  risk of a cardiac event per year -- you know, currently,

19  and I just need to better understand to -- to be able to

20  fine tune or decide if that number is -- has any

21  validity at all.

22            And so he responded with he believes that the

23  individual's risk of having a cardiac event -- or an

24  event related to his condition was about 2 percent a

25  year.  He quoted some studies in mice, and he said that

**EXHIBIT 12-20**

Scott Levy, M.D.                                                    August 30, 2024

1    those were positive, and potentially his -- his risk

2    could be less than 2 percent a year.

3         Q.   Okay.  In terms of the -- you said that

4    according to your data, there was a 4 to 5 percent risk

5    of a cardiac event per year.

6         A.   Yes.

7         Q.   How did you get that figure?

8              MS. FLECHSIG:  Sorry, Dr. Levy --

9              MR. MUSSIG:  Is he frozen?

10             MS. FLECHSIG:  I think it's just him.  He

11   froze.

12             MR. MUSSIG:  Okay.

13             MS. FLECHSIG:  Dr. Levy, are you there?

14             MR. MUSSIG:  He's still frozen for me.

15             MS. FLECHSIG:  Yeah.  Me too.

16             THE VIDEOGRAPHER:  Would you like to go off the

17   record?

18             MR. MUSSIG:  Yeah, maybe -- yeah, we've been

19   going about an hour.  Does it make sense to take a break

20   now?

21             MS. FLECHSIG:  I mean, I'd rather not, you

22   know, break while we're -- have a question pending,

23   but -- Dr. Levy, are you there?  I see you turned your

24   video off.

25             MR. LEAL:  Does it make sense to ask him to log

**EXHIBIT 12-21**

1           THE WITNESS:  Oh, no, we're good.  We're good

2    now.  I can see this.  And this is easier for me at the

3    moment.

4    BY MS. FLECHSIG:

5        Q.  Okay.  So I'm going through -- it looks like

6    it's an e-mail from Mr. Snookal to you on August 23rd,

7    2019; correct?

8        A.  Correct.

9        Q.  Okay.  So I see the screenshot Mr. Snookal

10   included in his e-mail to you, which has a chart of

11   maximal aortic diameter and probability of aortic events

12   in one year.

13       A.  Uh-huh.

14       Q.  When you were evaluating the risk of an adverse

15   event for Mr. Snookal, did you consider the actual

16   diameter of his aortic aneurysm?

17       A.  Absolutely.  That's -- the larger the diameter

18   is, the higher the risk is.  Very similar to this chart.

19   The numbers we can debate, but, yeah, it's absolutely

20   relevant.

21       Q.  Okay.  Did you also consider the changes or

22   lack of changes in the diameter over time and whether

23   that impacted Mr. Snookal's risk?

24       A.  I have.  Yes, I did.

25       Q.  Okay.  Did you evaluate whether Mr. Snookal's

**EXHIBIT 12-22**

Scott Levy, M.D.                                                    August 30, 2024

```
1    management with medication impacted the risk of an
2    adverse outcome due to the aortic aneurysm?
3         A.   So the fact that he was on his medications and
4    the aneurysm had not grown in those three years -- I
5    took that as he was relatively stable.
6         Q.   So, yes, you did consider it.
7         A.   Correct.  Correct.  Yes.  Considered it, yes.
8         Q.   Okay.  And this e-mail, it does say that
9    Mr. Snookal attached a past research and he found a
10   paper.
11             Did you look at --
12        A.   I think --
13        Q.   -- the attachment that he included?
14        A.   No.  So I believe that the attachment that he
15   included is that photo right below.
16        Q.   Okay.  So your sense is that there was not any
17   separate attachment to this e-mail.
18        A.   Correct.
19        Q.   Okay.
20        A.   I actually believe there was a -- there was an
21   attachment to the e-mail, but it was the article that I
22   sent to him.  So he just replied with attachments and
23   then added this to the -- to the e-mail message.
24        Q.   Okay.  Let's see if we can track down the
25   article.  I'm going to screen share this with you as
```

**EXHIBIT 12-23**

Scott Levy, M.D.                                              August 30, 2024

1        A.   Yes.

2        Q.   -- about Mr. Snookal's risk?

3        A.   I would have, yes, correct.  I would have.

4        Q.   Okay.  Okay.  Did you review any of

5   Mr. Snookal's actual medical records in formulating your

6   opinion?

7        A.   I did not.  I -- I reviewed the medical

8   evaluations that he had for Chevron, and I reviewed his

9   message -- or letter from his cardiologist.  So the --

10  the key bit here is -- it's a risk tolerance issue.

11            So he has a medical issue with a risk, and we

12  can debate the risk even on this call, but there's a

13  certain risk and the -- the determination was based on

14  the host location's willingness to accept that risk.

15            MR. MUSSIG:  Do you -- he -- oh, it's me.

16  BY MS. FLECHSIG:

17       Q.   Okay.

18            MR. MUSSIG:  Can you guys hear me?

19            MS. FLECHSIG:  Yes.

20            MR. MUSSIG:  My computer froze for a second.

21            MS. FLECHSIG:  Yeah.

22  BY MS. FLECHSIG:

23       Q.   Okay.  So ultimately, the host location gets to

24  decide how much risk they're willing to tolerate at

25  their site; correct?

**EXHIBIT 12-24**

Scott Levy, M.D.                                          August 30, 2024

1      A.  Correct.  It's -- yeah, it is -- that's exactly

2  right.  And then the risk is a combination of things;

3  right?  It's the -- it's -- we need to know what the

4  condition is so we know what the risk is that we're

5  taking.  If it's -- if the risk is high risk that

6  someone's going to sprain their ankle, not so relevant;

7  but if it's -- you know, if it's a -- if it's a risk

8  that someone's going to potentially die or have a very

9  bad outcome, then it becomes very significant as far as

10  the discussion goes.

11      Q.  So when the host location makes a

12  determination, I guess, what -- what role do you have in

13  whether it's too much risk for Chevron to tolerate?

14      A.  My job in this situation would be to better

15  clarify the risk for them.  And I believe in our

16  situation -- I don't -- I don't believe that anyone had

17  a conversation with the cardiologist.

18          I did get the specifics from the cardiologist

19  about what his individualized risk is, again, not based

20  on studies, not based on -- not based on studies that

21  may or not -- may not pertain to him, but what his --

22  what his treating cardiologist thought the risk was for

23  him.  And I used this information to try to make a case

24  for Mr. Snookal with the medical team.

25      Q.  Did you have -- did you ever suggest that

**EXHIBIT 12-25**

Scott Levy, M.D.                                                      August 30, 2024

```
 1   Dr. Asekomeh speak with Dr. Khan?

 2        A.  No, I did not.  I felt that I had enough

 3   information.  Usually it's pretty complicated to make

 4   those connections work, given the time zones.

 5        Q.  Okay.  So did you suggest that anyone from the

 6   host team speak with Dr. Khan?

 7        A.  I did not -- I did not have that conversation.

 8   Correct.

 9        Q.  Okay.

10        A.  I did pass on the information word for word

11   from Dr. Khan to the medical team, though.

12        Q.  Did you speak with Dr. Asekomeh about

13   Mr. Snookal's case?

14        A.  I believe I forwarded him -- the information to

15   Asekomeh and Arenyeka, his boss.  And Arenyeka responded

16   with the risk is -- the risk in this location is still

17   too high and, if possible, we'd be very happy to take

18   him in Lagos where we have medical resources.  And I'm

19   paraphrasing.

20        Q.  Other than the e-mail exchange that you just

21   described, did you speak with Dr. Asekomeh about

22   Mr. Snookal in real time, like, over the phone or

23   video --

24        A.  I don't recall.  I don't recall that.

25            (Reporter admonishment.)
```

**EXHIBIT 12-26**

Scott Levy, M.D.                                                August 30, 2024

```
 1   BY MS. FLECHSIG:
 2        Q.   You don't recall speaking with him directly.
 3        A.   Correct.  I don't recall speaking with him.
 4        Q.   Okay.  Did you speak with Dr. Arenyeka about
 5   Mr. Snookal directly, other than the e-mail that you
 6   described?
 7        A.   Not about -- not about this case.  I -- sorry,
 8   I don't recall speaking to him about this case.
 9        Q.   Okay.  Did you speak with any other doctors in
10   Nigeria about Mr. Snookal's case?
11        A.   I have not.
12        Q.   Okay.  And that includes over e-mail.  You
13   didn't have any e-mail communications with anyone other
14   than what you described with Dr. Asekomeh and
15   Dr. Arenyeka.
16        A.   Not to my knowledge, no.
17        Q.   Okay.  Okay.  Other than the e-mail you
18   described -- I know you paraphrased with Dr. Asekomeh
19   and Arenyeka, did you have any other written exchanges
20   with them about Mr. Snookal?
21        A.   No, I don't believe so.  It was a simple, this
22   is the information from his provider, the risk doesn't
23   appear high, it appears of low to moderate -- I believe
24   I said risk doesn't appear high, and their response was
25   simply the risk is still too high for us.
```

**EXHIBIT 12-27**

Scott Levy, M.D.                                                    August 30, 2024

1    approach his cardiologist to talk about why he does --

2    why -- whether that pertains to him or not.  So I would

3    say that 4 or 5 is only my initial start at an appeal to

4    try to acquire more information.

5         Q.  Okay.  I'm going to show you another document.

6    I'll mark it as Exhibit C.

7              (Exhibit C marked for

8              identification.)

9    BY MS. FLECHSIG:

10        Q.  It's been produced as SNOOKAL-01091.  And I

11   think for this one, it's just a one-pager, so I'll

12   screen share.  And if you're having issues reading it,

13   please let me know.

14        A.  Yeah, if you could zoom in, please.  Okay.

15        Q.  So it looks like it's an August 23rd, 2019,

16   e-mail from Dr. Steven Khan to you,

17   scottlevy@chevron.com with a CC to Mark Snookal?

18        A.  Correct.  Yes.  I know this e-mail.

19        Q.  Okay.  I'll give you a second to look at it.

20             Okay.  So in this e-mail, Dr. Khan cites a 2002

21   study.  Is that the study that you are referring to in

22   terms of how you came up with the 4 to 5 percent figure?

23        A.  Yes.  Actually, can you zoom in a little bit

24   more, please?

25        Q.  Yes.  Of course.  So I'm referring to this --

**EXHIBIT 12-28**

Scott Levy, M.D.                                                    August 30, 2024

1          A.  Yes, yes.

2          Q.  That's the study that you were referring to?

3          A.  Correct.  Yes.

4          Q.  Okay.  Okay.  So in this e-mail, Dr. Khan also

5     notes that the studies of risk of rupture are fairly

6     old, 2002, and treatment has improved, as has our

7     understanding of aortic aneurysms.

8          A.  Yes.

9          Q.  So did you compare this 2002 study to more

10    recent research?

11         A.  I did not.  I took the word of the expert and

12    his treating provider who knows him better than I can.

13    And I accepted his number as a little bit lower.  He

14    says the risk of complications related to thoracic

15    aneurysm is low and likely less than 2 percent, but

16    he -- he says that it's 2 percent, and then the mouse

17    studies are likely -- likely show that he's better than

18    2 percent.

19              So that's what I took:  2 percent or lower was

20    his risk.  I didn't take zero was the risk.  I took 2

21    percent or lower.

22         Q.  Okay.  So basically that was your final thought

23    on the percentage of the risk that you then conveyed to

24    the host team?

25         A.  I conveyed this exact message.  I forwarded

**EXHIBIT 12-29**

Scott Levy, M.D.                                          August 30, 2024

1   way or another with certainty.  And so I apologize.

2        Q.   Okay.  Slightly different question.

3             Are you aware of anyone who died in Escravos

4   before being medically evacuated?

5        A.   I'm aware of people in Nigeria who have died --

6   working for us in Nigeria that have died without --

7   without warning.  So sudden onset, found slumped over,

8   found dead, found not waking up in the morning.  So

9   we've had cases like that.  The -- yeah.

10       Q.   Do you know where in Nigeria those deaths

11  occurred?

12       A.   So I believe they happened all over Nigeria and

13  all of our operations.  But Escravos is a very small

14  location, and I want to be very careful about telling

15  you anything that's not correct here.

16       Q.   Are you aware of anyone who's ever been injured

17  because of a medical evacuation, whether that's the

18  person being evacuated or a personnel who's carrying out

19  the evacuation?

20       A.   No, I'm not aware of anyone that was injured as

21  a result of a medical evacuation in Nigeria at all.  So

22  the -- in general, the -- we consider Escravos to be one

23  of the most remote locations in our company, and the

24  medical evaluation to -- for someone to get to Escravos

25  is -- is -- let's just say it has a higher criteria of

**EXHIBIT 12-30**

Scott Levy, M.D.                                                    August 30, 2024

1        Q.  Okay.

2        A.  And then the -- obviously, the condition itself

3    will warrant different types of planes based on -- based

4    on the capabilities, whether it needs to be ICU capable,

5    whether it can handle heart attacks, whether it's just a

6    simple transport.  All of these things come into play.

7    And then also visas of the -- visas or passports of the

8    individual.  Obviously, if we're going to move an

9    individual somewhere, can they get into the host country

10   that we're about to send them to.  And the same for the

11   medical team.  Can the medical team get into the host

12   country.  So there are a lot of factors to play -- that

13   come into play.

14       Q.  Okay.  I do want to ask -- I want to ask a

15   question specific to Mr. Snookal.

16            So was there anything about the actual job that

17   Mr. Snookal would have been performing in Escravos that

18   would increase the risk of an adverse outcome to him?

19            MR. MUSSIG:  Calls for speculation.

20            THE WITNESS:  So I believe that Mr. Snookal

21   was -- his proposed job in Nigeria was an office-based

22   job with just mild to light lifting activities.  I don't

23   think it's significant -- I don't think it's of --

24   sorry, let me start over.

25            I don't think that his condition would have

**EXHIBIT 12-31**

Scott Levy, M.D.                                          August 30, 2024

1   been an issue for his proposed role, had it not been for

2   the location.

3   BY MS. FLECHSIG:

4        Q.   Okay.  And in terms of the specific scenarios

5   you were concerned about, it -- again, it was the aortic

6   dissection or an aortic aneurysm; correct?

7            MR. MUSSIG:  Asked and answered.

8            THE WITNESS:  Yes.

9   BY MS. FLECHSIG:

10       Q.   Were you concerned at all that Mr. Snookal

11   would pose a threat to other people's safety?

12           MR. MUSSIG:  Calls for speculation.  Lacks

13   foundation.

14           THE WITNESS:  Potentially.  And I would say it

15   all -- again, it's so -- these are so complicated.  So

16   if -- I'll give you an example.  If he were to have an

17   event while he was on location, he would have tied up

18   the medical team for potentially days trying to sort out

19   his issue, if he survived that long during the

20   evacuation.  If he were doing something that were deemed

21   safety sensitive -- and I'm not sure he had

22   responsibilities that were -- if he were climbing up a

23   ladder or climbing upstairs and fell over -- potentially

24   a lot of things could have happened, and so it's -- it's

25   not so easy to say.

**EXHIBIT 12-32**

Scott Levy, M.D.                                      August 30, 2024

```
1          It all depends on specifically what he was
2   doing on location.  And again, I didn't have an issue
3   with the job at all.  I don't think any of us had an
4   issue with the specific type of work he was doing.  We
5   didn't have an issue -- even when he was declined or
6   turned down for this assignment, still working at the
7   refinery in Richmond, California, was still -- wasn't
8   something that we even considered stopping him from
9   doing because of the risk.
10         It was simply because of that -- that -- if
11  there -- if that -- if that sort of 2 percent occurred
12  while -- while he was on location, it was something that
13  the team could not manage.
14  BY MS. FLECHSIG:
15       Q.  Okay.  Did you document any concerns that you
16  had about any risk to other people that you thought
17  Mr. Snookal could have?
18       A.  I did not.
19       Q.  Okay.  Was it something that you were concerned
20  with at the time in assessing the risk that the host
21  location would tolerate?
22       A.  So I don't think it -- so I don't think it
23  ended up to be relevant in this situation.  So -- and
24  the reason being was there was no -- even the risk of 2
25  percent to himself was enough for them to say -- was
```

**EXHIBIT 12-33**

Scott Levy, M.D.                                                    August 30, 2024

1   enough for them to say no.  So I would say it wasn't

2   even -- the risk to others wasn't even -- let's just say

3   they didn't even have time to come up and -- or, no, it

4   wasn't discussed.  Not -- it wasn't discussed for me.

5           I don't know the discussions that they had

6   inside of the Nigeria Mid Africa business unit, but it

7   wasn't a discussion that I had with the medical teams.

8       Q.  Okay.

9       A.  Or Dr. Khan.

10      Q.  I want to ask -- I'm going to show you another

11  document.  I'm up to Exhibit D now.

12          (Exhibit D marked for

13          identification.)

14  BY MS. FLECHSIG:

15      Q.  This is -- this has been produced as

16  SNOOKAL-01088 through 01089.

17          Again, please go ahead and take a look at this.

18  It looks like it's an e-mail from you to Mr. Snookal on

19  September 16th, 2019.

20          I'm going to see if I can --

21      A.  Can you zoom in, please?

22      Q.  Yeah.  Is that -- is that better?

23      A.  Better, yes.

24      Q.  Do you recall writing this e-mail to

25  Mr. Snookal?

**EXHIBIT 12-34**

Scott Levy, M.D.                                        August 30, 2024

1          A.  Can you scroll up to the top of it?  Let me

2     just --

3          Q.  Yes.

4          A.  I do.  I do.

5          Q.  Absolutely.

6          A.  I know this message, yes.

7          Q.  Okay.  So in this e-mail, you send a list of

8     locations where it sounds like you would be okay with

9     Mr. Snookal working as an expatriate on assignment by

10    Chevron; right?

11         A.  So, yes, that's -- so that's what I did say.  I

12    said those are the locations that will -- would probably

13    be perfectly fine.  And then for the other locations,

14    it's one where we'd specifically need to talk with the

15    local -- I -- it would take additional work to -- to

16    clarify.

17         Q.  Okay.  And when you created the list of ones

18    that you did not foresee issues with, how did you come

19    up with those locations?

20         A.  Oh, so we have -- well, those are

21    higher-quality medical infrastructures.  And so -- so

22    between the -- where the work locations are and the

23    medical resources around them are a better fit for --

24    for dealing with an emergency and things like that.

25              So the -- and I believe we ranked the locations

**EXHIBIT 12-35**

Scott Levy, M.D.                                                           August 30, 2024

```
 1        A.   Correct.
 2             MR. MUSSIG:   Calls for speculation.
 3   BY MS. FLECHSIG:
 4        Q.   In terms of the -- in terms of procedurally,
 5   that's how this works; right?
 6        A.   Yeah.   From what I see here, it looks like he
 7   did a physical exam and took the history and then wrote
 8   notes, even restrictions, correct.   So I would assume --
 9   from reading this, I would assume that this was a -- he
10   did an actual exam on him.
11        Q.   Okay.   So ultimately, on the fifth page of this
12   document, SNOOKAL-00609, Dr. Sobel checks, "Fit for duty
13   with restrictions."
14             You see what I'm referring to; right?
15        A.   Yes.
16        Q.   And the restrictions are, "No heavy lifting
17   greater than 50 pounds, needs review of recommend letter
18   from cardiologist to clear him."   Right?
19        A.   Uh-huh, correct.
20        Q.   Okay.   So did you review the letter that
21   Mr. Snookal's cardiologist provided?
22        A.   I need to see it again to remember.   Sorry.
23        Q.   So -- no problem.   I -- I was going to segue us
24   there anyway.   So I'll mark as Exhibit E --
25             MS. FLECHSIG:   Is that right?
```

**EXHIBIT 12-36**

Scott Levy, M.D.                                              August 30, 2024

```
 1            THE REPORTER:   F.

 2            MS. FLECHSIG:  Okay.  Thank you.  Exhibit F,

 3    SNOOKAL-01090.

 4            (Exhibit F marked for

 5            identification.)

 6    BY MS. FLECHSIG:

 7       Q.  This is a letter dated July 29th, 2019, and

 8    it's signed by S. Khan, M.D.; correct?

 9       A.  Yes, I've seen this before.

10       Q.  Okay.  Is that the cardiology clearance letter?

11       A.  It is.  It would be, yes.

12       Q.  Okay.  So with Mr. Snookal's cardiologist

13    saying that "Mr. Snookal's under my care for his heart

14    condition.  It is safe for him to work in Nigeria with

15    his heart condition.  His condition is under good

16    control and no special treatments are needed";

17    ultimately, someone still made the determination that

18    Mr. Snookal was not fit for duty; correct?

19       A.  Correct.

20       Q.  And is it because despite Mr. Snookal's ability

21    to complete the job, Chevron felt it was too great of a

22    risk in the event he had to be evacuated?

23            MR. MUSSIG:  Calls for speculation.  Lacks

24    foundation.

25            THE WITNESS:  So the issue is -- I'll tell you
```

**EXHIBIT 12-37**

Scott Levy, M.D.                                    August 30, 2024

1    definite risk, not a theoretical risk.  And then the

2    ability to manage that risk is -- was -- was the basis

3    of their decision.  There was -- I would say there's

4    nothing theoretical about that 2 percent.

5    BY MS. FLECHSIG:

6        Q.  For example, would a pregnant woman be allowed

7    to go to Escravos, Nigeria?

8            MR. MUSSIG:  Calls for speculation.  Lacks

9    foundation.  Incomplete hypothetical.  Vague as to "go

10   to."

11           THE WITNESS:  Yeah, so I would say -- yeah,

12   it's complicated.  And what we need to know is how --

13   what term she was in, whether the expectation would be

14   that we'd allow a delivery on the ground in Escravos for

15   this individual.  There are a lot of factors in there.

16           I would say certain women who are pregnant with

17   high risk, so high-risk babies, IVF, previous

18   complications, known complication of the current

19   pregnancy, those things would be disqualifiers for sure.

20   BY MS. FLECHSIG:

21       Q.  In terms of health conditions that are not

22   actively impacting someone's ability to do the job, what

23   makes it too high risk for Chevron?

24           MR. MUSSIG:  Calls for speculation.  Lacks

25   foundation.  Asked and answered.

**EXHIBIT 12-38**

Scott Levy, M.D.                                                August 30, 2024

```
 1              THE WITNESS:  It's not the job.  It's the
 2    location.  So Chevron has a duty of care for their
 3    employees.  And we need to ensure that the quality of
 4    care delivered to our employees who we move around the
 5    world are consistent or compatible with what they would
 6    have received in their home country.
 7              So I would say it's the duty-of-care question
 8    and -- and the assignment.  It's the location, not
 9    the -- not the job here.
10    BY MS. FLECHSIG:
11        Q.  To confirm, the location of Escravos, Nigeria,
12    would not impact Mark's aortic aneurysm; correct?
13              In other words, being in Escravos, Nigeria,
14    would not affect the risk of an adverse event for
15    Mr. Snookal; correct?
16        A.  Not based on --
17              MR. MUSSIG:  Calls for speculation.
18              THE WITNESS:  Not based on his written job
19    desc- -- requirements.  However, I would look at the
20    aneurysm as -- with -- with the risk, it's 2 percent and
21    likely to grow -- I'll just say it's 2 percent, and I
22    would consider it more like a ticking -- ticking clock.
23    And it's just -- or a ticking time bomb, and it's just a
24    matter of time until it stops ticking.
25              And so -- so that's what the -- so the -- his
```

**EXHIBIT 12-39**

Scott Levy, M.D.                                                            August 30, 2024

1   risk is when -- when he does have an issue with that

2   heart -- and, again, we hope it never happens.  It's --

3   it would be a disaster if it happened in Escravos.

4   BY MS. FLECHSIG:

5       Q.  Right.

6       A.  Because we can't provide that duty of care to

7   him.  We wouldn't have been able to get him to a

8   high-quality tertiary care medical center that could

9   sort this issue.

10      Q.  Right.  But what I'm asking is in terms of the

11  likelihood of having an adverse event, it doesn't matter

12  whether Mr. Snookal is in Los Angeles; Texas; Escravos,

13  Nigeria; the risk of the adverse event happening remains

14  the same; correct?

15      A.  Correct.  But the outcome would be different

16  based on those locations.  The outcome would be

17  different based on his -- the time to get to a

18  high-quality medical center.  The -- the -- even across

19  medical centers -- all across the U.S., those that

20  have -- that see more cases per year have better

21  outcomes than those that see less cases per year.

22          So -- so we're talking about, yes, the problem

23  would happen, and then if he lived in certain locations,

24  he would do better if that problem happened than if he

25  lived in others.

**EXHIBIT 12-40**

Scott Levy, M.D.                                                    August 30, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                    SCOTT LEVY, M.D.,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21          DATED:  September 12, 2024.

22

23   _____

24   Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

**EXHIBIT 12-41**

# EXHIBIT 12 -C

## Subject: Patient MS

From: "Steven H. Khan" <Steven.S.Khan@kp.org>

To: "scottlevy@chevron.com" <scottlevy@chevron.com>

Cc: "mark@maygus.com" <mark@maygus.com>

Fri, 23 Aug 2019 21:35:33 +0000

Hi Dr. Levy,

I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.

I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.

I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this email.

Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.

From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).

Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.

Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.

Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.

For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS

Is on an ARB.

In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.

The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.

If you have any further questions, please feel free to email me or call me.

Best regards,

S. Khan, MD

Clinical Associate Professor, UCLA School of Medicine

Heart Failure and Transplant Cardiology, Kaiser Permanente

NOTICE TO RECIPIENT: If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

EXHIBIT
C
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

# EXHIBIT 12 -D

**EXHIBIT
D**
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

**Snookal, Mark**

| | |
|---|---|
| **From:** | Levy, Scott |
| **Sent:** | Monday, September 16, 2019 4:20 AM |
| **To:** | Snookal, Mark |
| **Subject:** | medical |

Mark,

I spoke with Andrew Powers who briefed me on your recent discussion with him and let me know that you were waiting on written documentation and perhaps further explanation of your recent MSEA (medical suitability for expat assignment) examination. I'll do my best to explain in writing but also happy to further discuss live.

As you know, foreign assignments (including, Escravos Nigeria) can be in locations where access to critical prescription medications or medical care is extremely limited. For these and other reasons, we conduct an MSEA to confirm that an employee is medically able to work in the new job and location.

I understand that you are willing to take the risk of potentially dying on the job, and that you do not feel it is the company's place to make that decision for you. I agree to a certain extent and recognize your concerns about paternalism. However, the company does have a right to not engage individuals where their assignment could pose a "direct threat" to their own health and safety.

We certainly don't believe that every employee with a health condition poses a direct threat; we need to analyze the condition and the attributes of the job. When there are ways of ameliorating the risks (including reasonable accommodations) we work with the individual to do so. I became involved on your case when you had requested a second opinion on the initial denial and with your consent involved your treating physician to better understand your specific risk. While reasonable professionals can debate the exact percentage, we are dealing with an established risk that is several magnitudes higher than the baseline and is a realistic possibility. We respectfully disagree that this finding (regardless of the exact percentage) is based on stereotypes, as distinguished from objective medical evidence. But the risk itself is not determinative. The concern is that if the condition were to occur, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos. There is no medical capability to manage this type of emergency in Escravos or anywhere near Escravos. It is also clear that the duration of your condition is not limited and is continually present, and the occurrence is not predictable and it's not possible to isolate triggers to reduce the risk.

We have no problems with you working in El Segundo and believe there are many other foreign locations where you could work. We in fact discussed whether you could perform this particular job at a different location in Lagos, but it wasn't possible.

In response to your question, I would not foresee issues with you working in the following locations:

Americas: US onshore operations, San Ramon, Houston, Calgary, Vancouver, St. John, Argentina (Buenos Aires); Colombia (Bogota); Brazil (Rio de Janeiro), Trinidad (Port of Spain)

Asia Pacific: Singapore, Australia (Perth based), Hong Kong, New Zealand, Thailand (Bangkok, Rayong, Sirai Chi); South Korea (Seoul, Ulsan, Geoje), Philippines (Manila), China (Beijing, Shanghai), Japan Metropolitan; Malaysia (Kuala Lumpur); Pakistan Metropolitan

EEMEA: UK (all locations), Belgium (all locations), Denmark (all locations), France (all locations), Italy (all locations), Netherlands (all locations), United Arab Emirates (all locations), Norway (all locations), Germany (all locations), Sweden (all locations), South Africa (all locations), Bahrain (all locations), Qatar (all locations), Kuwait (all locations), Turkey (all locations), Poland (all locations), Saudi Arabia (all locations), Nigeria (Lagos), Russia (Moscow)

I'd need to do a more specific assessment for:

Americas: US offshore operations (Deepwater), Colombia (Riohacha); Argentina- Nuquen, Colombia –Rio Hacha, Guatemala, Panama, Mexico, Brazil Offshore, Kitimat (Canada)

1

SNOOKAL-01088

**EXHIBIT 12-D-1**

D.1

AP: Australia (Barrow Island, Onslow, Dampier, Karratha, Thevenard Island & Wheatstone offshore); Bangladesh (Dhaka); China (Chengdu, Tianjin, Tanggu); Indonesia (Jakarta, Sumatra, Balikpapan); Malaysia (Lumut); Thailand (Songkla, Nakorn Srithammarat - NST, Offshore); Vietnam; India

EEMEA: Angola (Luanda); Nigeria (Lekki, Abuja), Azerbaijan (all locations), Ukraine (all locations), Romania (all locations), Rep. of Congo (Pointe Noire), Morocco (all locations), Egypt (all locations), Russia (outside Moscow).

I'd be quite concerned about other locations.  As I mentioned above, I'd be more than happy to discuss this with you further.

Scott

**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
TR & HM COE

Chevron Products UK Limited
1 Westferry Circus
Canary Wharf
London E14 4HA
Office-  +44 (0) 207 719 3390 (Also serves 24/7 medical emergency support)
Fax-    +44 (0) 207 719 5188
Mobile- +44 (0) 792 258 4538
CTN- (8) 584 3390
ScottLevy@chevron.com

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118

### Important Message from the Global Privacy Team

Remember that when it comes to sharing personal data, **less is more**. Do not share more information than is being requested from you. Share information securely and follow company policy by **encrypting** emails and attachments that contain **sensitive personal data**.  Before clicking "send" on an email, **double-check** that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com

SNOOKAL-01089

**EXHIBIT 12-D-2**

D.2

# EXHIBIT 12 -E



Chevron

**Medical Suitability for Expatriate Assignment History & Physical Examination**
**GO-146-MSEA**

Mark Snookal

CAI - MVZM

0724-15

RECEIVED
JUL 2 4 2019

Initial
Nigeria

Note to Examinee and Examiner: In the US, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information for any U.S. based employees (whether within the U.S. or outside the U.S. on assignment) when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. Local or Host Country legal requirements may also apply.

**Part A. Examinee: Please complete Parts A through F prior to exam.**

| F.I. | M.I | Last Name | First Name | CAI | Gender |
|------|-----|-----------|------------|-----|--------|
| | | Mark Snookal | | MVZM | M |

| Current Job Title | New Job Title* | Current Company/BU/OpCo | Next * Company/BU/OpCo | Current Location | Next * Location |
|---|---|---|---|---|---|
| IEA Reliability Team Lead | Reliability Engineering Manager | ESE | NMASBU | El Segundo CA USA | Escravos. Nigeria |

*if Applicable

**Part B.** Your country of assignment may or may not have full medical resources to support your health needs. Please answer the following questions as accurately as possible and check 'N' (no) or 'Y' (yes) in the column. Answers with Yes, please provide more information in the description boxes. This information is used to promote your safety and ensure your health needs can be met.

| | (If need, please use back page) | N | Y | Description |
|---|---|---|---|---|
| 1. | Do you have any medical, physical or psychological conditions under the care of a health professional? If yes, please describe. | ☐ | ☒ | I have a dilated aortic root, I am under the care of a cardiologist and see him once per year for a checkup. I have consulted with him on this assignment and he sees no issues with it. |
| 2. | (a) Are you taking any medicines that require a prescription? If yes, please list. | ☐ | ☒ | Losartan and Amlodipine |
| | (b) Are you taking any non-prescription medicines on a frequent basis? If yes, please list. | ☒ | ☐ | |
| 3. | (a) Do you have any allergies? | ☒ | ☐ | |
| | (b) Have you ever had severe allergic reactions? If yes, do you know what caused it? | ☒ | ☐ | |
| 4. | Do you exercise for at least 30 minutes 3 times a week, on average? | ☐ | ☒ | |
| 5. | (a) Do you feel unusual fatigue or sleepiness? | ☒ | ☐ | |
| | (b) Do you have any problems sleeping? | ☒ | ☐ | |
| | (c) Do you use sleeping aids, including medication? | ☒ | ☐ | |
| 6. | Have you ever experienced health problems working in extreme weather conditions? | ☒ | ☐ | |
| 7. | Have you experienced unexplained weight loss or gain? | ☒ | ☐ | |
| 8. | (a) Do you smoke? If yes, what and how much each day? | ☒ | ☐ | |
| | (b) Did you smoke regularly for more than 1 year ever in your past? | ☒ | ☐ | |
| 9. | Do you drink alcoholic beverages? If yes, what is your average weekly intake? | ☒ | ☐ | |
| 10. | Have you ever required a medical evacuation from a work location? If yes, what was the reason? | ☒ | ☐ | |

**EXHIBIT E**
Scott Levy, M.D.
8/30/2024
Rachel N. Barkume, CSR, RMR, CRR

Page 1 of 6

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00605

**EXHIBIT 12-E-1**

E.1

| | | | Examinee Last and First Name | Examinee CAI |
|---|---|---|---|---|
| | | | **Mark Snookal** | **MVZM** |

| | | | | |
|---|---|---|---|---|
| 11. | Have you ever had any mental health or psychological issues requiring at least a medical prescription? If yes, please describe | ☐ | ☒ | I was treated for depression with Effexor for a few years from approximately 1994-1996 |
| 12. | Have you been in the emergency room and or hospitalized within the last six months? | ☒ | ☐ | |
| 13. | Have you undergone any surgical procedure or operations within the last six months? | ☒ | ☐ | |
| 14. | Did you have a physical (periodic, preventive) exam within the past two years? | ☐ | ☒ | |
| 15. | Would you need health/medical resources for any disabling or special condition in the country of assignment? | ☒ | ☐ | |
| 16. | Would you like to schedule a discussion with a Chevron Physician or Regional Medical Manager to discuss further a health condition or learn more about the host country medical resources? | ☒ | ☐ | |
| 17. | Does your new position require you to work or travel Offshore, In Field/Plant or Strictly Office? Please advise if you need additional certifications for your new position (e.g. HUET/BOSIET, Oil and Gas U.K.) | ☐ | ☐ | My position is strictly office. |

**Part C.** Please answer the following questions and check 'N' (no) or 'Y' (yes) in the column. If 'Y' please describe.

| | Have you had any illness or condition related to the following body parts or systems? (minor conditions do not need to be mentioned): | | | N | Y | Description: |
|---|---|---|---|---|---|---|
| 18. | Head and Neck | | | ☒ | ☐ | |
| 19. | Eyes or Visual | | | ☒ | ☐ | |
| 20. | Ear, Nose and Throat | | | ☒ | ☐ | |
| 21. | Teeth (a) When was your last exam? (b) Is there any dental work pending? Please describe | | | ☐ ☒ | ☐ ☐ | 11/2017 |
| 22. | (a) Chest such as shortness of breath, chronic cough. (b) Breasts | | | ☒ ☒ | ☐ ☐ | |
| 23. | Heart such as chest pain, palpitations or irregular beating | | | ☐ | ☒ | I have PVC's which have been evaluated by a cardiologist and do not require any treatment |
| 24. | Abdomen such as pain, hernias, abnormal bowel movement | | | ☐ | ☒ | I had my gallbladder removed in 2014 |
| 25. | Kidney, bladder or genital area | | | ☒ | ☐ | |
| 26. | Spine and Musculo-skeletal, movement limitations or pain | | | ☒ | ☐ | |
| 27. | Skin changes such as rash, spots, moles or itching | | | ☒ | ☐ | |
| 28. | Epileptic seizures, dizzy spells or migraine | | | ☒ | ☐ | |
| 29. | Diabetes or increase in blood sugar | | | ☒ | ☐ | |
| 30. | Anemia or other blood conditions | | | ☒ | ☐ | |
| 31. | Tuberculosis (TB) or positive TB test, skin or blood (e.g. TB spot, IGRA/ Quantiferon®) | | | ☒ | ☐ | |
| 32. | Any other health problems (Please use space below. If need, use back page) | | | ☒ | ☐ | |

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00606

**EXHIBIT 12-E-2**

E.2

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## Part D. Exposure History (Employee Only)

Have you ever been exposed at work to dusts, solvents, other chemicals or any other known workplace hazards, e.g. biological agents?

☒ Yes   ☐ No

If YES, please list agents with dates and for how long:

I have worked in industrial and petrochemical locations from 1990   present

Have you ever been exposed in the workplace to:

☒ Noise   ☐ Radiation/X-ray Equipment   ☐ Vibrating Hand Tools   ☐ Repetitive Movement   ☐ Weight Lifting   ☐ Other

If you checked one of the boxes above, please specify for how long, and whether Personal Protective Equipment (PPE) was used:

In my work in industrial and petrochemical locations from 1990   present I have been exposed to noise but have always used PPE

## Part E. Occupational History (Employee Only)

Have you ever been part of a medical (health) surveillance program through your work due to exposure to workplace hazards? e.g. Part of a hearing conservation program due to exposure to workplace noise.

☒ Yes   ☐ No

If YES, please list with dates:

I am currently in a hearing conservation program in my employment with Chevron El Segundo

## Part F. Family History.

To comply with the US Genetic Information Nondiscrimination Act of 2008, this part should NOT be completed for any US based employees (whether in the U.S. or outside the U.S. on assignment).   Any information inadvertently provided for a US employee in this section should be redacted if the form is to be sent to the US for filing in the employee's medical record. Local related legislation may be also applicable.

Are there any medical conditions within your family relevant to be mentioned?

Physician Comments:

Have you ever been employed with Chevron or examined for employment by Chevron?

☐ No   ☒ Yes   If yes, when   At hiring at Chevron El Segundo in 2009

### EXAMINEE:

I certify that the information given by me is true and I authorize the examiner to furnish the results of this examination and other related medical investigation results to either the Chevron Regional Medical Managers or the Chevron Global Health and Medical facility. I acknowledge and agree that the results of this medical evaluation are managed by Chevron in a secure and confidential data system that will store and may transmit information to countries other than where the medical examination takes place, including but not limited to the U.S.

FOR APPLICANT ONLY: I understand that any misrepresentation, false statement or omission herein may result in the company rejecting my application, withdrawing any offer of employment, or terminating my employment at any time.

Examinee Signature   _____   Date (mm/dd/yyyy)   7/18/2019

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00607

**EXHIBIT 12-E-3**

E.3

| Examinee Last and First Name | Examinee CAI |
|---|---|
| **Mark Snookal** | **MVZM** |

## Part G. PHYSICAL EXAMINATION. To be completed by Health Care Provider.

### Vital Signs

| HEIGHT ft/cm | WEIGHT lb/kg | BMI | Abdominal Circumference In/cm | B.P. (mmHg) | PULSE | Temperature (°C/°F) |
|---|---|---|---|---|---|---|
| 72" | 256 lb | 34.7 | | 135/78 | 53 | 97.5 |

### Vision

| | | Uncorrected | | | Corrected | | Depth | Tonometry | Color Vision | Visual Fields |
|---|---|---|---|---|---|---|---|---|---|---|
| | Both | Right | Left | Both | Right | Left | | | | |
| Far | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ ꞁ ⭗ | 20/ 6/ ꞁ ∞ | 20/ 6/ ꞁ ⭗ | | | Normal | |
| Near | J# | J# | J# | J# ꞁ ← | J# ꞁ ꞁ | J# ꞁ ꞁ | | | | |

| N | A | | N = Normal. A = Abnormal, please describe | DESCRIPTION |
|---|---|---|---|---|
| ☑ | ☐ | 1. | General Appearance | |
| ☑ | ☐ | 2. | Head | |
| ☑ | ☐ | 3. | Ear, Nose Mouth and Throat | |
| ☑ | ☐ | 4. | Neck | |
| ☑ | ☐ | 5. | Eyes | |
| ☑ | ☐ | 6. | Chest | |
| ☑ | ☐ | 7. | Breasts | |
| ☑ | ☐ | 8. | Respiratory System | |
| ☐ | ☐ | 9. | Cardiovascular System | occas ectopics (PVC's) |
| ☑ | ☐ | 10. | Abdomen, Viscera/Hernias | |
| ☑ | ☐ | 11. | Genito-urinary | |
| ☑ | ☐ | 12. | Lower GI Tract | |
| ☑ | ☐ | 13. | Extremities | |
| ☑ | ☐ | 14. | Spine and Musculo-skeletal. Range of Motion. | |
| ☑ | ☐ | 15. | Skin and Lymphatic System | |
| ☑ | ☐ | 16. | Central Nervous System | |
| ☑ | ☐ | 17. | Peripheral Nervous System Reflexes | |
| ☐ | ☐ | 18. | Others, please specify | |

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00608

**EXHIBIT 12-E-4**

E.4

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## LABORATORY AND SPECIAL TESTS

| N | A | Not Done | AS INDICATED | RESULTS. N = Normal. A = Abnormal, please describe |
|---|---|---|---|---|
| ☐ | ☐ | ☑ | Audiogram | |
| ☐ | ☐ | ☑ | Chest X Ray | |
| ☑ | ☐ | ☐ | Complete Blood Count | |
| ☐ | ☐ | ☑ | Drug Screening | |
| ☐ | ☑ | ☐ | ECG | |
| ☐ | ☐ | ☑ | Pulmonary Function | |
| ☑ | ☐ | ☐ | Serum Profile/Chemistries | |
| ☐ | ☐ | ☑ | Stress Test | |
| ☑ | ☐ | ☐ | Urinalysis | |
| ☐ | ☐ | ☐ | Others, please specify | |

REMARKS; Describe significant / abnormal findings/limitations noted above (if need, please use back page)

① PVC's - frequent asymptomatic followed by cardiology
② Dilated aortic root followed by cardiology ongoing studies yearly echo vs CT chest stable on meds

If any abnormalities were found during the examination, was examinee informed? ☑ Yes  ☐ No

## Part H: MEDICAL RECOMMENDATION

| H.1. Fitness for Duty Classification, ONLY FOR INTERNAL CHEVRON USE | H.2. Restrictions pertinent to Job Requirements (refer to GO-308) |
|---|---|
| ☐ A. Fit for Duty | No heavy lifting >50lbs |
| ☑ B. Fit for Duty with Restrictions | needs review of |
| ☐ C. Not Fit for Duty | Recommend letter from |
| ☐ D. Failed to comply with requested evaluations, due to: | cardiologist to clear him |

| Examiner's Name (please print) | Signature | Date (mm/dd/yyyy) 07/24/2015 |
|---|---|---|
| IRVING SOBEL MD | M Sobel MD | USA Chevron Provider Number |
| Address  4676 ADMIRALTY WAY  4th FLOOR  MDR CA | | 1 1 4 0 8 |
| Street | City | State / Province | Postal / Zip Code  Country 90292 |

| Chevron Global Health & Medical Approval (please print name) | Signature | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

Page 5 of 6

GO-146 - MSEA (6-18)
Word Electronic Version

SNOOKAL-00609

**EXHIBIT 12-E-5**

E.5

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

**PLEASE ATTACH COPIES OF IMPORTANT REPORTS OF CURRENT INTEREST.**
If available, Form GO-308 (Physical Requirements and Working Conditions) must be included.

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00610

**EXHIBIT 12-E-6**

E.6

```
1    STATE OF CALIFORNIA   )
                           ) SS.
2    COUNTY OF VENTURA     )

3         I, John M. Taxter, a California Certified

4    Shorthand Reporter, Certificate No. 3579, a

5    Registered Professional Reporter, do hereby

6    certify:

7         That the foregoing proceedings were taken

8    before me at the time and place therein set forth,

9    at which time the deponent was put under oath by

10   me; that the testimony of the deponent and all

11   objections made at the time of the examination

12   were recorded stenographically by me and were

13   thereafter transcribed; that the foregoing is a

14   true and correct transcript of my shorthand notes

15   so taken.

16        I further certify that I am neither counsel

17   for nor related to any party to said action.

18        The dismantling, unsealing, or unbinding of

19   the original transcript will render the Reporter's

20   Certificate null and void.

21        Pursuant to Federal Rule 30(e), transcript

22   review was requested.

23   Dated May 22, 2024.

24                        _____
                          JOHN M. TAXTER
25                        California Certified Shorthand
                          Reporter No. 3579, RPR
```

**EXHIBIT 16-53**