# EXHIBIT 17

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MARK SNOOKAL, an                )
individual,                     )
                                )
            Plaintiff,          )
                                )
        vs.                     )    NO. 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a            )
California Corporation,         )
and DOES 1 through 10,          )
inclusive,                      )
                                )
            Defendants.         )
_____)

REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS

Tuesday, September 17, 2024

Houston, Texas

Reported by:
JANE BRAMBLETT, CLR, CCRR, CSR No. 7574
Job No. 114803

**EXHIBIT 17-1**

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARK SNOOKAL, an         )
     individual,              )
 5                            )
                 Plaintiff,   )
 6                            )
            vs.               )   NO. 2:23-cv-6302-HDV-AJR
 7                            )
     CHEVRON USA, INC., a     )
 8   California Corporation,  )
     and DOES 1 through 10,   )
 9   inclusive,               )
                              )
10               Defendants.  )
     _____)
11

12

13

14

15       REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS,

16   taken on behalf of Plaintiff, commencing at

17   10:00 a.m. and ending at 1:50 p.m., at Houston, Texas,

18   Tuesday, September 17, 2024, before Jane Bramblett, CLR,

19   CCRR, Certified Shorthand Reporter No. 7574.

20

21

22

23

24

25
```

**EXHIBIT 17-2**

Andrew Powers                                          September 17, 2024

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3   ALLRED, MAROKO & GOLDBERG
     BY:  DELORES Y. LEAL, ESQ.
 4   6300 Wilshire Boulevard, Suite 1500
     Los Angeles, California 90048
 5   323.653.6530
     dleal@amglaw.com
 6

 7   FOR THE DEFENDANTS:

 8   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     BY:  SARAH FAN, ESQ.
 9   333 South Hope Street, Suite 4300
     Los Angeles, California 90071-1422
10   213.620.1780
     sfan@sheppardmullin.com
11

12   Also Present:  Jenny Sherman, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 17-3**

Andrew Powers                                    September 17, 2024

```
1        Q     Is that it?

2        A     That's it.

3        Q     Who is your employer?

4        A     Chevron.

5        Q     On your paycheck stubs, what's the entity

6   that's identified as your employer?

7        A     Chevron USA.

8        Q     Has any entity other than Chevron USA paid

9   your salary?

10       A     No.

11       Q     And how long have you been employed by

12  Chevron?

13       A     15 years.

14       Q     When did you begin?  When were you hired?

15       A     June of 2009.

16       Q     And my understanding is that your current

17  position is senior adviser to the chief human

18  resources officer.

19       A     That's correct.

20       Q     And you've been in that position since on

21  or about June of '22?

22       A     I've been in this role since November of

23  2023.

24       Q     Okay.  And who is your current superior?

25       A     By "superior," do you mean who I report
```

**EXHIBIT 17-4**

Andrew Powers                                    September 17, 2024

```
1         A    Yes, it is.

2         Q    Which is it?  A division or a subsidiary?

3         A    I don't know off the top of my head.

4         Q    During the time that you reported to

5    Ms. Delaney, Chevron USA paid your salary?

6         A    Yes.

7         Q    During the time that you have been senior

8    adviser to Ms. Morris, from November of '23 through

9    the present, where are you physically located?

10        A    Houston, Texas.

11        Q    And when you were reporting to Ms. Delaney

12   as a senior HR, where were you physically located?

13        A    Houston, Texas.

14        Q    And during the time that you were senior HR

15   manager in Houston, Texas, reporting to Ms. Delaney,

16   was Chevron USA still your employer?

17        A    Yes.

18        Q    And they paid your salary.

19        A    Yes.

20        Q    What was the position you held just prior

21   to senior HR manager reporting to Ms. Delaney?

22        A    I was the senior HR manager of our

23   El Segundo refinery.

24        Q    And how long were you in that position?

25        A    For just about three years.
```

**EXHIBIT 17-5**

Andrew Powers                                      September 17, 2024

```
1        Q     From when to when?
2        A     June 2019 through May 2022.
3        Q     And who was your superior during that
4   period?
5        A     I had two during that period.
6        Q     Who were they?
7        A     It was Glenda Valero and Scott Wilcox.
8   They had changed out during that time, and the title
9   of them was GM of HR for manufacturing.
10        Q     And when was Mr. Wilcox your manager?
11        A     In the November 2020 time frame.
12        Q     Through May of '22?
13        A     Say it again, please.
14        Q     Through May of '22?
15        A     That's correct.
16        Q     And did you hold any other position prior
17   to Senior HR Manager in El Segundo?
18        A     Yes.
19        Q     What position was that?
20        A     I was the HR manager of our Appalachian
21   Mountain business unit in Coraopolis, Pennsylvania.
22        Q     And how long were you, in Pennsylvania, the
23   HR manager?
24        A     Two years.
25        Q     From when to when?
```

**EXHIBIT 17-6**

Andrew Powers                                        September 17, 2024

```
 1        A    May of 2017 to May of 2019.
 2        Q    And during the time that you were in
 3   Pennsylvania, did Chevron USA pay your salary?
 4        A    Yes.
 5        Q    And did you have any other positions with
 6   Chevron prior to that?
 7        A    I did.
 8        Q    What was your next position and what date?
 9        A    I was the executive compensation adviser
10   from 2015 -- May -- June 2015 to June 2017.
11        Q    And where were you geographically
12   stationed?
13        A    San Ramon, California.
14        Q    And Chevron USA was your employer at that
15   time as well?
16        A    Yes.
17        Q    And did -- do you hold any other position
18   prior to that one?
19        A    Yes.  I was an HR adviser in our joint
20   venture operation called Tengiz Chevroil.  That was
21   located in Kazakhstan, so this was an expatriot
22   assignment.  And that was from June of 2013 to June
23   of 2015.
24        Q    In the expatriot assignment in Kazakhstan,
25   was Chevron USA still your employer?
```

**EXHIBIT 17-7**

Andrew Powers                                          September 17, 2024

1          MS. FAN:  Objection.  Calls for a legal
2    conclusion.
3    BY MS. LEAL:
4          Q    You can answer.
5          A    I can't confirm that.  I don't know that
6    part right now.
7          Q    Did Chevron USA pay your salary during that
8    time that you were in Kazakhstan?
9          A    Yes.
10         Q    And did you hold any other position prior
11   to your assignment in Kazakhstan?
12         A    I did.  I was the senior labor relations
13   adviser and payroll supervisor in our San Joaquin
14   Valley business unit in Bakersfield, California,
15   from July of 2011 to June of 2013.
16         Q    And when you were stationed in Bakersfield,
17   was Chevron USA your employer?
18         A    Yes.
19         Q    And did Chevron USA pay your salary?
20         A    Yes.
21         Q    And did you hold any other position with
22   Chevron prior to this assignment in Bakersfield?
23         A    Yes, I did.  I was on our HR development
24   program from 2009 to 2011.  And on -- the
25   development program was located in San Ramon,

**EXHIBIT 17-8**

Andrew Powers                                        September 17, 2024

```
 1   California, from 2009 to 2010; Houston, Texas, for
 2   six months in 2010; and then I was -- another
 3   expatriot assignment where I was in Manila, the
 4   Philippines.  And that was from January of 2011 to
 5   June of 2011 for that expatriot assignment
 6   specifically.
 7        Q    Certainly have traveled around for Chevron.
 8        A    I have.
 9        Q    During this last position that you just
10   mentioned, HR development program, where you were in
11   San Ramon; Houston, Texas; and then Manila, was
12   Chevron USA your employer?
13        A    Yes.
14             MS. FAN:  Objection.  Calls for a legal
15   conclusion.  Calls for speculation.
16             Mr. Powers, you're doing great.  Just a
17   quick reminder to pause a little bit so I can get my
18   objections in.
19             THE WITNESS:  Sure.
20             MS. FAN:  Thank you.
21   BY MS. LEAL:
22        Q    And during the time that you were HR
23   development program in San Ramon; Houston, Texas;
24   and Manila, did Chevron USA also pay your salary?
25             MS. FAN:  Objection.  Compound.
```

**EXHIBIT 17-9**

Andrew Powers                                          September 17, 2024

```
 1              THE WITNESS:  Yes.
 2    BY MS. LEAL:
 3       Q     Any other position with Chevron prior to HR
 4    development program?
 5       A     No.
 6       Q     So you were hired into HR development
 7    program position in San Ramon in 2009?
 8       A     Yes.  That's correct.
 9       Q     So most of my questions today, Mr. Powers,
10    will pertain to the period of time when you were the
11    Senior HR Manager at the El Segundo refinery.  Okay?
12       A     Okay.
13       Q     So during the time that you were a senior
14    HR manager in El Segundo, were there any individuals
15    who reported to you?
16       A     Yes.
17       Q     Who?
18       A     Thalia Tse, Eric Stephenson, Kelly Andrews,
19    Violet Torres, Willy Martinez.
20       Q     Anyone else?
21       A     Those were my direct reports.
22       Q     Okay.  And what positions did these
23    individuals hold?  Were they all -- did they all
24    hold the same position?
25       A     No, they did not.  So --
```

**EXHIBIT 17-10**

Andrew Powers                                      September 17, 2024

1   all employees.  She went through onboarding for

2   Chevron as well, which would be our business code

3   and ethics.  Other policies on anti-harassment and

4   discrimination.

5       Q    Was it your expectation, Mr. Powers, as the

6   senior HR manager, that your HR business partners be

7   familiar with Chevron's human resources policy?

8            MS. FAN:  Objection.  Vague and ambiguous.

9            THE WITNESS:  Yes.  I would -- I would

10  expect my HR VPs to be familiar with the processes

11  in order to perform them and be partners to their

12  client groups.

13  BY MS. LEAL:

14      Q    Do you know if your HR business partners,

15  such as Ms. Tse, were responsible for providing

16  training to management within her area of

17  responsibility?

18           MS. FAN:  Objection.  Vague and ambiguous.

19           THE WITNESS:  Can you be more specific on

20  the type of training you're referring to?

21  BY MS. LEAL:

22      Q    Thank you for that clarification.  I think

23  I do need to clarify my question.

24           So do you know if Ms. Tse, for example, as

25  the HR business partner, as part of her

**EXHIBIT 17-11**

Andrew Powers                                              September 17, 2024

1    responsibilities, was she supposed to train

2    supervisors, managers in her specific clients' area

3    with respect to HR policy?

4         A    I don't know that I would call it "train"

5    them specifically, but Thalia, as an HR VP, would be

6    present for a variety of people processes.  And HR

7    VP's primary responsibility would often be to

8    facilitate and make sure that managers, supervisors,

9    employees were following appropriate steps and

10   processes.  You know, making sure, as an example,

11   that we're keeping bias out of a selection, making

12   sure that we are staying in compliance with, you

13   know, federal, state, and local laws for anything

14   that we did.

15        Q    So Ms. Tse, then, as the HR business

16   partner in El Segundo, in your opinion, was she

17   required to be familiar with federal, state and

18   local laws, as you mentioned?

19             MS. FAN:  Objection.  Vague and ambiguous.

20   Calls for speculation.

21   BY MS. LEAL:

22        Q    Employment law.

23        A    Can you clarify your question?  You're

24   referring to employment law?

25        Q    Yeah.  Let me make sure my question is

**EXHIBIT 17-12**

Andrew Powers                                      September 17, 2024

```
 1   clear.
 2            So would you expect Ms. Tse, who reports to
 3   you as the HR business partner in El Segundo for her
 4   specific client area of maintenance and reliability,
 5   do you believe that she should be familiar with
 6   federal, state, and local employment laws?
 7      A    Yes.  And I would also expect that the HR
 8   business partner partner with our legal counsel if
 9   there was any questions on those.
10      Q    Thank you.
11            Referring to the legal counsel you just
12   mentioned, was legal counsel also in El Segundo?
13      A    Yes.
14      Q    So you could partner with someone in
15   El Segundo who was an attorney?
16      A    Yes.
17      Q    In 2019 was there an employment counsel in
18   El Segundo with whom Ms. Tse or you could have
19   consulted?
20      A    There was senior counsel present.  Your
21   question was phrased as employment counsel.  That
22   individual was not located in El Segundo, but was
23   very accessible to us by phone or email as we needed
24   it.
25      Q    Who was the senior counsel present in
```

**EXHIBIT 17-13**

Andrew Powers                                    September 17, 2024

1       A    J-o-n-m-i, last name Koo, K-o-o.

2       Q    Was Mr. Koo the attorney who primarily

3   supported you and your team in 2019?

4       A    Just for clarification, Jonmi is a female.

5   And Jonmi was, yes, primary contact point for me,

6   for my HR VP specifically.  Just throughout the

7   course of my career at Chevron, I've had a

8   connection with Abiel, so I've also reached out to

9   him.

10      Q    Thank you.

11           The five individuals who reported to you in

12  El Segundo, were they all located in El Segundo as

13  well?

14      A    Yes.

15      Q    Did you supervise any other employees not

16  located in El Segundo during the time that you were

17  the senior HR manager in El Segundo?

18      A    No.

19      Q    Would you please describe your job

20  responsibilities as the senior HR manager in

21  El Segundo.

22      A    Yes.  So as the senior HR manager in

23  El Segundo, I was supervising a team of HR business

24  partners, a labor relation adviser, an HR assistant,

25  and our -- my primary responsibilities were to lead

**EXHIBIT 17-14**

Andrew Powers                                    September 17, 2024

1   HR operations at a local level for the refinery.

2   That includes day-to-day counsel and policy

3   administration for the HR VPs, and that our labor

4   relations was the primary contact point for our

5   union present in the refinery, and an HR assistant,

6   you know, primarily helping with logistics and other

7   tasks associated with our day-to-day operations.

8        Q    Was part of your responsibility as senior

9   HR manager in El Segundo to conduct investigations

10  if someone complained about discrimination?

11           MS. FAN:  Objection.  Vague and ambiguous.

12  BY MS. LEAL:

13       Q    Did you understand my question, Mr. Powers?

14       A    I did, yes.  Yes, as the senior HR manager,

15  complaints and investigations may come my way, but

16  oftentimes they would come through our HR business

17  partners or maybe even through our hotline that we

18  have available to employee.

19           So it was really case by case, but

20  depending on the nature of the complaint, it would

21  normally be assigned to one of our HR business

22  partners to conduct.  In some occasions we may ask

23  for our employee relations department, which is a

24  different group within Chevron, to take on the lead

25  of the investigation.  And that can be for a variety

**EXHIBIT 17-15**

Andrew Powers                                    September 17, 2024

1    of reasons, you know, where we didn't feel it was
2    suitable for the HR business partner to take the
3    lead on the investigation.
4             For myself specifically, it would be, if it
5    was more senior management-related complaints,
6    that's when I would get involved; otherwise, I would
7    ask my HR VPs to be the primary contact point.
8        Q    My tech skills will now be revealed.  I'm
9    going to put in the chat a document.
10            (Exhibit 1 was marked for identification.)
11   BY MS. LEAL:
12       Q    I have now put in the chat Exhibit 1, if
13   can you open that up, Mr. Powers.
14            MS. LEAL:  Did you get it, Counsel?
15            MS. FAN:  No.  I'm not seeing an attachment
16   in the chat.
17            THE WITNESS:  I'm not, either.
18            MS. FAN:  There we go.  It just came
19   through.
20            MS. LEAL:  Thank you.
21   BY MS. LEAL:
22       Q    If you'll both open that up now.
23       A    Okay.  I have it.
24       Q    Okay.  Good.  Have you seen this document
25   before today, Mr. Powers?

**EXHIBIT 17-16**

Andrew Powers                                          September 17, 2024

1      A     Yes.  This document looks familiar.  It's

2   our location premiums by area of assignment, a

3   document that exists to capture the different

4   premiums associated with our locations of work.

5      Q     Okay.  And for the record, this is a

6   document produced by Chevron.  The Bates number on

7   the bottom right-hand corner is CUSA000501 and 502.

8           So it's your understanding then,

9   Mr. Powers, that employees with rotational

10  assignments receive annual premium pay?

11     A     That's correct.

12     Q     So this document explains to Chevron

13  employees that irrespective of where in the world

14  they might work, they'll receive premium pay, and

15  this document shows how much the annual premium pay

16  percentage will be?

17          MS. FAN:  Objection.  Argumentative.

18          THE WITNESS:  I'm not sure I understand the

19  question.  I would describe it as not all locations

20  getting a premium percentage.  If you're in your own

21  home country, you would not be getting a premium

22  percentage.  This is if you're going on expat

23  assignment, rotational or residential, temporary.

24  BY MS. LEAL:

25     Q     Okay.  So, for example, when you went to

**EXHIBIT 17-17**

Andrew Powers                                        September 17, 2024

1   Kazakhstan, you received a rotational assignment
2   premium percentage pay?
3       A    Yes.  When I was located in Kazakhstan, I
4   received a premium percentage pay.
5       Q    And the same was true when you were in the
6   Philippines?
7       A    That's correct.
8       Q    And were you aware that Mr. Snookal, the
9   plaintiff in this case, the rotational assignment
10  that he sought was in Escravos, Nigeria?
11      A    Sorry.  Are you asking if I was aware of
12  him going to that assignment?
13      Q    Yeah.  Let me -- let me start again.
14           Were you aware that the rotational
15  assignment which Mr. Snookal sought was in Escravos,
16  Nigeria?
17      A    Yes, ma'am.  I was not aware of
18  Mr. Snookal's assignment or offer to Escravos until
19  I first received a note from him.
20      Q    Right.  So at that point you became aware
21  that it would have been in Escravos, Nigeria?
22      A    Correct.
23      Q    So looking at Exhibit 1, that would mean
24  that if Chevron were to have allowed Mr. Snookal to
25  work in Escravos, he would have been at the annual

**EXHIBIT 17-18**

Andrew Powers                                              September 17, 2024

1   premium of 55 percent; is that correct?

2          MS. FAN:  Objection.  Incomplete

3   hypothetical.

4          THE WITNESS:  That's correct, based on the

5   document you've shared.  I see 55 percent associated

6   with Nigeria, Escravos.

7   BY MS. LEAL:

8      Q    And what does it mean to be at 55 percent

9   annual percentage?

10     A    It could be interpreted as a hardship

11  allowance that we give our employees for going to

12  these different locations, and it's in recognition

13  of maybe a loss of amenities that they would be used

14  to in their home country as well as due to the

15  extreme conditions, lack of medical facilities or

16  access, other goods and services that they might not

17  be able to get.

18         So 55 percent, as an example, would mean

19  it's 55 percent additional income on top of their

20  base salary.

21     Q    Okay.  So you testified earlier that when

22  you were in Kazakhstan, that Chevron USA paid your

23  salary.  Do you know if the same would have been

24  true with respect to Mr. Snookal had he gone to

25  Escravos?

**EXHIBIT 17-19**

Andrew Powers                                    September 17, 2024

```
1   delivery model.  This was handled by another group
2   within HR, not me specifically as senior HR manager
3   in a refinery for my team as HR business partners.
4   This -- this policy, tax equalization administered
5   by HR Shared Service is a completely different
6   group.
7        Q    What is HR Shared Services?
8        A    That is an organization within HR that
9   administers various processes for HR.  Could be
10  reporting.  It could be global mobility topics.
11  It -- in short, it's an organization within HR at
12  Chevron.
13       Q    And so there's this organization called
14  "Human Resources Shared Services" that reports to
15  whom?
16       A    Can you clarify what -- what date you're
17  talking about?
18       Q    2019.
19       A    So that shared services organization would
20  report in to our HR leaders.  It's one of the
21  organizations that exists.  So I -- 2019 time frame,
22  I couldn't tell you who they exactly reported in to.
23       Q    Do you know what "Human Resources Shared
24  Services" mean; in other words, shared services?
25            MS. FAN:  Vague and ambiguous.
```

**EXHIBIT 17-20**

Andrew Powers                                        September 17, 2024

1           THE WITNESS:  As I've mentioned, it's an

2   organization within Chevron HR that handles a

3   variety of processes for us.  I don't know what

4   topics you would like me to refer to, but they're --

5   they're just an organization that is under our

6   umbrella.

7   BY MS. LEAL:

8       Q    Okay.  And this organization under your

9   umbrella, are they located in the Philippines and in

10  Argentina?

11      A    Yes.

12          MS. FAN:  Vague and ambiguous.

13  BY MS. LEAL:

14      Q    Do the different Chevron subsidiary --

15  strike that.

16          Are you aware if the different Chevron

17  subsidiaries are required to abide by the same

18  Chevron personnel policies?

19          MS. FAN:  Objection.  Calls for

20  speculation.  Calls for a legal conclusion.

21          THE WITNESS:  We have Chevron-wide policies

22  that exist, and then we have policies that may exist

23  due to local laws and regulations.

24  BY MS. LEAL:

25      Q    Do you know if there are policies that

**EXHIBIT 17-21**

Andrew Powers                                            September 17, 2024

1   Mr. Snookal was unfit for duty for the Escravos

2   assignment.  And once that determination is made,

3   then they begin to inform the employee so that they

4   know that the expat assignment is not going to

5   happen, as well as make necessary parties aware so

6   that we can figure out what role the employees is

7   going to go into instead.

8   BY MS. LEAL:

9      Q    So who was the individual or individuals

10  who actually made the decision to retract the expat

11  assignment to Mr. Snookal?

12          MS. FAN:  Objection.  Calls for

13  speculation.

14          THE WITNESS:  I am only aware of the

15  medical personnel that were part of making that

16  determination of unfit for duty.

17  BY MS. LEAL:

18     Q    And who were those medical personnel that

19  you're referring to?

20     A    It would be Chevron Nigeria Health and

21  Medical, so people that were actually in that

22  location, as well as Dr. Levy, who is a doctor who

23  looked over multiple locations.

24     Q    And do you remember the names of the

25  medical personnel in Chevron Nigeria in Health and

**EXHIBIT 17-22**

Andrew Powers                                      September 17, 2024

```
 1   Medical that you referenced?
 2       A    No, I don't.
 3            MS. FAN:  Counsel, we've been going for
 4   about an hour.  And when you get to a good stopping
 5   point, could we take a five-minute break?
 6            MS. LEAL:  We can take a five-minute break
 7   now.
 8            MS. FAN:  Okay.  Thank you.
 9            MS. LEAL:  Thank you.
10            THE VIDEO OPERATOR:  We are off the record.
11   The time is 11:00 a.m.
12            (Recess)
13            THE VIDEO OPERATOR:  We are back on the
14   record.  The time is 11:10 a.m.
15            MS. LEAL:  I'm going to put in the chat
16   another document marked Exhibit 3.
17            (Exhibit 3 was marked for identification.)
18   BY MS. LEAL:
19       Q    Let me know when you have it, Mr. Powers.
20       A    Okay.  I'm pulling it up now.  Okay.  I
21   have it.
22       Q    Why don't you scroll through it.  For the
23   record, it is a three-page document Bates number
24   CUSA000538 through 540.
25            So look at the first email beginning on
```

**EXHIBIT 17-23**

Andrew Powers                                    September 17, 2024

1    page 539, which is the second page.  The first email

2    is dated September 4, 2019, at 7:21 a.m. from

3    Mr. Snookal to you.

4              Do you see that?

5        A    Yes, I do.

6        Q    And the email begins, "Andrew, I am very

7    disappointed in the decision by Chevron Medical to

8    classify me as," quote/unquote, "'unfit' for the

9    Reliability Engineering Manager position at EGTL.  I

10   believe this decision was made based on a lack of

11   understanding and stereotypical assumptions about my

12   medical condition and is, therefore, discriminatory

13   in nature.  As my condition does not affect my

14   ability to perform the job duties of that position,

15   I require no ongoing care outside of annual

16   monitoring, working in a remote location does not

17   affect my condition, a complication from my

18   condition would cause no harm to others, and I have

19   no work restrictions from my physician this decision

20   seems excessively paternalistic."  And it goes on

21   for another long paragraph, two paragraphs.

22             Do you remember receiving this email from

23   Mr. Snookal, Mr. Powers?

24       A    I'm still reading through it.  If I could

25   just read through the rest, I'll confirm.

**EXHIBIT 17-24**

Andrew Powers                                    September 17, 2024

1     Q    Okay.

2     A    Okay.  Yes.  I'm familiar with this email.

3     Q    Would you look at the last page of

4  Exhibit 3, Mr. Snookal's signature line.

5          Are you there?

6     A    Yes.

7     Q    He was at the time an IEA reliability team

8  lead, but at the bottom, it says, in bold "Chevron

9  Products Company."

10         Do you know if Chevron Products Company

11  paid Mr. Snookal's salary at the time?

12         MS. FAN:  Objection.  Calls for

13  speculation.  Calls for a legal conclusion.

14         THE WITNESS:  I do not know if it was

15  listed as Chevron Products Company or Chevron USA.

16  I would need to confirm that.

17  BY MS. LEAL:

18     Q    Okay.  So is it possible for him to be

19  working for Chevron Products Company, but, at the

20  same time, being paid by Chevron USA?

21         MS. FAN:  Calls for speculation.  Calls for

22  a legal conclusion.

23         THE WITNESS:  I guess it's possible.

24  BY MS. LEAL:

25     Q    But going back to the second page of this

**EXHIBIT 17-25**

Andrew Powers                                    September 17, 2024

1    document, Exhibit 3, you sent an email that same day

2    at 7:35 a.m. to Mr. Snookal replying to him, and

3    then you copied Ms. Tse as well as Austin Ruppert.

4            Do you see that?

5        A    Yes, I do.

6        Q    And in this email from you to Mr. Snookal,

7    you're thanking him for bringing this issue to your

8    attention, and you said:  Let me look into this and

9    I'll get a better understanding and we'll get back

10   to you ASAP.  Correct?

11       A    Yes.  I also said, "This is the first I'm

12   hearing of this."

13       Q    Right.  So no one else, including the

14   Nigeria business unit, had not reached out to you in

15   connection with the job offer that was rescinded in

16   Nigeria.  Correct?

17       A    No.  Correct.

18       Q    So after responding to Mr. Snookal at

19   7:35 a.m., you then sent an email, same day, at

20   7:41 a.m. to Troy Tortorich -- I don't know if I'm

21   pronouncing the name correctly or not, but it's

22   T-o-r-t-o-r-i-c-h, and to Austin Ruppert, and you

23   again copied Ms. Tse.

24            Do you see that email?

25       A    Yes, I do.

**EXHIBIT 17-26**

Andrew Powers                                    September 17, 2024

1      Q    And you said, "Austin/Troy, please be

2    thinking about what role Mark could do if this falls

3    through."

4           What you were referring to is the actual --

5    the fact that the job was rescinded in Nigeria?

6      A    That's correct.

7      Q    And then you go on to say, "Thalia and I

8    will investigate and see what medical can share/set

9    up with an appropriate response."

10          Do you see that?

11     A    I see that.

12     Q    The next paragraph in your email, you say,

13   "Note he finds this discriminatory, however, that is

14   hard to know without further context from medical,"

15   period.

16          Who is the medical that you're referring to

17   there?

18     A    In this sentence, I was referring to

19   medical at a broad level, not a specific individual.

20     Q    Would it have been Nigeria business unit?

21     A    At this point in time, I wasn't even

22   specifically referring to Nigeria, just medical,

23   which is another organization within Chevron.

24     Q    And where is that organization?

25          MS. FAN:  Vague and ambiguous.  Calls for

**EXHIBIT 17-27**

Andrew Powers                                              September 17, 2024

```
 1    speculation.
 2    BY MS. LEAL:
 3        Q    Where is that organization geographically
 4    located?
 5            MS. FAN:  Same objections.
 6            THE WITNESS:  We have medical personnel
 7    throughout all of our assets in the company, so I
 8    would need more specific, if you could.
 9    BY MS. LEAL:
10        Q    Okay.  And when you say "all of our
11    assets," it's worldwide, I imagine?
12            MS. FAN:  Objection.  Calls for -- calls
13    for a legal conclusion.  Vague and ambiguous.  Calls
14    for speculation.
15            THE WITNESS:  We have medical
16    representatives in Chevron that are Chevron
17    employees that are looking over different assets.
18    BY MS. LEAL:
19        Q    What do you mean by "assets"?
20        A    Business units.
21        Q    Okay.  And these business units can be
22    located around the world?
23        A    Yes.
24            MS. FAN:  Objection.  Calls for
25    speculation.  Calls for a legal conclusion.  Vague
```

**EXHIBIT 17-28**

Andrew Powers                                          September 17, 2024

```
 1   and ambiguous.
 2           THE WITNESS:  Yes.  We're a global company.
 3   BY MS. LEAL:
 4      Q    So the next sentence in that second
 5   paragraph, you say, "I am sure there is a very good
 6   reason why this was rescinded."
 7           Do you see that?
 8      A    Yes.
 9      Q    And when you wrote this email, you had not
10   started your investigation, correct?
11      A    That's correct.
12      Q    So were you giving -- I'm sorry.  Did I cut
13   you off?  I apologize if I did.
14      A    It was within, you know, a very short time
15   frame of first hearing about it, so I had not ticked
16   that off yet.
17      Q    So you were giving Chevron the benefit of
18   the doubt, then, that there was a very good reason
19   for it?
20           MS. FAN:  Objection.  Argumentative.  Vague
21   and ambiguous.
22           THE WITNESS:  I don't know that I would
23   phrase it as "benefit of the doubt."  However, I do
24   know we have various policy, and as we spoke about
25   earlier, we comply with all federal, state, local
```

**EXHIBIT 17-29**

Andrew Powers                                          September 17, 2024

1    he was interested in applying for those roles.  And
2    so that's what I see from this email.
3    BY MS. LEAL:
4        Q    So after you advised Mr. Snookal that the
5    position in Escravos would not go forward, did you
6    personally look for any positions which might be
7    comparable for Mr. Snookal?
8            MS. FAN:  Objection.  Calls for a legal
9    conclusion.
10           THE WITNESS:  I don't recall at this point.
11   I do remember making sure his supervisor and his PDR
12   were involved in those discussions with Mark to
13   determine what roles would be available.
14   BY MS. LEAL:
15       Q    So you didn't ask Ms. Tse also to look for
16   any positions which might be comparable to the
17   Escravos position for Mr. Snookal?
18           MS. FAN:  Objection.  Calls for a legal
19   conclusion.
20           THE WITNESS:  I don't recall.
21           MS. LEAL:  Let's move on to the next
22   exhibit, Exhibit 5, which I just posted on the chat.
23   It's a two-page document Bates No. CUSA000542 and
24   543.  It is a document with two emails, one on the
25   bottom, and an email from Mr. Snookal to Mr. Powers

**EXHIBIT 17-30**

Andrew Powers                                        September 17, 2024

 1   with a copy to others, dated September 4th at

 2   7:21 a.m.

 3          (Exhibit 5 was marked for identification.)

 4   BY MS. LEAL:

 5       Q    And do you recognize that email,

 6   Mr. Powers, as the same email that we discussed

 7   earlier in Exhibit 3?

 8       A    Yes.  I recognize it.

 9       Q    So the only new email on this Exhibit 5 is

10   the email at the top, correct?

11       A    That's correct.

12       Q    And the email at the top is an email from

13   you to Mr. Snookal, correct?

14       A    That's correct.

15       Q    So you've seen this document before today?

16       A    Yes.  It's an email that I sent.

17       Q    In the second paragraph, you say, "I've

18   reached out to the medical department."  And I just

19   want to clarify, the medical department to whom

20   you're referring here is Dr. Levy?

21       A    That's correct.

22       Q    And then you say, "I understand a thorough

23   review was conducted and alternatives were

24   explored."

25          Is that understanding based upon your

**EXHIBIT 17-31**

Andrew Powers                                      September 17, 2024

1    conversation with Dr. Levy as well?

2        A    Yes.   That's correct.

3        Q    And where were the alternatives that were

4    explored that you mention here?

5        A    So through my summary and overview provided

6    by Dr. Levy, I know that they did explore whether

7    another location in Nigeria would be suitable.  That

8    location, Lagos, has more medical facilities that

9    would be available.  However, ultimately it was

10   determined that that would not be an appropriate

11   location for the role to be performed.  It would not

12   be possible for Mark to perform his duties from that

13   location.  And that was the main alternative that

14   was explored.

15       Q    Transferring Mr. Snookal to work from Lagos

16   instead of Escravos but performing the same job, the

17   reliability engineering manager's job?

18       A    That's correct.  Could he perform that job

19   effectively from another location is what we

20   explored.

21       Q    And the answer was no.

22       A    That's correct.

23       Q    And then you go on to say, "We would

24   respectfully disagree that the determination was

25   based on stereotyping or impermissible

**EXHIBIT 17-32**

Andrew Powers                                      September 17, 2024

1    discrimination."

2             Do you see that?

3        A    I see that.

4        Q    As of 2019, September of 2019, how many

5    investigations of complaints of discrimination

6    involving disability had you performed?

7             MS. FAN:  Objection.  Vague and ambiguous.

8    Calls for a legal conclusion.

9             THE WITNESS:  How many investigations had I

10   been part of?

11   BY MS. LEAL:

12       Q    Yeah.

13       A    Was that your question?

14            To my recollection, no other investigations

15   that I personally was part of.

16       Q    So as of September 2019 -- I'm going to

17   expand my question.  Let me start again.

18            So as of September 2019, had you conducted

19   any type of investigation into employee complaints

20   of discrimination?  Any form of discrimination?

21            MS. FAN:  Objection.  Vague and ambiguous.

22   Calls for a legal conclusion.

23            THE WITNESS:  Are you talking about

24   infinite amount of time, or just in September of

25   2019?  What time period are you referring to?  Can

**EXHIBIT 17-33**

Andrew Powers                                    September 17, 2024

```
 1   interact with the local manager in Nigeria.
 2   BY MS. LEAL:
 3        Q    Did you ask Ms. Tse to do so?
 4        A    No, I did not.
 5        Q    Okay.  I'm going to put in the chat one
 6   last exhibit, and it will be Exhibit 12.
 7             (Exhibit 12 was marked for identification.)
 8   BY MS. LEAL:
 9        Q    Let me know when you see this.
10        A    Okay.  It just came through.  I'm opening.
11        Q    And for the record, is it a two-page
12   document.  CUSA000650 and 651.
13        A    Okay.  I have it open.
14        Q    Great.  And if you'll see in the middle of
15   this email string, the top email is an email from
16   you to Jones, M.D. Jones, on September 4th.
17             Was this the same doctor you referred to
18   earlier today, Dr. Ayanna?
19        A    That's correct.
20        Q    So Ayanna Jones, correct?
21        A    That's correct.
22        Q    And Dr. Ayanna Jones was located at least
23   in 2019, in Houston, Texas.  Correct?
24        A    Correct.  Based on the email signature
25   line, that's what it looks like.
```

**EXHIBIT 17-34**

Andrew Powers                                    September 17, 2024

1      Q    And so this is the exhibit that you were

2   referring to when Dr. Ayanna Jones referred you to

3   another person to speak with in connection with

4   Mr. Snookal's complaint?

5      A    That's correct.  Just looking to make

6   contact with health and medical, and then was

7   pointed to someone else.

8      Q    Her email says, "Hello, Andrew.  The

9   EEMEA."  Do you know what that acronym stands for?

10     A    It's our -- at the time was our Europe and

11  Middle Eastern Africa business segment, which

12  encompassed multiple countries under it.  And so

13  this regional medical director -- or medical manager

14  looked over multiple countries.

15     Q    Do you know who that person was in 2019?

16     A    Yes.  Dr. Levy.

17         MS. LEAL:  Okay.  I have no further

18  questions.  You have time to spare to get to your

19  bus.

20         Ms. Court Reporter, we'll just handle the

21  transcript under Code.

22         MS. FAN:  Oh, Counsel, I apologize.  I do

23  have a couple of questions on my own.  I'm aware of

24  the 2:00 o'clock end time, and we'll try to get us

25  all out of here by then.

**EXHIBIT 17-35**

Andrew Powers                                              September 17, 2024

1              I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; that the foregoing transcript is a true

11    record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [  ] was [  ] was not requested.

16             I further certify I am neither financially

17    interested in the action, nor a relative or employee

18    of any attorney or party to this action.

19             IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: October 1, 2024

23

24    _____
                    _Jane A. Bramblett_

25                JANE BRAMBLETT, CLR, CCRR
                  CSR No. 7574

**EXHIBIT 17-36**

# EXHIBIT 17 -3

09.17.24
**Andrew Powers**
**3**

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Wednesday, September 4, 2019 12:49 PM |
| **To:** | Tortorich, Troy; Ruppert, Austin |
| **Cc:** | Tse, Thalia |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

All – Not for forwarding, but I wanted to give you a quick update. Apologies for the lengthy e-mail as I am traveling.

First, I heard back from medical. They were not able to provide any specific medical information but could state that having a medical condition by itself does not disqualify an individual if the risk can be managed effectively at the host location. In this situation, the host medical team reviewed the case and given the inherent risk and inability to mitigate/eliminate this risk in Escravos, led to the decision of unfit for expat assignment in this case. They did look into whether the position could be moved to Lagos, where there are hospitals and better medical resources but that was not feasible. It is common for the treating physician's decision to be overridden, this happens when the treating provider does not understand the local medical resources at the host location, the difficulty medically evacuating a person from the location, and the risk tolerance of the host, in short disagreements do happen. The use of the term "low risk" is a little misleading here as there is a specific risk of his underlying condition becoming problematic and although the treating doctor reported this individuals risk to be lower than what is written in the medical literature, it's still significant and higher than the business was willing to accept.

Second, I have asked medical how we have responded to these in the past. Mark is not the first person to be deemed unfit for expat assignment. I'd like to get proper and effective language before responding to Mark and let him know who his resources are to further discuss medical details (it is not appropriate if he discusses his condition with you, me or anyone besides medical).

Third, I think you will be best prepared by thinking about what role Mark can do within El Segundo. Do you have an existing vacancy? Do we have any roles that he could be good for in the near future? He mentions a backfill was identified, is that already finalized? I know it would not be ideal, but would you want to consider rescinding that person's offer since Mark's offer fell through? Main intent here is that we need to give Mark the assurance (if possible) that he should not worry about NOT having a job (we will figure something out). It is clear he is frustrated about not getting the expat role, but now is concerned what his employment looks like in general.

I will report back once I hear back from medical on how they have responded to these in the past. In the meantime, if you have any questions that need immediate attention, please feel free to call Thalia or myself.

Kind Regards,

**Andrew Powers**
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Powers, Andrew C
**Sent:** Wednesday, September 4, 2019 7:41 AM

CUSA000538

**EXHIBIT 17-3-1**

3.1

**To:** Tortorich, Troy (TRMT) <TRMT@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>
**Subject:** Fwd: Rescinded Job Offer in Nigeria

Austin/Troy,
Please be thinking about what role Mark could do if this falls through. Thalia and I will investigate and see what medical can share/set us up with an appropriate response.

Note he finds this discriminatory, however, that is hard to know without further context from medical. I am sure there is a very good reason why this was rescinded.

Andrew

Sent from my iPhone

Begin forwarded message:

> **From:** "Powers, Andrew C" <Andrew.Powers@chevron.com>
> **Date:** September 4, 2019 at 7:35:44 AM PDT
> **To:** "Snookal, Mark" <Mark.Snookal@chevron.com>
> **Cc:** "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
> **Subject:** Re: Rescinded Job Offer in Nigeria
>
> Mark,
> Thank you for bringing this to our attention. This is the first I am hearing of this. Therefore, please let me look into this and see if I can get a better understanding of why. We will get back to you ASAP.
>
> Andrew
>
> Sent from my iPhone
>
> On Sep 4, 2019, at 7:21 AM, Snookal, Mark <Mark.Snookal@chevron.com> wrote:
>
>> Andrew,
>>
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>>
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria…His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

CUSA000539

**EXHIBIT 17-3-2**

3.2

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.

Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

CUSA000540

**EXHIBIT 17-3-3**

3.3

# EXHIBIT 17-5

09.17.24

**Andrew Powers**

**5**

| | |
|---|---|
| **From:** | Powers, Andrew <Andrew.Powers@chevron.com> |
| **Sent:** | Friday, September 6, 2019 7:57 AM |
| **To:** | Snookal, Mark |
| **Cc:** | Tse, Thalia; Ruppert, Austin |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

*Andrew Powers*
HR Manager, El Segundo Refinery
Andrew.Powers@chevron.com

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

---

**From:** Snookal, Mark <Mark.Snookal@chevron.com>
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C <Andrew.Powers@chevron.com>
**Cc:** Tse, Thalia <thaliatse@chevron.com>; Ruppert, Austin <Austin.Ruppert@chevron.com>
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria…His [my] condition is under good control, and no special treatment

1

CUSA000542

**EXHIBIT 17-5-1**

5.1

is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

CUSA000543

**EXHIBIT 17-5-2**

5.2

# EXHIBIT 17 -12

From: Powers, Andrew C[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AFB7F7C935FE4FB4938203195698DFEA-BDQS]
Sent: Wed 9/4/2019 2:42:07 PM Coordinated Universal Time
To: Jones MD, Ayanna[Ayanna.Jones@chevron.com]
Cc: Tse, Thalia[thaliatse@chevron.com]; Levy, Scott[ScottLevy@chevron.com]
Subject: Re: Rescinded Job Offer in Nigeria

09.17.24

**Andrew Powers**

**12**

Thank you Dr. Ayana.
Would be great if we can get some further justification and suggested response today.


Sent from my iPhone

On Sep 4, 2019, at 7:39 AM, Jones MD, Ayanna <Ayanna.Jones@chevron.com> wrote:

> Hello Andrew,
> The EEMEA Regional Medical Manager would be able to provide you with context on this case and appropriate response.
> Regards,
> Ayanna Jones, MD, MPH
> Manager US Occupational and
> Expatriate Health Services
> **Chevron Services Company**
> A Division of Chevron U.S.A. Inc.
> TR & HM COE
> Global Health and Medical
> 1400 Smith, #03196
> Houston, TX 77002
> Tel: (713)372-5921
> Fax: (713)372-5941
> Email: Ayanna.Jones@chevron.com
> *This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any information in this message is strictly prohibited. If you have received this message in error, please notify me immediately at the telephone number indicated above*
> From: Powers, Andrew C <Andrew.Powers@chevron.com>
> Sent: Wednesday, September 04, 2019 9:33 AM
> To: Jones MD, Ayanna <Ayanna.Jones@chevron.com>
> Cc: Tse, Thalia <thaliatse@chevron.com>
> Subject: Fwd: Rescinded Job Offer in Nigeria
> Dr. Ayana,
> Are you able to provide me with any context on the below and suggested response? Is this common to have conflicting views between someone's personal physician and Chevron Expat Medical?
> If there is another resource you would suggest, could I please have their name?
> Note that Mark finds this discriminatory in nature, however, this is hard to know with the limited information.
> Kind Regards,
> Andrew Powers
>
> Sent from my iPhone
> Begin forwarded message:
>
>> From: "Snookal, Mark" <Mark.Snookal@chevron.com>
>> Date: September 4, 2019 at 7:20:38 AM PDT
>> To: "Powers, Andrew C" <Andrew.Powers@chevron.com>
>> Cc: "Tse, Thalia" <thaliatse@chevron.com>, "Ruppert, Austin" <Austin.Ruppert@chevron.com>
>> Subject: Rescinded Job Offer in Nigeria
>>
>> Andrew,
>> I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.
>> After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.
>> Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.
>> Mark Snookal

**EXHIBIT 17-12-1**

IEA Reliability Team Lead
**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel 310.615.5208
Mobile 310.678.5914
Mark.Snookal@chevron.com

CUSA000651

**EXHIBIT 17-12-2**

12.2

# EXHIBIT 18

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,    )
                                )
                                )
                Plaintiff,      )
vs.                             ) Case No.
                                ) 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                  )
                                )
                Defendants.     )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657


**EXHIBIT 18-1**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF:

 5             ALLRED, MAROKO & GOLDBERG
               By:  DOLORES Y. LEAL
 6             Attorney at Law
               6300 Wilshire Boulevard, Suite 1500
 7             Los Angeles, California 90048
               (323) 653-6530
 8             dleal@amglaw.com

 9    FOR THE DEFENDANT:

10             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
               By:  ROBERT E. MUSSIG
11             Attorney at Law
               333 South Hope Street, 43rd Floor
12             Los Angeles, California 90071
               (213) 620-1780
13             rmussig@sheppardmullin.com

14    THE VIDEOGRAPHER:

15             Jacob Rivera

16    ALSO PRESENT:

17             Eguono Erhun, In-House Counsel for Chevron

18

19

20

21

22

23

24

25
```

**EXHIBIT 18-2**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   foundation.  Let me just -- Doctor, when I object,
 2   unless I instruct you not to answer, you should still
 3   answer the question.  I'm just making objections for the
 4   record.  So unless I'm instructing you not to answer, go
 5   ahead and answer her questions.
 6           THE WITNESS:  Okay.  So by the nature of this
 7   contract, Deep Drill is providing medical services to
 8   Chevron by supplying manpower, doctors and nurses.
 9   BY MS. LEAL:
10      Q.  Do you know if Deep Drill Oil Services provides
11   medical services to any other companies other than
12   Chevron, or is Chevron the only client?
13      A.  I don't know.
14           MR. MUSSIG:  Calls for speculation.
15   BY MS. LEAL:
16      Q.  So prior to 2020, who was your employer?
17      A.  So prior to 2020, my employer was Delog Nigeria
18   Limited, D-E-L-O-G, Delog Nigeria Limited.
19      Q.  So prior to 2020, your employer was Delog
20   Nigeria Limited?
21      A.  Yes.  That's D-E-L-O-G.
22      Q.  So what business was Delog Nigeria Limited in
23   at the time?
24           MR. MUSSIG:  Calls for speculation.  Lacks
25   foundation.
```

**EXHIBIT 18-3**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              THE WITNESS:  Okay.  So -- so for my group, it
 2    was, again, provision of manpower, doctors and nurses,
 3    to Chevron in this instance.
 4    BY MS. LEAL:
 5         Q.  Okay.  Do you know if Delog Nigeria Limited
 6    provided doctors and nurses to other companies other
 7    than Chevron at the time?
 8              MR. MUSSIG:  Calls for speculation.
 9              THE WITNESS:  I don't know.
10    BY MS. LEAL:
11         Q.  Okay.  Has Chevron directly ever paid your
12    salary?
13         A.  No.
14         Q.  So the work that you did for Chevron was paid
15    either by Delog Nigeria Limited or by Deep Drill Oil
16    Services in conjunction with the contract that those
17    companies had with Chevron; is that correct then?
18         A.  Can you rephrase that question?
19         Q.  Yes.  I want to make sure I understand.
20              Prior to 2020, and since then, all of the work
21    that you have performed for Delog Nigeria Limited and
22    Deep Drill Oil Services was work that you did in
23    connection with services for Chevron.
24         A.  Yes.
25         Q.  Other than Chevron, did you have any other
```

**EXHIBIT 18-4**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   companies for which you provided any services at any
 2   time during your employment with either Delog Nigeria
 3   services or Deep Drill Oil Services?
 4       A.  No.
 5       Q.  When did you first start doing any work for
 6   Chevron?
 7       A.  My contract started in 2011.
 8       Q.  And at that time, then, your salary -- your
 9   compensation was paid by Delog?
10       A.  No.  So from 2011, my contract company was IMS
11   Medical Services.
12       Q.  I-V, as in Victor?
13       A.  No.  IMS, International Medical Services
14   Limited.
15       Q.  I apologize.  What were the letters again?
16       A.  IMS.  S --
17       Q.  "X" like X-ray.
18       A.  -- for services.  No, "S" like services.
19       Q.  IMS.
20       A.  Yes.
21       Q.  Okay.  And how long did you have a contract
22   with IMS Medical Services?  From 2011 until when?
23       A.  2011 until about -- I'm not sure now.  I have
24   to look that up.  About 2005, 2006.
25           Oh, sorry, '15, '16.  '11 to '15, '16.
```

**EXHIBIT 18-5**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   did residency training in internal medicine in the

2   University of Port Harcourt Teaching House, which was

3   specializing in the West African College of Physician.

4   Between 2003 and 2009, junior residency for three years

5   in general internal medicine, and then the last three

6   years subspecializing in neurology.

7           I have a Master's in pharmacology from the

8   University of Port Harcourt in Nigeria.  I have another

9   Master's in public health from the University of

10  Manchester.  And then in between, I've done a course in

11  occupational health from the University College

12  Hospital, Ibadan, Nigeria.

13      Q.  How do you spell Ibadan?

14      A.  I-B-A-D-A-N.

15      Q.  And how long have you been a physician -- a

16  licensed physician?

17      A.  1997 until date.  Last 27 years.

18      Q.  And do you have a medical specialty?

19      A.  Yes.

20      Q.  What is that?

21      A.  I'm a physician, that's equivalent to the U.S.

22  internist, and I'm also a neurologist.

23      Q.  An internist and neurologist.  Okay.

24      A.  Yes.

25      Q.  Have you ever practiced cardiology?

**EXHIBIT 18-6**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1        A.  Not as a cardiologist.
 2        Q.  Have you ever seen an aortic dissection or
 3   rupture?
 4        A.  No --
 5             MR. MUSSIG:  Vague and ambiguous as to "seen."
 6             THE WITNESS:  Can you clarify that?
 7   BY MS. LEAL:
 8        Q.  Sure.  Have you ever treated an individual who
 9   had an aortic dissection or a rupture?
10        A.  No.
11        Q.  The contract which you have with Deep Drill Oil
12   Services, which you've had since, you said, 2020, does
13   that contract specify that you only do work for Chevron?
14        A.  Not written in the contract.
15        Q.  Do you only do work for Chevron, though?
16        A.  Yes.
17        Q.  And prior to 2020, have you only done work for
18   Chevron?
19             MR. MUSSIG:  Vague and ambiguous.
20             THE WITNESS:  Yes.  When you say "do work," you
21   mean have contract with?  Or what do you mean "do work"?
22   BY MS. LEAL:
23        Q.  Well, in your work as a doctor, you said that
24   the company Delog provides doctors and nurses to
25   Chevron.
```

**EXHIBIT 18-7**

Dr. Eshiofe Asekomeh                                      October 10, 2024

```
1              So in your work as a doctor, do you provide
2    services to any other company other than Chevron?
3         A.   No.
4         Q.   So you're exclusive to Chevron then?
5              (Simultaneous crosstalk.  Reporter
6              clarification.)
7              MR. MUSSIG:  Vague and ambiguous as
8    "exclusive."
9    BY MS. LEAL:
10        Q.   I'll withdraw that.  You've already answered my
11   other question.
12             So let's focus on your job duties during the
13   time that you were an occupational health physician.
14             Can you tell me what your job duties were?
15        A.   Okay.  So specific for the occupational health
16   duties, I did annual --
17             (Reporter clarification.)
18             THE WITNESS:  Annual or periodic medical --
19   BY MS. LEAL:
20        Q.   Annual or periodic --
21        A.   -- medical --
22        Q.   -- medical --
23        A.   -- exams for the local employees, their
24   dependents; retirees, and their dependents.  I also did
25   work-related medicals for employees, pre-employments,
```

**EXHIBIT 18-8**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    recall also being deemed not fit for duty?

2         A.   I will have to look at the record to answer.

3         Q.   Okay.  Other than Mr. Snookal, in 2019, 2020,

4    are there any individuals whom you deemed to be unfit

5    for duty because of an aortic dissection or an aortic

6    aneurysm?

7         A.   No.

8         Q.   So Mr. Snookal was the only one?

9         A.   The only one with aortic aneurysm.

10        Q.   Okay.  So let's focus on the MSEA evaluations

11   that you were responsible for performing in 2019.

12             Can you tell me how you went about conducting

13   these evaluations?

14             MR. MUSSIG:  Vague and ambiguous.  Calls for a

15   narrative.

16             THE WITNESS:  Okay.  So do you want, like, a

17   generic description of what the process is like?

18   BY MS. LEAL:

19        Q.   Yes.

20        A.   Okay.  So from both end, both from the Nigeria

21   end and the U.S. end, or any other country where MSEAs

22   are done, there is a specific list of what you are

23   supposed to do, and that is captured in the Medical

24   Examination Protocol book that is a global guide to

25   Chevron occupational health screenings, work-related

**EXHIBIT 18-9**

Dr. Eshiofe Asekomeh                                        October 10, 2024

```
 1    screenings that tells you what forms the client should
 2    fill.  So we have a form for collecting background
 3    medical --
 4              (Reporter clarification.)
 5              THE WITNESS:  Medical history of the patient.
 6    There are forms for specific things.  Authorization,
 7    medical history, medical examination by his physician or
 8    the physician who is doing the MSEA, and then there's a
 9    list of investigations to be done for MSEA, what blood
10    works, X-rays, and all of that.
11              And after that is done, as of that time, the
12    country of origin would send those documents to the
13    destination country, and it is the job of the
14    destination country to review those documents and make a
15    determination of fitness or no fitness.  So it is --
16              (Reporter clarification.)
17              THE WITNESS:  It is sent -- it is sent through
18    the electronic medical record system.  So you get an
19    e-mail when it has been sent to you to say documents for
20    Mr. XYZ has been sent to you.  So you go to the EMR and
21    look at those documents, go through all the forms, make
22    sure they're properly filled, make sure the person has
23    been examined, look at the examination finding, look at
24    the medical history of that person, look at the results,
25    and make sure the results are complete and they are all
```

**EXHIBIT 18-10**

Dr. Eshiofe Asekomeh                                      October 10, 2024

```
 1    normal.  Okay?
 2          If there is any abnormality, make sure there is
 3    an explanation or the fact that the person has been
 4    reviewed.  And if you are not comfortable with any of
 5    those results, you send back a message to the team that
 6    sends you those MSEA documents and ask for further
 7    investigation or ask for further review, which you then
 8    get back and then you make a determination.
 9    BY MS. LEAL:
10        Q.  Thank you.  Can you tell me again what is the
11    name of that guide?
12          What is the title of that guide that you
13    utilized in ensuring that everything is completed, the
14    global guide?
15        A.  That is the Medical Examination Protocol, MEP,
16    Medical Examination Protocol.
17        Q.  And is that a Chevron document, to your
18    knowledge?
19        A.  Yes.
20        Q.  And this Medical Examination Protocol document
21    is a document that you utilize in order to ensure that
22    you properly conduct these MSEAs; correct?
23        A.  So it's a guide to tell you what -- what
24    investigations and what forms needs to be filled and
25    what needs to be done for every protocol.  So for MSEA,
```

**EXHIBIT 18-11**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   please?

 2            MS. LEAL:  Sure.

 3            THE VIDEOGRAPHER:  All right.  Going off the

 4   record at 8:04 a.m.

 5            (Off the record.)

 6            THE VIDEOGRAPHER:  All right.  We're back on

 7   the record at 8:17 a.m.

 8   BY MS. LEAL:

 9       Q.   Dr. Asekomeh, from 2016 through 2020, when you

10   were in Warri as the occupational physician, did you

11   learn of any instances where an employee required

12   medical attention which the local Escravos clinic was

13   not equipped to handle?

14       A.   Yes.

15       Q.   And can you tell me about those instances that

16   you do recall?

17       A.   Because of the date range given, it would be

18   difficult to recall specifics.  But we do have medevacs

19   from Escravos to Warri almost on a regular basis.

20       Q.   On what basis?

21       A.   On a regular basis.

22       Q.   What do you mean by "regular"?  How many times

23   a week?

24       A.   The answer I'm going to give you now is going

25   to be not -- maybe not for 2016, 2019.  I've been here
```

**EXHIBIT 18-12**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   since 2020.  So in the past week, I've had two medevacs.
 2   That's not counting referrals.  So we differentiate
 3   between referrals and medevac.  Medevacs are medevacs,
 4   urgent, emergency.  Referrals are things we can
 5   prioritize, and then put them on normal flights out.
 6       Q.  If someone suffered an aortic rupture, that, in
 7   your mind, would require a medevac?
 8       A.  Okay.  Again --
 9           MR. MUSSIG:  Incomplete hypothetical.
10           THE WITNESS:  That's --
11           (Reporter clarification.)
12           THE WITNESS:  I said that's if the person
13   survives from where they are driven, gets to the -- to
14   even get them to the Escravos clinic.  An aortic rupture
15   is a sudden, fatal event.
16   BY MS. LEAL:
17       Q.  I'm sorry.  Would you repeat what you said?
18       A.  I said an aortic rupture oftentime is fatal.
19       Q.  An aortic rupture is oftentimes fatal.
20       A.  Yes.
21       Q.  Correct.  So there's a possibility that the
22   person may just die as soon as there's a rupture, in
23   which case they would not even have to be medevacked
24   to --
25       A.  Yes.
```

**EXHIBIT 18-13**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1    "know"?
 2         Q.  Are you aware that Dr. Sobel was the doctor
 3    selected by Chevron to conduct an examination of
 4    Mr. Snookal?
 5              MR. MUSSIG:  Lacks foundation.
 6              THE WITNESS:  So this form was signed by
 7    Dr. Sobel, and as I said, we use -- these forms are sent
 8    through the electronic medical records.  So for the form
 9    to have been signed by him, it means that the U.S. team
10    were aware of him and that he had conducted the test
11    before he passed them into the EMR web chat and then
12    send them to me to review.
13    BY MS. LEAL:
14         Q.  My question was a bit different.
15              Are you aware that Dr. Sobel who signed this
16    form was not Mr. Snookal's own physician but rather a
17    physician --
18         A.  Yes.
19         Q.  -- from Chevron selected to do the
20    examination?
21         A.  Yes.
22              MR. MUSSIG:  Lacks foundation.
23    BY MS. LEAL:
24         Q.  And according to this form, he dated it
25    July 24th, 2019, and he determined that Mr. Snookal was
```

**EXHIBIT 18-14**

Dr. Eshiofe Asekomeh                                      October 10, 2024

```
 1   fit for duty with restrictions of no heavy lifting more
 2   than 50 pounds, and then he needed a review of a
 3   recommendation letter from a cardiologist to clear him.
 4           Is that your understanding?
 5           MR. MUSSIG:  Document speaks for itself.
 6           THE WITNESS:  Yes.
 7   BY MS. LEAL:
 8       Q.  Did you speak with Dr. Sobel at all?
 9       A.  No.
10       Q.  And did you at some point learn that Dr. Steven
11   Khan was Mr. Snookal's cardiologist?
12       A.  Yes.
13       Q.  Did you speak with Dr. Khan?
14       A.  There's a report from Dr. Khan in these
15   records.
16       Q.  My question was:  Did you speak with Dr. Khan?
17       A.  No.
18       Q.  Did you speak with Mr. Snookal at all in
19   conjunction with your MSEA evaluation?
20       A.  No.
21       Q.  So you didn't speak with Mr. Snookal to find
22   out how long he had worked at Chevron prior to 2019
23   without any medical incidents?
24           MR. MUSSIG:  Asked and answered.
25           THE WITNESS:  No.
```

**EXHIBIT 18-15**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   BY MS. LEAL:
 2       Q.   No, you did not speak with him to find out that
 3   information; correct?
 4       A.   It wasn't part of the process that I would
 5   speak to him.
 6       Q.   Well, you could have spoken to him, could you
 7   not?
 8           MR. MUSSIG:   Incomplete hypothetical.  Calls
 9   for speculation.
10           THE WITNESS:   As I said, it's a process.
11   Wasn't part of the process.
12   BY MS. LEAL:
13       Q.   Was there anything to preclude you from picking
14   up the phone or sending an e-mail to Mr. Snookal to get
15   more information from him in order for you to evaluate
16   him for assignment to Escravos?
17       A.   So the way the process work was if I need any
18   further information, on that EMR web chat, I will
19   request for those information and the U.S. team will
20   handle it.
21       Q.   Did you ask anyone in the U.S. team to find out
22   how Mr. -- how long Mr. Snookal had worked at Chevron
23   prior to 2019 without any medical incidents?
24       A.   What will you need that information for?
25       Q.   I'm just asking if you -- if you did.
```

**EXHIBIT 18-16**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1            Did you contact any person to find out whether
 2    Mr. Snookal had any prior medical incidents while
 3    working at Chevron?
 4         A.   That information was not necessary.
 5         Q.   In your opinion, it was not necessary?  Is that
 6    correct?
 7         A.   As of that time, it wasn't necessary.
 8         Q.   So because you didn't find out any information
 9    about Mr. Snookal's prior employment at Chevron, you
10    didn't know that he had worked there for ten years
11    before 2019 without any medical incidents; correct?
12         A.   That information is not necessary.
13         Q.   So the answer is "correct"?
14         A.   Ask the question again.
15            MS. LEAL:  Can I have the court reporter read
16    it back.
17            (Requested portion of record read.)
18            THE WITNESS:  So -- so the form you showed
19    before has his medical history.
20    BY MS. LEAL:
21         Q.   Did you know that Mr. Snookal had worked at
22    Chevron since 2009 without any medical incidents at
23    Chevron?
24         A.   That's what I said.  He sent in the medical
25    record form that shows his past medical history.  So if
```

**EXHIBIT 18-17**

Dr. Eshiofe Asekomeh                                              October 10, 2024

```
 1   he had an incident, it would be stated in his medical
 2   record.
 3        Q.  So had he had one, it would be reflected in the
 4   medical record, you're saying?
 5        A.  He would have stated it.  The form 146, the
 6   first part of it, he filled and state what medical
 7   history he has.  So the fact that he was on medication,
 8   he stated that.
 9        Q.  Did you speak with anyone in Escravos who would
10   be Mr. Snookal's supervisor to understand the job duties
11   of the reliability engineering manager position?
12        A.  No.
13        Q.  Did you speak with anyone in Escravos who would
14   be Mr. Snookal's supervisor to determine whether the
15   supervisor believed Mr. Snookal should be cleared for
16   duty?
17        A.  Again, the pathway --
18            (Reporter clarification.)
19            THE WITNESS:  I said the pathway -- the medical
20   team doesn't speak to the supervisor.  It was a process.
21   The medical team doesn't speak to his supervisor.
22   BY MS. LEAL:
23        Q.  So if it's not listed in the guidelines or in
24   the process, you don't do it, then, is what you're
25   saying?
```

**EXHIBIT 18-18**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1   role for managers, you don't do functional capacity

2   evaluation.

3           But having said that, Dr. Sobel talked about

4   lifting, not lifting up to so-so weight.  So those will

5   tell you what and what that role is going to involve.

6   If I needed more information, I would talk to the U.S.

7   team to get that information, not his supervisor.

8   BY MS. LEAL:

9       Q.  Did you think it was important for you to know

10  what a reliability engineering manager position entailed

11  in order to be able to properly assess Mr. Snookal,

12  whether he was fit for duty or not?

13      A.  That question has two answers.  Okay?  So if I

14  was writing my decision on whether he had to lift weight

15  above 30 kg, because Dr. Sobel had said fit with

16  limitation would not lift 30 kg, then I would have to

17  find out whether his job role involved lifting 30 kg.

18          The bulk of that decision was taken on the fact

19  that if he had a medical event, we would not be able to

20  support him in Escravos, irrespective of his job role.

21  So that is my answer.

22      Q.  Did you review the job description for the

23  reliability engineering manager?

24      A.  I can't remember now.  But there was no issue

25  around his duty.

**EXHIBIT 18-19**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   BY MS. LEAL:
 2       Q.  So he was qualified, then -- by the time you
 3   were involved, he was deemed qualified to perform the
 4   job of an REM; correct?
 5           MR. MUSSIG:  Calls for speculation.  Lacks
 6   foundation.
 7           THE WITNESS:  I wasn't part of that
 8   determination.  Mine was to decide is this man, coming
 9   to Escravos, fit to come.  Would we be able to manage
10   him if he had any issues, medically --
11   BY MS. LEAL:
12       Q.  Were you aware -- sorry.
13       A.  I'm done.
14       Q.  Were you aware that the REM job would be a desk
15   job?  Majority of the time spent working at a desk?
16       A.  Okay.  So that is the key, "majority of the
17   time," but never all of the time.
18       Q.  Were you aware that the REM was a management
19   position where he supervised persons who were actually
20   working at the location?
21       A.  So almost always the manager once --
22           (Reporter clarification.)
23           THE WITNESS:  Has to step into the field.
24   BY MS. LEAL:
25       Q.  Were you aware that the REM job was not
```

**EXHIBIT 18-20**

Dr. Eshiofe Asekomeh                                    October 10, 2024

 1   physically demanding?
 2           MR. MUSSIG:  Vague and ambiguous as to
 3   "physically demanding."  Calls for speculation.  Lacks
 4   foundation.
 5           THE WITNESS:  Okay.  I can answer that.
 6   Because I mentioned about the functional capacity
 7   evaluation -- so physically-demanding jobs, we do a
 8   functional capacity evaluation.  He had no functional
 9   capacity evaluation.  But that position entail visiting
10   the fields, so he would still have gone to the field
11   once in a while to see what the team was doing.
12   BY MS. LEAL:
13       Q.  Do you know why he was not given a functional
14   capacity evaluation?
15       A.  Because as --
16           (Simultaneous crosstalk.  Reporter
17           clarification.)
18           MR. MUSSIG:  Calls for speculation.
19   BY MS. LEAL:
20       Q.  You can answer, Doctor.
21       A.  Ask the question again.  I've forgotten how you
22   phrased it.
23       Q.  You said that he did not have a functional
24   capacity evaluation conducted.
25           And my question was:  Do you know why?

**EXHIBIT 18-21**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              MR. MUSSIG:  Same objection.
 2              THE WITNESS:  Okay.  I just said now that
 3    office jobs mean we don't have functional capacity
 4    evaluation.  Where almost-always office job and
 5    management will visit fields.
 6    BY MS. LEAL:
 7         Q.  So you don't know why?
 8         A.  Why what?
 9              MR. MUSSIG:  Misstates testimony.
10    BY MS. LEAL:
11         Q.  The functional capacity evaluation was not
12    conducted on Mr. Snookal.
13         A.  I just said this.  Office-based jobs don't have
14    functional capacity, but office-based managers would
15    visit the field once in a while to see what is going
16    on.
17         Q.  I see.  You're saying that office jobs don't
18    require the functional capacity evaluation.
19         A.  Yes.
20         Q.  Okay.  Was there anything about the actual
21    reliability engineering manager job that Mr. Snookal
22    would have been performing that would increase the risk
23    of an exacerbation of his condition?
24              MR. MUSSIG:  Calls for speculation.  Lacks
25    foundation.  Incomplete hypothetical.
```

**EXHIBIT 18-22**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
1              THE VIDEOGRAPHER:  All right.  We're back on
2      the record at 9:37 a.m.
3              MS. LEAL:  Jacob, can you put up Exhibit 2,
4      please, on the screen?  I'm sorry, that was Exhibit --
5      yes -- 2.
6      BY MS. LEAL:
7         Q.  For the record, it's a document Bates number
8      Snookal 01157 and 01158.  The title of the document is
9      Job Title: NMA EGTL Reliability Engineering Manager.
10             Have you seen this document before today,
11     Dr. Asekomeh?
12        A.  No.
13        Q.  So this was not a document that anyone sent you
14     in conjunction with your evaluation of Mr. Snookal's
15     suitability for the assignment?
16        A.  Can you scroll it down?
17             MR. MUSSIG:  Objection.  Asked and answered.
18             THE WITNESS:  No.
19             MS. LEAL:  Can we show the next document,
20     Exhibit 3?
21             (Exhibit Number 3 marked for
22             identification.)
23     BY MS. LEAL:
24        Q.  And for the record, Exhibit 3 is Bates number
25     CUSA000208 through 220.  And the title of this document
```

**EXHIBIT 18-23**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   records were inside the MSEA, and then I had reports
 2   from the cardiologist, which have not shown so far, and
 3   then review by Nigerian cardiologists.
 4   BY MS. LEAL:
 5        Q.  Did you review any published studies regarding
 6   aortic aneurysms?
 7        A.  So there was one review by one of the
 8   cardiologists.  Dr. Aiwuyo did the review.
 9        Q.  Which doctor?
10        A.  Dr. Henry Aiwuyo.
11        Q.  A-I-W-U-Y-O?
12        A.  Yes.
13        Q.  And how do you know that Dr. Aiwuyo reviewed
14   such published studies regarding aortic aneurysms?
15        A.  So it's in his reports as e-mailed to me.
16        Q.  Okay.  Well, I will -- I will ask you about
17   that because there were, as your attorney said this
18   morning, several documents sent to me before -- or
19   during your deposition, which I have not had a chance to
20   review.  So we'll take a break and I will review all of
21   those documents and we'll come back to that.
22             So I understand your testimony that
23   Dr. Aiwuyo --
24        A.  Aiwuyo.  Henry Aiwuyo.
25        Q.  Okay.  Aiwuyo.
```

**EXHIBIT 18-24**

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
1            MR. MUSSIG:  Calls for speculation.  Incomplete
2    hypothetical.
3            THE WITNESS:  Do you mean, like, the weather
4    or, like, the water?  What variables are you looking at?
5    BY MS. LEAL:
6       Q.  Anything.  I mean, is there anything about
7    being in Escravos, Nigeria, that would aggravate or
8    increase the likelihood that Mr. Snookal would suffer a
9    rupture?
10       A.  Those -- those risks would have to be recorded
11    risk, the risk we already know, which the cardiologist
12    had mentioned in their review, if he was smoking, if he
13    was doing vigorous exercise, was lifting heavy weights.
14       Q.  Yeah, I'm not talking about him.  I'm talking
15    about the location.
16            Being in Escravos, just him working in
17    Escravos, is there anything there that would increase or
18    aggravate the likelihood that he would have a rupture?
19            MR. MUSSIG:  Calls for speculation.  Lacks
20    foundation.  Incomplete hypothetical.
21            THE WITNESS:  So if we were talking of the
22    weather or food, these are not known risk anywhere in
23    the world that aggravates an aneurysm or the chances
24    that it ruptures, to the best of my knowledge.
25            MS. LEAL:  Okay.  Would -- Jacob, would you
```

**EXHIBIT 18-25**

Dr. Eshiofe Asekomeh                                              October 10, 2024

1   BY MS. LEAL:

2       Q.   Now, you said earlier that in reviewing the

3   documents, you saw that Mr. Snookal had had annual CT

4   scans and echocardiograms; correct?

5       A.   Yes.

6       Q.   Do you agree that annual imaging with the CT

7   scans and the echocardiograms was and could continue to

8   be used to monitor Mr. Snookal's aorta for changes?

9       A.   Are you asking me if I know after 2019 whether

10  he's been having more CTs and echocardiograms?

11      Q.   Well, do you agree that having annual imaging

12  of the CT scans and echoes could -- could continue to be

13  done in order to monitor Mr. Snookal?

14      A.   The first cardiologist -- Dr. Aiwuyo stated

15  that in his report, that the right thing to do is that,

16  to have his annual CTs and echocardiograms.

17      Q.   So that's something that could and should be

18  done; correct?

19      A.   That was what was recommended as of that

20  time.

21          MR. MUSSIG:   Calls for speculation.

22  BY MS. LEAL:

23      Q.   I'm sorry, you said that was what was

24  recommended at the time?

25      A.   Yes.

**EXHIBIT 18-26**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1   BY MS. LEAL:

 2        Q.  Nothing else comes to mind?

 3        A.  Not presently.

 4        Q.  Okay.  In Escravos, during a routine operation

 5   there at the facility, are there opportunities for

 6   employees to suffer whole or partial body crush

 7   injuries?

 8            MR. MUSSIG:  Vague and ambiguous as to "routine

 9   operation."  Calls for speculation.  Lacks foundation.

10   Incomplete hypothetical.

11            THE WITNESS:  Did you say "routine operation"?

12   BY MS. LEAL:

13        Q.  Well, let's just say operation.

14            So during the operations there in Escravos, are

15   there opportunities where employees could suffer whole

16   or partial body crush injury?

17            MR. MUSSIG:  Vague and ambiguous as to "whole

18   body crush injuries."  Calls for speculation.  Lacks

19   foundation.  Incomplete hypothetical.

20            THE WITNESS:  So -- so if an employee was

21   working where those risk exist, hypothetically, yes.

22   BY MS. LEAL:

23        Q.  So have there been any, for example,

24   amputations, employees working on a machine and

25   someone's arm or leg or other body part is amputated?
```

**EXHIBIT 18-27**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1        A.   That's possible.
 2        Q.   Have you heard of any such incidents there in
 3   Escravos?
 4        A.   Now, that's work related.  I don't know if I'm
 5   allowed to share that with you.
 6        Q.   Well, I don't need the identity of the person.
 7   I don't need you to violate anyone's privacy.  I'm just
 8   saying in general.
 9            MR. MUSSIG:  I'll say you can answer that
10   question.  I don't want to get into any details about,
11   you know, specific injuries that happened to specific
12   people.
13   BY MS. LEAL:
14        Q.   I'm just asking about the injuries themselves.
15   I don't want you to identify people.
16        A.   Yes.
17        Q.   Can you describe -- or can you list for me the
18   different injuries that you've seen occur there in
19   Escravos?
20            MR. MUSSIG:  Calls for a narrative.
21            THE WITNESS:  Okay.  So we've had injuries like
22   sea pirate attacks, finger injuries, crushed fingers.
23   Lacerations from -- lacerations, slip and falls.
24   BY MS. LEAL:
25        Q.   Have there been any amputations?
```

**EXHIBIT 18-28**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1        A.   Yes.
 2        Q.   And what type?
 3        A.   Finger.  I'm aware of a finger amputation.
 4        Q.   Any others?
 5        A.   Mainly fingers.
 6        Q.   Any other body parts?
 7             MR. MUSSIG:  Asked and answered.
 8             THE WITNESS:  I'm aware of fingers.
 9   BY MS. LEAL:
10        Q.   Was a head decapitated at one point?
11        A.   I'm aware of fingers.
12        Q.   I understand fingers.
13             But do you have a recollection that a head
14   actually was decapitated?
15        A.   I'm not aware of that.
16        Q.   Have you heard of legs being cut off?
17             MR. MUSSIG:  Asked and answered.
18             THE WITNESS:  None that I can recollect.
19   BY MS. LEAL:
20        Q.   Have you heard or recall arms being cut off?
21        A.   I am aware of fingers.  I am not aware of arm
22   amputations.  I can't recollect any arm amputation.
23        Q.   Do you recall any incidents where an employee
24   suffered a severe crushing injury to the chest?
25        A.   No.
```

**EXHIBIT 18-29**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1        Q.   And some are predictable and some are not

2   predictable; correct?

3        A.   Well, in the workplace, you want to try and

4   predict what can happen and mitigate it before it

5   happens.  You don't leave anything to chance, especially

6   in the oil industry.

7        Q.   Right.  But there are some injuries that occur

8   from accidents that occur that are not predictable there

9   in Escravos; correct?

10       A.   That's why they are called accident, I guess.

11       Q.   Okay.  I'm going to have Jacob show you the

12  next exhibit, 7.

13            (Exhibit Number 7 marked for

14            identification.)

15  BY MS. LEAL:

16       Q.   And these are seven pages of documents produced

17  this morning by Chevron's counsel, a series of e-mails.

18  The first Bates is CUSA000768 and it goes through 774.

19            Dr. Asekomeh, are these e-mails among the three

20  other doctors and you regarding Mark Snookal?

21       A.   Yes.

22       Q.   Other than these communications by e-mail with

23  these three other doctors in Nigeria, were there any

24  other communications that you had with them that are not

25  reflected here in this exhibit?

**EXHIBIT 18-30**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1          THE WITNESS:  It's -- you're asking me if I
 2   think physicians should determine fitness for work?
 3   BY MS. LEAL:
 4       Q.  No.
 5       A.  That's the equivalence of the question you're
 6   asking me, what was the essence of doing the medical.
 7       Q.  No.  My question is whether it's okay for you
 8   to substitute your judgment for an employee's decision,
 9   like Mr. Snookal, to assume a risk to work in Escravos.
10          Do you think that's okay for you to do that?
11          MR. MUSSIG:  Calls for speculation.  Lacks
12   foundation.  Incomplete hypothetical.  Asked and
13   answered.
14          THE WITNESS:  The essence of doing medical is
15   to decide whether the person is fit to work based on the
16   job type, based on the job location.  That was my task
17   to do.  And that was what I did.
18   BY MS. LEAL:
19       Q.  Right.  And he could perform the duties of an
20   REM.  That, we've established.  The reason he was deemed
21   unfit for duty is because in the event he had a rupture
22   or a dissection, he would not be able to be treated
23   there in Escravos because the medical facilities are
24   small; correct?
25       A.  Additionally, in the event he had the rupture
```

**EXHIBIT 18-31**

Dr. Eshiofe Asekomeh                                October 10, 2024

```
 1   in some location, it would put the life of others at
 2   risk.
 3        Q.  He'd put the life of what?
 4        A.  Others at risk.
 5        Q.  How is it that Mr. Snookal would -- would put
 6   the lives of others at risk if he had a rupture at work?
 7        A.  So I just cited an example of him as a manager
 8   going to visit an offshore location.
 9           MS. LEAL:  We can take this -- the exhibit off
10   the screen, Jacob.  Thank you.
11   BY MS. LEAL:
12        Q.  What did you just say?  I'm sorry.
13        A.  I said I cited an example as a manager, he has
14   to visit some work location from time to time.
15        Q.  Can you give me an example of how he would put
16   others at risk in the event he had a rupture?
17        A.  I wouldn't be able to cite specific example
18   now, but we fly around in choppers, so he's boarding a
19   chopper, he has a rupture at the point of boarding or
20   coming down that chopper.
21        Q.  Coming down a what?
22        A.  A helicopter.
23        Q.  Oh, helicopter.
24           So can you think of any specific way, though,
25   that he would put someone else's life in danger if he
```

**EXHIBIT 18-32**

Dr. Eshiofe Asekomeh                                    October 10, 2024

1    had a rupture to his aorta?

2         A.   Okay.   So he's in a work location, some

3    offshore location on inspection visit, he's climbing the

4    stairs, there's somebody walking behind him, and he

5    ruptures his aorta on that staircase.

6         Q.   He falls down; he falls on top of someone,

7    you're saying?

8         A.   That's a possibility.   We are speculating now.

9         Q.   Yeah, well, that can happen even if someone

10   doesn't have a rupture; correct?   I mean, they misstep,

11   you know, a step on a ladder, for example; they can fall

12   and fall on someone else.   That can happen too; right?

13              MR. MUSSIG:   Calls for speculation.   Incomplete

14   hypothetical.

15              THE WITNESS:   So we are looking at hypothetical

16   situations.   The risk is higher if he ruptures.

17   BY MS. LEAL:

18        Q.   Before you said that -- strike that.

19             Before you determined that Mr. Snookal was not

20   fit for duty for the REM position in Escravos, did you

21   contact anyone in the United States in legal to

22   determine whether or not your decision would be legal or

23   not?

24        A.   No.

25             MR. MUSSIG:   Asked and answered.

**EXHIBIT 18-33**

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                   DR. ESHIOFE ASEKOMEH,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21              DATED:  October 13, 2024.

22

23   _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

**EXHIBIT 18-34**

# EXHIBIT 18‑2

# Job Title: NMA EGTL Reliability Engineering Manager (PSG 23-24, FL 4-6)

Req ID **401333** - Posted **05/06/2019 - Facilities Engineering - Africa - Nigeria - Niger State - Not in list** (23; 24) **-** (Facilities Engineering)

This position is accepting applicants until May 20, 2019, 11:59 PM CST

Welcome to the Enterprise PDC postings, where you will find all open jobs managed within the Enterprise PDC process. You must obtain approval to apply to PDC jobs from both your supervisor and PDR before submitting your application(s); failure to do so may disqualify you from consideration.

As part of the application, you will be required to enter your Personnel Development Representative's (PDR) CAI; it is important that the correct PDR, representing you, is entered. When applying for each job, upload your updated GO-400-2 as your **Resume** attachment and your updated Career Development Plan (CDP) as your **Cover Letter** attachment. Updating your "Company Work Experience", "Previous Employment", etc. is not required within your 'Candidate Profile'.

For more information about the Enterprise PDC process and to locate your PDR, please visit the Corporate Organizational Capability site.

### Position Information:

**Work Locations: Escravos, Nigeria**
**Position Type: Career Ladder**
**Rotational?: Yes**
**Incumbent/Vacant/New: Vacant**
**Number of Vacancies: 1**
**Direct Reports: Yes**
**Pay Scale Group: 23; 24**
**Will expatriate assignments be considered for this position?: Yes**
**Will Relocation be considered within Chevron parameters?: No**
**Appointment: Method: Off-Cycle**
**Functional Level: 4,5,6**
**SBU: Nigeria Mid-Africa**
**Anticipated Start Date (MM/DD/YYYY): 07/01/2019**
**Duration: 3-4 Years**
**Contingent: No**

### Position Contacts:

**Job Owner: OLUWASIJIBOMI OKEOWO**
**PDR: ANDREW AJINDE OMOMEHIN**
**Sponsor: BAO VANG**

HIGH LEVEL JOB DESCRIPTION/SCOPE:
The EGTL Reliability Engineering Manager reports to the EGTL Technical Manager position located in Escravos, Nigeria. The position is responsible for managing a multidiscipline team of ~20 engineers and technicians in the areas of rotating equipment, instrumentation & analyzers, and electrical. Working closely with the Maintenance and Operations organizations, the RE Manager sets the high-level strategies and work direction for the asset integrity management program in a highly complex Gas to Liquids (GTL) plant environment. The RE Manager ensures adequate staff is in place to support the reliability initiatives, long term business plans, and nationalization goals. Coordinates joint reliability initiatives with the NMA base business organization as well as the Complex Process Facilities (CPF) Organization, and ETC. Ensures team compliance with all required training and field verification initiatives.

SPECIAL CONSIDERATIONS:
Engineering Degree preferred. Experience working in complex process facilities.
This is a 28/28 rotational assignment in Nigeria with multi-cultural workforce of many ethnicities. Scheduled work hours are from 06:00 to 18:00 Monday through Saturday, and 06:00 to 16:00 Sunday.
The work location is Escravos, Nigeria. Escravos is a closed camp environment. Escravos is an isolated, swamp location located on a river coast. Living quarters are dorm style
The area has a tropical environment with high humidity and average temperatures ranging between 74 and 86 degrees F and average rainfall of 71 inches. Malaria and other tropical diseases are prevalent - necessitating preventative treatment program. The Medical facilities available are sufficient for basic health and emergency care. All serious illness/injuries will be evacuated to a Chevron approved medical facility until the patient is stabilized and can be returned to their home country.
International Consideration: Expatriate assignments will be considered
Relocation Options: Relocation will not be considered

CRITICAL SELECTION CRITERIA
Operational Excellence and Safety:
• Demonstrated highest safety & environmental performance and leadership trait.
• Must be proactive in addressing safety issues and have a proven track record of strong support of processes that support

EXHIBIT
2
Eshiofe Asekomeh
10/10/2024
Rachel N. Barkume, CSR, RMR, CRR

**SNOOKAL-01157**

Incident Free Operations.
• Working knowledge of Root Cause Analysis (RCA) and Management of Change (MOC) work processes.

Technical Experience:
• At least 10 years plant experience preferably in a complex process facility managing multidiscipline technical teams.
• A working knowledge of rotating equipment, electrical power, and instrument/analyzer systems.
• Experience with Root Cause Analysis, RAM modeling, RCM, FMEA, and other reliability work processes.
• Working knowledge of the various reliability and integrity management programs in Chevron (ERIP, SERIP, URIP, FIRM, etc.)

Supervision and Leadership:
• Recognized as a leader with supervisory experience leading a technical support organization.
• Demonstrated working knowledge of Reliability Engineering and how to apply it to rotating equipment, instruments & analyzers, and electrical power systems.
• Requires strong oral and written communication skills.
• Demonstrated ability to lead work teams through difficult problems and present effective solutions with clear and concise recommendations.
.
Teamwork:
• Must have good communication skills and be able to build strong working relationships with diverse work groups (O&M, contractors, projects, etc.)
• Experience working in a multi-cultural work environment
• Experience with training, development, and mentoring of less experienced engineers.


Location Specific Information:
Some countries have specific location and legal requirements (e.g. age limit, college degree, etc.) for issuing work permits/visas allowing individuals to work in the country and Chevron must abide by these location and legal requirements. For more details, please refer to the Location Specific Information Sheet.
Living and Working:
To get a closer look at what life is like in one of our expat communities, take some time to review our Living & Working In website. This website will give you preliminary information to help decide if this assignment is suited for you and your family. You can also access this site outside the Chevron Internet, to view at home with your family.

SNOOKAL-01158

**EXHIBIT 18-2-2**

# EXHIBIT 18 -7



**From:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Sent:** Monday, 5 August 2019 17:55
**To:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Asekomeh, Eshiofe [DELOG]
<EAEV@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Sir/Ma,

I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures
highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine).  Guideline-
directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood
pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and
documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.

Kind regards,

Victor.

**From:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>
**Sent:** Monday, August 5, 2019 2:26 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>; ADEYEYE, VICTOR [DELOG MEDICAL
SERVICES] <DNOY@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report



EXHIBIT
7

Eshiofe Asekomeh
10/10/2024
Rachel N. Barkume, CSR, RMR, CRR

Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic
aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm
max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have
used values of <4.5cm as partition value for low risk situations., link below refers.

**EXHIBIT 18-7-1**

https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this

evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include

   a. Rupture/dissection ( sudden and catastrophic) and its attendant sequala
   b. Thromboembolic phenomenon
   c. Pressure symptoms on other vital organs
   d. Sudden death

2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support
   such an individual due to our peculiarities.

3. Instructions for the patient

   -avoid lifting heavy objects
   -quit smoking (if he is a smoker)
   -manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic (DOC beta blockers)
   -watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
   -avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic aneurysm, unfortunately I found none.  What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this sir.

Warm regards.


DR. AIWUYO, HENRY
OH Physician/Cardiologist
EGTL clinic
EXT-77943
B₂B dr oyebowale olaniyi
"as to diseases, make a habit of two things- to help, or at least, to do no harm"
hippocrates

**EXHIBIT 18-7-2**

CUSA000769

7.2

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Monday, August 5, 2019 11:43 AM
**To:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Below mail trail refers. Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:
1. Potential complications and the likelihood of progression
2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
3. Possible instructions to communicate to employee as per preventing complications.
Thanks for your usual help.


Warm regards,

Eshiofe Asekomeh


**From:** Asekomeh, Eshiofe [DELOG]
**Sent:** Tuesday, July 30, 2019 7:44 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Cc:** NIGEC Staff Physicians (l9esc300) <L9ESC300@chevron.com>
**Subject:** Snookal, Mark- Medical report

Good day Ma,

I will like to discuss Mark Snookal (Manager, Reliability Engineering) with you tomorrow. He is on transfer from El Segundo, USA to Escravos, Nigeria on international assignment.
He has aortic root dilatation and was reviewed by a Cardiologist April this year. The examining Physician in the US had declared him fit with limitation (not to lift weight above 50 pounds)
Attached are the medical reports and the Cardiologist report from April, 2019.


Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**

**EXHIBIT 18-7-3**



**From:** Akintunde, Ujomoti <UJOM@chevron.com>
**Sent:** Wednesday, 7 August 2019 17:08
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Dear Dr Asekomeh,

I concur with my colleagues. With an aortic root of 4.2cm, he is 'low risk' but not 'no risk'.
I would however be more comfortable if he were on a beta-blocker as one of his meds or in addition to current meds. The fact that he does not smoke cigarettes is beneficial.
There could be a reason his cardiologist did not put him on a beta-blocker. Could he have a contraindication such as asthma, COPD or allergy?
Is there a medical report from his cardiologist? I only see imaging reports.

Kind regards,
Ujomoti Akintunde

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Tuesday, August 6, 2019 12:35 PM
**To:** Akintunde, Ujomoti <UJOM@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Please see mail trail below.

Warm regards,

Eshiofe Asekomeh

**From:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Sent:** Monday, August 5, 2019 5:55 PM
**To:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

**EXHIBIT 18-7-4**

Sir/Ma,

I agree with Dr Aiwuyo submissions on above employee, especially the precautionary measures highlighted which we need to further reiterate to our client.

I have a little concern about his choice of anti-hypertensives (Losartan and Amlodipine). Guideline-directed management recommends Beta-blockers like Carvedilol, Bisoprolol as part of his blood pressure control meds with a systolic BP target of less than 120mmHg (Thoracic aortic aneurysm and documented runs of premature ventricular complexes).
It will be nice if this is brought to the attention of his physician.

Kind regards,

Victor.

---

**From:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>
**Sent:** Monday, August 5, 2019 2:26 PM
**To:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>; ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** RE: Snookal, Mark- Medical report

Good day,

With regards to this expert, 47years old employee with CT and ultrasound evidence of Thoracic aortic aneurysm,

It was documented in the report that he has aortic dilatation of 4.4cm on ECHCARDIOGRAPHY,

however CT aortography which is a more accurate imaging modality revealed a maximum value of 4.2cm max at the aortic root and 4.1cm max at the descending thoracic aorta.

From the Canadian guidelines these values appear low risk for a major adverse CV event. Some have used values of <4.5cm as partition value for low risk situations., link below refers.

https://www.ucalgary.ca/FTWguidelines/content/aortic-aneurysm

it is expected that every aneurysm must be subjected to 6months- 1year assessment to ascertain the rate of progression (>1cm is an indication for repair). I feel there should be a concrete plan by his home cardiologist for this

evaluation.

Below are my response to the questions put forward:

1. Complications associated with aneurysms include

    a. Rupture/dissection ( sudden and catastrophic) and its attendant sequala
    b. Thromboembolic phenomenon

**EXHIBIT 18-7-5**

    c. Pressure symptoms on other vital organs

    d. Sudden death

2. In Escravos unfortunately we are only limited to initial stabilization and transfer of such high risk CV complications if any occurs. In the unlikely event of any of the aforementioned complications, we may not be able to support such an individual due to our peculiarities.

3. Instructions for the patient

    -avoid lifting heavy objects
    -quit smoking (if he is a smoker)
    -manage hypertension strictly, there is need to aim for lower targets <120mmhg systolic (DOC beta blockers)
    -watch out for alarm symptoms like pain in the chest (throbbing, tearing, aching or sharp pain, often sudden), pain in the back, nausea, vomiting, fainting, and systemic shock
    -avoid moderate to high intensity exercises as much as possible

I made effort to search the MEP if there are clear cut field guidelines for patient with aortic aneurysm, unfortunately I found none. What is established is that a patient with symptomatic aneurysm should not be allowed to work in an offshore location.

I am still open to further discussions on this sir.

Warm regards.


DR. AIWUYO, HENRY
OH Physician/Cardiologist
EGTL clinic
EXT-77943
B2B dr oyebowale olaniyi
"as to diseases, make a habit of two things- to help, or at least, to do no harm"
hippocrates

---

**From:** Asekomeh, Eshiofe [DELOG] <EAEV@chevron.com>
**Sent:** Monday, August 5, 2019 11:43 AM
**To:** ADEYEYE, VICTOR [DELOG MEDICAL SERVICES] <DNOY@chevron.com>
**Cc:** Aiwuyo, Henry [SERVITICO] <henryaiwuyo@chevron.com>; Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Subject:** FW: Snookal, Mark- Medical report

Good day,

Below mail trail refers. Kindly help evaluated medical documents and attached Cardiologist report for above named EE who is coming to Escravos from the USA. His job description is- Reliability Engineering Manager.
Kindly review around the following key points:

**EXHIBIT 18-7-6**

1. Potential complications and the likelihood of progression
2. Management of these complications even if only initial intervention vis-à-vis available care level in Escravos
3. Possible instructions to communicate to employee as per preventing complications.

Thanks for your usual help.


Warm regards,

Eshiofe Asekomeh


---

**From:** Asekomeh, Eshiofe [DELOG]
**Sent:** Tuesday, July 30, 2019 7:44 PM
**To:** Pitan, Olorunfemi (femi.pitan) <femi.pitan@chevron.com>
**Cc:** NIGEC Staff Physicians (l9esc300) <L9ESC300@chevron.com>
**Subject:** Snookal, Mark- Medical report

Good day Ma,

I will like to discuss Mark Snookal (Manager, Reliability Engineering) with you tomorrow. He is on transfer from El Segundo, USA to Escravos, Nigeria on international assignment.
He has aortic root dilatation and was reviewed by a Cardiologist April this year. The examining Physician in the US had declared him fit with limitation (not to lift weight above 50 pounds)
Attached are the medical reports and the Cardiologist report from April, 2019.


Warm regards,

Eshiofe Asekomeh

**Dr. Asekomeh E.G**
**Chevron Hospital**
**Warri, Nigeria**


**EXHIBIT 18-7-7**

CUSA000774

7.7

# EXHIBIT 19

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, AN
INDIVIDUAL,

                Plaintiff,

     vs.

CHEVRON USA, INC., A
CALIFORNIA CORPORATION, AND
DOES 1 THROUGH 10,
INCLUSIVE,

                Defendants.
_____/

Case No.
2:23-cv-6302-HDV-AJR


ZOOM VIDEOCONFERENCE/VIDEO-RECORDED

DEPOSITION OF THALIA TSE

HELD REMOTELY

SEPTEMBER 13, 2024


REPORTED BY CYNTHIA DENISE STIRES, CSR NO. 4472


**EXHIBIT 19-1**

Thalia Tse                                        September 13, 2024



1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4    _____

5    MARK SNOOKAL, AN INDIVIDUAL,

6
              Plaintiff,              Case No.
7                                     2:23-cv-6302-HDV-AJR
         vs.
8
     CHEVRON USA, INC., A
9    CALIFORNIA CORPORATION, AND
     DOES 1 THROUGH 10, INCLUSIVE,
10

11            Defendants.
     _____/
12

13          ZOOM VIDEOCONFERENCE/VIDEO-RECORDED

14   DEPOSITION OF THALIA TSE, commencing at the hour of

15   9:02 A.M., Pacific Time, Friday, September 13, 2024,

16   held via Zoom Internet Conferencing Platform, before

17   Cynthia Denise Stires, Certified Shorthand Reporter in

18   and for the State of California.

19

20

21

22

23

24

25

**EXHIBIT 19-2**

Thalia Tse                                                    September 13, 2024

```
 1    APPEARANCES

 2    FOR THE PLAINTIFF:

 3              Allred Maroko & Goldberg
                BY:  Dolores Y. Leal, Esq.
 4                   Olivia Flechsig, Esq.
                6300 Wilshire Boulevard, Suite 1500
 5              Los Angeles, California 90048
                323.653.6530
 6              dleal@amglaw.com.
                oflechsig@amglaw.com
 7

 8    FOR THE DEFENDANT:

 9              Sheppard Mullin Richter & Hampton, LLP
                BY:  Sarah Fan, Esq.
10              333 South Hope Street, 43rd Floor
                Los Angeles, California 90071
11              213.620.1780
                sfan@sheppardmullin.com
12

13    ALSO PRESENT:

14              Michael Kelley, Video Technician

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT 19-3**

Thalia Tse                                                      September 13, 2024

```
 1   BY MS. LEAL:
 2        Q.   Do you know if there is a specific state law
 3   that prohibits discrimination on the job against
 4   persons with disabilities or perceived disabilities?
 5             MS. FAN:  Objection.  Relevance.  Calls for a
 6   legal conclusion.
 7             THE WITNESS:  No.
 8   BY MS. LEAL:
 9        Q.   No, you don't know?
10        A.   I don't.
11        Q.   Okay.  Getting back to the training that you
12   received when you were hired by Chevron, you said that
13   you didn't receive any formal training but that you
14   were instructed to learn Chevron policies; is that
15   correct?
16             MS. FAN:  Objection.  Misstates prior
17   testimony.
18             THE WITNESS:  Yes.
19   BY MS. LEAL:
20        Q.   Okay.  And do you remember which policies
21   during the time of your employment as an HR business
22   partner in El Segundo that you were responsible for
23   becoming familiar with?
24        A.   We have a website where it housed, you know,
25   policies, so it wasn't like I was told to read
```

**EXHIBIT 19-4**

1    everything, but it was more so get familiar, know where

2    to find policies if questions come up.

3        Q.   So you didn't have any, for example, any

4    classroom training or computerized-type training when

5    you were hired by Chevron with respect to their

6    policies then?

7            MS. FAN:  Objection.  Compound.

8            MS. LEAL:  I'll break it up.

9    BY MS. LEAL:

10       Q.   At the time of your hire as an HR business

11   partner for the El Segundo facility, did Chevron

12   provide you with any classroom-type training with

13   respect to their policies?

14       A.   No.

15       Q.   At the time of your hire, did Chevron provide

16   you with any training on computers with respect to

17   their personnel policies?

18       A.   No.

19       Q.   Did Mr. Powers provide you with any specific

20   training at the time of your hire with respect to your

21   job responsibilities as an HR business partner in

22   El Segundo?

23       A.   No.

24       Q.   I'm going to show you a document now.

25           MS. LEAL:  Olivia, if you can go to Exhibit

**EXHIBIT 19-5**

Thalia Tse                                                    September 13, 2024

```
 1   BY MS. LEAL:
 2        Q.   Do you know, or do you not know, if
 3   rotational assignment employees receive premium pay?
 4        A.   I believe they do.
 5        Q.   And is it your knowledge that the premiums
 6   are based on the area of assignment; in other words,
 7   which country they're assigned to?
 8             MS. FAN:  Calls for speculation.
 9             THE WITNESS:  I think so.
10   BY MS. LEAL:
11        Q.   Employees who become expats, in other words,
12   working at Chevron facilities outside the continental
13   US, do you know who pays their salary?
14             MS. FAN:  Objection.  Calls for speculation.
15   Calls for a legal conclusion.
16             THE WITNESS:  I don't know.
17   BY MS. LEAL:
18        Q.   Let's go to Exhibit 2.
19             (Deposition Exhibit 2 was marked.)
20   BY MS. LEAL:
21        Q.   And this document is a one-page document,
22   Bates No. CUSA000503.  It's a document produced by
23   Chevron and it's titled Chevron Tax Equalization
24   Policy, Human Resources Shared Services.
25             MS. FAN:  Counsel, I apologize for jumping in
```

**EXHIBIT 19-6**

Thalia Tse                                                      September 13, 2024

1    e-mail from Mr. Ruppert to you with a copy to Troy

2    Tortorich.

3              Have you seen this document before, Ms. Tse?

4         A.   Yes.

5         Q.   And this e-mail is dated November 6th, 2019.

6              So I assume you received this e-mail from

7    Mr. Ruppert?

8         A.   Yes.

9         Q.   And he's telling you that he would like to

10   manage or move Mr. Snookal into a reliability change OA

11   role starting as soon as possible.

12             Do you see that?

13        A.   Yes, I can see it.

14        Q.   Did you do anything prior to November 6th,

15   2019 to move Mr. Snookal into the reliability change OA

16   position?

17        A.   No.

18        Q.   Do you know if Mr. Powers -- do you know if

19   Mr. Powers did?

20        A.   No.  The position didn't exist.

21        Q.   So your understanding is that Mr. Ruppert was

22   the one who created this position for Mr. Snookal, this

23   position of reliability change OA role?

24        A.   Yes.

25        Q.   Did you respond to Mr. Ruppert's e-mail?

**EXHIBIT 19-7**

Thalia Tse                                          September 13, 2024

```
1              (Deposition Exhibit 10 was marked.)

2              MS. FLECHSIG:  Give me one second.

3    BY MS. LEAL:

4        Q.   And this document is Bates No. CUSA000014

5    through 18.

6              MS. LEAL:  Move up to the first page, please.

7    BY MS. LEAL:

8        Q.   So this document before you, Ms. Tse, is HR

9    Policy 410 for US payroll employees, employment of

10   individuals with disabilities.

11             Do you see that?

12       A.   Yes, I see it.

13       Q.   Are you familiar with this policy?

14       A.   I know where I can find it if I need it.

15       Q.   Is it the policy that you as an HR business

16   partner is responsible for being familiar with?

17       A.   Like I previously said, we -- as an HR

18   business partner, we just need to know where we need to

19   find the document or have the policy and so as needed.

20       Q.   So an HR business partner only needs to know

21   where to find policies and not necessarily know

22   anything about the policy?

23             MS. FAN:  Argumentative.  Asked and answered.

24   BY MS. LEAL:

25       Q.   Is that what you're saying?
```

**EXHIBIT 19-8**

Thalia Tse                                            September 13, 2024

```
 1              MS. FAN:  Compound.  Same objections.
 2              THE WITNESS:  We have access to it, so
 3   meaning that if we need to reference it, we know where
 4   to find it.
 5   BY MS. LEAL:
 6       Q.   But as an HR business partner both in
 7   El Segundo and now in Texas, are you supposed to know
 8   what these policies are about?
 9       A.   Well, we don't need to memorize everything
10   from the policy.
11       Q.   And that's not what I'm suggesting, Ms. Tse.
12   I'm suggesting, are you as an HR business partner
13   responsible for being familiar with the contents of
14   these types of personnel policies?
15              MS. FAN:  Asked and answered.
16              THE WITNESS:  Maybe.
17   BY MS. LEAL:
18       Q.   What do you mean by "maybe"?
19       A.   I know where to find the policy.  So if I
20   need to reference it, that's what I'm going to do.
21       Q.   When Mr. Snookal sent the e-mail saying he
22   thought he was being discriminated against because of
23   his disability, did you pull up this policy,
24   Policy 410, employment of individuals with
25   disabilities?
```

**EXHIBIT 19-9**

Thalia Tse                                    September 13, 2024

```
 1         A.   No.

 2         Q.   Why not?

 3         A.   I don't know.

 4         Q.   Did you think it wasn't important to pull up

 5    the policy involving individuals with disabilities when

 6    an employee was complaining about disability

 7    discrimination?

 8              MS. FAN:  Objection.  Argumentative.

 9              THE WITNESS:  No.  But I was fairly new at

10    the time.

11    BY MS. LEAL:

12         Q.   Did Mr. Powers ask you to pull up Chevron's

13    policies with respect to employment of individuals with

14    disabilities after Mr. Snookal made the complaint of

15    disability discrimination?

16         A.   I don't remember.

17         Q.   So he may have; he may not have.  You just

18    don't remember one way or the other?

19              MS. FAN:  Asked and answered.

20    BY MS. LEAL:

21         Q.   Is that correct?

22         A.   Yes.

23         Q.   So let's stay on the exhibit, please.  So

24    under general it looks like something is hyper linked,

25    Corporate Policy 200, employment.
```

**EXHIBIT 19-10**

Thalia Tse                                            September 13, 2024

```
1   did you say in that conversation, the exit interview
2   conversation?
3        A.   I think there were questions
4   about -- actually, I think there is a document on the
5   exit interview.
6        Q.   What do you remember being discussed during
7   this exit interview?
8        A.   Questions that was on the interview template.
9   I think there are questions about management, benefits
10  that Chevron offers.
11       Q.   So it's a form or template that you use when
12  you conduct an exit interview?
13       A.   At that time, yes.
14       Q.   During that exit interview with Mr. Snookal,
15  did you think to ask him if he was resigning because of
16  the fact that Chevron had retracted the Nigeria
17  position?
18       A.   No, I didn't ask him that question.
19            MS. LEAL:  I'm going to suggest a five-minute
20  break or so, Counsel, so I can look at my notes.  We
21  might be almost finished.
22            MS. FAN:  Okay.
23            MS. LEAL:  We'll take a break.
24            MS. FAN:  Sounds good.
25            VIDEO TECHNICIAN:  This is the end of Media
```

**EXHIBIT 19-11**

Thalia Tse                                                    September 13, 2024

```
 1
 2                      REPORTER CERTIFICATE
 3              I, Cynthia Denise Stires, Certified Shorthand
 4      Reporter, Certificate No. 4472, for the State of
 5      California, hereby certify that Thalia Tse was by me
 6      duly sworn/affirmed to testify to the truth, the whole
 7      truth and nothing but the truth in the within-entitled
 8      cause; that said deposition was taken at the time and
 9      place herein named; that the deposition is a true
10      record of the witness's testimony as reported to the
11      best of my ability by me, a duly certified shorthand
12      reporter and a disinterested person, and was thereafter
13      transcribed under my direction into print by computer.
14              That request [XX] was    [   ] was not made to
15      read and correct said deposition.
16              I further certify that I am not interested in
17      the outcome of said action, nor connected with nor
18      related to any of the parties in said action, nor to
19      their respective counsel.
20              IN WITNESS WHEREOF, I have hereunto set my
21      hand this 27th day of September, 2024.
22
23
24                            _____
                              Cynthia Denise Stires
25                            CSR No. 4472
```

**EXHIBIT 19-12**