# EXHIBIT A

# MSEA Location Clusters Table

| Category | Definitions | Locations list |
|---|---|---|
| A | * Health care infrastructure is well developed, and site is often used as a referral center.<br>* Has competent care in English in most or all sub-specialties, including non-clinical adjuncts such as speech therapy, developmental needs, etc.<br>* Endemic diseases are well controlled or not significant.<br>* Chevron maintains or has ready access to health care resources. | **Americas:** US onshore operations, San Ramon, Houston, Calgary, Vancouver, St. John<br>**AP:** Singapore, Australia (Perth based), Hong Kong, New Zealand<br>**EEMEA: UK** (all locations), **Belgium** (all locations), **Denmark** (all locations), **France** (all locations), **Italy** (all locations), **Netherlands** (all locations), **United Arab Emirates** (all locations), **Norway** (all locations), **Germany** (all locations), **Sweden** (all locations), **South Africa** (all locations), **Bahrain** (all locations), **Qatar** (all locations) |
| B | * Health care infrastructure is developed and site has resources for most advanced care.<br>* Some non-clinical adjunctive care may be available. English language may be limited. Endemic diseases are present but generally controlled.<br>* Chevron maintains or has ready access to good health care resources. | **Americas:** Argentina (Buenos Aires); Colombia (Bogota); Brazil (Rio de Janeiro),Trinidad (Port of Spain),<br>**AP:** Thailand (Bangkok, Rayong, Sirai Chi); South Korea (Seoul, Ulsan, Geoje), Philippines (Manila), China (Beijing, Shanghai), Japan Metropolitan; Malaysia (Kuala Lumpur); Pakistan Metropolitan<br>**EEMEA: Kuwait** (all locations), **Turkey** (all locations), **Russia** (all locations), **Poland** (all locations), **Saudi Arabia** (all locations) |
| C | * Health care infrastructure is partially developed and not always available.<br>* Advanced care is on an emergency-only basis because of concerns about access, competence, communications in English, medical culture, follow up, hygiene, etc.<br>* Few or non-clinical adjunctive care resources are present.<br>* Endemic diseases may be present with irregular control.<br>* Chevron has limited internal health support and relies on limited external health care resources. | **Americas:** US offshore operations (Deepwater), Colombia (Riohacha);<br>Argentina- Nuquen, Colombia –Rio Hacha, Guatemala, Panama, Mexico, Brazil Offshore, Ktimat (Canada)<br>**AP:** Australia (Barrow Island, Onslow, Dampier, Karratha, Thevenard Island & Wheatstone offshore); Bangladesh (Dhaka); China (Chengdu, Tianjin, Tanggu); Indonesia (Jakarta, Sumatra, Balikpapan); Malaysia (Lumut); Thailand (Songkla, Nakorn Srithammarat - NST, Offshore); Vietnam; India<br>**EEMEA: Angola** (Luanda); **Kazakhstan** (Atyrau, Almaty, Aktau, Astana), **Nigeria** (Lagos, Lekki, Abuja) , **Azerbaijan** (all locations), **Ghana** (Accra), **Iraq** (all locations), **Ukraine** (all locations), **Romania** (all locations), **Rep. of Congo** (Pointe Noire), **Morocco** (all locations), **Egypt** (all locations) |

CUSA000519

CUSA000520

| D | * Health care infrastructure is poorly developed.<br>* Care is available for basic needs and sometimes for diagnostics only.<br>* Endemic diseases may be present with poor control.<br>* Chevron has limited or no internal health support; external health care resources are unreliable. | **Americas:** Venezuela (Puerto La Cruz), El Salvador, Honduras, Venezuela (Maracaibo), Venezuela (Caracas).<br>**AP:** Bangladesh (Sylhet), China (Nanba, Zhuhai, Gaoqiao); Cambodia (Phnom Penh); Myanmar (Yangon)<br>**EEMEA: Nigeria** (Warri, Escravos) **Angola** (Ambriz, Cabinda, Lobito, Porto Amboim, Soyo), **Kazakhstan** (Tengiz, Aksai, Prorva, Bautino), **Liberia** (all locations), **Mauritania** (all locations), **Ghana** (Takotadi), **Rep of Congo** (all locations except Pointe Noire), **Sierra Leone** (all locations) |

| Version | Date | Created by | Updates |
|---------|------|-----------|---------|
| 0.1 | June 29, 2015 | Girlie Manlapaz | Created the location cluster table |
| 0.2 | October 14, 2015 | Sirisha Palla | Asia Pacific locations has been updated |
| 0.3 | July 5, 2016 | Sirisha Palla | Moved Venezuela (Caracas) & Venezuela (Maracaibo) from "C" location to "D" location. |
| 0.4 | September 13, 2016 | Sirisha Palla | EEMEA locations has been updated in all categories. |

**EXHIBIT A-2**

# EXHIBIT B

**From:** Levy, Scott
**Sent:** 26 August 2019 00:51
**To:** Steven H. Khan <████████████>
**Cc:** Mark Snookal <████████████>
**Subject:** Re: [**EXTERNAL**] Patient MS

Dr. Khan,

Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss.

Scott

Sent from my iPad

On Aug 23, 2019, at 10:35 PM, Steven H. Khan <████████████> wrote:

Hi Dr. Levy,
I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.

I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this email.

Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.
From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).

Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.
Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.

Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.
For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
Is on an ARB.

In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.
The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.

If you have any further questions, please feel free to email me or call me.

Best regards,

S. Khan, MD
Clinical Associate Professor, UCLA School of Medicine
Heart Failure and Transplant Cardiology, Kaiser Permanente

CUSA000557
SNOOKAL-00089

NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

CUSA000558
SNOOKAL-00090
EXHIBIT B-2

# EXHIBIT C



Chevron

# Expatriate Exam Recommendations GO-1769

**Examiner:** When completed, please forward to the Chevron regional medical manager office checked below:

☐ Americas: Chevron Health and Medical, P.O. Box 6024, San Ramon, CA , USA 94583
☐ Asia / Pacific Region: Chevron International Pte LTD, Health and Medical, Chevron House, 30 Raffles Place #21-01, Singapore 048622
☒ Europe / Eurasia / Middle East / Africa  Chevron Health and Medical 1 Westferry Circus, Canary Wharf, London, UK, E14 4HA
☐ Chevron Shipping Medical Manager, 6101 Bollinger Canyon Road, BR1, Room 4646, San Ramon, CA, USA  94583
☐ Other Chevron Medical Facility:

## Part A –Examinee Information

For medical confidentiality, please complete one form per examinee. If the examinee is a dependent, please complete Part B below

| Last Name | First Name | MI | CAI | Birth Date (mm/dd/yyyy) | ☒ Male | Examinee ID |
|---|---|---|---|---|---|---|
| SNOOKAL | MARK | | MVZM | ▮▮▮▮ | ☐ Female | |
| Job Title | | | Operating Company | Current Work Location | Destination Location | |
| IEA RELIABILITY TEAM LEAD | | | | EL SEGUNDO, USA | ESCRAVOS, NIGERIA | |

## Part B:  Chevron Employee Information

If the examinee is a dependent, please complete this section with the Chevron employee information

| Last Name | First Name | CAI | Chevron Employee ID |
|---|---|---|---|
| Job Title | Operating Company | Current Work Location | Destination Location |

Number of dependents in Host Location

## Part C – OpCo / Business Unit Contact – Human Resources, Sponsor (if applicable), other.

| Name | Phone No. | | Date (mm/dd/yyyy) |
|---|---|---|---|
| Contact Address | City | State/Province | Postal/Zip Code | Country |

## Part D – Examination - The recommendation below is based on a review of the medical history and physical examination

Exam Type   INITIAL EXPAT EXAM (ROTATIONAL)

Date of Exam (mm/dd/yyyy):   07/24/2019   Exam Location   MEL DEL RAY

State/Province   CALIFORNIA   Country:   USA

**Disposition**
☒ **Employee**
  ☐ FIT for Duty
  ☒ NOT FIT for Duty
  Describe:   REMOTE LOCATION  CAN BE CLEARED FOR ASSIGNMENT IN LAGOS
  ☐ FIT for Duty with Limitation(s) (list below and provide estimated duration of limitations)
  Describe:

  ☐ Failed to comply with requested evaluations
  Describe:

  Exam Periodicity: ☐ One Year   ☐ Two Years   ☐ Other
☐ **Dependents**
  ☐ Cleared
  ☐ Not Cleared
  Describe:

  ☐ Cleared with Limitation(s) (list below and provide estimated duration of limitations)
  Describe:

  ☐ Failed to comply with requested evaluations
  Describe:

  Exam Periodicity: ☐ One Year   ☐ Two Years   ☐ Other

| Examiner Name (please print) | Signature | | Date (mm/dd/yyyy) |
|---|---|---|---|
| DR. ASEKOMEH ESIHOFE | | | 08/15/2019 |
| Address | City | State/Province   Postal/Zip Code | Country |
| CHEVRON HOSPITAL | WARRI | DELTA | NIGERIA |

GO  1769 (9-13)

CUSA000564

EXHIBIT C-1

# EXHIBIT D

# HR Policy 400 for U.S.-Payroll Employees
# Equal Employment Opportunity

## I.  GENERAL

It is the policy of the company to provide equal employment opportunity (EEO) to all qualified job applicants and employees without regard to race, color, religious creed, sex (including pregnancy, childbirth, breastfeeding and related medical conditions), sexual orientation, gender identity, gender expression, national origin or ancestry, age, mental or physical disability (including medical condition), military or veteran status, political preference, marital status, citizenship, genetic information or other status protected by law or regulation. Additionally, Corporate Policy 200 – Employment provides that no individual shall be discriminated against in any aspect of employment, including hiring, promotion, demotion, transfer, layoff or termination, rates of pay or selection for training.

Affirmative Action programs (AAPs) for women, minorities, individuals with disabilities, and protected veterans are developed as a tool to help eliminate potential barriers to equal employment opportunity and achieve a diverse and inclusive workforce. In addition, our commitment ensures reasonable accommodation for qualified individuals with a disability. All of Chevron's U.S. employees are covered under affirmative action programs designed to ensure equal opportunity for employees and applicants and prohibit discrimination in any aspect of employment. The results of the Affirmative Action programs shall be reviewed at least annually and the programs modified as necessary to achieve stated objectives.

## II.  GUIDELINES

### A.  Responsibilities/Authorities

Management at all levels is responsible for ensuring compliance with equal employment opportunity, and for communicating their commitment to employees. Each Chevron employee is responsible for supporting this commitment and complying with the policy.

The Human Resources (HR) Policy and Employment Compliance unit has overall responsibility to coordinate the company's compliance with all EEO laws and regulations, assisting business units with fair employment selection procedures, development of the AAPs, and coordinating all compliance evaluation activities.

It is the primary responsibility of the various business units, with support from HR Policy and Employment Compliance, to ensure that Chevron's employment practices are administered without regard for race, color, religious creed, sex (including pregnancy, childbirth, breastfeeding and related medical conditions), sexual orientation, gender identity, gender expression, national origin or ancestry, age, mental or physical disability (including medical condition), military or veteran status, political preference, marital status, citizenship, or other status protected by law or regulation.

**EXHIBIT D-1**

## B. Reporting and Complaint Procedures

An employee who believes they have been discriminated against or have witnessed any actual or suspected workplace conduct that could be regarded as discriminatory should make a verbal or written complaint to any of the following:

- The immediate supervisor,
- The next level of management,
- The HR business partner, or
- In the U.S., the company Hotline (1-800-284-3015), or
- Outside the U.S., the company Hotline (1-704-556-7046, collect via an operator).

Employees and the company representative should promptly document the alleged misconduct. After a complaint is received, a prompt, thorough, and impartial investigation will be conducted as appropriate. To the extent possible, a complaint will be kept confidential, and the investigation will be tracked for reasonable progress. Prompt and effective remedial and disciplinary action will be undertaken for any substantiated violations of this policy.

Managers or supervisors who receive a complaint should promptly report the complaint to their HR business partner. Failure to do so may result in disciplinary action.

## C. Retaliation

The company will not tolerate retaliation against any person for making a good faith complaint or for participating in a harassment or discrimination investigation, proceeding, or hearing conducted by the company, federal or state agency.

Further, to encourage all employees to report concerns, the company does not condition an employee's receipt of compensation, benefits or other terms and conditions of employment on any agreement to release and/or not to communicate their allegations of discrimination or harassment (e.g., non-disclosure or non-disparagement agreements). Consistent with maintaining a harassment-free workplace, however, the company may request employees to maintain confidentiality to maintain the integrity of investigations and to refrain from inappropriate disparagement of other employees in violation of anti-harassment or other policies. This policy does not apply to legal settlements, which are governed by applicable state and federal laws.

## D. Data Privacy Notice

The company respects the confidentiality of personal information collected from employees, contractors, applicants, customers and other third parties with whom the company transacts business. Therefore, it is company policy to guard against unauthorized or improper collection, control, use, transfer, storage, or disclosure of such information.

### E. Counsel

Counsel on this policy may be obtained from Employee Relations, HR Policy and Employment Compliance. They may engage other Human Resources groups, such as Total Rewards, and the Employment Law team of the Law Function to resolve applicable equal opportunity matters.

## III.  FURTHER GUIDANCE AND REFERENCES

Chevron's Commitment to Equal Employment Opportunity
Chevron's Commitment to Prohibit Discrimination and Harassment

The following **Corporate Policies** are available on the Corporate Governance website. On that page, access the policies by name or by number:
- Corporate Policy 200 – Employment
- Corporate Policy 202 – Harassment in the Workplace

The following HR Policies are available on My HR portal. To access HR policies, click on the **United States HR** tab on the top navigation bar, and select **policies** from the mega menu. Then, click on United States to view the expanded list of policies:
- HR Policy 300 – Employment
- HR Policy 410 - Employment of Individuals with Disabilities
- HR Policy 420 - Harassment in the Workplace
- Oregon State Law Addendum to HR Policies 400 and 420

The Anti-Harassment Guide can be found at hr.chevron.com/local-hr/us/ under **programs.** Expand **policies and programs** from on the left menu.

The company's Social Media Guidelines and additional resources can be found on inside.chevron.com under **tools & resources.**


Effective October 2020
Replaces April 2019

# EXHIBIT E

```
1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5  MARK SNOOKAL, an individual,     )
                                    )
6           Plaintiff,              )
                                    )
7       v.                          )  NO. 2:23-cv-6302-
                                    )        HDV-AJR
8  CHEVRON USA, INC., a California  )
   Corporation, and DOES 1 through  )
9  10, inclusive,                   )
                                    )
10          Defendants.             )
   _____)

11

12

13

14

15

16

17          Videotaped deposition of MARK JORDAN

18     SNOOKAL, Plaintiff, taken on behalf of Defendants

19     at 333 South Hope Street, 43rd Floor, Los Angeles,

20     California, commencing at 10:00 a.m. on Friday,

21     May 10, 2024, before John M. Taxter, Certified

22     Shorthand Reporter No. 3579 in and for the State

23     of California, a Registered Professional Reporter.

24

25
```

```
1    APPEARANCES OF COUNSEL:

2

3

4    FOR PLAINTIFF MARK JORDAN SNOOKAL:

5            ALLRED, MAROKO & GOLDBERG
             BY:  DOLORES Y. LEAL, Attorney at Law
6            6300 Wilshire Boulevard, Suite 1500
             Los Angeles, California  90048-5217
7            323.653.6530
             dleal@amglaw.com
8

9

10   FOR DEFENDANT CHEVRON USA, INC.:

11           SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
             BY:  ROBERT E. MUSSIG, Attorney at Law
12           333 South Hope Street, 43rd Floor
             Los Angeles, California  90071-1422
13           213.620.1780
             rmussig@sheppardmullin.com
14
                     -and-
15
             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
16           BY:  LINDA Z. SHEN, Attorney at Law
             501 West Broadway, 18th Floor
17           San Diego, California  92101-3598
             619.338.6500
18           lshen@sheppardmullin.com

19

20

21   VIDEOGRAPHER:

22           GIGI FADICH

23

24

25
```

Abrams, Mah & Kahn                                2

**EXHIBIT E-2**

| | | |
|---|---|---|
| 1 | Q    Anyone else? | 10:11:22 |
| 2 | A    I'm just thinking of the ones that | 10:11:28 |
| 3 | haven't retired yet.  Mario.  That's not his name. | 10:11:30 |
| 4 | Joseph Olvieros.  He goes by Mario.  That's it. | 10:11:42 |
| 5 | Q    Anyone else?  Were these all basically | 10:11:49 |
| 6 | peers of yours at -- at Chevron, or were they | 10:11:52 |
| 7 | supervisors? | 10:11:55 |
| 8 | A    They were primarily my direct reports, | 10:11:56 |
| 9 | except for Stewart Harwell. | 10:11:59 |
| 10 | Q    And what was he? | 10:12:01 |
| 11 | A    He was a peer. | 10:12:03 |
| 12 | Q    You, I think, started for -- working for | 10:12:07 |
| 13 | Chevron January 12, 2009. | 10:12:09 |
| 14 | Does that sound right? | 10:12:12 |
| 15 | A    Yeah. | 10:12:14 |
| 16 | Q    And just going back, why -- why did you | 10:12:15 |
| 17 | apply for a job at Chevron? | 10:12:18 |
| 18 | A    In 2008 I had a contracting company that | 10:12:25 |
| 19 | did process automation, and during the economic | 10:12:28 |
| 20 | downturn the contracts all dried up.  I was | 10:12:34 |
| 21 | working as a contractor at another oil facility at | 10:12:39 |
| 22 | the time, and my son was two years old, almost | 10:12:45 |
| 23 | three.  And after discussing it with my wife, we | 10:12:51 |
| 24 | decided not to go into contracting or to continue | 10:12:55 |
| 25 | contracting, and so I looked for permanent | 10:12:58 |

| | | |
|---|---|---|
| 1 | for the job at Chevron? | 10:14:28 |
| 2 | A    I was unaware that I had a disability, | 10:14:30 |
| 3 | if I, in fact, had one at the time.  It had not | 10:14:33 |
| 4 | been diagnosed at that point. | 10:14:36 |
| 5 | Q    Okay.  And the disability we're talking | 10:14:38 |
| 6 | about is -- it's, I think, dilated aortic root; is | 10:14:39 |
| 7 | that -- | 10:14:39 |
| 8 | A    Correct. | 10:14:44 |
| 9 | Q    When was that diagnosed? | 10:14:45 |
| 10 | A    I believe it was 2014. | 10:14:47 |
| 11 | Q    And you -- you -- I'm not sure exactly | 10:14:53 |
| 12 | how you phrased it, but are you -- do you consider | 10:14:58 |
| 13 | that a disability? | 10:15:01 |
| 14 | A    I do, yeah. | 10:15:02 |
| 15 | Q    Okay. | 10:15:03 |
| 16 | A    I just meant that in 2009 I didn't -- it | 10:15:04 |
| 17 | could have been there, but I wouldn't have known | 10:15:08 |
| 18 | it. | 10:15:10 |
| 19 | How is that? | 10:15:12 |
| 20 | Q    I see.  And what job were you initially | 10:15:12 |
| 21 | hired into? | 10:15:15 |
| 22 | A    I was hired in as an analyzer engineer | 10:15:16 |
| 23 | in the "technical shared services department" I | 10:15:19 |
| 24 | believe it was called at the time. | 10:15:22 |
| 25 | Q    And what is an analyzer engineer? | 10:15:24 |

| | | |
|---|---|---|
| 1 | A    The oil refining business strives for | 10:15:30 |
| 2 | efficiency just like any other facility, and they | 10:15:39 |
| 3 | use online process analyzers which would be gas | 10:15:42 |
| 4 | "chromato" -- gas chromatographs, infrared | 10:15:45 |
| 5 | analyzers, chem luminescence; various different | 10:15:48 |
| 6 | technologies that are traditionally lab based, but | 10:15:59 |
| 7 | they're placed into the field to measure online | 10:16:02 |
| 8 | realtime data from the processes in the refinery. | 10:16:05 |
| 9 | So an analyzer engineer would primarily | 10:16:09 |
| 10 | focus on either replacing existing systems or | 10:16:13 |
| 11 | installing new systems.  There's some amount of | 10:16:16 |
| 12 | assistance in maintaining the existing equipment | 10:16:21 |
| 13 | in that, you know, they're fairly complicated | 10:16:25 |
| 14 | systems and not always made right the first time. | 10:16:32 |
| 15 | So there's some modifications.  Also, process | 10:16:34 |
| 16 | changes can cause the systems to stop working.  So | 10:16:37 |
| 17 | it's, I would say, a typical engineering job in a | 10:16:41 |
| 18 | very specialty field -- | 10:16:46 |
| 19 | Q    Okay. | 10:16:48 |
| 20 | A    -- which is why they opened it up. | 10:16:48 |
| 21 | Q    And I think you held that position from | 10:16:50 |
| 22 | January, 2009, to March, 2011. | 10:16:53 |
| 23 | Is that right? | 10:16:55 |
| 24 | A    That sounds right. | 10:16:56 |
| 25 | Q    And your Chevron pay salary grade was 21 | 10:16:58 |

**EXHIBIT E-6**

| | | |
|---|---|---|
| 1 | while you were in that position; correct? | 10:17:03 |
| 2 | A     Correct. | 10:17:04 |
| 3 | Q     Okay.  Can you just briefly explain | 10:17:05 |
| 4 | the -- the pay salary grade system, how that | 10:17:06 |
| 5 | works. | 10:17:10 |
| 6 | MS. LEAL:  As you understand it. | 10:17:11 |
| 7 | BY MR. MUSSIG: | 10:17:11 |
| 8 | Q     As you understand it, of course. | 10:17:12 |
| 9 | A     It isn't published, so it has to be | 10:17:14 |
| 10 | qualified with that.  Basically, the PSG is | 10:17:18 |
| 11 | defined as the grade of pay and responsibility | 10:17:22 |
| 12 | that a job entails.  They are basically pay | 10:17:29 |
| 13 | brackets.  But not every job has the same | 10:17:36 |
| 14 | responsibilities and the same pay bracket, if that | 10:17:40 |
| 15 | makes sense. | 10:17:44 |
| 16 | So an engineer might be paid the same as | 10:17:45 |
| 17 | a "mana" -- or a supervisor, even though their | 10:17:48 |
| 18 | responsibilities are very different.  Chevron | 10:17:50 |
| 19 | considers them to be in the same pay grade because | 10:17:53 |
| 20 | of the level of -- I don't know -- maybe | 10:17:55 |
| 21 | difficulty.  I'm not sure exactly how they decide | 10:18:03 |
| 22 | what -- what gets into a grade. | 10:18:07 |
| 23 | Q     Fair enough.  Is it -- is it -- so one | 10:18:09 |
| 24 | job title can have multiple PSGs; right? | 10:18:12 |
| 25 | A     Correct. | 10:18:15 |

| | | |
|---|---|---|
| 1 | A    Correct. | 10:27:23 |
| 2 | Q    And your next job, I believe, was | 10:27:26 |
| 3 | instrumentation, electrical, and analyzer | 10:27:28 |
| 4 | reliability team lead; is that right? | 10:27:31 |
| 5 | A    Yes. | 10:27:33 |
| 6 | Q    Okay.  And that's -- that's -- I've seen | 10:27:33 |
| 7 | it written "IEAR team lead." | 10:27:36 |
| 8 | A    Yes. | 10:27:38 |
| 9 | Q    Is that how it's referred to? | 10:27:39 |
| 10 | A    Yes.  Nobody wants to say that whole | 10:27:40 |
| 11 | thing, so -- | 10:27:44 |
| 12 | Q    It's a long -- it's a long job title. | 10:27:45 |
| 13 | A    Yeah. | 10:27:47 |
| 14 | Q    And is that in the maintenance group -- | 10:27:48 |
| 15 | A    It is -- | 10:27:48 |
| 16 | Q    -- or the maintenance department?  I | 10:27:52 |
| 17 | apologize. | 10:27:54 |
| 18 | A    It is in the maintenance department, | 10:27:54 |
| 19 | yeah. | 10:27:56 |
| 20 | Q    Okay.  So you moved back to the | 10:27:56 |
| 21 | maintenance department -- | 10:27:58 |
| 22 | A    Yes. | 10:27:58 |
| 23 | Q    -- when you took that position? | 10:27:59 |
| 24 | A    Yeah. | 10:28:00 |
| 25 | Q    And I think it's in the reliability | 10:28:01 |

| | | |
|---|---|---|
| 1 | subgroup. | 10:28:03 |
| 2 | Is that right? | 10:28:03 |
| 3 | A    That is correct. | 10:28:04 |
| 4 | Q    Then so at this point you had worked in | 10:28:06 |
| 5 | the maintenance department and in the engineering | 10:28:08 |
| 6 | group; is that right? | 10:28:12 |
| 7 | A    Yes. | 10:28:13 |
| 8 | Q    And you held that IEAR team lead | 10:28:16 |
| 9 | position from November of 2016 to November of | 10:28:19 |
| 10 | 2019; is that right? | 10:28:22 |
| 11 | A    Yes. | 10:28:22 |
| 12 | Q    Okay.  And did I already ask you this? | 10:28:26 |
| 13 | You were a PSG 22 in that position? | 10:28:28 |
| 14 | A    I was. | 10:28:32 |
| 15 | Q    And then I think that was around the | 10:28:34 |
| 16 | time of the Escravos which we'll get into in a | 10:28:38 |
| 17 | moment. | 10:28:43 |
| 18 | Is that right? | 10:28:43 |
| 19 | A    Yes, it was. | 10:28:43 |
| 20 | Q    Okay.  Now, you -- you were based out of | 10:28:44 |
| 21 | Chevron's El Segundo refinery throughout your time | 10:28:47 |
| 22 | with Chevron; correct? | 10:28:50 |
| 23 | A    That's correct. | 10:28:51 |
| 24 | Q    And your employer was Chevron USA, Inc.; | 10:28:53 |
| 25 | is that right? | 10:28:53 |

| | | |
|---|---|---|
| 1 | MS. LEAL:  And also at what time? | 10:32:14 |
| 2 | THE WITNESS:  Yeah.  I'd like you to be | 10:32:16 |
| 3 | more specific. | 10:32:17 |
| 4 | BY MR. MUSSIG: | 10:32:18 |
| 5 | Q   Sure.  So let -- let me come back to | 10:32:18 |
| 6 | that.  Why -- why don't we -- because I think it | 10:32:27 |
| 7 | comes up more.  I'm going to talk about Escravos | 10:32:35 |
| 8 | now because I think it makes more sense. | 10:32:40 |
| 9 | So you applied for a position in | 10:32:43 |
| 10 | Escravos, Nigeria; correct? | 10:32:49 |
| 11 | A   Correct. | 10:32:51 |
| 12 | Q   And that was in May, 2019; right? | 10:32:56 |
| 13 | A   Sounds right. | 10:33:00 |
| 14 | Q   And you were working in the position of | 10:33:01 |
| 15 | IEAR team lead at that point; right? | 10:33:04 |
| 16 | A   I was. | 10:33:06 |
| 17 | Q   And I have here that your supervisors | 10:33:06 |
| 18 | were Kit Deaver and Austin Ruppert. | 10:33:08 |
| 19 | Is that correct? | 10:33:13 |
| 20 | A   At the time that I applied it was Kit | 10:33:14 |
| 21 | Deaver.  During the entire process, they did | 10:33:15 |
| 22 | change leadership in that role to Austin Ruppert. | 10:33:19 |
| 23 | Q   And they -- and Kit Deaver endorsed you | 10:33:23 |
| 24 | for the REM position? | 10:33:27 |
| 25 | A   He did. | 10:33:29 |

| | | |
|---|---|---|
| 1 | Q    And I -- I guess it's the reliability | 10:33:30 |
| 2 | engineering manager position; right? | 10:33:32 |
| 3 | A    Correct. | 10:33:32 |
| 4 | Q    And that's abbreviated REM; right? | 10:33:35 |
| 5 | A    Yes. | 10:33:37 |
| 6 | Q    Is it REM or just REM? | 10:33:38 |
| 7 | A    I don't know how they said it in | 10:33:40 |
| 8 | Nigeria, since I didn't go. | 10:33:41 |
| 9 | Q    Are you comfortable with REM or -- | 10:33:44 |
| 10 | A    That's fine. | 10:33:47 |
| 11 | Q    Okay.  Now -- now, at some point a | 10:33:48 |
| 12 | doctor in Nigeria determined that you were | 10:33:51 |
| 13 | medically unfit for the position; correct? | 10:33:54 |
| 14 | A    Correct. | 10:33:56 |
| 15 | Q    And prior to that do you think there was | 10:33:56 |
| 16 | anyone at Chevron who did not want you to hold the | 10:33:58 |
| 17 | REM position? | 10:34:02 |
| 18 | A    Not to my knowledge. | 10:34:02 |
| 19 | Q    And so you applied in May, and then | 10:34:05 |
| 20 | around July, 2019, you were conditionally extended | 10:34:07 |
| 21 | a job offer for the REM position; correct? | 10:34:11 |
| 22 | A    Correct. | 10:34:14 |
| 23 | MR. MUSSIG:  And let's -- I'll mark as | 10:34:17 |
| 24 | Exhibit 1 a document entitled "assignment offer." | 10:34:25 |
| 25 | It's Bates No. -- Bates-numbered SNOOKAL-647 to | 10:34:29 |

**EXHIBIT E-11**

| | | |
|---|---|---|
| 1 | -650. | 10:34:33 |
| 2 | (Exhibit 1 was marked for identification | 10:34:33 |
| 3 | by the Certified Shorthand Reporter.) | 10:34:52 |
| 4 | BY MR. MUSSIG: | 10:34:52 |
| 5 | Q    Are you familiar with this document? | 10:34:53 |
| 6 | A    Yes. | 10:34:53 |
| 7 | Q    And this is the REM job offer; right? | 10:35:06 |
| 8 | A    Correct. | 10:35:10 |
| 9 | Q    Okay.  Now, so the first paragraph on | 10:35:11 |
| 10 | page 1 of this document, of this exhibit | 10:35:14 |
| 11 | SNOOKAL-647, it says: | 10:35:19 |
| 12 | "Contingent upon obtaining | 10:35:21 |
| 13 | work residence permit clearances | 10:35:22 |
| 14 | where applicable and company | 10:35:25 |
| 15 | medical suitability for assignment | 10:35:26 |
| 16 | where required by law and/or | 10:35:28 |
| 17 | related to your job and consistent | 10:35:30 |
| 18 | with business necessity, you are | 10:35:31 |
| 19 | offered the following assignment." | 10:35:33 |
| 20 | Do you see that? | 10:35:34 |
| 21 | A    Yes. | 10:35:35 |
| 22 | Q    Okay.  So the job offer was contingent | 10:35:35 |
| 23 | on passing a -- being approved medically; correct? | 10:35:38 |
| 24 | A    Correct. | 10:35:41 |
| 25 | Q    Okay.  And on page 1 do you see the -- | 10:35:42 |

| | | |
|---|---|---|
| 1 | about the middle of the page do you see there's | 10:35:47 |
| 2 | sort of different titles here? | 10:35:52 |
| 3 | It -- it has a series of -- of | 10:35:56 |
| 4 | information.  It starts with "job title," "EDTL | 10:35:58 |
| 5 | reliability engineering manager," "salaried rate: | 10:36:01 |
| 6 | 22," et cetera. | 10:36:03 |
| 7 | Do you see that? | 10:36:04 |
| 8 | A    I do. | 10:36:05 |
| 9 | Q    Okay.  And next to the field "SBU" it | 10:36:05 |
| 10 | says "Nigeria, mid Africa." | 10:36:10 |
| 11 | Do you see that? | 10:36:12 |
| 12 | A    Yes. | 10:36:12 |
| 13 | Q    So SBU is the strategic business unit at | 10:36:12 |
| 14 | issue; is that right? | 10:36:15 |
| 15 | A    Yes. | 10:36:16 |
| 16 | Q    Okay.  And your then current SBU was not | 10:36:16 |
| 17 | Nigeria, mid Africa; correct?  It was El Segundo | 10:36:21 |
| 18 | refinery? | 10:36:24 |
| 19 | A    Correct. | 10:36:25 |
| 20 | Q    And do you understand that the -- the | 10:36:25 |
| 21 | REM offer was extended by the entity Chevron | 10:36:27 |
| 22 | Nigeria, Limited? | 10:36:31 |
| 23 | A    Yes. | 10:36:31 |
| 24 | Q    And do you agree that Chevron Nigeria, | 10:36:33 |
| 25 | Limited, is a different corporate entity than the | 10:36:37 |

```
 1        Q    In the subsection "intent" right at the        10:44:03

 2   top of the page the first sentence states:              10:44:06

 3              "The company requires fitness                 10:44:08

 4         for expatriate" assignments --                     10:44:10

 5         "assignment medical evaluations.                   10:44:13

 6         This ensures that your health                      10:44:15

 7         status is appropriate for your work                10:44:17

 8         assignment and that your overall                   10:44:18

 9         health is appropriate for working                  10:44:20

10         in a proposed host-country                         10:44:22

11         location."                                         10:44:24

12         Do you see that?                                   10:44:24

13        A    I do.                                          10:44:25

14        Q    Okay.  So I guess I don't think this is        10:44:25

15   controversial in this case, but I just want to          10:44:29

16   make sure.                                               10:44:31

17              You understood that you would have to be      10:44:32

18   medically cleared to -- to get the position, the        10:44:35

19   REM position in Escravos; right?                         10:44:40

20        A    I did understand that, yes.                    10:44:42

21        Q    And the job offer in July, 2019, was           10:44:44

22   contingent on you obtaining that medical                 10:44:46

23   clearance; right?                                        10:44:50

24        A    Yes.                                           10:44:51

25              MR. MUSSIG:  I'll mark as Exhibit 3 a         10:44:59
```

| | | |
|---|---|---|
| 1 | document titled "medical suitability for | 10:45:01 |
| 2 | expatriate assignment history & medical | 10:45:04 |
| 3 | examination."  It's Bates-numbered SNOOKAL-605 to | 10:45:07 |
| 4 | -610. | 10:45:10 |
| 5 | MS. LEAL:  Thanks. | 10:45:23 |
| 6 | (Exhibit 3 was marked for identification | 10:45:23 |
| 7 | by the Certified Shorthand Reporter.) | 10:45:23 |
| 8 | BY MR. MUSSIG: | 10:45:23 |
| 9 | Q    Do you recognize this document? | 10:45:24 |
| 10 | A    I do. | 10:45:27 |
| 11 | Q    Okay.  And this is just your completed | 10:45:28 |
| 12 | copy of "Chevron's standard medical suitability | 10:45:30 |
| 13 | for expatriate assignment history & physical | 10:45:34 |
| 14 | examination" form; correct? | 10:45:38 |
| 15 | A    Correct. | 10:45:38 |
| 16 | Q    And Chevron requires this form to be | 10:45:39 |
| 17 | completed for all employees who are conditionally | 10:45:40 |
| 18 | awarded expatriate assignments; is that right? | 10:45:43 |
| 19 | A    As far as I know. | 10:45:46 |
| 20 | Q    And the form is typically completed by | 10:45:49 |
| 21 | a -- by -- by you and a U.S. doctor; right? | 10:45:52 |
| 22 | A    I don't know what's typically done -- | 10:45:56 |
| 23 | Q    Oh. | 10:45:58 |
| 24 | A    -- but it was in this case. | 10:45:58 |
| 25 | Q    Well, fair enough.  If you turn to | 10:45:59 |

**EXHIBIT E-17**

| | | |
|---|---|---|
| 1 | page 3 of the document, SNOOKAL-607, is that your | 10:46:02 |
| 2 | signature at the bottom? | 10:46:07 |
| 3 | A    It is. | 10:46:08 |
| 4 | Q    And it's dated July 18, 2019; is that | 10:46:08 |
| 5 | right? | 10:46:08 |
| 6 | A    That's correct. | 10:46:13 |
| 7 | Q    And is this referred to as an MSEA form? | 10:46:16 |
| 8 | A    It is. | 10:46:19 |
| 9 | Q    And so on -- and so on the first three | 10:46:24 |
| 10 | pages of the form up to your signature, all the | 10:46:28 |
| 11 | boxes that are checked, you checked those; right? | 10:46:33 |
| 12 | A    That's correct. | 10:46:36 |
| 13 | Q    Okay.  And so box No. 1 is: | 10:46:36 |
| 14 |         "Do you have any medical, | 10:46:40 |
| 15 |         physical or psychological | 10:46:41 |
| 16 |         conditions under the care of a | 10:46:42 |
| 17 |         health professional?  If yes, | 10:46:44 |
| 18 |         please describe." | 10:46:46 |
| 19 |         You marked by the box "yes"; right? | 10:46:48 |
| 20 | A    Correct. | 10:46:48 |
| 21 | Q    And then you said: | 10:46:50 |
| 22 |         "I have a dilated aortic root. | 10:46:51 |
| 23 |         I am under the care of a | 10:46:54 |
| 24 |         cardiologist and see him once per | 10:46:56 |
| 25 |         year for a checkup.  I have | 10:46:58 |

**EXHIBIT E-18**

| | | | |
|---|---|---|---|
| 1 | | consulted with him on this | 10:46:59 |
| 2 | | assignment, and he sees no issues | 10:47:00 |
| 3 | | with it." | 10:47:02 |
| 4 | | You wrote that; correct? | 10:47:02 |
| 5 | A | I did. | 10:47:03 |
| 6 | Q | And you -- you had -- you had testified | 10:47:05 |
| 7 | | about this earlier.  I'm sorry for -- for -- I | 10:47:09 |
| 8 | | think you were diagnosed with the dilated aortic | 10:47:12 |
| 9 | | root in 2015. | 10:47:16 |
| 10 | | Is that wrong? | 10:47:17 |
| 11 | A | I -- I honestly can't remember if it was | 10:47:19 |
| 12 | | late 2014 or 2015. | 10:47:21 |
| 13 | Q | Okay.  But in that time frame? | 10:47:24 |
| 14 | A | In that time frame. | 10:47:26 |
| 15 | Q | And who -- who diagnosed you with that? | 10:47:27 |
| 16 | A | Dr. Khan who was my doctor through this | 10:47:30 |
| 17 | | whole event. | 10:47:34 |
| 18 | Q | Is he with Cedars? | 10:47:36 |
| 19 | A | He, I think, has multiple affiliations. | 10:47:40 |
| 20 | | I saw him at Kaiser Permanente, Los Angeles. | 10:47:44 |
| 21 | Q | And, I mean, I -- I just want to ask a | 10:47:49 |
| 22 | | couple background questions about it.  I don't | 10:47:54 |
| 23 | | want to get too far into your -- your medical | 10:47:55 |
| 24 | | history. | 10:48:00 |
| 25 | | What -- when -- when he diagnosed you | 10:48:00 |

1    with it, what was the prognosis?                              10:48:02

2         A    To sum it up, he said that sometimes the            10:48:09

3    aortic root will not expand any more than it                  10:48:15

4    already has and it will never expand to a point               10:48:18

5    where they consider it to be something that they              10:48:23

6    should operate on, or it can expand at a rate and             10:48:26

7    to a size that they consider to be operable or                10:48:36

8    something that they should operate on.  He said               10:48:40

9    that there's no way to accurately predict --                  10:48:44

10   predict which one mine would be but that the rate             10:48:51

11   of growth determines how they treat it, basically.            10:48:54

12        Q    Okay.  And -- and I think here you say              10:49:04

13   that you had to see him on a yearly basis.  Was               10:49:08

14   that what he -- what he --                                    10:49:11

15        A    They call it --                                     10:49:13

16        Q    -- said at the time?                                10:49:14

17        A    Yes.  They call it "watchful waiting"               10:49:16

18   which is basically taking a picture of it once a              10:49:19

19   year and seeing if it's grown or not and at what              10:49:22

20   rate from the last time.                                      10:49:25

21        Q    And so you -- you followed up on a                  10:49:26

22   yearly basis with him, I'm assuming?                          10:49:28

23        A    Every year.                                         10:49:30

24        Q    And how did it develop, if at all?                  10:49:31

25        A    There were some years where it grew at a           10:49:36

| | | |
|---|---|---|
| 1 | low rate and other years where it had remained | 10:49:40 |
| 2 | stable.  I believe at the time that I applied it | 10:49:44 |
| 3 | had been stable for two or three years. | 10:49:47 |
| 4 | Q    And you may have already said this, but | 10:49:53 |
| 5 | the cardiologist that you're referring to here on | 10:49:56 |
| 6 | page 1 of -- of this exhibit, Exhibit 3, is | 10:49:58 |
| 7 | Dr. Khan; right? | 10:50:02 |
| 8 | A    Yes.  That's correct. | 10:50:03 |
| 9 | Q    What's the current state of the | 10:50:08 |
| 10 | condition? | 10:50:10 |
| 11 | A    I'm not sure how to answer that | 10:50:13 |
| 12 | question. | 10:50:15 |
| 13 | Q    Have you continued to see Dr. Khan about | 10:50:17 |
| 14 | the dilated aortic root? | 10:50:19 |
| 15 | A    Dr. Khan retired.  He retired during | 10:50:22 |
| 16 | COVID.  Kaiser had trouble assigning me a new | 10:50:25 |
| 17 | doctor, and during that time I left Chevron. | 10:50:30 |
| 18 | After this I went to Portland, and I continued my | 10:50:37 |
| 19 | care in Portland. | 10:50:43 |
| 20 | Q    Okay.  With a different cardiologist, I | 10:50:44 |
| 21 | assume? | 10:50:47 |
| 22 | A    With a different -- yeah. | 10:50:47 |
| 23 | Q    And what is his or her name? | 10:50:48 |
| 24 | A    I've actually -- the first two years I | 10:50:49 |
| 25 | was in Portland they did not assign me a | 10:50:53 |

| | |
|---|---|
| 1 | Q    So that's a separate heart issue from | 10:52:07 |
| 2 | the dilated aortic -- dilated aortic root? | 10:52:10 |
| 3 | A    Not necessarily.  The dilated aortic | 10:52:11 |
| 4 | root expands the root portion of the heart and can | 10:52:15 |
| 5 | cause other heart conditions that are related to | 10:52:18 |
| 6 | it but not necessarily caused by it. | 10:52:22 |
| 7 | Q    I see.  And so one of those conditions | 10:52:26 |
| 8 | is PVCs? | 10:52:28 |
| 9 | A    Correct. | 10:52:31 |
| 10 | Q    And so you were treated for PVCs? | 10:52:31 |
| 11 | A    I was. | 10:52:34 |
| 12 | Q    And I think you said they -- that they | 10:52:35 |
| 13 | resolved the issue? | 10:52:37 |
| 14 | A    They did. | 10:52:39 |
| 15 | Q    But you -- the dilated aortic root can't | 10:52:39 |
| 16 | be treated; is that right? | 10:52:42 |
| 17 | A    Not without open heart surgery, no. | 10:52:44 |
| 18 | Q    I'm assuming you haven't had open heart | 10:52:46 |
| 19 | surgery to treat it. | 10:52:50 |
| 20 | A    I have not. | 10:52:50 |
| 21 | Q    So you still have the dilated aortic | 10:52:51 |
| 22 | root? | 10:52:51 |
| 23 | A    I do. | 10:52:54 |
| 24 | Q    And when was the last time you spoke to | 10:52:55 |
| 25 | a doctor who I'm assuming is Dr. Schneider -- | 10:52:56 |

**EXHIBIT E-22**

| | | |
|---|---|---|
| 1 | correct me if that's wrong -- about the dilated | 10:52:58 |
| 2 | aortic root? | 10:53:01 |
| 3 | A    It was early in -- it was around | 10:53:02 |
| 4 | September of 2023 when I switched jobs. | 10:53:05 |
| 5 | Q    And what, if anything, did he say about | 10:53:10 |
| 6 | the dilated aortic root? | 10:53:11 |
| 7 | A    The same thing that Dr. Khan said, | 10:53:13 |
| 8 | essentially.  "We'll just watch it until we have | 10:53:16 |
| 9 | to make a decision about its size." | 10:53:20 |
| 10 | Q    Okay.  So has it expanded at all since | 10:53:22 |
| 11 | the initial diagnosis? | 10:53:27 |
| 12 | A    It has. | 10:53:29 |
| 13 | Q    And -- but not -- not to the extent that | 10:53:32 |
| 14 | it would need to be treated with surgery; is that | 10:53:35 |
| 15 | right? | 10:53:35 |
| 16 | A    That's correct. | 10:53:38 |
| 17 | Q    Have any changes over the last few years | 10:53:46 |
| 18 | since you left Chevron impacted the risk of aortic | 10:53:50 |
| 19 | rupture, as far as you know, as far as what your | 10:53:54 |
| 20 | doctor has told you? | 10:53:57 |
| 21 | A    Not as far as I know. | 10:53:57 |
| 22 | Q    Aortic dissection? | 10:53:58 |
| 23 | A    Not as far as I know. | 10:54:01 |
| 24 | Q    Has the -- well, have -- have your heart | 10:54:05 |
| 25 | conditions impacted your ability to work? | 10:54:08 |

**EXHIBIT E-23**

1        A    Never.                                              10:54:11

2        Q    Have you seen any other doctors in                 10:54:16

3   connection with your heart condition?                        10:54:18

4        A    When I first came up to the Portland               10:54:22

5   area, I consulted with Kaiser, and they pushed me            10:54:25

6   around a few times until they settled on someone            10:54:30

7   to handle the case --                                        10:54:32

8        Q    Okay.                                              10:54:34

9        A    -- but no one other than that.                     10:54:34

10       Q    I thought -- I thought you said it was             10:54:36

11  your general practitioner.  Is that --                       10:54:37

12       A    It was by the time we finally settled             10:54:39

13  out.  But she tried to get me in with cardiology,            10:54:42

14  and cardiology said, "We don't need to monitor              10:54:46

15  this," so that's what I mean by I got pushed                 10:54:50

16  around a little bit.                                         10:54:51

17       Q    I see.  And I don't think I got the name          10:54:52

18  of the -- the primary-care physician you treated            10:54:53

19  with in Portland.                                            10:54:57

20            Do you know that?                                  10:54:57

21       A    Kaiser was actually in Washington.                10:54:58

22  Sorry.  Sorry to be confusing.  It's right there           10:55:00

23  on the border, so people do things in both states          10:55:02

24  like all the time like it's nothing.                         10:55:04

25       Q    I see.  So when you lived in Oregon, you          10:55:06

| | | |
|---|---|---|
| 1 | moved to Washington; right? | 10:55:50 |
| 2 | A    Correct. | 10:55:52 |
| 3 | Q    And you still live in Washington? | 10:55:52 |
| 4 | A    I do. | 10:55:54 |
| 5 | Q    And you accepted another job that's in | 10:55:55 |
| 6 | Oregon recently, but you still live in Washington; | 10:55:56 |
| 7 | right? | 10:56:00 |
| 8 | A    Correct. | 10:56:00 |
| 9 | Q    Okay.  And when you moved to Washington, | 10:56:01 |
| 10 | you treated with Kaiser in Washington with a | 10:56:03 |
| 11 | general practitioner? | 10:56:07 |
| 12 | A    Correct. | 10:56:08 |
| 13 | Q    And do you have that GP's name? | 10:56:09 |
| 14 | A    Not off the top of my head, no. | 10:56:13 |
| 15 | Q    And -- and then at some point you were | 10:56:17 |
| 16 | referred to a heart specialist in Portland, and | 10:56:21 |
| 17 | that's Dr. Schneider? | 10:56:23 |
| 18 | A    I self-referred -- | 10:56:25 |
| 19 | Q    Oh, I see. | 10:56:26 |
| 20 | A    -- when I got the new insurance. | 10:56:27 |
| 21 | Q    Got it.  Okay.  So going back to -- to | 10:56:30 |
| 22 | Exhibit 3, so on page -- well, let -- let me ask | 10:56:38 |
| 23 | this:  So in completing this form, a Cedars doctor | 10:56:50 |
| 24 | named Irving Sobel examined you in July, 2019; is | 10:56:53 |
| 25 | that right? | 10:56:53 |

| | | |
|---|---|---|
| 1 | A    That's correct. | 10:57:01 |
| 2 | Q    And beginning on page 4 of the document, | 10:57:02 |
| 3 | SNOOKAL-608, through the end of the document | 10:57:04 |
| 4 | that's all filled in by Dr. Sobel; right? | 10:57:09 |
| 5 | A    Yes -- | 10:57:14 |
| 6 | MS. LEAL:   As far as you understand. | 10:57:14 |
| 7 | THE WITNESS:   -- as far as I know. | 10:57:15 |
| 8 | BY MR. MUSSIG: | 10:57:16 |
| 9 | Q    So on page 5 of the document, | 10:57:21 |
| 10 | SNOOKAL-609, under part H which is near the bottom | 10:57:29 |
| 11 | of the page there's a -- a mark next to "fit for | 10:57:35 |
| 12 | duty with restrictions." | 10:57:39 |
| 13 | Do you see that? | 10:57:40 |
| 14 | A    I do. | 10:57:41 |
| 15 | Q    And then there's handwriting, and -- and | 10:57:41 |
| 16 | this isn't your handwriting -- right? -- next to | 10:57:44 |
| 17 | it where it says "no heavy lifting" over | 10:57:47 |
| 18 | 50 pounds, "needs review of recommend" -- | 10:57:50 |
| 19 | "recommend letter from cardiologist to clear him." | 10:57:52 |
| 20 | Do you see that? | 10:57:54 |
| 21 | A    I do. | 10:57:54 |
| 22 | Q    Okay.  That's not your writing; right? | 10:57:56 |
| 23 | A    It is not. | 10:57:57 |
| 24 | Q    Do you know whether that's Dr. Sobel's | 10:57:59 |
| 25 | writing? | 10:58:01 |

**EXHIBIT E-26**

| | | | |
|---|---|---|---|
| 1 | A | I do not. | 10:58:01 |
| 2 | Q | Do you have any reason to doubt that | 10:58:02 |
| 3 | | it's his writing? | 10:58:04 |
| 4 | A | I don't have any reason to doubt that. | 10:58:05 |
| 5 | Q | And Dr. Sobel wasn't a cardiologist; | 10:58:07 |
| 6 | | right? | 10:58:11 |
| 7 | A | That is correct. | 10:58:11 |
| 8 | Q | Okay. | 10:58:12 |
| 9 | A | Well, I'm sorry.  I don't actually know | 10:58:13 |
| 10 | | what he is.  My understanding is he was not a | 10:58:15 |
| 11 | | cardiologist, but I didn't look him up, so -- | 10:58:17 |
| 12 | Q | Oh, I see.  Do you have any reason to | 10:58:20 |
| 13 | | doubt that he was a -- he was -- he practices | 10:58:23 |
| 14 | | general internal medicine? | 10:58:26 |
| 15 | A | No. | 10:58:27 |
| 16 | Q | And the restrictions he listed here | 10:58:28 |
| 17 | | under section H.2. were based on information you | 10:58:30 |
| 18 | | provided him and general diagnostic tests; right? | 10:58:34 |
| 19 | | He didn't do any tests specific to your heart | 10:58:37 |
| 20 | | condition? | 10:58:43 |
| 21 | A | Not as far as I know. | 10:58:46 |
| 22 | Q | And then -- so Dr. Sobel didn't write | 10:58:52 |
| 23 | | here that a recommendation letter would guarantee | 10:58:56 |
| 24 | | medical clearance; correct? | 10:58:59 |
| 25 | | MS. LEAL:  Calls for speculation. | 10:59:00 |

| | | |
|---|---|---|
| 1 | BY MR. MUSSIG: | 10:59:00 |
| 2 | Q   Well, I -- you know, let me -- let me | 10:59:03 |
| 3 | rephrase it. | 10:59:04 |
| 4 | The document speaks for itself, but did | 10:59:05 |
| 5 | Dr. -- did Dr. Sobel tell you at any point that | 10:59:08 |
| 6 | getting the recommendation letter would guarantee | 10:59:10 |
| 7 | medical clearance? | 10:59:12 |
| 8 | A   What Dr. Sobel said when he gave this to | 10:59:14 |
| 9 | me was -- he said, "You'll just need a letter from | 10:59:16 |
| 10 | your cardiologist.  This is what it should say, | 10:59:19 |
| 11 | and then it should be fine." | 10:59:22 |
| 12 | Q   Okay.  Did he say anything about needing | 10:59:27 |
| 13 | further assessment? | 10:59:33 |
| 14 | A   He did not. | 10:59:35 |
| 15 | Q   Since this visit, have you ever seen | 10:59:40 |
| 16 | Dr. Sobel again? | 10:59:42 |
| 17 | A   No.  He's not my doctor, so -- | 10:59:42 |
| 18 | Q   I understand.  It was just this one | 10:59:47 |
| 19 | time? | 10:59:49 |
| 20 | A   Yeah. | 10:59:51 |
| 21 | MR. MUSSIG:  I'll mark as Exhibit 4. | 10:59:55 |
| 22 | It's a letter from Dr. Khan on Kaiser Permanente | 11:00:00 |
| 23 | letterhead.  It's Bates-numbered SNOOKAL-665. | 11:00:05 |
| 24 | (Exhibit 4 was marked for identification | 11:00:05 |
| 25 | by the Certified Shorthand Reporter.) | 11:00:18 |

```
1    BY MR. MUSSIG:                                    11:00:18

2         Q    Do you recognize this?                 11:00:19

3         A    I do.                                   11:00:19

4         Q    And what is this?                       11:00:20

5         A    This is the letter that Dr. Sobel asked 11:00:22

6    me to produce from my cardiologist.  So this is   11:00:25

7    the letter that my cardiologist wrote after I     11:00:29

8    asked him for it.                                 11:00:32

9         Q    Do you agree the letter doesn't provide 11:00:36

10   any information about your specific heart          11:00:38

11   condition?                                        11:00:41

12        A    I was not actually told to put anything 11:00:42

13   about my specific heart condition on there.       11:00:44

14   Dr. Sobel left me a voice-mail message with the   11:00:46

15   wording of the letter.                            11:00:49

16        Q    Oh.  Do you have any documentation of   11:00:51

17   that voice-mail message?                          11:00:54

18        A    I think we do have it, yeah.            11:00:59

19             MS. SHEN:  It was produced.             11:01:04

20             MS. LEAL:  It was produced, Counsel.    11:01:06

21   BY MR. MUSSIG:                                    11:01:08

22        Q    Okay.  At any point did you discuss --  11:01:09

23   well, prior to this letter did you discuss with   11:01:11

24   Dr. Khan that you'd be working in the city of     11:01:13

25   Escravos?                                         11:01:17
```

| | | |
|---|---|---|
| 1 | A    No.  This letter -- there's a medical | 11:04:17 |
| 2 | liaison.  There are many liaisons during the | 11:04:20 |
| 3 | process, and so all documentation, including the | 11:04:22 |
| 4 | MSEA form -- all that stuff goes through that | 11:04:25 |
| 5 | group so that form -- this letter would have gone | 11:04:30 |
| 6 | through that group via e-mail. | 11:04:32 |
| 7 | Q    Oh.  And did you discuss this letter | 11:04:34 |
| 8 | with Dr. Levy? | 11:04:37 |
| 9 | A    I don't recall. | 11:04:42 |
| 10 | Q    Do you recall discussing this letter | 11:04:44 |
| 11 | with anybody from Chevron? | 11:04:45 |
| 12 | A    No. | 11:04:45 |
| 13 | MR. MUSSIG:  I'll mark as Exhibit 5 a | 11:05:05 |
| 14 | document titled "expatriate exam recommendations | 11:05:09 |
| 15 | GO-1769."  It's Bates-numbered SNOOKAL-1099. | 11:05:13 |
| 16 | (Exhibit 5 was marked for identification | 11:05:13 |
| 17 | by the Certified Shorthand Reporter.) | 11:05:26 |
| 18 | BY MR. MUSSIG: | 11:05:26 |
| 19 | Q    Do you recognize this document? | 11:05:27 |
| 20 | A    I do. | 11:05:27 |
| 21 | Q    And is this a completed copy -- your | 11:05:29 |
| 22 | completed copy of Chevron's standard expatriate | 11:05:32 |
| 23 | exam recommendation form? | 11:05:36 |
| 24 | A    Are you asking me if I filled it out? | 11:05:38 |
| 25 | Q    Sure.  Yeah. | 11:05:41 |

| | | | |
|---|---|---|---|
| 1 | A | I did not. | 11:05:42 |
| 2 | Q | Okay.  Do you know who filled it out? | 11:05:43 |
| 3 | A | I assume the person that signed it, but | 11:05:46 |
| 4 | | I don't know. | 11:05:48 |
| 5 | Q | Okay.  And that's Dr. Asekomeh Eshiofe; | 11:05:49 |
| 6 | | correct? | 11:05:49 |
| 7 | A | Correct. | 11:05:55 |

```
 8            Q    And do you know, does Chevron require        11:05:55

 9      this form to be completed for all employees who        11:05:57

10      are conditionally awarded expatriate assignments?      11:06:01

11            A    I don't know the answer to that.            11:06:04

12            Q    Okay.  Okay.  And so about halfway down      11:06:05

13      the page under "disposition" it has a box or a         11:06:13

14      checked box under -- right next to "not fit for        11:06:17

15      duty, remote location.  Can be cleared for             11:06:21

16      assignment in Lagos."                                  11:06:25

17                 Do you see that?                            11:06:26

18            A    I do.                                       11:06:26

19            Q    Okay.  And so for "remote location,"        11:06:27

20      that's referring to Escravos; correct?                 11:06:29

21            A    I assume it is, but I can't say that for    11:06:33

22      sure.                                                  11:06:36

23            Q    Do you know -- I guess do you -- so         11:06:37

24      Lagos is a different location in Nigeria; right?       11:06:39

25            A    Correct.                                    11:06:43
```

**EXHIBIT E-31**

| | | |
|---|---|---|
| 1 | Q    Do you have any reason to doubt that | 11:37:31 |
| 2 | Chevron believed there was a chance that you would | 11:37:33 |
| 3 | have an aortic event and the inability to get you | 11:37:40 |
| 4 | to adequate medical care in time would lead to | 11:37:44 |
| 5 | your death? | 11:37:47 |
| 6 | A    I believe Chevron did believe that, yes. | 11:37:50 |
| 7 | Q    Just I -- I -- I think I asked you this, | 11:37:56 |
| 8 | but all of your substantive conversations with | 11:37:58 |
| 9 | this topic were with Dr. Levy; correct? | 11:38:02 |
| 10 | A    Correct. | 11:38:06 |
| 11 | Q    So when did you first speak to Dr. Levy? | 11:38:07 |
| 12 | And -- and I'm not trying to trick you. | 11:38:10 |
| 13 | I think it was sometime between August 16th and | 11:38:11 |
| 14 | August 23rd. | 11:38:15 |
| 15 | A    I was going to say sometime kind of mid | 11:38:16 |
| 16 | to late August.  I don't remember exactly when the | 11:38:19 |
| 17 | conversations happened. | 11:38:22 |
| 18 | Q    Okay.  And how did that occur?  Did he | 11:38:23 |
| 19 | call you?  Did you call him? | 11:38:25 |
| 20 | A    It was a combination of -- it was a | 11:38:27 |
| 21 | combination of those two as well as I believe | 11:38:35 |
| 22 | there were some texts exchanged -- those may have | 11:38:38 |
| 23 | just been about timing -- and maybe a few e-mails, | 11:38:41 |
| 24 | as well.  Those may also have just been about | 11:38:45 |
| 25 | timing.  I don't remember. | 11:38:47 |

| | | |
|---|---|---|
| 1 | conversations taken together went from the | 11:39:47 |
| 2 | beginning where it was clear he didn't really | 11:39:51 |
| 3 | understand what medical condition that I had to | 11:39:53 |
| 4 | the end where he was very concerned with the | 11:39:59 |
| 5 | remoteness of the facility. | 11:40:02 |
| 6 |     Q   And what did he tell you in terms of the | 11:40:05 |
| 7 | remoteness of the facility? | 11:40:15 |
| 8 |     A   I mean, that actually stayed consistent | 11:40:18 |
| 9 | through the whole time; just that it was a remote | 11:40:21 |
| 10 | facility with an on -- on-staff doctor with | 11:40:24 |
| 11 | limited access to "med" -- medicine and equipment. | 11:40:27 |
| 12 |     Q   Were you aware that the company at least | 11:40:34 |
| 13 | talked about whether or not the position could be | 11:40:37 |
| 14 | done from Lagos? | 11:40:39 |
| 15 |     A   I am aware that they -- not until this | 11:40:43 |
| 16 | document was I aware of that. | 11:40:48 |
| 17 |     Q   Which document? | 11:40:49 |
| 18 |     A   The -- Exhibit 5. | 11:40:50 |
| 19 |     Q   Oh, I see.  Where it says "can be | 11:40:58 |
| 20 | cleared for assignment in Lagos"? | 11:40:59 |
| 21 |     A   Uh-huh. | 11:41:01 |
| 22 |     Q   So after you got this document did you | 11:41:02 |
| 23 | talk to Dr. Levy or anyone else at Chevron about | 11:41:03 |
| 24 | Lagos? | 11:41:07 |
| 25 |     A   I know that that position can't be done | 11:41:09 |

| | | |
|---|---|---|
| 1 | from Lagos, so -- | 11:41:11 |
| 2 | Q    How did you know that? | 11:41:13 |
| 3 | A    Because I know what the job duties of | 11:41:16 |
| 4 | the position entail which is on-site supervision | 11:41:20 |
| 5 | and interaction with personnel and equipment. | 11:41:24 |
| 6 | Q    And we might have covered this earlier, | 11:41:31 |
| 7 | but Dr. Levy didn't specifically discuss with you | 11:41:36 |
| 8 | the difficulties in -- in transport to a medical | 11:41:40 |
| 9 | facility in Lagos; is that right? | 11:41:47 |
| 10 | A    He didn't speak anything about Lagos, | 11:41:49 |
| 11 | except that, if they had been able to -- if I had | 11:41:52 |
| 12 | been able to perform my job duties from Lagos, | 11:41:57 |
| 13 | then they would have located me in Lagos. | 11:42:01 |
| 14 | Q    But he did tell you that they had talked | 11:42:04 |
| 15 | about whether or not you could do it from Lagos; | 11:42:06 |
| 16 | right? | 11:42:06 |
| 17 | A    Yes. | 11:42:10 |
| 18 | MR. MUSSIG:  I have some e-mails.  I'll | 11:42:20 |
| 19 | mark as Exhibit 6 e-mail correspondence between | 11:42:21 |
| 20 | Dr. Khan and Dr. Levy.  It's Bates-numbered | 11:42:26 |
| 21 | SNOOKAL-89 to -90. | 11:42:29 |
| 22 | (Exhibit 6 was marked for identification | 11:42:29 |
| 23 | by the Certified Shorthand Reporter.) | 11:42:29 |
| 24 | BY MR. MUSSIG: | 11:42:29 |
| 25 | Q    Are you familiar with this document? | 11:42:51 |

**EXHIBIT E-34**

| | | | |
|---|---|---|---|
| 1 | A | I am. | 11:42:52 |
| 2 | Q | Okay.  And you -- this is e-mail | 11:42:52 |
| 3 | correspondence between Dr. Khan and Dr. Levy; | | 11:42:55 |
| 4 | right? | | 11:42:55 |
| 5 | A | Correct. | 11:42:58 |
| 6 | Q | And you're copied on at least the | 11:42:58 |
| 7 | response from Dr. Levy to Dr. Khan; right? | | 11:43:01 |
| 8 | A | Yes. | 11:43:04 |
| 9 | Q | Okay.  But I can't -- were you copied on | 11:43:05 |
| 10 | the original e-mail from Dr. Khan? | | 11:43:08 |
| 11 | A | I don't recall. | 11:43:10 |
| 12 | Q | And -- and Dr. Levy had reached out to | 11:43:13 |
| 13 | Dr. Khan directly with your permission; right? | | 11:43:16 |
| 14 | A | That's correct. | 11:43:18 |
| 15 | Q | And you may or may not know this. | 11:43:19 |
| 16 | | So Dr. Levy left a voice mail for | 11:43:25 |
| 17 | Dr. Khan requesting to connect; right?  That is | | 11:43:28 |
| 18 | how it started? | | 11:43:31 |
| 19 | A | I believe that is correct. | 11:43:32 |
| 20 | Q | And then Dr. Khan responded by e-mail, | 11:43:33 |
| 21 | and that's this e-mail that we're looking at; | | 11:43:36 |
| 22 | right? | | 11:43:36 |
| 23 | A | Yes, as far as I know.  They -- I don't | 11:43:39 |
| 24 | know if they had other -- I know they had more | | 11:43:43 |
| 25 | than one conversation.  I don't know the time line | | 11:43:46 |

**EXHIBIT E-35**

| | | |
|---|---|---|
| 1 | for those conversations. | 11:43:48 |
| 2 | Q    How many conversations did they have | 11:43:50 |
| 3 | that you know of? | 11:43:52 |
| 4 | A    I don't know how many.  I -- I don't | 11:43:54 |
| 5 | have any way of knowing.  I only know that | 11:43:57 |
| 6 | Dr. Khan told me that he spoke with him several | 11:43:59 |
| 7 | times.  I don't know what that means. | 11:44:01 |
| 8 | Q    And in this e-mail from Dr. Khan to | 11:44:10 |
| 9 | Dr. Levy, if you look one, two -- three paragraphs | 11:44:13 |
| 10 | down, this indicates -- this is -- this is where I | 11:44:17 |
| 11 | got the two percent number from before; right? | 11:44:24 |
| 12 | This is -- this says: | 11:44:26 |
| 13 | "From...published studies, the | 11:44:28 |
| 14 | risk of rupture or dissection is 2% | 11:44:29 |
| 15 | per year for aneurysms between 4.0 | 11:44:33 |
| 16 | and 4.5" centimeters. | 11:44:37 |
| 17 | And -- and that was the size of your -- | 11:44:38 |
| 18 | your rupture; right? | 11:44:39 |
| 19 | A    It wasn't a rupture, but, yeah, I | 11:44:42 |
| 20 | think -- | 11:44:44 |
| 21 | Q    Or your -- your -- what's the -- what's | 11:44:44 |
| 22 | the proper term? | 11:44:47 |
| 23 | A    They -- they use "aneurysm" and | 11:44:47 |
| 24 | "aortic" -- or "dilated aortic root" | 11:44:50 |
| 25 | interchangeably. | 11:44:53 |

| | | |
|---|---|---|
| 1 | Q    Okay.  So what had been communicated to | 11:44:54 |
| 2 | Chevron was two percent; right? | 11:44:56 |
| 3 | A    In this e-mail. | 11:45:01 |
| 4 | Q    Do you know if another number was | 11:45:02 |
| 5 | communicated at some other time? | 11:45:06 |
| 6 | A    I don't know. | 11:45:08 |
| 7 | Q    I mean, do you agree that Dr. Levy and | 11:45:18 |
| 8 | Chevron spent a lot of time considering whether or | 11:45:21 |
| 9 | not this would work? | 11:45:26 |
| 10 | MS. LEAL:  Objection.  Calls for | 11:45:27 |
| 11 | speculation as to whether he knows how much time | 11:45:29 |
| 12 | they spent together. | 11:45:33 |
| 13 | THE WITNESS:  Yeah.  I -- I'd have no | 11:45:34 |
| 14 | idea how much time they spent. | 11:45:39 |
| 15 | BY MR. MUSSIG: | 11:45:39 |
| 16 | Q    Well, there were -- you -- you're aware | 11:45:43 |
| 17 | at least of -- of multiple conversations between | 11:45:44 |
| 18 | Dr. Levy and Dr. Khan; right? | 11:45:46 |
| 19 | MS. LEAL:  His word was "several," | 11:45:49 |
| 20 | Counsel. | 11:45:52 |
| 21 | MR. MUSSIG:  What did I say? | 11:45:53 |
| 22 | MS. LEAL:  "Numerous." | 11:45:54 |
| 23 | MR. MUSSIG:  Okay.  Several. | 11:45:55 |
| 24 | THE WITNESS:  Yeah, I am aware of that. | 11:45:56 |
| 25 | BY MR. MUSSIG: | 11:45:56 |

**EXHIBIT E-37**

| | | |
|---|---|---|
| 1 | Q    Okay.  And e-mails were exchanged | 11:45:58 |
| 2 | between Dr. Levy and Dr. Khan. | 11:46:00 |
| 3 | You're aware of that; right? | 11:46:02 |
| 4 | A    Yes. | 11:46:03 |
| 5 | Q    Do you have any knowledge about any | 11:46:03 |
| 6 | conversations between Dr. Levy and the -- the | 11:46:04 |
| 7 | doctors in Nigeria? | 11:46:08 |
| 8 | A    I do not. | 11:46:09 |
| 9 | Q    And are you aware of any conversations | 11:46:16 |
| 10 | between Dr. Levy and anyone else other than | 11:46:19 |
| 11 | Dr. Khan regarding this topic? | 11:46:21 |
| 12 | A    I am not aware of any. | 11:46:25 |
| 13 | Q    It's -- and, obviously, you spoke to | 11:46:30 |
| 14 | Dr. "Khan" a few times? | 11:46:32 |
| 15 | A    I only spoke to Dr. Khan -- | 11:46:34 |
| 16 | Q    Dr. Levy.  I'm sorry.  My -- | 11:46:36 |
| 17 | A    Yes.  Dr. Levy, yes. | 11:46:39 |
| 18 | Q    -- mistake.  And how many -- | 11:46:41 |
| 19 | approximately how many times did you have any | 11:46:44 |
| 20 | written correspondence with Dr. Levy? | 11:46:45 |
| 21 | A    I don't recall how many times we | 11:46:49 |
| 22 | exchanged e-mails. | 11:46:50 |
| 23 | Q    Do you have any estimate? | 11:46:52 |
| 24 | A    I would say a few. | 11:46:53 |
| 25 | Q    Okay.  Is that -- more than one; right? | 11:46:55 |

| | | |
|---|---|---|
| 1 | A    More than -- I -- yeah.  Somewhere | 11:46:58 |
| 2 | between one and four. | 11:47:00 |
| 3 | MR. MUSSIG:  Let's look at one.  I'll | 11:47:07 |
| 4 | mark as Exhibit 7 an e-mail from Dr. Levy to | 11:47:10 |
| 5 | Mr. Snookal dated September 16, 2019, | 11:47:16 |
| 6 | Bates-numbered SNOOKAL-645, -646. | 11:47:18 |
| 7 | (Exhibit 7 was marked for identification | 11:47:18 |
| 8 | by the Certified Shorthand Reporter.) | 11:47:18 |
| 9 | BY MR. MUSSIG: | 11:47:18 |
| 10 | Q    Do you recognize this e-mail? | 11:47:42 |
| 11 | A    I do. | 11:47:43 |
| 12 | Q    Now, I think you said somewhere between | 11:47:46 |
| 13 | one and four. | 11:47:48 |
| 14 | Do you specifically recall any other | 11:47:49 |
| 15 | e-mails that you received from him? | 11:47:51 |
| 16 | A    No, but I do remember exchanging either | 11:47:52 |
| 17 | texts or e-mails, like I said, for coordination. | 11:47:56 |
| 18 | So I'm just making an assumption about how many | 11:48:00 |
| 19 | there were. | 11:48:03 |
| 20 | Q    Oh.  Do you know if you ever responded | 11:48:04 |
| 21 | to this e-mail? | 11:48:05 |
| 22 | A    I did not -- | 11:48:06 |
| 23 | Q    Why not? | 11:48:07 |
| 24 | A    -- to my recollection. | 11:48:08 |
| 25 | Q    And why not? | 11:48:10 |

**EXHIBIT E-39**

| | | |
|---|---|---|
| 1 | A    This e-mail was sent after I requested | 11:48:12 |
| 2 | this e-mail, so there was no response necessary. | 11:48:14 |
| 3 | Q    How did you request the e-mail? | 11:48:18 |
| 4 | A    Through Andrew Powers which was the HR | 11:48:20 |
| 5 | manager at El Segundo. | 11:48:23 |
| 6 | Q    And why did you request the e-mail? | 11:48:25 |
| 7 | A    Because I wanted them to give me written | 11:48:28 |
| 8 | documentation of why they were saying that I | 11:48:29 |
| 9 | couldn't go to Escravos and to identify other | 11:48:32 |
| 10 | locations where they would consider me to be | 11:48:35 |
| 11 | medically fit. | 11:48:38 |
| 12 | Q    Oh.  And he does that in this e-mail -- | 11:48:40 |
| 13 | right? -- at the -- at the bottom? | 11:48:42 |
| 14 | A    Correct. | 11:48:43 |
| 15 | Q    Did you ever apply to any jobs in those | 11:48:44 |
| 16 | locations? | 11:48:47 |
| 17 | A    There were no job openings in those | 11:48:48 |
| 18 | locations. | 11:48:49 |
| 19 | Q    I see.  And I -- I guess most -- are | 11:48:49 |
| 20 | these locations -- well, I -- I don't know if | 11:49:04 |
| 21 | you -- you probably don't know, but I'll ask the | 11:49:10 |
| 22 | question.  You can say "I don't know." | 11:49:13 |
| 23 | Would they have adequate medical | 11:49:14 |
| 24 | facilities in all these locations where he | 11:49:15 |
| 25 | indicates he would not foresee any issues with you | 11:49:17 |

| | | |
|---|---|---|
| 1 | A    Yeah. | 11:50:27 |
| 2 | Q    -- that you wouldn't be able to work in | 11:50:28 |
| 3 | any other locations? | 11:50:29 |
| 4 | A    I did take it that way.  Correct. | 11:50:30 |
| 5 | Q    And I think you had testified there were | 11:50:32 |
| 6 | no jobs available in the first set of countries. | 11:50:33 |
| 7 | Did you look to see if there were any | 11:50:36 |
| 8 | jobs available in the second set? | 11:50:38 |
| 9 | A    I looked in all of the countries, yeah. | 11:50:40 |
| 10 | It's through a posting site.  It's not hard to do. | 11:50:43 |
| 11 | You can have it send you an e-mail.  So, like, I | 11:50:47 |
| 12 | did look at all of these locations for the | 11:50:49 |
| 13 | remainder of my employment. | 11:50:51 |
| 14 | Q    With Chevron? | 11:50:54 |
| 15 | A    Uh-huh. | 11:50:55 |
| 16 | Q    And when you say "all of these | 11:50:55 |
| 17 | locations," you're referring to all the locations | 11:50:57 |
| 18 | specifically identified in this exhibit, | 11:50:59 |
| 19 | Exhibit 7; right? | 11:51:02 |
| 20 | A    That's correct. | 11:51:03 |
| 21 | MR. MUSSIG:  All right.  I'll mark as | 11:51:09 |
| 22 | Exhibit 8 e-mails between Mr. Snookal and Andrew | 11:51:14 |
| 23 | Powers dated September 4, 2019, and September 6, | 11:51:17 |
| 24 | 2019. | 11:51:32 |
| 25 | (Exhibit 8 was marked for identification | 11:51:32 |

**EXHIBIT E-41**

| | | |
|---|---|---|
| 1 | by the Certified Shorthand Reporter.) | 11:51:32 |
| 2 | BY MR. MUSSIG: | 11:51:32 |
| 3 | Q   Are you I familiar with this e-mail -- | 11:51:48 |
| 4 | A   I am. | 11:51:49 |
| 5 | Q   -- or, I guess, these e-mails?  Are you | 11:51:50 |
| 6 | familiar with these e-mails? | 11:51:55 |
| 7 | A   Yes, I am. | 11:51:55 |
| 8 | Q   So the first e-mail in this chain is an | 11:51:58 |
| 9 | e-mail from you to Mr. Powers on September 4, | 11:52:00 |
| 10 | 2019; right? | 11:52:04 |
| 11 | A   Yes. | 11:52:08 |
| 12 | Q   And you copied Thalia Tse and Austin | 11:52:08 |
| 13 | Ruppert; correct? | 11:52:13 |
| 14 | A   Correct. | 11:52:13 |
| 15 | Q   And so Mr. Ruppert was your supervisor | 11:52:14 |
| 16 | at that point; right? | 11:52:16 |
| 17 | A   He was. | 11:52:17 |
| 18 | Q   And Thalia Tse was in HR? | 11:52:17 |
| 19 | A   She was. | 11:52:21 |
| 20 | Q   And Mr. Powers was in HR, also? | 11:52:21 |
| 21 | A   Yes. | 11:52:23 |
| 22 | Q   Do you know, was Mr. Powers -- why -- | 11:52:23 |
| 23 | was he above Thalia Tse?  Was he -- | 11:52:28 |
| 24 | A   Yes. | 11:52:32 |
| 25 | Q   -- the HR at the time?  Okay. | 11:52:32 |

EXHIBIT E-42

| | | | |
|---|---|---|---|
| 1 | A | He's the HR manager for the El Segundo | 11:52:34 |
| 2 | facility. | | 11:52:37 |
| 3 | Q | Okay. | 11:52:37 |
| 4 | A | And Thalia is my HR business partner, so | 11:52:37 |
| 5 | she would be -- | | 11:52:40 |
| 6 | Q | More of your direct contact? | 11:52:42 |
| 7 | A | -- more my direct contact. | 11:52:44 |
| 8 | Q | You -- in the first paragraph of your | 11:52:47 |
| 9 | e-mail here the third line, the sentence that | | 11:53:08 |
| 10 | begins "as my condition," you say: | | 11:53:15 |
| 11 | "As my condition does not | | 11:53:17 |
| 12 | affect my ability to perform the | | 11:53:19 |
| 13 | job duties of that position, I | | 11:53:21 |
| 14 | require no ongoing care outside of | | 11:53:23 |
| 15 | annual monitoring, working in a | | 11:53:25 |
| 16 | remote -- remote location does not | | 11:53:27 |
| 17 | affect my condition" and "a | | 11:53:29 |
| 18 | complication from my condition | | 11:53:30 |
| 19 | would cause no harm to others, and | | 11:53:31 |
| 20 | I have no work restrictions from my | | 11:53:34 |
| 21 | position this decision seems | | 11:53:36 |
| 22 | excessively paternalistic." | | 11:53:39 |
| 23 | Do you see that? | | 11:53:41 |
| 24 | A | I do. | 11:53:42 |
| 25 | Q | And so by "my condition" you're | 11:53:42 |

| | | |
|---|---|---|
| 1 | referring to the heart condition, the dilated | 11:53:44 |
| 2 | aortic root -- correct? -- that we have been | 11:53:46 |
| 3 | talking about? | 11:53:46 |
| 4 | A    Correct. | 11:53:47 |
| 5 | Q    Did you have any other condition? | 11:53:48 |
| 6 | A    No. | 11:53:49 |
| 7 | Q    As you sit here today, do you still | 11:53:53 |
| 8 | believe all those statements are true? | 11:53:57 |
| 9 | A    Yes. | 11:54:00 |
| 10 | Q    So in your view, there was never any | 11:54:07 |
| 11 | point during your employment with Chevron that you | 11:54:10 |
| 12 | needed some sort of accommodation? | 11:54:12 |
| 13 | A    That is correct. | 11:54:19 |
| 14 | Q    Then on page 2 you talk about -- you | 11:54:24 |
| 15 | say: | 11:54:27 |
| 16 | "I spoke with" my | 11:54:27 |
| 17 | "manager" -- "with the manager I | 11:54:28 |
| 18 | would have reported to in Nigeria | 11:54:31 |
| 19 | this morning...they are rescinding | 11:54:33 |
| 20 | the offer." | 11:54:34 |
| 21 | And that's the manager we talked about | 11:54:35 |
| 22 | earlier whose name you don't remember; right? | 11:54:36 |
| 23 | A    That's correct.  Yeah. | 11:54:38 |
| 24 | Q    And the manager you spoke to, was he an | 11:54:43 |
| 25 | employee of Nigeria -- Chevron Nigeria, Limited? | 11:54:46 |

| | | |
|---|---|---|
| 1 | MS. LEAL: Calls for speculation. | 11:54:49 |
| 2 | MR. MUSSIG: If you know. | 11:54:50 |
| 3 | THE WITNESS: I don't know. | 11:54:51 |
| 4 | BY MR. MUSSIG: | 11:54:52 |
| 5 | Q And so do you agree that the REM offer | 11:54:52 |
| 6 | was rescinded when you spoke to that manager on | 11:54:56 |
| 7 | the morning of September 4, 2019? | 11:54:59 |
| 8 | A Yes. | 11:55:01 |
| 9 | Q Okay. And that's the first time you had | 11:55:01 |
| 10 | heard that it had been rescinded; right? | 11:55:03 |
| 11 | A Yes. | 11:55:06 |
| 12 | Q Is this September 4 e-mail -- 2019 | 11:55:16 |
| 13 | e-mail the first time you reached out to | 11:55:18 |
| 14 | Mr. Powers about the rescinded REM job offer? | 11:55:20 |
| 15 | A It is. | 11:55:22 |
| 16 | Q And so going back to the first page | 11:55:34 |
| 17 | of -- of this exhibit, the first paragraph of your | 11:55:36 |
| 18 | e-mail, you say you believe the decision "was made | 11:55:40 |
| 19 | based on a lack of understanding and stereotypical | 11:55:44 |
| 20 | assumptions and is, therefore, discriminatory in | 11:55:47 |
| 21 | nature." | 11:55:51 |
| 22 | Was that the first time you had reported | 11:55:51 |
| 23 | any sort of discrimination? | 11:55:53 |
| 24 | A It is. | 11:55:54 |
| 25 | Q And is -- did you report any -- any sort | 11:55:57 |

| | | |
|---|---|---|
| 1 | of discrimination to anyone else at Chevron? | 11:55:59 |
| 2 | A    No. | 11:56:02 |
| 3 | Q    And when you say "based on a lack of | 11:56:03 |
| 4 | understanding," what -- what do you mean by that? | 11:56:13 |
| 5 | A    In my opinion, I don't believe that the | 11:56:18 |
| 6 | people that evaluated me did their due diligence | 11:56:21 |
| 7 | in understanding the condition that I had and the | 11:56:24 |
| 8 | effects that a remote location would have.  That's | 11:56:28 |
| 9 | what I meant by that. | 11:56:30 |
| 10 | Q    Okay.  And why do you believe that? | 11:56:31 |
| 11 | A    Just based on the conversations that I | 11:56:35 |
| 12 | had with them, it was clear that they didn't | 11:56:36 |
| 13 | really know what they were looking at and the fact | 11:56:38 |
| 14 | that they took a 17-year-old study as the only | 11:56:41 |
| 15 | piece of evidence that they looked at, as far as I | 11:56:47 |
| 16 | knew. | 11:56:50 |
| 17 | Q    Wasn't the 17-year-old study referenced | 11:56:53 |
| 18 | by Dr. Khan? | 11:56:55 |
| 19 | A    It's not Dr. Khan's job to give them the | 11:56:57 |
| 20 | information that they need.  They didn't -- | 11:57:01 |
| 21 | Q    So you agree that they were -- they | 11:57:05 |
| 22 | based their decision on the information provided | 11:57:07 |
| 23 | by Dr. Khan; right? | 11:57:09 |
| 24 | MS. LEAL:  Objection.  Calls for | 11:57:10 |
| 25 | speculation. | 11:57:11 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yeah.  I don't know what | 11:57:11 |
| 2 | they based it on. | 11:57:12 |
| 3 | BY MR. MUSSIG: | 11:57:13 |
| 4 | Q    Okay. | 11:57:14 |
| 5 | A    That is a piece, I am sure, of what they | 11:57:15 |
| 6 | used. | 11:57:17 |
| 7 | Q    Okay.  And you agree that the study | 11:57:18 |
| 8 | referenced a moment ago, the 17-year study, that | 11:57:20 |
| 9 | was referenced by Dr. Khan? | 11:57:23 |
| 10 | A    It was. | 11:57:25 |
| 11 | Q    And the two percent figure, that was the | 11:57:25 |
| 12 | from Dr. Khan; right? | 11:57:27 |
| 13 | A    It's two percent with caveats -- yes -- | 11:57:31 |
| 14 | Q    Okay. | 11:57:36 |
| 15 | A    -- in that e-mail. | 11:57:36 |
| 16 | Q    So in your view, what else should they | 11:57:37 |
| 17 | have done? | 11:57:45 |
| 18 | A    Well, my understanding of accommodation | 11:57:45 |
| 19 | from some of Chevron's own training is that they | 11:57:49 |
| 20 | are supposed to reference current medical | 11:57:56 |
| 21 | technology and the most recent studies that they | 11:57:58 |
| 22 | can find and base their decisions on that. | 11:58:02 |
| 23 | Q    Okay.  When you say most "recent | 11:58:08 |
| 24 | studies...they can find," are you referring to the | 11:58:12 |
| 25 | study you mentioned, the 2018, 2019 study? | 11:58:15 |

```
 1          Q    Oh.  And just so we're all clear, so the        12:00:37

 2    very first sentence of your e-mail is you say:              12:00:40

 3                    "I am very disappointed in the              12:00:43

 4               decision by Chevron medical to                   12:00:44

 5               classify me as 'unfit' for the                   12:00:46

 6               reliability engineering manager                  12:00:48

 7               position at EGTL."                               12:00:50

 8               "EGTL" is Escravos; right?                       12:00:53

 9          A    Yes.                                             12:00:55

10          Q    And I think you had testified about this        12:00:55

11    earlier, but you -- you agree that the -- the REM          12:00:57

12    position entailed hands-on responsibility that             12:01:00

13    required you to be at the plant in Escravos;               12:01:02

14    right?                                                      12:01:02

15          A    Yes.                                             12:01:05

16          Q    And that -- that position could not have        12:01:09

17    been relocated to Lagos; right?                             12:01:11

18          A    Not from my understanding of the                12:01:16

19    position.                                                   12:01:18

20          Q    Do you know if Mr. Powers -- and maybe          12:01:24

21    you don't.                                                  12:01:27

22               Do you know if he had any control over         12:01:28

23    the rescission of -- the rescission of your                12:01:29

24    conditional offer for the REM position?                     12:01:32

25          A    I don't know.                                    12:01:35
```

| | | |
|---|---|---|
| 1 | A    The same basis that "you" -- that I | 12:10:46 |
| 2 | would say when you asked me before which is that I | 12:10:48 |
| 3 | don't think that they investigated my condition | 12:10:51 |
| 4 | and the impact that it would have on my ability to | 12:10:53 |
| 5 | work in Escravos by using the most recent medical | 12:10:55 |
| 6 | information and a thorough understanding of the | 12:11:01 |
| 7 | condition that I did have. | 12:11:05 |
| 8 | Q    Okay.  Yeah.  So before you had said you | 12:11:06 |
| 9 | felt there were other studies they should have | 12:11:11 |
| 10 | consulted; right? | 12:11:13 |
| 11 | A    Yes. | 12:11:15 |
| 12 | Q    Anything other than that? | 12:11:15 |
| 13 | A    Not that I can think of. | 12:11:17 |
| 14 | Q    Do you disagree that alternatives were | 12:11:18 |
| 15 | explored? | 12:11:27 |
| 16 | MS. LEAL:  Assumes facts not in | 12:11:28 |
| 17 | evidence.  Lacks foundation. | 12:11:30 |
| 18 | Go ahead. | 12:11:31 |
| 19 | BY MR. MUSSIG: | 12:11:31 |
| 20 | Q    Let me ask it this way:  Do you have any | 12:11:34 |
| 21 | reason to -- to dispute that alternatives were | 12:11:36 |
| 22 | explored? | 12:11:38 |
| 23 | A    No. | 12:11:38 |
| 24 | MR. MUSSIG:  Let me mark as Exhibit 10 | 12:12:07 |
| 25 | e-mails involving Mr. Snookal and Austin Ruppert | 12:12:09 |

**EXHIBIT E-47**

| | | |
|---|---|---|
| 1 | dated September 5th, 2019 -- well, an e-mail from | 12:12:12 |
| 2 | Mr. Snookal but to Austin Ruppert and then from | 12:12:15 |
| 3 | Mr. Ruppert to Troy Tortorich, Thalia Tse, and | 12:12:19 |
| 4 | Andrew Powers. | 12:12:24 |
| 5 | (Exhibit 10 was marked for | 12:12:24 |
| 6 | identification by the Certified | 12:12:24 |
| 7 | Shorthand Reporter.) | 12:12:24 |
| 8 | BY MR. MUSSIG: | 12:12:24 |
| 9 | Q     Do recognize the first e-mail in this | 12:12:45 |
| 10 | chain, the one at the bottom of the page? | 12:12:47 |
| 11 | A     Yes. | 12:12:47 |
| 12 | Q     Okay.  And this is an e-mail from you to | 12:12:53 |
| 13 | Mr. Ruppert; correct? | 12:12:55 |
| 14 | A     Correct. | 12:12:56 |
| 15 | Q     And Mr. Ruppert at this point was your | 12:12:57 |
| 16 | supervisor; right? | 12:12:59 |
| 17 | A     Correct. | 12:13:00 |
| 18 | Q     And it says "position" -- the "subject" | 12:13:01 |
| 19 | line is "positions in 2H PDC." | 12:13:03 |
| 20 | What does -- what does the "2H PDC" | 12:13:06 |
| 21 | mean? | 12:13:09 |
| 22 | A     A second half PDC.  I don't know what | 12:13:10 |
| 23 | the acronym stands for.  It's just what they used | 12:13:14 |
| 24 | for the job selection process at Chevron. | 12:13:17 |
| 25 | Q     Okay.  And so why -- they look -- you're | 12:13:24 |

**EXHIBIT E-48**

| | | |
|---|---|---|
| 1 | Q    And each of those jobs also has a job | 12:14:38 |
| 2 | owner; is that right? | 12:14:41 |
| 3 | A    That's my understanding.  Yes. | 12:14:43 |
| 4 | Q    Okay.  And the job owner is typically | 12:14:45 |
| 5 | the hiring supervisor for the opening; is that | 12:14:47 |
| 6 | right? | 12:14:47 |
| 7 | A    I don't know if it's typically the -- I | 12:14:50 |
| 8 | don't know if it works that way. | 12:14:52 |
| 9 | Q    Okay.  You just don't have any knowledge | 12:14:53 |
| 10 | one way or the other? | 12:14:56 |
| 11 | A    I don't. | 12:14:58 |
| 12 | Q    Do you know if the job owner is also | 12:14:58 |
| 13 | typically the supervisor who the employee would | 12:15:02 |
| 14 | report to, if they get that job? | 12:15:04 |
| 15 | A    I -- I do not know the answer to that. | 12:15:06 |
| 16 | No. | 12:15:08 |
| 17 | Q    Okay.  Do you have any knowledge about | 12:15:09 |
| 18 | the job owner's role in the decision-making | 12:15:14 |
| 19 | process as to -- as to the particular job? | 12:15:16 |
| 20 | A    Not in a generic sense.  Generally, each | 12:15:20 |
| 21 | job is defined -- they'll tell you who to talk to. | 12:15:22 |
| 22 | It's not, in my experience, always the same | 12:15:27 |
| 23 | person. | 12:15:31 |
| 24 | Q    What do you mean, "it's not"? | 12:15:31 |
| 25 | A    The -- the -- the owner of the position | 12:15:32 |

**EXHIBIT E-49**

| | | |
|---|---|---|
| 1 | is not always the person that will be your | 12:15:35 |
| 2 | supervisor -- | 12:15:38 |
| 3 | Q    I see. | 12:15:39 |
| 4 | A    -- in my experience.  That doesn't mean | 12:15:39 |
| 5 | I know the process. | 12:15:43 |
| 6 | Q    Sure.  In your experience, is it usually | 12:15:44 |
| 7 | the supervisor? | 12:15:47 |
| 8 | A    No. | 12:15:47 |
| 9 | Q    So more often than not the job owner is | 12:15:54 |
| 10 | not the same as the person that would be | 12:15:56 |
| 11 | supervising the position, in your experience? | 12:15:58 |
| 12 | A    In my recollection and experience, that | 12:16:01 |
| 13 | is correct. | 12:16:03 |
| 14 | Q    In -- in your recollection and | 12:16:05 |
| 15 | experience, do you know then like how a job owner | 12:16:06 |
| 16 | would be selected or assigned? | 12:16:10 |
| 17 | A    I do not. | 12:16:18 |
| 18 | Q    Earlier you had said -- going back to | 12:16:25 |
| 19 | the exhibit, Exhibit 10, you had said they told | 12:16:27 |
| 20 | you to look through the PDC openings. | 12:16:30 |
| 21 | When you said "they" -- is that right? | 12:16:34 |
| 22 | A    Yes. | 12:16:36 |
| 23 | Q    Okay.  When you said "they," who do | 12:16:37 |
| 24 | you -- who were you referring to? | 12:16:39 |
| 25 | A    We had a meeting between Austin | 12:16:41 |

**EXHIBIT E-50**

| | | |
|---|---|---|
| 1 | "Powers," Thalia Tse, and -- | 12:16:44 |
| 2 | Q    Austin Ruppert? | 12:16:49 |
| 3 | A    Sorry.  Yes.  Austin Ruppert, Andrew | 12:16:50 |
| 4 | Powers, and Thalia Tse.  I believe that was on the | 12:16:53 |
| 5 | 6th or 7th of September. | 12:17:04 |
| 6 | Q    Well, this e-mail is dated | 12:17:04 |
| 7 | September 5th -- | 12:17:07 |
| 8 | A    Okay. | 12:17:07 |
| 9 | Q    -- so it couldn't have been the 6th or | 12:17:09 |
| 10 | 7th. | 12:17:11 |
| 11 | A    So it might have been the 4th then. | 12:17:11 |
| 12 | Q    Okay.  Sometime shortly before you sent | 12:17:13 |
| 13 | this? | 12:17:15 |
| 14 | A    I don't remember the exact date, but, | 12:17:15 |
| 15 | yeah, it must be September 5th.  It would be the | 12:17:17 |
| 16 | same day that we had the meeting. | 12:17:19 |
| 17 | Q    So you had the meeting, and then you | 12:17:24 |
| 18 | immediately went to look for positions; right? | 12:17:29 |
| 19 | A    Right.  So there is a time limit; right? | 12:17:31 |
| 20 | The PDCs happen on a cycle -- that's why | 12:17:35 |
| 21 | it's called "2H" -- and there's deadlines.  I | 12:17:39 |
| 22 | believe we were -- I believe the deadline was | 12:17:43 |
| 23 | Friday, so -- | 12:17:45 |
| 24 | Q    And this was on Thursday? | 12:17:49 |
| 25 | A    Yeah, if I recall correctly. | 12:17:50 |

**EXHIBIT E-51**

| | | |
|---|---|---|
| 1 | A    I think it was 147,000. | 12:27:41 |
| 2 | Q    Okay.  So about another -- what? -- | 12:27:44 |
| 3 | sixteen, seventeen thousand a year? | 12:27:47 |
| 4 | A    Roughly, plus there's an increase in | 12:27:49 |
| 5 | your bonus, your annual bonus, as well. | 12:27:52 |
| 6 | Q    And what is that increase? | 12:27:54 |
| 7 | A    Between 22 and 23 I think it goes from | 12:27:56 |
| 8 | 14 to 16 percent, and 24 I believe is 18 percent. | 12:28:00 |
| 9 | Q    And how -- what would that translate to | 12:28:06 |
| 10 | in terms of dollars, again, estimates? | 12:28:08 |
| 11 | A    Two percent of my base pay.  So what is | 12:28:11 |
| 12 | that? | 12:28:14 |
| 13 | Like 5,000, $6,000 each grade. | 12:28:15 |
| 14 | Q    Okay.  So what jobs did you ultimately | 12:28:20 |
| 15 | apply to in this September, October, November time | 12:28:26 |
| 16 | frame, 2019? | 12:28:32 |
| 17 | A    I applied to the maintenance general | 12:28:33 |
| 18 | team lead, the operating assistant, and the | 12:28:35 |
| 19 | maintenance change OA. | 12:28:39 |
| 20 | Q    Okay.  Including -- so one of -- and | 12:28:41 |
| 21 | that's the OA -- the -- one of those OA positions | 12:28:49 |
| 22 | stated that it had a college degree requirement; | 12:28:54 |
| 23 | right? | 12:28:54 |
| 24 | A    Yes. | 12:28:58 |
| 25 | Q    Do you know -- and maybe you don't -- | 12:28:58 |

**EXHIBIT E-54**

```
 1              Los Angeles, California              12:30:52

 2              Friday, May 10, 2024                 12:30:52

 3                  1:34 p.m.                         12:30:52

 4                                                    12:30:52

 5         THE VIDEOGRAPHER:  Video deposition        13:34:40

 6    returning to the record at 1:34 p.m., beginning of  13:34:41

 7    media 3.                                        13:34:45

 8                                                    13:34:45

 9              FURTHER EXAMINATION                   13:34:45

10    BY MR. MUSSIG:                                  13:34:45

11         Q    One question I wanted to circle back on,  13:34:49

12    then we'll move on to -- to these documents.    13:34:51

13              Would you agree the decision to rescind  13:34:54

14    the REM job offer in Escravos was not based on  13:34:56

15    your ability or inability to do the job?        13:35:04

16         A    Yeah.  It didn't have anything to do  13:35:11

17    with my ability to do the job.                  13:35:14

18              MR. MUSSIG:  So let me mark as        13:35:16

19    Exhibit 11 a document that's titled "Job title:  13:35:18

20    Maintenance change operating assistant (OA),"   13:35:24

21    SNOOKAL-1131 to -1132.                          13:35:27

22              (Exhibit 11 was marked for            13:35:27

23              identification by the Certified       13:35:27

24              Shorthand Reporter.)                  13:35:27

25    BY MR. MUSSIG:                                  13:35:27
```

**EXHIBIT E-55**

```
 1        Q    Now, I -- I assume you're familiar with       13:35:48
 2   this document?                                           13:35:51
 3        A    Uh-huh.                                        13:35:51
 4        Q    You have to say "yes" or "no."                13:35:52
 5        A    Yes.  I'm sorry.                              13:35:54
 6        Q    So this is a -- a copy of the El Segundo       13:35:56
 7   maintenance change operating assistant, OA, job        13:36:00
 8   posting in the PDC database as of the time you         13:36:03
 9   were searching for a job in or around September,       13:36:07
10   2019; right?                                            13:36:12
11        A    Yes.                                          13:36:13
12        Q    One question just sort of logistical:        13:36:13
13   So this says -- at the top it's -- it says:            13:36:18
14             "Chevron is accepting online                 13:36:24
15        applications for the position of                  13:36:26
16        maintenance change operating                      13:36:27
17        assistant (OA) located in                         13:36:28
18        El Segundo, California through                    13:36:31
19        8/11/19."                                          13:36:34
20             Do you know -- I mean, you weren't           13:36:36
21   looking for a position as of 8/11/19.                  13:36:38
22             Was -- was the job extended?  Was this       13:36:41
23   deadline extended?                                      13:36:44
24        A    It may have been.  I'm not sure.             13:36:46
25        Q    Okay.  You don't recall?                     13:36:47
```

| | | |
|---|---|---|
| 1 | Q    And did you meet all of the preferred | 13:40:29 |
| 2 | qualifications? | 13:40:31 |
| 3 | A    No. | 13:40:31 |
| 4 | Q    And I assume one of them was you didn't | 13:40:37 |
| 5 | have a Bachelor's degree; right? | 13:40:40 |
| 6 | A    Correct. | 13:40:42 |
| 7 | Q    Were there any other preferred | 13:40:42 |
| 8 | qualifications that you didn't meet? | 13:40:44 |
| 9 | And, again, this is at the time you | 13:40:46 |
| 10 | applied for the job. | 13:40:48 |
| 11 | A    Uh-huh.  For this particular job I would | 13:40:48 |
| 12 | say that it did not align with my career | 13:41:00 |
| 13 | development plan which is one of the preferred | 13:41:03 |
| 14 | qualifications. | 13:41:08 |
| 15 | Q    I see.  Any others? | 13:41:08 |
| 16 | A    No. | 13:41:08 |
| 17 | Q    Do you know who ultimately got this job? | 13:41:12 |
| 18 | A    I can't remember their name.  I -- I -- | 13:41:21 |
| 19 | I know loosely who they are, but I don't really | 13:41:23 |
| 20 | know them. | 13:41:26 |
| 21 | Q    Okay.  Do you think that you didn't get | 13:41:26 |
| 22 | this job for any sort of discriminatory reason? | 13:41:28 |
| 23 | A    No. | 13:41:31 |
| 24 | MR. MUSSIG:  Let's mark as Exhibit 12 a | 13:41:44 |
| 25 | document titled "Job title: DS&C - MFG - | 13:41:48 |

**EXHIBIT E-57**

| | | |
|---|---|---|
| 1 | El Segundo operating assistant (PSG 22-23, 2 | 13:41:55 |
| 2 | positions)."  It's Bates-labeled SNOOKAL-1150 to | 13:41:59 |
| 3 | -1152. | 13:42:03 |
| 4 | (Exhibit 12 was marked for | 13:42:03 |
| 5 | identification by the Certified | 13:42:03 |
| 6 | Shorthand Reporter.) | 13:42:13 |
| 7 | MS. LEAL:  Thank you. | 13:42:13 |
| 8 | BY MR. MUSSIG: | 13:42:13 |
| 9 | Q    And are you familiar with this document? | 13:42:17 |
| 10 | A    Yes. | 13:42:17 |
| 11 | Q    Is this another one of the jobs that you | 13:42:21 |
| 12 | applied to during this time period? | 13:42:22 |
| 13 | A    It is. | 13:42:24 |
| 14 | Q    And just a -- so "DS&C" is downstream | 13:42:27 |
| 15 | and chemicals; right? | 13:42:31 |
| 16 | A    Yes. | 13:42:33 |
| 17 | Q    And that's a -- a line of business | 13:42:34 |
| 18 | within Chevron; right? | 13:42:35 |
| 19 | A    Yes. | 13:42:37 |
| 20 | Q    And "MFG" is short for manufacturing? | 13:42:37 |
| 21 | A    Yes. | 13:42:37 |
| 22 | Q    And now, again, on the very bottom but | 13:42:42 |
| 23 | below the Bates number it's -- it's dated | 13:42:47 |
| 24 | 10/11/2019. | 13:42:50 |
| 25 | Is that when you printed this? | 13:42:51 |

| | | |
|---|---|---|
| 1 | various different positions; right? | 13:44:03 |
| 2 | So he's in operations, and I was in | 13:44:06 |
| 3 | engineering and maintenance.  He was in his | 13:44:08 |
| 4 | various roles someone that I would work with on a | 13:44:11 |
| 5 | regular basis. | 13:44:13 |
| 6 | Q    Do you -- do you know whether Mr. Byrd | 13:44:20 |
| 7 | would have any reason to have knowledge about your | 13:44:22 |
| 8 | heart condition? | 13:44:26 |
| 9 | A    No. | 13:44:26 |
| 10 | Q    You don't know or, "no," he would not? | 13:44:29 |
| 11 | A    No, he would not.  Sorry. | 13:44:31 |
| 12 | Q    And, again, would he know your age, | 13:44:33 |
| 13 | other than just making a general estimate based | 13:44:37 |
| 14 | on, you know, the fact that he knew you? | 13:44:39 |
| 15 | A    No, I wouldn't think so, other than | 13:44:41 |
| 16 | that. | 13:44:44 |
| 17 | Q    Well, I mean, let me ask this:  Did you | 13:44:50 |
| 18 | get this job? | 13:44:52 |
| 19 | A    I did not. | 13:44:53 |
| 20 | Q    And do you believe that decision was | 13:44:53 |
| 21 | discriminatory in any way? | 13:44:55 |
| 22 | A    I believe it might have been, yes. | 13:44:59 |
| 23 | Q    Okay.  So let me ask a few more | 13:45:01 |
| 24 | questions. | 13:45:04 |
| 25 | Do you know who the decision maker was | 13:45:06 |

**EXHIBIT E-60**

| | | |
|---|---|---|
| 1 | for this job, meaning, the person who decided or | 13:45:08 |
| 2 | persons who decided whether or not you would get | 13:45:11 |
| 3 | this job? | 13:45:14 |
| 4 | A    I do not know all of them, no. | 13:45:15 |
| 5 | Q    Do you know some of them? | 13:45:17 |
| 6 | A    Well, Zak Byrd.  Actually, he's the only | 13:45:20 |
| 7 | one that I know. | 13:45:28 |
| 8 | Q    Okay. | 13:45:29 |
| 9 | A    I'm thinking of a different job, so -- | 13:45:29 |
| 10 | Q    All right. | 13:45:31 |
| 11 | A    I do know that they do not make the | 13:45:31 |
| 12 | decision -- that one person doesn't make the | 13:45:35 |
| 13 | decision. | 13:45:40 |
| 14 | Q    Do you know how many people make the | 13:45:40 |
| 15 | decision technically? | 13:45:42 |
| 16 | A    I do not. | 13:45:43 |
| 17 | Q    Do you have any estimate?  It's -- is | 13:45:43 |
| 18 | it -- is it two or three?  Is it ten or 12? | 13:45:46 |
| 19 | A    I know that they have a meeting to talk | 13:45:49 |
| 20 | about position changes and resource moves on a | 13:45:55 |
| 21 | recurring basis at an upper-level management. | 13:45:59 |
| 22 | I don't know how many people attend that | 13:46:04 |
| 23 | meeting; right? | 13:46:06 |
| 24 | Q    Okay.  On page 2 of the document it has | 13:46:07 |
| 25 | a list of "required qualifications," and one of | 13:46:15 |

**EXHIBIT E-61**

| | | |
|---|---|---|
| 1 | coordination and what jobs were important, what | 14:26:41 |
| 2 | jobs weren't important.  I had a project | 14:26:45 |
| 3 | management background through other jobs before | 14:26:48 |
| 4 | Chevron.  I had done more influential leadership | 14:26:54 |
| 5 | positions which is also necessary in GTL because | 14:26:59 |
| 6 | you're working with other departments and other | 14:27:03 |
| 7 | groups.  I just had more general experience that | 14:27:05 |
| 8 | aligned with the selection criteria. | 14:27:11 |
| 9 | Q    Anything else? | 14:27:15 |
| 10 | A    No. | 14:27:15 |
| 11 | Q    What -- so, ultimately, Chevron created | 14:27:27 |
| 12 | a role for you; right? | 14:27:30 |
| 13 | A    Yes. | 14:27:33 |
| 14 | Q    And it was the reliability change | 14:27:33 |
| 15 | operating assistant; correct? | 14:27:36 |
| 16 | A    Yes. | 14:27:38 |
| 17 | Q    Okay.  And so that's an OA role; right? | 14:27:38 |
| 18 | A    No. | 14:27:41 |
| 19 | Q    Why not? | 14:27:42 |
| 20 | A    All of the OA roles are in operations, | 14:27:46 |
| 21 | except for the two change OA positions which were | 14:27:48 |
| 22 | both in maintenance and were both discontinued | 14:27:52 |
| 23 | during the reorganization.  They also only existed | 14:27:54 |
| 24 | for one year.  OA positions has been around in the | 14:27:57 |
| 25 | organization by one title or another as far back | 14:28:02 |

| | | |
|---|---|---|
| 1 | Q    "No"? | 14:29:27 |
| 2 | A    No.  That was Kit Deaver. | 14:29:28 |
| 3 | Q    Okay.  He was your -- he was your | 14:29:30 |
| 4 | supervisor at the time you applied for that | 14:29:33 |
| 5 | position? | 14:29:35 |
| 6 | A    That's correct. | 14:29:35 |
| 7 | Q    And what -- did Mr. Ruppert move into | 14:29:38 |
| 8 | Kit Deaver's role? | 14:29:43 |
| 9 | A    He did. | 14:29:43 |
| 10 | Q    Okay.  And so Kit Deaver had a good | 14:29:45 |
| 11 | opinion of your abilities, as well; right? | 14:29:46 |
| 12 | A    Yes. | 14:29:48 |
| 13 | Q    And the -- the reliability change | 14:29:49 |
| 14 | operating assistant paid the same as your IEAR | 14:29:53 |
| 15 | team lead role; right? | 14:29:57 |
| 16 | A    It did. | 14:29:59 |
| 17 | MR. MUSSIG:  And let's mark as | 14:30:00 |
| 18 | Exhibit 14.  It's a letter to Mr. -- well, it's a | 14:30:08 |
| 19 | letter dated November 20th, 2019, titled "job | 14:30:13 |
| 20 | offer," SNOOKAL-1136. | 14:30:17 |
| 21 | (Exhibit 14 was marked for | 14:30:17 |
| 22 | identification by the Certified | 14:30:17 |
| 23 | Shorthand Reporter.) | 14:30:17 |
| 24 | BY MR. MUSSIG: | 14:30:17 |
| 25 | Q    Are you familiar with this document? | 14:30:37 |

| | | |
|---|---|---|
| 1 | Q    How do you know that? | 14:32:58 |
| 2 | A    Well, he told me he did. | 14:32:59 |
| 3 | Q    Okay.  Do you know of any other -- | 14:33:00 |
| 4 | A    Any other reason?  No, I don't know; | 14:33:03 |
| 5 | just that he told me he did. | 14:33:05 |
| 6 | Q    Okay.  I believe in this case you've | 14:33:06 |
| 7 | alleged that the reliability change OA position | 14:33:13 |
| 8 | was not as good because you didn't have any direct | 14:33:21 |
| 9 | reports. | 14:33:23 |
| 10 | Right? | 14:33:24 |
| 11 | A    Among other reasons; but, yes. | 14:33:25 |
| 12 | Q    Okay.  Among other reasons? | 14:33:28 |
| 13 | A    Yeah. | 14:33:30 |
| 14 | Q    But the other OA roles also -- other OA | 14:33:30 |
| 15 | roles also did not have direct reports; right? | 14:33:34 |
| 16 | A    That is correct. | 14:33:36 |
| 17 | Q    Okay.  And so you're saying that the -- | 14:33:36 |
| 18 | the reliability change OA was different from all | 14:33:38 |
| 19 | the other OA positions at the facility; right? | 14:33:41 |
| 20 | There was one other that was -- that fell under | 14:33:44 |
| 21 | the same category? | 14:33:46 |
| 22 | A    Correct. | 14:33:48 |
| 23 | Q    Was it the maintenance change OA? | 14:33:49 |
| 24 | A    It was. | 14:33:51 |
| 25 | Q    Okay.  So you're saying reliability | 14:33:51 |

**EXHIBIT E-81**

| | | |
|---|---|---|
| 1 | description for it because it doesn't exist. | 14:35:06 |
| 2 | Q    What were you doing on a day-to-day | 14:35:09 |
| 3 | basis? | 14:35:11 |
| 4 | A    Whatever Austin wanted me to do.  I | 14:35:12 |
| 5 | spent the first three or so months training the | 14:35:15 |
| 6 | new IEAR team lead and wrapping up some projects | 14:35:19 |
| 7 | that I was working on.  I think I also got | 14:35:26 |
| 8 | assigned to an investigation, but it was just -- | 14:35:31 |
| 9 | it's kind of like whatever -- | 14:35:34 |
| 10 | Q    Almost like special projects? | 14:35:36 |
| 11 | A    Yeah. | 14:35:38 |
| 12 | Q    Okay.  Now, less than a year later | 14:35:44 |
| 13 | around October, 2020, that's when this big reorg | 14:35:47 |
| 14 | happened -- right? -- restructuring of the | 14:35:49 |
| 15 | business? | 14:35:51 |
| 16 | A    That's -- that's when it rolled down to | 14:35:51 |
| 17 | my level, yeah.  It began much earlier than that. | 14:35:54 |
| 18 | Q    Okay.  And are you aware that ten | 14:35:57 |
| 19 | percent of the employees were laid of? | 14:35:58 |
| 20 | A    I am. | 14:36:00 |
| 21 | Q    And -- | 14:36:00 |
| 22 | A    I actually take issue with that number. | 14:36:02 |
| 23 | It's not ten percent were laid off.  Ten percent | 14:36:05 |
| 24 | of the employee -- there was a reduction of ten | 14:36:08 |
| 25 | percent of the workforce. | 14:36:10 |

**EXHIBIT E-82**

| | | |
|---|---|---|
| 1 | Q    I see.  And it was during this | 14:36:13 |
| 2 | restructuring period that you applied to the IEAR | 14:36:26 |
| 3 | team lead position again; right? | 14:36:32 |
| 4 | A    I did not apply for that IEAR team lead | 14:36:34 |
| 5 | position during the restructuring. | 14:36:36 |
| 6 | Q    When was that? | 14:36:36 |
| 7 | A    I never re-applied for the IEAR team | 14:36:37 |
| 8 | lead. | 14:36:40 |
| 9 | Q    How did you get that job? | 14:36:40 |
| 10 | A    They gave it to me. | 14:36:41 |
| 11 | Q    What do you mean, they gave it to you? | 14:36:43 |
| 12 | A    They told me that, if I didn't take the | 14:36:45 |
| 13 | IEAR team lead position -- that I wouldn't have a | 14:36:49 |
| 14 | position at Chevron. | 14:36:51 |
| 15 | Q    Was that because the -- the reliability | 14:36:54 |
| 16 | change OA position was going to go away? | 14:37:00 |
| 17 | A    Yes. | 14:37:00 |
| 18 | Q    And was that because of the | 14:37:04 |
| 19 | restructuring? | 14:37:06 |
| 20 | A    Yes. | 14:37:06 |
| 21 | Q    And what happened to the person who was | 14:37:11 |
| 22 | in the "I" -- "I" -- IEAR team lead position prior | 14:37:13 |
| 23 | to that? | 14:37:17 |
| 24 | A    It was -- the restructuring was quite | 14:37:24 |
| 25 | complicated in the way they did it, so that's not | 14:37:26 |

**EXHIBIT E-83**

| | | |
|---|---|---|
| 1 | the future." | 15:07:48 |
| 2 | Q    Okay. | 15:07:50 |
| 3 | A    So that's, "Don't -- don't put OA | 15:07:50 |
| 4 | because you won't get it."  And then I said, "Am I | 15:07:54 |
| 5 | even on the list?" and he said, "No." | 15:08:04 |
| 6 | Q    And so -- and we had talked about the | 15:08:05 |
| 7 | four jobs you ultimately applied for. | 15:08:07 |
| 8 | One was IE -- IEAR lead; right? | 15:08:10 |
| 9 | A    I do not apply for that job. | 15:08:12 |
| 10 | Q    No.  That's right.  You had applied for | 15:08:14 |
| 11 | four jobs. | 15:08:15 |
| 12 | Three of them you say you had no issue | 15:08:16 |
| 13 | with, and the fourth was the one in Houston, the | 15:08:18 |
| 14 | analyzer position? | 15:08:21 |
| 15 | A    Right.  The other three I don't know | 15:08:22 |
| 16 | enough about to have an opinion one way or the | 15:08:24 |
| 17 | other. | 15:08:26 |
| 18 | Q    Okay.  And so then how -- were you -- | 15:08:26 |
| 19 | were you denied for all four of those jobs? | 15:08:29 |
| 20 | A    I was. | 15:08:32 |
| 21 | Q    And then they put you in the IEAR lead? | 15:08:32 |
| 22 | A    That's correct. | 15:08:35 |
| 23 | Q    And, I mean, you must have accepted it | 15:08:36 |
| 24 | at some point like; right? | 15:08:40 |
| 25 | I -- I -- I -- and I understand what | 15:08:42 |

**EXHIBIT E-89**

| | | |
|---|---|---|
| 1 | your testimony is -- is they told you, "This is | 15:08:44 |
| 2 | it.  This is all we have.  You can have this, or | 15:08:46 |
| 3 | there's nothing."  But you accepted.  You said, | 15:08:49 |
| 4 | "Okay.  I'll take -- I'll take the position." | 15:08:51 |
| 5 | A    Oh.  Did I accept it?  Yeah, I accepted | 15:08:52 |
| 6 | it. | 15:08:56 |
| 7 | Q    Were there any more messages with | 15:08:57 |
| 8 | Mr. Ruppert on Teams? | 15:09:05 |
| 9 | It looks like there were. | 15:09:06 |
| 10 | A    There's a ton of messages with -- he was | 15:09:06 |
| 11 | my supervisor and it was COVID, so this is how we | 15:09:10 |
| 12 | communicated. | 15:09:14 |
| 13 | Q    Were there any other text messages about | 15:09:15 |
| 14 | OA lists? | 15:09:17 |
| 15 | A    Not that I recall.  I'm sure that's why | 15:09:18 |
| 16 | I pulled these out. | 15:09:21 |
| 17 | Q    Okay.  Sorry.  I said "text messages," | 15:09:22 |
| 18 | but I meant Teams messages. | 15:09:24 |
| 19 | A    Yeah.  We also had text messages | 15:09:26 |
| 20 | during -- during that period of time. | 15:09:29 |
| 21 | It was a very -- lots of means of | 15:09:30 |
| 22 | communication, not all of which were the same all | 15:09:36 |
| 23 | the time; right? | 15:09:40 |
| 24 | Sometimes it was text.  Sometimes it was | 15:09:41 |
| 25 | Teams.  Sometimes it was video calls.  Sometimes | 15:09:43 |

```
1        Q    You didn't talk about anything else in        15:13:03

2    15 minutes?                                             15:13:07

3        A    Not really, no.  I'm not sure it lasted        15:13:09

4    15 minutes.  I'm saying it was a 15-minute              15:13:12

5    meeting, so it was 15 minutes or less.  But, no, I      15:13:15

6    don't believe we talked about anything else.            15:13:18

7        Q    Okay.  On the -- do you believe your --        15:13:21

8    let me ask this way:  In this case is the -- the        15:13:27

9    only disability that you are alleging the heart         15:13:33

10   condition that we talked about?                         15:13:38

11       A    Yes.                                           15:13:38

12       Q    And other than the revocation of the REM       15:13:40

13   job in Escravos, do you believe your heart             15:13:45

14   condition had anything to do with any other            15:13:48

15   decision in terms of promotions or anything else       15:13:50

16   at Chevron?                                            15:13:52

17       A    No, only -- only that I expressed that I       15:13:55

18   thought it was discrimination.  So anything after      15:14:02

19   that, you know, could be affected by that but not      15:14:05

20   directly by the fact that I had the disability.        15:14:09

21       Q    Okay.  So you're saying it's possible         15:14:13

22   there was some retaliation, but you don't think        15:14:15

23   any other decision at Chevron was ever based in        15:14:17

24   any part on your disability?                           15:14:21

25       A    That's correct.                               15:14:24
```

**EXHIBIT E-91**

| | | |
|---|---|---|
| 1 | you believe you may have been retaliated against | 15:20:38 |
| 2 | on that basis? | 15:20:39 |
| 3 |     A    Yes. | 15:20:39 |
| 4 |     Q    And is there any specific person at | 15:20:49 |
| 5 | Chevron that you believe retaliated against you? | 15:20:50 |
| 6 |     A    No specific person, no. | 15:20:55 |
| 7 |     Q    In terms of disability discrimination, I | 15:21:03 |
| 8 | think we talked about earlier you believe the | 15:21:07 |
| 9 | people that discriminated against you were | 15:21:09 |
| 10 | Dr. Levy and the doctor in Nigeria who you spoke | 15:21:11 |
| 11 | to? | 15:21:16 |
| 12 |     A    Yes. | 15:21:17 |
| 13 |     Q    Anyone else that you're aware of? | 15:21:17 |
| 14 |     A    That I'm aware of, no. | 15:21:19 |
| 15 |     Q    And the discrimination was the | 15:21:21 |
| 16 | rescinding of the job offer; right? | 15:21:23 |
| 17 |     A    Yes. | 15:21:25 |
| 18 |         MR. MUSSIG:  Let's look at this.  So | 15:21:48 |
| 19 | I'll mark as Exhibit 16 Mr. Snookal's responses to | 15:21:50 |
| 20 | defendants' interrogatories. | 15:21:56 |
| 21 |         MS. LEAL:  Thank you. | 15:22:09 |
| 22 |         (Exhibit 16 was marked for | 15:22:09 |
| 23 |         Identification by the Certified | 15:22:09 |
| 24 |         Shorthand Reporter.) | 15:22:09 |
| 25 | BY MR. MUSSIG: | 15:22:09 |

| | | |
|---|---|---|
| 1 | A    No. | 15:46:49 |
| 2 | Q    Okay.   So -- so you resigned your | 15:46:51 |
| 3 | position at Chevron; right? | 15:47:01 |
| 4 | A    Yes. | 15:47:07 |
| 5 | Q    You -- you allege that you were | 15:47:08 |
| 6 | constructively discharged? | 15:47:09 |
| 7 | A    Yes. | 15:47:10 |
| 8 | Q    You resigned effective August 20, 2021; | 15:47:11 |
| 9 | correct? | 15:47:11 |
| 10 | A    Yes. | 15:47:15 |
| 11 | Q    And to announce your resignation you | 15:47:15 |
| 12 | sent Thalia Tse -- Tse -- Tse? | 15:47:19 |
| 13 | A    Now -- now I can't get it in my head. | 15:47:25 |
| 14 | Q    I thought it was Tse. | 15:47:27 |
| 15 | A    I think it's Tse. | 15:47:29 |
| 16 | Q    Tse? | 15:47:30 |
| 17 | A    But she told everyone -- she would say | 15:47:30 |
| 18 | her name when you first met her, then she would | 15:47:32 |
| 19 | say to call her "T," and so no one ever said her | 15:47:36 |
| 20 | name after that.  So I don't honestly know how to | 15:47:39 |
| 21 | say her name. | 15:47:43 |
| 22 | Q    All right.  Well, you sent a letter to | 15:47:43 |
| 23 | Thalia T-s-e? | 15:47:45 |
| 24 | A    Yes. | 15:47:45 |
| 25 | Q    A resignation letter on August 4, 2021; | 15:47:47 |

| | | |
|---|---|---|
| 1 | correct? | 15:47:47 |
| 2 | A    Yes. | 15:47:56 |
| 3 | MR. MUSSIG:  What exhibit are we on? | 15:48:00 |
| 4 | 17? | 15:48:02 |
| 5 | THE STENOGRAPHIC REPORTER:  Yes. | 15:48:03 |
| 6 | MS. LEAL:  Yeah. | 15:48:03 |
| 7 | MR. MUSSIG:  I'll mark as Exhibit 17 a | 15:48:03 |
| 8 | letter from Mr. Snookal to Thalia Tse dated | 15:48:05 |
| 9 | August 4, 2021. | 15:48:13 |
| 10 | (Exhibit 17 was marked for | 15:48:13 |
| 11 | identification by the Certified | 15:48:13 |
| 12 | Shorthand Reporter.) | 15:48:13 |
| 13 | BY MR. MUSSIG: | 15:48:13 |
| 14 | Q    Now, I -- I assume you're familiar with | 15:48:26 |
| 15 | this letter? | 15:48:27 |
| 16 | A    I am. | 15:48:27 |
| 17 | Q    You sent it to Ms. Tse on August 4, | 15:48:28 |
| 18 | 2021? | 15:48:33 |
| 19 | A    Uh-huh. | 15:48:33 |
| 20 | Q    Did you -- how did you -- did you | 15:48:34 |
| 21 | deliver it, hand-deliver it, or e-mail it?  How | 15:48:35 |
| 22 | did you get it to her? | 15:48:37 |
| 23 | A    I believe I e-mailed it to her and to my | 15:48:39 |
| 24 | supervisor, but I -- I may have handed my | 15:48:41 |
| 25 | supervisor a copy.  I'm -- I'm honestly not sure. | 15:48:44 |

EXHIBIT E-98

| | | |
|---|---|---|
| 1 | say anything bad about a company that you're | 15:53:33 |
| 2 | leaving, and I saw no benefit to writing it down | 15:53:36 |
| 3 | to people that really don't have anything to do -- | 15:53:40 |
| 4 | any power to affect what I was complaining about. | 15:53:43 |
| 5 | Q    Did you talk to anyone else at Chevron | 15:53:54 |
| 6 | about your resignation? | 15:53:56 |
| 7 | A    No. | 15:53:56 |
| 8 | Q    And I'm not -- again, I'm not trying to | 15:54:01 |
| 9 | surprise. | 15:54:03 |
| 10 | Did you talk to Troy Tortorich? | 15:54:04 |
| 11 | A    I don't believe I did, no. | 15:54:06 |
| 12 | MR. MUSSIG:  I'll mark as Exhibit 18 a | 15:54:19 |
| 13 | document titled "voluntarily termination - | 15:54:21 |
| 14 | GO-439-1," Bates-numbered SNOOKAL-1143. | 15:54:26 |
| 15 | (Exhibit 18 was marked for | 15:54:26 |
| 16 | identification by the Certified | 15:54:26 |
| 17 | Shorthand Reporter.) | 15:54:37 |
| 18 | MS. LEAL:  Thank you. | 15:54:37 |
| 19 | BY MR. MUSSIG: | 15:54:38 |
| 20 | Q    Are you familiar with this document? | 15:54:39 |
| 21 | A    I am. | 15:54:41 |
| 22 | Q    Is it -- is that your signature in the | 15:54:43 |
| 23 | middle of the page? | 15:54:44 |
| 24 | A    It is. | 15:54:45 |
| 25 | Q    And you signed this on August 4, 2021? | 15:54:47 |

**EXHIBIT E-99**

| | | |
|---|---|---|
| 1 | A    I did. | 15:54:49 |
| 2 | Q    And this says: | 15:54:51 |
| 3 | "I wish to resign my | 15:54:52 |
| 4 | employment with the Chevron | 15:54:53 |
| 5 | Products Company effective | 15:54:55 |
| 6 | August 20, 2021, for the following | 15:54:56 |
| 7 | reasons:  I am leaving for an | 15:54:59 |
| 8 | opportunity with significantly | 15:55:01 |
| 9 | increased responsibility." | 15:55:02 |
| 10 | There's no other stated reason for your | 15:55:04 |
| 11 | resignation; correct? | 15:55:07 |
| 12 | A    Correct. | 15:55:08 |
| 13 | Q    Is that true?  You were leaving for an | 15:55:08 |
| 14 | opportunity with a significantly increased | 15:55:10 |
| 15 | responsibility? | 15:55:12 |
| 16 | A    It is a correct statement.  Yeah. | 15:55:13 |
| 17 | Q    Did you discuss with anyone at Chevron | 15:55:17 |
| 18 | in this time period about anything with regard to | 15:55:22 |
| 19 | discrimination or retaliation? | 15:55:27 |
| 20 | MS. LEAL:  Again, that he hasn't already | 15:55:29 |
| 21 | discussed today, I assume. | 15:55:30 |
| 22 | BY MR. MUSSIG: | 15:55:30 |
| 23 | Q    During -- during this -- during the | 15:55:34 |
| 24 | resignation -- | 15:55:36 |
| 25 | MS. LEAL:  Okay. | 15:55:37 |

**EXHIBIT E-100**

| | | |
|---|---|---|
| 1 | BY MR. MUSSIG: | 15:55:37 |
| 2 | Q    -- in connection with the resignation? | 15:55:37 |
| 3 | A    No. | 15:55:39 |
| 4 | Q    And, again, why not? | 15:55:45 |
| 5 | A    The same answer.  There's no point in | 15:55:49 |
| 6 | putting it on this form which is just going to get | 15:55:52 |
| 7 | stuck in my file.  They probably didn't even read | 15:55:55 |
| 8 | it. | 15:55:58 |
| 9 | MR. MUSSIG:  19.  I'm going to mark as | 15:56:14 |
| 10 | Exhibit 19 a document entitled "exit interview." | 15:56:16 |
| 11 | (Exhibit 19 was marked for | 15:56:16 |
| 12 | identification by the Certified | 15:56:16 |
| 13 | Shorthand Reporter.) | 15:56:16 |
| 14 | BY MR. MUSSIG: | 15:56:16 |
| 15 | Q    And you participated in an exit | 15:56:36 |
| 16 | interview with Ms. Tse before you left Chevron; | 15:56:38 |
| 17 | correct? | 15:56:38 |
| 18 | A    I did. | 15:56:42 |
| 19 | Q    And the interview was voluntary; | 15:56:43 |
| 20 | correct? | 15:56:43 |
| 21 | A    Yes. | 15:56:45 |
| 22 | Q    Do you know -- you might not know the | 15:56:48 |
| 23 | answer to this. | 15:56:51 |
| 24 | Do you know whether Chevron only | 15:56:51 |
| 25 | requests this type of exit interview when | 15:56:52 |

**EXHIBIT E-101**

| | | |
|---|---|---|
| 1 | employees leave voluntarily? | 15:56:55 |
| 2 | A    I don't know. | 15:56:57 |
| 3 | Q    Are you familiar with this document, | 15:57:00 |
| 4 | Exhibit 19? | 15:57:01 |
| 5 | A    No. | 15:57:01 |
| 6 | Q    Do you -- if you read through it, is | 15:57:07 |
| 7 | this a fair summary of your exit interview? | 15:57:10 |
| 8 | A    You'll have to give me some time to read | 15:57:13 |
| 9 | through it. | 15:57:15 |
| 10 | Q    Sure. | 15:57:16 |
| 11 | A    It seems accurate. | 16:02:08 |
| 12 | Q    Okay.  Let's see.  Anything in here that | 16:02:09 |
| 13 | you think is inaccurate? | 16:02:18 |
| 14 | A    No. | 16:02:22 |
| 15 | Q    On page 3, question 14, you say that | 16:02:25 |
| 16 | you -- it says: | 16:02:37 |
| 17 | "Based on your overall | 16:02:37 |
| 18 | experience at Chevron, what did you | 16:02:38 |
| 19 | like the least?" | 16:02:40 |
| 20 | And you answered: | 16:02:40 |
| 21 | "Politics." | 16:02:41 |
| 22 | You say: | 16:02:44 |
| 23 | "Example, I was told by my | 16:02:45 |
| 24 | previous manager that the reason I | 16:02:47 |
| 25 | didn't get the GTL because someone | 16:02:48 |

**EXHIBIT E-102**

| | | | |
|---|---|---|---|
| 1 | A | No. | 16:03:27 |
| 2 | Q | "No," that's not right or, "yes," that's | 16:03:29 |
| 3 | right? | | 16:03:31 |
| 4 | A | Yes, that's right.  Sorry. | 16:03:32 |
| 5 | Q | And so you didn't say anything in here | 16:03:33 |
| 6 | about Chevron wanting you to leave; right? | | 16:03:44 |
| 7 | A | I mean, I wouldn't read it that way. | 16:03:54 |
| 8 | Q | What do you mean by that? | 16:03:59 |
| 9 | A | I think that you can take answer 14 and | 16:04:00 |
| 10 | say that Chevron didn't really -- wasn't really | | 16:04:03 |
| 11 | interested in advancing my career which I had | | 16:04:06 |
| 12 | expressed interest in, and so that's, in effect, | | 16:04:08 |
| 13 | telling me that they don't want me to stick | | 16:04:11 |
| 14 | around.  I think that my supervisor not talking to | | 16:04:14 |
| 15 | me very often or being particularly involved in my | | 16:04:17 |
| 16 | career development or my team or my group is a | | 16:04:20 |
| 17 | pretty good indicator that they're not | | 16:04:24 |
| 18 | particularly interested in what I have to do. | | 16:04:27 |
| 19 | And a very long section in question 5 | | 16:04:30 |
| 20 | where I said that my career development and | | 16:04:33 |
| 21 | advancement was poor, when I talked about that all | | 16:04:36 |
| 22 | of these jobs that I've applied for have always | | 16:04:41 |
| 23 | been on my career development plan and I have | | 16:04:44 |
| 24 | never been able to get one, so I think effectively | | 16:04:45 |
| 25 | Chevron was telling me, "We value you -- you for | | 16:04:50 |

**EXHIBIT E-103**

| | | |
|---|---|---|
| 1 | specific things but not for anything that you're | 16:04:55 |
| 2 | interested in." | 16:04:58 |
| 3 | Q    Okay.   So I understand that you felt | 16:04:58 |
| 4 | that your career wasn't progressing as you would | 16:05:01 |
| 5 | like at Chevron, but no one at Chevron wanted you | 16:05:03 |
| 6 | to quit; right? | 16:05:06 |
| 7 | A    I don't know that. | 16:05:08 |
| 8 | Q    Well, that you -- or that you're aware | 16:05:09 |
| 9 | of. | 16:05:12 |
| 10 | A    Not that I'm aware of. | 16:05:12 |
| 11 | Q    And, in fact, didn't your -- didn't | 16:05:15 |
| 12 | you -- Mr. Ruppert and Mr. Curtin were very | 16:05:18 |
| 13 | supportive of you; right? | 16:05:21 |
| 14 | A    Yes. | 16:05:24 |
| 15 | MR. MUSSIG:  And so -- well, let's look | 16:05:29 |
| 16 | at a couple more documents here.  I'll mark as | 16:05:31 |
| 17 | Exhibit 20.  It's a document titled "Mark" -- | 16:05:41 |
| 18 | "Snookal, Mark Chevron year-end performance review | 16:05:47 |
| 19 | 2020." | 16:05:49 |
| 20 | (Exhibit 20 was marked for | 16:05:49 |
| 21 | identification by the Certified | 16:05:49 |
| 22 | Shorthand Reporter.) | 16:05:49 |
| 23 | BY MR. MUSSIG: | 16:05:49 |
| 24 | Q    And take whatever time you need.  This | 16:06:00 |
| 25 | is your performance review from the year 2020; | 16:06:02 |

| | | |
|---|---|---|
| 1 | influencing skills outside | 16:11:35 |
| 2 | El Segundo," et cetera? | 16:11:36 |
| 3 | A    Yes. | 16:11:36 |
| 4 | Q    Okay.  So -- and -- and I think you had | 16:11:38 |
| 5 | testified before that all of your performance | 16:11:40 |
| 6 | reviews talked about opportunities to grow. | 16:11:41 |
| 7 | A    Correct. | 16:11:44 |
| 8 | Q    And so this one does, as well; right? | 16:11:44 |
| 9 | A    Yes.  It's -- it's actually a | 16:11:49 |
| 10 | requirement of writing the performance reviews by | 16:11:50 |
| 11 | the person that writes them that they give you | 16:11:52 |
| 12 | both positive and negative feedback.  I also wrote | 16:11:54 |
| 13 | performance reviews.  So they're all going to have | 16:11:57 |
| 14 | something positive, and, really, they should have | 16:11:59 |
| 15 | some area for development.  Otherwise, they're a | 16:12:02 |
| 16 | waste of time. | 16:12:05 |
| 17 | Q    Sure.  So no one at Chevron asked you to | 16:12:06 |
| 18 | leave; right? | 16:12:09 |
| 19 | A    No. | 16:12:10 |
| 20 | Q    "No," that's not right or -- | 16:12:12 |
| 21 | A    Or no one asked me to leave. | 16:12:14 |
| 22 | Q    Okay.  And did your supervisor when you | 16:12:15 |
| 23 | spoke to him, Mr. Curtin, indicate that he would | 16:12:17 |
| 24 | prefer you stay? | 16:12:20 |
| 25 | A    He did. | 16:12:22 |

**EXHIBIT E-105**

1                    DEPONENT'S DECLARATION

2

3            I, MARK JORDAN SNOOKAL, hereby declare:

4            I have read the foregoing deposition,  I

5        identify it as my own, and I have made any

6        corrections, additions or deletions that I was

7        desirous of making in order to render the within

8        transcript true and correct.

9

10       _____,_____.
                    (Date)                  (City and State)

11

12                                _____
                                        (Signature)

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT E-106

```
 1    STATE OF CALIFORNIA   )
                            ) SS.
 2    COUNTY OF VENTURA     )

 3          I, John M. Taxter, a California Certified

 4    Shorthand Reporter, Certificate No. 3579, a

 5    Registered Professional Reporter, do hereby

 6    certify:

 7          That the foregoing proceedings were taken

 8    before me at the time and place therein set forth,

 9    at which time the deponent was put under oath by

10    me; that the testimony of the deponent and all

11    objections made at the time of the examination

12    were recorded stenographically by me and were

13    thereafter transcribed; that the foregoing is a

14    true and correct transcript of my shorthand notes

15    so taken.

16          I further certify that I am neither counsel

17    for nor related to any party to said action.

18          The dismantling, unsealing, or unbinding of

19    the original transcript will render the Reporter's

20    Certificate null and void.

21          Pursuant to Federal Rule 30(e), transcript

22    review was requested.

23    Dated May 22, 2024.

24    _____
      JOHN M. TAXTER
25    California Certified Shorthand
      Reporter No. 3579, RPR
```

**EXHIBIT E-107**

1

2

3

4          I, John M. Taxter , Certified Shorthand Reporter,

5     CSR No.   3579, hereby certify:

6          The foregoing is a true and correct copy of the

7     original transcript of the proceedings taken by me

8     as thereon stated.

9

10

11

12     Dated:   May 23, 2024
                 _____

13

14

15

16                                 _____
                                   John Taxter, CSR No. 3579

17

18

19

20

21

22

23

24

25

Abrams, Mah & Kahn

**EXHIBIT E-108**

# EXHIBIT E-1



## Assignment Offer

**To**: Mark Snookal

Contingent upon obtaining work/residence permit clearances where applicable and Company medical suitability for assignment where required by law (and/or related to your job and consistent with business necessity), you are offered the following assignment:

**Job Title**: EGTL Reliability Engineering Manager
**Salary Grade**: 22
**Position Type**: Career Ladder
**Base Salary**: No Change
**Competitive Objective**: No Change
**Location**: Escravos, Nigeria
**Anticipated Assignment Start Date**: July 1, 2019
**Anticipated Length**: 3-4 Years
**Offer Type**: Assignment Offer
**Assignment Subtype**: Resident greater than 24 months (Intl)
**Host Organization**: Africa / Latin America
**SBU**: Nigeria Mid-Africa
**Function**: Facilities Engineering
**Sponsor**: Vang, Bao - BAVU
**Supervisor(s)**: OLUWASIJIBOMI OKEOWO
**PDR(s)**: Omomehin, Andrew-AAOM
**HRBP**: NWAMAKA ANITA AJAYI

All details regarding your new expatriate work location and expatriate benefits will be provided to you directly from the position owner, or in some cases, through authorized HR contacts. In the interim, you can access the Expatriate Resources website to learn more about expatriate assignments. If you have specific questions regarding your expatriate assignment, please contact your Global Mobility Specialist/Expatriate Counselor. You can find your Global Mobility Specialist/Expatriate Counselor by searching the Counselor Finder which is also located on the Expatriate Resources website.

The attached details cover the compensation, relocation and other policies and programs that currently apply to this position and location (where applicable).  Where applicable, it is important to complete specific pre-assignment requirements (e.g. medical, orientations, etc., see attached letter) of your assignment.  If you fail to fulfill these requirements within the identified time frame, you will be deemed to have declined the job offer.  Though the Company expects that your assignment will continue as described, special circumstances or a change in business conditions or policies and programs may result in a modification of the assignment or its duration, including elimination of the assignment (where applicable) at the sole discretion of the Company and/or Receiving Organization.  Nothing in this Offer changes the "at-will" status of your



Page 1 of 4

employment.

Please advise your HRBP (for domestic assignments) of your effective transfer date. For international assignments, please advise your Expatriate Assignee Counselor of your departure date (date you board the plane to start your assignment), since that becomes your actual assignment effective date and begins your over-base allowance and premium. I accept this assignment.


Signed: _____      Date: _____

                Employee


I do not accept this assignment. I understand that the Company might not place me in another assignment and that I may be subject to termination of employment.


Signed: _____      Date: _____

                Employee


**The completed form should be emailed to the Sponsor Group at SPGRP@chevron.com within one week of receiving this offer.** If we do not receive an acceptance within the deadline specified on this note, you will be deemed to have declined the job offer. Note: Any hand written changes will not be honored.  Please contact your Sponsor to discuss corrections or revisions prior to signing.

Special Instructions (if you are US-payroll, please disregard the following sections):

For Non US-Payroll Employees Only:
U.S. Export Controls/Trade Sanctions Compliance: U.S. export controls and trade sanctions can restrict the Company's ability to share certain technologies with employees who are non U.S. nationals (i.e. those who are not U.S. citizens, those who are not permanent residents, and those who do not enjoy protected individual status such as refugees or asylees). If our understanding of your immigration status is incorrect, please let us know immediately.

If your employment is subject to U.S. export license and/or trade sanction authorization requirements, your employment may not commence until Chevron receives the required license and/or authorization from the U.S. government; obtains approval of your work visa; and receives Company medical suitability for assignment (where required). While Chevron has been successful in obtaining U.S. export licenses and/or trade sanctions authorizations in the past, Chevron cannot guarantee the issuance of an export license and/or trade sanction authorization request. Similarly, Chevron cannot make any guarantee as to the timing for the U.S. government's processing of the export license and/or trade authorization application. Chevron reserves the right to modify your employment location, duties and assignments, if such modification is required or necessitated by the terms of any U.S. export license and/or trade sanctions

SNOOKAL-00648

**EXHIBIT E-1-2**

authorization. Chevron also reserves the right to rescind this offer of employment if a required export license and/or trade sanction authorization is not granted.

### For UK-Payroll Employees Only: Mobility Clause

The demands of the Company's business and organization make it necessary for its employees to be able to transfer from place to place. It is therefore a condition of your employment that:

> (1) at any time during your employment with the Company you may be required, at the Company's absolute discretion, to transfer to any of the locations in the UK in which Chevron is from time to time located, either on a temporary or a permanent basis; and

> (2) at any time when you are on temporary expatriate assignment outside the UK, and regardless of the originally agreed or intended length of that particular assignment, you may be required, at the Company's absolute discretion, either to repatriate to the UK or to transfer to any of the locations in which Chevron is from time to time located (which you accept and acknowledge may be another location outside the UK).

In either instance, you will be given reasonable notice of any such requirement and where a permanent transfer within, or a repatriation to, UK is required, the Company's relocation and other applicable policies may apply, as appropriate.

### If I agree to the mobility clause, what will this mean for me in the future?

You will continue to be considered for positions both in your home country and on a global basis in accordance with Chevron's established policies and procedures and in line with your career aspirations, skills and experience.

### Will the Company use this in future to transfer me to a hardship location?

This is not the driver for introducing such a clause. The business wishes to be able to place the right employees, into the right jobs, at the right time, regardless of where those jobs are located. In operating the mobility clause, the Company will always act reasonably and will take into consideration personal preferences where possible.

### If I agree to the mobility clause, what would happen in the future if my mobility status changed and I was unwilling or unable (for example, for personal or health reasons) to move to a certain country?

If you advise the Company that you are no longer mobile, at the end of your existing assignment you will be repatriated to the UK and suitable alternative employment will be sought. If no suitable role is identified, you will be at risk of redundancy. If notice of redundancy is served, redundancy terms at that time will apply.

### If I don't accept the mobility clause, what will happen to me?

If you do not wish to accept the mobility clause, the job offer will be withdrawn and you will be repatriated to the UK. You will enter a period of redeployment and a search for suitable alternative employment will be undertaken. If no suitable role is identified, you will be at risk of redundancy. If notice of redundancy is served, redundancy terms at that time will apply.

### What if I am willing to agree to the clause but I don't agree with the wording of it? Can I make changes to the clause and still accept the offer?

No, no changes to the clause will be agreed by the Company and you will be deemed to have declined the offer unless you agree to the mobility clause as it is presented with

SNOOKAL-00649

**EXHIBIT E-1-3**

your offer.

SNOOKAL-00650

**EXHIBIT E-1-4**

# EXHIBIT E-3



**Chevron**

Medical Suitability for Expatriate Assignment History & Physical Examination
GO-146-MSEA

Mark Snookal

CAI - MVZM

07-24-15

Initial
Nigeria

Note to Examinee and Examiner: In the US, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information for any U.S. based employees (whether within the U.S. or outside the U.S. on assignment) when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. Local or Host Country legal requirements may also apply.

**Part A. Examinee: Please complete Parts A through F prior to exam**

| F.I.  M.I  Last Name | First Name | CAI | Gender | | | | |
|---|---|---|---|---|---|---|---|
| Mark Snookal | | MVZM | M | | | | |

| Current Job Title | New Job Title* | Current Company/BU/OpCo | Next * Company/BU/OpCo | Current Location | Next * Location |
|---|---|---|---|---|---|
| IEA Reliability Team Lead | Reliability Engineering Manager | ESE | NMASBU | El Segundo CA USA | Escravos, Nigeria |

*If Applicable

**Part B.** Your country of assignment may or may not have full medical resources to support your health needs. Please answer the following questions as accurately as possible and check 'N' (no) or 'Y' (yes) in the column. Answers with Yes, please provide more information in the description boxes. This information is used to promote your safety and ensure your health needs can be met.

| | (If need, please use back page) | N | Y | Description |
|---|---|---|---|---|
| 1. | Do you have any medical, physical or psychological conditions under the care of a health professional? If yes, please describe. | ☐ | ☒ | I have a dilated aortic root. I am under the care of a cardiologist and see him once per year for a checkup. I have consulted with him on this assignment and he sees no issues with it. |
| 2. | (a) Are you taking any medicines that require a prescription? If yes, please list. | ☐ | ☒ | Losartan and Amlodipine |
| | (b) Are you taking any non-prescription medicines on a frequent basis? If yes, please list. | ☒ | ☐ | |
| 3. | (a) Do you have any allergies? | ☒ | ☐ | |
| | (b) Have you ever had severe allergic reactions? If yes, do you know what caused it? | ☒ | ☐ | |
| 4. | Do you exercise for at least 30 minutes 3 times a week, on average? | ☐ | ☒ | |
| 5. | (a) Do you feel unusual fatigue or sleepiness? | ☒ | ☐ | |
| | (b) Do you have any problems sleeping? | ☒ | ☐ | |
| | (c) Do you use sleeping aids, including medication? | ☒ | ☐ | |
| 6. | Have you ever experienced health problems working in extreme weather conditions? | ☒ | ☐ | |
| 7. | Have you experienced unexplained weight loss or gain? | ☒ | ☐ | |
| 8. | (a) Do you smoke? If yes, what and how much each day? | ☒ | ☐ | |
| | (b) Did you smoke regularly for more than 1 year ever in your past? | ☒ | ☐ | |
| 9. | Do you drink alcoholic beverages? If yes, what is your average weekly intake? | ☒ | ☐ | |
| 10. | Have you ever required a medical evacuation from a work location? If yes, what was the reason? | ☒ | ☐ | |

EX. 3
FOR ID
5/10/24 8mT

07/24/2019 7:38AM  FAX                                                                    ⌀0010/0024

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

| | | | | |
|---|---|---|---|---|
| 11. | Have you ever had any mental health or psychological issues requiring at least a medical prescription? If yes, please describe | ☐ | ☒ | I was treated for depression with Effexor for a few years from approximately 1994-1996 |
| 12. | Have you been in the emergency room and or hospitalized within the last six months? | ☒ | ☐ | |
| 13. | Have you undergone any surgical procedure or operations within the last six months? | ☒ | ☐ | |
| 14. | Did you have a physical (periodic, preventive) exam within the past two years? | ☐ | ☒ | |
| 15. | Would you need health/medical resources for any disabling or special condition in the country of assignment? | ☒ | ☐ | |
| 16. | Would you like to schedule a discussion with a Chevron Physician or Regional Medical Manager to discuss further a health condition or learn more about the host country medical resources? | ☒ | ☐ | |
| 17. | Does your new position require you to work or travel Offshore, In Field/Plant or Strictly Office?  Please advise if you need additional certifications for your new position (e.g. HUET/BOSIET, Oil and Gas U.K.) | ☐ | ☐ | My position is strictly office |

**Part C. Please answer the following questions and check 'N' (no) or 'Y' (yes) in the column. If 'Y' please describe.**

| | Have you had any illness or condition related to the following body parts or systems? (minor conditions do not need to be mentioned): | N | Y | Description: |
|---|---|---|---|---|
| 18. | Head and Neck | ☒ | ☐ | |
| 19. | Eyes or Visual | ☒ | ☐ | |
| 20. | Ear, Nose and Throat | ☒ | ☐ | |
| 21. | Teeth<br>(a) When was your last exam?<br>(b) Is there any dental work pending? Please describe | ☐<br>☒ | ☐<br>☐ | 11/2017 |
| 22. | (a) Chest such as shortness of breath, chronic cough.<br>(b) Breasts | ☒<br>☒ | ☐<br>☐ | |
| 23. | Heart such as chest pain, palpitations or irregular beating | ☐ | ☒ | I have PVC's which have been evaluated by a cardiologist and do not require any treatment |
| 24. | Abdomen such as pain, hernias, abnormal bowel movement | ☐ | ☒ | I had my gallbladder removed in 2014 |
| 25. | Kidney, bladder or genital area | ☒ | ☐ | |
| 26. | Spine and Musculo-skeletal, movement limitations or pain | ☒ | ☐ | |
| 27. | Skin changes such as rash, spots, moles or itching | ☒ | ☐ | |
| 28. | Epileptic seizures, dizzy spells or migraine | ☒ | ☐ | |
| 29. | Diabetes or increase in blood sugar | ☒ | ☐ | |
| 30. | Anemia or other blood conditions | ☒ | ☐ | |
| 31. | Tuberculosis (TB) or positive TB test, skin or blood (e.g. TB spot, IGRA/Quantiferon®) | ☒ | ☐ | |
| 32. | Any other health problems<br>(Please use space below.  If need, use back page) | ☒ | ☐ | |

Page 2 of 6

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00606

**EXHIBIT E-3-2**

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## Part D. Exposure History (Employee Only)

Have you ever been exposed at work to dusts, solvents, other chemicals or any other known workplace hazards, e.g. biological agents?

☒ Yes   ☐ No

If YES, please list agents with dates and for how long:

I have worked in industrial and petrochemical locations from 1990  present

Have you ever been exposed in the workplace to:

☒ Noise   ☐ Radiation/X-ray Equipment   ☐ Vibrating Hand Tools   ☐ Repetitive Movement   ☐ Weight Lifting   ☐ Other

If you checked one of the boxes above, please specify for how long, and whether Personal Protective Equipment (PPE) was used:

In my work in industrial and petrochemical locations from 1990  present I have been exposed to noise but have always used PPE.

## Part E. Occupational History (Employee Only)

Have you ever been part of a medical (health) surveillance program through your work due to exposure to workplace hazards?  e.g. Part of a hearing conservation program due to exposure to workplace noise.

☒ Yes   ☐ No

If YES, please list with dates:

I am currently in a hearing conservation program in my employment with Chevron El Segundo

## Part F. Family History

To comply with the US Genetic Information Nondiscrimination Act of 2008, this part should NOT be completed for any US based employees (whether in the U.S. or outside the U.S. on assignment).   Any information inadvertently provided for a US employee in this section should be redacted if the form is to be sent to the US for filing in the employer's medical record. Local related legislation may be also applicable.

Are there any medical conditions within your family relevant to be mentioned?

Physician Comments:

Have you ever been employed with Chevron or examined for employment by Chevron?

☐ No   ☒ Yes   If yes, when  At hiring at Chevron El Segundo in 2009

### EXAMINEE:

I certify that the information given by me is true and I authorize the examiner to furnish the results of this examination and other related medical investigation results to either the Chevron Regional Medical Managers or the Chevron Global Health and Medical facility. I acknowledge and agree that the results of this medical evaluation are managed by Chevron in a secure and confidential data system that will store and may transmit information to countries other than where the medical examination takes place, including but not limited to the U.S.

FOR APPLICANT ONLY: I understand that any misrepresentation, false statement or omission herein may result in the company rejecting my application, withdrawing any offer of employment, or terminating my employment at any time.

Examinee Signature _____     Date (mm/dd/yyyy)  7/18/2019

SNOOKAL-00607

**EXHIBIT E-3-3**

07/24/2019 7:37AM  FAX                                                    ☐0012/0024

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## Part G. PHYSICAL EXAMINATION. To be completed by Health Care Provider

### Vital Signs

| HEIGHT ft/cm | WEIGHT lb/kg | BMI | Abdominal Circumference in/cm | B.P. (mmHg) | PULSE | Temperature (°C/°F) |
|---|---|---|---|---|---|---|
| 72" | 256 lbs | 34.7 | | 135/78 | 53 | 97.5 |

### Vision

| | Uncorrected | | | Corrected | | | Depth | Tonometry | Color Vision | Visual Fields |
|---|---|---|---|---|---|---|---|---|---|---|
| | Both | Right | Left | Both | Right | Left | | | | |
| Far | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ 1Ç | 20/ 6/ ∞ | 20/ 6/ 1© | | | Normal | |
| Near | J# | J# | J# | J# / ← | J# / F | J# / F | | | | |

| N | A | N = Normal. A = Abnormal, please describe | DESCRIPTION | | | | | |
|---|---|---|---|---|---|---|---|---|
| ☑ | ☐ | 1. | General Appearance | | | | | |
| ☑ | ☐ | 2. | Head | | | | | |
| ☑ | ☐ | 3. | Ear, Nose Mouth and Throat | | | | | |
| ☑ | ☐ | 4. | Neck | | | | | |
| ☑ | ☐ | 5. | Eyes | | | | | |
| ☑ | ☐ | 6. | Chest | | | | | |
| ☑ | ☐ | 7. | Breasts | | | | | |
| ☑ | ☐ | 8. | Respiratory System | | | | | |
| ☐ | ☐ | 9. | Cardiovascular System | occas ectopics (PVC's) | | | | |
| ☑ | ☐ | 10. | Abdomen, Viscera/Hernias | | | | | |
| ☑ | ☐ | 11. | Genito-urinary | | | | | |
| ☑ | ☐ | 12. | Lower GI Tract | | | | | |
| ☑ | ☐ | 13. | Extremities | | | | | |
| ☑ | ☐ | 14. | Spine and Musculo-skeletal. Range of Motion. | | | | | |
| ☑ | ☐ | 15. | Skin and Lymphatic System | | | | | |
| ☑ | ☐ | 16. | Central Nervous System | | | | | |
| ☑ | ☐ | 17. | Peripheral Nervous System Reflexes | | | | | |
| ☐ | ☐ | 18. | Others, please specify | | | | | |

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00608

**EXHIBIT E-3-4**

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## LABORATORY AND SPECIAL TESTS

| N | A | Not Done | AS INDICATED | RESULTS. N = Normal. A = Abnormal, please describe |
|---|---|---|---|---|
| ☐ | ☐ | ☑ | Audiogram | |
| ☐ | ☐ | ☑ | Chest X Ray | |
| ☑ | ☐ | ☐ | Complete Blood Count | |
| ☐ | ☐ | ☑ | Drug Screening | |
| ☐ | ☑ | ☐ | ECG | |
| ☐ | ☐ | ☑ | Pulmonary Function | |
| ☑ | ☐ | ☐ | Serum Profile/Chemistries | |
| ☐ | ☐ | ☑ | Stress Test | |
| ☑ | ☐ | ☐ | Urinalysis | |
| ☐ | ☐ | ☐ | Others, please specify | |

REMARKS; Describe significant / abnormal findings/limitations noted above (if need, please use back page)

① PVC's - frequent asymptomatic followed by cardiology
② Dilated aortic root followed by cardiology
ongoing studies yearly Echo us CT chest
stable on meds

If any abnormalities were found during the examination, was examinee informed?   ☑ Yes   ☐ No

## Part H MEDICAL RECOMMENDATION

### H.1. Fitness for Duty Classification, ONLY FOR INTERNAL CHEVRON USE

| | |
|---|---|
| ☐ | A. Fit for Duty |
| ☑ | B. Fit for Duty with Restrictions |
| ☐ | C. Not Fit for Duty |
| ☐ | D. Failed to comply with requested evaluations, due to: |

### H.2. Restrictions pertinent to Job Requirements (refer to GO-308)

No heavy lifting >50 lbs
needs review of
recommend letter from
cardiologist to clear him

| Examiner's Name (please print) | Signature | Date (mm/dd/yyyy) |
|---|---|---|
| IRVING SOBEL MD | I. Sobel MD USA | 07/24/2019 |
| Address | | Chevron Provider Number |
| 4676 ADMIRALTY WAY 4th FLOOR MDR CA 90292 | | 1 1 4 0 8 |
| Street  City  State / Province  Postal / Zip Code  Country | | |

| Chevron Global Health & Medical Approval (please print name) | Signature | Date (mm/dd/yyyy) |
|---|---|---|
| | | |

GO-146- MSEA (6-18)
Word Electronic Version

SNOOKAL-00609

**EXHIBIT E-3-5**

07/24/2019 7:37AM  FAX                                                    ☑0014/0024

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

**PLEASE ATTACH COPIES OF IMPORTANT REPORTS OF CURRENT INTEREST.**
If available, Form GO-308 (Physical Requirements and Working Conditions) must be included.

GO-146 - MSEA (5-18)
Ward Electronic Version

SNOOKAL-00610

**EXHIBIT E-3-6**

# EXHIBIT E-4



**KAISER PERMANENTE.**

7/29/2019                                    MR# ████████

Re: Mark J Snookal

████████████████

Dear Sirs,

Mr. Snookal is under my care for his heart condition. It is safe for him to work in Nigeria with his heart condition. His condition is under good control and no special treatments are needed.

If you have any questions, please feel free to contact me at the number below.

Sincerely,

Electronically signed by,

S. KHAN MD
Attending Cardiologist, Division of Cardiology, SCPMG
Clinical Associate Professor, UCLA School of Medicine
Ph: ████████
7/29/2019
10:14 AM



SNOOKAL-00665

**EXHIBIT E-4-1**

# EXHIBIT E-5



**Chevron**

## Expatriate Exam Recommendations GO-1769

**Examiner: When completed, please forward to the Chevron regional medical manager office checked below:**

☐ Americas: Chevron Health and Medical, P.O. Box 6024, San Ramon, CA , USA 94583
☐ Asia / Pacific Region: Chevron International Pte LTD, Health and Medical, Chevron House, 30 Raffles Place #21-01, Singapore 048622
☒ Europe / Eurasia / Middle East / Africa: Chevron Health and Medical 1 Westferry Circus, Canary Wharf, London, UK, E14 4HA
☐ Chevron Shipping Medical Manager, 6101 Bollinger Canyon Road, BR1, Room 4646, San Ramon, CA, USA  94583
☐ Other Chevron Medical Facility:

### Part A – Examinee Information
For medical confidentiality, please complete one form per examinee. If the examinee is a dependent, please complete Part B below

| Last Name SNOOKAL | First Name MARK | MI | CAI MVZM | Birth Date (mm/dd/yyyy) | ☒ Male ☐ Female | Examinee ID |
|---|---|---|---|---|---|---|

| Job Title IEA RELIABILITY TEAM LEAD | Operating Company | Current Work Location EL SEGUNDO, USA | Destination Location ESCRAVOS, NIGERIA |
|---|---|---|---|

### Part B:  Chevron Employee Information
If the examinee is a dependent, please complete this section with the Chevron employee information.

| Last Name | First  Name | CAI | Chevron Employee ID |
|---|---|---|---|

| Job Title | Operating Company | Current Work Location | Destination Location |
|---|---|---|---|

Number of dependents in Host Location:

### Part C – OpCo / Business Unit Contact – Human Resources, Sponsor (if applicable), other.

| Name | Phone No. | Date (mm/dd/yyyy) |
|---|---|---|

| Contact Address | City | State/Province | Postal/Zip Code | Country |
|---|---|---|---|---|

### Part D – Examination - *The recommendation below is based on a review of the medical history and physical examination.*
Exam Type:    INITIAL EXPAT EXAM (ROTATIONAL)

Date of Exam (mm/dd/yyyy):    07/24/2019       Exam Location:   MEL DEL RAY

State/Province:   CALIFORNIA          Country:   USA

**Disposition**
☒ *Employee*
  ☐ FIT for Duty
  ☒ NOT FIT for Duty
  Describe:        REMOTE LOCATION. CAN BE CLEARED FOR ASSIGNMENT IN LAGOS
  ☐ FIT for Duty with Limitation(s) (list below and provide estimated duration of limitations)
  Describe:

  ☐ Failed to comply with requested evaluations
  Describe:

  Exam Periodicity: ☐ One Year    ☐ Two Years    ☐ Other
☐ *Dependents*
  ☐ Cleared
  ☐ Not Cleared
  Describe:

  ☐ Cleared with Limitation(s) (list below and provide estimated duration of limitations)
  Describe:

  ☐ Failed to comply with requested evaluations
  Describe:

  Exam Periodicity: ☐ One Year    ☐ Two Years    ☐ Other

*Handwritten note: EX 5  FOR ID  5/10/24 SMT*

| Examiner Name (please print) DR. ASEKOMEH ESHIOFE | Signature | Date (mm/dd/yyyy) 08/15/2019 |
|---|---|---|

| Address CHEVRON HOSPITAL | City WARRI | State/Province DELTA | Postal/Zip Code | Country NIGERIA |
|---|---|---|---|---|

GO  1769 (9-13)

SNOOKAL-01099

# EXHIBIT E-6

From: Levy, Scott
Sent: 26 August 2019 00:51
To: Steven H. Khan <█████████████>
Cc: Mark Snookal <█████████████>
Subject: Re: [**EXTERNAL**] Patient MS

Dr. Khan,

Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss.

Scott

Sent from my iPad

On Aug 23, 2019, at 10:35 PM, Steven H. Khan <█████████████> wrote:

> Hi Dr. Levy,
> I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
> I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern
> about his aortic aneurysm.
>
> I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this
> email.
>
> Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-
> 4.2 cm on his most recent CT scan.
> From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0
> and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).
>
> Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm
> has not changed between his CTs in May 2016, May 2017, and April 2019.
> Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the
> published 2% number above which would be based on "average" growth rates.
>
> Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our
> understanding of aortic aneurysms.
> For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers
> (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
> Is on an ARB.
>
> In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and
> likely less than 2% per year.
> The risk is primarily related to further enlargement of the aneurysm which can be tracked with an
> annual CT scan.
>
> If you have any further questions, please feel free to email me or call me.
>
> Best regards,
>
> S. Khan, MD
> Clinical Associate Professor, UCLA School of Medicine
> Heart Failure and Transplant Cardiology, Kaiser Permanente



Ex. 6
FOR ID
5/10/24 9MT

**EXHIBIT E-6-1**

NOTICE TO RECIPIENT: If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

SNOOKAL-00090

**EXHIBIT E-6-2**

# EXHIBIT E-7

## Snookal, Mark

| | |
|---|---|
| **From:** | Levy, Scott |
| **Sent:** | Monday, September 16, 2019 4:20 AM |
| **To:** | Snookal, Mark |
| **Subject:** | medical |



Mark,

I spoke with Andrew Powers who briefed me on your recent discussion with him and let me know that you were waiting on written documentation and perhaps further explanation of your recent MSEA (medical suitability for expat assignment) examination. I'll do my best to explain in writing but also happy to further discuss live.

As you know, foreign assignments (including, Escravos Nigeria) can be in locations where access to critical prescription medications or medical care is extremely limited. For these and other reasons, we conduct an MSEA to confirm that an employee is medically able to work in the new job and location.

I understand that you are willing to take the risk of potentially dying on the job, and that you do not feel it is the company's place to make that decision for you. I agree to a certain extent and recognize your concerns about paternalism. However, the company does have a right to not engage individuals where their assignment could pose a "direct threat" to their own health and safety.

We certainly don't believe that every employee with a health condition poses a direct threat; we need to analyze the condition and the attributes of the job. When there are ways of ameliorating the risks (including reasonable accommodations) we work with the individual to do so. I became involved on your case when you had requested a second opinion on the initial denial and with your consent involved your treating physician to better understand your specific risk. While reasonable professionals can debate the exact percentage, we are dealing with an established risk that is several magnitudes higher than the baseline and is a realistic possibility. We respectfully disagree that this finding (regardless of the exact percentage) is based on stereotypes, as distinguished from objective medical evidence. But the risk itself is not determinative. The concern is that if the condition were to occur, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos. There is no medical capability to manage this type of emergency in Escravos or anywhere near Escravos. It is also clear that the duration of your condition is not limited and is continually present, and the occurrence is not predictable and it's not possible to isolate triggers to reduce the risk.

We have no problems with you working in El Segundo and believe there are many other foreign locations where you could work. We in fact discussed whether you could perform this particular job at a different location in Lagos, but it wasn't possible.

In response to your question, I would not foresee issues with you working in the following locations:

Americas: US onshore operations, San Ramon, Houston, Calgary, Vancouver, St. John, Argentina (Buenos Aires); Colombia (Bogota); Brazil (Rio de Janeiro), Trinidad (Port of Spain)

Asia Pacific: Singapore, Australia (Perth based), Hong Kong, New Zealand, Thailand (Bangkok, Rayong, Sirai Chi); South Korea (Seoul, Ulsan, Geoje), Philippines (Manila), China (Beijing, Shanghai), Japan Metropolitan; Malaysia (Kuala Lumpur); Pakistan Metropolitan

EEMEA: UK (all locations), Belgium (all locations), Denmark (all locations), France (all locations), Italy (all locations), Netherlands (all locations), United Arab Emirates (all locations), Norway (all locations), Germany (all locations), Sweden (all locations), South Africa (all locations), Bahrain (all locations), Qatar (all locations), Kuwait (all locations), Turkey (all locations), Poland (all locations), Saudi Arabia (all locations), Nigeria (Lagos), Russia (Moscow)

I'd need to do a more specific assessment for:

Americas: US offshore operations (Deepwater), Colombia (Riohacha); Argentina- Nuquen, Colombia –Rio Hacha, Guatemala, Panama, Mexico, Brazil Offshore, Kitimat (Canada)

SNOOKAL-00645

**EXHIBIT E-7-1**

AP: Australia (Barrow Island, Onslow, Dampier, Karratha, Thevenard Island & Wheatstone offshore); Bangladesh (Dhaka); China (Chengdu, Tianjin, Tanggu); Indonesia (Jakarta, Sumatra, Balikpapan); Malaysia (Lumut); Thailand (Songkla, Nakorn Srithammarat - NST, Offshore); Vietnam; India

EEMEA: Angola (Luanda); Nigeria (Lekki, Abuja), Azerbaijan (all locations), Ukraine (all locations), Romania (all locations), Rep. of Congo (Pointe Noire), Morocco (all locations), Egypt (all locations), Russia (outside Moscow).

I'd be quite concerned about other locations.  As I mentioned above, I'd be more than happy to discuss this with you further.

Scott

**Scott Levy**
Regional Medical Manager, Europe, Eurasia, Middle East & Africa
TR & HM COE

Chevron Products UK Limited
1 Westferry Circus
Canary Wharf
London E14 4HA
Office-   +████████████   (Also serves 24/7 medical emergency support)
Fax-     +████████████
Mobile- +████████████
CTN- ████████
████████████

Chevron Malaria Hotline for any questions about symptoms or treatment- +1 866 276 5118

### Important Message from the Global Privacy Team

Remember that when it comes to sharing personal data, less is more. Do not share more information than is being requested from you. Share information securely and follow company policy by encrypting emails and attachments that contain sensitive personal data.  Before clicking "send" on an email, double-check that the email is addressed to the people you actually want it to go to!  Do not forward emails containing detailed information about a patient's health or wellbeing when a summary would suffice. Wherever possible, anonymize personal data by removing patient names and other individual identifiers.  Finally, don't hesitate to contact the Global Privacy Team if you have any questions: privacy@chevron.com

SNOOKAL-00646

**EXHIBIT E-7-2**

# EXHIBIT E-8

| From: | Powers, Andrew < ███████████████ > |
|---|---|
| **Sent:** | Friday, September 6, 2019 7:57 AM |
| **To:** | Snookal, Mark |
| **Cc:** | Tse, Thalia; Ruppert, Austin |
| **Subject:** | RE: Rescinded Job Offer in Nigeria |

Mark,

Thanks for your email and I hear your concerns.

I've reached out to the Medical Department and while I'm not privy to any medical information, I understand a thorough review was conducted and alternatives were explored. We would respectfully disagree that the determination was based on stereotyping or impermissible discrimination.

In terms of next steps, we will ensure you have a position in El Segundo. However, the PDC is also exploring alternative expat and domestic assignments and we should have more information on that soon.

Regards,

**Andrew Powers**
HR Manager, El Segundo Refinery
██████████████████

*This message may contain confidential information and is intended only for the use of the parties to whom it is addressed. If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any information in this message is strictly prohibited. If you have received this message by error, please notify me immediately at the telephone number listed above.*

**From:** Snookal, Mark < ██████████████████ >
**Sent:** Wednesday, September 4, 2019 7:21 AM
**To:** Powers, Andrew C < ████████████████ >
**Cc:** Tse, Thalia < ██████████ >; Ruppert, Austin < ██████████████ >
**Subject:** Rescinded Job Offer in Nigeria

Andrew,

I am very disappointed in the decision by Chevron Medical to classify me as "unfit" for the Reliability Engineering Manager position at EGTL. I believe this decision was made based on a lack of understanding and stereotypical assumptions about my medical condition and is, therefore, discriminatory in nature. As my condition does not affect my ability to perform the job duties of that position, I require no ongoing care outside of annual monitoring, working in a remote location does not affect my condition, a complication from my condition would cause no harm to others, and I have no work restrictions from my physician this decision seems excessively paternalistic.

After the initial finding of "unfit," I appealed the decision, and Chevron Medical requested permission to contact the specialist who cares for me, and I agreed. That specialist sent an email to Chevron Medical, stating that my condition is stable and has been for three years and that the risk is "low." That same physician had earlier provided me with a letter stating that "it is safe for him [me] to work in Nigeria...His [my] condition is under good control, and no special treatment

1

**EXHIBIT E-8-1**

is needed." Which I provided to Chevron Medical before they made their initial determination of "unfit." Additionally, I passed all aspects of the regular examination, and the issue arises purely from a question about medical history.

Aside from my complaint of medical discrimination, where does their decision leave me? I spoke with the manager I would have reported to in Nigeria this morning, and they are rescinding the offer, but my position in El Segundo has already been filled.


Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel ███████████
Mobile ███████████

**EXHIBIT E-8-2**

# EXHIBIT E-10

| | |
|---|---|
| **From:** | Ruppert, Austin < ████████████ > |
| **Sent:** | Thursday, September 5, 2019 1:28 PM |
| **To:** | Tortorich, Troy; Tse, Thalia; Powers, Andrew |
| **Subject:** | FW: Positions in 2H PDC |

All,

Update from Mark on his review of the PDC as well as a previously discussed new role/group here

**From:** Snookal, Mark < ████████████ >
**Sent:** Thursday, September 5, 2019 1:21 PM
**To:** Ruppert, Austin < ████████████ >
**Subject:** Positions in 2H PDC

Austin,

Looking through the postings I see three possible positions:

EBU - TCO - Instrument & Control Maintenance Supervisor (PSG 21-24, FL 3-6, Expat Eligible) – According to Scott Levy, Regional Medical Manager EEMEA, I would be considered "unfit" at TCO as well

DS&C - MFG - El Segundo Routine Maintenance General Team Lead (PSG 23) – This is on my career development plan, and I believe I am well qualified for this position

DS&C - MFG - El Segundo Operating Assistant (PSG 22-23, Contingent, 2 Positions) – This is also on my career development plan, but this posting is for the degree required OA positions, and I do not have a degree

While Kit Deaver and Tim Sutherland were still here, they had discussions around forming an analyzer group that incorporated Engineering, Maintenance, and Reliability under one organization similar to the way the SIS group is structured here. I would have been the leader of that organization and if that is something that Troy is aware of or interested in that would be my first choice, I have over 20 years of analyzer system design and maintenance experience.

Mark Snookal
IEA Reliability Team Lead

**Chevron Products Company**
El Segundo Refinery
324 W. El Segundo Blvd.
El Segundo, CA 90245
Tel ████████
Mobile ████████



1

**EXHIBIT E-10-1**

# EXHIBIT E-12

# Job Title: DS&C - MFG - El Segundo Operating Assistant (PSG 22-23, 2 Positions)

This position is accepting applicants until September 13, 2019, 11:59 PM CST

Welcome to the Enterprise PDC postings, where you will find all open jobs managed within the Enterprise PDC process. You must obtain approval to apply to PDC jobs from both your supervisor and PDR before submitting your application(s); failure to do so may disqualify you from consideration.

As part of the application, you will be required to enter your Personnel Development Representative's (PDR) CAI; it is important that the correct PDR, representing you, is entered. When applying for each job, upload your updated GO-400-2 as your **Resume** attachment and your updated Career Development Plan (CDP) as your **Cover Letter** attachment. Updating your "Company Work Experience", "Previous Employment", etc. is not required within your 'Candidate Profile'.

For more information about the Enterprise PDC process and to locate your PDR, please visit the HR PDC site.

<div style="display:flex; justify-content:space-between;">
<div>

**Position Information:**

**Work Locations:** El Segundo, CA
**Position Type:** Placed
**Rotational?:** No
**Incumbent/Vacant/New:** Vacant
**Number of Vacancies:** 2
**Direct Reports:** No
**Pay Scale Group:** 22; 23
**Will expatriate assignments be considered for this position?:** No
**Will Relocation be considered within Chevron parameters?:** Yes
**Appointment: Method:** 2H PDC
**Functional Level:**
**SBU:** El Segundo Refinery
**Anticipated Start Date (MM/DD/YYYY):** 12/02/2019
**Duration:** 2-3 Years
**Contingent:** No

</div>
<div>

**Position Contacts:**

**Job Owner:** JAMES Z BYRD
**PDR:** TROY M TORTORICH
**Sponsor:** PAUL Jamieson



</div>
</div>

The Operating Assistant will be responsible for interfacing with personnel supporting the 24/7 operation as well the various support groups (Technical, Maintenance, Capital Projects, Finance, etc) in the refinery. This position is responsible for safe, reliable, and environmentally sound operation for a given set of process plants and equipment in an operating division in the refinery as well as identifying areas of optimization opportunities. This position is a change agent working with various personnel in the Division and the Refinery.

**Responsibilities for this position may include but are not limited to:**

• Provide support and continuity to 24/7 organization, sustain asset availability through maintenance work processes, and interface with the Planning organizations to coordinate all activities which may affect the operating plans. The Operating Assistant is often the primary liaison on short to medium term issues to collaborate and coordinate with support required.
• Participates in the preparation and monitoring of all budgets including routine/control maintenance, capital, and operating expense.
• Participates in turnaround planning, work scope review, execution, and typically the single point contact for communication of schedules and timelines.
• In the process section area of responsibility, the Operating Assistant will provide input into the development and implementation of the business plan, lead the Unit Reliability Process, ensure sustained health of routine duties, establish and nurture the Critical Process Monitoring metrics, oversee changes in operating procedures, PSM and other related activities/studies/recommendations, BIN audits/assessments/gap closure plans, maintain compliance with the MOC process, and provide final Operations approval for engineering work orders.
• Ensures plant incidents are investigated in a timely manner, i.e. develops, recommends and follows up on corrective actions.
• Initiates and coordinates projects related to energy conservation including fuel, steam, electricity, water, catalysts, and chemicals.
• Initiates and coordinates the development of process or equipment design changes that improve safety, environmental compliance and profitability.
• May be assigned as the operating liaison for design and construction of new plants, alterations to existing plants, or maintenance and reliability projects.
• Analyzes a variety of complex capital or special projects and collaborates with Operating, Maintenance and Technical groups as needed.
• Works with the Refinery Shift Leader to develop the 24/7 organization, coach First Line Supervisors, Head Operators, and

Operators.
• Process area specific knowledge and operating experience will be a consideration of the selection process.

**Required Qualifications:**
• BS Degree in Engineering
• Prior refining or large scale oil and gas processing facility experience
• Demonstrated experience in the areas of Operations, Process, or Designs Engineering
• Proven knowledge in the HES, PSM, IMPACT, Reliability and Capital Projects areas
• Demonstrated Change Management experience
• Excellent verbal, written and interpersonal communication skills

**Relocation Options:**

Relocation may be considered within Chevron parameters.

**International Considerations:**
Expatriate assignments will not be considered.
Chevron regrets that it is unable to sponsor employment Visas or consider individuals on time-limited Visa status for this position.

**Position Type:** This Manufacturing position is a placed multi-level PSG 22-23 position. A PSG 21 would be promoted into the position as a PSG 22 if successful. A PSG 22 or 23 candidate, if successful, would be a lateral move.

**CRITICAL SELECTION CRITERIA:**

**1. Technical/Professional Knowledge and Skills:**

Requires a bachelor's degree in Chemical or Mechanical Engineering and a minimum of 5 years work experience.
Experience using safe work processes, maintenance/reliability processes, and engineering standards to support facility operations.
Has experience and knowledge of oil/chemical processes.
Has experience with processes/engineering standards/tools used in design of equipment and relief system

**2. Leadership Behaviors/We Lead:**

Demonstrated ability to collaborate with dispersed teams including technical and functional resources to deliver high quality results.
Capable of managing strong relationships and partnerships with Refinery Personnel including Operations Committee, Section Head Operating committee, IMPACT, Reliability, Technical and Capital Projects.
Facilitates alignment with objectives, performance driven, leads by example, inspires others, accountable and hold other accountable.
Strategic and innovative thinker and adopter.

**3. People Skills/Teamwork:**

Ability to rapidly establish credibility and influence with new teams.
Ability to build and lead a team.
Demonstrated leadership/influencer, team building, and coaching skills.
Leads and drives change
Supports innovative ideas

**4. Communication:**

Strong interpersonal skills with excellent listening and negotiation skills.
Encourages open expression/discussions.
Capable of effective communication with work teams, refinery operations, refinery senior management, technical, and maintenance teams and contractors
Ability to facilitate team meetings obtaining and valuing input from all levels.
Good written and oral communication skills with the ability to communicate at all levels within the organization.
Strong presentation skills.

**Location Specific Information:**
Some countries have specific location and legal requirements (e.g. age limit, college degree, etc.) for issuing work permits/visas allowing individuals to work in the country and Chevron must abide by these location and legal requirements. For more details, please refer to the Location Specific Information Sheet.
**Living and Working:**
To get a closer look at what life is like in one of our expat communities, take some time to review our Living & Working In

**EXHIBIT E-12-2**

SNOOKAL-01151

website. This website will give you preliminary information to help decide if this assignment is suited for you and your family. You can also access this site outside the Chevron Internet, to view at home with your family.

# EXHIBIT E-17

Mark Snookal


August 4, 2021

Thalia Tse
HR Business Partner, El Segundo Refinery
Chevron Products Company
324 W. El Segundo Blvd.
El Segundo, CA 90245

Dear Ms. Tse,

I am writing to inform you of my resignation from my position as Instrumentation, Electrical, and Analyzer Reliability Team Leader, effective August 20, 2021. I appreciate all the opportunities you've given me during my time at Chevron Products Company, and the support I've received from the rest of the team.

If I can be of any assistance during the transition, please don't hesitate to ask. I'm always available for questions if need be.

Sincerely,

Mark Snookal



**EXHIBIT E-17-1**

# EXHIBIT E-18



# Voluntary Termination – GO-439-1

I wish to resign my employment with the   Chevron Products Company

(Employing Organization)

effective   August 20, 2021      , for the following reason(s):

I am leaving for an opportunity with significantly increased responsibility

(Continue on reverse, if needed)

_____
Full Signature

_____
SAP Personnel Number

Mark Snookal
Name (print)

August 4, 2021
Date Signed

_____
Home Address

_____
City, State, Zip

(If this is a recent change of address, you need to update your records in SAP HR on-line.)



Distribution:    Original to Personnel File
Employee – Retain Copy

GO-439-1 (7-05)
Word Electronic Version

SNOOKAL-01143

EXHIBIT E-18-1

# EXHIBIT E-19



# Exit Interview

## INTRODUCTION

Thanks for your willingness to participate in this exit interview. It will take up to 30 minutes and consists of a standard set of questions we ask of employees who have decided to voluntarily leave Chevron.

We value your feedback and encourage you to be candid. Your responses will help us understand important aspects of your employment experience and, aggregated with other exit interview data, will reinforce what Chevron can do strategically to enhance attraction and retention efforts.  During the interview, your verbatim comments will be captured and then shared confidentially with your HR Business Partner and appropriate level of line management.

***Do we have your permission to share your comments with HR and line management?***
***Yes***

***Indicate your primary reason for leaving Chevron.***
New job opportunity – paper mil in the state of Washington. Interested in management, leadership to continue career path. I didn't find the opportunity within Chevron, so I decied to look outside of Chevron.

### Topics for Rating and Comment

Based on your experience, please **rate** the following making a choice of **Excellent, Good, Fair, Poor, or Not Applicable** from the drop down. After you give your rating, please provide any comments that describe your rating.

1. *Your current supervisor's communication with you*  Fair
   I don't talk to my direct supervisor very much and when we do talked, we didn't talk about topics that I wanted to talk about. Example – my carerr development, feedback after Sprint exercise (simplity) and CES results (How we going to address the results/low ranking on employees feel we would not take action after the result). Didn't give much advise/direction. Doesn't know much about my craft or my team so it was difficult for my supervisor to provide constructive or helpful feedback.

2. *Your current supervisor's leadership and supervisory skills*  Fair
   Need improvement – align & inspire / team engagement (build relationship) with my team/employees. At times in cross disciplines meetings, my supervisor provided incorrect answer in the meeting (instead of saying "I don't know or defer the questions) and my team has to clean-up/clarify with the other teams after.



**EXHIBIT E-19-1**

3. *Local business unit management's responsiveness to employee concerns*  Good

They do response but quality of the answers can be improved (not always give great answer).

4. *Quality and challenge of your assignments*  Fair

The assignment that I was assigned to is not challenging to me. I like problem solving – the assignments I felt challenged were the ones I started/initiated myself.

5. *Opportunity for career development and advancement*  Poor

Since my first year, I completed my CDP, and talked to my supervisor (3 jobs – GTL, OA, and Reliability). Recently (2 years ago), I was finally told by a RBM post-renewal that my name is not on the "list" to backfill an OA. I was told during renewal that I should not put in for the OA role because I would not get it. The second job (GTL), I mentored Brian G. and Javier L. for leadership skills. Then Brian and I applied to the GTL job and Brian got the job. I asked for feedback (I was told that Brian G has better leadership skills then me). I then asked for constructive feedback how I can improve/what can I do better for leadership skills but Troy/Cotey did not give me any specific other than "It's not that you are bad, Brian is just better". I then asked "Okay, what/how can I improve?" and was told "oh I don't know, no specific". I got the same response from Cotey. I have also been told I couldn't apply to jobs because of business needs or I don't bring anything to the OA role (some time ago though). In renewal, told me not to apply to GTL/OA, I applied to a technical position in Houston (I have told them I am mobile) for an analyzer position. However, I didn't get the job and picked a candidate with no analyzer experience (I spoke to the job owner and supv +1). When I called and asked why, I was told again "business needs". Feel less qualified candidates got selected for the job but I wasn't given feedback. There's no transpencey in selection process.

6. *Compensation (base salary and bonuses)*  Good

I would say excellent but some jobs are not evaluated correctly by TR.

7. *Availability and use of programs that help balance work and personal life*  Good

My mother was in the hospice in 2014 and I asked if I could work from home. I was told no and I went to ESE EAP (and I was told no, because you are not doing drugs / alcohol (referred me to a therapist). I was not allowed to take a personal leave. I did later learn that Ombuds is much helpful.

8. *Performance Management Process (PMP) or other performance evaluation process*  Good

Old PMP system was flawed and if people were ranked hi-po, they always got high ranking regardless of the person's performance. Pay determination – my manager told me I couldn't use the whole budget (the amount of raises) because the raises would have been too much and that's not the right message. I weighted the role (individual vs. influencer) performance, time in role to make my

salary determination recommendation (all within range) even my person got 3 EE and 1 VC. I feel like I wasn't empowered to really make the decision like I was told.

9. *Fit-for-purpose processes that produce the right results*   Fair
Chevron tend to go overboard with their process (eg. not safety related, there's a lot of steps to make the change). Big org., not agile.

10. *Ethical behaviors at Chevron*   Excellent
I have never witnessed anything or knew anything wasn't addressed.

## Questions for Comment

11. *Why did you choose Chevron initially?*
I thought I would have a lot of opporutnies and a place to contribute. I thought the oil/gas industry has the most concerns about environment and safety (reputation of Chevron in the industry).

12. *If you are taking a new job, what does your new job offer that your Chevron job did not?*
Career advancement and Leadership – I look for opportunity in leadership position. I also feel Chevron's leadership has failed to recognize my leadership experience and my capabilities (even CES results/360 feedback were always positive).

13. *Based on your overall experience at Chevron, what did you like the most?*
Everyone has an attitude getting to a solution (they don't tend to get bonk down by credit or knowledge) especially in an emergency situation. Good teamwork cross disciplines.

14. *Based on your overall experience at Chevron, what did you like the least?*
Politics (el segundo) – example, I was told by my previous manager that the reason I didn't get the GTL because someone on the selection team didn't like me. I reached out to HRM Andrew and he tried to get M&R Mgr Troy to get me feedback. Troy told me, I don't know what Austin said but it wasn't true.
I don't have enough visibility – I feel like everyone knows me, I haven't presented to RLT (I wasn't given the opportunities) but I also had presented to Mfg president Mike Coyle. Even if it's not true, but it certainly gives that perception that "it's all about who you know" (eg. DPD Section Head position). It's inconsistent between what we tell our emplooyees vs. our actions.

15. *In summary, what key message would you like to convey to management?*

Chevron decided to change leadership style, but they keep promoting the same people and tried to change those behaviors/leadhership style. It would be better to promote people who already has the leadership skills/styles, look beyond of the "leader" to like if my team is excelling and successful (because that's also a reflection of the person who leads the team). This is more appearnatly in El Segundo (seems like Chevron as an org. is doing a better job but not the "middle" levels).

Dr. Ujomoti Akintunde                                    October 31, 2024

1    foundation.  Vague and ambiguous.

2            THE WITNESS:  It would be higher than the

3    person who does not have a dilated aortic root and is

4    otherwise well, yes.

5    BY MS. FAN:

6        Q.    So you assessed Mr. Snookal's risk of

7    complication with his dilated aortic root to be low.

8    What did you base your assessment on?

9        A.    The outcomes of people from -- from many -- I

10   mean, experience on literature, the outcome of people in

11   that category, based on scientific literature.

12       Q.    When you say outcomes, what are you referring

13   to?

14       A.    Adverse outcomes, adverse aortic outcomes and

15   death.

16       Q.    I see.  So when you say you based it on your

17   knowledge of medical literature regarding his condition,

18   what medical literature are you referring to?

19       A.    I read a lot of articles and medical

20   materials, various kinds, you know, in my -- in the

21   course of my practice.  I come across different reading

22   materials or texts.

23       Q.    At the time that you made your assessment of

24   Mr. Snookal's risk of complication, were you aware that

25   his cardiologist had quoted his risk of complication at