# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

| | | |
|---|---|---|
| MARK SNOOKAL, an individual, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. |
| | ) | 2:23-cv-6302-HDV-AJR |
| | ) | |
| CHEVRON USA, INC., a California | ) | |
| Corporation, and DOES 1 through | ) | |
| 10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF:

 5              ALLRED, MAROKO & GOLDBERG
                By:  DOLORES Y. LEAL
 6              Attorney at Law
                6300 Wilshire Boulevard, Suite 1500
 7              Los Angeles, California 90048
                (323) 653-6530
 8              dleal@amglaw.com

 9    FOR THE DEFENDANT:

10              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                By:  ROBERT E. MUSSIG
11              Attorney at Law
                333 South Hope Street, 43rd Floor
12              Los Angeles, California 90071
                (213) 620-1780
13              rmussig@sheppardmullin.com

14    THE VIDEOGRAPHER:

15              Jacob Rivera

16    ALSO PRESENT:

17              Eguono Erhun, In-House Counsel for Chevron

18

19

20

21

22

23

24

25
```

Dr. Eshiofe Asekomeh                                    October 10, 2024

1      Q.   Occupational head [sic] functions.   Okay.

2           And at the time that you held these positions,

3   you were in Warri, W-A-R-R-I, Nigeria?

4      A.   Okay.   So between 2011 and 2016, I was in Port

5   Harcourt, Nigeria.   Between 2016 and 2020, I was in

6   Warri, Nigeria.

7      Q.   And then after 2020, what was your next

8   position?

9      A.   So after 2020, I'm presently in Escravos as

10  Escravos staff physician in charge.   Escravos staff

11  physician in charge.

12     Q.   So since you've been in Escravos as the staff

13  position in charge -- physician in charge, I'm sorry,

14  Deep Drill Oil Services has paid your salary; correct?

15     A.   Correct.

16     Q.   So most of my questions are going to focus

17  during the time in 2019 when you were the attending

18  physician working for Deep Drill Oil Services.   Okay?

19     A.   Okay.

20     Q.   Unless I say otherwise.

21          Would you please describe your educational

22  background, Dr. Asekomeh?

23     A.   Okay.   So -- so I have a Bachelor's of

24  Medicine, Bachelor's of Surgery degree from the

25  University of Ibadan, Nigeria.   Graduated in 1997.   I

```
 1    did residency training in internal medicine in the
 2    University of Port Harcourt Teaching House, which was
 3    specializing in the West African College of Physician.
 4    Between 2003 and 2009, junior residency for three years
 5    in general internal medicine, and then the last three
 6    years subspecializing in neurology.
 7              I have a Master's in pharmacology from the
 8    University of Port Harcourt in Nigeria.  I have another
 9    Master's in public health from the University of
10    Manchester.  And then in between, I've done a course in
11    occupational health from the University College
12    Hospital, Ibadan, Nigeria.
13          Q.  How do you spell Ibadan?
14          A.  I-B-A-D-A-N.
15          Q.  And how long have you been a physician -- a
16    licensed physician?
17          A.  1997 until date.  Last 27 years.
18          Q.  And do you have a medical specialty?
19          A.  Yes.
20          Q.  What is that?
21          A.  I'm a physician, that's equivalent to the U.S.
22    internist, and I'm also a neurologist.
23          Q.  An internist and neurologist.  Okay.
24          A.  Yes.
25          Q.  Have you ever practiced cardiology?
```

Dr. Eshiofe Asekomeh                                        October 10, 2024

```
 1              (Simultaneous crosstalk.  Reporter

 2              clarification.)

 3              MR. MUSSIG:  Incomplete hypothetical.

 4      BY MS. LEAL:

 5          Q.  Let me rephrase.  So how long is the

 6      transportation time, approximately, from Warri to

 7      Escravos or Escravos to Warri by helicopter?

 8              MR. MUSSIG:  Same objection.

 9              THE WITNESS:  Okay.  So transport by

10      helicopter, so many variables:  Weather condition,

11      flight -- helicopter availability as of that time.  So

12      are we factoring in those -- those variables?

13      BY MS. LEAL:

14          Q.  Sure.

15          A.  Okay.  So because I work in Escravos now, even

16      as a --

17              (Reporter clarification.)

18              THE WITNESS:  As when I was in Warri, I had

19      come to do --

20              (Reporter clarification.)

21              THE WITNESS:  When I first got to Warri, I had

22      come to work in Escravos on two rotations just to

23      relieve the doctor.  So you know already the choppers

24      are field choppers.  They're not standby helicopters

25      waiting for injuries or waiting for people to take ill.
```

Dr. Eshiofe Asekomeh                                              October 10, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4         I, RACHEL N. BARKUME, a Certified Shorthand

 5    Reporter of the State of California, hereby certify that

 6    the witness in the foregoing deposition,

 7                   DR. ESHIOFE ASEKOMEH,

 8    was by me duly sworn to tell the truth, the whole truth,

 9    and nothing but the truth in the within-entitled cause;

10    that said deposition was taken at the time and place

11    therein named; that the testimony of said witness was

12    stenographically reported by me, a disinterested person,

13    and was thereafter transcribed into typewriting.

14         Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties to said

18    deposition, nor in any way interested in the outcome of

19    the cause named in said caption.

20

21              DATED:  October 13, 2024.

22

23    _____

24         Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1                    WITNESS SIGNATURE PAGE

 2            I, DR. ESHIOFE ASEKOMEH, do declare under

 3   penalty of perjury that the foregoing is my deposition

 4   under oath; are the questions asked of me and my answers

 5   thereto; that I have read the deposition and have made

 6   the necessary corrections, additions, or changes to my

 7   answers that I deem necessary.

 8

 9         _____  I have no changes to my deposition.

10         _____  Following are the changes I wish to make:

11   Page    Line    Change

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23

24   _____        _____

25   SIGNATURE                           DATE
```

# EXHIBIT G

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,      )
                                  )
                                  )
                Plaintiff,        )
vs.                               ) Case No.
                                  ) 2:23-cv-6302-HDV-AJR
                                  )
CHEVRON USA, INC., a California   )
Corporation, and DOES 1 through   )
10, inclusive,                    )
                                  )
                Defendants.       )
_____)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Scott Levy, M.D.                                              August 30, 2024

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF:

 5            ALLRED, MAROKO & GOLDBERG
              By:  OLIVIA FLECHSIG
 6                 DOLORES Y. LEAL
              Attorneys at Law
 7            6300 Wilshire Boulevard, Suite 1500
              Los Angeles, California 90048
 8            (323) 653-6530
              oflechsig@amglaw.com
 9            dleal@amglaw.com

10    FOR THE DEFENDANT:

11            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  ROBERT E. MUSSIG
12            Attorney at Law
              333 South Hope Street, 43rd Floor
13            Los Angeles, California 90071
              (213) 620-1780
14            rmussig@sheppardmullin.com

15    THE VIDEOGRAPHER:

16            Jacob Rivera

17

18

19

20

21

22

23

24

25
```

```
 1         THE WITNESS:  When they were embedded medical
 2    teams, they were -- there was a medical director for
 3    these businesses that managed their teams.
 4    BY MS. FLECHSIG:
 5         Q.  In other words, they managed the simple --
 6    like, quote, unquote, simple medical evacuations?
 7         A.  Yes, could be anything.  And -- and -- it
 8    can -- yes, I would say they handled the simple
 9    evacuations.  It could be from an offshore platform to
10    the onshore location, can be from a remote location to
11    a -- to a -- our own clinic, our own hospital, or -- or
12    a local -- local medical facility.
13         Q.  Okay.  Did you have any employees who you
14    supervised?
15         A.  I did, yes.
16         Q.  Who -- what was the nature of the jobs you were
17    supervising?
18         A.  So the team that I directly supervised were all
19    in London.  So I had one nurse and three administrative
20    positions.  So logist- -- helping me with logistics,
21    helping me with contracting with different medical
22    facilities, scheduling exams, things like this.
23         Q.  Okay.  What were you scheduling exams for?  For
24    the fitness-for-duty exams?
25         A.  Correct.  So we would schedule exams for -- so
```

```
1    we -- we would more or less be the embedded medical team
2    for London, for the UK.  So -- that's where our office
3    was, so London is -- well, is and was a -- our
4    international hub.
5            So there was lots of travel in and out of
6    London, and so when people were coming through town,
7    they would get their work-related exams, if convenient
8    for them, or get anything they needed; or we would
9    handle business-travel-related exams, make sure people
10   get there all right, that they have their full
11   vaccinations and antimalarial medicines and what have
12   you.
13           And then we had lots of people that were in
14   transit.  So I always think of it like a -- we -- sort
15   of air traffic controller sometimes.  There's always
16   people coming and going.  We've had, you know, rotator
17   who may live -- they could live anywhere on the planet,
18   but they work in Nigeria, and whenever they stop in
19   London on their way back home -- and so we'll get their
20   exam done in a place where there's a -- call it a
21   western standard of -- a good, strong, western standard
22   of medicine where they can get all of their needs met.
23           So yeah, there was lots of -- I would say lots
24   of scheduling.  And then we had lots of people who
25   were -- became sick -- we -- either injured -- mostly
```

```
 1   sick, though -- that was probably the most common --
 2   where they developed a medical condition in a location
 3   where they didn't have the capabilities of managing that
 4   problem, so they would be -- frequent destination for
 5   people in that region to come into London to get sorted.
 6             (Reporter admonishment.)
 7   BY MS. FLECHSIG:
 8        Q.  Were you also responsible for reviewing the
 9   fitness-for-duty determinations that the evaluating
10   doctors made?
11        A.  Not always.  And I can explain.  So the
12   policy -- what we did -- the way things were handled
13   were the host location would do the evaluations -- so
14   the host would be -- in the situation we're dealing with
15   today -- would be the U.S. location would be in charge
16   of collecting the data, get the exam done where the
17   person lives or relatively close to where they live, and
18   then the host -- H-O-S-T -- location -- that's the --
19   embedded medical team would then review the medical
20   records for fitness for duty.
21             As they were receiving that person to their
22   communities, into their systems, they would perform an
23   evaluation -- well, perform a review to make sure that
24   the person was fit.  And so these -- we called our
25   fitness for duties for expats Medical Suitability for
```

1  Expat Assignment, MSCA, and so the host location would

2  review for suitability to their -- for their new

3  location.

4      Q.  Okay.  So I just want to make sure I'm

5  understanding correctly.

6          So basically -- it sounds like you're familiar

7  with the facts of Mr. Snookal's case; right?

8      A.  Correct.

9      Q.  Generally.  So you -- you know that he was

10 evaluated in Los Angeles, and then he was trying to go

11 to a host location in Nigeria; right?

12     A.  Yes.

13     Q.  Okay.  So in the policy that you just outlined,

14 in other words, Mr. Snookal, you know -- the policy is

15 the person gets evaluated by a doctor on the ground

16 where they live and then a medical team in the place

17 they're going to go reviews the evaluation.

18     A.  Correct.

19     Q.  Okay.  So you said you sometimes are involved

20 in reviewing the determinations that are made for a

21 person's fitness for duty.

22         So when would you become involved after the

23 local exam and the host location review?

24     A.  When there's a challenge or uncertainty about

25 the situation.  So the -- so there are, I would say,

1   many intricate pieces to this.  And so one could be

2   something that we're not really sure of.  Second could

3   be where maybe the person can't be -- a condition can't

4   be managed locally but can be managed close by, and so

5   there might be an opportunity to set up a second

6   treatment center close by to -- to their host location.

7   Or try to identify other -- other factors that could

8   potentially mitigate.  And -- happy to expand as needed.

9        Q.   Yeah.  So I guess in terms of -- you said you

10  get involved when there's a challenge or uncertainty.

11          Does that include when an employee challenges

12  the decision that they were not fit for duty?

13       A.   Yeah, I was thinking that exactly, that if --

14  the fact that I'm here shows that I do get involved in

15  certain situations.  And so, yes, that's correct.

16       Q.   Okay.  Do you get the final say on the fitness

17  for duty when an employee makes such a challenge to the

18  determination?

19       A.   I do not.

20       Q.   Who -- who would get the final say?

21       A.   The host location.

22       Q.   Okay.  So you have to defer to what the host --

23  the doctors at the host location determine.

24       A.   Correct.  Correct.  So the host location,

25  they -- host location reviews -- the doctors review.

1    They would then discuss any, let's say, conflict or

2    challenges or issues with, you know -- with their

3    business, so -- HR and their teams to determine and work

4    with the supervisors to determine whether a position can

5    be accommodated, whether something else can be worked

6    out, whether they need to bring me into the situation to

7    try to troubleshoot.  So -- but that's -- yeah, that

8    decision would have been at the host location.

9         Q.   Okay.  And what kind -- so I think you started

10   describing, but what sort of troubleshooting can you do

11   if the host location says that there's an issue with the

12   employee's fitness for duty?

13        A.   Correct.  So potentially -- it depends on the

14   specific issue.  If it's -- there are times where -- and

15   I'll give you an example.

16             There are times where the medication that the

17   person wasn't taking -- that the person was taking at

18   home is just simply not available in country and can't

19   be -- it can't -- it can't come into country, it can't

20   be prescribed in country, so sometimes the issue may be

21   simply is there a way of -- of setting up a close stop

22   for the person to come in -- when they fly in and out,

23   they can pick up their medications.

24             Potentially, if there's a specialist that they

25   need to follow instead of -- and if -- I'm just making

1    what I think the -- the risk may be or not be.

2        Q.  So how did you -- how did you first become

3    involved with Mr. Snookal's challenge to the host team

4    deeming him unfit for duty?

5        A.  I was asked as a second opinion to review the

6    case.

7        Q.  To provide a medical opinion on whether it was

8    safe for him?

9        A.  I was -- so I don't recall exactly, but I know

10   Mr. Snookal asked for a second opinion and -- that, I

11   know for a fact.  And then this was sent to me for a

12   review.

13       Q.  Who sent it to you for review?

14       A.  I don't remember.  Again, it was years ago.  I

15   know Mark and I did speak, so I'm not sure if he

16   approached me first or if someone sent it to me, but I

17   do know that Mark and I chatted about his situation.

18       Q.  Okay.  So when you were asked to give a second

19   opinion, were you allowed to override the decision that

20   the host team had made?

21       A.  I was not allowed to override, but I would say

22   that the -- even the -- as I'm thinking of the word

23   "second opinion," that might be incorrect as well.  I

24   would say that -- I was here to help with an appeal.  So

25   I would look at a case and see if there was anything

1   that was missed or some other information that might be

2   pertinent to the case and then have that discussion,

3   doctor to doctor, with our host medical team so they're

4   aware of potentially mitigating factors.

5            So it wasn't necessarily a second -- a second

6   opinion.  It just -- maybe another opinion or -- maybe

7   that's not necessarily different.  But just assist with

8   an appeal.  But -- but the absolute -- the final

9   decision was with the host location.

10       Q.  Okay.  At the time that you were the regional

11  medical director for the EEMEA region, do you recall

12  anyone else who complained about the host decision not

13  to allow the transfer to take place?

14       A.  No.

15       Q.  Okay.  So Mark Snookal was the only time --

16  Mark Snookal's complaint about the decision was the only

17  time you became involved in that way --

18       A.  Correct.

19       Q.  -- to give a second opinion?

20       A.  Correct.

21       Q.  Okay.  In terms of the organizational chart,

22  are you considered the supervisor of the host medical

23  teams?

24       A.  I am not.

25       Q.  Okay.  Who would be supervising those folks?

 1  the evacuation?

 2      A.  We've had people die of liver failure who --

 3  who died waiting for the medical evacuation to occur.  I

 4  mentioned earlier that the -- we had an aortic

 5  dissection that died waiting for something to occur,

 6  waiting for someone to get out of there.  We've had --

 7  we've had a child with -- with cancer who -- who died on

 8  location waiting for -- or trying to decide on

 9  whether -- whether he was safe to travel by medical

10  evacuation.

11          So the important thing to understand is that

12  the -- not everybody is eligible.  And I'll clarify the

13  word "eligible."  If someone's not safe to travel,

14  they're not going to be medically evacuated.  So they

15  have to be stable and safe to make the trip in the first

16  place.  And so that's the -- that's the -- that's the

17  challenge is we're not going to put them in harm's way

18  and take them away from even -- even the lowest level of

19  medical care for nothing for a six- or eight-hour trip

20  in a plane.

21          So they would have to be stable to transport.

22  So they -- I would say they don't die often or

23  frequently, but these things can happen.

24      Q.  Okay.  Do you know how long it typically takes

25  to perform a medical evacuation from the Escravos,

```
 1    Nigeria, location?

 2           MR. MUSSIG:  Calls for speculation.  Lacks

 3    foundation.

 4           THE WITNESS:  So in general, the number I

 5    usually use for any location is it takes about seven

 6    hours to get a plane -- a medevac plane or air ambulance

 7    available for such a -- such a -- such a transport.  The

 8    challenge with Escravos is given -- A, given its

 9    remoteness, it -- the -- well, I would say it's -- it's

10    very common that air transport is shut down there.

11           So sand storms from the Sahara, bad weather,

12    things like this impact ability to fly in and out, and

13    so when we do -- when the -- when the weather or the

14    environment is not cooperative to a medical evacuation,

15    the only other route is by boat.

16           And to move someone out by boat -- again, this

17    is the Niger delta, which is a dangerous area in

18    Nigeria.  There are militants in the Niger delta, Boko

19    Haram.  Other militants operate there.  And so if we

20    want to move someone by boat out of Escravos, we need to

21    notify the Nigerian military to help us to escort us

22    through the -- through the location.  So -- so in the

23    meantime, it's -- it's -- and it's -- it's very

24    challenging.

25    ///
```

Scott Levy, M.D.                                                  August 30, 2024

```
1              CERTIFICATE OF STENOGRAPHIC REPORTER

2

3

4          I, RACHEL N. BARKUME, a Certified Shorthand

5    Reporter of the State of California, hereby certify that

6    the witness in the foregoing deposition,

7                        SCOTT LEVY, M.D.,

8    was by me duly sworn to tell the truth, the whole truth,

9    and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21          DATED:  September 12, 2024.

22

23   _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

# EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARK SNOOKAL, an individual, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. 2:23-cv-6302-HDV-AJR |
| CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive, | ) ) ) ) | |
| Defendants. | ) ) ) | |

REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS

Tuesday, September 17, 2024

Houston, Texas

Reported by:
JANE BRAMBLETT, CLR, CCRR, CSR No. 7574
Job No. 114803

```
1              UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4   MARK SNOOKAL, an          )
    individual,               )
5                             )
                 Plaintiff,   )
6                             )
            vs.               )   NO. 2:23-cv-6302-HDV-AJR
7                             )
    CHEVRON USA, INC., a      )
8   California Corporation,   )
    and DOES 1 through 10,    )
9   inclusive,                )
                              )
10               Defendants. )
    _____)
11

12

13

14

15       REMOTE VIDEOTAPED DEPOSITION of ANDREW POWERS,

16   taken on behalf of Plaintiff, commencing at

17   10:00 a.m. and ending at 1:50 p.m., at Houston, Texas,

18   Tuesday, September 17, 2024, before Jane Bramblett, CLR,

19   CCRR, Certified Shorthand Reporter No. 7574.

20

21

22

23

24

25
```

Andrew Powers                                          September 17, 2024

1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3    ALLRED, MAROKO & GOLDBERG
     BY:  DELORES Y. LEAL, ESQ.
4    6300 Wilshire Boulevard, Suite 1500
     Los Angeles, California 90048
5    323.653.6530
     dleal@amglaw.com

6

7    FOR THE DEFENDANTS:

8    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     BY:  SARAH FAN, ESQ.
9    333 South Hope Street, Suite 4300
     Los Angeles, California 90071-1422
10   213.620.1780
     sfan@sheppardmullin.com

11

12   Also Present:  Jenny Sherman, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE WITNESS:  Yes.
 2    BY MS. LEAL:
 3        Q    Any other position with Chevron prior to HR
 4    development program?
 5        A    No.
 6        Q    So you were hired into HR development
 7    program position in San Ramon in 2009?
 8        A    Yes.  That's correct.
 9        Q    So most of my questions today, Mr. Powers,
10    will pertain to the period of time when you were the
11    Senior HR Manager at the El Segundo refinery.  Okay?
12        A    Okay.
13        Q    So during the time that you were a senior
14    HR manager in El Segundo, were there any individuals
15    who reported to you?
16        A    Yes.
17        Q    Who?
18        A    Thalia Tse, Eric Stephenson, Kelly Andrews,
19    Violet Torres, Willy Martinez.
20        Q    Anyone else?
21        A    Those were my direct reports.
22        Q    Okay.  And what positions did these
23    individuals hold?  Were they all -- did they all
24    hold the same position?
25        A    No, they did not.  So --
```

Andrew Powers                                    September 17, 2024

1        Q    Okay.  Yes, what positions did they hold?

2        A    So Thalia Tse was HR business partner.

3   Kelly Andrews, also HR business partner.  Eric

4   Stephenson, also HR business partner.  Willy

5   Martinez was the labor relations adviser.  And

6   Violet Torres was the HR assistant.

7        Q    And of the three HR business partners, how

8   is it that the job responsibilities were broken up?

9   In other words, was Ms. Tse responsible for only

10  particular departments within the El Segundo

11  facility as well as the others?  Or how did you

12  define their work?

13       A    They were broken out to different client

14  groups.  So Thalia Tse had maintenance and

15  reliability.  Eric Stephenson had operations.  And

16  Kelly Andrews had our other functions remaining,

17  which would be health, safety, environmental,

18  operational excellence, and technical.

19       Q    Did you hire Thalia Tse?

20       A    Yes, I did.

21       Q    When you hired Ms. Tse, did you provide her

22  with any HR training?

23       A    I was personally involved in helping her

24  onboard at Chevron, get acquainted with our

25  policies, procedures, as part of our training for

1        I declare under penalty of perjury that

2    under the laws of the State of California that

3    the foregoing is true and correct.

4

5                Executed on  11/1/2024                ,

6      at  Spring                            ,  Texas.

7                    (city)

8

9                        DocuSigned by:

10                   *Andrew Powers*
                    ─4E44833DF7F14DC...

11                    ANDREW POWERS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andrew Powers                                    September 17, 2024

```
 1        I, the undersigned, a Certified Shorthand

 2   Reporter of the State of California, do hereby

 3   certify:

 4        That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a record

 8   of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given.

12        Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [  ] was [  ] was not requested.

16        I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: October 1, 2024

23

24   _____

25   JANE BRAMBLETT, CLR, CCRR
     CSR No. 7574
```

# EXHIBIT I

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  MARK SNOOKAL, an individual,   )
                              )

5                       )
            Plaintiff,    )

6                       )
                       )

7      vs.           )  CASE No.
                       )  2:23-cv-6302

8                       )  HDV-AJR
  CHEVRON USA, INC., a California )

9  Corporation and DOES 1 through )
  10, inclusive,          )

10                     )
                       )

11           Defendants.   )
  _____)

12

13

14

15     Videotaped Remote Deposition via Zoom videoconference

16  of SHAHID HAMEED KHAN, M.D., taken on behalf of Defendant

17  Chevron USA, Inc., at Culver City, California, commencing

18  at 2:06 p.m., Monday, February 10, 2025, before Marivon H.

19  Christine, CSR No. 3735.

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3       For the Plaintiff:

 4           ALLRED, MAROKO & GOLDBERG
             BY:  OLIVIA FLECHSIG, ESQ.
 5           6300 Wilshire Boulevard
             Suite 1500
 6           Los Angeles, California  90048
             (323) 653-6530
 7           oflechsig@amglaw.com

 8

 9       For the Defendant:

             SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
10           BY:  TRACEY A. KENNEDY, ESQ.
             350 South Grand Avenue
11           40th Floor
             Los Angeles, California  90071
12           (213) 620-1780
             tkennedy@sheppardmullin.com

13

14    ALSO PRESENT:

15

16           Blake Jones, Videographer

17

18

19

20

21

22

23

24

25
```

```
 1    have any recollection at all, your best response, if it's

 2    a truthful response, is "I don't know" or "I don't

 3    recall."

 4          Do you understand that?

 5     A    Yes.                                                        02:09

 6     Q    Is there any reason why we can't go forward with

 7    your deposition this afternoon?

 8     A    No, not that I know.

 9     Q    Do you have any questions before we get started?

10     A    No.                                                         02:09

11     Q    Like I said, I won't be taking that long, but if

12    you need to take a break, grab a cup of coffee or some

13    water, just let me know.  I'm more than happy to

14    accommodate, but if there's a question pending, just

15    answer the question and then we can take a break.  Is that   02:09

16    okay?

17     A    Sure.

18     Q    First of all, let's get a little bit of

19    background information.

20          Can you give me a little bit of your educational       02:09

21    background since high school?

22     A    Since high school, I went to college at

23    Northwestern University in Evanston, Illinois.  Then I

24    went to Rush Medical College for med school, which is in

25    Chicago, and then I did my internal medicine training at     02:10
```

```
 1    Cedars-Sinai Hospital here in Los Angeles.  I did my

 2    cardiology fellowship at UCLA Wadsworth Program, and then

 3    joined Cedars as faculty.

 4        Q    When did you start at Cedars?

 5        A    I started at Cedars in 1987, and I was also on      02:10

 6    the UCLA faculty at the same time.

 7        Q    And do you have any medical specialty?

 8        A    Yes.  I'm a cardiologist.

 9        Q    In the cardiology field do you have any type of

10    subspecialty within being a cardiologist?  In other words,   02:10

11    are you a cardiac surgeon?

12        A    Yeah.  I did primarily transplant cardiology,

13    which is heart transplant cardiology.

14        Q    Are you currently employed?

15        A    No.                                                  02:11

16        Q    Are you retired?

17        A    I am retired.

18        Q    When did you retire?

19        A    I retired from Kaiser when I turned 65, which was

20    in 2021, July 1st, and then took six months, and then I      02:11

21    worked for United Healthcare for about a year and a half,

22    and then I fully retired from United Healthcare last

23    July 2024.

24        Q    Let's talk a little bit about your patient Mark

25    Snookal.  Do you know who he is?                             02:11
```

1    Ms. Kennedy's Exhibit 3.  I can pull it up on my end here.

2    I'll share my screen.

3          So this is Exhibit 3, again.  It's marked as

4    Snookal 644.  You know what?  Hold on.

5          MS. KENNEDY:  That's a different one.                    02:57

6          MS. FLECHSIG:  Yes.

7    BY MS. FLECHSIG:

8    Q     Snookal 644, it looks like an e-mail, dated

9    August 23, 2019, from you to scottllevy@chevron.com, with

10   a CC to mark@maygus.com.                                      02:58

11         Just as a remedial question.  Does this look like

12   a true and correct copy of the e-mail that you sent?

13   A     Yeah.  I mean, I don't remember four and a half

14   years ago, but it looks like something I would have sent.

15   Q     In the signature line here you say, "I understand    02:58

16   he is applying for a job in a rural or remote area of

17   Nigeria, and I understand the concern about his aortic

18   aneurysm."

19         Does that refresh your memory at all about the

20   sort of location and specific concerns about the            02:58

21   remoteness of the job position at Chevron?

22   A     I mean, no more than what's said there.  Not

23   that -- I mean, I don't remember him saying whether

24   there's any medical facilities there or how remote it is

25   or how far it is to a clinic or anything like that, if      02:59

1    that's the question.

2       Q     Yeah.  I guess, does it make you think that you

3    at least must have known that it was in a rural or remote

4    area of Nigeria?

5              MS. KENNEDY:  I'll object to the form of the                    02:59

6    question.

7              THE WITNESS:  I mean, it does look like I

8    understood that this was a rural or remote location.

9    BY MS. FLECHSIG:

10      Q     Okay.  I wanted to ask, I guess to follow up on          02:59

11   that, why was it in your opinion that he could perform a

12   job in a rural or remote area of Nigeria?

13      A     Well, a couple of things.  One is that his

14   aneurysm appeared stable.  Second, his blood pressure

15   appeared under reasonably good control; and third, the       03:00

16   follow-up for this kind of disease is very intermittent,

17   very periodic.

18             Once a year come back and have a CT scan done.

19   It's not an elaborate follow-up, and it's not complex or

20   difficult to follow.  I mean, it's a very quick, simple      03:01

21   visit.  You just have him come in.  Check the results of

22   the CT, check the blood pressure, chat a little bit, and

23   it's not a complicated disease process.

24             If it was to get bigger, then the follow-up would

25   be more intense, but at the level he's at it's not           03:01

1    for your time.

2         MS. KENNEDY:  Dr. Khan, just a couple follow-up

3    questions from counsel.

4

5                    FURTHER EXAMINATION

6    BY MS. KENNEDY:

7         Q    Based on your experience and training if a

8    dilated aortic root ruptured, what happens?

9         A    If it ruptures, then it's a medical emergency so

10   they need to have surgery done.                          03:24

11        Q    And how soon after that rupture should a person

12   have surgery?

13        A    As soon as possible, but, I mean, it needs to be

14   done immediately.  We helicopter patients in for that.

15        Q    Is there any other medical treatment for someone   03:24

16   who has a ruptured dilated aortic root other than surgery?

17        A    No.

18        MS. KENNEDY:  I have no further questions.  Do

19   you have any questions, Olivia?

20        MS. FLECHSIG:  No.                                  03:24

21        MS. KENNEDY:  This concludes Dr. Khan's

22   deposition.  You are free to go, Dr. Khan.  Hopefully, you

23   never see us, again.  I think the court reporter and

24   videographer have a read-off, and then we will be done.

25   So hold on for one second.                               03:24

```
 1                  DECLARATION UNDER PENALTY OF PERJURY

 2

 3              I hereby declare under penalty of perjury that

 4   the foregoing is my deposition under oath including the

 5   questions asked of me and my answers thereto; that I

 6   have read same and have made the necessary corrections,

 7   additions, or changes to my answers that I deem

 8   necessary.

 9              In witness thereof, I hereby subscribe my name

10   this _____day of _____, _____.

11

12

13

14                                 _____

15                                 SHAHID H. KHAN, M.D.

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE

2                         OF

3            CERTIFIED SHORTHAND REPORTER

4

5            The undersigned Certified Shorthand Reporter

6    of the State of California does hereby certify:

7            That the foregoing proceeding was taken

8    remotely before me at the time and place therein set

9    forth, at which time the witness was duly sworn by me;

10           That the testimony of the witness and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed, said transcript being a true and correct

14   copy of my shorthand notes thereof;

15           I hereby certify that I am not interested in

16   the event of the action.

17           IN WITNESS WHEREOF, I have subscribed my name

18   this date: February 17, 2025.

19

20

21           MARIVON H. CHRISTINE, CSR
             Certificate No. 3735
22

23

24

25
```

1

2

3

4       Marivon H. Christine , Certified Shorthand Reporter,

5    CSR No.   3735, hereby certify:

6       The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12   Dated:    February 24, 2025
                _____

13

14

15

16                          _____

17

18

19

20

21

22

23

24

25

# EXHIBIT J

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


MARK SNOOKAL, an individual,

       Plaintiff,                Case No.

     vs.                  2:23-cv-6302-HDV-AJR

CHEVRON USA, INC., a California
Corporation, and DOES 1 through 10,
inclusive,

       Defendants.
_____


DEPOSITION OF DR. UJOMOTI AKINTUNDE

OCTOBER 31, 2024

CONDUCTED VIA ZOOM VIDEOCONFERENCE




REPORTED BY LAUREN RAMSEYER, CSR NO. 14004

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARK SNOOKAL, an individual,

 5            Plaintiff,              Case No.

 6        vs.                        2:23-cv-6302-HDV-AJR

 7   CHEVRON USA, INC., a California
     Corporation, and DOES 1 through 10,
 8   inclusive,

 9            Defendants.
     _____
10

11

12

13

14

15          DEPOSITION OF DR. UJOMOTI AKINTUNDE,

16   commencing on Thursday, October 31, 2024, at 8:00 a.m.,

17   Pacific Time, held via Zoom videoconference, all

18   participants appearing remotely before Lauren Ramseyer,

19   Certified Shorthand Reporter, CSR No. 14004.

20

21

22

23

24

25
```

Dr. Ujomoti Akintunde                                    October 31, 2024

 1        Q.    And does a rupture -- excuse me, strike that.

 2              Can a rupture lead to death?

 3        A.    Sorry?

 4        Q.    Can a rupture --

 5        A.    Please repeat.

 6        Q.    I apologize.  Can a rupture lead to death?

 7        A.    Yes.

 8        Q.    Under what circumstances would a rupture lead

 9   to death?

10        A.    If it's sudden, its inability to get to -- if

11   it's large and sudden or there isn't enough time to get

12   appropriate medical attention, it can lead to death.

13   Sometimes even when you get appropriate medical

14   attention, it can lead to death.

15        Q.    And is that because of the blood loss

16   associated with the rupture?

17        A.    Largely.  Largely, yes.

18        Q.    And you also mentioned a dissection being a

19   complication.  What is a dissection?

20        A.    It's a tear in the wall of the aorta, and when

21   that tear occurs, blood fills into the defects created

22   by the tear, so the wall of the aorta becomes weak and

23   prone to rupture.

24        Q.    So would it be accurate to say that a

25   dissection could lead to rupture?

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1        A.    Correct.
 2        Q.    Do you have a sense for how often a rupture --
 3   I'm sorry, strike that.
 4              Do you have a sense for how often a dissection
 5   leads to a rupture?
 6        A.    No, I don't have the numbers off the top of my
 7   head.
 8        Q.    Okay.  And can a dissection lead to death?
 9        A.    Yes.
10        Q.    Under what circumstances would a dissection
11   lead to death?
12        A.    Likely, commonly due to rupture, commonly.
13        Q.    You also separately mentioned that death was a
14   complication associated with a dilated aortic root?
15        A.    Yes.
16        Q.    Could you tell us more about that?
17              MS. FLECHSIG:  Vague and ambiguous.
18              THE WITNESS:  Sorry?  Oh, okay.
19   BY MS. FAN:
20        Q.    Let me rephrase.  So you mentioned that death
21   is another complication associated with a dilated aortic
22   root.
23        A.    Yes.
24        Q.    How does a dilated aortic root, how does that
25   condition result in death?
```

Dr. Ujomoti Akintunde                                    October 31, 2024

1          A.    If there's an increase of size or a dissection

2      or if there's a rupture.  Sometimes it will cause even

3      undiagnosed, and it's only detected at autopsy.

4          Q.    With these complications that we discussed,

5      they -- can they be associated with an asymptomatic

6      dilated aortic root?

7          A.    Oftentimes, they are associated with

8      symptomatic, but it's also possible for the person to

9      not have a chance to present in hospital and they

10     present as a fatality.

11         Q.    So to make sure I understand you correctly,

12     sometimes these complications could result without the

13     patient experiencing any symptoms?

14         A.    Sometimes.  But most times, most times they do

15     have symptoms.  But the reason I put it that way is

16     before the patient gets to the hospital to complain of

17     symptoms, they may have passed away.  That's what I mean

18     by that.

19         Q.    Understood.  Thank you.  Based on your

20     assessment of Mr. Snookal's imaging reports, what was

21     your assessment of the risk associated with his

22     condition?

23         A.    I thought he was low risk.

24         Q.    What do you mean by "low risk"?

25         A.    The chance of him having an adverse cardiac

1    foundation.  Vague and ambiguous.

2             THE WITNESS:  It would be higher than the

3    person who does not have a dilated aortic root and is

4    otherwise well, yes.

5    BY MS. FAN:

6        Q.   So you assessed Mr. Snookal's risk of

7    complication with his dilated aortic root to be low.

8    What did you base your assessment on?

9        A.   The outcomes of people from -- from many -- I

10   mean, experience on literature, the outcome of people in

11   that category, based on scientific literature.

12       Q.   When you say outcomes, what are you referring

13   to?

14       A.   Adverse outcomes, adverse aortic outcomes and

15   death.

16       Q.   I see.  So when you say you based it on your

17   knowledge of medical literature regarding his condition,

18   what medical literature are you referring to?

19       A.   I read a lot of articles and medical

20   materials, various kinds, you know, in my -- in the

21   course of my practice.  I come across different reading

22   materials or texts.

23       Q.   At the time that you made your assessment of

24   Mr. Snookal's risk of complication, were you aware that

25   his cardiologist had quoted his risk of complication at

Dr. Ujomoti Akintunde                                    October 31, 2024

 1   could you state it again, please?

 2   BY MS. FAN:

 3        Q.    Yeah, of course.   If Mr. Snookal experienced a

 4   cardiovascular complication relating to his aortic root,

 5   what interventions are required?

 6             MS. FLECHSIG:   Same objections, but also

 7   incomplete hypothetical.   Go ahead.

 8             THE WITNESS:   So he would need to be medevaced

 9   immediately to the center where he could have access to

10   definitive care.

11   BY MS. FAN:

12        Q.    And to be clear, the kind of cardiovascular

13   complications that Mr. Snookal would experience with an

14   aortic root would be a rupture, or dissection; is that

15   correct?

16        A.    Yes.

17        Q.    And the third complication you mentioned

18   relating to a dilated aortic root was death?

19        A.    Yes.

20        Q.    So, of course, if a death had occurred, no

21   interventions would be possible.

22             MS. FLECHSIG:   Incomplete hypothetical.

23             THE WITNESS:   Yes.

24   BY MS. FAN:

25        Q.    Based on your knowledge of the medical

Dr. Ujomoti Akintunde                                    October 31, 2024

1  facilities in Escravos, would they be able to support

2  Mr. Snookal if he suffered a cardiological event?

3            MS. FLECHSIG:  Objection.  Incomplete

4  hypothetical.  Vague and ambiguous as to cardiac event.

5            THE WITNESS:  No.

6  BY MS. FAN:

7       Q.   And to clarify, if Mr. Snookal suffered a

8  rupture in -- strike that.

9            If Mr. Snookal experienced a rupture relating

10 to his dilated aortic root in Escravos, based on your

11 knowledge of the medical facilities available, would

12 they be able to support Mr. Snookal in the event of a

13 rupture?

14           MS. FLECHSIG:  Objection.  Vague and ambiguous

15 as to the meaning of support.

16           THE WITNESS:  No.

17 BY MS. FAN:

18      Q.   Based on your knowledge of the medical

19 facilities in Escravos, would they be able to support

20 Mr. Snookal if he suffered a dissection relating to his

21 dilated aortic root?

22           MS. FLECHSIG:  Objection.  Vague and ambiguous

23 as to the meaning of support.  Incomplete hypothetical.

24           THE WITNESS:  No.

25

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1                        * * *

 2              I, DR. UJOMOTI AKINTUNDE, hereby declare under

 3       penalty of perjury that the foregoing is my deposition

 4       under oath; that these are the questions asked of me and

 5       my answers thereto; that I have read my deposition and

 6       have made corrections, additions, or changes that I deem

 7       necessary.

 8

 9              DATED this _____day of _____ 2024.

10

11              _____

12                        DR. UJOMOTI AKINTUNDE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dr. Ujomoti Akintunde                                        October 31, 2024

1                    REPORTER'S CERTIFICATE

2

3           I, Lauren Ramseyer, Certified Shorthand

4    Reporter licensed in the State of California, License

5    No. 14004, hereby certify that the deponent was by me

6    first duly sworn and the foregoing testimony was

7    reported by me and was thereafter transcribed with

8    Computer-Aided Transcription; that the foregoing is a

9    full, complete, and true record of said proceedings.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties in the

12   foregoing proceeding and caption named or in any way

13   interested in the outcome of the cause in said caption.

14          The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificate null and void.

17          In witness whereof, I have hereunto set my

18   hand this day: November 19, 2024.

19

20

21          Lauren Ramseyer, CSR No. 14004

22

23

24

25