1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   TRACEY A. KENNEDY, Cal Bar No. 150782
3  ROBERT E. MUSSIG, Cal. Bar No. 240369
   H. SARAH FAN, Cal. Bar No. 328282
4  350 South Grand Avenue, 40th Floor
   Los Angeles, CA 90071-3460
5  Telephone: 213.620.1780
   Facsimile: 213.620.1398
6  E-mail:   tkennedy@sheppardmullin.com
             rmussig@sheppardmullin.com
7            sfan@sheppardmullin.com

8  Attorneys for Defendant.
   CHEVRON U.S.A. INC.,
9  a Pennsylvania corporation

10

11              UNITED STATES DISTRICT COURT

12        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| 13  MARK SNOOKAL, an individual, | Case No. 2:23-cv-6302-HDV-AJR |
| 14      Plaintiff, | **DECLARATION OF ROBERT E. MUSSIG IN SUPPORT OF DEFENDANT CHEVRON U.S.A., INC.'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR LEAVE TO FILE A MOTION TO COMPEL FURTHER DISCOVERY AND TO FILE A MOTION FOR SANCTIONS** |
| 15      vs. | |
| 16  CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, | |
| 17  inclusive, | |
| 18      Defendants. | |
| 19  | **(Dkt. No. 47)** |
| 20  | District Judge: Hon. Hernán De. Vera |
| 21  | Magistrate Judge: Hon. A. Joel Richlin |
| 22  | Action Filed: August 3, 2023 Trial Date: February 4, 2025 |

23

24

25

26

27

28

SMRH:4934-1558-0721.1                           DECLARATION OF ROBERT E. MUSSIG

## <u>DECLARATION OF ROBERT E. MUSSIG</u>

I, Robert Mussig, declare as follows:

1.     I am an attorney licensed to practice law in California.  I am a partner with the law firm Sheppard, Mullin, Richter & Hampton LLP, counsel of record for Defendant Chevron U.S.A., Inc., a Pennsylvania corporation ("Chevron U.S.A.").  I have personal knowledge of the facts set forth below and, if called as a witness, could and would testify competently to such facts under oath.

2.     On or about November 30, 2023, Chevron U.S.A. served its Initial Disclosures in this case pursuant to Federal Rules of Civil Procedure, Rule 26(a)(1), identifying individuals it believed may have discoverable information that Chevron U.S.A. may use to support its defenses or to rebut Plaintiff's claims.  Chevron U.S.A. conducted a diligent search for information and documents regarding nonprivileged matters that are relevant to the parties' claims or defenses in this case.  As part of its initial search, Chevron U.S.A. identified the decisionmaker with respect to Plaintiff's MSEA determination, Dr. Asekomeh, and based on information he provided, identified the individuals Dr. Asekomeh communicated with during his review of Plaintiff's MSEA determination.  Neither Dr. Asekomeh nor anyone else identified Dr. Frangos as an individual who was involved in the process.  Chevron U.S.A. also identified the Human Resources representatives whom Plaintiff contacted after Plaintiff's conditional offer was rescinded and identified Dr. Levy as the individual who spoke with Plaintiff and with one of the HR representatives regarding Plaintiff's MSEA determination.  Dr. Levy did not identify Dr. Frangos as an individual who was involved in the MSEA determination process.  Chevron U.S.A. was not aware that Dr. Stephen Frangos was involved in Plaintiff's Medical Suitability for Expatriate Assignment fitness for duty ("MSEA") determination in any capacity at that time.  I am informed and believe that Dr. Frangos retired from his employment with Chevron U.S.A. in 2022.

DECLARATION OF ROBERT E. MUSSIG

3.      On May 10, 2024, I took the deposition of Plaintiff Mark Snookal.  I am in possession of a certified copy of his deposition transcript.  Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from Plaintiff's deposition transcript.  At his deposition, Mr. Snookal testified that that after he was deemed unfit for duty in Escravos, he was referred to Dr. Stephen Frangos, who passed him off to Dr. Mark Levy to discuss the MSEA determination.

4.      Plaintiff has taken six depositions in this case thus far, including four of the doctors involved in the MSEA determination—Dr. Mark Levy, Dr. Eshiofe Asekomeh, Dr. Ujomoti Akintunde, and Dr. Victor Adeyeye.  Dr. Adeyeye's deposition is still pending completion.  (*See* Fan Dec., ¶ 2.)  I defended the depositions of Drs. Levy and Asekomeh, and neither testified about any involvement by Dr. Frangos in Plaintiff's MSEA determination, nor indicated in any way that he was a decisionmaker with respect to the determination.

5.      On August 30, 2024, Plaintiff took the deposition of Dr. Mark Levy.  I defended Dr. Levy's deposition and am in possession of a certified copy of his deposition transcript.  Attached hereto as **Exhibit B** is a true and correct copy of relevant excerpts from Dr. Levy's deposition transcript.  During that deposition, Dr. Levy did not testify regarding any involvement by Dr. Frangos at all in Plaintiff's MSEA determination.

6.      On October 8, 2024, when I met with Dr. Asekomeh, I learned that Dr. Asekomeh had corresponded by email with Drs. Akintunde and Adeyeye regarding Plaintiff.  Chevron U.S.A. does not have the ability to search the records of all Chevron-related entities because electronic records are not centrally stored.  Chevron U.S.A. worked with Chevron Nigeria to search for and obtain copies of Dr. Asekomeh's emails with Drs. Akintunde and Adeyeye, which Dr. Asekomeh had to regain access to.  From that search, my office produced copies of emails between Dr. Asekomeh and Drs. Akintunde and Adeyeye on October 10, 2024, in advance of Dr. Asekomeh's deposition.

7.      On October 10, 2024, Plaintiff took the deposition of Dr. Eshiofe Asekomeh.  I defended Dr. Asekomeh's deposition and am in possession of a certified copy of his

DECLARATION OF ROBERT E. MUSSIG

deposition transcript.  Attached hereto as **Exhibit C** is a true and correct copy of relevant excerpts from Dr. Asekomeh's deposition transcript.  During his deposition, Dr. Asekomeh did not testify regarding any involvement by Dr. Frangos in Plaintiff's MSEA determination.  Dr. Asekomeh did not testify that he ever communicated with Dr. Frangos or considered Dr. Frangos's input in making his MSEA determination.

8.     During his deposition, Dr. Asekomeh testified that he did not specifically recall, but may have corresponded by email with Dr. Olorunfemi Pitan, former Head of Occupational Health in Lagos, Nigeria.  Following Dr. Asekomeh's deposition, Chevron U.S.A. again worked with Chevron Nigeria to conduct a search for any email correspondence between Dr. Asekomeh and Dr. Pitan.  In the course of this search, Chevron U.S.A. received a copy of an email chain which Dr. Pitan forwarded to Dr. Asekomeh on August 15, 2019, which included an email from Dr. Frangos dated August 8, 2019, which is the subject of Plaintiff's ex parte application.  My office duly produced the email chain on November 8, 2024.  Until this point, Chevron U.S.A. had not known of any involvement by Dr. Frangos except for the referral that Plaintiff testified to in his deposition.

9.     To date, Plaintiff has not served any discovery on Chevron Nigeria, nor made any attempts to do so either before or after the Court reopened discovery in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed on April 2, 2025, at Los Angeles, California.

/s/ *Robert E. Mussig*

ROBERT E. MUSSIG

SMRH:4934-1558-0721.1

DECLARATION OF ROBERT E. MUSSIG

# EXHIBIT A

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5   MARK SNOOKAL, an individual,      )
                                      )
6          Plaintiff,                 )
                                      )
7       v.                            )   NO. 2:23-cv-6302-
                                      )       HDV-AJR
8   CHEVRON USA, INC., a California   )
    Corporation, and DOES 1 through   )
9   10, inclusive,                    )
                                      )
10          Defendants.               )
    _____   )

11

12

13

14

15

16

17          Videotaped deposition of MARK JORDAN

18      SNOOKAL, Plaintiff, taken on behalf of Defendants

19      at 333 South Hope Street, 43rd Floor, Los Angeles,

20      California, commencing at 10:00 a.m. on Friday,

21      May 10, 2024, before John M. Taxter, Certified

22      Shorthand Reporter No. 3579 in and for the State

23      of California, a Registered Professional Reporter.

24

25

```
 1      APPEARANCES OF COUNSEL:

 2


 3


 4      FOR PLAINTIFF MARK JORDAN SNOOKAL:

 5              ALLRED, MAROKO & GOLDBERG
                BY:  DOLORES Y. LEAL, Attorney at Law
 6              6300 Wilshire Boulevard, Suite 1500
                Los Angeles, California  90048-5217
 7              323.653.6530
                dleal@amglaw.com
 8


 9


10      FOR DEFENDANT CHEVRON USA, INC.:

11              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                BY:  ROBERT E. MUSSIG, Attorney at Law
12              333 South Hope Street, 43rd Floor
                Los Angeles, California  90071-1422
13              213.620.1780
                rmussig@sheppardmullin.com
14
                        -and-
15
                SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
16              BY:  LINDA Z. SHEN, Attorney at Law
                501 West Broadway, 18th Floor
17              San Diego, California  92101-3598
                619.338.6500
18              lshen@sheppardmullin.com

19


20


21      VIDEOGRAPHER:

22              GIGI FADICH

23


24


25
```

| | | |
|---|---|---|
| 1 | A    That is correct. | 11:10:18 |
| 2 | Q    Okay.  And did you have any | 11:10:18 |
| 3 | conversations with anybody else from Chevron about | 11:10:20 |
| 4 | this topic? | 11:10:22 |
| 5 | And I'm not referring to, you know, | 11:10:24 |
| 6 | later with Mr. Powers.  I -- I mean about the | 11:10:27 |
| 7 | topic of what it would -- what would happen with | 11:10:29 |
| 8 | this -- this job in Escravos and why you weren't | 11:10:31 |
| 9 | going to get it. | 11:10:35 |
| 10 | A    I talked -- so when I first received | 11:10:37 |
| 11 | information that I had been deemed not fit for | 11:10:43 |
| 12 | duty, I reached out to my coordination team.  I | 11:10:46 |
| 13 | don't remember the person that had been assigned | 11:10:51 |
| 14 | to me, but I just -- I wrote an e-mail and asked | 11:10:53 |
| 15 | if there was any way to contest the decision. | 11:10:55 |
| 16 | They weren't aware of any. | 11:11:01 |
| 17 | So I reached out to the Chevron omsbud | 11:11:02 |
| 18 | to ask the same question.  I don't believe I went | 11:11:06 |
| 19 | into any level of detail with either one.  The | 11:11:10 |
| 20 | omsbud is the one that got me in contact with, I | 11:11:13 |
| 21 | believe it was, Dr. Frangos who is the equivalent | 11:11:18 |
| 22 | of Dr. Levy in the U.S., covers the North America | 11:11:22 |
| 23 | business units, and Dr. Frangos got me in touch | 11:11:27 |
| 24 | with Dr. Levy.  So other than that, I haven't had | 11:11:32 |
| 25 | any conversations. | 11:11:35 |

| | | |
|---|---|---|
| 1 | determination that you were not fit for duty in | 11:22:17 |
| 2 | Escravos? | 11:22:20 |
| 3 | A    If I recall correctly, it was when I | 11:22:21 |
| 4 | received this form via e-mail which was on -- I | 11:22:22 |
| 5 | believe that it was on the date that it's signed | 11:22:29 |
| 6 | there, August 15th. | 11:22:30 |
| 7 | Q    Okay.  And you testified that you | 11:22:31 |
| 8 | reached out to the omsbud -- right? -- after | 11:22:36 |
| 9 | your -- | 11:22:41 |
| 10 | A    Not -- no.  That wasn't the first step. | 11:22:42 |
| 11 | The first step was to reach out to the medical | 11:22:45 |
| 12 | liaison to ask them if there was a -- a way to ask | 11:22:48 |
| 13 | for a second -- | 11:22:51 |
| 14 | Q    You -- | 11:22:51 |
| 15 | A    -- or a review. | 11:22:53 |
| 16 | Q    You had said that, and the medical | 11:22:54 |
| 17 | liaison said they weren't aware of any? | 11:22:56 |
| 18 | A    Correct.  So then I reached out to the | 11:22:58 |
| 19 | omsbud. | 11:22:59 |
| 20 | Q    The omsbud.  That's who put you in touch | 11:23:01 |
| 21 | with Dr. Frangos who put you in touch with | 11:23:02 |
| 22 | Dr. Levy? | 11:23:05 |
| 23 | A    Correct. | 11:23:06 |
| 24 | Q    Did you have any subsequent discussions | 11:23:06 |
| 25 | with the omsbud about any of this, the | 11:23:08 |

| 1  | determination or anything else? | 11:23:12 |
| 2  | A    Even if I did, they're confidential. | 11:23:13 |
| 3  | Q    Well, I meant essentially was the omsbud | 11:23:16 |
| 4  | putting you in touch with the people you should | 11:23:19 |
| 5  | talk to? | 11:23:20 |
| 6  | A    Yes. | 11:23:20 |
| 7  | Q    Okay.  And Dr. Frangos, same thing?  He | 11:23:21 |
| 8  | just put you in touch with Dr. Levy? | 11:23:23 |
| 9  | A    Correct. | 11:23:25 |
| 10 | MS. LEAL:  Is this a good time for a | 11:23:32 |
| 11 | break? | 11:23:34 |
| 12 | MR. MUSSIG:  Sure.  Yeah. | 11:23:34 |
| 13 | THE VIDEOGRAPHER:  Before we go off the | 11:23:35 |
| 14 | record, Counsel, would you like to waive the | 11:23:37 |
| 15 | federal rule that requires the opening read-on to | 11:23:40 |
| 16 | be read at the beginning of each new media? | 11:23:44 |
| 17 | MR. MUSSIG:  Defendant will, yes. | 11:23:46 |
| 18 | MS. LEAL:  Plaintiff will, as well. | 11:23:48 |
| 19 | THE VIDEOGRAPHER:  Video deposition off | 11:23:50 |
| 20 | the record at 11:23 a.m., conclusion of media 1. | 11:23:51 |
| 21 | (Recess.) | 11:23:56 |
| 22 | THE VIDEOGRAPHER:  Video deposition | 11:37:22 |
| 23 | returning to the record at 11:37 a.m., beginning | 11:37:24 |
| 24 | of media 2. | 11:37:28 |
| 25 | BY MR. MUSSIG: | 11:37:29 |

**Abrams, Mah & Kahn**                    80

1    STATE OF CALIFORNIA   )
                           ) SS.
2    COUNTY OF VENTURA     )

3         I, John M. Taxter, a California Certified

4    Shorthand Reporter, Certificate No. 3579, a

5    Registered Professional Reporter, do hereby

6    certify:

7         That the foregoing proceedings were taken

8    before me at the time and place therein set forth,

9    at which time the deponent was put under oath by

10   me; that the testimony of the deponent and all

11   objections made at the time of the examination

12   were recorded stenographically by me and were

13   thereafter transcribed; that the foregoing is a

14   true and correct transcript of my shorthand notes

15   so taken.

16        I further certify that I am neither counsel

17   for nor related to any party to said action.

18        The dismantling, unsealing, or unbinding of

19   the original transcript will render the Reporter's

20   Certificate null and void.

21        Pursuant to Federal Rule 30(e), transcript

22   review was requested.

23   Dated May 22, 2024.

24   _____
     JOHN M. TAXTER
25   California Certified Shorthand
     Reporter No. 3579, RPR

1

2

3

4    I, John M. Taxter , Certified Shorthand Reporter,

5    CSR No.   3579, hereby certify:

6    The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12    Dated:   May 23, 2024

13

14

15

16    _____

17    John Taxter, CSR No. 3579

18

19

20

21

22

23

24

25

EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,    )
                                )
                                )
                Plaintiff,      )
vs.                             ) Case No.
                                ) 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                  )
                                )
                Defendants.     )
_____)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Scott Levy, M.D.                                                    August 30, 2024

```
 1                A P P E A R A N C E S

 2

 3

 4   FOR THE PLAINTIFF:

 5           ALLRED, MAROKO & GOLDBERG
             By:  OLIVIA FLECHSIG
 6               DOLORES Y. LEAL
             Attorneys at Law
 7           6300 Wilshire Boulevard, Suite 1500
             Los Angeles, California 90048
 8           (323) 653-6530
             oflechsig@amglaw.com
 9           dleal@amglaw.com

10   FOR THE DEFENDANT:

11           SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
             By:  ROBERT E. MUSSIG
12           Attorney at Law
             333 South Hope Street, 43rd Floor
13           Los Angeles, California 90071
             (213) 620-1780
14           rmussig@sheppardmullin.com

15   THE VIDEOGRAPHER:

16           Jacob Rivera

17

18

19

20

21

22

23

24

25
```

Scott Levy, M.D.                                                    August 30, 2024

1    program across North America and then involved with

2    different health and wellness events as they arose.

3              (Reporter clarification.)

4    BY MS. FLECHSIG:

5         Q.   How long were you in that occupational health

6    role?

7         A.   It was about two years or so.

8         Q.   What was your next role?

9         A.   I was moved to Singapore, and I was assigned

10   the role of regional medical manager for the Asia

11   Pacific region.

12        Q.   What did you do in that capacity?

13        A.   Similar responsibilities just -- I guess, more

14   of a -- of a senior position.  So I managed, again, more

15   complicated businesses and had more reports.

16        Q.   How long were you in that role?

17        A.   Three years approximately.

18        Q.   Okay.  And after that -- excuse me, the role in

19   Singapore, what was your next role at Chevron?

20        A.   I took a lateral position to regional medical

21   manager of our EEMEA, E-E-M-E-A, region, which is

22   Europe, Eurasia, Mid East, and Africa, based out of

23   London.

24        Q.   Okay.  So what was the date range on that -- on

25   that role?  I want to -- like, in time.

Scott Levy, M.D.                                          August 30, 2024

1        A.  It ended on May 31st of this year.  So I moved

2   to my current role May 31 -- on June 1st.  So it was

3   May 31st and then I would subtract seven years.  2017

4   roughly, '18.

5        Q.  Started 2018, and then you were in that role

6   until May 31st, 2024?

7        A.  Correct.

8        Q.  Okay.  Were you located in London that whole

9   time?

10       A.  I was.

11       Q.  Okay.  And what's your current role?

12       A.  I now have the role of regional medical manager

13  for the Americas based out of Houston.

14       Q.  Do you know what entity -- what Chevron

15  corporate entity was your employer during the time you

16  were the regional medical director for the EEMEA role?

17       A.  Yeah, so I was working out of the -- it was

18  Chevron Products UK.  And, again, that was the title

19  that we used in my signature.  I can't tell you the

20  technical bits, though, about payroll and whether I was

21  paid through Chevron USA or not, but my paychecks remain

22  the same -- through the same -- for my 12 years that I

23  was a Chevron employee.

24       Q.  You mean the entity that's paying your paycheck

25  is the same?

Scott Levy, M.D.                                    August 30, 2024

1   sick, though -- that was probably the most common --

2   where they developed a medical condition in a location

3   where they didn't have the capabilities of managing that

4   problem, so they would be -- frequent destination for

5   people in that region to come into London to get sorted.

6           (Reporter admonishment.)

7   BY MS. FLECHSIG:

8       Q.  Were you also responsible for reviewing the

9   fitness-for-duty determinations that the evaluating

10  doctors made?

11      A.  Not always.  And I can explain.  So the

12  policy -- what we did -- the way things were handled

13  were the host location would do the evaluations -- so

14  the host would be -- in the situation we're dealing with

15  today -- would be the U.S. location would be in charge

16  of collecting the data, get the exam done where the

17  person lives or relatively close to where they live, and

18  then the host -- H-O-S-T -- location -- that's the --

19  embedded medical team would then review the medical

20  records for fitness for duty.

21          As they were receiving that person to their

22  communities, into their systems, they would perform an

23  evaluation -- well, perform a review to make sure that

24  the person was fit.  And so these -- we called our

25  fitness for duties for expats Medical Suitability for

1    Expat Assignment, MSCA, and so the host location would

2    review for suitability to their -- for their new

3    location.

4        Q.   Okay.  So I just want to make sure I'm

5    understanding correctly.

6            So basically -- it sounds like you're familiar

7    with the facts of Mr. Snookal's case; right?

8        A.   Correct.

9        Q.   Generally.  So you -- you know that he was

10   evaluated in Los Angeles, and then he was trying to go

11   to a host location in Nigeria; right?

12       A.   Yes.

13       Q.   Okay.  So in the policy that you just outlined,

14   in other words, Mr. Snookal, you know -- the policy is

15   the person gets evaluated by a doctor on the ground

16   where they live and then a medical team in the place

17   they're going to go reviews the evaluation.

18       A.   Correct.

19       Q.   Okay.  So you said you sometimes are involved

20   in reviewing the determinations that are made for a

21   person's fitness for duty.

22           So when would you become involved after the

23   local exam and the host location review?

24       A.   When there's a challenge or uncertainty about

25   the situation.  So the -- so there are, I would say,

Scott Levy, M.D.                                    August 30, 2024

1   many intricate pieces to this.  And so one could be

2   something that we're not really sure of.  Second could

3   be where maybe the person can't be -- a condition can't

4   be managed locally but can be managed close by, and so

5   there might be an opportunity to set up a second

6   treatment center close by to -- to their host location.

7   Or try to identify other -- other factors that could

8   potentially mitigate.  And -- happy to expand as needed.

9        Q.  Yeah.  So I guess in terms of -- you said you

10  get involved when there's a challenge or uncertainty.

11        Does that include when an employee challenges

12  the decision that they were not fit for duty?

13        A.  Yeah, I was thinking that exactly, that if --

14  the fact that I'm here shows that I do get involved in

15  certain situations.  And so, yes, that's correct.

16        Q.  Okay.  Do you get the final say on the fitness

17  for duty when an employee makes such a challenge to the

18  determination?

19        A.  I do not.

20        Q.  Who -- who would get the final say?

21        A.  The host location.

22        Q.  Okay.  So you have to defer to what the host --

23  the doctors at the host location determine.

24        A.  Correct.  Correct.  So the host location,

25  they -- host location reviews -- the doctors review.

Scott Levy, M.D.                                      August 30, 2024

1    They would then discuss any, let's say, conflict or
2    challenges or issues with, you know -- with their
3    business, so -- HR and their teams to determine and work
4    with the supervisors to determine whether a position can
5    be accommodated, whether something else can be worked
6    out, whether they need to bring me into the situation to
7    try to troubleshoot.  So -- but that's -- yeah, that
8    decision would have been at the host location.
9        Q.   Okay.  And what kind -- so I think you started
10   describing, but what sort of troubleshooting can you do
11   if the host location says that there's an issue with the
12   employee's fitness for duty?
13       A.   Correct.  So potentially -- it depends on the
14   specific issue.  If it's -- there are times where -- and
15   I'll give you an example.
16            There are times where the medication that the
17   person wasn't taking -- that the person was taking at
18   home is just simply not available in country and can't
19   be -- it can't -- it can't come into country, it can't
20   be prescribed in country, so sometimes the issue may be
21   simply is there a way of -- of setting up a close stop
22   for the person to come in -- when they fly in and out,
23   they can pick up their medications.
24            Potentially, if there's a specialist that they
25   need to follow instead of -- and if -- I'm just making

Scott Levy, M.D.                                              August 30, 2024

1   what I think the -- the risk may be or not be.

2       Q.   So how did you -- how did you first become

3   involved with Mr. Snookal's challenge to the host team

4   deeming him unfit for duty?

5       A.   I was asked as a second opinion to review the

6   case.

7       Q.   To provide a medical opinion on whether it was

8   safe for him?

9       A.   I was -- so I don't recall exactly, but I know

10  Mr. Snookal asked for a second opinion and -- that, I

11  know for a fact.  And then this was sent to me for a

12  review.

13      Q.   Who sent it to you for review?

14      A.   I don't remember.  Again, it was years ago.  I

15  know Mark and I did speak, so I'm not sure if he

16  approached me first or if someone sent it to me, but I

17  do know that Mark and I chatted about his situation.

18      Q.   Okay.  So when you were asked to give a second

19  opinion, were you allowed to override the decision that

20  the host team had made?

21      A.   I was not allowed to override, but I would say

22  that the -- even the -- as I'm thinking of the word

23  "second opinion," that might be incorrect as well.  I

24  would say that -- I was here to help with an appeal.  So

25  I would look at a case and see if there was anything

Scott Levy, M.D.                                    August 30, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4         I, RACHEL N. BARKUME, a Certified Shorthand

 5    Reporter of the State of California, hereby certify that

 6    the witness in the foregoing deposition,

 7                    SCOTT LEVY, M.D.,

 8    was by me duly sworn to tell the truth, the whole truth,

 9    and nothing but the truth in the within-entitled cause;

10    that said deposition was taken at the time and place

11    therein named; that the testimony of said witness was

12    stenographically reported by me, a disinterested person,

13    and was thereafter transcribed into typewriting.

14         Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties to said

18    deposition, nor in any way interested in the outcome of

19    the cause named in said caption.

20

21         DATED:  September 12, 2024.

22

23    _____

24    Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,    )
                                )
                                )
                Plaintiff,      )
vs.                             ) Case No.
                                ) 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                  )
                                )
                Defendants.     )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Dr. Eshiofe Asekomeh                                          October 10, 2024

```
 1                    A P P E A R A N C E S

 2

 3

 4   FOR THE PLAINTIFF:

 5            ALLRED, MAROKO & GOLDBERG
              By:  DOLORES Y. LEAL
 6            Attorney at Law
              6300 Wilshire Boulevard, Suite 1500
 7            Los Angeles, California 90048
              (323) 653-6530
 8            dleal@amglaw.com

 9   FOR THE DEFENDANT:

10            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  ROBERT E. MUSSIG
11            Attorney at Law
              333 South Hope Street, 43rd Floor
12            Los Angeles, California 90071
              (213) 620-1780
13            rmussig@sheppardmullin.com

14   THE VIDEOGRAPHER:

15            Jacob Rivera

16   ALSO PRESENT:

17            Eguono Erhun, In-House Counsel for Chevron

18

19

20

21

22

23

24

25
```

Dr. Eshiofe Asekomeh                                October 10, 2024

1   foundation.  Let me just -- Doctor, when I object,

2   unless I instruct you not to answer, you should still

3   answer the question.  I'm just making objections for the

4   record.  So unless I'm instructing you not to answer, go

5   ahead and answer her questions.

6        THE WITNESS:  Okay.  So by the nature of this

7   contract, Deep Drill is providing medical services to

8   Chevron by supplying manpower, doctors and nurses.

9   BY MS. LEAL:

10       Q.  Do you know if Deep Drill Oil Services provides

11  medical services to any other companies other than

12  Chevron, or is Chevron the only client?

13       A.  I don't know.

14       MR. MUSSIG:  Calls for speculation.

15  BY MS. LEAL:

16       Q.  So prior to 2020, who was your employer?

17       A.  So prior to 2020, my employer was Delog Nigeria

18  Limited, D-E-L-O-G, Delog Nigeria Limited.

19       Q.  So prior to 2020, your employer was Delog

20  Nigeria Limited?

21       A.  Yes.  That's D-E-L-O-G.

22       Q.  So what business was Delog Nigeria Limited in

23  at the time?

24       MR. MUSSIG:  Calls for speculation.  Lacks

25  foundation.

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              THE WITNESS:  Okay.  So -- so for my group, it
 2    was, again, provision of manpower, doctors and nurses,
 3    to Chevron in this instance.
 4    BY MS. LEAL:
 5        Q.  Okay.  Do you know if Delog Nigeria Limited
 6    provided doctors and nurses to other companies other
 7    than Chevron at the time?
 8              MR. MUSSIG:  Calls for speculation.
 9              THE WITNESS:  I don't know.
10    BY MS. LEAL:
11        Q.  Okay.  Has Chevron directly ever paid your
12    salary?
13        A.  No.
14        Q.  So the work that you did for Chevron was paid
15    either by Delog Nigeria Limited or by Deep Drill Oil
16    Services in conjunction with the contract that those
17    companies had with Chevron; is that correct then?
18        A.  Can you rephrase that question?
19        Q.  Yes.  I want to make sure I understand.
20              Prior to 2020, and since then, all of the work
21    that you have performed for Delog Nigeria Limited and
22    Deep Drill Oil Services was work that you did in
23    connection with services for Chevron.
24        A.  Yes.
25        Q.  Other than Chevron, did you have any other
```

Dr. Eshiofe Asekomeh                                    October 10, 2024

1          So it's a back-and-forth process that we are --
2   until is complete.  Now, outside that checklist, if any
3   of the results has an abnormality -- even before it
4   starts to you, it's a doctor-to-doctor thing.  So you
5   send me a result that is borderline, and you know ahead
6   I'm going to ask why the result is borderline.

7          If you need to do a further evaluation, that
8   evaluation is already done.  But if it is not, then ask
9   them back and say, this person has borderline or this
10  result is abnormal, you want to run for that check to
11  strengthen or to confirm what is really going on until
12  you have everything that you can make your determination
13  with.

14     Q.  So in this case, you conducted an MSEA for Mark
15  Snookal in 2019 who at the time was employed in
16  California.

17          Do you recall that?

18     A.  Yes.

19     Q.  And you do recall that Mark Snookal had an
20  aortic dissection or an aortic aneurysm?

21     A.  Okay.  So we need to differentiation between
22  aortic dissection and aneurysm.  So the condition is
23  aortic aneurysm or aortic dilatation.  When it gets
24  complicated, it starts dissecting or it ruptures.  So a
25  dissection is pathway to rupturing.

Dr. Eshiofe Asekomeh                                          October 10, 2024

1        The doctor also commented that he had annual
2   echocardiogram and annual chest CT scans as a way of
3   monitoring that aortic aneurysm.  So those results were
4   also attached, and those results are not normal part of
5   an MSEA from the MEP program.  So that already makes the
6   case different from the normal case.

7        So at that point, I looked at those records and
8   then involved the cardiologists to do a review.  The
9   three cardiologists did a review and looked at the
10  records, the results of investigations, because I wanted
11  them to, as cardiologists, look at the results and
12  confirm, determine risk and possible complications.

13     Q.  So after all of that, a determination was made
14  that Mr. Snookal was unfit for duty; correct?

15          MR. MUSSIG:  Vague and ambiguous.

16          THE WITNESS:  Okay.  So --

17  BY MS. LEAL:

18     Q.  My question -- my question is very simple,
19  Dr. Asekomeh.

20          Was Mark Snookal determined to be unfit for
21  duty for a position in Escravos, Nigeria?  Yes or no?

22     A.  So a determination was made that he wasn't fit
23  for duty in Escravos but fit to work in Lagos.

24     Q.  I understand that.  My question simply was
25  about Escravos.

ERRATA SHEET

DEPOSITION OF DR. ESHIOFE ASEKOMEH

TAKEN OCTOBER 10, 2024

<u>MARK SNOOKAL V. CHEVRON U.S.A., INC.</u>

CASE NO.  2:23-cv-06302-HDV-AJR

| CITATION | CHANGE | REASON |
|---|---|---|
| 2:17 | Replace "In-House Counsel for **Chevron**" with "In-House Counsel for **Chevron Nigeria, Limited**" | Reporter error. |
| 4:6 | Replace "**ASEKOMEHE**" with "**ASEKOMEH**" | Reporter error. |
| 84:12 | Replace "what **it taught**" with "what **he thought**" | Reporter error. |
| 108:3 | Replace "**Except their criteria is international criteria**" with "**Except there are criteria, international criteria**" | Reporter error. |
| 110:18 | Replace "**several**" with "**cerebral**" | Reporter error. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Dated: __11/11/2024__

DocuSigned by:

*ESHIOFE ASEKOMEH*

FC2DBA2DC50A4CA...

Deponent: DR. ESHIOFE ASEKOMEH

Dr. Eshiofe Asekomeh                                        October 10, 2024

```
1              CERTIFICATE OF STENOGRAPHIC REPORTER

2

3

4         I, RACHEL N. BARKUME, a Certified Shorthand

5    Reporter of the State of California, hereby certify that

6    the witness in the foregoing deposition,

7                   DR. ESHIOFE ASEKOMEH,

8    was by me duly sworn to tell the truth, the whole truth,

9    and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14         Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21              DATED:  October 13, 2024.

22

23   _____

24         Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```