1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           CENTRAL DISTRICT OF CALIFORNIA

10    MARK SNOOKAL,                          Case No. 2:23-cv-06302-HDV-AJR

11

12                   Plaintiff,              **ORDER RE: DEFENDANT CHEVRON
                                             USA, INC.'S MOTION FOR SUMMARY
13                                           JUDGMENT [43]**

14           v.

15

16    CHEVRON USA, INC.,

17

18                   Defendants.

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

This action arises out of the rescission of a job offer.  Plaintiff Mark Snookal had been working in California for Defendant Chevron U.S.A. for approximately a decade when he applied to an open position based in Escravos, Nigeria.[1]

On July 9, 2019, Snookal was offered the position provided he could pass the standard medical assessment for expatriate positions.  As part of that medical assessment, Snookal disclosed that he had a heart condition.  Snookal then met with an independent physician that approved Snookal for the position in Escravos provided that he get approval from his treating cardiologist.  His cardiologist, Dr. Steven Khan, readily approved.

The final part of the process required assessment by doctors based in Nigeria, who were familiar with the local conditions in Escravos.  On August 15, 2019, one of those local doctors—Dr. Eshiofe Asekomeh—deemed Snookal unfit for the position in Escravos due to the risk imposed by his heart condition and the lack of medical infrastructure in Escravos.  In light of the disapproval, the offer was rescinded.  Snookal remained employed with Chevron; first in a job created for him after the position he left in expectation of leaving to Escravos was backfilled, then back in the job he held prior to the Escravos offer when that position became available again.  In August of 2021—after approximately a year in his old position—Snookal resigned from Chevron.

Snookal brought this suit in August of 2023 alleging that Chevron violated California's Fair Employment and Housing Act ("FEHA") by discriminating against him when they rescinded his offer due to his heart condition and failing to provide a reasonable accommodation for his disability after the offer was rescinded.  Snookal also alleged that Chevron constructively discharged him in violation of state common law.

Before the Court is Chevron's motion for summary judgment on all of Plaintiff's claims.  Motion for Summary Judgment ("Motion") [Dkt. No. 43].  Chevron moves on Plaintiff's disability discrimination claim on the grounds that (i) Plaintiff was not qualified for the Escravos assignment,

---

[1] Escravos is a remote location on a swamp not accessible by land, with two small medical clinics capable of only the most minor medical treatment and procedures.

(ii) Chevron was not the employer of the assignment, and (iii) Plaintiff's heart condition rendered him a direct threat to himself and others.  The Court disagrees as to all three assertions.  Despite his heart condition, the record contains genuine disputes of material fact on the question of whether Snookal was capable of performing the essential job functions of the desk-job assignment in Escravos.  There are also material facts in dispute over whether the medical assessment rested with Chevron's doctors.  There is also plenty of evidence suggesting that Snookal's condition and the accompanying risk did not rise to the level of substantial and imminent harm.  The likelihood of an adverse cardiac event was ***at most*** two percent, while any increase in risk could be easily monitored.

Additionally, Chevron moves for summary judgment on Plaintiff's reasonable accommodation claim on the grounds that, *inter alia*, Chevron did not have a duty to accommodate.  On this claim, the Motion is granted.  By Snookal's own admissions, he never needed or requested an accommodation.  Chevron was made aware of Snookal's heart condition as part of the medical assessment, but Plaintiff concedes that he did not experience any limitations necessitating an accommodation.

Chevron also seeks dismissal of Plaintiff's constructive discharge claim, arguing that the conditions when Plaintiff resigned were not so intolerable or aggravating that Snookal was compelled to quit.  Snookal contests by averring that the discrimination he suffered caused him to develop financial difficulties and worsening depression, which in turn caused his resignation.  The Court is unpersuaded.  The conditions in the year up to his resignation were by all accounts the same as they were for the three years before Snookal applied to the Escravos position, albeit absent the alleged discrimination.  But one instance of (alleged) discrimination years before his resignation is by itself insufficient to qualify as objectively intolerable conditions for constructive discharge.  There are no material facts in dispute and the Motion on this claim is also granted.

Finally, Chevron moves for summary judgment on punitive damages, arguing that there is no evidence of malicious or oppressive behavior by Chevron's managing agents or directors.  The Court agrees.  There is no plausible evidence for a reasonable jury to find that the actions by Chevron's doctors leading up to and including the rescission of the offer were despicable or made with intent to injure.  The undisputed facts make clear that Chevron's decision was made after extensive

3

consultation with various doctors and based on their opinion on the dangerousness of placing

Plaintiff in Escravos.

## II.    BACKGROUND

Plaintiff Mark Snookal was hired by Defendant Chevron U.S.A. ("Chevron") on January 12,

2009, as an analyzer engineer.  Joint Statement of Uncontroverted Facts And Genuine Disputes

("JSUF") ¶ 1 [Dkt. No. 44].[2]  In November 2016, Plaintiff was promoted to team lead of

Instrumentation, Electrical, and Analyzer Reliability ("IEAR").  *Id.* ¶ 2.

In May 2019, Plaintiff applied to be a Reliability Engineering Manager based in Escravos,

Nigeria (the "Escravos Assignment").  *Id.* ¶ 3.  On or about July 9, 2019, Plaintiff was offered the

Escravos Assignment, contingent upon Plaintiff being deemed medically fit by passing Chevron's

Medical Suitability for Expat Assignment ("MSEA").  *Id.* ¶ 5.  The MSEA standards grade work

sites by level of safety, from A being the safest to D being the least safe, based on the promptness

and availability of medical care.  *Id.* ¶ 7.  Escravos has a D grade, reflecting the lowest level of

available medical care in a given work site.  *Id.* ¶ 8.  That is because the healthcare system in

Escravos consists of two clinics capable only of minor, non-surgical procedures.  *Id.* ¶ 10.  Any

complex adverse health event requires evacuation to the nearest medical center.  *Id.*  Evacuations are

complicated because Escravos is located on an isolated swamp on the Niger delta, with no roads

going in or out.  *Id.* ¶ 9.

The MSEA clearance process began with Plaintiff filling out a "Standard Medical Suitability

for Expatriate Assignment History & Physical Examination" form, wherein Plaintiff disclosed that

he had a dilated aortic root, also known as a thoracic aortic dilation or aneurysm, initially diagnosed

in 2014 or 2015.  *Id.* ¶ 11; Declaration of Robert E. Mussig ("Mussig Decl."), Ex. E-3 ("MSEA

Form") at 1 [Dkt. No. 43-15].  Plaintiff managed the condition with his cardiologist, Dr. Steven

Khan.  *Id.* ¶ 12.  Plaintiff's heart condition did not impact his day-to-day ability to work.  *Id.* ¶ 13.

The next step of the MSEA clearance procedure was for Plaintiff to be seen by an independent

provider of internal medicine named Dr. Irving Sobel.  *Id.* ¶ 17.  On July 24, 2019, Dr. Sobel

_____

[2] Discrete facts referenced herein and cited to the JSUF are undisputed.

1  indicated that Plaintiff was fit for the Escravos Assignment with two conditions: that Plaintiff not lift

2  anything more than 50 pounds and that Plaintiff receive a clearance letter from Dr. Khan.  *Id.*;

3  MSEA Form at 5.

4          On July 29, 2019, Dr. Khan prepared a letter declaring his approval of Plaintiff's fitness for

5  the Escravos Assignment.  JSUF ¶ 18; Mussig Decl., Ex. 3-4 ("Dr. Khan Approval Letter") [Dkt.

6  No. 43-15].  However, on August 15, 2019, Dr. Eshiofe Asekomeh—then the Occupational Health

7  Physician at the Chevron Hospital in Warri, Nigeria—deemed Plaintiff ***unfit*** for the Escravos

8  Assignment, after consulting Plaintiff's records and additional doctors based in Nigeria, including

9  Drs. Victor Adeye and Ujomoti Akintunde.  JSUF ¶¶ 20, 22; Declaration of Mark Snookal

10  ("Snookal Decl."), Ex. 4 ("Escravos Assignment Recommendation") [Dkt. No. 43-11].  Plaintiff

11  appealed that determination, which instigated a discussion between Dr. Scott Levy—then Chevron's

12  Regional Medical Manager serving the Africa region—and Dr. Khan.  JSUF ¶ 24.  Ultimately, the

13  appeal was unsuccessful, *id.* ¶ 26, and Plaintiff's Escravos Assignment offer was rescinded on

14  September 4, 2019.  *Id.* ¶ 28.

15          By the time the offer was rescinded, Plaintiff's former position had been backfilled.  *Id.* ¶ 34.

16  Chevron continued to employ Plaintiff—first in a position created for Plaintiff and then, in or around

17  2020, into his previous position as team lead of IEAR. *Id.* ¶¶ 40–41. Plaintiff remained in that

18  position until, on August 4, 2021, Plaintiff sent Chevron a letter resigning effective August 20, 2021.

19  *Id.* ¶ 42; Snookal Decl., Ex. 9 ("Snookal Resignation")  [Dkt. No. 43-11].

20          On August 3, 2023, Plaintiff brought suit against Chevron for disability and age

21  discrimination in violation of Cal. Gov't Code § 12940 *et seq*, failure to accommodate in violation of

22  the same, and wrongful constructive discharge in violation of public policy.  Complaint [Dkt. No. 1].

23  On March 27, 2025, Chevron filed the instant Motion.  The Court heard argument on May 8, 2025,

24  and took the Motion under submission [Dkt. No. 56].

25  **III.    LEGAL STANDARD**

26          Summary judgment is proper if the moving party "shows that there is no genuine dispute as

27  to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

28  *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  A fact is material if it may

1    affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

2    1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A dispute

3    is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

4    party." *Liberty Lobby*, 477 U.S. at 248.

5         The burden is on the movant to establish the absence of a genuine dispute of material fact.

6    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet the burden of production the movant

7    must either: (1) produce evidence negating an essential element of the nonmovant's claim or

8    defense; or (2) show that there is an absence of evidence to support the nonmovant's case. *Nissan*

9    *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant has met

10   this initial burden, it is up to the nonmovant to "go beyond the pleadings and by [their] own

11   affidavits, or by the 'depositions, answers to interrogatories and admissions on file,' designate

12   'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P.

13   56(c), (e)). When reviewing the evidence at the summary judgment stage, courts "do[] not make

14   credibility determinations or weigh conflicting evidence," but instead draw "all inferences in the

15   light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984

16   (9th Cir. 2007).

17   **IV.    DISCUSSION**

18       **A. Disability Discrimination Under Cal. Gov't Code Section 12940**

19       "It is an unlawful employment practice…[f]or an employer, because of the…physical

20   disability…of any person, to refuse to hire or employ the person…[unless] the employee…is unable

21   to perform the employee's essential duties even with reasonable accommodations, or cannot perform

22   those duties in a manner that would not endanger the employee's health or safety or the health or

23   safety of others even with reasonable accommodations." Cal. Gov't Code § 12940(a), (a)(1).

24       For disability discrimination claims under FEHA, "the California Supreme Court has adopted

25   the tripartite burden-shifting framework established in *McDonnell Douglas*… starting with a

26   plaintiff making a prima facie case of discrimination." *See Chisolm v. 7-Eleven, Inc.*, 383 F. Supp.

27   3d 1032, 1048 (S.D. Cal. 2019) (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317 (2000) and

28   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The burden then shifts to the defendant

to show that the adverse employment action was grounded in a "legitimate, non-discriminatory" reason. *Id.* If defendant does so, the burden shifts back to the plaintiff to "demonstrate that the proffered reason was pretext for discrimination." *Id.*

The burden shifting is ***reversed*** when it is the employer moving for summary judgment. *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011). To get summary judgment here, Chevron is required to show that either Plaintiff fails to establish one of the elements of his FEHA claim or the offer was rescinded on "legitimate, non-discriminatory" grounds. *Id.* If Chevron meets that burden, all Plaintiff has to do to defeat summary judgment is raise a "triable issue of fact material" related to Chevron's assertion. *Id.* at 746.

Chevron moves for summary judgment on Plaintiff's discrimination claim on the grounds that (1) Plaintiff could not perform the essential duties of the job; (2) Chevron was not the employer of the Escravos Assignment and was not responsible for rescinding the offer; and (3) the rescission was based on the fact that Plaintiff's condition posed a direct threat to himself or others.[3]

### 1. Essential duties

In order to prevail on a disability discrimination claim under FEHA, a plaintiff must show that he is "qualified for the position," *i.e.,* that the plaintiff could "perform the job's essential functions." *Green v. State of California*, 42 Cal. 4th 254, 266–267 (2007). "Essential functions

---

[3] Both parties submitted independent, expansive lists of objections to each other's evidence. Objections to Plaintiff's Evidence in Support of the Motion [Dkt. No. 45]; Objections to Defendant's Evidence in Opposition to the Motion [Dkt. No. 46]. The guiding principle of admissibility at the summary judgment stage is whether the "contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document…" *Sandoval v. County of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). Put simply, a party on summary judgment need not produce evidence in a form that would be admissible at trial, so long as the party could produce it admissibly at trial. *See Nevada Dep't of Corrections v. Green*, 648 F.3d 1014, 1019 (9th Cir. 2011) ("At summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial.") (citation omitted); *see also Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they could be presented in an admissible form at trial.") (citation omitted). The parties' blanket, one- or two-word objections such as "lacks foundation" are particularly unhelpful and just serve to distract from the merits. *Sandoval*, 985 F.3d at 666–667. To the extent the Court relies on evidence to which a party objects, the objections are overruled. The parties are free to raise the same objections at trial. The remaining objections are denied as moot.

1    means the fundamental job duties of the employment position…[and] does not include the marginal

2    functions of the position." *Lui v. City and County of San Francisco*, 211 Cal. App. 4th 962, 971

3    (2012); Cal. Gov't Code § 12926(f).

4              Here, there is a genuine dispute as to whether Plaintiff is qualified for the Escravos

5    Assignment. Chevron presents evidence that Plaintiff's disability rendered him unable to perform

6    the job duties in Escravos. JSUF ¶ 27. But there is countervailing evidence in the record that

7    Plaintiff in fact ***could*** have performed the day-to-day functions of the job. *See* Declaration of Olivia

8    Flechsig ("Flechsig Decl."), Ex. 12 Excerpts from the Transcript of Scott Levy, M.D.'s Deposition

9    ("Levy Depo.") at 75:20–22 ("So I believe Mr. Snookal as – his proposed job in Nigeria was an

10   office-based job with just mild to light lifting activities."). What Chevron was worried about clearly

11   wasn't his ability to do the job, but rather the risk of his cardiac condition flaring up, which could

12   lead to complications such as death. *Id.* at 77:10–13 ("It was simply because…if that sort of 2

13   percent occurred while…he was on location, it was something that the team could not manage."). In

14   other words, it was not that Plaintiff *could not* perform the functions of the role on site, but rather

15   that Plaintiff *should not*, in light of the 2% risk that he suffers an adverse medical event. Motion at

16   12. While this may constitute a possible defense (see the direct threat defense below), this risk does

17   not implicate his ability to perform the essential functions of the role.[4]

18              **2.  Chevron as employer**

19              In order to be held liable for FEHA discrimination, the offending entity must be Plaintiff's

20

21   _____

22   [4] The Court cannot count out the possibility that in some rare case the risk of an adverse health event
     is so high that the condition makes it practically impossible for an individual to do the job, without

23   implicating his overall safety or the safety of others. Here, Plaintiff produced sufficient evidence for
     a reasonable factfinder to conclude this is not such a case, including the fact that this role is a desk

24   job, an email from Dr. Khan to Dr. Levy suggesting the risk may be even lower than 2%, and
     testimony that monitoring the risk is "not complex," done by "a very quick, simple [doctor's] visit."

25   *See* Snookal Decl., Ex. 5 at 1 (email from Dr. Khan to Dr. Levy saying, *inter alia*, "[f]rom the
     published studies, the risk of rupture or dissection is 2% per year…[s]ince Mr. Snookal's aneurysm

26   has not shown any growth for 3 years, his risk may be lower than the published 2% number above
     which would be based on 'average' growth rate.") [Dkt. No. 43-11]; Mussig Decl., Ex. I Excerpts

27   from the Transcript of Dr. Shahid Hameed Khan's Deposition ("Khan Depo.") at 31:13–25 [Dkt. No.
     43-16]

28

"employer." *See* Cal Gov't Code § 12940(a).  An employer is defined as "any person regularly

employing five or more persons, or any person acting as an agent of an employer, directly or

indirectly…."  Cal. Gov't Code § 12926(d).  A "person" in this context includes corporations.  Cal

Gov't Code § 12925(d).

Whether a particular entity is an employer depends on the "totality of the circumstances that

reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to

which the defendant controls the plaintiff's performance of employment duties." *Vernon v. State of

California*, 116 Cal. App. 4th 114, 124 (2004) (citation omitted).  The inquiry requires courts to

probe "myriad facts surrounding the employment relationship in question," the "precise contours" of

which "can only be established by a careful factual inquiry." *Id.* at 125.

Applying that standard to the evidence presented, the Court concludes that a reasonable jury

could find that Chevron was the employer of the Escravos Assignment, or at least had authority over

rescinding the offer.  While Chevron contends that the ultimate decision rested in the hands of

Chevron Nigeria and the embedded medical team in Nigeria led by Dr. Asekomeh, *see* Motion at 13,

57, Plaintiff has proffered plausible evidence that the decision ultimately rested with Chevron's

doctors, or at least their doctors had overwhelming influence in the final decision.  *See, e.g.*,

Declaration of Dolores Y. Leal ("Leal Decl."), Ex. 27 ("Email Thread") [Dkt. No. 43-14].  For

example, Dr. Asekomeh initiates an email thread on August 7, 2019, by sending Dr. Olorunfemi

Pitan of Chevron Nigeria documents related to the Plaintiff's medical clearance, including a MSEA.

*Id.* at 4.  On August 8, 2019, Dr. Pitan sends the materials to Dr. Arenyeka.  *Id.* at 3.  Dr. Arenyeka

in turn sends the materials the same day to Dr. Stephen Frangos and Dr. Levy—of Chevron—cc'ing

Dr. Pitan.  *Id.* at 2.

On August 8, 2019, Dr. Frangos responds to Drs. Arenyeka and Pitan giving what appears to

be the opinion of Chevron headquarters: "[t]here is health risk in an Escravos Assignment. This

individual would likely be fit for expatriate assignment in Lagos." *Id.* at 1–2.  That opinion from

Chevron USA appears to have carried the day.  On August 15, Dr. Pitan forwards Dr. Frangos's

email to Dr. Asekomeh and adds "[k]indly decline a job transfer to Escravos…You can indicate that

he will be cleared for an assignment in Lagos ***if that is the direction the U.S. decides to pursue***." *Id.*

1  at 1 (emphasis added).  Later the same day, Dr. Asekomeh responds by thanking Dr. Pitan for the

2  feedback, and stating that he will be completing Plaintiff's paperwork that day.  *Id.*  Dr. Asekomeh

3  completes the MSEA recommendation that same day declaring Plaintiff unfit.  Escravos Assignment

4  Recommendation at 1.  Chevron argument vis-à-vis this email thread—*i.e.*, that the Chevron Nigeria

5  doctors were simply doing their due diligence—is unpersuasive.  At a minimum, there is a dispute of

6  material fact as to how to interpret these communications regarding final decision-making authority.

7  ### 3.  Direct threat defense

8  Under California law, employers generally cannot be held liable for disability discrimination

9  if the disability "endanger[s] the employee's health or safety or the health or safety of others even

10  with reasonable accommodations."  Cal. Gov't Code § 12940(a)(1).  In other words, an employer

11  can assert a defense to a FEHA discrimination claim by showing that "no reasonable

12  accommodation… would allow the applicant or employee to perform the essential functions of the

13  position in question in a manner that would not endanger [the health and safety of himself or others]

14  because the job imposes an imminent and substantial degree of risk to [the applicant, employee, or

15  others]."  Cal. Code Regs., tit. 2, § 11067(b), (c).

16  To determine whether this defense—better known as the "direct threat" defense—applies,

17  courts consider the following five factors: (1) the duration of the risk; (2) the nature and severity of

18  the potential harm; (3) the likelihood that potential harm will occur; (4) the imminence of the

19  potential harm; and (5) consideration of relevant information about an employee's past work history.

20  Cal. Code Regs., tit. 2, § 11067(e)(1)–(5).  Analysis of the foregoing factors must be "based on a

21  reasonable medical judgment that relies on the most current medical knowledge and/or on the best

22  available objective evidence."  *Id.*  "However, it is no defense to assert that an individual with a

23  disability has a condition or a disease with a future risk, so long as the condition or disease does not

24  presently interfere with his or her ability to perform the job in a manner that will not endanger the

25  individual with a disability or others."  Cal. Code Regs., tit. 2, § 11067(d).

26  The evidence on this point is heavily disputed.  Chevron proffers evidence that the nature and

27  severity of the harm to Plaintiff in the event of a cardiac complication is exceedingly high –

28  including likely death.  *See* Mussig Decl., Ex. J Excerpts from the Transcript of Dr. Ujomoti

10

Akintunde's Deposition ("Akintunde Depo.") at 67:13–15 ("Q. You also separately mentioned that death was a complication associated with a dilated aortic root? A. Yes.").  On the other hand, Plaintiff adduces evidence that the likelihood of a cardiac event, or harm therefrom, is exceedingly small and not at all imminent.  Snookal Decl., Ex. 5 at 1 (email from Dr. Khan to Dr. Levy saying, *inter alia*, "[f]rom the published studies, the risk of rupture or dissection is 2% per year…[s]ince Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on 'average' growth rate.").  Indeed, even Chevron's initial reviewing doctor, Dr. Sobel, marked Plaintiff as fit for duty with two restrictions: clearance from Dr. Khan and for Plaintiff not to lift more than 50 pounds.  JSUF ¶¶ 52–54.  There is also evidence that any change in risk *i.e.*, any increase (or decrease) in imminence of a cardiac event could be easily tracked over time.  Khan Depo. at 31:13–25 ("[Plaintiff's] aneurysm appeared stable…follow-up for this kind of disease is very intermittent, very periodic. Once a year come back and have a CT scan done…it's a very quick, simple visit…[i]f it was to get bigger, then the follow up would be more intense….") [Dkt. No. 43-16].  Finally, if the 2% risk did manifest, there is plenty of evidence that medical evacuations from Escravos are regularly done by helicopter.  JSUF ¶¶ 86.

In summary, the Court cannot grant summary judgment on this defense because the record is replete with material facts in dispute about the overall risk of death, the ability of this risk to be managed, and the ability of Plaintiff to be evacuated if an incident occurred.  Contrary to Chevron's assertion, a denial of summary judgment is not the Court "second guessing" reasoned medical decision making.  *See* Reply at 55.  To the contrary, the Court acknowledges the conflicting-yet-reasonable medical opinions, and, drawing every reasonable inference in the non-movant's favor, is compelled to deny the Motion.[5]

---

[5] Because the Court denies summary judgment on the direct threat defense, it need not decide whether Chevron's analysis of the factors was based on reasonable medical judgment.  Moreover, because Chevron is the moving party, the Court need not address the parties' arguments concerning pretext.  It is sufficient that Plaintiff has raised a triable issue of fact material to Chevron's assertion of the direct threat defense.  *See Chisolm*, 383 F. Supp. 3d at 1048 (citing *Dep't of Fair Emp't & Hous.*, 642 F.3d at 745–746).

**B.  Reasonable Accommodation Claim**

Under FEHA, it is an unlawful employment practice for an employer to "fail to make a reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov't Code § 12940(m)(1).  In order to prevail on a "reasonable accommodation" claim, a plaintiff must establish that the employee (1) suffered a disability, (2) could perform the essential functions of the job with a reasonable accommodation, and (3) the employer failed to reasonably accommodate.  *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 373 (2015).  The duty to accommodate "does not arise until the employer is aware of [plaintiff's] disability and physical limitations."  *See Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 949 (1997) (citing favorably the Washington Supreme Court's interpretation of that state's equivalent of FEHA).

Here, there is insufficient evidence for a reasonable juror to find that Chevron had a duty to accommodate.  While there is ample evidence that Chevron became aware of Plaintiff's disability[6] through the MSEA process, there is no evidence that Plaintiff was experiencing any limitations (physical or otherwise) as a result of his disability.  Snookal Depo. at 53:24–54:1 ("Q. Has the – well, have – have your heart conditions impacted your ability to work? A. Never.").  Indeed, Plaintiff himself concedes that during his employment with Chevron he never needed an accommodation.  *Id.* at 95:10–13 ("Q. So in your view, there was never any point during your employment with Chevron that you needed some sort of accommodation? A. That is correct.").  And "[a]n employer also has no duty to accommodate an employee who…denies a need for accommodation."  *Prilliman*, 53 Cal. App. 4th at 954.

Plaintiff does not argue that his disability required accommodation.  Instead, he argues that the duty to accommodate was initiated by the rescission of the Escravos Assignment and the back-filling of his previous job.  Motion at 45 ("Although the REM position was rescinded on an illegal basis in the first instance, after making this decision, Chevron was required to accommodate Mr. Snookal's disability."), 46 ("In this instance, Defendant was on actual notice of Mr. Snookal's

---

[6] Chevron does not dispute that Plaintiff's heart condition qualifies as a disability.

12

1   disability and his corresponding need for a reasonable accommodation after the REM position was

2   rescinded…He also specifically asked: 'where does this decision leave me?' now that the REM role

3   had been rescinded, and his previous job had been given to someone else."). But loss of a held or

4   desired position, even if due to disability discrimination, is not in and of itself a disability to be

5   accommodated. Plaintiff cannot simultaneously concede that he did not have limitations on his

6   ability to perform in the Escravos Assignment (or any subsequent position), yet insist on an

7   accommodation after not receiving the Escravos Assignment. *Cf. Fewer v. Copper & Brass Sales,*

8   *Inc.*, 183 Fed. Appx. 696, 696–697 (9th Cir. June 9, 2006) (Unpub. Disp.) ("Because [plaintiff]

9   failed to proffer a sufficient explanation to the district court for these inconsistent positions, the court

10  did not abuse its discretion in applying the doctrine of judicial estoppel.") (citing *Cleveland v. Policy*

11  *Management Systems Corp.*, 526 U.S. 795, 806 (1999)).

12      **C. Constructive Discharge Claim**

13      "Constructive discharge occurs when the employer's conduct effectively forces an employee

14  to resign." *Simers v. Los Angeles Times Communications, LLC*, 18 Cal. App. 5th 1248, 1269 (2018).

15  An employee saying "I quit" will be "legally regarded as a firing rather than a resignation" if the

16  "employer either intentionally created or knowingly permitted working conditions that were so

17  intolerable or aggravated at the time of the employee's resignation that a reasonable employer would

18  realize that a reasonable person in the employee's position would be compelled to resign." *Id.* The

19  working conditions must be "unusually aggravated or amount to a continuous pattern before the

20  situation will be deemed intolerable." *Id.* at 1270. The inquiry "is an objective one, and the proper

21  focus is on the working conditions themselves." *Id.* ("Bruised egos and hurt feelings are not part of

22  the *Turner* [*v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244–1245 (1994)] equation.") (citation

23  omitted).

24      The Court finds that there is no evidentiary support for the constructive discharge claim. The

25  focal point of the inquiry is the working conditions themselves. Before resigning, Plaintiff had been

26  working for a year in the same position he previously held for three years prior to the Escravos

27  Assignment incident. JSUF ¶¶ 2, 3, 41. In his resignation letter, Plaintiff stated that he was leaving

28  "for an opportunity with significantly increased responsibility." *See* Resignation Letter; Snookal

13

1    Depo. 230:12–231:12.  In his exit interview, Plaintiff cited his reason for leaving as "New job

2    opportunity…Interested in management, leadership to continue career path. I didn't find the

3    opportunity within Chevron, so I decided to look outside of Chevron."  Mussig Decl., Ex. E-19

4    ("Exit Interview") at 1 [Dkt. No. 43-15].  That is consistent with the rest of the answers in his exit

5    interview, complaining of "[p]olitics" and stagnation in his career.  *See generally, id.*

6        Plaintiff argues that the incident of alleged discrimination, demotion, and career stagnation

7    were conditions that led to depression and financial challenges that forced him to relocate out of

8    state.  Motion at 49.  A demotion—even with a pay cut, not present here—is not an unusually

9    aggravating working condition, and the subjective reaction to it does not make it such.  *See Turner*, 7

10   Cal. 4th at 1254–1256; *see also Simers* at 1271–1272 ("Plaintiff's personal reaction to that

11   investigation or to his demotion cannot provide a basis to conclude that plaintiff's working

12   conditions were 'unusually aggravated' or that there was a 'continuous pattern of mistreatment…the

13   proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reaction to

14   those conditions.'") (citing *Gibson v. Aro Corp.*, 32 Cal. App. 4th 1628, 1636 (1995)) (emphasis in

15   original).  Even if Chevron is ultimately found liable for disability discrimination, the

16   "discriminatory motive for plaintiff's working conditions has no bearing on whether the evidence

17   was sufficient to establish constructive discharge."  *Simers*, 18 Cal. App. 5th at 1271.  In the end,

18   "every job has its frustrations, challenges, and disappointments; these inhere in the nature of work."

19   *Turner* at 1247.  But not every frustration, challenge, or disappointment is an actionable discharge.

20   **D.  Punitive Damages**

21       Plaintiff argues that Chevron—in rescinding the Escravos Assignment—intentionally

22   disregarded Plaintiff's low risk of complications, going against the recommendation of multiple

23   doctors, including Plaintiff's own cardiologist.  Motion at  50.  Plaintiff further argues that the

24   intentional disregard that resulted in the rescission was ratified by Chevron's managing agents;

25   namely, Dr. Levy and Andrew Powers, Chevron's Human Resources Manager.  *Id.*; JSUF ¶ 105.

26       Punitive damages are recoverable in a FEHA action against a corporation if plaintiff can

27   show by clear and convincing evidence that an officer, director, or managing agent of the

28   corporation committed, authorized, or ratified an act of malice, oppression, or fraud on the plaintiff.

1   Cal. Civ. Code § 3294(a);  *Martinez v. Costco Wholesale Corporation*, 481 F. Supp. 3d 1076, 1104

2   (S.D. Cal. 2020) (citing *Commodore Home Systems, Inc. v. Superior Ct.*, 32 Cal. 3d 211, 221

3   (1982)).  Malice is "intentional injury or despicable conduct which is carried on by the defendant

4   with a willful and conscious disregard of the rights or safety of others."  *Roby v. McKesson Corp.*, 47

5   Cal. 4th 686, 712 (2009) (citation omitted).  Oppression is "despicable conduct that subjects a person

6   to cruel and unjust hardship in conscious disregard of that person's rights."  *Id.*

7         Plaintiff cannot meet that standard here.   There is nothing in the record to even suggest

8   malice on the part of Chevron.  To the contrary, Plaintiff concedes that Chevron consulted multiple

9   doctors in the process of making the ultimate rescission determination, many of whom were based in

10   Nigeria and familiar with the conditions.  *See* Motion at 42–44.  Again, one of those doctors stated

11   unequivocally that the medical facilities on site in Escravos would be unfit to handle a cardiac event

12   and another that recommended against placing Plaintiff in Escravos.  Motion at 37; Mussig Decl.,

13   Ex. J  Excerpts from the Transcript of Dr. Ujomoti Akintunde's Deposition ("Akintunde Depo.") at

14   82:18–24 ("Q. Based on your knowledge of the medical facilities in Escravos, would they be able to

15   support Mr. Snookal if he suffered a dissection relating to his dilated aortic root?...THE WITNESS:

16   No."); Escravos Assignment Recommendation (Dr. Asekomeh's recommendation stating that

17   Plaintiff is unfit for the position in Escravos).  There is no basis for a finding of punitive damages.

18   **V.    CONCLUSION**

19         For the foregoing reasons, Chevron's Motion is ***denied*** as to Plaintiff's disability

20   discrimination claim and ***granted*** as to Plaintiff's reasonable accommodation and constructive

21   discharge claims.  The Court also dismisses the claim for punitive damages.

22

23   Dated: June 11, 2025                              _____

24                                    Hernán D. Vera
                                      United States District Judge

25

26

27

28