SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
TRACEY A. KENNEDY, Cal Bar No. 150782
ROBERT E. MUSSIG, Cal. Bar No. 240369
H. SARAH FAN, Cal. Bar No. 328282
350 South Grand Avenue, 40th Floor
Los Angeles, CA 90071-3460
Telephone:  213.620.1780
Facsimile:  213.620.1398
E-mail:      tkennedy@sheppardmullin.com
              rmussig@sheppardmullin.com
              sfan@sheppardmullin.com

Attorneys for Defendant.
CHEVRON U.S.A. INC.,
a Pennsylvania corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARK SNOOKAL, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. 2:23-cv-6302-HDV-AJR<br><br>**DEFENDANT CHEVRON U.S.A. INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Final Pretrial Conference: July 29, 2025<br><br>District Judge: Hon. Hernán De. Vera<br>Magistrate Judge: Hon. A. Joel Richlin<br><br>Action Filed: August 3, 2023<br>Trial Date: August 19, 2025 |

SMRH:4933-0526-9840          DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Local Rule 16-4 and the Court's Modified Order Setting Pretrial and Trial Schedule (Dkt. 38), Defendant Chevron U.S.A. Inc., a Pennsylvania corporation ("Chevron U.S.A.") hereby submits its Memorandum of Contentions of Fact and Law ("Memorandum").

## I.    CLAIMS AND DEFENSES (L.R. 16-4.1)

### A.    Summary Statement of Plaintiff's Claims

**Claim 1**: Plaintiff Mark Snookal ("Plaintiff") alleges a single cause of action for disability discrimination under the California Fair Employment and Housing Act ("FEHA") against Chevron U.S.A.

Plaintiff's claim for punitive damages associated with this claim was dismissed by the Court in its Order partially granting Chevron U.S.A.'s Motion for Summary Judgment. (See Dkt. 63.)

### B.    Elements Required to Establish Plaintiff's Claim for Disability Discrimination

1.    Chevron U.S.A. was an employer.

2.    Plaintiff applied to Chevron U.S.A. for the Reliability Engineering Manager position in Escravos, Nigeria.

3.    Chevron U.S.A. knew that Plaintiff had a disability (an aortic root dilation).

4.    Plaintiff was able to perform the essential job duties of the Reliability Engineering Manager position in Escravos, Nigeria, with or without reasonable accommodation for his disability.

5.    Chevron U.S.A. refused to hire Plaintiff for the Reliability Engineering Manager position in Escravos, Nigeria.

6.    Plaintiff's disability was a substantial motivating reason for Chevron U.S.A.'s decision to refuse to hire Plaintiff for the Reliability Engineering Manager position in Escravos, Nigeria.

7.    Plaintiff was harmed.

8.      Chevron U.S.A.'s conduct was a substantial factor in causing Plaintiff's harm.

C.A.C.I. 2540.

### C.      Key Evidence in Opposition to Plaintiff's Claim

#### 1.      *Plaintiff Could Not Perform the Essential Duties of the REM Position in Escravos, Nigeria.*

Plaintiff cannot prove that he was a qualified individual with a disability, because he could not perform the essential functions of the job, with or without reasonable accommodations.  See Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC, 704 F.3d 1235, 1242 (9th Cir. Cal. 2013) (quoting Green v. State, 42 Cal. 4th 254, 262 (Cal. 2007)).  Employees who are not qualified to perform the essential duties of the job are excluded from the FEHA's prohibition against discrimination.  See Cuiellette v. City of Los Angeles, 194 Cal. App. 4th 757, 766 (2011).

Plaintiff's expatriate assignment offer was contingent upon Plaintiff undergoing and passing a Medical Suitability for Expat Assignment ("MSEA") fitness for duty examination by being able to work in Escravos, Nigeria.  The evidence is undisputed that one of the essential duties of the REM position was that it had to be performed on-site in Escravos, Nigeria.  Chevron Nigeria doctors determined, as part of the MSEA process, that Plaintiff could not safely work in Escravos.  They did conclude that he could work in Lagos, Nigeria, but the REM job was in Escravos. Thus, Plaintiff was not a qualified individual with a disability for this particular job.

It is undisputed that Escravos is a highly remote location in Nigeria with extremely limited medical care capabilities.  Escravos is not an actual town or city; it is an oil production facility at the mouth of the Escravos River. There are no roads in or out.   The only access is by air or boat, and due to local militant activity, a Nigerian military escort is necessary for boat transport through the region.  The health care infrastructure in Escravos is not set up to handle complex cases and only minor procedures can be performed, such as for minor sutures for lacerations and handling minor illnesses.  The

SMRH:4933-0526-9840

1   clinics cannot perform blood transfusions or provide other medical care.  Individuals with

2   any serious medical condition must be evacuated to Lagos or Warri, which can take up to

3   10-12 hours depending on the weather.  For serious cardiac events requiring surgery, the

4   closest cardiothoracic surgeon works for the government hospital in Benin,

5   approximately 100 kilometers (62 miles) away from Escravos, who must travel from

6   Benin to an adequate medical facility or to whom the patient must be transferred for

7   treatment.  Based on the MSEA standards, Escravos is rated as having the lowest level of

8   access to medical care.

9       As part of the MSEA procedure,  in 2019, Plaintiff disclosed that he had an aortic

10  root dilation, which was diagnosed in or about 2014 or 2015, and that he saw his

11  cardiologist, Dr. Steven Khan, annually for his condition. Dr. Khan assessed that Plaintiff

12  had a risk of occurrence of a cardiac event at 2% or less, based on a cited medical study

13  published in 2002.

14      On August 15, 2019, Dr. Eshiofe Asekomeh, who was then the Occupational

15  Health Physician at the Chevron Hospital in Warri, Nigeria, was assigned to make a

16  determination as to Plaintiff's fitness for duty in Escravos. In making his assessment of

17  Plaintiff's medical clearance, Dr. Asekomeh consulted with two cardiologists in Nigeria

18  who were familiar with Plaintiff's type of aortic condition and with the conditions and

19  availability of medical care in Escravos – Dr. Victor Adeyeye in Warri and Dr. Ujomoti

20  Akintunde in Lagos – who independently reviewed Plaintiff's medical records based on

21  their education, experience, and knowledge of existing medical literature.

22      Like Plaintiff's cardiologist, Dr. Khan, Dr. Adeyeye assessed that the risk of an

23  adverse cardiovascular event associated with Plaintiff's aortic dilation was low, at 1% to

24  2%.  Dr. Akintunde likewise assessed that Plaintiff's risk of an occurrence was low, and

25  was familiar with literature which assessed the risk of an adverse aortic event at around

26  2%.  Based on their knowledge of the medical facilities in Escravos, Drs. Adeyeye and

27  Akintinde both opined that if Plaintiff suffered an adverse cardiological event in

28  Escravos, it would almost certainly result in his death because of the inability to provide

1  timely treatment.

2      In an effort to accommodate his disability, Chevron U.S.A. attempted to determine

3  on Plaintiff's behalf whether the REM position could be performed remotely from Lagos,

4  Nigeria where Plaintiff was cleared for duty because of the availability of medical care in

5  that location.  However, the essential duties of the REM position had to be performed on-

6  site in Escravos.  Due to Plaintiff's heart condition and its unpredictable risk of an

7  adverse cardiovascular occurrence, which would lead to Plaintiff's death if occurring in

8  Escravos, based on the medical opinions of doctors in Nigeria familiar with the working

9  conditions in Escravos, Plaintiff was deemed to not be fit for duty, and not able to

10  perform the essential function of the REM position, which is to be on-site in Escravos.

11          **2.     *Chevron U.S.A. Did Not Refuse to Hire Plaintiff for the REM Position.***

12

13      Because Plaintiff did not receive the MSEA clearance for duty, which was a

14  condition of his expatriate assignment offer, his offer was rescinded.  Dr. Asekomeh was

15  the sole decisionmaker in Plaintiff's MSEA determination.  Dr. Asekomeh is employed

16  by De-Log Nigeria Limited, a contracting company engaged by Chevron Nigeria.  The

17  evidence is undisputed that Dr. Asekomeh has never been employed by Chevron U.S.A.

18          **3.     Plaintiff Was Not Economically Harmed By the Rescission of the REM Position Offer.**

19

20      Plaintiff suffered no economic damages as a result of the rescission of the REM

21  position offer.  The evidence is undisputed that Plaintiff's compensation and benefits

22  continued without change, even though Plaintiff's former position as the IEAR Team

23  Lead had been backfilled pending Plaintiff's assumption of the REM position.  Chevron

24  U.S.A. ensured that Plaintiff's employment continued even after the REM position offer

25  was rescinded, encouraging Plaintiff to find other positions he was qualified for and

26  interested in.  Ultimately, Chevron U.S.A. created a position for Plaintiff with the same

27  compensation and benefits as his prior position.  When Chevron U.S.A. went through a

28  reorganization about 12 months later, Plaintiff was placed in his prior position as the

SMRH:4933-0526-9840
DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  IEAR Team Lead in October 2020.  Until the time of his voluntary resignation, Plaintiff

2  never experienced a decrease in his compensation or benefits.

3      Although Plaintiff will argue that Chevron U.S.A. did not provide him a location

4  premium (i.e., a hazard premium) and equalization tax benefits associated with the REM

5  position in Escravos, Nigeria, these additional benefits are to compensate employees for

6  work that they perform in areas outside of the usual amenities available in the United

7  States.  Since Plaintiff continued working in Los Angeles County, California, and did not

8  experience any of the hazards, inconveniences, or potential tax consequences of working

9  in an expatriate assignments, he was not entitled to these other compensation and tax

10  benefits.

11      **D.    Summary of Defendant's Affirmative Defenses**

12      Chevron U.S.A. intends to proceed on the following affirmative defenses pled in

13  its Answer to Plaintiff's Complaint (Dkt. 12), as to which it has or may have the burden

14  of proof:

15      1.    **First Affirmative Defense**: Direct Threat to Himself or Others

16      2.    **Second Affirmative Defense**: Failure to Mitigate Damages

17      **E.    Elements Required to Establish Defendant's Affirmative Defenses**

18      *1.    First Affirmative Defense: Plaintiff Would have Posed a Direct Threat to Himself or Others*

19

20      1.    The requirement for the REM position to be performed on-site in Escravos,

21  Nigeria was an essential job duty.

22      2.    There was no reasonable accommodation that would have allowed Plaintiff

23  to perform this job duty without endangering his health or safety or the health and/or

24  safety of others.

25      3.    Plaintiff's performance of duties in Escravos, Nigeria would present an

26  immediate and substantial degree of risk to himself and/or others.

27      4.    Factors considered include: the duration of the risk; the nature and severity

28  of the potential harm; the likelihood that the potential harm would have occurred; how

SMRH:4933-0526-9840    DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  imminent the potential harm was; and relevant information regarding Plaintiff's past

2  work history. These factors are considered based on a reasonable medical judgment that

3  relies on the most current medical knowledge or on the best available objective evidence.

4  C.A.C.I. 2544.

>   ***2.      Second Affirmative Defense: Plaintiff Failed to Mitigate His Damages***

7      1.    Employment substantially similar to the REM position was available to

8  Plaintiff;

9      1.    Plaintiff failed to make reasonable efforts to seek this employment; and

10     2.    The amount that Plaintiff could have earned from this employment.

11  C.A.C.I. 3963.

>   **F.    Key Evidence Relied On In Support of Defendant's Affirmative Defenses.**

>   ***1.      First Affirmative Defense: Plaintiff Would have Posed a Direct Threat to Himself or Others***

15     An employer has a duty to "furnish to each of his employees employment and a

16  place of employment which are free from recognized hazards that are causing or are

17  likely to cause death or serious physical harm to his employees." <u>Chevron U.S.A. v.</u>

18  <u>Echazabal</u>, 536 U.S. 73, 84-85 (2002) (*quoting* 29 U.S.C. § 654(a)(1)).  An employer has

19  an affirmative duty to "avert disaster, rather than simply wait and hope it does not occur."

20  <u>McMillen v. Civil Service Commission</u>, 6 Cal. App. 4th 125, 131 (1992).  Therefore, an

21  employer is not prohibited from refusing to hire an employee who cannot perform his

22  duties without endangering the health or safety of himself or others.  <u>Raytheon Co. v.</u>

23  <u>Cal. Fair Employment & Hous. Comm'n</u>, 212 Cal. App. 3d 1242, 1252 ( 1989) (*citing*

24  Cal. Gov't Code § 12940(a)(1)).

25     Plaintiff's heart condition resulted in an unpredictable risk of an adverse

26  cardiovascular event, which in most circumstances could be accommodated.  Due to the

27  limited access to medical care and the difficulty in entering and exiting Escravos, the

28  occurrence of an adverse cardiological event would most likely lead to Plaintiff's death.

SMRH:4933-0526-9840
DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    Additionally, if Plaintiff was operating equipment at the time of an occurrence, it could

2    lead to serious injury or death for others working at the facility.

3         Because Plaintiff could not perform the essential duties of his position without

4    endangering the health or safety of himself or others, Chevron U.S.A. has a valid defense

5    to Plaintiff's disability discrimination claim (known as the "direct threat" defense).  *See*

6    Cal. Code Regs., tit. 2, § 11067, subds. (b) and (c).  Courts consider the following factors,

7    as well as others, in determining whether an employer has established the direct threat

8    defense:

9         (1)    the duration of the risk;
          (2)    the nature and severity of the potential harm;
10        (3)    the likelihood that potential harm will occur;
          (4)    the imminence of the potential harm; and
11        (5)    consideration of relevant information about an employee's past work
                 history.
12        (6)    and other factors, such as medical opinions.

13   Cal. Code Regs., tit. 2, § 11067(e); C.A.C.I 2544.  Where an individual's disability

14   interferes with his ability to perform his job safely, without endangering himself or

15   others, even a future risk can form the basis for denial of a job position.  *Id.* at subd. (d).

16        The first factor weighs in favor of finding a direct threat when the duration of the

17   risk exists for as long as the employee holds the position.  Hutton v. Elf Atochem North

18   American, Inc., 273 F.3d 884, 894 (9th Cir. 2001) (citing 29 C.F.R. § 1630.2(r)).  This is

19   true here because Plaintiff's dilated aortic root is a life-long condition that has to be

20   monitored and cannot be treated without open-heart surgery, which Plaintiff did not have.

21   Had Plaintiff assumed the expatriate assignment in Escravos, his heart condition and the

22   risk of a cardiac event would remain throughout his employment.

23        As for the second and third factors, the Ninth Circuit has made clear that even

24   where "the likelihood of an [incident] is small . . . if the threatened harm is grievous . . .

25   even a small risk may be 'significant.'" *Id.* (quoting Donahue v. Consol. Rail Corp., 224

26   F.3d 226, 231 (3d Cir. 2000) (emphasis added).  Courts have found that "frequency, or

27   the likelihood of risk, is not as important of a factor in determining whether the patient is

28   a direct threat when the potential harm is grave." Grosso v. UPMC, 857 F. Supp. 2d 517,

SMRH:4933-0526-9840    DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1   538-39 (W.D. Penn. 2012) (citing Hutton v. Elf Atochem North American, Inc., 273 F.3d
2   884 (9th Cir. 2001); Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284 (10th Cir.
3   2000)) (collecting cases).  Here, the potential harm is **death**, so even though there was
4   only a relatively small chance a cardiac event would occur, the second and third factors
5   weigh in favor of finding a direct threat existed.

6          Courts also hold the third factor weighs in favor of finding a direct threat when it is
7   impossible to predict whether or when the occurrence will happen, as is the case here.
8   Milan v. Union Pac. R.R. Co., 2019 U.S. Dist. LEXIS 78489, *19-20, 23-24 (Or. Dist.
9   2019) (citing Hutton v. Elf Atochem North American, Inc., 273 F.3d 884, 894 (9th Cir.
10  2001)) (finding even a "very unlikely" chance of occurrence to be a "greater safety risk"
11  due to the unpredictability of the employee's condition).

12         Similarly, the fourth factor weighs in favor of finding a direct threat exists where
13  the "imminence" or immediacy of the potential harm is unknown.  Hutton, 273 F.3d at
14  894-95 (finding a direct threat where the "imminence of the potential harm" is unknown
15  when the employee's medical condition is unpredictable).  Here, the stability or
16  expansion of Plaintiff's aortic root was not predictable, which Plaintiff's own cardiologist
17  acknowledged.  Rupture or dissection of Plaintiff's aortic root was likewise unpredictable
18  and isolation of triggers to reduce the risk of an occurrence was impossible.  The risk of
19  rupture or dissection would have been prevalent throughout the assignment in Escravos.

20         Finally, because it is impossible to predict whether or when a cardiac event would
21  occur due to Plaintiff's heart condition, the fifth factor regarding consideration of
22  relevant information about an employee's past work history should not be accorded any
23  weight at all.  Even though Plaintiff previously had an uneventful past work history, such
24  a fact does not reduce the risk of a future occurrence of a cardiac event, which is
25  impossible to predict.

26         The essential duties of the REM position had to be performed on-site in Escravos,
27  Nigeria. The job posting as well as the job description for this ex pat position, required
28  that it be performed in Escravos.  While Plaintiff's heart condition may not have

SMRH:4933-0526-9840    DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    impacted his day-to-day ability to work, a rupture or dissection due to Plaintiff's heart

2    condition was completely unpredictable and it was impossible to isolate triggers to reduce

3    the risk of an occurrence.  If Plaintiff had an occurrence in Escravos, the remoteness of

4    the Escravos facility and its lack of access to appropriate medical care for serious medical

5    conditions would likely lead to Plaintiff's death.  Due to Plaintiff's heart condition and its

6    unpredictable risk of occurrence of an adverse cardiovascular event, Plaintiff was deemed

7    not fit for duty in Escravos, Nigeria.  Because Plaintiff could not perform work in

8    Escravos, Nigeria, with or without reasonable accommodations, Plaintiff was not a

9    qualified individual with a disability under the FEHA's definition.

10          Drs. Asekomeh, Adeyeye, and Akintunde are all highly educated medical doctors

11    with extensive experience in their respective fields of medicine in Nigeria and the

12    specific working conditions in Escravos, as well as the medical facilities.  In providing

13    their opinion regarding Plaintiff's heart condition and ability to work in Escravos, these

14    doctors used their medical knowledge, which they kept current throughout their practice

15    through hands on practice and the review of medical journals and studies, as well as their

16    knowledge of the conditions and limited medical capabilities in Escravos.  In particular, a

17    research report published in 2019 by the Cardiothoracic Surgery Unit at the University of

18    Lagos and Lagos University Teaching Hospital found an extremely high 30-day mortality

19    rate of 64.7% in patients with the same heart condition as Plaintiff in a low-resource

20    environment like Nigeria.  This statistic factors in mortality rates of patients who were

21    able to obtain surgical intervention, which is not available in Escravos.  Both Drs.

22    Adeyeye and Akintunde were aware of this study at the time they provided their opinion

23    on Plaintiff's case.

24          It is undisputed that the risk of a cardiac event was small—something in the 1 to 2

25    percent range—but even small risks can be significant when the threatened harm is

26    grievous.  *See* *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001)

27    (citing Donahue v. Consol. Rail Corp., 224 F.3d 226, 231 (3d Cir. 2000)) (finding that

28    despite a small likelihood of an accident, "the severity and scale of the potential harm to

SMRH:4933-0526-9840    DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  others . . . nevertheless pose a significant risk" under the direct-threat analysis).

2  **2.    *Second Affirmative Defense: Plaintiff Failed to Mitigate His Damages***

3

4  Even assuming <u>arguendo</u> that Plaintiff may be entitled to a location premium (i.e.,

5  hazard premium) and equalization tax benefits while he continued to work in Los

6  Angeles County, which he is not, the evidence shows that after Plaintiff's offer for the

7  expatriate position was rescinded, there were other expatriate positions available with

8  associated location premiums and equalization tax benefits.  However, by Plaintiff's

9  admission, he did not even make any attempt to apply applications for other expatriate

10  assignments.  Instead, the evidence shows that while Plaintiff was aware of available

11  expatriate assignments, including one with Tengizchevroil in Kazakhstan, Plaintiff did

12  not even submit applications apply for those assignments.

13  **G.    <u>Statements for Third Parties</u>**

14  There are no third parties named in this case.  Plaintiff did not name Chevron

15  Nigeria as a defendant in this matter.

16  **H.    <u>Anticipated Evidentiary Issues</u>**

17  **1.    *Plaintiff and His Expert's Testimony About His Speculative Future Damages.***

18

19  Chevron U.S.A. anticipates that Plaintiff will attempt to introduce evidence

20  speculating that he would have received a promotion to a higher pay salary grade six to

21  twelve months after he assumed the REM position, or that he would have continued in

22  the same position or a different expatriate position after the REM position assignment

23  was scheduled to end in 3 to 4 years.  Damages that are "speculative, remote, imaginary,

24  contingent,  or merely possible" are not recoverable.  <u>Atkins v. City of Los Angeles</u>, 8

25  Cal. App. 5th 696, 738 (2017).

26  Indeed, there is no guarantee that even if Plaintiff had assumed the REM position,

27  he would have stayed in the position for longer than one year.  The evidence will show

28  that, following the COVID-19 pandemic, the Chevron entities underwent a massive

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  reorganization and, due to the reorganization, Amir Zaheer, the employee who assumed

2  the REM position after Plaintiff's offer was rescinded, was only in the position for less

3  than one year before the REM position was reselected as part of the reorganization.

4  Another employee, Cesar Malpica, assumed the REM position in 2021.

**2.      *The Opinion of Plaintiff's Cardiology Expert, Dr. Alexander Marmureanu, Is Not Based on Reliable Data, Not Relevant to the Issues To Be Determined By the Jury, and Will Not Aid the Jury in Determining the Issues.***

8        Dr. Alexander Marmureanu is a cardiologist who practices in West Los Angeles,

9  California.  He has never been to Nigeria, and he has no knowledge of the conditions in

10 Escravos, the medical capabilities in Escravos, or Nigeria as a nation at-large.  Dr.

11 Marmureanu has opined that Plaintiff's heart condition has a low risk of occurrence of an

12 adverse cardiological event at roughly 1% per year, and that he assesses Plaintiff's risk

13 profile as similar to that of individuals without an aneurysm.  Dr. Marmureanu has also

14 opined that the physical requirements and working conditions of the REM position in

15 Escravos do not present any additional risk that would exacerbate Plaintiff's heart

16 condition, and that annual imaging is sufficient to monitor Plaintiff's heart condition for

17 changes.  All of Dr. Marmureanu's opinions are phrased in the present tense, and there is

18 no indication they reflect the state of medical knowledge in 2019, when the actual

19 decision was made.

20       Dr. Marmureanu's opinions are irrelevant because Chevron U.S.A.'s defenses

21 relate to the fact an essential job duty of the REM position was to work and to live in

22 Escravos, Nigeria.  Dr. Marmureanu admits his opinion is not based on any research

23 whatsoever as to the location of the REM position in Escravos, nor the safety of workers

24 in that location.  He also admits that he believes Plaintiff can do the job in Escravos,

25 Nigeria because it is a "desk job," but he has "no idea where he got that information" and

26 does not even know what the REM position is.  Dr. Marmureanu's opinion does not take

27 into account the other factors considered by the doctors in Nigeria—namely, the

28 conditions and medical facilities available in Escravos.  However, Dr. Marmureanu also

SMRH:4933-0526-9840        DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1    acknowledged that if an adverse cardiological event had occurred, "medical management

2    and more likely than not surgical management" would be necessary, which are

3    indisputably not available in Escravos.

4        Additionally, Dr. Marmureanu's opinions are irrelevant to the issues to be

5    considered by the jury and will not aid the jury in reaching its decision.  The jury must

6    consider whether Drs. Asekomeh, Adeyeye, and Akintunde made a reasonable medical

7    judgment that relied on the most current medical knowledge or on the best available

8    objective evidence.  Dr. Marmureanu's opinion is delivered in 2025, sitting in Los

9    Angeles County, California, which is irrelevant to the facts of Plaintiff's MSEA

10   determination in 2019, the relevant time period.  Additionally, Dr. Marmureanu's opinion

11   that the working conditions in Escravos would not exacerbate Plaintiff's heart condition

12   and that Plaintiff's condition could be monitored annually for changes is irrelevant to the

13   issues in this case, as the occurrence of an adverse cardiological event is unpredictable.

14   Dr. Marmureanu's deliberate disregard of the working conditions and lack of medical

15   resources in Escravos is telling, because he conducted no research and has no personal

16   knowledge of either the conditions or medical capabilities in Escravos, nor of the medical

17   literature regarding the ability to treat Plaintiff's condition in Nigeria.

18       **I.    Identification of Any Issues of Law**

19       1.    Chevron U.S.A. is not liable for disability discrimination because Plaintiff

20   could not perform the essential duties of the REM position because he was not cleared to

21   work in Escravos, where the job was located.  "[D]rawing distinctions on the basis of

22   physical or mental disability . . . is prohibited *only* if the adverse employment action

23   occurs because of a disability *and* the disability would not prevent the employee from

24   performing the essential duties of the job . . . with or without reasonable

25   accommodation."  Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC, 704

26   F.3d 1235, 1242 (9th Cir. Cal. 2013) (quoting Green v. State, 42 Cal. 4th 254, 262 (Cal.

27   2007)).  Employees who are not qualified to perform the essential duties of the job are

28

SMRH:4933-0526-9840        DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  excluded from the FEHA's prohibition against discrimination.  See <u>Cuiellette v. City of</u>

2  <u>Los Angeles</u>, 194 Cal. App. 4th 757, 766 (Cal. Ct. App. 2011).

3       2.       Chevron U.S.A. is not liable for disability discrimination because allowing

4  Plaintiff to assume the REM position would have endangered the health or safety of

5  Plaintiff or others.  An employer is allowed to refuse to hire an employee who cannot

6  perform his duties without endangering the health or safety of himself or others.

7  *Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n*, 212 Cal. App. 3d 1242, 1252

8  (Cal. Ct. App. 1989) (*citing* Cal. Gov't Code § 12940(a)(1)); C.A.C.I. 2544.

9       3.       Plaintiff is not entitled to economic damages based on the location premium

10  or the value of equalization tax benefits and/or a promotion to a higher pay salary grade

11  and/or front pay during the time period he would have remained in Los Angeles due to

12  the COVID-19 pandemic, or for more than one year (when the reorganization occurred)

13  or 3-4 years (when the assignment was scheduled to end).  Damages that are "speculative,

14  remote, imaginary, contingent,  or merely possible" are not recoverable.  <u>Atkins v. City</u>

15  <u>of Los Angeles</u>, 8 Cal. App. 5th 696, 738 (2017).

16  **II.   <u>JURY TRIAL (L.R. 16-4.5)</u>**

17       Plaintiff has requested a jury trial.  Chevron U.S.A. did not seek a jury trial.

18  **III.  <u>ATTORNEYS' FEES (L.R. 16-4.5)</u>**

19       Plaintiff seeks attorneys' fees pursuant to California Government Code section

20  12965(b), which allows the Court in its discretion to award fees and costs to the

21  prevailing party.  Chevron U.S.A.'s position is that, before Plaintiff may be awarded any

22  fees or costs, it must first be determined who the prevailing party is, taking into account

23  the claims asserted and the disposition of those claims.  For instance, fees and costs

24  should not be awarded on Plaintiff's voluntarily dismissal of his age discrimination

25  claim, or on Plaintiff's failure to accommodate and wrongful constructive termination

26  claims, which were summarily adjudicated in Chevron U.S.A.'s favor.  Chevron U.S.A.

27  believes that Plaintiff's decision to go forward with his FEHA claim is in bad faith as the

28  claim is frivolous and groundless.  As such, Chevron U.S.A. reserves the right to seek

SMRH:4933-0526-9840
DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  attorney's fees as prevailing party should it prevail at trial.

2  **IV.    ABANDONMENT OF ISSUES (16-4.6)**

3      None at this time.

4

5  Dated:  July 1, 2025

6                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8                              By _____/s/ Tracey Kennedy_____

9                                      TRACEY A. KENNEDY
                                       ROBERT E. MUSSIG
10                                     H. SARAH FAN
                                       Attorneys for Defendant
11                                     CHEVRON U.S.A. INC.,
                                       a Pennsylvania Corporation
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28