# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

---o0o---

| | |
|---|---|
| MARK SNOOKAL, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | 2:23-cv-6302-HDV-AJR |
| CHEVRON USA, INC., a California ) | |
| Corporation, and DOES 1 through ) | |
| 10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

DEPOSITION OF

DR. VICTOR ADEYEYE

Volume 1, Pages 1 - 34

Taken Remotely Via Videoconference

Friday, November 15, 2024

Stenographically reported by:
Renee M. Bencich, CSR No. 11946, RPR

STENO
concierge@steno.com
888.707.8366
Job Number 117195

**EXHIBIT 1/1**

Dr. Victor Adeyeye                                                          November 15, 2024

|    |                                                  |
|----|--------------------------------------------------|
| 1  | APPEARANCES                                      |
| 2  |                                                  |
| 3  | For Plaintiff, Mark Snookal:                     |
| 4  |     ALLRED, MAROKO & GOLDBERG |
|    |     By: OLIVIA FLECHSIG, Attorney at Law |
| 5  |     6300 Wilshire Boulevard, Suite 1500 |
|    |     Los Angeles, California 90048 |
| 6  |     323.653.6530             |
|    |     oflechsig@amglaw.com     |
| 7  |                                                  |
| 8  |                                                  |
| 9  | For Defendant Chevron USA, Inc.:                 |
| 10 |     SHEPPARD MULLIN          |
|    |     By: SARAH FAN, Attorney at Law |
| 11 |     333 South Hope Street, 43rd Floor |
|    |     Los Angeles, California 90071 |
| 12 |     213.620.1780             |
|    |     sfan@sheppardmullin.com  |
| 13 |                                                  |
| 14 |                                                  |
| 15 | Also Present:                                    |
| 16 |     Dolores Y. Leal, Attorney at Law |
|    |     Allred, Maroko & Goldberg |
| 17 |                                                  |
|    |     Paris Stephen, Attorney at Law |
| 18 |     Allred, Maroko & Goldberg |
| 19 |     Eguono Erhun, Attorney at Law |
|    |     Chevron Nigeria Limited  |
| 20 |                                                  |
| 21 |                                                  |
| 22 |                                                  |
| 23 |                                                  |
| 24 |                                                  |
| 25 |                                                  |

**EXHIBIT 1/2**

Dr. Victor Adeyeye                                    November 15, 2024

```
 1        Q.   Okay.  What is your best estimate of how long
 2   you met with Sarah for each of those two or three times
 3   you met?
 4        A.   A lot of interruptions.  Maybe one, two hours.
 5   A lot of interruptions in the course of discussing with
 6   her.
 7        Q.   Okay.
 8        A.   Job-related interruptions.
 9        Q.   Understood.
10             Did you review any documents to prepare for
11   your deposition today?
12        A.   I'm too busy.  No.  No, too busy.  Yeah.
13        Q.   Okay.  Sorry.  That's my coffee machine turning
14   off in the background.  I apologize for the noise.
15             Have you read the complaint in this case?
16        A.   I'm not aware of --
17        Q.   Like the actual lawsuit?
18        A.   No, no, no, no.  I'm not aware of that.
19        Q.   Okay.  Have you done anything to search for
20   documents related to Mark Snookal, the plaintiff in this
21   case?
22        A.   No.
23        Q.   Okay.  Have you ever -- besides -- strike that.
24             Besides with your attorneys, have you spoken
25   with anyone about Mark Snookal in writing?
```

```
 1      A.   People with cardiovascular problem generally is
 2   the main core of my job, and that takes over 70 percent,
 3   looking at the record of the cardiovascular boarding and
 4   hospital visits.  Thank you.
 5      Q.   Okay.  When did you become a cardiologist?
 6      A.   Specialist, cardiology, 2010.  Consultant
 7   cardiologist, 2015.
 8      Q.   Okay.  So just to clarify, you completed your
 9   training to become a cardiologist in 2010?
10      A.   2015.
11      Q.   2015.  Okay.  What training did you undergo to
12   become a cardiologist?
13      A.   I underwent fellowship training of both
14   National Postgraduate Medical College and West African
15   College of Physician.  Subspecialty, cardiologist.
16      Q.   Okay.  When did you graduate from medical
17   school?
18      A.   2005.
19      Q.   Do you have a board like -- strike that.
20           Can you describe any board certifications that
21   you hold currently?
22      A.   Okay.  Apart from the National Postgraduate
23   Medical College, Nigeria, I also hold West African
24   College of Physician.
25           I also have Committee on Trauma of American
```

```
 1   College of Surgeon, ATLS, Advanced Trauma Life Supports.
 2            I also have American College of Physician,
 3   Advanced Cardiovascular Life Supports.
 4            Also, Basic Life Supports for America.
 5            Then, luckily, too, I have Health Management
 6   Certification of Nigerian Postgraduate Medical College,
 7   and a Physician of Emergency Medicine, Nigeria, where I
 8   also have a certification.
 9            Thank you.
10       Q.   Have you ever treated any patients with a
11   thoracic aortic aneurysm?
12       A.   In the course of my treating, I've had one case
13   of such.
14       Q.   Okay.  When was that?
15       A.   That was between 2010 to 2012.
16       Q.   Okay.  Do you know whether that patient had a
17   descending aortic aneurysm or an ascending aortic
18   aneurysm?
19       A.   Aortic roots aneurysm.  That was the patient's
20   type.
21       Q.   Okay.  Is -- since I'm a layperson, is that --
22   does that mean it's an ascending or --
23       A.   Yes --
24       Q.   -- descending?
25       A.   -- yes, yes.  Ascending.  Ascending.
```

Dr. Victor Adeyeye                                         November 15, 2024

1    Q.    Okay.
2    A.    Ascending.
3    Q.    Thank you.
4          Have you ever treated anyone with a dissection
5    who -- whose aortic aneurysm has dissected?
6    A.    Same patient.
7    Q.    Okay.  Would it be fair to say, then, that
8    you've never treated someone with a thoracic aneurysm
9    that has ruptured?
10   A.    That was the case.  That was the case.
11   Q.    Sorry, so the -- in the same case that you
12   were --
13   A.    Same patient.
14   Q.    -- describing --
15   A.    Same patient.
16   Q.    -- it had ruptured?
17   A.    Ruptured, yeah.
18   Q.    Okay.  So to clarify, had it ruptured or had it
19   dissected?
20         THE COURT REPORTER:  I'm sorry?  One more time.
21         THE WITNESS:  The distinction between
22   dissecting and rupture is thin.  So in an individual, it
23   could coexist.  In the same case I mentioned, it was
24   actually an autopsy that --
25         THE COURT REPORTER:  One more time, Doctor.

```
 1   One more time.  I didn't understand one word.
 2            THE WITNESS:  Okay.  The very case I mentioned,
 3   it was dissecting eventual rupture and patient passed
 4   away.  The very case.  In the last 10, 12 years.  Thank
 5   you.  Before Chevron.
 6   BY MS. FLECHSIG:
 7       Q.   Okay.  I know you've said that there was an
 8   autopsy conducted, so I --
 9       A.   Yes.
10       Q.   -- want to clarify.
11       A.   Yes.
12       Q.   That was after you treated the patient, or were
13   you conducting -- you were conducting the autopsy?
14       A.   When we conducted the autopsy.  It was a
15   follow-up patient.  Nothing could be done.  Ruptured,
16   and that was the --
17            THE COURT REPORTER:  And -- I'm sorry.  May we
18   go off the record real quick?
19            MS. FLECHSIG:  Yes.
20            THE COURT REPORTER:  Thank you.
21            (Off the record.)
22            (The record was read as follows:
23            QUESTION: That was after you treated the
24            patient, or were you conducting the autopsy?)
25            ANSWER: When we conducted the autopsy.  It was
```

```
 1              a follow-up patient.  Nothing could be done.
 2              Ruptured, and that was the --)
 3              THE COURT REPORTER:  There was more.
 4              THE WITNESS:  Mortality.  Death.  Death.
 5              THE COURT REPORTER:  Thank you.
 6   BY MS. FLECHSIG:
 7       Q.   So was the patient alive when they first came
 8   to you?
 9       A.   Yes.
10       Q.   Understood.
11              Were you able to administer any treatments to
12   the patient before they passed away?
13       A.   The treatment could not be given.  Not
14   available.
15       Q.   Understood.
16              Do you have a current curriculum vitae or a
17   resume?
18       A.   Have but not updated.
19       Q.   Okay.  Do you know when you would have last
20   updated it?
21       A.   Over a year ago.
22       Q.   Have you published any medical research during
23   the last 10 years?
24       A.   Two contributions to textbooks of medicine with
25   over 20 publications in local and international
```

```
 1   journals.
 2      Q.   Okay.  Are those on cardiology or different
 3   subjects?
 4      A.   Part, cardiology.  Others, all of them on
 5   medical conditions.
 6      Q.   Okay.  I want to clarify also one thing about
 7   your training.  I understand you have training in trauma
 8   surgery.  I also understand you have training in
 9   cardiology.
10           Are you trained as a cardiac surgeon?
11      A.   No, I'm not a surgeon.
12      Q.   Okay.  Understood.
13           Now I want to ask you some questions specific
14   to the plaintiff in this lawsuit, Mark Snookal.  I may
15   refer to him also as Mr. Snookal.
16           When did you first hear the name Mark Snookal?
17      A.   Sometimes twenty -- sometimes in 2019.  I can't
18   be very specific.
19      Q.   Okay.  How did you -- what was the context of
20   hearing about him?
21      A.   It was a -- an expert opinion review by --
22   request by the occupational health physician of Chevron
23   medical.
24      Q.   Who was the occupational health physician of
25   Chevron medical who asked you to offer an opinion on
```

```
 1   figure to that.  Not only consultation, even medevac
 2   cases that require expats' management as a supporting
 3   facility to offshore -- location.  Thank you.
 4           THE COURT REPORTER:  To offshore?  Doctor, to
 5   offshore what location?
 6           THE WITNESS:  Offshore location.  Offshore.
 7   Offshore.  Escravos.  Offshore Escravos.  Escravos.
 8   Escravos.  Escravos location.  Offshore Escravos
 9   location.
10           Thank you.
11   BY MS. FLECHSIG:
12       Q.  Okay.  You have never spoken to Mark Snookal,
13   the plaintiff in this case, correct?
14       A.  Never spoken with him.
15       Q.  Okay.  Have you ever reviewed Mr. Snookal's
16   employment history?
17       A.  Employment history?
18       Q.  Yes.
19       A.  Or medical history?
20       Q.  No, have you ever reviewed his employment
21   history?
22       A.  Oh, that's not within my scope.
23       Q.  Okay.  So, no, you have not reviewed his
24   employment history, correct?
25       A.  Yes.
```

Dr. Victor Adeyeye                      November 15, 2024

```
 1              MS. FAN:  Asked and answered.
 2    BY MS. FLECHSIG:
 3        Q.   That's a -- you said yes?
 4        A.   I've never reviewed his employment history.
 5        Q.   Thank you.
 6             You mentioned also giving treatment in response
 7    to medical evacuations.
 8        A.   Yes.
 9        Q.   Do you -- do you treat people who have been
10    medevaced from Escravos, Nigeria?
11        A.   Yes.
12        Q.   How often do you treat people who have been
13    medevaced on an emergency basis from Escravos, Nigeria?
14        A.   Putting specific number is difficult because
15    not all cases are medevaced.  Many cases are, based
16    on --
17             THE COURT REPORTER:  Based --
18             THE WITNESS:  Expats advised.  Based on expat
19    advised.
20    BY MS. FLECHSIG:
21        Q.   Okay.  Can you give me your best estimate of
22    how often on average you treat someone who has been
23    evacuated from Escravos on an emergency basis?  Just
24    approximately.
25        A.   That varies.  In a year -- it's -- it's quite
```

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                       ---o0o---

 4  MARK SNOOKAL, an individual,    )
              Plaintiff,            )
 5  vs.                             ) Case No.
                                    ) 2:23-cv-6302-HDV-AJR
 6  CHEVRON USA, INC., a California )
    Corporation, and DOES 1 through )
 7  10, inclusive,                  )
              Defendants.           )
 8  _____)

 9              REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
10                 DR. VICTOR ADEYEYE
                Volume 1, Pages 1 - 34
11             Friday, November 15, 2024

12          I, RENÉE M. BENCICH, Certified Shorthand
    Reporter in and for the State of California, hereby
13  certify to the following:
            That the witness, DR. VICTOR ADEYEYE, was duly
14  sworn by the officer and that the transcript of the oral
    deposition is a true record of the testimony given by
15  the witness;
            I further certify that pursuant to FRCP Rule
16  30(e)(1) that the signature of the deponent:
            (XX) was requested by the deponent or a party
17  before the completion of the deposition and returned
    within 30 days from date of receipt of the transcript.
18  If returned, the attached Changes and Signature Page
    contains any changes and the reasons therefor;
19          (  ) was not requested by the deponent or a
    party before the completion of the deposition.
20          I further certify that I am neither attorney
    nor counsel for, related to, nor employed by any of the
21  parties to the action in which this testimony was taken.
            Further, I am not a relative or employee of any
22  attorney of record in this cause, nor do I have a
    financial interest in the action.
23          Subscribed and sworn to on this the 1st day of
    December, 2024.
24                          _____
                            RENÉE M. BENCICH, CSR, RPR
25                          California License No. 11946
```