# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5    MARK SNOOKAL, an individual,    )
                                     )
6            Plaintiff,              )
                                     )
7        v.                          )  NO. 2:23-cv-6302-
                                     )        HDV-AJR
8    CHEVRON USA, INC., a California )
     Corporation, and DOES 1 through )
9    10, inclusive,                  )
                                     )
10           Defendants.             )
     _____)

11

12

13

14

15

16

17            Videotaped deposition of MARK JORDAN

18     SNOOKAL, Plaintiff, taken on behalf of Defendants

19     at 333 South Hope Street, 43rd Floor, Los Angeles,

20     California, commencing at 10:00 a.m. on Friday,

21     May 10, 2024, before John M. Taxter, Certified

22     Shorthand Reporter No. 3579 in and for the State

23     of California, a Registered Professional Reporter.

24

25

```
1     APPEARANCES OF COUNSEL:

2

3

4     FOR PLAINTIFF MARK JORDAN SNOOKAL:

5          ALLRED, MAROKO & GOLDBERG
           BY:  DOLORES Y. LEAL, Attorney at Law
6          6300 Wilshire Boulevard, Suite 1500
           Los Angeles, California  90048-5217
7          323.653.6530
           dleal@amglaw.com
8

9

10    FOR DEFENDANT CHEVRON USA, INC.:

11         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
           BY:  ROBERT E. MUSSIG, Attorney at Law
12         333 South Hope Street, 43rd Floor
           Los Angeles, California  90071-1422
13         213.620.1780
           rmussig@sheppardmullin.com
14
                  -and-
15
           SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
16         BY:  LINDA Z. SHEN, Attorney at Law
           501 West Broadway, 18th Floor
17         San Diego, California  92101-3598
           619.338.6500
18         lshen@sheppardmullin.com

19

20

21    VIDEOGRAPHER:

22         GIGI FADICH

23

24

25
```

| | | |
|---|---|---|
| 1 | for the job at Chevron? | 10:14:28 |
| 2 | A   I was unaware that I had a disability, | 10:14:30 |
| 3 | if I, in fact, had one at the time.  It had not | 10:14:33 |
| 4 | been diagnosed at that point. | 10:14:36 |
| 5 | Q   Okay.  And the disability we're talking | 10:14:38 |
| 6 | about is -- it's, I think, dilated aortic root; is | 10:14:39 |
| 7 | that -- | 10:14:39 |
| 8 | A   Correct. | 10:14:44 |
| 9 | Q   When was that diagnosed? | 10:14:45 |
| 10 | A   I believe it was 2014. | 10:14:47 |
| 11 | Q   And you -- you -- I'm not sure exactly | 10:14:53 |
| 12 | how you phrased it, but are you -- do you consider | 10:14:58 |
| 13 | that a disability? | 10:15:01 |
| 14 | A   I do, yeah. | 10:15:02 |
| 15 | Q   Okay. | 10:15:03 |
| 16 | A   I just meant that in 2009 I didn't -- it | 10:15:04 |
| 17 | could have been there, but I wouldn't have known | 10:15:08 |
| 18 | it. | 10:15:10 |
| 19 | How is that? | 10:15:12 |
| 20 | Q   I see.  And what job were you initially | 10:15:12 |
| 21 | hired into? | 10:15:15 |
| 22 | A   I was hired in as an analyzer engineer | 10:15:16 |
| 23 | in the "technical shared services department" I | 10:15:19 |
| 24 | believe it was called at the time. | 10:15:22 |
| 25 | Q   And what is an analyzer engineer? | 10:15:24 |

| | | |
|---|---|---|
| 1 | Q    In the subsection "intent" right at the | 10:44:03 |
| 2 | top of the page the first sentence states: | 10:44:06 |
| 3 | "The company requires fitness | 10:44:08 |
| 4 | for expatriate" assignments -- | 10:44:10 |
| 5 | "assignment medical evaluations. | 10:44:13 |
| 6 | This ensures that your health | 10:44:15 |
| 7 | status is appropriate for your work | 10:44:17 |
| 8 | assignment and that your overall | 10:44:18 |
| 9 | health is appropriate for working | 10:44:20 |
| 10 | in a proposed host-country | 10:44:22 |
| 11 | location." | 10:44:24 |
| 12 | Do you see that? | 10:44:24 |
| 13 | A    I do. | 10:44:25 |
| 14 | Q    Okay.  So I guess I don't think this is | 10:44:25 |
| 15 | controversial in this case, but I just want to | 10:44:29 |
| 16 | make sure. | 10:44:31 |
| 17 | You understood that you would have to be | 10:44:32 |
| 18 | medically cleared to -- to get the position, the | 10:44:35 |
| 19 | REM position in Escravos; right? | 10:44:40 |
| 20 | A    I did understand that, yes. | 10:44:42 |
| 21 | Q    And the job offer in July, 2019, was | 10:44:44 |
| 22 | contingent on you obtaining that medical | 10:44:46 |
| 23 | clearance; right? | 10:44:50 |
| 24 | A    Yes. | 10:44:51 |
| 25 | MR. MUSSIG:  I'll mark as Exhibit 3 a | 10:44:59 |

| | | |
|---|---|---|
| 1 | document titled "medical suitability for | 10:45:01 |
| 2 | expatriate assignment history & medical | 10:45:04 |
| 3 | examination."  It's Bates-numbered SNOOKAL-605 to | 10:45:07 |
| 4 | -610. | 10:45:10 |
| 5 | MS. LEAL:  Thanks. | 10:45:23 |
| 6 | (Exhibit 3 was marked for identification | 10:45:23 |
| 7 | by the Certified Shorthand Reporter.) | 10:45:23 |
| 8 | BY MR. MUSSIG: | 10:45:23 |
| 9 | Q    Do you recognize this document? | 10:45:24 |
| 10 | A    I do. | 10:45:27 |
| 11 | Q    Okay.  And this is just your completed | 10:45:28 |
| 12 | copy of "Chevron's standard medical suitability | 10:45:30 |
| 13 | for expatriate assignment history & physical | 10:45:34 |
| 14 | examination" form; correct? | 10:45:38 |
| 15 | A    Correct. | 10:45:38 |
| 16 | Q    And Chevron requires this form to be | 10:45:39 |
| 17 | completed for all employees who are conditionally | 10:45:40 |
| 18 | awarded expatriate assignments; is that right? | 10:45:43 |
| 19 | A    As far as I know. | 10:45:46 |
| 20 | Q    And the form is typically completed by | 10:45:49 |
| 21 | a -- by -- by you and a U.S. doctor; right? | 10:45:52 |
| 22 | A    I don't know what's typically done -- | 10:45:56 |
| 23 | Q    Oh. | 10:45:58 |
| 24 | A    -- but it was in this case. | 10:45:58 |
| 25 | Q    Well, fair enough.  If you turn to | 10:45:59 |

```
 1    page 3 of the document, SNOOKAL-607, is that your    10:46:02
 2    signature at the bottom?                             10:46:07
 3        A    It is.                                      10:46:08
 4        Q    And it's dated July 18, 2019; is that       10:46:08
 5    right?                                               10:46:08
 6        A    That's correct.                             10:46:13
 7        Q    And is this referred to as an MSEA form?    10:46:16
 8        A    It is.                                      10:46:19
 9        Q    And so on -- and so on the first three      10:46:24
10    pages of the form up to your signature, all the      10:46:28
11    boxes that are checked, you checked those; right?    10:46:33
12        A    That's correct.                             10:46:36
13        Q    Okay.  And so box No. 1 is:                 10:46:36
14             "Do you have any medical,                   10:46:40
15             physical or psychological                   10:46:41
16             conditions under the care of a              10:46:42
17             health professional?  If yes,               10:46:44
18             please describe."                           10:46:46
19             You marked by the box "yes"; right?         10:46:48
20        A    Correct.                                    10:46:48
21        Q    And then you said:                          10:46:50
22             "I have a dilated aortic root.              10:46:51
23             I am under the care of a                    10:46:54
24             cardiologist and see him once per           10:46:56
25             year for a checkup.  I have                 10:46:58
```

| | | |
|---|---|---|
| 1 | consulted with him on this | 10:46:59 |
| 2 | assignment, and he sees no issues | 10:47:00 |
| 3 | with it." | 10:47:02 |
| 4 | You wrote that; correct? | 10:47:02 |
| 5 | A    I did. | 10:47:03 |
| 6 | Q    And you -- you had -- you had testified | 10:47:05 |
| 7 | about this earlier.  I'm sorry for -- for -- I | 10:47:09 |
| 8 | think you were diagnosed with the dilated aortic | 10:47:12 |
| 9 | root in 2015. | 10:47:16 |
| 10 | Is that wrong? | 10:47:17 |
| 11 | A    I -- I honestly can't remember if it was | 10:47:19 |
| 12 | late 2014 or 2015. | 10:47:21 |
| 13 | Q    Okay.  But in that time frame? | 10:47:24 |
| 14 | A    In that time frame. | 10:47:26 |
| 15 | Q    And who -- who diagnosed you with that? | 10:47:27 |
| 16 | A    Dr. Khan who was my doctor through this | 10:47:30 |
| 17 | whole event. | 10:47:34 |
| 18 | Q    Is he with Cedars? | 10:47:36 |
| 19 | A    He, I think, has multiple affiliations. | 10:47:40 |
| 20 | I saw him at Kaiser Permanente, Los Angeles. | 10:47:44 |
| 21 | Q    And, I mean, I -- I just want to ask a | 10:47:49 |
| 22 | couple background questions about it.  I don't | 10:47:54 |
| 23 | want to get too far into your -- your medical | 10:47:55 |
| 24 | history. | 10:48:00 |
| 25 | What -- when -- when he diagnosed you | 10:48:00 |

| | | |
|---|---|---|
| 1 | with it, what was the prognosis? | 10:48:02 |
| 2 | A    To sum it up, he said that sometimes the | 10:48:09 |
| 3 | aortic root will not expand any more than it | 10:48:15 |
| 4 | already has and it will never expand to a point | 10:48:18 |
| 5 | where they consider it to be something that they | 10:48:23 |
| 6 | should operate on, or it can expand at a rate and | 10:48:26 |
| 7 | to a size that they consider to be operable or | 10:48:36 |
| 8 | something that they should operate on.  He said | 10:48:40 |
| 9 | that there's no way to accurately predict -- | 10:48:44 |
| 10 | predict which one mine would be but that the rate | 10:48:51 |
| 11 | of growth determines how they treat it, basically. | 10:48:54 |
| 12 | Q    Okay.  And -- and I think here you say | 10:49:04 |
| 13 | that you had to see him on a yearly basis.  Was | 10:49:08 |
| 14 | that what he -- what he -- | 10:49:11 |
| 15 | A    They call it -- | 10:49:13 |
| 16 | Q    -- said at the time? | 10:49:14 |
| 17 | A    Yes.  They call it "watchful waiting" | 10:49:16 |
| 18 | which is basically taking a picture of it once a | 10:49:19 |
| 19 | year and seeing if it's grown or not and at what | 10:49:22 |
| 20 | rate from the last time. | 10:49:25 |
| 21 | Q    And so you -- you followed up on a | 10:49:26 |
| 22 | yearly basis with him, I'm assuming? | 10:49:28 |
| 23 | A    Every year. | 10:49:30 |
| 24 | Q    And how did it develop, if at all? | 10:49:31 |
| 25 | A    There were some years where it grew at a | 10:49:36 |

| | | |
|---|---|---|
| 1 | from Lagos, so -- | 11:41:11 |
| 2 | Q    How did you know that? | 11:41:13 |
| 3 | A    Because I know what the job duties of | 11:41:16 |
| 4 | the position entail which is on-site supervision | 11:41:20 |
| 5 | and interaction with personnel and equipment. | 11:41:24 |
| 6 | Q    And we might have covered this earlier, | 11:41:31 |
| 7 | but Dr. Levy didn't specifically discuss with you | 11:41:36 |
| 8 | the difficulties in -- in transport to a medical | 11:41:40 |
| 9 | facility in Lagos; is that right? | 11:41:47 |
| 10 | A    He didn't speak anything about Lagos, | 11:41:49 |
| 11 | except that, if they had been able to -- if I had | 11:41:52 |
| 12 | been able to perform my job duties from Lagos, | 11:41:57 |
| 13 | then they would have located me in Lagos. | 11:42:01 |
| 14 | Q    But he did tell you that they had talked | 11:42:04 |
| 15 | about whether or not you could do it from Lagos; | 11:42:06 |
| 16 | right? | 11:42:06 |
| 17 | A    Yes. | 11:42:10 |
| 18 | MR. MUSSIG:  I have some e-mails.  I'll | 11:42:20 |
| 19 | mark as Exhibit 6 e-mail correspondence between | 11:42:21 |
| 20 | Dr. Khan and Dr. Levy.  It's Bates-numbered | 11:42:26 |
| 21 | SNOOKAL-89 to -90. | 11:42:29 |
| 22 | (Exhibit 6 was marked for identification | 11:42:29 |
| 23 | by the Certified Shorthand Reporter.) | 11:42:29 |
| 24 | BY MR. MUSSIG: | 11:42:29 |
| 25 | Q    Are you familiar with this document? | 11:42:51 |

| | | | |
|---|---|---|---|
| 1 | A | I am. | 11:42:52 |
| 2 | Q | Okay.  And you -- this is e-mail | 11:42:52 |
| 3 | correspondence between Dr. Khan and Dr. Levy; | | 11:42:55 |
| 4 | right? | | 11:42:55 |
| 5 | A | Correct. | 11:42:58 |
| 6 | Q | And you're copied on at least the | 11:42:58 |
| 7 | response from Dr. Levy to Dr. Khan; right? | | 11:43:01 |
| 8 | A | Yes. | 11:43:04 |
| 9 | Q | Okay.  But I can't -- were you copied on | 11:43:05 |
| 10 | the original e-mail from Dr. Khan? | | 11:43:08 |
| 11 | A | I don't recall. | 11:43:10 |
| 12 | Q | And -- and Dr. Levy had reached out to | 11:43:13 |
| 13 | Dr. Khan directly with your permission; right? | | 11:43:16 |
| 14 | A | That's correct. | 11:43:18 |
| 15 | Q | And you may or may not know this. | 11:43:19 |
| 16 | | So Dr. Levy left a voice mail for | 11:43:25 |
| 17 | Dr. Khan requesting to connect; right?  That is | | 11:43:28 |
| 18 | how it started? | | 11:43:31 |
| 19 | A | I believe that is correct. | 11:43:32 |
| 20 | Q | And then Dr. Khan responded by e-mail, | 11:43:33 |
| 21 | and that's this e-mail that we're looking at; | | 11:43:36 |
| 22 | right? | | 11:43:36 |
| 23 | A | Yes, as far as I know.  They -- I don't | 11:43:39 |
| 24 | know if they had other -- I know they had more | | 11:43:43 |
| 25 | than one conversation.  I don't know the time line | | 11:43:46 |

1                    DEPONENT'S DECLARATION

2

3          I, MARK JORDAN SNOOKAL, hereby declare:

4          I have read the foregoing deposition,  I

5    identify it as my own, and I have made any

6    corrections, additions or deletions that I was

7    desirous of making in order to render the within

8    transcript true and correct.

9

10   _____,_____.
                (Date)                (City and State)

11

12                        _____
                                (Signature)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA  )
                           ) SS.
 2    COUNTY OF VENTURA    )

 3           I, John M. Taxter, a California Certified

 4    Shorthand Reporter, Certificate No. 3579, a

 5    Registered Professional Reporter, do hereby

 6    certify:

 7           That the foregoing proceedings were taken

 8    before me at the time and place therein set forth,

 9    at which time the deponent was put under oath by

10    me; that the testimony of the deponent and all

11    objections made at the time of the examination

12    were recorded stenographically by me and were

13    thereafter transcribed; that the foregoing is a

14    true and correct transcript of my shorthand notes

15    so taken.

16           I further certify that I am neither counsel

17    for nor related to any party to said action.

18           The dismantling, unsealing, or unbinding of

19    the original transcript will render the Reporter's

20    Certificate null and void.

21           Pursuant to Federal Rule 30(e), transcript

22    review was requested.

23    Dated May 22, 2024.

24                            _____
                              JOHN M. TAXTER
25                            California Certified Shorthand
                              Reporter No. 3579, RPR
```

1

2

3

4           I, John M. Taxter, Certified Shorthand Reporter,

5   CSR No.   3579, hereby certify:

6       The foregoing is a true and correct copy of the

7   original transcript of the proceedings taken by me

8   as thereon stated.

9

10

11

12   Dated:   May 23, 2024

13

14

15

16   _____
     John Taxter, CSR No. 3579

17

18

19

20

21

22

23

24

25

**Abrams, Mah & Kahn**

# EXHIBIT B

07/24/2019 7:35AM  FAX                                                                                     ☑0009/0024



**Chevron**

## Medical Suitability for Expatriate Assignment History & Physical Examination
### GO-146-MSEA

Mark Snookal

CAI - MVZM

0724-15                                        JUL 2 4 2019                        *Initial Nigeria*

Note to Examinee and Examiner:  In the US, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information for any U.S. based employees (whether within the U.S. or outside the U.S. on assignment) when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. Local or Host Country legal requirements may also apply.

**Part A. Examinee: Please complete Parts A through F prior to exam**

| F.I. | M.I | Last Name | First Name | | CAI | Gender |
|---|---|---|---|---|---|---|
| | | Mark Snookal | | | MVZM | M |

| Current Job Title | New Job Title* | Current Company/BU/OpCo | Next * Company/BU/OpCo | Current Location | Next * Location |
|---|---|---|---|---|---|
| IEA Reliability Team Lead | Reliability Engineering Manager | ESE | NMASBU | El Segundo CA USA | Escravos, Nigeria |

*If Applicable

**Part B. Your country of assignment may or may not have full medical resources to support your health needs. Please answer the following questions as accurately as possible and check 'N' (no) or 'Y' (yes) in the column. Answers with Yes, please provide more information in the description boxes. This information is used to promote your safety and ensure your health needs can be met.**

| | (If need, please use back page) | N | Y | Description |
|---|---|---|---|---|
| 1. | Do you have any medical, physical or psychological conditions under the care of a health professional? If yes, please describe. | ☐ | ☒ | I have a dilated aortic root. I am under the care of a cardiologist and see him once per year for a checkup. I have consulted with him on this assignment and he sees no issues with it. |
| 2. | (a) Are you taking any medicines that require a prescription? If yes, please list. | ☐ | ☒ | Losartan and Amlodipine |
| | (b) Are you taking any non-prescription medicines on a frequent basis? If yes, please list. | ☒ | ☐ | |
| 3. | (a) Do you have any allergies? | ☒ | ☐ | |
| | (b) Have you ever had severe allergic reactions? If yes, do you know what caused it? | ☒ | ☐ | |
| 4. | Do you exercise for at least 30 minutes 3 times a week, on average? | ☐ | ☒ | |
| 5. | (a) Do you feel unusual fatigue or sleepiness? | ☒ | ☐ | |
| | (b) Do you have any problems sleeping? | ☒ | ☐ | |
| | (c) Do you use sleeping aids, including medication? | ☒ | ☐ | |
| 6. | Have you ever experienced health problems working in extreme weather conditions? | ☒ | ☐ | |
| 7. | Have you experienced unexplained weight loss or gain? | ☒ | ☐ | |
| 8. | (a) Do you smoke? If yes, what and how much each day? | ☒ | ☐ | |
| | (b) Did you smoke regularly for more than 1 year ever in your past? | ☒ | ☐ | |
| 9. | Do you drink alcoholic beverages? If yes, what is your average weekly intake? | ☒ | ☐ | |
| 10. | Have you ever required a medical evacuation from a work location? If yes, what was the reason? | ☒ | ☐ | |

*EX. 3 FOR ID 5/10/24 9mT*

GO-146 - MSEA (6-18)
Ward Electronic Version

SNOOKAL-00605          **Exhibit B**
                                                                                                          p. 16

| | | Examinee Last and First Name | Examinee CAI |
|---|---|---|---|
| | | **Mark Snookal** | **MVZM** |

| | | | | |
|---|---|---|---|---|
| 11. | Have you ever had any mental health or psychological issues requiring at least a medical prescription? If yes, please describe | ☐ | ☒ | I was treated for depression with Effexor for a few years from approximately 1994-1996 |
| 12. | Have you been in the emergency room and or hospitalized within the last six months? | ☒ | ☐ | |
| 13. | Have you undergone any surgical procedure or operations within the last six months? | ☒ | ☐ | |
| 14. | Did you have a physical (periodic, preventive) exam within the past two years? | ☐ | ☒ | |
| 15. | Would you need health/medical resources for any disabling or special condition in the country of assignment? | ☒ | ☐ | |
| 16. | Would you like to schedule a discussion with a Chevron Physician or Regional Medical Manager to discuss further a health condition or learn more about the host country medical resources? | ☒ | ☐ | |
| 17. | Does your new position require you to work or travel Offshore, in Field/Plant or Strictly Office?  Please advise if you need additional certifications for your new position (e.g. HUET/BOSIET, Oil and Gas U.K.) | ☐ | ☐ | My position is strictly office |

**Part C: Please answer the following questions and check 'N' (no) or 'Y' (yes) in the column. If 'Y' please describe.**

| | Have you had any illness or condition related to the following body parts or systems? (minor conditions do not need to be mentioned): | | N | Y | Description: |
|---|---|---|---|---|---|
| 18. | Head and Neck | | ☒ | ☐ | |
| 19. | Eyes or Visual | | ☒ | ☐ | |
| 20. | Ear, Nose and Throat | | ☒ | ☐ | |
| 21. | Teeth (a) When was your last exam? (b) Is there any dental work pending? Please describe | | ☐ ☒ | ☐ ☐ | 11/2017 |
| 22. | (a) Chest such as shortness of breath, chronic cough. (b) Breasts | | ☒ ☒ | ☐ ☐ | |
| 23. | Heart such as chest pain, palpitations or irregular beating | | ☐ | ☒ | I have PVC's which have been evaluated by a cardiologist and do not require any treatment |
| 24. | Abdomen such as pain, hernias, abnormal bowel movement | | ☐ | ☒ | I had my gallbladder removed in 2014 |
| 25. | Kidney, bladder or genital area | | ☒ | ☐ | |
| 26. | Spine and Musculo-skeletal, movement limitations or pain | | ☒ | ☐ | |
| 27. | Skin changes such as rash, spots, moles or itching | | ☒ | ☐ | |
| 28. | Epileptic seizures, dizzy spells or migraine | | ☒ | ☐ | |
| 29. | Diabetes or increase in blood sugar | | ☒ | ☐ | |
| 30. | Anemia or other blood conditions | | ☒ | ☐ | |
| 31. | Tuberculosis (TB) or positive TB test, skin or blood (e.g. TB spot, IGRA/ Quantiferon®) | | ☒ | ☐ | |
| 32. | Any other health problems (Please use space below.  If need, use back page) | | ☒ | ☐ | |

GG-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00606    Exhibit B
p. 17

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## Part D. Exposure History (Employee Only)

Have you ever been exposed at work to dusts, solvents, other chemicals or any other known workplace hazards, e.g. biological agents?

☒ Yes  ☐ No

If YES, please list agents with dates and for how long:

I have worked in industrial and petrochemical locations from 1990  present

Have you ever been exposed in the workplace to:

☒ Noise  ☐ Radiation/X-ray Equipment  ☐ Vibrating Hand Tools  ☐ Repetitive Movement  ☐ Weight Lifting  ☐ Other

If you checked one of the boxes above, please specify for how long, and whether Personal Protective Equipment (PPE) was used:

In my work in industrial and petrochemical locations from 1990  present I have been exposed to noise but have always used PPE

## Part E. Occupational History (Employee Only)

Have you ever been part of a medical (health) surveillance program through your work due to exposure to workplace hazards?  e.g. Part of a hearing conservation program due to exposure to workplace noise.

☒ Yes  ☐ No

If YES, please list with dates:

I am currently in a hearing conservation program in my employment with Chevron El Segundo

## Part F.  Family History

To comply with the US Genetic Information Nondiscrimination Act of 2008, this part should NOT be completed for any US based employees (whether in the U.S. or outside the U.S. on assignment).  Any information inadvertently provided for a US employee in this section should be redacted if the form is to be sent to the US for filing in the employee's medical record. Local related legislation may be also applicable.

Are there any medical conditions within your family relevant to be mentioned?

Physician Comments:

Have you ever been employed with Chevron or examined for employment by Chevron?

☐ No  ☒ Yes   If yes, when  At hiring at Chevron El Segundo in 2009

### EXAMINEE:

I certify that the information given by me is true and I authorize the examiner to furnish the results of this examination and other related medical investigation results to either the Chevron Regional Medical Managers or the Chevron Global Health and Medical facility.  I acknowledge and agree that the results of this medical evaluation are managed by Chevron in a secure and confidential data system that will store and may transmit information to countries other than where the medical examination takes place, including but not limited to the U.S.

FOR APPLICANT ONLY:  I understand that any misrepresentation, false statement or omission herein may result in the company rejecting my application, withdrawing any offer of employment, or terminating my employment at any time.

Examinee Signature _____                Date (mm/dd/yyyy)  7/18/2019

SNOOKAL-00607      Exhibit B
p. 18

07/24/2019 7:37AM FAX ⌀0012/0024

| Examinee Last and First Name | Examinee CAI |
|---|---|
| **Mark Snookal** | **MVZM** |

### Part G. PHYSICAL EXAMINATION. To be completed by Health Care Provider

#### Vital Signs

| HEIGHT ft/cm | WEIGHT lb/kg | BMI | Abdominal Circumference in/cm | B.P. (mmHg) | PULSE | Temperature (°C/°F) |
|---|---|---|---|---|---|---|
| 72" | 256 lbs | 34.7 | | 135/78 | 53 | 97.5 |

#### Vision

| | | Uncorrected | | | Corrected | | Depth | Tonometry | Color Vision | Visual Fields |
|---|---|---|---|---|---|---|---|---|---|---|
| | Both | Right | Left | Both | Right | Left | | | | |
| Far | 20/ 6/ | 20/ 6/ | 20/ 6/ | 20/ 6/ ＱＣ | 20/ 6/ ＥＯ | 20/ 6/ ＱＣ | | | Normal | |
| Near | J# | J# | J# | J# / ← | J# / F | J# / F | | | | |

| N | A | N = Normal. A = Abnormal, please describe | | DESCRIPTION |
|---|---|---|---|---|
| ☑ | ☐ | 1. | General Appearance | |
| ☑ | ☐ | 2. | Head | |
| ☑ | ☐ | 3. | Ear, Nose Mouth and Throat | |
| ☑ | ☐ | 4. | Neck | |
| ☑ | ☐ | 5. | Eyes | |
| ☑ | ☐ | 6. | Chest | |
| ☑ | ☐ | 7. | Breasts | |
| ☑ | ☐ | 8. | Respiratory System | |
| ☐ | ☐ | 9. | Cardiovascular System | occas ectopics (PVC's) |
| ☑ | ☐ | 10. | Abdomen, Viscera/Hernias | |
| ☑ | ☐ | 11. | Genito-urinary | |
| ☑ | ☐ | 12. | Lower GI Tract | |
| ☑ | ☐ | 13. | Extremities | |
| ☑ | ☐ | 14. | Spine and Musculo-skeletal. Range of Motion. | |
| ☑ | ☐ | 15. | Skin and Lymphatic System | |
| ☑ | ☐ | 16. | Central Nervous System | |
| ☑ | ☐ | 17. | Peripheral Nervous System Reflexes | |
| ☐ | ☐ | 18. | Others, please specify | |

GO-146 - MSEA (5-18)
Word Electronic Version

SNOOKAL-00608    Exhibit B
p. 19

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

## LABORATORY AND SPECIAL TESTS

| N | A | Not Done | AS INDICATED | RESULTS. N = Normal. A = Abnormal, please describe |
|---|---|---|---|---|
| ☐ | ☐ | ☑ | Audiogram | |
| ☐ | ☐ | ☑ | Chest X Ray | |
| ☑ | ☐ | ☐ | Complete Blood Count | |
| ☐ | ☐ | ☑ | Drug Screening | |
| ☐ | ☑ | ☐ | ECG | |
| ☐ | ☐ | ☑ | Pulmonary Function | |
| ☑ | ☐ | ☐ | Serum Profile/Chemistries | |
| ☐ | ☐ | ☑ | Stress Test | |
| ☑ | ☐ | ☐ | Urinalysis | |
| ☐ | ☐ | ☐ | Others, please specify | |

REMARKS; Describe significant / abnormal findings/limitations noted above (if need, please use back page)

① PVC's - frequent asymptomatic followed by cardiology
② Dilated aortic root followed by cardiology ongoing studies yearly echo vs CT chest stable on meds

If any abnormalities were found during the examination, was examinee informed? ☑ Yes ☐ No

## Part H: MEDICAL RECOMMENDATION

### H.1. Fitness for Duty Classification, ONLY FOR INTERNAL CHEVRON USE

☐ A. Fit for Duty
☑ B. Fit for Duty with Restrictions
☐ C. Not Fit for Duty
☐ D. Failed to comply with requested evaluations, due to:

### H.2. Restrictions pertinent to Job Requirements (refer to GO-308)

No heavy lifting >50/bs needs review of Recommend letter from cardiologist to clear him

| Examiner's Name (please print) IRVING SOBEL MD | Signature | Date (mm/dd/yyyy) 07/24/2019 |
|---|---|---|
| Address 4676 ADMIRALTY WAY 4th FLOOR MDR CA 90292 | USA Chevron Provider Number 1 1 4 0 8 | |

| Chevron Global Health & Medical Approval (please print name) | Signature | Date (mm/dd/yyyy) |
|---|---|---|

Page 5 of 6

| Examinee Last and First Name | Examinee CAI |
|---|---|
| Mark Snookal | MVZM |

**PLEASE ATTACH COPIES OF IMPORTANT REPORTS OF CURRENT INTEREST.**
If available, Form GO-308 (Physical Requirements and Working Conditions) must be included.

SNOOKAL-00610    Exhibit B
p. 21

# EXHIBIT C

Exhibit C
p. 22

**From:** Levy, Scott
**Sent:** 26 August 2019 00:51
**To:** Steven H. Khan <Steven.S.Khan@kp.org>
**Cc:** Mark Snookal <Mark@maygus.com>
**Subject:** Re: [**EXTERNAL**] Patient MS

Dr. Khan,

Thank you for the very quick response. I'm working with my team in Nigeria right now to discuss.

Scott

Sent from my iPad

On Aug 23, 2019, at 10:35 PM, Steven H. Khan <Steven.S.Khan@kp.org> wrote:

> Hi Dr. Levy,
> I received your voicemail about Mr. MS who is a Chevron employee and my patient here at Kaiser.
> I understand he is applying for a job in a rural or remote area of Nigeria and I understand the concern about his aortic aneurysm.
>
> I just spoke to Mr. MS and received his permission to email you back. I am also copying him on this email.
>
> Mr. MS's aneurysm is relatively small and considered low risk. His Thoracic aortic aneurysm size is 4.1-4.2 cm on his most recent CT scan.
> From the published studies, the risk of rupture or dissection is 2% per year for aneurysms between 4.0 and 4.5 cm (Ann Thor Surg 2002 Vol 73, pg 17-28, figure 3).
>
> Further, the average rate of growth of thoracic aortic aneurysms is 0.1%/year and Mr. MS's aneurysm has not changed between his CTs in May 2016, May 2017, and April 2019.
> Since Mr. Snookal's aneurysm has not shown any growth for 3 years, his risk may be lower than the published 2% number above which would be based on "average" growth rates.
>
> Finally, the studies of risk of rupture are fairly old (2002) and treatment has improved as has our understanding of aortic aneurysms.
> For example, animal studies have shown a significant benefit from use of Angiotensin Receptor Blockers (ARB) in preventing or even reversing aortic aneurysm growth and Mr MS
> Is on an ARB.
>
> In summary, Mr. MS's risk of serious complications related to his thoracic aortic aneurysm is low and likely less than 2% per year.
> The risk is primarily related to further enlargement of the aneurysm which can be tracked with an annual CT scan.
>
> If you have any further questions, please feel free to email me or call me.
>
> Best regards,
>
> S. Khan, MD
> Clinical Associate Professor, UCLA School of Medicine
> Heart Failure and Transplant Cardiology, Kaiser Permanente



NOTICE TO RECIPIENT:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

SNOOKAL-00090

Exhibit C
p. 24

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,      )
                                  )
                                  )
                Plaintiff,        )
vs.                               )  Case No.
                                  )  2:23-cv-6302-HDV-AJR
                                  )
CHEVRON USA, INC., a California   )
Corporation, and DOES 1 through   )
10, inclusive,                    )
                                  )
                Defendants.       )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

DR. VICTOR ADEYEYE

VOLUME 2

Tuesday, April 22, 2025

Via Zoom Video Conferencing

6:00 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Dr. Victor Adeyeye                                                    April 22, 2025

```
 1                    A P P E A R A N C E S

 2


 3


 4    FOR THE DEFENDANT:

 5            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  SARAH FAN
 6                 ROBERT MUSSIG
              Attorney at Law
 7            333 South Hope Street, 43rd Floor
              Los Angeles, California 90071
 8            (213) 620-1780
              sfan@sheppardmullin.com
 9            rmussig@sheppardmullin.com

10    FOR THE PLAINTIFF:

11            ALLRED, MAROKO & GOLDBERG
              By:  OLIVIA FLECHSIG
12                 DOLORES LEAL
              Attorney at Law
13            6300 Wilshire Boulevard, Suite 1500
              Los Angeles, California 90048
14            (323) 653-6530
              oflechsig@amglaw.com
15            dleal@amglaw.com

16    THE VIDEOGRAPHER:

17            Cliff Gonshery

18    ALSO PRESENT:

19            Eguono Erhun, Chevron Nigeria Limited

20


21


22


23


24


25
```

Dr. Victor Adeyeye                                                    April 22, 2025

1        A.   What is what?

2        Q.   What is an aortic dilatation or an aortic

3    aneurysm?

4        A.   Abnormal diameter of the great aortic vessels.

5    That is all it means medically.  Abnormal, increased

6    diameter of the great aortic vessel.

7        Q.   And how would this condition impact an

8    individual's health who had that condition?

9        A.   Like I pointed out earlier, for that very

10   individual, it portends a risk.  The risk now depends on

11   the diameter.  The risk classifications now depends on

12   the diameter.  "Low risk," "high risk," "medium risk"

13   now depends on the diameter.  And these are things that

14   are not individual based; they're based on what the

15   guidelines have put in place to classify such.  Based on

16   this measurement, this is the risk.  Based on this

17   measurement, this is the risk.

18       Q.   And based on your understanding of the

19   guidelines, what was the risk associated with

20   Mr. Snookal's aortic dilatation?

21       A.   It falls into a low-risk category.  The point

22   here is a low risk, one to two percent, of adverse

23   cardiovascular event.  Adverse cardiovascular event:

24   Dissections or rupture.  These are the adverse

25   cardiovascular events.  Thank you.

Dr. Victor Adeyeye                                    April 22, 2025

```
 1    cases in Escravos, and no full complements of medical
 2    specialists in Escravos.  Thank you.
 3        Q.  That means there's no cardiologist on site in
 4    Escravos; is that right?
 5        A.  There is no designated cardiologist, no
 6    designated surgeon, no designated anesthetist in
 7    Escravos.
 8        Q.  Earlier you mentioned that if an individual
 9    experiences a dissection, they require immediate
10    intervention within a couple of minutes.
11        A.  Yes.
12        Q.  Are those interventions available in Escravos?
13        A.  No.  No.  No, even in Warri, not available, not
14    talk of Escravos.
15        Q.  Then you mentioned interventions for a rupture.
16            Are those available in Escravos?
17        A.  No.  No.  No.  No.
18        Q.  And so based on what you know of Mr. Snookal's
19    cardiovascular condition and the medical resources
20    available in Escravos, if Mr. Snookal had experienced a
21    cardiovascular complication in Escravos, would it have
22    led to his death?
23            MS. FLECHSIG:  Objection as to form.
24            THE WITNESS:  Hypothetical, if I may say, but
25    it could have led to his death.  Why?  Because both the
```

Dr. Victor Adeyeye                                              April 22, 2025

1   medical personnel -- medical facility, medical personnel

2   required, both in Escravos and in Warri location, are

3   not there.

4          MS. FAN:  Understood.  Thank you.  I don't have

5   any further questions at this point.

6          MS. FLECHSIG:  I just have a couple of

7   follow-up.  It will be -- I think it will be very quick.

8   If I may.

9                      EXAMINATION

10  BY MS. FLECHSIG:

11      Q.  So, Dr. Adeyeye, you testified about, sort of,

12  a golden period during which someone who has suffered a

13  dissection or rupture has the best odds of survival

14  through medical intervention; is that correct?

15      A.  Yes.

16      Q.  Okay.  And you said that someone generally

17  needs to get care within minutes if they suffer a

18  rupture; correct?

19      A.  Yes.  Yes.

20      Q.  And that's true no matter where the person's

21  rupture occurs.  In other words, if they're in the

22  United States, they need to get care within minutes.  If

23  they're in Escravos --

24      A.  Yes.

25      Q.  -- they need to get care within minutes.

Dr. Victor Adeyeye                                                April 22, 2025

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5    Reporter of the State of California, hereby certify that

 6    the witness in the foregoing deposition,

 7                    DR. VICTOR ADEYEYE,

 8    was by me duly sworn to tell the truth, the whole truth,

 9    and nothing but the truth in the within-entitled cause;

10    that said deposition was taken at the time and place

11    therein named; that the testimony of said witness was

12    stenographically reported by me, a disinterested person,

13    and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties to said

18    deposition, nor in any way interested in the outcome of

19    the cause named in said caption.

20

21              DATED:  May 6, 2025.

22

23    _____
                                Rachel N. Barkume

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


MARK SNOOKAL, an individual,

      Plaintiff,             Case No.

      vs.                  2:23-cv-6302-HDV-AJR

CHEVRON USA, INC., a California
Corporation, and DOES 1 through 10,
inclusive,

      Defendants.

_____


DEPOSITION OF DR. UJOMOTI AKINTUNDE

OCTOBER 31, 2024

CONDUCTED VIA ZOOM VIDEOCONFERENCE




REPORTED BY LAUREN RAMSEYER, CSR NO. 14004

**Exhibit E**
**p. 33**

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARK SNOOKAL, an individual,

 5            Plaintiff,                    Case No.

 6            vs.                           2:23-cv-6302-HDV-AJR

 7   CHEVRON USA, INC., a California
     Corporation, and DOES 1 through 10,
 8   inclusive,

 9            Defendants.
     _____
10

11

12

13

14

15            DEPOSITION OF DR. UJOMOTI AKINTUNDE,

16   commencing on Thursday, October 31, 2024, at 8:00 a.m.,

17   Pacific Time, held via Zoom videoconference, all

18   participants appearing remotely before Lauren Ramseyer,

19   Certified Shorthand Reporter, CSR No. 14004.

20

21

22

23

24

25
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1        Q.    And does a rupture -- excuse me, strike that.
 2              Can a rupture lead to death?
 3        A.    Sorry?
 4        Q.    Can a rupture --
 5        A.    Please repeat.
 6        Q.    I apologize.  Can a rupture lead to death?
 7        A.    Yes.
 8        Q.    Under what circumstances would a rupture lead
 9    to death?
10        A.    If it's sudden, its inability to get to -- if
11    it's large and sudden or there isn't enough time to get
12    appropriate medical attention, it can lead to death.
13    Sometimes even when you get appropriate medical
14    attention, it can lead to death.
15        Q.    And is that because of the blood loss
16    associated with the rupture?
17        A.    Largely.  Largely, yes.
18        Q.    And you also mentioned a dissection being a
19    complication.  What is a dissection?
20        A.    It's a tear in the wall of the aorta, and when
21    that tear occurs, blood fills into the defects created
22    by the tear, so the wall of the aorta becomes weak and
23    prone to rupture.
24        Q.    So would it be accurate to say that a
25    dissection could lead to rupture?
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1        Q.    This document has been produced under Bates
 2    numbered CUSA776 to 787.
 3              Can you take a moment to review the document,
 4    let me know if you need me to scroll up or down.
 5        A.    Can you please scroll up.
 6        Q.    This is the top of the page, do you need me to
 7    scroll down?
 8        A.    Down, sorry.
 9        Q.    Yes.  I can keep scrolling, just let me know.
10        A.    It's -- are there any tables or images?
11        Q.    Yes.
12        A.    Can you scroll down for me.
13        Q.    This is the first table?
14        A.    Okay.  Can you go further down.  To another
15    image, yeah.  Okay.  I think that will be all.
16        Q.    Okay.  There's other tables and figures in
17    this document as well.  Okay.  So this document is
18    titled "Yearly Rupture or Dissection Rates for Thoracic
19    Aortic Aneurysms, Simple Prediction Based on Size."
20              Did I read that correctly?
21        A.    Yes.
22        Q.    This was published by Ryan R. Davies and
23    others in the section of Cardiothoracic Surgery and
24    School of Epidemiology and Public Health in the Yale
25    University School of Medicine.
```

Dr. Ujomoti Akintunde                                        October 31, 2024

```
 1              Are you familiar with this study?
 2      A.   Yes.
 3      Q.   Okay.  And can you summarize for us some of
 4  the findings in this study?
 5      A.   It's such as that, the rate of -- the risk of
 6  an adverse aortic event was around 2 percent in someone
 7  who's -- with an aortic size in the range of that of the
 8  client in question.
 9      Q.   And the client in question here, that's
10  referring to Mr. Snookal?
11      A.   Yes.
12      Q.   Okay.  I'm going to show you another document
13  that I'm going to mark as Exhibit 3.
14          (Exhibit 3 was marked for identification.)
15  BY MS. FAN:
16      Q.   Can you see the document that I placed on the
17  screen?
18      A.   Okay.  Yeah.
19          MS. FLECHSIG:  Counsel, has this been produced
20  to us?
21          MS. FAN:  Yes, they've been produced.
22          MS. FLECHSIG:  Was it last night or at another
23  time?
24          MS. FAN:  It was produced last night.
25          MS. FLECHSIG:  Oh.  I haven't had a chance to
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   could you state it again, please?

 2   BY MS. FAN:

 3        Q.   Yeah, of course.  If Mr. Snookal experienced a

 4   cardiovascular complication relating to his aortic root,

 5   what interventions are required?

 6             MS. FLECHSIG:  Same objections, but also

 7   incomplete hypothetical.  Go ahead.

 8             THE WITNESS:  So he would need to be medevaced

 9   immediately to the center where he could have access to

10   definitive care.

11   BY MS. FAN:

12        Q.   And to be clear, the kind of cardiovascular

13   complications that Mr. Snookal would experience with an

14   aortic root would be a rupture, or dissection; is that

15   correct?

16        A.   Yes.

17        Q.   And the third complication you mentioned

18   relating to a dilated aortic root was death?

19        A.   Yes.

20        Q.   So, of course, if a death had occurred, no

21   interventions would be possible.

22             MS. FLECHSIG:  Incomplete hypothetical.

23             THE WITNESS:  Yes.

24   BY MS. FAN:

25        Q.   Based on your knowledge of the medical
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
1   facilities in Escravos, would they be able to support
2   Mr. Snookal if he suffered a cardiological event?
3            MS. FLECHSIG:  Objection.  Incomplete
4   hypothetical.  Vague and ambiguous as to cardiac event.
5            THE WITNESS:  No.
6   BY MS. FAN:
7       Q.   And to clarify, if Mr. Snookal suffered a
8   rupture in -- strike that.
9            If Mr. Snookal experienced a rupture relating
10  to his dilated aortic root in Escravos, based on your
11  knowledge of the medical facilities available, would
12  they be able to support Mr. Snookal in the event of a
13  rupture?
14           MS. FLECHSIG:  Objection.  Vague and ambiguous
15  as to the meaning of support.
16           THE WITNESS:  No.
17  BY MS. FAN:
18      Q.   Based on your knowledge of the medical
19  facilities in Escravos, would they be able to support
20  Mr. Snookal if he suffered a dissection relating to his
21  dilated aortic root?
22           MS. FLECHSIG:  Objection.  Vague and ambiguous
23  as to the meaning of support.  Incomplete hypothetical.
24           THE WITNESS:  No.
25
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                         * * *

 2              I, DR. UJOMOTI AKINTUNDE, hereby declare under

 3     penalty of perjury that the foregoing is my deposition

 4     under oath; that these are the questions asked of me and

 5     my answers thereto; that I have read my deposition and

 6     have made corrections, additions, or changes that I deem

 7     necessary.

 8

 9              DATED this _____day of _____ 2024.

10

11              _____

12                         DR. UJOMOTI AKINTUNDE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Lauren Ramseyer, Certified Shorthand

 4   Reporter licensed in the State of California, License

 5   No. 14004, hereby certify that the deponent was by me

 6   first duly sworn and the foregoing testimony was

 7   reported by me and was thereafter transcribed with

 8   Computer-Aided Transcription; that the foregoing is a

 9   full, complete, and true record of said proceedings.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties in the

12   foregoing proceeding and caption named or in any way

13   interested in the outcome of the cause in said caption.

14          The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificate null and void.

17          In witness whereof, I have hereunto set my

18   hand this day: November 19, 2024.

19

20   _____

21          Lauren Ramseyer, CSR No. 14004

22

23

24

25
```

# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,   )
                                      )
                                      )
             Plaintiff,    )
vs.                           ) Case No.
                           ) 2:23-cv-6302-HDV-AJR
                           )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                )
                                      )
             Defendants.   )
_____)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

DR. ESHIOFE ASEKOMEH

Thursday, October 10, 2024

Via Zoom Video Conferencing

7:03 a.m.

Reported by:  Rachel N. Barkume, CSR, RMR, CRR
                  Certificate No. 13657

Dr. Eshiofe Asekomeh                                                          October 10, 2024

```
 1                        A P P E A R A N C E S

 2

 3

 4    FOR THE PLAINTIFF:

 5              ALLRED, MAROKO & GOLDBERG
                By:  DOLORES Y. LEAL
 6              Attorney at Law
                6300 Wilshire Boulevard, Suite 1500
 7              Los Angeles, California 90048
                (323) 653-6530
 8              dleal@amglaw.com

 9    FOR THE DEFENDANT:

10              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                By:  ROBERT E. MUSSIG
11              Attorney at Law
                333 South Hope Street, 43rd Floor
12              Los Angeles, California 90071
                (213) 620-1780
13              rmussig@sheppardmullin.com

14    THE VIDEOGRAPHER:

15              Jacob Rivera

16    ALSO PRESENT:

17              Eguono Erhun, In-House Counsel for Chevron

18

19

20

21

22

23

24

25
```

Exhibit F
p. 44

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              (Simultaneous crosstalk.  Reporter

 2              clarification.)

 3              MR. MUSSIG:  Incomplete hypothetical.

 4    BY MS. LEAL:

 5         Q.  Let me rephrase.  So how long is the

 6    transportation time, approximately, from Warri to

 7    Escravos or Escravos to Warri by helicopter?

 8              MR. MUSSIG:  Same objection.

 9              THE WITNESS:  Okay.  So transport by

10    helicopter, so many variables:  Weather condition,

11    flight -- helicopter availability as of that time.  So

12    are we factoring in those -- those variables?

13    BY MS. LEAL:

14         Q.  Sure.

15         A.  Okay.  So because I work in Escravos now, even

16    as a --

17              (Reporter clarification.)

18              THE WITNESS:  As when I was in Warri, I had

19    come to do --

20              (Reporter clarification.)

21              THE WITNESS:  When I first got to Warri, I had

22    come to work in Escravos on two rotations just to

23    relieve the doctor.  So you know already the choppers

24    are field choppers.  They're not standby helicopters

25    waiting for injuries or waiting for people to take ill.
```

Dr. Eshiofe Asekomeh                                    October 10, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                    DR. ESHIOFE ASEKOMEH,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21          DATED:  October 13, 2024.

22

23          _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

# EXHIBIT G

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5    MARK SNOOKAL, an individual,      )
                                        )
6             Plaintiff,               )
                                        )
7         v.                           )   NO. 2:23-cv-6302-
                                        )        HDV-AJR
8    CHEVRON USA, INC., a California   )
     Corporation, and DOES 1 through   )
9    10, inclusive,                    )
                                        )
10            Defendants.              )
     _____)

11

12

13

14

15

16

17                  Videotaped deposition of ALEXANDER

18      R. MARMUREANU, M.D., Witness, taken remotely

19      on behalf of Defendants commencing at 2:04

20      p.m. on Wednesday, January 29, 2025, before John

21      M. Taxter, Certified Shorthand Reporter No. 3579

22      in and for the State of California, a Registered

23      Professional Reporter.

24

25

```
 1      APPEARANCES OF COUNSEL:

 2

 3

 4      FOR PLAINTIFF MARK JORDAN SNOOKAL:

 5              ALLRED, MAROKO & GOLDBERG
                BY:  DOLORES Y. LEAL, Attorney at Law
 6                   dleal@amglaw.com

 7                     -and-

 8                   OLIVIA FLECHSIG, Attorney at Law
                     oflechsig@amglaw.coM
 9              6300 Wilshire Boulevard, Suite 1500
                Los Angeles, California  90048-5217
10              323.653.6530

11

12

13      FOR DEFENDANT CHEVRON USA, INC.:

14              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                BY:  TRACEY A. KENNEDY, Attorney at Law
15              350 South Grand Avenue, 40th Floor
                Los Angeles, California  90071
16              213.620.1780
                tkennedy@sheppardmullin.com

17

18

19

20      VIDEOGRAPHER:

                JODY PADILLA
21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | I believe that Mr. Snookal had a | 14:32:22 |
| 2 | 4.2-centimeter dilated aortic annulus which is | 14:32:26 |
| 3 | borderline, just millimeters, perhaps one | 14:32:32 |
| 4 | millimeters above normal.  He -- technically, he | 14:32:36 |
| 5 | did not have an aortic aneurysm, but even if he | 14:32:39 |
| 6 | did, four centimeters -- his ascending aorta was | 14:32:42 |
| 7 | four centimeters.  That's basically normal or just | 14:32:47 |
| 8 | perhaps minimally dilated. | 14:32:49 |
| 9 | None of those findings are clinically | 14:32:51 |
| 10 | significant to warrant exclusion from his | 14:32:54 |
| 11 | assignment in Escravos -- I've got to find the | 14:32:56 |
| 12 | word again -- especially given his well-documented | 14:33:04 |
| 13 | stability in terms of his blood pressure was | 14:33:07 |
| 14 | normal and none of those aortic numbers were | 14:33:09 |
| 15 | growing.  Blood pressure control is appropriate, | 14:33:13 |
| 16 | and it is my opinion that he could have safely | 14:33:17 |
| 17 | proceeded to work in that location in Nigeria. | 14:33:21 |
| 18 | And I don't identify any medical or social grounds | 14:33:26 |
| 19 | to consider him unfit for duty or classify his | 14:33:30 |
| 20 | condition a direct threat to him or anyone else. | 14:33:34 |
| 21 | And that's kind of it in a nutshell. | 14:33:38 |
| 22 | BY MS. KENNEDY: | 14:33:38 |
| 23 | Q    Okay.  Let me ask you this:  Did you -- | 14:33:42 |
| 24 | did you review any of the medical studies about | 14:33:45 |
| 25 | health care medical risks working in Escravos, | 14:33:50 |

```
 1    Nigeria?                                             14:33:53

 2        A    Well, can you be more -- I -- I reviewed   14:33:56

 3    whatever was provided to me.  I did not do an        14:34:00

 4    independent research for the safety of workers in    14:34:04

 5    that location, but I believe he's fit to work in     14:34:08

 6    any location anywhere in the world, including that   14:34:12

 7    location.  So I didn't find it necessary to study    14:34:13

 8    the condition in that place.  I believe he would     14:34:18

 9    be fit to work in Alaska, the base of the            14:34:20

10    Himalaya, in Africa, anywhere else, South America,   14:34:26

11    et cetera.  And, by the way, that location clearly   14:34:30

12    had some sick people there because I've seen a lot   14:34:32

13    of fatalities, I think, in five years.  So they      14:34:35

14    were going through some -- they had some sick        14:34:44

15    employees.                                           14:34:45

16        Q    I've highlighted the last sentence of      14:34:45

17    the first paragraph of Exhibit 2 which is page 6,    14:34:47

18    and it reads:                                        14:34:52

19              "Given that his work is                    14:34:53

20          desk-based and not physically                 14:34:55

21          demanding, there is no evidence to            14:34:56

22          suggest that his condition would             14:34:58

23          affect his job performance or pose           14:35:00

24          an immediate risk."                           14:35:02

25          What did you mean by that, Doctor?            14:35:05
```

```
 1        A    It's exactly what it says.   But I will    14:35:07

 2   add today that, even if his work was not             14:35:09

 3   desk-based and involved a lot of physical            14:35:13

 4   activities and would have been physically            14:35:17

 5   demanding, I still didn't find any evidence to       14:35:19

 6   suggest that his condition would affect his job      14:35:24

 7   performance or pose any immediate risk.              14:35:26

 8        Q    And when you say a "desk job," did you     14:35:28

 9   get that from the job description?                   14:35:30

10        A    I have no idea.   I don't remember.        14:35:32

11        Q    Do you remember if that's something that   14:35:33

12   the -- your -- the attorneys told you?               14:35:36

13        A    I don't remember.                          14:35:36

14        Q    And I'm going to highlight another         14:35:44

15   sentence here -- whoops -- sorry -- and it's this    14:35:46

16   first sentence of the third paragraph on page 6.    14:35:51

17   It says:                                             14:35:55

18             "In conclusion, the evidence              14:35:55

19             overwhelmingly supports that              14:35:57

20             Mr. Snookal's aneurysm does not           14:35:59

21             pose any clinically significant           14:36:02

22             risk...given" -- "particularly            14:36:03

23             given his travel to Nigeria every         14:36:08

24             other month."                             14:36:11

25             So my question is when you say            14:36:12
```

| | | |
|---|---|---|
| 1 | it's one millimeter on each side.  That's not a | 14:37:38 |
| 2 | big deal, but it is a little bit enlarged, I have | 14:37:41 |
| 3 | to admit. | 14:37:44 |
| 4 | However, the ascending aorta, as we look | 14:37:44 |
| 5 | on this heart, this is basically the area that | 14:37:47 |
| 6 | tears.  This is the aneurysm we're talking, not | 14:37:50 |
| 7 | the annulus.  The annulus is a strong structure | 14:37:53 |
| 8 | where I actually saw the valve.  This part is | 14:37:57 |
| 9 | whatever tears, dissects, and ruptures.  So this | 14:38:01 |
| 10 | part is pretty much normal.  It's four centimeters | 14:38:03 |
| 11 | on him. | 14:38:07 |
| 12 | So, to summarize, I don't believe that | 14:38:07 |
| 13 | his numbers, the aortic numbers, size, dimensions | 14:38:09 |
| 14 | will pose any risk to anyone, including himself or | 14:38:12 |
| 15 | anyone else around him. | 14:38:16 |
| 16 | Q    Doctor, do you know what the reliability | 14:38:21 |
| 17 | engineering manager does in Escravos? | 14:38:23 |
| 18 | A    I don't remember.  I read the assignment | 14:38:28 |
| 19 | job at that time when I wrote the report. | 14:38:30 |
| 20 | Q    Do you have any information from any | 14:38:35 |
| 21 | source -- from the lawyers, from any documents -- | 14:38:36 |
| 22 | about what the working conditions would be for | 14:38:39 |
| 23 | Mr. Snookal in Escravos? | 14:38:41 |
| 24 | A    I don't remember if I have, but let me | 14:38:46 |
| 25 | do my best to answer this.  I don't believe that | 14:38:49 |

| | | |
|---|---|---|
| 1 | time would need to pass, in your professional | 14:47:32 |
| 2 | opinion, expert opinion, before he could get that | 14:47:34 |
| 3 | treatment or assessment? | 14:47:37 |
| 4 | A    It depends.  Sometimes there is a -- | 14:47:40 |
| 5 | it's called a "sudatter."  It's a small | 14:47:43 |
| 6 | rupture-contained leak.  People live the rest of | 14:47:46 |
| 7 | their lives like this.  Sometimes the dissections | 14:47:47 |
| 8 | become chronic.  They live for the rest of their | 14:47:50 |
| 9 | life.  It could be a huge rupture which data shows | 14:47:54 |
| 10 | that we have to start considering that at 5.5 | 14:47:58 |
| 11 | centimeters, not at four centimeters.  So I | 14:48:02 |
| 12 | can't -- I can't tell you.  He might be just fine | 14:48:05 |
| 13 | to be -- stay there and not go anywhere, or he | 14:48:07 |
| 14 | might need to go to the hospital immediately. | 14:48:10 |
| 15 | Q    Do you have any knowledge, any | 14:48:15 |
| 16 | information from any source, as to whether or not | 14:48:16 |
| 17 | in the event of a rupture that he could actually | 14:48:18 |
| 18 | be treated in Escravos? | 14:48:21 |
| 19 | A    Well, he could be treated with medical | 14:48:25 |
| 20 | management, if that's what's indicated.  Now, I | 14:48:27 |
| 21 | would like to make a clear hypothetical that | 14:48:30 |
| 22 | usually ascending aortic rupture dissection, the | 14:48:33 |
| 23 | initial treatment is medical management and more | 14:48:38 |
| 24 | likely than not surgical management. | 14:48:42 |
| 25 | However, we do see a fair amount of | 14:48:45 |

| | | |
|---|---|---|
| 1 | chronic dissection, if they only have medical | 14:48:47 |
| 2 | management.  So I can't answer that question | 14:48:49 |
| 3 | without some more information. | 14:48:51 |
| 4 | Q    All right.  I'm going to go to the next | 14:48:52 |
| 5 | page of your report which is page 7.  I'm going to | 14:48:55 |
| 6 | go -- look to the first sentence under "opinions," | 14:48:59 |
| 7 | and the first sentence which I've highlighted | 14:49:02 |
| 8 | reads: | 14:49:05 |
| 9 | "After thoroughly reviewing | 14:49:06 |
| 10 | the medical records, imaging | 14:49:07 |
| 11 | studies, and current clinical | 14:49:09 |
| 12 | guidelines, it is my expert opinion | 14:49:11 |
| 13 | that Mr. Snookal is fit for duty in | 14:49:13 |
| 14 | Escravos, Nigeria." | 14:49:16 |
| 15 | Do you see that? | 14:49:18 |
| 16 | A    Very well. | 14:49:18 |
| 17 | Q    And when you say "fit for duty," what do | 14:49:19 |
| 18 | you mean by that? | 14:49:21 |
| 19 | A    I don't see any sort of limitation in | 14:49:22 |
| 20 | his job here. | 14:49:24 |
| 21 | Q    And that is based on what? | 14:49:30 |
| 22 | A    Training, practice, education, and | 14:49:32 |
| 23 | experience.  I believe his cardiologist also | 14:49:33 |
| 24 | cleared him.  But if he would have been my patient | 14:49:35 |
| 25 | and if you asked me, "Hey, I'm going to Escravos, | 14:49:37 |

1                    DEPONENT'S DECLARATION

2

3            I, ALEXANDER R. MARMUREANU, M.D., hereby

4     declare:

5            I have read the foregoing deposition,  I

6     identify it as my own, and I have made any

7     corrections, additions or deletions that I was

8     desirous of making in order to render the within

9     transcript true and correct.

10

11    _____,_____.
                   (Date)                    (City and State)

12

13                              _____
                                         (Signature)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA  )
                          ) SS.
 2   COUNTY OF VENTURA    )

 3            I, John M. Taxter, a California Certified

 4   Shorthand Reporter, Certificate No. 3579, a

 5   Registered Professional Reporter, do hereby

 6   certify:  That the foregoing proceedings were

 7   taken before me at the time and place therein set

 8   forth, at which time the deponent was put under

 9   oath by me; that the testimony of the deponent and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed; and that the foregoing is

13   a true and correct transcript of my shorthand

14   notes so taken.

15            I further certify that I am neither

16   counsel for nor related to any party to said

17   action.

18            The dismantling, unsealing, or unbinding

19   of the original transcript will render the

20   Reporter's Certificate null and void.

21            Pursuant to Federal Rule 30(e),

22   transcript review was requested.

23   Dated February 11, 2025.

24                          _____
                            JOHN M. TAXTER
25                          California Certified Shorthand
                            Reporter No. 3579, RPR
```

Exhibit G
p. 57

1

2

3

4          I, John M. Taxter , Certified Shorthand Reporter,

5     CSR No.   3579, hereby certify:

6          The foregoing is a true and correct copy of the

7     original transcript of the proceedings taken by me

8     as thereon stated.

9

10

11

12    Dated:    February 13, 2025
                _____

13

14

15

16    _____
                John Taxter, CSR No. 3579

17

18

19

20

21

22

23

24

25

# EXHIBIT H

# EXHIBIT 11



Exhibit H
p. 60

# ALEXANDER R. MARMUREANU, MD

Diplomate, American Boards of Surgery and Thoracic Surgery
Thoracic and Cardiovascular Surgery
Assistant Professor of Surgery

---

## EXPERT REPORT

I, Alexander R. Marmureanu, M.D. declare as follows:

I currently practice Thoracic and Cardiovascular Surgery in Los Angeles, CA. I am Board Certified in Cardiothoracic Surgery and General Surgery and licensed to practice in the states of California and New York. I am also an Assistant Professor of Surgery and Vice Chair of the Bylaws Committee at the School of Medicine at California University of Science and Medicine.

I am the CEO and President of California Heart and Lung Surgery Medical Center in Los Angeles and the Director of Cardiothoracic Surgery at Centinela Hospital Medical Center as well as the Director of Cardiovascular Surgery at Southern California Hospital at Culver City.

I am also the Medical Staff President-Elect and the Chairman of the Multi-Disciplinary Peer Review Committee, as well as member of the Medical Executive Committee Leadership at Hollywood Presbyterian Medical Center.

My offices are located in Westwood, at 10921 Wilshire Blvd., #1205 Los Angeles, CA 90024, and at Centinela Hospital Medical Center on 501 East Hardy St. #315, Inglewood CA 90301.

I completed my General Surgery residency at New York University Medical Center and Mt. Sinai Medical Center from 1994 – 2000. I then completed my Cardiothoracic Surgery fellowship at UCLA Medical Center from 2000 – 2002, where I served on the Faculty, before founding California Heart and Lung Surgery Center.

Currently, in addition to my Thoracic and Cardiovascular surgical practice, I continue to train medical students, residents, as well as other surgeons. I also continue to publish and lecture on various topics in the field of Thoracic and Cardiovascular Surgery.

Through my education, training and professional experience, I am very familiar with this patient's medical conditions, treatment, and associated prognosis.

My opinions are based upon my medical education, thoracic and cardiovascular surgical training, practice, and experience, as well as the medical records, and all other documents that I have reviewed.

I reserve the right to supplement my opinion based upon the receipt of additional information.

My education and background are accurately listed on the curriculum vitae, attached as Exhibit "A", which sets forth my education, training, experience, and qualifications as a physician and expert.

1

**EXHIBIT 11-1**

# DOCUMENTS REVIEWED

Review of Legal Documents:

- Dr. Levy Deposition & Exhibits
- Medical Suitability for Expatriate Assignment History & Physical Examination
- Physical Requirements and Working Conditions
- Expatriate Exam Recommendations
- Complaint for Damages
- Assignment Offer
- Job Description
- Employee Mental Health Questionnaire
- Request for Medical Service
- Email Communications
- Kim, Joon Bum, et al. "Risk of rupture or dissection in descending thoracic aortic aneurysm." *Circulation* 132.17 (2015): 1620-1629.

Review of Medical Records

- Kaiser Permanente Medical Records & Imaging Studies
    - CT Angiogram Report
    - ECHO Report
    - Chest CT
    - Chest X-ray
- Holter Monitor Results
- Work Letter by Dr. Khan
- Immunization Records
- Quest Lab Results
- Access Medical Group (Chevron) Medical Examination

**EXHIBIT 11-2**

# SUMMARY OF RECORDS

Mr. Mark J. Snookal, a 52-year-old male (DOB: April 13, 1972), has a stable 4.2 cm dilated aortic root and ascending aortic aneurysm, both of which have remained asymptomatic. His ejection fraction is normal, indicating that the aneurysm has not impacted his cardiac function.

Mr. Snookal was being considered for a promotion to Reliability Engineering Manager at Chevron, a desk-based role that would have required travel to Escravos, Nigeria every other month. However, the offer was withdrawn following a routine medical evaluation due to concerns about his cardiovascular condition.

His cardiologist, Dr. Khan, had cleared him from a cardiovascular standpoint, confirming that the aneurysm was stable, well-managed, and posed minimal risk to his health. Dr. Khan recommended continued medical management and annual imaging. Despite this expert opinion, Chevron's medical team overruled Dr. Khan's recommendation, deeming Mr. Snookal's condition a "direct threat" to his safety based on perceived risks rather than clinical evidence.

## Timeline of Events

**2019 - Application for Nigeria Position**

- Chevron required a medical evaluation before starting the assignment in Escravos, Nigeria. Dr. Irving Sobel assessed Mr. Snookal and deemed him fit for duty with two restrictions:
    - Avoid lifting weights over 50 lbs.
    - Obtain clearance from his cardiologist.

**April 19, 2019 - Cardiology Note by Dr. Khan**

- **Chronic Conditions**:
    - **Dilated Aortic Root: Stable and unchanged.**
    - **Aortic Valve Regurgitation: Stable and unchanged**.
    - Cholelithiasis
    - Hypertriglyceridemia

- **Key Points**:
    - **Mr. Snookal remained asymptomatic from a cardiac standpoint**, without shortness of breath during his daily activities.
    - He exercises regularly, performing 30 minutes of cardio on a treadmill about 4 times per week.
    - **His blood pressure at home was generally under 120 mmHg.**
    - **No history of syncope.**

3

**EXHIBIT 11-3**

Exhibit H
p. 63

## Review of Imaging Studies

**February 11, 2012 - Chest CT with Contrast**

- Findings included diffuse mixed ground-glass and dense airspace consolidation, likely due to an infectious or inflammatory cause, unrelated to chronic heart conditions.
- Small bilateral pleural effusions and reactive subcarinal lymph nodes were noted, with no chronic or progressive pulmonary condition.

**November 5, 2014 - Chest X-ray**

- Imaging showed resolution of previous lower lobe opacities, suggesting the findings were not persistent or significant.
- **A normal cardiac silhouette** and absence of lung consolidation indicated no active cardiopulmonary pathology.

**February 16, 2015 - Holter Monitor**

- **Sinus rhythm** predominated, with occasional PACs and frequent PVCs (20% of beats), which are common and benign in the general population.
- Ventricular tachycardia was limited to brief, three-beat runs, suggesting no significant impact on physical ability or daily activities.

**March 26, 2015 - Echocardiogram**

- Showed normal biventricular size and function, with an **ejection fraction of 55-60%**, adequate for normal cardiac performance.
- Mild to moderate eccentric aortic regurgitation was present, but **Mr. Snookal was asymptomatic, indicating no functional limitation.**
- **The aortic root measurements were stable**, with no concerning elevation in right ventricular pressure.

**May 26, 2016 - CTA Cardiac**

- **The aortic root remained stable at 4.2 cm, with no significant progression.**

    *Comment: No evidence suggested any pathology that would interfere with physical tasks.*

**February 24, 2017 - Echocardiogram**

- Findings included normal **systolic function/ejection fraction of 50-55%, stable aortic dimensions, and no significant strain on the heart.**

4

**EXHIBIT 11-4**

**March 29, 2018 - 2D Echocardiogram**

- Mild left ventricular enlargement and trace mitral regurgitation were noted, but the **ejection fraction was robust (60-65%)**

  *(\*Comment: the ejection fraction is the best indicator regarding how strong Mr. Snookal's heart is. He has normal ejection fraction)*

- Stable aortic regurgitation and mild right atrial enlargement were present.

**April 10, 2019 - CTA Chest**

- **Stable aortic root (4.2 cm) and ascending aorta measurements, with no significant enlargement or dissection.**

## Review of Clinical Notes

**March 13, 2017 - Cardiology Consultation**

- **Mr. Snookal was asymptomatic from a cardiac perspective, with no limitations on physical exertion**.
- **His cardiac evaluations were precautionary, with no functional deficits identified**.

**April 19, 2019 - Office Visit**

- **Mr. Snookal continued to be asymptomatic, engaging in routine physical activity without limitations.**

**June 5, 2019 - Holter Monitor Follow-Up**

- The Holter results were consistent with previous findings, indicating benign PVCs.
- **Dr. Khan recommended a beta blocker as a precautionary measure to help prevent the growth of the ascending aorta**, even though it isn't strictly necessary since the patient has no symptoms.

5

**EXHIBIT 11-5**

In summary, the clinical data consistently indicates that Mr. Snookal's ascending aortic aneurysm and aortic root have remained stable at 4.2 cm, with no significant progression over several years of monitoring. At this size, in my opinion, the annual risk of rupture or dissection is less than 1%, especially considering the stability of his condition and aortic measurements. Given that his work is desk-based and not physically demanding, there is no evidence to suggest that his condition would affect his job performance or pose an immediate risk.

The risk of aortic dissection and possible rupture typically increases when the aneurysm reaches measurements around 5.5 cm, meaning Mr. Snookal's aneurysm is not large enough to be considered clinically significant. Moreover, there is no indication that his condition would worsen or present a danger while he carries out his duties in Escravos, Nigeria (his aortic measurements have remained stable). Additionally, his ejection fraction has remained normal, indicating that the aneurysm has had no impact on his cardiac function. This, combined with the absence of any symptoms, further supports his fitness for duty.

In conclusion, the evidence overwhelmingly supports that Mr. Snookal's aneurysm does not pose any clinically significant risk, particularly given his travel to Nigeria every other month. It is important to emphasize that before considering the risk of aortic dissection or rupture, there must be clear documentation of rapid growth or an increase in size to around 5.5 cm. In contrast, Mr. Snookal's aortic root dilation and ascending aortic aneurysm have consistently remained stable, with no signs of growth to date. With proper blood pressure management and regular monitoring, there is no justification for classifying his condition as a "direct threat." His functional capacity remains fully intact, further reinforcing that the perceived risks are unfounded.

**EXHIBIT 11-6**

# METHODOLOGY OF OPINIONS

All of my opinions and conclusions are stated within a reasonable degree of medical certainty. The following opinions are based on my education, training, practice, and experience as well as the applicable medical literature available.  I applied the same generally accepted methodology utilized in the medical community for diagnosing and treating cardiovascular diseases. I also utilized the same methodology in rendering my opinions as I do in my daily medical/surgical practice as a board-certified thoracic and cardiovascular surgeon. I reserve the right to amend, supplement or modify those opinions as new evidence is developed, including new or additional medical records become available.

# OPINIONS

After thoroughly reviewing the medical records, imaging studies, and current clinical guidelines, it is my expert opinion that Mr. Snookal is fit for duty in Escravos, Nigeria. His 4.2 cm ascending aortic aneurysm and dilated aortic root have remained stable over several years of monitoring, staying well below the threshold for significant risk, which is generally considered to be around 5.5 cm. The stability of the aneurysm, combined with Mr. Snookal's well-controlled blood pressure, indicates there is no medical reason to restrict him from performing his job duties. I agree with Dr. Khan's recommendation to continue annual CT scans to monitor the aneurysm's stability. No additional treatments are necessary at this time.

## Low Risk of Complications

In my expert opinion and according to the clinical data, ascending aortic aneurysms between 4.0 and 4.9 cm carry a very low annual risk of rupture or dissection, estimated at roughly 1% per year in this size range. This risk is considered negligible compared to the general population, especially given the absence of rapid growth in Mr. Snookal's case. Aneurysms typically become clinically significant and warrant surgical intervention when they become around 5.5 cm, OR if there is a rapid increase in size (more than 0.5 cm within six months). These conditions are not relevant in Mr. Snookal's case, as his aneurysm has demonstrated long-term stability, making the likelihood of rapid expansion exceedingly low.

## Supporting Medical Evaluations

Dr. Khan's assessment, along with the corroborating medical evaluations, clearly indicates that Mr. Snookal's aneurysm poses a minimal to no risk. The lack of significant change in the aneurysm's size over the last several years, coupled with effective blood pressure management, places his risk profile near that of individuals without an aneurysm. As such, there is no medical justification for preventing him from undertaking his duties in Nigeria.

7

EXHIBIT 11-7

Exhibit H
p. 67

## Job Requirements and Fitness for Duty

The physical requirements and working conditions for the assignment in Nigeria do not specify that an ascending aorta of 4.2 cm would preclude employment. Mr. Snookal's desk job is not physically demanding and does not present any additional risk factors that would exacerbate his condition. The concern cited by Chevron's medical team about the remote location and limited medical facilities in Nigeria (where he would be located every other month) does not outweigh the fact that routine monitoring (annually) is sufficient to ensure Mr. Snookal's safety.

## Clinical Management and Recommendations

Annual imaging with CT scans or echocardiograms is sufficient to continue monitoring Mr. Snookal's aorta for any changes. This approach is consistent with standard practice for stable aortic aneurysms and aortic root dilations of this size. In addition, maintaining blood pressure control through medication and lifestyle modifications—keeping levels ideally below 130/80 mm Hg—will further minimize any potential risks associated with the aneurysm.

Additional recommendations include:

- Regular, moderate physical activity to support overall cardiovascular health.
- Adherence to a heart-healthy diet rich in fruits, vegetables, and whole grains.
- Awareness of symptoms indicating aneurysm expansion or rupture, such as sudden chest or back pain, with an understanding of the importance of seeking immediate medical care if such symptoms arise.

## Conclusion

In conclusion, it is my expert opinion that Mr. Snookal's 4.2 cm ascending aortic aneurysm and 4.2 cm dilated aortic root are not clinically significant to warrant exclusion from his assignment in Nigeria, especially given the well-documented stability. Blood pressure control as well as annual monitoring are appropriate and effective measures to ensure his continued health. Based on the evidence, Mr. Snookal could have safely proceeded with his work in Nigeria, provided that standard annual surveillance remains in place. There are no medical grounds to consider him unfit for duty or to classify his condition as a "direct threat" to his safety.

Alexander Marmureanu MD

October 9, 2024

8

**EXHIBIT 11-8**

# EXHIBIT I

Exhibit I
p. 69

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,      )
                                  )
                                  )
                 Plaintiff,       )
vs.                               ) Case No.
                                  ) 2:23-cv-6302-HDV-AJR
                                  )
CHEVRON USA, INC., a California   )
Corporation, and DOES 1 through   )
10, inclusive,                    )
                                  )
                 Defendants.      )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

SCOTT LEVY, M.D.

Friday, August 30, 2024

Via Zoom Video Conferencing

9:31 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Exhibit I
p. 70

```
 1   the evacuation?
 2        A.  We've had people die of liver failure who --
 3   who died waiting for the medical evacuation to occur.  I
 4   mentioned earlier that the -- we had an aortic
 5   dissection that died waiting for something to occur,
 6   waiting for someone to get out of there.  We've had --
 7   we've had a child with -- with cancer who -- who died on
 8   location waiting for -- or trying to decide on
 9   whether -- whether he was safe to travel by medical
10   evacuation.
11           So the important thing to understand is that
12   the -- not everybody is eligible.  And I'll clarify the
13   word "eligible."  If someone's not safe to travel,
14   they're not going to be medically evacuated.  So they
15   have to be stable and safe to make the trip in the first
16   place.  And so that's the -- that's the -- that's the
17   challenge is we're not going to put them in harm's way
18   and take them away from even -- even the lowest level of
19   medical care for nothing for a six- or eight-hour trip
20   in a plane.
21           So they would have to be stable to transport.
22   So they -- I would say they don't die often or
23   frequently, but these things can happen.
24        Q.  Okay.  Do you know how long it typically takes
25   to perform a medical evacuation from the Escravos,
```

Exhibit I
p. 71

Scott Levy, M.D.                                        August 30, 2024

1    Nigeria, location?

2            MR. MUSSIG:  Calls for speculation.  Lacks

3    foundation.

4            THE WITNESS:  So in general, the number I

5    usually use for any location is it takes about seven

6    hours to get a plane -- a medevac plane or air ambulance

7    available for such a -- such a -- such a transport.  The

8    challenge with Escravos is given -- A, given its

9    remoteness, it -- the -- well, I would say it's -- it's

10   very common that air transport is shut down there.

11           So sand storms from the Sahara, bad weather,

12   things like this impact ability to fly in and out, and

13   so when we do -- when the -- when the weather or the

14   environment is not cooperative to a medical evacuation,

15   the only other route is by boat.

16           And to move someone out by boat -- again, this

17   is the Niger delta, which is a dangerous area in

18   Nigeria.  There are militants in the Niger delta, Boko

19   Haram.  Other militants operate there.  And so if we

20   want to move someone by boat out of Escravos, we need to

21   notify the Nigerian military to help us to escort us

22   through the -- through the location.  So -- so in the

23   meantime, it's -- it's -- and it's -- it's very

24   challenging.

25   ///

Exhibit I
p. 72

Scott Levy, M.D.                                             August 30, 2024

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5   Reporter of the State of California, hereby certify that

 6   the witness in the foregoing deposition,

 7                      SCOTT LEVY, M.D.,

 8   was by me duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth in the within-entitled cause;

10   that said deposition was taken at the time and place

11   therein named; that the testimony of said witness was

12   stenographically reported by me, a disinterested person,

13   and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties to said

18   deposition, nor in any way interested in the outcome of

19   the cause named in said caption.

20

21          DATED:  September 12, 2024.

22

23          _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

Exhibit I
p. 73