# <u>EXHIBIT A</u>

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| MARK SNOOKAL, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | 2:23-cv-6302-HDV-AJR |
| CHEVRON USA, INC., a California ) | |
| Corporation, and DOES 1 through ) | |
| 10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

DEPOSITION OF

DR. VICTOR ADEYEYE

Volume 1, Pages 1 - 34

Taken Remotely Via Videoconference

Friday, November 15, 2024

Stenographically reported by:
Renee M. Bencich, CSR No. 11946, RPR

STENO
concierge@steno.com
888.707.8366
Job Number 117195

Dr. Victor Adeyeye                                November 15, 2024

```
 1                        APPEARANCES

 2

 3    For Plaintiff, Mark Snookal:

 4         ALLRED, MAROKO & GOLDBERG
           By: OLIVIA FLECHSIG, Attorney at Law
 5         6300 Wilshire Boulevard, Suite 1500
           Los Angeles, California 90048
 6         323.653.6530
           oflechsig@amglaw.com
 7

 8

 9    For Defendant Chevron USA, Inc.:

10         SHEPPARD MULLIN
           By: SARAH FAN, Attorney at Law
11         333 South Hope Street, 43rd Floor
           Los Angeles, California 90071
12         213.620.1780
           sfan@sheppardmullin.com
13

14

15    Also Present:

16         Dolores Y. Leal, Attorney at Law
           Allred, Maroko & Goldberg
17
           Paris Stephen, Attorney at Law
18         Allred, Maroko & Goldberg

19         Eguono Erhun, Attorney at Law
           Chevron Nigeria Limited
20

21

22

23

24

25
```

Exhibit A
p. 3

Dr. Victor Adeyeye                                November 15, 2024

1   Mark Snookal, the plaintiff in this case?

2       A.   No notes.

3       Q.   Okay.  Okay.  Who is your current employer?

4       A.   Chevron Nigeria Limited as a contractor.

5       Q.   Okay.  How long have you worked for Chevron

6   Nigeria Limited?

7       A.   Seven years plus.

8       Q.   Okay.  What's your current job title?

9            THE COURT REPORTER:  I'm sorry.  One more time,

10  Doctor.  The first word I did not understand.

11           THE WITNESS:  Seven years -- May twenty -- May

12  2017 to date.  Seven years.

13           MS. FLECHSIG:  I think he said consultant

14  cardiologist --

15           THE WITNESS:  May --

16  BY MS. FLECHSIG:

17      Q.   -- am I correct?

18      A.   May -- yes.  May 2017 to date as consultant

19  physician cardiologist.

20      Q.   Okay.  So you've been a consultant physician

21  cardiologist since May of 2017, correct?

22      A.   For Chevron.

23      Q.   For Chevron.

24           Okay.  Before becoming a consultant physician

25  cardiologist, what position for Chevron did you hold?

Dr. Victor Adeyeye                                November 15, 2024

 1   Or that's when you started?

 2        A.    Again, please.

 3        Q.    Sorry.  So you started -- your first job for

 4   Chevron Nigeria Limited was consultant physician

 5   cardiologist?

 6        A.    Yes.

 7        Q.    Okay.  And before May of 2017 you were working

 8   for a different company?

 9        A.    I was in a university as a consultant

10   cardiologist and lecturer.

11        Q.    Understood.

12             Okay.  As a consultant physician cardiologist,

13   what are your job duties?

14        A.    Job duties include acute emergency management

15   for cardiovascular cases and other medical emergencies

16   in --

17             THE COURT REPORTER:  May I ask the witness to

18   repeat?

19             MS. FLECHSIG:  (Counsel nods head.)

20             THE COURT REPORTER:  Doctor, if you'd please

21   repeat your answer.

22             THE WITNESS:  Job description, management of

23   acute medical emergency and outpatient management of

24   medical cases, especially cardiovascular disease.

25             THE COURT REPORTER:  Thank you.

Dr. Victor Adeyeye                                    November 15, 2024

```
 1   One more time.  I didn't understand one word.
 2          THE WITNESS:  Okay.  The very case I mentioned,
 3   it was dissecting eventual rupture and patient passed
 4   away.  The very case.  In the last 10, 12 years.  Thank
 5   you.  Before Chevron.
 6   BY MS. FLECHSIG:
 7      Q.   Okay.  I know you've said that there was an
 8   autopsy conducted, so I --
 9      A.   Yes.
10      Q.   -- want to clarify.
11      A.   Yes.
12      Q.   That was after you treated the patient, or were
13   you conducting -- you were conducting the autopsy?
14      A.   When we conducted the autopsy.  It was a
15   follow-up patient.  Nothing could be done.  Ruptured,
16   and that was the --
17          THE COURT REPORTER:  And -- I'm sorry.  May we
18   go off the record real quick?
19          MS. FLECHSIG:  Yes.
20          THE COURT REPORTER:  Thank you.
21          (Off the record.)
22          (The record was read as follows:
23          QUESTION: That was after you treated the
24          patient, or were you conducting the autopsy?)
25          ANSWER: When we conducted the autopsy.  It was
```

Dr. Victor Adeyeye                                    November 15, 2024

```
 1            a follow-up patient.  Nothing could be done.
 2            Ruptured, and that was the --)
 3            THE COURT REPORTER:  There was more.
 4            THE WITNESS:  Mortality.  Death.  Death.
 5            THE COURT REPORTER:  Thank you.
 6   BY MS. FLECHSIG:
 7       Q.   So was the patient alive when they first came
 8   to you?
 9       A.   Yes.
10       Q.   Understood.
11            Were you able to administer any treatments to
12   the patient before they passed away?
13       A.   The treatment could not be given.  Not
14   available.
15       Q.   Understood.
16            Do you have a current curriculum vitae or a
17   resume?
18       A.   Have but not updated.
19       Q.   Okay.  Do you know when you would have last
20   updated it?
21       A.   Over a year ago.
22       Q.   Have you published any medical research during
23   the last 10 years?
24       A.   Two contributions to textbooks of medicine with
25   over 20 publications in local and international
```

Dr. Victor Adeyeye                                        November 15, 2024

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      ---o0o---

 4   MARK SNOOKAL, an individual,    )
                     Plaintiff,      )
 5   vs.                             )   Case No.
                                     )   2:23-cv-6302-HDV-AJR
 6   CHEVRON USA, INC., a California )
     Corporation, and DOES 1 through )
 7   10, inclusive,                  )
                     Defendants.     )
 8   _____)

 9                REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
10                   DR. VICTOR ADEYEYE
                    Volume 1, Pages 1 - 34
11                Friday, November 15, 2024

12           I, RENÉE M. BENCICH, Certified Shorthand
     Reporter in and for the State of California, hereby
13   certify to the following:
             That the witness, DR. VICTOR ADEYEYE, was duly
14   sworn by the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
15   the witness;
             I further certify that pursuant to FRCP Rule
16   30(e)(1) that the signature of the deponent:
             (XX) was requested by the deponent or a party
17   before the completion of the deposition and returned
     within 30 days from date of receipt of the transcript.
18   If returned, the attached Changes and Signature Page
     contains any changes and the reasons therefor;
19           (  ) was not requested by the deponent or a
     party before the completion of the deposition.
20           I further certify that I am neither attorney
     nor counsel for, related to, nor employed by any of the
21   parties to the action in which this testimony was taken.
             Further, I am not a relative or employee of any
22   attorney of record in this cause, nor do I have a
     financial interest in the action.
23           Subscribed and sworn to on this the 1st day of
     December, 2024.
24                              _____
                                RENÉE M. BENCICH, CSR, RPR
25                              California License No. 11946
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,    )
                                )
                                )
                 Plaintiff,     )
vs.                             ) Case No.
                                ) 2:23-cv-6302-HDV-AJR
                                )
CHEVRON USA, INC., a California )
Corporation, and DOES 1 through )
10, inclusive,                  )
                                )
                 Defendants.    )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

DR. VICTOR ADEYEYE

VOLUME 2

Tuesday, April 22, 2025

Via Zoom Video Conferencing

6:00 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Dr. Victor Adeyeye                                                April 22, 2025

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE DEFENDANT:

 5            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
              By:  SARAH FAN
 6                 ROBERT MUSSIG
              Attorney at Law
 7            333 South Hope Street, 43rd Floor
              Los Angeles, California 90071
 8            (213) 620-1780
              sfan@sheppardmullin.com
 9            rmussig@sheppardmullin.com

10    FOR THE PLAINTIFF:

11            ALLRED, MAROKO & GOLDBERG
              By:  OLIVIA FLECHSIG
12                 DOLORES LEAL
              Attorney at Law
13            6300 Wilshire Boulevard, Suite 1500
              Los Angeles, California 90048
14            (323) 653-6530
              oflechsig@amglaw.com
15            dleal@amglaw.com

16    THE VIDEOGRAPHER:

17            Cliff Gonshery

18    ALSO PRESENT:

19            Eguono Erhun, Chevron Nigeria Limited

20

21

22

23

24

25
```

Exhibit A
p. 10

Dr. Victor Adeyeye                                      April 22, 2025

1    why maybe, maybe not.  Alleviating the symptoms

2    medically does not equate to addressing the dissection,

3    the tearing.  That's what I mean by that.

4    BY MS. FLECHSIG:

5        Q.  What can you do to alleviate the symptoms of

6    the dissection?

7        A.  Give some peripheral beta blockers.

8        Q.  And what does that do for someone?

9        A.  What's that?

10        Q.  Yeah.  What does that do for someone who's had

11    a dissection?

12        A.  That would reduce the symptoms of pain,

13    excruciating pain, that individual would be having.

14        Q.  Okay.  Does it -- does it slow their risk of

15    death from occurring while they await surgery?

16            Or does it have any other benefits?

17        A.  No.  No.  It confers no benefit of survival on

18    such individual.

19        Q.  Understood.  Okay.

20            Have you ever treated a patient whose dilated

21    aortic root has dissected?

22        A.  None of note.

23        Q.  Okay.  Sorry, you said "none of note."

24            There's -- there's none that you have

25    treated?

Dr. Victor Adeyeye                                      April 22, 2025

```
 1        A.  No.  No.  None.
 2        Q.  Okay.  Have you ever treated someone with a
 3   dilated aortic root that ruptured?
 4        A.  No.
 5        Q.  Okay.  Okay.  I want to ask about Mark Snookal,
 6   the plaintiff in this lawsuit.
 7            Have you reviewed the complaint in this
 8   lawsuit?
 9        A.  How?
10        Q.  Just -- yeah, have you reviewed the actual
11   complaint of the lawsuit, so at any time --
12        A.  I'm not -- I'm not privy to that document.
13        Q.  Okay.  When did you first hear the name Mark
14   Snookal?
15        A.  2019.
16        Q.  Okay.  And how did you -- how did you hear
17   about him?
18        A.  Via e-mail communication between myself and the
19   occupational health unit; Dr. Femi Pitan, you mentioned,
20   Dr. Asekomeh, Dr. Henry Aiwuyo.
21        Q.  I'm sorry.  Who was the third one that you
22   said?
23        A.  Via e-mail communication --
24        Q.  Oh --
25        A.  -- with myself and the occupational health
```

Dr. Victor Adeyeye                                    April 22, 2025

```
 1        Q.  So we're at the top of Exhibit A now.
 2        A.  Yes, that's my response.  That's the summary of
 3   my own search.
 4        Q.  Okay.  So there's this August 5th, 2019,
 5   e-mail, and this is your summary of your research;
 6   correct?
 7        A.  Yeah.  Yeah.  Yes.
 8        Q.  Okay.  There's -- is there anything that you
 9   know today that would change your opinion of what you
10   expressed in that August 5th, 2019, e-mail?
11        A.  I don't get your question, please.  Again,
12   please.  Repeat again, please.
13        Q.  Oh, I'm sorry.  I think my internet --
14   apologies.  Yeah.
15            I just was asking is the opinion you expressed
16   in this August 5th, 2019, e-mail -- is that consistent
17   still with your opinion today of Mark Snookal's cardiac
18   condition?
19        A.  Very consistent.  Very consistent.
20        Q.  Okay.  So you said that you undertook some
21   research to inform this opinion.
22            What did you do to find -- what did you do to
23   research?
24        A.  First of all, I search for such cases in
25   Nigeria, and that brought me to a publication I was part
```

Dr. Victor Adeyeye                                                April 22, 2025

1    of the author; 2,501 echocardiographic studies for

2    individuals with heart conditions.  I mean 2,501 cardiac

3    patients, what did we find out is their cardiac

4    condition.  Why is that so?  That is so, for me, to have

5    an idea how many of such cases do we see in real life.

6           And I found out that it's quite very rare.

7    This publication, which I'm part of the author, is

8    available -- can be made available to you.  Out of

9    2,501, no such case, and that tells you the reality of

10   the condition, the limited cases of such condition to

11   warrant physicians' experience.

12          Then I also found out that most of those cases

13   were from autopsy, not in real life.  I look at

14   literature and I saw that, oh, even for those cases

15   being found, they were found at autopsy.  Those are

16   local cases.  And I also look at a U.S. study between

17   1999 and 2016, then; the epidemiology of fatal ruptured

18   aortic aneurysms in the United States.  Epidemiology of

19   fatal ruptured aortic aneurysms in the United States,

20   1999 to 2016.

21          This also gives me an idea how much of

22   mortality is still with this condition.  So putting all

23   these things together, I was able to have my own

24   opinion; which, looking at literature from 2019 to now,

25   they say the same; and I am able to advise, as put in

Dr. Victor Adeyeye                                        April 22, 2025

1    this, my write-up, on such cases.  Thank you.

2        Q.  Okay.  Thank you for that.  I just wanted to

3    clarify.

4            How many -- how many studies did you review?

5    It sounds like there were two.  Or am I missing some?

6        A.  Okay.  Two local studies.  I can remember one

7    now.  And one foreign study.  The foreign study is the

8    one in United States, 1999 to 2016, epidemiology of

9    fatal ruptured aortic aneurysms in United States, 1999

10   to 2016.  The local one I remember vividly was an

11   article I also am part of the co-authors, the 2,501

12   cases echocardiographic studies done in the Southwestern

13   Nigeria.  This can be made available to you if you are

14   so interested, or you can go online and search there.

15   Thank you.

16       Q.  Okay.  So the local study using 2,051

17   echocardiographic studies --

18       A.  2,501.  '501.

19       Q.  2,501?

20       A.  '01.  '501, yes.

21       Q.  Sorry.  Okay.  2,501 local studies.

22           You said it's reviewing that number of

23   echocardiographic studies; correct?

24       A.  Yes.

25       Q.  But it's not specifically on people with

Dr. Victor Adeyeye                                    April 22, 2025

1    dilated aortic roots; it's just echocardiographic

2    studies generally; correct?

3        A.  Yes.  That's a sample study showing us that

4    that condition is rare.  If you do echo on 2,501

5    individual and cannot have one case, that tells you it's

6    quite rare.  And the available local studies of such

7    cases are at postmortem, autopsy, and that gives a lot

8    of clinical information.  Thank you.

9        Q.  Understood.

10           (Reporter clarification.)

11   BY MS. FLECHSIG:

12       Q.  The postmortem studies, is -- strike that.

13           So you said of the 2,501 echocardiographic

14   studies done locally, none of those showed patients with

15   a dilated aortic root; correct?

16       A.  Correct.  Correct.

17       Q.  Okay.  Is it fair to say that dilated aortic

18   roots are more rare in Nigeria than in the United

19   States?

20       A.  You cannot say that because we've not actually

21   compare region to region.  What we can say is most cases

22   are found at autopsy.

23       Q.  Understood.

24       A.  Because patients don't often live to warrant

25   such evaluation for treatment and what have you.  I

Dr. Victor Adeyeye                                        April 22, 2025

1  don't know if I'm getting my point.  So it takes high

2  index of suspicion and a standard screening methods for

3  you to dictate.  But any country where autopsy is top

4  notch, you can see more of such.

5       Q.  Understood.  Did any of the studies you

6  referred to refer to a patient's risk of mortality when

7  they do have a dilated aortic root?

8       A.  Mortality is over 90 percent.

9       Q.  So -- okay.  So let me clarify.

10          You referred to -- the studies referred to

11  someone with a dilated aortic root having a 90 percent

12  risk of mortality?

13       A.  Over 90 percent risk of mortality.

14       Q.  Is that a risk of mortality once they have

15  suffered a dissection or rupture?

16       A.  That is once they have suffered a dissection or

17  rupture.

18       Q.  Okay.

19       A.  The mortality --

20       Q.  I am so sorry.  Go ahead.

21       A.  In other words, when they suffer a dissection

22  or rupture; the chance, the likelihood of that is over

23  90 percent.

24       Q.  Understood.  Which of the studies that you

25  cited referred to that statistic?

Dr. Victor Adeyeye                                        April 22, 2025

1      A.   Some of the local studies revealed before my

2   submission.

3      Q.   Okay.  Did any of the studies you referred to

4   discuss the overall risk of a rupture or dissection

5   occurring when someone has a dilated aortic root?

6      A.   The risk of rupture or dissection is done based

7   on those centers, those regions that were able to pool

8   patient with aortic dilatation, and they were able to

9   put some theory to measure the risk.  Like I told you,

10  in our setting, it is not a common occurrence.

11       If I are to do 2,501 echocardiography, and I

12  cannot find one, so how many will I do to have a sizable

13  number to apportion risk?  I don't know if I'm clear on

14  that.

15     Q.   Yeah, I think so.  What I'm trying to

16  understand is, I guess, did you refer to anything that

17  gave you a sense of how often someone with a dilated

18  aortic root has a rupture or a dissection?

19     A.   Yes.  Yes.  Some of them in that e-mail link,

20  if you click on them and read, you will see the Western

21  literatures studying the risk of dissection, the risk of

22  rupture, and the attendant mortality related.

23     Q.   In the -- you're referring to the University of

24  Calgary article that Dr. Aiwuyo linked to?

25     A.   Those links.

Dr. Victor Adeyeye                                                    April 22, 2025

```
1   descriptions of the individual.  How do I mean?  If
2   somebody has frequent arrhythmias from palpitations and
3   what have you, and they ask me, what is your opinion on
4   this?  I can say, oh, this person stands a risk of
5   disturbing arrhythmia with chest pain, with difficulty
6   with breathing.  And based on this, there are various
7   aids, put them on this kind of drug, to be seen with
8   this frequency, once a month, once in two weeks, once in
9   three months, once in six months.
10        They are the one who understand the works they
11  do.  Oh, this one is going to climb crane.  This one is
12  going to be in the air.  This one is going to be in the
13  boat.  This one is going to be on the sea.  And they
14  will now be able -- being doctors, too -- to match the
15  opinion of an expat with the work of the very
16  individual.  Thank you.
17     Q.  So what kind of information do you consider
18  when you're assessing the risk of an individual's
19  cardiovascular condition?
20        A.  The information I consider are patient orient
21  on point results -- cardiovascular results.  And there
22  are three or four main results that are important to
23  consider their cardiovascular -- for their
24  cardiovascular status, either their ECG, their echo, or
25  other imagings.
```

Dr. Victor Adeyeye                                      April 22, 2025

1          These are the things that are necessary to put

2    things together and make an opinion.  Because most

3    cardiovascular opinions are based on data from very

4    specific cardiac values, cardiac results, not based on

5    is he genotype, is he BMI, is he dark or white or blue

6    or black.  No.  Thank you.

7          Q.  Aside from your own medical expertise, are

8    there guidelines you're required to follow when

9    assessing the risk of an individual's cardiovascular

10   condition?

11         A.  Yes.  There are guidelines.

12         Q.  What kind of --

13         A.  Guidelines that are developed by reputable

14   institution, for example, Nigeria -- potentially Society

15   of Nigeria -- Nigerian Cardiac Society.  These bodies

16   develop guidelines that help us to make informed

17   decision.

18          Also on international scale, there are European

19   Society of Cardiology, American College of Cardiology,

20   Canadian College, and they all have guidelines available

21   for us.  And these are the things that we look into at

22   the time we have to make decisions, and these are

23   available to everyone on websites, on subscriptions, in

24   journals, and at our conferences.  We look at all these

25   guidelines, merit, demerit, what have you, and

Dr. Victor Adeyeye                                                April 22, 2025

1    deliberate.  Thank you.

2         Q.  And when you're making your assessment of risk

3    relating to an individual's cardiovascular condition, is

4    any part of your compensation based on the conclusions

5    you reach in your assessments?

6         A.  Compensation how?  I don't get.

7         Q.  Your -- your pay.  Your salary compensation.

8             Is any of that based on the conclusions that

9    you reach in your assessments of risk?

10        A.  We've not gotten to that.  That's not part

11   of -- the salary structure -- of the medical, no.  We

12   are not paid by the opinion you make, the recommendation

13   you make, and all that.  No.  No.  No.  That has no

14   bearing, any payslip or any payment structure.  It's

15   just an advisory.

16            And for your information, please, it's like a

17   lawyer who has a case and he knows of a colleague who

18   has and do such case and just share opinion, what's your

19   advice on this?  Which, of course, the person goes into

20   the archive or the legal literature and give opinion on

21   that.  That is not with remunerations because, like I

22   said, this is teamwork.  It is part of what I'm

23   supposed -- when they ask for my opinion on such cases

24   about a impression I had, I give.

25            Same way a surgeon who want to fix bone from

Dr. Victor Adeyeye                                    April 22, 2025

1              For an individual with an aortic dilatation, is

2    the occurrence of a dissection or a rupture predictable?

3              MS. FLECHSIG:  Objection.  Incomplete

4    hypothetical.

5              THE WITNESS:  Science give us guidelines on

6    monitoring of such patient and give us opportunity to

7    make some prediction, and that's why we're able to

8    classify the risk for any individual with aortic

9    dilatation.  The risk of dilatation -- the risk of

10   dissection, I mean, the risk of rupture is this, this,

11   this, this, based on these diameter, this dimension.

12   That's what science tells us.  Thank you.

13   BY MS. FAN:

14      Q.  Did you speak with Mr. Snookal in making your

15   assessment of his risk relating to his cardiovascular

16   condition?

17      A.  No.  No.  I didn't do medical consultation with

18   Mr. Snookal.  No medical consultation with Mr. Snookal.

19   I've said it over and over.

20      Q.  And in your assessment of Mr. Snookal's risk

21   relating to his cardiovascular condition, did your

22   assessment of risk require a conversation with

23   Mr. Snookal?

24      A.  Not at all.  Not at all.  Not at all.

25      Q.  Why was -- why wasn't it necessary to speak

Dr. Victor Adeyeye                                    April 22, 2025

1   with Mr. Snookal regarding his condition in order to

2   assess the risk of his condition?

3         A.   The beauty of medical science is ability to

4   prognosticate based on available evidence.   In

5   Mr. Snookal's case, all is required for any cardiologist

6   all over the world to put him into any risk is for that

7   cardiologist to have an idea of the dimension of his

8   dilatation.

9            Any cardiologist anywhere in the world will

10  give you a risk value without seeing Mr. Snookal.  Just

11  like the other case I mentioned, any individual with

12  cardiac failure with ejection fraction, EF, 30 or 40

13  percent has likelihood of being dead 50 percent within

14  six month to one year.  This what science has gone for,

15  over the decades, in cardiology.  So I don't need to

16  speak to Mr. Snookal to make that assertion of the risk

17  level.  Thank you.

18        Q.   And did you speak with Mr. Snookal's

19  cardiologist in making your assessment of his risk

20  relating to his condition?

21        A.   The answer is no.

22        Q.   And in your --

23        A.   Because -- say what?

24        Q.   I didn't mean to cut you off.  Go ahead,

25  Doctor.

Dr. Victor Adeyeye                                    April 22, 2025

1      A.  I do not need to have that conversation with

2   Mr. Snookal's cardiologist.  Please note and please

3   note, Mr. Snookal and his cardiologist are relating with

4   doctor in occupational health, not with me as a

5   cardiologist.  So there is no room for that.

6         And I use the word "blinded opinion," without

7   bias.  An opinion is blinded to remove elements of bias,

8   elements of conflicts of interests.  That is why it has

9   to be blinded.  And that is why some parameters like the

10  liver function test, E/U/Creatinine and others, were not

11  privy -- were not made available to me because I do not

12  stand in that occupational health department to

13  understand all the protocol and do their risk

14  assessments for patients' suitability to work called

15  fitness for duty.  Thank you.

16      Q.  In other words, you were making an independent

17  assessment of risk --

18      A.  Excellent.

19      Q.  -- regarding --

20      A.  Excellent.

21      Q.  -- the cardiological --

22      A.  Excellent.

23      Q.  -- condition.

24      A.  Excellent.  That is summary.  Thank you.

25      Q.  And you also testified earlier that you didn't

Dr. Victor Adeyeye                                          April 22, 2025

1   just the third buckets; and that very third bucket, just

2   a small part of it is cardiac.  The renal function is

3   there, the liver function is there, the brain function

4   is there, the metabolic is there.  It's just that

5   cardiac.  That is required of me to make an opinion.

6        It is there in occupational health who has

7   everything in these three buckets to make their own

8   informed decision on fitness for duty.  Thank you.

9        Q.  And these other types of inform- -- medical

10  information regarding Mr. Snookal that is being

11  considered by occupational health but which was not

12  available to you -- all of that other information, like

13  you said, was not necessary to your assessment of his

14  cardiological risk; is that right?

15       A.  Yeah.

16       MS. FLECHSIG:  Objection as to form, including

17  assumes facts not in evidence.

18       THE WITNESS:  Okay.

19  BY MS. FAN:

20       Q.  And if you had additional information regarding

21  Mr. Snookal's family history and their medical

22  conditions, would that have --

23       A.  Excellent.

24       Q.  -- would that have impacted your assessment --

25       A.  Excellent question.

Dr. Victor Adeyeye                                        April 22, 2025

1        Q.   -- of Mr. Snookal's risk --

2        A.   Excellent question.

3        Q.   -- of --

4        A.   Excellent question.   Excellent question.

5   It's --

6           MS. FLECHSIG:   I'm sorry, form objection.

7   Incomplete hypothetical.

8           THE WITNESS:   Yes.  Yes.  Yes.  It's

9   hypothetical.  But there is a science to this

10  hypothesis.  And the science to this is -- the medical

11  science of this is an individual who has aortic root

12  dilatation of 4.2, 4.5 centimeter with a positive family

13  history of Marfan syndrome, Ehlers-Danlos syndrome, this

14  individual is a chronic smoker, this person has coronary

15  heart disease, this individual has to do heavy lifting

16  of objects, that could have worsened -- emphasis

17  "worsened" -- this risk assessment.

18          That could have worsened the submission of the

19  risk -- will have increased, will have been worsened if

20  all these are present in that individual.  I can only

21  get all of these when you do a full medical

22  consultation:  The family tree, the metabolic panel, and

23  his social history.  These could have worsened the risk

24  because history of all of those, smoking, positive

25  family history, connective tissue disorder, like I

Dr. Victor Adeyeye                                      April 22, 2025

1    mentioned, the Marfan, the Ehlers-Danlos -- all of them

2    worsen the aortic dilatation, because the risk of

3    dissection or ruptures multiplies in multiple folds if

4    any of these are present.  Thank you.

5    BY MS. FAN:

6        Q.  Understood.  So to understand -- to make sure I

7    understand that correctly, if you had additional

8    information, aside from the -- aside from the imaging

9    reports, it would have -- it would have indicated a

10   higher level of risk for Mr. Snookal; is that correct?

11       A.  Yes.  And I mentioned those factors that could

12   have increased the level of risk if they are there.  I

13   mentioned, like, five.  If they are there, the level of

14   risk will have increased if they are positive from

15   medical consultation.

16           THE REPORTER:  Counsel, are we at a good break

17   spot?

18           MS. FAN:  Yes.  We can take a quick break here.

19   What are we thinking, five or ten minutes?

20           THE REPORTER:  I think it's been an hour, so if

21   we could do ten.

22           MS. FAN:  Okay.

23           THE VIDEOGRAPHER:  Off the record.  Time now,

24   8:43 a.m.

25           (Off the record.)

Dr. Victor Adeyeye                                    April 22, 2025

1    cases in Escravos, and no full complements of medical

2    specialists in Escravos.  Thank you.

3         Q.  That means there's no cardiologist on site in

4    Escravos; is that right?

5         A.  There is no designated cardiologist, no

6    designated surgeon, no designated anesthetist in

7    Escravos.

8         Q.  Earlier you mentioned that if an individual

9    experiences a dissection, they require immediate

10   intervention within a couple of minutes.

11        A.  Yes.

12        Q.  Are those interventions available in Escravos?

13        A.  No.  No.  No, even in Warri, not available, not

14   talk of Escravos.

15        Q.  Then you mentioned interventions for a rupture.

16             Are those available in Escravos?

17        A.  No.  No.  No.  No.

18        Q.  And so based on what you know of Mr. Snookal's

19   cardiovascular condition and the medical resources

20   available in Escravos, if Mr. Snookal had experienced a

21   cardiovascular complication in Escravos, would it have

22   led to his death?

23             MS. FLECHSIG:  Objection as to form.

24             THE WITNESS:  Hypothetical, if I may say, but

25   it could have led to his death.  Why?  Because both the

Dr. Victor Adeyeye                                    April 22, 2025

1    medical personnel -- medical facility, medical personnel

2    required, both in Escravos and in Warri location, are

3    not there.

4         MS. FAN:  Understood.  Thank you.  I don't have

5    any further questions at this point.

6         MS. FLECHSIG:  I just have a couple of

7    follow-up.  It will be -- I think it will be very quick.

8    If I may.

9                        EXAMINATION

10   BY MS. FLECHSIG:

11        Q.  So, Dr. Adeyeye, you testified about, sort of,

12   a golden period during which someone who has suffered a

13   dissection or rupture has the best odds of survival

14   through medical intervention; is that correct?

15        A.  Yes.

16        Q.  Okay.  And you said that someone generally

17   needs to get care within minutes if they suffer a

18   rupture; correct?

19        A.  Yes.  Yes.

20        Q.  And that's true no matter where the person's

21   rupture occurs.  In other words, if they're in the

22   United States, they need to get care within minutes.  If

23   they're in Escravos --

24        A.  Yes.

25        Q.  -- they need to get care within minutes.

Dr. Victor Adeyeye                                          April 22, 2025

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4         I, RACHEL N. BARKUME, a Certified Shorthand

 5    Reporter of the State of California, hereby certify that

 6    the witness in the foregoing deposition,

 7                    DR. VICTOR ADEYEYE,

 8    was by me duly sworn to tell the truth, the whole truth,

 9    and nothing but the truth in the within-entitled cause;

10    that said deposition was taken at the time and place

11    therein named; that the testimony of said witness was

12    stenographically reported by me, a disinterested person,

13    and was thereafter transcribed into typewriting.

14         Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties to said

18    deposition, nor in any way interested in the outcome of

19    the cause named in said caption.

20

21              DATED:  May 6, 2025.

22

23    _____

24         Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

# **EXHIBIT B**

Dr. Ujomoti Akintunde                                    October 31, 2024

1              UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    MARK SNOOKAL, an individual,

5              Plaintiff,              Case No.

6         vs.                         2:23-cv-6302-HDV-AJR

7    CHEVRON USA, INC., a California
     Corporation, and DOES 1 through 10,
8    inclusive,

9              Defendants.
     _____

10

11

12

13

14

15         DEPOSITION OF DR. UJOMOTI AKINTUNDE,

16   commencing on Thursday, October 31, 2024, at 8:00 a.m.,

17   Pacific Time, held via Zoom videoconference, all

18   participants appearing remotely before Lauren Ramseyer,

19   Certified Shorthand Reporter, CSR No. 14004.

20

21

22

23

24

25

Exhibit B
p. 32

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1                         I N D E X

 2    WITNESS:

 3    DR. UJOMOTI AKINTUNDE

 4

 5    EXAMINATION:                              PAGE

 6    BY MS. FLECHSIG                          5, 85

 7    BY MS. FAN                                 56

 8

 9

10    DEPOSITION EXHIBITS:                      PAGE

11    Exhibit 1        Email (CUSA000771-775)     21

12    Exhibit 2        Article Entitled "Yearly Rupture    71
                       or Dissection Rates for Thoracic
13                     Aortic Aneurysms, Simple
                       Prediction Based on Size" (CUSA
14                     776-787)

15    Exhibit 3        Article Entitled "Risk of      73
                       Rupture or Dissection in
16                     Descending Thoracic Aortic
                       Aneurysm" (CUSA778-797)
17

18

19

20

21

22

23

24

25
```

Exhibit B
p. 33

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3         ALLRED, MAROKO & GOLDBERG

 4         BY: OLIVIA FLECHSIG, ESQ.

 5         6300 Wilshire Boulevard, Suite 1500

 6         Los Angeles, California 90048

 7         (323)653-6530

 8         oflechsig@amglaw.com

 9

10    FOR THE DEFENDANTS:

11         SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

12         BY: SARAH FAN, ESQ.

13         333 South Hope Street, 43rd Floor

14         Los Angeles, California 90071

15         (213)620-1780

16         sfan@sheppardmullin.com

17

18    ALSO PRESENT:  EGUONO ERHUN

19

20

21

22

23

24

25
```

Dr. Ujomoti Akintunde                                October 31, 2024

1    ago.

2        Q.    As you sit here today, though, you don't have

3    any memory of discussing it with Dr. Asekomeh other than

4    in this email?

5        A.    Correct.

6        Q.    Okay.   Other than Dr. Asekomeh, do you

7    remember speaking about Mr. Snookal and his medical

8    condition with anyone else, other than your lawyers?

9        A.    Dr. Adeyeye, the other cardiologist.

10       Q.    Is Dr. Adeyeye your colleague in Lagos?

11       A.    He works in Chevron Warri, Warri Hospital.

12       Q.    Okay.   When did you discuss Mr. Snookal with

13   Dr. Adeyeye?

14       A.    Within the last couple of weeks.   Recently,

15   within the last two to three weeks or so.

16       Q.    Okay.   Was that one conversation that you had

17   with Dr. Adeyeye about Mr. Snookal?

18            MS. FAN:   I apologize, Counsel.   You broke up

19   for me.   Would you mind repeating your question?

20   BY MS. FLECHSIG:

21       Q.    Yeah.   How many conversations did you have

22   with Dr. Adeyeye about Mr. Snookal?

23       A.    One or two maximum.

24       Q.    What did you discuss during those

25   conversations?

Dr. Ujomoti Akintunde                                    October 31, 2024

1  to ask you some questions about that.

2          So why did you feel you would be more

3  comfortable if he was on a beta blocker?

4      A.   A beta blocker will slow down the rate of the

5  increase in size of his dilated aortic root.  It will

6  slow down the rate of increase, and essentially make him

7  safer, so that was my primary priority, that the patient

8  is safer.

9      Q.   Why does it matter the rate of growth of the

10  dilated aortic root?

11      A.   The rate of growth correlates positively with

12  the rate of dissection and rupture.

13      Q.   In other words, the faster it's growing, the

14  more likely it is to dissect or rupture?

15      A.   Correct.

16      Q.   If a dilated aortic root is stable in size

17  over time, does that, therefore, indicate that the rate

18  of dissection or rupture is decreased?

19          MS. FAN:  Objection.  Argumentative.

20          THE WITNESS:  Can you say that again, please?

21  BY MS. FLECHSIG:

22      Q.   Yeah.  So in other words, if the size of the

23  aortic root dilation is stable over time, that would

24  indicate a negative risk factor; there would be less

25  risk that it will dissect or rupture?

Dr. Ujomoti Akintunde                                    October 31, 2024

```
1            MS. FAN:  Objection.  Argumentative.
2            THE WITNESS:  Well, size is important, so the
3    risk is lower that it would dissect or rupture, but it
4    may also -- that may also occur, even at the current
5    size; that is why there is a risk category to it.  So
6    you really want to make sure, like I said, as a
7    physician, my priority one is the health and wellbeing
8    of every patient, so I also want to make sure all the
9    factors that may potentially increase the risk of this
10   person are doing well, are put into perspective and
11   addressed.
12   BY MS. FLECHSIG:
13        Q.   In your email did you intend to express any
14   opinion about whether it was safe for Mr. Snookal to
15   work in Escravos?
16        A.   That's not within my sphere of work.  My
17   communication was strictly cardiology, about the signs,
18   and its possible issues that may arise.  Nothing within
19   my sphere of work allows me to determine suitability for
20   work or otherwise.
21        Q.   For someone with an aortic root of
22   4.2 centimeters, is that a situation where you would
23   recommend surgical intervention?
24        A.   I would not recommend surgical intervention at
25   that size except he didn't have symptoms.
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   foundation.  Vague and ambiguous.
 2           THE WITNESS:  It would be higher than the
 3   person who does not have a dilated aortic root and is
 4   otherwise well, yes.
 5   BY MS. FAN:
 6       Q.   So you assessed Mr. Snookal's risk of
 7   complication with his dilated aortic root to be low.
 8   What did you base your assessment on?
 9       A.   The outcomes of people from -- from many -- I
10   mean, experience on literature, the outcome of people in
11   that category, based on scientific literature.
12       Q.   When you say outcomes, what are you referring
13   to?
14       A.   Adverse outcomes, adverse aortic outcomes and
15   death.
16       Q.   I see.  So when you say you based it on your
17   knowledge of medical literature regarding his condition,
18   what medical literature are you referring to?
19       A.   I read a lot of articles and medical
20   materials, various kinds, you know, in my -- in the
21   course of my practice.  I come across different reading
22   materials or texts.
23       Q.   At the time that you made your assessment of
24   Mr. Snookal's risk of complication, were you aware that
25   his cardiologist had quoted his risk of complication at
```

Dr. Ujomoti Akintunde                                    October 31, 2024

1       Q.   Okay.  You mentioned you based your assessment
2   of Mr. Snookal's risk of complication on your knowledge
3   of medical literature and his imaging reports.  Did you
4   speak --
5       A.   Yes.
6       Q.   -- with Mr. Snookal -- I apologize.
7            Did you speak with Mr. Snookal in making your
8   assessment?
9            MS. FLECHSIG:  Asked and answered.
10           THE WITNESS:  No.
11  BY MS. FAN:
12      Q.   And in your opinion, did your assessment of
13  Mr. Snookal's risk require a conversation with
14  Mr. Snookal?
15      A.   No.
16      Q.   Why not?
17      A.   The aortic size is a very strong predictor of
18  outcomes, and I was already given the aortic size.
19      Q.   Okay.  Earlier -- strike that.
20           Have you ever treated a rupture resulting from
21  a dilated aortic root?
22           MS. FLECHSIG:  Asked and answered.
23           THE WITNESS:  No.
24  BY MS. FAN:
25      Q.   And have you ever treated --

Dr. Ujomoti Akintunde                              October 31, 2024

1    could you state it again, please?

2    BY MS. FAN:

3        Q.    Yeah, of course.  If Mr. Snookal experienced a

4    cardiovascular complication relating to his aortic root,

5    what interventions are required?

6            MS. FLECHSIG:  Same objections, but also

7    incomplete hypothetical.  Go ahead.

8            THE WITNESS:  So he would need to be medevaced

9    immediately to the center where he could have access to

10   definitive care.

11   BY MS. FAN:

12       Q.    And to be clear, the kind of cardiovascular

13   complications that Mr. Snookal would experience with an

14   aortic root would be a rupture, or dissection; is that

15   correct?

16       A.    Yes.

17       Q.    And the third complication you mentioned

18   relating to a dilated aortic root was death?

19       A.    Yes.

20       Q.    So, of course, if a death had occurred, no

21   interventions would be possible.

22           MS. FLECHSIG:  Incomplete hypothetical.

23           THE WITNESS:  Yes.

24   BY MS. FAN:

25       Q.    Based on your knowledge of the medical

Dr. Ujomoti Akintunde                                    October 31, 2024

1  facilities in Escravos, would they be able to support

2  Mr. Snookal if he suffered a cardiological event?

3            MS. FLECHSIG:  Objection.  Incomplete

4  hypothetical.  Vague and ambiguous as to cardiac event.

5            THE WITNESS:  No.

6  BY MS. FAN:

7       Q.   And to clarify, if Mr. Snookal suffered a

8  rupture in -- strike that.

9            If Mr. Snookal experienced a rupture relating

10 to his dilated aortic root in Escravos, based on your

11 knowledge of the medical facilities available, would

12 they be able to support Mr. Snookal in the event of a

13 rupture?

14           MS. FLECHSIG:  Objection.  Vague and ambiguous

15 as to the meaning of support.

16           THE WITNESS:  No.

17 BY MS. FAN:

18      Q.   Based on your knowledge of the medical

19 facilities in Escravos, would they be able to support

20 Mr. Snookal if he suffered a dissection relating to his

21 dilated aortic root?

22           MS. FLECHSIG:  Objection.  Vague and ambiguous

23 as to the meaning of support.  Incomplete hypothetical.

24           THE WITNESS:  No.

25

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, Lauren Ramseyer, Certified Shorthand

 4   Reporter licensed in the State of California, License

 5   No. 14004, hereby certify that the deponent was by me

 6   first duly sworn and the foregoing testimony was

 7   reported by me and was thereafter transcribed with

 8   Computer-Aided Transcription; that the foregoing is a

 9   full, complete, and true record of said proceedings.

10           I further certify that I am not of counsel or

11   attorney for either or any of the parties in the

12   foregoing proceeding and caption named or in any way

13   interested in the outcome of the cause in said caption.

14           The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificate null and void.

17           In witness whereof, I have hereunto set my

18   hand this day: November 19, 2024.

19

20

21           Lauren Ramseyer, CSR No. 14004

22

23

24

25
```

# **<u>EXHIBIT C</u>**

Exhibit C
p. 43

1                UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4

5    MARK SNOOKAL, an individual,    )
                                      )
6            Plaintiff,               )
                                      )
7        v.                           )   NO. 2:23-cv-6302-
                                      )        HDV-AJR
8    CHEVRON USA, INC., a California  )
     Corporation, and DOES 1 through  )
9    10, inclusive,                   )
                                      )
10           Defendants.              )
     _____)

11

12

13

14

15

16

17            Videotaped deposition of ALEXANDER

18    R. MARMUREANU, M.D., Witness, taken remotely

19    on behalf of Defendants commencing at 2:04

20    p.m. on Wednesday, January 29, 2025, before John

21    M. Taxter, Certified Shorthand Reporter No. 3579

22    in and for the State of California, a Registered

23    Professional Reporter.

24

25

Exhibit C
p. 44

```
 1      APPEARANCES OF COUNSEL:

 2

 3

 4      FOR PLAINTIFF MARK JORDAN SNOOKAL:

 5              ALLRED, MAROKO & GOLDBERG
                BY:  DOLORES Y. LEAL, Attorney at Law
 6                   dleal@amglaw.com

 7                    -and-

 8                   OLIVIA FLECHSIG, Attorney at Law
                     oflechsig@amglaw.coM
 9              6300 Wilshire Boulevard, Suite 1500
                Los Angeles, California  90048-5217
10              323.653.6530

11

12

13      FOR DEFENDANT CHEVRON USA, INC.:

14              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                BY:  TRACEY A. KENNEDY, Attorney at Law
15              350 South Grand Avenue, 40th Floor
                Los Angeles, California  90071
16              213.620.1780
                tkennedy@sheppardmullin.com
17

18

19      VIDEOGRAPHER:
20
                     JODY PADILLA
21

22

23

24

25
```

Exhibit C
p. 45

```
 1         A    It's exactly what it says.  But I will      14:35:07

 2    add today that, even if his work was not             14:35:09

 3    desk-based and involved a lot of physical            14:35:13

 4    activities and would have been physically            14:35:17

 5    demanding, I still didn't find any evidence to       14:35:19

 6    suggest that his condition would affect his job      14:35:24

 7    performance or pose any immediate risk.              14:35:26

 8         Q    And when you say a "desk job," did you     14:35:28

 9    get that from the job description?                   14:35:30

10         A    I have no idea.  I don't remember.         14:35:32

11         Q    Do you remember if that's something that  14:35:33

12    the -- your -- the attorneys told you?               14:35:36

13         A    I don't remember.                          14:35:36

14         Q    And I'm going to highlight another         14:35:44

15    sentence here -- whoops -- sorry -- and it's this    14:35:46

16    first sentence of the third paragraph on page 6.    14:35:51

17    It says:                                             14:35:55

18              "In conclusion, the evidence               14:35:55

19         overwhelmingly supports that                    14:35:57

20         Mr. Snookal's aneurysm does not                14:35:59

21         pose any clinically significant               14:36:02

22         risk...given" -- "particularly               14:36:03

23         given his travel to Nigeria every             14:36:08

24         other month."                                  14:36:11

25         So my question is when you say                 14:36:12
```

| | | |
|---|---|---|
| 1 | "clinically significant risk," what do you mean by | 14:36:13 |
| 2 | that? | 14:36:17 |
| 3 | A    That's exactly what I say, "clinically | 14:36:17 |
| 4 | significant risk."  I could add today, now that | 14:36:20 |
| 5 | you asked me, in my opinion, the evidence based on | 14:36:22 |
| 6 | my training, practice, education, experience, and | 14:36:28 |
| 7 | the nine articles I provided, it shows that the | 14:36:30 |
| 8 | incidence of aortic dissection rupture in someone | 14:36:33 |
| 9 | with his comorbidities and the size of the aortic | 14:36:38 |
| 10 | aneurysm, ascending aorta, would be probably | 14:36:43 |
| 11 | around .1 percent.  So this is ten times less than | 14:36:46 |
| 12 | one percent. | 14:36:49 |
| 13 | So as I sit here today, it is my opinion | 14:36:50 |
| 14 | that those issues, the so-called annulus which it | 14:36:54 |
| 15 | is minimally large, probably the upper limit of | 14:36:58 |
| 16 | normal, does not pose any risk.  And I did say | 14:37:02 |
| 17 | here "particularly given his travel to Nigeria | 14:37:05 |
| 18 | every other month."  The reality of, I could add, | 14:37:09 |
| 19 | given his travel to anywhere in the world every | 14:37:14 |
| 20 | week, it's just there is no risk.  So I don't want | 14:37:17 |
| 21 | you to link it to the -- to the Nigeria.  I don't | 14:37:20 |
| 22 | believe that -- clearly, he's got some disability. | 14:37:25 |
| 23 | Clearly, he's got the aortic annulus, a little bit | 14:37:28 |
| 24 | enlarged.  And I'm going to say four -- at 4.0 is | 14:37:31 |
| 25 | normal.  4.2.  The way you look at a CAT scan, | 14:37:34 |

Exhibit C
p. 47

| | | |
|---|---|---|
| 1 | was asked. | 15:17:32 |
| 2 | A   I did answer.  I said not that I | 15:17:33 |
| 3 | remember -- | 15:17:35 |
| 4 | Q   Okay. | 15:17:35 |
| 5 | A   -- and then I elaborated. | 15:17:35 |
| 6 | MS. KENNEDY:  All right.  Thank you. | 15:17:40 |
| 7 | All right.  I don't have any more questions.  I | 15:17:40 |
| 8 | don't know. | 15:17:40 |
| 9 | Dolores, Olivia, do you have any | 15:17:43 |
| 10 | questions? | 15:17:44 |
| 11 | | 15:17:44 |
| 12 | EXAMINATION | 15:17:44 |
| 13 | BY MS. LEAL: | 15:17:44 |
| 14 | Q   Just one follow-up question.  Doctor, | 15:17:45 |
| 15 | Ms. Kennedy asked you if you had spoken with Mark | 15:17:49 |
| 16 | Snookal, and I believe your answer was "no." | 15:17:54 |
| 17 | Is that correct? | 15:17:57 |
| 18 | A   That's the best of my recollection.  Do | 15:17:58 |
| 19 | you -- refresh my recollection. | 15:18:00 |
| 20 | Q   Right. | 15:18:01 |
| 21 | A   I don't think I did, no. | 15:18:02 |
| 22 | Q   Okay.  So would your opinion have | 15:18:03 |
| 23 | changed in any way, had you spoken or interviewed | 15:18:05 |
| 24 | Mr. Snookal? | 15:18:09 |
| 25 | A   Absolutely not.  My opinions are based | 15:18:11 |

| | | |
|---|---|---|
| 1 | on the data, the CT scan, the CT angio, and all | 15:18:13 |
| 2 | the medical records.  I can formulate the plan.  I | 15:18:19 |
| 3 | don't need to look at the patient or evaluate the | 15:18:21 |
| 4 | patient.  It's all the based on the guidelines | 15:18:24 |
| 5 | that I actually provided to you yesterday.  It | 15:18:26 |
| 6 | might be today. | 15:18:29 |
| 7 | Q    Okay.  Thank you. | 15:18:30 |
| 8 | A    Thank you. | 15:18:31 |
| 9 | MS. LEAL:  Thank you, Doctor. | 15:18:31 |
| 10 | I don't have anything else, Tracey. | 15:18:32 |
| 11 | | 15:18:32 |
| 12 | FURTHER EXAMINATION | 15:18:32 |
| 13 | BY MS. KENNEDY: | 15:18:32 |
| 14 | Q    Just one follow-up. | 15:18:33 |
| 15 | A    Sure. | 15:18:34 |
| 16 | Q    Doctor, you said the guidelines you | 15:18:35 |
| 17 | provided yesterday. | 15:18:36 |
| 18 | Are you referring to the Exhibit 3 I | 15:18:37 |
| 19 | just showed you? | 15:18:39 |
| 20 | A    That -- that's correct.  Actually, that | 15:18:40 |
| 21 | I sent today. | 15:18:42 |
| 22 | Q    Okay. | 15:18:42 |
| 23 | A    It's the main part of that.  I wrote it. | 15:18:45 |
| 24 | And, again, if you feel that was provided to you | 15:18:46 |
| 25 | and being late and I understand and I agree, and I | 15:18:48 |

```
1    STATE OF CALIFORNIA  )
                          ) SS.
2    COUNTY OF VENTURA    )

3            I, John M. Taxter, a California Certified

4    Shorthand Reporter, Certificate No. 3579, a

5    Registered Professional Reporter, do hereby

6    certify:  That the foregoing proceedings were

7    taken before me at the time and place therein set

8    forth, at which time the deponent was put under

9    oath by me; that the testimony of the deponent and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed; and that the foregoing is

13   a true and correct transcript of my shorthand

14   notes so taken.

15           I further certify that I am neither

16   counsel for nor related to any party to said

17   action.

18           The dismantling, unsealing, or unbinding

19   of the original transcript will render the

20   Reporter's Certificate null and void.

21            Pursuant to Federal Rule 30(e),

22   transcript review was requested.

23   Dated February 11, 2025.

24                          _____
                            JOHN M. TAXTER
25                          California Certified Shorthand
                            Reporter No. 3579, RPR
```

Exhibit C
p. 50

1

2

3

4       I, John M. Taxter , Certified Shorthand Reporter,

5    CSR No.   3579, hereby certify:

6       The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12   Dated:    February 13, 2025

13

14

15

16   _____

17        John Taxter, CSR No. 3579

18

19

20

21

22

23

24

25

# <u>EXHIBIT D</u>



Human Energy. Yours.™

# Medical Examination Program

Your Health.



**Chevron**

Human Energy®

Global Health and Medical

CUSA000837