# EXHIBIT A

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4   MARK SNOOKAL, an individual,

 5            Plaintiff,              Case No.

 6            vs.                     2:23-cv-6302-HDV-AJR

 7   CHEVRON USA, INC., a California
     Corporation, and DOES 1 through 10,
 8   inclusive,

 9            Defendants.
     _____
10

11

12

13

14

15            DEPOSITION OF DR. UJOMOTI AKINTUNDE,

16   commencing on Thursday, October 31, 2024, at 8:00 a.m.,

17   Pacific Time, held via Zoom videoconference, all

18   participants appearing remotely before Lauren Ramseyer,

19   Certified Shorthand Reporter, CSR No. 14004.

20

21

22

23

24

25
```

Exhibit A
p. 2

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                      I N D E X

 2    WITNESS:

 3    DR. UJOMOTI AKINTUNDE

 4

 5    EXAMINATION:                              PAGE

 6    BY MS. FLECHSIG                          5, 85

 7    BY MS. FAN                                56

 8

 9

10    DEPOSITION EXHIBITS:                      PAGE

11    Exhibit 1        Email (CUSA000771-775)      21

12    Exhibit 2        Article Entitled "Yearly Rupture    71
                       or Dissection Rates for Thoracic
13                     Aortic Aneurysms, Simple
                       Prediction Based on Size" (CUSA
14                     776-787)

15    Exhibit 3        Article Entitled "Risk of      73
                       Rupture or Dissection in
16                     Descending Thoracic Aortic
                       Aneurysm" (CUSA778-797)
17

18

19

20

21

22

23

24

25
```

Exhibit A
p. 3

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1                      APPEARANCES:

 2    FOR THE PLAINTIFF:

 3         ALLRED, MAROKO & GOLDBERG

 4         BY: OLIVIA FLECHSIG, ESQ.

 5         6300 Wilshire Boulevard, Suite 1500

 6         Los Angeles, California 90048

 7         (323)653-6530

 8         oflechsig@amglaw.com

 9

10    FOR THE DEFENDANTS:

11         SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

12         BY: SARAH FAN, ESQ.

13         333 South Hope Street, 43rd Floor

14         Los Angeles, California 90071

15         (213)620-1780

16         sfan@sheppardmullin.com

17

18    ALSO PRESENT:  EGUONO ERHUN

19

20

21

22

23

24

25
```

Exhibit A
p. 4

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1  BY MS. FLECHSIG:
 2      Q.   Do you understand my question?  I can restate.
 3      A.   I've reviewed literature around aortic tissue
 4  for years.  It's part of --
 5      Q.   Yeah, I -- so my question is, when did you
 6  review literature relating to Mark Snookal, the
 7  plaintiff in this case?
 8          MS. FAN:  Objection.  Vague and ambiguous.
 9  Asked and answered.
10          THE WITNESS:  Over the last -- I mean, over
11  the years, I've always reviewed literature regarding
12  aortic and other cardiology topics, but of course, over
13  the last number of weeks or so, I have also reviewed
14  them as well, so, like I said, nothing unusual.  That's
15  the way I practice medicine.  Because what was --
16  what -- the management of a particular case are managing
17  today, may change in the next one year, for instance.
18  BY MS. FLECHSIG:
19      Q.   Okay.  Have you searched for any documents
20  that are related to this litigation, in other words,
21  have you made any efforts to look for documents or
22  communications in your possession that relate to
23  Mark Snookal?
24          MS. FAN:  Objection.  Vague and ambiguous.
25          THE WITNESS:  Yes.  Like I -- the only
```

Exhibit A
p. 5

Dr. Ujomoti Akintunde                                    October 31, 2024

```
1              MS. FAN:  Objection.  Vague and ambiguous.
2              THE WITNESS:  I can't remember.  I'm not so
3   sure how many, but I have managed them in the past.
4   They're not as common in this part of the world.
5   BY MS. FLECHSIG:
6        Q.   In the last year, how many patients with a
7   dilated aortic root have you -- have you treated?
8        A.   A couple.  I'm not sure exactly.
9        Q.   Since joining Chevron in 2018, how many people
10  with a dilated aortic root have you -- have you seen?
11             MS. FAN:  Vague and ambiguous as to "Chevron."
12             THE WITNESS:  I'm not certain of the exact
13  number, but I've seen a few.
14  BY MS. FLECHSIG:
15       Q.   So I want to turn now to Mark Snookal, the
16  plaintiff in this case.  Have you ever spoken with
17  Mr. Snookal?
18       A.   No.
19       Q.   Have you ever reviewed a job description for
20  the position that Mr. Snookal was seeking in Escravos?
21       A.   No.
22       Q.   Did you have any work history, for
23  Mr. Snookal, to review?
24       A.   No.  That's not within my purview as a
25  cardiologist.  That's managed by the occupational health
```

Exhibit A
p. 6

Dr. Ujomoti Akintunde                                    October 31, 2024

1    ago.

2        Q.    As you sit here today, though, you don't have

3    any memory of discussing it with Dr. Asekomeh other than

4    in this email?

5        A.    Correct.

6        Q.    Okay.  Other than Dr. Asekomeh, do you

7    remember speaking about Mr. Snookal and his medical

8    condition with anyone else, other than your lawyers?

9        A.    Dr. Adeyeye, the other cardiologist.

10       Q.    Is Dr. Adeyeye your colleague in Lagos?

11       A.    He works in Chevron Warri, Warri Hospital.

12       Q.    Okay.  When did you discuss Mr. Snookal with

13    Dr. Adeyeye?

14       A.    Within the last couple of weeks.  Recently,

15    within the last two to three weeks or so.

16       Q.    Okay.  Was that one conversation that you had

17    with Dr. Adeyeye about Mr. Snookal?

18            MS. FAN:  I apologize, Counsel.  You broke up

19    for me.  Would you mind repeating your question?

20    BY MS. FLECHSIG:

21       Q.    Yeah.  How many conversations did you have

22    with Dr. Adeyeye about Mr. Snookal?

23       A.    One or two maximum.

24       Q.    What did you discuss during those

25    conversations?

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   excuse me, let me try that again.
 2             In August of 2019, did you have any
 3   supervisory role over other doctors?
 4        A.   No.
 5        Q.   Who was your boss at the time in August of
 6   2019?
 7             MS. FAN:  Objection.  Vague and ambiguous.
 8             THE WITNESS:  The current medical director was
 9   my supervisor at the time.
10   BY MS. FLECHSIG:
11        Q.   Okay.  Who is that?
12        A.   Dr. Obomanu.
13        Q.   I'm sorry, could you spell that for me,
14   please?
15        A.   Oscar, Bravo, Oscar, Mike, Alpha, November,
16   Uniform.  That's O-b-o-m-a-n-u.
17        Q.   Thank you so much.  Do you know who
18   Dr. Asekomeh's supervisor was at this time in
19   August 2019?
20        A.   Dr. Pitan.
21        Q.   Okay.  Going back to this email thread in
22   Exhibit 1, you say, "I would, however, be more
23   comfortable if he were on a beta blocker as one of his
24   meds or in addition to current meds.  The fact that he
25   does not smoke cigarettes is beneficial."  I just want
```

Dr. Ujomoti Akintunde                                October 31, 2024

1    to ask you some questions about that.

2          So why did you feel you would be more

3    comfortable if he was on a beta blocker?

4          A.   A beta blocker will slow down the rate of the

5    increase in size of his dilated aortic root.  It will

6    slow down the rate of increase, and essentially make him

7    safer, so that was my primary priority, that the patient

8    is safer.

9          Q.   Why does it matter the rate of growth of the

10   dilated aortic root?

11         A.   The rate of growth correlates positively with

12   the rate of dissection and rupture.

13         Q.   In other words, the faster it's growing, the

14   more likely it is to dissect or rupture?

15         A.   Correct.

16         Q.   If a dilated aortic root is stable in size

17   over time, does that, therefore, indicate that the rate

18   of dissection or rupture is decreased?

19         MS. FAN:  Objection.  Argumentative.

20         THE WITNESS:  Can you say that again, please?

21   BY MS. FLECHSIG:

22         Q.   Yeah.  So in other words, if the size of the

23   aortic root dilation is stable over time, that would

24   indicate a negative risk factor; there would be less

25   risk that it will dissect or rupture?

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1              MS. FAN:  Objection.  Argumentative.
 2              THE WITNESS:  Well, size is important, so the
 3    risk is lower that it would dissect or rupture, but it
 4    may also -- that may also occur, even at the current
 5    size; that is why there is a risk category to it.  So
 6    you really want to make sure, like I said, as a
 7    physician, my priority one is the health and wellbeing
 8    of every patient, so I also want to make sure all the
 9    factors that may potentially increase the risk of this
10    person are doing well, are put into perspective and
11    addressed.
12    BY MS. FLECHSIG:
13         Q.   In your email did you intend to express any
14    opinion about whether it was safe for Mr. Snookal to
15    work in Escravos?
16         A.   That's not within my sphere of work.  My
17    communication was strictly cardiology, about the signs,
18    and its possible issues that may arise.  Nothing within
19    my sphere of work allows me to determine suitability for
20    work or otherwise.
21         Q.   For someone with an aortic root of
22    4.2 centimeters, is that a situation where you would
23    recommend surgical intervention?
24         A.   I would not recommend surgical intervention at
25    that size except he didn't have symptoms.
```

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1        A.   Yes.
 2        Q.   As part of your consultation, do the
 3   occupational health physicians ask you to assess the
 4   risk of an individual's cardiological condition?
 5        A.   Yes.
 6        Q.   And how do you assess the risk of an
 7   individual's cardiological condition?
 8        A.   Based on data provided.
 9        Q.   And what kind of data do you usually consider
10   when you're making these assessments?
11        A.   Imaging.
12        Q.   And the --
13        A.   Blood pressure numbers.  Anything of concern
14   within my area of work, they ask.
15        Q.   When you say imaging, what is that referring
16   to?
17        A.   Such as a CT scan or other medical images that
18   they choose to share.
19        Q.   Does imaging also include echocardiograms?
20        A.   Yes.
21        Q.   What is the primary purpose of your
22   consultation on cases that are referred to you by
23   occupational health physicians?
24        A.   Cardiovascular risk and opinions.
25        Q.   And do you know why your consultation is
```

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   foundation.  Vague and ambiguous.
 2           THE WITNESS:  It would be higher than the
 3   person who does not have a dilated aortic root and is
 4   otherwise well, yes.
 5   BY MS. FAN:
 6      Q.   So you assessed Mr. Snookal's risk of
 7   complication with his dilated aortic root to be low.
 8   What did you base your assessment on?
 9      A.   The outcomes of people from -- from many -- I
10   mean, experience on literature, the outcome of people in
11   that category, based on scientific literature.
12      Q.   When you say outcomes, what are you referring
13   to?
14      A.   Adverse outcomes, adverse aortic outcomes and
15   death.
16      Q.   I see.  So when you say you based it on your
17   knowledge of medical literature regarding his condition,
18   what medical literature are you referring to?
19      A.   I read a lot of articles and medical
20   materials, various kinds, you know, in my -- in the
21   course of my practice.  I come across different reading
22   materials or texts.
23      Q.   At the time that you made your assessment of
24   Mr. Snookal's risk of complication, were you aware that
25   his cardiologist had quoted his risk of complication at
```

Dr. Ujomoti Akintunde                                        October 31, 2024

1         Q.    Okay.  You mentioned you based your assessment

2    of Mr. Snookal's risk of complication on your knowledge

3    of medical literature and his imaging reports.  Did you

4    speak --

5         A.    Yes.

6         Q.    -- with Mr. Snookal -- I apologize.

7               Did you speak with Mr. Snookal in making your

8    assessment?

9               MS. FLECHSIG:  Asked and answered.

10              THE WITNESS:  No.

11   BY MS. FAN:

12        Q.    And in your opinion, did your assessment of

13   Mr. Snookal's risk require a conversation with

14   Mr. Snookal?

15        A.    No.

16        Q.    Why not?

17        A.    The aortic size is a very strong predictor of

18   outcomes, and I was already given the aortic size.

19        Q.    Okay.  Earlier -- strike that.

20              Have you ever treated a rupture resulting from

21   a dilated aortic root?

22              MS. FLECHSIG:  Asked and answered.

23              THE WITNESS:  No.

24   BY MS. FAN:

25        Q.    And have you ever treated --

Dr. Ujomoti Akintunde                                    October 31, 2024

1        A.    Ruptured ones are managed by cardiothoracic

2    surgeons once they rupture.

3        Q.    Understood.

4              And have you ever treated a dissection

5    resulting from a dilated aortic root?

6              MS. FLECHSIG:  Asked and answered.

7              THE WITNESS:  No.  No.

8    BY MS. FAN:

9        Q.    In order to render your risk assessment, do

10   you have to have experience treating these conditions --

11   let me rephrase.

12             Do have you to have experience treating

13   ruptures or dissections resulting from dilated aortic

14   roots in order to make a risk assessment regarding

15   complication?

16       A.    Not necessarily.  You have to have a good

17   understanding and knowledge of the pathology and

18   real-world statistics.

19       Q.    So this understanding of the pathology and

20   real-world statistics can come from your knowledge and

21   experience regarding the condition?

22       A.    Yes.

23       Q.    And -- and the understanding of the pathology

24   and statistics can also come from medical literature

25   regarding the condition?

Dr. Ujomoti Akintunde                                    October 31, 2024

1          A.    Yes.

2          Q.    At the time that you consulted on

3     Mr. Snookal's case, were you aware that Mr. Snookal was

4     trying to take on an expatriate assignment in Escravos?

5          A.    I had that impression because the occupational

6     health physician was the one reaching out to me.

7          Q.    And you mentioned previously that you've

8     worked in Escravos before, correct?

9          A.    Yes.

10         Q.    Can you describe for us the medical facilities

11    that are available in Escravos?

12         A.    There is an in-house clinic, which manages

13    basic conditions.  There are few beds, but it's largely

14    an ambulatory service.  There are no surgical

15    capabilities there and no ICU service, so just manages

16    primary any -- it's the basic care that is needed, and

17    anyone that exceeds capacity of the clinic, in terms of

18    the resources, are referred or medevaced.

19         Q.    Is there medical equipment available in

20    Escravos to monitor cardiovascular conditions?

21         A.    Not if it's there -- not if it's -- no, just

22    very basic.  Like I said, there's no intensive care

23    unit, there's no coronary care unit, there's no high

24    dependency unit.  It's just a basic clinic.

25         Q.    So when you say there's basic equipment

Dr. Ujomoti Akintunde                                    October 31, 2024

1    could you state it again, please?

2    BY MS. FAN:

3        Q.   Yeah, of course.  If Mr. Snookal experienced a

4    cardiovascular complication relating to his aortic root,

5    what interventions are required?

6            MS. FLECHSIG:  Same objections, but also

7    incomplete hypothetical.  Go ahead.

8            THE WITNESS:  So he would need to be medevaced

9    immediately to the center where he could have access to

10   definitive care.

11   BY MS. FAN:

12       Q.   And to be clear, the kind of cardiovascular

13   complications that Mr. Snookal would experience with an

14   aortic root would be a rupture, or dissection; is that

15   correct?

16       A.   Yes.

17       Q.   And the third complication you mentioned

18   relating to a dilated aortic root was death?

19       A.   Yes.

20       Q.   So, of course, if a death had occurred, no

21   interventions would be possible.

22           MS. FLECHSIG:  Incomplete hypothetical.

23           THE WITNESS:  Yes.

24   BY MS. FAN:

25       Q.   Based on your knowledge of the medical

Dr. Ujomoti Akintunde                                      October 31, 2024

1    facilities in Escravos, would they be able to support

2    Mr. Snookal if he suffered a cardiological event?

3              MS. FLECHSIG:  Objection.  Incomplete

4    hypothetical.  Vague and ambiguous as to cardiac event.

5              THE WITNESS:  No.

6    BY MS. FAN:

7        Q.   And to clarify, if Mr. Snookal suffered a

8    rupture in -- strike that.

9              If Mr. Snookal experienced a rupture relating

10   to his dilated aortic root in Escravos, based on your

11   knowledge of the medical facilities available, would

12   they be able to support Mr. Snookal in the event of a

13   rupture?

14             MS. FLECHSIG:  Objection.  Vague and ambiguous

15   as to the meaning of support.

16             THE WITNESS:  No.

17   BY MS. FAN:

18       Q.   Based on your knowledge of the medical

19   facilities in Escravos, would they be able to support

20   Mr. Snookal if he suffered a dissection relating to his

21   dilated aortic root?

22             MS. FLECHSIG:  Objection.  Vague and ambiguous

23   as to the meaning of support.  Incomplete hypothetical.

24             THE WITNESS:  No.

25

Dr. Ujomoti Akintunde                                    October 31, 2024

```
 1   Nigeria.
 2        Q.   When you say consumables necessary for the
 3   surgery, what do you mean by that?
 4        A.   The materials and, you know, the materials
 5   used to repair the damaged vessel.
 6        Q.   Understood.  Thank you.  I don't have any
 7   further questions.
 8             MS. FLECHSIG:  Okay.  I just have -- I just
 9   have a few more, and thank you, Dr. Akintunde for your
10   time today.
11                   FURTHER EXAMINATION
12   BY MS. FLECHSIG:
13        Q.   With respect to Exhibit 2 that Ms. Fan showed
14   you, the article, titled, "Yearly Rupture or Dissection
15   Rates for Thoracic Aortic Aneurysms, Simple Prediction
16   Based on Size," you know which study I'm referring to,
17   right?
18        A.   Yes.
19        Q.   When did you become familiar with this
20   specific study?
21        A.   I can't remember.
22        Q.   Was it recently, was it a long time ago,
23   what's your best estimate?
24        A.   Honestly, I can't remember.  Like I said, I
25   read lots of articles, so which one when, exactly, I
```

Dr. Ujomoti Akintunde                                    October 31, 2024

1    don't know.

2         Q.   Did you become familiar with it before August

3    of 2019?

4         A.   I can't remember.

5         Q.   Okay.  With respect to the 2015 article that

6    Ms. Fan showed you, which is marked as Exhibit 3, when

7    did you become familiar with that study?

8         A.   In the last, very recently, couple of weeks,

9    maybe -- or was it last week.  I think last week.

10        Q.   Okay.  For determining a patient's risk of a

11   rupture or dissection, what materials would you review

12   or what information would you review to get the

13   most -- strike that.  Strike that.  Let me start over.

14            If you're reviewing a patient who has a

15   dilated aortic root, what information would you need to

16   have the best sense of what their risk of rupture or

17   dissection is?

18        A.   The primary one would be the size, as it is

19   clearly the -- a powerful predictor of adverse aortic

20   event and death, and it also forms the basis for the

21   surgical criteria for repair.  So it's the key one to

22   look out for.

23        Q.   What are the other pieces of information that

24   informs someone's risk of dissection or rupture?

25        A.   Like the blood pressure or whether they're on

Dr. Ujomoti Akintunde                                          October 31, 2024

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, Lauren Ramseyer, Certified Shorthand

 4     Reporter licensed in the State of California, License

 5     No. 14004, hereby certify that the deponent was by me

 6     first duly sworn and the foregoing testimony was

 7     reported by me and was thereafter transcribed with

 8     Computer-Aided Transcription; that the foregoing is a

 9     full, complete, and true record of said proceedings.

10            I further certify that I am not of counsel or

11     attorney for either or any of the parties in the

12     foregoing proceeding and caption named or in any way

13     interested in the outcome of the cause in said caption.

14            The dismantling, unsealing, or unbinding of

15     the original transcript will render the reporter's

16     certificate null and void.

17            In witness whereof, I have hereunto set my

18     hand this day: November 19, 2024.

19

20

21            Lauren Ramseyer, CSR No. 14004

22

23

24

25
```

Exhibit A
p. 20

# <u>EXHIBIT B</u>

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

MARK SNOOKAL, an individual,           )
                                       )
                                       )
                    Plaintiff,         )
           vs.                         ) Case No.
                                       ) 2:23-cv-6302-HDV-AJR
                                       )
CHEVRON USA, INC., a California        )
Corporation, and DOES 1 through        )
10, inclusive,                         )
                                       )
                    Defendants.        )
_____)


REPORTER'S TRANSCRIPT


VIDEOTAPED DEPOSITION OF

DR. VICTOR ADEYEYE

VOLUME 2

Tuesday, April 22, 2025

Via Zoom Video Conferencing

6:00 a.m.


Reported by:  Rachel N. Barkume, CSR, RMR, CRR
              Certificate No. 13657

Dr. Victor Adeyeye                                                      April 22, 2025

```
 1                    A P P E A R A N C E S

 2

 3

 4    FOR THE DEFENDANT:

 5             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
               By:   SARAH FAN
 6                   ROBERT MUSSIG
               Attorney at Law
 7             333 South Hope Street, 43rd Floor
               Los Angeles, California 90071
 8             (213) 620-1780
               sfan@sheppardmullin.com
 9             rmussig@sheppardmullin.com

10    FOR THE PLAINTIFF:

11             ALLRED, MAROKO & GOLDBERG
               By:   OLIVIA FLECHSIG
12                   DOLORES LEAL
               Attorney at Law
13             6300 Wilshire Boulevard, Suite 1500
               Los Angeles, California 90048
14             (323) 653-6530
               oflechsig@amglaw.com
15             dleal@amglaw.com

16    THE VIDEOGRAPHER:

17             Cliff Gonshery

18    ALSO PRESENT:

19             Eguono Erhun, Chevron Nigeria Limited

20

21

22

23

24

25
```

Dr. Victor Adeyeye                                                    April 22, 2025

```
 1        Q.  So we're at the top of Exhibit A now.

 2        A.  Yes, that's my response.  That's the summary of

 3   my own search.

 4        Q.  Okay.  So there's this August 5th, 2019,

 5   e-mail, and this is your summary of your research;

 6   correct?

 7        A.  Yeah.  Yeah.  Yes.

 8        Q.  Okay.  There's -- is there anything that you

 9   know today that would change your opinion of what you

10   expressed in that August 5th, 2019, e-mail?

11        A.  I don't get your question, please.  Again,

12   please.  Repeat again, please.

13        Q.  Oh, I'm sorry.  I think my internet --

14   apologies.  Yeah.

15            I just was asking is the opinion you expressed

16   in this August 5th, 2019, e-mail -- is that consistent

17   still with your opinion today of Mark Snookal's cardiac

18   condition?

19        A.  Very consistent.  Very consistent.

20        Q.  Okay.  So you said that you undertook some

21   research to inform this opinion.

22            What did you do to find -- what did you do to

23   research?

24        A.  First of all, I search for such cases in

25   Nigeria, and that brought me to a publication I was part
```

Dr. Victor Adeyeye                                          April 22, 2025

1  of the author; 2,501 echocardiographic studies for

2  individuals with heart conditions.  I mean 2,501 cardiac

3  patients, what did we find out is their cardiac

4  condition.  Why is that so?  That is so, for me, to have

5  an idea how many of such cases do we see in real life.

6          And I found out that it's quite very rare.

7  This publication, which I'm part of the author, is

8  available -- can be made available to you.  Out of

9  2,501, no such case, and that tells you the reality of

10 the condition, the limited cases of such condition to

11 warrant physicians' experience.

12          Then I also found out that most of those cases

13 were from autopsy, not in real life.  I look at

14 literature and I saw that, oh, even for those cases

15 being found, they were found at autopsy.  Those are

16 local cases.  And I also look at a U.S. study between

17 1999 and 2016, then; the epidemiology of fatal ruptured

18 aortic aneurysms in the United States.  Epidemiology of

19 fatal ruptured aortic aneurysms in the United States,

20 1999 to 2016.

21          This also gives me an idea how much of

22 mortality is still with this condition.  So putting all

23 these things together, I was able to have my own

24 opinion; which, looking at literature from 2019 to now,

25 they say the same; and I am able to advise, as put in

Dr. Victor Adeyeye                                                April 22, 2025

1    this, my write-up, on such cases.  Thank you.

2         Q.  Okay.  Thank you for that.  I just wanted to

3    clarify.

4            How many -- how many studies did you review?

5    It sounds like there were two.  Or am I missing some?

6         A.  Okay.  Two local studies.  I can remember one

7    now.  And one foreign study.  The foreign study is the

8    one in United States, 1999 to 2016, epidemiology of

9    fatal ruptured aortic aneurysms in United States, 1999

10   to 2016.  The local one I remember vividly was an

11   article I also am part of the co-authors, the 2,501

12   cases echocardiographic studies done in the Southwestern

13   Nigeria.  This can be made available to you if you are

14   so interested, or you can go online and search there.

15   Thank you.

16        Q.  Okay.  So the local study using 2,051

17   echocardiographic studies --

18        A.  2,501.  '501.

19        Q.  2,501?

20        A.  '01.  '501, yes.

21        Q.  Sorry.  Okay.  2,501 local studies.

22           You said it's reviewing that number of

23   echocardiographic studies; correct?

24        A.  Yes.

25        Q.  But it's not specifically on people with

Dr. Victor Adeyeye                                    April 22, 2025

1   descriptions of the individual.  How do I mean?  If

2   somebody has frequent arrhythmias from palpitations and

3   what have you, and they ask me, what is your opinion on

4   this?  I can say, oh, this person stands a risk of

5   disturbing arrhythmia with chest pain, with difficulty

6   with breathing.  And based on this, there are various

7   aids, put them on this kind of drug, to be seen with

8   this frequency, once a month, once in two weeks, once in

9   three months, once in six months.

10          They are the one who understand the works they

11  do.  Oh, this one is going to climb crane.  This one is

12  going to be in the air.  This one is going to be in the

13  boat.  This one is going to be on the sea.  And they

14  will now be able -- being doctors, too -- to match the

15  opinion of an expat with the work of the very

16  individual.  Thank you.

17     Q.  So what kind of information do you consider

18  when you're assessing the risk of an individual's

19  cardiovascular condition?

20     A.  The information I consider are patient orient

21  on point results -- cardiovascular results.  And there

22  are three or four main results that are important to

23  consider their cardiovascular -- for their

24  cardiovascular status, either their ECG, their echo, or

25  other imagings.

Dr. Victor Adeyeye                                                    April 22, 2025

1              These are the things that are necessary to put

2    things together and make an opinion.  Because most

3    cardiovascular opinions are based on data from very

4    specific cardiac values, cardiac results, not based on

5    is he genotype, is he BMI, is he dark or white or blue

6    or black.  No.  Thank you.

7         Q.  Aside from your own medical expertise, are

8    there guidelines you're required to follow when

9    assessing the risk of an individual's cardiovascular

10   condition?

11        A.  Yes.  There are guidelines.

12        Q.  What kind of --

13        A.  Guidelines that are developed by reputable

14   institution, for example, Nigeria -- potentially Society

15   of Nigeria -- Nigerian Cardiac Society.  These bodies

16   develop guidelines that help us to make informed

17   decision.

18            Also on international scale, there are European

19   Society of Cardiology, American College of Cardiology,

20   Canadian College, and they all have guidelines available

21   for us.  And these are the things that we look into at

22   the time we have to make decisions, and these are

23   available to everyone on websites, on subscriptions, in

24   journals, and at our conferences.  We look at all these

25   guidelines, merit, demerit, what have you, and

Dr. Victor Adeyeye                                        April 22, 2025

1    deliberate.  Thank you.

2         Q.  And when you're making your assessment of risk

3    relating to an individual's cardiovascular condition, is

4    any part of your compensation based on the conclusions

5    you reach in your assessments?

6         A.  Compensation how?  I don't get.

7         Q.  Your -- your pay.  Your salary compensation.

8             Is any of that based on the conclusions that

9    you reach in your assessments of risk?

10        A.  We've not gotten to that.  That's not part

11   of -- the salary structure -- of the medical, no.  We

12   are not paid by the opinion you make, the recommendation

13   you make, and all that.  No.  No.  No.  That has no

14   bearing, any payslip or any payment structure.  It's

15   just an advisory.

16            And for your information, please, it's like a

17   lawyer who has a case and he knows of a colleague who

18   has and do such case and just share opinion, what's your

19   advice on this?  Which, of course, the person goes into

20   the archive or the legal literature and give opinion on

21   that.  That is not with remunerations because, like I

22   said, this is teamwork.  It is part of what I'm

23   supposed -- when they ask for my opinion on such cases

24   about a impression I had, I give.

25            Same way a surgeon who want to fix bone from

Dr. Victor Adeyeye                                            April 22, 2025

1              For an individual with an aortic dilatation, is
2       the occurrence of a dissection or a rupture predictable?
3              MS. FLECHSIG:  Objection.  Incomplete
4       hypothetical.
5              THE WITNESS:  Science give us guidelines on
6       monitoring of such patient and give us opportunity to
7       make some prediction, and that's why we're able to
8       classify the risk for any individual with aortic
9       dilatation.  The risk of dilatation -- the risk of
10      dissection, I mean, the risk of rupture is this, this,
11      this, this, based on these diameter, this dimension.
12      That's what science tells us.  Thank you.
13      BY MS. FAN:
14         Q.  Did you speak with Mr. Snookal in making your
15      assessment of his risk relating to his cardiovascular
16      condition?
17         A.  No.  No.  I didn't do medical consultation with
18      Mr. Snookal.  No medical consultation with Mr. Snookal.
19      I've said it over and over.
20         Q.  And in your assessment of Mr. Snookal's risk
21      relating to his cardiovascular condition, did your
22      assessment of risk require a conversation with
23      Mr. Snookal?
24         A.  Not at all.  Not at all.  Not at all.
25         Q.  Why was -- why wasn't it necessary to speak

Dr. Victor Adeyeye                                        April 22, 2025

1    with Mr. Snookal regarding his condition in order to

2    assess the risk of his condition?

3         A.   The beauty of medical science is ability to

4    prognosticate based on available evidence.   In

5    Mr. Snookal's case, all is required for any cardiologist

6    all over the world to put him into any risk is for that

7    cardiologist to have an idea of the dimension of his

8    dilatation.

9              Any cardiologist anywhere in the world will

10   give you a risk value without seeing Mr. Snookal.   Just

11   like the other case I mentioned, any individual with

12   cardiac failure with ejection fraction, EF, 30 or 40

13   percent has likelihood of being dead 50 percent within

14   six month to one year.   This what science has gone for,

15   over the decades, in cardiology.   So I don't need to

16   speak to Mr. Snookal to make that assertion of the risk

17   level.   Thank you.

18        Q.   And did you speak with Mr. Snookal's

19   cardiologist in making your assessment of his risk

20   relating to his condition?

21        A.   The answer is no.

22        Q.   And in your --

23        A.   Because -- say what?

24        Q.   I didn't mean to cut you off.   Go ahead,

25   Doctor.

Dr. Victor Adeyeye                                              April 22, 2025

```
 1         A.  I do not need to have that conversation with
 2   Mr. Snookal's cardiologist.  Please note and please
 3   note, Mr. Snookal and his cardiologist are relating with
 4   doctor in occupational health, not with me as a
 5   cardiologist.  So there is no room for that.
 6              And I use the word "blinded opinion," without
 7   bias.  An opinion is blinded to remove elements of bias,
 8   elements of conflicts of interests.  That is why it has
 9   to be blinded.  And that is why some parameters like the
10   liver function test, E/U/Creatinine and others, were not
11   privy -- were not made available to me because I do not
12   stand in that occupational health department to
13   understand all the protocol and do their risk
14   assessments for patients' suitability to work called
15   fitness for duty.  Thank you.
16         Q.  In other words, you were making an independent
17   assessment of risk --
18         A.  Excellent.
19         Q.  -- regarding --
20         A.  Excellent.
21         Q.  -- the cardiological --
22         A.  Excellent.
23         Q.  -- condition.
24         A.  Excellent.  That is summary.  Thank you.
25         Q.  And you also testified earlier that you didn't
```

Dr. Victor Adeyeye                                                April 22, 2025

1   just the third buckets; and that very third bucket, just

2   a small part of it is cardiac.  The renal function is

3   there, the liver function is there, the brain function

4   is there, the metabolic is there.  It's just that

5   cardiac.  That is required of me to make an opinion.

6         It is there in occupational health who has

7   everything in these three buckets to make their own

8   informed decision on fitness for duty.  Thank you.

9         Q.  And these other types of inform- -- medical

10  information regarding Mr. Snookal that is being

11  considered by occupational health but which was not

12  available to you -- all of that other information, like

13  you said, was not necessary to your assessment of his

14  cardiological risk; is that right?

15        A.  Yeah.

16        MS. FLECHSIG:  Objection as to form, including

17  assumes facts not in evidence.

18        THE WITNESS:  Okay.

19  BY MS. FAN:

20        Q.  And if you had additional information regarding

21  Mr. Snookal's family history and their medical

22  conditions, would that have --

23        A.  Excellent.

24        Q.  -- would that have impacted your assessment --

25        A.  Excellent question.

Dr. Victor Adeyeye                                              April 22, 2025

1          Q.  -- of Mr. Snookal's risk --

2          A.  Excellent question.

3          Q.  -- of --

4          A.  Excellent question.  Excellent question.

5    It's --

6          MS. FLECHSIG:  I'm sorry, form objection.

7    Incomplete hypothetical.

8          THE WITNESS:  Yes.  Yes.  Yes.  It's

9    hypothetical.  But there is a science to this

10   hypothesis.  And the science to this is -- the medical

11   science of this is an individual who has aortic root

12   dilatation of 4.2, 4.5 centimeter with a positive family

13   history of Marfan syndrome, Ehlers-Danlos syndrome, this

14   individual is a chronic smoker, this person has coronary

15   heart disease, this individual has to do heavy lifting

16   of objects, that could have worsened -- emphasis

17   "worsened" -- this risk assessment.

18         That could have worsened the submission of the

19   risk -- will have increased, will have been worsened if

20   all these are present in that individual.  I can only

21   get all of these when you do a full medical

22   consultation:  The family tree, the metabolic panel, and

23   his social history.  These could have worsened the risk

24   because history of all of those, smoking, positive

25   family history, connective tissue disorder, like I

Dr. Victor Adeyeye                                    April 22, 2025

1    mentioned, the Marfan, the Ehlers-Danlos -- all of them

2    worsen the aortic dilatation, because the risk of

3    dissection or ruptures multiplies in multiple folds if

4    any of these are present.  Thank you.

5    BY MS. FAN:

6        Q.  Understood.  So to understand -- to make sure I

7    understand that correctly, if you had additional

8    information, aside from the -- aside from the imaging

9    reports, it would have -- it would have indicated a

10   higher level of risk for Mr. Snookal; is that correct?

11       A.  Yes.  And I mentioned those factors that could

12   have increased the level of risk if they are there.  I

13   mentioned, like, five.  If they are there, the level of

14   risk will have increased if they are positive from

15   medical consultation.

16           THE REPORTER:  Counsel, are we at a good break

17   spot?

18           MS. FAN:  Yes.  We can take a quick break here.

19   What are we thinking, five or ten minutes?

20           THE REPORTER:  I think it's been an hour, so if

21   we could do ten.

22           MS. FAN:  Okay.

23           THE VIDEOGRAPHER:  Off the record.  Time now,

24   8:43 a.m.

25           (Off the record.)

Dr. Victor Adeyeye                                          April 22, 2025

1   cases in Escravos, and no full complements of medical

2   specialists in Escravos.  Thank you.

3        Q.  That means there's no cardiologist on site in

4   Escravos; is that right?

5        A.  There is no designated cardiologist, no

6   designated surgeon, no designated anesthetist in

7   Escravos.

8        Q.  Earlier you mentioned that if an individual

9   experiences a dissection, they require immediate

10  intervention within a couple of minutes.

11       A.  Yes.

12       Q.  Are those interventions available in Escravos?

13       A.  No.  No.  No, even in Warri, not available, not

14  talk of Escravos.

15       Q.  Then you mentioned interventions for a rupture.

16            Are those available in Escravos?

17       A.  No.  No.  No.  No.

18       Q.  And so based on what you know of Mr. Snookal's

19  cardiovascular condition and the medical resources

20  available in Escravos, if Mr. Snookal had experienced a

21  cardiovascular complication in Escravos, would it have

22  led to his death?

23            MS. FLECHSIG:  Objection as to form.

24            THE WITNESS:  Hypothetical, if I may say, but

25  it could have led to his death.  Why?  Because both the

Dr. Victor Adeyeye                                      April 22, 2025

1    medical personnel -- medical facility, medical personnel

2    required, both in Escravos and in Warri location, are

3    not there.

4            MS. FAN:  Understood.  Thank you.  I don't have

5    any further questions at this point.

6            MS. FLECHSIG:  I just have a couple of

7    follow-up.  It will be -- I think it will be very quick.

8    If I may.

9                        EXAMINATION

10   BY MS. FLECHSIG:

11       Q.  So, Dr. Adeyeye, you testified about, sort of,

12   a golden period during which someone who has suffered a

13   dissection or rupture has the best odds of survival

14   through medical intervention; is that correct?

15       A.  Yes.

16       Q.  Okay.  And you said that someone generally

17   needs to get care within minutes if they suffer a

18   rupture; correct?

19       A.  Yes.  Yes.

20       Q.  And that's true no matter where the person's

21   rupture occurs.  In other words, if they're in the

22   United States, they need to get care within minutes.  If

23   they're in Escravos --

24       A.  Yes.

25       Q.  -- they need to get care within minutes.

Dr. Victor Adeyeye                                                April 22, 2025

```
 1              CERTIFICATE OF STENOGRAPHIC REPORTER

 2

 3

 4          I, RACHEL N. BARKUME, a Certified Shorthand

 5     Reporter of the State of California, hereby certify that

 6     the witness in the foregoing deposition,

 7                      DR. VICTOR ADEYEYE,

 8     was by me duly sworn to tell the truth, the whole truth,

 9     and nothing but the truth in the within-entitled cause;

10     that said deposition was taken at the time and place

11     therein named; that the testimony of said witness was

12     stenographically reported by me, a disinterested person,

13     and was thereafter transcribed into typewriting.

14          Pursuant to Federal Rule 30(e), transcript

15     review was requested.

16          I further certify that I am not of counsel or

17     attorney for either or any of the parties to said

18     deposition, nor in any way interested in the outcome of

19     the cause named in said caption.

20

21                      DATED:  May 6, 2025.

22

23     _____

24          Rachel N. Barkume, CSR No. 13657, RMR, CRR

25
```

# <u>EXHIBIT C</u>

Exhibit C
p. 39

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4

 5   MARK SNOOKAL, an individual,    )
                                     )
 6           Plaintiff,              )
                                     )
 7        v.                         )  NO. 2:23-cv-6302-
                                     )       HDV-AJR
 8   CHEVRON USA, INC., a California )
     Corporation, and DOES 1 through )
 9   10, inclusive,                  )
                                     )
10           Defendants.            )
     _____)

11

12

13

14

15

16

17              Videotaped deposition of ALEXANDER

18      R. MARMUREANU, M.D., Witness, taken remotely

19      on behalf of Defendants commencing at 2:04

20      p.m. on Wednesday, January 29, 2025, before John

21      M. Taxter, Certified Shorthand Reporter No. 3579

22      in and for the State of California, a Registered

23      Professional Reporter.

24

25
```

Exhibit C
p. 40

```
 1     APPEARANCES OF COUNSEL:

 2

 3

 4     FOR PLAINTIFF MARK JORDAN SNOOKAL:

 5             ALLRED, MAROKO & GOLDBERG
               BY:  DOLORES Y. LEAL, Attorney at Law
 6                  dleal@amglaw.com

 7                    -and-

 8                  OLIVIA FLECHSIG, Attorney at Law
                    oflechsig@amglaw.coM
 9             6300 Wilshire Boulevard, Suite 1500
               Los Angeles, California  90048-5217
10             323.653.6530

11

12

13     FOR DEFENDANT CHEVRON USA, INC.:

14             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
               BY:  TRACEY A. KENNEDY, Attorney at Law
15             350 South Grand Avenue, 40th Floor
               Los Angeles, California  90071
16             213.620.1780
               tkennedy@sheppardmullin.com
17

18

19     VIDEOGRAPHER:
20
               JODY PADILLA
21

22

23

24

25
```

```
 1        A    It's exactly what it says.  But I will      14:35:07

 2   add today that, even if his work was not             14:35:09

 3   desk-based and involved a lot of physical            14:35:13

 4   activities and would have been physically            14:35:17

 5   demanding, I still didn't find any evidence to       14:35:19

 6   suggest that his condition would affect his job      14:35:24

 7   performance or pose any immediate risk.              14:35:26

 8        Q    And when you say a "desk job," did you     14:35:28

 9   get that from the job description?                   14:35:30

10        A    I have no idea.  I don't remember.         14:35:32

11        Q    Do you remember if that's something that   14:35:33

12   the -- your -- the attorneys told you?               14:35:36

13        A    I don't remember.                          14:35:36

14        Q    And I'm going to highlight another         14:35:44

15   sentence here -- whoops -- sorry -- and it's this    14:35:46

16   first sentence of the third paragraph on page 6.     14:35:51

17   It says:                                             14:35:55

18             "In conclusion, the evidence              14:35:55

19        overwhelmingly supports that                    14:35:57

20        Mr. Snookal's aneurysm does not                 14:35:59

21        pose any clinically significant                 14:36:02

22        risk...given" -- "particularly                  14:36:03

23        given his travel to Nigeria every               14:36:08

24        other month."                                   14:36:11

25        So my question is when you say                  14:36:12
```

Exhibit C
p. 42

| | | |
|---|---|---|
| 1 | "clinically significant risk," what do you mean by | 14:36:13 |
| 2 | that? | 14:36:17 |
| 3 | A    That's exactly what I say, "clinically | 14:36:17 |
| 4 | significant risk."  I could add today, now that | 14:36:20 |
| 5 | you asked me, in my opinion, the evidence based on | 14:36:22 |
| 6 | my training, practice, education, experience, and | 14:36:28 |
| 7 | the nine articles I provided, it shows that the | 14:36:30 |
| 8 | incidence of aortic dissection rupture in someone | 14:36:33 |
| 9 | with his comorbidities and the size of the aortic | 14:36:38 |
| 10 | aneurysm, ascending aorta, would be probably | 14:36:43 |
| 11 | around .1 percent.  So this is ten times less than | 14:36:46 |
| 12 | one percent. | 14:36:49 |
| 13 | So as I sit here today, it is my opinion | 14:36:50 |
| 14 | that those issues, the so-called annulus which it | 14:36:54 |
| 15 | is minimally large, probably the upper limit of | 14:36:58 |
| 16 | normal, does not pose any risk.  And I did say | 14:37:02 |
| 17 | here "particularly given his travel to Nigeria | 14:37:05 |
| 18 | every other month."  The reality of, I could add, | 14:37:09 |
| 19 | given his travel to anywhere in the world every | 14:37:14 |
| 20 | week, it's just there is no risk.  So I don't want | 14:37:17 |
| 21 | you to link it to the -- to the Nigeria.  I don't | 14:37:20 |
| 22 | believe that -- clearly, he's got some disability. | 14:37:25 |
| 23 | Clearly, he's got the aortic annulus, a little bit | 14:37:28 |
| 24 | enlarged.  And I'm going to say four -- at 4.0 is | 14:37:31 |
| 25 | normal.  4.2.  The way you look at a CAT scan, | 14:37:34 |

Exhibit C
p. 43

| | | |
|---|---|---|
| 1 | was asked. | 15:17:32 |
| 2 | A    I did answer.  I said not that I | 15:17:33 |
| 3 | remember -- | 15:17:35 |
| 4 | Q    Okay. | 15:17:35 |
| 5 | A    -- and then I elaborated. | 15:17:35 |
| 6 | MS. KENNEDY:  All right.  Thank you. | 15:17:40 |
| 7 | All right.  I don't have any more questions.  I | 15:17:40 |
| 8 | don't know. | 15:17:40 |
| 9 | Dolores, Olivia, do you have any | 15:17:43 |
| 10 | questions? | 15:17:44 |
| 11 | | 15:17:44 |
| 12 | EXAMINATION | 15:17:44 |
| 13 | BY MS. LEAL: | 15:17:44 |
| 14 | Q    Just one follow-up question.  Doctor, | 15:17:45 |
| 15 | Ms. Kennedy asked you if you had spoken with Mark | 15:17:49 |
| 16 | Snookal, and I believe your answer was "no." | 15:17:54 |
| 17 | Is that correct? | 15:17:57 |
| 18 | A    That's the best of my recollection.  Do | 15:17:58 |
| 19 | you -- refresh my recollection. | 15:18:00 |
| 20 | Q    Right. | 15:18:01 |
| 21 | A    I don't think I did, no. | 15:18:02 |
| 22 | Q    Okay.  So would your opinion have | 15:18:03 |
| 23 | changed in any way, had you spoken or interviewed | 15:18:05 |
| 24 | Mr. Snookal? | 15:18:09 |
| 25 | A    Absolutely not.  My opinions are based | 15:18:11 |

| | | |
|---|---|---|
| 1 | on the data, the CT scan, the CT angio, and all | 15:18:13 |
| 2 | the medical records.  I can formulate the plan.  I | 15:18:19 |
| 3 | don't need to look at the patient or evaluate the | 15:18:21 |
| 4 | patient.  It's all the based on the guidelines | 15:18:24 |
| 5 | that I actually provided to you yesterday.  It | 15:18:26 |
| 6 | might be today. | 15:18:29 |
| 7 |      Q    Okay.  Thank you. | 15:18:30 |
| 8 |      A    Thank you. | 15:18:31 |
| 9 |      MS. LEAL:  Thank you, Doctor. | 15:18:31 |
| 10 |      I don't have anything else, Tracey. | 15:18:32 |
| 11 | | 15:18:32 |
| 12 |            FURTHER EXAMINATION | 15:18:32 |
| 13 | BY MS. KENNEDY: | 15:18:32 |
| 14 |      Q    Just one follow-up. | 15:18:33 |
| 15 |      A    Sure. | 15:18:34 |
| 16 |      Q    Doctor, you said the guidelines you | 15:18:35 |
| 17 | provided yesterday. | 15:18:36 |
| 18 |      Are you referring to the Exhibit 3 I | 15:18:37 |
| 19 | just showed you? | 15:18:39 |
| 20 |      A    That -- that's correct.  Actually, that | 15:18:40 |
| 21 | I sent today. | 15:18:42 |
| 22 |      Q    Okay. | 15:18:42 |
| 23 |      A    It's the main part of that.  I wrote it. | 15:18:45 |
| 24 | And, again, if you feel that was provided to you | 15:18:46 |
| 25 | and being late and I understand and I agree, and I | 15:18:48 |

```
 1   STATE OF CALIFORNIA   )
                           ) SS.
 2   COUNTY OF VENTURA     )

 3           I, John M. Taxter, a California Certified

 4   Shorthand Reporter, Certificate No. 3579, a

 5   Registered Professional Reporter, do hereby

 6   certify:  That the foregoing proceedings were

 7   taken before me at the time and place therein set

 8   forth, at which time the deponent was put under

 9   oath by me; that the testimony of the deponent and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed; and that the foregoing is

13   a true and correct transcript of my shorthand

14   notes so taken.

15           I further certify that I am neither

16   counsel for nor related to any party to said

17   action.

18           The dismantling, unsealing, or unbinding

19   of the original transcript will render the

20   Reporter's Certificate null and void.

21            Pursuant to Federal Rule 30(e),

22   transcript review was requested.

23   Dated February 11, 2025.

24                            _____
                              JOHN M. TAXTER
25                            California Certified Shorthand
                              Reporter No. 3579, RPR
```

**Exhibit C
p. 46**

1

2

3

4          I, John M. Taxter , Certified Shorthand Reporter,

5    CSR No.   3579, hereby certify:

6          The foregoing is a true and correct copy of the

7    original transcript of the proceedings taken by me

8    as thereon stated.

9

10

11

12    Dated:    February 13, 2025
                _____

13

14

15

16                         _____
                           John Taxter, CSR No. 3579

17

18

19

20

21

22

23

24

25

**Abrams, Mah & Kahn**

Exhibit C
p. 47