```
 1  DOLORES Y. LEAL (134176)
    OLIVIA FLECHSIG (334880)
 2  ALLRED, MAROKO & GOLDBERG
    6300 Wilshire Blvd. Suite 1500
 3  Los Angeles, CA 90048-5217
 4  (323) 653-6530
    dleal@amglaw.com
 5  oflechsig@amglaw.com
 6
 7  Attorneys for Plaintiff MARK SNOOKAL
 8
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SNOOKAL, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>CHEVRON USA, INC., a California Corporation, and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | CASE NO.: 2:23-cv-6302-HDV-AJR<br><br>**DECLARATION OF OLIVIA J. FLECHSIG IN SUPPORT OF PLAINTIFF MARK SNOOKAL'S MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>[*Filed concurrently with Plaintiff Mark Snookal's Notice of Motion and Motion for Attorneys' Fees and Costs; Tables 1 and 2 to Plaintiff's Motion for Attorneys' Fees and Costs, Declarations of Dolores Y. Leal, Renee Mochkatel, Karis Stephen, Sabrina Medler, J. Bernard Alexander, Lisa Bloom, Tamara Freeze, and Mark Snookal; and [Proposed] Order Granting Plaintiff's Motion for Attorney's Fees and Costs]*<br><br>Action Filed: August 3, 2023<br>Trial Dates: August 19-25, 2025<br>Judgment Entered: September 3, 2025<br><br>Date:  November 13, 2025<br>Time: 10:00 a.m.<br>Crtrm: 5B |

**DECLARATION OF OLIVIA J. FLECHSIG**

I, OLIVIA J. FLECHSIG, declare as follows:

1. I am an attorney duly licensed to practice in the State of California and in the Central District of California. If called as a witness, I could and would competently testify to the following facts based upon my own personal knowledge.

2. This declaration is being filed in support of Plaintiff Mark Snookal's Motion for Attorney Fees and Costs.

**Personal Qualifications**

3. I am an Associate in the law firm of Allred, Maroko & Goldberg in Los Angeles, California, where I have worked full time since October of 2020. Since joining the firm, I have helped recover tens of millions in judgments and in settlements for our clients.

4. I graduated with my Juris Doctorate from Stanford Law School in 2020. I was sworn in to the California Bar in January of 2021.

5. In 2019, I was a summer law clerk at Allred, Maroko & Goldberg in 2019, and in 2018, I was a summer law clerk at Levy, Vinick, Burrell & Hyams, a plaintiff-side employment law firm in Oakland, California and a legal intern in the San Francisco, California office Outten & Golden, also a plaintiff-side employment law firm.

6. A substantial part of our practice is plaintiff employment litigation which focuses on litigating and trying complex civil rights and employment matters. Our firm litigates individual and multi-plaintiff cases in these areas. My practice specialty has always been Plaintiff-side employment law and Plaintiff-side personal injury cases relating to sexual and/or intimate partner violence.

7. For 2026, (which I understand is the first year for which I was eligible), I was selected by my peers as a SuperLawyer Rising Star in Employment Law, an honor for which only 2.5% of practitioners are selected.

8. This fall, I became a professor of Applied Trial Advocacy at Loyola Marymount University, for which I researched and developed original curriculum regarding trial presentation strategy and skills. I also volunteer my time to coach Loyola Marymount University's

undergraduate Mock Trial team.

9. My firm and I have invested significant time and resources into preparing my trial skills. In 2023, I attended the Los Angeles County Bar Association's Trial Advocacy Program over multiple weeks; in or about May of 2024, I attended the California Employment Lawyers Association's annual three-day trial college; and in June of 2025, I attended one of Trial Lawyers University's employment law intensives over a three-day period.

10. I have been invited to speak before groups and organizations on various topics related to Plaintiff-side employment law. These speaking engagements include "Emerging Trends with California Harassment Law: How to Invoke the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act" (California Employment Lawyers Association Conference, upcoming in October of 2025); facilitating deposition workshops at Stanford Law School's Plaintiff's Lawyer Association Conference; and "Navigating Power Dynamics with Your Client to Learn about and Litigate Your Client's Non-Economic Damages" (California Employment Lawyers Association Conference, October 2023).

11. I am also an active member of professional organizations including the California Employment Lawyers Association, for which I also serve as a member of its Diversity Outreach Committee; I have also served as a Litigation Section Liaison to the Los Angeles County Bar Association's (LACBA) Barristers Section; and a Professional Development Co-Chair of LACBA's Barristers section.

## My Firm's Hourly Rates

12. With the exception of a few limited matters, my firm has a contingency-based practice. However, we are retained on an hourly basis in certain matters. We set our rates in all matters (contingent and retained) to be comparable with those of other plaintiff employment attorneys in the Los Angeles area. Over 90% of our firm's work is done on a contingency basis. Because of my association with the California Employment Lawyers Association, I know this is also the case with the substantial majority of attorneys who practice plaintiff employment litigation.

13. Based on my experience in the field, employment cases are by nature risky and

expensive to litigate. Recovery is never assured. Cases often take years to resolve. Our clients are invariably unable to pay our legal fees and costs. In order to maintain a viable private practice, I must place a premium on assessing a case from the perspective of trial costs versus the legal merits and the expected recovery.  In cases where damages may be lower, or difficult to obtain, I examine the possibilities of fee shifting statutes, should I prevail.

14. My hourly rate is $650. The rate of our firm's partners, Dolores Y. Leal and Renee Mochkatel, is also $1200 per hour. The rate of associates Karis Stephen and Sabrina Medler is $450 per hour. These are the rates we charge to hourly clients who hire our firm. These rates are well within the range of practitioners at our level of experience, within members of the Los Angeles employment law community. This is confirmed by the concurrently filed declarations of other highly respected plaintiff employment attorneys in the Los Angeles area (Bernard Alexander, Lisa Bloom and Tamara Freeze) as well as the exhibits in Mr. Alexander's declaration which has defense attorneys at Munger Tolles and Olsen's 1st and 2nd year associates' hourly rates at $745 and $820, respectively.

15. In May of 2024, I requested my then-hourly rate of $550 in the matter *Madison Zavala v. Amazon.com International, Inc. et al.* (Los Angeles Superior Court Case No. 23GDCV02348). The Honorable Joel Lofton awarded me the full amount in his order issued in August 2024.

### Hours Worked on this Case

16. I am familiar with our firm's billing rates and billing practices. The firm has a practice whereby I and other attorneys record the time spent on client matters describing the work performed in a computer billing system in 6-minute increments. On a monthly basis, these records are submitted to the firm's office manager who prepares client billing statements setting forth the services rendered and time spent performing each task as well as the costs expended on the case.

17. I have reviewed my hourly billing statements attached as Exhibit A to the Declaration of Dolores Y. Leal in Support of Plaintiff's Motion for Attorneys' Fees and Costs, and they are accurate. All the billing reflected therein was reasonably necessary to the successful

prosecution of this litigation. I have incurred a total of 604.17 hours to date at a rate of $650 per hour, for a total of $392,710.50 in fees.

18. As a preliminary matter, in an exercise of billing judgment, we have not included the time that we spent throughout the litigation conferring with named partners, Gloria Allred, Nathan Goldberg and Michael Maroko regarding the case. I did not record and bill for that time. The total number of hours represent only those hours for which we are requesting compensation, after the exercise of reasonable billing judgment. We have also not included any billing for the time spent by our support staff, including our firm's Legal Assistants or IT personnel who also assisted in the litigation and trial of this matter.

**Meet and Confer Efforts and Stipulation to Costs**

19. On September 10, 2025, Parties' respective counsel met and conferred about the contents of this motion via Zoom video conference. Parties are continuing to meet and confer regarding a potential stipulation as to Defendant's payment of Plaintiff's costs.

**Multipliers in Contingent Risk Matters**

20. Most individuals cannot afford to pay on an hourly basis for skilled representation in civil rights litigation. Therefore, plaintiff's civil rights attorneys represent virtually all discrimination claims on a contingency fee basis. Under this arrangement, such attorneys are not compensated for their time unless and until they prevail, whether it be by trial, arbitration or successful settlement of the case. Civil rights attorneys are taking the risk that they will not be reimbursed for time spent or the costs unless their client settles or wins at trial or arbitration. As such, plaintiff's civil rights attorneys cannot afford to represent an individual employee on a contingency basis if, at the end of the representation, the attorney is destined to receive only the regular hourly rate for the services performed, if they win, but nothing if they lose.

21. When plaintiff's civil rights attorneys prevail on the merits, it is essential that they recover a multiplier--an amount which is more than their regular hourly rate, if they are to remain in practice and to continue representing individuals in civil rights employment disputes. With this in mind, courts and judges routinely apply a multiplier to the attorney fees awarded in

Plaintiff employment discrimination lawsuits, in order to encourage competent attorneys to represent individuals in such cases, and further the public policy of this state.

22. Beginning in July 2025 and continuing through August 25, 2025, I was unable to consider taking any "new" prospective clients. I also had to delay progress on some of my existing cases.

23. Based on my work and contact with plaintiffs' lawyers in Los Angeles, I am very familiar with the standard billing analysis applied by attorneys in determining whether to take civil rights and employment cases. In those instances, the primary expectation of payment is contingent on winning and recovery of fees under a fee shifting statute. This analysis adopts a formula utilizing hourly billing rates significantly higher than that for retained work, in order to account for delay in payment, risk of loss, risk of partial recovery, or other contingent factors. The manner in which the higher hourly rate is recovered is by application of a multiplier to the actual lodestar figure in a case.

24. The market expectation for multipliers on contingent risk cases, as a class, is at least two to three times the fees that would have been earned in retained litigation where there is no contingent risk of non-payment. Fees of this measure are necessary because of the investment in costs, the long delays, and the total or partial lack of success in many cases. Such an expectation has been expressly acknowledged by the California Supreme Court in *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132, to be determined based on the market in a particular locality. Unless compensation paid for civil rights and employment representation is commensurate with for profit, non-contingent litigation (by application of a multiplier to account for the risks discussed above), firms such as mine, which have special expertise in the handling of civil rights cases, will be unable to handle such matters on an extensive basis.

25. Our firm took this case on a purely contingent basis and has thus far invested $155,277.39 in actual litigation costs (attorney fees and costs) in order to prosecute this matter through trial. The contingent risk in a case like this is very high and, in my opinion, justifies a multiplier or enhancement to the lodestar calculations.

26. Contingent cases present the very real risk of working hundreds or thousands of

1  hours that may never be fully compensated or may go uncompensated altogether. Unfortunately,
2  the prospect of loss is very real. Thus, the risk inherent in contingent representation is, indeed, a
3  reality even in an expected victory case. The contingent risk in this case, in my view, was huge
4  because of the affirmative defense in this case and because I knew that Chevron had litigated a
5  similar case(but under the ADA as opposed to FEHA -- *Chevron U.S.A. Inc v Echazabal*, 536
6  U.S. 73 (2002)) all the way to the U.S. Supreme court. Hence, I knew it would be a heavily
7  litigated case.

8      27.    Based on my discussions with other plaintiff's side lawyers who represent
9  plaintiffs in contingent FEHA litigation, including within and outside of my own firm; and,
10 given the real risk of contingent fee representation (including the risks of an outright loss, a less
11 than fully compensatory result, or the delay in payment), it is the prevailing expectation within
12 the community that a multiplier or enhancement will be awarded when a FEHA plaintiff
13 prevails. Other factors which contribute to my conclusion that a 2.0 multiplier is warranted are:

14     (a)    preclusion of other employment cases by me and Dolores Y. Leal prior to and
15 during trial;

16     (b)    at Allred, Maroko & Goldberg, we receive telephone calls/emails from many
17 individuals each week seeking legal representation in employment matters. Because of the
18 contingent nature of employment cases, we are able to take only a very few of these cases.
19 Although we attempt to refer these individuals to other attorneys handling employment cases,
20 there are very few attorneys able to take such cases because of the sophisticated subject matter
21 and because they are hard fought, extremely expensive and inevitably result in protracted
22 litigation and appeals.

23     (c)    Due to the tremendous number of requests for assistance in employment litigation
24 and the dearth of counsel willing and able to accept such cases, it is imperative that those
25 attorneys willing to provide such representation on a contingency basis be encouraged to do so,
26 through awards of attorneys' fees, which include the multiplier that is necessary to attract and
27 retain competent counsel to accept these types of cases.

28     28.    An award of the lodestar amount without an enhancement does not compensate

the attorney for the contingent risk undertaken. In addition to the risk of taking this case on contingency, we have been working on this matter now for almost three years without payment and advancing all costs required to vindicate Plaintiff Snookal's rights and successfully litigate the case.

29. Given the contingent nature of the representation, the preclusion of other work that necessarily results from a lengthy litigation and trial such as this trial, and the exceptional result obtained, I believe that a multiplier of 2.0 of the lodestar is reasonable in this case. As Plaintiff's counsel we are seeking a 2.0 multiplier because of the exceptional risks involved in prosecuting this case, in which significant costs and fees are at risk during the pendency of this case. The skill, expertise, and experience exhibited by my co-counsel Dolores Y. Leal, and myself warrants the application of at least this 2.0 multiplier.

30. This week, I reviewed The Daily Journal's Verdict and Settlement online publication (https://www.dailyjournal.com/verdicts_and_settlements/ments), then filtered results for disability discrimination cases in employment. The results show that the $4 million verdict in favor of Mr. Snookal is the 15th highest verdict and settlement out of 281 results, even including multi-Plaintiff and class action cases.

31. Though I have extensively researched this issue, I am not aware of any prior cases in which a Plaintiff has succeeded in obtaining a judgment despite Defendant's assertion of a "direct threat" defense to disability discrimination under the California Fair Employment and Housing Act. I also recall Defense counsel, Robert Mussig, remarking about this during oral argument on Chevron's Motion for Summary Judgment.

**Chevron's Opportunities to Settle**

32. In or about June of 2024, Parties participated in a private mediation with Angela Reddock-Wright. Ms. Reddock-Wright is a highly-respected and skilled mediator, to whom both parties agreed to serve as mediator. Mr. Snookal participated in good faith efforts, but Chevron did not settle the case. Even after Chevron failed to settle the case during that mediation, Ms. Reddock-Wright remained in contact up until the eve of trial to see if she could help parties reach a settlement.

33. On August 6, 2025, only thirteen days before the date set for trial (August 19, 2025), Defendant served Plaintiff with a $750,000 settlement offer pursuant to FRCP Rule 68. This offer is attached hereto as **Exhibit A**.

### Chevron's Dilatory Discovery Tactics

34. Chevron's dilatory discovery tactics also resulted in *extensive* extra work for my colleagues and I and, their unreasonable delay repeatedly created crisis conditions that necessitated work well into the night, weekends, and/or at the expense of other time to devote to other work responsibilities.

35. For example:

(a) On October 10, 2024 at 6:52 am Pacific Time, Defendant produced documents bates stamped CUSA000768-775. These documents included email threads in which key witness Dr. Eshiofe Asekomeh communicated with others about whether Mr. Snookal was "fit for duty" in Escravos, Nigeria. Defendant served these emails only eight minutes before the start time of his 7:00 am Pacific Time deposition.

(b) On October 30, 2024 at 10:48 P.M. Pacific Time, Defendant produced documents bates stamped CUSA000776-815. This document production consisted of four medical studies regarding thoracic aneurysms. These documents were produced the night before the 8:00 A.M. Pacific Time start time for Plaintiff to take the deposition of Dr. Ujomoti Akintunde, one of the people Defendant has disclosed as an expert witness. During Dr. Akintunde's deposition the next morning, Sarah Fan ("Ms. Fan"), counsel for Chevron, then used two of these articles as exhibits during Dr. Akintunde's deposition.

(c) On November 8, 2024, Defendant Chevron U.S.A. Inc. ("Chevron" or Defendants") produced documents bates stamped CUSA000816-948. These documents contained significant new information bearing on facts and issues at the heart of Defendant's first Motion for Summary Judgment. We had already briefed and filed our opposition papers. Accordingly, on November 20, 2024, I had to move the Court on an *ex parte* basis to reopen discovery. The Court agreed that "Defendant's dilatory tactics negatively affected Plaintiff's ability to take discovery on issues central to Chevron's

pending motion for summary judgment" and that Defendant's were "not prejudiced here given their inexcusable delay in producing probative documents." (Dkt 37.)

The Court re-opened discovery for 90 days and issued a Modified Order Setting Pretrial and Trial Schedule. (Dkt. 38.)

(d) Throughout the two discovery periods, I made extensive efforts to meet and confer with Defense counsel regarding a handful of Defendant's inadequate discovery responses. Though it became increasingly clear that Court intervention was required to obtain the necessary discovery, because of the positions taken by Defense counsel, Defense counsel ignored *five written requests* to provide us with their availability for an Informal Discovery Conference (requests made on January 16, 2025; February 11, 2025; February 24, 2025; February 27, 2025; and March 5, 2025).

(e) On Thursday, March 6, 2025, Defendant served Plaintiff with a second Motion for Summary Judgment. Five days later (i.e., 9 days before Plaintiff's deadline to oppose Defendant's Motion, on March 11, 2025, Defendant served Plaintiff with 613 pages of new documents, despite the fact that many of those documents were responsive to Plaintiff's First Set of Requests for Production served in May of 2024.

(f) After an issue with the court reporter's ability to understand witness Dr. Victor Adeyeye's accent, Parties stipulated to schedule a time to conclude his deposition. Ms. Leal and I sent no fewer than *nine emails* between November 2024 and February 2025 to Defendant's counsel to schedule a mutually agreeable time, yet they never provided a time until the Honorable Judge Richlin intervened.

(g) After the Informal Discovery Conferences began, Defense counsel produced over *a thousand pages* of additional new documents, many of which were used as Exhibits at trial.

There are yet additional examples of Defendant's unreasonable delay listed Docket 47-1, the declaration I made in support of Plaintiff's Second *Ex Parte* Application.

36.     Ultimately, these delays resulted in us having to oppose two of Chevron's Motion for Summary Judgment instead of only one; prepare two *Ex Parte* Applications; and prepare for

and attend four Informal Discovery Conferences, in addition to numerous meet and confer efforts, all of which were owing to Chevron's inexcusable discovery delays.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 17th day of September 2025, in Long Beach, State of California.

_____
OLIVIA J. FLECHSIG