1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2  Including Professional Corporations
   TRACEY A. KENNEDY, Cal Bar No. 150782
3  ROBERT MUSSIG, Cal. Bar No. 240369
   H. SARAH FAN, Cal. Bar No. 328282
4  350 South Grand Avenue, 40th Floor
   Los Angeles, CA 90071-3460
5  Telephone:  213.620.1780
   Facsimile:  213.620.1398
6  E-mail:     tkennedy@sheppardmullin.com
               rmussig@sheppardmullin.com
7              sfan@sheppardmullin.com

8  Attorneys for Defendant.
   CHEVRON U.S.A. INC.,
9  a Pennsylvania corporation

10              UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

12  MARK SNOOKAL, an individual,              Case No. 2:23-cv-6302-HDV-AJR

13              Plaintiff,                     **DEFENDANT CHEVRON U.S.A. INC.'S
                                               MEMORANDUM OF POINTS AND
14        vs.                                  AUTHORITIES IN SUPPORT OF
                                               RENEWED MOTION FOR JUDGMENT
15  CHEVRON USA, INC., a California            AS A MATTER OF LAW PURSUANT TO
    Corporation, and DOES 1 through 10,        FED. R. CIV. P. 50(b), OR IN THE
16  inclusive,                                 ALTERNATIVE, MOTION FOR NEW
                                               TRIAL AND/OR REMITTITUR**
17              Defendants.
                                               [*Filed concurrently with Notice of Motion;
18                                             Declaration of Tracey Kennedy; and
                                               [Proposed] Order*]
19
                                               Date: October 30, 2025
20                                             Time: 9:00 a.m.
                                               Place: Courtroom 5B – Fifth Floor
21
22
                                               District Judge: Hon. Hernán De. Vera
23                                             Magistrate Judge: Hon. A. Joel Richlin

24                                             Action Filed: August 3, 2023
                                               Trial Date: August 19, 2025
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF RELEVANT EVIDENCE AND THE JURY VERDICT ...................... 2

    A.      The Undisputed Facts ............................................................................ 2

    B.      Plaintiff's Excessive Damages .............................................................. 7

    C.      The Jury Verdict .................................................................................... 9

III.    RELEVANT LEGAL STANDARDS ...................................................................... 10

IV.     PLAINTIFF FAILED TO PROVE DISABILITY DISCRIMINATION IN
    VIOLATION OF THE FEHA. ........................................................................... 11

    A.      Defendant Lawfully Withdrew The Conditional Offer Because Plaintiff
        Could Not Satisfy The Offer's Condition Or Perform the REM Position's
        Essential Duties. .................................................................................. 11

    B.      Plaintiff Could Not Work in Escravos Without Endangering His and
        Others' Health and Safety. ................................................................... 16

    C.      The Damages Are Excessive. .............................................................. 20

        1.      The Economic Damages Are Not Based on Substantial Evidence and
            Are Speculative. ......................................................................... 21

        2.      The Noneconomic Damages Award is Excessive. ........................... 23

V.      CONCLUSION .............................................................................................. 25

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

# TABLE OF AUTHORITIES

Page(s)

**Cases**

In re the Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.,
1980 No. 80-33, 1980 WL 20906 (Cal. F.E.H.C. 1980) ..........................................................17

Adams v. Murakami
54 Cal. 3d 105 (Cal. 1991) ...................................................................................................23

Allen v. Pac. Bell
212 F. Supp. 2d 1180 (C.D. Cal. 2002) ............................................................................13, 16

Anthony v. Trax Internat. Corp.
955 F.3d 1123 (9th Cir. 2020) ...............................................................................................11

Atkins v. City of Los Angeles
8 Cal. App. 5th 696 (Cal. Ct. App. 2017),
as modified on denial of reh'g (Mar. 13, 2017) ...............................................................20, 22

Basilio v. Reif
272 Cal. App. 2d 564 (Cal. Ct. App. 1969) .............................................................................19

Beagle v. Vasold
65 Cal. 2d 166 (Cal. 1966) ....................................................................................................19

Borgialli v. Thunder Basin Coal Co.
235 F.3d 1284 (10th Cir. 2000) .............................................................................................18

Brownfield v. City of Yakima
612 F.3d 1140 (9th Cir. 2010) ...............................................................................................12

Caldwell v. Paramount Unified School Dist.
41 Cal. App. 4th 189 (Cal. Ct. App. 1996) ..............................................................................11

Cassino v. Reichhold Chemicals, Inc.
817 F.2d 1338 (9th Cir. 1987) ...............................................................................................20

City of Palo Alto v. Serv. Emps. Int'l Union
77 Cal. App. 4th 327 (Cal. Ct. App. 1999) ..............................................................................12

Cuiellette v. City of Los Angeles
194 Cal. App. 4th 757 (Cal. Ct. App. 2011) ............................................................................11

Darnell v. Thermafiber, Inc.
417 F.3d 657 (7th Cir. 2005) .................................................................................................16

**Page(s)**

<u>**Cases**</u>

<u>DFEH v. Di Salvo Trucking Co.</u>
  No. 87–14, 1987 WL 114862, at *8 (Cal. F.E.H.C. 1987) ....................................17

<u>Diaz v. Tesla, Inc.</u>
  598 F. Supp. 3d 809 (N.D. Cal. 2022) ...........................................................19, 23

<u>Diffey v. Riverside County Sheriff's Dep't.</u>
  84 Cal. App. 4th 1031 (Cal. Ct. App. 2001) ...................................................11

<u>Donahue v. Consol. Rail Corp.</u>
  224 F.3d 226 (3d Cir. 2000)............................................................................17

<u>E.E.O.C. v. United Parcel Serv., Inc.</u>
  424 F.3d 1060 (9th Cir. 2005)....................................................................16, 17

<u>Escriba v. Foster Poultry Farms, Inc.</u>
  743 F.3d 1236 (9th Cir. 2014)..........................................................................9

<u>Gasperini v. Ctr. for Humans, Inc.</u>
  518 U.S. 415 (1996) ......................................................................................19

<u>Green v. State of California</u>
  42 Cal. 4th 254 (Cal. 2007) ...........................................................................11

<u>Grosso v. UPMC</u>
  857 F. Supp. 2d 517 (W.D. Penn. 2012) ........................................................18

<u>Handelman v. Victor Equip. Co.</u>
  21 Cal. App. 3d 902 (Cal. Ct. App. 1971).......................................................19

<u>Hastings v. Dep't of Corrections</u>
  110 Cal. App. 4th 963 (Cal. Ct. App. 2003) ........................................11, 13, 14

<u>Hetzel v. Prince William County</u>
  523 U.S. 208 (1998) ......................................................................................19

<u>Hill v. Bayer Healthcare LLC</u>
  No. C 09-00235, 2010 WL 3504837 (N.D. Cal. Sept. 7, 2010)..............10, 11, 12, 14, 15

<u>Horsford v. The Board of Trustees of California State University</u>
  132 Cal. App. 4th 359 (Cal. Ct. App. 2005) ......................................21, 22, 23

SMRH:4907-4910-3726.2
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1

Page(s)

**Cases**

2

<u>Hutton v. Elf Atochem North American, Inc.</u>
   273 F.3d 884 (9th Cir. 2001).................................................................................17, 18

<u>Johnson v. Albertsons LLC</u>
   2020 WL 3604107 (W.D. Wash. July 2, 2020) .........................................................20

<u>Kelly-Zurian v. Wohl Shoe Co.</u>
   22 Cal. App. 4th 397 (Cal. Ct. App. 1994) ...............................................................23

<u>Landes Const. Co. v. Royal Bank of Canada</u>
   833 F.2d 1365 (9th Cir. 1987)......................................................................................9

<u>Lawler v. Montblanc N. Am., Lawler v. Montblanc N. Am., LLC</u>
   704 F.3d 1235 (9th Cir. 2013)....................................................................................11

<u>Loth v. Truck-A-Way Corp.</u>
   60 Cal. App. 4th 757 (Cal. Ct. App. 1998)................................................................19

<u>McCray v. Westrock Servs., LLC</u>
   No. 21-9853-DMG, 2024 WL 4579108 (C.D. Cal. Sept. 10, 2024)........................20

<u>McMillen v. Civ. Serv. Com.</u>
   6 Cal. App. 4th 125 (Cal. Ct. App. 1992) .....................................................12, 14, 17

<u>Michael v. City of Troy Police Dep't</u>
   808 F.3d 304 (6th Cir. 2015)................................................................................16, 17

<u>Milan v. Union Pac. R.R. Co.</u>
   No. 3:17-CV-01246-YY, 2019 WL 2030553 (D. Or. Apr. 19, 2019) ......................18

<u>Molski v. M.J. Cable, Inc</u>.
   481 F.3d 724 (9th Cir. 2007).......................................................................................10

<u>Montoya v. Orange Cnty. Sheriff's Dep't</u>
   No. CV 11-1922-JGB, 2014 WL 6389433 (C.D. Cal. Nov. 13, 2014).....................20

<u>Murphy v. City of Long Beach</u>
   914 F.2d 183 (9th Cir. 1990)........................................................................................10

<u>Nelson-Briggs v. California</u>
   No. CV 000943, 2001 WL 36024377 (San Luis Obispo Sup. Ct. 2001)...............11

<u>Pavao v. Pagay</u>
   307 F.3d 915 (9th Cir. 2002).........................................................................................9

**Cases**                                                                                   **Page(s)**

Quinn v. City of Los Angeles
    84 Cal. App. 4th 472 (Cal. Ct. App. 2000) ....................................................11, 12, 13, 14, 15

Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n
    212 Cal. App. 3d 1242 (Cal. Ct. App. 1989).......................................................................16

Ryan v. Crown Castle NG Networks Inc.
    6 Cal.App.5th 775 (Cal. Ct. App. 2016) ...........................................................................19

Satrap v. Pac. Gas and Elec. Co.
    42 Cal. App. 4th 72 (Cal. Ct. App. 1996) .........................................................................23

Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287
    175 F.3d 680 (9th Cir. 1999)..............................................................................................23

Thorne v. El Segundo
    802 F.2d 1131 (9th Cir. 1986).............................................................................................20

Turco v. Hoechst Celanese Corp.
    101 F.3d 1090 (5th Cir. 1996).............................................................................................18

Van Ostrum v. State
    148 Cal. App. 2d 1 (Cal. Ct. App. 1957)............................................................................19

Young v. Bank of America
    141 Cal. App. 3d 108 (Cal. Ct. App. 1983)........................................................................22

**Statutes**

Cal. Civ. Code § 3359.................................................................................................................19

Cal. Civ. Proc. Code § 662.5 ....................................................................................................19

Cal. Gov't Code
    § 12926..............................................................................................................................13
    § 12940.................................................................................................................10, 15, 16

**Other Authorities**

Cal. Code Regs., Title 2
    § 7293.8.........................................................................................................................16, 17
    § 11067..........................................................................................................................15, 16

**Page(s)**

**<u>Other Authorities</u>**

29 C.F.R. § 1630.2(r) .......................................................................................... 17

Federal Rules of Civil Procedure ("Fed. R. Civ. P.")
   Rule 50(a).......................................................................................................... 9
   Rule 50(b) ..........................................................................................2, 9, 10, 24
   Rule 59 ..................................................................................................2, 9, 10

-vi-

Case No. 2:23-cv-6302-HDV-AJR

SMRH:4907-4910-3726.2

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

As a matter of law, Defendant Chevron U.S.A. Inc. ("Defendant") did not engage in disability discrimination. Defendant reasonably concluded that Mark Snookal ("Plaintiff") was not fit to work in Escravos, Nigeria, and followed California law requiring it to ensure its workers' safety. Indeed, Defendant effectively had no choice but to rescind the offer given the medical judgments before them—where doctors with first-hand knowledge of Escravos concluded that Plaintiff could not safely work there. The trial record confirmed that Plaintiff could have significantly threatened his and others' safety had he transferred to Escravos and suffered an adverse cardiovascular event there. Specifically, the evidence showed the following:

- Defendant offered Plaintiff the Escravos-based Reliability Engineering Manager ("REM") position but expressly conditioned the offer on Plaintiff's passing a "Medical Suitability for Expatriate Assignment" ("MSEA") examination—a fitness-for-duty examination.

- Working and living in Escravos was, without dispute, an essential function of the REM position.

- Plaintiff has a disability—a dilated aortic root.

- Every doctor who evaluated Plaintiff as part of his MSEA, including Plaintiff's treating cardiologist, agreed that Plaintiff's dilated aortic root posed a risk of rupture or dissection—a risk Plaintiff's cardiologist conceded was reasonably estimated at 2% per year in the relevant time frame.

- The doctors with personal knowledge of Escravos agreed that Escravos could not manage Plaintiff's dilated aortic root if it dissected or ruptured. Escravos has no advanced medical care. There is no cardiothoracic surgeon in Escravos, or even close to Escravos. The Escravos medical staff would have no ability to diagnose, let alone stabilize and treat, Plaintiff if he suffered a cardiovascular event there; he likely would die and injure others. Thus, the doctor who truly understood what it would mean to have a rupture or dissection in Escravos concluded that Plaintiff could not work there.

- Defendant relied on these medical judgments from highly trained medical professionals, and

SMRH:4907-4910-3726.2

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

Plaintiff was not cleared for duty in Escravos, which meant he did not fulfill the essential job duty of working in Escravos on which his offer was conditioned.

On these facts, Defendant's only lawful and ethical choice was to rescind Plaintiff's conditional offer, and Defendant did not discriminate in doing so. The California Fair Employment and Housing Act ("FEHA") does not prohibit fitness qualifications, nor does it require employers to eschew medical safety and ignore medical opinions when evaluating whether a position is so unsafe for an individual that the person is not qualified for it. To the contrary, the FEHA allows employers to establish medical fitness standards so long as their assessment is reasonable and based on medical and/or other objective evidence—exactly what Defendant did here. The FEHA must allow employers to evaluate fitness, because employers are legally <u>required</u> to provide a safe work environment for its employees and others. Defendant could not simply sit by and hope that a known risk, which could result in death, would be averted.

In light of these undisputed facts, the Court should grant this renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or alternatively grant a new trial under Rule 59. Defendant did not discriminate against Plaintiff; it lawfully rescinded his offer. To the extent this Court disagrees, it should nonetheless order a new trial or remittitur, because the jury's damage award was excessive and not based on the evidence. Accordingly, the Court should grant this Motion.

## II.    <u>SUMMARY OF RELEVANT EVIDENCE AND THE JURY VERDICT</u>

### A.    <u>The Undisputed Facts</u>

Much of the Defendant's case at trial was undisputed. For example, there was no dispute that the REM position had to be performed in Escravos, Nigeria; the position's posting identified Escravos as the job's location. Kennedy Decl., Ex. B, Trial Transcript, Levy at 100:9-20; Kennedy Decl., Ex. C, Trial Transcript, Snookal at 118:4-19, 119:10-11; Kennedy Decl., Ex. D, Trial Transcript, Snookal at 54:1-7, 71:14-21; Trial Ex. 16.[1] <u>See also</u> Kennedy Decl., Ex. B,

---

[1] All cited trial exhibits were admitted. *See* Decl. of Tracey A. Kennedy.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    Trial Transcript, Malpica at 155:14-156:4. In addition (again without dispute), to qualify for the

2    REM position, Plaintiff had to obtain MSEA clearance from the embedded Escravos doctor.

3    Kennedy Decl., Ex. D, Trial Transcript, Snookal at 63:15-64:12; Kennedy Decl., Ex. B, Trial

4    Transcript, Asekomeh, 44:11-45:13; Trial Ex. 20.

5        Plaintiff also conceded that he had a disability—a dilated aortic root. Dkt. 102. A dilated

6    aortic root is by definition larger than average. The risks associated with it are rupture and

7    dissection. Kennedy Decl., Ex. A, Trial Transcript, Khan at 120:11-20, 121:6-19.

8        All the doctors involved in analyzing Plaintiff's dilated aortic root for the MSEA agreed

9    that Plaintiff's rupture or dissection risk was low, but not zero. Kennedy Decl., Ex. B, Trial

10   Transcript, Asekomeh 23:12-15, 31:1-5; Kennedy Decl., Ex. A, Trial Transcript, Levy 153:11-

11   154:17 (testifying that a 2% risk rate was not low due to the potential impacts).[2] Plaintiff's

12   treating cardiologist, Dr. Shahid Khan, testified that at the time of Plaintiff's 2019 MSEA

13   determination, the then-current understanding (based on a "very reputable," frequently-cited

14   medical publication) was that Plaintiff's risk of rupture or dissection was reasonably estimated

15   at 2% per year. Kennedy Decl., Ex. A, Trial Transcript, Khan at 120:11-121:19; Trial Ex. 68.

16   That is, 1 out of 50 people with an aortic root as dilated as Plaintiff's *will* suffer a rupture or

17   dissection every year. Id., Khan at 121:6-12. And at the time, Dr. Kahn expected it would grow

18   and would need to be more formally addressed in "3 to 8 years." Id. at 118:2-13.

19       This risk would have been exacerbated by the REM job's demands. The evidence at trial,

20   which as undisputed, was that the REM shift is 12 hours daily, 7 days per week (with nightly

21   on-call duty), in temperatures ranging from 36ºC (96.8ºF) to 48ºC (118.4ºF), and Plaintiff would

22   have been required to climb up and down 10 to 15 stories of ladders or stairs multiple times per

23

24   _____

     [2] Dr. Aiwuyo opined, based on a Canadian medical journal, that Plaintiff had a "low risk" for a "major

25   [cardiovascular] event." Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at 26:22-28:4; Trial Ex. 39-006. Dr.
     Adeyeye, after reviewing the Canadian medical journal Dr. Aiwuyo cited and conducting his own research,

26   agreed that Plaintiff had a "low risk," 1 to 2 percent, of an adverse cardiovascular event such as dissection or
     rupture. Kennedy Decl., Ex. C, Trial Transcript, Adeyeye, 77:13-16, 54:2-10, 55:15-24; Trial Ex. 39-006. Dr.

27   Akintunde testified that, based on Plaintiff's cardiovascular imaging records, Plaintiff had a "low risk but not no
     risk." Kennedy Decl., Ex. B, Trial Transcript, Asekomeh, 30:22-31:5; Trial Ex. 39-005; Kennedy Decl., Ex. D,

28   Trial Transcript, Akintunde, 29:17-30:9.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

day. Kennedy Decl., Ex. B, Trial Transcript, Malpica at 154:19-157:13, 146:10-17. These are the kinds of stressors that can increase blood pressure and cause dilated aortic roots to grow. Kennedy Decl., Ex. A, Trial Transcript, Khan at 116:7-13, 127:1-25; Kennedy Decl., Ex. B, Trial Transcript, Sobel at 135:5-25.

Escravos, however, has no advanced medical care, and no doctor specializes in cardiology. Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at 24:9-25:1; 34:24-35:3, 43:23-44:6, 54:12-16. None of the Escravos doctors can treat an aortic rupture or dissection. Id., Asekomeh at 44:7-10. Indeed, the Escravos doctors "wouldn't be able to recognize" or diagnose an aortic rupture or dissection and could mistakenly view and treat one like a heart attack. Kennedy Decl. Ex. B, Trial Transcript, Levy, at 82:7-15; Kennedy Decl., Ex. A, Trial Transcript, Khan at 123:13-124:12 (testifying about the need for a CT scan or transesophageal echo for diagnostic purposes and need to diagnose).

Escravos is also one of the most remote locations on Earth; it is accessible only by helicopter or boat and has extreme weather conditions. Kennedy Decl., Ex. B Trial Transcript, Asekomeh at 43:12-44:10, 45:22-49:12. As a result, had Plaintiff suffered a rupture or dissection he would need to be evacuated by helicopter or boat to receive care. Id. There is, however, no medical evacuation team or helicopter on-site in Escravos, and depending on the weather, time of day, and location/availability of a medical helicopter, a helicopter evacuation might not be possible. Id., Asekomeh, 46:24-49:4. Evacuation by boat is incredibly dangerous due to the prevalence of kidnapping and requires a military escort, which is not always available. Id. As a result, had Plaintiff's aorta ruptured or dissected in Escravos, he most likely would have died; his evacuation would have threatened the safety of others; and his absence from work would have threatened the environment and the safety of Escravos workers. Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at 49:23-50:12; id., Levy at 101:25-103:11, 85:3-11.

In light of these facts, Dr. Eshiofe Asekomeh, the head occupational physician in Nigeria with personal knowledge of the medical facilities and team in Escravos, concluded that Plaintiff was not fit to work in Escravos, but was fit for duty in Lagos. Id., Asekomeh at 23:6-22, 38:4-19, 45:14-21. In making this determination, Dr. Asekomeh reviewed Plaintiff's medical history,

-4-

Case No. 2:23-cv-6302-HDV-AJR
DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1   his doctor's physical examination, laboratory and other medical test results, and a CT scan and
2   echocardiogram—all of which confirmed Plaintiff's dilated aortic root. Kennedy Decl., Ex. B,
3   Trial Transcript, Asekomeh at 50:13-51:8. Dr. Asekomeh then consulted with three Nigerian
4   cardiologists—Dr. Henry Aiwuyo, Dr. Victor Adeyeye, and Dr. Ujomoti Akintunde—who have
5   personal knowledge of Escravos' medical facilities and conditions. Id., Asekomeh at 52:7-9. All
6   three cardiologists concluded that Escravos could not handle a rupture or dissection of Plaintiff's
7   aorta. Id., Asekomeh at 20:17-21:14, 38:4-10.

8       Based on the inability of the Escravos team to care for Plaintiff if he had a rupture or
9   dissection, Dr. Asekomeh concluded that Plaintiff could not be safely cleared for duty in
10  Escravos. Id., Asekomeh at 23:6-15, 24:19-25:1, 50:13-52:6; see also id., Levy at 81:3-85:11
11  (testifying that the safety of the employee and the people they work with is the primary concern
12  in MSEA determinations). In Dr. Asekomeh's view, Escravos simply did not have the
13  equipment or medical personnel to diagnose or treat Plaintiff if his aortic root ruptured or
14  dissected. Id., Asekomeh at 35:8-24, 44:7-10, 45:22-46:23; id. Levy at 82:7-15. Sending
15  Plaintiff to Escravos to work and live thus posed a real risk that Plaintiff would die and would
16  threaten the safety of the medical evacuation team and other Escravos employees. Kennedy
17  Decl., Ex. B, Trial Transcript, Asekomeh at 43:12-44:10, 45:22-49:12, 49:23-50:12, 69:5-25;
18  Levy at 78:17-79:6 (because REM position was a "safety-sensitive job," a two percent risk was
19  too high); see also, Kennedy Decl., Ex. A, Trial Transcript, Levy at 156:10-24 (risk "would
20  apply as soon as he was on . . . the ground").

21      Indeed, no doctor involved in Plaintiff's MSEA determination, including Plaintiff's
22  treating physician (Kennedy Decl., Ex. A, Trial Transcript, Khan at 128:9-22; Exhibit 33),
23  cleared Plaintiff for duty in Escravos (Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at
24  37:13-22). Dr. Asekomeh determined that Plaintiff could be cleared for duty in Lagos, which
25  had better medical facilities and more specialized personnel. Id., Asekomeh at 24:9-18, 52:3-6.
26  Plaintiff's cardiologist cleared Plaintiff for Nigeria, not specifically for Escravos. Id., Asekomeh
27  at 37:13-22; Kennedy Decl., Ex. A, Trial Transcript, Khan at 128:9-22; Trial Ex. 33.
28      Plaintiff requested a second opinion and was referred to Dr. Scott Levy, who was then the

-5-                                    Case No. 2:23-cv-6302-HDV-AJR

1   Europe, Eurasia, Middle East, and Africa ("EEMEA") regional medical manager. Kennedy

2   Decl., Ex. A, Trial Transcript, Levy, 134:23-135:1, 147:10-14. Dr. Levy conducted his own

3   research and reviewed medical literature to ascertain for himself Plaintiff's risk of dissection or

4   rupture, taking into consideration the diameter of Plaintiff's aortic root, the root's stability, and

5   the medication Plaintiff used to manage his condition. Id., Levy at 149:25-150:22, 153:11-

6   154:3; see also Kennedy Decl., Ex. B, Trial Transcript, Levy at 91:11-92:5, 92:14-23. He

7   initially determined that Plaintiff's dissection risk was approximately 4 to 4.5%. Id.

8        Dr. Levy also consulted with Dr. Khan, who told him that Plaintiff's risk was 2% or less

9   based on the then-existing medical literature. Id., Levy at 89:3-14, Ex. 68. Because Dr. Khan

10  was Plaintiff's treating cardiologist with full access to Plaintiff's medical records and credible

11  support for his opinion, Dr. Levy accepted Dr. Khan's 2% risk assessment and understood that

12  Plaintiff had an actual risk of 2% per year of an adverse cardiovascular event. Id., Levy at 90:13-

13  91:10; Kennedy Decl., Ex. A, Trial Transcript, Levy at 158:16-159:13. Dr. Levy weighed that

14  risk against the "extremely high" result that Plaintiff would die from a rupture or dissection

15  (Kennedy Decl., Ex. B, Trial Transcript, Levy, 69:9-17, Trial Ex. 88; Kennedy Decl., Ex. A,

16  Trial Transcript, Levy, 156:5-158:5), and the "likely" risk that others would be hurt if a rupture

17  or dissection occurred in Escravos (Kennedy Decl., Ex. A, Trial Transcript, Levy, 157:1-9). Dr.

18  Levy also consulted with the Nigerian medical team to determine what care they could provide

19  in the event of an adverse cardiovascular event and whether they could manage the risk through

20  annual screening of Plaintiff's dilated aortic root in the United States. Trial Ex. 69; Kennedy

21  Decl., Ex. B, Trial Transcript, Levy, 66:7-24; see also id. at 94:8-95:18.

22       Ultimately, Dr. Levy deferred to the Nigerian doctors' determination that Escravos could

23  not safely support Plaintiff, because they had the best understanding of Escravos' medical

24  experience and resources. Id., Levy, 94:8-95:5, 95:9-18; id., Asekomeh at 45:7-13. In short,

25  Defendant could not ignore Plaintiff's risk of an adverse cardiological event, because any such

26  event would have an extremely significant impact. Id., Levy, 89:20-90:12, 94:22-95:8, 96:17-

27  97:1, 102:1-103:11; 104:7-20.

28       Dr. Levy's review did not stop with the Nigerian team's determination. He also evaluated

1   whether the REM position could be performed outside of Escravos, since Plaintiff was cleared

2   for duty in Lagos. Id., Levy, 97:2-15, Ex. 70, 98:20-99:3, 100:5-20. But, without dispute, the

3   REM position had to be performed on-site in Escravos. Id., Levy, 100:9-20; Id., Malpica at

4   155:14-156:4; Kennedy Decl., Ex. D, Trial Transcript, Snookal at 71:14-21.

5          Ultimately, because Plaintiff could not be cleared for duty in Escravos, his conditional

6   offer of employment in Escravos was rescinded. Trial Exs. 54, 88.

7          Plaintiff then sent an email to Senior Human Resources Manager, Andrew Powers,

8   claiming the determination was disability discrimination. Kennedy Decl., Ex. B, Trial

9   Transcript, Powers, 172:2-8; Trial Ex. 76. Mr. Powers responded that he would look into the

10  matter and spoke to Dr. Levy. Id., Powers, at 173:10-18, 200:19-202:7. Lacking any medical

11  training, Mr. Powers ultimately deferred to the medical doctors involved in the MSEA

12  determination. Id., Powers, 182:7-183:2, 200:19-202:7.

13          B.    **Plaintiff's Excessive Damages**

14          Several facts relevant to Plaintiff's damages claim are also undisputed. Plaintiff claimed

15  that the recession of the conditional REM offer caused him significant economic and emotional

16  distress.[3] He believed the REM position would entitle him to move from Pay Salary Grade

17  ("PSG") 22 to PSG 23 after 6-12 months in the position. Kennedy Decl., Ex. C, Trial Transcript,

18  Snookal, 128:11-25. Plaintiff also believed that Chevron U.S.A. had a policy that "jobs have a

19  pay grade for a reason and that people should be in the correct pay grade for the job that they're

20  in." Id. However, Plaintiff admitted that no one promised him a promotion to PSG 23. Kennedy

21  Decl., Ex. D, Trial Transcript, Snookal, 50:14-17.

22          In fact, undisputed testimony disproves Plaintiff's assumptions. See Kennedy Decl., Ex.

23  B, Trial Transcript, Malpica at 144:8-145:2 (testifying that the REM position was offered at

24  PSG 24, while the employee was PSG 25, but it did not result in a loss of benefits or decreased

25  PSG). Plaintiff's base salary and benefits would have remained the same, but he would have

26

27

28  [3] Pursuant to the Court's order on Chevron U.S.A.'s Motion for Summary Judgment, Plaintiff's punitive damages claim was dismissed. Dkt. 63.

1    received hazard or premium pay for working in Escravos. Kennedy Decl., Ex. D, Trial

2    Transcript, Snookal, at 59:19-60:12. Escravos offers the highest premium pay—55% of base

3    pay—because it is such a dangerous place to work. Kennedy Decl., Ex. B, Trial Transcript,

4    Malpica at 161:20-162:24.

5        In addition, the evidence at trial showed that the REM assignment generally lasted only 3

6    to 4 years due to Nigerian visa restrictions. Id., Malpica at 149:24-150:9; Kennedy Decl., Ex. D,

7    Trial Transcript, Snookal, 65:4-8; Trial Ex. 20. But Plaintiff's REM position was posted for

8    reselection in 2020 because of a company-wide reorganization, meaning that Plaintiff would

9    have been subject to the reselection after about a year in Escravos. Kennedy Decl., Ex. B, Trial

10   Transcript, Malpica at 148:22-149:15. Amir Zaheer—who received the position in lieu of

11   Plaintiff—was not reselected after approximately 19 people applied for it; Cesar Malpica was

12   selected. Id.

13       Regardless of reorganization, Plaintiff would have been a "priority move" after 3 to 4

14   years, as part of which he would have been required to compete for another open position. Id.,

15   Malpica at 159:23-160:12. If he were unable to find one, Plaintiff would have been deemed a

16   "must move" and required to leave the company had he failed to find a new position. Id.,

17   Malpica at 160:2-22. By Plaintiff's own admission, after August 2019, he never applied for any

18   other expatriate roles, even though he appeared eligible for approximately 50. Kennedy Decl.,

19   Ex. D, Trial Transcript, Snookal, 86:8-10, 96:2-97:4; Trial Ex. 88.

20       Despite this record evidence, Plaintiff's economics expert, Dr. Charles Baum, opined that

21   Plaintiff's economic damages ranged from $2,564,653 (assuming Plaintiff was PSG 22) to

22   $3,321,301 (assuming PSG 23), from August 1, 2019, through February 23, 2035—a span of

23   nearly 16 years, until Plaintiff's 70th birthday. Kennedy Decl., Ex. B, Trial Transcript, Baum at

24   223:15-224:4, 229:1-12, 244:3-7; Trial Ex. 148. Specifically, Dr. Baum calculated Plaintiff's

25   past economic damages as ranging from $901,953 to $1,172,355, and his future economic

26   damages as ranging from $1,662,700 to $2,148,946. Id.

27       Dr. Baum's assumption that Plaintiff would receive a PSG 23 was not based on any

28   evidence, facts, testimony, or documents. Id., Baum at 241:16-20. Similarly, Dr. Baum's

1   assumption that Plaintiff would remain in the Escravos REM position (or any other ex pat

2   position) for nearly 16 years failed to take into account the Nigerian visa issues and 3-to-4 year

3   nature of the position. Id., Baum at 250:10-250:24. It also ignored that the REM position would

4   have been subject to multiple reorganizations and reselections during this 16-year span.

5   Kennedy Decl., Ex. B, Trial Transcript, Malpica at 148:22-149:15, 143:6-21. And Dr. Baum

6   used the Escravos premium pay—the highest of all premiums—in his calculations without

7   considering that it could change over time or be lower in other expatriate locations. Id., Baum at

8   252:9-253:12; Trial Ex. 127; cf. Kennedy Decl., Ex. B, Trial Transcript, Malpica at 161:20-

9   162:24.

10        Defendant's expert, Dr. Chen Song, opined that, assuming liability was established,

11   Plaintiff's economic damages would range between $520,296 (assuming PSG 22) and $665,505

12   (assuming PSG 23 after 6 months), because the REM assignment's expected duration was only

13   approximately 4 years. Kennedy Decl., Ex. D, Trial Transcript, Song at 151:7-15; Trial Ex. 154.

14   Dr. Song further opined that these estimates were "conservative" because "the Escravos

15   assignment could have lasted less than four years." Id., see also Kennedy Decl., Ex. B, Trial

16   Transcript, Malpica at 148:22-149:15, 143:6-21.

17        With respect to Plaintiff's emotional distress damages, Plaintiff's psychological expert,

18   Dr. Anthony Reading, opined that Plaintiff's emotional distress had improved in February 2025

19   and from 2019 to 2020, and was in "partial remission." Kennedy Decl., Ex. D, Trial Transcript,

20   Reading at 128:4-129:2, 130:25-131:2; see also id. Snookal at 110:18-22. Dr. Reading also

21   testified that Plaintiff's depression symptoms could be based on "his belief that he was adversely

22   and unfairly treated," even if no wrongful conduct occurred. Id., Reading at 132:2-133:9. But

23   Dr. Reading did not opine that the loss of the REM position was the only cause of Plaintiff's

24   major depressive disorder. Id., Reading, at 142:23-144:1.

25   **C.    The Jury Verdict**

26        On August 25, 2025, the jury returned a verdict in Plaintiff's favor, finding that he could

27   perform the essential REM job duties in Escravos and that Plaintiff's disability did not pose an

28   immediate and substantial risk to the health and safety of Plaintiff or others. The jury awarded

-9-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  Plaintiff $1 million in past economic loss, $1.1 million in future economic loss, $1 million in

2  past noneconomic loss, and $900,000 for future noneconomic loss. Dkt. 120. None of those

3  amounts correspond with the trial evidence or the experts' opinions.  Trial Exs. 127, 154.

4  **III.    RELEVANT LEGAL STANDARDS**

5          A party is entitled to obtain judgment as a matter of law where there is no "legally

6  sufficient evidentiary basis" for a claim. See Fed. R. Civ. P. 50(a). Thus, a Rule 50(b) motion

7  should be granted "if the evidence, construed in the light most favorable to the nonmoving party,

8  permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."

9  Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236, 1242 (9th Cir. 2014) (quoting Pavao v.

10  Pagay, 307 F.3d 915, 918 (9th Cir. 2002)). It should not be granted if the verdict is supported by

11  substantial evidence.

12          "The existence of substantial evidence does not, however, prevent the court from granting

13  a motion for a new trial pursuant to Fed. R. Civ. P. 59 if the verdict is against the clear weight of

14  the evidence." Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir.

15  1987). Under Rule 59, "[t]he judge can weigh the evidence and assess the credibility of

16  witnesses, and need not view the evidence from the perspective most favorable to the prevailing

17  party." Id. "[T]he district court has 'the duty. . . to weigh the evidence as [the court] saw it, and

18  to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the

19  court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'"

20  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Murphy v. City of Long

21  Beach, 914 F.2d 183, 187 (9th Cir. 1990)) (alterations in original).

22          Applying those standards here, Defendant's motion should be granted. There is no

23  substantial evidence supporting the jury's conclusion that Plaintiff was eligible to work in

24  Escravos. Without dispute, he failed the MSEA on which his employment offer was

25  conditioned. As a result, Plaintiff could not perform the essential job function of working in

26  Escravos. In addition, undisputed testimony proved Defendant's health-and-safety affirmative

27  defense. C.A.C.I. 2544. Finally, the jury's damage award was not based on the evidence at trial

28  and is unreasonably excessive. Accordingly, the Court should grant the renewed motion for

1  judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the

2  alternative, grant Defendant a new trial under Rule 59 and/or a remittitur.

3  **IV.  PLAINTIFF FAILED TO PROVE DISABILITY DISCRIMINATION IN VIOLATION OF THE FEHA.**

4       **A.  Defendant Lawfully Withdrew The Conditional Offer Because**
5           **Plaintiff Could Not Satisfy The Offer's Condition Or Perform the**
            **REM Position's Essential Duties.**
6

7       Plaintiff's disability discrimination claim fails first and foremost because Defendant did

8  not engage in unlawful discrimination. The overwhelming, undisputed evidence proves that

9  Defendant lawfully withdrew its conditional employment offer because Plaintiff did not satisfy

10 the MSEA on which his offer was conditioned, and he could not perform the assignment's

11 essential function—work in Escravos. Accordingly, as a matter of law, Defendant did not

12 engage in disability discrimination. Defendant lawfully enforced a fitness-for-duty standard—a

13 standard Plaintiff does not challenge—that is part and parcel of their duty to provide a safe

14 workplace.

15      "Under the FEHA, an employer is <u>not</u> prohibited from refusing to hire or discharg[ing] an

16 employee with a physical or mental disability who is 'unable to perform his or her essential

17 duties even with reasonable accommodations, or cannot perform those duties in a manner that

18 would not endanger his or her health or safety or the health or safety of others even with the

19 reasonable accommodation.'" <u>Hill v. Bayer Healthcare LLC</u>, No. C 09-00235, 2010 WL

20 3504837, at *5 (N.D. Cal. Sept. 7, 2010) (<u>quoting</u> Cal. Gov't Code § 12940(a) (1)) (emphasis

21 added). "By its terms, [the FEHA] makes it clear that drawing distinctions on the basis of

22 physical or mental disability is not forbidden discrimination <u>in itself</u>. Rather, drawing these

23 distinctions is prohibited <u>only if</u> the adverse employment action occurs because of a disability

24 and the disability would not prevent the employee from performing the essential duties of the

25 job, at least not with reasonable accommodation." <u>Green v. State of California</u>, 42 Cal. 4th 254,

26 262 (Cal. 2007) (emphasis in original); <u>see also</u> <u>Lawler v. Montblanc N. Am., Lawler v.</u>

27 <u>Montblanc N. Am., LLC</u>, 704 F.3d 1235, 1242 (9th Cir. 2013) (holding same). Employees who

28 are not so qualified are excluded from the FEHA's prohibition against discrimination. <u>See</u>

1  Cuiellette v. City of Los Angeles, 194 Cal. App. 4th 757, 766 (Cal. Ct. App. 2011). Finally, "the

2  plaintiff employee bears the burden of proving he or she was able to do the job, with or without

3  reasonable accommodation." Green, 42 Cal. 4th at 262; Caldwell v. Paramount Unified School

4  Dist., 41 Cal. App. 4th 189, 201 (Cal. Ct. App. 1996) ("The adequacy of the plaintiff's prima

5  facie showing is a question of law for resolution by the trial court.").

6        Where, as here, an employer revokes a conditional employment offer because the

7  employee failed to satisfy the required condition, it does not engage in discrimination. Rather, as

8  the law so states, the employee is not qualified to perform an essential function. See Hastings v.

9  Dep't of Corrections, 110 Cal. App. 4th 963, 971 (Cal. Ct. App. 2003) (no discrimination where

10 plaintiff could not complete training on which offer was conditioned due to a permanent knee

11 injury); Hill v. Bayer Healthcare LLC, No. C 09-00235, 2010 WL 3504837, at *5-*6 (N.D. Cal.

12 Sept. 7, 2010) (no discrimination where plaintiff could not work without a wrist brace and wrist

13 braces were prohibited); Quinn v. City of Los Angeles, 84 Cal. App. 4th 472, 483 (Cal. Ct. App.

14 2000) (no discrimination where employee failed a required hearing test); see also Anthony v.

15 Trax Internat. Corp., 955 F.3d 1123, 1130 (9th Cir. 2020) (no discrimination where employee

16 terminated for lacking required degree); Diffey v. Riverside County Sheriff's Dep't, 84 Cal.

17 App. 4th 1031, 1039 (Cal. Ct. App. 2001) (no discrimination where employee fired for failing

18 color-vision test); Nelson-Briggs v. California, No. CV 000943, 2001 WL 36024377 (San Luis

19 Obispo Sup. Ct. 2001) (no discrimination where work-related injuries rendered plaintiff unable

20 to perform essential functions).

21       This is true even where the condition implicates a disability. "The fact that the initial

22 disqualifying criterion may also constitute a physical disability is irrelevant." Quinn, 84 Cal.

23 App. 4th at 483. An employer is allowed "to set the minimal requirements for its employees."

24 Hill, 2010 WL 3504837 at *6; see also Quinn, 84 Cal. App. 4th at 482-83. After all, under

25 California law, employers are effectively required to establish some safety-related qualification

26 standards in potentially dangerous environments due to their duty to provide a safe workplace.

27 See City of Palo Alto v. Serv. Emps. Int'l Union, 77 Cal. App. 4th 327, 335 (Cal. Ct. App.

28 1999). And California employers "need not wait for disaster to strike before taking action,"

-12-

Case No. 2:23-cv-6302-HDV-AJR

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1   because they owe a duty to their "employees affirmatively to avert disaster, rather than simply

2   wait and hope it does not occur." <u>McMillen v. Civ. Serv. Com.</u>, 6 Cal. App. 4th 125, 131 (Cal.

3   Ct. App. 1992); <u>see also</u> <u>Brownfield v. City of Yakima</u>, 612 F.3d 1140 (9th Cir. 2010)

4   (upholding requirement that employee undergo a fitness-for-duty exam under the ADA, noting

5   that "an employer could subject itself to liability for negligent hiring or retention by turning a

6   blind eye").

7        There is no dispute that Plaintiff (indeed none of Defendant's expatriate employees)

8   could work in Escravos without first obtaining MSEA clearance from the doctor on the ground

9   there; this clearance was <u>the</u> requirement on which Plaintiff's offer was conditioned. Kennedy

10  Decl., Ex. B, Trial Transcript, Levy, 94:8-95:18, 105:11-23, 111:3-5; <u>id.</u>, Asekomeh at 44:16-

11  45:21, 45:5-21; Trial Ex. 20.

12       For good reason. Without dispute, Escravos is one of the most remote places in the world

13  and one of the most dangerous places to work—thus the highest premium pay—with very

14  limited medical facilities. <u>See</u>, <u>supra</u>, pp. 3-7, fn. 2 (and citations therein). It is not a safe

15  workplace for someone who needs advanced medical care, which is why the MSEA requirement

16  exists. <u>See</u> Kennedy Decl., Ex. B, Trial Transcript, Levy at 80:5-11, 81:3-83:7, 90:4-12, 95:9-

17  18, 102:6-24, 104:24-105:23; <u>id.</u>, Asekomeh, at 37:13-22, 44:16-45:13, 49:23-50: 12, 51:21-

18  52:6, 56:8-57:9. Thus, Plaintiff has <u>never</u> challenged the MSEA requirement. To the contrary,

19  Plaintiff testified, "I have no issue with fitness for duty programs" (Kennedy Decl., Ex. D, Trial

20  Transcript, Snookal 81:13-18), and he conceded that he understood the health and safety reasons

21  underlying them. (<u>Id.</u>, Snookal at 80:11-81:18).

22       But no doctor involved in Plaintiff's MSEA determination, including Plaintiff's treating

23  physician, found Plaintiff fit to work in Escravos.[4] Kennedy Decl., Ex. B, Trial Transcript,

24

25  ---

26  [4] To be sure, Plaintiff's hired expert testified that he would have cleared Plaintiff to work in Escravos (Kennedy Decl., Ex. A, Trial Transcript, Marmureanu 73:13-25), but Defendant did not have that expert opinion at the time of Plaintiffs' MSEA evaluation, rendering it legally irrelevant. <u>See</u> <u>Allen v. Pac. Bell</u>, 212 F. Supp. 2d 1180,

27  1193-94 (C.D. Cal. 2002) (medical evidence not provided to the employer "cannot create or manufacture a triable issue of fact as to whether Plaintiff was a qualified individual with a disability"); <u>see also</u> <u>Quinn</u>, 84 Cal. App. 4th

28  at 482 (individual officer's testimonial opinion about plaintiff's performance irrelevant).

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
                            OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

Asekomeh at 14:25-15:4, 24:21-25:1, 37:13-22, 38:7-10; <u>see also</u> <u>supra</u> pp. 3-5, fn.2. The embedded Escravos physician, Dr. Asekomeh, found Plaintiff unfit for duty in Escravos and fit for duty in Lagos. <u>Id.</u>, Asekomeh at 24:9-18, 52:3-6.

As a result, Plaintiff could not be physically present in Escravos. Without dispute, an essential function of the REM job was working in Escravos—being physically present there.[5] Plaintiff and Defendant agree on this point. <u>See</u> <u>id.</u>, Levy at 100:9-20; <u>id.</u>, Malpica at 155:14-156:4; Kennedy Decl., Ex. D, Trial Transcript, Snookal at 71:14-21; <u>see also</u> Cal. Gov't Code § 12926(f)(1)(A) (defining essential job functions); Cal. Gov't Code § 12926(f)(2)(A), (G) (employer's judgment that a function is essential is evidence it is). Plaintiff conceded that the REM position he was conditionally offered could not be moved to Lagos or anywhere else in Nigeria. Kennedy Decl., Ex. D, Trial Transcript, Snookal at 71:14-21. And, the job posting identified the job location as Escravos, Nigeria. Kennedy Decl., Ex. C, Trial Transcript, Snookal at 118:4-19, 119:10-11; Kennedy Decl., Ex. D, Trial Transcript, Snookal at 54:1-7, Trial Ex. 16; Cal. Gov't Code § 12926(f)(2)(B) (written job descriptions evidence essential job functions).

Finally, while Defendant was not required to do so, <u>see</u> <u>Quinn</u>, 84 Cal. App. 4th at 483; <u>Hastings</u>, 110 Cal. App. 4th at 972, the undisputed record evidence shows that Defendant attempted to accommodate Plaintiff by evaluating whether the REM position could be relocated and inviting him to apply for alternative expatriate positions. Kennedy Decl., Ex. B, Trial Transcript, Levy, 98:20-99:3, 100:5-20, 107:23-109:20. But Plaintiff declined to apply for other expatriate assignments (Kennedy Decl., Ex. D, Trial Transcript, Snookal, 86:8-10, 96:2-97:4, Trial Ex. 88), and all agreed that the REM position could not be moved (Kennedy Decl., Ex. B, Trial Transcript, Levy at 99:23-100:1, 100:9-20; Kennedy Decl., Ex. C, Trial Transcript, Snookal at 141:10-15, 142:5-21).

On this record, Defendant did not discriminate; it lawfully withdrew the offer due to Plaintiff's inability to satisfy the MSEA requirement (on which his offer was expressly

---

[5] <u>See</u> Kennedy Decl., Ex. B, Trial Transcript, Levy at 100:9-20; <u>Id.</u>, Malpica at 155:14-156:4, 154:19-157:13, 146:10-17; Kennedy Decl., Ex. C, Trial Transcript, Snookal at 118:4-19, 119:10-11; Kennedy Decl., Ex. D, Trial Transcript, Snookal at 54:1-7, 71:14-21; Trial Ex. 16.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    conditioned) and his inability to work in Escravos. Indeed, in light of the medical opinions

2    provided to it, Defendant could not send Plaintiff to Escravos. Dr. Asekomeh, the final arbiter,

3    was adamant that Escravos could not care for Plaintiff. See, supra, pp. 4-7, fn. 2. Dr. Levy, who

4    provided a second review, opined that there was a 1 in 50 chance every year that Plaintiff would

5    die if sent there. Id. Faced with these reports, Defendant would have run afoul of "avert[ing]

6    disaster, rather than simply wait[ing] and hop[ing] it does not occur" by sending Plaintiff to

7    Escravos. McMillen, 6 Cal. App. 4th at 131.

8        Indeed, this case is effectively indistinguishable from Hastings, Quinn and Hill. In

9    Hastings, the employer withdrew a conditional offer of employment after the plaintiff's knee

10    injury prevented him from completing "the prerequisite training [on which the offer was

11    conditioned] and also made it impossible for him to perform the essential functions of the

12    position for which he was hired." 110 Cal. App. 4th at 971. The court held that the employer

13    lawfully withdrew the conditional offer under the FEHA because the plaintiff "failed to satisfy

14    the prerequisites for permanent appointment to that position." Id.

15        In Quinn, a former police officer sued the City under the FEHA after he was terminated

16    due to his hearing impairment. 84 Cal. App. 4th at 475. Specifically, when the plaintiff applied,

17    he failed a "sound localization test," a required fitness-for-duty test. Id. at 476–477. But due to a

18    clerical error, he was hired and then fired when the employer realized its mistake. Id. at 477.

19    Following a jury verdict in plaintiff's favor, the Court of Appeal reversed. The Court noted that

20    "plaintiff was required to prove as part of his prima facie case of disability discrimination

21    brought under the FEHA that he was qualified to be hired," which the Court held was "a

22    question of law for the trial court to resolve." Id. at 482. The Court then reasoned that "there was

23    no discharge based upon a disability" but a discharge "because [the plaintiff] had failed one of

24    the required medical exams." Id. "Consequently, this is not," the Court continued, "a situation of

25    an employee properly hired who subsequently suffers an adverse employment decision because

26    of his disability." Id. at 483. "Instead, this situation involves an individual who was never

27    qualified to be hired from the outset." Id.

28        Similarly, in Hill, Bayer Healthcare fired the plaintiff due to his doctor's requirement that

-15-

SMRH:4907-4910-3726.2    DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  he use a wrist brace because wearing a wrist brace violated Bayer's procedures for working in

2  aseptic areas—procedures designed to maintain the areas' purity. Hill, 2010 WL 3504837, at *2-

3  *3. The court granted summary judgment for Bayer on the plaintiff's FEHA claims, holding that

4  the plaintiff was "unable to establish a prima facie case of disability discrimination because he

5  cannot demonstrate that he is able to perform the essential duties of his position without

6  endangering himself or others." Id. *5. The court rejected plaintiff's argument that the brace

7  could be safely used in aseptic areas, reasoning that Bayer had authority "to set the minimal

8  requirements for its employees." Id. at *6.

9      Here, too, Plaintiff could not satisfy the requirement on which his offer was

10  conditioned—being cleared to work in Escravos by the embedded doctor—and he could not

11  perform the essential function of the job—being physically present in Escravos. It is undisputed

12  that no medical professional cleared him to work in Escravos. See, supra, p. 5. As the Quinn

13  court put it: Plaintiff was "never qualified to be hired from the outset." 84 Cal. App. 4th at 483.

14  And here, too, Defendant was permitted to condition Plaintiff's offer on the MSEA. Defendant

15  is required to provide Plaintiff a safe workplace.

16      Given the lack of substantial evidence supporting the jury's finding that Plaintiff was

17  qualified and could perform the REM job's essential functions, this Court should grant

18  Defendant's motion for judgment as a matter of law. At the very least, it should grant a new trial

19  given the overwhelming evidence that Defendant lawfully revoked Plaintiff's conditional

20  employment offer.

21  **B.   Plaintiff Could Not Work in Escravos Without Endangering His and Others'
22      Health and Safety.**

23      To the extent this Court disagrees, Plaintiff's disability discrimination claim separately

24  fails because Defendant proved through overwhelming evidence that Plaintiff could not perform

25  the REM position's essential functions without endangering his own or others' health or safety.

26      The FEHA's "health or safety" defense permits employers to decline to employ

27  individuals who can perform essential functions (with or without a reasonable accommodation)

28  but cannot do so "in a manner which would not endanger his or her health or safety or the health

1    and safety of others." Cal. Gov't Code § 12940(a)(1); <u>see also</u> C.A.C.I. 2544; Cal. Code Regs.,

2    tit. 2, § 11067(b), (c). The relevant regulations clarify:

3            It is a permissible defense for an employer or other covered entity to
         demonstrate that after reasonable accommodation has been made,
4        the applicant or employee cannot perform the essential functions of
         the position in question in a manner which would not <u>endanger the</u>
5        <u>health or safety of others to a greater extent than if an individual</u>
         <u>without a disability performed the job</u>.

6

7    Cal. Code Regs., tit. 2, §7293.8(d) (emphasis added). "The employer has the burden of proving

8    the defense of the threat to the health and safety of other workers by a preponderance of the

9    evidence." <u>Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n</u>, 212 Cal. App. 3d 1242,

10   1252 (Cal. Ct. App. 1989) (<u>citing</u> Cal. Gov't Code § 12940(a)(1)). Courts can consider the

11   following factors, among others, when evaluating the defense:

12       (1)    the duration of the risk;
         (2)    the nature and severity of the potential harm;
13       (3)    the likelihood that potential harm will occur;
         (4)    the imminence of the potential harm; and
14       (5)    consideration of relevant information about an employee's past work history.

15   Cal. Code Regs., tit. 2, § 11067(e).

16       "The analysis of these factors should be based on a reasonable medical judgment that

17   relies on the most current medical knowledge and/or on the best available objective evidence" at

18   the time the employer is evaluating the risk. <u>Id.</u> But an employer does not need to obtain medical

19   unanimity or acquire medical expertise to evaluate a doctor's medical judgment; the employer's

20   determination need only be objectively reasonable. <u>E.E.O.C. v. United Parcel Serv., Inc.</u>, 424

21   F.3d 1060, 1074 (9th Cir. 2005) (holding that literature that "generally supports" the judgment

22   and "objective" evidence suffices). "An employer's determination that a person cannot safely

23   perform his job functions is objectively reasonable when the employer relies upon a medical

24   opinion that is itself objectively reasonable." <u>Michael v. City of Troy Police Dep't</u>, 808 F.3d

25   304, 307 (6th Cir. 2015) (deciding ADA direct-threat defense); <u>see also</u> <u>Darnell v. Thermafiber,</u>

26   <u>Inc.</u>, 417 F.3d 657, 660 (7th Cir. 2005) (holding that employers can rely on "reliable, medical

27

28

1   evidence" in evaluating ADA defense).[6] In addition, "[a] medical opinion may conflict with

2   other medical opinions and yet be objectively reasonable." <u>Michael</u>, 808 F.3d at 307. Thus, the

3   law does not require a correct medical judgment for the defense to prevail; it requires only

4   reasonable medical judgment. <u>Id.</u> at 309. This is precisely the case here.

5        The evidence at trial overwhelmingly showed that Defendant acted reasonably in

6   concluding that Plaintiff's presence in Escravos would endanger himself and/or others. For

7   example, at the time of the MSEA, the Nigerian doctors agreed that Plaintiff had an ever-present

8   risk of his dilated aortic root dissecting or rupturing—<u>i.e.</u>, none could say the risk was zero or

9   the same as someone without a dilated aortic root of Plaintiff's size. <u>See</u> Kennedy Decl., Ex. B,

10  Trial Transcript, Asekomeh at 20:17-21:14, 44:7-10, 45:14-49:12, 52:7-9; Kennedy Decl., Ex.

11  A, Trial Transcript, Khan at 120:5-121:19; <u>see also</u>, <u>supra</u>, fn. 2. Where, as here, a risk is ever-

12  present, the risk-duration factor weighs in favor of finding safety endangered. <u>Hutton v. Elf</u>

13  <u>Atochem North American, Inc.</u>, 273 F.3d 884 (9th Cir. 2001) (citing 29 C.F.R. § 1630.2(r)).

14  Indeed, in that instance, the employee's performance, by definition, "endanger[s] the health or

15  safety of others to a greater extent than if an individual without a disability performed the job."

16  Cal. Code Regs., tit. 2, § 7293.8(d)

17       As for risk and severity, the Ninth Circuit has held that under the FEHA "even a modest

18  increase in the risk that a problem will occur is significant when the potential consequences of

19  that problem are very serious." <u>United Parcel Serv.</u>, 424 F.3d at 1074; <u>see also</u> <u>DFEH v. Di</u>

20  <u>Salvo Trucking Co.</u>, Dec. No. 87–14, 1987 WL 114862, at *8 (Cal. F.E.H.C. 1987) (holding

21  25% chance of herniated discs causing paralysis established significant harm to others); <u>In re the</u>

22  <u>Accusation of the Dep't of Fair Employment & Housing v. S. Pac. Transp. Co.</u>, 1980 CAFEHC

23  LEXIS 23, Dec. No. 80-33, 1980 WL 20906, at *6 (Cal. F.E.H.C. 1980) (finding that despite an

24  "extensive and completely safe record as an engineer," a train engineer's susceptibility to

25  dizziness and blackouts posed a "significantly greater danger to others"); <u>McMillen</u>, 6 Cal. App.

26

27  _____

    [6] "Because California relies on federal discrimination decisions to interpret the FEHA, California follows ADA
28  precedent in analyzing analogous FEHA provisions." <u>Allen v. Pac. Bell</u>, 212 F. Supp. 2d 1180, 1192, fn.4 (C.D.
    Cal. 2002).

                                                        -18-                    Case No. 2:23-cv-6302-HDV-AJR

4th at 130-31 (upholding weight limitations because "excess fat" negatively affected performance and contributed to risk of back injury, and "sudden incapacitation of an ambulance driver could be life-threatening"); Hutton, 273 F.3d at 894 (considering ADA direct threat defense and holding that even where "the likelihood of an [incident] is small . . . if the threatened harm is grievous . . . even a small risk may be 'significant.'") (quoting Donahue v. Consol. Rail Corp., 224 F.3d 226, 231 (3d Cir. 2000)). In short, "frequency, or the likelihood of risk, is not as important of a factor in determining whether the patient is a direct threat when the potential harm is grave." Grosso v. UPMC, 857 F. Supp. 2d 517, 538-39 (W.D. Penn. 2012); Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284 (10th Cir. 2000)) (collecting cases).

Here, at the time of the MSEA, the medical evidence was that Plaintiff reasonably had a 1 in 50 chance, every year, of his aortic dilated aortic root rupturing or dissecting, which would almost certainly result in his death in Escravos. See, e.g., Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at 43:12-44:10, 45:22-49:12, 49:23-50:12, 69:5-25; id., Levy at 78:17-79:5; Trial Ex. 68. In addition, Plaintiff ran the same risk he would endanger the health or safety of others, because a rupture or dissection would result in a medical evacuation that would endanger the evacuators' lives and strain the Escravos medical resources; and his sudden absence would threaten the environment and overall workplace safety. See, supra, pp. 3-7. No one would be there to perform Plaintiff's highly sensitive safety job, which would pose a significant threat to other workers and the environment. Kennedy Decl., Ex. B, Trial Transcript, Asekomeh at 49:23-50:12; id., Levy at 69:5-20; 78:17-79:5, 81:3-85:11, 89:20-90:12, 94:22-95:8, 96:17-97:1, 102:1-104:20. Just as the "sudden incapacitation of a locomotive engineer" "poses significant and imminent risk for substantial harm to the worker, co-workers, the public, property, and the environment," so too the sudden incapacitation of an employee with a sensitive safety position significantly risks the safety of others. Milan v. Union Pac. R.R. Co., No. 3:17-CV-01246-YY, 2019 WL 2030553, at *9 (D. Or. Apr. 19, 2019), report and recommendation adopted, No. 3:17-CV-01246-YY, 2019 WL 2030723 (D. Or. May 8, 2019); see Kennedy Decl., Ex. B, Trial Transcript, Levy at 69:5-20; 78:17-79:5, 81:3-85:11, 103:2-11. Accordingly, Defendant reasonably concluded that Plaintiff's rupture or dissection risk was just too high for

1  Escravos. <u>Id.</u>, Levy at 78:17-79:6.

2      Finally, Plaintiff had a "time bomb in his chest." <u>Id.</u> Levy at 112:16-21; <u>see also</u> <u>id.</u> at

3  78:17-79:6, 112:7-21. And allowing "a walking time bomb" would be "woe unto the employer

4  who places an employee in that [dangerous] position." <u>Turco v. Hoechst Celanese Corp.</u>, 101

5  F.3d 1090, 1094 (5th Cir. 1996). Plaintiff's Escravos duties also would have put additional, new

6  strain on Plaintiff's heart. <u>See, supra,</u> pp. 3-4; Kennedy Decl., Ex. B, Trial Transcript, Malpica at

7  154:19-157:13, 146:10-17; <u>id.,</u> Sobel, at 135:5-25; Kennedy Decl., Ex. A, Trial Transcript, Khan

8  at 116:7-13. In short, Plaintiff's presence in Escravos endangered him and others. <u>Milan</u>, 2019

9  WL 2030553, at *7-*9 (citing <u>Hutton</u>, 273 F.3d at 894).

10      In light of this evidence, Defendant has established the FEHA's safety defense as a

11  matter of law, or at the very least is entitled to a new trial.

12      **C.    <u>The Damages Are Excessive.</u>**

13      Assuming this Court upholds the jury's liability finding (and it should not), it should

14  order a new trial or a new trial contingent on Plaintiff's acceptance of a remittitur, because the

15  jury's damages awards are excessive, unsupported by the evidence and speculative.

16      When assessing the excessiveness of damages and remittiturs of state-law claims, federal

17  courts apply state law. <u>See</u> <u>Gasperini v. Ctr. for Humans, Inc.</u>, 518 U.S. 415, 431 (1996). Under

18  California law, damage awards must be reasonable and bear a rational relationship to the

19  evidence. <u>See</u> Cal. Civ. Code, § 3359; <u>Beagle v. Vasold</u>, 65 Cal. 2d 166, 179 (Cal. 1966)

20  ("[W]hatever manner of calculation is proposed by counsel or employed by the jury, the verdict

21  must meet the test of reasonablenes."). And "[t]he jury must impartially determine

22  [compensatory] damages based on evidence specific to the plaintiff[.]" <u>Loth v. Truck-A-Way</u>

23  <u>Corp.</u>, 60 Cal. App. 4th 757, 764 (Cal. Ct. App. 1998). In considering whether an award is

24  excessive, courts frequently look to analogous cases and verdicts. <u>See</u> <u>Diaz v. Tesla, Inc.</u>, 598 F.

25  Supp. 3d 809, 825-40 (N.D. Cal. 2022).

26      "The trial judge not only has discretion to grant a new trial on the ground of excessive

27  damages, but it is his duty to do so, if under the evidence he believes it to be too large."

28  <u>Handelman v. Victor Equip. Co.</u>, 21 Cal. App. 3d 902, 909 (Cal. Ct. App. 1971). Or the court

1    may order a remittitur to an amount that "the court . . . determines . . . to be fair and reasonable."

2    Cal. Civ. Proc. Code § 662.5. The trial court independently reviews whether the jury's award

3    was excessive—i.e., it may reweigh the evidence, reassess the credibility of witnesses, draw

4    different inferences than the jury, and, in general, act as a "thirteenth juror." Ryan v. Crown

5    Castle NG Networks Inc., 6 Cal. App. 5th 775, 784 (Cal. Ct. App. 2016); Basilio v. Reif, 272

6    Cal. App. 2d 564, 567–68, fn. 4 (Cal. Ct. App. 1969); Van Ostrum v. State, 148 Cal. App. 2d 1,

7    7 (Cal. Ct. App. 1957). The compensatory damages here are grossly excessive, requiring a new

8    trial or a new trial contingent on Plaintiff's agreeing to a remittitur. Hetzel v. Prince William

9    County, 523 U.S. 208, 211 (1998).

10

11    ### 1.    *The Economic Damages Are Not Based on Substantial Evidence and Are Speculative.*

12    "In the specific context of front pay awards in employment discrimination cases, courts

13    presume that the award will be temporary in nature," not a lifetime annuity. McCray v.

14    Westrock Servs., LLC, No. 21-9853-DMG, 2024 WL 4579108, at *7 (C.D. Cal. Sept. 10, 2024)

15    (citing Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1347 (9th Cir. 1987)). In addition,

16    both front and backpay awards must be reduced by the amount an employee could have earned

17    using reasonable mitigation efforts. Cassino, 817 F.2d at 1347 (citing Thorne v. El Segundo, 802

18    F.2d 1131, 1137 (9th Cir. 1986)). And "courts in this district disfavor awarding front pay" for

19    long periods of time, like 16 years. McCray, 2024 WL 4579108, at *7 (citing Montoya v.

20    Orange Cnty. Sheriff's Dep't, No. CV 11-1922-JGB, 2014 WL 6389433, at *8 (C.D. Cal. Nov.

21    13, 2014)) (halving front pay award due to jury's assumption plaintiff would be employed for 16

22    years, which was too long); Johnson v. Albertsons LLC, 2020 WL 3604107, at *4 (W.D. Wash.

23    July 2, 2020) (ordering remittitur of front pay award where "counsel asked the jury to assume

24    that" plaintiff would have remained in the same position for 16.9 years and that she would never

25    find comparable employment).

26    All of these fundamental principles were violated here. Indeed, the jury's award of past

27    and future economic damages was untethered to any trial evidence at all and utterly speculative.

28    The $1 million past economic loss award and the $1 million future economic loss award is not

-21-

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    rationally related to any party's expert's damages calculations. See Trial Exs. 148, 154.

2    To the extent the jury relied on Plaintiff's expert Dr. Baum's calculations, the verdict is

3    unsupported as a matter of law because Dr. Baum's calculations were "not grounded in

4    reasonable assumptions." McCray, 2024 WL 4579108, at *7 (internal quotation marks and

5    citation omitted); see also Atkins v. City of Los Angeles, 8 Cal. App. 5th 696, 740 (Cal. Ct.

6    App. 2017), as modified on denial of reh'g (Mar. 13, 2017) ("An expert's testimony about a

7    plaintiff's earning capacity must be grounded in reasonable assumptions, not speculative or

8    conjectural data. If the expert's opinion is not based on facts otherwise proved or if the opinion

9    assumes facts contrary to the evidence, it cannot rise to the dignity of substantial evidence.")

10   (internal citations and quotation marks omitted). Dr. Baum assumed that: (i) Plaintiff would

11   have received a PSG promotion within 6 months of assuming the REM position; (ii) Plaintiff

12   would work in the REM position for 16 years, far longer than the typical 3 to 4 year period; and

13   (iii) Plaintiff would continue to work in expatriate assignments with the highest location

14   premium until he turned 70. See Kennedy Decl., Ex. B, Trial Transcript, Baum at 241:16-20,

15   250:10-24.

16   The undisputed record evidence proves these assumptions wrong. Plaintiff's REM

17   position was subject to reorganization in October 2021, and the individual in the position was

18   replaced, meaning Plaintiff had no incumbency guarantee and would have been subject to a

19   reposting after approximately a year in Escravos. Kennedy Decl., Ex. B, Trial Transcript,

20   Malpica at 148:22-149:15. In addition, Dr. Baum could not reasonably assume that Plaintiff

21   would remain in Escravos for over four years due to Nigerian visa rules. Id., Malpica at 149:24-

22   150:9; Trial Ex. 20. After a few years, Plaintiff would have been required to find a new

23   expatriate assignment or other new position. Id., Malpica at 159:23-160:22. At the time of trial,

24   August 2025, Chevron U.S.A. was beginning a second reorganization and had posted the REM

25   position for reselection once again, again proving Dr. Baum's incumbency assumption

26   unreasonable and unsupported. Id., Malpica at 143:6-21.

27   In addition, the undisputed record evidence is that Plaintiff failed to mitigate his

28   economic damages. He failed to apply to any other expatriate assignments after the REM offer

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  was rescinded, even though approximately 50 expatriate assignments were open and appropriate

2  for him. Kennedy Decl., Ex. D, Trial Transcript, Snookal, 86:8-10, 96:2-97:4; Kennedy Decl.,

3  Ex. B, Trial Transcript, Levy at 107:23-109:9; Trial Ex. 88. Although Plaintiff contends he was

4  not interested in these positions, he cannot and does not dispute that he failed to apply for any

5  expatriate assignments, even after he resigned—powerful evidence that Plaintiff would not have

6  wanted to stay in an expatriate assignment until the age of 70 and powerful proof of a failure to

7  mitigate. See id. Given Plaintiff's lack reasonable mitigation efforts, there is no evidentiary basis

8  in the record or in the law to justify an economic damages award extending for any period of

9  time beyond 3 to 4 years.

10  Accordingly, the Court should exercise its broad discretion to order a new trial or remit

11  the jury's economic damages award. See Horsford v. The Board of Trustees of Cal. State Univ.,

12  132 Cal. App. 4th 359, 387-88 (2005) (reducing plaintiffs' economic damages due to

13  speculation about one plaintiff's promotion and limiting front pay to two years for another

14  plaintiff); see also Atkins, 8 Cal. App. 5th at 742 (finding the district court improperly assumed

15  the employee would have remained with the employer for the rest of her career).

16  ### 2.    *The Noneconomic Damages Award is Excessive.*

17  Under California law, "[i]n order to recover damages for emotional distress the injury

18  suffered must be severe, i.e., substantial or enduring as distinguished from trivial or transitory."

19  Young v. Bank of America, 141 Cal. App. 3d 108, 114 (Cal. Ct. App. 1983).

20  Here, the jury awarded Plaintiff $1 million in past noneconomic damages and $900,000

21  in future noneconomic damages. But, Plaintiff failed to introduce any evidence that his

22  emotional distress was so substantial and enduring as to warrant such a significant award.

23  Plaintiff's emotional distress symptoms included "withdraw[ing] a little bit from [his] family"

24  (Kennedy Decl., Ex. D, Trial Transcript, 35:15-23), taking a prescription for Cymbalta (id.,

25  Snookal, 36:5-11), and according to his expert, Plaintiff had a "depressed mood, inability to

26  derive pleasure from customary activities, a loss of self-worth, a loss of motivation, difficulty

27  with sleep, and difficulty with concentration and focus, along with energy" (id., Reading, 124:8-

28  17). Plaintiff's expert also admitted that Plaintiff's emotional distress improved in February

-23-

SMRH:4907-4910-3726.2

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  2025 from 2019-2020, and was in "partial remission." Id., Reading at 128:4-129:2, 130:25-

2  131:2; see also id. Snookal at 110:18-22. Plaintiff's expert did not, and could not, opine that the

3  only stressor causing Plaintiff's depressive disorder was the REM offer rescission. Id., Reading,

4  at 142:23-144:1.

5  In addition, there is only a single alleged act of disability discrimination—the conditional

6  offer's rescission—and the alleged harm was primarily economic—offsetting the cost of his

7  son's private school. Kennedy Decl., Ex. C, Trial Transcript, Snookal at 121:8-16. There is no

8  evidence that any Defendant or anyone involved in the MSEA process harbored ill will towards

9  the Plaintiff. Rather, as this Court previously noted, there is no suggestion of malice on anyone's

10  part. Dkt. 63, p. 15. All the individuals involved with Plaintiff's MSEA were focused solely on

11  keeping Plaintiff safe, relying on their medical knowledge and then-current medical literature in

12  making their determination. See, supra, pp. 3-7.

13  On these undisputed facts, the jury's emotional distress award was clearly excessive and

14  unsupported by the evidence. Plaintiff's symptoms are reasonably characterized as ordinary

15  emotional distress arising out of job loss. See Horsford, 132 Cal. App. 4th at 359 (upholding

16  reductions where alleged emotional harm was limited in duration and arose only from adverse

17  job actions, not from "such direct psychological assaults as use of racial epithets").

18  Yet, the jury's award far exceeds the emotional distress damages in cases involving

19  reprehensible and egregious acts of discrimination and harassment. For example, in Diaz v.

20  Tesla, Inc., a Black employee was subjected to repeated and frequent use of the N-word by

21  coworkers and supervisors, called a "porch monkey," told to "go back to Africa," encountered

22  slurs and swastikas on bathroom walls, and encountered a racist drawing near his workstation.

23  598 F. Supp. 3d at 835. The court noted that "no single act can more quickly alter the conditions

24  of employment and create an abusive working environment than the use of the N-word by a

25  supervisor in front of subordinates." Id. (internal quotation marks and citation omitted). The

26  court reduced the jury's "excessive" award of $6.9 million to a "relatively high award" of $1.5

27  million—less than Plaintiff's noneconomic damages award here. Id.; see also Kelly-Zurian v.

28  Wohl Shoe Co., 22 Cal. App. 4th 397, 406-07 (Cal. Ct. App. 1994) (affirming $125,000 award

for plaintiff who had panic attacks, chest tightness, heart palpitations, insomnia, and posttraumatic stress disorder following her supervisor repeatedly groping her); Horsford, 132 Cal. App. 4th at 368-72, 390 (reducing awards ranging from $1 million to $1.5 million, to $250,000 to $300,000, where plaintiffs had "extensive" evidence of racial discrimination, to avoid a "windfall unsupported by the evidence"); Satrap v. Pac. Gas and Elec. Co., 42 Cal. App. 4th 72, 75 (Cal. Ct. App. 1996) (upholding $225,000 emotional distress award where plaintiff was demoted after being instructed not to engage in whistleblowing activity).

Because the jury's award cannot be reconciled with the trial record or analogous cases, the jury's award can only be explained by passion or prejudice. See Snyder v. Freight, Constr., Gen. Drivers, Warehousemen & Helpers, Local No. 287, 175 F.3d 680, 689 (9th Cir. 1999) (finding that a new trial is appropriate where an award of damages is "clearly not supported by the evidence, or only based on speculation or guesswork . . . and gives rise to an inference that 'passion and prejudice' tainted the jury's finding of liability" (internal citations omitted)). The jury attempted to "send a message" to Defendant through excessive compensatory awards, which is unconstitutional. See Adams v. Murakami, 54 Cal. 3d 105, 116 (Cal. 1991). Accordingly, if the Court declines to enter judgment in Defendant favor, it should order a new trial or a new trial contingent on a remittitur.

## V.  **CONCLUSION**

The record compels only one reasonable conclusion: judgment should be entered as a matter of law under Federal Rule of Civil Procedure 50(b) in Defendant's favor. Alternatively, the Court should order a new trial and/a remittitur.

*[signature appears on following page]*

Case No. 2:23-cv-6302-HDV-AJR

SMRH:4907-4910-3726.2

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

Dated: September 30, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    /s/ Tracey A. Kennedy
                    TRACEY A. KENNEDY
                    ROBERT E. MUSSIG
                    H. SARAH FAN

                    Attorneys for Defendant
                    CHEVRON U.S.A. INC.,
                    a Pennsylvania Corporation