# **<u>EXHIBIT A</u>**

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    - - -

5    HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7    MARK SNOOKAL,                        )
                                          )
8          Plaintiffs,                    )
                                          )
9                                         )
                                          )
10         vs.                            ) No. CV 23-06302-HDV
                                          )
11                                        )
                                          )
12   CHEVRON USA, INC.,                   )
                                          )
13         Defendants.                    )
     ─────────────────────────────       )

14

15
     REPORTER'S TRANSCRIPT OF PARTIAL JURY TRIAL PROCEEDINGS
16
                        *TRIAL DAY ONE*
17
                    LOS ANGELES, CALIFORNIA
18
                 TUESDAY, AUGUST 19, 2025
19   ────────────────────────────────────────────────────

20                    MARIA R. BUSTILLOS
                    OFFICIAL COURT REPORTER
21                       C.S.R. 12254
                   UNITED STATES COURTHOUSE
22                   350 WEST 1ST STREET
                          SUITE 4455
23              LOS ANGELES, CALIFORNIA 90012
                       (213) 894-2739
24                    MADAMREPORTER.COM

25

1                    **A P P E A R A N C E S**

2

3

4    **ON BEHALF OF THE PLAINTIFFS,**
     **MARK SNOOKAL:**                    ALLRED MAROKO and GOLDBERG
5                                         BY:  DOLORES Y. LEAL, ESQ.
                                          6300 WILSHIRE BOULEVARD
6                                         SUITE 1500
                                          LOS ANGELES, CA 90048
7                                         (323)653-6530

8

9                                         ALLRED MAROKO and GOLDBERG
                                          BY:  OLIVIA J. FLECHSIG,
                                          ESQ.
10                                        6300 WILSHIRE BOULEVARD
                                          SUITE 1500
11                                        LOS ANGELES, CA 90048
                                          (323)653-6530

12

13

14   **ON BEHALF OF THE DEFENDANTS,**
     **CHEVRON USA, INC.:**               SHEPPERD, MULLIN, RICHTER,
                                          and HAMPTON, LLP
15                                        BY:  ROBERT E. MUSSIG, JR.,
                                          ESQ.
16                                        350 SOUTH GRAND AVENUE
                                          FORTIETH FLOOR
17                                        LOS ANGELES, CA 90071
                                          (213)620-1780

18

19                                        SHEPPERD, MULLIN, RICHTER,
                                          LLP
20                                        BY:  TRACEY A. KENNEDY, ESQ.
                                          350 SOUTH GRAND AVENUE
21                                        FORTIETH FLOOR
                                          LOS ANGELES, CA 90071
22                                        (213)620-1780

23

24

25

1                    <u>I N D E X</u>

2

3

4                                              PAGE

5    PLAINTIFF'S OPENING STATEMENTS.....        6

6    DEFENSE'S OPENING STATEMENTS.......       31

7

8

9    PLAINTIFF'S WITNESSES:   DIRECT  CROSS   REDIRECT   RECROSS

10

11   **DR. MARMUREANU, ALEXANDER**   --       --        --       --

12   BY OLIVIA FLECHSIG          51       --        --       --

13   BY ROBERT MUSSIG            --       78        --       101

14   **DR. KHAN, SHAHID**           --       --        --       --

15   BY OLIVIA FLECHSIG         105       --       128       --

16   BY ROBERT MUSSIG            --      118        --       --

17   **DR. LEVY, CRAIG**            --       --        --       --

18   BY DOLORES LEAL           130       --        --       --

19

20

21

22

23

24

25                    - - -

Exhibit A
p. 4

```
 1    just allow you to speculate on everything.  I think the
 2    question was just -- let me look at it again -- whether
 3    since 2019 to the present, has the understanding of the
 4    medical community changed as to the issues that you've
 5    discussed?
 6              THE WITNESS:  No.
 7    BY MS. FLECHSIG:
 8    Q        Okay.  In other words, the general research
 9    about what to do when someone has a dilated aortic root
10    and the risk associated with it, it is basically the
11    same now as it was then?
12    A        Correct.
13    Q        Okay.  When you formulated the opinions that
14    you put into your report, did you consider the fact that
15    Escravos, Nigeria, where this job was located, is
16    extremely remote and has limited surgical capability
17    nearby?
18    A        Yes, I did.  My opinion is based on medical
19    data and not on geography.  So his risk, his condition
20    remains the same regardless where he is located,
21    New York, Los Angeles, or Escravos.  His location has
22    nothing to do with his risk of disease.
23    Q        Right.  So if Mr. Snookal was your patient, you
24    would clear him wherever in terms of work?
25    A        Correct.  Wherever, yes.
```

```
1    before providing this clearance, did you also consider

2    whether Mr. Snookal was managing his condition with any

3    medications?

4    A       Yes.

5    Q       What kind of medications would manage this

6    condition?

7    A       Well, the main issue is blood pressure control,

8    so he was on blood pressure medicines at that time.

9    Q       Okay.  And how does it control -- how do blood

10   pressure medicines serve to manage dilated aortic root?

11   A       Well, the blood pressure is one of the forces

12   that makes the aortic expand.  So if the blood pressure

13   is out of the control, it would not be a good thing.

14          MS. FLECHSIG:  Okay.  Moving onto Exhibit 68.

15   This also -- the admissibility has been stipulated to.

16   May it be published to the jury?

17          THE COURT:  Go ahead.

18    (Whereupon, Plaintiff's Exhibit 68 is admitted hereto.)

19   BY MS. FLECHSIG:

20   Q       Dr. Khan, you probably see in front of you a

21   lengthier e-mail.  It looks like you said on August 23,

22   of 2019, addressed to a Dr. Levy, is that -- are you

23   seeing where I'm looking at?

24   A       Uh-huh, yes.

25   Q       So you said, "I understand he is applying for a
```

**Exhibit A
p. 6**

```
 1   A        I don't understand the question.
 2   Q        Sorry, I did not ask a good question.  I guess
 3   time passes for a year, and during that year,
 4   Mr. Snookal is not getting a scan; right?  So I guess
 5   why are you not worried about a sudden large change in
 6   the size to the aortic aneurysm?
 7   A        Well, it just doesn't happen.  I mean, they
 8   typically grow fairly slowly.  If there is going to be
 9   any kind of progression, the typical rate of growth
10   would be -- the literature at the time said .1
11   centimeter per year.  So he looked like he was at least
12   3 to 8 years away from needing anything done at that
13   point.
14   Q        Okay.  Thank you so much, Doctor.  I think
15   those are all of my questions.
16            THE COURT:  All right.  Cross-examination?
17                      CROSS-EXAMINATION
18            THE COURT:  Go ahead, Counsel.
19   BY MR. MUSSIG:
20   Q        Good afternoon, Doctor.
21            MR. MUSSIG:  Could we pull up that same
22   exhibit, Exhibit 68?
23   BY MR. MUSSIG:
24   Q        And we were looking at this a moment ago,
25   Doctor.  This is the e-mail you sent to Dr. Levy;
```

**Exhibit A**
**p. 7**

```
 1   aneurysm in medical terms, but we're in layman's terms.
 2   We're calling it an aneurysm.  Let's put it that way.
 3   This is more layman's terms, but it is not technically
 4   correct.  It is not an aneurysm at that point.
 5   Q       Understood.  And so you say the size is 4.1 to
 6   4.2 centimeters on his most recent CT scan.  And that
 7   4.1, 4.2, you're confident in that number?
 8   A       He's had, I think, three CTs at that point, and
 9   they all showed the same numbers so that certainly makes
10   the confidence quite high.
11   Q       All right.  And then you say from the published
12   studies, the risk of rupture or dissection is 2 percent
13   per year.  And I think you cite -- well, let me ask:
14   What publication are you citing?
15   A       Yeah, there is a paper I think it was in *The*
16   *Annals of Thoracic Surgery* -- I don't know if I have the
17   reference -- oh, yeah, it is here, *Annals of Thoracic*
18   *Surgery*, 2002.  But I state the studies are pretty old.
19   Treatment is improved as has our understanding of aortic
20   aneurysms.
21   Q       Understood.  Is that a publication that you
22   would cite frequently in your practice?
23   A       I publish a bunch of papers, and then I do cite
24   it, you know, when I worked at Cedars, yeah, quite a
25   bit.
```

**Exhibit A**
**p. 8**

```
1    Q          Okay.  Is it a reputable publication?

2    A          Say that again.

3    Q          Is it a reputable publication?

4    A          Yes, it is an official organized society of

5    thoracic surgeons.  So, yeah, it's very reputable.

6    Q          Understood.  And I have a question about what

7    that 2 percent per year means.  Does that mean that out

8    of a hundred people, two per year would rupture or

9    dissect with aneurysms of this size?

10   A          It does, which that number has been modified

11   significantly because this is a very unselected group in

12   that -- in that publication.

13   Q          When you say "the number has been modified

14   significantly," do you mean in recent years?

15   A          Yeah.

16   Q          Understood.  So back in 2019, this is what the

17   understanding was; right?

18   A          Yeah, I would say it's a reasonable estimate,

19   yeah.

20   Q          And then later in your e-mail, you do say --

21   and you saw this language a few minutes ago -- that

22   because the aneurysm was stable, it -- it could be --

23   might be less than 2 percent per year?

24   A          Yes.

25   Q          Do you recall seeing that?
```

**Exhibit A**
**p. 9**

```
 1    patient need?

 2    A         Well, these types of dilated aortas -- aortic

 3    aneurysms don't typically rupture per se.  They tend to

 4    dissect, what is called an aortic dissection.  Or they

 5    can have other complications such as a perforating ulcer

 6    or integral hematoma.  So it would be exceptionally rare

 7    for this to rupture, especially given that he is what we

 8    call a non-syndromic aortic dilation.

 9    Q         So more likely to dissect?

10    A         It would be more likely to present as

11    dissection or one of those other acute aortic syndromes,

12    we call them.

13    Q         Understood.  And in the event of dissection,

14    what -- what does the patient need?

15    A         If the starts to dissect, he'll typically have

16    symptoms, and then they -- we would need to get them to

17    a hospital.

18    Q         They need to have surgery done?

19    A         They need to have a CT scan done first, yeah.

20    Q         Okay.

21    A         Or a transesophageal echo, we do sometimes.

22    Q         I'm sorry, a --

23    A         Or a transesophageal echo.

24    Q         And how soon after the dissection would that

25    happen, from your perspective?
```

```
 1   A          It depends on where they are.  So this is a
 2   frequent reason people get transported to the hospital.
 3   So at Cedars, we would get a lot of helicopter
 4   transports in from central California, or wherever, to
 5   get CT or transesophageal echo and make a diagnosis and
 6   then triage them, whether they needed surgery urgently
 7   or if they could wait.
 8   Q          Okay.  Isn't it fair to say that you want this
 9   dissection treated as soon as possible?
10   A          I think we need a diagnosis first.  So we need
11   a diagnosis as soon as possible, and then the treatment
12   will be based on what the specific diagnosis is.
13              MR. MUSSIG:  Your Honor, I'd like to read from
14   his deposition.
15              THE COURT:  All right.  Just a second.  Let me
16   get the --
17              MR. MUSSIG:  If we have a copy.  If we don't,
18   I'll move on.
19              THE COURT:  No?
20              Then you'll need to move on.
21   BY MR. MUSSIG:
22   Q          In the event of a dissection, how soon should
23   the person have this -- the word you referred to a
24   minute ago, the examination and then -- and then
25   surgery?
```

Exhibit A
p. 11

1  Q        Is it fair to say that a person working, say,

2  12-hour shifts, a physically demanding job, in places

3  where the temperature gets up to 115 degrees in the

4  summer and there are monsoons in the winter, could

5  suffer stress as a result of all that?

6          MS. FLECHSIG:  Objection; incomplete

7  hypothetical.

8          THE COURT:  Overruled.

9          THE WITNESS:  Well, yeah, I mean, your question

10 is sort of self-evident, I guess.

11 BY MR. MUSSIG:

12 Q        And those conditions could drive up someone's

13 blood pressure, right?

14 A        I don't think high temperatures necessarily

15 would, but certainly climbing a ladder.  Yeah, if he's

16 going up a ladder, that could -- or would.

17 Q        And isn't it true that something -- if

18 something were to drive up his blood pressure, it could

19 potentially exacerbate this aortic aneurysm?

20 A        It is a chronic process, yes.  But again, I

21 mean, these are true for everybody with this condition.

22 Q        Sure.

23 A        Their blood pressure is going to go up and down

24 depending on who cuts them off in a parking space or,

25 you know, whatever.

**Exhibit A**
**p. 12**

```
 1   Q        Understand.  And one last series of questions.
 2            MR. MUSSIG:  If we could pull up to Exhibit 33.
 3   The parties have stipulated to admissibility,
 4   Your Honor.
 5            THE COURT:  Go ahead.
 6            MR. MUSSIG:  We may have looked at it during
 7   his direct.
 8   BY MR. MUSSIG:
 9   Q        This is your letter to Chevron saying it's safe
10   for him to work in Nigeria; correct?
11   A        Yes.
12   Q        Okay.  And at this point, you didn't know that
13   he was working specifically in Escravos; right?
14   A        I don't believe -- I think I was only told it
15   was Nigeria.
16   Q        Okay.  And so you never wrote a letter
17   to Chevron clearing him to work in Escravos;
18   correct?
19            MS. FLECHSIG:  Objection; misstates facts.
20            THE COURT:  Overruled.
21            THE WITNESS:  I don't believe so.  No, I think
22   this is the only letter I wrote.
23            MR. MUSSIG:  Okay.  No further questions.
24            THE COURT:  Any redirect?
25            MS. FLECHSIG:  Yes, Your Honor.  Very quickly.
```

**Exhibit A
p. 13**

1    A        Three years.

2            THE COURT:  Just lean -- bring the microphone a

3    little closer.

4    BY MS. LEAL:

5    Q        So then we're talking about approximately

6    2017/2018?

7    A        Correct.

8    Q        And after that role in Singapore, what was your

9    next role at Chevron, Doctor?

10   A        I was moved to London to manage a similar type

11   of role across a different region.  We called it EEMEA,

12   Europe, Eurasia, the Middle East, and Africa.

13   Q        A very large role.  EE- --

14   A        -MEA.

15   Q        -- -MEA.  EEMEA.  Okay.

16           So your responsible for Europe, Eurasia,

17   Mid East, and Africa?

18   A        Correct.

19   Q        And you were working in London, did you say?

20   A        Yes.

21   Q        Okay.  And how long were you in that position?

22   A        In total, seven years.

23   Q        So you were in that position, the EEMEA

24   regional medical manager position, during the events at

25   issue in this case in 2019; correct?

**Exhibit A
p. 14**

1   A        Correct.

2   Q        Now, you've been in a number of different roles

3   with Chevron, including transferring from Houston to

4   London to Asia, Singapore.

5            Every time you transferred, Chevron still

6   continued to be your employer; correct?

7   A        That's correct.

8   Q        And you continued to be on the same Chevron

9   payroll; correct?

10  A        That is correct.

11  Q        And the same Chevron benefits; correct?

12  A        Yes.

13  Q        Okay.  So now, the rest of my questions now are

14  going to be focused during the time that you were the

15  EEMEA regional medical manager.  Okay?  Again, in 2019.

16  A        Okay.

17  Q        Now, in your role as the EEMEA, were you --

18  regional medical manager, were you aware of the process

19  of what happened when an employee in the States, for

20  example, wanted to transfer to another country, be an

21  expat employee?

22  A        I am -- I was very aware.

23  Q        Okay.  And as part of that process, a doctor in

24  the United States, where the employee lived or work, was

25  required to be medically examined; correct?

**Exhibit A
p. 15**

```
 1    was fit and who wasn't and performed additional reviews

 2    if needed or get additional records, testing, and things

 3    like that.  So in this situation, we have a medical exam

 4    that was done in California for a position that was in

 5    my region in Nigeria.  So that was managed between

 6    the -- the U.S. group and the Nigerian medical team and

 7    then it came to me when Mr. Snookal asked for -- I think

 8    he asked for an appeal or a second opinion or something

 9    similar to that.

10    Q       Okay.  So you got involved because Mr. Snookal

11    was asking for a second opinion after the -- after

12    Dr. Asekomeh deemed him not fit for duty for the

13    position in Escravos; correct?

14    A       That's correct.

15    Q       And as a result of that, you and Mr. Snookal

16    spoke regarding Dr. Asekomeh not granting him the

17    fitness for duty; correct?

18    A       We spoke.  I may have been -- I may have spoken

19    to him in person or on the phone, but it was definitely

20    some e-mail interactions we had.  It was a long time

21    ago, but I know definitely we had e-mail interactions.

22    I don't remember if we spoke in person.  I think we did

23    but I can't remember that.

24    Q       Okay.  All right.  And do you recall if you had

25    more than one conversation with Mr. Snookal?
```

**Exhibit A**
**p. 16**

1    Levy --

2    A        Yep.

3    Q        -- to Mark Snookal.  Subject, medical.  And

4    then you say, "Mark, thanks for speaking with me, et

5    cetera."  Do you recall sending this e-mail to

6    Mr. Snookal?

7    A        I do.  I do.  So I obviously spoke with him.

8    Q        Okay.  And if you turn to the first page of

9    Exhibit 65.  There is an e-mail also underneath the

10   black box from Mark Snookal to you, the same day.  And

11   he is responding to your e-mail and providing you

12   information.  Do you remember having received this

13   information from Mr. Snookal?

14   A        Yes, I do.

15   Q        And you recall there is a graph on the second

16   page.  Do you recall seeing that graph?

17   A        Yes, I do.

18   Q        And what did that graph tell you when you saw

19   it?

20   A        It told me what Mr. Snookal's opinion of his

21   risk was and what he based it on.

22   Q        And what was that?

23   A        According to this chart, the risk appears to be

24   less than one percent.

25   Q        So when you were evaluating Mr. Snookal's case

**Exhibit A
p. 17**

1    for a second opinion, if you will, you were also

2    evaluating the risk for -- the risk of an adverse event

3    occurring to Mr. Snookal in Escravos; is that correct?

4    A       That is correct.  We were looking.  We --

5    Q       Thank you.

6    A       Yes.

7    Q       Did you consider the actual diameter of

8    Mr. Snookal's aortic aneurysm?

9    A       Yes.

10   Q       And you also, I assume, considered the fact

11   that Mr. Snookal had not had any changes in size of his

12   aortic root over the prior three years?

13   A       Yes.

14   Q       We can put that exhibit down.

15           And at the time you were reviewing

16   Mr. Snookal's case for a second opinion, did you

17   evaluate whether Mr. Snookal's management with

18   medication impacted the risk of an adverse outcome due

19   to the aortic aneurysm?

20   A       Yes, that would have been part of the

21   evaluation.  After -- I don't think there was any

22   medication-related issues that we saw as a problem.

23   Q       And you took that as Mr. Snookal being

24   relatively stable; correct?

25   A       Yes.

**Exhibit A
p. 18**

1    That is why you didn't call him?

2    A        I understood what he was saying about the risk.

3    I think you quoted it as low risk or very small.

4    Q        And isn't it true that as part of your review

5    for a second opinion, that you learned that Dr. Khan

6    reported that any risk -- he was the cardiologist so he

7    was reporting that any risk was primarily related to

8    further enlargement of the aneurysm and it could be

9    tracked with an annual CT scan; correct?

10   A        Can you repeat that question, sorry?

11   Q        During the time that you were doing the second

12   review, you were aware that Dr. Khan reported to you

13   that any growth in the aorta could be tracked with

14   annual CT scans; correct?

15   A        Partially correct.  So the -- at the size the

16   aneurysm was, there was risk for it rupturing or having

17   problems; however, the risk increases by further growth

18   of the aneurysm.

19   Q        Are you saying that the size that Mr. Snookal

20   had the aneurysm that he was at risk for rupture or

21   dissection?

22   A        Correct.

23   Q        What do you base that on?

24   A        I base that on the scientific literature.  I

25   base that on the note that you're showing me right now

1    that says his risk is low and less -- and likely less

2    than 2 percent based on the information.  So 2 percent

3    is not low to me.  And that's possible.

4    Q        What's possible?

5    A        If there's -- risk is 2 percent a year, then

6    it's possible to rupture at that size.

7    Q        And you base that on what --

8    A        What it says, according to his specialist.

9    Q        He says that there's a 2 percent chance of

10   rupturing?

11   A        "Serious complications," yes, that's what it

12   says.

13   Q        Does it say "rupturing"?

14   A        It says "serious complications."

15   Q        It doesn't say "rupture"; correct?

16   A        There are only two significant consequences:

17   dissection or rupture.

18   Q        Correct.  You didn't call Dr. Khan to find out

19   what he meant by "serious consequences" to find out

20   whether there was a rupture or -- or a dissection;

21   correct?

22   A        I didn't, but the --

23   Q        Okay.  Thank you.

24   A        It's understood.

25   Q        Thank you.  Thank you, Dr. Levy.

**Exhibit A
p. 20**

```
1    Q        So the concern that you just expressed was

2    that --

3            THE COURT:  Give us a second.

4    BY MS. LEAL:

5    Q        So the concern that you just expressed,

6    Dr. Levy, was that if -- if Mr. Snookal had an aortic

7    event in the future, the team in Escravos might require

8    some sort of emergency response that they may or may not

9    he about able to manage.  Was that part of the concern?

10   A        The concern was that if he had that event

11   today, they were not equipped to handle that emergency.

12   Q        What do you mean by "today"?  Today at the time

13   that he was in Escravos?

14   A        If today was -- on his first day in Escravos.

15   The risk would apply as soon as he was on -- as soon as

16   he was on the ground.

17   Q        So the concern was that if Mr. Snookal, the day

18   he arrived in Escravos or the day after or two weeks

19   later -- if, in the future, he had an aortic event,

20   that's the reason you agreed with Dr. Asekomeh that he

21   was not fit for duty; correct?

22   A        I --

23   Q        Yes or no, Dr. Levy.  Is that correct or not?

24   A        That sounds correct, yes.

25   Q        Thank you.
```

```
 1              Isn't it true, Dr. Levy, that you believe that
 2     if Mr. Snookal had an aortic event in Escravos, he could
 3     possibly pose a threat to other employees because, for
 4     example, if he were climbing up a ladder or climbing
 5     upstairs and fell over, he could injure other people;
 6     correct?
 7     A         Not possibly, likely.  Likely -- if it was
 8     likely, he could have hurt other people if he had an
 9     event in Escravos.
10     Q         If that happened?
11     A         Sure.
12     Q         Right.  In the end, though, isn't it true that
13     a risk to other people, other employees working with
14     Mr. Snookal in the event of a cardiac event was not
15     relevant to your determination about Mr. Snookal's
16     matter?
17     A         So I want to say one thing, that I didn't -- I
18     didn't make the determination on whether he is fit or
19     not fit for this assignment.  This decision was made by
20     the Nigeria medical team.
21     Q         I apologize.  I meant in your reviewing their
22     decision.
23     A         So their -- their decision was based on the
24     fact that they don't have the resources in Escravos, and
25     I would argue that they don't have the resources in
```

UNITED STATES DISTRICT COURT

**Exhibit A
p. 22**

```
 1   Lagos either to be able to support this emergency.  We
 2   don't have the right medical providers, the medications,
 3   or the ability to manage this.  The risk of fatality,
 4   should this event have happened, would have been
 5   extremely high.
 6   Q        Should it happen, you don't know what was going
 7   to happen; right?  You're -- you're thinking perhaps it
 8   might happen.  You were just guessing.
 9   A        It's a 1 in 50 chance --
10   Q        We don't know what could happen; correct?
11            THE COURT:  Wait, wait, wait.  Let's -- you're
12   talking over each other.
13            THE WITNESS:  Sorry.
14            THE COURT:  What is your question, Counsel?
15   BY MS. LEAL:
16   Q        I said -- you said in the event it would
17   happen, so there is no way for you to be able to predict
18   whether or not Mr. Snookal would have had an aortic
19   event if he were in Escravos; correct?
20   A        No, I knew that -- I knew the risk was
21   2 percent based on the available literature and the
22   treating medical provider.  So the risk of him having an
23   event in one year was 1 in 50.
24   Q        And if -- but you had no idea whether or not
25   that would happen during the first week, during the
```

**Exhibit A
p. 23**

1    first 28 days that he was there, when he returned the

2    following year.  You had no idea; right?  Everything was

3    based upon just a hypothetical; correct?

4    A        It's not hypothetical.  It's actual.  It's an

5    actual risk of 2 percent a year right now, and if it

6    were to get larger, the risk would increase.

7    Q        But you don't know if it was 2 percent?

8    A        I have the medical experts telling me it's

9    2 percent.  I have the medical literature telling me

10   it's close to 2 percent.  That's about as good of

11   evidence as I have to be able to make the decision or --

12   or the team used to make that decision.  It's -- it was

13   based on the actual risk of it happening.

14   Q        Okay.  So it was based upon the actual risk of

15   it possibly happening.  And you're saying there's a

16   2 percent -- but you're saying there's a 2 percent

17   chance that it might happen.  It might happen; right --

18   in the future, if it happens; correct?

19            THE COURT:  Counsel, I think you've asked it

20   several times.  He's answered it.  Let's move on.

21   BY MS. LEAL:

22   Q        Okay.  So after you received Dr. Khan's e-mail,

23   did you contact the Nigerian medical team to provide

24   them with your opinion?

25   A        I spoke to the Nigerian medical team, and I

**Exhibit A
p. 24**

**C E R T I F I C A T E**

MARK SNOOKAL                              :

         vs.                           :   No. CV 23-06302-HDV

CHEVRON USA, INC.                         :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE
UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,
TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND
CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED
PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE
TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS
OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.
FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE
REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE
REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____/S/_____         _08/20/2025_

MARIA R. BUSTILLOS                    DATE
OFFICIAL REPORTER

Exhibit A
p. 25

# EXHIBIT B

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4                    - - -

5     HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7     MARK SNOOKAL,                    )
                                       )
8            Plaintiffs,               )
                                       )
9                                      )
                                       )
10          vs.                        ) No. CV 23-06302-HDV
                                       )
11                                     )
                                       )
12    CHEVRON USA, INC.,               )
                                       )
13          Defendants.                )
      ─────────────────────────────   )
14

15

       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16
                      *TRIAL DAY TWO*
17
                  LOS ANGELES, CALIFORNIA
18
                WEDNESDAY, AUGUST 20, 2025
19     ───────────────────────────────────────────────

20                  MARIA R. BUSTILLOS
                  OFFICIAL COURT REPORTER
21                    C.S.R. 12254
                  UNITED STATES COURTHOUSE
22                  350 WEST 1ST STREET
                        SUITE 4455
23            LOS ANGELES, CALIFORNIA 90012
                    (213) 894-2739
24                  MADAMREPORTER.COM

25

1                          **A P P E A R A N C E S**

2

3      **ON BEHALF OF THE PLAINTIFFS,**
       **MARK SNOOKAL:**                    ALLRED MAROKO and GOLDBERG
                                            BY:  DOLORES Y. LEAL, ESQ.
4                                           6300 WILSHIRE BOULEVARD
                                            SUITE 1500
5                                           LOS ANGELES, CA 90048
                                            (323)653-6530
6

7                                           ALLRED MAROKO and GOLDBERG
                                            BY:  OLIVIA J. FLECHSIG,
8                                           ESQ.
                                            6300 WILSHIRE BOULEVARD
9                                           SUITE 1500
                                            LOS ANGELES, CA 90048
10                                          (323)653-6530

11

12     **ON BEHALF OF THE DEFENDANTS,**
       **CHEVRON USA, INC.:**               SHEPPERD, MULLIN, RICHTER,
13                                          and HAMPTON, LLP
                                            BY:  ROBERT E. MUSSIG, JR.,
14                                          ESQ.
                                            350 SOUTH GRAND AVENUE
15                                          FORTIETH FLOOR
                                            LOS ANGELES, CA 90071
16                                          (213)620-1780

17

18                                          SHEPPERD, MULLIN, RICHTER,
                                            LLP
                                            BY:  TRACEY A. KENNEDY, ESQ.
19                                          350 SOUTH GRAND AVENUE
                                            FORTIETH FLOOR
20                                          LOS ANGELES, CA 90071
                                            (213)620-1780

21

22

23

24

25

**I N D E X**

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **DR. ASEKOWEH, ESHIOFE** | -- | -- | 57 | -- |
| BY OLIVIA FLECHSIG | 9 | -- | -- | -- |
| BY ROBERT MUSSIG | -- | 41 | -- | -- |
| **DR. LEVY, SCOTT** | -- | -- | -- | -- |
| (RESUMED) | -- | -- | -- | -- |
| BY DOLORES LEAL | 60 | -- | 110 | -- |
| BY ROBERT MUSSIG | -- | 81 | -- | -- |
| **DR. SOBEL, IRVING** | -- | -- | -- | -- |
| BY DOLORES LEAL | 118 | -- | 138 | -- |
| BY SARAH FAN | -- | 131 | -- | -- |
| **MALPICA, CESAR** | -- | -- | -- | -- |
| BY DOLORES LEAL | 140 | -- | 163 | -- |
| BY ROBERT MUSSIG | -- | 154 | -- | -- |
| **POWERS, ANDREW** | -- | -- | -- | -- |
| BY DOLORES LEAL | 165 | -- | 213 | -- |
| BY ROBERT MUSSIG | -- | 200 | -- | -- |
| **BROWN, LEWIS CHARLES** | -- | -- | -- | -- |
| BY OLIVIA  FLECHSIG | 221 | -- | -- | -- |
| BY TRACEY KENNEDY | -- | 238 | -- | -- |

- - -

1    Q        And it did not have any guideline with respect

2    to not denying someone's fitness for duty if they're

3    able to presently perform the job duties in a manner

4    that won't pose a risk -- an immediate and substantial

5    risk to themselves; right?

6    A        In the case we are looking now, we're looking

7    at the present risk --

8    Q        No.  So I'm just asking you -- I'm sorry.  I'm

9    just asking you -- maybe I'm not being clear.

10            I'm just asking you whether anyone at Chevron

11   told you about this law in 2019 or before 2019?

12            MR. MUSSIG:  Objection, Your Honor.  Asked and

13   answered.

14            THE COURT:  Sustained.

15            Counsel, he's answered that.  Please move on.

16            MS. FLECHSIG:  Sure.

17   BY MS. FLECHSIG:

18   Q        In 2019, you conducted Mr. Snookal's medical

19   suitability for expatriate assignment exam; is that fair

20   to say?

21   A        Fair to say, yes.

22   Q        And you will recall that Mr. Snookal had a

23   condition called a dilated aortic root; right?

24   A        Right.

25   Q        And you, after doing the medical suitability

UNITED STATES DISTRICT COURT

```
 1    screening, determined that Mr. Snookal was unfit for

 2    duty in Escravos, Nigeria; is that all true?

 3    A        So the conclusion was not fit for duty in

 4    Escravos, fit for duty in Lagos.

 5    Q        Okay.  So -- but you did not say that --

 6    basically, he was not fit for duty in Escravos; is that

 7    true?

 8    A        The conclusion was not fit for duty in

 9    Escravos, fir for duty in Lagos.

10    Q        Sure.  Okay.

11             And you're not a cardiologist; right?

12    A        I'm not.

13    Q        You've never practiced cardiology?

14    A        Well, that would need some explanation.  I'm

15    not a cardiologist.  I'm a physician.  I'm trained in

16    internal medicine with a specialization in neurology.

17    So in this instance, the determination was made after

18    consulting with a team of cardiologists --

19    Q        I'm sorry.  I'm just asking whether you've ever

20    practiced cardiology?

21    A        Well, the answer to that question would be yes.

22    The way medicine is practiced in Nigeria is an interest

23    you see all medical cases, and the ones that require

24    specialist attention are then referred to a

25    cardiologist.
```

**Exhibit B**
p. 31

```
1   job -- job duties at the time you made decision?

2   A        The job position was a manager reliability and

3   engineering.  That was stated in the forms.

4        MS. FLECHSIG:  Your Honor, I'd like to read

5   from Dr. Asekomeh's deposition transcript, page 71,

6   lines 22 through 25.

7        THE COURT:  Okay.  Go ahead.

8        MS. FLECHSIG:  Question:  Did you review the

9   job description for the reliability engineering manager.

10       Answer:  I can't remember now, but there was no

11  issue around his duty.

12  BY MS. FLECHSIG:

13  Q        Dr. Asekomeh, based on what I just read, isn't

14  it true that your decision not to clear Mr. Snookal for

15  duty was -- was based -- was -- excuse me -- strike

16  that.

17            Would you agree that your decision not to clear

18  Mr. Snookal was not based upon whether Mr. Snookal could

19  actually perform the duties of his job in Escravos?

20  A        Okay.  So the forms that were sent said he was

21  going to work as a manager reliability engineering.  The

22  doctor who examined him put a restriction and said,

23  "Restricted clearance, not to lift at work with EKG."

24  The main reason we look at was the fact that he had a

25  dilated aortic aneurysm.
```

**Exhibit B**
**p. 32**

```
 1              So I sent those forms on for further review,

 2    starting with the cardiologist who was on ground in

 3    Escravos, Dr. Aiwuyo.  And I asked him three questions.

 4    First of the three questions was can you manage someone

 5    with this condition in Escravos, and are there signs to

 6    determine if he was getting worse.  And I know if there

 7    was an emergency, would we be able to handle this

 8    condition.

 9              Those are the three questions asked and that

10    was together with the three cardiologists.  And based on

11    the condition on ground, the agreement was no.  The --

12    there was an emergency which could be dissection or a

13    rupture, the facilities on ground would not be able to

14    handle the condition.

15    Q       So --

16            THE COURT:  Before we go on, Counsel.  Doctor,

17    it seems like the light in your room turned off, if you

18    can fix that.

19            THE WITNESS:  Yes, if you just give me a

20    minute.

21            THE COURT:  Yes, go ahead.  We'll wait for you.

22            THE WITNESS:  Okay.

23            THE COURT:  Okay.  All right.  That's better.

24    Thank you.  Go ahead, Counsel.

25    BY MS. FLECHSIG:
```

**Exhibit B**
p. 33

```
 1   A        The location was removed location and far from

 2   standard care.  It will need if you had complications.

 3   Q        Thank you, Doctor.  So lifting heavy weights is

 4   not a requirement of being in Escravos; right?

 5   A        Right.

 6   Q        Okay.  So assuming he is not lifting heavy

 7   weight while he is there, which I understand, you know,

 8   was recommended against, as long as he is not lifting

 9   heavy weight while he is there, being there itself is

10   not going to increase his risk that he would ever have a

11   rupture or a dissection; right?

12   A        The determination of this case was not

13   recognized in present risk.  It was looking at current

14   risk.  As a doctor, the size of the dilation carried

15   risk of rupture.

16   Q        Right.  So it was based on future risk not that

17   going there would increase his risk relative to being at

18   home in Los Angeles; right?

19   A        It had the risk of rupture and was going to a

20   location where that rupture could not be managed.

21   Q        Okay.

22   A        As would be required.

23   Q        Are you aware that many community hospitals

24   even here in Los Angeles or other major cities in the

25   United States are not able to conduct surgery on a
```

**Exhibit B
p. 34**

1    dilated aortic root if it ruptures or dissects?

2            MR. MUSSIG:  Objection; relevance, Your Honor.

3            THE COURT:  Overruled.

4            THE WITNESS:  I told you my practice is in

5    Nigeria, and this location is as removed as it can get.

6    BY MS. FLECHSIG:

7    Q       Is it fair to say that you didn't consider

8    whether it was worse -- excuse me -- strike that.

9            It's fair to say that you did not consider what

10   medical care realities exist even in major cities?

11   A       When we're looking at the medical care

12   available in Nigeria, and that is why that's different

13   between Escravos and Lagos.  The -- the -- the

14   categorization of medical care available is that you

15   have medical care that could respond from somehow in

16   Lagos.  But in Escravos, that medical care for that

17   condition was almost next to nothing.  So for Escravos,

18   it was -- that was the primary consideration.

19   Q       Okay.  But it's fair to say that you didn't

20   consider healthcare realities in Los Angeles; right?

21   A       That wasn't my determination.  My determination

22   was if he comes to work in Escravos and he had

23   complications, which risk was there, would the Nigerian

24   team or I be able to manage him.  Especially, would I be

25   able to keep him alive.  That was the main

Exhibit B
p. 35

1    consideration.

2    Q        Okay.  So let's talk about the cardiologist.

3    You testified that you relied on the opinions of three

4    cardiologists with whom you consulted before making your

5    decision; is that -- am I -- is that a fair

6    characterization?

7    A        Correct.

8    Q        Okay.  And all three of those colleagues,

9    they -- at the time at least, they all worked for one of

10   the Chevron's medical facilities in Nigeria; correct?

11   A        So Dr. Veer [sic] was working for the same

12   company I -- I worked with here in Warri.  Dr. Ariel was

13   also on that same contract in Escravos.  He was the

14   cardiologist on ground in Escravos, and he was the first

15   we contacted of working in Lagos, correct.

16   Q        Yeah.  Okay.  So that's fair.  But they were

17   all providing services for Chevron and Nigeria at the

18   time, is that -- that's true; right?

19   A        True.

20   Q        Okay.  So did you review -- do you remember

21   reviewing any medical studies before making a

22   determination with respect to Mr. Snookal?

23   A        So the first cardiologist who was contacted was

24   Dr. Aiwuyo who referenced a Canadian journal, and it was

25   part of his summary submitted back to me.

1    Q        Thank you.

2             So just first, before we get to that, I'm

3    asking:  Do you remember actually reviewing any studies

4    yourself before making decision?

5    A        As I said, it was first sent to Dr. Aiwuyo.

6    What I can't remember -- because he sent a link to that

7    Canadian journal in his report.  I can't remember now

8    whether I look at it or not.

9    Q        Okay.  So it's fair to say, then, you were

10   relying on your colleagues in cardiology to review the

11   literature?

12   A        I was relying on the opinion of the

13   cardiologist -- three of the Nigerian cardiologists.

14   Q        Okay.  And only one of them referenced any

15   study regarding Mr. Snookal's medical condition; is that

16   true?

17   A        I am not sure now, but I remember the Canadian

18   journal from Dr. Aiwuyo.

19   Q        Okay.  Let's turn to that --

20   A        They -- they [indiscernible] give their

21   professional opinions.

22   Q        Sure.  Okay.  So let's turn to that.  If you

23   could kindly open up Exhibit 39 and go to page 6.

24             MS. FLECHSIG:  This has been admitted -- this

25   exhibit has been admitted by stipulation.

**Exhibit B**
**p. 37**

1    (Whereupon, Plaintiff's Exhibit 39 is admitted hereto.)

2    BY MS. FLECHSIG:

3    Q        It looks like I'm able to screen-share it with

4    you, as well, if you can see it that way.

5    A        Oh, okay.  Just a minute.

6    Q        That might be easier.  Page 6, please.

7            THE COURT:  Is this 39-006?

8            MS. FLECHSIG:  That's right.

9            THE COURT:  Okay.  Go ahead.

10   BY MS. FLECHSIG:

11   Q        And it's page -- yeah, exactly page 6.

12           So, Dr. Asekomeh -- 39, page 6.  I think --

13   yeah, perfect.

14           So you'll see halfway down the page, I think

15   this is one study that you were saying that Dr. Aiwuyo

16   referred to; is that -- is that true?

17   A        True.

18   Q        And Dr. Aiwuyo writes, "From the Canadian

19   guidelines, these values appear low risk for a major CV

20   event.  Some have used values of less than 4.5

21   centimeters as a partition value for low-risk

22   situations.  Link below refers."  And then he seems to

23   link that study there.

24           Is that -- am I identifying correctly the one

25   study you were talking about?

**Exhibit B**
**p. 38**

1   A        Correct.

2   Q        Okay.  So he says that the values that

3   Mr. Snookal have, 4.1, 4.2, are low risk; correct?

4   A        Correct.

5   Q        And he doesn't say a specific percentage at

6   all; right?

7   A        Correct.

8   Q        Is it fair to say that "low risk" could mean

9   one in a million; it could mean one in a billion?  It

10  could mean truly anything that one might think of as low

11  risk; right?

12  A        So -- so -- so this was a second reference to

13  low risk.  The -- the reference from Mr. Snookal's

14  cardiologist actually put it as normal, said 2 percent.

15  Q        I think I know what you're referring to,

16  Dr. Asekomeh.  Let me find that if I may.

17           Isn't it true that whatever e-mail you're

18  referring to from Dr. Khan came after you made your

19  decision?

20  A        Well, I'm not sure of those sequences again.

21  But I know there was a risk in one of his memos.

22  Q        Okay.  But that came after you already decided

23  not to clear him; right?

24  A        As I said before, there is no decision -- the

25  way you saw (indiscernible).  The decision was made that

**Exhibit B
p. 39**

1    it was low risk?

2    A       So -- so Dr. Akintunde's conclusion was low

3    risk is not no risk.

4    Q       Okay.

5    A       So --

6            THE COURT:  Doctor -- Doctor, we appreciate --

7    this is Judge Vera.  Please try to answer the question

8    directly.  You can add your explanation but please try

9    to directly answer it.  It is taking much longer because

10   you're not doing that.  So if you can, listen to

11   question again.  I'm going to ask Counsel to repeat it,

12   and then I'm going to ask you to answer it "yes" or

13   "no," and then you can add your explanation to it.

14           Go ahead, Counsel.

15           MS. FLECHSIG:  Thank you.

16   BY MS. FLECHSIG:

17   Q       Dr. Asekomeh, it is true that none of three

18   cardiologists you conferred with sent you any percentage

19   they attributed to Mr. Snookal's risk, other than to say

20   he was low risk; true?

21   A       Yes, true.

22   Q       And turning to other e-mail you referenced --

23   so one of the other cardiologists who we haven't

24   discussed her opinion yet was Dr. Akintunde; right?

25   A       Right.

**Exhibit B**
**p. 40**

1    Q        She also e-mailed back on this e-mail thread

2    and said, "I concur with my colleagues.  With an aortic

3    root of 4.2 centimeters, he is low risk but not no

4    risk"?

5    A        Yes.

6    Q        And actually, we can turn -- we can turn to

7    page 5 of this exhibit, and we'll see that.

8             So that's true; right?  That was the quote you

9    were referencing, when she said, "He's low risk but no

10   not no risk"; true?

11   A        True.

12   Q        She didn't say any additional studies; true?

13   A        True.

14   Q        And she didn't say any other risk percentage,

15   other than it is low risk but not no risk?

16   A        True.

17   Q        But no one can ever be said to be at no risk of

18   a cardiac event; true?

19   A        True.  But cardiac event and dissection

20   (indiscernible) -- I struggle to exchange the two words.

21   He had a dilated aortic root that was at risk of

22   dissecting or rupturing.  So the risk we're looking at

23   is specific here.

24   Q        Isn't it true that everyone, even with a,

25   quote, unquote, "normal-sized aorta," has some risk of

**Exhibit B**
**p. 41**

```
1    Q        Okay.  So you didn't consider whether this
2    would also be true in Los Angeles?
3    A        No, because that wasn't -- that wasn't -- that
4    wasn't in the purview of determining whether he was fit
5    to work in Escravos.
6    Q        Did you consider what initial stabilization the
7    medical team in Escravos would have been able to provide
8    Mr. Snookal?
9    A        So again, it depends on whether he was having a
10   dissection or he was having the rupture.  So when it
11   says "initial stabilization," in Escravos, what you can
12   do is set up IV fluid.  I'm aware, even as of this time,
13   that in Escravos, you cannot get blood.  You cannot
14   transfuse him.  So --
15   Q        Why would he need --
16   A        -- again --
17   Q        -- a blood transfusion, Dr. Asekomeh?
18   A        If he had a ruptured aorta --
19   Q        Okay.
20   A        -- he would need a blood transfusion.
21   Q        It's your testimony that you need a blood --
22   you need to add blood if you have an aortic rupture?
23   A        Yes.
24   Q        Okay.  All right.  What about if someone has a
25   dissection?  Isn't it true that you're supposed to lower
```

UNITED STATES DISTRICT COURT

Exhibit B
p. 42

1  their blood pressure so that they don't worsen the

2  dissection?

3  A        Again, I'm not a cardiologist.  So...

4  Q        Okay.  Well, did you ask Dr. Aiwuyo to

5  elaborate on what type of initial stabilization

6  Mr. Snookal would potentially need if something -- in

7  the unlikely event something catastrophic happened?

8  A        It depends -- no.  So this memo, in conjunction

9  with the opinions of the other two cardiologists, was

10 put in together.  So the first thing is that we wanted

11 to know whether we would have warning signs on which we

12 could quickly extract him, and they had said those

13 warning signs were this, this, and this.  And

14 oftentimes, when you have these complications, they

15 happen fast, and it could even result in sudden death.

16 Q        Okay.  But you didn't ask Dr. Aiwuyo whether

17 Mr. Snookal could be stabilized with blood pressure

18 medication, like a pill or an IV; right?

19 A        You -- as you mean, the complication is not a

20 rupture.  So the answer is no.  But if he had a rupture,

21 I know what initial stabilization he would need.  You

22 would need to support him with fluids and with blood --

23 Q        Isn't it true --

24 A        -- which we could not do at that time.

25 Q        Isn't it true that in the extremely unlikely

**Exhibit B**
**p. 43**

```
1    could, go quickly to Exhibit 33, if possible.

2             So this was the clearance letter from

3    Mr. Snookal's doctor that you had in your file while you

4    were making this decision; correct?

5    A        Correct.

6    Q        And you testified that the three cardiologists

7    locally disagreed with Dr. Khan's opinion; true --

8    A        True.

9    Q        -- which is why you disregarded Dr. Khan's

10   opinion that it was safe for Mr. Snookal to work in

11   Nigeria; true?

12   A        Not true.  That's not correct.  So Mr. --

13   Dr. Khan's conclusion was that he was fit to work in

14   Nigeria.  We were on the team on the ground in Nigeria.

15   We considered him working in Escravos.  Nigeria is --

16   Nigeria is a big place.  As I said earlier, the medical

17   facilities are very (indiscernible).  Escravos is

18   removed, and the determination was that he wasn't fit to

19   work in Escravos because in the event anything happened,

20   we would not be able to provide the level of care we

21   need on time.  So the conclusion was that he could work

22   in Lagos, Nigeria.

23   Q        Okay.  I understand that.  I understand that.

24            What I'm asking is, you decided that the

25   cardiologists disagreed with opinion that it was safe
```

**Exhibit B**
**p. 44**

```
 1    for him, at least with respect to Escravos; is that

 2    true?

 3    A         Correct.

 4    Q         But nowhere in the e-mails you exchanged with

 5    any of the three cardiologists in Nigeria did they

 6    disagree with Dr. Khan's opinion; did they?

 7    A         They did.  The conclusion here was that in the

 8    event anything happened, all three cardiologists agreed

 9    the facilities in Escravos will not be able to manage

10    Mr. Snookal's condition.  They did.

11    Q         Would you be surprised to learn that

12    Dr. Akintunde and Dr. Adeyeye, these cardiologists

13    testified that they were not expressing any opinion with

14    respect to Mr. Snookal's fitness for duty?

15    A         Yes, because, ultimately, that determination is

16    made by me as the organizational head physician.  He

17    consulted cardiologists.  But as I said earlier, in the

18    very first e-mail that was sent out, my consultation

19    directly asks them three questions.  The first question

20    was --

21    Q         Thank you.  Thank you, Dr. Asekomeh.

22              I guess I'm asking:  Where in any of the

23    e-mails where they wrote their opinions to you, did they

24    conclude it's not safe for Mr. Snookal's in Escravos?

25    A         So -- so -- so when you look at those e-mails,
```

1    A        Correct.

2    Q        And had -- at that point in 2019, had you ever

3    been to Escravos?

4    A        Yes, I was going to Escravos and doing two

5    rotations, two weeks each, every month, for weeks.

6    Q        So is it fair to say you were familiar with the

7    conditions in Escravos?

8    A        Definitely, very familiar.

9    Q        And you currently work in Escravos; right?

10   A        I do.  I've been working in Escravos since is

11   2020 to date.

12   Q        And can you describe the medical facilities in

13   Escravos?

14   A        So in Escravos, we have two small clinics.

15   There's a joint venture clinic where I work currently on

16   the EGTO side, which is the Escravos gas-to-liquid side.

17   It's a small clinic.  We now have a complement of three

18   doctors on ground and nurses in both clinics.

19   Q        Is there a hospital in Escravos?

20   A        No, there's no hospital in Escravos.  It's

21   actually an off-shore location.  It's a small island

22   somewhere on the Atlantic Ocean.

23   Q        What type of medical situations are the

24   facilities in Escravos capable of handling?

25   A        So basic medical care.  We treat some fever,

**Exhibit B**
**p. 46**

1    some malaria, some minor injuries.  So we have

2    patient -- or workers who come in, who blood pressure

3    medication -- have them -- it's just the basics, nothing

4    surgical, no surgeons on ground, no X-rays, no

5    ultrasounds, no CT scans.  Not labor of care, very

6    basics.

7    Q          And maybe this is obvious, would you -- would

8    the facilities in Escravos be capable of handling a

9    rupture or dissection of an aortic aneurysm?

10   A          Definitely not.  Definitely not, no.

11   Q          Okay.  I'm going to switch gears.  I know we've

12   talked about Mr. Snookal's fitness for duty evaluation.

13   I want to give a little more background in that regard.

14              First, what exactly do you do when you're

15   conducting a fitness for duty evaluation?

16   A          So the process in a fitness for duty

17   evaluation, as I said earlier, we have employees go back

18   and forth.  The employees going from Nigeria to the U.S.

19   or U.S. to Nigeria.  So if an employee from Nigeria is

20   going to the U.S., we do a full medical screening, blood

21   works, lab tests, take history, doctor's examination.

22   And the same thing happens in the U.S.

23              The second part of it is that once it is

24   concluded, the package is sent in.  Like, for example,

25   those coming from the U.S. to Nigeria, those results,

**Exhibit B**
**p. 47**

1    the history is sent to the team on ground to look at

2    those results and make sure they are complete and make a

3    determination whether they're fit to come work in

4    Nigeria or not.

5    Q         Why does the team on the ground get to make

6    that determination?

7    A         Okay.  The reason is that the team on ground

8    will have to determine if there is background with that

9    condition, whether that person will be able to work here

10   in times of complications or if there was need for --

11   need for medical care while on ground in Nigeria.  So

12   the team on ground in Nigeria really knows what is

13   available in what location.

14   Q         And I think we all know -- so Mr. Snookal was

15   deemed not fit for duty to work in Escravos, deemed fit

16   for duty to work in Lagos; correct?

17   A         Correct.

18   Q         And who made that decision?

19   A         The team on ground made the decision.  I made

20   the decision as the occupational head physician on

21   ground that day.

22   Q         And I know you've touched on this, but why was

23   Mr. Snookal not deemed -- deemed not fit for duty in

24   Escravos?

25   A         So, again, the facilities are available in

1    Escravos.  In Escravos, as I said, there are basic

2    medical things we do, not necessarily complex cases.

3    That's the primary reason.

4            And if you take it for that, as of that time,

5    whenever there are cases -- difficult cases in Escravos

6    that needs to be taken out for further care, we'll then

7    be medevac to Warri almost 90 percent of the time or

8    very, very legal.  And in Warri, we have a

9    hospital where I'm presently at that has suddenly to get

10   at a facility and without -- more manpower on ground.

11   So, like, in the Warri hospital, we have a tier that --

12   with all the facilities for X-ray and all of that.

13           Okay.  If you also look at it, if there was a

14   rupture or a dissection in case of Mr. Snookal, it was

15   going to require not any doctor, where it was going to

16   require cardiothoracic surgeon.  Even as a doctor and

17   even though we have a cardiothoracic surgeon here in

18   Warri, that cardiothoracic surgeon will have to be

19   brought in from Benin, which is another, like, one hour

20   and half hour away from Warri itself or brought in from

21   Lagos, which is like two -- two hours -- one hour, two

22   hours by flight from Lagos to Warri.  So outside the

23   facilities, the manpower was the strong issue too.

24   Q       What would have to happen to evacuate someone

25   from Escravos to Warri?

**Exhibit B**
**p. 49**

1   A          So to evacuate someone from Escravos to Warri,

2   the process usually is that once that determination is

3   made, the evacuation team is contacted, (indiscernible)

4   a helicopter to do that medevac.  And there's a few

5   helicopters.  Helicopters are used to fly to other

6   remote facilities.  So we have Escravos, and then we

7   have platforms where the production takes place.  So

8   these choppers are always on the move.  So you have to

9   get to one, and then you have to consider other

10  variables, whether it was raining or not raining,

11  whether it's a night flight or no night flight, none of

12  those vehicles come.  So it's not like we have a chopper

13  standing there waiting for that emergency to happen.

14  Q          Is there a -- a plane in Warri set and ready to

15  take off in case there is a medical emergency?

16  A          Definitely not.  There is no -- there is no --

17  there is such -- such plane doesn't exist.  And we don't

18  have a medical plane.  They are commercial flights and

19  the -- and helicopters.

20  Q          And you mention the rain.  Why would the rain

21  be a problem?

22  A          Oh, Escravos is in the -- it is on the south --

23  south side of Nigeria (indiscernible), which is a

24  mangrove-y area.  It almost rains, like, half of the

25  year.  So the weather is very, very unpredictable.

1    And...

2    Q        And would the rain potentially prohibit

3    flights?

4    A        Definitely.  There is no way we're going to do

5    a immediate evacuation with a helicopter.  That would be

6    putting the life of the person and the pilot and even

7    the medical team who are accompanying that flight at

8    high risk.

9    Q        What about sand storms?

10   A        Everything happens in Escravos.  I don't know

11   if you're familiar with the weather -- weather is like

12   you have in southeast Asia, a lot of rain, a lot of

13   thunderstorm.  And you have to factor a lot of that in

14   when you have medical emergencies.

15   Q        How do you evacuate a patient if air transport

16   is not available?

17   A        So next -- next available means will be to go

18   by boat.  Again, that becomes about a four-hour boat

19   trip, and that boat trip has to be accompanied by

20   military escorts because of the high risk of being

21   kidnapped and a lot of risk involving the waterways.

22   Q        Are there any roads from Escravos to Warri

23   or --

24   A        No, none.  None.

25   Q        Lagos, I was going to say.

UNITED STATES DISTRICT COURT

**Exhibit B
p. 51**

1    A          No roads.  So you have to first of all get a

2    blessing from Escravos to Warri and if you decide to

3    then go to Lagos, you go by road or you go by flights.

4    But there is no road from Escravos to Warri.

5    Q          And did all of these concerns factor into your

6    decision to deem Mr. Snookal not fit for duty in

7    Escravos?

8    A          Definitely.  Definitely.  As I said, the risk

9    of a dissection or rupture, you want to be very quick in

10   what you are doing.  You want to save time and all of

11   these considerations are top considerations you have to

12   follow.

13   Q          Realistically, how long could it take to

14   evacuate a patient with I dissected or -- or ruptured

15   aortic aneurysm to the closest hospital?

16   A          So -- so where Escravos is located to the point

17   of medevac which would be toward the chopper, you would

18   have to pray that all of the variables are dead whether

19   it is good or all of that.  So chopper time from

20   Escravos to Warri, is 30 to 35 minutes.  But with all of

21   these variables, it could be two hours.  It could be ten

22   hours.  It could be 12 hours.

23   Q          And based on your knowledge of the conditions

24   in Escravos and based on your discussions with the

25   cardiologists that we've already talked about, if

**Exhibit B**
**p. 52**

1    Mr. Snookal had a ruptured or dissection in Escravos,

2    what do you think would have been result?

3    A        Oh, I doubt if he would survive it.  It is not

4    likely he would survive it.

5    Q        And what about other people?  Did the potential

6    impact on other people factor into your decision?

7    A        Yes.  As I said, the bulk of it was the fact

8    that it could lead to fatality for himself.  But, again,

9    when you work in operations, as I said earlier, even the

10   office this manager asked to visit sites and look at

11   what a team on ground does.  Any rupture in a location

12   like that could put us at risk.

13   Q        I want to go back to the decision-making

14   process.  You've talked about it, but I don't know if we

15   have laid it out in a linear fashion.  So I want to give

16   you an opportunity to do that.  What is the first thing

17   you did with respect to Mr. Snookal's evaluation?

18   A        So when documented task to mean, first thing

19   you do is that says this documents have been sent to you

20   to do a review.  So you go into the medical report and

21   look at the document that I've been sent.  This would

22   include his medical history, a doctor's physical

23   examination, the laboratory investigation and any other

24   investigations.  So from his medical history as stated a

25   dilated aortic root.  He also had attached to his

1   documents the CT scan the had been done and

2   echocardiogram, which are not routine.  So that already

3   shows that additional tests had been done.

4        So in viewing this review, I knew that we were

5   going to need further review of this case.  So I

6   informed my supervisor that this is not a

7   straightforward case, and it is going to take time to

8   review.

9        The next thing I did was to then look at all

10  the documents and bring in a team of cardiologists on

11  ground at Escravos, who was then stationed in Escravos.

12  And then we had the cardiologist here in Warri with me.

13  And so I sent them a summary of this case, the CT

14  reports and the echo reports.  We asked for a medical

15  review, and ask basic question:  Can we handle this in

16  Escravos?  Are there warning signs if he was getting

17  worse.  Are there signs where we get him or get him out.

18  And if there was complication or rupture or dissection,

19  could we handle this in Escravos.

20       So I then waited for the review, put all of

21  review together.  We did a back-and-forth e-mail.  I did

22  the review and submitted the review and then condition

23  on ground in Escravos the fact that he had a risk of

24  rupture, even though they knew there was no risk and

25  that if there was a rupture, the chances that you will

1    make it alive out of Escravos was very slim, considering

2    the facilities on ground and the situation we're even to

3    do that medevac was not guaranteed.  That determination

4    was then made that he wasn't fit to work in Escravos.

5    He would be fit to work in Lagos for the fact that we

6    had more facilities on ground in Lagos.

7    Q        Just so we're clear, the three cardiologists,

8    that's Dr. Aiwuyo, Dr. Adeye, and Dr. Akintunde; right?

9    A        Correct, right.

10   Q        And we've looked at some of the e-mails with

11   those three cardiologists already.  I don't want to

12   cover ground we've already covered.

13            MR. MUSSIG:  But if we could pull up

14   Exhibit 59.

15   BY MR. MUSSIG:

16   Q        And it is a two-page document, Doctor.  Really

17   it is titled "Summary of Cardiology Opinions, NMA

18   Cardiologists."  I only have a couple of questions about

19   this.  First, what is NMA cardiologist mean?  Are you --

20   first let me ask:  Are you familiar with this document?

21   A        Yes, I am.

22   Q        And what does "NMA cardiologist" mean?

23   A        So -- so the NMA is actually an acronym for

24   Nigeria Mid-Africa.  That's the business units.  It's

25   its own business unit that is also called Nigeria

```
 1   Q        Okay.  You were asked some other questions
 2   about Mr. Snookal's treating cardiologist here in
 3   Los Angeles, including the fact that he would have
 4   cleared Mr. Snookal to work in Nigeria.  Did that factor
 5   into your decision?
 6   A        No.
 7   Q        Why not?
 8   A        The reason is even the -- the work in Nigeria,
 9   it is -- Nigeria is a big country.  We -- as a doctor on
10   ground and the cardiologist on ground, they knew already
11   that the facility in Lagos is totally different that is
12   what is available from Warri to Escravos.  The mere fact
13   that we don't have a cardiologist in Escravos speaks for
14   the fact that that is already a country like Nigeria.
15   Escravos is a place that is removed where you have no
16   facilities on ground.
17            I also shared about the cardiothoracic surgeon.
18   In the whole of -- even if you are able to bring him out
19   to Warri, the nearest cardiothoracic surgeon we have is
20   in another town -- another town called Benin City.  We
21   have no cardiothoracic surgeon even in Warri.  So based
22   on the facilities on ground and the ability to manage if
23   there is any complication, Escravos was and no-no that
24   is why the conclusion was work in Lagos.
25   Q        And you also testified, I believe, that you
```

UNITED STATES DISTRICT COURT

**Exhibit B
p. 56**

1    missing test, we contact the U.S. team and U.S. team

2    would then contact him.

3    Q        But did you think that was necessary in this

4    case?

5    A        No, it wasn't necessary.

6    Q        And you testified that the work history wasn't

7    relevant to your decision.  Why not?

8    A        It wasn't.  The decision was if he had a

9    medical condition, the medical condition had a risk of

10   having complication.  It was coming to work in a

11   location where we could not handle that complication.

12   So it was mainly the professional and moral obligation

13   of if something happens to him knowing he has this

14   condition and we make this condition knowing that we

15   don't have the facilities to manage him on ground.  So

16   the moral obligation was to put him in a place where we

17   could help him and that was Lagos.

18   Q        Did you say there was a moral obligation?

19   A        Definitely.  When you take these decisions,

20   they are difficult decisions to take.  And you are

21   looking at a human life at stake here.  So he had a

22   condition where if he had a rupture in this type of

23   location, in a -- in a country where the medical

24   facilities are not that developed -- and not only was it

25   not developed, he was now going to a very remote

1    location in that country.  That was double -- double

2    problematic for providing help if he needed that help.

3    Q        Last question, Dr. Asekomeh:  As you sit here

4    today, do you believe you made the right decision?

5    A        Definitely, we made the right decision.  The

6    decision is to ensure that when we are aware there's a

7    risk, no matter how low it is, we make the decision to

8    protect life.  And so that was why that decision was

9    made.

10           MR. MUSSIG:  No further questions.

11           THE COURT:  Any re-cross?

12           MS. FLECHSIG:  I just have one very brief,

13   thing.

14                    **REDIRECT EXAMINATION**

15   BY MS. FLECHSIG:

16   Q        Dr. Asekomeh, you made a point that I was very

17   confused by.  Are you saying that you were also

18   concerned about Mr. Snookal being a harm to others if he

19   had an aortic rupture?

20   A        That is a possibility, yes.

21   Q        Isn't it true that at your deposition, you

22   couldn't think of a single example, except if he fell on

23   someone else while the aortic rupture happened to

24   happen?

25   A        So that was an example I cited.  The background

```
 1   Q        That's why you were saying that the fact that

 2   he was a rotator would even decrease the risk; correct?

 3   A        Correct.  It's more complicated than that

 4   because of the pressures and stress --

 5   Q        Thank you, Dr. Levy.  You've answered my

 6   question.

 7            So why don't you look at the top of page 2.

 8   And at the top of this page 2, you are now sending an

 9   e-mail to Dr. Paul Arenyeka; correct?

10   A        Correct.

11   Q        And in this e-mail, you say, "I had a

12   conversation Mark Snookal's nephrologist" -- you

13   probably meant the cardiologist?

14   A        Yeah, cardiologist.

15   Q        Cardiologist.  [As read]:  "-- and the info is

16   below.  Although not without some risk, I don't think

17   we're dealing with high risk.  We can make -- we can

18   mandate yearly clearance and report from" --

19   cardiologist; right?

20   A        Correct.

21   Q        " -- on yearly basis.  Risk is even lower when

22   you consider that he'll be a rotator."

23            You wrote that to Dr. Arenyeka?

24   A        Correct.

25   Q        So despite the fact that you said what you
```

**Exhibit B**
p. 59

1    health and safety."

2            This is your explanation -- part of your

3    explanation to Mr. Snookal; correct?

4    A       Correct.

5    Q       And again, the direct threat you're referring

6    to is the possibility that Mr. Snookal could have an

7    aortic event in Escravos; correct?

8    A       Correct.

9    Q       If you look at paragraph 4, the next paragraph,

10   where it starts "We certainly," towards the middle, it

11   says, "The concern is that if the condition were to

12   occur, the outcome could be catastrophic and would

13   require an immediate emergency response, which is not

14   available, and would most certainly result in death in

15   Escravos."

16           So that was your concern?

17   A       Absolutely.

18   Q       And that is what you expressed to Mr. Snookal;

19   correct?

20   A       Correct.

21   Q       Isn't it true that you were involved in a case

22   of an employee who had an aortic aneurysm

23   that required -- that ruptured in Kazakhstan and the

24   patient subsequently died?

25   A       Yes, that case happened.  I wasn't directly

1    does not presently interfere with his ability to perform

2    the job?

3            MR. MUSSIG:  Objection; calls for a legal

4    conclusion.

5            THE COURT:  All right.  I'm going to overrule

6    it, but I'm going to just explain to the jurors that

7    counsel -- neither counsel can state what the law is.  I

8    have to instruct you on that at the end.  But -- so to

9    the extent a question may have -- may relate to the law,

10   it's what was said or what wasn't said, that can be

11   answered.  But don't take from the question -- the

12   question itself that a principle of law is correct or

13   incorrect.

14           Okay.  So yes, you can answer the question,

15   Doctor.  Were you -- essentially, were -- did someone

16   from Chevron ever say that to you -- to your knowledge?

17           THE WITNESS:  I don't understand the question

18   completely.  And I can explain.  Different jobs have

19   certain criteria for allowing or considering someone to

20   be fit.  Like pilots, pilots can't function with certain

21   medical conditions, lots of them.  You are allowed to

22   disqualify them if they can't -- same thing for a

23   driver, same thing for police and fire fighters.

24           This is a safety-sensitive job working with

25   hydrocarbons, heat, fire.  And a person has essentially

Exhibit B
p. 61

1   a time bomb in their chest with a 2 percent risk of it

2   going off at any time.  There is significant risks

3   that's here.  And so I don't see that as -- I don't see

4   the company has no ability to make a decision on that

5   person hurting themselves, others, or the community.

6   So -- so I don't understand the -- the answer to the --

7   BY MS. LEAL:

8   Q      Let me see if I can clear it up.  And I

9   apologize.  It may have just been me.

10          So did anyone at Chevron, including human

11  resources, tell you that the employer can't say, "We're

12  not discriminating.  We're not discriminating based on

13  disability.  Because of a potential future risk,

14  something might happen to them."  If the employee today

15  can perform the job, they can't discriminate.  Did you

16  understand that?

17  A      I -- I understand what you're saying.

18  Q      Answer my question:  If the employee can

19  perform the job today, can the employer deny a position

20  to the employee, yes or no?

21          MR. MUSSIG:  That calls for a legal conclusion.

22          THE COURT:  Sustained.

23  BY MS. LEAL:

24  Q      So I don't think I got an answer to my

25  question, however, because it wasn't very clear

**Exhibit B**
**p. 62**

1    obviously.  So did anyone at the company instruct you --

2    tell you in any way that it's not a defense for them to

3    say that an employee has a disability with a future risk

4    as long as they can do it today?

5    A        The company has -- we have a duty to care for

6    our employees and the inability to care for him at Lagos

7    and Escravos created the issue for us.  If -- if we were

8    able to manage that risk, we wouldn't -- we would have

9    let him goes to Escravos.  We offered him to go to

10   Lagos, another position, another location.  They just

11   weren't available to him.

12   Q        Thank you, Dr. Levy.  That wasn't my question

13   though.  My question was whether or not anyone at

14   Chevron, including human resources, told you that it was

15   not a defense that the employer -- the company could not

16   say, "Well, we'll deny the position because of a

17   potential future risk."  Was that ever said to you?

18   A        That conversation?

19   Q        Yes or no?

20   A        No.

21   Q        Thank you.

22            MR. MUSSIG:  I don't have anything further,

23   Your Honor.

24            THE COURT:  All right.  Any redirect?  Yeah, I

25   guess it would be redirect.

Exhibit B
p. 63

**CROSS-EXAMINATION**

BY MR. MUSSIG:

Q        Dr. Levy, in a case like this where there's
been a determination that an employee is not deemed fit
for duty because they could potentially die, what is
your primary concern, legal concerns or other?

A        It is a safety of the employee and the
workforce.  The people they work with.  That is my main
concern in that situation.  I'm glad that nothing
happened to Mr. Snookal.  I'm glad things went well, but
as you saw from the list earlier, we deal with
emergencies all the time.  We have fatalities that
happen.  I'd much rather be debating something like this
than the opposite end then have to explain to a family
why something -- why we allowed somebody to go to a
location where we can't keep them safe or healthy.

Q        We heard testimony that, at least one doctor,
felt there was a moral obligation here.  Do you feel
there was a moral obligation?

A        A moral obligation to protect the employee from
a dangerous condition, absolutely.

Q        And you testified earlier this is a dangerous
place; right?

A        It is.  It is a remote location.  There is no
medical care outside of what we provide.  There is no

Exhibit B
p. 64

```
1    EMS.  There is no police.  There is no hospitals.
2    The -- and the ability -- and we mentioned that earlier
3    about the Kazakhstan case.  There are hospitals in
4    Kazakhstan where an individual would be able to go to.
5    In a short period of time, they were stabilized.  We're
6    waiting for a plane to come in.
7              There is no such thing as this in Escravos.
8    This person would have been in an outpatient clinic on a
9    bed with doctors who have no idea how to deal with --
10   wouldn't be able to recognize -- if they think it is a
11   heart attack probably or something else and treat it as
12   a standard heart attack as opposed to a rupturing
13   artery.  Even if we made it to Lagos, the reality is
14   that the hospitals don't have the ability to support
15   this.
16             Average age of -- average life span of a male
17   in Nigeria is 53, and in the U.S., it is about 78,
18   79 years old.  The number one cause of death there is
19   malaria.  Where they spend their resources and how and
20   what resources they have are very different than they
21   have here in the U.S.  And so even if we got -- even if
22   an event happened and we got someone onto Lagos, the
23   first thing I would have tried to do after they
24   stabilize him was fly him out someplace else to another
25   country that has the competency to be able to manage
```

1    that risk.

2         So it is complicated, yes.  Escravos is the

3    worse place.  But I wouldn't have been happy with him

4    having that event in Lagos because it would have taken a

5    military-like operation, if at all possible, to get him

6    into a -- a location that has a sort of western standard

7    of medicine.

8    Q       And we saw a document a few minutes ago showing

9    there were a lot of medical evacuations from Escravos

10   over the years; do you recall that document?

11   A       That is correct.  Yes, I do.

12   Q       So why not just let Mr. Snookal work in this

13   location with his 2 percent risk?

14   A       So it's -- 2 percent is significant.  So those

15   other cases go in without that 2 percent risk, so events

16   do happen.  Any of us can have an appendix rupture at

17   any time without warning.  The issue there is that

18   because the team is busy dealing on managing the work

19   force, a case like this where we couldn't move him

20   because he is unstable would tie up resources for the

21   rest of the camp.

22        We wouldn't be able to manage the rest of

23   anything else that is going on there for anyone else to

24   get hurt or injured.  And while -- in this case it would

25   have been Mr. Snookal -- while Mr. Snookal is

**Exhibit B**
**p. 66**

```
1    incapacitated --
2            THE COURT:  Slow do down a bit.
3            THE WITNESS:  Sorry, it's the New York in me.
4    A       So while Mr. Snookal was -- in this example --
5    incapacitated, management of his team and his
6    responsibilities would be done by who?  His replacement
7    wouldn't be there for 2 to 3 days at an absolute
8    minimum, if they left the second he started having chest
9    pain or having an event.
10           So this one event like this would tie up the
11   whole medical system.  It would -- if it happened at
12   night, there may be -- we probably would try to call in
13   a late-night helicopter evacuations, which are very
14   dangerous.  If the weather wasn't cooperating --
15           THE COURT:  Doctor, you're still --
16   A       If there were sand storms, we would have to
17   forget any kind of air evacuation, shift to a boat, put
18   him on a boat, call the Nigerian Navy to escort us
19   through the Niger Delta to protect us from the
20   militants, and then get him to Lagos that way, which is
21   a very, very dangerous event and something we try not to
22   do at all cost.  And so I'm not talking about something
23   simple.  If it were something that we could have managed
24   without expert and specialty care that's -- that's --
25   that wasn't available, we would have had a different
```

**Exhibit B**
**p. 67**

1    decision on this case for sure.

2    BY MR. MUSSIG:

3    Q        And you mentioned that late night medical

4    evacuations are dangerous.  Dangerous to who?

5    A        Dangerous to the pilot, dangerous to the staff,

6    dangerous to the patient.  So it's landing at night.

7    That's the issue.  That -- no visibility whatsoever.

8    The same issues happen if we have sand storms in the

9    daytime.  We have them at night as well.  But the night

10   evacuation is much more dangerous and unsafe for a lot

11   of different reasons.

12   Q        And have you ever -- you testified that in your

13   position in 2019 you were based in London; right?

14   A        Correct.

15   Q        And as part of your job did you ever travel to

16   Escravos?

17   A        Many times.  I can't tell you exactly how many

18   times I've been there, but I was looking at this

19   yesterday trying to count all my trips, somewhere

20   between eight to 15 trips to Nigeria and six to eight at

21   least to Escravos.

22   Q        What is travel to Escravos entail?

23   A        So it depends on where you're coming from --

24            THE COURT:  Counsel, you've gone through all

25   this before, so please move on.

```
 1    them.  I haven't dealt with hundreds of them, but I've

 2    dealt with a handful.

 3    Q        And then could we pull up Exhibit 68.  We've

 4    discussed this exhibit at length.  And I don't want to

 5    spend a lot of time on it, but I do want to get your --

 6    your thoughts on it, on a couple of the points in it.

 7             And we've talked about this third -- well, let

 8    me -- are you familiar with this e-mail.

 9    A        I am, yes.

10    Q        Okay.  And -- and we understand, this is an

11    e-mail that Dr. Khan sent to you after you had left a

12    voicemail for him asking for more information about

13    Mr. Snookal; right?

14    A        Correct.

15    Q        And let's highlight paragraph 3 where it starts

16    "Mr. MS's aneurysm is relatively small and considered

17    low risk."

18             When you received this, what did you take away

19    from it?

20    A        I -- I mean, I think that the obvious issue

21    there to me is the 2 percent or the actual risk.  You

22    know, words "low," "medium," "high" don't mean as much

23    to me as the actual -- what is -- what are the numbers?

24    What are we trying to make a decision on?  For a one in

25    a million, it's -- we consider that low risk.  But 2
```

**Exhibit B**
**p. 69**

1    percent or 1 in 50 chance of it happening is -- that's

2    really the situation that -- that the team and we need

3    to be aware of.

4    Q        And how did you interpret this 2 percent?

5    A        It's significant.  It's significant as far as a

6    fitness for duty decision.

7    Q        What -- go ahead.

8    A        Generally, the criteria for -- for most fitness

9    for duty decisions in safety sensitive workers are about

10   1 percent, 1 percent or less: pilots, drivers,

11   nuclear -- railroad employees, nuclear regulatory

12   agencies.  So 2 percent is significant.

13   Q        And did you have any reason to doubt Dr. Khan's

14   assessment of the risk?

15   A        Dr. Khan is his treating medical provider with

16   all of his records.  The studies he's quoting are

17   reasonable to me.  There's no reason for me to have

18   questioned the expert -- not -- not like this.  And so I

19   thought that was fair.

20   Q        And so did you move forward with an assumption

21   that the risk here was 2 percent or in that range?

22   A        Yeah.  So -- and I can tell you that studies

23   are one -- with research -- medical research, medical

24   literature, you need to read lots and lots of studies.

25   The one -- there's -- these things happen all the time.

```
 1    There's lots of studies.  Sometimes they get done better
 2    or improved methods over time, and so you've got to keep
 3    up with the literature to try to get some sense of what
 4    the current numbers are.
 5            You know, if you looked at data from 30 years
 6    ago, the numbers would be different because of --
 7    because we're looking at -- well, at least as -- as
 8    current as possible, yeah, this is as good as we're
 9    going to get.  And yeah, I try to rely on the treating
10    specialist, the one who knows the patient the best.
11    Q       Now, when you first learned about Mr. Snookal,
12    and -- and him reaching out through the Chevron Human
13    Resources, did you do any research to try and wrap your
14    head around -- around this?
15    A       I did.
16    Q       And --
17    A       Again, Internet search, went through -- went
18    through articles on similar cases on -- on --
19    specifically cases where the aorta was of this size,
20    trying to get up sort of a baseline.  Again, I'm not the
21    specialist, a cardiologist or thoracic surgeon here.
22    But I am able to -- I understand, and I read medical
23    literature very well.
24            And so I got something that I thought was
25    reasonable as a starting point, with, like, a reasonable
```

**Exhibit B**
**p. 71**

1    decent graph.  Showed it to Mr. Snookal and said, "This

2    is what I'm looking at here.  I'd like to speak to your

3    medical provider to understand why you -- or you either

4    fit in this -- these numbers or don't fit in these

5    numbers.  I want to understand your specific situation."

6    Q        And that's what led you to Dr. Khan?

7    A        That is; correct.

8    Q        And -- but did you speak to Mr. Snookal in the

9    interim?

10   A        I don't remember how many conversations with

11   Mr. Snookal I -- I had.  But I did speak to him at least

12   once and -- and probably several times via e-mail.  But

13   honestly, it's five or six years ago, hard to remember.

14   Q        And we saw an e-mail yesterday, and I'm happy

15   to pull it up, if it'll help you.  But it's an e-mail

16   exchange between you and -- and Mr. Snookal, and there

17   was a chart.  Do you recall that --

18   A        I do.

19   Q        -- testimony yesterday?

20   A        I do, yes.  That's what I sent him as my

21   baseline.  And so I shared a chart with him, and it had

22   the risks, had risks at about 4 percent, 4 1/2 percent.

23   And I said, "Why don't we start with this."  And

24   Mr. Snookal said, "I don't believe that study," or "I

25   don't believe I fit in that study.  There's better

```
 1    is different than the data that his -- that his treating

 2    specialist referred me to.

 3    Q        Going back to Exhibit 68 for a moment, if we

 4    could, pull up the -- the top of the e-mail, the last

 5    e-mail in this chain.

 6             Are you able to see that?

 7    A        Yes, I am, sorry.

 8    Q        Okay.  And so you reply to Dr. Khan.  You said,

 9    "I'm working with my team in Nigeria right now to

10    discuss" -- can you just give a general overview of what

11    you were discussing with the team in Nigeria?

12    A        The -- sorry, I had to review it quickly.

13             So what I needed to review with the team in

14    Nigeria is -- is this discussion, the risks --

15    specifically the risks and the potential outcomes.  And

16    so conversation would have went something like I -- I

17    think I spoke with Dr. Khan, the treating cardiologist.

18    And this is -- and here is -- here is the information

19    that he sent.  The risk is about 2 percent.  There is

20    some risk here, but he's been stable for a few years.

21    So I -- this is not incredibly high risk, you know.

22             And that would have been my -- my conversation

23    with Dr. Arenyeka, to see if this is something that they

24    could accept.  And I would say this is one where, again,

25    it's -- if you think -- I mentioned the hospitals
```

**Exhibit B**
p. 73

1    earlier.  This is one where they run the medical system.

2    They're the ones treating, and they have to feel

3    comfortable taking a hand-off of a medical condition

4    that they may not have experience with or may not have

5    resources to fix.

6            And so that was the discussion.  This is the

7    risk.  This is what could potentially happen.  And he

8    subsequently replied, "That's still too high for us."

9    Q       In your position, were you able to overrule

10   Dr. Arenyeka?

11   A       No, I can't.  I mean, it's the same as trying

12   to send someone to a hospital that can't handle an

13   issue.  So no, this is not -- it's their --

14   they're the -- their ability to support the patient is

15   the deciding factor here.  And if we could have brought

16   in resources to have helped in a reasonable manner, we

17   would have.  But because it's such a remote location, it

18   was -- it wasn't feasible.

19   Q       And we actually looked at this e-mail earlier.

20   I'll pull it up again, just real briefly.  It's

21   Exhibit 69.

22   A       Okay.

23   Q       And this is the e-mail exchange between you and

24   Dr. Arenyeka; correct?

25   A       That is correct.

```
 1    Q        Okay.  And he says -- in the e-mail that's in
 2    the middle of the page, he says, [As read]:  "I still
 3    believe -- I believe we should still be very cautious.
 4    The risk of an incident, no matter how low, is a major
 5    factor in Escravos medical care.  Logistics of getting
 6    an emergency out of Escravos, especially when there is
 7    weather challenge, compounds the risk of an adverse
 8    outcome."  Did you agree with that?
 9    A        Absolutely.
10    Q        And so when you had reached out to Dr. Arenyeka
11    originally, what you mentioned a moment ago where you --
12    you said, "I understand this is low risk," and you
13    talked about the rotator stuff, were you trying to help
14    Mr. Snookal?
15    A        I was advocating for him, yes.  He might not
16    have felt that way, but that's what I was doing, yes.
17    Q        Okay.  And how would you describe
18    Dr. Arenyeka's response?
19    A        That was friendly and -- and open.  And, I
20    mean, I would say the -- the words that you see here
21    were very similar to discussions that we had of, you
22    know, it's -- you know, we can't handle this.  And --
23    yeah, and it wasn't -- it was -- we knew about it, and
24    we knew -- we knew about a 2 percent risk, and it was
25    just hard to say, "Let's ignore it, hope for the best
```

**Exhibit B**
**p. 75**

1    for a few years."

2    Q        Okay.  I want to switch gears.  If we could,

3    pull up Exhibit 70.

4            MR. MUSSIG:  The parties have stipulated to

5    admissibility, Your Honor.

6            THE COURT:  Go ahead.

7     (Whereupon, Defense's Exhibit 70 is admitted hereto.)

8    BY MR. MUSSIG:

9    Q        This is a several-page e-mail.  I'm going to

10   start at the first e-mail in the chain, which is on

11   page 3 of the document.

12           Dr. Levy, this is an e-mail from you to someone

13   named Bijo Velante --

14   A        Correct.

15   Q        -- Mirabueno (phonetic).

16           Who is that?

17   A        So when our expats or potential expats are in

18   the process of moving or transferring, we have a group

19   called Global Mobility who serve as sort of their

20   connections or like an HR person -- like an HR person to

21   help and support their move.  So I would -- and so this

22   Bijo person would be following up with us saying, "We've

23   got this expat.  What is going on?  Is he clear or not?

24   The deadline is coming up."  And so we would work with

25   Bijo.  So in this situation, yes, I notified Bijo that

**Exhibit B**
**p. 76**

```
 1    we have an issue and clearance on one of his -- on one

 2    of his employees may not happen.

 3    Q        You say in the e-mail to him -- you introduce

 4    yourself.  And you say -- in the second sentence of your

 5    e-mail, you say, "In short, he can be cleared to work in

 6    Lagos and not Escravos.  Is there any chance this

 7    position can be moved?"

 8            Why were you reaching out to Mr. Mirabueno?

 9    A        At that time, I thought he was the person to

10    ask about negotiating with the business to decide --

11    negotiating with NMA, the Nigeria mid-Africa business

12    unit, on whether this position can be moved.  We

13    thought -- Dr. Arenyeka and myself and, I believe,

14    Dr. Frangos in the past had this conversation about --

15    about whether we can support Mr. Snookal in Lagos, and

16    they said, "We can.  We'll try."  It was still risky,

17    but they were willing to take him in Lagos if the job

18    owner thought that made sense or was possible for him to

19    work out of Lagos.

20    Q        What do you mean by "the job owner"?

21    A        So it appears to me, based on all of these

22    discussions, that his position was in Escravos in an

23    office managing a team.  So the question was:  If being

24    in Escravos was the problem, why can't he work in an

25    office in Lagos and manage his team remotely with trips
```

**Exhibit B**
p. 77

1    back and forth, potentially, to minimize his time in

2    Escravos?  So -- so accommodating -- trying to

3    accommodate the issue.

4    Q       Okay.  And then Mr. -- going on page 2 of the

5    exhibit, Mr. Mirabueno responds to you.  He says, "Hi

6    Scott, it would be best to seek advice from Amaka, the

7    host HRBP."  Do you see that?

8    A       Yes.

9    Q       It is about two-third of the way down the page.

10            What is HRBP?

11   A       Human resources business partner.  So I think

12   Amaka was the local Nigeria HR person, but I don't

13   remember.  It's been a long time.  Sorry.

14   Q       Okay.  And then he asks Amaka -- it says,

15   "Kindly advise on Scott's inquiry below."  And then we

16   see above that, there is an e-mail from Amaka, and he

17   e-mails a person named Ciji (phonetic).

18            And do you see that e-mail?

19   A       I do.

20   Q       And so it essentially asks, "Can this job be

21   moved?"  Right?

22   A       Correct.

23   Q       And if we look at the first page of the

24   document, what was the ultimate response?

25   A       Well, the ultimate response, that this position

UNITED STATES DISTRICT COURT

**Exhibit B**
**p. 78**

1    cannot be moved.

2            MR. MUSSIG:  Can we go to the first page of the

3    document, please?

4    BY MR. MUSSIG:

5    Q        And so ultimately, you respond.  It is the top

6    e-mail in this chain.  You say, "Understood.  I just

7    wanted to confirm"?

8    A        It's correct.

9    Q        And so you had actually reached out to see if

10   this job could be performed in Lagos?

11   A        That is correct.  It was part of my

12   responsibility and -- and from a moral and ethical path

13   and also a business path.  The business decided that

14   Mr. Snookal was the best person for this job.  It's in

15   my best interest to try to make this work and see if we

16   can support him, and in this case, that seems like

17   potentially a reasonable alternative.  The challenge was

18   that, you know, their response was that they needed him

19   to perform duty -- job duties in Escravos, and it was

20   not movable.  And so that is what the issue was.

21   Q        Understood.

22            Last exhibit I'm going to look at with you,

23   it's one we look at before.  It is Exhibit 68.  Oh, my

24   apologies.  It is Exhibit 88.

25            We looked at this before.  This is an e-mail

**Exhibit B**
**p. 79**

```
 1   you sent to Mr. Snookal on September 16, 2019; correct?

 2   A       Correct.

 3   Q       Why did you send this e-mail to Mr. Snookal?

 4   A       I believe it was a request from Mr. Snookal for

 5   something in writing regarding his situation with

 6   reasoning.  And there is a message somewhere -- an

 7   e-mail somewhere where he requested -- again, he

 8   mentioned he thought he was being discriminated and

 9   requested something and -- a document to explain.

10   Q       Okay.  And so there is some specific language

11   in the e-mail I want to focus on.  Third paragraph, if

12   we can pull that out, you say, "I understand that you

13   are willing to take the risk of potentially dying on the

14   job."

15           What did Mr. Snookal say or do that led you to

16   that understanding?

17   A       I believe his message was almost referencing

18   that it's very paternalistic.  And again, I'm

19   paraphrasing what he wrote.  But there is an e-mail from

20   Mr. Snookal, I think, to Andrew Powers and myself that

21   said that Chevron is taking a very paternalistic

22   approach here, and "If it is my risk, it is my risk" or

23   something similar to that.  And so this was referencing

24   that.

25   Q       Okay.  And then you go on to say in the last
```

Exhibit B
p. 80

```
 1   sentence, "However, the company does have a right to not
 2   engage individuals where their assignment could pose a
 3   direct threat to their own health and safety."
 4          Why did you say that?
 5   A      Because -- so this is -- I would say it is a
 6   combination of things.  But it is a moral and
 7   ethical issue.  It is also a safety issue.  I think that
 8   the -- that the concern from us was simply, yes, we
 9   understand that he is willing to take risks, and I can
10   appreciate that, but at the end of the day, it's --
11   we've got a duty to make sure he is safe and then also
12   his coworkers and colleagues are safe, as well.
13          And yeah, I -- I -- I think that the key here
14   is that we didn't want him to have a significant issue
15   we couldn't solve or we couldn't help him with.  We're
16   not psychic.  We can't predict everything that's going
17   to happen, but at the same time, we had a very
18   identifiable risk.  And I referred to it earlier as sort
19   of a time bomb in his chest.  And to put him in a
20   safety-sensitive position, one where sudden
21   incapacitation could create significant issues for him,
22   for his team, for the environment potentially, was
23   significant, and so that is the reason I wrote that
24   message.  I hope that makes sense.
25   Q      When you say "for the environment potentially,"
```

**Exhibit B**
**p. 81**

1    what do you mean by that?

2    A        So his -- that's a good -- so his job was,

3    again, maintaining and -- and fixing issues at the

4    plant, so correcting problems, so spills into the --

5    into the river, pollution into the air can cause

6    accidents, potentially.  Again, this is all natural gas,

7    and heat and pressure explosions happen.  We've had

8    these before.  I've had two fires in the last three

9    months in -- in different locations.  And so failure of

10   him to be able to do his job or to manage his team has

11   potential consequences.

12   Q        And if we go to the next paragraph, fourth

13   sentence down, it starts, "While reasonable

14   professionals can debate."  Do you see that language?

15   It is the fourth sentence down.  It's the fifth line

16   down.  It says, "While reasonable professionals" --

17   A        Yes.

18   Q        -- "can debate the exact percentage, we're

19   dealing with an established risk that is several

20   magnitudes higher than the baseline, and it is a

21   realistic possibility."

22            Is it common for medical professionals to

23   disagree about things like the exact percentage?

24   A        Absolutely, absolutely.  And it is possible to

25   have differing data to some degree.  It may be people

1    with different techniques on how they fix something.

2    The key is mostly trying to understand what this

3    person's underlying risk factors are and then put them

4    into -- get them based on studies that had that specific

5    individual's situation in the studies.  And then it

6    takes repeatable results and things like that.

7              So yeah, it is normal to have some did debate

8    on the exact percentage, but from a safety

9    perspective -- or really, it's -- whether it's zero or

10   1.9 or 2.5 or -.4, it is still pretty high, and that was

11   the issue we had.  If we -- I would say one percent is a

12   typical standard that we use for -- for the

13   transportation industry and others for safety-sensitive

14   position and -- positions, and Mr. Snookal's risk at

15   that moment was -- was close to 2.  And then as we age,

16   the size of the aorta typically grows slightly, and so

17   there was no reason for us to think that the aorta was

18   going to get smaller with time.  It's just the 2 percent

19   risk today with potential for it to rise over an unknown

20   period of time.

21   Q        Okay.  And while there may be a debate about

22   percentages, is it fair to say that ultimately, Chevron

23   had to make a decision?

24   A          Absolutely.  I think there is -- we -- we used

25   information available to us, and we used a treating

**Exhibit B**
**p. 83**

1    medical provider as -- as the expert.  And we had to --

2    so the expert gave us the -- a reasonable estimate of

3    the -- of the current risk, and then there was a second

4    piece of it, is the risk tolerance.

5              So the risk tolerance is really the heart of

6    all of this.  What was our risk tolerance to accept this

7    case in Escravos?  What was our -- how willing were we

8    to have this potential event happen?  And that is really

9    what we're fighting over -- or what the debate seems to

10   be over, is our tolerance to have that risk.

11   Q       And I think what you had said earlier is that

12   risk tolerance decision rests with the embedded medical

13   team?

14   A       Yes.

15   Q       Why is that?

16   A       Because they're the receiving end of this, and

17   so they're the ones that would have to support.  They

18   know their competencies to be able to treat or manage

19   this medical condition.  They clearly know what it takes

20   for a medical evacuation to get someone out.  So it's --

21   yeah, so they're absolutely the best to -- the best to

22   understand their own capabilities to manage and -- to

23   manage this outcome and what it would take to sort.

24   Q       Okay.  The last thing I want to talk about on

25   this exhibit is:  If we go to the fifth paragraph down,

**Exhibit B**
**p. 84**

1    resources on his own to hospitals, emergency rooms, and

2    his own doctors.  While he is in Escravos, he lives in

3    an oil camp.  It's -- it's our responsibility.  It is

4    our medical team.  It's our resources 24 hours a day for

5    the 28 straight days that he is on.

6          So there is no going home.  It's a -- it is a

7    constant need to support the individuals that doesn't

8    exist in -- in El Segundo.  So in Los Angeles, the

9    resources are really, really good and strong and solid,

10   and we can get him where we need to.  We couldn't do

11   that in Escravos.  That's issue here.  That is the big

12   difference.

13   Q       And then you go on to say, "We, in fact,

14   discussed whether you could perform this particular job

15   at a different location, in Lagos, but it wasn't

16   possible."

17          We talked about that; right?  Do you recall

18   that?

19   A       Yes, I -- yes, I do.

20   Q       And so that is a conversation you had with

21   Mr. Snookal?

22   A       Correct.

23   Q       Okay.  And then if we take down the

24   highlighting and we look at the bottom of the document,

25   you actually list a number of locations -- foreign

```
 1   locations where he can work.  Do you see that?

 2   A       I do.

 3   Q       And why did you do that?

 4   A       Because these were -- I mean, these were

 5   literally alternatives.  And so the issue was, is that

 6   this -- Escravos was the most -- one of the remote

 7   places we have on the planet.  The risks was high as

 8   Iraq or maybe Bangladesh.  But this was extremely high

 9   risk.  And these are all places that I know we could

10   have supported his medical condition.  These are places

11   where we have the medical operations that -- that could

12   handle his issue.  There were plenty of places here that

13   I would have felt comfortable with him going.

14           And then I also listed some locations that we

15   would have to talk about specifically location

16   dependent -- more individualized assessment for certain

17   things, like offshore work and things like this.  But we

18   thought that these -- I thought this would help him to

19   help identify another expat location or another place

20   that he could work should another opportunity arise.

21           This is, like, a very stressful situation for

22   anybody.  I mean, it's -- you're offered a position,

23   and you expect to go and then end up -- you know,

24   potentially end up stuck because you can't get a visa or

25   because can't get a medical clearance.  And so having
```

**Exhibit B**
**p. 86**

1    other options to work with their teams to help identify

2    location, usually, the first question is, "Okay, if he's

3    not fit for this location, are there any place else that

4    we could send him?"

5              And so I was trying to help by listing a whole

6    bunch of places, places that would be opportunities and

7    definitely would -- would negate the need to be

8    concerned about his underlying condition because we

9    could have sorted them at all these places.

10   Q        Okay.  Do you believe you did everything you

11   could, reasonably, to help Mr. Snookal in this

12   situation?

13   A        I do, I do.  I think it's -- I feel like the --

14   this treating specialist was -- was key to identifying

15   the issue.  I think trying to find alternative locations

16   for him, having this -- having those conversations with

17   the embedded Nigerian medical team, I think, were needed

18   to understand there is tolerance.  And -- but I don't

19   know what else I could have done that would have changed

20   anything here.

21   Q        Okay.  And I asked this question of

22   Dr. Asekomeh.  At the end of the day, this decision to

23   deem Mr. Snookal not fit for duty to work in Escravos,

24   do you -- as you sit here today, do you believe that's

25   the right decision?

**Exhibit B**
**p. 87**

```
1              THE COURT:  Overruled.

2              You can answer, Doctor.

3              THE WITNESS:  I did not do that because it

4    wouldn't have changed anything.  I couldn't send him

5    there without the accepting team giving me the approval.

6    So --

7    BY MS. LEAL:

8    Q        And you supervised.  You were the leader of the

9    Nigerian doctors; correct?  You testified to that

10   yesterday?

11   A        No, it was their decision.

12   Q        But you said you were their leader; were you

13   not?  Doesn't that show -- that's shown in your CV.

14   Your words, you lead a team of about 300 medical doctors

15   in that geographical area; isn't that true?

16   A        I lead --

17   Q        Isn't that true?

18   A        They are licensed medical --

19   Q        You lead them?

20   A        Licensed physic- --

21   Q        Do you lead them, Mr. -- Dr. Levy?  That's what

22   your CV says.

23   A        I lead them, but it doesn't mean I make every

24   decision for them.

25   Q        But you have -- you're very influential; aren't
```

**Exhibit B**
**p. 88**

1     you?  You manage $40 million budget a year.  You can buy

2     a plane to Kazakhstan.  Aren't you an influential

3     person; yes or no?

4     A        I would not have asked --

5     Q        Are you an influential person, Dr. Levy?

6     A        Potentially.

7     Q        Mr. Mussig showed you Exhibit 8, which are the

8     fatalities in Escravos, the list that we obtained from

9     Chevron for a number of years.  And he identified a

10    number of them.  And you testified that they were

11    contractors, not employees.  But we received that list

12    from Chevron.  So isn't it true that those contractors

13    still do work for Chevron; correct?

14    A        They do.

15    Q        Thank you.

16             So you just testified a few minutes ago that

17    you can understand that Mr. Snookal would say why his

18    risk was low, but in your opinion, he had a time bomb in

19    his chest.  Do you remember that testimony a few minutes

20    ago?

21    A        Yes, I do.

22    Q        So did you want no risk in order for

23    Mr. Snookal to go to Escravos and work there?

24    A        No, so it's impossible to have no risk.  We all

25    have some risk.

1    Q        And you wrote a restriction here stating that

2    there's -- that he was restricted from heavy lifting

3    more than 50 pounds.  Did I read that correctly?

4    A        Yes.

5    Q        And you testified that this was because heavy

6    lifting would cause an individual to hold their breath,

7    and that would raise their blood pressure; is that

8    right?

9    A        Yes.

10   Q        Could other types of physical exertion like

11   climbing a ladder, cause a person's blood pressure to go

12   up?

13   A        It can, absolutely.

14   Q        Could stress or other stress conditions cause a

15   person's blood pressure to go up?

16   A        Absolutely.

17   Q        Could lack of sleep -- or regular sleep cause a

18   person's blood pressure to go up?

19   A        Lack of regular sleep?  Is that your question?

20   Q        Yes.  Lack of regular sleep.

21   A        Yes.

22   Q        Thank you.

23   A        Any disruption in his usual circadian rhythm

24   could definitely aggravate blood pressure.

25   Q        Thank you.

**Exhibit B**
**p. 90**

```
 1   A        They offered say 3 to 4 years -- the offer

 2   letter.

 3   Q        And how long have you actually now been in

 4   Escravos?

 5   A        Four years and three or four months.

 6   Q        So you're going on your fifth year in Escravos?

 7   A        Yes.

 8   Q        Okay.  And how is it that you went from an

 9   offer of 3 to 4 years in Escravos to now going almost

10   five years?  What did you have to do?

11   A        Okay.  Actually, I was already informed that I

12   would both move of any other people that original of the

13   four years.  However, Chevron has a transformation now

14   in the organization.  That means it is going to be

15   complete next month, and they put on hold all the

16   changes.

17   Q        Okay.  So there was a transformation -- if I

18   understood, there is a transformation and as a result of

19   that transformation, you continued as the REM in

20   Escravos?

21   A        Yes.

22   Q        Okay.  So you've been in Escravos since when?

23   Late 2020, early '21?

24   A        Yeah, 2021.

25   Q        Early 2021, thank you.  Now, I understand that
```

**Exhibit B
p. 91**

1    Chevron has what are called PSGs, or pay salary grades?

2    A        Yes.

3    Q        You understand that?

4    A        Yes.

5    Q        And at the time that you were given the offer

6    in October of 2020 to be the REM in Escravos, what

7    PSG -- what pay grade were you offered?

8    A        35 -- actually, 30.  The position is 24, place

9    and my -- my PSG at that time was 25.

10   Q        Okay.  So you were offered a 24 in October of

11   2020, and you're currently a 25?

12   A        Yes.

13   Q        And when did you become a 25?

14   A        No, I -- as I said, the offer was 24 because

15   the position is blocked for 24.  It is a place position.

16   I was already 25 when I got that position.

17   Q        I see.  So when they offered you the position

18   in October of 2020, you were a 25, but they gave you a

19   24?

20   A        Yes.

21   Q        Yes?

22   A        Yes.

23   Q        Okay.  As a result of that, did you lose any

24   money?

25   A        No, I didn't lose any benefit.

**Exhibit B
p. 92**

1    Q        So they kept you at your same salary?

2    A        Yes.

3    Q        Okay.  Now, is it correct that because you're

4    in Escravos, that you receive what is called a location

5    premium -- a 55 percent on top of your salary.

6    A        Yes.  Basically, due to the risk of the site.

7    Q        Due to the site, yes.

8             And during the time since October 2020, when

9    you're offered the position, you were offered position

10   as a rotator; correct?

11   A        Yes.

12   Q        And my understanding is that a rotator means

13   you worked for 28 days in Escravos and then you come

14   home for 28 days.  And you don't work, or you do

15   whatever it is you want to do during those 28 days;

16   correct?

17   A        It is supposed to be like that.

18   Q        Okay.

19   A        In many opportunities, you need to continue

20   supporting the facility from home for a specific task.

21   Q        If someone comes up, then you should --

22   A        Yes.

23   Q        -- respond to Chevron, you're saying?

24   A        Yes.

25   Q        Okay.  But in essence, you really only work six

1    months out of the year?

2    A      Yes.

3    Q      Okay.

4    A      Actually, the way that it has been explained,

5    even to our -- is that because we work there 12 hours a

6    day for 28 days, you are actually working the double of

7    time -- total of time is really one year work.

8    Q      Because?

9    A      Focus on six months.

10   Q      So what I'm understanding you is when you're in

11   Escravos, you don't really have a whole lot of time off

12   because all you're doing is working?

13   A      Well, Monday through Sunday, 12 hours a day.

14   Q      So --

15   A      And you also have to be available at night.

16   Q      If need be?

17   A      If needed, yes.

18   Q      Okay.  When you're in Escravos you don't have

19   to pay rent, utilities, groceries, anything like that;

20   correct?

21   A      Officially not.  Commonly, we just take what we

22   ask whatever we with think we may need there.

23   Q      So they provide you all of the necessities for

24   living in Escravos during that period of time; correct?

25   A      Yes.

**Exhibit B
p. 94**

 1    instrumentation, and analyzers and electrical; is that

 2    correct?

 3    A        Yeah.

 4    Q        So that was your job -- or is your job, because

 5    you're still there?

 6    A        Yes.  That's possibly short way to explain

 7    that, yes.

 8    Q        Okay.  And was Amir Zaheer your predecessor in

 9    Escravos?

10    A        Yes, he was.

11    Q        And were aware that Mr. Zaheer received the

12    position in 2019 because Chevron rescinded the REM

13    position to Mr. Mark Snookal?

14    A        No, I didn't know about that.

15    Q        You didn't know that?

16    A        No.

17    Q        Okay.  Did you ever have a conversation with

18    Mr. Zaheer to ask him how it was that he ended up in

19    Escravos in 2019?

20    A        No, actually, I never listened to anybody talk

21    about that in the last four years.

22    Q        Okay.  All right.  So Mr. Zaheer obviously

23    stopped being the REM, reliability engineering manager,

24    in Escravos because you then came in -- the offer came

25    in in October of 2020.  Do you know why Mr. Zaheer

**Exhibit B**
p. 95

```
1    stopped working in Escravos?

2    A        Due to the transformation of that year, Chevron

3    and other companies have what we call posting, the

4    position was posted out.  I think it was about 19 people

5    in that competition.  Amir was one of that.  I was also

6    one of that.  I was the -- the finally selected one.

7    Amir was not acumen -- he was acumen, but he wasn't

8    selected for the position.  They made a comparison

9    between Amir, the other 18 people, and myself.

10   Q        I see.  So you're saying that in 2020, there

11   was a company transformation, and people were encouraged

12   to apply for the position.  He applied, you applied, 18

13   other people applied, and you ended up getting the

14   position?

15   A        Yes.

16   Q        Got it.

17   A        Yes.

18   Q        I assume you like being in Escravos since

19   you've been there almost five years?

20   A        Sorry, can you repeat?

21   Q        I said I assume you like being in Escravos

22   since you've been there almost five years?

23   A        Yes.

24   Q        Do you intend to stay working in Escravos?

25   A        Actually, it will be depending on Chevron;
```

UNITED STATES DISTRICT COURT

**Exhibit B**
**p. 96**

1    however, as I understand, because I'm already four

2    years -- I've been working there four years, I cannot

3    continue working there.  Same thing with other two or

4    three people that I know, that they were also informed

5    that.  About four years, they cannot continue working

6    there.

7    Q        Is that because of the Nigerian Government

8    would not approve another visa for you?

9    A        Yes.

10    Q        All right.  So I assume you like being an

11    expat?

12    A        Huh?

13    Q        Yes?

14    A        Actually, that position, as I said, was not

15    because I was looking to be an expat.  At that time,

16    Chevron just post a pool of positions.  You apply for

17    them, and then Chevron come back with which one that

18    they want to give to you.  At that time, I was also

19    posting my name to some position in the U.S.

20    Q        Right.  So that's why you applied in October --

21    A        Yes.

22    Q        -- or maybe a little before October; then

23    October, they offered you the position --

24    A        Yes.

25    Q        -- in 2020?

1    A        Supporting offshore.

2    Q        And where did you work?

3    A        Onshore, EGTL, gas-to-liquid plant.

4    Q        Onshore, okay.

5             And do you know if these offshore employees,

6    whom you believe may also be included here on Exhibit 8,

7    if they also -- if they -- if they're sick or ill or in

8    an accident, if they also have to be transported away

9    from Escravos?

10   A        I'm actually not aware, but I think that

11   they're -- they need to be done, then they will be

12   admitted back.  But I'm not aware of that.  As I say, a

13   different facility, possibility no.

14             MS. LEAL:  Okay.  I don't have anything else.

15   Thank you.

16             THE COURT:  Okay.  Direct?

17                   **CROSS-EXAMINATION**

18   BY MR. MUSSIG:

19   Q        Good afternoon, Mr. Malpica.  I just have a few

20   questions.  And my first -- I think this is probably

21   clear, but just -- and I don't think this is disputed.

22   Do you understand that the position you're in is the

23   position that Mr. Snookal had applied for?

24   A        I understand that.  I understand that.

25   Q        And can you tell us a little bit about the job?

1   What do you do on day-to-day basis?

2   A          We start at 6:00 a.m.  At that time, we have

3   about one hour to know what happened the night before,

4   all other team's maintenance, operation together before

5   the meeting at 7:00 a.m. with the GM.  After that,

6   normally three times, four times a week, I go to the

7   plant.  I meet the people.  We decide what to do.  We

8   decide what -- whether it's a routine day.  Then we just

9   decide to work with meetings or go to the plant.  And if

10  that is something that is being -- happening the past

11  few days, happen the night before, we just go to the

12  plant with engineers and technician.  We call

13  maintenance as to what to do.

14  Q          Now, we've heard the term "office-based job" or

15  "desk-based job."  Is any part of your job performed

16  outside of an office?

17  A          Yes.

18  Q          Can you explain that?

19  A          Yeah, commonly we're responsible of providing

20  maintenance.  We advise on side for repairs.  We also

21  are the reliability team, the one providing the

22  inspection and the -- for the work done by maintenance.

23  And in many cases, also, we need to perform, I mean, in

24  general, inspections of equipments.  Then we have -- as

25  a leader, I'm not going to say that we are all

1  hundred percent with the people, but to be able to --

2  to -- to provide the analysis, we need to go there and

3  support the people on site.  And that need happen

4  possibly three or four times a week, at least.

5  Q        Is it a physically demanding job?

6  A        Yes.  Mainly -- let me then say that mainly due

7  to the environmental condition of the facility, it might

8  be very easily around 36 to 40, 44 centigrade degrees.

9  We then mark succession (indiscernible) that you can

10  Google, maybe 44 to 48.

11          Also, with regard to the -- to the -- it is a

12  facility, and sometimes you need to go up and go down

13  and definitely -- it is a demanding job.  If you need to

14  go to possibly -- like, if you go to 10-, 15-story

15  buildings twice or three times in the morning, if you're

16  not in such condition that you can do that, you will be

17  like, ready to say that.  You can go to 10-, 15-story

18  building up and down.

19  Q        You're climbing stairs?

20  A        Sometimes they're just standard ladder, but in

21  many cases, it's like the one we call a cage -- cage.

22  It's a ladder.  You need to use both type of ladders.

23  Q        So 10 to 15 stories of ladders and stairs?

24  A        Sometimes, yes.

25  Q        And you mentioned the temperature in

```
 1   centigrade.  Could you transfer that to Fahrenheit?

 2   A        It should be about 114, 120.  I need to...

 3   Q        114 degrees Fahrenheit?

 4   A        Yes.

 5   Q        And how many hours a day do you work?

 6   A        Minimal, 12.  The position commonly --

 7   officially, we work 12 hours.  Commonly, after 12, you

 8   can -- I was just chatting with my supervisor now, and

 9   we go 7:00, 7:30 because that's when we have the chance

10   to reply e-mails and to work on some other respond

11   that (indiscernible).  Nobody is interrupting us at

12   night.  But yes, commonly at least 12 hours a day.

13   Mondays at -- 28 days.

14   Q        And I think you had referenced during your --

15   during your testimony previously -- that the rotator

16   idea, 28 days on, 28 days off.  Do you recall that?

17   A        Yes.

18   Q        And is it always 28 on, 28 off?

19   A        No, actually, it is not always.  Like, say

20   there is cases in which you need to extend the 28 days.

21   If I say in 2023, I worked 50 extra days on site, for

22   example.  And then sometimes you need to work because

23   your backup is not available or there are other

24   conditions, and you have turnaround, and you have been

25   in the position to work more.  This year, possibly, I
```

**Exhibit B
p. 101**

159

1    clothes, but you wear the hat.  You wear the utility

2    glove and everything, and you also have the gas

3    detector, and you have to take with you a lot of

4    equipment.

5    Q        Did you say "gas detector"?

6    A        Yes, gas detector.  We cannot go to the plant

7    without the gas detector because that can be a risk.

8    Concentration of gases, that can make you to die.

9    Q        To die?

10   A        Yes, to die.

11   Q        As part of your job, is there any risk that

12   there could be some sort of environmental hazard along

13   the lines of, like, an oil spill or something like that?

14   A        Actually, the facility -- according to Chevron

15   and the industry standard, we have the classification of

16   the risk.  We have -- there is a Risk 1.  That means

17   that you may be killing more than 100 people if

18   something happens.  But -- from there, we have 2 and 3,

19   that you can be killing 50 people or five people.  You

20   are always exposed to that.  And then you need to be

21   taking care of any leak or any something that you may

22   have in the facility.

23   Q        Now, earlier, you talked about the fact you've

24   been in the position for over four years.  Do you recall

25   that?

**Exhibit B
p. 102**

```
 1    A        Yes, a little bit more.

 2    Q        And you used a term called "must move"; is that

 3    right?

 4    A        Yes.

 5    Q        What does that mean?

 6    A        Commonly, when you are approaching the end of

 7    your assignment, you are what Chevron -- let's say

 8    Chevron.  I'm not sure about other.  They call that

 9    priority move.  And you go to the PDC, and you need to

10    go to through this process in which Chevron is posting a

11    position all around globe, and you need to compete for

12    the position that you considered you want to be part of.

13    If you don't -- if you are not successfully on that

14    process that was supposed to be, say, like last year --

15    Q        Uh-huh.

16    A        -- then you are moved to the next round of

17    these PDC as a must move.  It means that you must be

18    taking that position -- position there.  Otherwise, you

19    need to leave the company.

20    Q        So does it mean you need to move out of this

21    position?

22    A        Yes.

23    Q        And you used word transformation earlier, and I

24    think you used that synonymously with reorganization; is

25    that correct?
```

**Exhibit B**
**p. 103**

```
1    A        Yes.

2    Q        And when did that happen?

3    A        You mean, the 2020?

4    Q        Fair point.  The most recent one?

5    A        The one happening now.

6    Q        So is it your testimony that you're only still

7    in the position because of this reorganization?

8    A        Yes.  Otherwise, I should be in -- last March,

9    it would be like the standard PDC process that we have

10   and the standard process for people to be getting in and

11   out of the positions.  But due to this transformation,

12   that process was suspended, and the company has -- has a

13   different process that has been a monthly basis by PSE

14   and by facilities.

15   Q        Okay.

16   A        It is a whole transformation in the company.

17   Q        And do you expect to be out of this position

18   relatively soon?

19   A        In possibly October.

20   Q        You also had talked about the 55 percent -- you

21   talked about a premium payment associated with working

22   in Escravos.  Do you recall that?

23   A        Yes.

24   Q        And is that 55 percent?

25   A        Yeah, 55 percent.
```

Exhibit B
p. 104

1    Q        Okay.  And you had mentioned it is due to the

2    risk of the site?

3    A        Yes.

4    Q        What did you mean by that?

5    A        If the -- depending on security or safety or,

6    let's say, hardship, Chevron has different ranking.

7    Let's say you work in Australia.  Chevron is only going

8    to give you 10 percent -- or Argentina.  If you go to

9    Angola, it is 30 percent.  If you go to Nigeria, due to

10   the risk and the conditions in which you will be

11   working, Chevron give you 55 with the recognition that

12   you will be really -- I mean, working in a tougher area.

13   Q        What you do mean by "tougher area"?

14   A        Again, that might be sometimes environmental,

15   security, many other risks.

16   Q        There are all those risks in Escravos?

17   A        Yeah.  They might be risks in Escravos, yes.

18   Q        Are you aware of any location with a higher

19   premium?

20   A        I think at this time, it is only Venezuela, but

21   I'm not sure.  But I think it is one going in

22   competition.  Even Iraq is lower.

23   Q        Lower than Escravos?

24   A        Lower than Escravos.

25   Q        Last question:  I -- and I just -- I wanted to

**Exhibit B**
p. 105

```
 1    A        Correct.

 2    Q        And Mr. Snookal filed a written complaint of

 3    disability discrimination with you during time that you

 4    were the senior HR manager in El Segundo; correct?

 5    A        Yes, I received an e-mail from him.

 6             MS. LEAL:  Let's look at that e-mail.  Exhibit

 7    76 and this is another one, Your Honor, that's been

 8    stipulated.

 9             THE COURT:  All right.  Go ahead.

10    BY MS. LEAL:

11    Q        Mr. Powers, there is also a mini binder -- a

12    very thin binder in front of you, if you prefer to look

13    at the document rather than the screen.  It's in front

14    of you.

15    A        Okay.  Thank you.

16    Q        Okay.  So that binder would have a 76 tab.

17    A        I'm going to look at the screen.

18    Q        Okay.  All right.

19             So if you look at page 2 of Exhibit 76, there

20    is an e-mail on the bottom, "September 4, 2019, at 7:21

21    a.m. Mark Snookal wrote"; do you see that?

22    A        Yes.

23    Q        So is that the complaint of discrimination

24    which you received from Mr. Snookal on or about

25    September 4th, 2019?
```

```
 1   A       Yes, this is when it first came to my attention

 2   of what his concern was.

 3   Q       Okay.  And then you responded, "Thank you for

 4   bringing this to my attention"; correct?

 5   A       Yes, it is not on the screen right now, but

 6   that is my recollection.

 7   Q       Okay.  Let's make sure that it's on the screen.

 8   A       That's correct.

 9   Q       Okay.  Thank you.

10           And you acknowledge this e-mail from

11   Mr. Snookal pretty quickly.  He sent it to you at

12   7:21 a.m., and you responded at 7:25 a.m.; correct?

13   A       Yes, that's right.  I was actually traveling

14   that day, and I remember looking at e-mails in the

15   morning and looked at this one and, you know, definitely

16   wanted to show that I was taking it seriously.  And I

17   wanted to make sure -- I let him know I got it, and I

18   would need to look into it.

19   Q       Okay.  It says "PDT" so it was probably the

20   same time as Mr. Snookal, correct, if he was in

21   El Segundo?

22   A       If he was in El Segundo when he wrote it, yes.

23   I don't see that on his time stamp.

24   Q       And I'm referring to your time stamp.

25   A       Okay.  Yes.
```

**Exhibit B**
**p. 107**

1    you also did not ask anyone or do anything to find out

2    how long Mr. Snookal had had the dilated aortic root;

3    correct?

4    A        That's correct.  That would be none of my

5    business.

6    Q        Thank you.  I understand.

7             But you wanted to do a thorough -- or you said

8    you had to do a complete thorough investigation.  So

9    don't you think that finding out how long he had had a

10   dilated aortic root was important and whether or not it

11   had affected his employment at Chevron given that he had

12   already been there about ten years?

13   A        Those personal details were not important to

14   me.

15   Q        Okay.

16   A        It was the doctor's analysis that made it very

17   black-and-white for me.  They are the experts.  I was

18   not.  I should not be asking questions about one's

19   personal health and conditions.

20   Q        Wouldn't whether or not Mr. Snookal had had an

21   aortic event ten years before this -- wouldn't that have

22   been relevant to you?  Irrespective of whether you

23   thought it was right or wrong to contact Mr. Snookal

24   directly or his doctors, didn't you think that was

25   relevant?

**Exhibit B**
**p. 108**

1    A        It's -- it's not my expertise.  I wouldn't even

2    know where to begin to ask questions on that.

3    Q        The only question I'm asking is whether or not

4    you asked Mr. Snookal, "How long have you had

5    this dilated aortic root, and has it ever interfered

6    with your ability to work at Chevron?"

7    A        No, absolutely not.

8    Q        You didn't do that?

9    A        No.

10   Q        Okay.  Thank you.

11            And as part of your investigation into

12   Mr. Snookal's complaint of discrimination, you also did

13   not review the job description, the reliability

14   engineering manager position; correct?

15   A        I don't recall.

16   Q        You don't recall doing it, or you just don't

17   recall today?

18   A        I, in general, don't recall.  This was over six

19   years ago.

20   Q        So do you have a recollection of actually

21   having done it?

22   A        Done what?

23   Q        Reviewed the job description from Mr. Snookal

24   for the reliability engineering manager position?

25   A        I don't recall.

1    Mr. Powers.  Since you're in the middle of your

2    testimony, there is no discussion with counsel on the

3    topic of your testimony.

4              THE WITNESS:  Okay.

5              THE COURT:  All right.  Let's take our

6    afternoon break.

7                        (Recess.)

8    (Whereupon, the following was held in the presence of the

9    jury:)

10             THE COURT:  Mr. Powers, you are still under

11   oath.

12             THE WITNESS:  Yes.

13             THE COURT:  Go ahead, Mr. Mussig.

14             MR. MUSSIG:  Thank you, Your Honor.

15                   **CROSS-EXAMINATION**

16   BY MR. MUSSIG:

17   Q       Good afternoon, Mr. Powers.

18   A       Good afternoon.

19   Q       You were asked a lot of questions about your

20   investigation after you received Mr. Snookal's e-mail

21   complaining about disability discrimination.

22             Are you satisfied that you conducted a thorough

23   investigation?

24   A       Yes, I am.

25   Q       And why is that?

```
1    A        I spoke to the experts who were dealing with

2    this medical suitability for expatriate assignments

3    exam, and I fully trust their expert opinion.

4    Q        And when you say "experts," you're referring to

5    Dr. Levy?

6    A        That's correct.

7    Q        And what exactly did Dr. Levy tell you -- or if

8    not exactly, what was the gist of what he told you?

9    A        He basically laid it out in a linear fashion

10   for me of, you know, not sharing any medical information

11   because, again, that is not something I needed to be

12   privy to.  But he essentially said there is an

13   individual who has been offered an assignment in

14   Escravos and, you know, as usual goes through the

15   medical suitability for expatriate assignments exam, and

16   during the course of that, they found a personal issue

17   that needed to be discussed amongst the doctors, and

18   that discussion happened.

19           They also explored alternative locations for

20   where the individual could do the role.  Eventually,

21   that was not deemed suitable, to -- to do the job in

22   another location.  And so overall, just the really

23   high-level thorough summary that Dr. Levy gave me, that

24   made me very comfortable with the answer.

25   Q        And at the end of it, was it your understanding
```

**Exhibit B**
p. 111

```
 1    it was a medical decision?
 2    A       Yes.
 3    Q       And would you ever, in your role as human
 4    resources, second-guess a doctor's medical decision?
 5    A       No.
 6    Q       And why is that?
 7    A       It's not my expertise.
 8    Q       Would you ever ask an employee to sign a waiver
 9    in a situation where -- so that they could work in a job
10    where this they could potentially die?
11    A       No, absolutely not.
12    Q       I'm going to look at an exhibit that you --
13    that we talked about before.  If we can, pull up
14    Exhibit 76.  If we can, go to the second page of the
15    exhibit.
16            So we looked at this e-mail before.  This is
17    Mr. Snookal's e-mail to you claiming this decision was
18    discriminatory.  We talked about that.  We talked about
19    your response to him, and then we talked a little bit
20    about the top e-mail on the page here, where you
21    e-mail -- you forward the e-mail to Mr. -- Mr. Snookal's
22    supervisor, the supervisor above that, and Thalia Tse.
23            And I know we talked about Mr. Tortorich and
24    Mr. Austin.  Who is Thalia Tse?
25    A       She was an HR business partner reporting to me.
```

1    the writing of my report, and my position of employment

2    hasn't changed.  I've testified in a few trials since

3    then, but it's essentially current.

4    Q        Okay.  So you're involved in this case because

5    we requested that you analyze Mr. Snookal's economic

6    losses in this case; correct?

7    A        Yes.  And in -- in addition to my

8    responsibilities at the university, I periodically

9    assist in matters that are in litigation.  Usually,

10   attorneys will ask me to calculate something.  And in

11   this case, I was asked to calculate the present value of

12   economic losses from lost earnings and employment

13   benefits for Mr. Snookal due to the events in this case.

14   Q        Thank you so much.

15            And you created a report sort of outlining your

16   findings and how you got to that opinion; true?

17   A        Yes, my report has sort of narrative text

18   describing my calculations.  It also includes a couple

19   of tables that show the calculations.

20   Q        Thank you so much.  I'll -- I'll have you turn

21   directly to that.

22            MS. FLECHSIG:  I believe that this has also

23   been stipulated to, Exhibit 148.

24            MS. KENNEDY:  Yes.  Again, Your Honor, per --

25   per the sidebar, yes, Exhibit 148.

```
 1              THE COURT:  All right.  Exhibit 148 is
 2    admitted.
 3              MS. FLECHSIG:  Thank you so much.
 4    (Whereupon, Plaintiff's Exhibit 148 is admitted hereto.)
 5              MS. FLECHSIG:  And at this time, we do move to
 6    submit Dr. Baum as an expert in economics.
 7              THE COURT:  Any objection?
 8              MS. KENNEDY:  No, Your Honor.
 9              THE COURT:  Okay.  Granted.
10    BY MS. FLECHSIG:
11    Q      So now you have your report in front of you, as
12    well.  Did you review any documents to prepare your
13    report or -- yeah, what did you do?
14    A      Yes, I did review some case-specific documents.
15    They are listed in -- as Exhibit B in my report, which
16    is at the very end on page -- I believe it's page 50.
17    Q      I think you're right.  Yep, you're exactly
18    right.  Okay.
19    A      And so if you want to show that on screen, page
20    50 would show all the case-specific documents that I
21    reviewed.  It included things like tax returns and W-2
22    forms for Mr. Snookal, as well as some information from
23    Chevron as a corporation about its compensation and
24    benefits.
25    Q      And in terms of sort of formulating your
```

```
1    Q          Please.  Yeah, why don't you start by telling
2    us why you created two tables, and then maybe we can go
3    through the columns.
4    A          Okay.  In scenario number 1, which is in table
5    number 1, I am assuming that Mr. Snookal would have gone
6    to Nigeria to work, but he would have remained in grade
7    22.  In scenario number 2, in table number 2, I am
8    assuming that by January the 1st of 2020, he would have
9    been promoted to grade 23.  So the difference in the two
10   scenarios, the difference in the two tables has to do
11   with whether he stays at grade 22 or whether he moves to
12   grade 23.
13   Q          Thank you, Dr. Baum.
14              And I guess is it fair to say that provided
15   both so that the jury can decide, based on the facts,
16   what's appropriate to award for Mr. Snookal's damages?
17   A          That's correct.  It gives you, as a jury,
18   options because it's my understanding there was a
19   commitment, if he had gone to Nigeria or when he went to
20   Nigeria, to move him up to grade 23.  And so if -- if
21   that is what would have happened in scenario number 2,
22   in table 2 is the correct one -- or is the one you would
23   select.
24   Q          Thank you so much.
25              So now let's -- let's look at table -- let's
```

**Exhibit B**
**p. 115**

1   were assigned to Escravos; correct?

2   A       Yes, in one of the scenarios, I do assume that.

3   Q       And were you shown any documents that would

4   demonstrate that if he had, in fact, been assigned to

5   Escravos that he would, in fact, been promoted?

6   A       No.

7   Q       Did you ask for any documents that would show

8   if Mr. Snookal had actually been assigned to Escravos

9   that he would have been put on a promotion list, as an

10  example?

11  A       No.

12  Q       So your assumption is based upon what

13  Mr. Snookal told you as part of the litigation here;

14  correct?

15  A       Yes.

16  Q       And, in fact, you have no evidence, no facts,

17  no testimony, no documents, no e-mails, no HR documents

18  to show that being assigned to Escravos, you would be

19  entitled to a promotion within six months; correct?

20  A       Correct.

21  Q       Okay.  Now, also, if you're looking at your

22  report, you have a list of the documents that you were

23  provided.  And I think it is on page 50 of your report.

24  Do you have that?

25  A       Yes.

**Exhibit B**
p. 116

1    that?

2    A        Yes.

3    Q        Okay.  Now, in doing calculations here, did you

4    actually do your economic losses calculations for the

5    time period August 1st, 2019, through February 23rd,

6    2035?

7    A        Yes.

8    Q        Okay.  Now, in looking at these calculations,

9    you -- it shows the August 1st, 2019, date based on what

10   Mr. Snookal told you?

11   A        Yes.  But I do have a job offer letter from

12   Chevron that mentions a start date, and so I -- I did

13   have Chevron documents for that.

14   Q        Isn't the start date August 31st of 2019?

15   A        My recollection is that Chevron's initial start

16   date that they mentioned was July the 1st of 2019.

17            MS. KENNEDY:  All right.  Greg, can you hold

18   onto that?  Can you go to Exhibit 24, please?  And I

19   believe this has been stipulated to, Your Honor, as

20   well.

21            THE COURT:  All right.  Go ahead.

22     (Whereupon Defendant's Exhibit 24 is admitted hereto.)

23   BY MS. KENNEDY:

24   Q        And Exhibit 24 is an e-mail string regarding

25   Nigeria assignment.  And if you go to -- I think it's

1    that he would have been -- remained with Chevron.  But

2    it's my understanding -- in fact, I've counted them.

3    Chevron has 56 different expat locations.  So he could

4    have been in Nigeria with renewals, could have been in a

5    different location.

6    Q       Let me ask you:  Do you see any documentation

7    that any Chevron employee in the history of Chevron was

8    ever an expat for over 30 years in a row?

9    A       Again, I'm not claiming that in my analysis,

10   30 years.  In my analysis, the analysis just goes from

11   2019 to 2035 so it's at a 15-year period not 35-year

12   period or 30-year period.  But it is my -- I -- it is my

13   understanding that the individual who is in the Nigeria

14   position at the moment has been in the position for more

15   than four years.  That would presumably include a

16   renewal.

17           So in my calculations, Mr. Snookal could have

18   gone to Nigeria, and his contract could have been

19   renewed.  He could have gone to a different expat

20   location.  Again, I've counted them.  There's 56 around

21   the world.  They presumably have more than one employee

22   at each location, so if this is something that

23   Mr. Snookal wanted to do -- it sounds like there are a

24   lot of opportunities, not just one opportunity.

25   Q       And to your knowledge, in particular case, do

**Exhibit B**
**p. 118**

1  Q       And those other positions at Chevron were in

2  El Segundo; correct?

3  A       Again, I didn't ask him for the locations

4  specifically.  Maybe I should have, but I knew that he

5  was excited about the position in Nigeria.  He had

6  applied for other positions with Chevron after that

7  position was rescinded.  And so it certainly signalled

8  to me that he was enthusiastic about the opportunity.

9  Q       Do you know if any of the positions that

10 Mr. Snookal applied for, to which you believe you have

11 knowledge of -- did any of those positions have the

12 expat premium?

13 A       From the documents I've reviewed, all Chevron

14 expat positions have a location premium.  There's 56 of

15 them -- 56 locations.  Each premium is a little bit

16 different.  They're not all exactly 55 percent.  Some

17 are -- are a little bit different amount.  But my

18 recollection is they all have a location premium

19 associated with them, yes.

20 Q       And in your analysis for the expat premium, you

21 used 55 percent, which is the highest expat premium

22 location; correct?

23 A       I did use 55 percent.  I don't recall whether

24 that was the highest one or not.  But that is the one I

25 used because it was the one associated with the job that

1    Mr. Snookal was on -- on his way to.

2    Q        Were you provided any documentation which show

3    what the expat premiums were for any of the other 56

4    locations that you were aware of?

5    A        Yes, I have seen them.

6    Q        And did you see the range was anywhere from

7    10 percent to 55 percent?

8    A        I don't recall.  That's possible.  I really

9    didn't attempt to memorize the location premiums at the

10   other locations, other than there's 56 other locations;

11   they all have a location premium.  I was interested in

12   the 55 percent in Nigeria.

13   Q        And did you have an understanding that the

14   position in Nigeria was a three- to four-year

15   assignment?

16   A        I was aware that -- that it had a term

17   associated with it, but I was also aware that that term

18   could be extended.  And in fact, the individual -- my

19   understanding is the individual who's in that position

20   right now, the position Mr. Snookal was headed to, has

21   been in that position for over four years.  So I'm --

22   I'm inferring from that that an extension was granted.

23   So maybe a four-year contract, but it could have

24   certainly been longer.

25   Q        And where did you get the information that the

**Exhibit B
p. 120**

1                          **C E R T I F I C A T E**

2

3

4

5       MARK SNOOKAL                          :

6              vs.                            :   No. CV 23-06302-HDV

7       CHEVRON USA, INC.                      :

8

9

10      I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11      UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12      CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13      TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14      CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15      PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16      TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17      OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18      FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19      REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20      REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22      _____/S/_____        __08/21/2025__

23      MARIA R. BUSTILLOS                  DATE
        OFFICIAL REPORTER
24

25

# <u>EXHIBIT C</u>

Exhibit C
p. 122

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4                      - - -

5       HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7    MARK SNOOKAL,                    )
                                      )
8          Plaintiff,                 )
                                      )
9                                     )
                                      )
10         vs.                        ) No. CV 23-06302-HDV
                                      )
11                                    )
                                      )
12   CHEVRON USA, INC.,               )
                                      )
13         Defendants.                )
     ─────────────────────────────────)

14

15

        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
16
                    *TRIAL DAY THREE*
17
                  LOS ANGELES, CALIFORNIA
18
                 THURSDAY, AUGUST 21, 2025
19   ──────────────────────────────────────────────────────

20                  MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
21                   C.S.R. 12254
               UNITED STATES COURTHOUSE
22               350 WEST 1ST STREET
                     SUITE 4455
23           LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
24               MADAMREPORTER.COM

25

1                          **A P P E A R A N C E S**

2

3

4        **ON BEHALF OF THE PLAINTIFFS,**
         **Mark Snookal:**                    ALLRED MAROKO and GOLDBERG
5                                             BY:  DOLORES Y. LEAL, ESQ.
                                              6300 WILSHIRE BOULEVARD
6                                             SUITE 1500
                                              LOS ANGELES, CA 90048
7                                             (323)653-6530

8
                                              ALLRED MAROKO and GOLDBERG
9                                             BY:  OLIVIA J. FLECHSIG,
                                              ESQ.
10                                            6300 WILSHIRE BOULEVARD
                                              SUITE 1500
11                                            LOS ANGELES, CA 90048
                                              (323)653-6530

12

13

14       **ON BEHALF OF THE DEFENDANTS,**
         **CHEVRON USA, INC.:**               SHEPPERD, MULLIN, RICHTER,
15                                            and HAMPTON, LLP
                                              BY:  ROBERT E. MUSSIG, JR.,
16                                            ESQ.
                                              350 SOUTH GRAND AVENUE
17                                            FORTIETH FLOOR
                                              LOS ANGELES, CA 90071
18                                            (213)620-1780

19                                            SHEPPERD, MULLIN, RICHTER,
                                              LLP
20                                            BY:  TRACEY A. KENNEDY, ESQ.
                                              350 SOUTH GRAND AVENUE
21                                            FORTIETH FLOOR
                                              LOS ANGELES, CA 90071
22                                            (213)620-1780

23

24

25

3

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **DR. ADEYEYE, VICTOR** | -- | -- | -- | -- |
| BY OLIVIA FLECHSIG | 36 | -- | 79 | -- |
| BY TRACEY KENNEDY | -- | 62 | -- | -- |
| **SNOOKEL, MARK** | -- | -- | -- | -- |
| BY DOLORES LEAL | 83 | -- | -- | -- |

- - -

UNITED STATES DISTRICT COURT

**Exhibit C
p. 125**

54

1    Q        You can see the link, okay.

2             And did you look at the link before responding

3    to the e-mail?

4    A        I looked at the link, and also searched -- did

5    my own research too.

6    Q        So you did look at it.  And when you looked at

7    it, you concluded that at Mr. Snookal's size, which was

8    4.1 to 4.2 centimeters, he falls into the low risk

9    category; right?

10   A        Possibly low category, yes.

11   Q        Okay.  And, though, you didn't tell this to

12   Dr. Asekomeh at the time, what you understood from the

13   guidelines was that Mr. Snookal's risk of any type of

14   cardiac complication was between 1 and 2 percent; right?

15   That's what you were thinking?

16   A        I wasn't (inaudible).

17   Q        I'm sorry, could you repeat that?

18   A        I did put -- I did put in low risk, was all I

19   indicated, not 1 to 2 percent.

20   Q        Right.  But you testified at your deposition

21   you're right.  You didn't write it in this e-mail.  I

22   agree with you.

23            What I'm asking is you looked at the

24   guidelines, and the guidelines made you conclude

25   Mr. Snookal's risk of -- of adverse cardiovascular event

**Exhibit C**
**p. 126**

```
1    was between 1 to 2 percent; right?

2    A        Was a low risk of the guidelines.

3             MS. FLECHSIG:  Your Honor, I would request to

4    read from Volume II of Dr. Adeyeye's deposition, page

5    114, lines 18 through 24.

6             MS. KENNEDY:  Counsel, page 115?

7             MS. FLECHSIG:  114, and then lines 18 through

8    24.

9             THE COURT:  Go ahead.

10            MS. KENNEDY:  No objection.

11            THE COURT:  Read through 25 just to be

12   complete.

13            MS. FLECHSIG:  Okay.  Yes, Your Honor.

14   BY MS. FLECHSIG:

15   Q        "And based on your understanding of --

16   Question, And based on your understanding of the

17   guidelines, what was the risk associated with

18   Mr. Snookal's aortic dilatation?" said in context.

19            "Answer, It falls into low-risk category.

20   Point here is a low risk, 1 to 2 percent of adverse

21   cardiac -- cardiovascular event."

22            "Adverse cardiovascular event?"

23            "Dissections or rupture, these are the adverse

24   cardiovascular events."

25            "Thank you."
```

```
 1              MS. KENNEDY:  And finally, Stephanie, can we go
 2      to the first page of Exhibit 43, which is the e-mail
 3      from Dr. Adeyeye to Dr. Aiwuyo, Dr. Asekomeh, and
 4      Dr. Pitan.  It is on the first page at very top on --
 5      no, it is going to be on the -- 43, page 1, the first
 6      e-mail dated August 5, 2019.
 7              MS. STEPHANIE:  I don't have it on the spot.
 8      BY MS. KENNEDY:
 9      Q       All right.  Let me just ask you, Dr. Adeyeye:
10      At some point in time, did you agree with Dr. Aiwuyo's
11      assessments regarding Mr. Snookal?
12      A       Repeat.
13      Q       Yes.  Did you -- in August of 2015, did you
14      agree with Dr. Aiwuyo's assessments of Mr. Snookal and
15      his condition?
16      A       I agree with him.
17      Q       Okay.  Did you have any concern about
18      Mr. Snookal's choice of hyper- -- of
19      anti-hypersensitives, for example, losartan and
20      amlodipine, A-M-L-O-D-I-P-I-N-E?
21      A       Yes.
22      Q       Why did you have a little concern about those?
23      A       Because amlodipine advocates the use of beta
24      blocker in an individual with an aortic aneurysm.  So I
25      was surprised when (indiscernible) had no beta blocker.
```

Exhibit C
p. 128

```
 1    did you look at the job description for the reliability

 2    engineering manager?

 3    A         I did.

 4              MS. LEAL:  And, Your Honor, we're going to pull

 5    up Exhibit 16, which has been stipulated for admission.

 6              THE COURT:  Okay.  Go ahead.

 7     (Whereupon, Plaintiff's Exhibit 16 is admitted hereto.)

 8    BY MS. LEAL:

 9    Q         So, Mr. Snookal, you can see the document

10    either on the monitor.  There is also a binder there in

11    front of you with tabs.  So this is 16.

12    A         I see it.

13    Q         You can use whatever -- whatever you'd prefer.

14              You have seen this document before?

15    A         I have.

16    Q         And what is this document?

17    A         This is the internal job posting for the NMA,

18    which is Nigeria Mid-Africa, EGTL reliability

19    engineering manager.

20    Q         And what is the EGTL?

21    A         Escravos gas-to-liquid plant.

22    Q         So did you believe you were qualified for this

23    position, reliability engineering manager?

24    A         I did.

25    Q         Why?
```

**Exhibit C**
**p. 129**

```
 1    A        Because this was actually the next job in
 2    El Segundo that I would have been placed in.  I was
 3    aware of the job duties that my supervisor currently
 4    had.  They very much matched this position.  I had
 5    familiarity with all of the kinds of equipment and
 6    everything that they were mentioning on there, including
 7    the studies that they run and environmental -- or sorry.
 8    I don't think they actually mention it on this form,
 9    but -- so yeah, I felt like I was very qualified.
10    Q        And this form does provide a job description?
11    A        It does.
12    Q        Okay.  And at the time that you applied for
13    this position, who was your boss?
14    A        Kit Deaver.
15    Q        And did you -- well, strike that.
16             At the top of this document, it says, "Welcome
17    to the Enterprise PDC postings" -- at the top -- "where
18    you will find open jobs managed within the Enterprise
19    PDC process.  You must obtain approval to apply to PDC
20    jobs from both your supervisor and PDR before submitting
21    your applications."
22             Did you do that?
23    A        Yes, I did.
24    Q        Who were your supervisors -- or who were the
25    persons from whom you sought approval?
```

```
 1              You know, it has things like a 4-to-1
 2    student-to-teacher ratio, on-site therapists, and the
 3    idea of the school is not just to give them an
 4    education, but to teach them ways to recognize what's
 5    going on with them, you know, and how to manage that so
 6    that they can be successful in the future.  And it's
 7    very expensive.
 8    Q         So by getting a promotion to a grade 23, which
 9    you just mentioned, that would have allowed you to send
10    your school to Bridges Academy?
11    A         Not a 23 alone.  It's about $50,000 a year.  So
12    given the 55 percent incentive pay and the other high
13    incentive pays for the other remote locations that
14    Chevron has, you know, that would allow me to send him
15    for two years of junior high and four years of high
16    school.
17    Q         And were there other perks along with the 55
18    percent location premium that you just mentioned if you
19    went to Escravos?
20    A         Yeah.  So some of it has been discussed
21    earlier.  There is a vacation -- you know, I had five
22    weeks of vacation, so they pay you for that.  But one of
23    biggest things for my family and myself would have been
24    you work 28 days and then you're home for 28 days.  And
25    I know we covered that before.  But you know, with a
```

```
 1   A        This is the offer letter that I received after

 2   applying for the job.

 3   Q        And when you received this offer letter saying

 4   "you got the job," what was your reaction?

 5   A        I was very excited.  We had actually already

 6   had to enroll my son in school, so -- you know, kind of

 7   in anticipation of getting it, hoping that it would come

 8   through, and so it did.  And it meant everything to

 9   my -- to me and my family, right.  Like, this -- yeah,

10   it was going to be good.

11   Q        Okay.  Now, we just saw in the job description

12   that the salary pay grade was a 23 or 24.  This document

13   says a 22.  Did this concern you?

14   A        It did not.

15   Q        Why?

16   A        Two reasons, really:  One is that I've given

17   promotions before, and I know that often people will be

18   moved into a new job at the same pay grade that they

19   were already in.  And then they'll be reevaluated in six

20   to 12 months and moved into the grade -- the lowest

21   grade in the job.  It's part of Chevron's total

22   remuneration -- it's a very difficult word for me to

23   say -- policy that jobs have a pay grade for a reason

24   and that people should be in the correct pay grade for

25   the job that they're in.
```

```
 1    A        Yep.

 2    Q        -- it says "disposition."

 3    A        Yep, I see that.

 4             MS. LEAL:  Can you highlight that, please?

 5    BY MS. LEAL:

 6    Q        It says, "Not fit for duty.  Remote location

 7    can be cleared for assignment in Lagos -- or Lagos."

 8             When you receive this form advising you that

 9    you were not fit for duty, what did you think?

10    A        I mean, I really -- I didn't understand what

11    was happening.  It seemed like they had made a mistake,

12    or I don't -- I didn't know how they reached that

13    conclusion.  I was particularly confused with the

14    assignment for Lagos in that my job could not be

15    performed in Lagos.  And I hadn't talk to anyone from

16    Chevron asking for more information or for

17    clarifications or -- you know, to discuss anything;

18    right.  Like, is there -- I just didn't understand what

19    happened; right.  It didn't make any sense to me.

20             I thought so much that it was a mistake that

21    I -- I actually -- I -- I didn't tell my wife about it,

22    even.  So I was so sure I could fix it; right.  And I

23    really do tell my wife everything.  So yeah, I guess I

24    was in a state of disbelief.

25    Q        Okay.  So prior to receiving this on
```

**Exhibit C**
**p. 133**

```
 1    August 15th, had any doctor on behalf of Chevron

 2    contacted you to ask you any questions about your

 3    medical condition?

 4    A       They had not.

 5    Q       And how do you know that the position could not

 6    be performed in "Lagos" -- or Lagos?

 7    A       I mean, again, I know what the job entailed,

 8    right.  You need to be leading your team, even if that

 9    is primarily from the office.  You still need to be

10    on-site so that communication can be quick, can been

11    active, can be ready.  Um, you know, I might need to go

12    into the field on a short-term, right, just for part a

13    day or something, to communicate with them about, you

14    know -- have them show me what's happening, what's going

15    on, right.  Maybe help them figure out the next steps.

16    So it's a just a very involved -- you know, you can't --

17    that kind of role can't be done, like, over the

18    telephone or over Teams or whatever.  It just doesn't

19    work.

20    Q       It has to be hands-on?

21    A       Yeah.

22    Q       Okay.  Now, you just testified a few moments

23    ago that you thought you could fix it and that's why you

24    didn't tell your wife.  What did you do to try to fix

25    it?
```

**Exhibit C**
p. 134

154

```
 1              MS. LEAL:  So what we'll do, I think we'll

 2     start with Dr. Akintunde, and then we'll continue Mark.

 3              MS. KENNEDY:  Okay.  And then Dr. Reading?

 4              MS. LEAL:  And then Dr. Reading.

 5              MS. KENNEDY:  And then Constance Snookal.  Then

 6     I'll have Dr. -- I'll have her come in in the afternoon.

 7              THE COURT:  I think -- I think that's safe.

 8              MS. KENNEDY:  Okay.

 9              THE COURT:  All right.  Very good.  Just be

10     mindful of -- of the time.  We'll give you the total

11     time tomorrow morning.  And I had one other issue.  Now

12     I'm blanking on it.  Well, I will -- I'm sure I will

13     remember.  Oh, I know.

14              Since we have attorneys coming now in the

15     afternoon, please take your materials for the afternoon.

16              MS. KENNEDY:  Oh, yes.

17              THE COURT:  On the tables -- just on the

18     tables.

19              MS. KENNEDY:  Sure.

20                  (Whereupon, proceeding adjourned.)

21                          - - -

22

23

24

25
```

UNITED STATES DISTRICT COURT

**Exhibit C**
p. 135

# EXHIBIT D

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                - - -

5     HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7     MARK SNOOKAL,                    )
                                       )
8            Plaintiffs,               )
                                       )
9                                      )
                                       )
10         vs.                         ) No. CV 23-06302-HDV
                                       )
11                                     )
                                       )
12    CHEVRON USA, INC.,               )
                                       )
13           Defendants.               )
      _____)

14

15

      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
16
                     *TRIAL DAY FOUR*
17
               LOS ANGELES, CALIFORNIA
18
              FRIDAY, AUGUST 222, 2025
19

20    _____

21              MARIA R. BUSTILLOS
                OFFICIAL COURT REPORTER
22                 C.S.R. 12254
              UNITED STATES COURTHOUSE
23             350 WEST 1ST STREET
                  SUITE 4455
24        LOS ANGELES, CALIFORNIA 90012
                 (213) 894-2739
25             MADAMREPORTER.COM

```
 1                          I N D E X

 2

 3

 4      PLAINTIFF'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS

 5

 6      XXX, XXXXX               --       --      --         --

 7      BY DOLORES LEAL          6        --      --         --

 8      BY ROBERT MUSSIG         --       187     --         --

 9      BY OLIVIA FLECHSIG       --       232     --         --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                           - - -

25
```

1    cardiovascular risk factors or cardiovascular disease.

2    So you want to -- and for those who already have risk

3    factors, you want to prevent an acute coronary event

4    from occurring, like a heart attack, or you want to

5    prevent a stroke.

6            So it's a lot of preventive strategy in

7    cardiology because when you compare the quality of

8    life -- when an individual doesn't have

9    the [inaudible] -- it's much better than -- so as the

10   word implies, preventive cardiology is process

11   of [indiscernible] --

12   Q        I'm sorry.  Dr. Akintunde, as part of your

13   practice as cardiology, do you actually do surgeries on

14   aortic roots?  Is that part of your practice?

15   A        No.  Cardiothoracic surgeons do surgeries on

16   aortic roots.

17   Q        And in this case with Mr. Snookal, other than

18   responding to some e-mails, do you recall how you got

19   involved in the decision-making as to whether or not

20   Mr. Snookal was medically fit to come to Escravos?

21   A        I had no role in the decision-making.

22   Decision-making is the exclusive reserved of the

23   occupational health physician.  I was asked to provide

24   an opinion on his imaging records, and that was what I

25   did.

**Exhibit D**
p. 139

```
 1   Q          And that was your sole role; correct?
 2   A          That was my sole role, just to provide a
 3   feedback on what I thought of his images, which were
 4   provided to me.
 5   Q          And in your practice as a cardiologist --
 6   preventive cardiologist, do you regularly give feedback
 7   on -- on images of the heart?
 8   A          Whenever I'm asked to, I do.  If I'm asked to,
 9   I do.
10          MS. KENNEDY:  Thank you, Your Honor.  I have no
11   more questions.
12          THE COURT:  Any redirect?
13          MS. FLECHSIG:  No, Your Honor.
14          THE COURT:  Okay.  All right.  Dr. Akintunde,
15   that concludes your testimony.  We appreciate it.  Thank
16   you very much.
17          THE WITNESS:  Thank you.  Have a good day.
18          THE COURT:  You too.
19          All right.  Does plaintiff recall Mr. Snookal?
20          MS. LEAL:  Yes, Your Honor.  Plaintiff recalls
21   Mr. Snookal.
22          THE COURT:  Okay.  Mr. Snookal, if you can come
23   back up.  We won't need to re-administer the oath.  I'll
24   just remind you that you're still under oath.  And you
25   can take a seat.
```

**Exhibit D**
p. 140

1    you?

2    A        They did.

3    Q        And what was that job?

4    A        The reliability change OA.

5    Q        And when did that occur, approximately?

6    A        I believe it was November, as well.

7    Q        So now that Chevron created this reliability

8    change OA position, did that make you happy?

9    A        It did not.

10   Q        How come?

11   A        Austin Ruppert, my boss at the time, told me

12   that the position was created specifically for me and

13   that it would not outlast the time that I, quote,

14   unquote, "needed to be in it."

15   Q        So how were you feeling at time?

16   A        I was starting to feel really in September, you

17   know, depression kind of keeping in, and I was starting

18   to withdraw a little bit from my family.  And -- and you

19   know, I recognized it as an oncoming depressive episode,

20   so I utilized techniques that I learned in the past to

21   try and fend it off.  And you know this kind of pushed

22   me over the edge, and so I reached out to Kaiser

23   Permanente for mental health.

24   Q        Did you at some point start treating with

25   anyone at Kaiser?

1  A       Yes, I did.

2  Q       Do you remember with whom?

3  A       I spent most of my time with -- I believe her

4  first name was Linda Engel.  Last name Engel.

5  Q       Okay.  And did anyone at Kaiser ever prescribe

6  you any sort of medication to deal with the depression

7  you were experiencing?

8  A       Yes.  I don't recall the name of the doctor.

9  But I did receive a prescription for Cymbalta.

10  Q       Okay.  And are you still taking Cymbalta?

11  A       Yes.

12  Q       How come?

13  A       I still feel a lot of depression, yeah.

14  Q       Okay.  How long were you in this new position

15  that Chevron created you for, the reliability change OA

16  position?

17  A       Um, about a year -- a little bit less.

18  Q       And do you remember how come you were in that

19  position only a little less than a year?

20  A       Chevron had a transformation event or

21  reorganization in 2020.

22  Q       And what happened to you thereafter?

23  A       That role was eliminated.  They had everyone in

24  the entire company apply for four different positions.

25  I did not receive any of those positions and was placed

1    if I would be promoted to a 23.  She told me it is

2    typical in expat assignments to be promoted into the

3    position -- or into the pay grade that the position is

4    advertised at, at about six months.

5    Q        I understand that.  I understand that

6    confidential informant -- we'll get to that in a minute.

7    My question is:  Were you promised a promotion?  You

8    say, by the way if you take --

9    A        Oh, promised, no.

10   Q        Okay.  So you agree there were discussions.

11   And as part of your career ladder, there is always

12   discussions about moving up; correct?

13   A        Not in my experience.

14   Q        Well, in this particular instance, regarding

15   this particular job, you agree no one at Chevron

16   promised you a promotion; correct?

17   A        That is correct.

18   Q        Now, prior to applying -- strike that.

19            Prior to the job being posted, the REM position

20   in Escravos, you actually had a recheck with your

21   physician at Kaiser regarding your heart condition;

22   correct?

23   A        As I do every year, yes.

24   Q        Yes.  And that was April 19th, 2019?

25   A        Correct.

```
 1   Q        And I want to take a look at the first three or
 2   four paragraphs where it says -- do you see the work
 3   location, Escravos, Nigeria?  Do you see that?
 4   A        I do.
 5   Q        And you understood that is where this position
 6   was going to be; correct?
 7   A        Correct.
 8   Q        And it says "Position type."  That's career
 9   ladder; do you see that?
10   A        I do.
11   Q        And if you also go down, it's -- there is only
12   one position that's there, number of vacancies; do you
13   see that?
14   A        I do.
15   Q        And at the bottom of that paragraph, it is
16   duration.  So it is a 3- to 4-year maximum sort of term
17   for that position as posted; correct?
18   A        No.
19   Q        Well, as posted, that's what it says, in three
20   to four years; correct?
21   A        You said "maximum."
22   Q        Yes, as -- it says the duration here on this
23   document, three to four years; is that what it says?
24   A        It says duration, three to four years, yes.
25   Q        Okay.  And you understood that this was, at
```

**Exhibit D**
p. 144

1    talking to other folks, do you know if there were any

2    surgical facilities in Escravos?

3    A        I do not.

4    Q        Do you know, again, from your research or

5    talking to folks, if there were -- if there was a

6    coronary care unit in Escravos?

7    A        I do not.

8    Q        Do you know if Escravos had the ability to do

9    CT scans?

10   A        I do not.

11   Q        Do you know if Escravos had an echocardiograph

12   or the ability to do -- use an echocardiograph?

13   A        I do not.

14   Q        Do you know if Escravos had a blood bank?

15   A        I do not.

16   Q        At the time that you applied for this position

17   in Escravos, it was a lateral move; correct?

18   A        It depends on how you define "lateral move."

19   Q        Well, let me ask you this:  Did your base pay

20   increase?

21   A        No.

22   Q        You would get, if you had gone -- you'd

23   actually got the job and actually gone to Escravos, you

24   would have got the premium pay or the hazard pay;

25   correct?

```
 1    A        Correct.

 2    Q        But the benefits would have been the same from

 3    Chevron; correct?

 4    A        Yes.

 5    Q        And the base pay would have been the same;

 6    correct?

 7    A        Correct.

 8    Q        You would have -- you would have gotten

 9    additional vacation and other things, but other than

10    that, it was a lateral move with respect to -- to base

11    pay; correct?

12    A        With respect to base pay, yes.

13    Q        And so you applied for that position -- the REM

14    position in Escravos in May of 2019; correct?

15    A        I believe it was May, yes.

16    Q        And you were conditionally offered that job in

17    the June/July 2019 time period; correct?

18    A        That sounds right.

19    Q        And when you were conditionally offered that

20    job, you mean that you were not actually getting ready

21    to go for that job unless you satisfied certain

22    requirements; correct?

23    A        That's correct.

24    Q        And that include the visa, the shots, the

25    medical clearance and the like; correct?
```

Exhibit D
p. 146

1    A        No.

2    Q        So any of the things -- the stressful things

3    with your family, your son, those were all -- weren't

4    affecting you at all; correct?

5    A        I wouldn't say that they weren't affecting me

6    at all.

7    Q        All right.  So once this form was completed,

8    you submitted this form as part of your package;

9    correct?

10    A        Yes.

11    Q        And do you recall who you submitted that form

12    to.

13    A        I believe her name was Lindsay Smith, but it

14    may have been someone else on the medical liaison staff.

15    Q        All right.  Let's go to Exhibit 20.  I want to

16    go back to Exhibit 20, which is the assignment offer.

17            MS. KENNEDY:  This has already been admitted,

18    Your Honor.

19            THE COURT:  All right.  Go ahead.

20    BY MS. KENNEDY:

21    Q        And let's take a look at the first page.  Do

22    you see on the first page, it says "to Mark Snookal"?

23    And the first paragraph, it says, "Contingent upon

24    obtaining work/resident permit clearances where

25    applicable and company medical suitability for

UNITED STATES DISTRICT COURT

**Exhibit D**
**p. 147**

```
 1   assignment where required by law and/or related to your
 2   job and consistent with business necessity, you are
 3   offering -- you are offered the following assignment."
 4           Do you recall seeing this?
 5   A       Yes.
 6   Q       So you'd agree as of the June/July period,
 7   whenever that was, that you still did not have a full
 8   offer to take this job; correct?
 9   A       I had a contingent offer.
10   Q       Correct.  But it was contingent on certain
11   things being completed and passed; correct?
12   A       Yes.
13   Q       And you also knew in late July, in response to
14   a voicemail that you received from -- from Dr. --
15           MS. FAN:  Sobel.
16           MS. KENNEDY:  Sobel, thank you.
17   BY MS. KENNEDY:
18   Q       -- Dr. Sobel, that he left a voicemail message
19   for you advising that you would have to be cleared by
20   the doctors in Nigeria; correct?
21   A       That was not my understanding of the e-mail --
22   or the voicemail message.
23   Q       All right.  We'll go back to that -- that's
24   Exhibit 30.  We'll go back to that in a minute.
25           So if you take a look at Exhibit 20, which is
```

**Exhibit D**
**p. 148**

1    the assignment offer, when you got this, did you

2    actually read it and understand it?

3    A        I did.

4    Q        And you understood that at least for here in

5    the first paragraph, it says, "Anticipated length: three

6    to four years"; do you see that?

7    A        I do see that it says "anticipated length,"

8    yes.

9    Q        And it says here, "Anticipated assignment start

10   date: July 1, 2019."

11           You knew that was not accurate; correct?

12   A        Correct.

13   Q        Because you hadn't had even done your fitness

14   for duty with anyone until late July; correct?

15   A        Correct.

16   Q        And in fact, in early July of 2019, you were

17   actually on vacation; isn't that right?

18   A        That is correct.

19   Q        And when you spoke to your expert, Dr. Baum,

20   did you talk to him at all about the time period in July

21   of 2019, that you were actually -- had not completed the

22   pre-conditions for the job in Escravos?

23   A        I don't recall discussing that, no.

24   Q        All right.  Let's go down to the --

25           MS. KENNEDY:  Greg, the very last paragraph on

1    A        That's correct.

2    Q        In this form, you talked about your dilated

3    aortic root; you talked about your irregular or skipping

4    heart beats, whatever that is, and you provided other

5    information on here.

6             And everything was accurate at the time you

7    provided it; correct?

8    A        That is correct.

9    Q        And you understood that the purpose of this

10   document was to make sure that you were medically fit to

11   undertake the job that you were being offered to work in

12   Escravos; correct?

13   A        That is correct.

14   Q        And you knew that the job being offered to you

15   and the reason for this document was not to work in

16   Lagos or anywhere else in Nigeria, but to only work in

17   Escravos; correct?

18   A        Correct.

19   Q        And you knew at the time that this job could

20   only be done in Escravos and nowhere else; correct?

21   A        Correct.

22   Q        And when you had your fitness for duty with

23   Dr. Sobel, he gave you some restrictions based upon your

24   heart condition in -- in relation to your taking

25   medication for high blood pressure.

**Exhibit D**
**p. 150**

```
1   things that is instilled in Chevron employees; correct?

2   A        I don't think I would put it that way.  But

3   yes, I could agree with that.

4   Q        So let's -- so looking at page 18, where we

5   were, and see -- this is job transfer protocol.

6            My question is:  Before you applied for the

7   Escravos job, did you actually look at the MEP?

8   A        Um, before I applied?

9   Q        Yes.

10  A        Sorry.  No, not before I applied.

11  Q        And you understood that the fitness for duty

12  test that you were asked to undergo was required for

13  your Escravos position; correct?

14  A        Correct.  That's when I looked at the MEP.

15  Q        Before the break, we'll go to one more

16  paragraph.

17           MS. KENNEDY:  Go to page 47, please, Greg, in

18  Exhibit 6.

19  BY MS. KENNEDY:

20  Q        And this is actually the medical suitability

21  for expatriate assignment for adults.  It talks about

22  the purpose and description at the top.

23           Do you recall reading this as the company

24  policy regarding basically fitness for duty?  Do you

25  recall reading this?
```

1    A        I do.

2    Q        And do you recall that at least in this policy,

3    that Chevron says, "It is committed to understanding and

4    supporting expatriate assignees and their families'

5    health needs before, during, and after their

6    assignment"?  Do you have an understanding that was the

7    policy?

8    A        Yes.

9    Q        And it says here, "The health of expatriates

10   and their families is critical to the success of an

11   expatriate assignment."  Do you understand that?

12   A        Yes.

13   Q        And you understood that Chevron, at least in

14   having you go through this fitness for duty, was trying

15   to make sure that you were healthy and fit for this

16   assignment; correct?

17   A        I have no issue with fitness for duty programs,

18   yes.

19   Q        And you also understood that --

20            MS. KENNEDY:  Looking at third column, Greg,

21   where it says, [As read]:  "Basically, the content of

22   the medical examination is reviewed and customized to

23   include specific -- tests specific to the individual's

24   identified medical conditions or location exposures."

25   BY MS. KENNEDY:

**Exhibit D**
**p. 152**

1    Q        At any point in time after August of 2019, did

2    you ever apply for any Chevron expat roles?

3    A        There were --

4    Q        Did you ever apply?

5    A        I'm sorry, after?

6    Q        After August of 2019?

7    A        No.

8    Q        Let me ask the question:  After August of 2019,

9    did you ever apply for any other expat roles at Chevron?

10   A        No.

11   Q        And you understood that the 55 percent premium

12   pay was based on your base pay and the job at Escravos

13   offered the same bonus eligibility and the same

14   benefits; correct?

15   A        That is correct.

16   Q        Now, in August of 2019, you were told that you

17   were not getting the role in Escravos; correct?

18   A        Not officially, no.  In August; right?

19   Q        Well, let me ask you this:  When do you believe

20   you were officially told that you were not getting the

21   Escravos role?

22   A        September 4th.

23   Q        Of 2019?

24   A        Correct.

25   Q        And so up to the time period of September 4,

1    A        Not yet.  Now it is.

2    Q        Did you ask Dr. Levy if there were any other

3    expat assignments you could apply to?

4    A        I did.

5    Q        And, in fact, he responded with a list of expat

6    assignments around the world, in the Americas, Asia

7    Pacific, and in Europe, and mid-Asia -- I'm sorry --

8    mid-Africa region; correct?

9    A        Yes, it was quite kind of him to be so

10   thorough.

11   Q        And there was probably, I don't know, 20 to 30,

12   maybe 50 different options there; correct.

13   A        Yes.

14   Q        And when you read this, you understood at least

15   that Chevron -- at least through Dr. Levy -- thought you

16   could work at a lot of expat assignments; correct?

17   A        Yes.

18   Q        And in the next paragraph, he also talks about

19   various other places, but he would need to have more

20   information to do an assessment; correct?

21   A        Correct.

22   Q        Now, although you disagreed with the decision

23   in -- with respect to your position at Escravos, at

24   least you knew at this point in time, through Dr. Levy,

25   that Chevron was not precluding you to apply to, go to

**Exhibit D**
**p. 154**

1    dozens, 20, 30, 40, 50 other expat assignments; correct?

2    A        Most of those locations --

3    Q        Is that correct, sir?

4    A        It is correct.

5    Q        And also, in this e-mail, one of the first

6    things that Dr. Levy told you is that, quote, "We

7    certainly don't believe that every employee with a

8    health condition poses a direct threat.  We need to

9    analyze the condition in the attributes of the job.

10   When there are ways of ameliorating the risk including

11   reasonable accommodations, we work with the individuals

12   to do so."

13           So my question is:  When you read those two

14   sentences, you know that that complies with Chevron

15   policy with regard to disabled employees; correct?

16   A        That -- or those sentences do comply with their

17   policy, yes.

18   Q        And you also agreed that your condition of a

19   dilated aortic root is a -- it is a current condition

20   that you have; correct?

21   A        It is.

22   Q        And you know -- you may have a rupture, you may

23   not have a rupture, but there is nothing that can

24   predict whether you will have a rupture; correct?

25   A        That is not my understanding of the condition.

1    A        I did.

2    Q        Did you ever tell Dr. Reading that you decided

3    to move and take a lower-paying job even though you had

4    to learn a new industry?

5    A        I believe I said something like that to him,

6    yes.

7    Q        All right.  Now, finally, I believe you said

8    you're taking Cym- -- Cymbalta?

9    A        Correct.

10   Q        And you've been taking that since when?

11   A        I cannot remember the exact date that it was

12   prescribed, but it was sometime late-ish 2020.  It was

13   very difficult to get an appointment with a psychiatrist

14   during COVID.

15   Q        And has that prescription been the same since

16   2020?

17   A        It has been.

18   Q        Now, according to Dr. Reading, is it correct

19   that you are doing better now than you were doing in

20   2019 and 2020; correct?

21   A        I believe I testified earlier to that, as well,

22   yes.

23            MS. KENNEDY:  Thank you, Your Honor.  I have no

24   more questions.

25            THE COURT:  Brief redirect.

**Exhibit D**
p. 156

```
 1    disorder, which requires ongoing depression -- a

 2    consolation of specific symptoms.  It is a diagnosis

 3    that has relevance with respect to outcome or what we

 4    call prognosis about -- for two reasons:  20 percent of

 5    the people don't recover, and we know that the longer a

 6    person who is exposed to depression, the less likely it

 7    is that they will recover.

 8    Q        And which symptoms did you find Mr. Snookal

 9    had?

10    A        He developed a consolation of symptoms, which

11    embraced depressed mood, inability to derive pleasure

12    from customary activities, a loss of self-worth, a loss

13    of motivation, difficulty with sleep, and difficulty

14    with concentration and focus, along with energy.  So

15    he -- he fulfilled criteria that we require for that

16    range of symptoms.  So they're not just transient.  They

17    were ongoing and voluntary.

18    Q        So were these sufficient to qualify Mr. Snookal

19    for a diagnosis of major depressive disorder?

20    A        Yes, they were.

21    Q        And did you rely on anything else?

22    A        Certainly, I relied on records, his

23    self-report, his deposition from testimony, and

24    psychological testing, and some data from the records,

25    which also assessed him on screening measures for
```

**Exhibit D
p. 157**

1    factors just means that the more you have, the more

2    likely it is you'll develop a depressive disorder

3    arising from an adverse experience.

4    Q        And what was your overall finding, Dr. Reading?

5    A        My overall finding to a reasonable degree of

6    psychiatric probability was that Mr. Snookal developed a

7    major depressive disorder, which I would rate as a

8    recurrence.  He had had it before.  It was moderate in

9    severity.  That is a three point scale from our moderate

10   to severe.  And when I saw him, he was in partial

11   remission, so he'd improved.  He hadn't fully recovered.

12         And it used to be thought -- just a quick

13   aside -- that partial remission was a pathway to full

14   remission.  But now over many years, we see that partial

15   remission may be an endpoint.  So people may remain in a

16   state of partial remission.  What does that mean?  That

17   means that the mood is not fully recovered, and usually,

18   there is some diminution in the quality of their life

19   arising from that.

20         So it is not a benign condition.  And my

21   understanding in terms of exploring the universe of

22   potential stressors that suddenly owned to the pivotal

23   nature of work and the nonnormative view Mr. Snookal

24   held as to what happened to him, meaning he felt

25   unfairly treated by others, led to the occurrence of

**Exhibit D**
**p. 158**

1    this -- or the recurrence, I should say, of this major

2    depressive disorder.

3    Q        And you stated earlier that another one of your

4    opinions was regarding treatment.  What is your opinion

5    as to the treatment needed by Mr. Snookal?

6    A        He did avail himself of treatment.  He is still

7    being treated interestingly enough.  With those scores,

8    he is receiving what we would consider a therapeutic

9    dose of an antidepressant medication.  So he is still

10   being treated.  But given the failure of achieving a

11   full recovery, I would recommend a year of cognitive

12   behavioral psychotherapy, which is evidenced based and

13   standard of care, to see if it can improve him further.

14   Q        So is your prognosis at this point?

15   A        My prognosis at this point -- there is a four

16   point scale: poor, guarded, fair, good.  So he is

17   between fair an good.  So he is not achieved a fall

18   recovery even with treatment.  It may be difficult to

19   discontinue those antidepressant medications.  With

20   treatment, we may move him towards good, but he is --

21   his prognosis is affected by what we call the duration

22   of exposure to depression.  And it is because of that

23   extended duration, he is at risk for not -- even with

24   the treatment I recommended -- not achieving what we

25   would hope for as a full recovery.

**Exhibit D**
p. 159

```
 1    Q        Thank you, Dr. Reading.

 2             MS. LEAL:  Your honor, I would move that

 3    Exhibit 141 the report -- and 140 which is a CV, which

 4    we didn't show, be admitted into evidence.  And I

 5    believe it's been stipulated.

 6             MS. KENNEDY:  Yes.

 7             THE COURT:  All right.  So admitted.

 8             MS. KENNEDY:  Yes.

 9     (Whereupon, Plaintiff's Exhibit 141 and 140 is admitted

10                          hereto.)

11    A        Oh, thank you.

12                       CROSS-EXAMINATION

13    BY MS. KENNEDY:

14    Q        Hello, Dr. Heading?

15    A        Hello, Ms. Kennedy.

16    Q        So if I understand you correctly, you have

17    diagnosed Mr. Snookal with a major depressive disorder,

18    moderate and recurrent?

19    A        Originally, now in partial remission.

20    Q        Now in partial remission?

21    A        Yes.

22    Q        And you were using the standard set forth for

23    major depressive disorder in the DSM-5; is that correct?

24    A        5-TR, yes.

25    Q        And you saw Mr. Snookal one time in February of
```

**Exhibit D**
p. 160

1    2025 for about three to four hours; correct?

2    A        Correct.

3    Q        And that was basically for the purpose of this

4    lawsuit; correct?

5    A        That is correct, yes.

6    Q        And you administered three psychological tests

7    to him; correct?

8    A        Correct.

9    Q        One is the MMPI-2; correct?

10   A        MMPI-3, I believe.

11   Q        Sorry, MMPI-3?

12   A        Yes.

13   Q        The PAI, personality assessment inventory?

14   A        Yes.

15   Q        And you also administered the TSI-2, which is a

16   trauma test; correct?

17   A        Trauma symptom inventory, yes.

18   Q        Now, if I understand correctly, you met with

19   Mr. Snookal remotely on February 6, 2025, for about

20   three to four hours; correct?

21   A        Yes.  Six -- that doesn't include the testing.

22   The testing is in addition to that.

23   Q        And then after you had this meeting with him,

24   were you -- you asked him questions and he self-reported

25   a lot of things; correct?

```
1    A        Everything was self-report, yes.

2    Q        And in your opinion, if I understand correctly,

3    is based upon his feelings of being mistreated; correct?

4    A        That -- his deception or belief is an important

5    component enhancing the risk of psychiatric injury.

6    You're correct.

7    Q        Right.  So even though he may feel he was

8    mistreated, if, in fact, he wasn't, he would still have

9    the same feelings of depression; correct?

10   A        Well, if there was evidence that there was

11   grounds, he -- his -- the trajectory and severity of his

12   depression may be different.  But because he still

13   believed it even if he wasn't mistreated, yes.

14   Q        Right.  In other words, the symptoms of

15   depression are all based on his perceptions of

16   mistreatment or unfairness; correct?

17   A        That's right.  Their based on his belief that

18   he was adversely and unfairly treated.  You are correct.

19   Q        And if I understand correctly, if --

20   hypothetically speaking -- if Mr. Snookal was properly

21   and legally denied the job in Escravos, he could still

22   suffer from a major depressive disorder because he felt

23   it was unfair; correct?

24   A        He could.  Or even if he didn't feel it was

25   unfair, he could still experience a significant loss,
```

1    and given his vulnerability, he could develop a

2    depressive disorder in either event, yes.

3    Q       And also, you would agree, that he would also

4    -- he could experience a major depressive disorder as

5    you've described, if Mr. Snookal hopes of getting this

6    job in Escravos and told his family and told his friends

7    and then those hopes and expectations were diminished,

8    he could still have major depressive disorder; correct?

9    A       That could he about a significant loss, yes.

10   Q       And when you talk about loss, it is loss as

11   perceived by the employee; correct?

12   A       Well, the loss may be real.  So -- but it -- it

13   can be enhanced by the perception of unfair.  So the

14   loss of that job in Nigeria, that's a empirically --

15   verified loss.  And the loss was enhanced by his feeling

16   that it was unfair or it could have been avoided, yes.

17   Q       Did Mr. Snookal tell you when he spent the

18   three to four hours with him that the job offer in

19   Escravos was conditional, that he actually didn't have

20   that job?

21   A       It was conditional on his health.

22   Q       And other things, did he tell you that?

23   A       I don't recall other things.

24   Q       After you had your 3- to 4-hour meeting with

25   Mr. Snookal where he self-reported his life, his family,

1    et cetera, those could all be caused by things unrelated

2    to the loss of the job in Escravos; correct?

3    A       Well, that consolation could be.  As I say, one

4    has to rule out a medical condition, medication side

5    effects, which I -- I did with the assistance of the

6    records.  But what we see is a person that has had a

7    prior history of depression.  Then we see another

8    significant adverse event.

9           We know that 80 percent of depressive disorders

10   are a product of an adverse life event, a loss.  So

11   you'd have to identify an alternate candidate, and the

12   data don't provide a fit for any alternate candidate.

13   So we see work as the candidate that provides the fit

14   for those data, and then you can examine -- which is not

15   my role -- whether what happened at work was --

16   comported with what he's claiming.

17   Q       And --

18           THE COURT:  Wait, let me pause you, Counsel.

19   If you have much more, we need to --

20           MS. KENNEDY:  Final question.

21           THE COURT:  Okay.

22   BY MS. KENNEDY:

23   Q       Dr. Reading, for your diagnosis of Mr. --

24   Mr. Snookal, you can't sit here today and tell the jury

25   that there is a sole cause of his major depressive

1    disorder; correct?

2    A        Well, that's a leading question, sole.

3    Certainly, there was a -- there was a precipitating

4    event that set that in motion for a confluence of

5    reasons.

6    Q        But you can't say that there's a sole cause;

7    can you?

8    A        Well, certainly we're looking for a significant

9    event.  And I can certainly say that there were no other

10   candidates, so that provided the best fit for the data.

11   Q        And -- but everything else that's going on in

12   his life you exclude as a cause of his major depressive

13   disorder; is that correct?

14   A        I don't exclude it, but it didn't -- all those

15   things were ongoing, and we don't see the emergence of

16   symptoms.  So his son's health issues were ongoing.  His

17   marital -- he had a strong marriage, but his wife was

18   maybe over involved with his son.

19            The -- so what we're looking at -- all those

20   are constant.  And we see at a certain point in time

21   what we call discontinuity.  We see a change, and we see

22   that change is following an event.  But we can't -- we

23   don't identity other events -- I ruled out these other

24   considerations.  But when you say "sole," there are

25   obviously other risk factors that applied to

UNITED STATES DISTRICT COURT

**Exhibit D**
**p. 165**

1    Mr. Snookal.

2            MS. KENNEDY:  No more questions, Your Honor.

3            THE COURT:  Okay.  Any final redirect?

4            MS. LEAL:  No, Your Honor.

5            THE COURT:  Okay.  All right.  Dr. Reading,

6    thank you for --

7            THE WITNESS:  Thank you, Your Honor.  Thank you

8    so much.

9            THE COURT:  All right.  Ladies and gentlemen,

10   we are going to take our lunch break now.  Let's --

11   let's be back a few minutes before 1:00, and we will

12   finalize the evidence, and then we'll hear closing.  So

13   enjoy your lunch.  Let's be back ready to go at

14   1:00 o'clock.  All right.

15           (Whereupon, the following was held outside

16           the presence of the jury:)

17           THE COURT:  All right.  Please take your seat.

18   Just some quick housekeeping.

19           Counsel, I can't, in good conscience, allow you

20   to call Ms. Snookal at this point.  You have 35 minutes

21   left, and I assume that you want to cross their expert.

22   So...

23           MS. FLECHSIG:  That's right, Your Honor.

24           I know I told the jury that we'd be hearing

25   from her.  Is it possible to make any comment to the

**Exhibit D**
p. 166

```
 1    expert, Dr. Baum's, report.  I was asked to offer

 2    rebuttal calculations.

 3    Q        In this case, was your deposition taken?

 4    A        No.

 5    Q        Did you, in fact, prepare a report?

 6    A        Yes, I did.

 7             MS. KENNEDY:  And, Your Honor, I think by

 8    stipulation, we'd like to admit Exhibit 154, which is

 9    Dr. Song's resume or CV starting on page 29 as well as

10    her report, which is dated September 3, 2024.

11             THE COURT:  154 -- I assume no objection,

12    Counsel?

13             MS. FLECHSIG:  No objections, Your Honor.

14             THE COURT:  All right.  So admitted.

15    (Whereupon, Defense's Exhibit 154 is admitted hereto.)

16             MS. KENNEDY:  Thank you.

17             Greg, can we display Exhibit 154?

18    BY MS. KENNEDY:

19    Q        So -- so, Dr. Song, we talked a little bit

20    about your qualifications and your assignment.

21             Can you give me just a sort of brief overview

22    of what your rebuttal opinions are?

23    A        Sure.  The brief overview is essentially in my

24    report.  If we go to section 3, page 3, section 3

25    provides a summary of rebuttal calculations.
```

1                    **C E R T I F I C A T E**

2

3

4

5    MARK SNOOKAL                        :

6              vs.                       :   No. CV 23-06302-HDV

7    CHEVRON USA, INC.                   :

8

9

10   I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   _____/S/_____        _08/23/2025_

23   MARIA R. BUSTILLOS                  DATE
     OFFICIAL REPORTER

24

25