

1  DOLORES Y. LEAL (134176)
   OLIVIA FLECHSIG (334880)
2  ALLRED, MAROKO & GOLDBERG
3  6300 Wilshire Blvd. Suite 1500
   Los Angeles, CA 90048-5217
4  (323) 653-6530
   dleal@amglaw.com
5  oflechsig@amglaw.com

6  **Attorneys for <u>Plaintiff MARK SNOOKAL</u>**

7

                    UNITED STATES DISTRICT COURT
8
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10  MARK SNOOKAL, an individual,          )  CASE NO.: 2:23-cv-6302-HDV-AJR
                                          )
11                                        )  **PLAINTIFF MARK SNOOKAL'S**
12              Plaintiff,                 )  **MEMORANDUM OF POINTS AND**
                                          )  **AUTHORITIES IN OPPOSITION TO**
13       vs.                              )  **CHEVRON USA, INC.'S RENEWED**
                                          )  **MOTION FOR JUDGMENT AS A**
14                                        )  **MATTER OF LAW PURSUANT TO FED.**
                                          )  **R. CIV. 50(b), OR IN THE**
15  CHEVRON USA, INC., a California       )  **ALTERNATIVE, MOTION FOR NEW**
16  Corporation, and DOES 1 through 10,   )  **TRIAL AND/OR REMITTITUR**
    inclusive,                            )
17                                        )  [*Filed concurrently with Declaration of Olivia*
                                          )  *Flechsig in Opposition to Defendant's Motion*
18                                        )  *for Judgment as a Matter of Law, or in the*
                                          )  *Alternative, Motion for New Trial and/or*
19              Defendants.                )  *Remittitur; and [Proposed] Order Denying*
                                          )  *Defendant's Motion in Full*]
20                                        )
21                                        )  District Judge: Hon. Hernan D. Vera
                                          )  Magistrate Judge: Hon. A. Joel Richlin
22                                        )  Action Filed: August 3, 2023
                                          )  Trial Date: August 19, 2025
23                                        )  Judgment Entered: September 3, 2025
                                          )
24                                        )  Hearing Date: November 13, 2025
25                                        )  Hearing Time: 10:00 a.m.
26                                        )  Courtroom: 5B

27

28

---

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1

## **TABLE OF CONTENTS**

2
**Page**

3  MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

4  I.      INTRODUCTION ...................................................................................................... 1

5  II.     FACTUAL OVERVIEW ............................................................................................ 2

6  B.      Mr. Snookal's Significant and Lasting Damages ..................................................... 8

7

8  III.    LEGAL STANDARDS .............................................................................................. 9

9          A.      Renewed Motion for Judgment as a Matter of Law .................................... 9

10         B.      Motion for New Trial ................................................................................... 9

11         C.      Motion for Remittitur ................................................................................ 10

12  IV.    ARGUMENT ........................................................................................................... 11

13         A.      Defendant's Direct Threat Defense to Disability Discrimination Failed ................ 11

14
                   1.      Plaintiff Provided Overwhelming Evidence that He Could Perform the Duties
15                         of the REM Position in Escravos without Accommodation ............................ 13

16
                   2.      Plaintiff Provided Overwhelming Evidence that His Disability Posed Neither an
17                         Immediate Nor Substantial Threat to Himself or Others ................................. 15

18         B.      The Jury's Damage Award Was Supported by Substantial Evidence ..................... 16

19                 1.      Plaintiff's Economic Damages Were Based Upon Substantial Evidence ........ 16

20                 2.      The Jury's Emotional Distress Damages Award Was Based Upon Substantial
21                         Evidence .......................................................................................................... 18

22  V.     CONCLUSION ......................................................................................................... 21

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                   **Page(s)**

3

*Adams v. City of Chi.*,
   798 F.3d 539 (7th Cir. 2015) .................................................................20

4

5

*Bell v. Williams*,
   108 F.4th 809 (9th Cir. 2024) ...............................................12, 18, 19, 20

6

7

*Bihun v. AT&T Info. Sys., Inc.*,
   13 Cal. App. 4th 976 (1993) ..................................................................17

8

9

*Boehm v. Am. Broad. Co.*,
   929 F.2d 482 (9th Cir. 1991) .............................................................10, 16

10

*D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982) ...............................................................11

11

12

*Del Monte Dunes v. City of Monterey*,
   95 F.3d 1422 (9th Cir. 1996) .................................................................12

13

*Erhart v. Bofi Fed. Bank*,
   No. 23-3065 (9th Cir., Feb. 6, 2025, No. 23-3065) ...............................12

14

15

*Guy v. City of San Diego*,
   608 F.3d 582 (9th Cir. 2010) .................................................................10

16

17

*Horsford v. Bd. of Trs. of Cal. State Univ.*,
   132 Cal. App. 4th 359 (2005) ................................................................21

18

*Josephs v. Pac. Bell*,
   443 F.3d 1050 (9th Cir. 2006) ...............................................................12

19

20

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) .............................................................10, 16

21

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000) ..............................................................................13

22

23

*Silver Sage Partners, LTD v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) .................................................................21

24

*Sloane v. Equifax Info. Servs.*,
   510 F.3d 495 (4th Cir. 2007) .................................................................18

25

26

*Tortu v. Las Vegas Metro. Police Dep't*,
   556 F.3d 1075 (9th Cir. 2009) ...............................................................18

27

28

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1

*Valencia v. Shell Oil Co.*,
    23 Cal. 2d 840 (1944) ........................................................................................16

2

*Wittkopf v. Cnty. of L.A.*,
    90 Cal. App. 4th 1205 (2001) ...........................................................................12

3

4

*Wooten v. BNSF Ry. Co.*,
    387 F. Supp. 3d 1078 (D. Mont. 2019) ........................................................17, 18

5

6

7

**Other**

8

Cal. Code Regs., tit. 2, § 11067 ........................................2, 3, 4, 6, 7, 8, 9, 10, 11, 12

Cal. Code Regs., tit. 2, § 11067 (b-c) ...........................................................................9

Cal. Code Regs., tit. 2, § 7293.8(d) .............................................................................12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

## MEMORANDUM OF POINTS AND AUTHORITIES

**PLAINTIFF MARK SNOOKAL, BY AND THROUGH HIS COUNSEL OF RECORD, HEREBY** submits his Opposition to Defendant Chevron USA, Inc.'s Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R.  Civ. 50(b), or in the Alternative, Motion for New Trial and/or Remittitur. This Opposition shall be based upon the Moving, Opposition and Reply papers, the declarations and exhibits submitted in support thereof, all pleadings in this matter, the complete trial record, and oral argument at the hearing of this matter.

### I.    INTRODUCTION

In defense to Plaintiff Mark Snookal's claim for disability discrimination in violation of the California Fair Employment and Housing Act, Defendant Chevron USA, Inc. asserted a "direct threat" defense to disability discrimination. To succeed on this affirmative defense, Defendant had to prove by a preponderance of the evidence that Mr. Snookal's disability prevented him safely from performing the essential duties of the job because his performance of those duties would have posed an "imminent and substantial" threat to himself or others. Cal. Code Regs., tit. 2, § 11067(b-c). Moreover, California law instructs that "it is no defense to assert that an individual with a disability has a condition or a disease with a future risk, so long as the condition or disease does not presently interfere with his or her ability to perform the job in a manner that will not endanger the individual with a disability or others." Id. at § 11067(d).

After a four-day jury trial and an additional day of deliberations, an eight-person jury unanimously rendered a measured verdict for Mr. Snookal, awarding him with $4 million comprising of his past and future emotional distress, and past and future wage loss. Given the factual record, Chevron simply cannot meet the high standards required for a renewed motion for judgment as a matter of law, nor those for a motion for a new trial and/or remittitur. The jury reached an eminently reasonable conclusion which is well-supported by the facts and the weight of the evidence. Plaintiff therefore respectfully submits that the considerable deference owed to juries ought not be disturbed, and Chevron's Motion should be denied in full.

## II.     FACTUAL OVERVIEW

### A.  Chevron's Disability Discrimination Against Mr. Snookal

Ten years into Plaintiff Mark Snookal's ("Mr. Snookal's") career working for Defendant Chevron USA, Inc. ("Chevron" or "Defendant"), in or around May of 2019, Chevron selected Mr. Snookal for an expatriate rotational assignment in Escravos, Nigeria as the Reliability Engineering Manager ("the REM position"). (Kennedy Decl. at Tr. Exh. 20.) Before beginning the role, Mr. Snookal had to pass Chevron's Medical Suitability for Expatriate Assignment (MSEA) exam. (Id.) Accordingly, a Chevron-appointed physician, Dr. Irving Sobel, saw Mr. Snookal in his office and evaluated Mr. Snookal's medical history. (Flechsig Decl. at Tr. Exh. 29) During this MSEA exam, Mr. Snookal disclosed his disability, an asymptomatic dilated aortic root, to Chevron for the first time. (Id.) After reviewing Mr. Snookal's medical history, Dr. Sobel filled out Chevron's MSEA paperwork (which noted Mr. Snookal's assignment location in Escravos, Nigeria) and concluded Mr. Snookal was "fit for duty with restrictions." (Id.) The only restrictions Dr. Sobel noted were 1) no heavy lifting over 50 pounds (there was no such heavy lifting requirement for the job) and 2) to obtain a clearance letter from Mr. Snookal's treating cardiologist. (Id.) Mr. Snookal promptly obtained a letter from Dr. Shahid Khan, the cardiologist who had been supervising Mr. Snookal's preventative care since 2014. (Kennedy Decl., Tr. Exh. at 33.) Indeed, it is undisputed that Mr. Snookal was on blood pressure medications and that the only other recommendation for monitoring his dilated aortic root was a once annual scan of his heart. (Kennedy Decl., Tr. Exh. 68.) Since the REM position had a rotational schedule, Mr. Snookal would easily be able to obtain this routine care during the six months per year during which he returned home to Los Angeles.

On July 29, 2019, Dr. Khan wrote a clearance letter containing the exact language Dr. Sobel had instructed Mr. Snookal to obtain (Flechsig Decl., Tr. Exh. 30, 31), affirming that "Mr. Snookal is under my care for his heart condition. It is safe for him to work in Nigeria with his heart condition. His condition is under good control, and no special treatments are needed." (Kennedy Decl., Tr. Exh. 33.)

Despite this support for Mr. Snookal's ability to safely do the job, Chevron allowed Dr.

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    Eshiofe Asekomeh, an Occupational Health Physician located in Nigeria, to deem Mr. Snookal

2    "unfit for duty in Escravos."  (Kennedy Decl., Tr. Exh. 54.) Dr. Asekomeh subsequently rescinded

3    the job offer from Mr. Snookal. Though Chevron provided guidelines for Dr. Asekomeh to follow

4    in making these fitness for duty determinations, it did not train Dr. Asekomeh on California law.

5    (Flechsig Decl., Exh. B). Dr. Asekomeh is not a cardiologist, never spoke to Mr. Snookal, never

6    spoke to Dr. Khan, and in fact never even reviewed the job description for the REM position. (Id.)

7    Dr. Asekomeh has no experience with Mr. Snookal's condition, nor potential complications of

8    same, nor did he know what is needed to treat a patient who has suffered a complication of this

9    condition. (Id.) Dr. Asekomeh also cannot recall whether he personally reviewed any studies prior

10    to making the assumption that Mr. Snookal was "unfit for duty in Escravos." (Id.)

11         Chevron insists that because Dr. Asekomeh first "consulted with" three of Chevron

12    Nigeria's staff cardiologists, he must have come to a reasonable conclusion. But the undisputed

13    record shows that aside from one brief email thread with these cardiologists, Dr. Asekomeh never

14    spoke with the cardiologists in real time, nor provided them with Mr. Snookal's medical history,

15    even though Dr. Asekomeh had this information in his possession. (Flechsig Decl., Exh. B; Tr. Exh.

16    43, 44, 46.) To the contrary, Dr. Asekomeh only provided the consulting cardiologists with one set

17    of Mr. Snookal's most recent cardiology scans, and he did not provide them with information

18    regarding a number of factors that further reduced Mr. Snookal's risk of ever having a complication:

19    his lack of genetic conditions, his lack of family history, the blood pressure medication he took to

20    stabilize the condition, the fact that the aorta had been stable in size for years prior, and so on.

21    (Flechsig Decl., Exh. B-D.)

22         In addition to Dr. Asekomeh's failure to conduct his due diligence in gathering the relevant

23    information and provide it to the cardiologists, the qualifications of Chevron's consulting

24    cardiologists are also suspect. One of Chevron's two cardiologists who testified, Dr. Victor

25    Adeyeye, has never treated a patient with Mr. Snookal's condition, nor has he ever treated a patient

26    who has had a complication of the condition. (Flechsig Decl. Exh. C.) The other of Chevron's two

27    cardiologists who testified, Dr. Ujomoti Akintunde, has only treated "a few" patients with Mr.

28

3

1    Snookal's condition over the years, and she has never once treated a patient who has had a

2    complication of the condition. (Id. at Exh. D.) Regardless of the limited information and limited

3    experience they had, the cardiologists on the email thread unanimously agreed that given the small

4    size of Mr. Snookal's dilated aortic root, Mr. Snookal was well within the "low risk" category.

5    (Flechsig Decl., Tr. Exh. 43-44, 46). Notably, they did not provide any more specificity regarding

6    Mr. Snookal's perceived risk of future complication. (Id.) Further still, *none of them ever made any*

7    *recommendation against Mr. Snookal's ability to work in Escravos*. (Id.) They did, however, opine

8    that people with symptomatic dilated aortic roots should not work in offshore locations, but Mr.

9    Snookal *did not have symptoms*, nor was he working in the offshore location. (See e.g., Kennedy

10   Decl. Exh. 33, 68) They further opined that they would be limited to "initial stabilization" of the

11   patient in the event that a complication arose in the future. However, this is the case for the vast

12   majority of medical facilities around the world. (Flechsig Decl., Exh. A.)

13          After compiling these recommendations from the embedded medical team in Nigeria, they

14   consulted with Dr. Stephen Frangos, then Chevron USA's Regional Manager, Health and Medical –

15   Americas, via email. (Flechsig Decl., Tr. Exh. 55/2). Dr. Frangos wrote to the Nigerian medical

16   team: "[a]s is pointed out, the patient is low risk for a major adverse CV event. Yet in Escravos,

17   there are only limited resources for initial stabilization and transfer in the event of a major adverse

18   CV event." (Id.) Immediately after this, Dr. Asekomeh notified Mr. Snookal that Chevron was

19   rescinding the REM position offer because of the MSEA. (Id. at 55/1).

20          What is more, it is undisputed that after Mr. Snookal received notification from Dr.

21   Asekomeh of this decision, he took appeal with Dr. Scott Levy, then Chevron's Regional Medical

22   Manager for the Eurasia, Europe, Middle East, and Africa region, an employee of Defendant

23   Chevron USA, Inc.

24          Dr. Levy claimed for the first time at trial that the REM position was a "safety-sensitive

25   position" which could endanger Mr. Snookal and others in the event of a complication while in

26   Escravos. (Flechsig Decl., Exh. C.) He further testified at trial that he understood Mr. Snookal's

27   annual risk of complication to be "around 2%" and that per his expertise in occupational health, this

28

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    risk was unreasonably high and contrary to Chevron's duty to keep its employees safe. (Id.) Indeed,

2    as a part of Dr. Levy's "review" of the decision to deem Mr. Snookal "unfit for duty," Mr.

3    Snookal's treating cardiologist provided further information concerning Mr. Snookal's care, and on

4    August 23, 2019, wrote a second letter affirming and expanding upon his opinion that it was safe for

5    Mr. Snookal to work "in a remote region of Nigeria," noting that given the stability of Mr.

6    Snookal's dilated aortic root, and given medical advances in stabilizing the condition, Mr.

7    Snookal's risk of a future complication were "low and likely less than 2% per year." (Kennedy

8    Decl., Tr. Exh. 68.)

9         Dr. Levy's credibility, however, was eviscerated by Chevron's own internal documentation

10   regarding the physical requirements of the REM position, confirming that the job is an "office based

11   job," which did not requiring heavy lifting or strenuous activity, and which is specifically "not

12   safety-sensitive." (Flechsig Decl., Tr. Exh. 5/1.) Further, for all of Dr. Levy's *post hoc* testimony

13   about his purported concerns of catastrophe, Dr. Levy, who is familiar with the conditions of

14   Escravos, *actually did recommended clearing Mr. Snookal for duty*. On August 24, 2019, he wrote

15   to the Nigerian team, inter alia: "I had a conversation with Mark Snookal's nephrologist (sic) an the

16   info is below. Although not without some risk, I don't think we're dealing with high risk. We can

17   mandate yearly clearance and report from nephrologist (sic) on a yearly basis. Risk is even lower

18   when we consider that he'll be a rotator." (Flechsig Decl., Tr. Exh. 69/2). Though Chevron admits

19   that "[u]ltimately, Dr. Levy deferred to the Nigerian doctors' determination" (Defendant's Motion

20   at p. 6:22), Dr. Levy clearly did so at his own election (i.e., he ratified the decision). At that time,

21   Dr. Levy was supervising over 500 medical providers (including Chevron's Nigeria-based providers

22   who made the original decision), and Dr. Levy commanded a budget of $40 million per year.

23   (Flechsig Decl., Exh. A/58.)

24        Further still, Chevron allowed Mr. Snookal to be in what *were* actually safety-sensitive

25   position both *before and after* he disclosed his dilated aortic root to Chevron. (Flechsig Decl., Exh.

26   C/60.) Chevron's claim that Mr. Snookal posed an imminent and substantial threat to others is even

27   less credible when one considers the frequency with which its workers, who it put there at its own

28

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  election, must be medically evacuated from Escravos, and the number of occupational injuries and

2  fatalities which occur there. (Flechsig Decl., Tr. Exh. 7-8.)  By Chevron's own admission, the 55%

3  location premium it pays to its rotational expatriates is to compensate them for living in a place with

4  safety risks. Further still, Dr. Levy opined that in his experience as an occupational health physician,

5  "[g]enerally, the criteria for—for most fitness for duty decisions in safety sensitive workers are

6  about 1 percent, 1 percent of less: pilots, drivers, nuclear – railroad employees, nuclear regulatory

7  agencies." (Flechsig Decl., Exh. B/46). If this is true, and pilots can be cleared to fly with a 1%

8  annual risk of health complication, surely Mr. Snookal should have been cleared to work in a non-

9  safety sensitive, office-based job even if the risk of complication was 2% per year.

10  Chevron also raised a new theory for the first time at trial that, in essence, the rigors of the job itself

11  could have somehow aggravated Mr. Snookal's condition. For example, Cesar Malpica, who

12  currently holds the REM Position in Escravos, testified that other than his office-based managerial

13  duties, he sometimes has to wear personal protective equipment (PPE), work under hot conditions,

14  and climb tall ladders to examine stack equipment. (Flechsig Decl., Exh. B/67.) For one thing, it is

15  undisputed that Mr. Snookal was on blood pressure medication to prevent his dilated aortic root

16  from growing, but for another, Mr. Snookal was doing all of those things (wearing PPE, working

17  under hot conditions, climbing tall ladders, etc.) at Chevron's El Segundo refinery without incident

18  for years. (Id. at Exh. B/67, C/41-44.)

19       In addition, all of the contemporaneous documentation regarding Chevron's reasoning for

20  rescinding the REM position memorialized, repeatedly, that Chevron's sole concern was with a

21  hypothetical, miniscule, future risk that Mr. Snookal would require emergency medical evacuation

22  from Escravos. By way of just some examples: "Based on recent developments around increasing

23  medical evacuation from the field there is heightened focus on [Fitness for Duty] in field locations

24  by management. The risk of an incident no matter how low is a major factor in Escravos medical

25  care. The logistics of getting an emergency out of Escravos especially when there is (sic) weather

26  challenge . . ." (email from Dr. Paul Arenyeka to Dr. Levy on August 26, 2019) (Flechsig Decl.,

27  Exh. 69/1). In a lengthy email to Mr. Snookal on September 16, 2019, Dr. Levy wrote that "the

28

6

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

company does have a right to not engage individuals where their assignment poses a "direct threat to their own health and safety . . . But the risk itself is not determinative. The concern is that if the condition were to occur, the outcome would be catastrophic and would require an immediate emergency response which is not available and would most certainly result in death in Escravos . . . We have no problems with you working in El Segundo. . ." (Flechsig Decl., Tr. Exh. 88/1). Nowhere in this email does Dr. Levy refer to any concern about Mr. Snookal somehow posing a threat to others. Dr. Levy also admitted at trial that he "can't remember" whether he even reviewed the job duties for the REM position because "there was no issue around his duty." (Flechsig Decl., Exh. B/12-13.) This "justification" is exactly what is disallowed by the FEHA because by that logic, almost anyone with any disability or latent medical condition could be considered to have some slightly elevated, future risk.

Last, adding to the volume of evidence undermining Chevron's direct threat defense to disability discrimination, was the testimony of Mr. Snookal's cardiology expert, Dr. Marmureanu. Dr. Marmureanu possesses, by far, the most experience in managing patients with Mr. Snookal's condition, both with or without a resulting complication of the condition. (Flechsig Decl, Tr. Exh. 121.) Dr. Marmureanu opined that Mr. Snookal's actual risk of complication was far lower than Chevron's assumptions, at around only .1% per year, which is a risk "negligible relative to the general population." (Id. at 122.) Dr. Marmureanu also clarified that complications of dilated aortic root range from the exceptionally rare sudden rupture, which is more commonly associated with a trauma to the heart (and which everyone carries some risk), to the more common complication of a tear. (Flechsig Decl. at Exh. A/15-18.) Some of those tears, he explained, go undetected for years. (Id.) Dr. Marmureanu further explained that many hospitals, even in metropolitan areas in the United States, are limited to providing initial stabilization of patients who have had a serious rupture or dissection. (Id. at Exh. A/19-21) He has personally witnessed frequent delays, ranging from hours to days, in surgical care for patients California as they often must be transferred and await available beds. (Id.) Moreover, contrary to Chevron's assumptions that Mr. Snookal would "certainly" die if he had a complication, Dr. Marmureanu explained how patients may be stabilized through basic

7

1   first aid – intravenous and oral medication to slow heart rate and drop blood pressure. (Id. at Exh.

2   A/18-19.) These are capabilities available in Escravos, which Chevron agrees has onsite doctors and

3   basic medical care available.

4   **B.  Mr. Snookal's Significant and Lasting Damages**

5   Mr. Snookal testified extensively regarding how much he had loved working for Chevron,

6   how he had understood it as a fair and reasonable place, and how he identified deeply with his work

7   for them. (Flechsig Decl. at Exh. C, D.) But after Chevron rescinded the REM position offer from

8   him, the insults to Mr. Snookal continued. Chevron backfilled Mr. Snookal's previous role at the El

9   Segundo refinery. (Id. at Exh. D/9-14.) Even though Mr. Snookal's replacement had not yet started

10  the role, Chevron declined to offer Mr. Snookal even his old, inferior position back, instead electing

11  to have Mr. Snookal train his replacement over the course of several months. (Id.) Mr. Snookal sat

12  in limbo and applied for multiple other job openings at the El Segundo refinery. (Id.) Chevron

13  rejected him for those jobs. (Id.) Instead, Chevron created a new role for Mr. Snookal which was not

14  in the same department as the one Mr. Snookal had worked in for the proceeding ten years of his

15  career at Chevron (analyzing). (Id.) The new job in which Chevron placed Mr. Snookal also had no

16  managerial responsibilities or opportunities for career advancement, unlike the REM position, and

17  unlike Mr. Snookal's previous role at the El Segundo refinery. (Id.) Crucially, Mr. Snookal

18  continued to search for available expatriate positions at Chevron in the places where Dr. Levy said

19  he could have been cleared, but he was unable to find any such opportunities for which he qualified.

20  (Id. at Exh. D/26.)

21  Mr. Snookal was never able to find a job with comparable pay and benefits to those offered

22  by Chevron's expatriate assignments. (Id. at Exh. D/4-19.) Moreover, when Mr. Snookal eventually

23  left for another role, he moved out of state for the job, selling his cherished family home in Los

24  Angeles. (Id. at Exh. D/18-19.) Compounding the emotional impacts on Mr. Snookal, Mr. Snookal

25  had sought expatriate assignments to help support his son's special education needs, and after

26  having received the REM position offer, he was thrilled to have enrolled his son in the

27  recommended private school. (Id. at Exh. C/37-38.) His son's education and social life were

28

8

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

progressing well. (Id.) However, after the job was rescinded, Mr. Snookal had to bear the weight of not being able to provide for his family's needs in this way, and he continues to be confronted with what was taken from him, especially when his son faces an educational setback. (Id.)

As further documentation of Mr. Snookal's extensive emotional distress damages, Mr. Snookal contacted Kaiser's mental health support team approximately two months after the role was rescinded from them. Shortly thereafter, Mr. Snookal commenced therapy and taking antidepressants, which he continues to take to this day over six years later. (Id. at Exh. D/34-35.) As corroborated by the expert testimony and report of psychologist Dr. Anthony E. Reading, Mr. Snookal suffered a major depressive episode from this ordeal. Even now, Mr. Snookal has not fully recovered from this. (Id. at Exh. D/34-36.)

## III.    LEGAL STANDARDS

### A.  Renewed Motion for Judgment as a Matter of Law

Canonically, "[j]udgment as a matter of law is proper only when 'the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Erhart v. Bofi Fed. Bank* (9th Cir. Feb. 6, 2025, No. 23-3065) 2025 U.S. App. LEXIS 2719, at *1 citing *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 455 (9th Cir. 2018) quoting *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). In making this determination, the Court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). In doing so, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (S. Ct. 2000).

### B.  Motion for New Trial

As the Ninth Circuit has noted, "'[Federal Rule of Civil Procedure] Rule 59 does not specify the grounds on which a motion for a new trial may be granted.' Rather, the court is "bound by those grounds that have been historically recognized.'" *Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 729 quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the

1    verdict is against the weight of the evidence, that the damages are excessive, or that, for other

2    reasons, the trial was not fair to the party moving.'" *Molski*, supra 481 F.3d 724, 729 quoting

3    *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (S. Ct. 1940).

4       "Jury verdicts are due considerable deference." *Boehm v. American Broadcasting Co.*

5    929 F.2d 482, 486 (9th Cir. 1991) quoting *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775

6    (9th Cir. 1990). Contrary to the lower standard which Defendant claims, the Ninth Circuit has

7    more recently held that a court "must uphold a jury verdict if it is supported by substantial

8    evidence." *Guy v. City of San Diego*, 608 F.3d 582, 585 (9th Cir. 2010). "Substantial evidence is

9    evidence 'adequate to support the jury's conclusion, even if it is also possible to draw a contrary

10   conclusion.'" *Id.* quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "[A] district court

11   may not grant a new trial simply because it would have arrived at a different verdict. [citation]

12   Thus if the jury's verdict is not against the clear weight of the evidence, we may find that a

13   district court abused its discretion in granting a new trial. [citation]" *Silver Sage Partners, LTD v.*

14   *City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). In other words, the trial court may

15   not order a new trial simply because of a disagreement with the jury's finding. To the contrary,

16   the jury's finding must have been "against the clear weight of the evidence." Here, the jury's

17   finding for verdict was readily supported by the clear weight of the evidence.

18                 **C.  Motion for Remittitur**

19       Similarly, the Ninth Circuit requires courts to give "substantial deference to a jury's

20   finding of the appropriate amount of damages." *Del Monte Dunes at Monterey, Ltd. v. City of*

21   *Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). "The jury's verdict must be upheld unless the

22   amount is 'grossly excessive or monstrous, clearly not supported by the evidence, or based only

23   on speculation or guesswork.'" *Bell v. Williams*, 108 F.4th 809, 830-831 (9th Cir. 2024) quoting

24   *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996). See

25   also *Boehm v. American Broadcasting Co.*, 929 F.2d 482, 488 (9th Cir. 1991). ("The jury's

26   finding as to the amount of damages must be upheld unless found to be grossly excessive, clearly

27

28

1   not supported by the evidence, or based only on speculation or guesswork.") In the instant case,

2   the damages are not excessive, as they are based directly upon the evidence presented at trial.

3          "When assessing remittiturs of state-law claims, federal courts apply state law." *D & S*

4   *Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982) citing

5   *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 431 (S. Ct. 1996).

6   **IV.    ARGUMENT**

7          **A.  Defendant's Direct Threat Defense to Disability Discrimination Failed**

8          Parties agree that at the heart of this case was the question of whether Defendant could

9   successfully apply a "direct threat" defense to Mr. Snookal's disability discrimination claim

10  pursuant to the California Fair Employment and Housing Act. Parties further agree that Defendant

11  had the burden to prove this affirmative defense by a preponderance of the evidence. The California

12  Code of Regulations, repeated in the Judicial Council of California Jury Instructions, provide the

13  specific standards for the direct threat defense, namely that there must be no reasonable

14  accommodation to allow the "applicant or employee to perform the essential functions of the

15  position in question in a manner that would not endanger his or her health or safety because the job

16  imposes an imminent and substantial degree of risk to the applicant or employee" Cal. Cod. Regs,

17  tit. 2, § 11067(a). Or, there must be no reasonable accommodation available to allow the

18  "employee to perform the essential functions of the position in question that would not endanger the

19  health or safety of others because the job imposes an imminent and substantial degree of risk to

20  others. Cal. Cod. Regs, tit. 2, § 11067(b).

21         California law is also clear about the limits of any direct threat defense to disability

22  discrimination pursuant to the California Fair Employment and Housing Act. "[I]t is no defense to

23  assert that an individual with a disability has a condition or a disease with a future risk, so long as

24  the condition or disease does not presently interfere with his or her ability to perform the job in a

25  manner that will not endanger the individual with a disability or others." Cal. Cod. Regs, tit. 2, §

26  11067(d); see also CACI No. 2544 – Direct Threat Affirmative Defense.

27         The California Court of Appeals has further noted that the "FEHA's 'danger to self'

28

11

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    defense has a narrow scope; an employer must offer more than mere conclusions or speculation in

2    order to prevail on the defense. . . . As one court said, '[t]he defense requires that the employee face

3    an "imminent and substantial degree of risk" in performing the essential functions of the job.' An

4    employer may not terminate an employee for harm that is merely potential . . ." *Wittkopf v. County*

5    *of Los Angeles*, 90 Cal.App.4th 1205, 1218-1219 (2001).

6           This standard has already been litigated in this case repeatedly, in Chevron's two Motions

7    for Summary Judgment, during discussions of the appropriate jury instructions, and during

8    discussions of the correct verbiage for the special verdict form. Nonetheless, in an act of

9    desperation, Defendant now cites a ***since repealed standard*** in its brief, falsely claiming that

10   California regulations provide that "[i]t is a permissible defense for an employer or other covered

11   entity to demonstrate that . . . the applicant or employee cannot perform the essential functions of

12   the position in question in a manner which would not <u>endanger the health or safety of others to a</u>

13   <u>greater extent than if an individual without a disability performed the job</u>." Cal. Code Regs., tit. 2, §

14   7293.8(d)" (Defendant's Motion at p. 17:2-7) (emphasis in Defendant's original). This provision,

15   however, was amended and replaced by Cal. Code Regs., tit. 2 , § 11067 in 2013, which now

16   provides the significantly higher burden for defendants wishing to avail themselves of the direct

17   threat defense.[1] All of the cases Defendant subsequently cites in support of it for its assertion that it

18   correctly applied the direct threat defense similarly use the incorrect and inapplicable standards—

19   either the lower standard set by the federal Americans with Disabilities Act, or the lower California

20   standard which has since been repealed. In any event, those cases are readily distinguishable from

21   Mr. Snookal's case, where his disability was asymptomatic, where he had been safely performing

22   similar, if not more dangerous duties than the job that was rescinded from him, and where he was

23   working a non-safety sensitive, office-based job, and where the highest estimate of any possible

24   complication was only 2% per year.

25

26

27   [1] See Note 1 to Cal. Cod. Regs, tit. 2, § 11067 "Change without regulatory effect renumbering former
     section 7293.8 to new section 11067 and amending section filed 10-3-2013 pursuant to section 100, title
28   1, California Code of Regulations (Register 2013, No. 40)."

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1.   **Plaintiff Provided Overwhelming Evidence that He Could Perform the Duties of the REM Position in Escravos without Accommodation**

Chevron next makes a circular argument that "Plaintiff was not cleared for duty in Escravos, which meant he did not fulfill the essential duty of working in Escravos on which his offer was conditioned." (Defendant's Motion at p. 2:1-2). And, Chevron asserts that "without dispute, [Mr. Snookal] failed the MSEA on which his employment offer was conditioned. As a result, Plaintiff could not perform the essential job function of working in Escravos." (Id. at p. 10:24-27). Chevron's refusal to clear Mr. Snookal for duty in Escravos *was* the discriminatory decision in question that prevented him from doing the duties of the REM position. That the Defendant's discrimination itself prevented the Plaintiff from doing the job cannot be a defense.

Next, Chevron makes significant misrepresentations regarding the factual record at trial, repeatedly asserting that "no medical professional cleared him to work for Escravos." (Defendant's Motion at p. 16:11-12). To the contrary, Plaintiff's cardiology expert, Dr. Marmureanu, specifically testified that it would have been entirely safe for Mr. Snookal to work in Escravos, and that in his extensive experience evaluating and treating patients with Mr. Snookal's condition, the job itself, the location of the job in Escravos, would not pose any direct threat to Mr. Snookal's safety or the safety of others. (Flechsig Decl., Tr. Exh. 122.)

At the time of the precipitating events, Mr. Snookal's then-treating cardiologist, Dr. Khan, also clear Mr. Snookal for work in Escravos and provided not one, but two letters stating his support for this proposition. (Kennedy Decl., Tr. Exh. 33, 68.) Dr. Khan is not a retained expert and in fact, testified that his own son is a lawyer for Chevron. He nonetheless truthfully testified against Chevron's discriminatory assumptions about Mr. Snookal's medical condition. (Flechsig Decl., Exh. A/31-50.) Insofar as Mr. Snookal's treating physician, Dr. Khan, did not use the specific word "Escravos" in the two contemporaneous clearance letters he provided to Chevron, he nonetheless cleared Mr. Snookal for assignment in Nigeria generally, and in "a remote area of Nigeria" specifically. (Kennedy Decl., Tr. Exh. 33, 68.) In any event, the logic underlying Dr. Khan's professional opinion that "it is safe for Mr. Snookal to work in Nigeria"

13

1    stands, and he testified that this semantic difference would not have modified his opinion that it

2    was safe for Mr. Snookal to work in Escravos. (Flechsig Decl., Exh. A/50.) Dr. Khan, moreover,

3    noted that he would have been happy to have provided additional information had Chevron ever

4    asked him to clarify or be more specific. (Id.)

5         To the extent Chevron's own cardiologists actually made any contrary recommendation

6    regarding Mr. Snookal's fitness for duty, it is clear that their opinions should not have

7    superseded the expertise of Mr. Snookal's treating cardiologist. Chevron's embedded

8    cardiologists did not review the best available medical information Mr. Snookal's condition and

9    had extremely limited experience with Mr. Snookal's condition. Even so, they unanimously

10   opined that Mr. Snookal was "low risk" of complication. (Flechsig Decl., Exh. 43, 44.) This begs

11   the question: why did Chevron not clear Mr. Snookal if the first five physicians who weighed in

12   were supportive of Mr. Snookal's fitness for duty?

13        Chevron then asserts, without justification, that the doctors "with personal knowledge of

14   Escravos agreed that Escravos could not manage Plaintiff's dilated arotic root if it dissected or

15   ruptured. . . The Escravos medical staff would have no ability to diagnose, let alone stabilize and

16   treat Plaintiff if he suffered a cardiovascular event there. . ." (Defendant's Motion at p. 1:21-25.)

17   This too is patently false in light of the evidence. Dr. Levy, who testified to his numerous trips to

18   Escravos, and who admitted to his supervisory role over the embedded medical team in Nigeria,

19   admitted in writing that "[a]lthough not without some risk, I don't think we're dealing with high

20   risk. We can mandate yearly clearance and report from nephrologist (sic) on a yearly basis. Risk is

21   even lower when we consider that he'll be a rotator." (Flechsig Decl., Tr. Exh. 69/2).

22        Next, Chevron posits that Mr. Snookal's "risk would have been exacerbated by the REM

23   Job's demands." (Defendant's Motion at p. 3:19). Defendant cites the hours of the job, the

24   temperatures of the climate, and having to intermittently climb ladders/stairs during the job.

25   (Defendant's Motion at p. 3:19-4:1). Mr. Snookal, however, testified to having done all of these

26   things both before and during his work for Chevron, including climbing towers for Chevron both

27   before and after he disclosed his dilated aortic root. (Flechsig Decl., Exh. C/39-44.) Moreover,

28

14

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

the extensive contemporary documentation is devoid of reference to any purported concern about exacerbation of Mr. Snookal's condition. To the contrary, all of the evidence reflects a concern about a future risk, no matter how small, that Mr. Snookal could not be evacuated from Escravos quickly enough if he had a serious complication. (Flechsig Decl., Tr. Exh. 55; Kennedy Decl., Tr. Exh. 88, 69.)

## 2. Plaintiff Provided Overwhelming Evidence that His Disability Posed Neither an Immediate Nor Substantial Threat to Himself or Others

As further elaborated upon above, Mr. Snookal was readily able to safely perform the duties of the job. Even Dr. Levy admitted that he "can't remember" whether he even reviewed the job duties for the REM position because "there was no issue around his duty." (Flechsig Decl., Exh. B/12-13). Drs. Frangos, Arenyeka, and Levy contemporaneously noted that their only concern was with a hypothetical future risk if Mr. Snookal required emergency medical evacuation from Escravos. (Flechsig Decl., Tr. Exh. 55; Kennedy Decl., Tr. Exh. 88, 69.) Never once did they Chevron document any then-present concern for Mr. Snookal's safety, nor any concern for the safety of others. Id.

Tellingly, even now Chevron insists that Escravos "is not a safe workplace for someone **who needs advanced medical care,** which is why the MSEA requirement exists." (Defendant's Motion at p. 13:13-16). However, the record is devoid of any evidence that Mr. Snookal actively needed "advanced medical care." He would only require "advanced medical care" in the incredibly unlikely event that he had a future complication while in Escravos. In addition, Mr. Snookal was diagnosed with a dilated aortic root in 2014. To date, he has never suffered any complication, and he continues to only need preventative management via blood pressure medication and a once annual rescan of his heart. (Flechsig Decl., Exh. D/20.) He could have readily accessed this care during the approximately six month period during which he would have returned home every year of his expatriate assignment.

15

**B.  The Jury's Damage Award Was Supported by Substantial Evidence**

**1.  Plaintiff's Economic Damages Were Based Upon Substantial Evidence**

Defendant makes several assertions in support of its argument that the jury's economic damages award was excessive because of its .

Defendant also argues that Plaintiff failed to mitigate his damages because "Plaintiff declined to apply for other expatriate assignments." (Defendant's Motion at p. 14:19-20). "The burden to prove that [Plaintiff]'s efforts to mitigate damages were unreasonable rested at all times with [Defendant]." *Boehm v. American Broadcasting Co.*, 929 F.2d 482, 486 (9th Cir. 1991) (affirming award of six years of front pay).

Plaintiff did not "decline" to apply for other expatriate assignments – to the contrary, he continued to search for expatriate jobs for nearly two years thereafter but was unable, given the discriminatory restrictions Chevron posed upon him, to find any roles for which he would qualify. (Flechsig Decl., Exh. D/10-26.) It is well established that "[t]he duty to minimize damages does not require an injured person to do what is unreasonable or impracticable. . ." *Valencia v. Shell Oil Co.*, 23 Cal.2d 840, 846 (1944) (internal citations omitted); CACI 3930 – Mitigation of Damages. Chevron provided no evidence to contradict Mr. Snookal's credible testimony. They have never offered him any other expatriate assignments, nor have they ever identified any available expatriate roles they believe Mr. Snookal qualified for, but to which he supposedly failed to apply.

The jury's award of front pay damages is also reasonable and based upon the evidence. "[C]ourts have awarded front pay based upon a wage differential that will persist over the employee's working life. For example, an employee terminated from a private company that regularly paid year-end bonuses had accepted permanent employment with a government agency that did not pay bonuses; she was awarded permanent front pay. [citation] There was evidence in *Bihun* that the employee planned to stay with the private employer for the rest of her career; that she still made less at the government agency after five years than she would have after her next

---

16

1  promotion at the private employer; and that she had resigned when, after complaining of sexual

2  harassment by a supervisor, the employer demoted her by two pay levels." *Bihun v. AT&T*

3  *Information Systems, Inc.*, 13 Cal.App.4th 976, 996–997 (1993). See also Wooten v. BNSF Ry.

4  Co. 387 F. Supp. 3d 1078, 1091 (D.Mont. 2019) (upholding $1,407,978 front pay award). Here,

5  Plaintiff's economic expert, Dr. Baum, provided a calculation of future wage loss, discounted to

6  present value, based upon Mr. Snookal's ongoing losses into the future. (Kennedy Decl., Tr.

7  Exh. 148.)

8      Though Chevron insists that the REM position offer letter states an anticipated duration

9  of 3-4 years, Cesar Malpica, who currently holds the actual role, has already been in the position

10 for going on five years now. (Flechsig Decl., Exhibit B.) Further still, Mr. Snookal testified that

11 he is familiar with Chevron's expatriate assignment policies and practices, and as a former

12 manager, knows multiple people who have cycled through different expatriate assignments in

13 different locations, all with the benefits of paid out vacation time, a rotational schedule, tax

14 equalization, and a significant location premium. (Flechsig Decl., Exh. C/10-26; Kennedy Decl.

15 127, 132.) Mr. Snookal specifically testified to a plan to have sought high-paying expatriate

16 assignments years into the future. (Flechsig Decl., Exh. C/52-55.) Mr. Snookal also explained

17 why, consistent with Chevron's own policies, and based upon the representations made to him by

18 Chevron's employees when he applied for the REM Position, that he would likely be promoted

19 to Pay Scale Grade 23. (Id. at C/53, 64.) After the rescission of the REM position, Mr. Snookal

20 was stuck at Pay Scale Grade 22. (Id.)  Moreover, Mr. Snookal noted that, having spent 12 years

21 of his career at Chevron, he would never have left absent the discriminatory decision, and

22 switching jobs in turn cost him additional pension benefits. Moreover, Dr. Baum provided a

23 downward adjustment for the statistical possibility that Chevron would have left the job for a

24 reason other than the discrimination in question, and the jury did not award the entire amount

25 stated in Dr. Baum's report. (Kennedy Decl., Tr. Exh. 148.)

26     We further note that while Chevron's rebuttal expert, Dr. Chen Song, attempted to

27 discredit Dr. Baum's calculations, she had never even reviewed Dr. Baum's most recent report.

28

17

Dr. Baum had actually updated and corrected his most recent report (Exhibit 148) in a number of ways, rendering her alleged critiques moot. (Kennedy Decl., Tr. Exh. 148, 154.) Dr. Song also nonsensically applied multiple downward adjustments, including a cost of living adjustment, in her calculations. (Id. at 154.)

For all of these reasons, credible evidence supports the jury's measured conclusion that Mr. Snookal's past and future wage loss totaled $2.1 million.

## 2. The Jury's Emotional Distress Damages Award Was Based Upon Substantial Evidence

"Courts consider several factors in determining when an award is grossly excessive. Two are particularly relevant. First, because damages awards, especially emotional distress damages award, are fact-dependent, we consider the evidence presented at trial. Evidence supporting an emotional damages award may consist of nothing more than oral testimony." *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024) quoting *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003). The Ninth Circuit further instructs that "[o]ther evidence may also be relevant, including related economic damages such as loss of income and documentation of medical treatment or conditions caused by the distress; impairment of reputation; and physical injuries caused by the distress. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086 (9th Cir. 2009) (jury's emotional damages award based on medical bills, physical pain, and job loss); [citation]; [*Sloane v. Equifax Info. Servs.*, LLC, 510 F.3d 495, 502-07 (4th Cir. 2007)] (listing multiple factors to consider, including medical evidence and loss of income)." *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024).

Last, Defendant claims that "there is only a single alleged act of disability discrimination . . . and the alleged harm was primarily economic—offsetting the cost of his son's private school." (Defendant's Motion at p. 24:5-7). This proposition is unsupported by the facts. Mr. Snookal testified to his extensive emotional distress damages, noting that he sincerely valued his job with Chevron and derived a huge part of his personal identity and self esteem from working there. (Flechsig Decl., Exh. C, D.) Shortly after Chevron's discriminatory decision was rendered,

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1    Mr. Snookal sought mental health support, commenced professional therapy, and began taking

2    antidepressants for the first time since the 90's. (Id.; see also Flechsig Decl., Tr. Exh. 25.) He is

3    still on those antidepressants to this day, and reason dictates that after six years of

4    antidepressants, one does not instantly recover and cease taking them. (Flechsig Decl., Tr. Exh.

5    141.) What is more, Mr. Snookal enjoyed being able to be the breadwinner for his family, but

6    after pulling his son out of the special needs private school in which he was thriving, he

7    continues, even years later, to feel the frustration and sadness of the continued consequences

8    Chevron's decision has had on his family, and he still regularly thinks about what Chevron's

9    discriminatory decision means for him and his family. (Flechsig Decl., Exh. C, D.) At the

10   recommendation of his therapist who suggested he leave Chevron to try to heal, Mr. Snookal

11   also eventually moved out of state for a new job and sold his beloved family home. (Id.)

12         Mr. Snookal's forensic psychological expert, Dr. Anthony Reading further testified that

13   the major loss Mr. Snookal suffered due to Chevron's actions is the most likely cause of his

14   subsequent major depressive episode. (Flechsig Decl., Exh. D; Tr. Exh. 141.) Though this has

15   improved in the past six years, given that Mr. Snookal is still on medication, Dr. Reading opined

16   that even less severe symptoms can still result in a major decrease in one's quality of life. (Id.)

17         Moreover, the consequences of Chevron's rescission of the REM position continued to

18   snowball after Chevron's initial decision was made. Chevron backfilled Mr. Snookal's old role at

19   the Chevron refinery in El Segundo California, then forced Mr. Snookal to train his own

20   replacement over a course of months. (Id.) Chevron placed Mr. Snookal into a different role

21   which was not in the area of expertise Mr. Snookal had been cultivating since he was in high

22   school. Mr. Snookal also continued to seek alternative pathways to promotion within Chevron

23   for nearly two years afterwards. (Id.) And, he continued to search for other expatriate decisions

24   for which he would be eligible, but found none. (Id.) This compounded Mr. Snookal's feelings of

25   the injustice, arbitrariness, and betrayal by a company he once deeply loved and respected.

26         Defendant also argues that "there is no suggestion of malice on anyone's part."

27   (Defendant's Motion at p. 24:9-10). That is irrelevant because there is no requirement that

28

                                            19

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR

1  Plaintiff prove "malice" of Defendant to support his emotional distress damages. What matters is

2  the effect it has had on Mr. Snookal, and what is needed to make Mr. Snookal whole. CACI No.

3  3928 further instructs that juries "must decide the full amount of money that will reasonably and

4  fairly compensate [Plaintiff] for all damages caused by the wrongful conduct of [Defendant],

5  even if [Plaintiff] was more susceptible to injury than a normally healthy person would have

6  been, and even if a normally healthy person would not have suffered similar injury."

7        ii. **Comparison Cases**

8        As a threshold matter, the Ninth Circuit has repeatedly "emphasize[d] that the evidence

9  presented at trial should be given foremost priority in assessing the reasonableness of a damages

10  award. If the evidence is sufficient to support even a high award, there is no need to compare

11  cases. [citations] In this way, we do not restrain the effects of social change on damages awards.

12  ***Whether due to inflation or changing attitudes toward certain types of official misconduct, a***

13  ***damages award based on emotional distress can be substantial if a plaintiff presents sufficient***

14  ***evidence to support it***." *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024) (emphasis added.)

15  See also *Adams v. City of Chicago*, 798 F.3d 539, 545 (7th Cir. 2015) (reversing grant of

16  remittitur; comparing other cases only after reviewing evidence in record).

17        If the Court is inclined, however, to weigh comparator cases, none of the cases to which

18  Chevron cites are actually comparable. In *Kelly-Zurian*, a decision over 20 years old, the trial

19  and appellate courts *declined* to disturb the decision of the jury. Moreover, the Plaintiff's wage

20  loss was only $7,000; the evidence at trial indicated that the Plaintiff's treatment consisted of two

21  therapy sessions which took place over one year after she left her employment with Defendant.

22  Here, Mr. Snookal has a mental health record of six years of antidepressants, and counting.

23        In *Horsford*, another case over 20 years old, the Court of Appeals was reviewing the trial

24  court's decision for abuse of discretion, and found that "the harm was of limited duration (that is,

25  had ended or would soon end for all three plaintiffs); that the harm had other causes in addition

26  to the discriminatory and retaliatory conduct (e.g., litigation stress, dislike of Shell's leadership

27  style); that the harm arose only from the adverse job actions and not from such direct

28

20

1  psychological assaults as use of racial epithets; that the form of the adverse job actions did not

2  result in financial distress to the plaintiffs (and was, therefore, less stressful  than if lack of

3  income had added to plaintiffs' psychological burdens); and that the psychological injuries were

4  not diagnosed as severe." *Horsford v. Board of Trustees of California State University*, 132

5  Cal.App.4th 359, 389-390 (2005).  Defendant carries the burden to show that these cases are

6  actually comparable, and they have failed to meet this burden.

7     **V.    CONCLUSION**

8        For the foregoing reasons, Mr. Snookal respectfully submits that Defendant's Motion should

9  be denied in full.

10

11  Dated: October 10, 2025                                    ALLRED, MAROKO & GOLDBERG

12

13                                                           By: _____

14                                                              DOLORES Y. LEAL
                                                              OLIVIA FLECHSIG
15                                                            Attorneys for Plaintiff,
                                                              **MARK SNOOKAL**
16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R.
CIV. 50(b), OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR