# EXHIBIT "A"

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4                      - - -

 5      HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

 6

 7   MARK SNOOKAL,                    )
                                      )
 8         Plaintiffs,                )
                                      )
 9                                    )
                                      )
10      vs.                           ) No. CV 23-06302-HDV
                                      )
11                                    )
                                      )
12   CHEVRON USA, INC.,               )
                                      )
13         Defendants.                )
     _____)

14

15

    REPORTER'S TRANSCRIPT OF PARTIAL JURY TRIAL PROCEEDINGS
16
                      TRIAL DAY ONE
17
                  LOS ANGELES, CALIFORNIA
18
               TUESDAY, AUGUST 19, 2025
19   _____

20                  MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
21                   C.S.R. 12254
                UNITED STATES COURTHOUSE
22               350 WEST 1ST STREET
                      SUITE 4455
23          LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
24                 MADAMREPORTER.COM

25
```

**EXH A/1**

```
1                        A P P E A R A N C E S

2

3

4          ON BEHALF OF THE PLAINTIFFS,
           MARK SNOOKAL:
5                                          ALLRED MAROKO and GOLDBERG
                                           BY:  DOLORES Y. LEAL, ESQ.
6                                          6300 WILSHIRE BOULEVARD
                                           SUITE 1500
7                                          LOS ANGELES, CA 90048
                                           (323)653-6530
8
                                           ALLRED MAROKO and GOLDBERG
9                                          BY:  OLIVIA J. FLECHSIG,
                                           ESQ.
10                                         6300 WILSHIRE BOULEVARD
                                           SUITE 1500
11                                         LOS ANGELES, CA 90048
                                           (323)653-6530
12

13

14         ON BEHALF OF THE DEFENDANTS,
           CHEVRON USA, INC.:
                                           SHEPPERD, MULLIN, RICHTER,
15                                         and HAMPTON, LLP
                                           BY:  ROBERT E. MUSSIG, JR.,
16                                         ESQ.
                                           350 SOUTH GRAND AVENUE
17                                         FORTIETH FLOOR
                                           LOS ANGELES, CA 90071
18                                         (213)620-1780

19                                         SHEPPERD, MULLIN, RICHTER,
                                           LLP
20                                         BY:  TRACEY A. KENNEDY, ESQ.
                                           350 SOUTH GRAND AVENUE
21                                         FORTIETH FLOOR
                                           LOS ANGELES, CA 90071
22                                         (213)620-1780

23

24

25
```

**EXH A/2**

```
1                        I N D E X

2

3

4                                        PAGE

5    PLAINTIFF'S OPENING STATEMENTS.....     6

6    DEFENSE'S OPENING STATEMENTS.......     31

7

8

9    PLAINTIFF'S WITNESSES:  DIRECT  CROSS  REDIRECT  RECROSS

10

11   DR. MARMUREANU, ALEXANDER  --       --      --      --

12   BY OLIVIA FLECHSIG         51       --      --      --

13   BY ROBERT MUSSIG           --       78      --      101

14   DR. KHAN, SHAHID           --       --      --      --

15   BY OLIVIA FLECHSIG         105      --      128     --

16   BY ROBERT MUSSIG           --       118     --      --

17   DR. LEVY, CRAIG            --       --      --      --

18   BY DOLORES LEAL            130      --      --      --

19

20

21

22

23

24

25                        - - -
```

**EXH A/3**

```
 1              E X H I B I T S (STIPULATED)

 2

 3     PLAINTIFF'S                        RECEIVED        MARKED

 4

 5       121                                54             --

 6       122                                75             --

 7       13                                113             --

 8       31                                115             --

 9       33                                115             --

10       68                                116             --

11       29                                136             --

12       33                                139             --

13       68                                106             --

14       29                                136             --

15       33                                139             --

16       137                               142             --

17

18

19

20

21

22

23

24

25
```

1          <u>E X H I B I T S</u> (STIPULATED)

2

3     <u>DEFENSE'S</u>                              <u>RECEIVED</u>        <u>MARKED</u>

4

5       68                                      92            --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

**EXH A/5**

```
 1              THE WITNESS:  Sorry.  Dr. Alex Marmureanu,
 2    M-A-R-M-U-R-E-A-N-U.
 3              THE COURT:  Very good.
 4              Go ahead, Counsel.
 5              MS. FLECHSIG:  Thank you, Your Honor.
 6                    DIRECT EXAMINATION
 7    BY MS. FLECHSIG:
 8    Q         Doctor, could you start by telling us what you
 9    do professionally?
10    A         I'm a thoracic and cardiovascular surgeon.
11              THE WITNESS:  I guess you can hear me; yes?
12    It's loud enough?
13              THE COURT:  Yes, thank you.
14              THE WITNESS:  So I do heart and lung surgery.
15    I do thoracic midchest.  Cardiac is heart.  And
16    vascular, all the blood vessels except the one in the
17    brain.  I'm a surgeon.
18    BY MS. FLECHSIG:
19    Q         All right.  Where do you currently work?
20    A         I practice in seven hospitals in Los Angeles.
21    I'm the chief of cardiothoracic surgery in two
22    hospitals.  I have a very busy practice, probably around
23    300 cases per year, Los Angeles, part of the university.
24    Travel all over the world to give talks and do pro bono
25    cases, as well as teaching.
```

**EXH A/6**

```
 1   Q        You said you do some teaching.  Who do you
 2   teach, or what do you teach?
 3   A        I teach surgery.  I'm board-certified in
 4   cardiothoracic surgery, as well as general surgery,
 5   which is surgery all over the body.  I teach students,
 6   residents, fellows, other surgeons, including travel
 7   usually once a year, sometimes twice a year all over the
 8   world from Italy to Mongolia to Africa to South America
 9   to do charity cases and do usually minimally invasive
10   surgery.
11   Q        And what training did you undergo to be able to
12   do that?
13   A        I was born in Romania.  My parents were
14   physicians.  My sister is a physician too.  So I grew up
15   there.  I went to medical school in Romania.  I did my
16   training -- surgical training in Romania.
17            THE COURT:  Doctor, you're starting to talk a
18   little bit fast.  If you could, slow down just a bit.
19            THE WITNESS:  Thank you, sir.
20            I did my surgical training in Romania.  In the
21   early '90s, I was offered a position at New York
22   University.  So I had to do my training all over again,
23   déjà vu.  So I did my general surgery residency at
24   New York University at Mount Sinai.  Then I came to UCLA
25   in 2004, my cardiothoracic surgery fellowship, which is
```

**EXH A/7**

1    a training in heart and lung surgery.  I've been on

2    faculty for a while.  Then I went to private practice.

3    And, again, we have a very busy practice covering seven

4    hospitals: six in Los Angeles, one in Palm Springs.

5    BY MS. FLECHSIG:

6    Q        This may be an obvious question, by now, but do

7    you hold any board certifications?

8    A        Yes.  I am, again, board-certified in

9    cardiothoracic surgery and general surgery.

10   Q        And just to clarify, how long have you been

11   practicing as a cardiothoracic surgeon?

12   A        I think 35 years -- over 30 years, yeah.

13   Q        Okay.  Dr. Marmureanu, I handed you an exhibit

14   binder there.  If you could, kindly turn to what's been

15   marked as Exhibit 121.  Can you -- can you describe this

16   document?

17   A        It's my CV, my resume, curriculum vitae, first

18   page.

19   Q        Okay.  Are you familiar with the contents of

20   what's in that CV or resume?

21   A        Very familiar.  I wrote it.

22   Q        Is all the content true?

23   A        Yes.

24           MS. FLECHSIG:  Okay.  At this time, I offer

25   Exhibit 121 into evidence.

```
 1    four.  When we do a CAT -- the way we measure -- the
 2    best studies is called the CT scan, a CT angio.  What is
 3    an angio?  We put contrast.  So imagine this would be
 4    red.  It is much easier for you guys to see the size if
 5    it's red or blue or any color in here.  So we put
 6    contrast, and we see it white.  Why is that important?
 7    Because when you do a CAT scan, the patient sleeps on
 8    the table right here, and you look from your feet up so
 9    the multiple -- 120 usually.  So you get to see the size
10    of the aorta at all points.
11            Well, we advise the patients to get the same
12    study in the same place, read by the same radiologist
13    with the same sequence of giving contrast.  Why? Because
14    one millimeter could change the whole paradigm or two.
15    Why is that?  The way the radiologists measure, they
16    take the cursor on the computer and they put an X in
17    here, put an X in here, click the bottom, and the
18    computer gives them the size.
19            Now, all that you need is not that clear.  If
20    you put the X a little bit here, a little bit here, it
21    is one millimeter.  The next thing you know, you miss
22    one millimeter here, one millimeter here, which is not
23    that much.  It is 4.2.  So you can have 4.0, and it
24    reads 4.2, not a big deal.  Why?  Because you don't have
25    to do anything.  A 4.2, nothing really matters.  4.5,
```

**EXH A/9**

```
 1    probably nothing, the same.  4.7, you start wondering.
 2    You start saying perhaps you should get the test more
 3    often.  But if it is over 5, it is actually 5.5.  So
 4    that's what I'm saying.  You need to have those good
 5    studies, and you have to do them usually once a year.
 6    Q        So with respect to the studies you reviewed of
 7    Mr. Snookal, what was the range that you observed in the
 8    records?
 9    A        4.2.  I keep talking about 4 and 4.2 because
10    that's -- refers to this case.  It is 4.2, pretty
11    normal, mildly dilated by the number.  And again, the
12    1 or 2 millimeters question mark, but needless to say,
13    it's stable.  So this 4.2 has been there, and I'm not
14    going to say forever.  What I'm going to look for all of
15    the studies is I have seen is 4.2, which means it is not
16    growing.
17            So the teaching is as long as there is no blood
18    pressure -- what is a blood pressure?  If you put a lot
19    of water in this bottle, it might pop off.  So the blood
20    pressure is normal and you keep an eye on it, nothing
21    has to be done.  So it is a 4.2, and it is stable at
22    4.2.  It is not going anywhere in the studies that I
23    have reviewed.
24    Q        So I guess, would you recommend surgery for
25    Mr. Snookal at the size of the aorta that you observed
```

```
 1    in the scans?

 2    A         You know by now, absolutely not.  I would not

 3    recommend the 4.2, a 4.5.  I would not recommend a 5.  I

 4    would not recommend the 5.2.  I would talk to the

 5    patient at 5.5 and say, "Here is the deal.  This could

 6    rupture.  5.5, it is really big.  Plus, the bigger it

 7    is, the more pressure it is, the more chances that also

 8    you could die during the surgery.  So it is your

 9    decision how you want to deal with this."

10             My teaching point is that the 5.5, we offer

11    surgery.  I have to tell you at least half of my

12    patients do not want to have surgery at 5.5.  They

13    usually get close to 6.  Now, it is a bit more

14    complicated if the valve -- that is the heart.  That's

15    the aorta.  There is a valve in here.  That is the

16    aorta.  And if this valve is not working, you have to go

17    in and fix the valve, and then you repair the ascending

18    aorta.  And Mr. Snookal, the valve, it is pretty much

19    okay.

20    Q        Okay.  What -- are there any other

21    recommendations you would have with respect to

22    Mr. Snookal at that time?

23    A         4.2 is considered pretty much close to normal.

24    The risk of rupture, it's -- when we're not concerned

25    with, say, less than one percent.  It is usually
```

EXH A/11

1    probably .1 to .2 percent.  It is not significant,

2    negligible.  It is the same like in general population.

3    Again, we look at the numbers, but we don't treat

4    numbers.  We treat patient.

5          So from a medical point of view, I doubt that

6    the surgeon will actually even schedule him for a

7    consultation because a 4.2 is not significant.  It

8    didn't grow.  It is stable.  All we recommend, and I

9    agree with the other physicians probably going to come

10   up, surveillance, this CT scan once a year to be sure it

11   is not growing.  Blood pressure, 120 not more than one

12   130, take your pills.  Try not to bench 400 pounds

13   because that is going to -- it is going to increase size

14   in the blood pressure, pretty regular stuff.

15   Q       In terms of preventive care, I think you

16   mentioned an annual scan.  Is that something that you

17   would recommend to patients like Mr. Snookal with a 4.2

18   centimeter aorta?

19   A       Yes, I would recommend to be safe once a year.

20   You could make an argument that if it is not growing for

21   a few years, you just don't want to give them contrast,

22   you might want to do it every other year.  You can do an

23   electrocardiogram, take a transducer and put it on their

24   chest.  And it also gives you the size.  It is a little

25   bit more blurry.  And now you know the 1 millimeter

EXH A/12

1    makes a big difference.  4.1, 4.2 it depends on the X

2    scales, the cursor.  So echo, you get what you pay for.

3    It is not the Cadillac of testing.  Why?  Because it is

4    not that precise, but also, there is no down side.  You

5    just put the cursor on their chest, no contrast, no

6    needles, no nothing.

7    Q          Why recommend only a once annual screening and

8    not more frequently than that?

9    A          Well, because in plain terms, not a big

10   problem.  It is not a big deal.  At 5.5, you'll do it

11   once every six months.  At 4.2, especially being stable

12   for those all those years, no, I wouldn't do anything

13   else.

14   Q          You mentioned stability for all those years,

15   what are you referring to?

16   A          To prior testing that he had, CT scans and echo

17   that showed that the aneurysm did not increase.  And,

18   again, I'm calling it an aneurysm, but it's -- aneurysm

19   is usually over 4.5.  We're talking about a few

20   millimeters here and there.

21   Q          Okay.  In terms of any work restrictions for

22   Mr. Snookal, would you have made any recommended

23   restrictions as to what he could do for work?

24   A          No, I would not in neither work nor travel.

25   Again, it is pretty normal, 4.2.  I mean, again, by

EXH A/13

1   numbers it is a bit high by 1 or 2 millimeters.  We

2   don't treat numbers; we with treat patients.  It could

3   be that his size, that 4.2, is normal.  No, he can

4   travel anywhere he wants.  He can go to Antarctica on a

5   cruise ship, if he wants.  Work-wise, he can do anything

6   he wants.  Again, common sense, don't go to the gym and

7   try to bench 300 pounds.  It is not going to help

8   anyone, by the way.  You could have an issue, herniated

9   disk or anything.  No, no restriction whatsoever.

10  Q        You mentioned that an increase in blood

11  pressure could increase a risk of rupture.  Am I

12  understanding that correctly?

13  A        No, not really, not rupture.  Increase the

14  risk -- they don't rupture -- well, anything can happen.

15  Only God can give them assurance, not me.  It is not

16  going to rupture, 4.2.  But it will grow in theory the

17  more blood pressure.  We say no blood pressure, no grow.

18  Sometimes when they are so small, I operate on them I

19  just put a mesh.  I don't replace them they are so

20  small.  But I do put a mesh.  I wrap it with a mesh so

21  it cannot grow anymore.

22         So, no, I don't -- I wouldn't even talk about

23  rupture.  It is so minimal the risk, probably

24  .1 percent.  With blood pressure from 4.2, it might get

25  to 4.5, still nothing to be done.  When I get to 5,

EXH A/14

```
1    still nothing needs to be done.  But you're not happy to

2    see it growing because if it gets to 5.5, you need to

3    operate, or 6.  So you want to keep the blood pressure.

4    There is enough margin there.  But I'm not concerned of

5    rupture.  Well, especially in this patient.  As far as

6    I'm concerned, it is pretty similar to the patient

7    population all around us.

8    Q        Did you review any documents reflecting whether

9    Mr. Snookal was taking any blood pressure medications?

10   A        Yes, he was taking two blood pressure

11   medication -- two pills, yeah.

12   Q        And how did those interact to prevent any

13   further growth of the aortic root?

14   A        Well, there is good medication.  I mean, they

15   basically keep the blood pressure under control.  No

16   blood pressure, no increase in size, that is all we're

17   saying.

18   Q        Okay.  I want to go back to something you said.

19   So you corrected me about rupture.  I'm sorry for

20   misusing that.  What is rupture just so you can explain

21   to us?

22   A        I don't want to spill this butter but, you

23   know, a rupture would be something really bad.  It

24   rarely happens.  It rarely, rarely -- except you talk

25   about MVA trauma.  There is an accident.  There is the
```

```
 1    seatbelt, holds the button here, upper part of the aorta
 2    moves forward in this area, kind of tears because one
 3    part is fixed, the other one is mobile.  Gunshot wound.
 4    Stabs wounds.
 5            Eventually, for an aorta to rupture at 4.2, at
 6    4.5, at 5, I'm not going to say it is unheard, it is
 7    very, very, very minimal chance.  They tend to have
 8    problems over 5.5.  Nobody survives a major rupture.
 9    Ruptures could be in LA, could be in Africa, could be in
10    New York.  It doesn't matter.  They almost never rupture
11    in two.  It just doesn't happen.
12            The ruptures that -- what you're talking about
13    it is an intimal tear.  So on the inside, they're three
14    layers.  The inside, there is a little bit of plaque, a
15    little blood pressure.  There is a small crack.  The
16    blood goes from the heart up to the body that keeps
17    pumping.  There is a little tear.  That tear opens,
18    opens, opens, and the blood sneaks underneath.
19            That's around 5.5.  So because you have a lot
20    of pressure, it's an aneurysm.  5.5, I can tell it's
21    like this.  And the aorta, by the way, is not like this.
22    The aorta is probably this size.  So that is the
23    small -- that is the rupture we're talking about.  So
24    that creates a dissection and that dissection get them
25    to the operating room.  Okay.
```

**EXH A/16**

```
 1              So when we talk about rupture, we're not
 2    talking about tearing in half.  We're talking about
 3    those small ruptures, tearing on the inside.  Now, you
 4    can have a tear on the outside.  It could be a big
 5    rupture in theory, or it could be what is called a
 6    pseudo false aneurysm.  What it is, is a little tear
 7    that blood leaks out.  But the aorta is in the body, so
 8    there are lots of things around it.  So it becomes
 9    contained.  So they come to the operating room -- well,
10    they come to the emergency room first, and they have
11    chest pain.  Perhaps they have chest pain because, you
12    know, they had some bad food the night before.  We do a
13    CT scan.  And you see this little, tiny rupture in here,
14    and you know it has been there for 20 years.  It is
15    chronic.  It's got calcium.  So the blood leaks out of
16    the aorta, and there is a pool of blood here.  It is
17    called a pseudoaneurysm.  So those are the different
18    ruptures.  You almost never have it in heart.
19    Q        Okay.  I think you said if someone suffers a
20    rupture, most people don't survive.  Is that -- so are
21    you saying there is not medical intervention?
22    A        No.  I said I was only talking about the one
23    that almost never happens.  The rupture you see in
24    trauma, in accidents, and so on.  If it is a big
25    rupture, they're dead within seconds.  And that is not
```

**EXH A/17**

```
 1    the case here today because we talked about ruptures.
 2    At 4.2, it is almost normal.  It is not going to
 3    rupture.  The issue is that you could have a tear and
 4    anyone, by the way, not the 4.2.  5, 5.5, 6, 6.5 inside
 5    or outside -- what I said a major rupture will
 6    probably -- is unsurvivable anywhere.
 7              However, a small tear, it is the same -- you
 8    might not need to operate on them, or you might operate
 9    on them, depends on where the tear is.  Usually the
10    ascending part, you operate all the time, the ascending
11    part of the aorta.  The aorta goes this way, and then
12    you don't operate.  You just watch it, or you put a
13    stint in there certain ways.
14    Q        I do want to ask you about the small tear, is
15    that -- am I understanding correctly that that is what a
16    dissection is, other sort of outcome?
17    A        Correct.  The dissection starts in an aneurysm.
18    He doesn't have that.  At 4.2, it is too small.  That's
19    4.5, 5 5.5.  An aneurysm is like a ballooning.  And then
20    a small tear in the inside gets blood in between the
21    layers so the blood will sneak through here, will lift
22    this wall up.  And that is a dissection.
23    Q        I do want to ask you is there any way to
24    stabilize someone who has had a dissection?
25    A        Of course.  By now you know no blood pressure,
```

**EXH A/18**

```
 1    no rupture, no dissection.  You drop the blood pressure
 2    immediately with pills or medication.  So if we see a
 3    dissection on the films, the first thing we do, we give
 4    them a medication that slows down the heart rate to 50.
 5    It is called decreased DPDT.
 6              So what you do is you decrease the heart rate
 7    because, boom, boom.  All those things, they enlarge the
 8    dissection, and they increase the possibility of a
 9    rupture or more of a complication.  So from 90 you
10    decrease the heart rate to 50.  What it is going to do
11    is decrease the blood pressure probably around 100 and
12    you want 80 to 90.
13              And then if that doesn't do it, all those that
14    go -- drips, IV immediate -- instant gratification.  You
15    look on the monitor how the blood pressure and the heart
16    rate drops.  Then you give more medication and you drop
17    the blood pressure.  And if they have a dissection,
18    they -- never that stable but they are better off --
19    more stable in terms of getting them to the operating
20    room.
21              So to answer your question, we give them
22    medication to get them to the operating room.
23    Q         And in your experience as a surgeon here in
24    Los Angeles, have you ever seen patients get delays in
25    actually going to the operating room once they've had a
```

**EXH A/19**

```
 1    dissection?
 2    A          Almost all the time.  That's the rule.  Nobody
 3    dissects.  Only certain hospitals in Los Angeles can do
 4    this kind of procedure.  Got to open the chest.  A lot
 5    of times you put them on what -- always you put them on
 6    a heart/lung machine.  But a lot of times we have to
 7    cool them down to 15 to 20 degrees Celsius, put their
 8    head down this way, pack it in ice, and take all the
 9    blood out and stop the machine.
10          Again, there is no heart/lung machine.  Patient
11    is cold, so we can actually cut the aorta.  There is the
12    aorta and you replace.  You put a tube in here, and then
13    we turn on the machine back, put the blood back in the
14    patient, warm him up.  And then, you know, you're hoping
15    they don't have a stroke or anything.  But that is the
16    way to do it.
17          Only some hospitals do this so if it happens in
18    any hospital, it is more hospital downtown or Arcadia or
19    God knows -- Palm Springs, they will need to make it to
20    a big hospital.  And unfortunately, almost all the --
21    the insurance is an issue.  The transfer is an issue in
22    terms of no beds and the availability.  So there is
23    almost always -- more likely than not, there is a delay
24    somewhere for those patients to make it from hospital A
25    to a universal large hospital who can accommodate this
```

**EXH A/20**

1   surgery.

2   Q          So when someone dissected and had to deal with

3   the delays that you described, how long have you

4   witnessed it to take for someone to get surgery after

5   that happens?

6   A          In between eight hours and four days, anywhere

7   there.

8   Q          Okay.  I want to turn to your report directly.

9   The exhibit you have in front of you.  If you can kindly

10  turn to Exhibit 7.  I'm sorry.  Oh, my gosh, the same

11  exhibit we're looking at, page 7, excuse me.  So on that

12  page, you write, quote, "In my expert opinion and

13  according to the clinical data, ascending aortic

14  aneurysms between 4 and 4.9 --

15          MR. MUSSIG:  Objection, Your Honor.

16          THE COURT:  There is no question yet.  She is

17  just in the middle of it.  Go ahead, Counsel.

18          MS. FLECHSIG:  Thank you, Your Honor.

19  BY MS. FLECHSIG:

20  Q          "Between 4 and 4.9 centimeters carry a very low

21  annul risk of rupture or dissection estimated at roughly

22  one percent per year in this size range.  This risk is

23  considered negligible compared to the general

24  population, especially given the absence of rapid growth

25  in Mr. Snookal's case."

EXH A/21

```
 1    just allow you to speculate on everything.  I think the

 2    question was just -- let me look at it again -- whether

 3    since 2019 to the present, has the understanding of the

 4    medical community changed as to the issues that you've

 5    discussed?

 6            THE WITNESS:  No.

 7    BY MS. FLECHSIG:

 8    Q       Okay.  In other words, the general research

 9    about what to do when someone has a dilated aortic root

10    and the risk associated with it, it is basically the

11    same now as it was then?

12    A       Correct.

13    Q       Okay.  When you formulated the opinions that

14    you put into your report, did you consider the fact that

15    Escravos, Nigeria, where this job was located, is

16    extremely remote and has limited surgical capability

17    nearby?

18    A       Yes, I did.  My opinion is based on medical

19    data and not on geography.  So his risk, his condition

20    remains the same regardless where he is located,

21    New York, Los Angeles, or Escravos.  His location has

22    nothing to do with his risk of disease.

23    Q       Right.  So if Mr. Snookal was your patient, you

24    would clear him wherever in terms of work?

25    A       Correct.  Wherever, yes.
```

**EXH A/22**

```
1   Q          Okay.  Is there anything about Escravos,

2   Nigeria or any other location that would make

3   Mr. Snookal more likely to eventually have a rupture or

4   a dissection?

5   A          No, nothing.

6              MR. MUSSIG:  Lacks foundation, Your Honor.

7              THE COURT:  Overruled.

8   BY MS. FLECHSIG:

9   Q          Is there anything about -- excuse me -- I will

10  establish the foundation for this.  I believe you

11  reviewed the job position in question; correct?

12  A          Yes, I did.

13  Q          Was there anything about the intended job

14  duties in Escravos that would pose a threat to

15  Mr. Snookal's safety or worsen his condition?

16  A          No.

17  Q          Are you aware of any medical guidelines that

18  would instruct a healthcare provider or doctor to stop

19  someone, like Mr. Snookal, from traveling to remote

20  locations?

21  A          There are no -- there are -- I'm not familiar,

22  but -- well, I am familiar, but there are no guidelines

23  that would stop a patient, like Mr. Snookal, to travel

24  or to work in that location.

25  Q          Okay.  And if Mr. Snookal were your own patient
```

**EXH A/23**

```
 1   and you were personally responsible for ensuring his
 2   care as his physician, you would make all of these same
 3   recommendations?
 4   A        Absolutely.  He can travel anywhere he wants in
 5   world for any period he wants.  I would reemphasize that
 6   I would like him to be tested once a year with a CT scan
 7   and to take his medication and, again, try not to bench
 8   2-, 300 pounds.
 9   Q        Okay.  I want to very quickly turn to -- excuse
10   me.  I want to ask you about a supplement you did to
11   your initial expert report.
12            Do you remember creating this document?
13   A        Yes.
14   Q        Okay.  What did you express as to Mr. Snookal's
15   annual risks of rupture or dissection?
16   A        Less than 1 percent, negligible.
17            MS. FLECHSIG:  Okay.  I have no further -- or,
18   excuse me, I would move to admit Exhibit 122 into
19   evidence.
20            MR. MUSSIG:  Objection; it's hearsay.
21            THE COURT:  Overruled.  122 is admitted.
22   (Whereupon, Plaintiff's Exhibit 122 is admitted hereto.)
23            THE COURT:  All right.  I think this is a good
24   time for a break.  So let's -- let me remind our jurors
25   my admonition not to talk amongst yourselves about the
```

**EXH A/24**

```
 1    BY MR. MUSSIG:

 2    Q        Sure.  So your knowledge of Escravos is based

 3    on Google Maps?

 4    A        Correct.

 5    Q        But you've never been to Escravos; right?

 6    A        You already asked me.  No, I've not been there,

 7    no.

 8    Q        And so do you know what the weather is like in

 9    Escravos?

10    A        Today, I can check, no.  It's probably warm,

11    Africa.

12    Q        Do you know what the climate is like,

13    generally?

14    A        Climate?  If it is gets cold at night or warm

15    during the day?  I'm not sure I understand the question.

16    Q        Do you know whether there are monsoons in the

17    winter?

18    A        Actually, no, I didn't look into this.

19    Q        Okay.

20    A        I mean, it's close to -- to the equator so

21    could be.

22    Q        And do you know how hot it gets in the summer?

23    A        Actually, I don't, no.  I would assume it's

24    hot, but I don't know.

25    Q        But even though you've never been there, you --
```

**EXH A/25**

```
 1   you would have cleared Mr. Snookal to work in Escravos?
 2   A        Yeah.
 3   Q        Yes or no?
 4   A        He's -- from a medical point of view, has
 5   absolutely nothing to do with having or not having
 6   monsoons or it being hot or cold, yeah, no.  From a
 7   medical point of view, he's clear, correct.
 8   Q        Doctor, my -- it's a yes-or-no question.  If
 9   you would just please answer the questions, this would
10   go a little quicker.
11            And in your deposition, you testified that you
12   would have cleared him to work anywhere; correct?
13   A        Exactly.
14   Q        You would have cleared him to work in
15   Antarctica?
16   A        Yes.
17   Q        You would have cleared him to work in an oil
18   rig in the middle of the Pacific a thousand miles from
19   anywhere; is that correct?
20   A        That's correct, sir.
21   Q        And how much money are you getting paid to be
22   here today to testify?
23   A        I'm being paid for my time, correct, yeah.
24   Q        How much?
25   A        $10,000.
```

**EXH A/26**

```
 1   Q          Fair enough.  And so you would have cleared
 2   Mr. Snookal to work in Escravos, and it doesn't matter
 3   to you what the living conditions there are; is that
 4   fair?
 5   A          Fair, if he would live in a tent or in an
 6   igloo, wouldn't matter.  From a medical point of view, I
 7   cleared him to work.  Size (indiscernible).  The 4.2
 8   size, that did not change.  Doesn't make a difference if
 9   he has a monsoon, a river, a tent or he lives on the
10   moon; same.
11   Q          So you would have cleared him to work on the
12   moon?
13   A          I would have cleared from a medical point of
14   view.  And I said earlier and I just -- perhaps I didn't
15   clear it.  I think there's a misunderstanding.  I'm
16   talking about medicine; you're talking about logistics
17   for your company.  From a medical point of view, there
18   is no problem with him.  From a Chevron point of view,
19   there is a logistics issue based on their guidelines,
20   based on their rules, regul- -- whatever it is.
21              THE COURT:  All right.  Doctor, look, I'm going
22   to stop you from testifying about what you believe
23   Chevron's policies or logistics are.  But I think you've
24   made your point.  Next question.
25              MR. MUSSIG:  Thank you.
```

```
 1    aneurysm starts around 4.5.  A 4.0 is normal.  So from 4

 2    to 4.5, if you want to call it an aneurysm, it's okay.

 3    Q        So, Doctor, please answer my question:  Are you

 4    saying that if his cardiologist says he does have an

 5    aortic aneurysm, his cardiologist is wrong?

 6    A        I never said that.  It's his opinion.

 7    Q        But you said he doesn't have an aneurysm?

 8    A        From my point of view, a 4.2, you don't really

 9    have to call this an aneurysm.  That's my answer.

10    Q        Have you ever talked to Mr. Snookal about his

11    condition?

12    A        Yes.

13    Q        When?

14    A        I don't remember.  Probably, like, a month ago.

15    Q        A month ago?

16    A        Might be a few weeks ago.  More than two weeks,

17    less than a month, I think.

18    Q        And that was the first time you had ever talked

19    to him; right?

20    A        That's correct.

21    Q        And that was after you gave your expert report

22    in this case that you talked about on direct

23    examination; correct?

24    A        That's correct.

25    Q        Have you ever treated Mr. Snookal?
```

**EXH A/28**

```
 1    A         Yes, but it's not because I think he needs

 2    care.  I'm saying he doesn't need care.

 3    Q         Okay.  But the reason he wasn't cleared, from

 4    your point of view, is a logistical issue?

 5    A         It's not my point of view.  It's based on the

 6    records I reviewed.

 7    Q         Okay.  Fair enough.

 8    A         Yes.

 9              MR. MUSSIG:  No more questions.

10              THE WITNESS:  Okay.

11              THE COURT:  Wait just a second, Doctor.

12              Any redirect?

13              MS. FLECHSIG:  Yes, please.

14              THE COURT:  Okay.

15                      REDIRECT EXAMINATION

16    BY MS. FLECHSIG:

17    Q         Okay.  Doctor, you testified that you reviewed

18    depositions that were taken in this case.  Did any of

19    those depositions describe the remote conditions in

20    Escravos?

21    A         Yes, to some degree.

22    Q         Did they describe the degree of care available

23    or not available in Escravos?

24    A         Yes.

25    Q         And you considered -- did you consider that
```

**EXH A/29**

1    before rendering this opinion?

2    A        Yes.

3    Q        They referenced you speaking with Mr. Snookal.

4    Did speaking with Mr. Snookal change any of your

5    opinions or evaluation of his management and risks

6    associated with the dilated aortic root?

7    A        No, it did not change.

8    Q        Defense counsel asked whether you've ever

9    practiced medicine in Nigeria.  I know earlier you

10   mentioned that you do travel abroad to do charity

11   surgery cases.  How familiar are you with caring for

12   patients in medical systems with limited care or less

13   resources for care?

14   A        I'm quite familiar.  I mean, I've been to

15   Africa and certain locations, not to Nigeria.  I ran

16   several mountain rescue terms, sea rescue teams.  I'm

17   familiar with logistics in terms of rescue operations.

18   I mean, his risk is the same, like pretty much everybody

19   around, negligible, in my opinion, less than 1 percent.

20   I would not stop him from going anywhere.

21   Q        I just wanted to quickly look at the exhibit

22   that -- I think it's Exhibit 68.  It's marked as

23   CUSA 557.  It's that letter that -- from Dr. Khan that

24   Mr. Mussig showed you a moment ago.

25           Dr. Levy also says in this document, "In

```
 1              THE COURT:  You can help us by speaking closely
 2    into the microphone.  And do your best to wait until the
 3    question is finish and then pause in case there's an
 4    objection.
 5              THE WITNESS:  I will.
 6              THE COURT:  All right.  If you can, state your
 7    full name and spell your last name.
 8              THE WITNESS:  Full name is Shahid Khan,
 9    K-H-A-N.
10              THE COURT:  Very good.  Thank you.
11              Go ahead, Counsel.  Oh, you have a -- when you
12    refer to them, make sure to reference the exhibit number
13    in the broader set, as well.
14              MS. FLECHSIG:  Okay.  Thank you, Your Honor.
15                      DIRECT EXAMINATION
16    BY MS. FLECHSIG:
17    Q        Dr. Khan, thank you so much for taking your
18    time to be here today.
19              Can you tell us what is your profession?
20    A        I'm a physician and a cardiologist, to be
21    specific.
22    Q        Okay.  What training did you undergo to become
23    a cardiologist?
24    A        Well, I went to college, medical school,
25    residency, fellowship.
```

**EXH A/31**

```
1   Q        Do you currently practice medicine as a

2   cardiologist?

3   A        No.  I'm retired now -- fully retired.

4   Q        Do you have any subspecialization in the field

5   of cardiology?

6   A        I did a lot of research on heart valves and

7   then heart failure, and those are the main areas -- and

8   women in heart disease -- heart disease in women.

9   Q        Do you have any board certifications?

10  A        Yeah, I'm board-certified in internal medicine

11  and in cardiology.

12  Q        Okay.  Can I ask you why you wanted to become a

13  cardiologist?

14  A        I was trained as an engineer undergrad, so I

15  wanted to apply that, and cardiology was a good field to

16  do that.

17  Q        Are you familiar with a medical condition

18  called a dilated aortic root?

19  A        Yes.

20  Q        Okay.  Do you sometimes also refer to it as an

21  aortic aneurysm?

22  A        They're two different entities, actually.

23  Q        Okay.  What's the -- what's the difference,

24  in -- in your opinion?

25  A        Well, there's definitions, so it is not my
```

```
 1    opinion.  But there's definition from the European

 2    Society of Cardiology, American College of Cardiology,

 3    and so on.

 4    Q        Okay.

 5    A        So it depends on the size.

 6    Q        Understood.  Thank you for clarifying that.

 7             Do you have just a best estimate of how many

 8    patients you've treated over years who have a dilated

 9    aortic root?

10    A        I do not.

11    Q        Can you -- can you give me your best estimate?

12    Is it less than a hundred, less than 200?

13    A        You know, it's very hard to say because I

14    worked in a cardiac surgery intensive care unit at

15    Cedars for, you know, 15, 20 years.  So we saw lots of

16    patients with dilated aortas, and so it is very hard for

17    me to make an estimate.  But it would be more than a

18    hundred, probably.

19    Q        In 2019, do you remember where you were working

20    at the time?

21    A        Yeah, I was at Kaiser Permanente Los Angeles.

22    Q        Were you Mr. Snookal's treating cardiologist in

23    2019?

24    A        Yes.

25    Q        Okay.  Do you remember when you started
```

**EXH A/33**

108

```
 1    treating Mr. Snookal?

 2    A        I don't.

 3    Q        Was it before 2019?

 4    A        Not sure.

 5    Q        Okay.  I want to ask you just some very

 6    background questions.

 7             Were you hired as an expert for either Chevron

 8    or for Mr. Snookal in this case?

 9    A        No.

10    Q        Are you being paid for your testimony today?

11    A        I'm hoping to get parking re-emborsement, but

12    that's it.

13    Q     I have told you -- I have told you we will

14    reimburse your parking.  I'm so sorry.  We appreciate

15    your time.

16             Do you have any agenda against Chevron?

17    A        No.

18    Q        Okay.

19    A        My son works for Chevron, and he is an attorney

20    there.  He is lead counsel -- or he was promoted.  Now

21    he is -- and I own Chevron stock too.  So...

22    Q        Okay.  So I know it's been a while.  So -- and

23    it is not a memory test.  So I do want to go to what's

24    been marked as Exhibit 13.  You have that in your binder

25    in front of you?
```

UNITED STATES DISTRICT COURT

**EXH A/34**

110

```
 1    apologize.  Let's go -- I want to be respectful of your

 2    time.

 3            So let's go to Exhibit 15, if you would,

 4    please.

 5    A       Uh-huh.  How does that start?  So I can make

 6    sure --

 7    Q       It looks -- I believe in the bottom right page,

 8    go to page, I think, 6.  Bottom right should say page

 9    16, and then the next page says page 425.

10    A       My first page here says 49, then 50, then 51.

11    And it drops back --

12            THE COURT:  Yes.  Let's refer to that joint set

13    because I think your --

14            MS. FLECHSIG:  I'm sorry, Your Honor.

15            THE COURT:  -- your witness binder is much

16    different.  So let's just get rid of that.

17            MS. FLECHSIG:  Okay.  I apologize.

18    BY MS. FLECHSIG:

19    Q       Exhibit 13, does that say "818"?

20    A       Exhibit 13, 006.

21    Q       Perfect.  Thank you so much.  Thank you so

22    much, Doctor.

23            Have you seen -- can you describe the document

24    in front of you?

25    A       So what I'm looking at is a -- again, result
```

**EXH A/35**

1    notes for CTA cardiac with contrast and notes I made on

2    April 11, 2019.  So basically, I had reviewed the CT

3    scan results and it says, "Center nurses, please let

4    patient know his aorta looks stable on his recent CT, no

5    change in aortic size."  And then it gives the results

6    of the CT angiogram, which is the aortic root is stable

7    at 4.2 centimeters, maximal --

8              THE COURT:  Show down, Doctor.

9              THE WITNESS:  Oops.  Sorry.

10             Aortic root is stable at 4.2 centimeters.

11   Maximal size of ascending thoracic aorta is 4.1

12   centimeters.  Compared to 5/16/17, there has been no

13   significant change.

14   BY MS. FLECHSIG:

15   Q       So, Doctor, I want to ask you about that.  You

16   said there was no significant change.

17             Why does it matter that the size of the aorta

18   has been stable over time?

19   A         Because that's one of criteria that we can use

20   for deciding whether we need to follow the patient a

21   little more closely and if the patient is risk for any

22   problems.

23   Q       So if they're stable, then you follow the

24   patient less closely?

25   A       Um, we would continue to follow with the same

**EXH A/36**

```
 1    frequency.  We wouldn't need to speed up follow-up.

 2    Q        Okay.  What would be your recommendation in

 3    terms of screening Mr. Snookal for changes in size to

 4    his aorta?

 5    A        At this level and, you know, given the fact

 6    that he has no associated conditions, it would be about

 7    once a year.

 8    Q        Okay.  And why do you recommend an annual

 9    screening and not something more frequent or less

10    frequent than that?

11    A        The newer guidelines are actually less frequent

12    for somebody with his condition.  It would be every two

13    to three years instead of every one year -- the current

14    guidelines.  The guidelines at the time were once a year

15    follow-up.

16    Q        I guess is something that you're monitoring

17    for?  Is there something where it reaches a point where

18    you need to intervene medically?

19    A        Right.  If it reaches a certain size, then we

20    would be concerned that he might need surgery.  Then we

21    would refer him for a surgical evaluation.

22    Q        At 4.1 or 4.2, would you recommend a surgery

23    evaluation?

24    A        Not for Mr. Snookal, no.

25             MS. FLECHSIG:  I offer Exhibit 13 into
```

```
1     with my condition and that, quote, "Everything is under

2     control, and no special treatments are needed," end

3     quote.  Is this something you can provide?  Thanks,

4     Mark."

5             You agreed to provide the letter based on

6     Mr. Snookal's request; right?

7     A       Yes.

8     Q       Is that something you would have done if you

9     thought that it would endanger Mr. Snookal?

10    A       No.

11    Q       Why did you not think that working in Nigeria

12    was a danger to Mr. Snookal?

13    A       Because the interval of follow-up for this

14    condition is quite long.  As I said at the time, we were

15    doing CTs once a year.  I think now we realize it is

16    safer, so we backed off to every 2 to 3 years under the

17    2024 guidelines.  He does not have any high risk

18    characteristics that would make us concerned.  So it is

19    just a routine once a year return visit for checking up

20    on his aortic size.

21    Q       Okay.  Is that true even if the job in Nigeria

22    was located somewhere really remote?  Would that change

23    your clearance?

24    A       Based on his aortic size at that time and his

25    other conditions, no.
```

UNITED STATES DISTRICT COURT

**EXH A/38**

1    before providing this clearance, did you also consider

2    whether Mr. Snookal was managing his condition with any

3    medications?

4    A        Yes.

5    Q        What kind of medications would manage this

6    condition?

7    A        Well, the main issue is blood pressure control,

8    so he was on blood pressure medicines at that time.

9    Q        Okay.  And how does it control -- how do blood

10   pressure medicines serve to manage dilated aortic root?

11   A        Well, the blood pressure is one of the forces

12   that makes the aortic expand.  So if the blood pressure

13   is out of the control, it would not be a good thing.

14           MS. FLECHSIG:  Okay.  Moving onto Exhibit 68.

15   This also -- the admissibility has been stipulated to.

16   May it be published to the jury?

17           THE COURT:  Go ahead.

18    (Whereupon, Plaintiff's Exhibit 68 is admitted hereto.)

19   BY MS. FLECHSIG:

20   Q        Dr. Khan, you probably see in front of you a

21   lengthier e-mail.  It looks like you said on August 23,

22   of 2019, addressed to a Dr. Levy, is that -- are you

23   seeing where I'm looking at?

24   A        Uh-huh, yes.

25   Q        So you said, "I understand he is applying for a

**EXH A/39**

1    job in rural or remote Nigeria, and I understand the

2    concern for his aortic aneurysm."  So based on that, I

3    mean, do you remember if you had a sense of how remote

4    the location was?

5    A        Again, I don't think I looked up the location

6    at that time.

7    Q        But you knew enough to document that it was in

8    a rural or remote area of Nigeria; correct?

9    A        Correct.  I was told that, yep.

10   Q        All right.  Going down the document, at the

11   bottom there, the last big paragraph, you said, "In

12   summary, Mr. MS's risk of serious complications related

13   to his thoracic aortic aneurysm is low and likely less

14   than 2 percent per year.  The risk is primarily related

15   to further enlargement of the aneurysm, which can be

16   tracked with an annual CT scan, end quote."

17           So I guess -- am I understanding correctly that

18   the purpose of the annual scans is to make sure that

19   there hasn't been growth?

20   A        Yeah, that's the -- that is the primary

21   purpose, yes.

22   Q        Okay.  If there -- if there has been growth in

23   the intervening time -- so, you know, the year goes by

24   and he hasn't had his scan just yet, is there any way to

25   track a large change?

**EXH A/40**

```
 1   A        I don't understand the question.

 2   Q        Sorry, I did not ask a good question.  I guess

 3   time passes for a year, and during that year,

 4   Mr. Snookal is not getting a scan; right?  So I guess

 5   why are you not worried about a sudden large change in

 6   the size to the aortic aneurysm?

 7   A        Well, it just doesn't happen.  I mean, they

 8   typically grow fairly slowly.  If there is going to be

 9   any kind of progression, the typical rate of growth

10   would be -- the literature at the time said .1

11   centimeter per year.  So he looked like he was at least

12   3 to 8 years away from needing anything done at that

13   point.

14   Q        Okay.  Thank you so much, Doctor.  I think

15   those are all of my questions.

16            THE COURT:  All right.  Cross-examination?

17                     CROSS-EXAMINATION

18            THE COURT:  Go ahead, Counsel.

19   BY MR. MUSSIG:

20   Q        Good afternoon, Doctor.

21            MR. MUSSIG:  Could we pull up that same

22   exhibit, Exhibit 68?

23   BY MR. MUSSIG:

24   Q        And we were looking at this a moment ago,

25   Doctor.  This is the e-mail you sent to Dr. Levy;
```

**EXH A/41**

1    aneurysm in medical terms, but we're in layman's terms.

2    We're calling it an aneurysm.  Let's put it that way.

3    This is more layman's terms, but it is not technically

4    correct.  It is not an aneurysm at that point.

5    Q       Understood.  And so you say the size is 4.1 to

6    4.2 centimeters on his most recent CT scan.  And that

7    4.1, 4.2, you're confident in that number?

8    A       He's had, I think, three CTs at that point, and

9    they all showed the same numbers so that certainly makes

10   the confidence quite high.

11   Q       All right.  And then you say from the published

12   studies, the risk of rupture or dissection is 2 percent

13   per year.  And I think you cite -- well, let me ask:

14   What publication are you citing?

15   A       Yeah, there is a paper I think it was in *The*

16   *Annals of Thoracic Surgery* -- I don't know if I have the

17   reference -- oh, yeah, it is here, *Annals of Thoracic*

18   *Surgery*, 2002.  But I state the studies are pretty old.

19   Treatment is improved as has our understanding of aortic

20   aneurysms.

21   Q       Understood.  Is that a publication that you

22   would cite frequently in your practice?

23   A       I publish a bunch of papers, and then I do cite

24   it, you know, when I worked at Cedars, yeah, quite a

25   bit.

**EXH A/42**

```
 1   Q        Okay.  Is it a reputable publication?

 2   A        Say that again.

 3   Q        Is it a reputable publication?

 4   A        Yes, it is an official organized society of

 5   thoracic surgeons.  So, yeah, it's very reputable.

 6   Q        Understood.  And I have a question about what

 7   that 2 percent per year means.  Does that mean that out

 8   of a hundred people, two per year would rupture or

 9   dissect with aneurysms of this size?

10   A        It does, which that number has been modified

11   significantly because this is a very unselected group in

12   that -- in that publication.

13   Q        When you say "the number has been modified

14   significantly," do you mean in recent years?

15   A        Yeah.

16   Q        Understood.  So back in 2019, this is what the

17   understanding was; right?

18   A        Yeah, I would say it's a reasonable estimate,

19   yeah.

20   Q        And then later in your e-mail, you do say --

21   and you saw this language a few minutes ago -- that

22   because the aneurysm was stable, it -- it could be --

23   might be less than 2 percent per year?

24   A        Yes.

25   Q        Do you recall seeing that?
```

```
 1   A          Right.
 2   Q          But did you ever clarify for Dr. Levy or anyone
 3   else how much less?
 4   A          No.  Again, at that point, I think our
 5   understanding of these was not as good as it is now.
 6   But that was just basically people at work with patients
 7   with a certain condition tend to have a deeper
 8   understanding of what is going on than what is in the
 9   literature.  The literature tends to lag behind.
10   Q          Okay.  But you have that deeper understanding;
11   right?
12   A          I mean, probably more than most cardiologists.
13   Q          I have no reason to doubt that.
14              So -- so but -- so you're focused in this email
15   to Dr. Levy of 2 percent per year; right?
16   A          Yeah, I mean, I basically -- you'd like to cite
17   a source.  I mean, that is what we do when we write
18   scientifically in an article or, you know, book chapter
19   or something like that.  We cite a reference so that was
20   a reference I pulled up.  It was probably one of the
21   first ones I found.
22   Q          Let me ask you a slightly different question?
23   A          Uh-huh.
24   Q          So based on your experience and training, if an
25   aortic aneurysm ruptures, what happens?  What does a
```

EXH A/44

```
1   patient need?
2   A        Well, these types of dilated aortas -- aortic
3   aneurysms don't typically rupture per se.  They tend to
4   dissect, what is called an aortic dissection.  Or they
5   can have other complications such as a perforating ulcer
6   or integral hematoma.  So it would be exceptionally rare
7   for this to rupture, especially given that he is what we
8   call a non-syndromic aortic dilation.
9   Q        So more likely to dissect?
10  A        It would be more likely to present as
11  dissection or one of those other acute aortic syndromes,
12  we call them.
13  Q        Understood.  And in the event of dissection,
14  what -- what does the patient need?
15  A        If the starts to dissect, he'll typically have
16  symptoms, and then they -- we would need to get them to
17  a hospital.
18  Q        They need to have surgery done?
19  A        They need to have a CT scan done first, yeah.
20  Q        Okay.
21  A        Or a transesophageal echo, we do sometimes.
22  Q        I'm sorry, a --
23  A        Or a transesophageal echo.
24  Q        And how soon after the dissection would that
25  happen, from your perspective?
```

**EXH A/45**

```
 1   A        It depends on where they are.  So this is a
 2   frequent reason people get transported to the hospital.
 3   So at Cedars, we would get a lot of helicopter
 4   transports in from central California, or wherever, to
 5   get CT or transesophageal echo and make a diagnosis and
 6   then triage them, whether they needed surgery urgently
 7   or if they could wait.
 8   Q        Okay.  Isn't it fair to say that you want this
 9   dissection treated as soon as possible?
10   A        I think we need a diagnosis first.  So we need
11   a diagnosis as soon as possible, and then the treatment
12   will be based on what the specific diagnosis is.
13            MR. MUSSIG:  Your Honor, I'd like to read from
14   his deposition.
15            THE COURT:  All right.  Just a second.  Let me
16   get the --
17            MR. MUSSIG:  If we have a copy.  If we don't,
18   I'll move on.
19            THE COURT:  No?
20            Then you'll need to move on.
21   BY MR. MUSSIG:
22   Q        In the event of a dissection, how soon should
23   the person have this -- the word you referred to a
24   minute ago, the examination and then -- and then
25   surgery?
```

**EXH A/46**

```
 1   A         Again, it depends on the location of the
 2   dissection.  So it depends on whether the dissection is
 3   in the ascending aorta or descending aorta.  Descending
 4   aorta, we can manage conservatively.  We don't have to
 5   take them to surgery, again, depending on the specifics.
 6   Ascending aortic dissection, we would need to take them
 7   more urgently.
 8   Q         And was Mr. Snookal's aorta in the ascending
 9   area?
10   A         Yeah.
11   Q         And sorry, his aneurysm in the ascending aorta?
12   A         His aortic root was dilated in the ascending
13   aorta, yeah.  That doesn't mean that's where the
14   dissection would occur, but it was dilated in the
15   ascending aorta.
16   Q         Wouldn't it be most likely to occur there if it
17   was going to occur?
18   A         Not necessarily, no.
19   Q         Why not?
20   A         Because, typically, it can happen anywhere in
21   the aorta, basically.
22   Q         All right.  Let me ask a different question:
23   Do you -- do you -- and let's -- by way back, you've
24   never been to Escravos; correct?
25   A         To where?
```

**EXH A/47**

```
 1    Q        Escravos?

 2    A        In Nigeria?

 3    Q        Escravos, Nigeria?

 4    A        No.

 5    Q        And so I take it you don't know anything about

 6    the job Mr. Snookal would have been doing in Escravos?

 7    A        My impression was -- I think I put it in my

 8    deposition, that it was something managerial.  But I do

 9    remember writing -- or I saw that I wrote in there,

10    also, that he had told me that he was climbing ladders.

11             So my father worked at an oil refinery.  He was

12    a chemical engineer.  So I know that it can be pretty

13    physical to climb ladders and stuff like that and

14    inspect things and try and figure out why something is

15    blocked or not.

16    Q        It can be a physically demanding job; right?

17    A        It can be, yeah.

18    Q        And do you know whether Mr. Snookal would be

19    working eight-hour shifts?  Twelve-hour shifts?

20    Twenty-four-hour shifts?

21    A        I don't think I got any of that level of

22    detail.

23    Q        And do you know anything about the weather in

24    Escravos?

25    A        No.
```

**EXH A/48**

```
 1   Q        Is it fair to say that a person working, say,

 2   12-hour shifts, a physically demanding job, in places

 3   where the temperature gets up to 115 degrees in the

 4   summer and there are monsoons in the winter, could

 5   suffer stress as a result of all that?

 6           MS. FLECHSIG:  Objection; incomplete

 7   hypothetical.

 8           THE COURT:  Overruled.

 9           THE WITNESS:  Well, yeah, I mean, your question

10   is sort of self-evident, I guess.

11   BY MR. MUSSIG:

12   Q        And those conditions could drive up someone's

13   blood pressure, right?

14   A        I don't think high temperatures necessarily

15   would, but certainly climbing a ladder.  Yeah, if he's

16   going up a ladder, that could -- or would.

17   Q        And isn't it true that something -- if

18   something were to drive up his blood pressure, it could

19   potentially exacerbate this aortic aneurysm?

20   A        It is a chronic process, yes.  But again, I

21   mean, these are true for everybody with this condition.

22   Q        Sure.

23   A        Their blood pressure is going to go up and down

24   depending on who cuts them off in a parking space or,

25   you know, whatever.
```

**EXH A/49**

```
 1                    REDIRECT EXAMINATION
 2    BY MS. FLECHSIG:
 3    Q         Dr. Khan, do you have any memory of anyone at
 4    Chevron trying to speak with you in realtime about
 5    Mr. Snookal, other than the voicemail you received?
 6    A         I don't have any other -- any memory of that.
 7    Q         Okay.  If they had contacted you again or
 8    needed more information, would you have cooperated with
 9    that?
10    A         Yes.
11    Q         If Mr. Snookal was doing an office job in a
12    remote location, such as Escravos, Nigeria, would that
13    change any of the clearance letters you provided?
14    A         No.
15              MS. FLECHSIG:  No further questions.  Thank
16    you.
17              THE COURT:  May he be excused?
18              All right, Doctor, thank you for coming today.
19    You're excused.  Have a good day.
20              MS. FLECHSIG:  Thank you, Doctor.
21              THE COURT:  All right.  Who does Mr. Snookal
22    call next?
23              MS. LEAL:  Dr. Levy.
24              THE COURT:  Okay.  Let's get Dr. Levy in here.
25              MS. LEAL:  May I approach, Your Honor, to put
```

**EXH A/50**

1    manage people who get sick and hurt.  Make sure we have

2    programs to keep people healthy.

3    Q        Okay.  And you did that for how long?

4    A        I did that -- I was in that position for about

5    two years, and then I was moved to Singapore to take a

6    larger role managing occupational health -- really, all

7    of health for -- for the Asia Pacific region, so

8    everything from China down to Australia and as far west

9    as India.

10   Q        So it was the same job, just a larger

11   geographical responsibility?

12   A        Correct.  More responsibility, more people,

13   yes.

14   Q        Okay.  And during that period of time, how

15   many -- how many persons reported to you?

16   A        We had a total -- we had approximately 300

17   medical providers that reported up to us -- that

18   reported up to me.  Some reported directly; some were

19   contractors.  But it was a relatively large group.

20   Q        And these 300 medical providers were in the

21   Asia Pacific region at the time?

22   A        Correct.

23   Q        Okay.  And how long were you in that position?

24   A        Three years.

25   Q        So then --

**EXH A/51**

```
1    A        Three years.
2             THE COURT:  Just lean -- bring the microphone a
3    little closer.
4    BY MS. LEAL:
5    Q        So then we're talking about approximately
6    2017/2018?
7    A        Correct.
8    Q        And after that role in Singapore, what was your
9    next role at Chevron, Doctor?
10   A        I was moved to London to manage a similar type
11   of role across a different region.  We called it EEMEA,
12   Europe, Eurasia, the Middle East, and Africa.
13   Q        A very large role.  EE- --
14   A        -MEA.
15   Q        -- -MEA.  EEMEA.  Okay.
16            So your responsible for Europe, Eurasia,
17   Mid East, and Africa?
18   A        Correct.
19   Q        And you were working in London, did you say?
20   A        Yes.
21   Q        Okay.  And how long were you in that position?
22   A        In total, seven years.
23   Q        So you were in that position, the EEMEA
24   regional medical manager position, during the events at
25   issue in this case in 2019; correct?
```

**EXH A/52**

```
 1   A         Correct.

 2   Q         Now, you've been in a number of different roles

 3   with Chevron, including transferring from Houston to

 4   London to Asia, Singapore.

 5             Every time you transferred, Chevron still

 6   continued to be your employer; correct?

 7   A         That's correct.

 8   Q         And you continued to be on the same Chevron

 9   payroll; correct?

10   A         That is correct.

11   Q         And the same Chevron benefits; correct?

12   A         Yes.

13   Q         Okay.  So now, the rest of my questions now are

14   going to be focused during the time that you were the

15   EEMEA regional medical manager.  Okay?  Again, in 2019.

16   A         Okay.

17   Q         Now, in your role as the EEMEA, were you --

18   regional medical manager, were you aware of the process

19   of what happened when an employee in the States, for

20   example, wanted to transfer to another country, be an

21   expat employee?

22   A         I am -- I was very aware.

23   Q         Okay.  And as part of that process, a doctor in

24   the United States, where the employee lived or work, was

25   required to be medically examined; correct?
```

**EXH A/53**

1    A          That is correct.  We would call these

2    evaluations MSEA evaluations, or Medical Suitability for

3    Expatriate Assignment evaluations.

4    Q          And the doctors who performed those evaluations

5    for Chevron, those doctors were paid by whom?

6    A          So those doctors were paid in a variety of

7    different ways.  If they're -- if the person was seen in

8    one of our own medical clinics, then it would have been

9    Chevron that pays for it.

10   Q          Did the employee who was being evaluated or

11   going through the fitness for duty exam --

12   A          The company would pay for it all.  It was not

13   something that would be covered by insurance.  So

14   there's no cost to the employee.  The total cost is to

15   the company.

16   Q          So Chevron would have paid?

17   A          Yes.  Sorry for misspeaking.

18   Q          So why don't I now show you Exhibit 29, which

19   is the MSEA, which you just referred to.

20              THE COURT:  This has been admitted by

21   stipulation?

22              MS. LEAL:  Yes, Your Honor.  Thank you.

23              THE COURT:  Go ahead.

24   (Whereupon, Plaintiff's Exhibit 29 is admitted hereto.)

25              THE COURT:  Is it in front of him?

**EXH A/54**

```
 1    also admitted by stipulation, Your Honor?

 2             THE COURT:  Okay.  Go ahead.

 3      (Whereupon, Plaintiff's Exhibit 33 is admitted hereto.)

 4    BY MS. LEAL:

 5    Q        Is Exhibit 33 before you Dr. Levy?

 6    A        Yes, it is.

 7    Q        And again, you've seen this letter before?

 8    A        I have.

 9    Q        And this is the letter that Dr. Khan wrote to

10    Mr. Snookal in order to submit to Chevron in essence

11    saying that he believes -- he, Dr. Khan, believes that

12    it's safe for Mr. Snookal to work in Nigeria with his

13    heart condition?

14    A        That's correct.

15    Q        Okay.  And he also says his condition is under

16    good control and no special treatments are needed.

17             Were you aware also that Dr. -- strike that.

18             Were you aware that Mr. Snookal also submitted,

19    as part of his package, the CT scans which Dr. Khan had

20    performed over the years?

21    A        I'm aware of the CT scan reports that were sent

22    over, correct.  And I reviewed those reports.

23    Q        Thank you.

24             So after the fitness for duty exam was

25    completed and the doctor deemed Mr. Snookal fit for duty
```

**EXH A/55**

1    with the restrictions -- Dr. Sobel I'm referring to --

2    the next step was for the medical team in Nigeria to

3    then review the medical records of Mr. Snookal; correct?

4    A        Correct.

5    Q        Okay.  And those medical teams, I think you

6    called them embedded medical teams?

7    A        I -- I did.  And what that means is that they

8    report -- or they're hired by the business.  So they're

9    hired by the Nigerian business.  They work for the

10   business, and they're sitting where the work is.

11   Q        Okay.  And so the embedded medical team in

12   Nigeria, at least in 2019, included Dr. Asekomeh?

13   A        That's correct.

14   Q        And Dr. Adeyeye?

15   A        Yes.

16   Q        And Dr. Akintunde?

17   A        Correct.

18   Q        I may not be pronouncing the names correctly.

19            But you know who I'm referring to; correct?

20   A        Correct.

21   Q        When you were the regional medical director of

22   the EEMEA -- that is a very large acronym here -- you

23   were the leader, then, of large diverse embedded on-site

24   medical teams; correct?

25   A        That is correct.

**EXH A/56**

1    Q        Approximately how many medical providers were

2    you responsible for supervising during that time?

3    A        It was somewhere between 3- and 400.  Our

4    Nigeria team had about 200 people on it, and I also had

5    large teams at other locations.  Angola was another

6    large team.  Kazakhstan was a large team but not as big

7    as Nigeria.

8    Q        So during the time that you were the medical

9    director of the EEMEA, you actually supervised at least

10   500 medical providers; is that correct?

11   A        It was a lot.  So yes, it is -- the number is

12   probably very close.

13   Q        And during the time that you were the regional

14   medical manager for the EEMEA, what was your overall

15   budget?

16   A        So my budget that I was responsible for was

17   just my local team in London.  So the budget was

18   approximately three million USD a year.

19   Q        Did you put on your CV that your budget

20   exceeded $40 million?

21   A        It has in lots of different ways.  So my -- my

22   budget that I was responsible for was three million of

23   my own team.  I was then functionally responsible for --

24   I was the leader of the health function, and so the

25   Nigeria budget was about 20 million.  Angola budget was

**EXH A/57**

```
 1    A         I do.

 2    Q         You've seen this document before today;

 3    correct?

 4    A         That is correct.

 5    Q         And this document is the document signed by

 6    Dr. Asekomeh where he specifically said --

 7              MS. LEAL:  And if you can highlight that

 8    Ms. Stephens?

 9    BY MS. LEAL:

10    Q         "Not fit for duty.  Remote location.  Can be

11    cleared for assignment in Lagos" -- or "Lagos."

12    A         Correct.

13    Q         I don't know how to actually correctly

14    pronounce it.

15              And as the regional medical manager for EEMEA,

16    you were sometimes involved in reviewing determinations

17    such as the one made by Dr. Asekomeh whether or not a

18    person is fit for duty; correct?

19    A         That is correct.

20    Q         And as the EEMEA regional medical manager,

21    under what circumstances did you get involved in

22    situations where fitness for duty was an issue?

23    A         So we got involved in a few different ways.  So

24    if my team -- so in my region, did the evaluation.  I'd

25    be aware of the process and what was going on and who
```

**EXH A/58**

```
 1    Levy --
 2    A        Yep.
 3    Q        -- to Mark Snookal.  Subject, medical.  And
 4    then you say, "Mark, thanks for speaking with me, et
 5    cetera."  Do you recall sending this e-mail to
 6    Mr. Snookal?
 7    A        I do.  I do.  So I obviously spoke with him.
 8    Q        Okay.  And if you turn to the first page of
 9    Exhibit 65.  There is an e-mail also underneath the
10    black box from Mark Snookal to you, the same day.  And
11    he is responding to your e-mail and providing you
12    information.  Do you remember having received this
13    information from Mr. Snookal?
14    A        Yes, I do.
15    Q        And you recall there is a graph on the second
16    page.  Do you recall seeing that graph?
17    A        Yes, I do.
18    Q        And what did that graph tell you when you saw
19    it?
20    A        It told me what Mr. Snookal's opinion of his
21    risk was and what he based it on.
22    Q        And what was that?
23    A        According to this chart, the risk appears to be
24    less than one percent.
25    Q        So when you were evaluating Mr. Snookal's case
```

**EXH A/59**

150

```
 1    for a second opinion, if you will, you were also

 2    evaluating the risk for -- the risk of an adverse event

 3    occurring to Mr. Snookal in Escravos; is that correct?

 4    A       That is correct.  We were looking.  We --

 5    Q       Thank you.

 6    A       Yes.

 7    Q       Did you consider the actual diameter of

 8    Mr. Snookal's aortic aneurysm?

 9    A       Yes.

10    Q       And you also, I assume, considered the fact

11    that Mr. Snookal had not had any changes in size of his

12    aortic root over the prior three years?

13    A       Yes.

14    Q       We can put that exhibit down.

15            And at the time you were reviewing

16    Mr. Snookal's case for a second opinion, did you

17    evaluate whether Mr. Snookal's management with

18    medication impacted the risk of an adverse outcome due

19    to the aortic aneurysm?

20    A       Yes, that would have been part of the

21    evaluation.  After -- I don't think there was any

22    medication-related issues that we saw as a problem.

23    Q       And you took that as Mr. Snookal being

24    relatively stable; correct?

25    A       Yes.
```

**EXH A/60**

```
 1    A        I have.

 2    Q        And is this document an e-mail which Dr. Khan

 3    sent you in response to the voicemail message you left

 4    him requesting additional information with respect to

 5    Mr. Snookal?

 6    A        Yes, it is.

 7    Q        Okay.  And isn't it true that you learned that

 8    Dr. Khan acknowledged that he knew Mr. Snookal was

 9    applying for a job in a rural or remote area of Nigeria?

10    A        Correct.

11    Q        And it's also true that you learned that

12    Dr. Khan was reporting to you that he believed that

13    Mr. Snookal's aneurysm was relatively small and

14    considered low risk?

15    A        He did; however, the low risk piece is not

16    clear to me.

17    Q        Did you call him if it wasn't clear to you?

18    A        The word low risk --

19    Q        Did you call Dr. Khan if it was not clear to

20    you?  Did you call him to say, "Well, what do you mean

21    by low risk?"

22    A        I did not call as the risk was 2 percent so it

23    was -- calling it low and calling it 2 percent are two

24    separate things.  I understood what he was saying.

25    Q        Oh, so you did understand what he was saying.
```

**EXH A/61**

154

```
 1    that says his risk is low and less -- and likely less

 2    than 2 percent based on the information.  So 2 percent

 3    is not low to me.  And that's possible.

 4    Q       What's possible?

 5    A       If there's -- risk is 2 percent a year, then

 6    it's possible to rupture at that size.

 7    Q       And you base that on what --

 8    A       What it says, according to his specialist.

 9    Q       He says that there's a 2 percent chance of

10    rupturing?

11    A       "Serious complications," yes, that's what it

12    says.

13    Q       Does it say "rupturing"?

14    A       It says "serious complications."

15    Q       It doesn't say "rupture"; correct?

16    A       There are only two significant consequences:

17    dissection or rupture.

18    Q       Correct.  You didn't call Dr. Khan to find out

19    what he meant by "serious consequences" to find out

20    whether there was a rupture or -- or a dissection;

21    correct?

22    A       I didn't, but the --

23    Q       Okay.  Thank you.

24    A       It's understood.

25    Q       Thank you.  Thank you, Dr. Levy.
```

**EXH A/62**

```
 1              Isn't it true that the job which Mark Snookal

 2    sought in Escravos, Nigeria, was an office-based job

 3    where he would be supervising other employees; isn't

 4    that correct?

 5    A         Yes, it is.

 6    Q         And isn't it true, Dr. Levy, that you agree

 7    that Mr. Snookal's condition or the dilated aortic root

 8    did not interfere with his ability to perform the job in

 9    Nigeria, and the job was the reliability engineering

10    manager position?

11    A         I agreed that he can do his job.

12    Q         You agree that he could do his job?

13    A         As a -- as a reliability engineer, but the

14    location was the issue.

15    Q         Exactly.  So he could do the job.  That's what

16    I was asking.  He could --

17    A         Well, his job was in Escravos, which made it

18    complicated.

19    Q         Was Mr. Snookal able to perform the essential

20    functions of his job, and that would have been the

21    reliability engineering manager job?

22    A         Yes.

23    Q         That's the question.  Yes?  Thank you.

24              THE COURT:  He answered.

25    BY MS. LEAL:
```

```
1    Q        So the concern that you just expressed was

2    that --

3             THE COURT:  Give us a second.

4    BY MS. LEAL:

5    Q        So the concern that you just expressed,

6    Dr. Levy, was that if -- if Mr. Snookal had an aortic

7    event in the future, the team in Escravos might require

8    some sort of emergency response that they may or may not

9    he about able to manage.  Was that part of the concern?

10   A        The concern was that if he had that event

11   today, they were not equipped to handle that emergency.

12   Q        What do you mean by "today"?  Today at the time

13   that he was in Escravos?

14   A        If today was -- on his first day in Escravos.

15   The risk would apply as soon as he was on -- as soon as

16   he was on the ground.

17   Q        So the concern was that if Mr. Snookal, the day

18   he arrived in Escravos or the day after or two weeks

19   later -- if, in the future, he had an aortic event,

20   that's the reason you agreed with Dr. Asekomeh that he

21   was not fit for duty; correct?

22   A        I --

23   Q        Yes or no, Dr. Levy.  Is that correct or not?

24   A        That sounds correct, yes.

25   Q        Thank you.
```

EXH A/64

```
1                    C E R T I F I C A T E

2

3

4

5     MARK SNOOKAL                          :

6             vs.                           :   No. CV 23-06302-HDV

7     CHEVRON USA, INC.                     :

8

9

10    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22    _____/S/_____        __08/20/2025__

23    MARIA R. BUSTILLOS                    DATE
      OFFICIAL REPORTER
24

25
```

**EXH A/65**