# EXHIBIT "B"

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4                    - - -

5     HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7     MARK SNOOKAL,                    )
                                       )
8              Plaintiffs,             )
                                       )
9                                      )
                                       )
10          vs.                        ) No. CV 23-06302-HDV
                                       )
11                                     )
                                       )
12    CHEVRON USA, INC.,               )
                                       )
13             Defendants.             )
      _____)

14

15

        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16
                        *TRIAL DAY TWO*
17
                    LOS ANGELES, CALIFORNIA
18
                 WEDNESDAY, AUGUST 20, 2025
19    _____

20                  MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
21                   C.S.R. 12254
                 UNITED STATES COURTHOUSE
22                 350 WEST 1ST STREET
                      SUITE 4455
23           LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
24                 MADAMREPORTER.COM

25

**EXH B/1**

```
 1                    A P P E A R A N C E S

 2

 3     ON BEHALF OF THE PLAINTIFFS,
       MARK SNOOKAL:                    ALLRED MAROKO and GOLDBERG
                                        BY:  DOLORES Y. LEAL, ESQ.
 4                                      6300 WILSHIRE BOULEVARD
                                        SUITE 1500
 5                                      LOS ANGELES, CA 90048
                                        (323)653-6530
 6

 7                                      ALLRED MAROKO and GOLDBERG
                                        BY:  OLIVIA J. FLECHSIG,
 8                                      ESQ.
                                        6300 WILSHIRE BOULEVARD
 9                                      SUITE 1500
                                        LOS ANGELES, CA 90048
10                                      (323)653-6530

11

12     ON BEHALF OF THE DEFENDANTS,
       CHEVRON USA, INC.:               SHEPPERD, MULLIN, RICHTER,
13                                      and HAMPTON, LLP
                                        BY:  ROBERT E. MUSSIG, JR.,
14                                      ESQ.
                                        350 SOUTH GRAND AVENUE
15                                      FORTIETH FLOOR
                                        LOS ANGELES, CA 90071
16                                      (213)620-1780

17

18                                      SHEPPERD, MULLIN, RICHTER,
                                        LLP
                                        BY:  TRACEY A. KENNEDY, ESQ.
19                                      350 SOUTH GRAND AVENUE
                                        FORTIETH FLOOR
20                                      LOS ANGELES, CA 90071
                                        (213)620-1780
21

22

23

24

25
```

**EXH B/2**

```
 1                    I N D E X

 2

 3

 4      PLAINTIFF'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS

 5

 6      DR. ASEKOWEH, ESHIOFE    --       --      57         --

 7      BY OLIVIA FLECHSIG       9        --      --         --

 8      BY ROBERT MUSSIG         --       41      --         --

 9      DR. LEVY, SCOTT          --       --      --         --

10      (RESUMED)                --       --      --         --

11      BY DOLORES LEAL          60       --      110        --

12      BY ROBERT MUSSIG         --       81      --         --

13      DR. SOBEL, IRVING        --       --      --         --

14      BY DOLORES LEAL          118      --      138        --

15      BY SARAH FAN             --       131     --         --

16      MALPICA, CESAR           --       --      --         --

17      BY DOLORES LEAL          140      --      163        --

18      BY ROBERT MUSSIG         --       154     --         --

19      POWERS, ANDREW           --       --      --         --

20      BY DOLORES LEAL          165      --      213        --

21      BY ROBERT MUSSIG         --       200     --         --

22      BROWN, LEWIS CHARLES     --       --      --         --

23      BY OLIVIA  FLECHSIG      221      --      --         --

24      BY TRACEY KENNEDY        --       238     --         --

25                           - - -
```

**EXH B/3**

## E X H I B I T S (STIPULATED)

| PLAINTIFF'S | RECEIVED | MARKED |
|---|---|---|
| 39 | 27 | -- |
| 88 | 68 | -- |
| 8 | 75 | -- |
| 70 | 97 | -- |
| 30 | 130 | -- |
| 82 | 188 | -- |
| 147 | 222 | -- |
| 148 | 224 | -- |
| 132 | 242 | -- |
| 24 | 244 | -- |

- - -

**EXH B/4**

1                    E X H I B I T S (STIPULATED)

2

3     DEFENSE'S _____    RECEIVED    MARKED

4

5                         (None)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXH B/5**

```
 1    reviewed and investigations they have to do minimal.

 2    Yes.

 3    Q         Okay.  So it's fair to say that Chevron

 4    provided you with the list of steps to go through when

 5    you were conducting a suitability screening.  Is that --

 6    is that fair to say?

 7    A         Correct.

 8    Q         Okay.  That's called the medical examination

 9    protocol; true?

10    A         True.

11    Q         Okay.  Were you aware at the time you made a

12    decision about Mr. Snookal's fitness for duty of

13    California law that says that it's not a defense to a

14    disability discrimination case to assert that the

15    employee does not presently -- excuse me, that the

16    employee has a disability with a future risk as long as

17    the disability does not presently interfere with his

18    ability to perform job in a manner that will not

19    endanger him or others?

20    A      No, I was not aware.

21    Q        Yeah.  How would you know California law;

22    right?

23             MR. MUSSIG:  Argumentative, Your Honor.

24             THE COURT:  Sustained.

25    BY MS. FLECHSIG:
```

**EXH B/6**

```
 1   Q          No one at Chevron ever told you about this
 2   California law in 2019; right?
 3   A          If I may say, in this instance, that law did
 4   not come into the picture.
 5   Q          I'm sorry.  I'm not sure I understand.
 6              Did Chevron tell you about California law and
 7   that future risk is not a reason to decline someone's
 8   fitness for duty if they're able to presently perform
 9   job duties in a manner that will not endanger him or
10   others?
11   A          In this case, we're not looking at the future
12   risk.  We're looking at present risk.
13   Q          So I'm just asking:  Did Chevron ever tell you
14   about this law?  Yes or no?
15   A          My work was in Nigeria.  I did not need to know
16   about that law.
17   Q          So that is a no?  No one told you because
18   you're working in Nigeria, you're doing your job there?
19   A          I didn't need to know about that law.  My job
20   was in Nigeria.
21   Q          And it wasn't in the Chevron guidelines; is
22   that true?
23   A          That guideline was a guideline on the
24   screenings and investigations you needed to do for
25   fitness for duty.
```

**EXH B/7**

```
 1    screening, determined that Mr. Snookal was unfit for
 2    duty in Escravos, Nigeria; is that all true?
 3    A       So the conclusion was not fit for duty in
 4    Escravos, fit for duty in Lagos.
 5    Q       Okay.  So -- but you did not say that --
 6    basically, he was not fit for duty in Escravos; is that
 7    true?
 8    A       The conclusion was not fit for duty in
 9    Escravos, fir for duty in Lagos.
10    Q       Sure.  Okay.
11            And you're not a cardiologist; right?
12    A       I'm not.
13    Q       You've never practiced cardiology?
14    A       Well, that would need some explanation.  I'm
15    not a cardiologist.  I'm a physician.  I'm trained in
16    internal medicine with a specialization in neurology.
17    So in this instance, the determination was made after
18    consulting with a team of cardiologists --
19    Q       I'm sorry.  I'm just asking whether you've ever
20    practiced cardiology?
21    A       Well, the answer to that question would be yes.
22    The way medicine is practiced in Nigeria is an interest
23    you see all medical cases, and the ones that require
24    specialist attention are then referred to a
25    cardiologist.
```

**EXH B/8**

```
 1              MS. FLECHSIG:  Your Honor, I'd like to read
 2    from Mr. Asekomeh's transcript -- deposition transcript
 3    lines -- page 19, 25 through 20 -- line 1.
 4              THE COURT:  I'll need the transcript.  Let me
 5    ask our courtroom deputy to see if we have it in the...
 6              MS. FLECHSIG:  Page 19, line 25 through page
 7    20, line 1.
 8              THE COURT:  Okay.  Go ahead and read that.
 9              MS. FLECHSIG:  Question:  Have you ever
10    practiced cardiologist?
11              Answer:  Not as a cardiologist.
12    BY MS. FLECHSIG:
13    Q        Dr. Asekomeh, is it true to say other than
14    Mr. Snookal, you have never evaluated anyone else with a
15    dilated aortic root for a fitness for duty
16    determination; is that fair to say?
17    A        Correct.
18    Q        And before making a determination with respect
19    to Mr. Snookal, you did not speak with Dr. Sobel, the
20    Chevron appointed doctor in Los Angeles, who had
21    determined he was fit for duty with restrictions; is
22    that true?
23    A        True.
24    Q        And you never spoke with Dr. Khan,
25    Mr. Snookal's treating cardiologist, before making your
```

**EXH B/9**

1    determination; right?

2    A          True.  Because the process does not require me

3    to do that.

4    Q          Okay.  And you didn't review Mr. Snookal's

5    employment history with Chevron before making your

6    determination; is that true?

7    A          The determination was made after conversing

8    with a team of cardiologists in Nigeria.  Again, the

9    process had nothing to do with this.

10   Q          Thank you.  I'll get to that with respect to

11   the three cardiologist.  But what I'm asking you right

12   now is did you review Mr. Snookal's employment history

13   with Chevron before making the decision in 2019?

14   A          The process did not require his work history

15   prior to that.

16   Q          Are you aware that in California that's one of

17   the considerations for whether Chevron can assert a

18   direct threat defense?

19   A          I'm not.

20   Q          So you wouldn't have known at the time that

21   Mr. Snookal had been working for Chevron for a decade

22   without any medical incident; right?

23   A          In this process, the form to assenting from the

24   U.S. for a review to determine ground -- to determine

25   fitness to work here in Escravos.  And in that process,

**EXH B/10**

```
 1   there is a form that has the medical history of

 2   Mr. Snookal.  So I looked through that form, looked at

 3   his medical history, and saw his medical condition.  And

 4   that's determined he had a dilated aortic root.  They

 5   detect that the chest CT scan and echocardiogram, and he

 6   measured --

 7   Q        I'm sorry.  Dr Asekomeh, I think we're getting

 8   away from my question.  It was did you -- let me ask the

 9   question one more time.

10           You did not know whether during Mr. Snookal's

11   employment with Chevron he had not had any medical

12   incidents at work?

13   A        As I said, we concluded a medical history form

14   which we viewed and it did not mention that.  What it

15   mentioned in that form is that he was on hypertensive

16   medication.  He was also that news with the dilated

17   aortic root, and he had findings on his CT that is what

18   was on his medical history.

19   Q        Did you take any steps to find out whether

20   Mr. Snookal had ever had any prior incidents while

21   working for Chevron or -- actually, strike that.

22           Did you contact anyone to find out whether he

23   had any prior medical incidents while working at

24   Chevron?

25   A        That information was not required.
```

**EXH B/11**

```
1              THE COURT:  Counsel, he is not going to answer
2    your question.
3              MS. FLECHSIG:  Understood.
4              THE COURT:  So move on.
5    BY MS. FLECHSIG:
6    Q        And you never met or spoke with Mr. Snookal; is
7    that true?
8    A        The process did not require me to speak with
9    Mr. Snookal.
10   Q        And you did not speak to anyone with Escravos
11   to understand the job duties that Mr. Snookal would have
12   been completing there; true?
13   A        So the forms also had a description of his job
14   duty was to be transpiring as a manager reliability and
15   engineering.  And that was in the forms.
16   Q        Your testimony today is that you remember
17   reviewing his job duties before making the
18   determination?
19   A        Not -- say that again?
20   Q        Is your testimony today is that you did review
21   job duties that Mr. Snookal would have been doing before
22   making the determination in 2019?
23   A        No.  My testimony is that the job position was
24   stated in the forms.
25   Q        So you're saying that you were aware of the
```

**EXH B/12**

```
 1   job -- job duties at the time you made decision?
 2   A          The job position was a manager reliability and
 3   engineering.   That was stated in the forms.
 4              MS. FLECHSIG:   Your Honor, I'd like to read
 5   from Dr. Asekomeh's deposition transcript, page 71,
 6   lines 22 through 25.
 7              THE COURT:   Okay.  Go ahead.
 8              MS. FLECHSIG:   Question:   Did you review the
 9   job description for the reliability engineering manager.
10              Answer:   I can't remember now, but there was no
11   issue around his duty.
12   BY MS. FLECHSIG:
13   Q          Dr. Asekomeh, based on what I just read, isn't
14   it true that your decision not to clear Mr. Snookal for
15   duty was -- was based -- was -- excuse me -- strike
16   that.
17              Would you agree that your decision not to clear
18   Mr. Snookal was not based upon whether Mr. Snookal could
19   actually perform the duties of his job in Escravos?
20   A          Okay.  So the forms that were sent said he was
21   going to work as a manager reliability engineering.   The
22   doctor who examined him put a restriction and said,
23   "Restricted clearance, not to lift at work with EKG."
24   The main reason we look at was the fact that he had a
25   dilated aortic aneurysm.
```

**EXH B/13**

```
 1            So I sent those forms on for further review,
 2     starting with the cardiologist who was on ground in
 3     Escravos, Dr. Aiwuyo.  And I asked him three questions.
 4     First of the three questions was can you manage someone
 5     with this condition in Escravos, and are there signs to
 6     determine if he was getting worse.  And I know if there
 7     was an emergency, would we be able to handle this
 8     condition.
 9            Those are the three questions asked and that
10     was together with the three cardiologists.  And based on
11     the condition on ground, the agreement was no.  The --
12     there was an emergency which could be dissection or a
13     rupture, the facilities on ground would not be able to
14     handle the condition.
15     Q      So --
16            THE COURT:  Before we go on, Counsel.  Doctor,
17     it seems like the light in your room turned off, if you
18     can fix that.
19            THE WITNESS:  Yes, if you just give me a
20     minute.
21            THE COURT:  Yes, go ahead.  We'll wait for you.
22            THE WITNESS:  Okay.
23            THE COURT:  Okay.  All right.  That's better.
24     Thank you.  Go ahead, Counsel.
25     BY MS. FLECHSIG:
```

**EXH B/14**

```
 1   Q        So I believe what you just said is that the
 2   decision was based upon the location, not based upon
 3   whether or not Mr. Snookal could do the actual job that
 4   he had been select for; right?
 5   A        Decision was based on the fact that we had
 6   someone coming into work in a location where considering
 7   his background -- medical condition and the chance and
 8   risk that that can be a complication or we'll not be
 9   able to take care of him in that location.
10   Q        Okay.
11   A        That is why the conclusion was not fit to work
12   in Escravos and fit to work in Lagos.
13   Q        Okay.  Thank you.  So let's talk about the
14   location.  So is it fair to say that the location
15   itself, nothing about Escravos, the weather, the water,
16   the food, whatever pertains to this geographic location,
17   nothing about the location would aggravate Mr. Snookal's
18   dilated aortic root; is that fair to say?
19   A        Well, the -- the -- the doctor who did the
20   initial screening talked about restriction around
21   lifting weights.  But the main contradiction was that
22   the location itself if there was to be complication,
23   which we know can happen in this condition, will not be
24   able to manage him.
25   Q        So as long as he --
```

**EXH B/15**

```
 1   A        The location was removed location and far from
 2   standard care.  It will need if you had complications.
 3   Q        Thank you, Doctor.  So lifting heavy weights is
 4   not a requirement of being in Escravos; right?
 5   A        Right.
 6   Q        Okay.  So assuming he is not lifting heavy
 7   weight while he is there, which I understand, you know,
 8   was recommended against, as long as he is not lifting
 9   heavy weight while he is there, being there itself is
10   not going to increase his risk that he would ever have a
11   rupture or a dissection; right?
12   A        The determination of this case was not
13   recognized in present risk.  It was looking at current
14   risk.  As a doctor, the size of the dilation carried
15   risk of rupture.
16   Q        Right.  So it was based on future risk not that
17   going there would increase his risk relative to being at
18   home in Los Angeles; right?
19   A        It had the risk of rupture and was going to a
20   location where that rupture could not be managed.
21   Q        Okay.
22   A        As would be required.
23   Q        Are you aware that many community hospitals
24   even here in Los Angeles or other major cities in the
25   United States are not able to conduct surgery on a
```

**EXH B/16**

1    Q        Thank you.

2             So just first, before we get to that, I'm

3    asking:  Do you remember actually reviewing any studies

4    yourself before making decision?

5    A        As I said, it was first sent to Dr. Aiwuyo.

6    What I can't remember -- because he sent a link to that

7    Canadian journal in his report.  I can't remember now

8    whether I look at it or not.

9    Q        Okay.  So it's fair to say, then, you were

10   relying on your colleagues in cardiology to review the

11   literature?

12   A        I was relying on the opinion of the

13   cardiologist -- three of the Nigerian cardiologists.

14   Q        Okay.  And only one of them referenced any

15   study regarding Mr. Snookal's medical condition; is that

16   true?

17   A        I am not sure now, but I remember the Canadian

18   journal from Dr. Aiwuyo.

19   Q        Okay.  Let's turn to that --

20   A        They -- they [indiscernible] give their

21   professional opinions.

22   Q        Sure.  Okay.  So let's turn to that.  If you

23   could kindly open up Exhibit 39 and go to page 6.

24             MS. FLECHSIG:  This has been admitted -- this

25   exhibit has been admitted by stipulation.

**EXH B/17**

```
1   A          Correct.

2   Q          Okay.  So he says that the values that

3   Mr. Snookal have, 4.1, 4.2, are low risk; correct?

4   A          Correct.

5   Q          And he doesn't say a specific percentage at

6   all; right?

7   A          Correct.

8   Q          Is it fair to say that "low risk" could mean

9   one in a million; it could mean one in a billion?  It

10  could mean truly anything that one might think of as low

11  risk; right?

12  A          So -- so -- so this was a second reference to

13  low risk.  The -- the reference from Mr. Snookal's

14  cardiologist actually put it as normal, said 2 percent.

15  Q          I think I know what you're referring to,

16  Dr. Asekomeh.  Let me find that if I may.

17             Isn't it true that whatever e-mail you're

18  referring to from Dr. Khan came after you made your

19  decision?

20  A          Well, I'm not sure of those sequences again.

21  But I know there was a risk in one of his memos.

22  Q          Okay.  But that came after you already decided

23  not to clear him; right?

24  A          As I said before, there is no decision -- the

25  way you saw (indiscernible).  The decision was made that
```

**EXH B/18**

```
1   he is not fit to work in Escravos.  He was fit to work

2   in Lagos.  That was the final decision.  It's in form

3   1789, also in 1069 that is attached.

4   Q       And so, Dr. Asekomeh, it's true that none of

5   the cardiol- -- none of the three cardiologists you

6   consulted with provided you any percentage of risk that

7   they evaluated Mr. Snookal for; true?

8   A       So as I said, you are thinking of one aspect of

9   the task I asked the three cardiologists:  One was to

10  estimate risk; the second was to discuss around

11  symptoms -- any one of his symptoms with

12  which (indiscernible) deterioration and those intervene

13  quickly.  And the thought particularized to Dr. Aiwuyo,

14  as the cardiologist on ground in Escravos, was to say if

15  you have this patient develop that risk --

16  Q       Okay.

17  A       -- which in this instance, is whether there is

18  dissecting or a rupture, would you on ground be able to

19  manage him?  And the answer was no.

20  Q       Thank you.

21  A       He was the cardiologist --

22  Q       Thank you, Dr. Asekomeh.

23          I'm asking whether any of the colleagues you

24  conferred with gave you a percentage of risk they

25  thought was attributed to Mr. Snookal, other than saying
```

**EXH B/19**

```
1    it was low risk?

2    A        So -- so Dr. Akintunde's conclusion was low

3    risk is not no risk.

4    Q        Okay.

5    A        So --

6            THE COURT:  Doctor -- Doctor, we appreciate --

7    this is Judge Vera.  Please try to answer the question

8    directly.  You can add your explanation but please try

9    to directly answer it.  It is taking much longer because

10   you're not doing that.  So if you can, listen to

11   question again.  I'm going to ask Counsel to repeat it,

12   and then I'm going to ask you to answer it "yes" or

13   "no," and then you can add your explanation to it.

14           Go ahead, Counsel.

15           MS. FLECHSIG:  Thank you.

16   BY MS. FLECHSIG:

17   Q        Dr. Asekomeh, it is true that none of three

18   cardiologists you conferred with sent you any percentage

19   they attributed to Mr. Snookal's risk, other than to say

20   he was low risk; true?

21   A        Yes, true.

22   Q        And turning to other e-mail you referenced --

23   so one of the other cardiologists who we haven't

24   discussed her opinion yet was Dr. Akintunde; right?

25   A        Right.
```

UNITED STATES DISTRICT COURT

**EXH B/20**

```
 1   Q         She also e-mailed back on this e-mail thread
 2   and said, "I concur with my colleagues.  With an aortic
 3   root of 4.2 centimeters, he is low risk but not no
 4   risk"?
 5   A         Yes.
 6   Q         And actually, we can turn -- we can turn to
 7   page 5 of this exhibit, and we'll see that.
 8             So that's true; right?  That was the quote you
 9   were referencing, when she said, "He's low risk but no
10   not no risk"; true?
11   A         True.
12   Q         She didn't say any additional studies; true?
13   A         True.
14   Q         And she didn't say any other risk percentage,
15   other than it is low risk but not no risk?
16   A         True.
17   Q         But no one can ever be said to be at no risk of
18   a cardiac event; true?
19   A         True.  But cardiac event and dissection
20   (indiscernible) -- I struggle to exchange the two words.
21   He had a dilated aortic root that was at risk of
22   dissecting or rupturing.  So the risk we're looking at
23   is specific here.
24   Q         Isn't it true that everyone, even with a,
25   quote, unquote, "normal-sized aorta," has some risk of
```

**EXH B/21**

1    rupture or dissection?

2    A         I'm not sure of that answer.

3    Q         Okay.  Isn't it true that everyone has some

4    level of risk of a serious cardiac event, like a heart

5    attack?

6    A         I struggle to answer that question.  We expect

7    that for well, normal people, there is little risk.

8    Q         What if someone suffers a trauma?  They can

9    have an aortic rupture; correct?

10   A         Correct.

11   Q         So there's external factors that could happen

12   as well as internal factors, like family history; is

13   that true?

14   A         True.

15   Q         Age would be a factor that would contribute?

16   A         Sorry.  Contribute to?

17   Q         Sorry.  Contribute -- age would increase -- the

18   older you are, the more likely you are to have a

19   dissection or rupture one day?

20   A         Well, that depends on whether the person has

21   background of connective tissue disease or even a

22   background, dilated.

23   Q         Right.  I think you're referring to another

24   risk.  You're right.  So a connective tissue disorder

25   would also be another risk factor; true?

**EXH B/22**

```
 1    A        True.

 2    Q        Mr. Snookal didn't have any connective tissue

 3    disorders or genetic disorders; true?

 4    A        Not that I know of.

 5    Q        Okay.  I want to turn to Exhibit 39, page 7.

 6    This is turning, again, to what Dr. Aiwuyo wrote about

 7    Mr. Snookal.  You can see on subpart 2, Dr. Aiwuyo

 8    writes, "In Escravos, unfortunately, we are only limited

 9    to initial stabilization and transfer of such high-risk

10    CV complications if any occurs.  In the unlikely event

11    of any of the aforementioned complication, we may not be

12    able to support."

13             Do you see where I'm reading from,

14    Dr. Asekomeh?

15    A        Yes.

16    Q        It's true that many hospitals are not able to

17    do anything but offer initial stabilization of a patient

18    if a major cardiac event occurs; true?

19    A        In Nigeria, very true.

20    Q        Okay.  So you're familiar that this is an issue

21    in Nigeria.

22             But are you aware that that is also an issue in

23    other places, as well?

24    A        My practice is in Nigeria.  So I'm aware of in

25    Nigeria, true.
```

**EXH B/23**

```
 1   Q        Okay.  So you didn't consider whether this
 2   would also be true in Los Angeles?
 3   A        No, because that wasn't -- that wasn't -- that
 4   wasn't in the purview of determining whether he was fit
 5   to work in Escravos.
 6   Q        Did you consider what initial stabilization the
 7   medical team in Escravos would have been able to provide
 8   Mr. Snookal?
 9   A        So again, it depends on whether he was having a
10   dissection or he was having the rupture.  So when it
11   says "initial stabilization," in Escravos, what you can
12   do is set up IV fluid.  I'm aware, even as of this time,
13   that in Escravos, you cannot get blood.  You cannot
14   transfuse him.  So --
15   Q        Why would he need --
16   A        -- again --
17   Q        -- a blood transfusion, Dr. Asekomeh?
18   A        If he had a ruptured aorta --
19   Q        Okay.
20   A        -- he would need a blood transfusion.
21   Q        It's your testimony that you need a blood --
22   you need to add blood if you have an aortic rupture?
23   A        Yes.
24   Q        Okay.  All right.  What about if someone has a
25   dissection?  Isn't it true that you're supposed to lower
```

**EXH B/24**

```
 1   their blood pressure so that they don't worsen the

 2   dissection?

 3   A        Again, I'm not a cardiologist.  So...

 4   Q        Okay.  Well, did you ask Dr. Aiwuyo to

 5   elaborate on what type of initial stabilization

 6   Mr. Snookal would potentially need if something -- in

 7   the unlikely event something catastrophic happened?

 8   A        It depends -- no.  So this memo, in conjunction

 9   with the opinions of the other two cardiologists, was

10   put in together.  So the first thing is that we wanted

11   to know whether we would have warning signs on which we

12   could quickly extract him, and they had said those

13   warning signs were this, this, and this.  And

14   oftentimes, when you have these complications, they

15   happen fast, and it could even result in sudden death.

16   Q        Okay.  But you didn't ask Dr. Aiwuyo whether

17   Mr. Snookal could be stabilized with blood pressure

18   medication, like a pill or an IV; right?

19   A        You -- as you mean, the complication is not a

20   rupture.  So the answer is no.  But if he had a rupture,

21   I know what initial stabilization he would need.  You

22   would need to support him with fluids and with blood --

23   Q        Isn't it true --

24   A        -- which we could not do at that time.

25   Q        Isn't it true that in the extremely unlikely
```

**EXH B/25**

```
 1    Dr. Aiwuyo's e-mails dictate that in the likely event
 2    there was complication, managing him, stabilizing him in
 3    Escravos was just something (indiscernible) stabilize
 4    him.  What that e-mail doesn't address is:  So you
 5    stabilize him in Escravos, how soon can you get him out?
 6    Where are you taking him to?  Those are variables that
 7    we didn't factor in.
 8    Q        Okay, Dr. Asekomeh, you're not answering my
 9    question, I'm sorry.  And I have limited time here.
10             My question is:  They never said to you, "We
11    recommend Mr. Snookal not come to Escravos.  It's too
12    dangerous for him here," or anything like that?
13    A        That's not -- no, ultimately, that decision is
14    an organization head's decision -- the organization head
15    team.
16    Q        That's your decision --
17    A        I was the organization decision.
18    Q        It's your decision that you made after
19    reviewing their e-mails; true?
20    A        After I'm reviewing their -- their reviews of
21    Mr. Khan's report, yes.
22    Q        Okay.
23    A        True.
24    Q        All right.  One final thing, I think,
25    Dr. Asekomeh, if you could turn to 39, page seven.  This
```

**EXH B/26**

```
 1    is still the e-mail from Dr. Aiwuyo to you that we've

 2    been discussing.

 3              MS. FLECHSIG:   Sorry, Exhibit 39, page seven,

 4    please.

 5    BY MS. FLECHSIG:

 6    Q       I'm looking at the middle of this document

 7    here.  I'm going to -- I think I can annotate it on my

 8    screen.  No.  That's okay.  You'll see it.

 9              It says, in the middle, "I made effort to

10    search the MEP if there are clear-cut field guidelines

11    for patient with aortic aneurysm.  Unfortunately, I

12    found none.  What is established is that a patient with

13    symptomatic aneurysm should not be allowed to work in an

14    offshore location."

15              Am I reading that correctly?

16    A         Correct.

17    Q         The MEP, again, those are the guidelines that

18    Chevron gives to you; true?

19    A         As I said, the MEPs -- true, the MEPs, they

20    work and assist the guidelines on work investigations,

21    work protocols before you, when you do fitness for duty

22    screenings.

23    Q         Right.

24    A         What it doesn't say is how to determine who is

25    fit and not fit.
```

**EXH B/27**

```
 1   Q          Thank you, Dr. Asekomeh.

 2   A          That is a medical decision.

 3   Q          Thank you for that.  I want to move on to this.

 4              So he says, "What's clear is a patient with

 5   symptomatic aneurysm should not be allowed to work in an

 6   offshore location."  Am I reading that correctly,

 7   symptomatic, meaning someone who has symptoms; true?

 8   A          True.

 9   Q          But Mr. Snookal did not have symptoms; true?

10   A          True.

11              MS. FLECHSIG:  Those are all my questions for

12   now.  Thank you.

13              THE COURT:  All right, Doctor, now we're going

14   to have one of Chevron's lawyers ask you some questions.

15   So give us a second to have him come up.

16                        CROSS-EXAMINATION

17   BY MR. MUSSIG:

18   Q          Good afternoon, Dr. Asekomeh.

19   A          Good afternoon.

20   Q          I know I think the jury is aware that you are a

21   doctor.  But I wanted to give you an opportunity to

22   describe your -- your educational background.

23   A          Okay.  So I graduated from medical school at

24   the University of Ibadan medical school here in Nigeria

25   in 1997.  Thereafter, I went on -- on residency
```

```
 1    the history is sent to the team on ground to look at
 2    those results and make sure they are complete and make a
 3    determination whether they're fit to come work in
 4    Nigeria or not.
 5    Q        Why does the team on the ground get to make
 6    that determination?
 7    A        Okay.  The reason is that the team on ground
 8    will have to determine if there is background with that
 9    condition, whether that person will be able to work here
10    in times of complications or if there was need for --
11    need for medical care while on ground in Nigeria.  So
12    the team on ground in Nigeria really knows what is
13    available in what location.
14    Q        And I think we all know -- so Mr. Snookal was
15    deemed not fit for duty to work in Escravos, deemed fit
16    for duty to work in Lagos; correct?
17    A        Correct.
18    Q        And who made that decision?
19    A        The team on ground made the decision.  I made
20    the decision as the occupational head physician on
21    ground that day.
22    Q        And I know you've touched on this, but why was
23    Mr. Snookal not deemed -- deemed not fit for duty in
24    Escravos?
25    A        So, again, the facilities are available in
```

**EXH B/29**

1    Escravos.   In Escravos, as I said, there are basic

2    medical things we do, not necessarily complex cases.

3    That's the primary reason.

4         And if you take it for that, as of that time,

5    whenever there are cases -- difficult cases in Escravos

6    that needs to be taken out for further care, we'll then

7    be medevac to Warri almost 90 percent of the time or

8    very, very legal.  And in Warri, we have a

9    hospital where I'm presently at that has suddenly to get

10   at a facility and without -- more manpower on ground.

11   So, like, in the Warri hospital, we have a tier that --

12   with all the facilities for X-ray and all of that.

13        Okay.  If you also look at it, if there was a

14   rupture or a dissection in case of Mr. Snookal, it was

15   going to require not any doctor, where it was going to

16   require cardiothoracic surgeon.  Even as a doctor and

17   even though we have a cardiothoracic surgeon here in

18   Warri, that cardiothoracic surgeon will have to be

19   brought in from Benin, which is another, like, one hour

20   and half hour away from Warri itself or brought in from

21   Lagos, which is like two -- two hours -- one hour, two

22   hours by flight from Lagos to Warri.  So outside the

23   facilities, the manpower was the strong issue too.

24   Q     What would have to happen to evacuate someone

25   from Escravos to Warri?

```
 1    Limited.  It's also called Nigerian Mid-Africa's
 2    business unit.  The cardiologist will just manage to
 3    see those ready -- cardiologists who will then provide
 4    in-service for this business you need.
 5    Q        Okay.  And this document is titled "Summary of
 6    Cardiology Opinions."  It is a two-page document.  We're
 7    looking at page 1.  I'm going to show you page 2.  And
 8    my question is going to be:  Does this accurately
 9    summarize the cardiology opinions that you received?
10    A        Yes.
11             MR. MUSSIG:  I should have added this document,
12    Your Honor, was stipulated to.
13             THE COURT:  Yes, I saw.  It's admitted.
14    BY MR. MUSSIG:
15    Q        You were asked -- we can take the document
16    down.
17             Dr. Asekomeh, you were asked a question about
18    published studies, and I think you talked a little bit
19    about that.  Did you or any of the cardiologist involved
20    in this process review any published studies as part of
21    this process?
22    A        Yes.  There is a link from Dr. Aiwuyo that
23    address the Canadian journal.
24    Q        And Dr. Aiwuyo is the doctor in Escravos?
25    A        Cardiologist who was then in Escravos.
```

```
 1    Q         Okay.    You were asked some other questions
 2    about Mr. Snookal's treating cardiologist here in
 3    Los Angeles, including the fact that he would have
 4    cleared Mr. Snookal to work in Nigeria.    Did that factor
 5    into your decision?
 6    A         No.
 7    Q         Why not?
 8    A         The reason is even the -- the work in Nigeria,
 9    it is -- Nigeria is a big country.    We -- as a doctor on
10    ground and the cardiologist on ground, they knew already
11    that the facility in Lagos is totally different that is
12    what is available from Warri to Escravos.    The mere fact
13    that we don't have a cardiologist in Escravos speaks for
14    the fact that that is already a country like Nigeria.
15    Escravos is a place that is removed where you have no
16    facilities on ground.
17              I also shared about the cardiothoracic surgeon.
18    In the whole of -- even if you are able to bring him out
19    to Warri, the nearest cardiothoracic surgeon we have is
20    in another town -- another town called Benin City.    We
21    have no cardiothoracic surgeon even in Warri.    So based
22    on the facilities on ground and the ability to manage if
23    there is any complication, Escravos was and no-no that
24    is why the conclusion was work in Lagos.
25    Q         And you also testified, I believe, that you
```

```
 1    missing test, we contact the U.S. team and U.S. team
 2    would then contact him.
 3    Q        But did you think that was necessary in this
 4    case?
 5    A        No, it wasn't necessary.
 6    Q        And you testified that the work history wasn't
 7    relevant to your decision.  Why not?
 8    A        It wasn't.  The decision was if he had a
 9    medical condition, the medical condition had a risk of
10    having complication.  It was coming to work in a
11    location where we could not handle that complication.
12    So it was mainly the professional and moral obligation
13    of if something happens to him knowing he has this
14    condition and we make this condition knowing that we
15    don't have the facilities to manage him on ground.  So
16    the moral obligation was to put him in a place where we
17    could help him and that was Lagos.
18    Q        Did you say there was a moral obligation?
19    A        Definitely.  When you take these decisions,
20    they are difficult decisions to take.  And you are
21    looking at a human life at stake here.  So he had a
22    condition where if he had a rupture in this type of
23    location, in a -- in a country where the medical
24    facilities are not that developed -- and not only was it
25    not developed, he was now going to a very remote
```

**EXH B/33**

1    location in that country.  That was double -- double

2    problematic for providing help if he needed that help.

3    Q       Last question, Dr. Asekomeh:  As you sit here

4    today, do you believe you made the right decision?

5    A       Definitely, we made the right decision.  The

6    decision is to ensure that when we are aware there's a

7    risk, no matter how low it is, we make the decision to

8    protect life.  And so that was why that decision was

9    made.

10           MR. MUSSIG:  No further questions.

11           THE COURT:  Any re-cross?

12           MS. FLECHSIG:  I just have one very brief,

13    thing.

14                    **REDIRECT EXAMINATION**

15    BY MS. FLECHSIG:

16    Q       Dr. Asekomeh, you made a point that I was very

17    confused by.  Are you saying that you were also

18    concerned about Mr. Snookal being a harm to others if he

19    had an aortic rupture?

20    A       That is a possibility, yes.

21    Q       Isn't it true that at your deposition, you

22    couldn't think of a single example, except if he fell on

23    someone else while the aortic rupture happened to

24    happen?

25    A       So that was an example I cited.  The background

**EXH B/34**

```
1    to that was I said even this was a office-based job, he
2    still has to go out and occasionally see things for
3    himself.
4    Q        But you didn't know -- you didn't know what his
5    job duties were at the time, did you?
6    A        I cited an example of him boarding a chopper --
7    boarding a chopper or boarding a chopper to come out of
8    Escravos.  That was a specific example I cited, yes.
9    Q        So your only concern is if in the unlikely
10   event, he has an aortic rupture while he's mounting a
11   helicopter and then he falls onto someone else?
12   A        I gave that example in the deposition and said
13   the bulk of this decision, 90 percent, 95 percent, was
14   thinking on the fact that if he had a rupture or a
15   dissection, we would not be able to help him in that
16   location.  But --
17   Q        You never documented any concern about safety
18   to others?  Whoops.
19   A        In the deposition, I said, well, if we're
20   looking at situations, now, that was a possibility.
21   Q        Okay.  But the examples you can think of are
22   him falling onto someone else; true?
23   A        That was the example I gave, yes.
24            MS. FLECHSIG:  Okay.  No further questions.
25   Thank you for your time today, Dr. Asekomeh.
```

**EXH B/35**

```
 1    the reliability engineering manager position, was an

 2    office-based job with just mild to light lifting

 3    activities; correct?

 4    A        The -- from what I understand, the -- there are

 5    some lifting and climbing activities related to that

 6    job.  Yes, I said that.  And in the initial job he was

 7    applying for, he was trying to get, was that job in

 8    Escravos; correct.

 9    Q        And your testimony was that the job was an

10    office-based job with just mild to light lifting

11    activities; is that correct?

12    A        I don't recall that it was mild or -- or light

13    lifting.  I know the job has some physical

14    responsibilities associated with it, and it's deemed

15    safety sensitive.

16    Q        Dr. Levy, you recall that I took your

17    deposition last year, August 30th, 2024?

18    A        I do, yes.

19             MS. LEAL:  Counsel, line -- sorry, page 75,

20    line 16 through page 76, line 2.  Do you have that,

21    Your Honor?

22             THE COURT:  Go ahead.

23    BY MS. LEAL:

24    Q        Question:  "So was there anything about the

25    actual job that Mr. Snookal would have been performing
```

**EXH B/36**

```
 1    in Escravos that would increase the risk of an adverse
 2    outcome to him?"
 3          You said, "So I believe that Mr. Snookal was --
 4    his proposed job in Nigeria was an office-based job with
 5    just mild to light lifting activities.  I don't think
 6    it was significant" -- or "I don't think it's
 7    significant.  I don't think it's of -- sorry, let me
 8    start over.  I don't think that his condition would have
 9    been an issue for his proposed role, had it not been for
10    the location."
11          Do you recall that testimony?"
12    A     I do, correct.
13    Q     And was that testimony accurate at the time?
14    A     Yes, I think it was accurate at the time.
15    Q     Thank you.  I will show you another
16    document.
17          MS. LEAL:  It's a document, Your Honor,
18    Exhibit 5, which has also been stipulated to admission.
19          THE COURT:  Go ahead.
20    BY MS. LEAL:
21    Q     Do you see that document before you, Dr. Levy?
22    A     Yes, I do.
23    Q     And I assume you're familiar with this form?
24    It's called "Physical Requirements and Working
25    Conditions GO-308."  I assume that's the form number?
```

**EXH B/37**

```
 1    A        It is.  I am -- I am familiar with it, yeah,
 2    correct.
 3    Q        Okay.  And you'll see at the top --
 4             MS. LEAL:  Can you highlight that, please.
 5    BY MS. LEAL:
 6    Q        Very top, it says "category," "GO-306 category:
 7    Office-based job."  This is accurate; correct?
 8    A        That is correct.
 9    Q        Okay.  Now, Dr. Levy, isn't it true that
10    Dr. Arenyeka -- Paul Arenyeka advised you that
11    Mr. Sobel [sic] was deemed not fit for assignment in
12    Escravos because of the location?
13    A        He -- he was not deemed fit for Escravos
14    because of his risk of having an event --
15    Q        What I asked you is accurate, Dr. Levy?
16    A        It was because of the location; correct.
17    Q        Okay.  Thank you.  Let me show you another
18    document --
19             MS. LEAL:  Which I believe has already been
20    admitted, Exhibit 63.
21             THE COURT:  Yes, go ahead.
22    BY MS. LEAL:
23    Q        And you've seen this e-mail string before
24    today, right, Dr. Levy?
25    A        I have.
```

```
1    said, Dr. Arenyeka still did not agree with you,

2    correct, when he decided to maintain the restriction for

3    Mr. Snookal?

4    A        That is correct.

5    Q        As the EEMEA regional medical manager, which

6    you held in 2019, you deferred to what these doctors in

7    Nigeria -- I think you called them the embedded medical

8    team -- ultimately determined; correct?

9    A        That is correct.

10   Q        Now, at some point, Dr. Levy, you learn that

11   Mr. Snookal can contacted Andrew Powers, as a human

12   resources person, about the fact that he believed that

13   he was being discriminated against because of a

14   disability; correct?

15   A        Correct.

16   Q        And you learned from Mr. Powers that

17   Mr. Snookal just wanted something in writing explaining

18   why he was not being allowed to go to Escravos; correct?

19   A        Correct.

20   Q        And you provided that explanation to

21   Mr. Snookal?

22   A        I did.

23   Q        If we can, look at Exhibit 88.

24            MS. LEAL:  And, Your Honor, this is another one

25   that has been stipulated, with admissibility.
```

```
 1    hours before a medical evacuation plane was ready to

 2    pick up the individual; correct?

 3    A        Correct.

 4    Q        So to speed up the evacuation process time in

 5    Kazakhstan, you -- or Chevron was able to purchase your

 6    own plane and outfit it with medical emergency

 7    equipment; correct?

 8    A        It is correct.

 9    Q        What was that cost of that plane?

10             MR. MUSSIG:  Relevance, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  I'm not sure, to be honest with

13    you.  I don't know how much a plane costs.

14    BY MS. LEAL:

15    Q        A lot of money, I would imagine?

16    A        No question.

17    Q        Has a similar plane been purchased to speed up

18    the evacuation time for employees working in Escravos;

19    yes or no?

20    A        No.

21    Q        Now, during your term as the EEMEA regional

22    medical manager, you managed approximately 300

23    evacuations of employees, dependents per year, at least

24    according to the exhibit we saw yesterday, your CV,

25    Exhibit 137; is that correct?
```

**EXH B/40**

```
 1   A          That's correct.

 2   Q          And of the approximately 300 evacuations per

 3   year, they were extracted by ground transport,

 4   helicopter, air ambulance, ship, commercial airlines;

 5   correct?

 6   A          That is correct.

 7   Q          So as the EEMEA regional medical manager

 8   between 2018 and 2024, you were kept informed of

 9   medevacs from Escravos; correct?

10   A          I was, yes.

11   Q          Okay.  So let's turn to Exhibit 7.

12          MS. LEAL:  And, Your Honor, again, this is

13   another exhibit where the parties have stipulated to

14   admissibility.

15          THE COURT:  Let me stop and explain that to the

16   jury.

17          You may be wondering about that portion of the

18   back and forth.  The parties have agreed that various

19   exhibits are -- can be admitted into evidence, and that

20   is what you're seeing on the screen, as well.  You're

21   entitled to consider those, and you will have copies of

22   those exhibits brought back to you when you deliberate.

23          Go ahead.

24          MS. LEAL:  Thank you, Your Honor.

25   BY MS. LEAL:
```

**EXH B/41**

```
 1   Q        So this document, it is a little hard to read,
 2   but this document was produced by Chevron, of course,
 3   and it is a list of medevac evacuations -- or med
 4   evacuations from Escravos from 2017 through 2022.
 5            Do you see that?
 6   A        Yes.
 7   Q        Okay.  So just focusing on the years -- and you
 8   can see the years -- the years when you were responsible
 9   for Escravos, 2018, '19, 2021 and '22.
10            I see -- and correct me if I'm wrong -- that in
11   2018, there were 20 medevacs; in 2019, there were 31
12   medevacs; in 2020, there were 17; in 2021, there were
13   19; and in 2022, there were 20.  So I went through, and
14   I counted them.  If you don't trust me, you're welcome
15   to do that on the exhibit, Dr. Levy.
16   A        I have no reason to question that.
17   Q        Thank you.
18            So if my math is correct, there were a total of
19   107 medevacs from Escravos for varying medical reasons;
20   correct?
21   A        Correct.
22   Q        Including cardiac, coronary, and heart issues;
23   correct?
24   A        That is correct.
25   Q        And because these people were already in
```

**EXH B/42**

```
 1   does not presently interfere with his ability to perform

 2   the job?

 3            MR. MUSSIG:  Objection; calls for a legal

 4   conclusion.

 5            THE COURT:  All right.  I'm going to overrule

 6   it, but I'm going to just explain to the jurors that

 7   counsel -- neither counsel can state what the law is.  I

 8   have to instruct you on that at the end.  But -- so to

 9   the extent a question may have -- may relate to the law,

10   it's what was said or what wasn't said, that can be

11   answered.  But don't take from the question -- the

12   question itself that a principle of law is correct or

13   incorrect.

14            Okay.  So yes, you can answer the question,

15   Doctor.  Were you -- essentially, were -- did someone

16   from Chevron ever say that to you -- to your knowledge?

17            THE WITNESS:  I don't understand the question

18   completely.  And I can explain.  Different jobs have

19   certain criteria for allowing or considering someone to

20   be fit.  Like pilots, pilots can't function with certain

21   medical conditions, lots of them.  You are allowed to

22   disqualify them if they can't -- same thing for a

23   driver, same thing for police and fire fighters.

24            This is a safety-sensitive job working with

25   hydrocarbons, heat, fire.  And a person has essentially
```

**EXH B/43**

1    a time bomb in their chest with a 2 percent risk of it

2    going off at any time.  There is significant risks

3    that's here.  And so I don't see that as -- I don't see

4    the company has no ability to make a decision on that

5    person hurting themselves, others, or the community.

6    So -- so I don't understand the -- the answer to the --

7    BY MS. LEAL:

8    Q        Let me see if I can clear it up.  And I

9    apologize.  It may have just been me.

10            So did anyone at Chevron, including human

11   resources, tell you that the employer can't say, "We're

12   not discriminating.  We're not discriminating based on

13   disability.  Because of a potential future risk,

14   something might happen to them."  If the employee today

15   can perform the job, they can't discriminate.  Did you

16   understand that?

17   A        I -- I understand what you're saying.

18   Q        Answer my question:  If the employee can

19   perform the job today, can the employer deny a position

20   to the employee, yes or no?

21            MR. MUSSIG:  That calls for a legal conclusion.

22            THE COURT:  Sustained.

23   BY MS. LEAL:

24   Q        So I don't think I got an answer to my

25   question, however, because it wasn't very clear

**EXH B/44**

```
 1    decision on this case for sure.

 2    BY MR. MUSSIG:

 3    Q       And you mentioned that late night medical

 4    evacuations are dangerous.  Dangerous to who?

 5    A       Dangerous to the pilot, dangerous to the staff,

 6    dangerous to the patient.  So it's landing at night.

 7    That's the issue.  That -- no visibility whatsoever.

 8    The same issues happen if we have sand storms in the

 9    daytime.  We have them at night as well.  But the night

10    evacuation is much more dangerous and unsafe for a lot

11    of different reasons.

12    Q       And have you ever -- you testified that in your

13    position in 2019 you were based in London; right?

14    A       Correct.

15    Q       And as part of your job did you ever travel to

16    Escravos?

17    A       Many times.  I can't tell you exactly how many

18    times I've been there, but I was looking at this

19    yesterday trying to count all my trips, somewhere

20    between eight to 15 trips to Nigeria and six to eight at

21    least to Escravos.

22    Q       What is travel to Escravos entail?

23    A       So it depends on where you're coming from --

24            THE COURT:  Counsel, you've gone through all

25    this before, so please move on.
```

1    percent or 1 in 50 chance of it happening is -- that's

2    really the situation that -- that the team and we need

3    to be aware of.

4    Q        And how did you interpret this 2 percent?

5    A        It's significant.  It's significant as far as a

6    fitness for duty decision.

7    Q        What -- go ahead.

8    A        Generally, the criteria for -- for most fitness

9    for duty decisions in safety sensitive workers are about

10   1 percent, 1 percent or less: pilots, drivers,

11   nuclear -- railroad employees, nuclear regulatory

12   agencies.  So 2 percent is significant.

13   Q        And did you have any reason to doubt Dr. Khan's

14   assessment of the risk?

15   A        Dr. Khan is his treating medical provider with

16   all of his records.  The studies he's quoting are

17   reasonable to me.  There's no reason for me to have

18   questioned the expert -- not -- not like this.  And so I

19   thought that was fair.

20   Q        And so did you move forward with an assumption

21   that the risk here was 2 percent or in that range?

22   A        Yeah.  So -- and I can tell you that studies

23   are one -- with research -- medical research, medical

24   literature, you need to read lots and lots of studies.

25   The one -- there's -- these things happen all the time.

**EXH B/46**

1    we have an issue and clearance on one of his -- on one

2    of his employees may not happen.

3    Q        You say in the e-mail to him -- you introduce

4    yourself.  And you say -- in the second sentence of your

5    e-mail, you say, "In short, he can be cleared to work in

6    Lagos and not Escravos.  Is there any chance this

7    position can be moved?"

8            Why were you reaching out to Mr. Mirabueno?

9    A        At that time, I thought he was the person to

10    ask about negotiating with the business to decide --

11    negotiating with NMA, the Nigeria mid-Africa business

12    unit, on whether this position can be moved.  We

13    thought -- Dr. Arenyeka and myself and, I believe,

14    Dr. Frangos in the past had this conversation about --

15    about whether we can support Mr. Snookal in Lagos, and

16    they said, "We can.  We'll try."  It was still risky,

17    but they were willing to take him in Lagos if the job

18    owner thought that made sense or was possible for him to

19    work out of Lagos.

20    Q        What do you mean by "the job owner"?

21    A        So it appears to me, based on all of these

22    discussions, that his position was in Escravos in an

23    office managing a team.  So the question was:  If being

24    in Escravos was the problem, why can't he work in an

25    office in Lagos and manage his team remotely with trips

1    back and forth, potentially, to minimize his time in

2    Escravos?   So -- so accommodating -- trying to

3    accommodate the issue.

4    Q        Okay.  And then Mr. -- going on page 2 of the

5    exhibit, Mr. Mirabueno responds to you.  He says, "Hi

6    Scott, it would be best to seek advice from Amaka, the

7    host HRBP."  Do you see that?

8    A        Yes.

9    Q        It is about two-third of the way down the page.

10            What is HRBP?

11   A        Human resources business partner.  So I think

12   Amaka was the local Nigeria HR person, but I don't

13   remember.  It's been a long time.  Sorry.

14   Q        Okay.  And then he asks Amaka -- it says,

15   "Kindly advise on Scott's inquiry below."  And then we

16   see above that, there is an e-mail from Amaka, and he

17   e-mails a person named Ciji (phonetic).

18            And do you see that e-mail?

19   A        I do.

20   Q        And so it essentially asks, "Can this job be

21   moved?"  Right?

22   A        Correct.

23   Q        And if we look at the first page of the

24   document, what was the ultimate response?

25   A        Well, the ultimate response, that this position

UNITED STATES DISTRICT COURT

**EXH B/48**

1    what do you mean by that?

2    A       So his -- that's a good -- so his job was,

3    again, maintaining and -- and fixing issues at the

4    plant, so correcting problems, so spills into the --

5    into the river, pollution into the air can cause

6    accidents, potentially.  Again, this is all natural gas,

7    and heat and pressure explosions happen.  We've had

8    these before.  I've had two fires in the last three

9    months in -- in different locations.  And so failure of

10   him to be able to do his job or to manage his team has

11   potential consequences.

12   Q       And if we go to the next paragraph, fourth

13   sentence down, it starts, "While reasonable

14   professionals can debate."  Do you see that language?

15   It is the fourth sentence down.  It's the fifth line

16   down.  It says, "While reasonable professionals" --

17   A       Yes.

18   Q       -- "can debate the exact percentage, we're

19   dealing with an established risk that is several

20   magnitudes higher than the baseline, and it is a

21   realistic possibility."

22           Is it common for medical professionals to

23   disagree about things like the exact percentage?

24   A       Absolutely, absolutely.  And it is possible to

25   have differing data to some degree.  It may be people

**EXH B/49**

1   with different techniques on how they fix something.

2   The key is mostly trying to understand what this

3   person's underlying risk factors are and then put them

4   into -- get them based on studies that had that specific

5   individual's situation in the studies.  And then it

6   takes repeatable results and things like that.

7           So yeah, it is normal to have some did debate

8   on the exact percentage, but from a safety

9   perspective -- or really, it's -- whether it's zero or

10  1.9 or 2.5 or -.4, it is still pretty high, and that was

11  the issue we had.  If we -- I would say one percent is a

12  typical standard that we use for -- for the

13  transportation industry and others for safety-sensitive

14  position and -- positions, and Mr. Snookal's risk at

15  that moment was -- was close to 2.  And then as we age,

16  the size of the aorta typically grows slightly, and so

17  there was no reason for us to think that the aorta was

18  going to get smaller with time.  It's just the 2 percent

19  risk today with potential for it to rise over an unknown

20  period of time.

21  Q       Okay.  And while there may be a debate about

22  percentages, is it fair to say that ultimately, Chevron

23  had to make a decision?

24  A       Absolutely.  I think there is -- we -- we used

25  information available to us, and we used a treating

**EXH B/50**

1    A        Yes.

2    Q        And what types of services did you perform for

3    Chevron?

4    A        It would be medical evaluations for their

5    employees for work assignments.

6    Q        What types of work assignments?

7    A        Usually abroad.

8    Q        To other countries?

9    A        In other countries.

10   Q        And those were what are called expat

11   assignments?

12   A        Exactly.

13   Q        Okay.  And how long did you provide those types

14   of services for Chevron?

15   A        Probably over a period of a decade, I presume.

16   Q        Okay.  And would you tell us what's entailed in

17   performing a fitness for duty, as you said you did for

18   Chevron?

19   A        So beforehand, Chevron would submit detailed

20   documents that the employee would fill out and certain

21   requirements they would have for travel and work abroad.

22   Q        Okay.

23   A        And they would find the individual to see me.

24   Q        Okay.  And when you performed these fitness for

25   duty evaluations or examinations for these employees,

**EXH B/51**

1    who paid for your services?

2    A          Chevron.

3    Q          Okay.  And when an employee appeared at your

4    office at Cedars-Sinai in order to be evaluated, did

5    they provide you with any particular document?

6    A          Nothing that wasn't already submitted through

7    Chevron.

8    Q          Okay.  Are you familiar with the form -- and I

9    know it's been a number of years -- but people call it

10   the MSEA, or the medical evalua- -- medical -- medical

11   suitability for expatriate assignment and physical

12   examination form?

13   A          Yes, I am.

14   Q          Okay.  So let's put up Exhibit Number 29.

15              MS. LEAL:  And this is a document already

16   stipulated, Your Honor.

17              THE COURT:  Go ahead.

18              THE WITNESS:  Where would I see that?  Oh.

19              THE COURT:  You'll see it on the screen.  If

20   you want to refer it in the binders, we can direct you

21   to that, if you prefer.

22              THE WITNESS:  Okay.  I have it here.  That's

23   fine.

24   BY MS. LEAL:

25   Q          There is a binder there in front of you also.

**EXH B/52**

1    A        That I -- that was my impression, yes.

2    Q        Okay.  All right.  Would you read number 2,

3    please?

4    A        "He has a history of dilated aortic root,

5    followed by cardiology.  Ongoing studies, yearly echo

6    versus CT of his chest.  He's stable on his

7    medications."

8    Q        So what did you mean by "ongoing studies"?

9    A        So he has a known finding of a dilated aortic

10   root.  That's the main artery that comes out of the

11   heart, and he's followed by cardiologist to make sure

12   there's no sudden increase in size of the aortic root

13   because that would require a more urgent evaluation.  I

14   don't know how long he's known this or how long he's

15   been followed by the cardiologist.  But he noted in his

16   paperwork that he is being followed by the cardiologist.

17   Q        Okay.  And you found that to be unremarkable at

18   the time?

19   A        Well, it's not that it's unremarkable.  It's a

20   finding, whether it's remarkable.  Needs an ongoing

21   cardiac evaluation on a yearly basis.

22   Q        Okay.  And the reason I asked if you believe

23   that it was unremarkable, because you'll recall that I

24   took your deposition a year ago, I think?

25   A        I don't recall.  But I don't think I would have

1    said "unremarkable," or didn't intend to, because it is

2    a finding.

3    Q       Okay.

4    A       It may not be anything significant, but it is a

5    known finding --

6    Q       Right.

7    A       -- on his exam.

8    Q       Right.  Okay.  And you also said here, "yearly

9    echo versus CT."  What did you mean by that?

10   A       Well, I believe he either gets an

11   echocardiogram by the cardiologist or they order a CAT

12   scan of his chest to look at the blood vessels around

13   that area, either one.

14   Q       And that is something that you would have

15   recommended that Mr. Snookal do or continue to do if he

16   was already doing it?

17   A       He's already doing it, and his cardiologist is

18   the one who's supervising this ongoing surveillance.

19   Q       Okay, good.  Thank you.

20           And then the last handwriting there says,

21   "Stable on meds."  What did you mean by that?

22   A       So his blood pressure is controlled.

23   Q       Okay.

24   A       And he's been on this -- those medications that

25   he listed in his list.

```
1    Q        Okay.  All right.  And if you go down -- let's
2    see -- to -- it's too small for me to read, but the next
3    box --
4    A        Uh-huh.
5    Q        -- there is, on left side, a letter B?
6    A        Uh-huh, yes.
7    Q        It says, "Fit for duty with restrictions."
8             Did you mark that X?
9    A        Yes.
10   Q        Okay.  And there's some writing on right side.
11   Would you please read that for us?
12   A        Sure.  "No heavy lifting greater than
13   50 pounds.  Needs review.  Recommend letter from
14   cardiologist to clear him."
15   Q        Okay.  And why did you write "No heavy lifting
16   beyond or above 50 pounds"?
17   A        Oh, because of the aortic root being dilated,
18   if you exert a high lift load, you tend to hold your
19   breath, you raise your blood pressure, and that could
20   potentially over time cause your aortic root to dilate
21   further.
22   Q        Okay.  And why did you impose these
23   restrictions?  Any other reason?
24   A        No.  Basically, because of those findings.
25   Q        Okay.  And then you also say, "Needs" -- I
```

**EXH B/55**

```
 1    think you said, [As read]:  "Needs review of

 2    recommendation letter"?

 3    A       Yes.

 4    Q       And do you know if Mr. Snookal actually got

 5    that recommendation letter from his cardiologist?

 6    A       I don't know.

 7    Q       Okay.  So after seeing Mr. Snookal, what was

 8    the next thing you did with this MSEA form?

 9    A       That is faxed over to the Chevron health

10    assessment department, which I believe is in Houston.

11            THE COURT:  If you can, bring the microphone

12    over.

13            THE WITNESS:  Yes.  I'm sorry.

14    BY MS. LEAL:

15    Q       You said you faxed it over?

16    A       That's usually the protocol, is to fax over all

17    the documents completed to the Chevron health department

18    to review my recommendations, and that was, I believe,

19    in Houston.

20    Q       Okay.  And were you concerned at all about

21    Mr. Snookal having high blood pressure or taking these

22    blood pressure medications?

23    A       No.  That's the standard of care, and he was

24    controlled on his current medications.

25    Q       Okay.  So after you did the physical evaluation
```

```
 1   A        Yes, I am.

 2   Q        Okay.  And when were you first hired by

 3   Chevron?

 4   A        The first time I was hired in 2007.  Before

 5   then that, I worked for a joint venture that Chevron

 6   have with Conoco down in Minnesota for another seven

 7   years.

 8   Q        A joint venture?

 9   A        Yes.

10   Q        And where was that?

11   A        In Venezuela.

12   Q        In Venezuela?

13   A        Yeah.

14   Q        Okay.  And how long were you employed with the

15   Chevron joint venture in Venezuela?

16   A        Seven years.

17   Q        So you've been employed with Chevron -- just

18   Chevron, not a joint venture since 2007; correct?

19   A        Yes.

20           THE COURT:  Wait.  Let me just give the

21   instruction.  Please wait until the question is finished

22   and then pause because we can't get a record if -- if

23   you speak over each other.

24           THE WITNESS:  Thank you.

25           THE COURT:  All right.  Thank you.  Go ahead,
```

**EXH B/57**

```
 1    Counsel.

 2              MS. LEAL:  Thank you, Your Honor.

 3    BY MS. LEAL:

 4    Q        So you've been with Chevron now about 18 years;

 5    correct?

 6    A        Yes.

 7    Q        Okay.  How old are you?

 8    A        60.

 9    Q        And what is your current position with Chevron?

10    A        Reliability engineering manager.

11    Q        Reliability engineering manager?

12    A        In the facility EGTL, Escravos Gas-to-Liquid.

13    Q        Okay.  So EGTL means Escravos Gas-to-Liquid

14    facility?

15    A        Yes.

16    Q        That's where you're working, okay.

17             And were you offered this REM position in

18    Escravos in October of 2020?

19    A        Yes.

20    Q        And when you were offered this position in

21    Escravos, did Chevron tell you what the duration would

22    be?  In other words, how many years or how long you

23    would be in Escravos?

24    A        Yes.

25    Q        What did they say?
```

**EXH B/58**

1    A        They offered say 3 to 4 years -- the offer

2    letter.

3    Q        And how long have you actually now been in

4    Escravos?

5    A        Four years and three or four months.

6    Q        So you're going on your fifth year in Escravos?

7    A        Yes.

8    Q        Okay.  And how is it that you went from an

9    offer of 3 to 4 years in Escravos to now going almost

10   five years?  What did you have to do?

11   A        Okay.  Actually, I was already informed that I

12   would both move of any other people that original of the

13   four years.  However, Chevron has a transformation now

14   in the organization.  That means it is going to be

15   complete next month, and they put on hold all the

16   changes.

17   Q        Okay.  So there was a transformation -- if I

18   understood, there is a transformation and as a result of

19   that transformation, you continued as the REM in

20   Escravos?

21   A        Yes.

22   Q        Okay.  So you've been in Escravos since when?

23   Late 2020, early '21?

24   A        Yeah, 2021.

25   Q        Early 2021, thank you.  Now, I understand that

**EXH B/59**

```
1    Chevron has what are called PSGs, or pay salary grades?

2    A        Yes.

3    Q        You understand that?

4    A        Yes.

5    Q        And at the time that you were given the offer

6    in October of 2020 to be the REM in Escravos, what

7    PSG -- what pay grade were you offered?

8    A        35 -- actually, 30.  The position is 24, place

9    and my -- my PSG at that time was 25.

10   Q        Okay.  So you were offered a 24 in October of

11   2020, and you're currently a 25?

12   A        Yes.

13   Q        And when did you become a 25?

14   A        No, I -- as I said, the offer was 24 because

15   the position is blocked for 24.  It is a place position.

16   I was already 25 when I got that position.

17   Q        I see.  So when they offered you the position

18   in October of 2020, you were a 25, but they gave you a

19   24?

20   A        Yes.

21   Q        Yes?

22   A        Yes.

23   Q        Okay.  As a result of that, did you lose any

24   money?

25   A        No, I didn't lose any benefit.
```

UNITED STATES DISTRICT COURT

**EXH B/60**

```
 1    Q        So they kept you at your same salary?

 2    A        Yes.

 3    Q        Okay.  Now, is it correct that because you're

 4    in Escravos, that you receive what is called a location

 5    premium -- a 55 percent on top of your salary.

 6    A        Yes.  Basically, due to the risk of the site.

 7    Q        Due to the site, yes.

 8             And during the time since October 2020, when

 9    you're offered the position, you were offered position

10    as a rotator; correct?

11    A        Yes.

12    Q        And my understanding is that a rotator means

13    you worked for 28 days in Escravos and then you come

14    home for 28 days.  And you don't work, or you do

15    whatever it is you want to do during those 28 days;

16    correct?

17    A        It is supposed to be like that.

18    Q        Okay.

19    A        In many opportunities, you need to continue

20    supporting the facility from home for a specific task.

21    Q        If someone comes up, then you should --

22    A        Yes.

23    Q        -- respond to Chevron, you're saying?

24    A        Yes.

25    Q        Okay.  But in essence, you really only work six
```

**EXH B/61**

1    months out of the year?

2    A        Yes.

3    Q        Okay.

4    A        Actually, the way that it has been explained,

5    even to our -- is that because we work there 12 hours a

6    day for 28 days, you are actually working the double of

7    time -- total of time is really one year work.

8    Q        Because?

9    A        Focus on six months.

10   Q        So what I'm understanding you is when you're in

11   Escravos, you don't really have a whole lot of time off

12   because all you're doing is working?

13   A        Well, Monday through Sunday, 12 hours a day.

14   Q        So --

15   A        And you also have to be available at night.

16   Q        If need be?

17   A        If needed, yes.

18   Q        Okay.  When you're in Escravos you don't have

19   to pay rent, utilities, groceries, anything like that;

20   correct?

21   A        Officially not.  Commonly, we just take what we

22   ask whatever we with think we may need there.

23   Q        So they provide you all of the necessities for

24   living in Escravos during that period of time; correct?

25   A        Yes.

**EXH B/62**

1    Q        And Chevron also pays all your transportation

2    costs to and from Escravos; correct?

3    A        Yes.

4    Q        Okay.  Now, even though you're an expat working

5    in Escravos, you continue with your same pay from

6    Chevron U.S.A.; correct?

7    A        Yes, U.S. employee.

8    Q        And tell me if this statement that I'll read is

9    correct:  The EGTL reliability engineering manager

10   reports to the EGTL technical manager position located

11   in Escravos, Nigeria?

12   A        Yes.

13   Q        And who is the -- who was the EGTL technical

14   manager in October of 2020?

15   A        The -- because it is also rotated position, in

16   2020, it was Syed -- Sye?  I don't remember the name --

17   and Christopher Jergovic.

18   Q        Syed and Christopher?

19   A        Christopher Jergovic and Syed -- I don't

20   remember the last name of Syed.

21   Q        Okay.  All right.  And I'm going to read you

22   something else, and let me know if this is also

23   accurate:  The position is responsible for managing a

24   multidiscipline team of about 20 engineers and

25   technicians in the areas of rotating equipment,

**EXH B/63**

1    BY MS. LEAL:

2    Q        So before you, Mr. Malpica, is a document

3    produced to us by Chevron, and it's titled "Escravos

4    Fatalities, 2017 through 2022."  And I understand you

5    weren't there the entire period of time.  But if you

6    look down to 2020, when you were there, and then

7    continue -- so there's 2020, 2021, 2022 -- in 2020,

8    there were two deaths.  In 2021, there were three

9    deaths.  2022, there were seven deaths.  Do you see

10   that?  So a total of 12 deaths in a three-year period.

11   You never heard of any death during the time --

12   A        Can I give you a short comment back to this?  I

13   see that you are referring to another facility.  Because

14   some of them are referring to the barge or to the boat,

15   it is a different facility.  In Escravos, we have

16   actually two different facilities.  Their onshore

17   facility is Escravos Gas-to-Liquid, and you also have

18   the facilities supporting offshore.  And as I see

19   here --

20   Q        What?

21   A        -- at least one of them are now referring to

22   offshore -- to another facility that is also belong to

23   Chevron, but Chevron is not agent there.

24   Q        So in Escravos, there are two facilities,

25   you're saying.  One is onshore and one is offshore?

**EXH B/64**

1    A        Supporting offshore.

2    Q        And where did you work?

3    A        Onshore, EGTL, gas-to-liquid plant.

4    Q        Onshore, okay.

5            And do you know if these offshore employees,

6    whom you believe may also be included here on Exhibit 8,

7    if they also -- if they -- if they're sick or ill or in

8    an accident, if they also have to be transported away

9    from Escravos?

10   A        I'm actually not aware, but I think that

11   they're -- they need to be done, then they will be

12   admitted back.  But I'm not aware of that.  As I say, a

13   different facility, possibility no.

14            MS. LEAL:  Okay.  I don't have anything else.

15   Thank you.

16            THE COURT:  Okay.  Direct?

17                    **CROSS-EXAMINATION**

18   BY MR. MUSSIG:

19   Q        Good afternoon, Mr. Malpica.  I just have a few

20   questions.  And my first -- I think this is probably

21   clear, but just -- and I don't think this is disputed.

22   Do you understand that the position you're in is the

23   position that Mr. Snookal had applied for?

24   A        I understand that.  I understand that.

25   Q        And can you tell us a little bit about the job?

**EXH B/65**

160

```
 1    A          Yes, a little bit more.
 2    Q          And you used a term called "must move"; is that
 3    right?
 4    A          Yes.
 5    Q          What does that mean?
 6    A          Commonly, when you are approaching the end of
 7    your assignment, you are what Chevron -- let's say
 8    Chevron.  I'm not sure about other.  They call that
 9    priority move.  And you go to the PDC, and you need to
10    go to through this process in which Chevron is posting a
11    position all around globe, and you need to compete for
12    the position that you considered you want to be part of.
13    If you don't -- if you are not successfully on that
14    process that was supposed to be, say, like last year --
15    Q          Uh-huh.
16    A          -- then you are moved to the next round of
17    these PDC as a must move.  It means that you must be
18    taking that position -- position there.  Otherwise, you
19    need to leave the company.
20    Q          So does it mean you need to move out of this
21    position?
22    A          Yes.
23    Q          And you used word transformation earlier, and I
24    think you used that synonymously with reorganization; is
25    that correct?
```

**EXH B/66**

```
 1   A        Yes.

 2   Q        And you mentioned in response to Mr. Mussig's

 3   questions, you said PPE that you were required -- that

 4   you are required in Escravos to wear -- personal

 5   protective equipment, that is what PPE is; correct?

 6   A        Yes.

 7   Q        Okay.  And that means, you know, clothes and

 8   helmet, you're all covered up?

 9   A        Yes.

10   Q        And are you aware that that type of PPE

11   equipment is also required in El Segundo?

12   A        Everywhere when you have same problem.

13   Q        Yes.  Thank you.

14            THE COURT:  All right.  Mr. Malpica, you're

15   excused.  Thank you for coming.

16            THE WITNESS:  Thank you.

17            THE COURT:  Safe travels.

18            THE WITNESS:  Thank you, sir.

19            THE COURT:  All right.  Who does Mr. Snookal

20   call next?

21            MS. LEAL:  Andrew Powers.

22            THE COURT:  All right.  So, Mr. Powers, come

23   up.

24   PLAINTIFF'S WITNESS, ANDREW POWERS, SWORN.

25            THE COURT:  All right.  You've heard all my
```

**EXH B/67**

```
 1   Q         And then from June 2019 through May 2022, you
 2   were the senior HR manager at Chevron's El Segundo
 3   refinery; correct?
 4   A         Correct.
 5   Q         And that is a position you held in 2019 during
 6   the events in this particular case; correct?
 7   A         Yes.
 8   Q         And then from May 2022 through November of
 9   2023, you were the senior HR manager for Chevron's
10   global IT function downstream and technology services
11   business unit and Chevron's tech ventures business unit
12   based in Texas; correct?
13   A         That's correct.
14   Q         Okay.  And then now you have your most recent
15   assignment.
16            So I know you've moved around a lot, and you've
17   gone to other countries.  During those other country
18   assignments, I assume you also received a location
19   premium that's been talked about; correct?
20   A         Correct.
21   Q         And in Manilla -- when you were in Manilla, you
22   received a 30 percent location premium; correct?
23   A         Correct.
24   Q         And when you were in Kazakhstan, you received a
25   35 percent premium?
```

UNITED STATES DISTRICT COURT

**EXH B/68**

```
 1   A        Incorrect.

 2   Q        Okay.  Well, then let me show you Exhibit

 3   Number 127 and see if this refreshes your memory?

 4   A        Yep.

 5   Q        It's about two-thirds of the way down.  It's

 6   about two-thirds of way down.  Kazakhstan, it says

 7   35 percent.  Do you see that?

 8   A        I do.  This sheet is from 2019.  It looks like

 9   my assignment was from 2015 -- 2013 to 2015, and our

10   premiums do change over time.

11   Q        Oh, okay.  I apologize.  So was it higher or

12   was it lower?

13   A        It was lower -- higher, I apologize.

14   Q        Higher?

15   A        Yes.

16   Q        All right.  Thank you.

17            So you moved around a lot -- you've had a lot

18   of different HR positions.  Do you consider your several

19   is a loyal employee?

20   A        Yes.

21   Q        Okay.  So irrespective of where in the world

22   you worked or location within the United States, you've

23   always been paid by Chevron U.S.A; correct?

24   A        That's correct.

25   Q        So now focusing on the time when you were the
```

**EXH B/69**

```
1    A        You know, no direct reports but definitely

2    someone with power and influence within a specific area

3    of the refinery.

4    Q        Are you aware how -- how long Mr. Snookal was

5    in that operating assistant role?

6    A        Um, from -- let's see here.  2020 timeframe,

7    about a year before we had, like, a transformation

8    selection event.

9    Q        And you were in the courtroom when Mr. Malpica

10   talked about transformation.  Is that what you're

11   referring to?

12   A        That's correct.

13   Q        And I suppose in your words, what is that

14   event?

15   A        Yeah, transformations are another way to call

16   reorganizations or sometimes downsizing that a company

17   goes through.  Within my time at Chevron, we've had one

18   every three to four years, it seems like.  And so as you

19   heard in the earlier conversation, there was one in

20   2020.  And we're also going through one right now,

21   reducing -- downsizing the organization.  We call it a

22   transformation or reorganization.  Basically, downsizing

23   the number of team members that we have across the

24   enterprise.

25   Q        And so you said Mr. Snookal was in that
```

**EXH B/70**

```
1    Q        Mr. Powers, you testified that Chevron created

2    a role for Mr. Snookal, the reliability change OA

3    assistant position.  And who actually created that

4    position, if you know?

5    A        Yes, it would be his supervisor at the time,

6    Austin Ruppert as well as Troy Tortorich who was over

7    all maintenance and reliability.

8    Q        And the reason they created that position is

9    because Mr. Snookal is not going to Escravos; correct?

10   A        I think that was one component of it.  I think

11   there was also a business need identified.

12   Q        And Troy and Austin realized that Mr. Snookal

13   was an asset to Chevron, and they didn't want to lose

14   him; correct?

15   A        I think that's correct.

16   Q        And isn't it true that this reliability change

17   OA position, which was created, in essence was just

18   doing special projects for Mr. Ruppert.  Were you aware

19   of that?

20   A        I don't have direct knowledge of what his day

21   to day looked like reporting to Mr. Ruppert.

22   Q        And you're aware that this reliability change

23   OA position that was created for him was not a

24   supervisory position; correct?

25   A        Yes, I'm aware of that.
```

UNITED STATES DISTRICT COURT

**EXH B/71**

1    Q        And the position that he had held at the time

2    he applied for the REM position, it was an IEAR

3    position, which stands for "instrumentality electrical

4    analyzer reliability team lead," IEAR.  That is a

5    position Mr. Snookal had at the time he applied for the

6    position in Escravos; correct?

7    A        That's correct.

8    Q        And when he had the IEAR team lead position, he

9    supervised a number of employees; correct?

10   A        That's correct.

11   Q        And he reported to Austin Ruppert at the time;

12   correct?

13   A        Correct.

14   Q        And the fact that a position was created for

15   Mr. Snookal, the reliability change OA position, that

16   position did not pay the same amount that he,

17   Mr. Snookal, would have earned had he received the

18   position in Escravos; correct?

19   A        From a U.S. base pay?  It did pay the same.

20   Q        The salary?

21   A        That's his base salary, correct.

22   Q        Correct.  But he would not have received the 55

23   additional percent pay; correct?

24   A        That's correct.  That is only given if you are

25   in that location.

```
 1    A        No, I didn't look at those things.
 2    Q        After Mr. Snookal was denied the position in
 3    Escravos, he too looked for positions; correct?
 4    A        Yes, that is my understanding.
 5    Q        And of all of positions that he suggested that
 6    he might be able to -- to hold, he didn't receive a
 7    single one; you're aware of that?
 8    A        I'm aware of that.  I was not directly involved
 9    though.
10    Q        And you just testified, well, he was put back
11    into his old position, the IEAR position at some point;
12    correct?
13    A        That is correct.  After we had a transformation
14    selection event, which is a downsizing.
15    Q        And once he was put into this IEAR position
16    which he had held a couple of years before, again, the
17    PSG was still the same?
18    A        That's correct.
19    Q        And he didn't receive any additional location
20    premium, anything that he would have had, had he been
21    assigned to Escravos; correct?
22    A        That's correct.  El Segundo does not have a
23    premium associated with it.
24    Q        You just testified that you would not contact
25    Dr. Kahn.  It's not your responsibility and more
```

**EXH B/73**

```
 1    for that?

 2    A         Yes, and this has to do with the theory in

 3    economics and finance; it's the time value of money.

 4    You're correct.

 5    Q         Okay.

 6    A         Money today is worth more because you can -- it

 7    can be invested and grow with interest.

 8    Q         Okay.  And I think you alluded to this; you

 9    calculated both Mr. Snookal's past economic damages and

10    future economic damages.  Can you break down what those

11    two categories mean to you in your report?

12    A         Yes, the past economic damages are the lost

13    earnings and lost employment benefits from before this

14    trial.  And the future lost earnings are the lost

15    earnings and employment benefits after this trial.  And

16    that distinction is important in economics because the

17    future losses are discounted or shrunk to present value.

18    The past losses are not.  That's why that line of

19    demarkation in time is important from an economic

20    standpoint.  And in my calculations, the past losses are

21    not discounted to present value.  They're not in the

22    future.

23    Q         Right.  Okay.  That makes sense.

24              Did you account for the fact that Mr. Snookal

25    found new employment after leaving Chevron pretty much
```

UNITED STATES DISTRICT COURT

**EXH B/74**

1    right away?

2    A        Yes, my calculations really calculate the

3    difference in what Mr. Snookal could have earned at

4    Chevron with the -- the promotion minus what he has

5    actually earned and will earn without the promotion.

6    With the promotion, I'm considering him working in

7    Nigeria with the different benefits and higher salaries

8    that -- and benefits that go with that.

9            I'm subtracting from that what Mr. Snookal has

10   actually earned, and that includes some earnings from

11   several subsequent employers, like Nippon Dynawave and

12   Georgia-Pacific.  So I take what he has actually earned

13   and I deduct that from the economic losses so that the

14   losses, the economic losses from lost earnings, are

15   really the difference in what he could have earned and

16   what he's actually earning.

17   Q        And in -- so Mr. Snookal also remained employed

18   at Chevron for some time after the rescission of the --

19   the job in Nigeria.  Did you also account for the fact

20   that Chevron was paying him some amount during that

21   two-or-so-year period of time?

22   A        That is correct.  That amount is deducted from

23   economic losses as well.  This -- this period of time

24   goes from August the 1st of 2019, when he otherwise

25   would have begun working in Nigeria, to about September

1    Q         Please.  Yeah, why don't you start by telling

2    us why you created two tables, and then maybe we can go

3    through the columns.

4    A         Okay.  In scenario number 1, which is in table

5    number 1, I am assuming that Mr. Snookal would have gone

6    to Nigeria to work, but he would have remained in grade

7    22.  In scenario number 2, in table number 2, I am

8    assuming that by January the 1st of 2020, he would have

9    been promoted to grade 23.  So the difference in the two

10   scenarios, the difference in the two tables has to do

11   with whether he stays at grade 22 or whether he moves to

12   grade 23.

13   Q         Thank you, Dr. Baum.

14             And I guess is it fair to say that provided

15   both so that the jury can decide, based on the facts,

16   what's appropriate to award for Mr. Snookal's damages?

17   A         That's correct.  It gives you, as a jury,

18   options because it's my understanding there was a

19   commitment, if he had gone to Nigeria or when he went to

20   Nigeria, to move him up to grade 23.  And so if -- if

21   that is what would have happened in scenario number 2,

22   in table 2 is the correct one -- or is the one you would

23   select.

24   Q         Thank you so much.

25             So now let's -- let's look at table -- let's

**EXH B/76**

1    start with table 1, which I know you said was without

2    any assumption that Mr. Snookal would ever get promoted.

3    If you could tell us -- you know, column 1 is self --

4    self-evident.  It's the year; right?

5         So I see that you broke down the past wages up

6    until now, and then the future is a projection into the

7    future.  What's wage growth rate?

8    A       Yes, and you can see in column number 1 that I

9    calculate economic losses on a year-by-year basis.  And

10   you're right; 2025 isn't in there twice.  It's that part

11   of it is pretrial, and part of it is post-trial.

12        But I assume that earnings go up over time due

13   to cost of living adjustments and price inflation.

14   We've recently experienced some of the effects of price

15   inflation, and so most people are familiar with that.

16   And so I include wage growth, and the rate of wage

17   growth that I build into the model is in column 2.  For

18   some of those years, the wage growth rates are based on

19   historical economic data, and then at some point, it

20   becomes a projection of mine for the future.

21   Q       Okay.  And then column 3, what 's that?

22   A       Column 3 represents what I project what

23   Mr. Snookal would have earned from his promotion to the

24   position in Nigeria in terms of base pay and performance

25   in each year moving into the future.  You can see that

**EXH B/77**

1    these amounts go up slowly over time.  They go up at the

2    rate of wage growth in column number 2, and you can see

3    what the amounts are that would comprise his earnings in

4    column 3.

5          And then columns 4, 5, 6, 7 and 8 represent

6    different employment benefits.  One of these employment

7    benefits that Mr. Snookal would have gotten in Nigeria

8    would be supplemental vacation pay, and so I built that

9    into the model as an employment benefit.

10          An important employment benefit would be in

11   column 5.  This is the location premium.  Where he was

12   going in Nigeria, he would have received a location

13   premium of 55 percent.  His base pay would have been

14   increased by 55 percent, and so the numbers in column 5

15   represent that employment benefit.

16          Another employment benefit that would have been

17   associated with this he promotion involves tax

18   equalization payments.  Essentially, the company would

19   be providing some compensation for tax differentials or

20   tax benefits for being in Nigeria.  That's in column 6.

21          Column 7, Chevron provided an employee savings

22   and investment plan.  It's an amount -- they contributed

23   an amount of money equal to 8 percent of pay.  And so I

24   take into account that employment benefit in column

25   number 8.

**EXH B/78**

```
 1              And then the last employment benefit -- let's
 2    see here.  I'm sorry.  I take into account the employee
 3    savings and investment plan in column 7.
 4              And then the last employment benefit in
 5    column 8 represents the employer's portion of FICA tax,
 6    or the payroll tax.  Employers pay into the Social
 7    Security system on behalf of employees the same way
 8    employees do.  Most employees recognize that because
 9    they that money being taken out of their paycheck.  An
10    employer makes an equal contribution.  And so column 8
11    represents another employment benefit.  It is the
12    employer's contribution to the Social Security
13    Administration on the employee's behalf.
14              So columns 3 through 8 represent compensation
15    for Mr. Snookal from the promotion in Nigeria.
16    Q        And then 9 through 15 are the columns that you
17    deducted from first eight; is that true?  It is what he
18    actually earned?
19    A        I would say columns 9, 10, and 11 represent the
20    deductions.  They represent what Mr. Snookal has
21    actually earned.  In fact, column number 8 represents
22    his actual earnings and bonuses from these subsequent
23    employers.  Some of this time is actually with Chevron
24    for a while, but then it of moves to Nippon Dynawave,
25    and then it moves to Georgia-Pacific.
```

```
 1           Column 10 represents different employment
 2    retirement benefits and employee stock investment plan
 3    benefits.  And then column 11 represents the employer's
 4    portion of the FICA tax to the Social Security
 5    Administration from these subsequent jobs.  And so 9, 10
 6    and 11 represent pay and benefits, the compensation
 7    Mr. Snookal is actually receiving.  And again, that gets
 8    deducted from the losses, and the subtraction is in
 9    column 12.  Column 12 says "loss."
10    Q        That's the difference, then?
11    A        That's the difference.  And it shows the
12    difference in these two compensation steams.
13    Q        Let me just -- I'm so sorry to interrupt.  Let
14    me pause and ask you one thing.
15           So you said that one of the benefits
16    Mr. Snookal would have received was Chevron's
17    supplemental vacation pay.  Can you explain what that
18    benefit is, or why -- you know, what you reviewed to
19    make you add this as one of the benefits?
20    A        Yes, this is a -- an additional source of
21    compensation that Mr. Snookal would have gotten in
22    Nigeria but not if he hadn't gone to Nigeria.  He would
23    have been paid for an additional 25 days of vacation.
24    It is because in Nigeria, according to the, I guess,
25    experience with the position, workers there aren't in a
```

**EXH B/80**

```
 1    position to take vacation.  They're really going to be

 2    required to work the whole time, and so instead of

 3    taking vacation days, they get extra pay.

 4    Q        Understood.  Okay.

 5             Really quickly, let's go to the next page of

 6    this exhibit and just finish through kind of what these

 7    columns are.  So again, it looks like you're following

 8    over that other table, just won't all fit without being

 9    illegible.  And so you have years again.

10             Ans then "adjust loss," what is that?

11    A        Adjusted loss takes into account the likelihood

12    that Mr. Snookal would have remained employed for

13    Chevron for over the course of his remaining career.

14    There is some chance that before retirement, even

15    without the wrongdoing, he would have not remained with

16    Chevron.  He would have picked a different job or

17    selected a different job.  I take into account the

18    likelihood of that occurring so that in these future

19    years, the -- the adjust loss is the loss we talked

20    about adjusted for the likelihood in the future that

21    Mr. Snookal might have gone to a different employer

22    anyway for some other reason.

23    Q        So you actually adjusted it downwards based on

24    some probability that Mr. Snookal would no longer be

25    employed with Chevron for any reason, whether it is
```

**EXH B/81**

1    leaving or staying or whatever?

2    A        That is correct because we -- we all know as

3    workers sometimes we have multiple employers during our

4    career.  The adjusted loss takes into account the

5    likelihood that Mr. Snookal would have left for some

6    other reason unrelated to this case in the future.

7    Q        How do you get those numbers?  Like, how do you

8    get, you know, how much to discount it by?

9    A        It is -- these are numbers that are based on

10   Government data from a sample of literally thousands of

11   workers where the Government tracks how long workers

12   tend to stay with a particular employer before they pick

13   a new job or a different employer.

14            Using a multivariable regression statistical

15   model, that data can be used to make projections on how

16   long an individual would remain with an employer based

17   on that individual's characteristics, like education and

18   occupation and wage, and it is based on a number of

19   different factors that can be made to be specific for

20   Mr. Snookal in this case when those projection are made.

21   Q        Understood.

22            So -- and then again, table 1 assumes no

23   promotion ever from the Nigeria position, so at pay

24   grade 22?

25   A        That's correct.  In table number 1, there's no

**EXH B/82**

```
 1    there was some commitment for that to happen.  I guess

 2    it is possible he could have been promoted to even a

 3    grade.  But in scenario number 2, table 2, I am building

 4    into the calculations a promotion to grade 23.

 5    Q        After six months in the role?

 6    A        It begins January the 1st of 2020, so it

 7    actually begins after five months.

 8    Q        Got it.

 9             So final thing:  We just heard testimony from

10    someone who is currently in the reliability engineering

11    manager position that he was placed at a pay grade of 24

12    and, I think, subsequently elevated to 25.  We weren't

13    aware of that at the time that -- or you weren't aware

14    of that, let's say.  I wasn't either.

15             But you weren't aware of that at the time --

16             MS. KENNEDY:  Objection, Your Honor.

17             MS. FLECHSIG:  I'm sorry.

18             THE COURT:  Strike all that.

19             Just ask a question.

20    BY MS. FLECHSIG:

21    Q        You weren't aware of that at the time you

22    prepared your report?

23    A        I was not.  So I only provided one other

24    scenario.  It is in table 2, scenario number 2.  And in

25    the same spot in the table, the bottom right-hand corner
```

**EXH B/83**

```
 1   of column 23, with all of adjustments we've discussed

 2   built in so that no more adjustment needs to be made,

 3   the present value from lost earnings and lost employment

 4   benefits are $3,321,301.

 5   Q        And that's a promotion to pay grade 23.

 6            So that's understandably lower than a pay grade

 7   24 or 25?

 8            MS. KENNEDY:  Objection.  That is lack of

 9   foundation as phrased.

10            THE COURT:  Sustained.

11   BY MS. FLECHSIG:

12   Q    So I'll just ask it this way:  Again, that is

13   the cumulative total in pay grade 23?

14   A        Yes, with a promotion to pay grade 23 but no

15   subsequent promotions.  And so if there would have been

16   a subsequent promotion, then the numbers would change.

17   Presumably, they would be higher if the promotion

18   included a higher salary.

19            MS. FLECHSIG:  Thank you so much, Dr. Baum.

20   Those are all my questions.

21                       CROSS-EXAMINATION

22   BY MS. KENNEDY:

23   Q        Good afternoon, Dr. Baum.  How are you?

24   A        Good.  How are you doing?

25   Q        Good.
```

1    that he would have been -- remained with Chevron.  But

2    it's my understanding -- in fact, I've counted them.

3    Chevron has 56 different expat locations.  So he could

4    have been in Nigeria with renewals, could have been in a

5    different location.

6    Q        Let me ask you:  Do you see any documentation

7    that any Chevron employee in the history of Chevron was

8    ever an expat for over 30 years in a row?

9    A        Again, I'm not claiming that in my analysis,

10   30 years.  In my analysis, the analysis just goes from

11   2019 to 2035 so it's at a 15-year period not 35-year

12   period or 30-year period.  But it is my -- I -- it is my

13   understanding that the individual who is in the Nigeria

14   position at the moment has been in the position for more

15   than four years.  That would presumably include a

16   renewal.

17           So in my calculations, Mr. Snookal could have

18   gone to Nigeria, and his contract could have been

19   renewed.  He could have gone to a different expat

20   location.  Again, I've counted them.  There's 56 around

21   the world.  They presumably have more than one employee

22   at each location, so if this is something that

23   Mr. Snookal wanted to do -- it sounds like there are a

24   lot of opportunities, not just one opportunity.

25   Q        And to your knowledge, in particular case, do

1          **C E R T I F I C A T E**

2

3

4

5      MARK SNOOKAL                          :

6              vs.                           :   No. CV 23-06302-HDV

7      CHEVRON USA, INC.                     :

8

9

10   I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22   _____/S/_____        _08/21/2025_

23   MARIA R. BUSTILLOS                  DATE
     OFFICIAL REPORTER

24

25

**EXH B/86**