# EXHIBIT "C"

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                  - - -

5     HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7     MARK SNOOKAL,                    )
                                       )
8          Plaintiff,                  )
                                       )
9                                      )
                                       )
10         vs.                         ) No. CV 23-06302-HDV
                                       )
11                                     )
                                       )
12    CHEVRON USA, INC.,               )
                                       )
13         Defendants.                 )
      _____)

14

15

       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
16
                    TRIAL DAY THREE
17
                 LOS ANGELES, CALIFORNIA
18
              THURSDAY, AUGUST 21, 2025
19    _____

20                  MARIA R. BUSTILLOS
                 OFFICIAL COURT REPORTER
21                   C.S.R. 12254
                UNITED STATES COURTHOUSE
22               350 WEST 1ST STREET
                     SUITE 4455
23          LOS ANGELES, CALIFORNIA 90012
                   (213) 894-2739
24               MADAMREPORTER.COM

25

**EXH C/1**

```
 1              A P P E A R A N C E S

 2

 3

 4     ON BEHALF OF THE PLAINTIFFS,
       Mark Snookal:                   ALLRED MAROKO and GOLDBERG
 5                                      BY:  DOLORES Y. LEAL, ESQ.
                                        6300 WILSHIRE BOULEVARD
 6                                      SUITE 1500
                                        LOS ANGELES, CA 90048
 7                                      (323)653-6530

 8
                                        ALLRED MAROKO and GOLDBERG
 9                                      BY:  OLIVIA J. FLECHSIG,
                                        ESQ.
10                                      6300 WILSHIRE BOULEVARD
                                        SUITE 1500
11                                      LOS ANGELES, CA 90048
                                        (323)653-6530
12

13

14     ON BEHALF OF THE DEFENDANTS,
       CHEVRON USA, INC.:              SHEPPERD, MULLIN, RICHTER,
15                                      and HAMPTON, LLP
                                        BY:  ROBERT E. MUSSIG, JR.,
16                                      ESQ.
                                        350 SOUTH GRAND AVENUE
17                                      FORTIETH FLOOR
                                        LOS ANGELES, CA 90071
18                                      (213)620-1780

19                                      SHEPPERD, MULLIN, RICHTER,
                                        LLP
20                                      BY:  TRACEY A. KENNEDY, ESQ.
                                        350 SOUTH GRAND AVENUE
21                                      FORTIETH FLOOR
                                        LOS ANGELES, CA 90071
22                                      (213)620-1780

23

24

25
```

UNITED STATES DISTRICT COURT

**EXH C/2**

3

1                        **I N D E X**

2

3

4    PLAINTIFF'S WITNESSES:    DIRECT    CROSS    REDIRECT    RECROSS

5

6    **DR. ADEYEYE, VICTOR**      --        --        --        --

7    BY OLIVIA FLECHSIG          36        --        79        --

8    BY TRACEY KENNEDY           --        62        --        --

9    **SNOOKEL, MARK**            --        --        --        --

10   BY DOLORES LEAL            83        --        --        --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        - - -

**EXH C/3**

1                    E X H I B I T S (STIPULATED)

2

3       PLAINTIFF'S                          RECEIVED        MARKED

4

5       35                                      39            --

6       43                                      39            --

7       47                                      51            --

8       16                                     118            --

9       5                                      122            --

10      132                                    125            --

11      20                                     127            --

12      24                                     130            --

13      29                                     132            --

14      31                                     138            --

15      33                                     138            --

16      54                                     140            --

17      65                                     145            --

18      68                                     147            --

19

20

21

22

23

24

25



1          <u>E X H I B I T S</u> (STIPULATED)

2

3                    (None)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    listening to you, please make sure to wait until the
 2    question is finished before -- and then pause because
 3    otherwise it will be very hard to hear if there's even a
 4    little bit of overlap.  So please make sure to have the
 5    question end and then pause -- there may be an objection
 6    in the courtroom -- so that there is no overlap of
 7    people speaking at the same time.  All right.  Very
 8    good.
 9            Go ahead, Counsel.
10            MS. FLECHSIG:  Thank you, Your Honor.
11                    DIRECT EXAMINATION
12    BY MS. FLECHSIG:
13    Q       Thank you for your time being here,
14    Dr. Adeyeye.  I know we met back when we took your
15    depositions in this case; do you remember?
16    A       Yes.
17    Q       Okay.  And some time has passed, so I wanted to
18    check.  Are you still a contractor for Chevron Nigeria
19    Limited?
20    A       Yes.
21    Q       Okay.  And you have been providing contract
22    work for Chevron Nigeria Limited since 2017; is that all
23    true?
24    A       Yes.
25    Q       Okay.  And back in 2019, you were a contract
```

**EXH C/6**

1    let me back up.

2            You finished your training as a cardiologist in

3    2015; is that accurate?

4    A       Yes.

5    Q       So in 2019, you had been, you know, a fully

6    fledged cardiologist, if you will, for about four years?

7    A       Yes.

8    Q       Okay.  And you first learned who Mr. Snookal

9    was, the plaintiff in this case, back in 2019; that's

10   all true?

11   A       Yes.

12   Q       Okay.  And you found out who he was because one

13   of the occupational health physicians requested that you

14   provide an opinion on his -- on his heart health?

15   A       Yes.

16   Q       Okay.  And that was Dr. Asekomeh, the

17   occupational health physician who made this request to

18   you; true?

19   A       True.

20   Q       Okay.  And you never spoke to Dr. Asekomeh

21   about Mr. Snookal in person; true?

22   A       True.

23   Q       But you did formulate your opinion and then

24   follow up about it over e-mail; is that fair?

25   A       Yes.

**EXH C/7**

```
1    Q        Perfect.

2             Okay.  And then just below that, he asked you

3    to review the three following points.  This is what he

4    is asking you to provide in terms of an opinion; true?

5             MS. FLECHSIG:  Sorry.  If you can, go back out

6    so he can see the --

7    BY MS. FLECHSIG:

8    Q        So he says, "Kindly review around the following

9    key points: potential complications in the likelihood of

10   progression, management of these complications even if

11   only initial intervention vis-à-vis available care level

12   in Escravos, and then three possible instructions to

13   communicate to employee as per preventing

14   complications."

15            This is the e-mail thread we were -- you were

16   referring to, where Dr. Asekomeh first told you about

17   Mr. Snookal and asked you to provide an opinion; right?

18   A        Yes.

19   Q        Okay.  And isn't it true that the only

20   documents that Dr. Asekomeh provided you along with this

21   e-mail were three of Mr. Snookal's heart scans?

22   A        Only document provided by Dr. Asekomeh was used

23   to make my opinion on required areas.  They required

24   three items.

25   Q        Okay.  So let me clarify that a little bit.
```

```
 1              So I think that was a yes.  But basically,
 2   Dr. Asekomeh provided you with three scans of
 3   Mr. Snookal's heart; right?
 4   A        Yes.  Of Mr. Snookal's heart, yes.
 5   Q        And he did not provide you with any other
 6   documents when he asked you to --
 7   A        No, he did not provide.
 8   Q        I'm sorry -- when he asked you to provide an
 9   opinion; is that true?
10   A        True.
11   Q        Okay.  And all of the scans that Dr. Asekomeh
12   provided you, those were all from one point in time in
13   2019; right?
14   A        Again?
15   Q        "It is"?
16   A        Again.  Again repeat.
17   Q        Oh, I'm sorry.
18            All of this -- all of the three scans that
19   Dr. Asekomeh sent you with this e-mail were scans from
20   2019; true?
21   A        True.
22   Q        Okay.  So you were not able to tell that
23   Mr. Snookal's dilated aortic root had been stable in
24   size for years; true?
25   A        True.
```

**EXH C/9**

```
 1   your testimony, that it doesn't decrease your risk to
 2   zero, then I agree with you.
 3          Would you agree that you did not have the
 4   opportunity to speak with Mr. Snookal's treating
 5   cardiologist prior to making an opinion?  Is that fair
 6   to say?
 7   A      I did not speak with Mr. Snookal's
 8   cardiologist.  That is not in the job description.
 9   Q      Okay.  So you said you did not need to.
10          Did you speak with Mr. Snookal's cardiologist
11   before making an opinion?
12   A      I did not need to speak to Mr. Snookal's
13   cardiologist before making any opinion because I have
14   enough evidence to make an informed and valid opinion.
15   Q      Okay.  Let's get to that.
16          I'm asking you, yes or no, did you speak with
17   Dr. Khan, Mr. Snookal's treating cardiologist, at any
18   time?
19   A      No.
20   Q      Okay.  So I want to move to Exhibit 13, page 6.
21          MS. STEPHANIE:  Exhibit 13, you said?
22          MS. FLECHSIG:  Yes, Exhibit 13, page six,
23   please.  Okay.  Okay.  Go -- okay.
24   BY MS. FLECHSIG:
25   Q      So during your deposition, Dr. Adeyeye, you'll
```

**EXH C/10**

```
 1   recall I showed you some documents; right?

 2   A        Yes.

 3   Q        And this document was Exhibit C to your

 4   deposition; true?

 5            MS. FLECHSIG:  And you can -- if you could,

 6   kindly scroll forward so he can see the other pages.

 7            THE WITNESS:  Yes, I see the reports.

 8   BY MS. FLECHSIG:

 9   Q        Okay.  So you remember this.

10            You -- you said that this is a cardiology

11   report for Mr. Snookal's treating cardiologist; right?

12   A        This is the report.

13   Q        So yes, it is the report?

14   A        Yes, it is the report.

15   Q        Okay.  And you never saw this prior to

16   formulating an opinion about Mr. Snookal; right?

17   A        Not at all.

18            MS. FLECHSIG:  Okay.  If you could, please go

19   to Exhibit 13, page 7, I think.  I don't know what to

20   tell you.  It's CUSA 823.

21            For some reason, your exhibits are different

22   than ours.

23            THE COURT:  823?

24            MS. FLECHSIG:  823.

25            THE COURT:  So, Counsel, you're going to need
```

**EXH C/11**

1          MS. FLECHSIG:  And you don't have the document

2    available?

3          MR. MUSSIG:  We don't have the produced

4    document, no.  It only goes up to 22.

5          MS. FLECHSIG:  This is a document you've

6    produced in this litigation.  Maybe Ms. Steven can plug

7    in?  But I don't know how that will interact with

8    Dr. Adeyeye.

9    BY MS. FLECHSIG:

10   Q          Let's continue while we figure this out.

11         Dr. Adeyeye, is it fair to say that you

12   testified at your deposition that you only needed the

13   three scans from 2019 to provide your opinion; is that

14   fair to say?

15   A          True.

16   Q          So you did not need any background medical

17   information on Mr. Snookal in order to formulate your

18   opinion?

19   A          Yes.

20   Q          So you just need the scans?  You don't need

21   information about whether he smokes or not?

22   A          Yes.

23   Q          You don't need information about any

24   medications he's on?

25   A          Yes.

UNITED STATES DISTRICT COURT

**EXH C/12**

```
1   Q         "Yes," you don't need that information?

2   A         I don't need those information for smoking,

3   drug, to form an informed opinion on the case.

4   Q         Okay.  You don't need any information about

5   whether Mr. Snookal exercises or does not exercise?

6   A         I do not need that to make an opinion.

7   Q         Okay.  And you don't need any information about

8   whether Mr. Snookal even had symptoms or didn't have

9   symptoms; isn't that true?

10  A         I do not.

11  Q         Okay.  So at the time you made an opinion on

12  Mr. Snookal, you did not know whether he even had

13  symptoms or did not have symptoms; is that fair to say?

14  A         True.

15  Q         Okay.  And symptoms associated with a

16  complication from a dilated aortic group are things like

17  nausea, vomiting, systemic shock, fainting, things like

18  that; right?

19  A         Correct.

20  Q         It's fair to say that those are pretty -- I

21  don't know -- obvious symptoms; is that -- just is that

22  true to say?

23  A         Those are symptoms of individual with aortic

24  aneurysm.

25  Q         Right.  And you did not know whether
```

UNITED STATES DISTRICT COURT

**EXH C/13**

1    Mr. Snookal was having any of those symptoms; true?

2    A        The opinion requested to not -- or did not

3    require my knowledge of whatever symptom that person or

4    not.

5    Q        Okay.  Your opinion didn't require knowing

6    whether he was actively having symptoms of a

7    complication; right?

8    A        Yes.

9    Q        Interesting.  Okay.

10            And so you responded, then, to Dr. Aiwuyo's

11    e-mail, who had rendered an opinion on Mr. Snookal;

12    true?

13    A        Yes.

14    Q        Okay.  So in other words, Dr. Asekomeh e-mailed

15    you, Dr. Aiwuyo gave an opinion, and you then responded

16    to that e-mail to both of them; fair to say?

17    A        I also gave my own opinion; yes.

18    Q        And gave your own opinion, yeah.

19            When you gave your opinion to Dr. Asekomeh, you

20    didn't express any specific percentage of risk with

21    respect to Mr. Snookal; true?

22    A        True.

23    Q        Okay.  You just agreed with Dr. Aiwuyo's

24    opinion that Mr. Snookal was, quote, "low risk"?

25    A        True.

**EXH C/14**

```
 1   Q        And none of you said anything beyond your --
 2   excuse me.  As far as the risks of complication, you
 3   weren't more specific than saying he was low risk; true?
 4   A        Again, repeat.
 5   Q        In terms of expressing your opinion about
 6   Mr. Snookal's likelihood of a complication in the
 7   future, you weren't more specific than saying he's low
 8   risk; right?
 9   A        Yes, and that where -- if I can comment here,
10   let me inform the Court, medical opinion is based on
11   three major area of medical: the medical history, the
12   medical examination, and the investigation.
13   Q        Mr. Adeyeye, I'm sorry.  I know you want to
14   elaborate.  I'm already running low on time.  And I
15   didn't -- I didn't ask about, you know, your analysis of
16   whose job is whose.  But actually, I will get into that.
17            Now that we have Exhibit 47-8, this is the
18   medical summary I was referring to.  Dr. Adeyeye, isn't
19   it true that this was Exhibit B to your deposition?
20   A        This is medical summary by Dr. Asekomeh.  I
21   wasn't privy to this medical summary.
22   Q        You weren't privy to this medical summary when
23   you made your opinion on Mr. Snookal; true?
24   A        True, I wasn't privy to it.
25   Q        And that's why you didn't know that his
```

**EXH C/15**

```
 1    cardiologist had said he was asymptomatic, that no

 2    special treatments were needed; true?

 3    A        True.

 4    Q        Okay.

 5             MS. FLECHSIG:  Okay.  Exhibit 47 has also been

 6    stipulated to.  If we could, please admit that at this

 7    time.

 8             THE COURT:  All right.  Go ahead.

 9    (Whereupon, Plaintiff's Exhibit 47 is admitted hereto.)

10             MS. FLECHSIG:  Thank you, Your Honor.

11    BY MS. FLECHSIG:

12    Q        So you started to say that all you needed was

13    the scans because Mr. Snookal -- excuse me, strike that.

14             You started to say that all you needed was the

15    scans; is that fair to say?

16    A        All I needed was scans; true.

17    Q        And that's because you were just looking at the

18    size of Mr. Snookal's dilated aortic root on the scans;

19    right?

20    A        That was part of the things I look out for, is

21    the size of the aneurysm.

22    Q        Okay.  And you were applying a guideline that

23    Dr. Aiwuyo sent to the size of Mr. Snookal's dilated

24    aortic root; right?

25    A        Yes, and further details.
```

**EXH C/16**

```
 1   Q        And other than that guideline that Dr. Aiwuyo
 2   sent, you didn't find any other studies saying what
 3   Mr. Snookal's likelihood of an adverse outcome was; is
 4   that fair to say?
 5   A        There are other complications on that.
 6   Q        Right.  There are other complications.
 7            So I was asking, Dr. Adeyeye, you didn't find
 8   any other guidelines, other than what Dr. Aiwuyo sent,
 9   that applied to Mr. Snookal's condition; true?
10   A        Not true.  (Indiscernible) would Dr. Aiwuyo's
11   guideline.  There other guidelines that give an informed
12   opinion, not just (indiscernible).
13   Q        Okay.
14   A        Not just Dr. (inaudible).
15   Q        Okay.  Let's go to Exhibit 43 again.  If we
16   could, please go to Exhibit 43, page 1.  This one is
17   simple, I promise, and then we can look at it together.
18            Okay.  So, Dr. Adeyeye, at the bottom of this
19   first page, you'll see where you responded to Dr. Aiwuyo
20   and Dr. Asekomeh; right?  Do you see that at the bottom?
21   I know it's just the top of the e-mail.  We probably
22   have to go to the nest page to see the content.
23            Okay.  And you said, "I agree with Dr. Aiwuyo's
24   submission on above employee, especially the
25   precautionary measures highlighted, which we can further
```

**EXH C/17**

```
 1    reiterate to our client."

 2              Other than this -- other than this e-mail,

 3    which is up on the screen, you didn't send any other

 4    information about Mr. Snookal; true?

 5    A         True.

 6    Q         Okay.  And again, you didn't have any other

 7    conversation with Dr. Asekomeh about Mr. Snookal; right?

 8    So this was the only thing you contributed in terms of

 9    your opinion; yeah?

10    A         True.

11    Q         Okay.  So you didn't document any citation to

12    studies when you expressed an opinion to Dr. Asekomeh;

13    true?

14    A         True.

15    Q         Okay.  But you did testify, during your

16    deposition, that you looked at the guideline that

17    Dr. Aiwuyo linked in the e-mail below.

18              MS. FLECHSIG:  If you could get out of there so

19    we can see what Dr. Adeyeye was responded to below.

20    BY MS. FLECHSIG:

21    Q         Okay.  So do you see the -- the link in the

22    center where it says "calgary.ca," this link there?

23    Dr. Adeyeye, do you see -- do you see what I'm referring

24    to?

25    A         I can see the link.
```

**EXH C/18**

```
 1    Q        You can see the link, okay.
 2             And did you look at the link before responding
 3    to the e-mail?
 4    A        I looked at the link, and also searched -- did
 5    my own research too.
 6    Q        So you did look at it.  And when you looked at
 7    it, you concluded that at Mr. Snookal's size, which was
 8    4.1 to 4.2 centimeters, he falls into the low risk
 9    category; right?
10    A        Possibly low category, yes.
11    Q        Okay.  And, though, you didn't tell this to
12    Dr. Asekomeh at the time, what you understood from the
13    guidelines was that Mr. Snookal's risk of any type of
14    cardiac complication was between 1 and 2 percent; right?
15    That's what you were thinking?
16    A        I wasn't (inaudible).
17    Q        I'm sorry, could you repeat that?
18    A        I did put -- I did put in low risk, was all I
19    indicated, not 1 to 2 percent.
20    Q        Right.  But you testified at your deposition
21    you're right.  You didn't write it in this e-mail.  I
22    agree with you.
23             What I'm asking is you looked at the
24    guidelines, and the guidelines made you conclude
25    Mr. Snookal's risk of -- of adverse cardiovascular event
```

**EXH C/19**

```
 1              So I want to ask you about what you said about
 2   the two types of adverse cardiovascular events you were
 3   concerned about.  Dissection and rupture, that's --
 4   that's fair to say; right?  Those these were the two
 5   major complications you were concerned with; true?
 6   A        True.
 7   Q        And the percent percentage between 1 to
 8   2 percent, that's including rupture and dissection
 9   combined; right?  So the risk of any serious
10   complication; true?
11   A        True.
12   Q        Okay.  So for all we know, the risk of rupture
13   could be .001 percent; right?  And the remaining would
14   be dissection; right?  We don't know to what extent that
15   risk is of dissection versus rupture; is that fair to
16   say?
17   A        They are two hypotheticals.
18   Q        But the guideline 1 to 2 percent, that's a
19   combined risk of rupture and dissection; right?
20   A        Yes.
21   Q        It's not breaking down dissection versus
22   rupture; correct?  I see you nodding, Dr. Adeyeye.
23   A        Yes.
24   Q        Could you give a verbal answer for the record,
25   I'm sorry?  Is that a "yes"?
```

**EXH C/20**

```
1   A          Again.

2   Q          It didn't break down the risk of rupture versus

3   dissection in that guideline; right?

4   A          Yes, yes.

5   Q          Okay.  One of your duties at Warri hospital was

6   to help manage incoming medical evacuation emergencies

7   from Escravos; is that fair to say?

8   A          True.

9   Q          Okay.  And at your deposition, you shared that

10  you had helped oversee one medical evacuation in that

11  past year; fair to say?

12  A          True.

13  Q          Okay.  And that patient was able to get

14  medically evacuated from Escravos to Warri within about

15  an hour; right?

16  A          True.

17  Q          And at Warri, where you're a cardiologist,

18  you're able to provide non-surgical intervention for

19  patients; fair to say?

20  A          True.

21  Q          Is it also fair to say that you've never

22  treated anyone who has had a dissection?

23  A          True.

24  Q          And it's also fair to say you've never treated

25  anyone who has had a rupture; right?
```

**EXH C/21**

58

```
1    A         True, the only case that I performed was an
2    autopsy.
3    Q         Right.  You did -- you performed an autopsy
4    while you were in medical school on someone who had died
5    from a rupture; right?
6    A         I didn't perform.  I listened to autopsy report
7    of someone who died at the clinical ground.
8    Q         Other than listening to an autopsy report at a
9    clinical grand round though, you've never treated
10   someone with a rupture; right?
11   A         True.
12   Q         Okay.  And nothing about the location of
13   Escravos would increase Mr. Snookal's future risk of
14   having a complication with his heart; right?
15   A         Not true.  I can't answer for what I don't know
16   job description.
17   Q         So I'm not asking about the job description,
18   Dr. Adeyeye.  I'm asking about the location of Escravos.
19   Would anything about the conditions there increase his
20   likelihood of a complication?
21   A         How do I answer that when I don't work in
22   Escravos to evaluate his risk and the position.
23             MS. FLECHSIG:  Your Honor, I'd like to read
24   from Volume II of Dr. Adeyeye's deposition at page 130,
25   line 24, through page 31, line 8.
```

**EXH C/22**

```
1              MS. FLECHSIG:  Yes, Your Honor.

2              THE COURT:  Where it begins, "Okay, is there

3    anything about Escravos."

4              MS. FLECHSIG:  Okay.

5    BY MS. FLECHSIG:

6    Q        Okay.  So just to remind everyone where we were

7    heading before that interlude, Dr. Adeyeye, you just

8    testified that you don't know whether Mr. Snookal would

9    have any -- or excuse me -- you just testified that you

10   don't know whether Escravos would or would not increase

11   Mr. Snookal's risk of a complication there; right.

12   A        Correct.

13   Q        Because you've never -- you've never personally

14   been to Escravos; right?

15   A        True.

16             MS. FLECHSIG:  Okay.  Now I'll begin reading

17   from line -- excuse me -- page 130, line 14.

18             "Question, Okay.  Is there anything about

19   Escravos, the location, the medical facilities that are

20   available or things that are not available there, is

21   there anything about Escravos that would increase the

22   likelihood of a rupture occurring?

23             "Answer, Is there anything in Escravos that

24   would increase the likelihood or that would affect or

25   impact on the emergency response?  Please, which one are
```

UNITED STATES DISTRICT COURT

**EXH C/23**

1    you asking?

2            "Question, Exactly.  I'm asking about the first

3    one.  So is there anything that would increase the

4    likelihood that someone's dilated aortic root ruptures?"

5            "Answer, Anything in Escravos that would

6    increase the risk.  Location does not increase your

7    risk.  If I stayed in California, I stayed in New York,

8    I stayed in Alabama, you're risk is the same.  It is not

9    the environment that increases the risk.  Either you are

10   in Escravos, in Lagos, or in Warri, that singular

11   location does not increase the risk."

12           MS. FLECHSIG:  That's not -- keep going?

13           THE COURT:  No, please continue through 14.

14           MS. FLECHSIG:  Yes, Your Honor.

15           MS. FLECHSIG:  The appropriate question here

16   will have been:  "Are there activities in Escravos?  Are

17   there activities or things that could impact on the

18   survival of an individual who ruptures in any location?

19           "Now, more specifically, in Escravos?  That's a

20   question that's way -- that's all.  It's been so

21   interesting for me to answer.  Please."

22   BY MS. FLECHSIG:

23   Q        Dr. Adeyeye, in that response, you said the

24   location itself doesn't increase your risk of rupture;

25   right?

**EXH C/24**

```
1    A        True.

2    Q        But job duties potentially could increase your

3    risk of a rupture or any other complication; fair to

4    say?

5    A        True.

6    Q        Before giving an opinion on Mr. Snookal, you

7    didn't know what his job duties were; correct?

8    A        True.

9    Q        Dr. Asekomeh never referenced to you what he

10   would or would not be doing in Escravos; fair to say?

11   A        Yes.

12   Q        And you testified that that's Dr. Asekomeh's

13   job to decide whether Mr. Snookal is fit for duty; true?

14   A        True.

15   Q        Okay.  Thank you, Dr. Adeyeye.  Those are all

16   of my questions for now.

17   A        You're welcome.

18            THE COURT:  Don't go away yet, Dr. Adeyeye.

19   Attorney for Chevron is now going to ask you some

20   questions.

21            THE WITNESS:  Okay, sir.

22                      CROSS-EXAMINATION

23   BY MS. KENNEDY:

24   Q        Good afternoon, Dr. Adeyeye.  This is Tracy

25   Kennedy, again, how are you this afternoon?
```

**EXH C/25**

```
 1    Q        Sorry.  Dr. Adeyeye, can you give those five
 2  names again slower for the court reporter?
 3    A        Dr. Pitan --
 4            THE COURT:  Dr. Pitan.
 5            MS. KENNEDY:  Dr. Pitan.
 6            THE WITNESS:  -- Dr. Asekomeh --
 7  BY MS. KENNEDY:
 8    Q        Dr. Asekomeh?
 9    A        Yes.
10            Dr. Aiwuyo.
11    Q        Dr. Aiwuyo.
12    A        Dr. Akintunde.
13    Q        Dr. Akintunde.
14    A        And Dr. Adeyeye.
15    Q        I'm sorry.  Dr. who?
16    A        Myself.
17    Q        Oh, Dr. Adeyeye.  Okay.  Thank you.
18            MS. KENNEDY:  Your Honor, I have no more
19  questions.
20            THE COURT:  Very good.  Any re-cross?
21            MS. FLECHSIG:  Very quickly, Your Honor.
22                   REDIRECT EXAMINATION
23  BY MS. FLECHSIG:
24    Q        Dr. Adeyeye, you just testified that only a
25  cardiothoracic surgeon would be able to fix a rupture or
```

EXH C/26

1    a dissection if that occurred; true?

2    A        True.

3    Q        And you would agree that you would only need

4    the services of a cardiothoracic surgeon if there was a

5    complication; right?

6    A        True.

7    Q        And to your mind, the risk of that ever

8    happening was low; right?

9             MS. KENNEDY:  Objection.  That's beyond the

10   scope.

11            THE COURT:  Overruled.

12   BY MS. FLECHSIG:

13   Q        Dr. Adeyeye, you can answer that one.

14   A        Repeat, please.

15   Q        Yeah.  To your mind, the risk of a complication

16   ever happening and requiring the services of a

17   cardiothoracic surgeon was low; true?

18   A        True, (indiscernible).

19   Q        In fact, it was only 1 to 2 percent, based on

20   the guidelines and Mr. Snookal's scans, in your opinion?

21   A        True, true.

22   Q        Okay.  And because you didn't have any

23   information available to you at the time, other than the

24   three scans you looked at, no one ever told you that

25   Mr. Snookal's cardiologist had already determined

1    Mr. Snookal did not need any special treatments; right?

2            MS. KENNEDY:  Objection.  That's beyond the

3    scope.

4            THE COURT:  Sustained.

5            And you've gone over this, Counsel.

6            MS. FLECHSIG:  Yes, Your Honor.

7    BY MS. FLECHSIG:

8    Q       I want to ask you about your recommendation to

9    give -- excuse me, your recommendation with respect to

10   Mr. Snookal's choice of medications.

11           MS. FLECHSIG:  I just saw Defense counsel

12   display it as Exhibit 39, page 2.  So I'm confident that

13   will get us to the right place.  If you could, please

14   pull that up.

15   BY MS. FLECHSIG:

16   Q       Okay.  So this, again, is the one e-mail where

17   you expressed any opinion about Mr. Snookal, true, at

18   the top here?

19   A       True.

20   Q       Okay.  And you say, "I have a little concern

21   about his choice of anti-hypertensives, losartan and

22   amlodipine."

23           You expressed that opinion without having a

24   medical report on Mr. Snookal; true?

25   A       True.

**EXH C/28**

1    Q        Without knowing whether or not he was even

2    having these extreme symptoms; true?

3    A        True.

4           MS. FLECHSIG:  Thank you.  I have no further

5    questions, Your Honor.

6           Dr. Adeyeye, thank you for your time.

7           THE COURT:  Dr. Adeyeye, your examination is

8    finished.  So thank you for your time.  We appreciate

9    it.  Have a good day, sir.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  All right.  Thank you.

12          All right.  Why don't we take a five-minute

13   stretch break here.  Since we are pressed for time here,

14   we want to make the most out of our testimony today.

15   I'm not going to take a full break.  Why don't we just

16   get up, stretch.  You can check your messages if you

17   need to.  But let's make sure we have our next witness

18   and resume in five minutes.  I'll stay here, as well.

19                  (Recess.)

20          (Whereupon, the following was held in the

21          presence of the jury:)

22          THE COURT:  All right.  Are we ready?

23          MS. LEAL:  Yes, Your Honor.

24          THE COURT:  All right.  So let's continue.

25   Let's go back on the record.  Who does plaintiff call

```
 1    one more, University of North Dakota.
 2    Q         So did you end up getting a college degree?
 3    A         Did not.
 4    Q         Okay.  And do you believe the fact that you
 5    don't have a college degree has hindered your ability
 6    to -- to move up in your various employments?
 7    A         Yes, it has definitely hindered my progression
 8    throughout my entire career.
 9    Q         Okay.  Despite the fact that you don't have a
10    college degree, do you have any certificates or
11    specialized training?
12    A         I do.
13    Q         What is that?
14    A         I have a few.  I have Microsoft administrator,
15    although it's out of date at this point.  I have a SAFe
16    5E agile project owner certificate.  I have a Lean Six
17    Sigma Green Belt, and I have an Instrumentation Society
18    of America instrumentation certificate.
19    Q         And what is a SAFe project owner?
20    A         Agile is a methodology of project management
21    for computer software, I guess is the easiest way to say
22    it.  Project owner is the interface between the end-user
23    and the programming team -- or the data scientists,
24    mostly in my case.  It's kind of a translation role that
25    has to understand both sides; write what the refineries
```

**EXH C/30**

```
 1    wanted to compete with them better, so they studied what

 2    they did, and they came up with this lean methodology.

 3              It's gone by different names over time, but

 4    it's currently called Lean Six Sigma.  So it's basically

 5    a way of doing QA/QC, of identifying issues, finding out

 6    the root cause of those issues and then eliminating

 7    them, is the easiest way to say it.

 8    Q         Okay.  Thank you.

 9              You also said that you had a certificate or

10    specialized training in ISA instrumentation.  What is

11    that, and when did you receive that?

12    A         That, I received in 2004, so before my

13    employment with Chevron.

14    Q         Okay.  And what -- what is that specialization?

15    A         Um.

16    Q         That certificate, I apologize?

17    A         It's okay.  It's a little hard to explain.  Let

18    me -- let me take a second to think about how best to

19    say it.  So you know, like, on your car, how you have

20    gages maybe that tell you how much fuel you have or how

21    hot your radiator is or how hot your oil is, depending

22    on what kind of car you have, that's all measured with

23    instrumentation.  And so some of it is controlled with

24    instrumentation as well.  Like, there might be valves or

25    solenoids that click on and off to regulate and control
```

```
1    all of that.  It's a specialty in maintaining and

2    troubleshooting that kind of equipment.

3    Q        Great.  Thank you.

4             And I think the last one was Microsoft admin,

5    but you said that it's out of date.  So I'm not even

6    going to ask you about that, and I think most people

7    probably know what Microsoft is.

8    A        Yes.

9    Q        So let's talk about your work experience.  I

10   know you worked at a lot of different places.  So just

11   tell us about what job you consider the most memorable.

12   A        That would be my first job, actually.  I had it

13   between -- I started in my sophomore year of high

14   school, worked the summer there.  It was a very small

15   company.  We made analyzer systems, which are

16   specialized -- taking laboratory analyzers and putting

17   them in the field, so maybe at a refinery or a chemical

18   plant or measuring emissions out of stacks; right.  So

19   if you drive by and you see stacks, that's all monitored

20   by the South Coast Air Quality Management District in

21   this area.

22   Q        Can you tell us what you mean by "stacks"?  I

23   didn't know what stacks were when you told me "stacks."

24   A        So a stack is -- we call it a stack, but it's

25   basically what you think of as a smoke stack; right.  So
```

**EXH C/32**

```
1    it's the outlet of some kind of combustion; right.

2    You're either burning trash, like they do out on

3    Long Beach at the trash burning power plant, or you

4    might be burning natural gas.  And you may be burning

5    something like refinery fuel gas.  It might be some kind

6    of an incinerator, which is burning some kind of gas

7    that they're not allowed to release into the

8    environment.

9            For instance, when they sterilize medical

10   equipment, they have to burn the ethylene oxide, I

11   believe it is, because you're not allowed to release

12   that into the environment.  So all of that would come

13   out through the stack, and then we would measure what

14   came out to make sure you were in compliance.

15   Q        So why was that job so memorable?

16   A        Right.  So it wasn't just because it was a

17   summer high school job, but I actually went back to that

18   job, that same company, in 1991, so about two years

19   later-ish.  And then I continued there for another seven

20   years.  And I would say it is not only the way that I

21   got into a highly specialized field, which is what has

22   allowed me to progress as far as I have without a

23   degree, but it also, through the mentorship there,

24   allowed me to move from, you know, basically a delivery

25   driver, which is what I started as, into a project
```

**EXH C/33**

```
 1   manager and a project engineer.
 2           And then I did quite a bit of installation work
 3   of the -- you know, we built shelters somewhere between
 4   8 by 10, and I think the biggest one we ever built was
 5   about 15 by 30.  So installing those in different
 6   locations around the world.
 7   Q       And so did you have to travel around the world,
 8   then, to install these?
 9   A       I did.
10   Q       Where did you travel to?
11   A       The first place I traveled to -- I was -- I was
12   about 20 years old.  I remember because I had to use
13   traveler's checks because they wouldn't give me a credit
14   card.  This was back in the '90s.  And that was Trinidad
15   and Tobago, and I stayed there for about a year.  Then I
16   went to -- these may be a little bit out of order.  It
17   was a while ago.  But the other countries I went to --
18   Q       Doesn't have to be in -- doesn't have to be in
19   order, I'm sorry.
20   A       Yeah, okay.
21   Q       Where in the world were you traveling to?
22   A       Malaysia, Trinidad.  I spent a long time in
23   Qatar.  I did two different locations in Saudi Arabia,
24   all totaling roughly four or five years all added up
25   together.  It was a very long continuous stretch; right.
```

UNITED STATES DISTRICT COURT

**EXH C/34**

```
 1    So for the most part, that is what I did towards the end
 2    of my employment with them.
 3          So I would go for about three months and then
 4    come home for about three weeks, and then go back for
 5    another three months.  I might have some downtime at the
 6    end of one job before the next job is ready.  I didn't
 7    get a lot of downtime between those jobs.
 8    Q       And the countries where you were actually
 9    living for these different stretches that you just
10    described, what countries were those?
11    A       Qatar, Saudi Arabia, Malaysia, Trinidad and
12    Tobago, and Thailand.
13    Q       Okay.  And what were the living conditions
14    in -- let's just say in Qatar?
15    A       Qatar was what they call a green field
16    installation, which is basically brand-new plant, but it
17    was not only a brand-new plant; it was actually a
18    brand-new area of development.  So we were building the
19    first three plants there, so there was no
20    infrastructure, aside from roads, when we first started.
21    So I lived in a compound, which is basically just a
22    fenced area in the desert.  I had an 8-by-10-ish room
23    and a tiny little bathroom.
24    Q       And what about the living conditions in Saudi
25    Arabia?  Were they any different, or were they about the
```

**EXH C/35**

1   same?

2   A         They were a little bit varied.  So on one

3   assignment, I was in a Holiday Inn, but not like a

4   Holiday Inn in America.  And then the other one, I was

5   in a compound living in -- with the Saudis.  And that

6   particular one, they gave me a stipend for food, and

7   they gave me a car.  So I actually drove around and, you

8   know, shopped for groceries and that kind of thing.

9   Q         Okay.  All right.  So why don't we move on now

10  to your employment with Chevron.

11  A         Okay.

12  Q         When were you hired at Chevron?

13  A         2009.

14  Q         And why did you apply at Chevron?

15  A         Um, I was doing a lot of contracting work in

16  2007 and 2008 and ended up with a lot of travel, and my

17  son was very young.  He has some special needs, so it

18  was difficult both to be away and to put a burden on my

19  wife.  And so I was looking for a stable job that I

20  wouldn't have to travel much at that time.

21          And, you know, I had worked with -- like I

22  said, I was in a specialized industry, so I had worked

23  with a lot of different people across various oil

24  companies, power plants.  We have annual conferences

25  that I would attend, so I would meet all the different

**EXH C/36**

```
 1    people from different companies and different places.

 2    And, you know, companies get reputations.

 3            So Chevron seemed to match with both my

 4    philosophy and the kind of work that they did.  So that

 5    was not the only company that I looked for and applied

 6    to, but when an opportunity came up at Chevron that

 7    was -- I should say degree no longer required, I jumped

 8    on that.

 9    Q       You just said that Chevron's philosophy aligned

10    with your philosophy.  What was that philosophy that you

11    were referring to?

12    A       So Chevron has -- they were quite

13    forward-thinking; right?  They had a lot of inclusion

14    initiatives before that became really a thing.  They

15    recognized things, like benefits for partners sometime

16    in the early 2000s; right?  So that was encouraging.

17    It's not very typical in the oil industry at that time.

18    The other thing is the management philosophy, which was

19    by collaboration.  It was really more about what you

20    knew and what you could do than -- than your

21    background -- or at least so it seemed.

22    Q       And you just mentioned that another reason you

23    joined Chevron at the time was because you wanted to

24    travel less and you had a special needs child.  Is Ben a

25    special needs child?
```

**EXH C/37**

1    A          He is.

2    Q          You can tell us about that.

3    A          Um, it's sometimes referred to as
4    twice-exceptional, which I don't really like the
5    language much, but that is what it's called.  It means
6    high IQ but also fairly severe learning disabilities and
7    some mental health issues.  He's been in therapy, I
8    think, since he's, like, four, maybe.  And so we had to
9    pull him out of school also when he was in second grade,
10   even though that was a nonspecialized private school, it
11   was still kind of overwhelming for him.  And so he'd
12   been home-schooled until about 2019.

13   Q          When you started working at Chevron in 2009, do
14   you know if you had a disability?

15   A          I wasn't aware of any disability that I had.

16   Q          At some point, you learned that you have a
17   disability?

18   A          That is correct.

19   Q          And when did that occur?

20   A          That was 2014.

21   Q          And who diagnosed you?

22   A          Dr. Khan, ultimately.

23   Q          Was Dr. Khan your cardiologist at the time?

24   A          Yes, sorry.  My cardiologist, Dr. Khan.

25   Q          That's fine.  Don't worry.

**EXH C/38**

1          So when -- he diagnosed you with dilated aortic

2     root; correct?

3     A          Correct.

4     Q          When he diagnosed you with that, what was your

5     reaction?  I mean, this is a new -- a new -- new news,

6     if you will?

7     A          Yeah, I mean, I can't say that I was crazy

8     about it.  But he and I talked for quite some time.

9     When he -- you know, when I first got the diagnosis, and

10    he gave me a lot of information.  I ended up -- well,

11    just right at the time, he explained to me that it

12    wasn't really something to panic about.

13         They do what's called watchful waiting until it

14    gets to a size that they feel that it needs to be

15    operated on.  He told me that could be, you know, ten

16    years from now or never and to just, you know, do what

17    you're supposed to: follow the directions, take the

18    medicine that you're supposed to, get your annual

19    monitoring, and -- you know, we'll just take it a day --

20    well, not a day at a time, but kind of a year at a time,

21    which is the only time that I saw him.

22    Q          Okay.  And did you talk to Dr. Khan about your

23    job?

24    A          I did.  He did ask me what I was doing for

25    employment.  I told him that I was --

**EXH C/39**

```
 1              MS. KENNEDY:  Objection; hearsay.

 2              THE COURT:  Sustained.

 3    BY MS. LEAL:

 4    Q         Did Dr. Khan have an understanding of you did

 5    for employment, for work?

 6    A         He did.  I believe he alluded to it earlier in

 7    his testimony where I climbed ladders and that I was in

 8    the field of fair part of the time and that I also did

 9    office work as an engineer.

10    Q         Okay.

11              MS. LEAL:  Your Honor, I'd like to display some

12    documents and photos that are not marked as exhibits.

13    May I show them to the Court?

14              THE COURT:  Okay.  As demonstratives?

15              MS. LEAL:  Yes, demonstratives.

16              MS. KENNEDY:  Your Honor, may I see them as

17    well?

18              THE COURT:  Of course.

19              MS. LEAL:  Yes, of course.  Let me get the copy

20    out.

21              May I approach?

22              THE COURT:  Yes, please.

23              Let's just have a sidebar so we can look at

24    them together.

25                        (Sidebar.)
```

**EXH C/40**

```
 1    seen these before.
 2            THE COURT:  I'm going to let you ask him about
 3    it but only as demonstrative.  I'm not going to let them
 4    in as evidence.
 5            MS. LEAL:  That's fine, Your Honor.
 6            And again, the reason those were brought up, we
 7    looked for them last night, is because they started
 8    asking Mr. Malpica questions about how many stairs, how
 9    many flights.
10            THE COURT:  Yeah, okay.
11            MS. LEAL:  Thank you.
12                   (Sidebar concluded.)
13    BY MS. LEAL:
14    Q        We're going to show you a picture, Mr. Snookal.
15    It's going to be on the screens in a moment.
16            Can you tell us what this is?
17    A        So this is a stack or a smoke stack on the
18    delayed coking unit at the El Segundo refinery.
19    Q        Did you take this picture?
20    A        I did, as part of my engineering duties for
21    them.  We were doing a project on this particular stack.
22    And that top platform there at the way tippy-top is
23    where the analytical equipment for continuous emissions
24    monitoring or the environmental analyzers that I was
25    talking about before -- that's where that sits.  The
```

**EXH C/41**

1    stack is approximately 180 to 200 feet tall to that

2    platform.

3            And as you can see, it has what we would call

4    caged ladders that are offset for safety, so that if you

5    slip and fall, you only fall, in this case, about

6    30 feet.  The cage is also quite open to try to catch

7    you on your way down so that you don't fall all way.

8    I regularly climbed these for the majority of my time at

9    Chevron, both pre and post disability.  When I was doing

10   the projects for these, there's 26 of these stacks in

11   the refinery, and I regularly climbed all of them to

12   either take measurements or assist with maintaining that

13   equipment that's all the way up at the top.

14   Q        You said they were about 180 to 200 feet.  Can

15   you tell us how many stories, like in a building?

16   A        So yeah, typically a story -- not in this

17   building, obviously.  But generally, when you refer to a

18   story, you're either talking 10 or 12 feet, so that's

19   approximately, what, 18 -- you know, maybe as little as

20   15 -- 15 to 20 stories tall, give or take.

21   Q        And you just testified that you regularly

22   climbed.  What is it that you were climbing?  Can you --

23   can you describe?

24   A        Those ladders.  So if you -- if you see how

25   they're kind of staggered moving up, there's -- kind of

**EXH C/42**

```
 1    look like cages.  If you really look at it, you can see
 2    rungs in there.  And then there's, like, individual
 3    platforms, so you can take a rest, if you want, but also
 4    to catch you if you fall, like I said.
 5              In older refineries, they're actually straight
 6    ladders.  They would go all the way up, which is not
 7    great because then you don't really have anywhere to
 8    rest, but you still got to climb it.  So...
 9    Q        Now, when you were talking with Dr. Khan, did
10    you describe your work duties to Dr. Khan after he
11    diagnosed you with the dilated aortic root?
12    A        I did.  And this is what I told him that I did.
13    Q        Okay.  And did he express any concerns to you
14    about the fact that you would be going up and down
15    these -- these stories or these feet?
16    A        No, he just told me, you know, be careful,
17    basically.  I think that was just a general comment.
18    Q        Okay.  We have another picture to show you,
19    second one with the orange.
20              What is this picture, Mr. Snookal?
21    A        So this is a similar stack.  I took this
22    picture.  This is actually a picture of the work that we
23    were doing on the stacks.  We were putting in a new
24    tubing bundle, which is what takes some of the gases
25    from the top down to the bottom where they can be
```

UNITED STATES DISTRICT COURT

**EXH C/43**

```
 1    analyzed.  So it's -- some get analyzed at the top; some

 2    get analyzed at the bottom.

 3            That's that bundle next to the orange basket

 4    that the two people are in.  They'll string that down

 5    the side of the stack.  This picture was taken from a

 6    stack right next to it that's just as tall.  They happen

 7    to have two heaters right next to each other, so it gave

 8    me a nice vantage point for taking some demonstrative

 9    photos to include in my construction packages in the --

10    excuse me -- in the future.

11    Q        Thank you.

12            And one more picture -- well, before we get to

13    the other picture, in this one, did you -- you said you

14    were high enough, obviously, in order to be able to take

15    a picture of the two men in that orange.  What is that

16    orange thing called?

17    A        It's called a man lift.  Sometimes -- a lot of

18    time people call it by the manufacturer, like a JLG or a

19    Skylift, you know.  So people -- people use a lot of

20    different names for it, but it's official name is a man

21    lift.

22    Q        Okay.  So you were high enough to be able to

23    see the man lift across.  How did you get to that level

24    to be able to take that picture?

25    A        It's just like the stack in the picture, the
```

**EXH C/44**

```
 1    one that I climbed up.  It has also a series of ladders
 2    just like the other picture.  Here, you can see the
 3    platforms a little bit better and maybe the cages on the
 4    ladders a little bit more clearly because it's a side
 5    shot.
 6    Q       And do you remember when, approximately, you
 7    took that picture?
 8    A       This one should be around 2016.
 9    Q       Okay.  And one more picture.  Did you take this
10    picture as well?
11    A       I did.  This was for a non-personnel-involved
12    incident where we dropped some equipment off of the top
13    of it on accident.  And so this was a photo taken for
14    the investigation and safety write-up, basically.
15            You can see a person standing there.  He was
16    actually showing me where it happened.  I wasn't in
17    attendance when it happened.  And so that's why the
18    picture is a little weird, you know, shot at the ground,
19    because that's what happened.  It dropped from where I'm
20    standing.  Was actually one of those tubing bundles, so
21    it coiled up about 300 feet of tubing on the ground
22    there.
23    Q       And how high were you when you took this
24    picture?
25    A       This one, I think, was one of the taller ones.
```

UNITED STATES DISTRICT COURT

**EXH C/45**

1    It's around 200 feet.  It might even be a little but

2    taller than that.

3    Q        So 200 feet would be around 20 stories, then?

4    A        Correct.

5    Q        Okay.

6    A        This was actually one of the ones we had to

7    climb more often.  It is on a very difficult process.

8    This particular unit in the -- in the picture takes H2S,

9    which is like rotten eggs -- like the rotten egg gas, I

10   think is what most people call it or are familiar with

11   it as.  It takes almost pure H2S and turns it into pure

12   sulfur that we then sell or incinerate.

13   Q        Okay.  And what year was it that you took this

14   picture?

15   A        This was also around 2016, I think, later in

16   the year.

17   Q        Okay.  All right.  Now, when you were first

18   hired at Chevron, what was your first job?

19   A        My first job was analyzer engineer, which was

20   basically someone on the other side of the same business

21   that my first job was on; right?  So we would sell to

22   analyzer engineers and to facilities.  Now I am buying

23   analyzer systems from vendors as well as, because of my

24   background specifically, assisting our maintenance

25   department maintain those analyzers.  So that was a

**EXH C/46**

```
 1    little bit outside of what the other engineers did,

 2    necessarily.

 3    Q        And how long were you an analyzer engineer?

 4    A        For two years.

 5    Q        And at the time, what was your pay scale grade?

 6    A        I was a 21.

 7    Q        And what was your next position with Chevron?

 8    A        I was selected due to my technical --

 9    demonstrated technical ability, like I said, helping out

10    in the field, helping the maintenance department.  Upper

11    management was having some issues with the current

12    supervisor -- long-time supervisor of that department --

13              MS. KENNEDY:  Objection --

14              THE COURT:  Wait, wait.  I'm sorry?

15              MS. KENNEDY:  Objection; nonresponsive.

16              THE COURT:  Sustained.

17              Sir, the question was just:  "What was your

18    next position with Chevron?"

19              THE WITNESS:  Sorry.  Analyzer maintenance

20    supervisor.

21    BY MS. LEAL:

22    Q        And what is an analyzer maintenance supervisor,

23    in layperson's terms?

24    A        Someone that supervises the technicians that

25    take care of all of those analyzers, like, so those
```

**EXH C/47**

```
1    stacks, the other lab equipment.  We had about 360

2    pieces of equipment that had routine maintenance to be

3    done on them.  And so I supervised the people that did

4    those -- that routine maintenance.  I also acted as a

5    mentor and a technical expert in that capacity.

6    Q        And approximately how many persons did you

7    supervise at that time?

8    A        It fluctuated a little bit, but it was usually

9    around 18.

10   Q        And how long were you in this analyzer

11   maintenance supervisor position?

12   A        Just about two years.

13   Q        And what was your next job at Chevron?

14   A        I was the analyzer reliability champion.

15   Q        So are we talking now about around 2013?

16   A        Yes, that sounds right.

17   Q        Okay.  So you're an analyzer -- what was your

18   title again?  I'm sorry?

19   A        Analyzer reliability champion.

20   Q        Right.

21            And what is an analyzer reliability champion?

22   A        The maintenance of the analyzers have something

23   called a PM schedule, so like on your car, right,

24   preventive maintenance.  Our particular refinery didn't

25   have a lot of those PMs written.  A lot of it was just
```

**EXH C/48**

```
 1    done by memory.  The technicians would try to keep track
 2    of it and just kind of remember when they were supposed
 3    to do those PMs.
 4           So the analyzer reliability champion was a
 5    special project to document, develop, and implement a
 6    routine maintenance, preventive maintenance -- or a
 7    routine maintenance and preventative maintenance plan to
 8    increase the reliability of that equipment; right?  So
 9    it used to break down a lot, and it stopped by the end
10    of the, you know, special project.  We dramatically
11    increased the reliability.
12    Q       So how long were you in this position, the
13    reliability --
14    A       It think it was about three years.
15    Q       -- analyzer champion?
16           So now, we're talking about, what, 2016?
17    A       Yes.
18    Q       Okay.  So what was your next job in 2016?
19           THE COURT:  Could you, please, Counsel, just be
20    mindful of your total time?
21           MS. LEAL:  Yes, Your Honor.
22           THE WITNESS:  It was instrument electrical
23    analyzer reliability team lead, was also called IEAR
24    team lead because it was too long to say.
25    BY MS. LEAL:
```

**EXH C/49**

```
 1    Q        Okay.  And how long were you in the IEAR
 2    position?
 3    A        I was in that position until November of 2019,
 4    and then I was in that position again from 2021 --
 5    really November 2020 to the time that I ceased working
 6    for Chevron.
 7    Q        Okay.  And this IEAR, it is a team lead.
 8             Did you supervise employees, as well, because
 9    you were a team lead?
10    A        Yes, I did.  This was a team of -- a mixed team
11    of reliability analysts, engineers, and various
12    specialists in the fields that, you know, my group
13    covered.
14    Q        And who were your supervisors during the time
15    that you were an IEAR team lead?
16    A        Kit Deaver (phonetic) for the vast majority
17    and then Austin Ruppert for several months until I
18    wasn't an IEAR lead, and then he actually departed the
19    company.  So I technically had another supervisor at the
20    very end, Greg Curtin.
21    Q        Okay.  So you've identified four different
22    positions that you held with Chevron, and I heard the
23    word analyzer with each job title.
24             What does it mean to be an analyzer?  Is that a
25    specialized field?
```

**EXH C/50**

1    A        It is a very specialized field.  There are not

2    very many people that -- that have that specialty with

3    or without degrees, which is why Chevron had to

4    ultimately open it up in 2009 to non-degreed people.  I

5    think they'd been looking for almost two years to fill

6    that role.

7            During my time there, after -- you know,

8    starting fairly early on, they recognized that I had a

9    broad background having worked both as a technician, as

10   an engineer, and a field installation specialist.  So

11   they made me an SME, which is a subject matter expert.

12   Over my time there, in addition to my regular job

13   duties, I presented at the internal company conferences

14   and symposia.  I was often the keynote speaker in that.

15   I did research and development on analyzer technologies

16   in cooperation with vendors.  I testified ahead -- in

17   front of the South Coast Air Quality Management District

18   on three occasions as the company's technical

19   representative.  I -- I mean, I did a lot, but...

20   Q       You were clearly a specialist in analyzers,

21   whatever "analyzers" mean?

22   A       Yes.  They also used me for client screening.

23   They flew me to other facilities sometimes to do trouble

24   shooting.  So like a lot of different things; right?

25   Yeah.

**EXH C/51**

```
 1   Q          Okay.  Now, during your entire employment with
 2   Chevron, had you ever asked for any form of
 3   accommodation because of your dilated aortic root?
 4   A          I had not.
 5   Q          What about your employment since Chevron?  Have
 6   you asked those employers for any type of accomodation
 7   because of your dilated aortic root?
 8   A          I have not.
 9   Q          And during the time that you were employed with
10   Chevron, I assume you received performance evaluations?
11   A          I did.
12   Q          And typically, how often did you get them?
13   A          We were supposed to get them every six months.
14   They did okay at that.  But I definitely got one every
15   year, for sure.
16   Q          And typically, how were your performance
17   evaluations rated?
18   A          They had a numerical system.  So I was a 2 or a
19   2-plus, which is high to mid.
20   Q          Were you ever placed on any sort of performance
21   improvement plan?
22   A          No.
23   Q          So by this time, your last position, IEAR team
24   lead, you'd been with Chevron now for ten years, I
25   think.
```

```
 1              How did you feel about working for Chevron?
 2    A         Um, I would say that from when I started there,
 3    I was pretty happy, and I, you know, felt like I made a
 4    good choice, like I'd gotten what I was looking for.
 5    Ten years in, I was very happy.  I had progressed.  Even
 6    though it is a very engineer-centric company, I'd still
 7    managed to progress, not only in my expertise but in my
 8    recognition across all of Downstream, which is a section
 9    of Chevron.  And, you know, it kind of felt like my
10    first job again, right, where I would like to stay there
11    forever.  I didn't have any intention of leaving Chevron
12    despite my three-hour commute every day.  Yeah, it -- it
13    was great.
14    Q         Okay.  And at some point, you learned about the
15    reliability engineering manager position located in
16    Escravos; correct?
17    A         Correct.
18    Q         And how did you learn about that vacancy?
19    A         Um, as part of my regular duty -- you know, not
20    duties.  But one of the things that I did regularly was
21    look at the internal job board for my, you know, next
22    career progression but also for my direct reports,
23    several of who I helped get jobs outside of El Segundo
24    in different locations that were promotions.
25              And at the time, I happened to be looking to
```

**EXH C/53**

```
 1    increase my income due to my son.  I was looking to send

 2    him to a special school.  So I broadened my research a

 3    little bit, I would say, you know, looking for

 4    international opportunities because I know that they pay

 5    incentive pay based on hardship, you know, hot weather,

 6    location, low medical resources, that kind of thing,

 7    right.  That's -- that's how I found it.

 8    Q        Okay.  So does Chevron -- or did Chevron at the

 9    time have some sort of online location where you could

10    see these jobs?

11    A        Yeah.  Sorry.  So they have an online job board

12    internally.

13    Q        Okay?

14    A        And I had set up, like, filters that would send

15    me e-mails daily that would tell me, you know, this job

16    is open, that job is open.

17    Q        When you learned about the reliability

18    engineering manager position being open in Escravos, did

19    you know anything about Escravos?

20    A        I had some familiarity with Escravos.  One of

21    the people that reported to me had come from Angola as a

22    must move, and he was trying to get into Escravos but

23    was unsuccessful.  So he had talked to many of the other

24    expats.  They tend to rotate around between the

25    facilities, and so he knew a lot of people that had
```

**EXH C/54**

1    worked in Escravos.  I also knew several people

2    personally that had either recently gone to Escravos or

3    had been there for a few years, as well as I had sent

4    one of my own direct reports to Escravos about a year

5    earlier.

6    Q        So based upon what you learned, how would you

7    describe Escravos?

8    A        I mean, the way I thought of it was kind of

9    like a jungle version of Qatar, not a great place to

10   live, but you know, it paid really well.  Yeah.

11   Q        And at the time you decided that you were going

12   to apply for the REM position in Escravos, were you

13   aware that there was no hospital in Escravos?

14   A        I was.

15   Q        And were you concerned about applying for a job

16   in Escravos considering that you had a dilated aortic

17   root and there was no hospital there?

18   A        I had actually asked Dr. Khan before I

19   considered applying if he had any concern with me

20   working.  And I --

21           MS. KENNEDY:  Objection; calls for hearsay.

22           THE COURT:  Sustained.

23           MS. LEAL:  It's state of mind, Your Honor.

24           MS. KENNEDY:  Sorry.  Move to strike.

25           THE COURT:  He -- there's been no answer about

**EXH C/55**

```
 1   A        So my supervisor was Kit Deaver, and he gave me
 2   approval.  I also contacted my PDR, which also happened
 3   to be the general manager and director of the Escravos
 4   gas-to-liquid plant, Greg Gabel, who I had worked with
 5   in El Segundo already.
 6   Q        And why did you want to work in Escravos -- or
 7   "Escravos"?
 8   A        Um, it's twofold, really.  The El Segundo
 9   version of this job is degree-required.  The Escravos
10   version of this job is not degree-required.  That is
11   only part of it, though.  I would say even more than
12   that, because there would have been other ways to
13   progress, as -- I know we haven't mentioned it.  But it
14   is a pay grade 23, so it would have been a pay grade
15   promotion.
16            But also, earlier that year, my son no longer
17   wanted to be homeschooled, and we were very concerned
18   about sending him to a public school just based on his
19   therapy.  So we -- the therapist suggested that we hire
20   an educational consultant, which we did.  That
21   educational consultant advised us not to send him to
22   public school even with an IEP and suggested two private
23   schools, one of which the therapist concurred, which was
24   Bridges Academy, which is specifically tailored
25   education to his multiple difficulties.
```

**EXH C/56**

1           You know, it has things like a 4-to-1

2    student-to-teacher ratio, on-site therapists, and the

3    idea of the school is not just to give them an

4    education, but to teach them ways to recognize what's

5    going on with them, you know, and how to manage that so

6    that they can be successful in the future.  And it's

7    very expensive.

8    Q          So by getting a promotion to a grade 23, which

9    you just mentioned, that would have allowed you to send

10   your school to Bridges Academy?

11   A          Not a 23 alone.  It's about $50,000 a year.  So

12   given the 55 percent incentive pay and the other high

13   incentive pays for the other remote locations that

14   Chevron has, you know, that would allow me to send him

15   for two years of junior high and four years of high

16   school.

17   Q          And were there other perks along with the 55

18   percent location premium that you just mentioned if you

19   went to Escravos?

20   A          Yeah.  So some of it has been discussed

21   earlier.  There is a vacation -- you know, I had five

22   weeks of vacation, so they pay you for that.  But one of

23   biggest things for my family and myself would have been

24   you work 28 days and then you're home for 28 days.  And

25   I know we covered that before.  But you know, with a

**EXH C/57**

```
 1    long commute, I mostly only saw my family, and I
 2    definitely only saw my son on the weekends.  And so, you
 3    know, having that more or less uninterrupted time in
 4    between -- in between service trips to Nigeria was --
 5    was huge.
 6    Q       Let me show you another document.  It's
 7    Exhibit 5.
 8            MS. LEAL:  And Your Honor, it has also been
 9    stipulated to admissibility.
10            THE COURT:  Go ahead.
11    (Whereupon, Plaintiff's Exhibit 5 is admitted hereto.)
12            MS. KENNEDY:  I'm sorry, Counsel.  What exhibit
13    number?
14            MS. LEAL:  5.
15            MS. KENNEDY:  Yes, thank you.  That is correct.
16            THE COURT:  Okay.  Go ahead.
17    BY MS. LEAL:
18    Q       Have you seen this document before,
19    Mr. Snookal?
20    A       I have.
21    Q       What is it?
22    A       This is the physical requirements and working
23    conditions, the GO-308, which is a description of, you
24    know, kind of how you would be medically suitable for a
25    job.
```

UNITED STATES DISTRICT COURT

**EXH C/58**

1    Q          Okay.  And if you look at the top, it says,

2    "GO-308 category."  What does that say?

3    A          Office-based jobs.

4    Q          And was this document, Exhibit 5, pertinent to

5    the REM position in Escravos?

6    A          Yes.  This is the GO-308 that is for -- it

7    covers that job.

8    Q          So this sets forth physical and working

9    conditions in Escravos; correct?

10   A          Correct.

11   Q          Down -- a little further down, it says,

12   "Location."  It does have Escravos.  And then right

13   underneath that, it has three different sections with

14   little boxes.

15              But last box is marked, which says, "Non-Safety

16   sensitive."  Do you see that?

17   A          I do.

18   Q          What does that mean?

19   A          "Non-safety sensitive" means that in this

20   capacity, you cannot cause an unsafe condition to exist

21   in the plant.  In other words, you could be an office

22   assistant; you could be a cook; you could be anything;

23   right?  Like, you're not going to have any impact on

24   whether the plant explodes or whether the plant operates

25   correctly.  Any -- any decision that you make isn't

UNITED STATES DISTRICT COURT

**EXH C/59**

1    going to cause any kind of catastrophic event; right?

2    That is what is safety sensitive.

3            "Highly safety sensitive," I'm not sure exactly

4    the way Chevron defines them, other than I know what

5    non-safety sensitive is.  The differentiation between

6    safety sensitive and highly safety sensitive, I think,

7    is a pilot.  But I was safety sensitive in El Segundo.

8    Q        So you would have been -- if this type of

9    document, the physical requirements and working

10   conditions form for El Segundo, were -- were before you,

11   you're saying that the safety sensitive, first box,

12   would be marked?

13   A        That is correct.

14   Q        But in Escravos, it's non-safety sensitive?

15   A        That is correct.

16   Q        Okay.  And it also describes in first page, you

17   now, lifting requirements or limitations.  It has

18   physical demands, 12 kilos -- I guess kilograms -- which

19   I think is around 26-or-so pounds.

20            Is that your understanding?

21   A        That sounds about right.

22   Q        Okay.  So you already were unable to lift more

23   than 50 pounds, correct, based upon your diagnosis of

24   dilated aortic root?

25   A        That was a restriction put on me by Dr. Sobel,

**EXH C/60**

```
 1    yes.

 2    Q         Right.  And we'll talk about that in a moment.

 3    All right.  Thank you.

 4              Very quickly, let me put up Exhibit 132 on

 5    screen for you.  Or you can get it on your binder?

 6    A         I got it.

 7              MS. LEAL:  And, Your Honor, this is also a

 8    document that has been stipulated to admissibility.

 9              THE COURT:  Go ahead.

10    (Whereupon, Plaintiff's Exhibit 132 is admitted hereto.)

11    BY MS. LEAL:

12    Q         What is this document?

13    A         So this is the document that explains all of

14    the benefits and --

15    Q         And did you review this document at the time

16    that you made the application --

17    A         Yes.

18    Q         -- for the REM?  Okay.

19              And you reviewed this in order to be able to

20    learn the benefits of having a rotational assignment in

21    Escravos?

22    A         I did.

23    Q         Thank you.

24              MS. LEAL:  The next one is 20.

25    BY MS. LEAL:
```

**EXH C/61**

```
1    Q          You know, something I think something we need

2    to clear up:  When I asked you why you wanted to work in

3    Escravos and you were talking about paying tuition for

4    your son's special education, you said you wanted to be

5    there for at least 11 years.

6               Could you, in fact, have been there for

7    11 years, Mr. Snookal?

8               MS. KENNEDY:  Objection; calls for speculation.

9               THE COURT:  Overruled.

10              THE WITNESS:  I do know that Escravos, like all

11   of the other foreign locations, the governments have put

12   limits.  One of our major roles in these kinds of

13   positions is actually to teach and mentor the, in this

14   case, Nigerian population to eventually assume our

15   roles.

16              That has always been -- I didn't mention it

17   earlier.  But it has been actually one of the things

18   that I most enjoyed about being a supervisor, was

19   mentorship.  I mentored a lot of the engineers, and I

20   mentored any own staff in -- in their jobs.

21              And so the thought of, you know, letting the

22   Nigerians eventually take over the plant that's in their

23   country, you know, was pretty attractive to me.  I know

24   it takes a long time.  I saw it in Saudi Arabia, as

25   well, where there was a similar arrangement.
```

**EXH C/62**

```
1              MS. KENNEDY:  Objection.  I move to strike as
2     nonresponsive.
3              THE COURT:  Overruled.  Request denied.
4              THE WITNESS:  Sorry.
5     BY MS. LEAL:
6     Q         So how is it that you believed that you could
7     stay in Escravos for 11 years -- or was that your
8     intent?
9     A         Not to stay in Escravos, no.  There is a
10    typical rotation that expats do.  I mean, it is
11    well-known among the people that I know.  And you go
12    from -- it kind of depends on where you start.  But you
13    go to Nigeria.  You go to Angola, and you go to
14    Kazakhstan.  I believe Nigeria and Angola -- well, I
15    won't say because I don't know for sure.
16    Q         Okay.  So on the screen is Exhibit 20.
17             MS. LEAL:  Again, Your Honor, this is one
18    that's been stipulated for admissibility.
19             THE COURT:  Go ahead.
20    (Whereupon, Plaintiff's Exhibit 20 is admitted hereto.)
21    BY MS. LEAL:
22    Q         Before you, Mr. Snookal, is a document that
23    says "Assignment Offer."  Do you recognize this?
24    A         I do.
25    Q         What is this?
```

**EXH C/63**

```
1    A        This is the offer letter that I received after

2    applying for the job.

3    Q        And when you received this offer letter saying

4    "you got the job," what was your reaction?

5    A        I was very excited.  We had actually already

6    had to enroll my son in school, so -- you know, kind of

7    in anticipation of getting it, hoping that it would come

8    through, and so it did.  And it meant everything to

9    my -- to me and my family, right.  Like, this -- yeah,

10   it was going to be good.

11   Q        Okay.  Now, we just saw in the job description

12   that the salary pay grade was a 23 or 24.  This document

13   says a 22.  Did this concern you?

14   A        It did not.

15   Q        Why?

16   A        Two reasons, really:  One is that I've given

17   promotions before, and I know that often people will be

18   moved into a new job at the same pay grade that they

19   were already in.  And then they'll be reevaluated in six

20   to 12 months and moved into the grade -- the lowest

21   grade in the job.  It's part of Chevron's total

22   remuneration -- it's a very difficult word for me to

23   say -- policy that jobs have a pay grade for a reason

24   and that people should be in the correct pay grade for

25   the job that they're in.
```

**EXH C/64**

```
 1    A        I do.

 2    Q        Okay.  And then on page 2 of Exhibit 24, is

 3    this your response to Ms. Smith?

 4    A        Yes.

 5    Q        And you have a number of bullet points -- or

 6    actually, she had a number of bullet points where you

 7    were answering.  If you move down to the fifth bullet

 8    point.

 9    A        Okay.

10    Q        And the question she asked was:  "Advise if

11    your new position requires you to work offshore, in

12    field/plant, or strictly office-based."  And your answer

13    was, "Position is office-based."  That was your answer

14    at the time?

15    A        That is correct.

16    Q        And how did you know that this was an

17    office-based position?

18    A        As I said before, it's essentially my

19    supervisor at the time's job, and I know what his job

20    entails.  I also know, just from the job description

21    and -- and, like, his previous duties, that most of that

22    job is setting strategy and future actions for the area,

23    not so much the day-to-day, going out in the field,

24    working on stuff; right.  My boss at the time, actually,

25    I don't remember ever seeing him in the field in that
```

UNITED STATES DISTRICT COURT

**EXH C/65**

```
 1    position.

 2    Q          And you're referring to Kit Deaver?

 3    A          That's correct, same with Austin for the brief

 4    time that I worked with him.

 5    Q          Okay.  And you mentioned that you were also

 6    advised that you would have to go through a medical

 7    clearance?

 8    A          That is correct.

 9    Q          And what was the first step you had to take in

10    order to get that medical clearance?

11    A          We had to fill out -- or I had to fill out an

12    MSEA form.  The first few pages of it were mine, and

13    then I took the rest of it blank to the doctor,

14    Dr. Sobel.

15    Q          Okay.  And at the time, were you concerned

16    that, you know, having a dilated aortic root would

17    prohibit you from going to Escravos?

18    A          I was not.

19    Q          Okay.  So let's look at Exhibit 29.

20               MS. LEAL:  Again, this is a document that's

21    been stipulated to admissibility, Your Honor.

22               THE COURT:  All right.

23    (Whereupon, Plaintiff's Exhibit 29 is admitted hereto.)

24    BY MS. LEAL:

25    Q          And what is this document, Mr. Snookal?
```

**EXH C/66**

```
 1    write?

 2    A        I wrote, "Losartan and amlodipine."

 3    Q        Turn to the second page.  The top, number 11,

 4    did you complete that, as well?

 5    A        I did.

 6    Q        And the question is:  "Have you ever had any

 7    mental health or psychological issues requiring at least

 8    a medical prescription?  If yes, please describe."

 9             Would you read what you wrote here?

10    A        I said I was treated for depression with

11    Effexor for a few years from approximately 1994 to

12    approximately 1996.

13    Q        And that was prior to your employment with

14    Chevron; correct?

15    A        That is correct.

16    Q        And between 1996 through -- and we'll learn --

17    let me start again.

18             Are you currently taking any type of medication

19    for depression?

20    A        I am.

21    Q        Okay.  So between 1996 and today, when did you

22    first start taking medication for depression?

23    A        It was 2020.

24    Q        Okay.  Why don't we move down on same page,

25    page two.  Number 23.
```

1    had written on the form, anywhere that I checked "yes,"

2    repeated some of the questions.  And then they took an

3    EKG and a fair bit of blood work.

4    Q      And after you finished the examination with

5    Dr. Sobel, what happened next?

6    A      Dr. Sobel left me a voicemail message with some

7    instructions on what to do next, including a letter to

8    my cardiologist.

9    Q      Okay.  And we heard the voicemail message

10   yesterday, so I don't think we need to cover it.

11          Now, Dr. Sobel indicated some restrictions here

12   on the -- the second to the last page of Exhibit

13   Number 29, that there would be no heavy lifting over 50

14   pounds; do you see that?

15   A      I do.

16   Q      Okay.  Prior to your examination by Dr. Sobel,

17   was that something that Dr. Khan had also recommended

18   you not do because of the dilated aortic root?

19   A      He had just suggested that I not hold my

20   breath.  If I was doing that, then I was lifting

21   something too heavy.

22   Q      Okay.

23   A      No specific amount.

24   Q      Okay.  So other than -- well, strike that.

25          When Dr. Khan diagnosed you with a dilated

**EXH C/68**

```
 1    aortic root back in 2014, did he prescribe any
 2    medication?
 3    A         The losartan and amlodipine.
 4    Q         So the same medication that you identified on
 5    the MSEA form?
 6    A         That is correct.
 7    Q         Okay.  So other than that, were there any other
 8    restrictions imposed on you by the fact that you were
 9    being diagnosed with dilated aortic root?
10    A         Um, nothing formal, no.
11    Q         Okay.  So let's look at Exhibit 31.
12              MS. LEAL:  And again, Your Honor, this is
13    another document that --
14              THE COURT:  Yep.
15    (Whereupon, Plaintiff's Exhibit 31 is admitted hereto.)
16    BY MS. LEAL:
17    Q         Okay.  Before you, Mr. Snookal, is a
18    document -- an e-mail.  Have you seen this before?
19    A         Yes, I have.
20    Q         Okay.  And what is this document?
21    A         At the bottom portion is where I request a
22    letter from Dr. Khan.  And at the top portion is his
23    answer, that he'll send me one.
24    Q         Okay.  Thank you.  And moving on to Exhibit 33.
25              MS. LEAL:  And this is another document, Your
```

**EXH C/69**

```
 1    we had already enrolled my son.  Because of the timing,

 2    we had to, you know -- you have to commit, basically.

 3    And --

 4    Q         So how did --

 5    A         Yeah.

 6    Q         I'm sorry.

 7              So how did you pay for -- for that year where

 8    he was already enrolled inasmuch as now the job was

 9    rescinded?

10    A         We ended up refinancing our house.

11    Q    Okay.  All right.  So why did you reach out to

12    Mr. Powers, then?

13    A         Um, up to this point, I didn't think that HR

14    had been involved.  And so he's my local HR

15    representative, right, as long as I'm in El Segundo,

16    which I was still officially.  And so I made a bit of a

17    Hail Mary pass and hoped that HR would do a thorough

18    investigation and might be able to change the outcome.

19    Q         Okay.  So is 82, the e-mail on the bottom,

20    first page, continues on the second -- that is your

21    complaint of discrimination to Mr. Powers?

22    A         That is correct.

23    Q         Okay.  And top is Mr. Powers's response to you

24    that day?

25    A         That's correct.
```

UNITED STATES DISTRICT COURT

**EXH C/70**

```
 1   Q        And what was your reaction when you read his
 2   response here where he says, "I reached out to medical
 3   department, and while I'm not privy to any medical
 4   information, I understand a thorough review was
 5   conducted and alternatives were explored.  We would
 6   respectfully disagree that the determination was based
 7   on stereotyping or impermissible discrimination"?
 8   A        I mean, I was extremely disappointed, not just
 9   from the point of view that, you know, kind of this --
10   pretty much the end of the road and the end of my
11   options, but also that the company that I put a lot of
12   stock and a lot of trust in to do the right thing,
13   right -- they'd always demonstrated that they had
14   before -- to just tell me that "Oh, we asked the people
15   that discriminated against you, and they said they
16   didn't do it"; right?  That's -- I mean, he only -- he
17   took a day, I think it was -- maybe a day and a half to
18   reply.  So it just didn't make any sense to me.  I don't
19   see how you can do that.
20   Q        Okay.  And why did you think that it was
21   disability discrimination?
22   A        Um, so we go through a lot of training at
23   Chevron, including on the document we looked at earlier.
24   The HR policy 410, I think it was.  Plus, I had recently
25   had a disability discrimination -- not disability
```

**EXH C/71**

```
 1              MS. LEAL:  So what we'll do, I think we'll
 2    start with Dr. Akintunde, and then we'll continue Mark.
 3              MS. KENNEDY:  Okay.  And then Dr. Reading?
 4              MS. LEAL:  And then Dr. Reading.
 5              MS. KENNEDY:  And then Constance Snookal.  Then
 6    I'll have Dr. -- I'll have her come in in the afternoon.
 7              THE COURT:  I think -- I think that's safe.
 8              MS. KENNEDY:  Okay.
 9              THE COURT:  All right.  Very good.  Just be
10    mindful of -- of the time.  We'll give you the total
11    time tomorrow morning.  And I had one other issue.  Now
12    I'm blanking on it.  Well, I will -- I'm sure I will
13    remember.  Oh, I know.
14              Since we have attorneys coming now in the
15    afternoon, please take your materials for the afternoon.
16              MS. KENNEDY:  Oh, yes.
17              THE COURT:  On the tables -- just on the
18    tables.
19              MS. KENNEDY:  Sure.
20                  (Whereupon, proceeding adjourned.)
21                            - - -
22
23
24
25
```

UNITED STATES DISTRICT COURT

**EXH C/74**