# EXHIBIT "D"

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            WESTERN DIVISION

4              - - -

5     HONORABLE HERNÁN D. VERA, DISTRICT JUDGE PRESIDING

6

7     MARK SNOOKAL,                    )
                                       )
8            Plaintiffs,               )
                                       )
9                                      )
                                       )
10         vs.                         ) No. CV 23-06302-HDV
                                       )
11                                     )
                                       )
12    CHEVRON USA, INC.,               )
                                       )
13           Defendants.               )
      _____)

14

15

      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
16
                    *TRIAL DAY FOUR*
17
              LOS ANGELES, CALIFORNIA
18
            FRIDAY, AUGUST 222, 2025
19
      _____
20

21                MARIA R. BUSTILLOS
                OFFICIAL COURT REPORTER
22                  C.S.R. 12254
              UNITED STATES COURTHOUSE
23             350 WEST 1ST STREET
                    SUITE 4455
24        LOS ANGELES, CALIFORNIA 90012
                  (213) 894-2739
25              MADAMREPORTER.COM

EXH D/1

I **N** D **E** X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **XXX, XXXXX** | -- | -- | -- | -- |
| BY DOLORES LEAL | 6 | -- | -- | -- |
| BY ROBERT MUSSIG | -- | 187 | -- | -- |
| BY OLIVIA FLECHSIG | -- | 232 | -- | -- |

- - -

**EXH D/2**

1                              **E X H I B I T S**

2

3        STIPULATED                                    RECEIVED           MARKED

4

5        242                                              9               --

6        243                                              9               --

7        733                                            149

8        249                                            161               --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXH D/3**

```
1    of the day, and you'll have your real time to deliberate

2    on Monday.  But we will conclude the evidence today.

3              All right.  Very good.  Is plaintiff calling

4    the doctor, or is this defendant's?

5              MS. FLECHSIG:  Yes, Your Honor.  Plaintiff

6    calls Dr. Akintunde, please.

7              THE COURT:  Okay.  Very good.  So

8    Dr. Akintunde, we're going to administer the oath to you

9    before we begin.

10             THE WITNESS:  Okay.

11             THE COURTROOM DEPUTY:  If you, can, please your

12   right hand.

13   PLAINTIFF'S WITNESS, DR. UJOMOTI AKINTUNDE, SWORN.

14             THE COURTROOM DEPUTY:  Thank you.

15                    DIRECT EXAMINATION

16   BY MS. FLECHSIG:

17   Q        Thank you for your time today, Dr. Akintunde.

18   Happy Friday.

19             Is it true to say that you work for Chevron

20   Nigeria Limited as a staff physician in charge?

21   A        Yes, that's correct.

22   Q        And that's at Lucky Hospital, which Chevron

23   owns; right?

24   A        That's correct.

25   Q        Okay.  And during your employment, is it fair
```

**EXH D/4**

1   to say that you've also worked at other locations for

2   Chevron?

3   A        That's correct, though briefly.

4   Q        Okay.  So have you worked in Escravos?

5   A        Yes.

6   Q        Okay.  And during your time in Escravos, you

7   witnessed medical emergencies that required emergency

8   evacuation; is that fair to say?

9   A        Yes.

10  Q        And on average, you -- excuse me -- during your

11  deposition, you testified that on average you saw one to

12  two emergency evacuations every week; right?

13  A        That's correct.

14  Q        And those medical evacuations would take place

15  via helicopter or via regular flight when available;

16  fair to say?

17  A        That's correct.

18  Q        And of the emergency medical evacuations you

19  observed during your time in Escravos, you estimated

20  during your deposition that the medical -- the emergency

21  medical evacuation took on average about one-and-a-half

22  hours; correct?

23  A        Yes.

24  Q        Okay.  So I want to ask you about your

25  involvement in this case.  In 2019, Dr. Asekomeh, the

**EXH D/5**

1    occupational health physician in Escravos, asked you to

2    provide a cardiology opinion on plaintiff, Mr. Snookal;

3    is that -- is that all true?

4    A        He asked me to provide a cardiology opinion on

5    his images, which he provided.

6    Q        Thank you, doctor.  In 2019 -- excuse me -- in

7    2016, you finished your training as a cardiologist; is

8    that true?

9    A        I finished in 2009, but I did additional

10    training in 2016.

11    Q        Understood.  Okay.  And during your deposition,

12    you testified that over the years, you've only treated a

13    few patients with dilated aortic roots; is that fair to

14    say?

15    A        That's, true.  Yes.

16    Q        And you never -- oh, I'm so sorry.  You've

17    never treated a rupture; true?

18    A        True.

19    Q        And you've never treated a dissection, fair?

20    A        True, because those are treated by

21    cardiothoracic surgeon.

22    Q        Okay.  You haven't ever spoken to Mr. Snookal,

23    the plaintiff in this case; right?

24    A        That's correct.

25    Q        Okay.

**EXH D/6**

```
 1              MS. FLECHSIG:  If we could please pull up

 2    Exhibit 54, which has already been admitted.

 3              And, Dr. Akintunde, we'll allow you to make

 4    sure you can see this exhibit, as well.

 5    BY MS. FLECHSIG:

 6    Q         So I want to -- while they're pulling that up,

 7    I'd like to ask about -- ask about what you said about

 8    providing an opinion on imaging reports.  It's true that

 9    you -- other than Mr. Snookal's imaging report, so some

10    scans of his heart, you were not provided with his

11    medical summary; right?

12    A         Yes.

13    Q         Okay.  And you've never spoken to Dr. Asekomeh,

14    the occupational health physician, about Mr. Snookal

15    other than over e-mail; fair?

16    A         Correct.

17    Q         So the only information you had from

18    Dr. Asekomeh was the scans of Mr. Snookal's heart;

19    fair to say?

20    A         Yes, that's fair to say.

21    Q         Okay.  And so we'll -- while we're working on

22    pulling up Exhibit 44 [sic], I'll say that you may

23    recall what you wrote, and if not, we can look at it.

24    But it's fair to say that your conclusion as to

25    Mr. Snookal's risks that you then passed along to
```

**EXH D/7**

1    Dr. Asekomeh were that he was, quote, "low risk but not

2    no risk"; is that accurate?

3    A        That's correct.

4    Q        You never told Dr. Asekomeh in this e-mail and

5    you never spoke with him -- you never told him any more

6    specific range of risk than that; fair?

7    A        That's correct.

8    Q        And you'd have to agree that no one can be said

9    that they have zero risk of a serious cardiac event;

10   fair?

11   A        You could say so.

12   Q        Even if someone is young, healthy, has no

13   family history, they could still suffer a serious

14   cardiac event; right?

15   A        In certain situations.

16   Q        Okay.  Let's go to Exhibit 44 at page 1.  I --

17   I hope you're able to see that.  Dr. Akintunde, are

18   you -- do you recognize this document as your e-mail at

19   top where you were responding to Dr. Asekomeh?

20   A        Yes, I do.

21   Q        Okay.  And this has the opinion -- all of the

22   opinions you expressed to Dr. Asekomeh; right?

23   A        Yes.

24   Q        Okay.  And I see at the bottom, you said, "Is

25   there a medical report from his cardiologist?  I only

```
 1    A        I responded that I was very disappointed in

 2    that determination.  And that I didn't consider it to be

 3    a thorough investigation to just ask the people that I

 4    was saying may have discriminated against me or that I

 5    felt that they discriminated against me.

 6    Q        And if you look at the screen or the binder, is

 7    that the e-mail you sent to Mr. Powers responding to

 8    him?

 9    A        It is.

10    Q        And did Mr. Powers respond to you?

11    A        He did not.

12    Q        And what was the date of this e-mail?

13    A        September 8th.

14    Q        Okay.

15    A        2019.

16    Q        So after your conversation -- your last

17    conversation with Dr. Levy and now your conversation or

18    correspondence with Mr. Powers, did you have any hope

19    that the decision to rescind the position would be

20    over- -- overturned?

21    A        I did not.

22    Q        Now, what was going on -- what was going to

23    happen now that you weren't going to Escravos and you

24    had no job, in essence?

25    A        I had a lot of concerns about what was going to
```

**EXH D/9**

1    happen, irrespective of the promises that they made to

2    me.  We had talked about identifying some jobs around

3    September 5th, I believe.  They said they were going to

4    look for jobs for me as well.  I don't believe they

5    produced any -- I'm sorry, they did produce one job.

6    Q        And what was the job they produced?

7    A        Maintenance change OA.

8    Q        And was that the job that they offered you?

9    A        It was not.

10   Q        Okay.  Did you -- were you looking for jobs?

11   A        I was also looking for jobs at the same time,

12   and I found three different jobs that I was qualified

13   for.

14   Q        How were you looking for jobs?

15   A        Using the same internal job posting system that

16   I had used for.

17   Q        And did you apply for any of the jobs that you

18   found?

19   A        I applied for two.

20   Q        Did you get those jobs?

21   A        I did not.

22   Q        Did Chevron offer you -- after it was

23   rescinded, did they offer you any other expat

24   assignment?

25   A        They did not.

**EXH D/10**

1    Q        So at the time you applied for the REM position

2    and you were rescinded, you had been the IEAR team lead.

3    What happened to the IEAR team lead position that you

4    held at the time?

5    A        Once I had accepted the job in Nigeria, they

6    back-filled my position, although at that time, the

7    person had not taken -- taken over the role.

8    Q        And who was that person?

9    A        Brian Mueller.

10   Q        Do you know Brian Mueller -- or did you know

11   him at the time, I should say?

12   A        Yes, I did know him at the time.  There's two

13   departments.  The one that he came from worked closely

14   together.

15   Q        Okay.  And did you have any interaction with

16   Mr. Mueller after you were denied the REM position?

17   A        Yes, once he finally took the role -- or moved

18   into the role, which was about November, I spent the

19   next several months training him.

20   Q        Okay.  So other than training him for the next

21   couple of months or so, were you doing anything else

22   for -- work-wise?

23   A        I was doing some small special projects in

24   between.

25   Q        Okay.  Did Chevron ultimately create a job for

**EXH D/11**

1    you?

2    A        They did.

3    Q        And what was that job?

4    A        The reliability change OA.

5    Q        And when did that occur, approximately?

6    A        I believe it was November, as well.

7    Q        So now that Chevron created this reliability

8    change OA position, did that make you happy?

9    A        It did not.

10   Q        How come?

11   A        Austin Ruppert, my boss at the time, told me

12   that the position was created specifically for me and

13   that it would not outlast the time that I, quote,

14   unquote, "needed to be in it."

15   Q        So how were you feeling at time?

16   A        I was starting to feel really in September, you

17   know, depression kind of keeping in, and I was starting

18   to withdraw a little bit from my family.  And -- and you

19   know, I recognized it as an oncoming depressive episode,

20   so I utilized techniques that I learned in the past to

21   try and fend it off.  And you know this kind of pushed

22   me over the edge, and so I reached out to Kaiser

23   Permanente for mental health.

24   Q        Did you at some point start treating with

25   anyone at Kaiser?

**EXH D/12**

```
 1   A          Yes, I did.

 2   Q          Do you remember with whom?

 3   A          I spent most of my time with -- I believe her

 4   first name was Linda Engel.  Last name Engel.

 5   Q          Okay.  And did anyone at Kaiser ever prescribe

 6   you any sort of medication to deal with the depression

 7   you were experiencing?

 8   A          Yes.  I don't recall the name of the doctor.

 9   But I did receive a prescription for Cymbalta.

10   Q          Okay.  And are you still taking Cymbalta?

11   A          Yes.

12   Q          How come?

13   A          I still feel a lot of depression, yeah.

14   Q          Okay.  How long were you in this new position

15   that Chevron created you for, the reliability change OA

16   position?

17   A          Um, about a year -- a little bit less.

18   Q          And do you remember how come you were in that

19   position only a little less than a year?

20   A          Chevron had a transformation event or

21   reorganization in 2020.

22   Q          And what happened to you thereafter?

23   A          That role was eliminated.  They had everyone in

24   the entire company apply for four different positions.

25   I did not receive any of those positions and was placed
```

1   back into the IEAR role.

2   Q       Okay.  And the positions to which you applied,

3   you said, were four?

4   A       Yes.

5   Q       And you weren't hired for any of them?

6   A       That's correct.

7   Q       So this new position -- or the position you

8   were placed into, the IEAR team lead position, that was

9   your old job; correct?

10  A       That's correct.

11  Q       And didn't that make you happy, that now you

12  were in your old job?

13  A       It did not make me happy.

14  Q       How come?

15  A       The role had been reduced in scope to a fixed

16  22 PSG, no room for advancement.  The way that it was

17  given back to me did not make me feel very good.  The --

18  yeah, it was just -- it was -- I don't know -- kind of

19  like a slap in the face, like "Here.  You can have your

20  old job back now that we don't need this other guy, who

21  had gotten a promotion to go into the role as a 23."

22  And so because the reorganization placed it at a 22,

23  they had to move him out.

24  Q       You just said and I wrote, "The way it was

25  given to me."  What did you mean by that?

**EXH D/14**

1    A        They told me that I was an unsuccessful

2    candidate in all of the roles that I applied for and

3    that if I didn't take this role, that I wouldn't have a

4    job at Chevron.

5    Q        And how long were you in IEAR role, then?

6    A        Approximately nine months.

7    Q        Why only nine months?

8    A        I resigned from Chevron at that time, in

9    September or August of that year.

10    Q        What was going on that made you resign in

11    September of that year?

12    A        So you know, work has been very integral to my

13    identity; right.  My wife and I, early on in our

14    relationship, even before we even got married, my wife

15    basically said, "I don't like working very much."  And I

16    said, "That's okay.  I don't need you to work as long as

17    you don't ask me to go to Hawaii."  And she said,

18    "Deal."  Right.

19            So in the beginning, it was not as important to

20    me, but as I became the single provider for, you know,

21    my wife and then my son, it was -- you know, it became

22    my identity; right.  So that is who is -- what I do; I

23    provide for my family whatever they might need.  When my

24    wife needed to go to NYU, we moved to New Jersey, right,

25    so she can do that.  That is why my son was born in

```
 1    New Jersey.  You know, just whatever came up, I could
 2    provide.
 3              And -- and you know, in this case, I couldn't
 4    provide, and it was taken away from me for some
 5    theoretical risk.  It didn't even have anything to do
 6    with me.  So between that and the inability all of a
 7    sudden to no longer get roles at Chevron and to be told
 8    that I had to take one or they would let me go, I mean,
 9    it just seemed like -- like I was done there; right.
10    They -- they were done with me.
11              Additionally, my therapist was working with me
12    to try to disconnect that identity from my job, right,
13    to maybe put some distance.  And during our
14    conversations, she said that perhaps --
15              MS. KENNEDY:  Objection; calls for hearsay.
16              THE COURT:  Overruled.
17              Go ahead.
18              State of mind.
19              Go ahead.
20              THE WITNESS:  Thank you, Your Honor.
21              She was encouraging me to think about getting
22    another job outside of Chevron, that that -- that I was
23    having difficulty letting go of that identity as long as
24    I was there.
25    BY MS. KENNEDY:
```

**EXH D/16**

```
1    Q        So did you start looking for other jobs outside
2    of Chevron?
3    A        Yes, I did.
4    Q        When?
5    A        I actually started in/around 20- -- either late
6    2019 or early 2020.  But COVID kind of got rid of all
7    the jobs, in my field anyway.  So there weren't very
8    many hits until late -- well, I guess early 2021.
9    Q        And when you resigned from Chevron, did you
10   have another job lined up?
11   A        I did.
12   Q        What job was that?
13   A        It was a job with Nippon Dynawave in Washington
14   State.
15   Q        So does that mean you had to move from LA to
16   Washington?
17   A        It did.
18   Q        How did it impact your family, if at all?
19   A        My family understood the necessity but was not
20   happy about leaving Los Angeles.  My -- I'm from
21   California.  My wife has been in California since she
22   was six.  We've lived in the Los Angeles area, you know,
23   in various locations for probably 40, 45 years.  So
24   neither one of us were excited about leaving.  That is
25   why we came back after New Jersey.
```

**EXH D/17**

```
 1              Part of that decision factored in the fact that
 2     the house that I had inherited from my mother who -- it
 3     was her home for, you know, 25 or 30 years in the Hills
 4     across from Mount Washington.  And it had suffered major
 5     damage in the Northridge earthquake, and we couldn't
 6     afford to repair the foundation without some extra money
 7     and the extra time that I would have had from Nigeria.
 8     You know, we just couldn't pay someone else to do it,
 9     which is what I would have had to do.  And so, you know,
10     I guess that sums up a lot of reasons why, you know, we
11     did leave.  But it was difficult.
12     Q        Are you still employed with Nippon?
13     A        I am not.
14     Q        Why not?
15     A        Georgia-Pacific offered me a fairly substantial
16     increase in wages, and it's also a very large company
17     whereas Nippon only had one location.  So thinking about
18     future career opportunities, it was a good move.
19     Q        Okay.  So last week, August 15, was six years
20     since Chevron rescinded the offer of the REM position.
21              Six years later, how are you feeling now?
22     A        I guess I'm a little bit better than I was
23     while I was with Chevron.  So at Chevron, I was pretty
24     much thinking about what had happened to me every day
25     and the things that I lost.  We pulled my son out of
```

**EXH D/18**

1   the -- this -- the private school that we had him in

2   after the first year, and he had been doing very well

3   there; right.  We saw a lot of improvement.  And so, you

4   know, when I had to do that, it was -- it was extremely

5   difficult.

6           After I left Chevron, I would say that I still

7   think about it, just not every day; right.  But every

8   time something reminds me of the loss or I just happen

9   to think about it, um, you know, I would say it is

10  probably two or three times a week and more frequently

11  during the school year because we didn't have any

12  private school options that I could afford in the

13  Washington or Oregon area.  I live right on the border.

14  So watching my son struggle in high school -- we tried

15  to get him an IEP, and it didn't really work out.  We

16  didn't get one, I should say.

17  Q       Did your son graduate from high school?

18  A       Yeah.  He did graduate from a continuation

19  school, same as I had, which is not what I would have

20  wished for him at all.  I mean, it's not really

21  finishing, and it is not going to get you into college;

22  right.  He -- you know, he wants to become a therapist,

23  and he -- he will eventually make it, but he is not

24  prepared for it like he would have been; right.  So all

25  of his friends that he still talks to that were at

**EXH D/19**

```
 1    Bridges Academy, they actually are attending college.

 2    So his peers -- so you know, it is also a reminder of

 3    what I lost.

 4    Q        So, Mr. Snookal, it's been 11 years since you

 5    were first diagnosed with dilated aortic root.

 6             Have you had a dissection?

 7    A        No.

 8    Q        Have you had a rupture?

 9    A        No.

10    Q        Why did you file this lawsuit?

11             MS. KENNEDY:  Objection; relevance.

12             THE COURT:  Overruled.

13             THE WITNESS:  I filed the lawsuit because, as I

14    said, it was my identity to be able to provide for my

15    family, and I feel that Chevron took something

16    irreplaceable for me, and I can never get that back, and

17    that's the first time I've ever experienced that.

18             And I considered it -- well, still do consider

19    it to be discriminatory.  They made a decision based on

20    a theoretical future risk of something happening to me

21    that -- I never got any impression that they fully

22    understood my condition.  I don't think that they

23    understood the actual risk involved.  No one ever

24    explained to me that they calculated it.

25             And you know, I know that other people have
```

**EXH D/20**

```
 1    A         21.

 2    Q         And in the 11 years, you went from a pay grade

 3    21 to a pay grade 22; correct?

 4    A         Correct.

 5    Q         And during your employment at Chevron, did you

 6    ever see any documentation that said that if you went on

 7    an expat role, you're automatically entitled to a

 8    promotion?

 9    A         Yes.

10    Q         And was it for REM role that you saw this

11    documentation?

12    A         It was a general document -- an HR document

13    that I believe was from 2017-ish, and it talked about

14    the PASA -- I do not remember what the acronym stands

15    for -- and PMP process from an administration level for

16    supervisors.

17    Q         Right.  My question is:  Did you ever see a

18    document that said that if you take the REM role, that

19    you get an automatic promotion?

20    A         It says in that document, if I recall, among

21    many other things, it says that a person that is

22    placed -- I believe it's called PIJB.  I may be getting

23    the terminology incorrect.  I believe it stands for

24    "person in job," but -- and what that means is that a

25    person that is outside of the pay grade for the job will
```

**EXH D/21**

1    get reevaluated for a promotion.  And it is encouraged

2    for that person to move into the pay grade that the job

3    is advertised and has been rated by the total

4    remuneration people.

5    Q          You're referring to jobs that can potentially

6    be part of a career ladder; correct?  Not necessarily a

7    promotion; correct?

8    A          The Nigeria job was a career ladder position.

9    Q          Correct.  And my question was different.  My

10   question was when you were talking about this document

11   it talked about career ladder, not promotions; correct?

12   A          That is not correct.  It includes a section for

13   promotions, which is what I just quoted.  I have

14   promoted people within Chevron, so I am familiar with

15   the promotion procedure and how that is accomplished.

16   Q          And when you took -- when you were offered the

17   conditional offer of the RME position, it is true that

18   no one promised you a promotion; correct?

19   A          My -- I think it's called PDC, the person that

20   represents you on PDR -- PD -- I don't know.  I can't

21   keep track of all the acronyms six years later.  But you

22   get a representative for the process of applying to an

23   expat position, and that person briefs you on the job,

24   the job responsibilities, goes over the location in some

25   degree.  And we discussed the pay grade because I asked

1    if I would be promoted to a 23.  She told me it is

2    typical in expat assignments to be promoted into the

3    position -- or into the pay grade that the position is

4    advertised at, at about six months.

5    Q        I understand that.  I understand that

6    confidential informant -- we'll get to that in a minute.

7    My question is:  Were you promised a promotion?  You

8    say, by the way if you take --

9    A        Oh, promised, no.

10   Q        Okay.  So you agree there were discussions.

11   And as part of your career ladder, there is always

12   discussions about moving up; correct?

13   A        Not in my experience.

14   Q        Well, in this particular instance, regarding

15   this particular job, you agree no one at Chevron

16   promised you a promotion; correct?

17   A        That is correct.

18   Q        Now, prior to applying -- strike that.

19            Prior to the job being posted, the REM position

20   in Escravos, you actually had a recheck with your

21   physician at Kaiser regarding your heart condition;

22   correct?

23   A        As I do every year, yes.

24   Q        Yes.  And that was April 19th, 2019?

25   A        Correct.

**EXH D/23**

1    A        That is correct.

2    Q        Now, Mr. Snookal, once the job was rescinded,

3    you were given another job as the reliability change

4    operating -- operating assistant; correct?

5    A        That's correct.

6    Q        And you didn't -- I think you testified you

7    didn't like that job; correct?

8    A        That's correct.

9    Q        And it was -- it was a leadership position.

10   You may not have been supervising people, but you were a

11   leader in the El Segundo facility; correct?

12   A        That is not correct.

13   Q        You didn't view that as a leadership position?

14   A        That is correct.

15   Q        And you didn't view that as a position that

16   could help you in your career; correct?

17   A        That is correct.

18   Q        And do you know if Mr. Sutherland or Kit Deaver

19   or any of other leaders or managers at El Segundo ever

20   worked as a reliability change operating assistant; do

21   you know?

22   A        I do know that no one did.

23   Q        None of those individuals ever did?

24   A        Correct.

25   Q        Okay.  And you stayed at that job for, what,

**EXH D/24**

```
 1   A        I did.

 2   Q        Did you ever tell Dr. Reading that you decided

 3   to move and take a lower-paying job even though you had

 4   to learn a new industry?

 5   A        I believe I said something like that to him,

 6   yes.

 7   Q        All right.  Now, finally, I believe you said

 8   you're taking Cym- -- Cymbalta?

 9   A        Correct.

10   Q        And you've been taking that since when?

11   A        I cannot remember the exact date that it was

12   prescribed, but it was sometime late-ish 2020.  It was

13   very difficult to get an appointment with a psychiatrist

14   during COVID.

15   Q        And has that prescription been the same since

16   2020?

17   A        It has been.

18   Q        Now, according to Dr. Reading, is it correct

19   that you are doing better now than you were doing in

20   2019 and 2020; correct?

21   A        I believe I testified earlier to that, as well,

22   yes.

23            MS. KENNEDY:  Thank you, Your Honor.  I have no

24   more questions.

25            THE COURT:  Brief redirect.
```

**EXH D/25**

```
 1              MS. LEAL:  Just one question, Your Honor.
 2                      REDIRECT EXAMINATION
 3   BY MS. LEAL:
 4   Q        Mr. Snookal, Ms. Kennedy showed you an exhibit
 5   with a number of countries around the world where you
 6   could apply.  Did you look into those positions?
 7   A        I did explore what facilities and what
 8   opportunities existed in all of those locations.
 9   Q        And did you apply for any of those?
10   A        Some of the locations, they have presence but
11   no actual facilities.  Other locations, they have
12   facilities, but they're, like, accounting or something
13   not applicable to my profession.  And there were no job
14   postings available that I would have been qualified for,
15   for the duration of my employment with Chevron.
16   Q        Thank you.
17              THE COURT:  All right.  Mr. Snookal, thank you.
18   You can step down and take your seat with your counsel.
19              THE WITNESS:  Thank you, Your Honor.
20              THE COURT:  All right.  Who does plaintiff call
21   next?
22              MS. LEAL:  Plaintiff calls Dr. Reading to the
23   stand.
24              THE COURT:  Okay.
25              MS. LEAL:  May I go out, Your Honor?
```

**EXH D/26**

1    tests.  And third, I reviewed some records -- medical

2    records, deposition testimony, predominantly.  So those

3    were the three categories of data I accrued in this

4    matter.

5    Q        And the interview, what did that consist of?

6    A        The interview was a standard interview I use in

7    my clinical work and in litigation matters.  I reviewed

8    his family history, social history, educational history,

9    occupational history, marital history, and medical

10   history looking at what are the sources of stress that

11   may be in his life and whether he has developed any

12   psychiatric disorder at any time in his life.

13   Q        And did you find any evidence of prior

14   psychiatric disorders?

15   A        Yes, I did.  So I found that he had some

16   adverse experiences what we call -- as a child or a

17   minor, which are relevant in terms of future

18   vulnerability because adverse experiences occurring as a

19   child can interrupt the development of the brain.  And

20   so what now know is that those adverse experiences can

21   confer vulnerability or susceptibility to mental illness

22   later in life.

23           So I found that he did develop a significant

24   depressive disorder in his late teen years for which he

25   received mental heath treatment, both in the form of

**EXH D/27**

```
 1    counseling and medication.  And then there were -- it's
 2    interesting.  There were at least couple more incidents
 3    of depression and then the emotional perturbation, or
 4    depression, he claimed arising from his work experience
 5    at Chevron.  And what we see, an interesting thread
 6    through those occurrences of depression are what we call
 7    recurrences because this is a person who's had some
 8    recurrence.
 9            Loss seemed to be a feature of those
10    experiences.  So they were -- about 80 percent of
11    depressive episodes follow a loss experience.  That
12    means 20 percent do not.  And in Mr. Snookal's case,
13    there was a theme that those depressive episodes
14    followed an identifiable stress or loss rather than just
15    developed autonomously.
16    Q       You mentioned psychological tests.  What role
17    do they play?
18    A       Well, psychological tests -- and I administered
19    three -- they play a role in -- in assessing Mr. Snookal
20    across a broad range of psychological dimensions
21    enabling me to achieve a score in each of those
22    psychological dimensions and compare Mr. Snookal's score
23    to a normal population.  Just like in blood pressure,
24    your blood pressure is meaningless unless it is compared
25    to the normal blood pressure to see to what extent your
```

**EXH D/28**

 1    blood pressure departs from the normal.

 2            And we do that in psychological testing.  We

 3    look at how a person scores on a range of psychological

 4    dimensions, and we look at how their score departs or

 5    compares to a normal population to see to what extent

 6    there's any deviation from what we call the mean or the

 7    norm.  And those tests also play an important role

 8    because we can use those to examine one important

 9    component of motivation.  Now, at any clinical setting

10    or litigation setting, particularly --

11            THE COURT:  Doctor, let me interrupt you.

12            THE WITNESS:  Sorry.  Your Honor, I apologize.

13            THE COURT:  No, it's okay.  The Court has

14    limited time and so does the jury.  And we would love to

15    get all the detail that I'm sure you can give, but if

16    can, just give us what is essential.

17            THE WITNESS:  I beg your pardon, Your Honor.  I

18    thank you for that guidance.

19    BY MS. LEAL:

20    Q        So let me ask you this, Dr. Reading:  So if the

21    events at work --

22    A        Sorry.

23    Q        -- occurred as claimed by Mr. Snookal, would

24    they be sufficient to lead us to a psychiatric injury as

25    he has claimed?

1   A          Well, in a word, yes.  And in just a quick

2   note, he has factors of vulnerability, and he perceived

3   a very important loss in the trajectory of his career as

4   unfair.  That is a very important component.

5   Q          And you found that three conditions apply to

6   Mr. Snookal.  What were they?

7   A          Well, the three conditions were:  That work was

8   very important for his self-worth and identity -- that's

9   one.  So it wasn't peripheral -- two, he had factors of

10  vulnerability, as I touched upon; and three, he

11  perceived the experience at Chevron to be unfair,

12  targeted, and it fractured his assumption of a

13  predictable relationship between cause and effect, yeah.

14  Q          And I see in your report --

15          MS. LEAL:  And, Your Honor, the report did not

16  make it into -- for whatever reason -- the exhibit book,

17  but it is Exhibit 141.  And we have a stipulation.

18          THE COURT:  All right.  That will be admitted,

19  141.

20  (Whereupon, Plaintiff's Exhibit 141 is admitted hereto.)

21          MS. LEAL:  Thank you.

22  BY MS. LEAL:

23  Q          What is major depressive disorder, Dr. Reading?

24  A          Major depressive disorder is a psychiatric

25  disorder.  It speaks to a significant depressive

**EXH D/30**

1  disorder, which requires ongoing depression -- a

2  consolation of specific symptoms.  It is a diagnosis

3  that has relevance with respect to outcome or what we

4  call prognosis about -- for two reasons:  20 percent of

5  the people don't recover, and we know that the longer a

6  person who is exposed to depression, the less likely it

7  is that they will recover.

8  Q          And which symptoms did you find Mr. Snookal

9  had?

10  A          He developed a consolation of symptoms, which

11  embraced depressed mood, inability to derive pleasure

12  from customary activities, a loss of self-worth, a loss

13  of motivation, difficulty with sleep, and difficulty

14  with concentration and focus, along with energy.  So

15  he -- he fulfilled criteria that we require for that

16  range of symptoms.  So they're not just transient.  They

17  were ongoing and voluntary.

18  Q          So were these sufficient to qualify Mr. Snookal

19  for a diagnosis of major depressive disorder?

20  A          Yes, they were.

21  Q          And did you rely on anything else?

22  A          Certainly, I relied on records, his

23  self-report, his deposition from testimony, and

24  psychological testing, and some data from the records,

25  which also assessed him on screening measures for

1    depression.  On those screening measures in late 2020
2    and early '21, he was scrolling in the diagnostic range.
3           When I saw him in sixth of February of this
4    year, although he is working and -- he still had
5    residual features.  And on the psychological tests which
6    were valid, he showed elevations on all the tests of
7    depression scales but nothing else.
8           MS. LEAL:  Part of your report has an
9    attachment E.  Let's show that to you now, attachment E.
10   BY MS. LEAL:
11   Q       And is this a graph that refers to -- that you
12   refer to in your initial report?
13   A       Yes, it is.
14   Q       There should be a binder there?
15   A       It's right here.  Yes, it is.  This is a graph,
16   and this is what I was referencing.  This is a screening
17   measure for depression.  Maybe some of the Court has
18   exposure to this measure.  It is quite widely used.  And
19   five is the cutoff, which suggests possible clinical
20   depression.  15 would be in the moderately severe range.
21          So Mr. Snookal on September 28th, 2020, was
22   showing self-report symptoms that would be in the range
23   for major depressive disorder, moderate to severe.  And
24   by second of February -- or eighth of February, 2021, he
25   was still in the clinically diagnostic range but had

1    shown some improvement.  So these are the -- these would

2    be a contemporaneous documentation of -- if his reports

3    are reliable -- of clinical depression.

4    Q        So did you rely on anything else other than the

5    screening measures and your interview?

6    A        I relied on the psychological testing.  And

7    even though he indicated improvement, those tests

8    showed, as I think I mentioned, he was still showing

9    elevations, which we wouldn't expect if someone had made

10   a full recovery.

11   Q        And you also attached to your report graphs

12   showing results of testing in your initial report;

13   correct?

14   A        Yes, I did.

15   Q        Okay.  And I see that there is one from --

16   there are three tests, I think, that you administered,

17   the MMPI-3?

18   A        Yes.

19            MS LEAL:  Which is attachment F.  Can you put,

20   please, attachment F on the screen, first of two slides?

21   BY MS. LEAL:

22   Q        What does this show, Doctor?

23   A        This is interesting.  To the right of the

24   second vertical line are dots.  These are his scores.

25   The horizontal line at 50 is the mean of a normal

**EXH D/33**

```
 1    factors just means that the more you have, the more

 2    likely it is you'll develop a depressive disorder

 3    arising from an adverse experience.

 4    Q         And what was your overall finding, Dr. Reading?

 5    A         My overall finding to a reasonable degree of

 6    psychiatric probability was that Mr. Snookal developed a

 7    major depressive disorder, which I would rate as a

 8    recurrence.  He had had it before.  It was moderate in

 9    severity.  That is a three point scale from our moderate

10    to severe.  And when I saw him, he was in partial

11    remission, so he'd improved.  He hadn't fully recovered.

12              And it used to be thought -- just a quick

13    aside -- that partial remission was a pathway to full

14    remission.  But now over many years, we see that partial

15    remission may be an endpoint.  So people may remain in a

16    state of partial remission.  What does that mean?  That

17    means that the mood is not fully recovered, and usually,

18    there is some diminution in the quality of their life

19    arising from that.

20              So it is not a benign condition.  And my

21    understanding in terms of exploring the universe of

22    potential stressors that suddenly owned to the pivotal

23    nature of work and the nonnormative view Mr. Snookal

24    held as to what happened to him, meaning he felt

25    unfairly treated by others, led to the occurrence of
```

**EXH D/34**

1    this -- or the recurrence, I should say, of this major

2    depressive disorder.

3    Q        And you stated earlier that another one of your

4    opinions was regarding treatment.  What is your opinion

5    as to the treatment needed by Mr. Snookal?

6    A        He did avail himself of treatment.  He is still

7    being treated interestingly enough.  With those scores,

8    he is receiving what we would consider a therapeutic

9    dose of an antidepressant medication.  So he is still

10   being treated.  But given the failure of achieving a

11   full recovery, I would recommend a year of cognitive

12   behavioral psychotherapy, which is evidenced based and

13   standard of care, to see if it can improve him further.

14   Q        So is your prognosis at this point?

15   A        My prognosis at this point -- there is a four

16   point scale: poor, guarded, fair, good.  So he is

17   between fair an good.  So he is not achieved a fall

18   recovery even with treatment.  It may be difficult to

19   discontinue those antidepressant medications.  With

20   treatment, we may move him towards good, but he is --

21   his prognosis is affected by what we call the duration

22   of exposure to depression.  And it is because of that

23   extended duration, he is at risk for not -- even with

24   the treatment I recommended -- not achieving what we

25   would hope for as a full recovery.

1    Chevron and felt that his trajectory there was blocked.

2          And over the course of time, given that loss

3    and his understanding of the reasons, we see a

4    recurrence.  So if depression in someone that is

5    vulnerable, he has a significant vulnerability in the

6    context of loss and depression.  And so we see the onset

7    of that depressive disorder.

8    Q          And that's all based on his perceptions of work

9    was his self identity.  He has vulnerability based upon

10   his life and issues prior to Chevron and the perceived

11   unfairness that he perceives that Chevron engaged in

12   when it withdrew this offer; correct?

13   A          All of those are relevant, as well as the

14   contemporaneous records that do provide some

15   documentation that these symptoms emerged, and he also

16   availed himself of treatment proximal to the emergence

17   of those symptoms.  So we have a confluence of a number

18   of factors, and it's not for me to say whether what

19   happened at Chevron was purely legal, not legal, fair,

20   unfair.  But certainly, we see evidence of that disorder

21   emerging at this time.

22   Q        And in looking at the DSM-5 for the criteria

23   for major depressive disorder, including depressed mood,

24   diminished interest, problems sleeping, not enough

25   sleep, too much sleep, weight loss, weight gain,

**EXH D/36**

1   the location premium calculation is of now a percentage

2   of the base instead of base plus performance, and that

3   is correct.  I verified that; however, he still did not

4   change the text equalization and the vacation.  It's

5   still a percentage of base plus performance.  So it's

6   still inflated.  It's still too high.

7   Q       All right.  Thank you, Dr. Song.

8           MS. KENNEDY:  Your Honor, I have no more

9   questions.

10          THE COURT:  All right.  Cross?

11          MS. FLECHSIG:  Yes, Your Honor.

12                      **CROSS-EXAMINATION**

13  BY MS. FLECHSIG:

14  Q       Hi, Dr. Song.  I'm Olivia Flechsig.  I'm one of

15  the attorneys for Mr. Snookal.

16  A       Good afternoon.

17  Q       Good afternoon.

18          You were hired by Chevron's attorneys to try to

19  poke holes in Dr. Baum's report; is fair to say?

20  A       Offer a rebuttal, yes.

21  Q       Okay.  So to point out any issues you perceive

22  in Dr. Baum's report; fair?

23  A       Fair.

24  Q       And in preparing your first report, it is true

25  that your analytics firm, Cirque Analytics, made almost

**EXH D/37**

```
 1    $50,000 off of -- just for preparing that first report
 2    alone?
 3    A          Yeah, we invoiced about 50,000.  And by the
 4    way, there -- there's no second report.  I only --
 5    Q          Okay.
 6    A          -- one report.
 7    Q          Okay.  Are you aware that that would make you,
 8    your firm at least, the highest paid expert in this
 9    trial by a magnitude of -- I don't know -- four?
10              MS. KENNEDY:  Objection; relevance.  Objection;
11    argumentative.
12              THE COURT:  Sustained.
13    BY MS. FLECHSIG:
14    Q          Okay.  So you'd agree that the report that is
15    being submitted as an exhibit, you prepared in
16    September -- on September 3rd, 2024; true?
17    A          Yes.
18    Q          And that report that you prepared had
19    criticisms of Dr. Baum's report; right?
20    A          Yes.
21    Q          And since then, Dr. Baum has prepared the
22    newest report dated July 7th, 2025; right?
23    A          I have his most recent as March 11, 2025.
24    Q          Okay.  So then you have not -- so then you
25    haven't reviewed Exhibit 148 in this trial, which is
```

**EXH D/38**

1    Dr. Baum's July 7th supplemental report; true?

2    A        I haven't reviewed Exhibit 148, that's true.

3    Q        Okay.  In your report, you do a downward

4    adjustment for cost of living based upon Mr. Snookal's

5    move from Los Angeles, California, to Washington; is

6    that -- that's accurate; right?

7    A        It's more, like -- if you get $180,000 in

8    Vancouver, Washington, the value of that 180,000 is more

9    like, let's say, 192,000 as an apples-to-apples

10   comparison with the -- the 180 in El Segundo.  So --

11   Q        Right.  So in other words, you're saying the

12   money -- the value of the money to Mr. Snookal is more

13   because he moved; fair?  That's -- that's the logic

14   behind the downward cost of living adjustment?

15   A        You can state it that way, yeah.

16   Q        Okay.  So you didn't account for the fact that

17   had Mr. Snookal been allowed to go to Chevron -- excuse

18   me -- allowed to go to Nigeria, his basic needs would

19   have been provided for by Chevron for half the year

20   while he's in Escravos; true?

21   A        Well, that's actually not true, because the

22   but-for accounted for all of the premiums that he would

23   have gotten had he moved to Escravos; right.  That would

24   include part of the location premium.  The 55 percent

25   accounted for the needs -- extra needs --

**EXH D/39**

```
 1    Q        So Dr. Song, you said you reviewed

 2   Mr. Snookal's trial testimony from yesterday.  He

 3   testified that he knows that expatriates have their

 4   cost -- their basic living expenses covered while

 5   they're abroad; true?

 6   A        I didn't review Mr. Snookal's trial testimony

 7   from yesterday.  I reviewed Mr. Malpica and Dr. Baum's

 8   testimony.

 9   Q        Okay.  And wouldn't you agree that the cost of

10   living would probably be lower -- even absent Chevron

11   providing for the basic needs, wouldn't the cost of

12   living probably be lower in Escravos, Nigeria, than even

13   in Vancouver, Washington?

14   A        Again, the cost of -- I agree with you the cost

15   of living is lower, but again, the -- the -- all the

16   premiums accounted for, you know, the risk associated

17   with it and the needs that Mr. Snookal would have had,

18   had he moved to Nigeria.

19   Q        So your assumption is that the -- the -- excuse

20   me -- that the location premium is the only benefit

21   conferred to go to Nigeria.  In other words, your --

22   your testimony is that you know something that says that

23   they don't get their cost of living covered while

24   they're abroad?

25   A        I'm sorry, I you don't understand -- quite
```

**EXH D/40**

1          **C E R T I F I C A T E**

2

3

4

5     MARK SNOOKAL                        :

6              vs.                        :   No. CV 23-06302-HDV

7     CHEVRON USA, INC.                   :

8

9

10    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

11    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

12    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

13    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

14    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

15    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

16    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

17    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

18    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

19    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

20    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

21

22    _____/S/_____        _08/23/2025_

23    MARIA R. BUSTILLOS                     DATE
      OFFICIAL REPORTER
24

25

**EXH D/41**