UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SNOOKAL,<br><br>                          Plaintiff,<br><br>              v.<br><br>CHEVRON USA, INC.,<br><br>                   Defendants. | Case No. 2:23-cv-06302-HDV-AJR<br><br>**ORDER DENYING DEFENDANT CHEVRON USA, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL AND/OR REMITTITUR [129]** |

I.    **INTRODUCTION**

This case arises out of the rescission of a job offer at an oil refinery in Nigeria.  After working for Defendant Chevron U.S.A. in California for approximately a decade, Plaintiff applied for a position based in Escravos, Nigeria.[1]  He was offered the position on July 9, 2019, contingent upon his satisfying Chevron's standard medical assessment for expatriate positions.  As part of that medical assessment, Plaintiff disclosed that he had a heart condition, and was approved for the position provided he obtained a clearance letter from his treating cardiologist, Dr. Shahid Khan.  Dr. Khan, who had been supervising Plaintiff's care since 2014, wrote a clearance letter for him on July 29, 2019.

To complete the approval process, Chevron required assessment by doctors based in Nigeria who were familiar with the local conditions in Escravos.  On August 15, 2019, Dr. Eshiofe Asekomeh, one of the local Nigerian doctors, deemed Mr. Snookal unfit for the position in Escravos due to the risk imposed by his heart condition and the lack of medical infrastructure in Escravos.  After Dr. Asekomeh's disapproval, the job offer was rescinded.  Plaintiff remained employed with Chevron, first in a position created for him after his prior job was backfilled, then in his prior position, until he resigned in August of 2021.

Mr. Snookal brought this suit in August of 2023 alleging that Chevron violated California's Fair Employment and Housing Act ("FEHA") by discriminating against him when they rescinded his offer due to his heart condition.  After a four-day jury trial, the jury unanimously rendered a verdict in favor of Plaintiff.  The jury awarded him $4 million in damages for past and future emotional distress as well as past and future wage loss.  Chevron now seeks to undo the jury's verdict via a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative, a motion for new trial and/or remittitur pursuant to Federal Rule of Civil Procedure 59.  ("Motion") [Dkt. 129].  Having carefully considered the parties' submissions, the trial record, and the applicable law, the Court concludes that the jury's verdict is supported by substantial evidence.  For the reasons discussed below, the Motion is denied.

---

[1] Escravos is a remote location on a swamp on the Niger delta not accessible by land.

2

1    **II.     BACKGROUND**

2         **A.     Factual Background**

3         After working for Chevron for ten years, Plaintiff applied to be a Reliability Engineering

4    Manager ("the REM position") in May of 2019.  Declaration of Tracey A. Kennedy ("Kennedy

5    Decl."), Trial Exhibit ("Ex.") 20 [Dkt. 129-5].  The REM position was based in Escravos, Nigeria, a

6    remote location with limited medical facilities ("the Escravos or REM Assignment").  *Id.*  On or

7    about July 9, 2019, Plaintiff was offered the Escravos Assignment, contingent upon being deemed

8    medically fit by passing Chevron's Medical Suitability for Expat Assignment ("MSEA").  *Id.*

9         The MSEA clearance process began with Plaintiff filling out a "Standard Medical Suitability

10   for Expatriate Assignment History & Physical Examination" form, wherein Plaintiff disclosed that

11   he had an asymptomatic dilated aortic root.  Declaration of Olivia J. Flechsig ("Flechsig Decl."),

12   Trial Ex. 29 [Dkt. 132-10].  The risks associated with a dilated aortic root are rupture and dissection.

13   Kennedy Decl., Ex. A, Trial Transcript, Dr. Shahid Khan at 120:11-20, 121:6-19 [Dkt. 129-3].

14   Next, as part of the MSEA clearance procedure, Plaintiff was seen by Dr. Irving Sobel, a Chevron-

15   appointed internal medicine physician.  Flechsig Decl., Trial Ex. 29.  On July 24, 2019, Dr. Sobel

16   indicated that Plaintiff was "fit for duty with restrictions," namely, that Plaintiff: (1) not lift anything

17   more than 50 pounds; and (2) receive a clearance letter from his cardiologist.  *Id.*

18        Plaintiff's treating cardiologist was Dr. Shahid Khan.  Dr. Kahn testified, based upon

19   published studies at the time, that Plaintiff's risk of rupture or dissection was estimated to be 2% per

20   year.  Kennedy Decl., Ex. A, Trial Transcript, Khan, 120:11-121:19; Trial Ex. 68.  On July 29, 2019,

21   Dr. Khan prepared a letter declaring his approval of Plaintiff's fitness for the Escravos Assignment.

22   Kennedy Decl., Trial Ex. 33, ("Dr. Khan Approval Letter") [Dkt. 129-6].  Specifically, Dr. Kahn's

23   letter states that "Mr. Snookal is under my care for his heart condition.  It is safe for him to work in

24   Nigeria with his heart condition.  His condition is under good control and no special treatments are

25   needed."  *Id.*

26        On August 15, 2019, Dr. Eshiofe Asekomeh, an Occupational Health Physician at the

27   Chevron Hospital in Warri, Nigeria, deemed Plaintiff  "not fit for duty" in Escravos, and further

28   documented, "Remote location. Can be cleared for assignment in Lagos."  Kennedy Decl., Trial Ex.

54 [Dkt. 129-8]; Kennedy Decl., Ex. B, Trial Transcript, Asekomeh, 23:6-22, 38:4-19, 45:14-21.

Dr. Asekomeh made this determination after consulting with additional doctors based in Nigeria,

including Drs. Victor Adeye, Henry Aiwuyo, and Ujomoti Akintunde, via an email thread.  Flechsig

Decl., Ex. B; Trial Exs. 43, 44, 46 ("Escravos Assignment Recommendation") [Dkts. 132-13-15].

On this email thread, all of the doctors agreed that, based upon Plaintiff's aortic dilation of less than

4.5 cm, he was at "low risk" for a major cardiovascular event.  *Id.*  Dr. Akintunde specifically

concluded that he was "'low risk' but not 'no risk.'"  *Id.*  After consulting with the Nigerian medical

team, Dr. Asekomeh corresponded via email with Dr. Stephen Frangos, Chevron USA's Regional

Manager, Health and Medical – Americas.  Flechsig Decl., Trial Ex. 55 [Dkt. 132-16].  Dr. Frangos

emailed the Nigerian medical team that "[a]s pointed out, the patient is low risk for a major adverse

CV event.  Yet in Escravos, there are only limited resources for initial stabilization and transfer of a

major adverse CV event.  There is health risk in an Escravos assignment."  *Id.* at 2.

Plaintiff appealed that determination to Dr. Scott Levy, Chevron's Regional Medical

Manager for Eurasia, Europe, Middle East, and Africa ("EEMEA").  Kennedy Decl., Ex. A, Trial

Transcript, Levy, 134:23-135:1, 147:10-14.  At trial, Dr. Levy testified that, after consulting with Dr.

Khan, he believed Plaintiff's annual risk of complication was 2%.  *Id.,* Levy at 89:3-91:10.  Dr. Levy

referred to Dr. Kahn's email which stated that Plaintiff's "Thoracic aortic aneurysm size is 4.1-4.2

cm on his most recent CT scan.  From the published studies, the risk of rupture or dissection is 2%

per year for aneurysms between 4.0 and 4.5 cm," and concluded Plaintiff's risk "is low and likely

less than 2% per year."  Kennedy Decl., Trial Ex. 68 [Dkt. 129-9].  In an email dated August 23,

2019, Dr. Kahn wrote to Dr. Levy that Plaintiff was on blood pressure medication and recommended

monitoring his condition with an annual CT scan of his heart.  Kennedy Decl., Trial Ex. 68 [Dkt.

129-9].

Dr. Levy also consulted with the team of doctors in Nigeria about the care they could provide

Plaintiff in the event of an adverse cardiovascular event, such as an aortic rupture or dissection, and

deferred to them in their determination that Plaintiff could not be safely supported in Escravos.

Kennedy Decl., Ex. B, Trial Transcript, Levy, 66:7-24, 94:8-95:18; *Id.,* Asekomeh, 44:7-49:12,

49:23-52:9 [Dkt. 129-3].

1        This decision took into account that Escravos is in a remote location only accessible by

2    helicopter or boat and subject to extreme weather conditions.  Kennedy Decl., Ex. B, Trial

3    Transcript, Asekomeh, 43:12-44:10, 45:22-49:12 [Dkt. XYZ].  There is no hospital located on

4    Escravos, and it has only a small clinic with no surgeons, X-ray machine, ultrasounds, or CT scans,

5    and is capable of providing basic medical care, such as involving fever, malaria, and some minor

6    injuries.  *Id.*, Asekomeh, 43:12-44:10.  Escravos also has no advanced medical care available, no

7    doctor who specializes in cardiology, and no doctor qualified to treat an aortic root dissection or

8    rupture if it were to occur.  *Id.*, Asekomeh, 24:9-25:1, 34:24-35:3, 43:23-44:10 54:12-16.  According

9    to Dr. Asekomeh, if Plaintiff's aortic root were to rupture or dissect, Escravos would not have the

10   equipment or medical personal to diagnose or treat him properly.  *Id.*, Asekomeh, 35:8-24, 44:7-10,

11   45:22-46:23; Levy, 82:7-15.  Therefore, if Plaintiff were to suffer a cardiovascular emergency, he

12   would need to be evacuated by boat or helicopter to the nearest medical center.  *Id.*, Asekomeh,

13   43:12-44:10, 45:22-49:12.  However, there is no helicopter or medical evaluation team on site in

14   Escravos, and depending on the conditions and availability of a medical helicopter, evacuation might

15   not be possible.  *Id.*, Asekomeh, 46:24-49:4.  In terms of an evacuation by boat, Dr. Asekomeh

16   testified that it is a four-hour trip necessitating accompaniment by a military escort due to the

17   prevalence of kidnapping in the area.  *Id.*

18       Ultimately, Plaintiff's Escravos Assignment offer was rescinded on September 4, 2019.  Trial

19   Exs. 54, 88.  After the offer was rescinded, Plaintiff suffered emotional and economic distress.  For

20   instance, although he had not been promised a promotion, Plaintiff believed that he would have been

21   able to move from Pay Salary Grade ("PSG") 22 to PSG 23 after six to twelve months in the REM

22   position.  Kennedy Decl., Ex. D, Trial Transcript, Snookal, 50:14-17; Ex. C, Trial Transcript,

23   Snookal, 128:11-25.  By working in Escravos, Plaintiff's base salary and benefits would remain the

24   same but, because of the dangers of working there, Plaintiff would also have received hazard or

25   premium pay in the amount of 55% of his base pay.  Kennedy Decl., Ex. D, Trial Transcript,

26   Snookal, 59:19-60:12; Ex. B, Trial Transcript, Malpica, 161:20-162:24.  Plaintiff had chosen to

27   apply for the Escravos Assignment in part because the increase in pay would allow his son to attend

28   a private school recommended for his son's special needs.  *Id.* at Ex. C/37-38, C/53-54, C/56-57,

C/70. year. *Id.* at Ex. C/37-38, C/53-54, C/56-57, C/70. However, after the REM offer was rescinded, Plaintiff took his son out of the school after attending for only one year and paid the school's tuition by refinancing his home. *Id.*

By the time the offer was rescinded, Plaintiff's former position at the El Segundo refinery had been backfilled. Flechsig Decl., Ex. C, D. Chevron continued to employ Plaintiff—initially, by having him train his replacement, then, in a position created for Plaintiff in a different department, and lastly, in 2020, in his previous position as IEAR team lead but without the same opportunities for career advancement. *Id.* at Ex. D/9-14. Plaintiff did not find a job at Chevron with comparable pay to the Escravos Assignment. *Id.* Ultimately, Plaintiff found another job and moved out of California, selling his long-time family home in Los Angeles in the process. *Id.* at Ex. D/17-18.

Further, after the REM offer was rescinded, Plaintiff began therapy and antidepressants, which he still takes over six years later. *Id.* at Ex. D/29-30, D/34-36. Psychologist Dr. Anthony E. Reading provided testimony that Plaintiff suffered a major depressive disorder related in large part to the loss of the REM position as well as his belief that he was adversely and unfairly treated by Chevron. *Id.*; Kennedy Decl., Ex. D, Trial Transcript, Reading, 132:2-133:9, 142:23-144:1.

Evidence presented at trial showed that the anticipated length of the REM assignment was from three to four years based upon visa restrictions in Nigeria. Kennedy Decl., Ex. D, Trial Transcript, Snookal, 65:4-8; Ex. B, Trial Transcript, Malpica, 149:24-150:9. In actuality, the REM position was posted for reselection in 2020 due to a company transformation, and the individual who received the position, Amir Zaheer, was not reselected, rather, the position went to Cesar Malpica after eighteen applicants were vetted. Kennedy Decl., Ex. B, Trial Transcript, Malpica, 148:22-149:15.

Dr. Charles Baum, Plaintiff's economics expert, determined that Plaintiff's economic damages ranged from $2,564,653 (if Plaintiff was PSG 22) to $3,321,301 (if Plaintiff was PSG 23), from August 1, 2019 through February 23, 2035, until Plaintiff turned seventy-years old. Kennedy Decl., Ex. B, Trial Transcript, Baum, 223:15-224:4, 229:1-12, 244:3-7; Trial Ex. 148. Dr. Baum calculated that Plaintiff's past economic damages ranged from $901,953 to $1,172,355, and his future economic damages ranged from $1,662,700 to $2,148,946. *Id.*

Dr. Chen Song, Defendant's economics expert, determined that, assuming liability, Plaintiff's economic damages ranged between $520,296 (if PSG 22) and $665,505 (if PSG 23 after six months), due to the expected duration of the REM assignment being approximately four years in length. Kennedy Decl., Ex. D, Trial Transcript, Song, 151:7-15; Trial Ex. 154.

### B. Procedural Background

On August 3, 2023, Plaintiff brought suit against Chevron for disability and age discrimination in violation of Cal. Gov't Code § 12940 *et seq*, failure to accommodate in violation of the same, and wrongful constructive discharge in violation of public policy. Complaint [Dkt. No. 1]. On September 27, 2024, pursuant to a joint stipulation by the parties, the Court dismissed Plaintiff's claim for age discrimination. [Dkts. 27, 28]. On June 11, 2025, the Court dismissed on summary judgment Plaintiff's reasonable accommodation and constructive discharge claims as well as the claim for punitive damages. [Dkt. 63].

A jury trial was conducted on the remaining disability discrimination claim. [Dkts. 106-108, 111-112]. The jury returned a verdict in favor of Plaintiff on August 25, 2025, awarding $1 million for past economic loss, $1.1 million for future economic loss, $1 million for past noneconomic loss, and $900,000 for future noneconomic loss.[2] [Dkt. 120]. The Court entered Judgment for the Plaintiff on September 3, 2025. [Dkt. 125]. The Defendant filed this Motion on September 30, 2025. [129]. The Motion is fully briefed. *See* Plaintiff's Opposition [Dkt. 132]; Defendant's Reply [Dkt. 134]. The Court heard argument on November 17, 2025, and took the Motion under submission. [Dkt. 137].

---

[2] The jury found, via special verdict form, that: 1) Plaintiff was able to perform the essential job duties of the REM position in Escravos, Nigeria; 2) Plaintiff's disability was a substantial motivating reason for Chevron's decision to rescind the job offer for the REM position in Escravos; 3) Chevron's rescission of the REM position in Escravos was a substantial factor in causing harm to Plaintiff; and 4) Plaintiff's disability did not pose an immediate and substantial degree of risk to his health or safety or the health or safety of others. [Doc. 120].

7

1    **III.    LEGAL STANDARD**

2        **A.    Judgment As A Matter of Law**

3        Pursuant to Federal Rule of Civil Procedure 50(a), a motion for judgment as a matter of law

4    must be made before the case is submitted to the jury and must specify the judgment sought and the

5    law and facts that entitle the movant to the judgment.  Fed. R. Civ. P. 50(a).  If the Court does not

6    grant the motion, "the court is considered to have submitted the action to the jury subject to the

7    court's later deciding the legal questions raised by the motion." *E.E.O.C. v. Go Daddy Software,*

8    *Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citing Fed. R. Civ. P. 50(b)).  A party may move to renew its

9    motion for judgment as a matter of law within twenty-eight days after the entry of judgment, or, if

10    the motion addresses a jury issue not decided by a verdict, no later than twenty-eight days after the

11    jury was discharged.  Fed. R. Civ. P. 50(b).  It may also move in the alternative for a new trial under

12    Rule 59.  *Id.*

13        A moving party is entitled to judgment as a matter of law if the evidence, construed in the

14    light most favorable to the nonmoving party, permits only one reasonable conclusion that is contrary

15    to the jury's verdict.  *E.E.O.C.*, 581 F.3d at 961.  A jury's verdict "must be upheld" if it is supported

16    by substantial evidence, even where it "is possible to draw a contrary conclusion." *Pavao v. Pagay*,

17    307 F.3d 915, 918 (9th Cir. 2002).  In ruling on a motion for judgment as a matter of law, the court

18    may: "(a) allow the judgment to stand, (b) order a new trial, or (c) direct entry of judgment as a

19    matter of law." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).  Judgment is

20    appropriate "if there is no legally sufficient basis for a reasonable jury to find for that party on that

21    issue." *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).  Additionally, when making

22    its determination, the Court cannot "make credibility determinations" and "must disregard all

23    evidence favorable to the moving party that the jury is not required to believe." *Tan Lam v. City of*

24    *Los Banos*, 976 F.3d 986, 995 (9th Cir. 2020) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*.,

25    530 U.S. 133, 159–51 (2000)).

26        **B.    Motion for New Trial**

27        Pursuant to Federal Rule of Civil Procedure 59, the Court may grant a new trial "if the

28    verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or

to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)

(quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir.

2000)).  The motion should be granted if after according "full respect to the jury's findings," the

Court weighs the evidence and assesses the credibility of the witnesses and "is left with the definite

and firm conviction that a mistake has been committed." *Landes Const. Co., Inc. v. Royal Bank of

Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987) (citation omitted); *Experience Hendrix L.L.C. v.

Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

An error of law, including erroneous evidentiary rulings, can be a basis for granting a new

trial, but only "when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Ruvalcaba

v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).  An erroneous jury instruction may also

be a basis for a new trial unless the errant instruction was "more probably than not harmless."

*Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992).  Authority to grant a new trial "is

confided almost entirely to the exercise of discretion on the part of the trial court."  *Allied Chem.

Corp. v. Daiflon*, 449 U.S. 33, 36 (1980) (per curiam).

## IV.    DISCUSSION

### A.    Disability Discrimination Under Cal. Gov't Code Section 12940

"It is an unlawful employment practice…[f]or an employer, because of the…physical

disability…of any person, to refuse to hire or employ the person…[unless] the employee…is unable

to perform the employee's essential duties even with reasonable accommodations, or cannot perform

those duties in a manner that would not endanger the employee's health or safety or the health or

safety of others even with reasonable accommodations."  Cal. Gov't Code § 12940(a), (a)(1).

For disability discrimination claims under FEHA, "the California Supreme Court has adopted

the tripartite burden-shifting framework established in *McDonnell Douglas*… starting with a

plaintiff making a prima facie case of discrimination."  *See Chisolm v. 7-Eleven, Inc.*, 383 F. Supp.

3d 1032, 1048 (S.D. Cal. 2019) (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317 (2000) and

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  The burden then shifts to the defendant

to show that the adverse employment action was grounded in a "legitimate, non-discriminatory"

reason.  *Id.*  If defendant does so, the burden shifts back to the plaintiff to "demonstrate that the

1  proffered reason was pretext for discrimination." *Id.*

2      Defendant contends that the jury's verdict should be set aside and judgment should be

3  granted in Defendant's favor because of a lack of evidence supporting the jury's finding of disability

4  discrimination.  Defendant argues that Plaintiff failed to prove disability discrimination in violation

5  of FEHA on two bases: (1) because the rescission of the REM position was based upon Plaintiff's

6  inability to work in Escravos without endangering his own and others' health and safety; and (2)

7  because Plaintiff could not perform the essential duties of the position, the rescission of his offer was

8  not unlawful.  Motion at 10.  Lastly, Chevron claims that the damages awarded by the jury are

9  excessive.  *Id.*  None of these theories are persuasive for the reasons discussed below.

10     **1.    Direct Threat or Health and Safety Risk Defense**

11     At trial, Defendant asserted a "direct threat" affirmative defense to Plaintiff's disability

12  discrimination claim pursuant to FEHA.  Under this affirmative defense, Defendant had the burden

13  to prove by a preponderance of the evidence that Plaintiff's disability prevented him from

14  performing the essential functions of his job without endangering the health or safety of himself or

15  others "because the job impose[d] an imminent and substantial degree of risk."  Cal. Code. Regs., tit.

16  2, § 11067(b-c).

17     The factors to be considered when determining the merits of a "direct threat" defense

18  include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the

19  likelihood that potential harm will occur; (4) the imminence of the potential harm; and (5)

20  consideration of relevant information about an employee's past work history.  Cal. Code Regs., tit. 2,

21  § 11067(e)(1)–(5).  Analysis of the foregoing factors must be "based on a reasonable medical

22  judgment that relies on the most current medical knowledge and/or on the best available objective

23  evidence."  *Id.*  The employer bears the burden of proving this defense by a preponderance of the

24  evidence.  *Raytheon Co. v. Cal. Fair Employment & Hous. Comm'n.,* 212 Cal. App. 3d 1242, 1252

25  (1989).

26     Under California law, employers generally cannot be held liable for disability discrimination

27  if the disability "endanger[s] the employee's health or safety or the health or safety of others even

28  with reasonable accommodations."  Cal. Gov't Code § 12940(a)(1).  In other words, an employer

1   can assert a defense to a FEHA discrimination claim by showing that "no reasonable accommodation

2   . . . would allow the applicant or employee to perform the essential functions of the position in

3   question in a manner that would not endanger [the health and safety of himself or others] because the

4   job imposes an imminent and substantial degree of risk to [the applicant, employee, or others]." Cal.

5   Code Regs., tit. 2, § 11067(b), (c).

6        The central debate throughout this case has been whether the "direct threat" defense applies

7   to Defendant's conduct in the context of Plaintiff's FEHA claim for disability discrimination. At the

8   core of the parties arguments is—and has consistently been throughout the proceedings—the

9   question of what is meant by *imminent risk,* and now, whether this standard was proven by the

10  defense at trial. This issue has been repeatedly litigated during the course of the case including two

11  two summary judgment motions by the defense and during discussions regarding the applicable jury

12  instructions and language for the special verdict form at trial.

13       California law explicitly restricts the scope of the direct threat defense under FEHA by

14  stating, "it is no defense to assert that an individual with a disability has a condition or a disease with

15  a *future risk*, so long as the condition or disease does not *presently interfere* with his or her ability to

16  perform the job in a manner that will not endanger the individual with a disability or others." Cal.

17  Code Regs., tit. 2, § 11067(d) (emphasis added); *see also* CACI No. 2544 – Direct Threat

18  Affirmative Defense.

19       Defendant argues that "[t]he evidence at trial overwhelmingly showed that Defendant acted

20  reasonably in concluding that Plaintiff's presence in Escravos would endanger himself and/or

21  others." Motion at 18. In support of this argument, Defendant proffers that the Nigerian doctors all

22  agreed, at the time of the MSEA determination, that Plaintiff was at risk for developing an aortic

23  root dissection or rupture. According to Defendant, the medical evidence at the time of the MSEA

24  indicated that Plaintiff had a one-in-fifty annual chance of his aortic root rupturing or dissecting. *See*

25  Trial Ex. 68. If this were to occur, Defendant posits, it would "almost certainly result in his death in

26  Escravos" because, as the Nigerian doctors agreed, the conditions on the ground in Escravos were

27  not capable of handling a medical emergency of this nature. Motion at 19 (citing, *e.g.*, Kennedy

28  Decl., Ex. B, Trial Transcript, Asekomeh, 20:17-21:14, 23:6-22, 43:12-52:9, 69:5-25; Levy, 78:17-

79:5).  Moreover, such an event would risk the health and safety of others because it would necessitate a medical evacuation, endangering the evacuators themselves as well as creating an overall safety threat to the workplace environment and the employees located there.  *Id.,* Asekomeh. 49:23-50:12; Levy,  69:5-20, 78:17-79:5, 81:3-85:11, 94:22-95:8, 96:17-97:1, 102:1-104:20.

In its Opposition, Plaintiff notes that Defendant cites to a repealed standard of the California Code of Regulations that imposed a lower burden on defendants arguing the direct threat defense.[3] Motion at 12.  Plaintiff also asserts that the cases cited by the Defendant similarly incorporate this outdated standard or other outdated standards of the Americans with Disabilities Act.  *Id.* Regardless, the facts of Plaintiff's case are readily distinguishable from those cited by Defendant which involve immediate and substantial risk, and amply support a finding of disability discrimination unmitigated by the direct threat defense proffered by Defendant.  *See* Motion at 18 (citing, *e.g., In re the Accusation of the Department of Fair Employment & Housing v. S. Pac. Transp. Co.,* 1980 CAFEHC LEXIS 23, Dec. No. 80-33, 1980 WL 20906, at *6-7 (Cal. F.E.H.C. 1980) (Court found risk that train engineer "was at any time liable to suffer a blackout or dizzy spell" was "imminent and substantial" as the "potential destruction of life, health, and property was extreme.")).

Here, Plaintiff adduced evidence that Mr. Snookal's risk was neither immediate nor substantial.  All of the medical experts on both sides agreed that the risk of an aortic dissection was at most 2%, and the concern about this risk pertained to its potential at some unknowable future time.  Namely, that *if* Plaintiff were to have an aortic dissection or rupture, whether the medical facilities in Escravos would be able to evacuate him in sufficient time to receive the necessary medical treatment.  The concern, as articulated by Drs. Frangos, Arenyeka, and Levy, was with the potential for a "hypothetical future risk" if Plaintiff were to need an emergency medical evacuation from Escravos.  Opposition at 15 (citing Flechsig Decl., Trial Ex. 55; Kennedy Decl., Trial Exs. 88, 69).  Dr. Levy corroborated this concern in an email he wrote to Plaintiff stating, "But the risk itself

---

[3] Defendant cites to Cal. Code Regs., tit. 2, § 7293.8(d) which was amended by Cal. Code Regs., tit. 2, § 11067 in 2013.  *See* Note 1 to § 11067.

1  is not determinative. The concern is that if the condition were to occur, the outcome would be

2  catastrophic and would require an immediate emergency response which is not available and would

3  most certainly result in death in Escravos . . . We have no problems with you working in El

4  Segundo." Kennedy Decl., Trial Ex. 88/1 [Dkt. 129-12).

5          The only *current* risk, as presented by the evidence, could be mitigated by Plaintiff taking

6  blood pressure medicine, receiving yearly CT scans when he rotated back to the U.S., and by not

7  lifting anything weighing over 50 pounds.  Defendant's additional contention, that the specific job

8  demands would exacerbate Plaintiff's heart condition, was discredited by the evidence that Plaintiff

9  had been working under similar conditions, climbing tall ladders, and wearing personal protective

10  equipment while working at the refinery in El Segundo for years without complication.  Flechsig

11  Decl., Ex. B/67, C/39-44.  Further, Plaintiff had been treated by his cardiologist, Dr. Kahn, since his

12  heart condition was diagnosed in 2014, and he was and has remained asymptomatic.  Accordingly,

13  the Court finds that the evidence presented by Defendant at trial did not prove, by a preponderance

14  of the evidence, that  "the job impose[d] an imminent and substantial degree of risk."  Cal. Code.

15  Regs., tit. 2, § 11067(b-c).

16          Moreover, at trial, Plaintiff's expert, Dr. Marmureanu testified that the risk was exponentially

17  smaller.  He stated that the risk of rupture or dissection was less than 1% and that Plaintiff's

18  "aneurysm is not large enough to be considered clinically significant."  Flechsig Decl., Trial Ex.

19  122/6.  Dr. Marmureanu further opined that, because Plaintiff's aortic measurements have remained

20  stable, "there is no indication that his condition would worsen or present a danger while he carries

21  out his duties in Escravos, Nigeria."  *Id.*

22          In light of the above, the Court finds that the Plaintiff's case was supported by substantial

23  evidence at trial.  The Court acknowledges the conflicting-yet-reasonable medical opinions in this

24  case—including viable differing opinions about the overall risk of death, the ability of this risk to be

25  managed, and the ability of Plaintiff to be evacuated if an incident occurred—and that there was not

26  only one reasonable conclusion that could have been reached. *E.E.O.C.*, 581 F.3d at 961.  But while

27  there was arguably sufficient evidence for the jury to come to a different conclusion, it did not, nor

28  should it have done so.  Thus, because the evidence did not permit only one reasonable conclusion

1    contrary to the verdict reached by the jury here, the verdict in this case must be upheld. *Pavao*, 307

2    F.3d at 918 (9th Cir. 2002) (A jury's verdict "must be upheld" if it is supported by substantial

3    evidence, even where it "is possible to draw a contrary conclusion").

### 2.    Defense of Inability to Perform Essential Job Duties

5            Inherent in its duty to provide a safe workplace for its employees, Defendant enforced a

6    fitness-for-duty standard that required Plaintiff to pass the MSEA examination.  Defendant maintains

7    that Plaintiff's offer of employment was conditioned upon his passing the MSEA examination

8    which, the Defendant contends, the Plaintiff failed to satisfy because of his heart condition.  Motion

9    at 11.  When this failure became known, Defendant asserts, it determined that Plaintiff was unable to

10   perform the essential function of his assignment, namely, working in Escravos, and his conditional

11   offer of employment was lawfully rescinded. *Id.*  Defendant argues that revoking Plaintiff's

12   conditional offer of employment was not discrimination because he failed to satisfy an essential

13   function of his employment, *viz.*, being able to perform the job. *Id.* at 12.  As a result, Chevron

14   contends that the Court should grant its Motion because of the "lack of substantial evidence

15   supporting the jury's finding that Plaintiff was qualified and could perform the REM job's essential

16   functions."  Motion at 16.

17           In order to prevail on a disability discrimination claim under the FEHA, a plaintiff must show

18   that he is "qualified for the position," *i.e.,* that the plaintiff could "perform the job's essential

19   functions."  *Green v. State of California*, 42 Cal. 4th 254, 266–267 (2007).  "Essential functions

20   means the fundamental job duties of the employment position . . . [and] does not include the

21   marginal functions of the position."  *Lui v. City and County of San Francisco*, 211 Cal. App. 4th

22   962, 971 (2012); Cal. Gov't Code § 12926(f).  In an ADA context, a "plaintiff bears the burden of

23   proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without

24   reasonable accommodation, can perform the essential functions' of her job."  *Green,* 42 Cal. 4th at

25   261 (quoting *Cleveland v. Policy Management Systems,* 526 U.S. 795, 806 (1999)).  Accordingly, "it

26   is not unlawful under federal law to draw a distinction on the basis of a disability if that disability

27   renders an employee unqualified, with or without reasonable accommodation, to perform the

28   essential functions of a position."  *Id.* at 261-262.

Plaintiff has not contested the MSEA fit-for-duty requirement.  Mr. Snookal testified at trial that he understood the underlying health and safety purposes of MSEA and stated that "I have no issue with fitness for duty programs."  Kennedy Decl., Ex. D, Trial Transcript, Snookal, 80:11-81:18.  Plaintiff also does not dispute that MSEA clearance was required for Plaintiff to be able to work in Escravos and upon which his job offer there was conditioned.  Kennedy Decl., Ex. B, Trial Transcript Levy, 94:8-95:18, 105:11-23, 111:315; Asekomeh, 44:16-45:21, 45:5-21; Trial Ex. 20.  Further, while Plaintiff was cleared to work in Lagos, which has greater infrastructure and support for a medical emergency, none of the doctors who participated in making Plaintiff's MSEA decision found him fit for duty in Escravos.  Motion at 13-14, 16 (citing Kennedy Decl., Ex. B, Trial Transcript, Asekomeh, 14:25-15:4, 23:6-22, 24:21-25:1, 37:13-22, 38:7-10, 38:4-19, 45:14-21; Motion at 3, fn.2).

In response, Plaintiff argues that Dr. Alexander Marmureanu, his cardiology expert at trial, testified that Plaintiff could safely work in Escravos and that "in his extensive experience evaluating and treating patients with Mr. Snookal's condition, the job itself, the location of the job in Escravos, would not pose any direct threat to Mr. Snookal's safety or the safety of others."[4]  Opposition at 13 (citing Flechsig Decl., Trial Ex. 122).  Additionally, Dr. Khan, Plaintiff's treating cardiologist during the time of his application and MSEA evaluation, provided two letters in support of Plaintiff's working in "a remote area of Nigeria."[5]  Kennedy Decl., Trial Ex. 33, 68.  As his treating cardiologist, Plaintiff contends, Dr. Khan's opinion should not have been superseded by Chevron's Nigerian cardiologists.  Opposition at 14.  Further, even though Chevron's cardiologists had "limited experience" with Plaintiff's condition, they determined that his potential for complication was "low risk."  *Id.* (citing Flechsig Decl., Ex. 43, 44).  Lastly, the cases cited by the Defendant are factually

---

[4] Defendant argues that this expert opinion of Dr. Marmureanu is "legally irrelevant" because it did not exist at the time of Plaintiff's MSEA evaluation.  Motion at 13 fn.4 (citing *Allen v. Pac. Bell,* 212 F. Supp. 2d 1180, 1193-94 (C.D. Cal. 2002)).

[5] Although Dr. Khan's letters do not specifically mention Escravos by name, his trial testimony was that his opinion would not have been modified based on this specifically identified remote location. Flechsig Decl., Trial Ex. A/50, Trial Transcript, Kahn, 129:11-14 [Dkt. 132-3].

distinguishable in that they involve plaintiffs with existing conditions that prevented them from performing their required, current job duties.  *See* Motion at 15-16 (citing, *e.g.*, *Hastings v. Department of Corrections,* 110 Cal. App. 4th 963, 968 (2003) (plaintiff correctional officer suffered knee injuries while running during official training for position; injuries determined to be permanent condition and running was job requirement); *Quinn v. City of Los Angeles,* 84 Cal. App. 4th 472 (2000) (plaintiff police officer had been mistakenly hired despite failing hearing test required for duties as patrol officer; hearing problem manifested in multiple ways while on probation)).

Defendant's argument—that because Plaintiff's offer was conditioned on him passing the MSEA and when he failed the MSEA, he could not perform the essential job function which was working in Escravos—is a circular one.  Moreover, as Plaintiff points out, "Chevron's refusal to clear Mr. Snookal for duty in Escravos *was* the discriminatory decision in question that prevented him from doing the duties of the REM position.  That the Defendant's discrimination itself prevented the Plaintiff from doing the job cannot be a defense."  Opposition at 13.  The Court strongly agrees.  And, more importantly, so did the jury.

Here, Plaintiff provided persuasive evidence that he was more than able to perform the job duties required in Escravos.  Essentially, the issue was never that Plaintiff was unable to perform the functions of the role on site, but, rather, that if a cardiac event were to take place the medical team in Escravos would not be able to fully address it though surgery.  These issues are not the same.  Despite Defendant's attempts to conflate them, the jury clearly appreciated their legal and evidentiary differences and relative significance.  Accordingly, as there was more than sufficient evidence to support the conclusion reached by the jury, the Court finds that the verdict must be upheld.  *See* discussion, *supra*, at 13.

### B.    The Jury's Damage Award

Defendant avers that the damages awarded by the jury are excessive, speculative, and unsupported by the evidence, and, therefore, the Court should order a new trial or a new trial contingent upon Plaintiff's acceptance of a remittitur.  Motion at 20.

### 1.    The Economic Damages Award

"An expert's testimony about a plaintiff's earning capacity must be grounded in reasonable

1   assumptions, not speculative or conjectural data.  If the expert's opinion is not based on facts

2   otherwise proved or if the opinion assumes facts contrary to the evidence, 'it cannot rise to the

3   dignity of substantial evidence.'"  *Atkins v. City of Los Angeles,* 8 Cal. App. 5th 696, 740 (2017)

4   (cleaned up).

5           According to Defendant, the $1 million award for past economic loss and the $1 million

6   award for future economic loss are "not rationally related to any party's expert's damages

7   calculations."  Motion at 21-22 (citing Trial Exs. 148, 154).  Defendant claims that the calculation

8   used by Plaintiff's economic expert, Dr. Baum, were "not grounded in reasonable assumption," and,

9   assuming the jury relied on his testimony, the jury's verdict is "unsupported as a matter of law."

10  Motion at 22 (quoting *McCray v. Westrock Servs., LLC,* No. 21-9853-DMG, 2024 WL 4579108, at

11  *7 (C.D. Cal. Sept. 10, 2024) (internal quotation marks and citations omitted)).

12          Dr. Baum based his calculations on the following assumptions: (i) within six months of

13  commencing the REM position, Plaintiff would have received a PSG promotion; (ii) Plaintiff would

14  work for 16 years in the REM position which is much longer than the typical period of 3 to 4 years;

15  and (iii) Plaintiff would continue to work until he turned seventy years old and in expatriate

16  assignments with the highest location premium.  Motion at 22. (citing Kennedy Decl., Ex. B, Trial

17  Transcript, Baum, 241:16-20, 250:10-24).  Defendant contends that these assumptions are incorrect

18  because: (i) the person in the REM position was replaced based on an October 2021 reorganization,

19  thus, Plaintiff would have been subject to reposting after only one year located in Escravos (*Id.* Trial

20  Transcript, Malpica, 148:22-149:15); (ii) due to the Nigerian visa protocol, it was not reasonable for

21  Dr. Baum to assume that Plaintiff would be able to stay in Escravos for over four years (*Id.* Malpica,

22  149:24-150:9); and (iii) at some point, Plaintiff would have needed to find a new position or

23  expatriate posting.  *Id.* Malpica, 159:23-160:22.

24          In response, Plaintiff counters that the jury's $2.1 million damages award for past and future

25  wage loss is reasonable and based on credible evidence in the record.  Specifically, the front pay

26  damages award is reasonable because Dr. Baum's future wage loss calculation was premised upon

27  Plaintiff's ongoing future losses discounted to present value, and he also provided a downward

28  adjustment based upon the statistical probability that Plaintiff would have left the position for some

1   other non-discriminatory reason.  Opposition at 17 (citing Kennedy Decl., Trial Ex. 148).  Further,

2   the current employee in the REM position, Cesar Malpica, has been in the position for almost five

3   years now (Opposition at 17 citing Flechsig Decl., Ex. B); Plaintiff testified he would most likely

4   receive a promotion to Pay Scale Grade 23 and he had a plan for seeking out expatriate positions in

5   the future (Flechsig Decl., Ex. C/53, 64, C/52-55); and, as a former manager familiar with Chevron's

6   expatriate posting policies and practices, Plaintiff is aware of multiple individuals who have received

7   expatriate assignment in various locations with substantial location premiums and benefits.  *Id.* at

8   Ex. C/10-26.  Lastly, Plaintiff maintains that Defendant's economic rebuttal expert, Dr. Chen Song,

9   was not convincing in her attempt to discredit the calculations proffered by Dr. Baum as, *inter alia*,

10  she had failed to review Dr. Baum's most recent expert report in anticipation of trial.  Motion at 17-

11  18 (citing Kennedy Decl., Trial Ex. 148, 154).

12      Defendant also claims that Plaintiff's economic damages award is unsupported because

13  Plaintiff failed to mitigate his economic damages because he did not apply to other expatriate

14  assignments despite over fifty open assignments that fit his skillset.  Motion at 22-23 (citing

15  Kennedy Decl., Ex. D, Trial Transcript, Snookal, 86:8-10, 96:2-97:4; Kennedy Decl., Ex. B, Trial

16  Transcript, Levy, 107:23-109:9; Trial Ex. 88).  Due to Plaintiff's failure to apply for other expatriate

17  assignments after the REM offer was rescinded, according to Defendant, Plaintiff cannot prove that

18  he would have likely remained in an expatriate posting until the age of seventy.  *Id.*  Without this,

19  the economic damages award beyond three to four years is not justified.  Motion at 23.

20      "The burden to prove that [Plaintiff]'s efforts to mitigate damages were unreasonable rested

21  at all times with [Defendant]."  *Boehm v. American Broadcasting Co.,* 929 F.2d 482, 486 (9th Cir.

22  1991).  Plaintiff disputes Defendant's contention that he failed to mitigate and claims the opposite.

23  According to Plaintiff, he continued to apply for expatriate positions for two years but was unable to

24  qualify for any positions because of the limitations imposed upon him by Chevron.  Opposition at 16

25  citing (Flechsig Decl., Ex. D/10-26).

26      On this record, the Court concludes that the economic damages award is fully supported by

27  the trial evidence.  Specifically, the Court finds that Defendant failed to successfully contradict

28  Plaintiff's testimony.

2.    **The Noneconomic Damages Award**

The jury awarded Plaintiff $1 million in past noneconomic damages and $900,000 in future noneconomic damages. Defendant argues that Plaintiff's substantial noneconomic damages award is excessive, unsupported by the evidence, and not commensurate with the emotional distress he experienced. Motion at 23-24. Further, Defendant contends that Plaintiff's expert was unable to confirm that the REM offer rescission was the cause of Plaintiff's depressive disorder. Motion at 24 (citing Kennedy Decl., Ex. D. Trial Transcript, Reading, 142:23-144:1). Additionally, Defendant avers that the only alleged act of discrimination is the rescission of the job offer and the primary harm alleged was the inability to pay for his son's private school. *Id.* (citing Kenned Decl., Ex. C, Trial Transcript, Snookal, 121:8-16).

To recover damages on an emotional distress claim, "the injury suffered must be severe, i.e., substantial or enduring as distinguished from trivial or transitory. Such injury may include all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." *Young v. Bank of America,* 141 Cal. App. 3d 108, 114 (1983) (internal quotation marks and citations omitted).

The symptoms of Plaintiff's emotion distress, Defendant recounts, included, *inter alia:* withdrawing from his family, a depressed mood, loss of self-worth and motivation, difficulty with sleep, concentration, focus, and energy, and taking Cymbalta, a prescription for depression. Motion at 23 (citing Kennedy Decl., Ex. D, Trial Transcript 35:15-23, Snookal, 36:5-11, Reading, 124:8-17). These symptoms, according to Defendant, are "reasonably characterized as ordinary emotional distress arising out of job loss," and do not warrant the emotional distress damages awarded here. *Id.* at 24.

Plaintiff contends that the facts elicited at trial indicate otherwise. At trial, Plaintiff testified to his "extensive emotional distress damages," *viz.*, how much his identity and self-esteem were derived from working at Chevron, as well as the toll the loss of his job took on his mental health. Motion at 18 (citing Flechsig Decl., Ex. C, D). Soon after the rescission, he began going to therapy and taking antidepressants, something he had not done since the 1990s. Motion at 18-19 (citing *Id.*, *see also* Flechsig Decl., Trial Ex. 25). A significant contributing factor in his emotional distress,

1  Plaintiff testified, was having to take his son out of the special needs private school where he had

2  been thriving, a decision that still causes him frustration and sadness years later.  Motion at 19

3  (citing Flechsig Decl., Ex. C, D.)  The disappointment he experienced after the initial rescission

4  compounded over time as he had to train his replacement when his prior position in El Segundo was

5  backfilled by Chevron; he was placed in a different position that was not based on what he had

6  trained for since high school; he was unable to find other promotional pathways or expatriate

7  positions for over two years; and finally, he found a new job out of state but had to sell his long-time

8  family home.  *Id.*

9       Dr. Anthony Reading, Plaintiff's forensic psychological expert, confirmed that the most

10  likely cause of Mr. Snookal's major depressive episode was his job loss due to Chevron's actions.

11  *Id.* (citing Flechsig Decl., Ex. D/34-35, Reading, 128-129; Trial Ex. 141).  In determining an

12  emotional distress damages award, the Ninth Circuit instructs:

> because damages awards, especially emotional distress damages awards, are fact-dependent, we consider the evidence presented at trial. Evidence supporting an emotional damages award may consist of nothing more than oral testimony. Other evidence may also be relevant, including related economic damages such as loss of income and documentation of medical treatment or conditions caused by the distress; impairment of reputation; and physical injuries caused by the distress.

*Bell v. Williams,* 108 F.4th 809, 832 (9th Cir. 2024).

     In support of its contention that the jury's noneconomic damages award here is excessive,

Defendant cites to other cases involving "reprehensible and egregious acts of discrimination and

harassment" where, in comparison, lower damages amounts were awarded.  Motion at 24 (citing,

*e.g.*, *Diaz v. Tesla, Inc.,* 598 F. Supp. 3d 809, 835 (N.D. Cal. 2022); *Horsford v. Bd. of Trs. of Cal.*

*Sate Univ.,* 132 Cal. App. 4th 359, 368-72, 390 (2005).  However, in evaluating the reasonableness

of a damages award, courts need not compare cases and deference should be given to the evidence at

trial.  *See Bell,* 108 F.4th at 832 ("[T]he evidence presented at trial should be given foremost priority

in assessing the reasonableness of a damages award. If the evidence is sufficient to support even a

high award, there is no need to compare cases . . . [A] damages award based on emotional distress

can be substantial if a plaintiff presents sufficient evidence to support it").  "We afford great

deference to a jury's award of damages and will uphold the award unless it is clearly not supported

1  by the evidence or only based on speculation or guesswork." *Williams v. Gaye,* 895 F.3d 1106, 1128

2  (9th Cir. 2018) (internal quotation marks and citations omitted).  A jury's verdict "is entitled to great

3  deference, and that is especially true when it comes to non-economic harm." *Diaz,* 598 F.Supp.3d at

4  840.  Courts should recognize that "in cases involving intangible, non-economic losses determining

5  damages is a matter peculiarly within a jury's ken." *Id.* (citing *Smith v. Kmart Corp.,* 177 F.3d 19,

6  30 (1st Cir. 1999) (internal quotations omitted)).

7       Here, the jury's award of damages is clearly not based on speculation or guesswork and was

8  supported by the evidence in the record. *Williams,* 895 F.3d at 1128.  In keeping with this well-

9  founded, longstanding principle that damages are "peculiarly within a jury's ken," the Court cannot

10  and will not upset the jury's verdict, and denies the Motion for judgment as a matter of law.[6]

11  **V.    CONCLUSION**

12       For the foregoing reasons, the Motion is denied in its entirety.

13

14  Dated: December 8, 2025                                    _____

15                                                            Hernán D. Vera
                                                              United States District Judge
16

17

18

19

20

21

22

23

24

25  _____

26  [6] Defendant argues, in the alternative, that the Court should grant a new trial and/or remitter.  The
    Court is not persuaded.  Having reviewed (and re-reviewed) the evidence presented at trial, the Court
27  is not "left with the definite and firm conviction that a mistake has been committed [by the jury].
    *Landes,* 833 F.2d at 1371-72.  To the contrary, the Court again concludes that the jury's verdict was
28  more than amply supported by substantial evidence.